UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

RICHARD MAX STRAHAN                          )
                                             )
            *Plaintiff*                      )
                                             )    Civil Action No.
v.                                           )
                                             )    05 – 10140 - NMG
ELLEN ROY-HERZFELDER, *et al.*               )
                                             )    8 September 2005
            *Defendants*                     )

---

## AFFIDAVIT OF RICHARD MAX STRAHAN

I — Richard Max Strahan — do hereby swear and depose as follows —

1.      My Verified Complaint makes claims against the Defendants – Massachusetts state agencies responsible for the licensing and regulating of commercial marine fisheries activities — with violating the Section 9 take prohibitions of the Endangered Species Act by licensing the deployment of fishing gear in U. S. coastal waters that kills and injures ESA listed members of endangered species of whales and sea turtles by entanglement. I am seeking prospective injunctive relief against the Defendants — a permanent injunction banning the Defendants from further licensing of gill nets and lobster gear — fishing gear that Strahan claims routinely entangles listed species of endangered Whales and Sea Turtles.

2.      This is the second prosecution of these state agencies by me — acting as a "citizen attorney general" to enforce the ESA's prohibitions against the taking of listed endangered species — of the Defendants. . See *Strahan v. Coxe,* 939 F. Supp. 963 (D. Mass. 1996), aff'd in part and vacated in part, *Strahan v. Coxe,* 127 F. 3d 155 (1st Cir. 1997), cert. denied *Coates v. Strahan*, 525 U. S. 978 (1998). In that suit the court ruled that the Defendants had violated the Section 9 take prohibitions of the ESA by licensing fishing gear that kill and

injured endangered species of whales by entangling them. However, it failed to permanently enjoin them. Despite the court's rulings these state agencies have refused to adopt a policy and practice of only licensing fishing gear that has been pre-determined to not likely entangle endangered species of whales and sea turtles.

3.    In order to make my case against the Defendants I need to show —

1.    Endangered Whales and Sea Turtles are residents of the U. S. coastal waters under the concurrent state jurisdiction of Massachusetts.

2.    That fishing gear licensed by the Defendants is deployed in the same U. S. coastal waters under the concurrent state jurisdiction of Massachusetts that is simultaneously inhabited by listed species of whales and sea turtles.

3.    That members of ESA listed species of endangered Whales and Sea Turtles have been entangled by fishing gear licensed by the Defendants in the past and face a significant risk of future entanglement by said fishing gear in the future.

4.    The status of the "viability" (the adverse impact expect of a single killing of an endangered whale or sea turtle on the probability of its species becoming extinct in the near future) of each endangered species of whale and sea turtles.

4.    I am therefore seeking these relevant records from government agencies and their contracted agents. Almost all relevant records on the occurrence of whales, sea turtles and fishing gear along the U. S. coastline is in the exclusive possession of government agencies and their contracted agents. The Center for Coastal Studies ("CCS") and the New England Aquarium ("NEA") are the two prime contractors for all government licensed and funded field data collection efforts on endangered whales and sea turtles on the east coast. All relevant field data that constitutes evidentiary material for me to succeed on my claims against the defendants

is in the exclusive possession of four agencies — the CCS, the NEA, the National Marine

Fisheries Service, and Massachusetts state environmental agencies. The vast bulk of all existing

records on whale and fishing gear sightings on the U. S. east coast are in the exclusive

possession of these four sources.

      5.     The CCS, NEA, NMFS and the Defendants are all business partners — with the

majority of the money that CCS and NEA get to do field work coming from NMFS and the

Defendants. The CCS and NEA do this fieldwork under exclusive permits issued by the NMFS.

Upon information and belief, CCS and the NEA have received millions of dollars over the last

few years from the Defendants and NMFS to do filed work on endangered whales and sea

turtles. I have inspected hundreds of pages of documents relating to the contracts and permits

issued to both NEA and CCS by NMFS and the Defendants. These permits and contracts make it

clear that that both NMFS and the Defendants retain exclusive ownership of all data and data

products (e. g. pictures, videos, and audio recordings) produced pursuant to these contracts and

under the issued permits. Virtually all the documents requested by my current subpoenas in this

matter from CCS and the NEA are actually owned by either the Defendants or the NMFS. They

are in the possession of CCS/NEA because these parties are acting to archive these documents

for NMFS and the Defendants. Pursuant to the contracts/permits between NMFS/Defendants and

CCS/NEA, both the CCS and the NEA are required to turn over the work product from their

contract/permit work to NMFS and the Defendants at the request of these government agencies.

The CCS and the NEA have no discretion to refuse any such request by these government

agencies.

      6.     I want the field data, and not any "intellectual product" produced as a result of

any assessment of this filed data by the Defendants, CCS, NMFS, and the NEA.  I do not

consider any personnel employed by these four parties as scientific experts on the subject of whale and sea turtle conversation. In fact, these Four Parties act as business partners and together actively work to insure that the protective requirements of the Endangered Species Act — and other state and federal wildlife laws — are not enforced against commercial marine activities or in any way adversely affect these commercial activities. I have subpoenaed documents from NMFS, CCS and the NEA separately. But they have conspired together with the Defendants to oppose me being able to get any meaningful documents from any member of the Four Parties in order to prevail in my claims against the Defendants. Historically, the CCS and the NEA have opposed almost all proposed conservation measures for endangered whales and sea turtles. They do this as part of their business relationship with NMFS and the Defendants.

7.    Both CCS and the NEA — along with NMFS and the Defendants — engage in "Whale Fraud", the deliberate attempt to deceive the Public that they care about endangered species in order to insure that wildlife laws are not enforced that protect these endangered species. Both CCS and NEA are opposed to my prevailing on my claims against the Defendants — in part because they believe that they will lose millions of dollars in contracts with NMFS and the Defendants. For example, if I succeed in getting the Court to order that the Defendants license only fishing gear that has been pre-determined not to entangle whales and sea turtles then there will be no need any longer for NMFS and the Defendants to pay CCS millions of dollars as they do now to disentangle whales from fishing gear that has entangled these whales. Whale Safe fishing means that CCS is out of work because there will be no more entangled whales to disentangle by them. I believe that CCS — like commercial fisherman — would rather have the whales go extinct than their business.

### Field Data in the Possession of the Four Parties Constitutes Public Records

8.    The subpoenaed requested documents from the Four Parties constitute Public Information and are available to the Public as a matter of law. For example under the terms of the permits and contracts that bind the Four Parties, CCS and the NEA cannot use the requested field data for commercial gain and are prohibited from distributing it to anyone who would use it for commercial reasons. It their oppositions, the Four Parties make no claim that their business interests will be injured from supplying me the subpoenaed Field Data.

9.    The subpoenaed field data is also routinely made available to other researchers by CCS and the NEA under a protocol adopted by them that is published under the title "The North Atlantic Right Whale Consortium Data: Protocol For Data Access" ("Field Data Protocol"). The NEA has provided me some computer database on whale sightings and some copies of pictures on whales See Attachment ## 1, 2 and 3.I have also obtained database filed from CCS pursuant to subpoenas issued in other civil actions I have brought to protect endangered wildlife.

### Refusal to Provide Ongoing Information

10.    The Four Parties refuse all my requests to be provided information on the entanglement of endangered whales and sea turtles on an ongoing basis. Many killings and entanglements of whales have occurred since the issuing of the subpoenas on the Four Parties but they simply refuse to discuss any of these entanglements with me and/or provided me copies of any field data (including pictures) that they have gathered on these recent incidents. For example on 20 July 2005 — the date of my discovery conference with CCS — I was informed by CCS's Borrelli on the phone that a Humpback Whale had been seen entangled that very day on Stellwagen's Bank. I need the Court to order the Four Parties to provide me copies of incoming field data on ongoing occurrences of whales and sea turtles becoming entangled in fishing gear

and in generally ongoing sightings of these species. Also CCS' public web site claims that a Humpback Whale was disentangled by it on 15 July 2005 in Massachusetts state waters. I need this information yet the Four Parties refuse to provide it.The Court should require that CCS or the Defendants provide me with the password to CCS' disentanglement web site if I am going to not be impaired from keeping current with incidents of whale entanglements that will occur in the future.

### Viability Issues of Whale Biological Status

11.     On 22 July 2005, the NEA and CCS authored an op-ed piece in the journal *Science* that claimed that about 48 unreported Northern Right Whale deaths are occurring annually. See Attachment #4. It also claimed that the remaining population of this whale specie was declining. It also supported the continued use of gills nets as acceptable to the continued survival of these whales despite the claims of an ongoing collapse of the whale's remaining population. I need to get the subpoenaed Field Data to challenge these claims, which are hostile to my claims against the Defendants.

### Incidents of Known Whale Entanglements in State Waters

12.     The Four Parties have direct evidence of recent entanglements of endangered whales in state waters.  While I have seen anecdotal reports of these entanglements, I need the available field data to assess these entanglements and to provide me evidentiary information for the Court to assess liability for these entanglements on the Defendants. See Attachment # 5.

### Urban Whale Information

13.     The threats posed by the Defendants' licensing of commercial fisheries is in part due endangered whales' essential marine habitat consists of harbors of coastal cities like Boston. A Humpback Whale spent more than a month in Boston Harbor this summer. The NEA has

extensive video footage of this whale and otherwise much Field Data as a result of its

documentation of the Humpback Whale's said presence in Boston Harbor. I need this

information to document endangered whale use of coastal harbors and the NEA is refusing to

provide me a single picture in its possession of this incident.

### Birthing Areas of Endangered Whales in Massachusetts Waters

14.    I am claiming that endangered whales — like the Northern Right Whale — give

birth in Massachusetts coastal waters. I need to prove that these whales give birth outside the

Four Parties accepted area of the Florida coastline.  This January 2005, a fireman observed a

Right Whale giving birth in South Carolina. The NEA has refused to supply me copies of the

pictures taken of this incident. The NEA is claiming that no birth occurred. I claim it did and the

NEA is refusing to allow me access to the Field Data in its possession so that I cannot prove it

wrong.  The fireman supplied me a picture of the mother and calf that the NEA sent him after he

reported the birth to the NEA and supplied it for free pictures of the birth. See attachment #6.

### Information on Specific Whales Scarred by Whale Entanglements

15.    Under contract to NMFS, both NEA and CCS assessed the occurrence of scars on

whale that was indicative of them having been entangled with fishing gear at some point in the

past. Each of these parties produced a written report. NEA provided me a copy of its scarring

report. The CCS refuses to do so. They both refuse to provide me the list that they each have of

the names of identified whales that they determined to be scarred from past entanglements with

fishing gear. I need these lists in order to evaluate the likelihood of endangered whales becoming

entangled in the Defendants' fishing gear in the future and the incidents of past said

entanglements in fishing gear.

### The Four Parties Wholly refuse to Supply Original Pictures of Whales and Databases on Field Data

16.    The NMFS, the NEA and CCS have refused to comply with my subpoenas request to them to supply me original pictures of entangled whales and the database of its field data on sighted endangered whales entangled in fishing gear. This information is extensive and evidentiary. The CCS has published numerous annual reports on its survey efforts for the Defendants. See Attachment #7. These reports clearly show the amount and the significance of the Field Data in the possession of the CCS and the NEA that they continue to refuse to provide me.

### The CCS Web Site is Insufficient Substitute for Scientific Field Data and Original Digital Images of Entangled Whales

17.    I have routinely inspected the CCS web site dedicated to its business of disentangling whales for the NMFS and the Defendants. I find the material on this website to be a mess of poorly organized junk derived from anecdotal accounts from CCS' disentanglement work for the government. This web site is not any kind of "database." I deliberately subpoenaed the field data on whales in possession of NMFS and CCS because this web site provides me no useful information and is derivative in character. The information is provides the "opinion" of CCS and "stories" by it on its disentanglement efforts for NMFS and does not provide the scientific field data generated from these disentanglement efforts.

Signed under the pains and penalties of perjury this eight day of September in the year two thousand and five. .

BY:

_____
Richard Max Strahan, Plaintiff
928 Dorchester Avenue, #5
Boston, MA 02125
617.233.3854

*Pro Se and Proud!*



# Endangered Species Information Service, Inc
Boston, MA

SENT VIA E-MAIL

TO:      Amy Knowlton
New England Aquarium
One Central Wharf
Boston, MA

RE:      Update of Northern Right Whale Sighting Catalog

DATE:     April14, 2004

To the Above Party:

Pursuant to our phone conversation today, I am sending you this written request. I am requesting an update of the complete Northern Right Whale sighting database as it is now maintained. This requested data is intended to be used to assess the biological status of this critically endangered species and to develop conservation initiatives to protect and recover its depleted population. At this time I have no intention of publishing the analysis in any scientific journal. Pursuant to my last conversation with Scott Kraus, I agree to not publish any results of the intended analysis in any journal unless first offering a final draft of any paper to Kraus for comment and review. I also agree to cite the use of the database in any proposed paper in a manner agreeable to Kraus.

As to the Northern Right Whale sighting database itself, I am looking for a copy of the whole and complete database including all historical sightings and all information developed and included about these sighting and the sighted whale. If there is any other information about the sighted whales that you curate that exists as a compute file, then it is also subject to this request.

I hope this request will do the job. If you have any other concerns about my request, I am sure that we can work them out. I will agree to any reasonable condition for you to supply me the requested information. I am sure that you can appreciate the need of conservationists for complete scientific information on an endangered species in order adequately protect it from extinction. This is of course our only motivation for seeking the requested information.

In Peace

Richard Max Strahan
Chief Science Officer


**New England Aquarium**

CENTRAL WHARF • BOSTON, MASSACHUSETTS • 02110-3399
TEL 617-973-5200 • WEB www.neaq.org

Max Strahan
c/o Sierra Club
100 Boyleston Street
Boston, MA  02116

January 24, 2005

Hi Max,

Enclosed is the right whale database with data of all matched right whale sightings
through June 2004. One CD has it in Access and the other is in Excel. As I mentioned on
the phone, the data is fairly complete through 2003. I am also enclosing a copy of the
agreement letter that you sent us last April. We are proceeding with the understanding
that you will comply with all the specifics as defined in your agreement letter.

Sincerely,

Amy R. Knowlton
Research Scientist



## THE NORTH ATLANTIC RIGHT WHALE CONSORTIUM DATA:
PROTOCOL FOR DATA ACCESS

### Introduction

The North Atlantic Right Whale Consortium Database was established in 1986 as part of a cooperative right whale research program conducted by the University of Rhode Island, New England Aquarium, Center for Coastal Studies, Woods Hole Oceanographic Institution, and other organizations – the North Atlantic Right Whale Consortium. The data are comprised of two major datasets, the survey and "sightings database", maintained and curated by the University of Rhode Island, and the photo-id "catalog", maintained and curated by the New England Aquarium.

The Sightings database contains records of thousands of sightings of right whales in the North Atlantic Ocean, as well as sightings of many other species of whales, dolphins, sea turtles, seals, and large fishes. It also contains survey effort data associated with many of these sightings. Though most sightings in the Sightings database are from surveys conducted from the late 1970's to the present, some right whale historical records go back as far as the 18th Century. The sightings contained in the database come from a wide variety of contributors – both Consortium members and others.

The Catalog contains all photographed sightings of right whales since 1935. Research groups, whale watch vessels, and individual mariners from all along the eastern seaboard contribute these sightings. Photographed sightings are matched to the existing catalog whenever possible so that individual animals can be monitored over time. All photographed sightings are also included in the Sightings database, but the animals' identification numbers are not included there. The Sightings database and Catalog are cross-referenced, however, so that individual identification data from the latter can be linked to sighting data from the former.

In addition, there are several other databases that contain other types of biological data on right whales, contributed by numerous investigators, including: genetics, blubber thickness measurements, contaminant levels, steroid hormone levels, and health assessment scores. These data are all linked by animal identification number to the Catalog.

Since the materials in these various datasets come from numerous independent individuals and institutions, these datasets are not strictly proprietary. Rather, they represent a scientific resource, and access to the data for scientific, educational, conservation and management purposes is encouraged. Contributors to the datasets are given first access to the data in recognition of their contribution. The level of an individual or organization's contribution to the data may weight their rights to, and use of, the full database. After that, proposals for data access from scientists, managers, students or other individuals with a bona fide purpose will be reviewed by the Consortium Board members. Given the great effort required to collect the available data, the Consortium and the curators of the data have an obligation to protect the rights

1



of contributors by placing certain restrictions or conditions upon access to, and use of, the materials within it.

## Categories of data access

There are now two categories of data access. The first is a request for data for research that will lead to a peer reviewed publication ("Data for publications"). The second type is a request for data that will be used solely for management purposes ("Data for management"). The second request will not include any publishing. Each type of request has a separate access protocol.

### Data access protocols for publications

In order to ensure that research being planned or currently conducted by contributors is not compromised or unnecessarily duplicated, and that proper authorship or acknowledgment of all major data contributors occurs, any request for data must be submitted to the Consortium in the form of a brief proposal (email is preferred). The proposal need not be lengthy, but it should at a minimum contain sufficient information on the following:

- Name of the requesting institution(s) and of the Principal Investigator;
- Outline of the proposed work, including questions being addressed or hypotheses tested;
- Anticipated data requirements;
- Anticipated products of the work (e.g. scientific paper, student thesis, EA/EIS);
- Estimated time frame to completion of the study;

Proposals for scientific analyses and publication will be reviewed within three weeks of submission by a board of three Consortium members with knowledge of the type of work being proposed and/or a curatorial role with the data. Their review will be focused on ensuring that duplication of effort is minimized, proposed analyses seem appropriate, and determining whom potential coauthors should be. These three will review the proposal and discuss appropriate authorship given their knowledge of who contributed the majority of the data required for the proposed project. Their recommendations for authorship will be sent to the applicant via the Consortium secretary. In some cases, the reviewers may suggest that, instead of authorship, acknowledgement of the Right Whale Consortium as a whole and/or certain institutions/persons be included in any published document. The applicant must ask each proposed author whether they would be interested in authorship and let the Consortium secretary know what their responses are. Once authorship has been agreed upon (among the applicant, the authors, the secretary and the reviewers), the data will be released. If there is a disagreement about authorship, it will be resolved by the board. The applicant will then be provided with the requested data, with the method (diskette, Zip disk, email, FTP) determined by the size of the requested information file. Although curatorial workload is heavy, and researchers are often very busy, every effort will be made to provide information in a timely fashion.

The curator and the reviewers will treat proposals as confidential and ideas or hypotheses that

2



they may contain will be not be shared with third parties. The only exception would be if the Consortium reviewers wish to obtain confidential peer review of the proposed work in order to judge its feasibility or merit; this would only be done with prior approval of the applicant.

Conflicts over the use of the data will be mediated by Consortium officers in as timely a fashion as possible. The Consortium will encourage multi-investigator proposals where interests of several investigators may overlap.

Grounds for the rejection of a proposal will include lack of investigator qualifications, lack of necessary resources, an assessment that the scope of the project is unreasonably large or not feasible within the proposed time frame, unwillingness of the investigator(s) to acknowledge or offer authorship to major data contributors, or a determination that the proposed work is already underway by someone else.

## Data access conditions for publications

Provision of any data will be made subject to the conditions given below, to which the applicant must agree within his/her proposal. These conditions are designed to eliminate misunderstandings, and to protect both the applicant and the organizations that curate the data, as well as the data contributors.

- For a reasonable period of time (generally that of the estimated time frame of the applicant's proposed study), the Consortium will not provide similar data to others for the same or similar scientific purposes described in the applicant's proposal, without first obtaining the applicant's written permission.
- The applicant will use the requested materials for only those purposes set forth in his/her proposal. Requests for significant departures from the scope of the proposal must be submitted in writing to the review board or data curator, as applicable, for approval.
- The applicant will not share the requested materials with any third party without first obtaining written permission from the review board.
- The applicant agrees to complete the work in the time frame given, although requests for reasonable extensions of this time frame will of course be considered.
- The applicant agrees to publish the results in a refereed journal in a timely manner. Given the endangered status of the North Atlantic right whale population, it is critical that any research results that provide a better understanding of the biology and behavior of this species be disseminated so that they are accessible to other scientists and managers. Failure to do this constitutes unfair monopolization of data with no benefit to the population. A written report must be submitted to the Consortium and preferably presented at the annual meeting. If at all possible, a manuscript should be submitted to a peer-reviewed journal at the same time as the report to the Consortium. Failure to supply a report would preclude further data access. Reports will be accessioned by the secretary, and will be available to Consortium members.

3



## Data access protocols for management

The Consortium recognizes that access to up-to-date data will allow managers to fine tune any management decisions regarding right whales. Therefore, requests for data that will be used solely for management decisions will not require the panel review required above. Requests should be submitted to the Secretary who will then pass it to the appropriate curator. The requests should include:

- Name of the requesting institution(s) and of the Principal Investigator;
- Anticipated management application (e.g. EIS, GIS project for risk analysis);
- Anticipated data requirements;
- Anticipated products of the work;

If no conflicts are evident, the applicant will be provided with the requested data, with the method (diskette, Zip disk, email, FTP) determined by the size of the requested information file. Although curatorial workload is heavy, and researchers are often very busy, every effort will be made to provide information in a timely fashion.

## Data access conditions for management

- Applicants may use the data for other management related analyses on one condition: they inform the Consortium secretary of additional projects. This process allows the Consortium to establish links between the applicant and other managers and/or scientists interested in similar analyses. Also, by tracking the different ways the data are used, the Consortium can further illustrate the benefits of shared data. Although persons other than the initial applicant may perform the additional analyses, it remains the responsibility of the initial applicant to inform the Consortium of the additional work.

- If the management analyses result in publishable information, the applicant is required to submit an additional request for publication. If someone has already applied for data to publish on a similar analysis, the Consortium will encourage a dialog among the parties, but publication rights will go to the applicant who first applied for data under the publication request process.

If you have any questions, please contact Amy Knowlton at New England Aquarium (617 973-0210 or *aknowlton@neaq.org*) Please submit proposals for information from the Consortium Data to the Secretary of the Consortium, Marilyn Marx (*mmarx@neaq.org*). Proposals will be distributed to the appropriate members of the review board and/or to the curator of the data, as applicable. All proposals must include the following agreement:

4

22 July 2005

# Science



Vol. 309    No. 5734
Pages 521-652    $10

ATTACH #4





AAAS

Case 1:05-cv-10140-NMG    Document 56    Filed 09/07/2005    Page 16 of 23

# POLICY FORUM

ECOLOGY

# North Atlantic Right Whales in Crisis

Scott D. Kraus,[1]* Moira W. Brown,[1] Hal Caswell,[2] Christopher W. Clark,[3]
Masami Fujiwara,[4] Philip K. Hamilton,[1] Robert D. Kenney,[5] Amy R. Knowlton,[1]
Scott Landry,[6] Charles A. Mayo,[6] William A. McLellan,[7] Michael J. Moore,[2]
Douglas P. Nowacek,[8] D. Ann Pabst,[7] Andrew J. Read,[9] Rosalind M. Rolland[1]

**D**espite international protection from commercial whaling since 1935, the North Atlantic right whale (*Eubalaena glacialis*) remains one of the most endangered whales in the world (*1*). Whaling for almost 1000 years brought this species close to extinction in the

Enhanced online at
www.sciencemag.org/cgi/
content/full/309/5734/561

early 20th century (*2*). Right whales range in the coastal waters of eastern North America from Florida to the Canadian Maritimes, regions that are heavily used by the shipping and fishing industries and by the military. A low reproductive rate and recently declining survival probabilities (*1*, *3*), particularly for breeding females (*4*), appear to have prevented this population from recovering over the last 25 years (*5*). Most right whale mortalities are due to collisions with ships and entanglements in fishing gear (*5*). The right whale population growth rate has declined since 1980, and the total population now appears to be diminishing in size (*4*). This is in stark contrast to southern hemisphere right whales (*Eubalaena australis*), whose population is estimated to be over 10,000 animals and appears to be increasing at 7.2% per year (*6*).

Recent mortalities demonstrate the serious problem facing the North Atlantic right whale. In the past 16 months, there have been eight recorded deaths, including six adult females (three were carrying

near-term fetuses). Four of these whales were killed by human activities (three by ships and one by fishing gear), a fifth whale was probably killed by a ship, two whales were offshore and could not be retrieved for examination, and a young calf died on the beach in Florida. The loss of this number of whales, and particularly this number of reproductive females, in such a short period, is unprecedented in 25 years of study of this species (*7*). Four of these females were just starting to bear calves, and since the average lifetime calf production is 5.25 calves (*4*), the deaths of these females represent a lost reproductive potential of as many as 21 animals.

The most recently published estimates of right whale survival (*4*, *8*) suggest that the mortality rate increased between 1980 and 1998 to a level of 4 (±1%). From recent population estimates of 350 right whales (*1*), a 4% mortality rate implies 14 animals dying per year. In the last 20 years, an average of 2.4 dead whales has been reported each year, representing a detection rate of 17%. The eight deaths reported in the last 16 months is 2.9 times the average annual rate. Calculations based on demographic data through 1999 (*4*) show that this increase in mortality would reduce population growth by 3.5 to 12% per year. (The range reflects different choices in the details of model selection; the best model implies a reduction in population growth rate of 10% per year.) This dramatic increase in reported deaths may be partly due to improved sighting efforts and reporting awareness but is not a natural variation in mortality. If the 17% mortality detection rate from the last 20 years has remained



constant, as many as 47 right whales could have died in the last 16 months.

Of the 50 dead right whales reported since 1986, at least 19 were killed by vessel collisions, and at least six were killed by fishing gear entanglements (*7*). Also during this period, there were 61 confirmed cases of whales carrying fishing gear, including the mortalities. Outcomes of the remaining cases and the fate of individual whales varied. Death is suspected in 12 cases, because of an animal's subsequent disappearance and/or the extremely poor health condition observed at the time of last sighting. Another eight animals are still entangled; their fate is uncertain. Thirty-three animals either shed the gear or were disentangled, and the remaining cases involved unidentifiable individuals. Chronically entangled whales lose weight, so they sink after death, unlike healthy animals that float if killed. Thus, right whale mortality from fishing gear is probably underestimated to a greater degree than ship kills (*5*).

Calf production has increased recently, raising doubts in some quarters about the urgency of the mortality problem. Annual calf production averaged 12 calves up until 2000 (*1*), but totaled 31, 21, 19, 16, and 28 in 2001 to 2005, respectively. However, the increase in the birth rate will have a small positive impact on population growth rate, as a hypothetical doubling of the per capita birth rate would increase population growth rate by at most 1.6% per year. The population is estimated to have been declining at about 2% per year before 2000 (*3*, *4*, *8*). Thus, the effects of recent increases in birth rate are too small to overcome this decline.

Federal managers in the National Oceanic and Atmospheric Administration (NOAA) Fisheries are charged by the Endangered Species Act and the Marine Mammal Protection Act to ensure that there is no human-induced mortality of right whales. There have been efforts to minimize the risk of ship strikes with mandatory ship location reporting, extensive aerial survey efforts, and mariner education. But without requiring changes in the operation of ships within right whale habitats and migratory corridors, this increased awareness has not

[1]Edgerton Research Laboratory, New England Aquarium, Boston, MA 02110–3399, USA. [2]Biology Department, Woods Hole Oceanographic Institution, Woods Hole, MA 02543–1049, USA. [3]Cornell Laboratory of Ornithology, Cornell University, Ithaca, NY 14850–1923, USA. [4]Department of Ecology, Evolution and Marine Biology, University of California, Santa Barbara, CA 93106–9610, USA. [5]Graduate School of Oceanography, University of Rhode Island, Narragansett, RI 02882–1197, USA. [6]Provincetown Center for Coastal Studies, Provincetown, MA, 02657–1911, USA. [7]Biological Sciences, University of North Carolina Wilmington, Wilmington, NC 28403–3201, USA. [8]Oceanography Department, Florida State University, Tallahassee, FL 32306–4320, USA. [9]Marine Laboratory, Duke University, Beaufort, NC 28516–8648, USA.

*Author for correspondence. E-mail: skraus@neaq.org

**561**

*Published by AAAS*

led to a reduction in ship strike mortalities. The risk of fishing gear entanglement has been addressed by selective area closures and gear modifications (9). These closures do not adequately encompass the seasonal movements of right whales, and gear modifications implemented thus far have not reduced entanglement rates. Eight dead right whales in the past 16 months provide clear evidence that management efforts have been woefully inadequate, and much stronger measures are needed to reverse the right whale's decline.

Accordingly, we urge immediate changes to the management of right whales, focusing on reducing human-induced mortality. Some of the following recommendations will also benefit other marine species that face similar threats, such as the endangered leatherback sea turtle (*Dermochelys coriacea*) (10). First, emergency measures should be implemented to reduce speeds and reroute commercial and military ships as recommended in the NOAA Fisheries Advanced Notice of Proposed Rule-Making

(11). Second, the amount of fixed fishing gear in the water column should be eliminated or minimized. There are many steps that could be taken to do this, including (i) mandating changes in the pot-fishing industry (lobster, crab, hagfish, etc.) that will reduce gear in the water; (ii) requiring use of alternative rope types (e.g., sinking ground lines) to minimize entanglement deaths; (iii) developing and implementing fishing methods that do not use vertical lines attached to surface buoys; and (iv) developing a fast-track process for permitting and experimenting with conservation-focused fishing gear modifications and implementation. This means streamlining the current rule-making and National Environmental Policy Act (NEPA) process for right whale research and gear modifications, which now takes years.

Given the slow speed of the regulatory process, interim emergency measures to reduce shipping and fishing mortality in right whales should be implemented immediately. Delays in implementation would be

ignoring both scientific and legal mandates and could consign North Atlantic right whales to extinction.

**References and Notes**
1. S. D. Kraus, P. K. Hamilton, R. D. Kenney, A. R. Knowlton, C. K. Slay, *J. Cetacean Res. Manage. Spec. Issue* **2**, 231 (2001).
2. R. R. Reeves, *J. Cetacean Res. Manage. Spec. Issue* **2**, 187 (2001).
3. H. Caswell, M. Fujiwara, S. Brault, *Proc. Natl. Acad. Sci. U.S.A.* **96**, 3308 (1999).
4. M. Fujiwara, H. Caswell, *Nature* **414**, 537 (2001).
5. A. R. Knowlton, S. D. Kraus, *J. Cetacean Res. Manage. Special Issue* **2**, 193 (2001).
6. P. Best, A. Brandao, D. Butterworth, *J. Cetacean Res. Manage. Spec. Issue* **2**, 161 (2001).
7. M. J. Moore, A. R. Knowlton, S. D. Kraus, W. A. McLellan, R. K. Bonde, *J. Cetacean Res. Manage.* **6** (3), 199 (2005); available at www.whoi.edu/hpb/viewPage.do?id=1432.
8. M. Fujiwara, dissertation, Massachusetts Institute of Technology–Woods Hole Oceanographic Institution (2002).
9. U.S. Code of Federal Regulation (C.F.R.) **50**, Part 229.32
10. M. C. James, C. A Ottensmeyer, R. A. Myers, *Ecol. Lett.* **8**, 195 (2005).
11. *Fed. Regist.* **69** (105), 30857 (1 June 2004).

10.1126/science.1111200

**S U S T A I N A B I L I T Y**

# Millennium Assessment of Human Behavior

**Paul R. Ehrlich\* and Donald Kennedy**

A growing scientific consensus says that global society is under increasing threat from the impact of human activities: Climate change, loss of biological diversity and ecosystem services, and changes in patterns of land use and land cover are among the more troublesome problems (1–3). Some of these problems require attention from governments and other social institutions. But it is the collective actions of individuals that lie at the heart of the dilemma. Analysis of individual motives and values should be critical to a solution. Yet society has no prominent international forum in which such issues (like how we should treat our environment and each other) are publicly discussed.

In some countries, quite different views have surfaced recently about the ethics of governmental restrictions on the rights of landowners designed to protect endangered species and about legal provisions that permit "open space" set-asides of long duration. Even in nations with cultures as similar

as those of the United States and the United Kingdom, issues of land care, debates over related subsidies, and the responsibilities of private citizens versus their governments can take very different shapes. In approaching sustainability, one needs to determine how the rights of people in the current generation to consume natural capital should be balanced against the rights of future generations. Preservation of animal life and the ethics of various kinds of human interference with "natural" systems are viewed differently by those whose cultural traditions differ. The steps that most members of the relevant scientific community believe are necessary (e.g., reduction of human-caused greenhouse gas emissions, establishment of marine reserves, limiting human population growth and per capita consumption) are disconnected from those measures the rest of society, and especially politicians, are willing to undertake.

We propose to promote the establishment of an ongoing global discussion of key ethical issues related to the human predicament—a Millennium Assessment of Human Behavior (MAHB). The time seems ripe, with the experience gained from the Intergovernmental Panel on Climate Change (IPCC) and the Millennium

Ecosystem Assessment (MEA), to start discussing what to do. In the IPCC and the MEA, sociopolitical issues and policy changes that might lessen the chances of catastrophic consequences are considered. But we need an institution to conduct an ongoing examination and public airing of what is known about how human cultures (especially their ethics) evolve, and about what kinds of changes might permit transition to an ecologically sustainable, peaceful, and equitable global society.

Such a process could begin by asking behavioral scientists and laypeople to explore how their own values relate to environmental sustainability and to ask themselves whether their values, if shared by 6.4 billion people, would really lead to the sort of world they want for their descendents. Citizens of the rich nations should ask themselves whether their "way of life" should really be, as the first President Bush once said to Americans, "not negotiable" (4). They need to discuss possible lifestyle changes in a framework not limited merely to what is possible for citizens of powerful nations, but enlarged to evaluate what is ethical with respect to a more global view of needs and opportunities.

The MAHB could consist of an ongoing series of open, transparent forums. The MAHB could be modeled on the IPCC but would be focused mainly in the social sciences. It would include a deeper consideration of the ethical dimensions of how we treat each other and our life-support systems. It would also involve broader participation than the IPCC, encourage the involvement of politicians, and focus on public outreach at

P. R. Ehrlich is in the Department of Biological Sciences, D. Kennedy is at the Institute for International Studies, Stanford University, Stanford, CA 94305, USA. *Author for correspondence. E-mail: pre@stanford.edu

*Published by AAAS*

 **Atlantic Large Whale Disentanglement Network**

Home
Recent
Postings
Highlights
The Whales
The Tool Box
Telemetry
Documentation
Network Notes
Letters
Weather

## Last Updated October 25, 2004

Home | Recent Postings | Highlights | The Whales | The Tool Box | Telemetry
Documentation | Network Notes | Letters | Weather

# Entangled Humpback Whale
## South Wellfleet, Cape Cod
## August 30, 2004
## Tentative ID
## "Rapier"

### DISENTANGLED



Entangled humpback report
August 30, 2004

**First Report: August 30, 2004 09:50 EDT**
**A lobster fisherman reports an entangled humpback whale east of
Cape Cod near South Wellfleet.**

**DATE/TIME OBSERVED: 08/30/2004  ~ 09:50 EDT**

**POSITION OBSERVED (Approx.):  41° 55.61'N  69° 56.27'W**

**GENERAL LOCATION:  1.5 NM off beach, east of South Wellfleet,
Massachusetts**

**SPECIES: Humpback whale**

**ESTIMATED LENGTH: Not given**

**DESCRIPTION: Unknown whether whale is free-swimming or anchored**

**DESCRIPTION OF GEAR ON WHALE: Two red buoys are visible**

**PHOTO DOCUMENTATION: No**

**COMMENTS:  The CCS disentanglement team is underway to the scene at 10:30 aboard *Ibis 2*.  It is unknown whether there will be a vessel standing by.**

Update:  August 30, 2004, 12:00
*Ibis 2* **arrived on scene at 11:45.  The reporting fisherman stood by after reporting the whale this morining and then passed off the whale to local whale watch vessels (*Portuguese Princess* and Dolphin Fleet) which stood by until the disentanglement team arrived.  Visibility in the area is near zero in fog.**

Update:  August 30, 2004, 13:45
The CCS Disentanglement team successfully removed all entangling gear from this whale.

They found the whale entangled by two wraps of line through the mouth that then led back and loosely wrapped the tail. In order to remove the gear it was, unfortunately, necessary to cut it free of the gear that was anchoring the animal and that gear was lost. The whale then towed the *Ibis* for a short distance before managing to unwrap itself from the remaining gear.

The whale appears to be unharmed other than having sustained some minor scuffing due to the entanglement.

The team left the whale at 41° 54.0'N  69° 47.9'W.

Photographs and a diagram of the entanglement will be posted after the crew arrives back on shore.

Update:  August 30, 2004, 17:45



Line drops to weighted gear

August 30, 2004   Drawing by Scott Landry    © Center for Coastal Studies 2004



cut 2

cut 1    Illustration by Scott Landry  © Center for Coastal Studies 2004

**August 30, 2004**
**Click on image**



1.

Home

Return to top

**The Atlantic Large Whale Disentanglement Network operates under federal authority and major support from the National Marine Fisheries Service. The views expressed herein are those of the authors and do not necessarily reflect the views of NOAA or any of its sub-agencies.**



National
Oceanic and
Atmospheric
Administration

The text and images on this site are copyrighted by the Center for Coastal Studies and may not be

reproduced without permission from CCS. If you are viewing this page and are not designated personnel of the Agencies listed, please contact the Network for permission.





59 Commercial St., Provincetown, MA 02657

http://www.coastalstudies.org

Home | Membership | E-mail Us | About Us



# 6

MOTHER AND CALF RIGHT WHALE BORN
OFF South Carolina coast.



# Surveillance, Monitoring and Management of North Atlantic Right Whales in Cape Cod Bay and Adjacent Waters - 2003

**Final Report**

**Center for Coastal Studies**
**59 Commercial Street, P.O. Box 1036**
**Provincetown, MA 02657**

**October 2003**