UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| RICHARD MAX STRAHAN, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| JEREMY SHUGAR, | ) | |
| | ) | |
| Plaintiffs | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| ELLEN ROY-HERZFELDER, in her | ) | Civil Action No. 05-10140-NMG |
| official capacity as Secretary of the | ) | |
| Massachusetts Executive Office of | ) | |
| Environmental Affairs, | ) | |
| | ) | |
| DAVID M. PETERS, in his official capacity | ) | |
| as Commissioner of the Massachusetts | ) | |
| Department of Fish and Game, | ) | |
| | ) | |
| and | ) | |
| | ) | |
| PAUL DIODATI, in his official capacity | ) | |
| As Director of the Massachusetts | ) | |
| Division of Marine Fisheries, | ) | |
| | ) | |
| Defendants | ) | |

**AFFIDAVIT OF PAMELA ZORN ADAMS, ESQ. IN
SUPPORT OF MEMORANDUM OF *AMICUS CURIAE*
NEW ENGLAND LEGAL FOUNDATION IN SUPPORT OF
DEFENDANTS AND IN OPPOSITION TO MOTION FOR AN INJUNCTION**

I, Pamela Zorn Adams, on my oath swear and depose:

1.        I am an attorney at the law firm of Sherin and Lodgen LLP, special counsel to

*amicus curiae* the New England Legal Foundation ("NELF").  I have personal knowledge of the

facts recited in this affidavit.

2.       Attached hereto at <u>Tab A</u> is a true and accurate copy of M.J. Dean, S.R. Reed and T.B. Hoopes, 2004 Massachusetts Lobster Fishery Statistics (July 2006) ("2004 Lobster Fishery Statistics").

3.       Attached hereto at <u>Tab B</u> is a true and accurate copy of the referenced sections of Madeleine Hall-Arber PhD, MIT Sea Grant Program, *New England's Fishing Communities* ("NEFC") (2001).

4.       Attached hereto at <u>Tab C</u> is a true and accurate copy of Commercial Fishing Industry Needs On Gloucester Harbor, Now and in the Future (Community Panel Project, June 2005) ("Gloucester Report").

5.       Attached hereto at <u>Tab D</u> is a true and accurate copy of A Study of Gloucester's Commercial Fishing Infrastructure:  INTERIM REPORT,  Gloucester Community Panel (October 15, 2003) ("Gloucester Infrastructure Study").

6.       Attached hereto at <u>Tab E</u> is a true and accurate copy of the Rockport: Municipal Harbor Plan (July 2003) ("Rockport Plan").

7.       Attached hereto at <u>Tab F</u> is a true and accurate copy of Massachusetts South Shore Commercial Fishing Infrastructure (2004) ("South Shore Report").


Signed under the pains and penalties of perjury this 1st day of November, 2006.

*Pamela Zorn Adams*
Pamela Zorn Adams

Exhibit A

**Massachusetts Division of Marine Fisheries
Technical Report TR-26**

# 2004 Massachusetts Lobster Fishery Statistics

*M. J. Dean, S. R. Reed, and T. B. Hoopes*

Technical Report

**Massachusetts Division of Marine Fisheries
Department of Fish and Game
Executive Office of Environmental Affairs
Commonwealth of Massachusetts**

July 2006

# Massachusetts Division of Marine Fisheries Technical Report Series

Managing Editor: Michael P. Armstrong

The Massachusetts Division of Marine Fisheries Technical Reports present information and data pertinent to the management, biology and commercial and recreational fisheries of anadromous, estuarine, and marine organisms of the Commonwealth of Massachusetts and adjacent waters. The series presents information in a timely fashion that is of limited scope or is useful to a smaller, specific audience and therefore may not be appropriate for national or international journals. Included in this series are data summaries, reports of monitoring programs, and results of studies that are directed at specific management problems.

All Reports in the series are available for download in PDF format at: *http://www.mass.gov/marinefisheries/publications/technical.htm* or hard copies may be obtained from the Annisquam River Marine Fisheries Station, 30 Emerson Ave., Gloucester, MA 01930 USA (978-282-0308).

TR-1   McKiernan, D.J., and D.E. Pierce. 1995. **The *Loligo* squid fishery in Nantucket and Vineyard Sound.**

TR-2   McBride, H.M., and T.B. Hoopes. 2001. **1999 Lobster fishery statistics.**

TR-3   McKiernan, D.J., R. Johnston, and W. Hoffman. 1999. **Southern Gulf of Maine raised footrope trawl experimental whiting fishery.**

TR-4   Nelson, G.A, M.P. Armstrong, and T.B. Hoopes. 2001. **Massachusetts 2000 striped bass monitoring report.**

TR-5   Chase, B.C., and A.R. Childs. 2002. **Rainbow smelt (*Osmerus mordax*) spawning habitat in the Weymouth-Fore River.**

TR-6   Chase, B.C., J. Plough, and W. Castonguay. 2002. **A study of the marine resources of Salem Sound, 1997.**

TR-7   Estrella, B.T., and R.P. Glenn. 2001. **Massachusetts coastal commercial lobster sampling program May-November 2000.**

TR-8   Estrella, B.T. 2002. **Techniques for live storage and shipping of American lobster, third edition.**

TR-9   McBride, H.M., and T.B. Hoopes. 2002. **2000 lobster fishery statistics.**

TR-10  Sheppard, J.J, M.P. Armstrong, D.J. McKiernan and D.E. Pierce 2003. **Characterization of the Massachusetts scup (*Stenotomus chrysops*) fisheries.**

TR-11  Nelson, G.A., and T.B. Hoopes. 2002. **Massachusetts 2001 striped bass fisheries monitoring report.**

TR-12  Howe, A. B., S. J. Correia, T. P. Currier, J. King, and R. Johnston. 2002. **Spatial distribution of ages 0 and 1 Atlantic cod (*Gadus morhua*) off the Eastern Massachusetts coast, relative to 'Habitat Area of Special Concern'.**

TR-13  Dean, M.J., K.A. Lundy, and T.B. Hoopes. 2002. **2001 Massachusetts lobster fishery statistics.**

TR-14  Estrella, B.T., and R.P. Glenn. 2002. **Massachusetts coastal commercial lobster trap sampling program, May-November 2001.**

TR-15  Reback, K.E., P.D. Brady, K.D. McLauglin, and C.G. Milliken. 2004. **A survey of anadromous fish passage in coastal Massachusetts: Part 1. Southeastern Massachusetts.**

TR-16  Reback, K.E., P.D. Brady, K.D. McLauglin, and C.G. Milliken. 2004. **A survey of anadromous fish passage in coastal Massachusetts: Part 2. Cape Cod and the Islands.**

TR-17  Reback, K.E., P.D. Brady, K.D. McLauglin, and C.G. Milliken. 2004. **A survey of anadromous fish passage in coastal Massachusetts: Part 3. South Coastal.**

TR-18  Reback, K.E., P.D. Brady, K.D. McLauglin, and C.G. Milliken. 2004. **A survey of anadromous fish passage in coastal Massachusetts: Part 4. Boston and North Coastal.**

TR-19  Nelson, G.A. 2003. **2002 Massachusetts striped bass monitoring report.**

TR-20  Dean, M.J., K.A. Lundy, and T.B. Hoopes. 2003. **2002 Massachusetts lobster fishery statistics.**

TR-21  Nelson, G.A. 2004. **2003 Massachusetts striped bass monitoring report.**

TR-22  Lyman, E.G. and D.J. McKiernan. 2005. **Scale modeling of fixed-fishing gear to compare and quantify differently configured buoyline and groundline profiles: an investigation of entanglement threat.**

TR-23  Dean, M.J., K.A. Lundy, and T.B. Hoopes. 2005. **2003 Massachusetts lobster fishery statistics.**

TR-24  Nelson, G.A. 2005. **2004 Massachusetts striped bass monitoring report.**

TR-25  Nelson, G.A. 2006. **A guide to statistical sampling for the estimation of river herring run size using visual counts.**

TR-26  Dean, M. J., S. R. Reed, and T. B. Hoopes. 2006. **2004 Massachusetts lobster fishery statistics.**



Massachusetts Division of Marine Fisheries
Technical Report TR-26



# 2004 Massachusetts Lobster Fishery Statistics

**Micah J. Dean, Story R. Reed, and Thomas B. Hoopes**

Massachusetts Division of Marine Fisheries
Annisquam River Marine Fisheries Station
Gloucester, MA

July, 2006

**Massachusetts Division of Marine Fisheries**
Paul Diodati, Director
**Department of Fisheries, Wildlife and Environmental Law Enforcement**
Dave Peters, Commissioner
**Executive Office of Environmental Affairs**
Stephen R. Pritchard, Secretary
**Commonwealth of Massachusetts**
Mitt Romney, Governor

# Contents

Introduction..................................................................................................................1

Methods .......................................................................................................................1

Results and Discussion .................................................................................................5

      Permits issued and Reporting Status .........................................................5

      Coastal Lobster Permit Transfers..............................................................5

      Commercial Landings and Value................................................................6

      Recreational Landings ..............................................................................11

      Catch Rates ..............................................................................................12

      Fishing Gear and Vessels.........................................................................15

      Validity of Data .......................................................................................16

Acknowledgements......................................................................................................16

Appendix A: Supplementary Tables ............................................................................18

Appendix B: 2004 Commercial Catch Report Forms ..................................................22

## List of Tables

1.   Permit information for the Massachusetts lobster fishery, 2000 - 2004..........................2

2.   Recreational lobster permit information 2004 ...............................................................5

3.   Massachusetts commercial landings, traps fished and estimated value of
     landings for 2000 - 2004..........................................................................................6

4.   Number of active commercial lobstermen, traps fished and lobster
     landings for 2004 ......................................................................................................8

5.   2004 commercial lobster landings by month for territorial and non-territorial areas.....9

6.   2004 commercial lobster landings by permit and area.................................................10

7.   Reported catch and effort information for 2004 Massachusetts recreational
     lobster fishery ..........................................................................................................11

8.   Types of lobster traps fished and value by permit type for 2004 ................................15

A1.  Number of fishermen, landings and value for 2004 Massachusetts
     commercial lobster fishery .......................................................................................19

A2.  Number of fising vessels and pots fished for 2004 Massachusetts
     commercial lobster fishery .......................................................................................20

A3.  Value of fishing vessels and diving gear for 2004 Massachusetts
     commercial lobster fishery .......................................................................................21

## List of Figures

1A.  Map of DMF Statistical Reporting Areas ....................................................................3

1B.  Map of Lobster Management Areas.............................................................................4

2.  2004 weighted ex-vessel price derived from audit lobstermen's' records .....................7

3.  Total commercial lobster landings and estimated value for 1994 - 2004 ......................7

4.  2004 commercial lobster harvest by month for territorial and non-territorial areas .......9

5.  Map of 2004 commercial lobster landings from all permit types by
    statistical reporting area ...........................................................................................10

6.  2004 commercial lobster landings by permit type and area ..........................................10

7.  Reported recreational landings for 1994 - 2004 .........................................................11

8.  Reported recreational effort for 1994 - 2004...............................................................11

9.  Catch per unit of effort (pounds per trap-haul) by set-over day for coastal
    and offshore potmen in 2004.......................................................................................12

10.  Average catch per unit of effort (pounds per trap-haul * set-over-day) for
     coastal and offshore potmen for the last 10 years .........................................................13

11.  Average catch per unit of effort (pounds per trap-haul * set-over-day)
     by month for coastal and offshore potmen in 2004 .......................................................13

12.  2004 catch per unit of effort (pounds per trap-haul * set-over-day) for
     all license types by are area fished. ...........................................................................14

13.  Map of 2004 median catch per unit of effort (pounds per trap-haul * set-over-day)
     for all license types by area fished ..............................................................................14

14.  Percent of total traps fished by trap construction type; 1990 - 2004. ...........................15

15.  Frequency distribution of the percent difference between fishermen's
     reported catch and their audited records for 2004 commercial lobster fishery...............16

16.  Map of coastal Massachusetts showing county boundaries and
     statistical reporting areas............................................................................................17

## Introduction

The commercial lobster fishery of Massachusetts is the most economically important fishery conducted within the territorial waters of the Commonwealth. The overall importance of the fishery both in New England and the Mid-Atlantic states has focused the attention of federal, regional and state fishery managers on this species. With the passage of the Magnuson Fishery Conservation and Management Act in 1976, the New England Fisheries Management Council, in cooperation with the Mid-Atlantic Council, developed and implemented a management plan for the entire Atlantic Coast lobster fishery. Management of this fishery was transferred to the Atlantic States Marine Fisheries Commission (ASMFC) in 1997. Since its first implementation, the Interstate Management Plan for Atlantic Coast Lobster (FMP) has been modified several times. The most current revision at the time these data were collected was Addendum VI (February 2005).

The Commission's management plan introduced area management along the coast, with seven separate Lobster Management Areas (LMAs) from Maine to Maryland. Area designations were based primarily on the percent contribution from different stock components, but the manner in which the fisheries have been prosecuted were also taken into consideration. Each area has been designated a Lobster Conservation Management Team (LCMT) composed of fishermen whose task it is to develop management recommendations that achieve the objectives of the plan. The Massachusetts lobster fishery occurs in four of these LMAs: 1, 2, 3 and OC (Figure 1A).

Information provided by a peer-reviewed stock assessment in 2000 indicated a need for an increase in egg production across all Lobster Management Areas. To meet this requirement, ASMFC created a schedule of minimum gauge size increases through Addendum III to Amendment 3 of the FMP. At the end of 2004, the minimum gauge size was 3 $\frac{1}{4}$" for LMA 1, and 3 $\frac{3}{8}$" for LMAs 2, 3, and Outer Cape (OC). Additional increases of $\frac{1}{32}$" per year may be required, if necessary, for LMA 1 until a final minimum size of 3 $\frac{1}{2}$" is reached in 2008.

The basis and success of any such management plan is an accurate statistical database. The Commonwealth of Massachusetts, with funding from the National Marine Fisheries Service, has been collecting annual reports from permited lobster fishermen

since the early 1960's. In the past, these data were used primarily for descriptive and informational purposes, and occasionally for management. With the emphasis on coastwide management, however, these data have provided the respective management agencies with the information they need to protect the interests of Massachusetts' lobstermen and ensure a productive fishery in the Commonwealth.

During the mid 1970s, concerns over the ability of the resource to support rapidly expanding effort levels prompted statutory and regulatory measures to limit the number of new commercial lobster permits being issued. The issuance of new Coastal Permits was suspended entirely in 1988. As a result of these measures, the number of permits has declined from an all time high of 1,865 in 1988 to a more manageable 1,464 permits in 2004.

This report is the thirty-eighth annual publication of data compiled from the catch reports of permitted lobster fishermen. This report does not, however, cover the scope of the Project's existing database and computational capability. Requests for expanded information, or questions concerning this publication, should be directed to the Division's MIS & Fisheries Statistics Project in Gloucester, MA: (978) 282-0308.

## Methods

Chapter 130, Massachusetts General Laws, Section 33, requires all lobstermen to file an annual report of their catch by January 31 for the preceding calendar year. Commercial lobstermen (coastal, offshore and seasonal/student) receive a detailed catch report form specific to their permit type with their renewal application (Appendix B). Recreational fishermen are asked to report on their permit renewal application form the number of lobsters taken during the previous year, hours dived and the maximum number of traps fished. Catch reports are visually screened upon receipt and incomplete or improperly filled out forms are returned. Completed reports are entered into an Oracle database and the original forms are kept on file at our Gloucester office. As the data enters the database, it is validated against a set of QA/QC criteria by the data entry software. In addition, the data is once again reviewed for data entry errors prior to the production of this report.

Fisherman catch reports are the primary source of the data presented in this report. Some data elements, such as permits and transfer information come from our permitting database. Price and data

1

validity information are derived from records submitted by fishermen during our annual audit of commercial lobster catch reports.

Most of the data presented in this publication are broken out either by permit type or by area. Area data is reported according to MA DMF Statistical Reporting Areas (Figure 1A), which conform to National Marine Fisheries Service reporting areas. Reporting areas 1 through 14 are considered "Territorial" areas and include all waters under the jurisdiction of the Commonwealth. Reporting areas 15 through 25 are considered "Non-Territorial" areas, meaning they lie outside the State Waters. Statistical Reporting Area 26 refers to any area outside of Areas 1 through 25.

In keeping with Division policy, some of the data are masked or combined to protect the confidentiality of the individual submitting the report. Specifically, any grouping of data that represents less than three fishermen is not shown.

Data referring to the number of fishermen, number and value of gear, and number and value of boats are presented by the homeport of the vessel associated with the permit.

Vessel and SCUBA gear values were calculated on the basis of the fishermen's estimate of its present value and the percentage of the time it is in use specifically for lobstering. When fishermen reported the number of lobsters taken, rather than poundage, a conversion factor of 1.27 pounds per lobster was used to calculate poundage figures. This figure is based on information collected by the Division's Coastal Lobster Investigations Project.

Data presented in this publication are based on catch reports actually received as of April 2006. Late reports received beyond this point are not represented here but will be entered into our databases and accounted for in future publications.

**Table 1**. Permit information for the Massachusetts lobster fishery, 2000-2004

|  | 2000 | 2001 | 2002 | 2003 | 2004 |
|---|---|---|---|---|---|
| **Coastal Permits** |  |  |  |  |  |
| Issued | 1,541 | 1,538 | 1,531 | 1,504 | 1,464 |
| Fished | 1,125 | 1,098 | 1,086 | 1,044 | 982 |
| Did Not Fish | 399 | 416 | 422 | 433 | 450 |
| Not Reporting | 17 | 24 | 23 | 27 | 32 |
| **Offshore Permits*** |  |  |  |  |  |
| Issued | 534 | 530 | 555 | 553 | 346 |
| Fished | 345 | 344 | 376 | 381 | 203 |
| Did Not Fish | 129 | 142 | 140 | 142 | 116 |
| Not Reporting | 60 | 44 | 39 | 30 | 27 |
| **Offshore Non-Trap Permits*** |  |  |  |  |  |
| Issued |  |  |  |  | 202 |
| Fished |  |  |  |  | 129 |
| Did Not Fish |  |  |  |  | 53 |
| Not Reporting |  |  |  |  | 20 |
| **Seasonal (Student) Permits** |  |  |  |  |  |
| Issued | 92 | 96 | 98 | 104 | 100 |
| Fished | 53 | 51 | 57 | 55 | 51 |
| Did Not Fish | 17 | 14 | 16 | 15 | 15 |
| Not Reporting | 22 | 31 | 25 | 34 | 34 |
| **Recreational Permits** |  |  |  |  |  |
| Issued | 11,766 | 11,957 | 11,954 | 11,395 | 11,113 |
| Fished | 6,573 | 6,605 | 6,279 | 5,921 | 5,800 |
| Did Not Fish | 2,590 | 2,538 | 2,740 | 2,688 | 2,492 |
| Not Reporting | 2,604 | 2,814 | 2,935 | 2,786 | 2,821 |

* The "Offshore Non-Trap" permit type was created for the 2004 fishing year. In prior years, only one type Offshore permit existed, regardless of gear type.



Figure 1A. Map of DMF Statistical Reporting Areas
MA Territorial Waters = Reporting Areas 1 - 14
Division of Marine Fisheries
Produced July, 2002
NOTE: Cape Cod Canal = Area 14
Offshore Reporting Areas = 15 - 25
Comparison of Offshore Areas to NMFS Statistical Reporting Areas
DMF Area NMFS Area
15 539
16 537
17 526
18 521
19 514
20 513
21 515
22 522
23 525
24 523
25 524
Bathymetry
SEE REVERSE SIDE FOR MAP OF LOBSTER MANAGEMENT AREAS
USE THIS MAP FOR REPORTING CATCH ONLY
To download a color copy, visit: www.mass.gov/marinefisheries
ME
NH
MA
Boston
Stellwagen Bank
Territorial Waters
Nantucket Shoals
Great South Channel
Georges Bank
Canada
US
Browns Bank
15
16
17
19
20
22
23
24
25



Figure 1B. Map of Lobster Management Areas
Department of Fisheries, Wildlife, & Environmental Law Enforcement
Division of Marine Fisheries
DIRECTOR PAUL J. DIODATI
MASS GIS
Produced July, 2002
LMA Coordinate Points
Point Latitude (N) Longitude (W)
B 43 41.0 68 00.0
C 43 12.0 69 00.0
D 42 49.0 69 40.0
E 42 15.5 69 40.0
F 42 10.0 69 56.0
G 42 05.5 70 14.0
H 41 40.0 70 05.0
I 41 15.0 70 05.0
J 41 21.5 69 16.0
K 41 10.0 69 06.5
L 40 55.0 68 54.0
SEE REVERSE SIDE FOR MAP OF STATISTICAL REPORTING AREAS.
USE THIS MAP ONLY FOR INDICATING ON THE RENEWAL APPLICATION WHICH LOBSTER MANAGEMENT AREA(S) YOU PLAN TO FISH THIS YEAR.
TERRITORIAL WATERS
Bathymetry
Above 5m
5 to 10m
10 to 15m
15 to 20m
20 to 30m
30 to 40m
40 to 50m
50 to 60m
60 to 70m
70 to 80m
80 to 90m
90 to 100m
100 to 120m
120 to 140m
140 to 160m
160 to 180m
180 to 200m
200 to 220m
220 to 240m
240 to 260m
260 to 280m
280 to 300m
300 to 400m
400 to 500m
500 to 1000m
1000 to 2000m
To download a color copy, visit: www.mass.gov/marinefisheries
Browns Bank
Canada
US
Georges Bank
Great South Channel
Nantucket Shoals
Stellwagen Bank
AREA 1
AREA OC
AREA OC - 1 OVERLAP
AREA 2
AREA 2 3 OVERLAP
AREA 3
ME
NH
MA
Boston
G
H
I
L

**Results and Discussion**

Permits issued and reporting status. The Division of Marine Fisheries issues five types of lobster permits:

*Coastal Commercial*: Allows the holder to harvest lobster anywhere, most importantly inside territorial waters.

*Offshore Commercial*: Allows the holder to harvest lobster outside territorial waters only.

*Offshore Commercial (Non-trap):* Same as Offshore Permit, except the permit holder is restricted to non-trap gear types. This permit type was created for the 2004 fishing year. Prior to 2004, there was only one type of offshore permit, regardless of gear type.

*Seasonal Commercial:* Allows the holder, if he or she is a student, to harvest lobster anywhere, but with a maximum of 25 traps and only during the months of June - September.

*Recreational:* Allows the holder to harvest lobster anywhere using SCUBA gear, a maximum of 10 traps, or a combination of both. The catch may not be sold.

A total of 13,225 lobster permits were issued in 2004: 2,112 commercial and 11,113 recreational (Table 1). Of the commercial permits issued, 1,464 were coastal permits, a 2.7 percent decline over the previous year. This represents the 17th consecutive decline since a moratorium on new coastal permits was declared in 1988. The number of offshore permits issued decreased by less than 1 percent, while the number of seasonal permits decreased by 3.8 percent.

As of June 2006, 113 permitted commercial lobstermen (5.4 percent) failed to file a 2004 catch report with the Division. Of the 1,999 commercial fishermen who reported, 634 or 30 percent claimed they did not fish for lobster in 2004.

Recreational permits issued declined in 2004 by 2.5 percent, the third consecutive decrease. Compared to commercial permit holders, substantially more recreational fishermen failed to report at 25.4 percent; However, an annual reporting rate of 75 percent in the recreational fishery is not unusual. Seventy percent of the recreational permit holders that submitted catch reports declared that they fished for lobster in 2004. Of those that reported fishing, 42.2 percent declared using pots, 26.2 percent used dive gear and 31.6 used a combination of the two (Table 2).

Permit fees collected in 2004 totaled $962,440: $514,540 for commercial permits and $447,900 for recreational permits. The cost of Massachusetts lobster permits remained at $260 for coastal or offshore permits ($520 for non-residents), $65 for seasonal permits ($130 for non-residents) and $40 for recreational permits ($60 for non-residents). The last increase in permit fees was in 1989.

Coastal lobster permit transfer. During calendar year 2004, the Division authorized the transfer of 64 coastal licenses. Fourteen of the transfers went to captains who were previously authorized to fish another holder's license and who had fished that holder's license for at least twelve months prior to the transfer. Eighteen transfers were allowed within the holder's immediate family (and would have been allowed prior to the new regulation). Eleven transfers were made directly from the holder to a sternman with a documented fishing history. Thirty-six licenses were forfeited to the Division in 2004. Two of these coastal lobster permits were issued directly to waiting list applicants.

**Table 2**. Recreational lobster permit information for 2004

| Permit Type: | Diver | Diver/Pot | Potman | Total |
|---|---|---|---|---|
| Issued | 3,138 | 3,528 | 4,447 | **11,113** |
| Reporting | 2,248 | 2,701 | 3,336 | **8,285** |
| Fished | 1,520 | 1,831 | 2,445 | **5,796** |
| Did Not Fish | 728 | 870 | 891 | **2,489** |
| Not Reporting | 890 | 827 | 1,111 | **2,828** |

5

Commercial Landings and Value. In 2004, 11,784,110 pounds of lobster were reported landed by commercial lobstermen in Massachusetts, a 3.1 percent increase from 2003 (Table 3). Just over 60 percent of those landings were taken from Territorial Waters. The territorial fishery is predominantly a trap-fishery, with 98.8 percent of the landings coming from traps. In contrast, the non-territorial fishery landed 22.2 percent of its catch from non-trap gear types, such as bottom trawls and gillnets.

The state-wide weighted average ex-vessel price as taken from auditted fishermen's records was $4.50, a 3.2 percent increase over the previous year (Figure 2). The ex-vessel price followed a seasonal trend similar to prior years: prices increased steadily from the first of the year to a peak in April, then dropped sharply followed by a second smaller peak in mid-summer. The lowest prices of the year were seen in October and November, after which they rebounded steadily to above-average prices by the end of the year. The estimated total value of the commercial catch rose by 6.4 percent to $53,028,494 (total lbs x avg. price). This represents the highest value of commercial lobster landings since 2000 (Figure 3).

In total pounds of lobster landed, Essex County continues to be ranked first, Barnstable County second and Plymouth County third (Appendix A, Table A1). Gloucester was the number one port in total pounds landed followed by Sandwich, Beverly and Plymouth, in that order (Table 5). In terms of active commercial lobstermen, Essex County ranked first with 528, Plymouth County second with 254 and Bristol County third with 207. Among the cities and towns of the Commonwealth, Gloucester ranked first in active fishermen followed by Plymouth, Rockport and New Bedford in that order.

**Table 3.** Massachusetts commercial landings, traps fished and estimated value of landings for 2000-2004. "Total Traps" is calculated by summing each individual's maximum traps fished for the year. For the purposes of this table, all of an individual's maximum traps are considered "Territorial" if the majority of their landings come from Territorial Waters. Value is estimated by multiplying total landings by the state-wide average ex-vessel price per pound.

| | 2000 | 2001 | 2002 | 2003 | 2004 |
|---|---|---|---|---|---|
| Total Landings | 15,031,538 | 12,237,121 | 13,776,018 | 11,429,379 | 11,784,110 |
| Total Estimated Value | $54,865,114 | $45,766,833 | $51,246,785 | $49,832,092 | $53,028,494 |
| Total Traps Fished | 482,218 | 473,027 | 507,891 | 480,484 | 448,844 |
| Average Price ($) / Lb | $3.65 | $3.74 | $3.72 | $4.36 | $4.50 |
| Ave. Lbs. / Trap-Haul | 0.7763 | 0.6697 | 0.7006 | 0.6052 | 0.6714 |
| Ave. Lbs. / Trap | 29.67 | 24.22 | 25.27 | 21.45 | 23.75 |
| | | | **Territorial** | | |
| Landings | 9,859,453 | 7,175,335 | 8,189,365 | 6,884,885 | 7,100,620 |
| Estimated Value | $35,987,002 | $26,835,751 | $30,464,437 | $30,018,099 | $31,952,788 |
| Trap Landings | 9,837,213 | 7,163,730 | 8,159,401 | 6,831,179 | 7,016,460 |
| Traps Fished | 382,711 | 370,907 | 407,317 | 388,479 | 366,129 |
| Non-Trap Landings | 22,240 | 11,605 | 29,964 | 53,706 | 84,159 |
| | | | **Non-Territorial** | | |
| Landings | 5,172,085 | 5,061,787 | 5,586,653 | 4,544,494 | 4,683,490 |
| Estimated Value | $18,878,111 | $18,931,082 | $20,782,348 | $19,813,993 | $21,075,707 |
| Trap Landings | 4,468,805 | 4,293,430 | 4,675,725 | 3,473,630 | 3,641,366 |
| Traps Fished | 99,507 | 102,120 | 100,574 | 92,005 | 82,715 |
| Non-Trap Landings | 703,280 | 768,357 | 910,928 | 1,070,864 | 1,042,124 |

6

**Figure 2.** 2004 weighted ex-vessel price derived from audited lobstermen's records.



**Figure 3.** Total commercial lobster landings and estimated value for 1994—2004.



**Table 4.** Number of active commercial lobstermen and lobster landings by homeport for 2004 (does not include seasonal permits). Homeport data is taken from vessel information on the permit applications. In cases where no vessel or homeport was specified, the port of landing was used. Catch data encompasses all reported landings, regardless of gear type, while effort data represents only trap effort. Shaded areas denote towns which rank in the top 10 for either number of fishermen, total catch, or total effort. Some cities and towns are combined to protect the confidentiality of the data.

| City / Town | Fishermen Number | Rank | Catch (Pounds) Territorial | Non-Territorial | Total | Percent | Rank | Effort * Traps | Percent | Rank |
|---|---|---|---|---|---|---|---|---|---|---|
| Amesbury-Newbury-Rowley | 4 | 45 | 3,609 | 200 | 3,809 | 0.03% | 48 | 450 | 0.10% | 47 |
| Barnstable-Yarmouth | 7 | 35 | 35,794 | 231,343 | 267,137 | 2.30% | 15 | 3,905 | 0.88% | 28 |
| Beverly | 40 | 9 | 472,020 | 120,328 | 592,348 | 5.10% | 7 | 20,558 | 4.62% | 7 |
| Boston | 57 | 6 | 351,659 | 471,959 | 823,618 | 7.10% | 2 | 21,161 | 4.76% | 6 |
| Bourne | 3 | 48 | 3,433 | 0 | 3,433 | 0.03% | 49 | 355 | 0.08% | 49 |
| Chatham | 44 | 8 | 202,300 | 263,063 | 465,363 | 4.01% | 10 | 10,595 | 2.38% | 14 |
| Chilmark | 13 | 24 | 11,840 | 14,292 | 26,132 | 0.23% | 39 | 2,948 | 0.66% | 30 |
| Cohasset | 29 | 13 | 274,293 | 71,709 | 346,002 | 2.98% | 12 | 13,405 | 3.01% | 11 |
| Danvers | 8 | 34 | 45,933 | 0 | 45,933 | 0.40% | 31 | 2,660 | 0.60% | 33 |
| Dartmouth | 10 | 28 | 14,980 | 1,420 | 16,400 | 0.14% | 43 | 1,800 | 0.40% | 39 |
| Dennis | 14 | 23 | 63,323 | 0 | 63,323 | 0.55% | 28 | 4,999 | 1.12% | 24 |
| Duxbury-Kingston | 9 | 30 | 40,500 | 7 | 40,507 | 0.35% | 34 | 2,809 | 0.63% | 31 |
| Edgartown-Oak Bluffs | 3 | 48 | 1,363 | 0 | 1,363 | 0.01% | 50 | 305 | 0.07% | 50 |
| Essex | 5 | 41 | 15,365 | 0 | 15,365 | 0.13% | 44 | 1,760 | 0.40% | 40 |
| Fairhaven | 29 | 13 | 91,888 | 115,887 | 207,775 | 1.79% | 18 | 11,590 | 2.61% | 13 |
| Falmouth | 9 | 30 | 5,612 | 26,282 | 31,894 | 0.27% | 35 | 610 | 0.14% | 45 |
| Gloucester | 202 | 1 | 902,527 | 843,334 | 1,745,861 | 15.05% | 1 | 61,228 | 13.77% | 1 |
| Gosnold | 3 | 48 | 5,172 | 0 | 5,172 | 0.04% | 46 | 411 | 0.09% | 48 |
| Harwich | 7 | 35 | 4,350 | 24,250 | 28,600 | 0.25% | 36 | 1,236 | 0.28% | 43 |
| Hingham | 13 | 24 | 165,753 | 19,265 | 185,018 | 1.59% | 21 | 6,381 | 1.43% | 22 |
| Hull | 18 | 22 | 243,021 | 41,492 | 284,513 | 2.45% | 14 | 9,535 | 2.14% | 17 |
| Ipswich | 10 | 28 | 24,363 | 0 | 24,363 | 0.21% | 40 | 2,342 | 0.53% | 37 |
| Lynn | 4 | 45 | 21,427 | 5,475 | 26,902 | 0.23% | 38 | 1,615 | 0.36% | 41 |
| Manchester | 26 | 16 | 193,018 | 1,032 | 194,050 | 1.67% | 20 | 9,543 | 2.15% | 16 |
| Marblehead | 35 | 12 | 278,720 | 31,231 | 309,951 | 2.67% | 13 | 16,049 | 3.61% | 9 |
| Marion | 5 | 41 | 6,276 | 39,051 | 45,327 | 0.39% | 32 | 2,590 | 0.58% | 34 |
| Marshfield | 61 | 5 | 461,695 | 104,407 | 566,102 | 4.88% | 8 | 28,661 | 6.44% | 3 |
| Mattapoisett | 11 | 27 | 61,127 | 14,293 | 75,420 | 0.65% | 26 | 5,045 | 1.13% | 23 |
| Nahant | 20 | 20 | 254,169 | 6,736 | 260,905 | 2.25% | 16 | 11,775 | 2.65% | 12 |
| Nantucket | 6 | 38 | 12,214 | 34,349 | 46,563 | 0.40% | 30 | 1,181 | 0.27% | 44 |
| New Bedford | 117 | 2 | 49,070 | 418,531 | 467,600 | 4.03% | 9 | 7,285 | 1.64% | 21 |
| Newburyport | 20 | 20 | 53,516 | 21,296 | 74,812 | 0.64% | 27 | 4,563 | 1.03% | 26 |
| Orleans | 21 | 19 | 192,228 | 7,778 | 200,006 | 1.72% | 19 | 7,385 | 1.66% | 20 |
| Plymouth | 83 | 3 | 646,019 | 36,452 | 682,471 | 5.88% | 5 | 37,666 | 8.47% | 2 |
| Provincetown | 36 | 11 | 232,844 | 9,381 | 242,225 | 2.09% | 17 | 8,811 | 1.98% | 18 |
| Quincy | 5 | 41 | 22,990 | 0 | 22,990 | 0.20% | 41 | 1,830 | 0.41% | 38 |
| Rockport | 64 | 4 | 483,275 | 128,329 | 611,604 | 5.27% | 6 | 22,274 | 5.01% | 5 |
| Salem | 6 | 38 | 28,165 | 0 | 28,165 | 0.24% | 37 | 2,400 | 0.54% | 36 |
| Salisbury | 9 | 30 | 19,113 | 1,130 | 20,243 | 0.17% | 42 | 2,460 | 0.55% | 35 |
| Sandwich | 40 | 9 | 278,641 | 460,685 | 739,326 | 6.37% | 4 | 23,187 | 5.21% | 4 |
| Saugus-Revere | 22 | 17 | 157,758 | 1,248 | 159,006 | 1.37% | 22 | 10,294 | 2.31% | 15 |
| Scituate | 46 | 7 | 215,546 | 188,834 | 404,381 | 3.48% | 11 | 19,480 | 4.38% | 8 |
| Swampscott | 22 | 17 | 152,103 | 4,595 | 156,697 | 1.35% | 23 | 7,537 | 1.69% | 19 |
| Tisbury | 5 | 41 | 5,807 | 738 | 6,545 | 0.06% | 45 | 1,245 | 0.28% | 42 |
| Truro | 9 | 30 | 42,382 | 200 | 42,582 | 0.37% | 33 | 2,680 | 0.60% | 32 |
| Wareham | 4 | 45 | 3,982 | 0 | 3,982 | 0.03% | 47 | 505 | 0.11% | 46 |
| Wellfleet-Eastham | 7 | 35 | 80,111 | 0 | 80,111 | 0.69% | 25 | 3,460 | 0.78% | 29 |
| Westport-Fall River | 27 | 15 | 27,765 | 719,716 | 747,481 | 6.44% | 3 | 15,288 | 3.44% | 10 |
| Weymouth | 6 | 38 | 56,351 | 45,402 | 101,753 | 0.88% | 24 | 4,815 | 1.08% | 25 |
| Winthrop | 13 | 24 | 62,418 | 0 | 62,418 | 0.54% | 29 | 4,077 | 0.92% | 27 |
| Statewide Total | 1,267 | | 7,077,826 | 4,525,719 | 11,603,546 | | | 444,744 | | |
| Out Of State | 45 | | 0 | 163,678 | 163,678 | | | 1,860 | | |

* The number of "Traps" for each city/town represents the sum of each individual's maximum traps fished for the year.

8

Territorial landings by commercial lobstermen showed a distinct seasonal trend (Figure 4; Table 5). Landings increased steadily from a low of 40,019 pounds in February to a high of 1,223,601 pounds in October and then dropped off again to 270,864 pounds in December. Commercial landings from non-territorial waters showed a slightly different seasonal trend, with the low in May and the peak in November. These annual patterns in territorial and non-territorial landings are similar to previous years.

The greatest harvest of lobster from territorial waters came from the Cape Ann vicinity (Statistical Reporting Area 2), where approximately 22 percent of the state's territorial harvest was caught (Figure 4). Reporting Areas 4, 3 and 5 had the next highest territorial landings, respectively, with over 80 percent of the territorial harvest came from areas north of Cape Cod (Statistical Reporting Areas 1-7). In all, territorial landings were down 16.5 percent from 2002.

Reporting area 19 saw the highest non-territorial landings, which were dominated by Coastal permit holders (Figures 5 and 6; Table 6). Offshore permit holders, which are not permitted to harvest lobsters from territorial waters, had their highest landings from Georges Bank (reporting areas 25, 22 and 23 in decreasing order).

Some misreporting has occurred in the past due to lobstermen reporting by Lobster Management Area (Figure 1B) as opposed to Statistical Reporting Area (Figure 1A), thereby artificially inflating landings in Reporting Areas 1, 2 and 3. However, we feel this problem has been minimized since 2002, due to a redesigned catch report form and visual screening of effort data prior to data entry.

**Figure 4.** 2004 commercial lobster landings by month for territorial and non-territorial areas



**Table 5.** 2004 commercial lobster landings by month for territorial and non-territorial areas

| Month | Territorial | Non-Territorial |
|---|---|---|
| January | 71,343 | 246,219 |
| February | 37,498 | 198,064 |
| March | 52,120 | 215,745 |
| April | 159,699 | 176,212 |
| May | 369,470 | 114,148 |
| June | 492,514 | 270,449 |
| July | 999,471 | 421,442 |
| August | 1,081,958 | 524,063 |
| September | 1,196,081 | 548,143 |
| October | 1,284,443 | 601,753 |
| November | 1,056,663 | 832,123 |
| December | 299,360 | 535,128 |
| Total | 7,100,620 | 4,683,490 |

**Figure 5.** 2004 total commercial lobster landings from all permit types by statistical reporting area (A - territorial areas; B- non-territorial areas).



**Figure 6.** 2004 Commercial lobster landings by permit type and area



* Offshore and Offshore Non-Trap landings combined

**Table 6.** 2004 Commercial lobster landings by permit and area.

| Area | Coastal | Offshore* |
|------|---------|-----------|
| 1 | 197,548 | 947 |
| 2 | 1,564,542 | 4,002 |
| 3 | 914,199 | 803 |
| 4 | 1,381,955 | 234 |
| 5 | 671,873 | 360 |
| 6 | 549,233 | 285 |
| 7 | 405,425 | 1,074 |
| 8 | 601,556 | 0 |
| 9 | 485,407 | 508 |
| 10 | 27,796 | 0 |
| 11 | 0 | 0 |
| 12 | 74,163 | 0 |
| 13 | 102,303 | 324 |
| 14 | 115,933 | 150 |
| 15 | 9,510 | 5,654 |
| 16 | 190,368 | 293,087 |
| 17 | 19,302 | 240,150 |
| 18 | 235,785 | 259,942 |
| 19 | 1,163,475 | 74,054 |
| 20 | 84,514 | 7,186 |
| 21 | 520 | 221,374 |
| 22 | 3,635 | 406,368 |
| 23 | 0 | 357,524 |
| 24 | 0 | 137,302 |
| 25 | 179 | 942,054 |
| 26 † | 0 | 31,508 |
| Total | 8,799,221 | 2,984,889 |

† Area 26 includes any landings from outside the MA Statistical Reporting Areas

10

Recreational Landings. Recreational lobstermen reported landing 197,136 lobsters in 2004, a 2.7 percent increase from 2003 (Table 7). This represents the first increase in recreational landings since 1999 (Figure 7). Although recreational landings are reported in numbers of lobsters harvested, a rough estimate of total pounds harvested can be made by multiplying by an average size of 1.27 pounds per lobster. Therefore, estimated recreational landings of 250,363 pounds represents approximately 2.1 percent of the total commercial landings.

The total number of recreational traps-fished decreased by 1.9 percent to 24,849 and the number of hours diving decreased by 6.2 percent to 42,423 (Figure 8). The average number traps fished by potmen was 4.1 traps, while the average numbers of hours diving was 6.5 hours.

**Table 7.** Reported catch and effort information for 2004 Massachusetts recreational lobster fishery

|                   | Diver  | Diver/Pot | Potman  | Total   |
|-------------------|--------|-----------|---------|---------|
| Number of Lobsters | 28,469 | 66,190    | 102,477 | 197,136 |
| Pounds of Lobster * | 36,156 | 84,061    | 130,146 | 250,363 |
| Traps Fished       |        | 7,113     | 17,736  | 24,849  |
| Hours Diving       | 20,456 | 21,967    |         | 42,423  |

\* Based on 1.27 Pounds per Lobster.

**Figure 7.** Reported recreational lobster landings for 1994-2004



**Figure 8.** Reported recreational lobster effort for 1994-2004



11

Catch rates. The average catch per trap-haul for coastal lobstermen in 2004 was 0.662 pounds, a 2.2% increase from 2003. Catch rates gradually increased with respect to set-over-days, up to about 7 days (Figure 9). Beyond 7 days, catch rates became more variable. This relationship between catch rate and soak time is consistent with years past.

For offshore lobstermen, the average catch per trap-haul was 1.977 pounds, a 6.4% increase from 2003. Catch rates for offshore lobstermen were higher than those of their coastal counterparts, yet far more variable. In consequence, the relationship between catch rates and soak time is less well defined for offshore permit holders

Figures 10 through 12 show the average catch rate with set-over-day factored into the effort (pounds per trap-haul*set-over-day).

The average catch per trap-haul*set-over-day for offshore lobstermen was 0.237 pounds, a 3.3% decrease from 2003 (Figure 10). Coastal lobstermen landed 0.162 pounds per trap-haul*set-over-day, a 14% increase from 2003. This represents the highest catch rate for Coastal lobstermen since 2000.

Catch rates also followed a distinct annual trend

**Figure 9.** Catch per unit of effort (pounds per trap-haul) by set-over day for coastal and offshore potmen in 2004. The solid line represents the median values, the boxes represent 50% of the observations at each SOD, and the "whiskers" indicate the minimum and maximum values; outliers are not shown.





(Figure 11). Offshore lobstermen experienced their lowest catch rates in April and their highest in July. This general annual pattern is similar to previous years, but differs from 2003 in that the highest catch rates occurred in September in that year. Average catch rates for Coastal permit holders hit their low in February and high in November. Although offshore lobstermen had higher catch rates for most of the year, coastal permit holders were more productive in March and April.

The highest catch rates occurred in non-territorial waters in 2004 (Figures 12 and 13). However, catch rates in these areas were more variable than in territorial waters, as is indicated by the width of the box and whisker plots in Figure 12. Within territorial waters,

**Figure 10.** Average catch per unit of effort (pounds per trap-haul * set-over-day) for coastal and offshore potmen for the last 10 years.



**Figure 11.** Average catch per unit of effort (pounds per trap-haul * set-over-day) for coastal and offshore potmen by month in 2004



13

the highest catch rates occurred in areas 9 (Outer Cape Cod), 10 (Nantucket Sound) and 8 (Cape Cod Bay). The lowest catch rates for territorial waters occurred in areas 14 (Buzzards Bay), 12 (South of Martha's Vineyard and Nantucket) and 13 (Vineyard Sound). In non-territorial waters, the highest catch rates occurred in the vicinity of Georges Bank (areas 22 and 25) and area 21. Area 15, directly off the coast of Rhode Island, had the lowest catch rates for non-territorial waters. No traps were fished in areas 11 or 24 in 2004, therefore no catch rate information is available for these areas.

**Figure 12.** 2004 catch per unit of effort (pounds per trap-haul * set-over-day) for all license types by area fished. The center line of each box represents the median value for that area. The box represents 50% of the observed values, while the "whiskers" show the minimum and maximum values; outliers are not shown.



**Figure 13.** 2004 median catch per unit of effort (pounds per trap-haul * set-over-day) for all license types by area fished (A - territorial areas; B- non-territorial areas).



14

Fishing gear and vessels. In the commercial fishery, traps were valued at $31,742,670 (Table 8), diving gear at $88,650 and power and non-power boats at $66,910,710 (Table A3) yielding a total gear value of $98,742,120, a 2.7% increase over last year. Combined with the ex-vessel value of lobster sold, $53,028,494 (Table 4), this gives a total fishery value of $151,770,614, a 4.1% increase over last year.

Overall, 95.25 percent of the traps fished in the commercial fishery were wire framed, with 4.43% percent being wooden framed and approximately 0.31 percent categorized as "other." This represents the 10th consecutive increase in the percentage of wire-framed traps (Figure 14). Average value (including warp and buoy) ranged from $35.00 to $175.00 with an overall average value of $70.72. See Table 9.

**Table 8.** Types of lobster traps fished and value by permit type for 2004

|  | Coastal | Offshore | Seasonal | Total for Trap Type | Percent of Total |
|---|---|---|---|---|---|
| Wooden Framed Traps | 18,620 | 1,280 | 4 | 19,904 | 4.43% |
| Value | $1,256,618 | $164,566 | $140 | $1,421,324 | |
| Value/Trap | $60.71 | $144.25 | $35.00 | $71.41 | |
| | | | | | |
| Wire Framed Traps | 390,958 | 35,546 | 1,036 | 427,540 | 95.25% |
| Value | $25,975,435 | $4,122,764 | $54,929 | $30,153,128 | |
| Value/Trap | $62.84 | $99.91 | $53.27 | $70.53 | |
| | | | | | |
| Other Trap Types | 533 | 867 | 0 | 1,400 | 0.31% |
| Value | $34,613 | $133,605 | $0 | $168,218 | |
| Value/Trap | $65.00 | $175.00 | $0.00 | $120.16 | |
| | | | | | |
| Total for License Type | 410,111 | 37,693 | 1,040 | 448,844 | |
| Value | $27,266,666 | $4,420,935 | $55,069 | $31,742,670 | |
| Value/Trap | $66.49 | $117.29 | $52.95 | $70.72 | |

Value of trap includes warp and buoy. These figures include out-of-state fishermen.

**Figure 14.** Percent of total traps fished by trap construction type; 1990 - 2004.



Validity of data. Each year 150 coastal license holders are selected for audit and asked to submit the records they used to complete the harvest portion of their catch report. The Division does this to help estimate the amount of error involved in the reporting process. Selection is done randomly except when fishermen fail an audit. In these cases, they are audited again the following year. Over the last five years the lobstermen selected for audit reported landing 5,862,255 pounds. The audit of their records revealed a harvest of 5,768,534 pounds or a difference of 1.60 percent.

Last year the fishermen selected for audit reported harvesting 770,567 pounds of lobster on their 2004 catch reports. The audit of actual records showed total landings of 736,224 pounds, a difference of 34,343 pounds or 4.46 percent. Six of the randomly selected fishermen have yet to respond to the audit request. Figure 15 shows the distribution of the percent difference between the selected fishermen's reported catch and their audited records. In general, reported landings are very well documented by dealer receipts and/or personal records, especially by the so-called "high-liners" in the fishery. Most of the lobstermen have had licenses for several years and know what is required in terms of reporting their fishing activities and have been informed of the value of accurate reporting in the development of management plans. They also know that their reported information is kept strictly confidential and published only in aggregate form. These factors all contribute to a conscientious and responsible reporting constituency.

**Acknowledgements**

This report has been prepared by personnel of the Division of Marine Fisheries MIS and Fisheries Statistics Project, funded jointly by the Commonwealth and the National Marine Fisheries Service under the Interjurisdictional Fisheries Act (Public Law 11-407; Project IJ-NA05NMF4071027). The preparation of this report would not have been possible without the cooperation of licensed lobstermen who provided the information on their annual reports. The authors also wish to acknowledge the efforts of Maryann Fletcher, who helped interpret and key-punch the catch reports, as well as the assistance of Kerry Allard and Cecil French from our permitting office.

**Figure 15.** Frequency distribution of the percent difference between fishermen's reported catch and their audited records for 2004 commercial lobster fishery.



**Figure 16.** Map of coastal Massachusetts showing county boundaries and statistical reporting areas.



APPENDIX A  -  SUPPLEMENTARY TABLES

Table A1. Number of fishermen, landings (pounds) and value for 2004 Massachusetts commercial lobster fishery.

| AREA — COUNTY — GEAR TYPE | INSHORE (Areas 1–14) COASTAL Dive | COASTAL Pots | COASTAL Trawl/Gillnet | COASTAL Combined* | SEASONAL Pots | TOTAL INSHORE | OFFSHORE (Areas 15–25) COASTAL Pots | COASTAL Trawl/Gillnet | COASTAL Combined* | OFFSHORE Pots | OFFSHORE Trawl/Gillnet | OFFSHORE Combined* | SEASONAL Pos | TOTAL OFFSHORE | GRAND TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **BARNSTABLE** Fishermen | 4 | 135 | | 7 | 8 | 148 + | 8 | | | 9 | 36 | 3 | | 56 | 204 |
| Pounds | 20,090 | 1,085,244 | | 62,144 | 1,592 | 1,121,995 | 230,827 | | | 724,404 | 86,597 | 1,768 | | 1,043,596 | 2,165,591 |
| Value ($) | 90,465 | 4,883,599 | | 279,648 | 7,162 | 5,048,977 | 1,038,722 | | | 3,259,818 | 389,687 | 7,956 | | 4,696,182 | 9,745,159 |
| **BRISTOL** Fishermen | | 53 | | | | 54 + | 12 | | | 11 | 108 | | | 132 + | 186 |
| Pounds | | 206,242 | | | | 206,392 | 139,964 | | | 634,202 | 462,034 | | | 1,236,257 | 1,442,649 |
| Value ($) | | 928,089 | | | | 928,764 | 629,836 | | | 2,853,909 | 2,079,153 | | | 5,563,154 | 6,491,919 |
| **DUKES** Fishermen | | 18 | | | 3 | 21 | 3 | | | | | | | 6 + | 27 |
| Pounds | | 23,771 | | | 314 | 24,085 | 10,169 | | | | | | | 15,441 | 39,526 |
| Value ($) | | 106,968 | | | 1,413 | 108,382 | 45,761 | | | | | | | 69,485 | 177,867 |
| **ESSEX** Fishermen | | 368 | 5 | 5 | 31 | 411 | 24 | 7 | 4 | 4 | 72 | 3 | | 114 | 525 |
| Pounds | | 3,010,458 | 24,659 | 19,848 | 5,780 | 3,103,041 | 696,351 | 7,455 | 97,989 | 234,134 | 127,684 | 9,002 | | 1,172,614 | 4,275,655 |
| Value ($) | | 13,547,061 | 110,966 | 89,316 | 26,010 | 13,963,685 | 3,133,579 | 33,548 | 440,949 | 1,053,601 | 574,578 | 40,599 | | 5,276,763 | 19,240,448 |
| **NANTUCKET** Fishermen | | 5 | | | | 5 | | | | | | | | 2 + | 7 |
| Pounds | | 17,172 | | | | 17,172 | | | | | | | | 40,312 | 57,484 |
| Value ($) | | 77,274 | | | | 77,274 | | | | | | | | 181,404 | 258,678 |
| **NORFOLK** Fishermen | | 37 | | | | 37 | | | | | | | | 2 + | 39 |
| Pounds | | 392,535 | | | | 392,535 | | | | | | | | 78,209 | 470,744 |
| Value ($) | | 1,766,409 | | | | 1,766,409 | | | | | | | | 351,941 | 2,118,350 |
| **PLYMOUTH** Fishermen | | 209 | | | 3 | 220 + | 11 | | | 5 | 9 | | | 30 + | 250 |
| Pounds | | 1,869,711 | | | 753 | 1,918,742 | 264,673 | | | 58,912 | 7,365 | | | 369,733 | 2,288,474 |
| Value ($) | | 8,413,701 | | | 3,390 | 8,634,338 | 1,191,026 | | | 265,104 | 33,143 | | | 1,663,796 | 10,298,134 |
| **SUFFOLK** Fishermen | | 45 | | | | 47 + | | | | | 22 | | | 24 + | 71 |
| Pounds | | 436,985 | | | | 437,082 | | | | | 161,435 | | | 449,191 | 886,273 |
| Value ($) | | 1,966,430 | | | | 1,966,867 | | | | | 726,458 | | | 2,021,360 | 3,988,226 |
| **STATE TOTAL** Fishermen | 5 + | 870 + | 7 + | 13 + | 48 + | 943 | 61 + | 10 + | 6 + | 32 + | 249 + | 7 + | 1 + | 366 | 1,309 |
| Pounds | 20,488 | 7,842,118 | 52,690 | 97,061 | 8,686 | 7,221,044 | 1,447,484 | 26,141 | 112,792 | 1,956,491 | 846,145 | 16,243 | 57 | 4,405,352 | 11,626,396 |
| Value ($) | 92,196 | 31,689,533 | 237,105 | 436,775 | 39,088 | 32,494,696 | 6,513,677 | 117,635 | 507,563 | 8,804,208 | 3,807,653 | 73,094 | 257 | 19,824,065 | 52,318,761 |
| **OUT OF STATE** Fishermen | | | | | | 0 | | | | | 42 | | | 45 + | 45 |
| Pounds | | | | | | 0 | | | | | 136,917 | | | 157,714 | 157,714 |
| Value ($) | | | | | | 0 | | | | | 616,127 | | | 709,713 | 709,713 |

* Combined gear type means the use of more than one gear type in a year (i.e. pots & dive)

+ Row and column totals may not equal the sum of the rows or columns due to masking of the data

Value is based on an ex-vessel price of $4.50, per pound (see Figure 2)

19

Table A2. Number of fishing vessels and pots fished for 2004 Massachusetts commercial lobster fishery

| | | INSHORE (Areas 1–14) | | | | | | OFFSHORE (Areas 15–25) | | | | | | | | |
| | | COASTAL | | | | SEASONAL | | COASTAL | | | OFFSHORE | | | SEASONAL | | |
| COUNTY / LICENSE TYPE | GEAR TYPE | Dive | Trawl/Gillnet | Pots | Combined* | Pots | TOTAL INSHORE | Pots | Trawl/Gillnet | Combined* | Pots | Trawl/Gillnet | Combined* | Pots | TOTAL OFFSHORE | GRAND TOTAL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| BARNSTABLE | Pots Fished | 0 | 0 | 49,341 | 50 | 178 | 49,569 | 4,760 | 0 | 0 | 13,072 | 0 | 0 | 0 | 17,832 | 67,401 |
| | Power Boat | 5 | 0 | 151 | 0 | 1 | 165 | 8 | 0 | 0 | 11 | 32 | 3 | 3 | 54 | 219 |
| | Non Power Boat | 1 | 0 | 39 | 0 | 1 | 41 | 5 | 0 | 0 | 0 | 3 | 0 | 0 | 8 | 49 |
| BRISTOL | Pots Fished | 0 | 0 | 17,753 | 0 | 25 | 17,778 | 7,157 | 0 | 0 | 11,753 | 0 | 0 | 20 | 18,930 | 36,708 |
| | Power Boat | 0 | 0 | 57 | 0 | 1 | 58 | 13 | 0 | 0 | 11 | 100 | 0 | 0 | 125 | 183 |
| | Non Power Boat | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| DUKES | Pots Fished | 0 | 0 | 3,434 | 0 | 59 | 3,493 | 1,075 | 0 | 0 | 400 | 0 | 0 | 0 | 1,475 | 4,968 |
| | Power Boat | 0 | 0 | 19 | 0 | 3 | 22 | 3 | 1 | 0 | 1 | 1 | 1 | 0 | 6 | 28 |
| | Non Power Boat | 0 | 0 | 0 | 0 | 1 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| ESSEX | Pots Fished | 0 | 0 | 151,037 | 2,911 | 661 | 154,609 | 17,410 | 0 | 0 | 2,934 | 0 | 3,200 | 0 | 23,544 | 178,153 |
| | Power Boat | 0 | 5 | 396 | 8 | 31 | 440 | 25 | 7 | 2 | 4 | 70 | 1 | 3 | 113 | 553 |
| | Non Power Boat | 0 | 0 | 105 | 0 | 2 | 109 | 4 | 2 | 0 | 0 | 1 | 0 | 0 | 7 | 116 |
| NANTUCKET | Pots Fished | 0 | 0 | 881 | 0 | 0 | 881 | 800 | 0 | 0 | 0 | 0 | 0 | 0 | 800 | 1,681 |
| | Power Boat | 0 | 0 | 7 | 0 | 0 | 7 | 2 | 0 | 0 | 0 | 1 | 0 | 0 | 3 | 10 |
| | Non Power Boat | 0 | 0 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1 |
| NORFOLK | Pots Fished | 0 | 0 | 17,535 | 0 | 0 | 17,535 | 800 | 0 | 0 | 1,715 | 0 | 0 | 0 | 2,515 | 20,050 |
| | Power Boat | 0 | 0 | 42 | 0 | 0 | 42 | 1 | 0 | 0 | 1 | 0 | 0 | 0 | 2 | 44 |
| | Non Power Boat | 0 | 0 | 16 | 0 | 0 | 16 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 16 |
| PLYMOUTH | Pots Fished | 0 | 0 | 98,498 | 1,765 | 75 | 100,338 | 8,000 | 0 | 0 | 3,609 | 0 | 0 | 800 | 12,409 | 112,747 |
| | Power Boat | 0 | 2 | 255 | 4 | 4 | 266 | 18 | 2 | 0 | 5 | 9 | 2 | 1 | 37 | 303 |
| | Non Power Boat | 0 | 0 | 49 | 2 | 0 | 51 | 0 | 0 | 0 | 1 | 0 | 0 | 0 | 1 | 52 |
| SUFFOLK | Pots Fished | 0 | 0 | 21,904 | 0 | 22 | 21,926 | 1,800 | 0 | 0 | 1,550 | 0 | 0 | 0 | 3,350 | 25,276 |
| | Power Boat | 0 | 0 | 49 | 0 | 1 | 51 | 1 | 0 | 0 | 1 | 21 | 0 | 0 | 23 | 74 |
| | Non Power Boat | 0 | 0 | 9 | 0 | 0 | 9 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 9 |
| STATE TOTAL | Pots Fished | 0 | 0 | 360,383 | 4,726 | 1,020 | 366,129 | 41,802 | 0 | 0 | 35,033 | 0 | 3,200 | 820 | 80,855 | 446,984 |
| | Power Boat | 6 | 7 | 976 | 13 | 49 | 1,051 | 71 | 0 | 0 | 34 | 234 | 7 | 7 | 363 | 1,414 |
| | Non Power Boat | 1 | 0 | 220 | 0 | 4 | 229 | 9 | 0 | 0 | 1 | 4 | 0 | 0 | 16 | 245 |
| OUT OF STATE | Pots Fished | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 1,860 | 0 | 0 | 1,860 | 1,860 |
| | Power Boat | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 41 | 0 | 43 | 43 |
| | Non Power Boat | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

* Combined gear type means the use of more than one gear type in a year (i.e. pots & dive)

**Table A.3.** Value of fishing vessels and diving gear for 2004 Massachusetts commercial lobster fishery.

| AREA LICENSE TYPE — COUNTY — GEAR TYPE | INSHORE (Areas 1–14) | | | | | | OFFSHORE (Areas 15–25) | | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Dive | Coastal Pots | Coastal Trawl/Gillnet | Coastal Combined* | Seasonal Pots | Total Inshore | Coastal Pots | Coastal Trawl/Gillnet | Coastal Combined* | Offshore Pots | Offshore Trawl/Gillnet | Offshore Combined* | Seasonal Pots | Total Offshore | Grand Total |
| **BARNSTABLE** | | | | | | | | | | | | | | | |
| Diving Gear | 12,900 | 17,900 | 0 | 5,000 | 0 | 35,800 | 2,500 | 0 | 0 | 0 | 0 | 0 | 0 | 2,500 | 38,300 |
| Power Boat | 23,140 | 5,400,915 | 0 | 40,000 | 248,000 | 5,712,055 | 872,500 | 0 | 0 | 3,705,000 | 1,581,900 | 207,000 | 0 | 6,366,400 | 12,078,455 |
| Non Power Boat | 175 | 14,774 | 0 | 0 | 4,000 | 18,949 | 1,228 | 0 | 0 | 0 | 0 | 0 | 0 | 1,228 | 20,176 |
| **BRISTOL** | | | | | | | | | | | | | | | |
| Diving Gear | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Power Boat | 0 | 2,489,495 | 0 | 0 | 12,500 | 2,501,995 | 1,122,850 | 0 | 0 | 4,028,500 | 3,890,260 | 0 | 20,000 | 9,061,610 | 11,563,605 |
| Non Power Boat | 0 | 100 | 0 | 0 | 0 | 100 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 100 |
| **DUKES** | | | | | | | | | | | | | | | |
| Diving Gear | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Power Boat | 0 | 580,200 | 0 | 0 | 60,200 | 640,400 | 210,000 | 10,000 | 0 | 23,750 | 2,000 | 0 | 0 | 245,750 | 886,150 |
| Non Power Boat | 0 | 0 | 0 | 0 | 100 | 100 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 100 |
| **ESSEX** | | | | | | | | | | | | | | | |
| Diving Gear | 0 | 24,500 | 0 | 2,000 | 0 | 26,500 | 1,000 | 0 | 0 | 0 | 0 | 0 | 0 | 1,000 | 27,500 |
| Power Boat | 0 | 14,437,777 | 45,000 | 1,007,480 | 127,275 | 15,617,532 | 2,927,100 | 93,000 | 487,500 | 708,000 | 564,975 | 10,000 | 0 | 4,790,575 | 20,408,107 |
| Non Power Boat | 0 | 48,372 | 0 | 1,100 | 150 | 49,622 | 850 | 500 | 0 | 0 | 0 | 0 | 0 | 1,350 | 50,972 |
| **NANTUCKET** | | | | | | | | | | | | | | | |
| Diving Gear | 0 | 6,500 | 0 | 0 | 0 | 6,500 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 6,500 |
| Power Boat | 0 | 200,750 | 0 | 0 | 0 | 200,750 | 121,600 | 0 | 0 | 0 | 50,000 | 0 | 0 | 171,600 | 372,350 |
| Non Power Boat | 0 | 600 | 0 | 0 | 0 | 600 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 600 |
| **NORFOLK** | | | | | | | | | | | | | | | |
| Diving Gear | 0 | 3,000 | 0 | 0 | 0 | 3,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 3,000 |
| Power Boat | 0 | 1,713,450 | 0 | 0 | 0 | 1,713,450 | 2,000 | 0 | 0 | 500,000 | 0 | 0 | 0 | 502,000 | 2,215,450 |
| Non Power Boat | 0 | 7,950 | 0 | 0 | 0 | 7,950 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7,950 |
| **PLYMOUTH** | | | | | | | | | | | | | | | |
| Diving Gear | 3,000 | 5,750 | 0 | 4,000 | 0 | 12,750 | 600 | 0 | 0 | 0 | 0 | 0 | 0 | 600 | 13,350 |
| Power Boat | 16,000 | 9,917,855 | 130,000 | 123,750 | 17,900 | 10,205,505 | 1,510,400 | 112,500 | 65,000 | 682,500 | 141,900 | 60,000 | 0 | 2,572,300 | 12,777,805 |
| Non Power Boat | 0 | 37,475 | 0 | 500 | 0 | 37,975 | 0 | 0 | 0 | 2,560 | 0 | 0 | 0 | 2,560 | 40,535 |
| **SUFFOLK** | | | | | | | | | | | | | | | |
| Diving Gear | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Power Boat | 0 | 2,143,155 | 0 | 0 | 5,250 | 2,148,405 | 250,000 | 0 | 0 | 800,000 | 2,479,000 | 0 | 0 | 3,529,000 | 5,677,405 |
| Non Power Boat | 0 | 7,600 | 0 | 0 | 0 | 7,600 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 7,600 |
| **STATE TOTAL** | | | | | | | | | | | | | | | |
| Diving Gear | 15,900 | 57,650 | 0 | 11,000 | 0 | 84,550 | 4,100 | 0 | 0 | 0 | 0 | 0 | 0 | 4,100 | 88,650 |
| Power Boat | 39,140 | 36,883,597 | 175,000 | 1,171,230 | 471,125 | 38,740,092 | 7,016,450 | 215,500 | 552,500 | 10,447,750 | 8,710,035 | 277,000 | 20,000 | 27,239,235 | 65,979,327 |
| Non Power Boat | 175 | 116,871 | 0 | 1,600 | 4,250 | 122,896 | 2,078 | 500 | 0 | 2,560 | 0 | 0 | 0 | 5,138 | 128,033 |
| **OUT OF STATE** | | | | | | | | | | | | | | | |
| Diving Gear | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Power Boat | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 225,000 | 578,350 | 0 | 0 | 803,350 | 803,350 |
| Non Power Boat | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

* Combined gear type means the use of more than one gear type in a year (i.e. pots & dive)

APPENDIX B - COMMERCIAL CATCH REPORTS

# 2004 COASTAL LOBSTER CATCH REPORT

**1**

COMMONWEALTH OF MASSACHUSETTS
DIVISION OF MARINE FISHERIES
251 CAUSEWAY STREET, SUITE 101, BOSTON, MA  02114-2153

**CATCH REPORT DUE DATE: JANUARY 31, 2005**
**PRINT IN INK ONLY**
**PLEASE REFER TO INSTRUCTIONS ON BACK PAGE WHILE COMPLETING THIS LOBSTER CATCH REPORT**

**\*\*IMPORTANT\*\*** THIS REPORT IS SUBJECT TO A RANDOM STATISTICAL AUDIT BY THE DIVISION, YOU SHOULD MAINTAIN ALL RECEIPTS, DEALER SLIPS, PERSONAL RECORDS, ETC. USED TO COMPLETE THIS REPORT FOR AT LEAST ONE YEAR FOLLOWING THE DATE OF SUBMISSION IN CASE YOU ARE CHOSEN.

**PLEASE PRINT IN INK ONLY**

**IDENTIFICATION:**          DMF ID No: _____          Permit No: _____

Name as it appears
on permit application: _____
                     (Last)                    (First)                         (MI)

Address: _____
        (No.)      (Street)                  (City/Town)              (Zip Code)

Telephone Number: _____     Email: _____

**CATCH STATUS & PARTNERSHIP INFORMATION:**

A.   If you **DID NOT CATCH** any lobster during 2004, check the box ————————▶ ☐
     AND <u>sign your name and date the report at bottom</u> of this page and return it to the Division.

B.   If you **DID CATCH** lobster during 2004, complete **BOTH SIDES** of this report as completely and accurately as possible.  <u>All lobster taken</u>
     <u>under this license must be reported on this report, even if taken incidentally, unless reported on another report via a partnership.</u>

C.   Did you fish in a Partnership during 2004? ————▶ ☐ YES (If yes, complete D & E)     ☐ NO (If no, go to GEAR section)

D.   Check the box which matches how you and your partner are reporting (<u>check one box only</u>)

     1.   I am reporting for both me and my partner: ————————————▶ ☐

     2.   My partner is reporting for both of us: ————————————————▶ ☐

     3.   My partner and I are reporting separate catches even though we fished together: ————▶ ☐

E.   PARTNERS NAME: _____     DMF I.D. No: _____     PERMIT No: _____

**GEAR:**

A) Circle one or more of the following gear types used to catch lobster:     <u>**TRAPS/POTS**</u>     <u>**DIVING GEAR**</u>     <u>**TRAWL/DREDGES**</u>     <u>**GILLNET**</u>

B) If you fished traps in 2004, estimate the average value of one trap including warp and buoy:  $ |_ _ _ _|

C) Indicate the type of traps by completing the percent of total that were fished in 2004:

   1. Wood Framed |_ _ _|%     2. Wire Framed |_ _ _|%     3. Other _____ |_ _ _|%

D) If you dove for lobster in 2004, estimate the value of your diving gear and the percent used for catching lobsters:

   Estimated Value of Diving Gear: $ |_ _ _ _|     Percent Used for Catching Lobsters: |_ _ _| %

**PORT(S) OF LANDING:**

**PLEASE FILL OUT THIS SECTION WHETHER OR NOT YOU USED A BOAT TO LAND YOUR LOBSTER.**

| | PORT NAME | PERCENT |
|---|---|---|
| Indicate the port(s) where you landed your catch. If you landed your catch in more than one port, estimate the percent of lobster landed at each port listed. | 1. |_____| | |_ _| % |
| | 2. |_____| | |_ _| % |
| | 3. |_____| | |_ _| % |

SIGNATURE: _____     Date: _____

Knowingly falsifying any information contained within this report constitutes the act of perjury and may result in a fine, imprisonment or loss
of license (MGL, Chapter 130, Sections 2, 21, 33).

## COMPLETE BACK OF THIS FORM IF YOU CAUGHT LOBSTER IN 2004

# 2004 COASTAL LOBSTER CATCH REPORT

**VESSELS:**

THIS SECTION SHOULD BE COMPLETED BY VESSEL OWNER OR PRINCIPAL USER ONLY.  BE SURE TO INCLUDE TENDERS USED.

<u>Power Boat(s) Used For Lobstering</u> - (Any vessel with inboard or outboard engine)

1) Boat Name:_____ Length (ft): |_ _ _| Home Port:_____

Estimated Dollar Value of Vessel: $ |_ _ _ _ _ _| Percent Used for Lobstering: |_ _|

2) Boat Name:_____ Length (ft): |_ _ _| Home Port:_____

Estimated Dollar Value of Vessel: $ |_ _ _ _ _ _| Percent Used for Lobstering: |_ _|

<u>Non-Power Boat(s) Used For Lobstering</u> - (Any vessel without engine, including tenders/dinghies)

1) Length (ft): |_ _| Home Port:_____

Estimated Dollar Value of Vessel: $ |_ _ _ _ _ _| Percent Used for Lobstering: |_ _|

2) Length (ft): |_ _| Home Port:_____

Estimated Dollar Value of Vessel: $ |_ _ _ _ _ _| Percent Used for Lobstering: |_ _|

**FUEL:**

Total gallons of fuel used for the year to catch lobster:    Gasoline: |_ _ _ _ _|

Diesel:    |_ _ _ _ _|

**TOTAL EMPLOYMENT:**

**Counting yourself**, what was the **maximum** number of people fishing for lobster on your vessel at any one time in 2004?    |_ _|

* For example, if you employed one sternman, you would answer two (2).

**HARVEST TABLE:**

***** IMPORTANT *****

REFER TO MAP OF STATISTICAL REPORTING AREAS ON NEXT PAGE TO COMPLETE THE AREA(S) FISHED PORTION OF HARVEST TABLE

DO NOT INDICATE LMA'S (Lobster Management Areas) IN AREA(S) FISHED IN TABLE BELOW

| | GEAR USED TO HARVEST LOBSTER | FILL IN SHADED AREA ONLY IF YOU USED TRAPS AS YOUR GEAR | | | | POUNDS HARVESTED | | REFER TO MAP OF STATISTICAL REPORTING AREAS ON NEXT PAGE →→→→→→ | | | | | |
| | | MAX TRAPS FISHING | SET OVER DAYS | AVERAGE TRAPS HAULED PER TRIP WHEN FISHING | TOTAL TRIPS WHEN TRAPS HAULED | LOBSTER | CRABS | FIRST AREA FISHED | % OF CATCH | SECOND AREA FISHED | % OF CATCH | THIRD AREA FISHED | % OF CATCH |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| EX. | TRAPS | 400 | 2 | 200 | 28 | 2240 | 0 | 5 | 75 | 7 | 25 | | |
| JAN | | | | | | | | | | | | | |
| FEB | | | | | | | | | | | | | |
| MAR | | | | | | | | | | | | | |
| APR | | | | | | | | | | | | | |
| MAY | | | | | | | | | | | | | |
| JUN | | | | | | | | | | | | | |
| JUL | | | | | | | | | | | | | |
| AUG | | | | | | | | | | | | | |
| SEP | | | | | | | | | | | | | |
| OCT | | | | | | | | | | | | | |
| NOV | | | | | | | | | | | | | |
| DEC | | | | | | | | | | | | | |
| | TOTAL: | | | | | | | | | | | | |

# 2004 OFFSHORE LOBSTER CATCH REPORT

COMMONWEALTH OF MASSACHUSETTS
DIVISION OF MARINE FISHERIES
251 CAUSEWAY STREET, SUITE 101, BOSTON, MA 02114-2153

**CATCH REPORT DUE DATE: JANUARY 31, 2005**
**PRINT IN INK ONLY**
**PLEASE REFER TO INSTRUCTIONS ON BACK PAGE WHILE COMPLETING THIS LOBSTER CATCH REPORT**

**IDENTIFICATION:**          DMF ID: _____          Permit No: _____

Name as it appears
on license application: _____
                        (Last)              (First)                    (MI)

Address: _____
         (No.)      (Street)              (City/Town)              (Zip Code)

Telephone Number: _____    Email: _____

## CATCH STATUS & PARTNERSHIP INFORMATION:

A.  If you **DID NOT CATCH** any lobster during 2004, check the box ———————————▶ ☐
    AND <u>sign your name and date the report at bottom</u> of this page and return it to the Division.

B.  If you **DID CATCH** lobster during 2004, complete **BOTH SIDES** of this report as completely and accurately as possible.  <u>All lobster taken under this license must be reported on this report, even if taken incidentally, unless reported on another report via a partnership.</u>

C.  Did you fish in a Partnership during 2004? ———————▶ ☐  YES (If yes, complete D & E)     ☐ NO (If no, go to GEAR section)

D.  Check the box which matches how you and your partner are reporting (<u>check one box only</u>)

    1.  I am reporting for both me and my partner: ——————————————▶ ☐

    2.  My partner is reporting for both of us: —————————————————▶ ☐

    3.  My partner and I are reporting separate catches even though we fished together: ————▶ ☐

E.  PARTNERS NAME: _____    DMF I.D. No: _____    PERMIT No: _____

## GEAR:

A) Circle one or more of the following gear types used to catch lobster:    **TRAPS/POTS    DIVING GEAR    TRAWL/DREDGES    GILLNET**

B) If you fished traps in 2004, estimate the average value of one trap including warp and buoy:  $ |_ _ _ _ _|

C) Indicate the type of traps by completing the percent of total that were fished in 2004:

    1. Wood Framed |_ _ _|%    2. Wire Framed |_ _ _|%    3. Other _____ |_ _ _|%

D) If you dove for lobster in 2004, estimate the value of your diving gear and the percent used for catching lobsters:

    Estimated Value of Diving Gear: $ |_ _ _ _ _|     Percent Used for Catching Lobsters: |_ _ _| %

## PORT(S) OF LANDING:

**PLEASE FILL OUT THIS SECTION WHETHER OR NOT YOU USED A BOAT TO LAND YOUR LOBSTER.**

| | PORT NAME | PERCENT |
|---|---|---|
| Indicate the port(s) where you landed your catch. If you landed your catch in more than one port, estimate the percent of lobster landed at each port listed. | 1. |_____| | |_ _| % |
| | 2. |_____| | |_ _| % |
| | 3. |_____| | |_ _| % |

SIGNATURE:_____    Date:_____

Knowingly falsifying any information contained within this report constitutes the act of perjury and may result in a fine, imprisonment or loss of license (MGL, Chapter 130, Sections 2, 21, 33).

## COMPLETE BACK OF THIS FORM IF YOU CAUGHT LOBSTER IN 2004

# 2004 OFFSHORE LOBSTER CATCH REPORT

**VESSELS:**

**THIS SECTION SHOULD BE COMPLETED BY VESSEL OWNER OR PRINCIPAL USER ONLY.  BE SURE TO INCLUDE TENDERS USED.**

**Power Boat(s) Used For Lobstering** - (Any vessel with inboard or outboard engine)

1) Boat Name:_____    Length (ft): |___|   Home Port:_____

   Estimated Dollar Value of Vessel:  $ |_ _ _ _ _ _|   Percent Used for Lobstering: |_ _|

2) Boat Name:_____    Length (ft): |___|   Home Port:_____

   Estimated Dollar Value of Vessel:  $ |_ _ _ _ _ _|   Percent Used for Lobstering: |_ _|

**Non-Power Boat(s) Used For Lobstering** - (Any vessel without engine, including tenders/dinghies)

1) Length (ft): |___|   Home Port:_____

   Estimated Dollar Value of Vessel:  $ |_ _ _ _ _ _|   Percent Used for Lobstering: |_ _|

2) Length (ft): |___|   Home Port:_____

   Estimated Dollar Value of Vessel:  $ |_ _ _ _ _ _|   Percent Used for Lobstering: |_ _|

**FUEL:**

**Total gallons of fuel used for the year to catch lobster:**     Gasoline: |_ _ _ _ _|

                                                                 Diesel:   |_ _ _ _ _|

**TOTAL EMPLOYMENT:**

**Counting yourself,** what was the **maximum** number of people fishing for lobster on your vessel at any one time in 2004? ---------> |_ _|

                    * For example, if you employed one sternman, you would answer two (2).

**HARVEST TABLE:**

## ***** IMPORTANT *****
## REFER TO MAP OF STATISTICAL REPORTING AREAS ON NEXT PAGE TO COMPLETE THE AREA(S) FISHED PORTION OF HARVEST TABLE
## DO NOT INDICATE LMA'S (Lobster Management Areas) IN AREA(S) FISHED IN TABLE BELOW

| | GEAR USED TO HARVEST LOBSTER | MAX TRAPS FISHING | SET OVER DAYS | AVERAGE TRAPS HAULED PER TRIP WHEN FISHING | TOTAL TRIPS WHEN TRAPS HAULED | POUNDS HARVESTED LOBSTER | CRABS | FIRST AREA FISHED | % OF CATCH | SECOND AREA FISHED | % OF CATCH | THIRD AREA FISHED | % OF CATCH |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| EX. | TRAPS | 400 | 2 | 200 | 28 | 2240 | 1200 | 19 | 75 | 18 | 25 | | |
| JAN | | | | | | | | | | | | | |
| FEB | | | | | | | | | | | | | |
| MAR | | | | | | | | | | | | | |
| APR | | | | | | | | | | | | | |
| MAY | | | | | | | | | | | | | |
| JUN | | | | | | | | | | | | | |
| JUL | | | | | | | | | | | | | |
| AUG | | | | | | | | | | | | | |
| SEP | | | | | | | | | | | | | |
| OCT | | | | | | | | | | | | | |
| NOV | | | | | | | | | | | | | |
| DEC | | | | | | | | | | | | | |
| | | | | | TOTAL: | | | | | | | | |

FILL IN SHADED AREA ONLY IF YOU USED TRAPS AS YOUR GEAR

REFER TO MAP OF STASTICAL REPORTING AREAS ON NEXT PAGE →→→→→→

# 2004 SEASONAL LOBSTER CATCH REPORT

**1**

COMMONWEALTH OF MASSACHUSETTS
DIVISION OF MARINE FISHERIES
251 CAUSEWAY STREET, SUITE 101, BOSTON, MA  02114-2153

**CATCH REPORT DUE DATE: JANUARY 31, 2005**
**PRINT IN INK ONLY**
**PLEASE REFER TO INSTRUCTIONS ON BACK PAGE WHILE COMPLETING THIS LOBSTER CATCH REPORT**

**IDENTIFICATION:**    DMF ID: _____    Permit No: _____

Name as it appears
on license application: _____
                    (Last)              (First)                    (MI)

Address: _____
       (No.)      (Street)            (City/Town)              (Zip Code)

Telephone Number: _____    Email: _____

**CATCH STATUS & PARTNERSHIP INFORMATION:**

A.  If you **DID NOT CATCH** any lobster during 2004, check the box ————————▶ ☐
    AND <u>sign your name and date the report at bottom</u> of this page and return it to the Division.

B.  If you **DID CATCH** lobster during 2004, complete **BOTH SIDES** of this report as completely and accurately as possible.  <u>All lobster taken under this license must be reported on this report, even if taken incidentally, unless reported on another report via a partnership.</u>

C.  Did you fish in a Partnership during 2004? ————▶ ☐ YES (If yes, complete D & E)    ☐ NO (If no, go to GEAR section)

D.  Check the box which matches how you and your partner are reporting (<u>check one box only</u>):

    1.  I am reporting for both me and my partner: ————————————▶ ☐

    2.  My partner is reporting for both of us: ————————————▶ ☐

    3.  My partner and I are reporting separate catches even though we fished together: ————▶ ☐

E.  PARTNERS NAME: _____    DMF I.D. No: _____    PERMIT No: _____

**GEAR:**

A) Circle one or more of the following gear types used to catch lobster:    **TRAPS/POTS**    **DIVING GEAR**    **TRAWL/DREDGES**    **GILLNET**

B) If you fished traps in 2004, estimate the average value of one trap including warp and buoy:  $ |_ _ _ _ _|

C) Indicate the type of traps by completing the percent of total that were fished in 2004:

   1. Wood Framed |_ _ _|%    2. Wire Framed |_ _ _|%    3. Other _____ |_ _ _|%

D) If you dove for lobster in 2004, estimate the value of your diving gear and the percent used for catching lobsters:

   Estimated Value of Diving Gear: $ |_ _ _ _ _|    Percent Used for Catching Lobsters: |_ _ _| %

**PORT(S) OF LANDING:**

**PLEASE FILL OUT THIS SECTION WHETHER OR NOT YOU USED A BOAT TO LAND YOUR LOBSTER.**

Indicate the port(s) where    PORT NAME    PERCENT
you landed your catch. If you
landed your catch in more      1. |_____|  |_ _| %
than one port, estimate the
percent of lobster landed at   2. |_____|  |_ _| %
each port listed.              3. |_____|  |_ _| %

SIGNATURE: _____    Date: _____

Knowingly falsifying any information contained within this report constitutes the act of perjury and may result in a fine, imprisonment or loss of license (MGL, Chapter 130, Sections 2, 21, 33).

## COMPLETE BACK OF THIS FORM IF YOU CAUGHT LOBSTER IN 2004

# 2004 SEASONAL LOBSTER CATCH REPORT

**2**

**VESSELS:**

THIS SECTION SHOULD BE COMPLETED BY VESSEL OWNER OR PRINCIPAL USER ONLY. BE SURE TO INCLUDE TENDERS USED.

<u>Power Boat(s) Used For Lobstering</u> - (Any vessel with inboard or outboard engine)

1) Boat Name:_____ Length (ft): |_ _ _| Home Port:_____

    Estimated Dollar Value of Vessel: $ |_ _ _ _ _ _| Percent Used for Lobstering: |_ _ _|

2) Boat Name:_____ Length (ft): |_ _ _| Home Port:_____

    Estimated Dollar Value of Vessel: $ |_ _ _ _ _ _| Percent Used for Lobstering: |_ _ _|

<u>Non-Power Boat(s) Used For Lobstering</u> - (Any vessel without engine, including tenders/dinghies)

1) Length (ft): |_ _ _| Home Port:_____

    Estimated Dollar Value of Vessel: $ |_ _ _ _ _ _| Percent Used for Lobstering: |_ _ _|

2) Length (ft): |_ _ _| Home Port:_____

    Estimated Dollar Value of Vessel: $ |_ _ _ _ _ _| Percent Used for Lobstering: |_ _ _|

**FUEL:**

Total gallons of fuel used for the year to catch lobster:  Gasoline: |_ _ _ _ _|

                                      Diesel:   |_ _ _ _ _|

**TOTAL EMPLOYMENT:**

Counting yourself, what was the **maximum** number of people fishing for lobster on your vessel at any one time in 2004? ---------> |_ _|

    * For example, if you employed one sternman, you would answer two (2).

**HARVEST TABLE:**

***** IMPORTANT *****

## REFER TO MAP OF STATISTICAL REPORTING AREAS ON NEXT PAGE TO COMPLETE THE AREA(S) FISHED PORTION OF HARVEST TABLE
## DO NOT INDICATE LMA'S (Lobster Management Areas) IN AREA(S) FISHED IN TABLE BELOW

| | GEAR USED TO HARVEST LOBSTER | FILL IN SHADED AREA ONLY IF YOU USED TRAPS AS YOUR GEAR | | | | POUNDS HARVESTED | | REFER TO MAP OF STASTICAL REPORTING AREAS ON NEXT PAGE →→→→→→ | | | | | |
| | | MAX TRAPS FISHING | SET OVER DAYS | AVERAGE TRAPS HAULED PER TRIP WHEN FISHING | TOTAL TRIPS WHEN TRAPS HAULED | LOBSTER | CRABS | FIRST AREA FISHED | % OF CATCH | SECOND AREA FISHED | % OF CATCH | THIRD AREA FISHED | % OF CATCH |
| EX. | TRAPS | 25 | 2 | 12 | 30 | 95 | 10 | 5 | 75 | 6 | 25 | | |
| JUN | | | | | | | | | | | | | |
| JUL | | | | | | | | | | | | | |
| AUG | | | | | | | | | | | | | |
| SEP | | | | | | | | | | | | | |
| | TOTAL: | | | | | | | | | | | | |

# Exhibit B
# (Part 1)

# New England's Fishing Communities

**Madeleine Hall-Arber, PhD**
MIT Sea Grant College Program

**Chris Dyer, PhD**
**John Poggie, PhD**
**James McNally, PhD**
**Renee Gagne**
Human Ecology Associates

MIT Sea Grant College Program
292 Main Street, E38-300
Cambridge, MA  02139

MITSG 01-15

# Acknowledgements

The research upon which this report is based was funded by the Marine Fisheries Initiative (MARFIN) Grant #NA87FF0547.  This is a slightly revised version of the project's final report entitled "Fishing Communities and Fishing Dependency in the Northeast United States."

A sincere thank you to all of the key respondents who so generously donated their time to try to impart an understanding of their industry and their communities to the researchers.  We have tried to record the disparate views expressed without losing a sense of the whole.

Thanks too to our reviewers, some of who were asked to read large portions of the manuscript and some of who were asked to read only specific sections.   All reviewers offered useful additions and corrections.  The mistakes that remain, of course, are our own. We would like to thank (in alphabetical order): Robin Alden, Rodney Avila, Nancy Balcom, Rollie Barnaby, David Beutel, Keith Bisson, Ralph Boragine, Albert Carver, Judith Harris, Grace Lee, Carl Masi, Charles Saunders, Barbara Stevenson, Mary Beth Tooley, and John Williamson.  Keith Bisson and Debra Shrader also conducted some of the key respondent interviews and we thank them.

Thanks to students Mark Grant, Carol Miu, Peter Scott, Robert Mason and Michael Abbey for early enthusiasm, some interviews, help with tape transcription and for company on the long road trips.

# Table of Contents

| | | |
|---|---|---|
| 1.0. | Introduction | 1 |
| 2.0. | Conceptual Framework | |
| | 2.1.  A Regional Ecosystem Approach | 4 |
| | 2.2.  Space and Place in Human Ecosystems | 4 |
| | 2.3.  The Natural Resource Region | 6 |
| | 2.4.  The Natural Resource Community as a Regional Base Unit | 8 |
| | 2.5.  Forms of Capital | 9 |
| | 2.6.  Total Capital and the NRR | 11 |
| | 2.7.  Externalities to the NRR | 12 |
| | 2.8.  Flows and changes in total capital | 13 |
| | 2.9.  Case Study of the New England Groundfish Fishery | 15 |
| | 2.10.  Developing an NRR Model for New England | 18 |
| 3.0. | Measuring Fishing Dependency and Externalities in the New England NRR | 20 |
| | 3.1.  Using Dependency Ratios | 21 |
| | 3.2.  Fishery Dependency Ratios | 22 |
| | 3.3.  Externalities Affecting Dependency Measures | 23 |
| | 3.4.  Fishermen Individual-Level Characteristics and Dependence | 24 |
| | 3.5.  Precautions in Defining Dependency | 27 |
| | 3.6.  Establishing Dependency by Sub-Region | 29 |
| | 3.7.  Summary | 34 |
| 4.0. | Vulnerability, Infrastructure and Gentrification among Fishing Dependent Communities | 35 |
| | 4.1.  Historical and Total Capital | 37 |
| | 4.2.  Measuring Infrastructure | 38 |
| | 4.3.  Classification of Community Sample by Categories | 39 |
| | 4.4.  Gentrification and Loss of Infrastructure | 42 |
| 5.0. | Preface to Subregion and Port Profiles | 47 |
| | 5.1.  Connecticut | 49 |
| | 5.1.1 New London County | |
| | 5.1.1.1. Stonington | 53 |
| | 5.1.1.2. New London/Groton | 65 |
| | 5.1.2 Southwestern coast fishing clusters | |
| | 5.1.2.1. Bridgeport | 67 |
| | 5.2.  Rhode Island | 73 |
| | 5.2.1.  Washington County | |
| | 5.2.1.1.Point Judith/Galilee | 76 |
| | 5.2.2. Newport County | |
| | 5.2.2.1.  Jamestown | 88 |
| | 5.2.2.2.  Newport | 93 |
| | 5.2.2.3.  Tiverton | 101 |
| | 5.2.2.4.  Sakonnet Point | 104 |

5.3.    New Bedford/South Shore
        5.3.1. Bristol County                                105
                5.3.1.1.  New Bedford                        108
                5.3.1.2.  Fairhaven                          131
                5.3.1.3.  Westport                           137

5.4.    Cape Cod and the Islands
        5.4.1. Barnstable County                             143
                5.4.1.1.  Sandwich                           146
                5.4.1.2.  Hyannis                            154
                5.4.1.3.  Chatham                            160
                5.4.1.4.  Provincetown                       180

        5.4.2. Dukes County (Martha's Vineyard)              190
                5.4.2.1.  Vineyard Haven                     194

5.5.    Boston Area
        5.5.1. Suffolk County
                5.5.1.1.  Boston Harbor                      201

        5.5.2. Plymouth County                               214
                5.5.2.1.  Plymouth                           217
                5.5.2.2.  Scituate                           227

5.6.    Gloucester / North Shore
        5.6.1. Essex County                                  235
                5.6.1.1.  Gloucester                         236
                5.6.1.2.  Rockport                           252
                5.6.1.3.  Marblehead                         257

5.7.    New Hampshire Seacoast
        5.7.1. Rockingham County                             263
                5.7.1.1.  Hampton/Seabrook                   265
                5.7.1.2.  Portsmouth                         273
                5.7.1.3.  Isle of Shoals                     282

5.8.    Southern Maine
        5.8.1. York County                                   283
                5.8.1.1.  Kennebunkport/Cape Porpoise        285

5.9.    Lower Mid-Coast Maine                                291
        5.9.1. Lincoln County                                294
                5.9.1.1.  South Bristol                      296
                5.9.1.2.  Boothbay Harbor                    302

        5.9.2. Sagadahoc County                              309
                5.9.2.1.  Georgetown                         312
                5.9.2.2.  Phippsburg                         314

        5.9.3. Cumberland County                             316
                5.9.3.1.  Portland                           318
                5.9.3.2.  Harpswell                          330

5.10.   Upper Mid-Coast Maine                                339
        5.10.1. Hancock County                               341
                5.10.1.1.  Stonington/Deer Isle             342

        5.10.2. Waldo County                                 354

5.10.3.  Knox County                                             356
        5.10.3.1.  Rockland                                      357
        5.10.3.2.  Vinalhaven                                    367

5.11.   Downeast Maine                                           373
        5.11.1.  Washington County                               376
                5.11.1.1.  Beals Island and Jonesport            377
                5.11.1.2.  Cutler                                386
                5.11.1.3.  Eastport                              391
                5.11.1.4.  Lubec                                 397

6.0   Summary
      6.1.    Defining community                                 403
              6.1.1.  Themes                                      404
              6.1.2.  Sub-region summaries                        408

7.0   Conclusions and Recommendations                            415

8.0   Literature                                                 417

## 1. Introduction

The research upon which this report is based had two objectives, to identify fishing communities in the New England region and more specifically, to assess the fishing-dependency of these communities.  The communities of interest are those whose fishing fleets work in the exclusive economic zone (EEZ) under the jurisdiction of New England Fisheries Management Council.[1] Despite almost 25 years of regional fisheries management, New England's fishing communities are facing economic and social uncertainty due to declines in a number of fish species and the resulting management efforts to rebuild those stocks.

Information about the impact of regulatory change on communities has been constrained by a dearth of long-term, systematic studies of fisheries dependent communities in New England.  Shortly after the New England Fisheries Management Council was established in 1976 by the Magnuson Fishery Conservation and Management Act  (the Magnuson Act), a flurry of useful studies were published. Some attempted to characterize New England's fishing industry[2] or a limited number of ports[3].  Later reports focused on the economy[4] or attempted to measure the social impacts of specific management regulations.[5] Nowhere, however, was there a database of consistently gathered information about fishing dependent communities (FDCs) in the region.

While some of the recent studies have given managers and social scientists an improved understanding of the impact of regulatory changes on individual communities, neither their cumulative impacts nor the reverberation of impacts across communities and regions coincident with regulatory change have been assessed.  In order to begin to monitor these dynamic and complex consequences of change, consistent data-collection over time is needed.

This MARFIN-funded study is an attempt to lay the groundwork for regional and community data sharing among fishery managers, policy makers, and fishing industry participants and communities. This study of the social and cultural parameters of the fisheries is complemented by an economic model (based on IMPLAN) being developed at Woods Hole Oceanographic Institution.  Future in-depth or more specific analyses of the human aspects of fisheries issues in New England will benefit from the baseline drawn by these two studies.

The Magnuson-Stevens Fishery Conservation and Management Act  (SEC. 303 (a) (2))[6] requires fishery management plans to:  "contain a description of the fishery, including, but not limited to, the number of vessels involved, the type and quantity of fishing gear used, the species of fish involved and their location, the cost likely to be incurred in management, actual and potential revenues from the fishery, any recreational interest in the fishery, and the nature and extent of foreign fishing and Indian treaty fishing rights, if any. . . "

---

[1] The portion of the EEZ controlled by the New England Fishery Management Council lies off of the states of Connecticut, Rhode Island, Massachusetts, New Hampshire and Maine.
[2] Smith and Peterson 1977, 1979; Peterson and Smith 1981; Acheson et al 1980;Danowski 1980; Dewar 1983; Gatewood & McCay 1988; Gersuny, Poggie &Marshall 1976; Ladner et al 1981; Penrose 1981
[3] Acheson ed. 1980; McConnell and Smith 1979; Poggie and Pollnac 1980; Dewar et al 1978; Husing 1980; McCay 1980; 1989; Miller and Van Maanen 1979
[4] Doeringer, Moss and Terkla 1986; Fox and Lesser 1981; Holmsen 1976
[5] Hall-Arber (1993); Griffith and Dyer (1996); Dyer, Poggie and Hall-Arber (1998)
[6] 16 U.S.C. 1853

2                                    Introduction and Theory

In addition, plans must "(9) include a fishery impact statement for the plan or amendment (in the case of a plan or amendment thereto submitted to or prepared by the Secretary after October 1, 1990) which shall assess, specify, and describe the likely effects, if any, of the conservation and management measures on—-(A) participants in the fisheries and fishing communities affected by the plan or amendment. . ."

Discretionary provisions of the management plans include permission to establish a "limited access system for the fishery in order to achieve optimum yield. . ." If this is done, however, "the Council and the Secretary take into account-- (A) present participation in the fishery, (B) historical fishing practices in, and dependence on, the fishery, (C) the economics of the fishery,  (D) the capability of fishing vessels used in the fishery to engage in other fisheries, (E) the cultural and social framework relevant to the fishery and any affected fishing communities, and (F) any other relevant considerations". . .

When the Magnuson-Stevens Fishery Conservation and Management Act was amended in 1996 by the Sustainable Fisheries Act, a number of standards were identified as requisite for fishery management plans.  Among them, National Standard 8 dictates "Conservation and management measures shall, consistent with the conservation requirements of this Act (including the prevention of overfishing and rebuilding of overfished stocks), take into account the importance of fishery resources to fishing communities in order to (A) provide for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities."[7]

In its section on definitions, the Act defines the term "fishing community" as "a community which is substantially dependent on or substantially engaged in the harvest or processing of fishery resources to meet social and economic needs, and includes fishing vessel owners, operators, and crew and United States fish processors that are based in such a community."[8]

Thus, the fishing community is defined as a "place" and the legislation requires that the impact of regulations on fishing communities be analyzed.  The question then arises, how should the boundaries of that "place" be drawn and its dependency measured?  Does the whole setting have to be included in the measure or can a "fishing community" be abstracted from the whole and its dependency quantified?  Furthermore, is the focus on dependency the only critical assessment to be made or is there another parameter of equal value?  Those of us who are interested in fishing communities know that the answer is critical.  The success or failure of fisheries management may be inextricably bound to notions of "community."  Co-management and community quota systems are two of the most promising steps towards making fisheries sustainable without eliminating a "fishing way of life."  Both require a defined community.

A general absence of social and cultural longitudinal data on fishing communities in the U.S. has led to an effort to fulfill the requisite of National Standard 8 through simple economic assessment.  Unfortunately, such an approach is inadequate, and maybe even harmful, when applied to specific cases.[9]  Measurement of fishing dependence must include a complex of features that takes into account fishing history, infrastructure, specialization, social institutions and gentrification trends, in addition to economic characteristics. Most importantly, fishing communities must not be viewed as economic isolates but as contributing partners in regional networks of total capital flows and transformations associated with Natural Resource Regions.[10]

While the three principal investigators collaborated on each portion of the project, each of us took the lead in a particular approach to identifying fishing communities and ranking their fishing dependency.  Chris Dyer and John Poggie, in collaboration with Dr. James

---

[7] SEC. 301. NATIONAL STANDARDS FOR FISHERY 16 U.S.C. 1851 http://www.nmfs.noaa.gov/sfa/
[8] SEC. 3. DEFINITIONS 16 U.S.C. 1802
http://www.nmfs.noaa.gov/sfa/
[9] E.g., the spiny dogfish fishery.
[10] Dyer and Poggie (2000)

McNally of the University of Michigan, were responsible for the theoretical context based on a regional consideration of fishing-related employment.  John Poggie formulated the approaches that measure the complexity of the fishing infrastructure and the degree of gentrification of specific communities.  Madeleine Hall-Arber was principally responsible for the port profile approach that provides a more detailed consideration of individual ports, revealing patterns of contacts, characteristics of the community's culture and institutions, and some perspective on local residents' views about their way of life and about fisheries management.  All of the principal investigators interviewed key respondents and wrote portions of the profiles.  In addition, Renee Gagne wrote the profile of Chatham, Massachusetts.

These three methods, along with economic analyses, offer a way to approach a comprehensive analysis of human ecosystem dynamics in coastal regions. Ultimately, our goal is to take fisheries management development one step closer to the incorporation of knowledge about the whole "resource system from the resource base to the fishermen,[11] their families and communities, and the broader networks of policy distribution, and consumption of which they are also a part."[12]

We propose that the regional theory and method outlined here reflect the reality of contemporary coastal communities having a fishing component in their economies.  Furthermore, we suggest that this method be tested in other regions to determine if it should be accepted as the standard for the analysis of the fishing industry and fishing-dependent communities nationwide in fulfillment of the requisite associated with National Standard 8.

While we present this publication as an important step toward understanding fishing communities in New England, we do so with the caveat that we are aware of three major lacunae.  The first is that our dependency measures do not incorporate comparative economic data. Since the dependency of a community on particular resources is necessarily affected by the value of those resources, the economic profiles are requisite for a more complete profile.  Likewise, the second insufficiently covered pertinent aspect is history.  While each community profile incorporates a small historical sketch, these sketches hardly do justice to the rich, complicated history of fishing in New England and so provide only the barest context for what exists today. Finally, because the Census numbers are based in part on samples, they seem to undercount the numbers of individuals involved in the fishing industry.[13]  Nevertheless, when the regions are compared using the indices based on Census data, the relative dependency of communities on the fishing industry seems to be fairly accurately indicated.  Even so, we caution that the indices should not be relied upon for absolute numbers.  The ultimate dependency of the communities must also be weighed according to the infrastructure differentiation, gentrification scale, analysis of total capital flow and, importantly, according to the perspective of community stakeholders as described in the profiles.

---

[11] Both men and women who fish in New England seem to prefer to be referred to as fishermen rather than the academically-popular term 'fisher."  The term fisherman is used in this study as though gender-neutral.
[12] Durrenberger and King (2000)
[13]  Another difficulty in using Census data that is easily accessible (via the Internet, for example), is that the area being referred to is not always clear.  Many of the fishing communities are "CPD" (Census Designated Place)— "a statistical area defined for a census as a densely settled concentration of population that is not incorporated but which resembles an incorporated place in that it can be identified with a name." Or they are a subdivision of a county.  Other Census data is based on school districts.

4                                    Introduction and Theory

## 2.    Conceptual Framework

### 2.1.    A Regional Ecosystem Approach

The conceptual framework for this report is based on a regional approach that has its foundation in ecosystem modeling.  Internationally, the ecosystem paradigm is emerging as a dominant approach to large-scale management of natural resources.  For example, resource managers and social scientists concerned with the degradation of the worlds' seas suggest focusing on large ecosystems as a way to recover ecosystem health and make the utilization of renewable resources sustainable.  Emergence of this paradigm has also been spurred by the failure of single species approach to management. Yet, theoretical and applied paradigms linking human systems and large-scale ecosystems are undeveloped.

Some fundamental issues that *are* being addressed include the spatial and temporal scales of governance and policy-making arrangements that structure the institutional linkages between marine ecosystems and their governance. However, the dynamic between regional natural systems and human actions at the individual, household and community level is generally not included in ecosystem modeling and praxis. Given the worldwide state of decline in ecosystem health, there is an urgent need for marine policy bodies to develop and apply conceptual-theoretical models of human action that complement the large-scale ecosystem approach.

This report examines fishing-dependent communities in a regional context. We use a community and regional (large-scale) approach to the analysis of the New England fisheries in a way that complements Sherman et al.'s work on Large Marine Ecosystems (LMEs). LMEs are geographic areas of oceans that have distinct bathymetry, hydrography, productivity, and trophically dependent populations. The LME approach attempts to link the management of drainage basins and coastal areas with continental shelves and dominant coastal currents.  Our report provides a framework for monitoring and assessing socio-economics and governance of the associated Natural Resource Regions (NRR) of the US Northeast Shelf LME.   The Natural Resource Regions are defined through identification of networks of communities acting as nodes of regional total capital flow.  Communities are not viewed in isolation, but are defined internally through social, ethnic, and historical ties and externally through networks of regional and extra- regional total capital flow.

### 2.2.    Space and Place in Human Ecosystems

Although not conceptually linked to large-scale marine systems, the study of uses of space and place, including degradation by human action, is receiving some renewed attention from social scientists.[14] These studies contribute much to our understanding of how people perceive their connection to place. Yet most efforts to understand induced changes in environment suffer from a parochialism of scale. At the extreme are interpretations of human-environment interactions that take a person-centered (ego centered) approach to place as modified through human action.[15]  By emphasizing localized, individual or community-level outcomes, yet ignoring potential impacts and connections to regional and extra-regional factors, researchers can miss much of what determines the ultimate direction and magnitude of human-induced environmental change. While providing valuable insights into the localized interpretation and use of space and place, such foci also miss the connection of humans, communities, and the places they occupy as well as change as a *regional process,* dominated by human behavioral and value systems interfaced with environment.

---

[14] Aihoshi and Rodman (1992); Auge (1995); Basso (1988); Hirsch and O'Hanlon (1991); Kahn (1990); Munn (1990); Myers (1991); Pandya (1990); Parmentier (1987); Stewart (1988); Wassman (1991); Weiner (1991); Feld and Basso (1996)
[15] Berdoulay (1989); Entrikin (1989); Nir (1991); Shields (1991); Tauan (1991); Yoon (1986)

The political ecology of change does provide us with some parallels to a regional human-environment approach. For example, Giblin describes how the 19th century politics of environmental control created famine for farmers in Northeast Tanzania.[16] In this case, the ability of farming communities to control disastrous cattle infections and subsequent starvation depended on how external forces affected patronage and redistributed wealth. The most important relations of production were between patron and client, so the policy of patronage determined whether pre-colonial farmers succeeded in controlling disease, accumulating livestock and food reserves, and preventing drought from causing famine.

Adaptation to disruptive events within social systems has also been explored. For events such as cyclic ecological problems of drought, earthquakes, or floods, many societies are noted to possess adaptive flexibility, also described as "equilibration."[17] Equilibration is adjustment to changed environmental conditions in the face of new socio-technological exigencies, and is well documented in the ethnographic literature.[18] However, no parallel models of regional change exist to guide governance of marine natural resources. Modeling of natural resource management in fisheries has been dominated by biologists using, for example, such tools as the Schaefer-Gordon curve in fisheries management, with collaborating contributions from economists.  A lack of a regional perspective that includes social and cultural aspects of human action makes such bio-economic models inadequate as vehicles for the thorough understanding of human transformations of natural resources.

Moreover, with the recent exception of economic modeling, input of social scientists to natural resource models has historically been trivialized by policy and management bodies. For example, the standard requirement for social science assessment of U. S. fisheries management stipulates use of the "best available information."  Unfortunately, due in part to the lack of longitudinal studies and/or consistent data collection and analysis, the "best available" often consists of collected anecdotal opinions from public hearings as well as out-of-context and dated information applied from one fishery to another.  Furthermore, what information is available is often reviewed in a very hurried and reactive manner.

Social science data often fall into the category of add-ons to dominant biophysical or bio-economic models, which leave little room for human thought and action, and give even less consideration to the human consequences of resource management schemes.[19] Yet, the very nature of the critical resource transformations that are the target of management are founded in human perceptions and actions. It is not surprising that resource managers are not aware of the powerful influence of most non-bioeconomic factors in resource transformations, as their policy mandates are frequently swayed by participation in specialized intellectual environments that are inflexible in their consideration of new forms of interpretation.[20] Social scientists too are partly to blame, as resource managers have not been provided the necessary 'human' models to manage such human actions at the same regional scale in which they strive to deal with ecosystem transformations. The consequences of this shortcoming are potentially severe, and can include the collapse and degradation of the resource base despite the best intentions to manage it. One of the intents of this chapter is to help rectify this situation.

A remarkable pioneer formulation of a regional human resource model is Bennet's study of adaptive strategies of social groups of the Canadian Great Plains.[21] Bennet describes how his regional approach differs from prior intellectual traditions: "In defining an approach for this study we had available the following academic research traditions: human or cultural geography, with its descriptive emphasis on cultural-environmental correlation; economic development, with its concern for the ways agrarian populations use resources to forge a

[16] Giblin (1992)
[17] Torry (1978)
[18] Zaman (1991); Dirks (1980); Waddell (1976); Brookfield and Brown (1967); Spencer (1959)
[19] Poggie ( ); Dyer (1994)
[20] Ward and Weeks (1994)
[21] Bennet (1969)

viable economy; or cultural ecology, with its emphasis on the important role played by economic and technological adaptations in shaping institutions. None of these approaches by itself seemed to provide a suitable format for the synthesis of a large quantity of data from a particular geographical and human region."[22]

Bennet chose a regional approach over a community-based one in part because the complexity of resource flows of the Great Plains setting demanded it: "We selected a regional instead of the usual nucleated community studied by anthropologists and sociologists because of the way human activities are distributed in the Great Plains. Since resources are unevenly distributed, people who depend entirely on livestock production will occupy different portions of the region than those who depend on grain crops. Indians are confined to marginal "bush" areas of the hills. Some towns will have many services, others are highly specialized."[23]

Another early precursor to our model is the work of Pelto and Poggie in which they outline the utility of regional approaches to the understanding of processes of culture change. "The community approach used in anthropological studies produces rich and detailed descriptions of how rapid social and cultural changes have transformed the lives of individuals and local groups. On the other hand, such studies often depict local developments without sufficient attention to the ways in which the local community is articulated to the larger regional and national socioeconomic and political systems. Moreover, anthropologists frequently have placed heaviest emphasis on the unusual and different—the exceptional cases of modernization, good and bad. Thus it is not clear how these studies can be built into a more generalized theoretical framework."[24]

## 2.3.    The Natural Resource Region

We propose a regional model for New England to understand human-environmental interactions as shaped and transformed by various forms of capital in their interface with large-scale marine ecosystems. This approach builds on Bennet's and Pelto and Poggie's work, but differs in that it defines regions through a network of communities acting as nodes of regional total capital flow.  Communities are not viewed in isolation, but are defined internally through social, ethnic, and historical ties and externally through networks of regional and extra- regional total capital flow.

Capital—tangible or intangible resources that contribute to the long-term adaptation of a person, group, or population—is used here in the broadest sense to include human, social, cultural, biophysical, and economic transformations and exchanges, which we refer to as 'flows.'  An empirical question in regional studies is the extension of 'capital' beyond the economic. In some cases, economic capital may predominate as the most significant driver in a community and regional system. In most cases, we suspect other forms or combinations of capital forms (social, human, cultural, and economic) may predominate, with economic capital being one of a complex mix with others. The patterns and importance of various combinations of capital flow must be ascertained by empirical research and not assumed to be the same everywhere.

Economic capital is conceived to include more than monetary resources, but involves formal and informal exchanges of goods and services, with the primary source derived through production and transformation of biophysical capital (e.g. marine resources). For example, groundfishing in Downeast Maine traditionally includes exchange of labor (human capital—helping offload fish) and information (cultural capital—letting folks know where the fish are) among community residents without any formal monetary exchanges.[25] Such reciprocity results in the flow of long-term sustainable benefits that carry much more than narrowly conceived economic value.

---

[22] Ibid, p. 26
[23] Ibid, p. 27
[24] Pelto and Poggie (1974), p. 114
[25] Griffith and Dyer (1996)

Elsewhere, in a community-based assessment of the Native response to the Alaska Native Claims Act (ANCSA), Berger found overwhelming rejection by Alaska Natives of proposed economic incorporation.[26] Incorporation meant dividing up the natural resources (land, minerals, trees) into corporate stock, from which the corporations were to benefit. Berger demonstrated that the social and cultural capital associated with the Native subsistence way of life and resources were considered to be of much greater importance (value) to Native communities than any economic capital to be accrued through incorporation of Native lands and communities.

Since Berger's work, virtually all the Native corporations under ANCSA are bankrupt. Outside investors with no stake in maintaining the social and cultural capital of native Alaskan communities have been purchasing land and associated resources since a 1992 ANCSA sunset clause on stockholder control. Subsequent social problems and community decline in these Native populations confirms Berger's assessment that the natural resources possessed greater long-term social and cultural value in sustaining Alaska Native communities and their nature-focused life-ways than what was derived as short-term economic gain for corporate (community) stockholders.

Besides recognizing the importance of capital in all its forms, we propose that marine resource policy and management can benefit from a regional approach. We argue that by taking an isolated community, overall statistical, or individual perspective on place-space transformations, social scientists have misinterpreted cause and effect, seeing only disconnected pieces of what are actually wider processes of a regional and extra-regional dynamic of human-environment interaction.

There may, in fact, be inter-cultural diversity, communities may vary and there may be differently linked networks in the same region, but these are empirical questions that must be addressed in each specific NRR studied. Our focus is on networks of communities linked to *marine resource utilization*. Other regional use networks focused on such enterprises as agriculture, the service industry, manufacturing, and tourism necessarily overlap and integrate with the marine resource networks.

Variation in levels of capital exchange in marine-resource dependent regions reflects a continuum of community isolation and integration of capital flows. More isolated maritime communities are often economically marginal, have limited control over regional natural resources, are frequently culturally or ethnically distinct and geographically distant from more structurally differentiated communities in a region.[27] More integrated maritime communities are economically tied to regional networks; can represent a complex mix of ethnicity and cultural practices; and are less distinctive from and geographically closer to other such communities.[28]

The regional model proposed here, the Natural Resource Region (NRR) unifies elements of human actions and values to allow for interpretation and application of human factors by natural resource managers working within the framework of Large Marine Ecosystems (LMEs).[29] The LME model outlines five linked modules to assess ecosystem sustainability: productivity of the ecosystem, fish and fisheries, pollution and ecosystem health, socioeconomic conditions, and governance.[30] Modules of governance and socio-economics are at present undeveloped for LMEs.

The NRR is focused on the 'socioeconomic' module, but takes a much broader perspective in that it expands 'socio-economics' to include social, cultural, human, economic and biophysical capital and their dynamic interactions. In the interface with LMEs, primary

---

[26] Berger (1985)
[27] Dyer and Leard (1994)
[28] Griffith and Dyer (1996)
[29] Sherman et al (1998); Sherman et al (1993); Sherman et al (1992); Sherman et al (1990)
[30] Ibid

units of human-environment interaction—individuals, families, or communities—are to be viewed as interconnected within regional networks held together by forms of capital. The community as a nodal form of human organization helps structure regional interactions and capital flows. In aggregate, communities provide for points of spatial reference by which to study the LME/NRR dynamic. We begin detailed discussion of the model with the building blocks of NRRs—Natural Resource Communities (NRCs).[31]

## 2.4.    The Natural Resource Community as a Regional Base Unit

In a collection of case studies on folk management in fisheries around the world, Dyer and McGoodwin draw upon the concept of the Natural Resource Community (NRC) to characterize fishing communities worldwide.[32] The NRC is a social unit anchored in local history and local understandings of ecological relationships, consisting of "...a population of individuals living within a bounded area whose primary cultural existence is based on the utilization of renewable natural resources."[33] Residents of fishery-based Natural Resource Communities tend to hold in common a localized worldview, and locally developed assertions about how to best manage local natural resources. As such, NRCs can come in conflict with management regimes that impose external controls without acknowledging local interests, as often occurs in developed fisheries regimes.[34]

Although fishermen interact, often quite regularly, with individuals and institutions who have few or no ties to fishing, "where they [fishermen] live and work is still a localized, specific place, and quite often they perceive that they take their catches from a specific, bounded, marine ecosystem, which from their perspective has unique systemic attributes."[35] Thus, the NRC model provides a useful spatial context upon which to begin the study of regional and extra-regional ecosystem dynamics.

Nevertheless, unlike the original conceptualization of the NRC, which describes communities as spatially 'bounded,' most contemporary fishing NRCs are not isolated from national governance nor from the commercial and other institutions of the cities, towns and villages which share their region. Also, residents in marine-dependent communities do not perceive the ecosystems upon which they depend as closed systems. Moreover, extra-regional influences such as global market systems can dominate or even destroy regional networks and the communities they comprise. For example, in the late 19th century, the marine fisheries of Maine were tied into a three-way trade of sugar cane, dried fish, and salt with Europe and the Caribbean.[36] When the external demand for dried cod collapsed, the offshore marine fishery also collapsed, resulting in significant social, cultural and economic decline in the coastal Maine NRR.

Gallaher and Padfield, in their theory of the 'dying community', describe such declines as including (1) abandonment of a natural region, (2) decay of a sociocultural system or civilization and (3) extinction of a particular form of association.[37] Their 'form of association' is synonymous with the totality of interdependent relationships—or total capital—that define a community. Furthermore, the social and cultural fabric of *individual communities* is interwoven through a series of regional exchanges—economic, ritual, and otherwise. These exchanges define the degree of community dependence on the marine environment, and can be linked to varying regional and extra-regional influences of the marketplace, changing environments (e.g. sea level rise), governance, and extraction technologies and their associated innovations (e.g. nylon versus cotton nets).[38]

---

[31] Dyer, Gill and Picou (1992)
[32] Dyer and McGoodwin (1994)
[33] Dyer, Picou and Gill (1992)
[34] McGoodwin (1990)
[35] Dyer and McGoodwin (1994)
[36] O'Leary (1966); Gallaher and Padfield (1980)
[37] Gallaher and Padfield (1980), p.20
[38] Firth (1946)

Dyer and Griffith isolated five variables that help identify community dependence on a fishery.[39] These are relative isolation or integration of fishery-dependent people into alternative economic sectors; vessel types/ gear strategies within the port's fishery; degree of regional specialization; percentage of population involved in fishery or fishery-related industries; and competition and conflict within the port among different components of the fishery.

While each of these components is considered in the profiles that follow, our analyses combine them in different ways.  For example, the indices based on occupational categories combines the variable of relative isolation or integration into alternative economic sectors with the variable concerning the percentage of population involved in fishery-related industries.  The profiles also describe vessel and gear types, specialization and to some extent, the competition within ports.

Clearly, the components of community dependence on fishing define the social, economic and cultural relationships between fishermen and their communities.  Benefits that flow from these relationships are multiplied through a series of networked community exchanges and transformations based on different forms of capital. Understanding the various forms of capital and their relationships provides the basis for our regional model.

## 2.5.    Forms of Capital

Complementary forms of capital and their interactions allow for the production and reproduction of systems of marine resource utilization such as fisheries. Social, cultural, human, biophysical and economic capital maintain production units such as households and fishing crews and over time allow for recruitment of new community members into the occupational hierarchies of the fishery.

### Social capital

The concept of *social capital*—the configuration and functions of people's personal ties—was explicitly articulated by the late James Coleman but earlier versions have appeared in sociological and anthropological theory.[40] Drawing on several works in sociology and anthropology that demonstrate ways in which social ties influence and organize economic behavior, Coleman arrives at a definition of social capital that returns to his central themes of behavior as the product of self-interest and control: "Social capital is defined by its function.  It is not a single entity, but a variety of different entities having two characteristics in common: They consist of some aspect of a social structure, and they facilitate certain actions of individuals who are within the structure.  Like other forms of capital, social capital is productive, making possible the achievement of certain ends that would not be attainable in its absence.  Like physical capital and human capital, social capital is not completely fungible, but is fungible with respect to certain activities.  A given form of social capital that is valuable in facilitating certain actions may be useless or even harmful for others.  Unlike other forms of capital, social capital inherits the structure of relations between persons and among persons.  It is lodged neither in individuals nor in physical implements of production."[41]

In Coleman's sense, social capital enables individuals with reduced or no access to investment capital to accumulate the symbolic and material means to participate successfully in an economic activity such as fishing.  Social capital depends, however, on the social field in which people give and receive jobs, information, low-interest or no-interest loans, gifts, and so forth.  It is that social field which gives social capital life, transcending the individual without leaving her or him out of the equation, "...both accounting for different outcomes at the level of individual actors and making the micro-to-

---

[39] Griffith and Dyer (1996)
[40] Colman (1990, 1988); Coase (1960)
[41] Colman (1990)

macro transition without elaborating the social structural details through which this occurs."[42]

The social relations that engender social capital also assure its circulation through the group and its continual replenishment and reproduction.  Drawing on social capital carries with it the obligation to replenish the fund, depending on trust, expectation, normative values, cultural rules, etc., and some means—authority, shame, gossip, force—to enforce the obligation.  In the context of the regional resource model proposed here, we define social capital as the configuration and functioning of social ties that occur within and between communities. Social capital is key to the flow of other forms of capital, as well as central to the dynamics of governance and resource utilization.

### Human and cultural capital

Closely related to social capital is human and cultural capital, which are key to understanding fishery dependence.  These forms of capital are similar to social capital in that they depend on social ties that have meaning for the individuals who benefit from them.  Human capital includes people and their individual occupational and familial roles, achieved through schooling, apprenticeship, experience, and other formal and informal training.  This concept is better known among economists than either social or cultural capital, and is recognized by the general public (including potential employers) as something, if not entirely tangible, certainly useful.

Cultural capital is less familiar to and less widely recognized by the general public.  Nevertheless, most potential employers inadvertently consider cultural capital in selecting employees. Cultural capital consists of specific behaviors, values, and skills transmitted among and between members of a population, including across generations, applied to their adaptation to specific environments including the transformation and utilization of natural, human, and social resources in those environments.

Cultural capital can be either subtle or overt characteristics and learned skills and behavior.  The use of language and slang, notions of personal space, appropriate dress, presentation and learned use of specific technologies is part of a group's cultural capital.  In addition, the myriad parts of personal cultures, such as personal preferences that make one more or less satisfied, comfortable and, most importantly, predictable to be around are part of cultural capital.  People acquire cultural capital through families, peer groups, neighborhoods, special cultural centers such as bars or exclusive college campuses, churches or other voluntary associations.

### Function of social, human and cultural capital

Berkes and Folke define cultural capital as "factors that provide human societies with the means and adaptations to deal with the natural environment."[43]  We extend the adaptive character in our formulation to include human, social, and economic capital variations and their interactions.  If these interactions are disrupted or modified in a way that significantly reduces utilized marine resources, they may be modified to allow the system to recover, or if the disruption is too great, systematic collapse may take place.

It is assumed that the sociocultural evolution of specific adaptive strategies and occupations in a natural system such as a fishery can involve considerable individual and intergenerational investment to develop appropriate social, cultural and human capital networks necessary for the cultural and biological production and reproduction of households and families. This also entails long-term investment in gaining and applying knowledge necessary to compete for marine resources. As long as a healthy fishery exists - one that continues to promote the generation, mobilization, and use of the various forms of

---

[42] Ibid, p. 305
[43] Berkes and Folke (1994)

capital - current individuals operating within the industry will be able to weather economic and ecological downturns and reproduce the fishery through adaptive shifts in resource utilization patterns.

Understanding the interplay of social, human, cultural, capital with economic and biophysical capital has rarely been attempted. In their discussion of the share systems that characterize payments to labor and capital in the New England groundfishing industry, Doeringer, Moss, and Terkla recognize the importance of these alternative forms of capital without explicitly defining them as we have.[44]

Like the communities that make them up, Natural Resource Regions can be variably 'open' or 'closed' depending on the dynamic flow of biophysical, cultural, and human capital. A fishery can also be the sole socioeconomic entity in a region or it may be embedded in a more complex socioeconomic whole, as is the case in New England.[45] We propose that NRRs are interconnected by the flow of total capital – information, ideas, people and their behavior, technology, money, resources and seasonal and annual changes in fishing strategies.

A fundamental premise of the regional model is that use of natural resources for one's primary livelihood engenders relationships of dependence between the extractors (e.g. fishermen) and their support networks. Significant changes in access to fisheries resources thus has a multiplier effect across these personal networks that affects all levels of the social structure, including communities, businesses, organizations, families and individuals. These networks are both formal and informal, and fluctuate with changes in participants and communities within the region. Dependence on renewable natural resources such as fisheries presents an opportunity, but also limits the degree to which participants can engage in alternate activities. As one fishery-dependent informant in Downeast Maine puts it: "…when I first went inland 10 or 12 miles from the coast and I looked around, I asked myself, how can these people possibly make a living?"

## 2.6.    Total capital and the NRR

The direction of life activities towards natural resource extraction enlists various forms of capital—human, cultural, economic, and social, that when interfaced with the biophysical resources of the adjacent marine environment define the character of the region in which communities interact. The forms of capital which make up this dynamic in their whole are the total capital of the regional human ecosystem or NRR.[46]

Components of total capital are the same as those for NRCs with the addition of marine biophysical capital. Total capital is conceptually defined as the sum of all the component units of capital and their interactive states within a region. The interface between a regional natural system of extractive NRCs, their capital flows and the associated LME is here defined as a Natural Resource Region (NRR). An NRR is conceptualized as  a network of Natural Resource Communities, linked to the marine resources of a Large Marine Ecosystem, whose existence is defined by the interactive flow of total capital.   The context of this conceptualization may have a marine and fisheries focus depending upon its linkage to LMEs. The 'marine' NRR overlaps with the LME in both the terrestrial and marine sectors. For example, a fishing boat out at sea is a production-extraction unit of the NRR, relying directly on the physical attributes of the ocean to tap into the biological productivity of the fisheries of the LME (the NRR's biophysical capital). The fishing boat is thus an extension of the NRC from which it came, carrying with it social, cultural, and human and economic capital in its hunt for fish resources.

---

[44] Doeringer, Moss and Terkla (1986)
[45] Doeringer, Moss and Terkla (1986)
[46] Dyer and Poggie (1998)

Non-marine manifestations of large ecosystems, such as the Great Plains or the Amazon River Basin, have their own NRC networks and capital flows, and thus also represent NRRs. Linkages to biophysical capital can be dominated by economic, cultural, or social capital, but most commonly in a NRR is a complex mix of these—comprising what is often described in fishery-dependent NRCs as a "way of life." The conceptualization of capital flows within an NRR network lends understanding to the occupational valuation placed on a "way of life." For example, Doeringer, Moss and Terkla show how kinship support systems—a form of social capital in our formulation—allow fishermen to maintain labor linkages to the fishing industry despite seemingly debilitating economic conditions. [47]

The Natural Resource Region model provides a spatial-temporal framework that links the biophysical with the human-ecological, and most importantly points the way to understanding system dynamics over space-time as forms of total capital flow in the system. The interaction between human, cultural, social, biophysical, and economic forms of capital in an NRR represents a continuous dynamic that changes over time and is subject to both internal and external influences. The NRR model provides managers with a powerful tool to help to anticipate the consequences of proposed policies and human-resource interactions arising as direct and indirect consequences of policies, often so lacking in attempts to 'manage' the environment.

## 2.7.    Externalities to the NRR

Regional studies of human ecological processes help make possible systematic examination of the range of variation within particular political-ecological zones rather than depending on single fishery-dependent communities as type cases. The externalities presented for each capital form are idealized, non-exhaustive lists, and for any specific case must be empirically studied to ascertain the contemporary political ecology and environmental history of the NRR under consideration. Local inventions would not be considered externalities in that they would be part of the dynamic component of cultural capital.

**Externalities**
As an externality, *technology* refers to the means by which resources are extracted and transformed for human use, and is most frequently developed in extra-regional locations and "imported" into NRRs under study.  *Governance* is an externality that identifies the form and function of decision-making bodies, including the nature of policies and how resource policies are implemented.  *Markets* refer to the linkages of the producers in any particular NRR with buyers in other NRRs and/or with extra-national entities such as global markets (e.g., what Jentoft refers to as the "global fishing village" or Greider the "global capitalist system").[48]  *Environment* as a regional externality refers to processes and consequences of changes such as global climate, ecosystem-wide shifts in temperature regimes, or sea level rise associated with anthropogenic factors of pollution (e.g. the greenhouse effect), or as part of other large-scale cycles of natural changes.

**Population**
Population as an externality refers to the pressure of migration into coastal NRRs. Throughout the developing world, the coastal zone represents one of the last refuges for the impoverished and dispossessed.  Coastal regions of Southeast Asia are under pressure from landless immigrants seeking new resources, or from those moving from one environmentally degraded coastal area to another that still supports viable marine-based communities. In the developed world, coastal areas attract economic entrepreneurs, the elite, and others desiring the recreational-cultural capital offered by life near the sea.

Different forms of capital are equally weighted in our ideal model to avoid *a priori* valuing or devaluing any specific criteria at the expense of others. This does not mean their

---

[47] Doeringer, Moss and Terkla (1986)
[48] Jentoft (1995); Greider (1996)

importance cannot differ across NRRs, as they clearly do. Such differentiation is guided by the nature of associated LMEs, and the ethnohistory and political ecology of associated human communities and their governance aggregates (e.g. states, counties). The operationalization and empirical measurement of these domains of capital and associated changes in externalities are currently being developed by the co-authors in field research in two diverse parts of the world—New England in the US, and Palawan in the Philippines.

Once assessment of total capital is completed, measured capital importance is ranked and compared. With this information, it is possible to anticipate the magnitude and direction of policy agendas (a governance externality) on the total capital flows of the NRR in question. This gives decision-makers the capacity to determine the most favorable policy options to apply in a specific Natural Resource Region in order to maximize desired management goals and minimize negative outcomes. This analysis considers the assessment of 'total capital value' to include *direct value* (derived goods and services), *indirect values* (e.g. ecosystem and NRC maintenance), *option values* (future potential uses), and *existence values* (derived from some esthetic appreciation of biophysical capital). An example of existence value derives from the knowledge of the continued existence of some marine species, whether personally observed or not.[49]

## 2.8.    *Flows and Changes in Total Capital*

Natural Resource Regions have been described here as consisting of networks of Natural Resource Communities, held together by the flow of total capital. These networks include communities directly interfaced with the biophysical capital and communities on the interior margin, connected by roads or by waterways to the marine environment.  To understand the interactive flows of the different forms of capital, we must examine the conditions under which residents of Natural Resource Communities operate within the system. A basic assumption here is that there is some degree of reliance on natural resources, in this case, the biophysical capital of a Large Marine Ecosystem. The concept of biophysical capital used here is similar to "natural capital," first introduced by Vogt.[50]

The occupational roles involved in biophysical capital extraction define NRC residents as extensions of their environment.[51] However, this does not mean that such systems are static and unchanging. NRRs are constantly in flux, in rhythm with the changing availability of biophysical capital to residents. For example, a downward trend in the availability of one targeted fish species, for whatever reason, is often associated with shifting effort towards other species by fishing units.[52] Innovation and invention in resource extraction can also shift the balance of resource availability, at times favoring one group over another, or at times resulting in the total collapse of exploited fishery stocks.  Also, seasonal shifts in effort from one species to another are often practiced in NRRs. Pelagic stocks are supplemented in the off-season with benthic shellfish or crustaceans (e.g., combining lobster fishing with seasonal herring fishing by weirs in the eastern part of the Gulf of Maine sub-LME).

### Response to biophysical capital decline

When environmental factors result in a significant decline in available biophysical capital in an NRR, residents respond in culturally patterned ways. Unfortunately, the dynamic equilibrium in many world NRRs and their associated LMEs is being disrupted beyond normal recovery from intense anthropogenic pressures degrading the ability of environments to recover and ultimately leading to environmental disaster. The identified human-nature relationship that follows disaster in an NRR can be conceptually linked by the ecological-symbolic approach.[53] This approach recognizes the existence of culturally

---

[49] Goulder and Kennedy (1997)
[50] Vogt (1948)
[51] Dyer (1993)
[52] Dyer and McGoodwin (1994)
[53] Kroll-Smith and Couch (1991)

based responses to extreme environmental disruptions. Its basic tenants are: "(1) people exist in exchange relationships with their built, modified, and biophysical environments, and (2) disruptions in the ordered relationship between individuals, groups, and communities, and their built, modified, and natural environments are labeled and responded to as hazards and disasters."[54] Disasters exceed the limits of the system to recover, and reaching such a state through poor policy or management, or failure of a technology externality (e.g. a major coastal oil spill) can permanently damage an NRR to the point of non-recovery.[55]

As a fundament of total capital flow in an NRR, it is assumed that there are limits to the system. Ecological models predict such limits in natural systems, but economic growth models generally do not. The explanatory power of the NRR relies on understanding limits and options presented by the total capital in the system. However, accepting and working within natural limits is antithetical to the economic strategy practiced by the wider capitalist society.[56] This worldview is best portrayed using what Catton and Dunlap call the Dominant Social Paradigm (DSP).[57]

The assumptions of the Dominant Social Paradigm are:
1.  Humans are fundamentally different from all other creatures on earth over which they have domination.
2.  Humans are masters of their destiny; they can choose their goals and learn to do whatever is necessary to achieve them.
3.  The world is vast, and thus provides unlimited opportunities for humans; and
4.  The history of humanity is one of progress, for every problem there is a solution, and thus progress need never cease.

A corollary to DSP is the construct, Economic Man, the idea that everyone acts individualistically to maximize satisfaction of their needs or desires. Hardin's "Tragedy of the Commons," the most commonly quoted rationale for fisheries management, limited access, and privatization, is based on a belief that "Economic Man" will inevitably overuse any property held in common.[58] As a result, the argument continues, common property should be privatized so that self-interest constrains the owner and improves stewardship.

Certainly, there were limits to natural systems. Unlimited access to resources without constraints on manner or means of extraction could lead to system collapse. However, examination of cooperative and co-management systems of fisheries management suggest there are alternatives to privatization. Furthermore, this project suggests that management is more appropriately conceived within the conceptual framework of the Natural Resource Region and the natural resource communities (NRC) of which they are composed.

Characteristics of NRCs that contrast them to the DSP model, and act as a buffer against degradation of the natural resource base are as follows:

1.  Residents of NRCs are strongly linked to their resource base by behavioral and ideational patterns that blend with the natural order.
2.  To the extent that anthropogenic activities may destroy renewable resources, NRC residents frequently attempt to practice local management of resources within their NRR. This allows for sustainable reproduction of total capital in the region.
3.  Because natural resources are utilized and renewed within bounded areas of LMEs, they are viewed as limited and limiting in the variety of opportunities they provide their human stewards.

---

[54] Ibid, p.361
[55] Dyer (in press)
[56] Goulder and Kennedy (1997)
[57] Catton and Dunlap (1980)
[58] Hardin (1968)

4. Progress, as in change towards a DSP model, is resisted to the extent that it threatens the sustainability of the community network and the capital flows that hold it together. [59]

The ideal NRC relies exclusively on renewable natural resources, but most contemporary fishing communities are not 'pure' NRCs. They are instead modified NRCs existing on a continuum of community somewhere between the ideal DSP and NRC types. The character of social capital is a key in distinguishing between a primarily DSP type community and a NRC, with the contrast between DSP social capital and NRC social capital being a central point of conflict.

An example of such conflict is the gentrification process and its impact on coastal fishing communities. [60] As more community space is gentrified for tourist and associated recreational pursuits, the squeeze on the commercial fishing sectors inhibits the maintenance of total capital within the functioning NRR network. There are other less apparent costs as well. Social capital within an NRR is based on kinship and cooperative social ties. This has positive effects on household maintenance and occupational continuity within families. Other benefits include lowering social service costs and maintaining mental and physical health.[61]

Although impersonal social contracts predominate between residents and outside organizations, they are not prominent within the NRC units. Extended networks of family and worker relationships (e.g. fishing crews) allow for intense cooperative interaction in the occupational roles of natural resource extraction. By comparison, a DSP community within the same region relies heavily on social contracts both within and without the community. A social contract can be defined as a voluntary and mutual agreement to engage in purposefully limited cooperative endeavor.[62] Emphasis on "social contract" versus "social relationship" can limit the degree of traditional stewardship expressed toward other capital components (e.g. biophysical capital). We illustrate the NRR model with an analysis of the contemporary Multispecies groundfish fishery of New England.

## 2.9. The New England NRR and the Multispecies Groundfish Fishery

The 1976 Magnuson Fisheries and Conservation Act (re-authorized in 1996 as the Magnuson-Stevens Act), was instituted to protect the marine resources of the United States. It established a 200-mile Exclusive Economic Zone (EEZ) to regulate fisheries in the federal zone. Four years prior to the passage of the Magnuson Act, in an effort to 'revitalize' community-based fisheries, the National Marine Fisheries Service (NMFS) was authorized to provide low-interest loans to build up a domestic fishing fleet.[63] At the time, there were virtually no social scientists advising NMFS on policy and no assessment was made of the potential impact of increasing the economic production capital (boats and gear) of US fisheries communities.[64] This loan program can be conceptualized as a "strong market externality" that artificially increased the available economic capital in the region. We suggest that the loan program was based on a DSP worldview that saw only economic opportunity in the EEZ without consideration of the potential long-term biophysical, social, cultural and human impacts to communities.

In New England, investors quickly took advantage of the loan program (which was open to anyone) and the fishing capacity of domestic fleets increased dramatically. Just about every major East Coast port including Gloucester, Boston, and New Bedford (Massachusetts), Portland and Rockland (Maine), Newport and Point Judith (Rhode Island)

---

[59] Dyer (1993)
[60] Margavio (1992)
[61] Caritas Christi Health Care System (1996)
[62] Hillery (1982)
[63] The Fishing Vessel Obligation Guaranty Program was implemented in 1972 when Congress amended Title XI of the Merchant Marine Act of 1936 at the instigation of both the New England and California congressional delegations (Fricke, P., personal communication, 2002).
[64] McGoodwin (1990)

dramatically built up their fleets with powerful stern trawlers under the Fishing Vessel Obligation Guaranty Program.

Besides the buildup of the large dragger fleet, many small and medium size vessels were built, putting increased fishing pressure on both inshore and offshore stocks. Some of these smaller boast even ventured offshore to such rich areas in the Gulf of Maine and beyond as Cashes Ledge, Franklin Swell, Three Dory Ridge, and Platts Bank.[65] Contributing to the pressure on fishing stocks was the loss of prime areas of Georges Bank under a 1984 United Nations World Court decision. When the Court drew the Hague Line allocating parts of the Gulf of Maine and most of the Georges Bank's productive Northeast peak to the Canadians, fishing effort concentrated on the remaining grounds and accelerated stock declines.

Key respondents in fishing communities claimed that many of those who took advantage of the fishing vessel loan program were newcomers to the fishery.[66] Specifically, they claimed that from 1977-1980 many new vessel owners were outsiders whose primary occupations (e.g., doctor or lawyer) identified them as fishery "investors," not fishermen. As fishery "investors," they had no prior social, cultural, or human capital networks in the local fishing communities, and were thus not bound by the responsibilities and reciprocal exchanges of total capital that marked traditional fishing families, households, and networks. Furthermore, the sustainability and reproduction of the social, cultural, and human capital in the NRC fishing communities occupying the Natural Resource Regions of the New England Fisheries Management Zone was of no concern to these outsiders. This "outsider only" rationalization does not explain why Congress continued to reauthorize new funds until 1995.[67]

Build up of the Groundfish fleet resulted in intense pressure on stocks, both inshore and offshore.  As competition for groundfish resources increased, the breakdown and loss of capital (human, social, cultural, and biophysical) also increased both within and between fishing dependent communities.[68] Competition and acrimony increased between both the fleets of different ports and gear types in the same ports: "…The draggers really believe that gillnets are one of the major problems because there are ghost nets that get left out in the ocean, and they fish forever."  (Dragger; Gloucester, MA);  "I mean, they should say, "it is the large scale mobile gear fleet tearing up the bottom (and) …negatively impacting the food chain at its source." (Gillnetter; Gloucester, MA).

With the increase in fleet capacity and the pressure to provide "return on investment," overfishing of stocks followed.  "NMFS representatives and Senators Gravell and Chaffee consistently made the point that the majority of overfished stocks on the East Coast were being overfished by domestic fishermen."[69],[70]  Despite NMFS advice in the late 1970's urging the New England Fishery Management Council (the Council) to address this problem, no effective measures were taken until implementation of Amendment 5 to the Multispecies Fishery Management Plan, a long negotiated plan to gradually cut fishing effort by 50 percent over 5 years.   When NMFS scientists established that the primary groundfish stocks were more seriously depleted than originally thought, emergency regulations were imposed closing large portions of Georges Bank.   The Council quickly drafted Amendment 7 to the Multispecies plan, drastically cutting the number of allowable days at sea (DAS) for the groundfishing vessels.  It also eliminated significant exceptions to effort control regulations and broadened area closures to protect juvenile and spawning fish.

A 1998 National Research Council review of the New England groundfish stock assessment concluded that there was a significant overfishing capacity that could be directly traced to

---

[65] Prybot (1999)
[66] Griffith and Dyer (1996)
[67] Fricke (2002), personal communication.
[68] Communities dependent primarily on groundfish include Galilee (Rhode Island), Chatham, New Bedford and Gloucester (Massachusetts) and Portland (Maine)
[69] Fricke (2002), personal communication.
[70] Dewar (1983)

the government loan program. "When foreign harvesters were excluded when the exclusive economic zone (EEZ) was introduced in the 1970s, various public plans were put into place to increase the capacity of the Northeast fishing fleet. The plans encouraged recruitment of harvesters and increased investments in the industry, evidently in excess of what the fishery could sustain."[71]

The overall impact of the groundfish declines and subsequent regulations were catastrophic. In 1980, there were 3,500 finfish harvesters and 5,700 workers in the processing sector in Massachusetts. By 1992, finfish harvesters had decreased to 1,500 and processing workers to 2,700 (a respective 58% and 53% decline in 12 years). Related social impacts ranged from declines in attendance and participation in local fishermen organizations, outmigration (some older fishermen even returned to Sicily and Portugal "in disgrace"), and fierce gear conflicts between draggers, gillnetters and longliners of groundfish. In addition, there was a withdrawal of economic support from local banking systems, attrition of fishermen (human capital) and loss of portside support facilities such as marine railways, and declines in health insurance holders in the industry.[72]

Notable household impacts included increased domestic strife and avoidance behavior: "We used to go out to the club and go to church, but I don't do that anymore. What is the point? There is nothing good to talk about. We just go from the boat to the house. Sometimes we go to church, but it's usually now only on Easter or other holidays." In Gloucester, MA, participation in the local fishing association *Societa Siciliana* decreased from 304 in 1991 to 89 in 1995 (a 70% decline) and Sons of Italy from 200 in 1991 to 79 in 1995 (a 60% decline). By comparison, non-fishing associations such as the Gloucester Elks, whose membership consisted of newly arrived Boston suburbanites, increased from 76 members in1991 to 185 in 1995.

In the health care sector, increasing health care costs and the changing nature of eligibility for public programs led to a high proportion of the industry being left without health insurance. Lack of insurance caused even greater hardship as regulations restricted fishing effort and incomes declined, forcing already stressed fishing families out of the industry. A survey of 485 finfish fishing industry households in Massachusetts found that increased insurance costs and declines in income forced many families to go without health insurance.[73] In 1996, forty-seven percent of surveyed male adults, 37 percent of women, and 34 percent of children were uninsured at least one month during the year, representing an overall ten year decrease in insured fishing family members for the region of 35 percent.

The total at risk from lack of health insurance was 52 percent, including 43 percent uninsured and an additional 9 percent who were uninsured at the time of the survey but had a period of insurance during the last year. By comparison, the National Medical Expenditure Survey found that only 20 percent of the U.S. population was uninsured for all or part of the year 1989.[74] For the state of Massachusetts, the rate of uninsured was 13 percent for adults. Thus, the 1996-uninsured rate in fishing communities was at least three times higher than the statewide average.

Government reaction to the crisis included a $25 million buy-back program for groundfishing vessels, and retraining programs for fishermen. According to Andrea Marcaurelle, loan specialist for the NMFS Northeast Financial Services Office, the goal of the program "was to take out the most fishing capacity for the amount of money we had." Beginning with a $2 million pilot program which bought out 11 vessels, the initiative progressed with another $23 million and a final buyout count of 67 East Coast fishing vessels and their fishing permits. Bought out vessels where either scraped, sunk at sea, or transferred to non-fishery use such as research vessels for organizations such as the Maritime

---

[71] NRC (1998:37)
[72] Griffith and Dyer (1996)
[73] Caritas Christi (1996)
[74] http://www.meps.ahrq.gov/

Discovery Center in Rochester, NY.[75]   Ironically, the buyback program represented an attempt to decrease the over-capacity in economic (fishing) capital originally created by the vessel loan program. Unfortunately, a recent evaluation of the buyback program indicated that it ultimately failed to reduce capacity.[76]

Retraining programs represented an effort to redirect *human capital* into alternate occupational roles.  Some characteristics of fishermen arising from their collective cultural capital posed challenges to the retraining effort.  For example, many fishermen have independent natures and they find it difficult to comply with set (clocked) schedules within a workplace.  Others have difficulty relating to support personnel with different worldviews and there are often linguistic barriers to retraining.  In addition, fishermen who were 40-45 years of age regarded participation as evidence of having given up on fishing and considered it losing face in front of their peers.[77]  Despite these barriers, by 2000 the retraining program run by the Gloucester Fishermen and Family Assistance Center, under the guidance of the Gloucester Fishermen's Wives Association, had successfully trained 305 fishermen and other eligible workers, 137 of who obtained new employment.[78]

The overall loss in social, cultural, and human capital during the groundfish crisis was accompanied by the breakdown of capital flows within and between fishing NRCs of New England.  A cascade of multiplied effects reduced fish production, broke down credit relationships and social contracts, decreased cooperation and sharing on shore and at sea (e.g., sharing fishing information), and increased social problems as job satisfaction plummeted.[79]

The New England NRR groundfish case study illustrates how a strong market externality (low interest federal loans for purchase of fishing vessels) combined with the loss of a historically utilized and significantly important fishing area through the 1984 Hague Line decision (a governance externality) contributed to drastic declines in available biophysical capital (groundfish stocks).  This destabilized the fishery-dependent NRCs of New England, creating subsequent declines in total capital and disruption of capital flows in the system. These declines continue to have severe community impacts that are socially and economically devastating to fishing families and households in the region.

An anthropologically informed, community NRC-based assessment guided by a NRR/total capital model could have mitigated the decline in the multispecies fishery and the associated human impacts that followed. For example, a careful assessment of the community impacts of the Fishing Vessel Obligation Program informed by the NRR model could have led to checks on overfishing capacity by restricting the program to community residents having direct and historically dependence on the fishery. This could have reduced overfishing and sustained the total capital networks of the now (belatedly) recognized Fishing Dependent Communities of the region.[80]

Successful operationalization of the NRR approach requires adaptive flexibility in natural resource governance strategies - a flexibility that is only now being considered in New England. Funding of regional community studies of fisheries in New England and the recent creation of a Social Science Advisory Committee by the Council, should lead to improvements in the nature and direction of future management decisions.[81]   The

---

[75] Prybot (1998)
[76] Federal Fisheries Investment Task Force (1999) http://www.nmfs.noaa.gov/sfa/ITF.html
[77] Griffith and Dyer (1996)
[78] Angela San Filippo, personal communication.
[79] See Pollnac and Poggie 1988; Gelles 1974; Strauss 1979
[80] See discussion of National Standard 8 of the Sustainable Fisheries Act discussed in the introduction.
[81] The Social Science Advisory Committee consists of 14 social scientists from the New England region familiar with current issues and problems facing regional management and fishery-dependent communities.  Their mandate includes advising the NEFMC on policy, reviewing fishery management options and FMPs, and advising on ways to improve communication and collaboration among communities and managers.

potential impacts on fishing dependent communities and the total capital upon which they depend would be identified and, hopefully, mitigated.

## 2.10. Developing an NRR Model for New England

Development of fisheries management plans for New England is complicated by the diversity and complexity of the historical ecology and geography of the region. Because of this complexity, understanding the social and economic outcomes of any particular management measure is fraught with pitfalls. What may seem obvious as a likely outcome in one sub-region may not apply elsewhere. Relying primarily on stock assessments to select management options without consideration of the diversity of human communities and strategies across the region can result in deleterious oversimplifications.

Regional management needs to be refined with timely and in-depth understanding of the complexities of critical aspects of the human use equation. In each region, the unique dynamics of the fishing people and their communities stem from the history of their interactions with the environment and the opportunities afforded by the biophysical capital of the region. For example, in the Downeast Maine Sub-Region (Downeast), poor soils, community isolation, and underdeveloped transportation systems have resulted in few economic alternatives to fishing.

Many Downeast communities approach the 'pure' NRC type, with strong dependence on local natural resources, a high degree of environmental awareness among residents, and few inroads by forces of gentrification (economic externalities). At the opposite extreme, the DSP community of Stonington, Connecticut, historically a Portuguese fishing enclave with in-town residences dominated by fishing families, is highly gentrified. Most fishing families cannot now afford to live in the upscale water front neighborhoods, and live in lower cost areas away from the water.

Commercial fishing activities in Stonington constitute a small portion of the local economy. The fishing pier has no room for expansion, is surrounded by tourist facilities such as seafood restaurants and souvenir shops, and is just down river from a large marina for recreational boaters. While folks Downeast talk of fishing as a sustainable way of life, fishermen in Stonington talk about fishing as an economic survival act, their struggle to "keep their job," and the general lack of community ties among fishermen. Fishing, as everywhere, carries with it a great degree of uncertainty, but in Stonington this is magnified by the lack of expansion opportunities, numerous regulations and paperwork, the overall decline in fish stocks, days-at-sea restrictions, and market limitations.

One of the first respondents interviewed in Stonington (October 1998) operated one of two dockside fish wholesale operations. Six months later, he was out of business and his facility stood empty. This represented 50% of the total fish processing capacity in the port. Thus, the "Connecticut" sub-region (Stonington plus several smaller enclaves of finfish and lobster operations) is highly DSP oriented with fishing a tenuous but steady enterprise. In contrast, Downeast is much more NRC oriented and fishing intense. Overall, we divided New England up into *eleven* distinct subregions, centered on major ports or clusters of fishing or fishing-related industry. We then considered the social, cultural, human, and economic capital devoted to fishing enterprises in each of these subregions.

Exhibit B
(Part 2)

### 3. Measuring Fishery Dependency and Externalities in the New England NRR

As noted in Chapter 2, after the Magnuson Act effectively eliminated foreign fleet competition by creating the 200-mile exclusive economic zone, the US government substantially expanded the fishing capacity of the domestic fleet by granting low-interest loans for fishing vessels. This change occurred virtually over night without analysis of the potential impact of such an expansion on fishery stocks and fishery-dependent populations in the coastal zone.

This promotion of vessel ownership, combined with technological advances in navigation and gear development, led to a great expansion in fishing capacity and effort and ultimately, proved disastrous for both fishing stocks and fishing communities and regions.[82] For several years in New England, losses in fishery stocks combined with losses in regional total capital—social, cultural, human and economic capital characterized a declining industry and lowered fishing productivity.

Partially in response to such declines, the Sustainable Fisheries Act (SFA) amended the Magnuson Fishery Conservation and Management Act (renamed the Magnuson-Stevens Fishery Conservation and Management Act) in 1996. SFA amendments and changes to the Magnuson Act include numerous provisions requiring science, management and conservation action by the National Marine Fisheries Service (NMFS).[83] Importantly, this Act provided fishery management guidance by establishing National Standards on such topics as overfishing, by-catch and fishing communities.

SFA reflects changes in the political ecology of management that has experienced an increase in the number and complexity of stakeholder groups and special interest agendas. Now commercial harvesters, recreational fishermen, fisheries managers, fishery scientists, fish processors, fishery unions, and environmental organizations are all part of the debate over the future and uses of fishery stocks. Out of this debate has come a recognition of the "fishing community" as a unit of management, and of fishing dependence as a potential gauge of regulatory impact.

Specifically, National Standard 8 states: "Conservation and management measures shall, consistent with the conservation requirements of this Act (including the prevention of overfishing and rebuilding of overfished stocks), take into account the importance of fishery resources to fishing communities in order to (A) provide for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities."[84]

As a result of National Standard 8, all fishery management plans (FMPs) are now required to account for and assess the potential social and economic impacts to fishing communities of any particular management option under consideration. The caveat is that fishery conservation supercedes consideration of specific human (i.e. community) impacts from regulations. In many cases, councils use a regulatory impact review (RIR) in lieu of a community-based social impact assessment (SIA). An RIR differs from an SIA in that an RIR does not consider as important the historical dependence on and participation in a fishery by fishermen and communities (NMFS 1998).

A proper SIA requires that fishing dependence be measured in some way. Just what is a 'fishing community', and how we can measure 'fishery dependence' is not wholly answered in the legislation. Section 3(16) of the MSFCMA (16 U.S.C. 1802(16)) defines fishing community to mean "a community which is substantially dependent on, or engaged in the harvest or processing of fishery resources to meet social and economic needs, and includes

---

[82] Griffith and Dyer 1996; Dyer and Poggie 2000
[83] http://www.nmfs.noaa.gov/sfa/
[84] SEC. 301. NATIONAL STANDARDS FOR FISHERY 16 U.S.C. 1851 (104-297)

fishing vessel owners, operators, and crew and United States fish processors that are based in such a community." The NOAA General Counsel has interpreted "fishing community" as simply any place where vessel owners, operators, and crew or U.S. fish processors are based.

Small boat fleets run by family fishermen are not given specific consideration yet clusters of such boats are spread throughout New England and make up a large proportion of the total number of licensed vessels in the region. As coastal communities have developed, fishing has declined in its overall percentage contribution to local economies. Nevertheless, small-scale fishing enclaves or fishing 'villages within towns' define themselves not by their local community alone but through a network of connections with other such villages within other towns.

Such embedded villages have become more common as fishing fleets have shrunk and the value of commercial fishing dock space has risen. The small-scale fishery is presently endangered in places such as Cape Ann and the Gulf of Maine, where a shutdown of the inshore fishery via enlarged closed areas threatens the sustainability of the family-owned fleet.  Commercial fishermen and processors are also concerned that a geographically based (site-specific) interpretation of dependence could harm "fishing communities" that are based on shared interest rather than shared place.

Efforts to develop a baseline description of New England fisheries have been sporadic and not linked to any conceptual-theoretical framework.  Baseline data provides for measurement of change and adaptation brought on by adoption of new management measures or through other vectors of community change such as gentrification or environmental degradation. Baseline data collection should strive to establish a set of plainly understood benchmark terms and concepts that once communicated to managers become part of their decision-making tool kit. Research priorities can also be tailored to the identification of immediate and relevant information from a region or community.

Social scientists engaged in fisheries or fisheries-dependent community research may intuitively understand why a port profile or regional assessment is significant for anticipating the impacts of regulatory change. However, such understanding must be linked up to a theoretical framework that is understood by managers and social scientists alike for the data to have any cognitive relevance in their decision making. Explanations should build on what is known (the baseline template, or community profiles, regional assessments, and variables such as 'educational level' and 'ethnicity').

Since much of the government's statistical database is aggregated to the county level, the county is a highly convenient unit for statistical interpretation of change processes. One solution to the problem of shifting baselines with a system under stress is to use measures that are independent of immediate flux in particular communities. Such measures can identify dependency at levels above the community, and thus fit well with a regional approach to dependency analysis and policy making.

While we suggest the use of this approach as <u>one step</u> towards improving knowledge about the likely impacts of regulatory change on fishing communities, we do caution that frequent "sampling" at the community level is needed to confirm the analyses.  Furthermore, because the proposed measures rely on statistical data (regional census data) that is extremely limited in the numbers of parameters of interest, we strongly encourage the funding and use of in-depth studies on a regular basis.

## 3.1.    Using Dependency Ratios

Although measuring fishery dependence is considered crucial to recent management goals, few attempts to do so have been made.[85]  Developing comparative dependency ratios is one solution to the measurement of fishery dependence.   Ratios of various forms

---

[85] Griffith and Dyer 1996

are measures commonly used to analyze and compare independent population units with different age, income or social structures.  A dependency ratio is a special application of the ratio approach that provides a summary measure of the relationship or dependency between two related but independent populations.  This measure represents one of a family of standardization techniques commonly employed in demography to examine and describe aggregate population phenomena.  Dependency ratios are useful because they allow one to make direct comparisons between independent groups rather than just describe a group's proportionate share within the sample or universe of interest.  An added advantage of the dependency ration is that, unlike Hoover and other dissimilarity indexes, dependency ratios are statistically insensitive to population size and so allow for direct comparisons across regions.

Dependency ratios compare some sample population (the numerator) against a base population (the denominator). The higher the ratio the higher the hypothetical dependence of the numerator population upon the denominator population.  The youth dependency ratio is a common example of this type of application as employed in demographic research.  In this case, the population aged 0 to 15 is divided by the total working aged population 16 to 64 years of age.  The higher the resulting ratio the more young people the working aged population has to support.  The lower this resulting ratio is the fewer young people the working-aged population has to support.[86]

Dependency ratios are used by economists,[87] demographers,[88] and both ecologists and coastal resource management researchers.[89]  Because of their flexibility of application and wide array of use within the social and physical sciences they are commonly recognized as a useful diagnostic tool for comparative research.  However, our review of the literature found no direct application of dependency measures in the analysis of the regional management of fisheries, or in the delineation of fishery dependent communities. We are hopeful this application will add an additional useful diagnostic tool to this research discipline.

## 3.2.    Community Measures of Fishery Dependence

An ideal measure of the dependence of a community on a production sector accounts for the complexity of that sector and the contribution of that and other sectors to the overall community dynamic. Fishery components include the fishing fleet, transportation, processing/marketing, and related supply and repair businesses. However, management focuses on the fishing sector, with little attention paid elsewhere.  Unfortunately, the regional census data we use to generate our comparative dependence measures also focuses on this sector. Our comparative fishing dependence measure is thus best viewed as a comparative tool to be tempered with the local ethnography of communities and regions. For example, Boston has historically had a central role in regional and international marketing of fishery products, yet has a small contemporary fleet for the size of the port. Thus, focusing on the harvesting sector for this port would underestimate the contribution of the marketing/transportation sectors to the overall fishing industry of Boston and the region. What should not be overlooked in the search for fisheries dependency is the equally important consideration, what we term "Essential Provider."   While Boston's harvesting sector is modest, the service Boston provides to other fishing communities is essential to their survival.  The port profiles highlight the importance of retaining local-level data collection to complement the systematic regional efforts described herein.

One conceptualization of community that addresses dependence is the Natural Resource Community: "a population of individuals whose primary cultural existence depends upon

---

[86] Weeks (1989).
[87] Mason (1988), Horrell and Humphries (1992) and Frankel (1992)
[88] Massey (1987), Ahlburg (1993), Ahlburg and Vaupel (1990) and Jiang (1994)
[89] Howarth (1988), Levitan (1992), Johnson and Carpenter (1994), Livingston (1991), Mangel (1993).

the utilization of renewable natural resources."[90] Dependence in this community model is linked to cultural dependence on sustained fishery stocks. Declines in fishery stocks are therefore key to measurement of temporal changes in the fishing culture of communities and regions. However, external changes in the place and space of fishing communities (gentrification) can also force fishermen out of their occupational roles despite the ongoing sustainability of any available fishery stocks. This is accelerated when fishing efforts are reduced due to regulation or market influences.

Another community-centered attempt to measure fishery dependence stems from identification of social, cultural, and economic indicators, such as fishing monuments, fishing unions, and numbers of processing facilities to derive a Fishing Dependency Index (FDI) of the major ground fishing ports.[91] Although Dyer and Griffith's cumulative index included diverse indicators, it was not a comprehensive and dynamic measure. It did not link communities across common regions or measure changes in total capital forms across fisheries, since it was confined to the five identified primary ground fishing ports (New Bedford, Gloucester, Chatham, Point Judith, Portland) in New England.

### 3.3. Community Vulnerabilities and Externalities Affecting Fishery Dependence

Change between and within fishing dependent communities is occurring at an ever-accelerating pace. Driven by externalities of development, changes transform the linkages between communities and regions and modify the contexts within which people live and work. In New England, the significant forces of gentrification are modifying the coastal areas. Gentrification is a nation-wide trend as more people of means are attracted to coastal areas as places to live, play, and own property. This trend often plays out as a direct threat to established enclaves and communities dedicated to commercial fishing.

The mystique of commercial fishing is often evoked in posters and brochures advertising the quaint characteristics of New England by the sea, despite the fact that in many of the places depicted, gentrification has forced commercial fishing to the brink of extinction. For example, in highly gentrified Hyannis, Massachusetts, fishing interests in the community have been squeezed into a small piece of the overall town dock with the highest docking and unloading fees ($1.00/foot of vessel length/day) in New England. This decline of space and place has occurred despite the fact that significant runs of valuable fish such as fluke are still found in waters off Hyannis. Fishermen, who would prefer to dock in Hyannis for safety and convenience, come from other ports specifically to target this rich resource. However, landing fish amounts to a potential 'crash derby' as boats wheel and turn in the small space to offload their fish product one at a time to an out-of-town fish trucker.[92]

Such transformations strain the ability of fishing enclaves and communities to reproduce their particular forms of total capital. Thus, social networks, access to marine resources, and commitment to the occupation of fishing are devalued, while other aspects such as recreational fishing, tourism, and vacation residence construction begin to dominate. The argument can be made that maintaining a mixed economy, which allows for both fishing dependent populations and new wave populations to co-exist, is a viable option. Yet, evidence shows that when the momentum for transformation to non-traditional (gentrified) processes takes hold without protection for existing fishing operations, essential and irreplaceable fishing infrastructure (ice houses, marine railways, fish processors) is often lost.

Essential fishing infrastructure is impossible to replace once an upward shift occurs in property values and uses.[93] In the past, traditional fishing communities have not had any need for protective adaptations to resist such change. The energy to fight such changes

---

[90] Dyer et al (1992).
[91] Griffith and Dyer (1996)
[92] Dyer, Poggie and Hall-Arber (2000).
[93] Griffith and Dyer (1996), Bergeron, personal communication (1999)

divides the attention and efforts of fishing populations to survive such a dynamic. This is particularly true when they are also burdened by increasingly numerous and complex fishing regulations, described as regulatory layering.[94]

A recent example of this is the transformation of the Mississippi coast from a multi-ethnic fishing culture of Southeast Asians, Black and Whites to a gentrified row of gambling casinos (dockside gambling). Shoreside, nothing remains of the once thriving fishing cultures of Biloxi and Ocean Springs.  Remnants struggle to survive in the backwaters and upstream inaccessible for casino development.  In the New England sub-NRRs, the strong dependence on marine biophysical capital makes it crucial to recognize how management choices can affect community sustainability.

Downeast Maine, with a rugged coastline and strong dependence on fishing is one of the poorest areas in the region.  Any curtailment of access to the fisheries could seriously hamper the ability of locals to make a living. In a social impact assessment of the New England herring fishery, Dyer, Poggie and Hall-Arber demonstrated crucial dependence on the herring-processing sector in several coastal communities.[95]  At that time, fishery managers were considering allowing offshore processing of the fish.  Locals anticipated that such a step would effectively put the onshore processing sector out of business, disenfranchising up to a thousand workers and creating economic hardship and total capital losses across these fishing-dependent communities.

## 3.4.    Fishermen Individual-level Characteristics and Dependence

Not everyone can be a fisherman, and once a person becomes a successful fisherman, it is very difficult for him or her to assume other occupational roles.  The steps to fishing success entail a highly selective process characterized by investments of time and behavior.  Individuals who are thus selected tend to be uniquely suited for this occupational role, which tends to preclude their being selected to other ones.

Fishing is a hunting activity that has psycho-cultural requirements unmatched in any other contemporary occupation.  Because the hunting lifestyle is rare today, it is hard for persons who have not studied or experienced this life strategy to understand the motivations and requirements that make one a successful hunter at sea.  Nevertheless, we argue that fishing is unique in our contemporary space and time and requires special understanding and consideration in its management.

Dependence on natural resources necessarily limits occupational roles of residents and can result in an intense assimilation of some offspring to the fishing lifestyle.[96]  Part of the assimilation process occurs through the incorporation of appropriate newcomers and youth into existing social relations and cooperative networks. Another part of this process comes in the form of self-selection by those who have the necessary psycho-cultural prerequisites to be successful in this way of life.  Assimilation coincides with the creation of boundaries that protect these established networks of social capital against external (competing) networks.[97]

Boundaries are also defined by the sharing of special knowledge on where, when, and how to fish targeted species.  These boundaries can be distinctive enough to delimit fisheries even within communities by gear type, ethnicity, or by generation.[98]  In communities homogeneous by gear type, such as the lobster gangs of Mid-coast Maine studied by Acheson, knowledge is shared by distinct groupings that have territories established by tradition and effort, and which are informally protected and respected.[99]  Other

---

[94] Dyer, Poggie and Hall-Arber (2000)
[95] Dyer, Poggie and Hall-Arber (2000)
[96] Firestone (1967), Ruddle (1994)
[97] Acheson (1987); Palmer (1994).
[98] Acheson (1987); Griffith and Dyer (1996); Dyer and Leard (1994)
[99] Acheson (1985)

characteristics include limits on the sharing of knowledge between kin and gangs and a high degree of personal independence.[100]

On the psycho-cultural level, Poggie provides strong support for the idea that a deferred gratification orientation is inherent in being successful at small-scale fishing and is therefore one of the psycho-cultural components of a maritime life.[101]  Deferred gratification provides the psycho-cultural underpinnings for anticipation and management of uncertainty in resource availability.  This is clearly adaptive in fishing communities where fluctuations in annual catch and market conditions contribute to high periodicity of income. For example, this attribute allows individuals to save monetary resources when abundant to provide a reserve for potentially leaner seasons ahead. Those who are unable to defer gratification are unlikely to be successful as fishermen or to remain long in this occupational culture.

The indices we are advocating in this paper should not be taken to mean that fishing is a highly fungible activity.  In other words, alternative occupations are not easily substituted or exchanged for fishing as an occupation or as a way of life.  A cultural dependence on renewable natural resources that must be hunted and the behavioral characteristics of fishing populations has long insured the continuity of a tradition of fishing.[102]

This argument is most applicable to the small to medium-scale operations characteristic of inshore lobstermen, day, and short-trip fishermen that also have a high preponderance of owner operators.  Larger-scale operations such as scallop boats out of New Bedford that formerly employed as many as 13-15 men (before regulations set a 7-member crew limit) were less likely to rely on "traditional" fishermen.  Crewmembers tended to be "young men with strong backs" rather than necessarily individuals with particular psycho-cultural characteristics, members of fishing families or a fishing way of life.  Interestingly, Pollnac and Poggie found fishermen in the port of New Bedford had the lowest overall level of job satisfaction in their New England regional sample.[103]  Nevertheless, when the large-scale operations were scaled back due to restrictive management measures, some of the vessels returned to a more traditional crew composition with kin and friends having first priority for job retention.

Factors such as ethnic barriers and economic marginality can also affect measures of fishing dependency among individuals. Before the Gloucester dragger fleet was decimated by stock declines and regulations, many crew were middle-aged Sicilian immigrants with poor English language skills and little occupational experience outside of fishing, and thus were highly dependent on fishing.[104]

Such dependence is not easily modified because it is so specifically linked to utilization of a particular biophysical resource—fish.  This affects how people work and live, the schedule of their lives, their desires and needs as well as the uncertainty and risk required for success in this way of life. Given the occupational characteristics and the special forms of cultural capital needed to extract resource from nature, it is very wrenching for individuals to attempt to change their way of life and pursue a different occupation. In many cases it is impossible for individuals to do so.  This fact can lead to severely negative psychological, family, and social consequences.

In their study of the structure of job satisfaction among New England fishermen, Pollnac and Poggie used nine different measures of this construct.[105] These were drawn from a

---

[100] Palmer (1994; 1991; 1990), Griffith and Dyer 1996, Dyer and Poggie (2000)
[101] Poggie (1978)
[102] Characteristics typical of successful fishermen include: ability to defer gratification, ability to adapt to working non-traditional hours, and a profound need for personal independence as well as a proclivity for working on the sea and a devotion to family traditions.
[103] Pollnac and Poggie (1988)
[104] Griffith and Dyer (1996)
[105] Pollnac and Poggie (1988)

principal component analysis of the 22 items shown in Table 1. Two of the most significant questions asked whether the respondent would still go into fishing if he had his life to live over and whether he would advise a young person to go into fishing. Whether or not the respondent said he would go into fishing if he had his life to live over is a measure that is considered by many researchers to be the best single indicator of job satisfaction.[106]

While the relationship of job satisfaction to other variables such as port, age, owner-skipper status, and type of fishing is very complex, for the overall New England sample (Maine, Massachusetts, Rhode Island), the high level needs factor is the strongest predictor of the job satisfaction measure. Thus, the factor considered the best single indicator of job satisfaction is whether a person said he would go into fishing if he had his life to live over. This finding indicates that self-actualization is an important component of job satisfaction among New England fishermen.[107] This is contrary to the opinion expressed by some that fishermen only care about making money (the 'greedy' fisherman/tragedy of the commons stereotype).

**Table 1. Rotated factor loadings of job satisfaction items on middle-level, basic, and high-level needs factors (modified after Pollnac and Poggie 1988).**

### Needs Factors

|                                            | Middle–level | Basic | High-level |
|--------------------------------------------|:------------:|:-----:|:----------:|
| Time away from home                        | **.81**      | .09   | .21        |
| Hours spent working                        | **.72**      | .25   | .17        |
| Time for recreation/family activities      | **.71**      | .06   | .12        |
| Ability to come and go as desired          | **.61**      | -.12  | .41        |
| Time it takes to get to grounds            | **.47**      | .21   | .14        |
| Doing deckwork on vessel                   | **.41**      | .12   | .40        |
| Opportunity to be own boss                 | **.39**      | -.21  | .34        |
| Community in which live                    | **.39**      | .12   | .21        |
| Cleanliness                                | -.03         | **.59** | .02      |
| Physical fatigue of job                    | .03          | **.56** | .02      |
| Predictability of earnings                 | .11          | **.49** | .08      |
| Mental pressure on job                     | .18          | **.48** | .03      |
| Job safety                                 | .19          | **.45** | .11      |
| Earnings                                   | .19          | **.36** | -.15     |
| Healthfulness                              | .21          | **.31** | .26      |
| Being out on the water                     | .14          | -.02  | **.71**    |
| Adventure                                  | .16          | .05   | **.71**    |
| Challenge of job                           | .18          | -.01  | **.66**    |
| Working outdoors                           | .23          | .08   | **.57**    |
| Feeling job is worthwhile                  | .12          | .28   | **.51**    |
| Peace of mind                              | .28          | .24   | **.34**    |
| Performance of state and federal officials | .20          | -.15  | .22        |

Given the argument that fishermen must be uniquely psycho-culturally adapted to be successful at their work, it stands to reason that people who have been in fishing for an extended period would tend to have the greatest number of these characteristics. Individuals lacking such characteristics would be likely to seek alternative employment. Over time there would be a tendency for such characteristics to dominate a fishing fleet. Furthermore, this argues that any group of successful fishermen would be unlikely to be suited to a 9 to 5 working environment. This is anecdotally confirmed with fishermen who

[106] Robinson, Athanison and Herd (1969).
[107] Maslow (1954)

have tried other occupations such as engineer, oceanographer, gas station attendant, or truck driver but found that they were dissatisfied and returned to fishing. These were all people with prior experience fishing and who returned to it because it better suited them. These observations suggest why fungibility (or interchangeability) of fishing with other occupations is so difficult.  This not only affects how one looks at the construct of "dependency on fishing" but also raises the important issue of job satisfaction and its many known implications for health and well-being of individuals and families.

In the aforementioned analyses by Pollnac and Poggie, they argue that job satisfaction is a pivotal variable in people's lives. Job satisfaction profoundly impinges on people's mental and physical health, and low job satisfaction can result in increased family violence and other psycho-cultural and psychosocial maladies. Fishermen as a group express a high degree of job satisfaction:
*"I have been in this business for 45 years, and if I had to go back and do it over again – I would."*
*"Fishing is my life – I love being out there on the water"*
*'This is the greatest job in the world – because you have no boss, and are free out there on the water."*
*"In fishing you set your own hours – you can work hard or not, depending on how much money you want to earn – it's all up to you."*

A reduction in job satisfaction can accompany fishermen who are well adapted to and selected for fishing when they are forced to transfer to jobs they are not well suited for. Fungibility thus is a key consideration that amplifies the dependency factor of individuals on fishing and collectively of populations of individuals within communities and regions on the fishing industry. This is especially true in populations of well-established fishermen who remain in the industry even though it is difficult to do so at this time because of low stock levels and corresponding government regulations.

## 3.5.    Precautions in Defining Dependency

It is extremely important to note that strictly defined, "fishing-dependent communities," as stand-alone, independent entities are very rare in contemporary settings.  As the core of fishing's cultural, social, and economic activity is surrounded by non-fishing development, the percentage contribution of the fishing-related activity to the total capital of the community may be diminished, particularly with regard to occupational numbers.  Just fifteen years ago, there were over 90 medium to large-scale draggers with 5 to 7 men crews in Gloucester Harbor, today fewer than a dozen are in operation, most with smaller crews. Nevertheless, the economic impact of fishing activities remains high in Gloucester with significant landings and exchange associated with the two-year old display auction.

Other smaller ports, such as the fishing communities of New Hampshire, may retain infrastructure and fleet size despite an increase in surrounding coastal development.  A 1978 study (Acheson et al) of Seabrook/Hampton, Rye and Portsmouth describes extant fishing activities and infrastructure within a context of surrounding gentrification and development.  In 1978 the Seabrook /Hampton fishing complex consisted of 35 lobster boats and 12 vessels that participated in dragging, gillnetting, and/or switched gear to pursue herring or sea urchins. Twenty years later, the number of vessels has remained essentially unchanged, although over half the draggers are inactive because of closures and other restrictions on catch. Other changes include declines in numbers of individuals hired as crew.  Many fishermen are "going it alone" and often migrating seasonally to other areas to fish species such as monk fish and dogfish.

Overall, fifty commercial fishing vessels, both the operative and idle, still grace the port facility near Seabrook. However, tourist development in nearby Hampton has increased tremendously over the last twenty years. During the summer peak, fishermen and their families are lost in a swarm of thousands of daily visitors taking advantage of the nearby diversions - beach facilities, restaurants, hotels, bars, and nightclubs. Thus, the overall

contribution of the fishing sector has declined dramatically in twenty years, but the scale of fishing remains essentially constant, although seriously threatened by recent fishing regulations. Moreover, even though the contribution of fishing to the local economy has declined, and no one could describe tourist-driven Hampton as a "fishing dependent community," the infrastructure and social yield of fishing has been sustained. However, looking at our dependency indices puts the New Hampshire ports in the lowest third of fishing dependency (Table 2).

Consequently, we cautiously use the concept of dependency and ask: (1) what is the total collective contribution of such communities to local and regional fishing commerce, and (2) what would be the total capital replacement costs if we allowed such communities to be destroyed by management regulations that fail to take into account regional and spatial differences in total capital interactions in fisheries?

The tourist restaurants and hotels of Hampton, for example, have no real substitute to offer their customers if the fresh fish and traditional ambiance provided by the local fleet is lost. Moreover we cannot discount survivorship of total fishing capital in the face of surrounding development and growth. Managers should identify and conserve fishing facilities and populations that collectively provide a substantial benefit to the overall fishery commerce of a region, even if such commerce does not dominate the economy of a specific town or city.

If "fishing dependent communities" are so narrowly defined that only towns or cities that are "substantially dependent on … fishing resources …" are considered in the analysis, a large portion of the regional total fishing capital, and therefore, fishery commerce, of the New England Natural Resource Region could be ruined. In fact, we contend that the only communities that could possibly fit such a narrow interpretation of the Magnuson-Stevens Act's definition of 'fishing dependency' would be relatively isolated lobstering villages such as Jonesport, Cutler, or Beals Island in Downeast Maine.

While we use occupational census data to identify dependency on fishing in the context of the surrounding village, town or city, and offer further analysis based on the degree of gentrification, individual community profiles reveal critical details (cultural capital variables) that temper the number-driven rankings of dependency. For example:

- Ethnicity: ethnic and language barriers make it difficult to transfer to alternate occupational roles. Examples include Portuguese and Sicilian fishermen (New Bedford, Gloucester) faced with language and educational barriers, and less obviously, Downeast Mainers faced with cultural and dialectical differences. For example, Mainers face job discrimination from a telemarketing firm that will not hire locals "because of their accent" (key respondent, Jonesport, Maine).
- Adaptive specialization, meaning people successful at fishing are not well suited for other occupational roles, and may be limited by these characteristics to fishing. Adaptive specialization includes a strong need for independence, inability to tolerate fixed temporal (9 to 5) schedules, deferred gratification orientation, and tolerance of temporal periodicity in familial and other social relationships.
- High job satisfaction in fishing, and a correspondingly strong resistance to switching jobs due to the characteristics noted above.
- A strong sense of place, meaning fishermen and their families identify with a location on land and water that serves as a nexus for their sense of community. Connection to this specific place also helps build their self-reliance, meaning their ability to utilize local, on-hand (spatially bound) resources for daily problem solving, survival, extraction, and exchange. Further, sense of place both limits and grounds fisher folk's experiences to their location, while giving them familiarity and constancy—things leads to a high quality of life including social, emotional, and cultural stability. This accounts for the high mental, social and physical health of fisher folk under normal conditions compared to the wider populace (Caritas Christi 1996). Conditions which can abrogate this sense of place include forced seasonal migration when local stocks cannot provide income or fishing them is restricted by regulations, or complete collapse of local

resource from environmental disaster or overexploitation.

**What this Model of Dependency Does Not Yet Include**

Alluded to above, dependency measures used here do not incorporate comparative economic data. While this project complements one refining an economic model, the work is being done simultaneously, so we are not able to compare the results of the different approaches. Held in abeyance, then, is a fourth index of dependency that should be compared to the three indices described here, that is, economic value of landings and/or product sales within a community.

Dependency of a community on particular resources is necessarily affected by the value of those resources. It is conceivable that the ratio comparing numbers of individuals dependent on fishing relative to those in other occupations could be small even though the value of the landings are high. Yet incomes and expenditures associated with the value of the landings may provide tax-generated revenue and other benefits to the community that make it more dependent on fisheries-related activity than is predicted by the dependency model suggested here. This deficiency is, we believe, partially countered by the richness of the depiction of total capital flow (social, cultural and economic variables) and the community profiles in this report. Nevertheless, as the model is applied elsewhere, the importance of the fishing industry's revenue generation should not be ignored.

## 3.6.    Establishing Dependence by Sub-Region

Using the individual human characteristics and community dynamic of the NRC model, we propose a regional approach. In this approach, the New England NRR is divided into sub-NRRs consisting of networks of NRCs that are held together by flows of total capital (Dyer and Poggie 2000). Although each is not totally unique, it is clearly distinct in its combination of characteristics from its adjacent sub-Regions.

Sub-regions consist of one or more coastal counties, and hence represent useful clusters for socioeconomic and demographic analysis of the changing human dynamics of coastal fisheries. The dynamic includes the human, social, cultural, and biophysical components that make up the system. This system can then be modified or transformed in ways that can either negatively or positively influence the sustainability of fishery dependent communities (the NRCs within the system). A negative impact would be one where the fishery dependent sector (fishing boats, families, fish processors, transporters, and suppliers) and the total capital it comprises would be lost from the system, or transformed in a way that leads to its loss at some proximate future point.

Embedded within any of the eleven sub-NRRs are both dispersed clusters of fishing vessels-fishing households, related infrastructure, and communities sharing both fishing place and culture. Whether fishermen and their families and support networks live and work from "clusters" or from more distinctively identifiable communities, defining dependence within regions is key in the mitigation of harmful regulatory impacts.[108] Even though each of our indices is distinct and emphasizes particular aspects of dependency, we suggest that they are sufficiently similar in that they should co-vary and hence provide a measure of convergent validity of our measures of the underlying construct of fisheries dependence.

The eleven sub-NRRs of New England are, from south to north, (1) the Connecticut Seacoast, (2) Rhode Island, (3) New Bedford and the South Shore, (4) the Cape and Islands, (5) the Boston Area, (6) Gloucester/the North Shore, (7) New Hampshire Seacoast, (8) Southern Maine, (9) Lower Mid-Coast Maine, (10) Upper Mid-Coast Maine, and (11) Downeast Maine.

---

[108] Dyer and McGoodwin (1999)

### Dependency Indices

We propose to systematically measure fishery dependence in the eleven sub-NRRs using three indices. These are: (1) the percentage of labor force in fishing, (2) the percentage of related occupations within the Bureau of Labor Statistics category of fisheries /forestry/ farming, and (3) a summary measure of a series of dependency ratios that explore the number of fishermen per hundred to various alternative occupational roles that fishermen could enter with their particular skill profiles. Of the three, the most heuristically useful, and the one that provides the best tool for comparison across sub-NRRs, is the occupational alternatives index, discussed in detail below.

Measures 1 and 2, examine other aspects of the relationship of fishing to the region. Measure 1 is the simple percentage of fishermen to other occupations in the sub-NRR region.

$$\frac{\sum fishermen}{\sum all\ occupations} *100 \qquad\qquad \text{Measure 1}$$

This measure reflects the assumption that the higher the overall percentage of fishermen making up the labor force, the more dependent the particular sub-NRR is on fishing. Our second measure, the proportion of fishermen in relation to other occupations in the Bureau of Labor Statistics defined category of fishing/farming/forestry also assumes the higher the percentage of fishermen in this category, the more dependent a sub-NRR is on fishing.

$$\frac{\sum fishermen}{\sum BLS\_category(I)} *100 \qquad\qquad \text{Measure 2}$$

This measure is useful since most analysis of economic regions do not look specifically at fishermen but rather look at their broader occupational group of fishing/ farming/ forestry. The use of this measure provides us with a conservative estimated that can be compared across other studies related to the sub-NRR regions using economic or BLS based analysis of economic activity. Caution needs to be employed, however, as the measure represents a mixed category with fishermen as only a portion.

Our third index is, the Occupational Alternative Ratio Summary (OARs). This measure is more complex than the more straightforward proportion and ratios described above. OARs is an attempt to summarize a standard array of independent occupational alternative ratios within regions in a manner that provides a single measure of the impact of fishing upon the region in relation to other occupations available to people engaged in commercial fishing. The OARs measure emphasizes both the importance of fishing as an occupation to individual participants in the local labor force and the dependency of the local economy on the fishing industry.

The OARs measure is constructed in a series of steps. First, a series of occupational alternative dependency ratios (OAR) are calculated for a predetermined set of occupations. These OAR measures represent a standard set of alternative occupations that are compatible with the basis skills and training that are part of the fishing occupation. It is assumed that a fisherman could take up any one of these occupations but chooses not to, due to satisfaction with their current position as a fisherman. The alternative occupations identified and employed in this analysis consist of 13 occupations ranging from

mechanical trades to unskilled labor and active unemployment.[109] While this occupation set is not argued to be exhaustive, it is felt to represent a reasonable approximation of the potential occupation set open to fishermen in all 11 of the NRRs identified above.  The OAR measures are calculated using the standard formula for a dependency ratio:

$$\frac{\sum fishermen}{alternative\_occupation\ (i)} * 100 \qquad\qquad \textbf{Measure 3}$$

where (i) is the total number of individuals engaged in the ith alternative occupation.

Once the 13 OAR measures have been calculated they are then summed into a single measure of the total impact of fishing on an economic region.

$$OARs = \frac{\sum_{n}^{1} OAR}{N} \qquad\qquad \textbf{Measure 4}$$

*Where N=13 in this specific instance.*

The OARs measure summarizes the average potential impact that the size of the fishing industry has upon the supply of labor for alternative occupations within individual NNRs. The OARs measure provides two valuable insights into the importance of the fishing industry.  First, it tells us the relative competitiveness of the fishing industry within a specific NRR.  The higher the OARs score the more important fishing is as an economic occupation within the NRR compared to the alternative occupation set.  A score of 100 or greater suggests that, on average, fishing serves as the primary employment for as many individuals as are employed in any one of the typical alternative occupations.  A score below 100 suggests that, on average, fishing serves as the primary employment for fewer individuals than are working in any one of the typical alternative occupations.  Second, the OARs score suggests the potential impact on the local labor force of a specific NRR if fishing should suddenly cease as viable occupation.

Looking at the Downeast Maine NRR for example, it is seen that this sub-region has an OARs score of 255, indicating the powerful impact that fishing has on the region as a primary occupation.  If fishing should suddenly cease however the OARs score suggests that there would be two and one half fishermen for every individual working in a single alternative occupation on average.  Thus, if any one occupational alternative were more attractive to former fishermen, then the labor supply for this occupation would immediately be saturated.  This could result in the driving down of wages and depressing the overall labor market as alternative but less attractive occupations were sought by fishermen.

In contrast, the Connecticut Seacoast NRR with an OARs score of only 2.61 shows that fishing has little or no measurable impact on the overall economic strength of the sub-region.  If fishing were to end as an occupation in this NRR then the dispossessed fishermen would represent an increase in the labor pool of only two and one half workers per hundred workers in any average alternative occupation.  In this case, fishermen could easily be absorbed into the existing labor force economy without significant disruption to the NRR occupational structure.

---

[109] The thirteen occupational categories are: (1) security guard,  (2) food service/janitor, (3) trees and farming, (4) mechanics, (5) skilled construction, (6) machine operators, (7) manufacturing, (8) hand workers (9) truck drivers (10) marine related, (11) laborers & helpers, (12) manufacturing/other, and (13) unemployed.

The OARs index is a straightforward and easily interpreted measure but it represents only a summary measure that fails to capture the richness of the cultural life that underlies fishing as an occupation and as an avocation.  Specifically, the OARs does not address the question of occupational fungibility (i.e., interchangeability).  While the movement of fishermen to other occupational roles is clearly possible, Measure 3 implicitly assumes that the skills involved in fishing are readily transferable.  As we have discussed, this assumption is contrary to the characteristics of fishermen, the nature of their community dependencies, and consequently the very form and direction of capital flows within regions.

## Sample Design

The file used in this analysis is the 1990 Equal Employment Opportunity (EEO) Special File (US Bureau of the Census, 1994).  The EEO data files and tabulations have represented the primary recognized source of national and subnational estimates of detailed employment for the United States during the decades of 1980 to 1990 and 1990 to 2000.  The information is drawn directly from civilian labor force data gathered as part of the Decennial Census and is primarily intended to provide occupational and educational attainment data to support affirmative action planning for equal employment opportunity. The EEO file for the 1990 Census year consists of two sets of cross tabulations for the United States civilian labor force. The first set of tables, which is used for this analysis, provides data for 512 occupational categories by sex, race, and Hispanic origin.  The second set of files that we employ in this analysis provides detailed information on educational attainment.

The EEO data files used to generate estimates is based on the 1990 census sample.  The data are estimates of the actual figures that would have been obtained from a complete count.  When all Census samples on occupation are accounted for across the Nation for the 1990 Census period, approximately one out of every six households in the United States were included in the 1990 EEO census sample file on occupation.  It is the size of the EEO sample that makes it particularly attractive to the purposes of this analysis. Fishing as an occupation does not include a sizable portion of the total US population and as a result most samples are too small to allow us to look at the concentration of fishermen in any specific area.

While studies that focus on fishermen and fishing communities do exist, the number of individuals included in the study are generally small and cannot be generalized to the broader population.  Because the EEO files provide detailed occupation down to a sub-county level we are able to exactly reconstruct the total population of fishermen within each of the 11 defined NRR's in the New England area.  Using the EEO files we can also reconstruct total employment within each member of our set of alternative occupations that fishermen could engage in.  At present, no other data set of this size and detail exists so it represents the best tool available for our research design.

## Assessment of Indices

In Table 2, we have rank ordered the sub-NRRs by our first index (% related occupations), with Downeast Maine being the most fishing dependent and Connecticut Seacoast the least. It is quite clear from the correlation coefficients between and among the indices (Table 3) that there is a high degree of concordance, indicating a strong convergent validity for the measures.

A second observation from inspecting the data in these three indices is that there are three fairly homogeneous clusters of rankings, with Downeast and Upper Mid-Coast Maine, and Cape Cod and the Islands (I) being the most fishery dependent sub-NRRs.  New Bedford/ South Shore, Rhode Island, Lower Mid-Coast Maine, Southern Maine, and Gloucester/North Shore (II) form an intermediate cluster of dependency.  New Hampshire Seacoast, Boston Area and Connecticut Seacoast (III) cluster as the least dependent grouping.  We shall discuss in detail the characteristics of each sub-NRR as reflected in the ethnographic and geographic setting of each region and as evident in our OAR ratio index.

Table 2.  Comparative Fishing Dependence Indices for the Eleven Sub-NRRs of New England

| Sub-NRR | A. % Related Occupations | B. % Of Total Employed | C. Alternative Occupation Ratio Summary |
|---|---|---|---|
| Downeast Maine | 45 | 3.6 | 255.54 |
| Upper Midcoast ME | 36 | 2.0 | 171.05 |
| Cape and Islands | 27 | 0.79 | 104.43 |
| Lower Midcoast ME | 23 | 0.46 | 51.32 |
| New Bedford/ South Shore | 27 | 0.40 | 38.95 |
| Southern Maine | 23 | 0.39 | 36.94 |
| Rhode Island | 24 | 0.31 | 30.86 |
| Gloucester/North Shore | 20 | 0.21 | 24.91 |
| New Hampshire Coast | 8 | 0.09 | 9.46 |
| Boston Area | 7 | 0.05 | 6.39 |
| Connecticut Coast | 2 | 0.01 | 2.61 |

Table 3. Comparing the Three Dependency Ratios Using Pearsons r-Correlation

| Dependency ratios | A. % Related Occupations | B. % Of Total Employed | C. Alternative Occupation Ratio Summary |
|---|---|---|---|
| A. % Related Occupations | r = 1.0 | r = .833 | r = .869 |
| B. % Of Total Employed | r =.833 | r = 1.0 | r = .984 |
| C. Alternative Occupation Ratio Summary | r = .869 | r = .984 | r = 1.0 |

<u>Downeast, Upper Mid-Coast Maine and Cape Cod and the Islands</u>
The three sub-NRRs in the high dependency cluster share some characteristics that give them strong links to the fisheries resources of New England. Downeast and Upper-Midcoast Maine share a common topography and isolation from other parts of Maine and New England. Inland, the Downeast sub-NRR is characterized by rocky, shallow soil and pine forests, with most of the near-coast interior being wetlands mixed with forest. The convoluted coastline however provides a plethora of islands and harbors offering easy access to extraordinarily rich fishing grounds.

The peninsula of Cape Cod is also bordered with natural harbors and associated fishing dependent communities such as Sandwich, Chatham, and Provincetown. Nearby islands such as Nantucket and Martha's Vineyard have a strong historical connection to fishing and a geography which gives fishing residents ease of access to nearshore stocks of finfish and shellfish. However, the Cape and Islands are a magnitude below the NRRs of Maine (2.87 on Index C. compared to 5.50 for Upper Mid-Coast Maine and 8.92 for Downeast Maine) since they have experienced intense pressures from tourism and gentrification. For example, Provincetown, MA has long been a summer mecca for artists and those with an alternative lifestyle, while maintaining a separate but equally thriving, year-around fishing industry. As the summer season has started to extend into the spring and fall, the relative balance may be shifting. Due to the diminishing groundfish catches and regulatory response, the fishing fleet is currently down to a dozen vessels from over thirty a decade ago.

On the other end, Chatham, MA continues to support a thriving small boat fleet that engages a good third of the active (non-retired) working force of the township. Within Chatham, a strong sense of place and enjoyment of the fishing lifestyle keep people involved in the industry even in years when low catches force some into alternative occupations or seasonal out-migration.[110]

### 3.7.    Summary

The use of dependency indicators in the eleven sub-NRRs of the New England management region provides a new way to conceptualize the significance of fishing to local economies and regions.[111] Using these indicators, we can clearly see a distinction

---

[110] Rene Gagne, personal communication.
[111] Because our findings are based on the most recent available census data – 1990, it is important that our measures be interpreted as ordinal, not interval, measures. The assumption underlying this is that the relative size of populations of fishermen and others have remained the same. We know that absolute numbers have changed in all regions since 1990. It is important that our work be replicated once the 2000 census data become available.

between the most and least dependent regions, and these differences are supported by regional and community ethnographies.

There is also a high level of agreement between the indices with r-values of .833 (A-B), .869 (A-C) and .984 (B-C). Using the most differentiated ratio (C), Downeast Maine, Upper Mid-Coast Maine and Cape and the Islands form a cluster as the most fishing dependent sub-NRRs, ranging from 255.54 –104.43, with a mean of 176.88. The sub-NRRs 4 through 8 range from 51.32 (Lower Mid-Coast Maine) to 24.91 (Gloucester/North Shore), with a mean of 35.59. Sub-NRRs 9 through 11 (New Hampshire Seacoast, Boston Area, and Connecticut Seacoast) have the lowest scores, from 9.46 to 2.61, with a mean of 6.1.

Within all these regions, however, fishing infrastructure and fishermen populations are intermixed with gentrified coastal economies and communities that overtly subsume and mask total capital contributions of fishing. Though the distribution of fishing infrastructure and activities make it difficult to identify and characterize particular communities as "fishery dependent," examination of the networks of fisheries activities (total capital flows) reveals significant fishery dependency. In other words, consideration of its collective impact on regional economies and its historical contribution to localized secondary economies (i.e., the "multiplier effect") suggests the valuable contribution of fishing in several regions.

Any index has as its underpinning assumptions of about how the world works. The three dependency indices we have derived assume that fishermen are able to move into alternative occupations. As we indicate above, however, there are compelling reasons why this is not an accurate assumption. We would like to add this observation to the debate on how one should assess dependency of a fishing population. The analysis of impacts of fisheries regulations must include consideration of traditional fishing populations that have survived the biological and regulatory downturns in the fishery. Just as biologists extol the use of the precautionary principal in fisheries management, we propose a corresponding precautionary principal for extant fishing populations. The baseline economic, social, and cultural needs of surviving fishing enclaves, populations, and communities within the eleven sub-NRRs of New England should be given equal importance with conservation principals. Along with fish stocks, fishing populations and their communities are highly vulnerable. If measured too simplistically, their overall contribution to regional economies may be missed in an adherence to strict measures of contributions to site-specific community economies.

The myth that *laissez-faire* economies are both desirable and sustainable is contradicted by the inexorable destruction traditional communities can suffer when such economies run unchecked over established patterns of community living and their unique forms of human, social and cultural capital.[112] Preserving human uniqueness can be compared to conservation development that strives to preserve landscape and existing ecosystem structures while allowing for the creation of built environments. While change is inherent to the human condition and can provide welcome improvements in a community's or individual's quality of life, if the full range of social, economic, political and ecological variables are ignored, the consequences may be detrimental to individuals, communities, and the ecosystem.

In applying measures of fishing dependency to the sub-NRRs of New England, we outline the uniqueness of each unit, but also caution that for purposes of application to dependency issues, only detailed sub-regional and community analysis can reveal the whole story. Since this study represents the establishment of a baseline index, we suggest that comparative regional analyses must be linked to in-depth studies of the full range of variables to predict impacts of fisheries policy and regulation.

---

[112] Gerdsen (1997)

## 4. Vulnerability, Infrastructure and Gentrification among Fishing Dependent Communities

Like most of the nation's coastal areas, New England's coast is under increasing pressure from population growth and related development.  It is estimated that half of the nation's total population now lives in coastal areas and that by 2010, that population will have grown almost 60 percent. Inevitably, conflicts arise between competing interests and demands for access to and the use of coastal resources.  While an Internet-based "Town meeting on America's Coastal Future" sponsored by National Ocean Service (NOAA) found "strong support for conserving cultural heritage and diversity" as well as "traditional occupations," in truth, competition for space threatens fishing infrastructure and culture in many areas.[113]

When working harbors are transformed to address the demand of the middle-class for upscale housing, recreation, and entertainment rather than maintained in support of the productive activities associated with the commercial fishing industry, they may be said to be undergoing gentrification. The subsequent loss of localized community character and culture is termed delocalization and affects rural and coastal communities throughout the world.  Delocalization decreases diversity and thus the adaptive flexibility needed to respond to localized changes in environment. Fishing populations undergoing delocalization lose access to total capital as values change, making it difficult for them to pursue a fishing lifestyle. This process is particularly rapid during times when the NRR is undergoing stress from reduced stocks as is currently the case.

The process of gentrification and coastal transformation is accelerating in New England as it is in most coastal areas of the US. For example, now that seals are found in Chatham, MA year round, possibly due to changes in local water temperature regimes and fish migration patterns, an operator of seal tours has started a new business. The tour operator wants a 'no wake zone' in an area where commercial boats pass through on their way to and from the harbor, because waves disrupt the water so the tourists can't see the seals on the surface.[114] As these processes accelerate, it becomes more difficult to identify 'fishing dependent communities', since the fishing industry's percentage contribution to total capital and local economies is diminished. At the same time, fishing families within these communities have necessarily adapted by increasing their networked capital flows to other communities in the NRR, intensifying the process of *regional dependency* in place of *community dependence*. Thus, the very nature of fishing in the community context has changed, as trucks, boats, and people shift and move from place to place in order to respond to opportunities to optimize capital gain in the face of reduced community infrastructure and market, and increased regional dependence and market flows.

By definition, gentry are "landed proprietors" who "typically wield large social, political and economic power."[115]  Gentrification, then, of a fishing community implies a shift in power from the working men and women of the fishing industry to "those from away," those in white-collar jobs, or tourist (service) industries, and/or those who do not value the reality of a working waterfront.  When intense external capital flow comes into a community, it necessarily increases the vulnerability of existing total capital networks. Traditions—existing ways of working, socializing, sharing, learning, and extracting economic capital—are lost or weakened as new, often mono-cultural, patterns come to dominate. Boat owners stop sharing fish at the dock, and banks stop giving loans to the fishing industry.[116]  More frequently, land use patterns change, shoreline property prices inflate and the fishing industry is displaced, with less access to the waterfront.  In those areas that attract only seasonal visitors, the attractive centers are apt to be boarded up in the off-season leaving

---

[113] http://coast2025.nos.noaa.gov/pdfs/sum_results.pdf
[114] Renee Gagne, personal communication
[115] *Webster's Third New International Dictionary*.  1976.  Springfield, MA: Merriam Company Publishers.
[116] Griffith and Dyer (1996).

the year around population without a community center. Such external influences can engulf and transform unique fishing cultures and communities following the natural resource way of life.

Regulatory layering is an additional external influence that has negative impacts on the maintenance of a fishing way of life.  As the numbers of regulations mount to increasingly constrain fishing in response to perceived stock declines, fishermen attempt to adapt by switching gear and fishing locations in order to take advantage of available species.  However,

*"Many of the fishermen we interviewed had the sense that the regulations were confining them or "boxing them in" to one fishery at the expense of allowing them to take advantage of developments in other fisheries.  This reduces the flexibility that is a hallmark particularly of smaller and medium-sized vessels, as well as contradicts current government and private efforts to promote underutilized or newly developed fisheries."[117]*

Adaptation to changing conditions has made the fishing industry of New England resilient for over two centuries.  When necessary, fishermen have changed gear, changed fishing areas, changed target species, trip patterns, and crew and in some cases even vessels to remain in the industry.  In some areas in the region, a yearly round may include, for example, a combination of lobstering, shellfishing, shrimping and groundfishing to sustain the fishing household's livelihood.  What is different now is that traditional flexibility is being harnessed and restrained by regulatory requisites associated with permits, limited access, and a recorded history of landings.[118]

Furthermore, as gentrification pressure has increased, and fishing infrastructure subsequently diminished, remaining infrastructure, supply outlets, and market connections have become increasingly de-localized. A fishing boat pulling into Boston Harbor is not likely to get repairs or buy fishing gear nearby. They can buy ice and fuel and they do offload product to regional and international seafood brokers. In fact, Boston has become specialized as the major international/ national transshipment site for seafood product in New England. This same vessel may get their fishing supplies and gear from New Bedford and Gloucester and their crew from the Cape or Portland.  As this process of regional interdependence accelerates, dependency on remaining services and infrastructure is magnified and concentrated, creating an impetus for remaining dominant fishing sites to consolidate and specialize. As with the transshipment monopoly of Boston, the development of large, capital intensive fish auctions in Portland and Gloucester is an example of such a process of regional consolidation and specialization in the fishing industry.

The result is increased mobility of product as well as boats, gear, and fishermen, as they interact with the specialized centers, supply points, and seasonally changing fishing areas. Nevertheless, the maintenance of social and cultural capital resides at the local and community level.  As fishermen are forced to practice a regional strategy, human networks and social ties can become strained for the occupational nomads.  Where it is no longer possible to be a permanent part of a year round fishing crew that socializes and fishes together, social capital declines. Onshore, networks of families and friends often reflect the fishing crews and networks. These networks diminish along with the breakup of crews, resulting in a more atomized community with more social problems and decreased participation in community activities.

*"Fishers are embedded in households that represent a shoreside extension of fishing activity.  Wives and families of fishers are often intimately involved in management of fishing operations, including tracking of finances, attending public hearings on new regulations, and providing political and public input on fishery issues.  Management policies that do not*

---

[117] Griffith and Dyer (1996:29).
[118] The recorded history requirement is particularly onerous for the small vessels that rarely maintained official records of their catch.  NMFS did not generally collect statistics from small vessels, so only those who retained sufficiently detailed receipts from buyers are able to prove their history.

*recognize this can negatively impact the social, psychological, and economic well being of the fisher household.  Costs to fisher households can range from wives being forced to work multiple jobs outside the home to foreclosures on homes whose mortgages are tied to fishing vessel mortgages."*[119]

This is compounded by increasing competition under new stricter regulations, including declining collaboration at sea:

*"Crew reductions, of course, result in more work aboard vessels per crew member and the neglect of certain activities associated with safety.  Increased competition and conflicts between vessels and between fishers from other ports, due to the perceptions that fishers are having to divide up an ever shrinking pie, have decreased the extent to which fishers help one another out of trouble on the open seas."*[120]

Stress is placed on families, children, and marriages as fishermen are forced to work across regions and even outside of their region, to make ends meet. In Gloucester, it is not uncommon to find owners of family boats who will spend time dogfishing to the south in the winter or even join a summer Alaskan fishing venture as crew in the summer.  In this context, surviving fishing infrastructure represents an increasingly valuable capital investment in a way of life.

## 4.1.    Historical and Total Capital Determinants of Infrastructure

Complexity of infrastructure is one measure of a community's dependency on fishing. However, the scale of fishing activities and the size of the community in question must be considered when using infrastructure as a signal for dependency. For example, a lobster fishing community in Maine may lack many of the indicators of complexity (e.g. ice house, fish processor), fishermen may purchase their supplies from a nearby town, ship their product on regional truck carriers, and have their boats built in Nova Scotia. Yet, most of the households can still be directly or indirectly dependent on the harvest of lobsters as a primary means of maintaining total community capital.

At the opposite extreme, a historical fishing port can have many of the indicators of complexity.  Yet, it may be losing families through migration, retraining and job switching. Out-migration may be spurred by declining economic vibrancy of the local fisheries, reflected in a decline in the quality and quantity of port facilities, and loss of dock space to the externalities of gentrification. However, if the port still possesses sufficient remnants of key infrastructure, it may be designated as highly fishing dependent, even though it is in decline and at risk of collapse from change externalities. Thus, while fishing infrastructure is one measure of dependency, the analysis must take into consideration local ethno-historical conditions, community scale and type of fishing pursued, and degree of external pressure from gentrification, along with total capital flows.

In this context, surviving fishing infrastructure represents an increasingly valuable capital investment in a way of life.  As fishing infrastructure is lost, whichever community in a region that retains such critical infrastructure may become vital to nearby communities who lack or have lost such economic capital.  Active protection and improvement of such critical infrastructure or core facilities is a proactive measure that could be taken by managers to help preserve the viability of the New England fisheries.  Persistence of industry as well as fish stocks should be a strategic goal of the fisheries management agencies.

Vital regional facilities can become vulnerable when inadequate product is available from the production sector. For example, in Hampton/Seabrook, New Hampshire, a fishing cooperative is the major landing and marketing facility for the small local fleet.  Recent

---

[119] Griffith and Dyer (1996:31).
[120] Griffith and Dyer (1996:30).

restrictions on daily landings of groundfish such as cod are making it difficult to keep the facility going with so few fish to market. The port of Rockland in Maine has a central role in the distribution of herring for lobster bait. Rockland is the only regional port with a functioning dockside pump-out mechanism for offloading herring. Rockland pier represents a core facility for dozens of bait dealers from nearby towns and hamlets supplying many hundreds of lobster fishermen in scattered small ports and coves throughout the region. If the facilities as well as stocks are not protected, once the biophysical capital rebounds, communities dependent on facilities like those in Rockland and Hampton/Seabrook will not able to take advantage of the improved stock conditions to generate fisheries capital for the region and nation.

At the same time, the declining numbers of fishermen make it more difficult to constrain the land use demands associated with gentrification.  For example, in a recent development at the state pier in Galilee, Rhode Island, a proposal by a private firm to berth a 120-foot catamaran ferry there threatens space traditionally used by local fishermen to repair their boats or to load and unload gear.  Although one ferry already operates across the harbor from the proposed business, the new ferry is being touted for its ability to save five minutes on the crossing to Block Island as well its luxury value:
 *"…the boat would include carpeting, air conditioning, and televisions. "It's like going to an amusement park… Fast food, fast cars, fast everything – that's what people want."* [121]

From the fishermen's perspective: *"All of us use this dock,"* says Narragansett skipper Cliff Sambrook, who recently used the pier to paint the Laura Jean, a 40-year old fishing boat. *"Where are we going to go?"…"It's a huge concern among commercial fishermen,"* said Jim O'Grady, a commercial fisherman. *"The boat's too big."* [122]

## 4.2.    Measuring Infrastructure Differentiation

For this report, the baseline conditions of fishing infrastructure are measured using a set of variables identified through visits to diverse community sites in New England  (Table 4). Eighteen infrastructure components were tracked for 35 communities in the New England NRR. These communities are representative of the entire region, and are dispersed through the eleven sub-NRRs. We used principal component analysis to derive a scale of infrastructure differentiation.  The scale provides a weighted empirical measure of the construct. The total variance explained equals 29.7%.

**Table 4. Principal Components Analysis of Fishing Infrastructure Differentiation**

| Item | Item loading |
|------|--------------|
| NMFS Extension Office | 0.710 |
| Icehouse in-town | 0.679 |
| Boat Insurance | 0.633 |
| International Fish Brokers | 0.630 |
| Diesel Fuel Dockside | 0.621 |
| Fishing Monument | 0.585 |
| Fish Auction | 0.578 |
| Local Trucking | 0.574 |
| Fish Processor | 0.572 |
| Fishermen supply house | 0.539 |
| More than two fishing associations | 0.533 |
| Boat welders | 0.531 |
| Vessel haul-out facility | 0.507 |

---

[121] Davis (2000:C3).
[122] Davis (2000:C3).

| Local net maker | 0.459 |
|---|---|
| Marine Supply House | 0.412 |
| Bait House | 0.374 |
| Fish retail store | 0.359 |
| Two or fewer fishing associations | 0.336 |

Prime (top six) components of dependency include icehouse, NMFS extension office, dockside diesel fuel, international fish brokers, and boat insurance. The lower level (bottom six) components include bait house, more than 2 fishing associations, marine supply house, local net maker, fish retail store, and two or fewer associations.

Middle range items include local trucking, fish processor, fishing monument, boat welders, fishermen supply house, and vessel haul out facility. These eighteen total items load on a single factor of fishing infrastructure that allows us to rank order the sampled ports in the region by means of their particular factor scores on the scale. Those that score highest have the highest correlation to the factor, while those that score the lowest, the least. We assume there is some link between these scores and the level of one aspect of fishing dependency in the port.

However, it is critical to note that other economic activities besides fishing go on in a port, and can mask the importance of fishing infrastructure in any single community. This is an argument against using strict economic valuation (amount of total community economic capital measured against amount supplied by the fishing industry in any port) to identify a community as fishing or non-fishing dependent.  As noted earlier, fishing dependency is best measured by examining communities in a regional context of total capital exchanges, not by measuring each community as economic isolates having no regional value outside their non-fishing economies.

## 4.3.    Classification of Community Sample by Categories

The list of 36 communities (Table 5) shows seven ports that can be classified as having "primary" infrastructure (New Bedford, Portland, Gloucester, Chatham, Point Judith, Portsmouth) with the remainder being secondary and tertiary ports. Also, some ports contribute more to the regional flow of total fishery capital than others do. For example, New Bedford, that tied for top ranking of 1.5 and factor score of 1.999, is often mentioned by nearby communities in Massachusetts and Rhode Island as a source of fishing supplies and the site where vessel haul-out and repair is done.  Portland serves a similar role in Maine and New Hampshire.

**Table 5. Fishing Infrastructure Differentiation Scale for the New England NRR.**

| Port Ranking | New England Fishing Port | Factor Score |
|---|---|---|
| 1.5 | New Bedford, MA | 1.999 |
| 1.5 | Portland, ME | 1.999 |
| 3 | Gloucester, MA | 1.678 |
| 4 | Chatham, MA | 1.614 |
| 5 | Point Judith, RI | 1.350 |
| 6 | Portsmouth, NH | 1.000 |
| 7 | Stonington, ME | .789 |
| 8 | Rockland, ME | .759 |
| 9 | Vineyard Haven, MA | .598 |
| 10 | Stonington, CT | .440 |
| 11 | South Norwalk, CT. | .428 |
| 12 | Port Clyde, ME | .337 |
| 13 | Newport, RI | .248 |
| 14 | Sandwich, MA | .175 |
| 15 | Kennebunkport, ME | .061 |
| 16 | Beals Island/ Jonesport, ME | .036 |

| 17 | Plymouth, MA | -.015 |
| 18 | Tiverton, RI | -.035 |
| 19 | Niantic/Waterford, CT | -.096 |
| 20 | Belfast, ME | -.145 |
| 21 | York, ME | -.231 |
| 22 | Cape Porpoise, ME | -.240 |
| 23 | Searsport, ME | -.252 |
| 24 | Provincetown, MA | -.319 |
| 25 | Hingham, MA | -.329 |
| 26 | Hyannis ,MA | -.364 |
| 27 | Jamestown, RI | -.406 |
| 28 | Scituate, MA | -.481 |
| 29 | Boston, MA | -.629 |
| 30 | Bridgeport, CT | -.823 |
| 31 | Eastport, ME | -1.051 |
| 32 | Cutler, ME | -1.184 |
| 33 | Sakonnet Point, RI | -1.446 |
| 34 | Northport, ME | -1.628 |
| 35 | Woods Hole, MA | -1.844 |
| 36 | Bucksport, ME | -1.989 |

The infrastructure complexity results for New Bedford, Portland, Point Judith, and Gloucester are consistent with information generated from a 1996 study of the Multispecies (groundfish) fishery.[123] Table 6 shows that in 1996, infrastructure, as measured by number of marine equipment suppliers and fish dealers/processors, is consistent with the rankings generated using the infrastructure index presented herein. At the time, numbers of groundfishing permits ranked high for these ports, however there has been a significant decline in permits and infrastructure related items for groundfishing since then.

Table 6.  Comparative Fishery Dependency Table for the Five Primary Ports in the MGF in 1996

| | New Bedford | Gloucester | Chatham | Portland | Point Judith |
|---|---|---|---|---|---|
| Repair/supply facilities | 35 (5) | 12 (2) | 15 (3) | 21 (4) | 11 (1) |
| Fish dealers/processors | 77 (5) | 43 (4) | 29 (1) | 42 (3) | 32 (2) |
| Religious art/architecture dedicated to fishing | (1) | (1) | (0) | (0) | (1) |
| Secular art/architecture dedicated to fishing | (1) | (1) | (1) | (1) | (1) |
| Number of MGF permits | 128 (4) | 219 (5) | 110 (3) | 60 (1) | 78 (2) |
| Number of MGF vessels | 241 (4) | 322 (5) | 84 (3) | 80 (2) | 55 (1) |
| Fishing Dependency Index Score | 21 | 17 | 11 | 11 | 7 |

---

[123] Griffith and Dyer 1996.

In 1996 groundfishing supported a core part of the industry, accounting for between 44 and 53% of their seafood dealing and processing capacity and significant employment. Amendment 7, the groundfish vessel buyback program, reductions in Days at Sea (DAS), and recent closures in the Gulf of Maine have significantly reduced the groundfish fleet as well as the supporting infrastructure for this part of the industry.

Significant groundfish-related infrastructure were also recorded in 1996 for Portsmouth, NH, and Newport, RI and they retain high rankings at 5 (factor score of 1.024) and 12 (factor score of .287) on our 1999-2000 fishing infrastructure scale. According to key respondents, however, development interests are presently threatening Newport's commercial fishing infrastructure. These interests would like to see the commercial fishing dock space converted into a tourist site, to complement nearby gentrified areas of shops, recreational dock space, and restaurants. The fishing infrastructure, then, is not considered an integral part of the dockside tourist ambiance in Newport. It is instead separated in an enclosed area between a yacht building and docking facility and the gentrified dockside and recreational boating waterfront of the town. Overall, the comparative fishing dependency in 1996 identified five primary ports that remain the top five based on the differentiation scale used in this study.

Other significant ports in 2000 include Rockland, ME (rank of 8, factor score of .759), and Stonington, ME (rank of 7, factor score of .789). Rockland is important as a docking and distribution center for the herring fleet, and individual bait dealers congregate in Rockland and purchase herring dockside. They supply hundreds of fishermen in some fifty nearby communities in the region with herring. The Rockland fishing infrastructure is thus mostly dedicated to serving herring vessels. The infrastructure includes a pump-out facility for herring, and a separation tank for herring scales, used in the manufacture of cosmetics and jewelry.

Stonington (rank of 7, factor score of .789) is the most developed Maine port community dedicated to lobster fishing. Several hundred lobster fishermen live on the Stonington peninsula and dock at the Stonington port and nearby lobster "camps." Lobster camps are located in small coves and harbor a dozen or more boat moorings and nearby shanties for equipment storage. Stonington port also services a few scallopers and groundfishing vessels, and two large fish processing plants lie dormant on the docks. These were previously used to process herring and other finfish, but are now used as storage facilities. Stonington sits on the tip of a peninsula, and is the principal embarkation for fishing families inhabiting residential clusters and villages up and down the peninsula.

Vineyard Haven is a unique port on the island of Martha's Vineyard, MA, and is best known as a summer tourist mecca. Despite its historical importance as a refuge for the upper class, it has a surprising fishing infrastructure differentiation rank of 9 and a factor score of .598. This port has basically just one of each infrastructure item, but is home to a small but thriving commercial and artisanal fishery of part-time clammers, hook and line fishermen, lobster fishermen, and draggers. These fishermen fill the local demand for fresh seafood products, for local residents year round and for the large number of summer residents. The isolation of the site and its value as a recreational destination for upper class tourists and celebrities contributes to the reliable local demand for seafood products. Thus, being one of the most gentrified of ports does not threaten the small but active commercial fishery. The fleet benefits from high local product demand and the ability of the upscale consumer clientele to pay above average prices. Moreover, the fishing infrastructure, in contrast to Newport's, is integrated into the local ambiance of the town enhancing the "saltiness" of this island community and continuing to attract appreciative wealthy visitors.

Stonington, CT, with the largest fleet of draggers in Connecticut, ranks 10 on the scale (factor score of .440). Stonington has the only integrated commercial facility in the state where all fishing vessels can dock, and which is protected from incursions by developers through a set-aside agreement with the township. South Norwalk, CN also scores high with a ranking of 10 and factor score of .468. South Norwalk is unique in that it is the operations

center for the Talmadge Oyster Co., the largest shellfish operation in the region. Talmadge has dock space for vessels unloading product, and in nearby Bridgeport also has a dockside presence and a shucking operation for oysters. The difference between Stonington, with its set-aside dock, and South Norwalk is that commercial fishing vessels in South Norwalk are not located in one dock area, but are dispersed up and down the river.

This is the case with practically all other commercial fishing enclaves in Connecticut. For example, Groton, with 31 commercial fishermen, and New London, with 24, represent a considerable commercial fishing presence, but the vessels are found in dispersed clusters up and down the river, with no central docking facility for commercial fishing and no plans to construct one. New London does have an older docking facility, dominated by lobster vessels, but this is in considerable decay and only serves about a half dozen vessels.

This dispersed pattern of vessels by port makes it difficult for local economic leaders to recognize and identify with the fishing industry. Such a lack of recognition can be a threat to the survival of existing infrastructure and fishing operations. For example, Bridgeport has no significant fishing infrastructure (rank of 30, with a factor score of -.823), yet there is a cluster of 18 lobster boats that use rented recreational dock space. A major dockside development is planned, but there has been no consultation with or integration of the commercial lobster fishing cluster into the plan. As plans now stand, the 18 vessels in Bridgeport will be displaced from their present docking spaces without being provided with alternative spaces.

## 4.4.    Gentrification and Loss of Infrastructure.

Loss of existing port fishing infrastructure stands out as one of the potentially most harmful threats to the health of fishing dependent communities and regions in New England. Many ports now have just the bare minimum of supporting infrastructure, particularly with the losses associated with the regional decline in the groundfishing fleet. The diminishing numbers of fishermen, vessels, processors and supporting services also affects the ability of communities to retain social and cultural capital. Because of the decline in social and economic capital associated with the fishing industry, gentrification is much more difficult to resist.

As demand and prices for shoreside property rise, real estate taxes also mount and owners with modest incomes or life styles are forced to sell their property. Bought out and disenfranchised from their historic spaces and places, their networks of social and cultural capital can be lost. Gentrification can lead to undesirable social and human costs and an overall loss of communal identity. Once such transformations take place, it is difficult or impossible to reverse the process. As fishing infrastructure is lost, space it occupied can be permanently transformed for alternative uses.

Nevertheless, gentrification, like other processes of cultural transformation, is influenced by historical trends. Some ports and regions have adapted well to a history of gentrification, and are able to accommodate varied uses by tourists and seasonal residents. Generally, such communities are accessible by major highways and roads, have adequate support services for development, and have dockside and seaside space for expansion and/or transformation.

Not all communities with a history of gentrification, however, continue to support their fishing industry. Provincetown, MA, at the tip of Cape Cod, is in a very scenic area with wide expanses of natural beaches and dunes. Formerly a thriving fishing village, it has preserved its architectural heritage in its evolution into a summer art colony with a tourist shop and restaurant center that attracts thousands of weekend and summer visitors.[124] As the

---

[124] Griffith and Dyer (1996). On August 9, 2000, *The Boston Globe* reported that Rhode Island's Department of Environmental Management was denied permission to use the State Fish Pier because of the potential negative impacts on Galilee's fish industry.

Exhibit B
(Part 3)

County Profile
Cape Cod & the Islands Sub-region

## 5.4.    Cape Cod & the Islands Sub-region
### 5.4.1.  Barnstable County

*Background*

"Barnstable County consists of the 15 coastal towns located on the peninsula known as Cape Cod. Bordered on the north by Cape Cod Bay, to the east by the Atlantic Ocean and to the south by Nantucket Sound, it is the easternmost point of land in the Commonwealth of Massachusetts. With over 550 miles of shoreline and more than 360 lakes and ponds, the maritime heritage of the region is deeply rooted. Approximately 396 square miles of land are home to over 205,000 year round residents, swelling to more than three times that number during the peak summer months.

The County seat is located in Barnstable Village on Historic Route 6A, the Old King's Highway, in the Town of Barnstable. County offices are located in the Superior Court House, the First District Court House and the Registry of Deeds and Probate Building.

Established as a County in the year 1685, the current boundary lines were drawn in 1707 and have not changed since that date. Although initially the counties of the Commonwealth were mainly judicial in nature, over time additional responsibilities were assigned by the state legislature. Subsequently, many counties served as subdivisions of the state government, serving as an administrative arm of the Commonwealth on a regional basis, but without legislative authority.  This changed in Barnstable County with the passage of the Barnstable County Home Rule Charter, signed into legislation in July of 1988, which guaranteed certain rights of home rule for the county and established a legislative body with the power to enact ordinances. This increased Barnstable County's accountability to the residents of Cape Cod and provided for increased citizen participation and input in the function of County Government.

Barnstable County government has long been recognized as a model for successful regionalization of services, ranging from public safety to fiscal, health, human service, economic development, planning and land use functions."[1]

**The Cape Cod Commission**
In the wake of an unprecedented growth boom in the 1980s, the Cape Cod Commission Act found that the region known as Cape Cod (Barnstable County) possesses unique natural, coastal, historical, cultural and other values which are threatened by uncoordinated or inappropriate uses of the region's land and other resources.  Thus, the Cape Cod Commission was created in 1990 by an Act of the Massachusetts General Court and confirmed by a majority of Barnstable County voters.

The Commission was established as a regional planning and regulatory agency to prepare and implement a regional land use policy plan for all of Cape Cod, to review and regulate Developments of Regional Impact, and to recommend designation of certain areas as Districts of Critical Planning Concern.

The Commission is a department of Barnstable County and is funded by the Cape Cod Environmental Protection Fund.

---

[1] http://www.barnstablecounty.org/

COMMISSION MAKEUP
The Commission is made up of 19 members representing each of Barnstable County's 15 towns as well as the County Commissioners, minorities, Native Americans, and a governor's appointee. They are citizen volunteers who guide a professional staff to plan for Cape Cod's future growth, provide technical assistance to towns, review and vote on major developments and act as the Commission's liaison to their communities.

Commission planners and technical staff have expertise in a wide variety of areas including: landscape architecture, land use planning, economic development, affordable housing, historic preservation, wetland and wildlife resources, water resources, coastal resources, waste management, transportation planning, communications and computer mapping. Staff is available to discuss specific issues or projects with local officials, project proponents, and the public.

One example of a county-level service that has practical implications for the fishing industry of Cape Cod is their dredging service. "The Barnstable County Dredge *Codfish* provides dredging service to towns at approximately 70% below the market rate. The dredged material has been used to successfully renourish many of the Cape's beaches, while at the same time allowing ease of navigation in several harbors and riverways."

## Fisheries Dependency
The Cape and Islands is third, following Downeast Maine (1) and Upper Mid-coast Maine (2), on the dependency index that is based on the employment indices used in this project. The fishing infrastructure scale looks at individual ports, but several of the Cape Cod & Islands ports are listed among the top ports. For example, Chatham has a ranking of four, Vineyard Haven is ranked as nine, Sandwich is 14 out of the 36 ranked. Despite gentrification, these ports are actively engaged in the fishing industry.

Provincetown-Chatham are lumped together by *Fisheries of the United States, 1999.*[2] In comparison to other major U.S. ports 1998-99, Provincetown-Chatham numbered among the top 50 ports with landings of 17.8 million pounds in 1998 and 20 million pounds in 1999. The value of these landings was $10.2 million in 1998 and $12.9 million in 1999. While the price per pound was approximately the same as found in Pt. Judith, a port to which Chatham is often compared, the quantities landed were much smaller.

The profiles provide a more in-depth look at the social and cultural capital devoted to the industry.

## Governance
Barnstable County has two branches of government: the executive branch, the County Commissioners and the legislative branch, the Assembly of Delegates.

## Demography[3]
### Population
The 1990 Census found 186,605 residents of Barnstable County. Of these 88,161 were male, 98,444 were female.

### Age Structure
According to the 1990 Census, there were 44,733 children (under 20), 100,550 were adults (21 to 64), and 41,322 were 65 or over.

---

[2] *Fisheries of the United States*, 1999. U.S. Dept of Commerce, NOAA, NMFS. Prepared by Fisheries Statistics Division. Available at http://www.st.nmfs.gov/st1/fus/fus99/index.html
[3] http://venus.census.gov/cdrom/lookup/

Education
Of persons 25 years and over, 15,588 had no high school diploma, 41,186 had graduated from high school, 39,590 had some college, and 37,587 had a Bachelor's or higher degree.

Housing
There were 135,192 housing units, 77,586 occupied and 57,606 vacant.  Of the occupied housing, 56,136 were owner occupied, 21,450 were rented.  Median value of the owner-occupied housing was $162,500 and the median year the structures were built was 1971.

Racial and Ethnic Composition
Barnstable County was predominantly white (179,518 individuals) with Irish, English, and/or German ancestry frequently cited. There were also 2863 Blacks, 1158 American Indians/Eskimo, and 931 Asians.

*Economic Context*
Income
The median household income in 1989 was $31,766; per capita income was $16,402.

Employment
For persons 16 and over, 2,655 selected "agriculture, forestry, and fisheries as their "industry" and 2,271 selected "farming, forestry, and fishing occupations" as their "occupation."  Retail trade was the largest category for "industry" with 18,846, followed by construction (8191), health services (7314) and other professional services (7004).

Community Profiles
Barnstable County, Massachusetts
Cape Cod & the Islands Sub-region

## 5.4.1.1.  Sandwich

### Background

"Incorporated in 1639, Sandwich is the oldest town on Cape Cod.  It is located on both sides of the Cape Cod Canal with the majority of its population and landmass on the southerly side of the canal.  Sandwich is a mostly residential community with a winter population considerably smaller than the population during the warm summer.  Residents feel that its charm and uniqueness combined with its ideal location make Sandwich a very attractive place both to live and visit."[4]

"Sandwich's beaches along Cape Cod Bay stretch for miles and provide a wonderful view on a clear day of the many vessels that pass through on their way to or from the Boston area.  Commercial fishermen and lobstermen can be seen daily from the docks at the Sandwich Marina, the only harbor along the canal.  Not too far from the marina is historic Sandwich Village which is a world-renowned tourist destination, providing a glimpse into New England's rich colonial history.  Heritage Plantation, Sandwich Glass Museum, the Thornton Burgess Museum, Hoxie House (the oldest house on Cape Cod), Daniel Webster Inn, Dexter Grist Mill and various art galleries, rare book and antique stores are some examples of the attractions which bring visitors to Sandwich from all across New England and the world."[5]

A small fleet of commercial fishermen follows a long tradition of small-scale pursuit of lobster, shellfish and finfish.  Sandwich, described by locals as a "fishing enclave," lies at the intersection of the lower mid-coast of Massachusetts with the inner and outer Cape and Islands.

Sandwich has a long history of fishing, including a now defunct herring fishery (local inhabitants used to catch herring in inshore waters which they pickled and sold by the barrels).  Local fishermen also beach seined and did hook and line fishing.  The proximity of the Cape Cod Canal now allows boats to bring in cod and other fish caught off the Cape to be processed then shipped out to New Bedford, or sold locally in nearby fish markets.

Many historic buildings, elegant bed and breakfast locations, museums and shops make the central district of Sandwich an attractive weekend tourist destination. However, the fishing and marina operations are located northwest of this central tourist corridor. Despite the well-developed tourist sector in the central town, there is little sign of gentrification or expansion that would threaten existing commercial fishing operations. Thus, like Plymouth, with its stabilized meld of gentrified tourism and well-maintained commercial fishing space, the cultural and economic capital of fishing has not been usurped by development.

### Governance

Five-member, part-time, Board of Selectmen, Town Administrator and Town Meeting.

### Demography

Population[6]

The population of the Town of Sandwich, per the 1990 US Census, was 15,489 persons (349 people per square mile of Town area). Of that total, 7,539 were males and 7,950 were female. The Sandwich population as of January 1, 1997 was 19,521.

---

[4] http://www.state.ma.us/dhcd/iprofile/261.htm
[5] http://www.state.ma.us/dhcd/iprofile/261.htm#NARRATIVE
[6] http://www.state.ma.us/dhcd/iprofile/

Age Structure
According to the 1990 Census, there were 4664 children (under 21 years), 8641 adults (21-64) and 2184 seniors.

Education
Of persons over 25, 810 had not graduated from high school, 2659 had a high school diploma, 3310 had some college, and 3430 had a Bachelor's or higher degree.

Housing
There were 7,236 housing units, of which 5,557 were occupied and 1679 were vacant.  Of those occupied, 4653 were owner-occupied and 904 were rented.  The median year the structures were built was 1978 and the median value of owner-occupied housing was $159,700.

Racial and Ethnic Composition
The majority of the population was white (15,146) with 97 Blacks, 35 American Indians, 123 Asians and 88 "other."  Irish, English, Italian and German were the most common ancestries cited.

*Economic Context*
Income
The median household income is $43,500, rating 17.7% above the Massachusetts
 State average. Per capita income is $17,412. Average household size is 2.74 persons per household. Four point eight percent of households are below the poverty line.

Employment
INDUSTRY
Universe: Employed persons 16 years and over

| | |
|---|---:|
| **Agriculture, forestry, and fisheries (000-039)...** | **247** |
| Mining (040-059)... | 7 |
| Construction (060-099).. | 664 |
| Manufacturing, nondurable goods (100-229)... | 226 |
| Manufacturing, durable goods (230-399)... | 369 |
| Transportation (400-439)... | 306 |
| Communications and other public utilities (440-499)... | 301 |
| Wholesale trade (500-579)... | 262 |
| Retail trade (580-699)... | 1528 |
| Finance, insurance, and real estate (700-720)... | 618 |
| Business and repair services (721-760)... | 317 |
| Personal services (761-799)... | 294 |
| Entertainment and recreation services (800-811)... | 91 |
| Professional and related services (812-899): | |
|   Health services (812-840)... | 719 |
|   Educational services (842-860)... | 505 |
|   Other professional and related services (841, 861-899)... | 521 |
| Public administration (900-939)... | 357 |

OCCUPATION
Universe: Employed person's 16 years and over

| | |
|---|---:|
| Managerial and professional specialty occupations (000-202): | |
|   Executive, administrative, and managerial occupations (000-042)... | 1080 |
|   Professional specialty occupations (043-202)... | 1212 |
| Technical, sales, and administrative support occupations (203-402): | |
|   Technicians and related support occupations (203-242)... | 226 |
|   Sales occupations (243-302)... | 1393 |
|   Administrative support occupations, including clerical (303-402)... | 951 |

Service occupations (403-472):
  Private household occupations (403-412)...        10
  Protective service occupations (413-432)...        96
  Service occupations, except protective and household (433-472)...        754
**Farming, forestry, and fishing occupations (473-502)...**        **198**
Precision production, craft, and repair occupations (503-702)...        896
Operators, fabricators, and laborers (703-902):
  Machine operators, assemblers, and inspectors (703-802)...        140
  Transportation and material moving occupations (803-863)...        216
  Handlers, equipment cleaners, helpers, and laborers (864-902)...        160

CLASS OF WORKER
Universe: Employed persons 16 years and over
Private for profit wage and salary workers...        4905
Private not-for-profit wage and salary workers...        477
Local government workers...        635
State government workers...        169
Federal government workers...        229
Self-employed workers...        887
Unpaid family workers...        30

## Transportation and Access
Sandwich is situated on Cape Cod, a 65-mile long sandy peninsula comprising Barnstable County. The Cape has excellent highway, rail, bus and air connections to other parts of New England.  Air, bus, and passenger rail service expand during the summer months to accommodate the large numbers of tourists.

Major Highways
Principal highways are the Mid-Cape Highway (U.S Route 6), and State Routes 6A and 130. The portion of State Route 6A through Sandwich is a national historic district.

Rail
The Bay Colony Railroad provides freight rail service to Sandwich. The Cape Cod Scenic Railroad operates a seasonal excursion train between Hyannis and the Cape Cod Canal.

Bus
Sandwich is a member of the Cape Cod Regional Transit Authority (CCRTA), which operates a b-bus demand response service. The Plymouth and Brockton Street Railway Company provides bus service from the Sagamore Circle commuter lot to two locations in Boston.

Other
Barnstable Municipal Airport, a Primary Commercial Service (PR) facility, has two asphalt runways 5,249' and 5,430' long. Instrument approaches are available. Marstons Mills Airport, a privately owned public use facility, has 2 turf runways.

## Hospitals, schools, libraries, museums

Hospitals
Cape Cod Hospital (Hyannis)
Falmouth Hospital  (Falmouth)
Jordan Hospital      (Plymouth)
Tobey Hospital      (Wareham)
Rehabilitation Hospital of the Cape & Islands  (RHCI) (Sandwich)

Schools
Henry T. Wing School (K-8) 983 Students
Oak Ridge School  (K-8) 1,038 Students
Forestdale School (K-8) 1,016) Students
High School (9-12) 982 Students
Upper Cape Cod Vocational Technical School (Bourne) 90 Sandwich Students as of 10-1-99

Library
Sandwich Public Library, founded 1891.

Churches
St. John's Episcopal, Corpus Christi (Catholic),
Forestdale Baptist, Covenant Baptist,
Sandwich Community Church of the Assemblies of God,
First Church of Christ,
Sandwich Meeting of Friends (Quaker)

Museums
Heritage Plantation of Sandwich
The Old Hoxie House
Sandwich Glass Museum
Thornton W. Burgess Museum
Yesteryears Doll & Toy Museum

## Fisheries Profile

Community
Because the commercial fishing infrastructure (fishing basin) is separate from the tourist attractions, there are no dockside restaurants, hotels/inns, bars, or clubs. The enclave nature of this small-scale site is indicated by the absence of infrastructure components such as boat builders, boat yards, boat dealers, a fish auction, seafood brokers, fishing monuments, maritime museums, or marine railways. Although fishing represents an historical activity, it has always been part of a mixed economy including tourism, agriculture, and transport.

Although the fishing infrastructure *per se* is not seen as threatened, the transformation of surrounding areas by road development, increasing numbers of homes and hotels, and an influx of what local fishermen regard as outsiders (i.e., Boston-type suburbanites), has increased the price of real estate, a potential concern in the long-term.

Commercial fishing and fisheries-related employment

*Harvesting structure*
A small fleet of six stern draggers pursues the multispecies groundfish fishery. This activity has been hampered by Days At Sea restrictions, and groundfishermen pursue shoreside activities, lobster fishing, or shellfishing when they are unable to earn enough trawl fishing.  There are no purse seiners, urchin dive boats, or eastern rig trawlers, although there are several local divers who will occasionally fish for urchins.  In addition, five scallop boats fish nearby.  Until recently when regulations forbade targeting dogfish, gillnetters counted on catching them in the winter. Tuna are caught with rod and reel or harpoon.

The largest contingent of fishermen is lobstermen who set their traps in the inner Cape waters. However, there has been a noted decline in the lobster fishery, with fewer lobsters caught, some problems with shell rot disease, and a reduction in the size of lobsters.

*Processing structure*
The major fish processing company in Sandwich is Canal Marine Fisheries. This business has six regular employees, including clerical staff, one manager and four laborer/truck drivers. They pick up six other workers as temporary employees, most of whom are from Mexico and Guatemala.

This fish processor/shipper/wholesaler has been in operation since 1938, and has links to businesses all throughout New England, as evidenced by the entourage of trucks from Massachusetts, Maine, Rhode Island, and even Fulton's in New York parked outside in the dock lot. However, their primary market remains a local one in seafood restaurants and local hotels (e.g., in Hyannis). The specialties of this processor include lobster, tuna dressed and shipped, and bait (herring, mackerel, and skate). Other species from the area sold and shipped include cod, fluke, dabs, summer flounder, yellowtail, haddock, and gray sole. Other less significant species caught or processed include crab, striped bass, dogfish, skate, monkfish, bluefish, scallops, and menhaden (pogies—also used for bait, and shipped in from New Jersey).

This firm is another example of the regional connections linked by total capital flows. The company regularly buys from at least 20 purse seiners from Portland to New Jersey and 10 midwater trawlers. They send out their trucks (of which they have two) to pick up fish or product is trucked in to this site from all across the region. Each day begins with a ritual of regional phone calls that goes on from the very early morning throughout the day. Connections are not just dockside but directly with vessels at sea that call in using cell phones to check market demand and price.[7]

Additional workers are usually Hispanic immigrants who are brought in as a group and paid minimum wage. These workers are identified by brokers who generally use vans to get groups of workers from their homes in such immigration centers as New Bedford, Chelsea, Lowell, to their job sites. The use of immigrant workers associated with brokers is also common in the seafood-processing sector of Gloucester, Boston, Point Judith and New Bedford.

*Support Services*
Contemporary fishery infrastructure is adequate to maintain the existing activities. The infrastructure includes a fish retailer, air fill station for urchin divers, dockside diesel fuel, a dock with seasonal and year round transit slips, a fish processor, ice house, harbor master, one fish and tackle dealer, fish and seafood wholesaler, fish retailer, dockside welding service, cold storage warehouse, and four local seafood restaurants.

A small local grocer supplies food to the commercial sector, and operations are overseen by a harbormaster.  The lack of fishing capital in boat building, net making, and roadside fish vending distinguishes Sandwich from some of the northern ports of the same size in Downeast Maine, for example.

Sandwich Marina, open year-round, has 180 commercial and recreational slips, water, electricity, showers, parking, a playground area, boat amp, winter storage, and can accommodate boats up to 70 ft.

The East Boat Basin located on the south side of the Canal in Sandwich has slips for recreational and commercial vessels. The area is leased from the Corps of Engineers to the Town of Sandwich for operation year round. On a fee basis, boaters may utilize the marina's slips or boat ramp.

---

[7] One of the biggest knowledge deficits in the functioning of the Natural Resource Region and its sub-regions of New England is the regional flow of total capital represented in the marketing, shipment and consumption of fishery produce, and should be a topic of special consideration for research by the Department of Commerce.

On the west end of the Canal, the Buttermilk Bay channel provides boaters access to the Taylor Point Marina, which is owned and operated by the town of Bourne.

*Employment (year-around and seasonal)*
According to key respondents, the mix of commercial boats support approximately 70 commercial fishers, most of whom are engaged in lobster fishing.

According to key respondents, there are an estimated 200 households directly dependent on commercial fishing, and an additional 70 households that are indirectly dependent on the fishing industry.

*Marketing*
The parking lot of the Sandwich Fish Basin is filled with a sundry assortment of refrigerated small to mid-sized trucks, which vary with the season and availability of fish.  There are two delivery trucks that purchase mackerel, and two trucks from Long Island that will pick up product and deliver herring from Maine for lobster bait.  Seafood is brought into local markets through lobstering, tuna fishing, and gillnetting.

*Species, Seasonality*
Spring and fall are the peak fishing/ marketing seasons for lobster and winter for gillnetting. In the off season, some fishermen are involved in carpentry, while others may fish with rod and reel for striped bass, fluke, mackerel, and bluefish.

Until the recent rise of quotas for dogfish, fishermen would switch over to gillnetting, or long lining for dogfish and cod when dragging, lobstering, or shell fishing was poor.

<u>Recreational fishing and employment</u>
There are approximately ten recreational fishing vessels, which steam out of the protected basin marina via the canal to fish tuna, bluefish, striped bass, and other species.  In addition, 4 charter boats are available for tuna fishing using rod and reel.

<u>Fishing-related programs and services</u>
An indication of the logistic importance of Sandwich is the presence of a Coast Guard facility, and a National Marine Fisheries Service extension office.

## Perceptions of the Fishing Community[8]

<u>**Boundaries**</u>
Of the 70 commercial fishermen who work out of Sandwich, only half live in the immediate area. The others come from Bourne and Plymouth because there are no slips presently available in their hometowns. Many of the commercial fishermen are on waiting lists for slips in these locations, but given the value of coastal property and the significance of tourism to the area, commercial fishing slip space will probably remain scarce.

Community contacts are linked to the patterns of fishing, and to the closed nature of the fishing enclaves that make up the coast. Plymouth was noted as the community that people had the most contact with. It is interesting that Hyannis has "bigger buyers" in the fishery, and is where most fish from Sandwich is sold. Hyannis is also highly gentrified with numerous seafood restaurants, hotels, and tourist industry infrastructure. Other community contacts were as follows:

| Sell Fish | Hyannis |
|-----------|---------|
| Offload Fish | Chatham |

---

[8] Based on key informant interviews

152                                    Cape Cod & Islands

| Buy Fishing Gear | New Bedford |
| Buy Ice | Sandwich |
| Buy Fuel/ Oil | Sandwich |
| Haul out Boat Repairs | Sandwich |
| Book Keeping | Sandwich |
| Banking | Sandwich |
| Shopping | Sandwich or Hyannis |
| Go to Church | Sandwich |
| Got to School | Plymouth |
| Go for Health Care | Hyannis |
| Go for Childcare | Plymouth |
| Visit Relatives | Sandwich to Plymouth |
| Visit Friends | Sandwich to Plymouth |
| Go for Vacation | Florida |
| Go for Recreation | Plymouth, deep sea fishing |
| Socialize | Hyannis |

## Communication Issues

Despite regulatory limitations, communication with management is overall a success. Communication with local fishery managers was rated as "good," with state managers as "good," and with regional federal managers as "good." The overall mood is one of optimism that the fishery will sustain itself, and that management has done a good job in allowing the fishery of this region to continue to thrive.

## Assessments

There is clearly disagreement about the assessment of stock conditions between fishermen and scientists. Key respondents indicate that the groups "strongly disagree" on the conditions of stocks, and that fishermen see the ecosystem and supported fisheries in good shape, while the scientist are thought to be too rigid in interpreting conditions as in a state of collapse through over-fishing.

## Local management practices

Unlike Chatham, with its folk-managed shellfishing regime, there are no homegrown techniques for increasing stocks in this part of the Cape.

## Economic Change

As with small enclaves in Maine, the population of fishermen is stable, and the perception of several key respondents is that the fisheries here have been and will continue to be successful.

The perceived economic condition of the fishery over time has been good, with recent declines attributed to an increase in numbers of fishermen, particularly in the lobster-fishing sector. Ten years ago the fishery was "excellent," and five years ago "good," but today is rated as "average," with a mark of "fair" anticipated for the fishery five years from now due to the perceived trend of an increasing number of fishermen and traps.

The one counterbalance to perceived declines from increased competition is an increase in the price of product, particularly for finfish. High quality finfish attracts high prices at the fish auctions in New Bedford and Gloucester. The demand fueling high prices is partially from the large urban marketing sector of Boston, which serves local restaurants as well as elite hotels and international customers in Japan, Canada, and western Europe.

Today, increased prices for quality fishery products has improved the standard of living of those in the local fishery, though a countervailing force is the increased cost of real estate stemming from an influx of "outsiders."

### Effects of recent management

Regulations that are having the most impact for the Sandwich fishing enclave are trap limits for lobster, Days At Sea limits for draggers, and tuna quotas for the charter boat and commercial tuna fishing sector.

### Fishing families

Spouses of fishermen are working more outside the home today than five years ago, and this is significantly different from conditions five years ago.

Community Profiles
Barnstable County
Cape Cod & the Islands

## 5.4.1.2.  Hyannis

*Background*
The town of Barnstable includes seven villages within its boundaries.  Each village has unique and significant cultural and historical qualities. Centerville, located on the south side, is primarily residential, includes the Christian Camp Meeting Association and has a beautiful beach. Osterville is located on the south side, is primarily residential and includes inlets and harbors for fishing and boating.  Hyannis is the town's central business/commercial district, which includes town offices and several shopping malls.  Hyannis is also a fishing village and its harbor provides steamship access to Martha's Vineyard and Nantucket Islands.  Marstons Mills is primarily residential and is located on Route 28.  Cotuit is a village located on a peninsula on the south side, is primarily residential and has several small beaches.  West Barnstable is primarily residential and sparsely populated. Barnstable is located on the north side that houses the County Complex and has a working harbor and several small beaches.[9]

Hyannis is one of the most gentrified of the Cape Cod ports, with a long history of catering to the upper class of New England Society. The port of Hyannis is replete with marinas, dockside seafood restaurants, hotels, seaside condominiums, and sports a festive elitist demeanor of wealth and leisure. Dozens of recreational craft jam the dock space, and slips are the most expensive in New England, costing one dollar a foot/day.  The dockside space of marinas and recreational vessels are intermixed with curio shops, ice cream stands, parks, and back from the waterfront numerous hotels, antique shops, boutiques, and other tourist shops of all sorts.

Hyannis acts as a biophysical capital sink because of the high demand for seafood products, as evidenced by the numerous seafood restaurants that draw in much of the seafood catch from the region. A total of fifteen restaurants were counted dockside or just across the street from the docks, and numerous others up side streets and in the central part of town away from the docks. For example, the restaurant trade in Hyannis absorbs most of the seafood product processed in nearby Sandwich.  Fish is brought in to be sold both retail and wholesale.   In addition, there is a fish broker (North Atlantic Seafood, Boston) that buys directly from the docks in Hyannis. Hyannis is also the closest dock to areas having significant seasonal runs of valuable fish such as scup and fluke. This makes it attractive for vessels to offload fish here, but not to actually tie-up for any length of time.

In line with the tourist orientation of the port are whale watching tour operations, and pleasure ferry boats to take clients around the harbor and return them to enjoy numerous restaurants, bars and dockside clubs.

*Governance*[10]
Mayor - Council

*Demography*[11]

Population
The 1990 Census found 40,958 residents of the town of Barnstable, while the village of Hyannis was 14,120.  In the town as a whole there are 19,552 males, 21,406 females, while Hyannis itself was 6,591 male and 7,529 female.

---

[9] http://www.state.ma.us/dhcd/iprofile/020.HTM
[10] This is for the Town of Barnstable
[11] http://venus.census.gov/cdrom/lookup/

Age Structure
According to the 1990 Census, in the town of Barnstable, 10,028 were children under 21 years and 22,562 were adults (21 to 64), 8358 were 65 or over. In the village of Hyannis, there were 3,333 children (20 and under), 7885 adults (21 through 64) and 2902 seniors (65 and older).

Education
Of persons 25 years and over in the town of Barnstable, 3,265 had no high school diploma, 8787 had graduated from high school, 8716 had some college, and 8197 had a Bachelor's or higher degree. In Hyannis, 1786 had no high school diploma, 3444 were high school graduates, 2,795 had some college and 1751 had a Bachelor's or higher degree.

Housing
In Barnstable, there were 23,377 housing units, 16,607 occupied and 6770 vacant. Of the occupied housing, 11,772 were owner occupied, 4,835 rented. Median value of the owner-occupied housing was $159,400 and the median year the structures were built was 1973.

In Hyannis, there were 8340 housing units, 6022 occupied and 2318 vacant. Of those occupied, 3037 were owner-occupied and 2985 were rented. The median value of owner-occupied housing units was $127,800 and the median year housing units were built was 1969.

Racial and Ethnic Composition
Almost 93 percent of the population of Barnstable was white in 1989 (38,565 individuals) with 2.85 percent Black (1169 individuals), 345 American Indian/Eskimo, and 248 Asian. Like the rest of the town, the village of Hyannis had a white majority at the time of the 1990 Census (12,638 individuals), with 791 Blacks, 176 American Indian/Eskimo, and 100 Asian.

## Economic Context
Income
The median household income in the town of Barnstable in 1989 was $33,411; per capita income was $17,376. The median household income in Hyannis at the same time was lower at $25,492 and the per capita income was $14,053.

Employment
In the town of Barnstable for persons 16 and over, 500 selected "agriculture, forestry, and fisheries as their "industry" and 406 selected "farming, forestry, and fishing occupations" as their "occupation." Retail trade was the largest category for "industry" with 4,272, followed by construction (1763), health services (1714) and finance, insurance and real estate (1448).

In Hyannis, though considered the fishing village of Barnstable, the numbers indicated by the Census shows that the individuals involved in the fishing industry actually live all over the town, though their vessels and jobs might be based in Hyannis.

INDUSTRY (for Hyannis)
Universe: Employed persons 16 years and over

| | |
|---|---:|
| **Agriculture, forestry, and fisheries (000-039).** | **108** |
| Mining (040-059)... | 0 |
| Construction (060-099)... | 609 |
| Manufacturing, nondurable goods (100-229)... | 333 |
| Manufacturing, durable goods (230-399)... | 326 |
| Transportation (400-439)... | 283 |
| Communications and other public utilities (440-499)... | 187 |
| Wholesale trade (500-579)... | 115 |

| | |
|---|---:|
| Retail trade (580-699)... | 1880 |
| Finance, insurance, and real estate (700-720)... | 384 |
| Business and repair services (721-760)... | 239 |
| Personal services (761-799)... | 436 |
| Entertainment and recreation services (800-811)... | 70 |
| Professional and related services (812-899): | |
|   Health services (812-840)... | 680 |
|   Educational services (842-860)... | 341 |
|   Other professional and related services (841, 861-899)... | 467 |
| Public administration (900-939)... | 221 |

OCCUPATION (for Hyannis)
Universe: Employed persons 16 years and over

| | |
|---|---:|
| Managerial and professional specialty occupations (000-202): | |
|   Executive, administrative, and managerial occupations (000-042) | 735 |
|   Professional specialty occupations (043-202).. | 822 |
| Technical, sales, and administrative support occupations (203-402): | |
|   Technicians and related support occupations (203-242)... | 134 |
|   Sales occupations (243-302)... | 873 |
|   Administrative support occupations, including clerical (303-402).. | 999 |
| Service occupations (403-472): | |
|   Private household occupations (403-412)... | 32 |
|   Protective service occupations (413-432)... | 43 |
|   Service occupations, except protective and household (433-472) | 1266 |
| **Farming, forestry, and fishing occupations (473-502)..** | **97** |
| Precision production, craft, and repair occupations (503-702)... | 877 |
| Operators, fabricators, and laborers (703-902): | |
|   Machine operators, assemblers, and inspectors (703-802)... | 255 |
|   Transportation and material moving occupations (803-863)... | 306 |
|   Handlers, equipment cleaners, helpers, and laborers (864-902).. | 240 |

CLASS OF WORKER
Universe: Employed persons 16 years and over

| | |
|---|---:|
| Private for profit wage and salary workers... | 4832 |
| Private not-for-profit wage and salary workers... | 628 |
| Local government workers... | 415 |
| State government workers... | 166 |
| Federal government workers... | 119 |
| Self-employed workers... | 503 |
| Unpaid family workers... | 16 |

## Transportation and Access

Barnstable is located on the "biceps" of the Cape Cod arm. Bordered by Cape Cod Bay on the north, Nantucket Sound on the south, Sandwich and Mashpee on the west and Yarmouth on the east.  Barnstable is 53 miles east of Fall River, 69 miles southeast of Boston, and 250 miles from New York City.

## Fisheries Profile

Commercial fishing and fisheries-related employment

*Harvesting structure*
There are only eight commercial vessels in the port of Hyannis, including two eastern rigs, two lobster boats, two stern trawlers, and two scallop vessels. Two of the boats also fish for sea urchins.

Key respondents estimate that fishing directly supports twenty-five (25) households. This is based on a calculation that there are three to four individuals (captain and crew) per vessel. The eastern-rigged vessels and stern draggers are large (56-60 feet in length) and are able to compensate for their expensive dockside costs through the excellent prices they receive for their fresh fish and shellfish.

*Support Services*
Slips are the most expensive in New England, costing one dollar a foot/day. Thus, a commercial dragger of 65 feet must pay $65 dollars a day to hold a dockside space. Most commercial fishing vessels cannot support such prices.

There are no air fill stations, bait houses, boat yards, boat dealers, fish auctions, fishermen's associations, fish processors, ice houses, net makers, niche fisheries, or marine railways. An absence of significant fishing infrastructure echoes sites such as Newport, Rhode Island, which has been shaped by a long history of coastal tourism.

Nevertheless, because of the well-developed recreational fishery, there are some infrastructure components that allow the fishing industry to keep a foothold in the community. These include a harbor masters office, marinas, fish retailers, a fishermen's supply store, fish and tackle dealers, wholesale fish and seafood dealers, marine insurance companies, dockside welding services, and a dockside diesel fuel facility.

*Employment (year-around and seasonal)*
A key respondent estimated that besides 25 households directly dependent on fishing, there are at least another 300 households in the area that are indirectly dependent, ranging from owners of retail businesses and seafood restaurants to those who buy seafood for the dinner table.

*Marketing*
While the summer is a boon time for seafood, a large resident population, including a large number of retired persons who live in the town of Barnstable, maintain the demand throughout the year.

Truck brokers come from Boston to take advantage of local runs of valuable fish, and park their trucks adjacent to a small dockside area where boats come in, unload their catch, and then spin out and leave, making way for the next boat in line. This "unloading derby" spectacle is one of the regional adaptations commercial fishermen have developed in response to declining fishing infrastructure along the coast and specifically to combat expensive docking fees. Thus, boats from Sandwich, Plymouth, Scituate, and elsewhere may fish off Hyannis and unload their catch to be transported quickly to market in a refrigerated truck. By unloading locally, they maintain a high quality of catch, and thus optimize their price on the market.

*Species, Seasonality*
The local catch of fish and shellfish species is quite diverse, and includes cod, fluke, winter flounder, yellowtail, haddock, pollock, squid, lobster, swordfish, tuna, scup, monkfish, scallop, sea clams, and conch.

There are no alternative or niche fisheries that people are switching over to.

158                          Cape Cod & Islands

## Perceptions of the Fishing Community[12]

### Importance of fishing to the community

Like Kennebunkport, Maine, which is also highly gentrified, key respondents in the fisheries of Hyannis perceive fishing as being "very important".

### Boundaries

Capital contacts can be divided up into those encompassing social capital (e.g., visit friends, go for recreation, go for vacation, visit relatives, socialize, go to church); economic (e.g., sell fish, offload fish, buy fishing gear, haul out for boat repairs, go to the bank, go shopping), and human (e.g., go to school, go for childcare, go for health care, go for retraining).

People in the fishing community are said to have the most contact with New Bedford, while others are mostly linked to off Cape areas such as Boston. Other community contacts were as follows:

| | |
|---|---|
| Sell Fish | Hyannis, Chatham, Boston |
| Offload Fish | Hyannis, Chatham, Boston |
| Buy Fishing Gear | New Bedford |
| Buy Ice | New Bedford |
| Buy Fuel/ Oil | Hyannis |
| Haul out Boat Repairs | Provincetown, New Bedford |
| Book Keeping | Hyannis |
| Banking | Hyannis |
| Shopping | Hyannis |
| Go to Church | Hyannis |
| Got to School | Hyannis |
| Go for Health Care | Hyannis |
| Go for Childcare | Hyannis |
| Visit Relatives | Hyannis, out-of-state, everywhere |
| Visit Friends | Hyannis |
| Go for Vacation | Florida, White Mountains |
| Go for Recreation | Bars |
| Socialize | Hyannis |

### Communication Issues

There is optimism that groundfish catches and local stocks are on the rebound, and communication with management is considered overall a success. Specifically, communication with local fishery managers was rated as "good," with state managers as "excellent," and with regional federal managers as "very good."

### Assessments

Fishermen "strongly disagree" with the assessment of stocks, and are particularly concerned about having to throw back fish when quotas are exceeded, which is a thought to happen frequently.

---

[12] Based on key informant interviews

Cape Cod & Islands                                      159

## Economic Change

Fishing conditions and the standard of living were regarded as "stable." The perceived economic condition of the fishery is that it has declined somewhat, but is rebounding now from the virtual collapse of groundfish stocks. Ten years the fishery was noted as "good" and five years ago as "good," but today is rated as "average," with a rating of "very good" expected for the fishery five years from now. Today increased prices for quality fishery products have generated more income and thus have compensated for the increasingly complex and constantly shifting regulatory climate.

## Effects of recent management

Although the population of fishermen is threatened by the lack of overt local community support, there are no specific regulations that key respondent alluded to as having had a significant impact on recent fishing conditions.

The overall mood is one of optimism.   Key respondents believe that if they can maintain some dockspace, the high local demand and presence of trucking fish brokers will allow them to continue their lifestyle.  Overall, they feel that management has done a good job in allowing the fishery of this region to continue to thrive.

## Characteristics of local fishermen

*Job satisfaction*
Even though they have a tenuous hold on dock space, fishermen are perceived by key respondents to be "very satisfied with their work."  Unfortunately, the position of the commercial fleet is precarious because of the extremely limited dock space, and the town council is perceived as being "uncaring" when it comes to the commercial fishing industry.

There are occasional workers who come to try their hand on the few boats here, but leave after a short time. These "shackers" as they are called, come and go with the seasons but are most abundant in summer when tourism creates a high demand for seafood in local restaurants.

## Fishing families

Although spouses of fishermen are working outside the home today, this is not significantly different from conditions five years ago.

160                                    Cape Cod & Islands

Community Profiles
Barnstable County
Cape Cod and the Islands Sub-region
Author: Renee Gagne[13]

## 5.4.1.3.  Chatham

*Background*

Chatham, Massachusetts is a small (population 6,600 in 1989) coastal town within Barnstable County, better known as Cape Cod.  Cape Cod is a sandy peninsula extending off the southeastern coast of Massachusetts, 65 miles east into the Atlantic.  The peninsula then turns to the north and curves back toward the northwest, giving the whole landmass an appearance of a flexed arm.  Chatham is located at the elbow of this arm.  Covering approximately 17 square miles, it borders the waters of the Atlantic to the east and Nantucket Sound to the south.  This geographical location has spawned the diverse fisheries found in Chatham today.  A few miles to the east are fertile groundfish grounds, once teaming with cod, haddock, flounder and pollock.  To the south, the warmer waters of Nantucket Sound support coastal fisheries such as scup, mackerel, black bass and squid.  The convergence of cold Atlantic waters and warmer coastal waters also promote conditions for successful shellfisheries.

A location close to a fertile fishing ground is not necessarily sufficient for successful fisheries.  More importantly, Chatham has natural access to both the eastern and southern fishing grounds.  The Chatham Fish Pier is located at Aunt Lydia's Cove along the east facing shore. A barrier beach protects Aunt Lydia's Cove from a direct assault of the Atlantic.  This barrier beach also provides access to the Atlantic through an ever-changing inlet. Through a process of erosion and disposition, the beach breaches and repairs itself, creating often-dangerous shoal conditions for fishermen entering and exiting the cove.

The Town Pier includes unloading facilities for two private fish companies, as well as berthing areas to the north and south of the facilities for the loading and unloading of fish and fishing gear.  The facilities are maintained by the Town and are dedicated solely to commercial fishing endeavors, though the town maintains a floating dock seasonally for public access. The fleet primarily targets Georges Bank stock groundfish and dogfish.

Along the south facing shores, Stage Harbor, also a port of Safe Refuge maintained by the Army Corps of Engineers, houses a smaller groundfish fleet as well as a number of diverse seasonal fisheries such as weir and tuna fisheries. The town provides an area for both residential and commercial use and maintains a boat ramp.  Increased usage of these facilities has prompted recent regulations for limiting usage to residents only.   Stage Harbor also has a number of private docks dedicated to commercial fishing enterprises.

Chatham also encompasses lesser bays, coves, salt-water ponds and Monomoy Island, all ideal habitats for a variety of shellfish.  These areas support an extensive shellfish industry. The dominate shellfisheries are quahogs and soft-shell clams, but many other shellfisheries, such as mussels, sea clams and bay scallops, are seasonally  significant.

Chatham was first settled in 1656 and was incorporated in 1712, making it one of the Cape's earliest townships.[14] Names of the original Yankee settlers are still prominent in the town and include names such as Nickerson, Eldredge and Ryder.   As with the majority of the Cape, long before the colonists arrived, Native Americans utilized the benefits of both the land and shore for farming and marine harvesting.  Archaeological sites have indicated a number of seasonal

---

[13] This profile reflects the detail that is possible when a skilled and local participant-observer is able and willing to collaborate on a research project.
[14] http://www.state.ma.us/dhcd/iprofile/055.htm#NARRATIVE

settlements along the east facing shores of Cape Cod. Settlers of Chatham first established the town as a farming community and old pictures indicate a treeless landscape well into the early 1900s. But founding families soon found the surrounding waters more profitable than the thin-soiled land for their survival. To this day, fishing, shellfishing and their shore-side support industries are a major source of employment and income for the town of Chatham.

## Fishing Dependency

As noted in the introduction to this sub-region, Chatham is ranked fourth on the scale of infrastructure differentiation, after New Bedford, Portland and Gloucester. Though small, Chatham has a devoted fleet and a thriving shellfish industry and a complex of support services. As part of the Cape Cod and Islands sub-region, Chatham ranks third for dependency after Downeast and Upper Mid-coast Maine based on employment indices for the sub-region. As an individual community, Chatham is 14th on the gentrification scale.

## Governance

The Town of Chatham adopted a new Town Charter in 1995. The Town employs a Town Manager who is appointed by a five-person Board of Selectmen. The Town Manager administers the day to day affairs of the town as well as staffs and oversees all Town departments, except the regulatory boards. The part-time Board of Selectmen is the policy making body of the town. The Board meets weekly in a public forum, to discuss and finalize policy. Although comments from the public are encouraged, decisions from the Board are final (unless challenged in a court of law). The Board also signs-off on and presents the yearly budget at an annual open Town Meeting. The open town meeting forum of government is a process dating back to colonial times that allows the voting residents to approve or revise the Town's operating budget. Residents also vote on a variety of articles dealing with any appropriations over and above the operating budget.

With the adoption of the new Town Charter, many aspects of the Town's government were reorganized. All departments concerning Chatham waterways and shore-side issues were consolidated under the Coastal Resource Department (CRD) including the Harbormaster, Shellfish and Permit Offices. The Director of the Coastal Resource Department oversees the various harbor management plans throughout the Town and participates on coastal and water-related committees. The Director also participates in the planning and implementation of coastal-related capital projects such as dredging and reconstruction of municipal shore-side facilities.

## Demography

Population
Chatham's year-round population according to the1990 US Census information is 6,579. Simple observation indicates a significant increase in population numbers over the last ten years. Service industries such as small shops and restaurants, once closed during the winter months, now remain open year-round. New and large chain stores are on the increase (over the border in East Harwich) and resemble the larger urban areas of Hyannis and Falmouth. Traffic, though it subsides greatly from the summer months, has increased yearly during the off-seasons. All these indicate a population supporting these enterprises. Also important is the swell of Chatham's population in the summer months. Though there is no official count of Chatham's summer population, the Chatham Police Department estimates this to be between 25,000-30,000.[15]

It is interesting to note that Chatham was one of the communities chosen by the Federal Government to apply a door to door census taking along with the long form for the 2000 US

---

[15] Friends of Chatham Waterways, An Economic Study of the Town Chatham, Massachusetts, (December 1996), 12.

Census.  Federal Census takers asserted that this method was applied to towns estimated to have had major changes in their population.

Age Structure
Census information indicates the largest portion of Chatham's senior population was between the ages of 70 and 74 numbering 587, the second largest group was between the ages of 65 and 69 numbering 564, and the third largest was between the ages of 75 to 79 numbering 473 (for a total of 1624 seniors).  According to a study conducted in 1996, the distribution of Chatham's over 65 population was then one-third of the total population and was more than twice the state's average as well as Barnstable County's.[16]  Hence, Chatham's demographic profile supports the view that it is, in some respects, a "retirement town."  Total persons between the ages of 19 and 64 totaled 3,293, while those persons under the age of 18 totaled 1,045.

Education
There are two schools in Chatham, an elementary school spanning grades K through six and a high school spanning grades seven through twelve.  The 1990 data indicates 538 students attended Chatham's public schools while 31 students attended private institutions.  Massachusetts Department of Education statistics shows an increase in enrollment in 1998 with 685 students.  Enrollment increased again in 1999, according to the 1999 Annual Reports of the Town Officers,[17] with 707 students.  The increase in enrollment may be due to the School Choice Program instituted in recent years allowing Barnstable County residents to choose which school a student attends.  Ninety of the total student population in 1999 came from other Cape towns.

The school ethnic make-up reflects the overall Town make-up.  According to Massachusetts Department of Education statistics for 1998-1999, 96.8% of the public school student population was white, a 19.7% difference from the overall State statistic of 77.1% white student population.

The amount of monies spent per student also differed from the State average.  In the 1997-1998 school year, Chatham spent $7,743 per child while the State average was $5,221.  Chatham also surpassed the State in special education spending per child by $7,625, although Chatham did not dedicate any funds to bilingual or vocational education programs.

Chatham students may also opt to enroll in other Cape towns' schools, although the numbers who do so is unknown. The primary alternative choice is the Cape Cod Technical High School located in the bordering town of Harwich.  Thirteen Chatham students attend Cape Cod Tech.  The Tech school provides vocational and technical education and also offers adult education and training programs.

Housing
Since the mid-1800's Chatham has attracted a summer resident population.  Wealthy families from New York and Connecticut built large summer retreats along the picturesque shoreline.  With the advent of the automobile, those of lesser means built smaller summer cottages and camps.  Today, many homes are simply summer or part-time residences.  According to the 1990 U.S Census, close to half of the town's 6,301 total housing units were vacant. Also 2,333 housing units were owner occupied, while 690 were renter occupied.

These statistics are bound to change greatly with the 2000 US census.  According to the Cape Cod Commission, as of January 1997, housing units increased by 337.[18]  Between the beginning of 1997 and 1999, housing units further increased by 200, for a total of 6,838.[19]  From January through March 2000, a total of 38 permits for new single family dwellings have been issued

---

[16] Ibid.
[17] Town of Chatham, Annual Reports of the Town Officers of the Town of Chatham 1999
[18] Cape Cod Commission, CapeTrends, Barnstable County-Cape Cod, 4th edition, 1997. 47.
[19] Tim Woods, "Moratorium Talk Prompts Spike in New House Permits", The Cape Cod Chronicle, 27 April 2000

almost half of the total issued for all of 1998 with 78 permits.[20] Taxing of resources such as ground water and nitrogen loading of coastal waters by septic systems has prompted discussion on a building permit moratorium. A recent study by the Friends of Chatham Waterways showed approximately 750 buildable lots remain, with a few more "substandard" lots that could potentially be deemed as buildable dependent on zoning criteria.[21]

Sales of single family home sales have also jumped, from 55 in 1998 to 256 in 1999, a 365% increase,[22] the highest of any Cape town. Values of single family homes have also increased in value.  In 1994, the median price for a residential sale was $172,000[23] while current median residential sale is $237,000.[24]

The increased value of single family dwellings has all but eliminated affordable housing for Chatham residents earning low to moderate incomes.  These residents are often in service or labor fields of employment including fishing and shellfishing.  Concern has prompted town officials to examine the issue of affordable housing.  Only 3% of Chatham's housing stock can be classified as "affordable" while the State recommends a 10% housing stock designated as "affordable."[25]  The Town Manager recently proposed creation of an Affordable Housing Committee to first assess the Towns housing needs and second to propose a housing plan.

Rental units are also of concern.  The 1990 census shows 690 units as rentals and no new estimates are available. Yet competition for existing rentals is evident. A recent article in *The Cape Cod Chronicle* indicated 75 calls within the first few hours of a room for rent listed in the classifieds. With the increased value of homes, owners are opting to sell or seasonally rent single family homes instead of renting them year-round.  According to three shellfishermen who lost a year-round rental recently, the three were forced to rent a summer rental at $1200 each a month[26].  The Chatham Housing Authority, organized by State mandates,[27] subsidized eight families with rental vouchers in 1999.

The number of households indicated in the 1990 US Census was 3,023.  The majority of those households were married couples at 1,649 although 1,107 were listed as non-family households.

Racial and Ethnic Composition
Chatham is above the U.S. average for "white" persons at 6,485 in 1990 or 98.6% of the total population.  The total US percentage of "white" was 83.0% in 1990.  Those of Hispanic origin rated as the second highest population at 37 persons followed by blacks at 29 persons.

Those families with the longest traditions in Chatham are culturally from "Old Yankee" stock.  They are perceived by many to be non-demonstrative, conservative, and frugal people who seem to innately know the Town's family tree.  All other residents, even those with a generation of residency, are considered "wash-a-shores."

---

[20] Town of Chatham, Annual Reports of the Town Officers of the Town of Chatham 1999, 165.
[21] Michael J. Pessolano, Consultant, "Draft: Vacant Substandard Lot Study."  Friends of Chatham Waterways, February 12, 2000.
[22] Ibid.
[23] Friends of Chatham Waterways,  An Economic Study of the Town Chatham, Massachusetts, 1996,  34.
[24] Cape Cod Chronicle,  27 April 2000.
[25] Tim Wood, "Town Manager to Recommend affordable Housing Committee" Cape Cod Chronicle, 27 July 2000.
[26] In order to shellfish in Chatham, one must be a full-time resident of the town for at least one year beginning May 1st of a given year.
[27] Massachusetts General Laws, Chapter 121B, Section3.

## Economic Context

### Income

The median household income for Chatham ranked eight out of the 15 towns within Barnstable County with $31,315 in 1989 (1990 US Census).  However, Chatham ranked 2nd behind its neighbor Orleans with a per capita income of $18,471 in 1989 (1990 US Census).  The median household income fell below that of the State, while the per capita income was slightly higher than the State.  The higher per capita income may be due to high retirement income.

The majority of income was derived by wage and salary sources with 1,637 households earning an average income of $33,440 in 1989.  The second highest source of household income was derived from the non-farm self-employment sector, which included fishermen, shellfishermen, land-based support industries and construction work.

### Employment

At a glance, Chatham is the quintessential summer community, with the majority of visible labor sectors dedicated to summer residents and tourists.  Federal and State figures concur with those visible industries.  According to the 1990 US Census, 2,583 residents were employed while 129 persons were unemployed.  Further census data shows the service industries as employing the majority of residents with 887 individuals.  The second largest industry employer group was the wholesale and retail trade numbering 541 followed by construction at 261 individuals.

The State of Massachusetts' Division of Employment and Training figures for 1995 show an increase in employed residents totaling 3,231 persons.[28]  A breakdown into labor sectors shows the following:

## EMPLOYMENT TRENDS BY INDUSTRY 1995[29]

| Industry  Sector | Employment |
|---|---|
| Agriculture, Forestry & Fishing | 78 |
| Construction | 110 |
| Transportation & Public Utilities | 40 |
| Wholesale & Retail Trade | 1,011 |
| Finance, Insurance & Real Estate | 87 |
| Services | 1,593 |
| Manufacturing | 26 |
| Government | 286 |
| *Total Employed* | 3,231 |

Unfortunately, Federal and even State data sources do not present an accurate picture of Chatham's total employment history.  While the Federal figures are out-dated, State figures of employment exclude the self-employed and requires employers of "Agriculture, Forestry and Fishing" labor to report only if employing 10 or more employees.[30]  A report by Friends of Chatham Waterways utilized Chatham's Town Census to more fully understand the employment structure of the town.  The following shows a breakdown of employment utilizing categories that conform to the federal Standard Industrial Classification in the 1996 Town Census:

---

[28] Figures show  average annual employment
[29] Cape Trends, Barnstable County-Cape Cod, 4th Edition 1997 & Massachusetts Division of Employment and Training
[30] Friends of Chatham Waterways, 22.

Cape Cod & Islands                                    165

## CHATHAM EMPLOYMENT BY MAJOR ECONOMIC SECTORS[31]
### 1996 CHATHAM TOWN CENSUS

| ECONOMIC SECTORS | PERCENTAGE OF EMPLOYMENT |
|---|---|
| Fishing | 12 |
| Building Trades | 11 |
| Finances, Real Estate | 10 |
| Retail Trade | 10 |
| Professional Business Services | 8 |
| Health Services | 8 |
| Misc. Business Services | 8* |
| Education Services | 7 |
| Hotels, Restaurants | 7* |
| Landscaping | 4 |
| Family services | 3 |
| Government | 3* |
| Boatyards, Transportation | 3* |
| Other | 7 |

*Approximate percentage of total

State figures for 1995 put the percentage of those in agriculture and fishing occupations at 2% of total employment.  A Friends of Chatham Waterways report found employment in agriculture and fishing occupations to be 16% of total employment,[32] far different from the State's 2%. Fishing itself is the greatest employer in Chatham at 12% when the service sectors of employment are further broken down as in the above table.  This more realistic view of Chatham's labor force is the first indication of the importance of the fishing industry to Chatham.

Another important aspect to consider when examining Chatham's true employment picture is its annual rate of unemployment.  The majority of the service industries cater to seasonal visitors and tourists.  The following depicts the fluctuation of unemployment throughout the year.

---

[31] Friends of Chatham Waterways
[32] Friends of Chatham Waterways,  25.

Cape Cod & Islands

## LABOR FORCE AND UNEMPLOYMENT IN CHATHAM[33]
### 1996

| MONTH | LABOR FORCE | UNEMPLOYMENT RATE |
|-------|-------------|--------------------|
| JANUARY | 2,575 | 10.3 |
| FEBRUARY | 2,606 | 11.1 |
| MARCH | 2,632 | 10.1 |
| APRIL | 2,676 | 7.2 |
| MAY | 2,787 | 3.9 |
| JUNE | 3,043 | 2.7 |
| JULY | 3,223 | 1.8 |
| AUGUST | 3,238 | 1.7 |
| SEPTEMBER | 2,927 | 2.6 |
| OCTOBER | 2,806 | 2.8 |
| NOVEMBER | 2,702 | 4.5 |
| DECEMBER | 2,645 | 4.8 |

The above table depicts a very different story than the Federal unemployment rates for 1990 of 4.4%. Even the State's average annual rate of 5.1 percent for 1996 overlooks the great fluctuation between 11.10% in February and 1.70% in August.

### Transportation and Access

Chatham has no form of public transportation. A private bus company does make a route stop in Chatham before proceeding to Orleans and then back to Hyannis where connections to New York and Boston can be made.

The Cape's main highway is Route 6 and provides access to Chatham via exit 11. A lesser road, Route 28, also bypasses most Cape towns including Chatham. Since Route 28 is also many towns' Main Street, the drive is a slow method of accessing other towns.

### Hospitals, schools, libraries

There are no hospitals in Chatham. The closest facility, Cape Cod Hospital, is located in Hyannis, an approximate 20-minute car drive. Chatham does have emergency medical technicians.

Chatham has two libraries. The main library, Eldredge Public Library, is located across the street from Town Hall in the center of Chatham's downtown. The brick and ivy structure stands out amongst the traditional white clad storefronts. The library was recently renovated and is now "linked" via the Internet. Another smaller library is located on Route 28 in South Chatham. The South Chatham Library is only open two days a week, but remains open year-round.

### Fisheries Profile

Community
Chatham is primarily known as a tourist destination. People from all over the globe flock to Chatham from summer to early fall to admire its scenic beauty, walk through the quaint downtown shops, and to visit its active commercial fish pier. Since the early 1980's, visitors have been able to view fishermen unloading their catch from an observation deck directly above the commercial

---

[33] CapeTrends, Cape Cod Commission & Massachusetts Division of Employment and Training

fishermen.  At most Town Landings, tourist watch and ask questions of the fishermen and shellfishermen unloading their daily catch.  But beyond the very visible signs of an active commercial harvesting industries lies more extensive support industries.  Fish buyers and cutters, gear workers and shellfish shuckers are just a few of the many active and healthy industries nestled in and around Chatham.  These industries are, in turn, supported by an extensive work force, individuals who, for the most part, live in Chatham as part of the vibrant year-round community.

Commercial fishing and fisheries-related employment
Fishermen were asked to estimate the number of fishermen living within a defined area. The boundary of the "area" was also asked.  The numbers of fishermen estimated by respondents were quite close.  While one respondent indicated the "area" as including Chatham, Orleans and Harwich, he could only estimate the number of fishermen in Chatham to be 500.  Two respondents estimated the number to be between 800 and 1000 with one indicating the "area" as Chatham and Harwich.  Another defined "area" as a 15-mile radius, which would include parts of Orleans and Harwich, estimated the number of fishermen to be 1,000.

**Households Dependent on Fisheries**
Estimates of the number of households directly dependent of commercial fishing varied greatly.  One fisherman stated 200 families were directly dependent while another stated between 500 and 1,000 families were dependent on fisheries.  One respondent stated,

> "…30 to 40 percent of the working population.  I would think 30%
> of the households in town."

Respondents were less sure of how many other households were dependent on some aspect of the fishing industries.  Answer ranged from "I don't know" to 500 to:

> There's a lot, whether it's part-time or full-time.  You have
> gillnet hangers, long-line baiters, shucking sea or bay scallops,
> it depends on what  the population of [those] fishing is.  For every boat
> that goes cod fishing, there's two people who bait.  So if you
> have 30 boats that go cod fishing, you have 60 that are baiting.

*Harvesting structure*
Currently, there are 64 vessels with docking permits for the Town Pier.  From this total, 22 vessels solely use gillnets, 17 use longlines, 5 others use a combination of both gillnets and longlines, 8 are lobster boats, 3 are handline boats and 4 are party/charter boats.  There are also two draggers, one Scottish seiner and one strictly tuna boat.  The majority of fish targeted and landed at the Town Pier are codfish, dogfish, monkfish, haddock, bluefin tuna and lobster. A number of these vessels also utilize the private facilities offered at Stage Harbor depending on the season and the weather.  Stage Harbor offers greater protection and safer access to the fishing grounds, though the steam time to the grounds is longer.

Approximately fifteen vessels without docking permits utilize Stage Harbor full-time. Although the Town maintains a floating dock and boat ramp at Stage Harbor, most of the commercial finfish activity takes place on the two private docks adjacent to the Town's facilities.  The docks are owned by commercial fishermen who also own weir trap companies.  Weir traps are an ancient method of harvesting fish that travel in schools along the coastline. In Chatham, trap fishing takes place in the spring and summer and targets a number of species including scup, squid, mackerel, butterfish, Spanish mackerel, and bonito.  Other fishermen utilize the docks to unload codfish, dogfish and tuna.  Fish are boxed and iced on the docks and a forklift is used to carry the loads onto awaiting trucks.  One of the private docks utilizes a specific fish company whose main office is located in Boston.  The other private dock utilizes a local fish company who ships fish directly to larger markets as well as processes some of the catch in its local plant to supply local markets.

It should be noted that another harbor located in Harwich services a fleet considered to be part of the Chatham fleet. Approximately 40 commercial fishing vessels utilize the Town facilities at Wychmer Town Pier. A number of those vessel owners live in Chatham, but more importantly, the fleet fishes along side that of Chatham. The majority of these vessels use longline gear and target cod and dogfish, though there are a few gillnetters and lobster boats. Again, these vessels opt for the longer, but safer ride to offshore fishing grounds.

*Number of Vessels by Type*
Fishermen were asked to identify the number of vessels in Chatham by the type of vessel, its length and its age. The number of wood vessels estimated by interviewees ranged between three to 20-plus and ranged in length from 19 to 40 feet. All estimated their ages as over 20 years. No cement or PVC vessels were noted while the number of steel boats ranged from zero to six with lengths of those vessels to be between 30 to 42 feet. The greatest numbers of vessels noted were fiberglass and were estimated to be between 100 and 300 in number with lengths ranging between 12 to 49 feet. The lower end length estimates suggest some interviewees included commercial skiffs as well. All describe fiberglass vessels as being new to over 25 years of age. When asked about specific "types" of vessels, all participants added to the given list as follows:

| TYPE | OPERATING | DRY DOCK |
|---|---|---|
| Urchin dive boat | 0 | 0 |
| Eastern Rig | 0 | 0 |
| Lobster/conch | 15-30 | In winter only |
| Stern dragger | 2-4 | 0-1 |
| Purse seine | 0 | 0 |
| Longline/hook | 30-100 | 0 |
| Gillnet | 20-50 | 0 |
| Scottish seiner | 1 | 0 |
| Sea clam | 0-1 | 0 |

According to Chatham Harbormaster documents, the total number of commercially registered vessel in Chatham are 279[34] and they range from 10 feet to 57 feet. About two-thirds of these are commercial skiffs used primarily for shellfishing. Offshore fishing vessels holding docking permits at the Chatham Fish Pier are 63 vessels and can be categorized as follows

| | |
|---|---|
| Longline | 15 |
| Gillnet | 20 |
| Lobster | 7 |
| Gillnet/Longline | 4 |
| Longline/jig | 6 |
| Dragger | 2 |
| Scottish seiner | 1 |
| Party | 4 |

*Four vessels are undetermined

Another 16 (not including skiffs) commercial vessels are located at Stage Harbor.

---

[34] This number only includes commercially registered vessels at the Chatham Fish Pier and Stage Harbor mooring areas. Other lesser mooring areas are not included but most certainly contain a number of commercially registered skiffs.

*Shellfish*

Chatham has an extensive shellfish industry due to its expansive coastal area conducive to the propagation of a variety of shellfish species. In 1999, 548 commercial permits were issued. Throughout the year, approximately 50 to 75 work the shores year-round. The numbers swell in the summer months into the hundreds including college students and part-time shellfishermen. Shellfishing has also been an "insurance policy" for finfish fishermen during times of low catches and more recently during fish closures. Retired fishermen are often seen quahogging along the shores to supplement their income. The predominant species are soft-shell clams (or steamers) and quahogs. Through the years, sets of other shellfish species, such as mussels and sea clams, have surfaced to create periodic booms for the Town. Landings of shellfish are self-reported making the estimated wholesale value of shellfish over three million dollars in 1999.

*Infrastructure*

The most visible fishing industries are those that take place from the Chatham Municipal Town Pier. The Town Pier is home to the majority of Chatham's commercial groundfish fleet. Boats target fish in waters east and south east of Chatham.[35] The Town Pier includes two buildings and an upper and lower parking lot. The upper parking lot is maintained for crews (or deckhands) and the many visitors hoping to view fishing boats unloading their daily catch. The lower parking lot is reserved for captains and/or owners of those vessels holding docking permits for the pier. The lower lot abuts the cove allowing for easy access to vessels for repairs and the loading and unloading of gear and fish. Located on the upper level building is the Warfinger/Assistant Harbormaster's Offices as well as public bathrooms. Beneath the office is a large garage-type space used by fishermen to work on gear or bait longline gear. There are also two freezer/coolers rented out by the Town to store bait for lobstermen or longliners.

A Fishermen's Monument commissioned in 1992 to honor fishermen and their families, stands along the hill between the upper and lower parking lots. The monument depicts a hand reaching skyward holding a net filled with a variety of fish and shellfish with a plaque reading; "The Chatham Fishing Industry, Ever Changing to Remain the Same." The dedication hoped to capture Chatham's diverse maritime industries. The statue is a symbol of the cultural capital invested in the industry. The main building is located along the water and includes space and facilities for two fish companies to off-load incoming boats. These companies "rent" the space from the Town. Rent is derived from the actual amount of fish off-loaded from the fishing vessels. Currently, each company must give 25 cent for every "box" of fish unloaded.[36] The fish companies that occupy the pier have had the privilege for many years without a contract with the Town. According to the Chatham Harbormaster, occupancy of these spaces will soon go up for bid to any interested fish company. Rents will thereafter be based on a monthly fee. A Request for Proposals has already been published. Fishermen also have the option of unloading their own fish at a separate bulkhead in order to sell those fish to a company of their choice. A fuel service also rents space and is located between the fish companies on the front side of the dock. There is also an observation deck for visitors to view fishermen unloading their catch.

The majority of vessels utilize the facilities at one of the two companies along the pier. Each company employs a number of people who help the fishermen load fish into a bucket that is lowered onto the vessel. When full, the bucket is lifted above the dock and dumped into a shoot where other employees separate and weigh the catch by species and size. The fish are then iced and placed into separate boxes before being loaded onto 18-wheeler trucks backed up to the parking lot side of the building. The fish companies transport most of the fish directly to the larger markets of New York and Boston, while some fish are trucked to the individual fish companies' main facilities. These facilities are still located within Chatham. Fish are processed at the plant and filets are sold to local fish stores and restaurants. One of the fish companies also has its own retail fish store.

---

[35] The fish the Chatham fleet targets are considered part of the George's Bank stock.
[36] A box of fish weighs between 100 and 125 pounds whatever the species be.

Cape Cod & Islands

This fall a new type of marketing venture opened its doors for the sale of live fish. A holding facility was constructed through a grant from the US Department of Agriculture. The hope is to develop specialty markets for live or whole fresh fish to increase the value of the catch. The cooperative venture, Cape Live Seafood, includes a holding facility with tanks capable of holding 5000 pounds of live fish. The venture will begin with codfish, but hopes to expand to other species. Currently, ten hook fishermen (handline and longline) are participating. Boats are outfitted with small holding tanks containing titanium chillers in order to bring in live product year-round. The cooperative aspect will allow fishermen greater returns as well as generate funding to outfit other vessels and increase fishermen participation. The project is supported by a number of retailers including Stop and Shop and Legal Seafoods as well as conservation groups such as Conservation Law Foundation.

### Support Services

Other industries extend beyond the fish piers and are essential to those working on the water. For gillnetters, gillnets must be "hung" by sewing the top and bottom of a net to corresponding lines. For the top, floats are sewn in periodically to ensure the net floats approximately five feet above the ocean floor. The bottom line is filled with lead to ensure the net sits on top of the ocean floor. Net hanging is usually completed with two people, one sewing the net to the float line and the other sewing the net to the lead line, though, some hangers hang alone. Once these nets are in use, they often rip during the hauling process or the picking (of fish) process. These nets are then "stripped" from the float and lead line in order to reuse the lines with new nets. Each gillnet vessels employs both net strippers and hangers.

Another substantial industry emanating from fishing is longline baiting. Over the last 20 years changes in how longliners fish has created this niche industry. Previously, most longliners fished three handed, the captain and two crew. One crew gut and cleaned fish while the other stood by the hauling machine and "coiled" the longline as it was hauled onto the boat. The groundline used was of thinner, more rugged material then is used today and could be looped by the coiler. The hook would be hooked atop the coil and laid flat, one coil on top the other. This method made for easy rebaiting. The rebaiting took place on the trip home or soon thereafter by the crew. As the stocks near shore declined, vessels steamed further away from shore and were forced to set more and more gear to catch the same quantities of fish. Since the process of coiling was time consuming and hauling can only take place during certain periods of the tide, new gear was developed (first used in Alaska) which allowed the longlines to fall directly into fish totes so gear could be hauled at a faster pace. The coil man was eliminated from the crew. Without the convenience of "coiled" gear, baiting time increased and thus began the need for "baiters" onshore. Now, each longline vessel employs baiters to rebait their gear onshore. The task is time-consuming and tedious. It consists of placing small pieces of bait, usually sea clams or squid, on every hook and placing it just so within a fish tote so that the gear does not tangle while being set offshore. Most fishermen use 300 hook "bundles" and set between 14 and 20 of these bundles per trip. Baiters are paid per hook, but must also repair the gear and reset bent hooks. Each bundle of gear takes a baiter, depending on experience, between 45 minutes and two hours. Most vessels employ two baiters, if not more. Other than the few boats that utilize the town facilities at the Fish Pier, most baiting takes place away from shore. Some fishermen have shanties with coolers and freezers at their home, but most own or rent facilities in the number of industrial parks around Chatham.

### Employment (year-around and seasonal)

All the respondents worked as harvesters though they targeted differing species. A weir fisherman described his year as beginning in March. He begins by preparing the gear used for the traps. It is a labor-intensive industry. For most trap fishermen, actual fishing lasts for only two months, May and June. Some will continue to fish through September, but with only one other deck hand. Through the fall, traps are packed up and put away. This individual works on other boats in the winter but has also worked in construction during bad fishing winters.

Two other fishermen respondents simply change fisheries throughout the year. Cod, dogfish, and blue fin tuna are their primary target species though both subsidize their income with shellfishing. One helps his brother lobstering when fishing is slow. Neither fisherman relies on land-based jobs. One of the fishermen changes gear throughout the year. During the winter months of December through March, he longlines for cod. During the spring and summer, he targets cod and dogfish with gillnets and changes over to tuna fishing in the fall.

The full-time shellfisherman also changes his target species depending on the seasons. For instance, many areas closed during the summer and fall open for shellfishing December 1, so he long rakes for quahogs during the winter months. By April, he is back digging steamers and getting back in shape for the long days of June, July and August where, as the respondent described,

> *You can do double tides where you wake up at 3 am and get done around 10 am, take a nap, go back out at 1 p.m. and work until dark.*

By October he is back quahogging. This shellfisherman estimates fishing days to between 220 and 250 days a year. Days he takes off usually have to do with taking care of his three children.

When asked what other jobs were available in the area, most respondents listed a number of fishing support industries such as baiting and net hanging. Also mentioned were fishing supply industries such as gear, fuel and electronics. Service industries such as engine and electronic repair, out-board mechanics were also listed. Outside of the fishing industry, respondents listed other labor-intense occupations such as construction, landscaping, and plumbing. One fisherman mentioned service industries such as restaurants and banks. Most of the respondents looked down at other occupations, as one fishermen stated "…I don't know, everything else is a demotion from fishing." While another stated "You can either work in the shops as a salesperson, or manage a shop, or go fishing."

*Sales/revenue*
When asked to determine the percentage of the respondents annual income from fishing, two of the households interviewed depended on fishing for 100% of their annual income. One stated that recent winter work in construction has changed their annual income from 100% fishery dependent to about 80% currently. Another fishermen has a wife that works outside the home in a non-fishing related occupation making their annual income 60-80% dependent on fishing.

*Species, Seasonality*
The number of species fished for is vast.
Groundfish: cod, flounders (fluke, dabs, winter flounder, and yellowtail) haddock, pollock hake (red or silver) halibut, and gray sole.
Small mesh: whiting, squid, and shrimp are caught.
Pelagics: Both herring and mackerel are caught; though one fisherman stated herring were not harvested for economic reasons, but used for bait.
Crustaceans: lobsters
Highly migratory species: tuna
Other species listed included: Striped bass, dogfish, skate, monkfish, bluefish, conch, scallops, sea bass, scup (porgies), soft shell clams, quahogs, mussels, slime eels, menhaden (pogies). One fisherman included sturgeon but did not include scallops or slime eels. Another fisherman did not include menhaden.

*Niche Fisheries*
 Weir (or trap) fishing was mentioned as well as a variety of shellfishing including conch and mussels. A number of methods for harvesting were mentioned, such as long raking for quahogs, hand digging for steamers and hook and line fisheries. One fisherman described Chatham fisheries as "diverse and archaic."

Most respondents mentioned dogfish and monkfish when asked what alternatives fishermen were switching to. They clarified their answers by stating monk fishing was restricted and not many went into it. Dog fishing, on the other hand, was being taken away. Other alternatives mentioned were quahogs and steamers. As one fisherman stated:

> *Clams, steamers…the whole population is digging steamers. When the groundfish people aren't fishing, they're digging steamers, the people who don't really want to work dig when they need money, some dig all the time.*

*Form of ownership (e.g., owner/operator; corporation)*
The majority of vessels in Chatham are owner/operator. A very small number have other captains run their vessels either because they are retired, or the individual owns two boats, runs one and has the other captained. Some fishermen may be incorporated for tax purposes, but there are no large corporate interests in the Chatham fleet.

Recreational fishing and employment
Chatham is an increasingly popular destination for numerous recreational fishing enterprises. Striped bass is the favorite target species, followed by bluefish, scup and cod. The number of small day excursion boats have increased over the last five years and services offered range from dropping customers off along the pristine shore of South Beach and Monomoy Island for fly fishing, to all day, off-shore excursions. With increasing recreational fishing activity, conflicts concerning access have erupted. Boat ramps and parking lots at Town landings have become over saturated with both commercial and recreational fishing efforts, as well as other water based activities such as boaters, kayackers, windsurfers and sailors. A number of seal-watching tours have also added to the congestion. Efforts to control traffic have also created angst between commercial and recreational endeavors. Recent regulations have limited the usage of the Town's primary boat ramp and subsequent parking area to residents only. Those enterprises carrying recreational fishermen for fees must now be bonded for insurance purposes in order to utilize Town facilities.

All respondents affirmed the existence of recreational fisheries in Chatham. Two noted the increase in the last five years. Most mentioned the striped bass and blue fish fishery. One fisherman acknowledge the claim that Chatham is one of the premiere destination for flyfishermen on the East Coast, while another stated,

> *..it's an industry and many people are involved in it.*

Cultural role of fishing
Respondents were asked if most fishermen came from Chatham. All responded to the contrary, though where fishermen came from could not be specified. One fisherman stated,

> *Yes, I'm a native. There's really not a whole lot of us left. Most are wash-a-shores.*

*History and museums*
Chatham is one of the Cape's earliest townships and the harvesting of surrounding resources began over 250 years ago. The size of the fleet has changed over the years, but Chatham has always been a small day-boat port. Prior to the late l970's, Chatham had also always been a hook-boat port. Old timers still recount long trips to Georges Bank to hand-haul longline gear targeting halibut. But for the most part, fishing took place close to shore with many inshore spots in sight of land. Weir fishing has also had a long history in Chatham.

*Cultural events*
A number of cultural events are held and celebrated throughout the year, with the largest event being Chatham's Fourth of July Parade. Chatham's parade attracts an increasing number of

visitors every year, but is still attended by the majority of its residents. Many floats display a nautical theme.

Seafest is an event held in October and specifically celebrates Chatham's diverse natural bounties and shoreside industries. A number of demonstrations are held throughout the Town showing techniques in clamming, quahogging, baiting and how to eat a lobster. There are also discussions held on current events affecting the fisheries. The primary goal of the event is to attract visitors to Chatham during the off season and teach both visitors and residents about maritime industries.

Years ago, Chatham held the Miss Eelgrass Contest as a fundraiser for local children's programs. Local merchants would sponsor an individual who would vie to become Captain Eelgrass's mate. Women would dress in outrageous outfits, donning large, real cod heads, or mermaids garb made from actual seaweed. Each candidate would demonstrate a plea or talent to be chosen as Miss Eelgrass. A number of donated prizes were also raffled off. The event was held at the Veteran of Foreign Wars field and most locals attended. The theme song for the event was, "Jelly, Jelly, Jelly, Cuz Jam Don't Shake Like That". The winner joined Captain Eelgrass on the Fourth of July float. Unfortunately, as older organizers retired from the event, new organizers reinvented the event to "The Arts of Charity". The new event still raises money for local children's organizations but in a more upscale forum that lacks any local color. The new event takes place in Chase Park in Downtown Chatham and presents a live auction for all sorts of artwork. The Arts of Charity is still a well-attended and fun event, but the crowd and antics have most definitely changed.

*Ethnicity in the fisheries*
The great majority of Chatham citizens are white. Chatham's local population is derived from old Yankee stock. There are no outward celebrations of ethnicity other than the Fourth of July Parade.

*Kinship & family*
Although the majority of fishermen are not of local stock, those that are have been involved for generations. A number of those currently fishing or shellfishing are third generation. Unfortunately, most fishermen do not want their children to enter fishing, though some expressed this with reservation. "If its prolific and a stable environment," hedged one fishermen. Another offered:

*No…well I won't say I don't want to see them in the industry, don't think I want to see them fishing. …..I don't see them taking over the traps…I don't see them [the traps] being in existence after I'm through unless something dramatically changes.*

Two fishermen had wives or significant others who worked outside the house and outside the fishing industry. The other fishermen felt wives were vital to their enterprises. One fisherman described his wife as his co-worker stated,

*She does a little bit of everything. When I gillnet, she hangs nets, when I longline she baits the gear, She's also the bookkeeper. Elbows me in the ribs to get me out of bed,*

When asked, "What makes a good fisherman?" one fisherman answered, "My wife!"

*Where fishermen go for coffee*
Chatham supports a number of breakfast restaurants, but the majority of fishermen, active and retired, patronize Larry's PX. Most fishermen, whether working or not, are accustomed to early hours and Larry's opens at 4 a.m. The two gas stations that sell coffee are also a gathering spot for fishermen and shellfishermen.

*Where fishermen go for beer*

After hour gatherings for fishermen have changed over the years. Even ten years ago, fishermen mostly congregated at the Chatham Squire, located in downtown Chatham. On non-fishing days, fishermen would begin gathering at lunchtime. A number of factors have led to the demise of this kind of socializing. For one, the Squire's clientele has shifted to the tourist. It is also difficult to maneuver large trucks through downtown during the summer months, never mind finding a parking space. Also, the drunken driving laws and enforcement have simply changed how everyone socializes. Since there are few drinking establishments, local law enforcement keep watches over the few there are and take note on who is where and for how long. Still, small pockets of fishermen congregate during the early hours of the evening at a number of places throughout Chatham and Harwich. The younger crowd tends to gather at the Sou' Wester, while an older crowd gathers at Campari's in North Chatham and Castaways in Harwich.

<u>Fishing related organizations and their roles in the community and fishery</u>

Chatham Fisherman's Association: Not active

Chatham Fisherman's Wives Association: Not active, though there have been recent attempts at revitalizing the organization

Cape Cod groups include:

Cape Cod Commercial Hook Fisherman's Association: An ever expanding and important group supporting and advocating for small boat fishing. Activity includes lobbying on the federal level, assisting in grant writing and procurement of grants for projects such as Cape Live Seafood as well as sponsoring educational forums for fishermen and their families such as how to access fishing information online.

- Cape Cod Gillnetters Association
- Outer Cape Lobstermen's Association
- The Nereids: A recently form group of Cape women dedicated to supporting maritime communities by developing links between residents, visitors and maritime-related interests.

  And regional groups:
- Northwest Atlantic Marine Alliance (NAMA)
- General Category Tuna

<u>Fishing-related programs and services</u>

*Other NGOs/Training institutes*

Approximately five years ago the Fishing Family Assistance Program had an office in Chatham. J-Tech, located in Hyannis, still helps fishermen and their families in funding retraining in fields outside the fishing industry.

*Coast Guard*

Despite cutbacks, Chatham still maintains a Coast Guard station. The Coast Guard offers a few navigational courses every year to interested residents.

## Perceptions of the Fishing Community[37]

### <u>Importance of fishing to the community</u>

Based on a scale of one to five, with one being not important and five being very important, two fishermen believe fishing to be very important (5) to the community, while another believed it to be important (4). One fisherman stated,

    *More important than people in this community know. How about*

---

[37] Based on key informant interviews

# Exhibit B
# (Part 4)

*a 4 and a half? (between important and very important)*

## Boundaries

Two of the respondents named Harwich as the community Chatham folks have contact with the most. The other community is Orleans. Both towns are directly adjacent to Chatham. It is Harwich, though, that contains part of the "Chatham" fleet. East Harwich also offers ever-increasing retail services. Directly over the border between Chatham and East Harwich is the 24 hour Stop and Shop, a new CVS and a number of clothing stores with more scheduled for construction.

The following shows where the respondents conduct specific activities:

| Sell fish | Chatham (Shellfish=Hyannis, Falmouth[38]) |
|---|---|
| Offload fish | Chatham/Harwich |
| Buy fishing gear | Chatham/Harwich/New Bedford/Sandwich |
| Buy ice | Chatham |
| Buy boat fuel and oil | Chatham |
| Haul out for boat repairs | Chatham |
| Go for bookkeeping | Chatham/Yarmouth/Off-cape |
| Go to bank | Chatham |
| To shopping | Chatham, Harwich |
| Go to church | Chatham |
| Go to school | Chatham |
| Go for health care | Chatham/Hyannis/Orleans |
| Go for childcare | Chatham/Orleans |
| Visit relatives | Chatham/Eastham/Wakefield/Florida |
| Visit friends | Chatham/ Maine |
| Go for vacation | Maine/Western MA/South |
| Go for recreation | Chatham/Maine/Western MA |
| Go to socialize | Chatham |

The only respondent who answered yes to whether any of these contacts had changed in the last five years explained that his social life had changed since no one came over to their home anymore due to their three small children!

## Communication Issues

Communication with local fisheries managers and representatives was rated as "poor" by two respondents and "fair" by two. Communication with state managers and representatives was rated as "excellent" by one, "very good" by another and "poor" by two. Communication with Federal managers and representatives was thought to be "fair" by one, "poor" by two, "no comment" by one.

## Assessments

When asked how well scientists and fishermen agreed on the assessment of fish stocks, all four respondents believe fishermen and scientists disagree (number 2) on the assessment of stock conditions.

---

[38] The respondent added that those companies from Hyannis and Falmouth bring trucks to Chatham to buy shellfish.

**Local management practices**

Fishermen were asked if there were any local management practices that the local people themselves devised. One respondent had no idea, while two mentioned proposals hook fishermen had submitted to the New England Fisheries Management Council. The fourth gave an example of local management practices.

> *Yes, the shellfishing. The Town, shellfishermen and the shellfish advisory board that we have set the amount of shellfish that can be taken, some are limited to the times of year we can harvest…..There is a size limit [boat size] at the fish pier,*

The shellfishermen in Town also agreed to raise their own permit fees in the early 1980's in order to create a fund for the propagation of shellfish. With the revenues, the Shellfish Department constructed an upwelling system for a variety of shellfish species, though the primary focus is quahogs. Seed shellfish are grown out then planted in outdoors grow-out areas under protected mesh. Shellfishermen volunteer their time and along with Shellfish deputies, helping plant mature quahogs from the grow-out areas. Shellfishermen also agreed not to allow private aquaculture ventures to take place within Chatham since the Town "public" aquaculture venture benefited everyone.

**Economic Change**

Ten years ago, the economic condition of the fishing industry was rated as "excellent" by one and "good" by three. All the respondents attributed the good to excellent economic conditions ten years ago to the abundance of fish. One fisherman also added that prices for fish were high as well as,

> *…we were able to go where we wanted, as we please. It was a reasonably productive industry.*

Five years ago, three rated the economic condition as "good" and one as "average." Fishermen still attributed the fairly good economic conditions to the quantity of fish as well as the fish price. One fisherman noted that with the ability to diversify into dog fishing, they were able to sustain themselves. Another fisherman noted the boom in shellfishing as the reason.

> *Actually, I would give it a very good if I could and I'm basing that not just about ground fishing but mostly about shellfishing. I think because of the shellfishing. There were 200 to 300 people out there. Kids are putting themselves through college by shellfishing in the summer. It was a boom and it still is although its probably not a as good as it was five years ago, but its still doing well. The groundfishing may have gone down, but the shellfishing equalized it.*

Today, the economics were rated as "good" by one, "average" by two and "fair" by one. Two fishermen noted the decline of fish as well as the impacts from the fishing regulations for the lowering of economic conditions. One fisherman actually found the situation to be quite good and added:

> *So far this year, it's been good to excellent. There was a lot of fish caught and the prices were good most of the winter.*

At the same time one fisherman commented:

> *The fish have diminished. We're regulated to not be able to go and you just can't catch anything.*

The differing comments may simply reflect the individual variability of the industry.

Predicting the future, three anticipated that the economic condition would be "good" in five years. Most respondents were optimistic that the regulations would work to rebuild stocks. One fisherman believed the economic conditions would get worse before they became better, but still believed in a better future. Another fisherman, optimistic that regulations would help fish stocks, added his concern about the managers,

> I'm sure the regulations will work, but that's if they let us fish. Now that the government's involved, it will never be the same.

One respondent could not make a prediction for the future, but his response to why expresses his doubtful concerns over the unpredictability of the industry,

> I have no idea. We are on the brink of being shut down. If what happened in Cape Cod Bay happens here, we're finished. They put trip limits on it and finally ended the whole industry. …we are on the brink of that here. Especially if we're inundated by another fleet. If the boats from the North come down here, it will put undo pressure on our limited resources. …they are out of luck up there…they're all done.

Personal economic change

Next, fishermen were asked if their standard of living had changed for the better in the last five years. Three of the respondents felt there had been no change in their own standard of living, though one did believe his total income had decreased. Another fisherman believed the standard of living was worse.

When asked in what ways life was worse than five years ago, responses ranged from the increased costs in housing and the inability of a working family to survive in Chatham, to the increase in tourists during the summer months and finally,

> Lets put it this way, five years ago I was 50 and now I'm 55 and I'm working harder. Any reasonable person would not think that so good.

Two respondents believed their standard of living had decreased due to a decrease in their annual income over the last five years. Both mentioned the decline in income from fishing. One fisherman believed his standard of living had risen, though his annual income had remained pretty much the same in the last five years.

All four respondents had health insurance. Two of the fishermen were not part of any group plan. One fisherman was a part of the Fisherman's Partnership health plan, and another was covered under his wife's plan from work.

Changes in fishing effort

All respondents believed there had been a change in effort over the past 10 years. One fisherman stated a reduction in fishing effort was due to management, while another believed effort had increase because of the fear of being shut down. Another fisherman stated his effort had decreased by the reduction in traps he set out.

Other than shellfish, which has remained stable over the years, all fishermen noticed a change in the mix of fish stock. Both cod fishermen noted the role of dogfish. One believed the "balance" between cod and dogfish were off because of the increase in dogfish populations. The other cod fisherman confirmed his switch from cod to dogs was due to the decline in cod,

> Targeting the traditional species, cod, has changed because of regulations, quantity, availability of other resources and necessity.

The weir fisherman noted that mackerel has always been the predominate species, around 50 percent of the catch, followed by 25 percent squid and 25 percent scup. But, in recent years, that composition has changed to 75 percent mackerel, 24.5 percent squid and .5 percent scup. One fisherman also noted the increase in the striped bass population.

## Significant changes in the fishing industry

- *First, access to permits…you just can't get permits…And that's a big point, I can't diversify. Next is Amendment 5 and 7. The more people are regulated in the groundfish fishery, [they] come inshore and that puts more pressure on the inshore fisheries like the shellfish industry.*

- *Better, more reliable equipment. The boats are fiberglass now, they're safer and there are less repairs. Next is there's less camaraderie amongst fishermen now and I'm not sure why. Myself, I see a lot of people getting into this industry maybe 15 years ago because it was a quick way to make money and it was the only way they looked at it. I don't think it was like that before. I think that fishing has become more competitive because of the lack of fish. It creates dissention when you have that much competition. People just don't seem to be as friendly. Its harder to be friends and go steal a fish from under him the next day.*

- *Regulations and the failure of the cod fish. And the failure of the codfish is due to overfishing.*

- *The loran and gillnets in Chatham. Gillnets came in to Chatham in 1977-78. That changed Chatham. Also, increase in the horsepower in the draggers.*

## Effects of recent management

When asked which recent regulations would have the greatest impacts on them, all respondents mentioned some aspect of Amendment 7 and subsequent additional measures such as, Days at Sea, trip limits, the closed areas and blocks. But most comments focused on those regulations that are currently being promulgated. The uncertainties of new regulations seem to be a pervasive concern. One commented on the yet unknown dogfish regulations.

> *The dog fish regulations will be a huge shock to the Town….A lot Of boats diversified away from groundfish into dogfish.*

Another stated

> *They're working on new ones now so who knows.*

While still another added:

> *We know its going to be closed for 30 days, but then they're going to have a whole new set of rules…they're talking trip limits and closures. It's going to affect us and put a lot of us on the clam-flats and affect the clams so it's going to affect everyone. [Cape Fishermen's Supply] hasn't ordered much gear because he doesn't know what's going on. He's scaled back on what he orders.*

When asked what alternatives fishermen are switching to, most mentioned clams.  Again, the uncertainty of new dogfish regulations surfaced,

> …dog fish, but that's being taken away…so I don't know what they're going to switch to.


## Characteristics of local fishermen

Asked what makes a good fisherman, the fishermen replied:

- *Tenacity*
- *My wife!  Paying attention to everything that happens.  They're so many things that can make a good fisherman.*
- *Perseverance, drive and luck…also being at the right place at the right time.*
- *Today, someone who is conscientious of the environment and fishes for tomorrow. Meaning, the old school way of fishing where small fish didn't matter.  You took whatever you could get in the boat.  Didn't matter if you killed a bazillion fish to get them.  I think today's way of thinking is different, it needs to be different.  We need to think about tomorrow, to have fish for tomorrow.*

*Safety*

When asked if fishing was more dangerous, or safer than it was in the past, all but one answered that fishing was safer.  All three attributed the increase in safety to stricter regulations, but mostly emphasizing that boats were better today,

> …the boats are safer.  I don't want to admit that the regulations have made it safer.  People are making more money, so they have more money to put into their boats.  Its not like years ago when you made do with what you had because you couldn't afford any better. Coast Guard regulations have helped, but mostly the boats are better and safer.

One fisherman believed the fishing was more dangerous since many captains were forced to work alone without any crew.  Fishermen also have to fish further away to catch fewer fish. Therefore, fishermen, especially those fishing alone, are take greater chances.

*Job satisfaction*

Respondents were asked if most fishermen in the area were satisfied with their jobs.  Three directly answered yes, while another said he did not know, but he was satisfied.  When asked to explain why they felt fishermen were satisfied with their work, two mentioned the freedom they derived from it,

> We choose this profession because we like the lifestyle.  We're basically our own boss.  We have time off and are not dictated by a 9 to 5 work schedule.  It would be a real drastic change to get out of the fishing industry and think you have to go work with structured hours and days…I know a lot o guys who are not going to do it…I'm not going to do it.


## Fishing families

Asked whether spouses of harvesters worked outside the home, respondents commented that most spouses worked outside the home and that this was not different from five years ago.  One added that it might be different then 10 years ago, while another believed it was different 15 years ago.  When asked specifically whether the respondents spouses or partners worked, all answered affirmatively.  Two of the fishermen's wives were in integral part of their spouses fishing business, while two of the other spouse/partner worked outside the fishing industry.

Community Profiles
Barnstable County
Cape Cod and the Islands Sub-region

## 5.4.1.4. Provincetown

*Background*

Provincetown is at the very tip of Cape Cod, a commercial fishing center and, in the summer, a tourist center and art colony.  It's a picture perfect fishing village made up of narrow streets, clapboard and shingled cottages with Cape roses and old-fashioned gardens.

The Town of Provincetown was incorporated in 1727, but its history begins much earlier since its deep, well-protected harbor offered excellent protection from storms.[39]  The European explorer Gosnold recorded a stop in Provincetown as early as 1602 then the Pilgrims dropped anchor here in 1620. Before moving on to Plymouth where fresh water was more plentiful, they drew up the New World's first document of self-governance, The Mayflower Compact, sowing the seeds of self-determination and radical thought that still characterizes the people of Provincetown.[40]

As far as is known the Native Americans, the Wampanoag, did not establish permanent settlements here, but set up seasonal camps for fishing and hunting.  This pattern of a transient population that swells in the summer months continued with the Europeans.[41]  The rich fishing grounds of Grand, Stellwagen and Georges Banks led to seasonal leasing of fisheries with licenses granted for bass, mackerel and cod fishing but the first permanent settlement didn't take place until 1700.

Provincetown grew very slowly during the 18th century and its population fluctuated with the price of fish.  Farming was of secondary importance and aside from the fishing industry, there were only some salt works and one mill.  After the Revolution, the town boomed and its population rose 276.6% between 1790 and 1830.  Despite its relative lack of good farmland, by the middle of the 19th century, Provincetown had developed as the prime maritime, fishing and commercial center of the Cape. The beach itself was the main thoroughfare for horse-drawn carts loaded with fish and salt and the tools of the fisherman's trade. Most of the houses faced the bay. Side streets ran inland. Travel to the mainland was accomplished by stagecoaches that plied The Old King's Highway, portions of which still run through Truro and Wellfleet.[42]

As whaling came of age in New England, Provincetown's transition from a quiet fishing village to a bustling seaport was sudden. By the mid 1800s Provincetown, with the largest and safest natural harbor on the New England coast, had become one of the greatest and busiest seaports in the country.

Boasting a fishing fleet of more than 700 vessels, Provincetown had become wealthy and crowded, with more than 5,000 residents by mid-century. Fifty-six wharves jutted out into the bay. There were buildings for smoking and canning herring, and fish-flaking racks for curing codfish. Salt was supplied by 70 local salt works -windmills along the waterfront that pumped seawater into vats to be evaporated by the sun.

The Civil War, which destroyed so much New England business, only provided more markets for Provincetown's fish.  Portuguese sailors, picked up by American ships in the Azores and Cape Verde Islands to fill out their crews, came to Provincetown to live and additional Portuguese

---

[39] http://www.state.ma.us/cc/provincetown.html
[40] http://www.provincetown.com/about/history/
[41] http://www.provincetown.com/about/history/
[42]http://www.provincetown.com/about/history/

immigrants had moved to town by the 19th century to work on the whaling boats and coastal fishing vessels. In 1875, there were 25 coastwise and 36 ocean vessels operating in town, more than any community in the state including Boston.

Provincetown was a bustling place with all of the ancillary maritime businesses operating, such as ship chandlers, shipwrights, sail makers, caulkers, riggers and blacksmiths. But whaling declined after the turn of the century and a storm known in local legends as The Portland Gale destroyed most of the town's packing wharves, windmills and salt works. The era of Provincetown's fame as a seaport had ended but by then Provincetown had become known to many of the wealthier residents of Boston and New York. The railroad now brought an entirely new type of visitor to Provincetown—the upper class tourist, eager to escape the heat and grime of the industrial cities.

In the late 1800s Romanticism and Impressionism, with their fascinations with light and landscape, dominated the international art scene. American Impressionists, like Charles Hawthorne, were captivated by the ever-changing interplay of light and water that they found here at the narrow tip of Cape Cod. They quickly embraced Provincetown and its splendid environs as their own.

Hawthorne established The Cape Cod School of Art in 1899. A 'plein air' (open air or outdoor) school of painting, Hawthorne led his students out to the high hills, the low tidal flats and the dunes, stalking the essence of Provincetown's incomparable light in all its changing moods. Artists, out in every sort of weather and season, easels and paints in tow, have been a familiar sight in Provincetown ever since.

In 1914, Hawthorne and others founded The Provincetown Art Association and Museum, whose first exhibition, featuring works by 44 artists, was held in the Town Hall. By 1915, the Art Association had grown to 147 members.

Poets, novelists, journalists, socialists, radicals, entrepreneurs and dilettantes flocked to Provincetown. Abandoned wharves, barns, sail lofts and fish sheds were quickly converted to studios, galleries and little shops. Many especially hardy (and solitude-loving) artists built tiny shacks on the unclaimed land of the high ocean dunes in Provincetown and North Truro (some are still standing).

The Provincetown Players, a mixed group of writers, playwrights, actors and artists, and the first truly American theatre company, converted an abandoned fish house into The Wharf Theatre in 1915. In 1916 The Players opened with Eugene O'Neill's 'Bound East for Cardiff' and the *Boston Globe* ran a front page article proclaiming Provincetown the 'Biggest Art Colony in the World...' By 1917, the Art Association had grown to over 300 members. Throughout the next several decades, Provincetown moved into prominence as one of the primary cultural centers of the country.

Provincetown's creative spirit and stylistic aplomb endures. The Provincetown Art Association, Hawthorne's Cape Cod School of Art and the Fine Arts Work Center continue to be well-respected and vital organizations in the social and cultural context of the town.

The hippies of the 60s discovered Provincetown and instantly embraced the open-mindedness and non-judgmental ways of this already diverse Cape tip community. In the mid-70s, responding to the town's long tradition of tolerant open mindedness as much as to its delightful environs and exciting summer scene, the gay community also adopted Provincetown.

As a backdrop to this melange of fascinating people, the ocean beaches and the high dunes, incorporated into the Cape Cod National Seashore in 1961, remain preserved in their natural state, little altered than the Pilgrims first landing over 300 years ago. Cape Cod National Seashore comprises 43,604 acres of shoreline and upland landscape features, including a forty-mile long stretch of pristine sandy beach, dozens of clear, deep, freshwater kettle ponds, and

upland scenes that depict evidence of how people have used the land.[43] A variety of historic structures are within the boundary of the Seashore, including lighthouses, a lifesaving station, and numerous Cape Cod style houses. The Seashore offers six swimming beaches, eleven self-guiding nature trails, and a variety of picnic areas and scenic overlooks.

Provincetown is unique in that so many diverse social elements - the Portuguese fishermen, the artists and writers, the hippies and the gays have together built a cohesive community that really supports all its members in a manner that is not only tolerant, but completely respectful of 'lifestyle preferences.'[44]

## The changing fishing community

The Portuguese community and influence is still very strong. The fishing fleet, although reduced in numbers, still hauls out to sea. Every summer the Bishop blesses the fleet and the Portuguese Festival enlivens the town.

However, about 15 years ago, local respondents report that the industry began to experience a downturn as nearby fish stocks were depleted and area closures such as Stellwagen Bank limited the opportunities to fish near shore. What was once a proud fleet of day boats including eastern-rigged draggers, scallopers and lobster boats is now a derelict collection of aging vessels in poor repair and with little operating capital to keep the fishery viable. The Provincetown harvesting sector has also suffered from a lack of diversity in their industry's development. P-Town has concentrated its efforts on dragging for groundfish or whiting, and has not significantly diversified into other fisheries or gear.

Unlike ports such as Plymouth or Vineyard Haven that have, with active community support, successfully maintained their fishing industry while developing a tourist industry, Provincetown's fishing industry is failing. Despite the positive spin on the state of the fishing industry reported by web site pages, key respondents indicate there is little local support for the cultural capital of fishing in Provincetown. When fishing was an important element in the community there were fish processing plants, a NMFS marine extension office, a fisherman's memorial, marine and fishing supplies, an icehouse, net maker, and a fish auction. Now these items of economic and cultural capital have given way to additional seafood restaurants, tourist shops, art galleries, businesses, and hotels geared to outsiders:

"It used to be real wild around here. Fishermen had bars to celebrate in and small grocery stores where you could buy supplies on credit.  That is all gone now.  Now it is all regulated and full of tourists. Fishermen don't matter that much anymore."

Another disadvantage of P-Town is its geographic location.  Although it has the second deepest natural harbor in the world, its location at the northernmost tip of Cape Cod has made it distant from major fish markets and thus less competitive with ports having better access to ground transportation such as New Bedford and Gloucester.  In the summer time, the one road going into an out of Cape Cod is regularly clogged with tourist vehicles on their way to visiting the beaches or traveling to the art and tourists shops that have come to dominant the area's economic landscape.  In the wintertime, bad storms can close down the one road making regular access difficult.

The Portuguese and Portuguese-American fishing fleet was primarily composed of day-boats and they tended to work in extended family groupings.  At one time they commonly had 6 and 7 person crews, then by the 1970's were usually working with crews of 4 or 5 men.  Most of the fleet retained their traditional pattern of groundfish trawling, supplemented with whiting and

---

[43] http://www.nps.gov/caco/
[44] http://www.provincetown.com/about/history/

lobstering.  Late in the 1970's when bluefin tuna began to attract Japanese buyers, some of the vessels would try for a big one with hook and line.   In general, though, the Provincetown fleet did not significantly diversify their economic activities and thus remained somewhat culturally and linguistically isolated.

Migration between P-Town and Portugal was common.  Many of the more successful fishermen left Provincetown over the last 25 years to join the fleet in New Bedford.  Newer immigrants who would take over aging vessels and "have a go at it" replaced them.  However, others stayed and fished out of P-Town for up to 40 years.  Because of the outmigration of highliners and the ethnic insularity of the fleet, there was neither the impetus nor the necessary capital to diversify fishing strategies.[45] Those coming into the fishery took up what was available, and had little encouragement or incentive to change.

## Governance

Board of Selectmen, Town Manager and Open Town Meeting

## Demography

Population
According to the 1990 Census there was a population of 3,374 in Provincetown CDP, with 1644 males and 1730 females.

Age Structure
There were 465 children (under 21 years), 2275 adults (21 to 64 years) and 635 seniors in 1989.

Education
Of adults over 25, 501 had no high school diploma, 815 had graduated from high school, 715 had some college and 788 had a Bachelor's or higher degree in 1989.

Housing
There were 3660 housing units, 1868 of which were occupied and 1792 were vacant.  Of those occupied, 891 were owner-occupied and 977 were rented.  The median year housing units were built was 1939 and the median value of owner-occupied housing was $167,600 in 1989.

Racial and Ethnic Composition
The vast majority of the population was white (3309) with 52 Blacks, 6 American Indians and 7 Asians.  The first ancestry reported by 1175 individuals was Portuguese.  Four hundred-one persons claimed English ancestry and over 200 each claimed Irish and Italian ancestry.

## Economic Context
Income
The median household income in 1989 was $19,935 and the per capita income was $15,235.

Employment[46]

Whale watching has replaced whale hunting as an important source of revenue and fame for Provincetown.

INDUSTRY
Universe: Employed persons 16 years and over

---

[45] Key respondent interview.
[46] http://venus.census.gov/cdrom/lookup

| | |
|---|---:|
| **Agriculture, forestry, and fisheries (000-039)...** | **67** |
| Mining (040-059)... | 0 |
| Construction (060-099)... | 136 |
| Manufacturing, nondurable goods (100-229)... | 55 |
| Manufacturing, durable goods (230-399)... | 36 |
| Transportation (400-439)... | 48 |
| Communications and other public utilities (440-499)... | 33 |
| Wholesale trade (500-579)... | 14 |
| Retail trade (580-699)... | 512 |
| Finance, insurance, and real estate (700-720)... | 93 |
| Business and repair services (721-760)... | 40 |
| Personal services (761-799)... | 133 |
| Entertainment and recreation services (800-811)... | 15 |
| Professional and related services (812-899): | |
|   Health services (812-840)... | 78 |
|   Educational services (842-860)... | 129 |
|   Other professional and related services (841, 861-899)... | 60 |
| Public administration (900-939).. | 66 |

OCCUPATION
Universe: Employed persons 16 years and over

| | |
|---|---:|
| Managerial and professional specialty occupations (000-202): | |
|   Executive, administrative, and managerial occupations (000-042)... | 204 |
|   Professional specialty occupations (043-202)... | 264 |
| Technical, sales, and administrative support occupations (203-402): | |
|   Technicians and related support occupations (203-242)... | 39 |
|   Sales occupations (243-302)... | 180 |
|   Administrative support occupations, including clerical (303-402)... | 141 |
| Service occupations (403-472): | |
|   Private household occupations (403-412)... | 0 |
|   Protective service occupations (413-432)... | 0 |
|   Service occupations, except protective and household (433-472)... | 400 |
| **Farming, forestry, and fishing occupations (473-502)...** | **85** |
| Precision production, craft, and repair occupations (503-702)... | 142 |
| Operators, fabricators, and laborers (703-902): | |
|   Machine operators, assemblers, and inspectors (703-802)... | 42 |
|   Transportation and material moving occupations (803-863)... | 20 |
|   Handlers, equipment cleaners, helpers, and laborers (864-902)... | 98 |

CLASS OF WORKER
Universe: Employed persons 16 years and over

| | |
|---|---:|
| Private for profit wage and salary workers... | 1002 |
| Private not-for-profit wage and salary workers... | 65 |
| Local government workers... | 195 |
| State government workers... | 33 |
| Federal government workers... | 23 |
| Self-employed workers... | 297 |
| Unpaid family workers... | 0 |

## Transportation and Access[47]

Provincetown is situated on Cape Cod, a 65-mile long sandy peninsula comprising Barnstable County. The Cape has excellent highway, rail, bus and air connections to other parts of New

---

[47] http://www.state.ma.us/cc/provincetown.html

England. Air, bus, and passenger rail service expand during the summer months to accommodate the large numbers of tourists.

**Major Highways**
Principal highways are U.S. Route 6, the Mid Cape Highway, and State Route 6A.

**Rail**
There is no freight rail service, but the network of intermodal facilities serving Eastern Massachusetts and Rhode Island is accessible.

**Bus**
Provincetown is a member of the Cape Cod Regional Transit Authority (CCRTA), which operates a b-bus demand response service. The Plymouth and Brockton Street Railway Company provides two trips daily between Provincetown and Boston.

**Other**
The Provincetown Municipal Airport, a Commercial Service (CM) facility located 2 mi. NW of town, has a 3,498'x 100' asphalt runway. Precision and non-precision Instrument approaches are available.  The Plymouth and Brockton Street Railway Company provides two bus trips daily between Provincetown and Logan Airport.

Ferries (people and bikes, no cars) from Plymouth and from Boston make daily trips in season to Provincetown.

## Hospitals, schools, libraries, museums[48]

There is no hospital in Provincetown.

Provincetown Public Library

Pilgrim Monument and Provincetown Museum, Cape Cod Pilgrim Memorial Association
    Provincetown Art Association and Museum
    Provincetown Heritage Museum
American Lighthouse Foundation restored the keeper's house and outbuildings at Race
    Point Light.

## Fisheries Profile

<u>Community</u>
The Portuguese community and influence is still very strong. The fishing fleet, although reduced in numbers, still hauls out to sea.  Every summer the Bishop blesses the fleet and the Portuguese Festival enlivens the town.[49]

<u>Commercial fishing and fisheries-related employment</u>

*Harvesting structure*
The majority of the fleet are eastern-rigged otter trawlers, complemented by a small fleet of inshore angling vessels.  A total of 18 vessels were counted at the docks, with their numbers equally divided between steel and wooden hull vessels.

---

[48] http://www.state.ma.us/cc/provincetown.html
[49] http://www.provincetown.com/about/history/

186                                    Cape Cod & Islands

The nearest fishing ground is Stellwagen Bank, though "fished out" when the groundfish stocks fell to low levels, now shows signs of a recovering biomass of groundfish and other species. However, the Provincetown fleet must compete for Stellwagen fish with the North shore fleets of Boston and Gloucester. This competition forced P-town vessels further and further off shore, but because of the declining condition of their vessels, they can no longer risk going far, especially in marginal weather.

In 1996 there were 28 large vessels and 19 small jig boats.[50] Of these, 15 were longliners, two gillnetters, and two lobster fishing boats. Only 17 of the 28 vessels were in working condition. In 2001, there are only eight of the 28 large vessels operating, plus 12 small longlining/jigging/ lobstering boats. The smaller boats are in better financial shape, since they are less costly and are expected to provide direct support for only 1 or 2 fishermen and their families.

Nevertheless, all vessels and fishing families are marginalized in a fishing community that is experiencing the worst possible combination of marketing, fish stock, and production capital losses. The total estimated participation in fishing is approximately 25 in groundfishing, 20 lobstering and another 10 in diverse small-scale fisheries. The estimate is a total of 55 fishermen, with 26 households directly dependent on fishing, and the remainder indirectly (doing other jobs such as trucking and carpentry).

*Support Services*
Local political leaders have not taken any action to support and integrate fishing into the changing economy. A significant decline in fishing infrastructure has occurred over the last two decades. Infrastructure which did exist but is now absent includes an icehouse, bait house, fish auction, boat builders, and NMFS extension office. Surviving facilities include two marine railways, two diesel fuel stations, three fish retail markets, a harbormaster, the Coast Guard, and a fishing/sailing monument in the town proper.

The marine railways target the recreational fishing sector, and the diesel facilities are also used by recreational vehicles, while the fish retail markets also rely on outside product, particularly during the summer tourist season. The town pier has two large docks that extend for approximately 300 yards. The construction is wood and cement and is sturdy enough for 18-wheeler truck traffic. At the end of the pier are two fish buyers: Oceanic Seafood and Whaling City Seafoods. The docks are in good condition, and the Chamber of Commerce has been actively promoting the quality of the harbor for berthing of large offshore (foreign) vessels, while providing little support to maintain the commercial fishing sector. Restaurants and local shops dominate the end of the pier, but there is little evidence of businesses dependent on the fishing industry.

*Marketing*
Most fish is sold locally, or taken by truck to the fish auctions or other markets. As with other ports, the imprecise knowledge on the marketing of fish products indicates a need for a region-wide study on marketing flows (human, biophysical, economic capital flows).

*Species, Seasonality*
While the summer is a boon time for fish produce, fishermen work through the year to make ends meet. However, the dilapidated condition of the fleet and limited DAS forces some boats to be tied up six months out of the year. January through March is the period for scallop fishing, draggers fish April to June, and scalloping resumes from July through September.

Landed species include:

---

[50] Dyer and Griffith 1996.

The local catch of fish and shellfish species is quite diverse and includes cod, fluke, winter flounder, whiting, red hake, herring ( for bait), yellowtail, haddock, pollock, squid, lobster, swordfish, tuna, scup, monkfish, scallop, sea clams, and conch.

*Form of ownership (e.g., owner/operator; corporation)*
Vessels are usually owner-operated.

<u>Recreational fishing and employment</u>
Whale watching and fishing charters are available.
Some of the companies include:
Bay Lady II Excursion
Cape Cod Whale Watch
Dolphin Fleet Whale Watch
Flyer's Boat Shop Inc—Charter & Rental
Hindu Schooner—Charter & Rental
Off The Coast Kayak
Portuguese Princess Whale Watch
Shady Lady Co—Fishing Charters

<u>Cultural role of fishing</u>
*Cultural events*
The Portuguese fleet and the recreational fleet join together to celebrate the Portuguese Festival and parade for the Blessing of the Fleet in June.

*Ethnicity in the fisheries*
The dragger fleet is predominantly Portuguese and Portuguese-American.

*Religion*
Roman Catholicism predominates in the dragger fleet.

*Kinship & family*
For many years there were strong family ties among the fishermen. It was a way of life that young men longed to join. In the late 1970's many of the skippers had dropped out of school at 15 years of age to go fishing with their fathers, uncles, and/or brothers.


<u>**Fishing-related programs and services**</u>
*Other NGOs*
The Center for Coastal Studies, an independent, non-profit institution dedicated to research, conservation, and public education was founded in 1976. The Center has become internationally known for its progressive and innovative programs and scientific research. As part of the Entanglement Network, the Center and fishermen cooperate to protect and rescue marine mammals when they have become entangled in fishing gear.

# Perceptions of the Fishing Community[51]


<u>**Importance of fishing to the community**</u>
Provincetown epitomizes what can go wrong in a port highly reliant on one fishery albeit a multispecies fishery. There has been a steady decline and no diversification in the local commercial fishery since the 1996 groundfish study, and the lost human capital is not being replaced as fishermen retrain out of the industry or move to different ports such as New Bedford,

---

[51] Based on key informant interviews

Gloucester and Chatham. Overall importance of the fishery to the community today is noted as "slightly important."  Nevertheless, there are innovative individuals who remain strongly committed to the industry and who seek ways to make their efforts profitable and sustainable.

## Boundaries

Community contacts are tied to the local town linkages, such as Chatham and Truro.  People have the most contact with Truro, while others are linked to off Cape areas such as Boston and New Bedford. Specific community contacts were as follows:

| | |
|---|---|
| Sell Fish | Provincetown |
| Offload Fish | Provincetown |
| Buy Fishing Gear | New Bedford/Chatham |
| Buy Ice | Cape Cod Ice (Yarmouth, Hyannis, Sandwich) |
| Buy Fuel/ Oil | Provincetown |
| Haul out Boat Repairs | Provincetown/New Bedford |
| Bookkeeping | Provincetown |
| Banking | Provincetown |
| Shopping | Provincetown |
| Go to Church | Provincetown |
| Got to School | Provincetown |
| Go for Health Care | Hyannis-Outer Cape Health/ Medical Center |
| Go for Childcare | Provincetown |
| Visit Relatives | Provincetown/out of state |
| Visit Friends | Provincetown |
| Go for Vacation | Florida, White Mountains, anywhere |
| Go for Recreation | Bars |
| Socialize | Provincetown, bars, dockside, home |

## Communication Issues

Communication with local fishery managers was rated as "poor," with state managers as "good," and with regional federal managers as "poor."

"*Managers just don't listen to us. We can go to meetings and write letters, and we never get back a response.*"

## Assessments

Key respondents "strongly disagree" with the assessment of stocks, and are particularly concerned over having to throw back fish when quotas are exceeded.

## Economic Change

The local fishery is certainly in decline, maybe an irreversible decline for the present, made worse by a lack of overt local community support and no apparent infusion of outside economic capital into fishing. Ten years ago, the economic condition of the fishery was rated as "good."  However, even five years ago it was noted to be "poor" due to lost DAS and the increase in mesh size to 6 inches. Today, with DAS down to 88 and stiff quotas on catch, the fishery also receives a ranking of "poor."  Today, life is in no way  "better" than it was five years ago, and is made "worse" by higher operating expenses, fewer fish, and more regulations. One advantage is that quality fish will receive a better price than five years ago, in part because of the influence of fish auctions in New Bedford, Gloucester and Portland.

The situation is not seen to be improving, and five year from now, key respondents still predict a condition of "poor" for the local fishery.

### Effects of recent management

The most onerous local regulations are the closures in nearby water, including Stellwagen, and the limited DAS.

### Other concerns

Another issue which fishermen are concerned may impede the viability of fishing is a sewage outfall pipe from Boston's new sewage treatment plant.  The outfall pipe carries fresh water and dumps it onto Stellwagen Bank. One fisherman of 40 years experience who was very encouraged by the recent comeback of scallops on the Bank, as well as the recuperation of the local lobster population which serves as a secondary catch on draggers said, *"It will be the end of us."*

An environmental engineer who worked on aspects of the outfall pipe remarked, "the ecosystem will certainly be changed since they will be dumping millions of gallons of freshwater onto the Stellwagen Bank."  It is too early to tell what impact the outfall will have on the fishing industry, and this situation should be closely monitored by the responsible agencies.

### Characteristics of local fishermen

For this population, there is still a sense of optimism, with key respondents indicating that most fishermen are "satisfied with their work. However, by some the future looks bleak:

*"A lot of the guys fishing here now are dying to get out (of fishing) because there are too many laws, the price is poor, there are too few fish, and there are better places to work."*

Community Profiles
Dukes County
Cape Cod & the Islands Sub-region

## 5.4.2.  Duke's County (Martha's Vineyard)

*Background[52]*

"Martha's Vineyard, the largest island in New England, was formed by glacial action 10,000 years ago and lies 7 miles off the coast of Cape Cod. The Island is roughly shaped like a triangle with its base the straight south shore. It is 9 miles wide and 23 miles long at its furthest points and has a total land area of about 100 square miles. The Vineyard has 124.6 miles of tidal shoreline."[53]

 "The first humans probably came here before the Vineyard was an island. It is thought that they arrived after the ice was gone, but before the melting glaciers in the north raised the sea level enough to separate Martha's Vineyard and Nantucket from the mainland. Indian camps that carbon date to about 2270 BC have been uncovered on the Island.

Legend surrounds the much later arrival of the first white men. Some believe Norsemen were here about 1000 AD.  In 1524 Verrazzano sailed past and named the Island Louisa. The Indians called it Noepe which means 'island in the streams." Other explorers gave different names, but Bartholomew Gosnold, who named it for the wild grapes and for one of his little daughters, gave the one that stuck in 1602.

Within 40 years of Gosnold's visit, all of New England was being claimed and divided up by Europeans.  Thomas Mayhew, a Bay Colony businessman, bought Martha's Vineyard, Nantucket, and the Elizabeth Islands for forty pounds. He made his only son and namesake copatentee. In 1642 the first white settlement on the Vineyard was established at Great Harbour, now Edgartown, under the leadership of Thomas Mayhew, Jr.

The ordained pastor of his flock, this young man by example and precept instituted a policy of respect and fair dealing with the natives that was unequaled anywhere. One of the first Mayhew rulings was that no land be taken from the native Island people, the Wampanoag Indians, without consent and fair payment.  From this time on the colonial settlers and the Indians lived without the terror and bloodshed that has marked American history elsewhere. Within a few years a congregation of "Praying Indians" was established at what is still known as Christiantown.

This colonial period was marked by plenty as well as peace. The sea provided fish for both export and Island use, and the Indians taught the settlers to capture whales and tow them ashore to boil out the oil. Farms were productive as well; in 1720 butter and cheese were being exported by the shipload." [54]

"One of the earliest mentions of African home ownership on-Island was in the 1763 will of a Wampanoag man named Elisha Amos. The will, 1/272 Dukes County Probate, provides that his "beloved wife Rebecca" receive livestock and his house for as long as she lived. Rebecca Amos was an enslaved woman originally from Guinea, West Africa."[55]

"The American Revolution, however, brought hardships to the Vineyard. Despite the Island's vulnerable position, the people rallied to the Patriot cause and formed companies to defend their homeland. With their long heritage of following the sea, Vineyarders served effectively in various

---

[52] http://www.mvy.com/mvhistory.html
[53] http://www.mvy.com/minute_guide.html
[54] http://www.mvy.com/mvhistory.html
[55] http://www.mvy.com/diaspora.html

maritime operations.  In fact, it is probable that the first naval engagement of the war occurred in April, 1775, when Nathan Smith of Tisbury mounted three small cannons on a whaleboat and sailed with a small crew across Vineyard Sound, attacking and capturing the armed British schooner *Volante*.

Vineyarders, of course, knew that they could do little to resist a British invasion of the Island, and their worst fears were confirmed on September 10, 1778, when a British fleet of 40 ships sailed into Vineyard Haven harbor.  Within a few days the British raiders had burned many Island vessels and had removed more than 10,000 sheep and 300 head of cattle from the Vineyard. The raid was an economic blow that affected Island life for more than a generation.

Before the Revolution, Vineyarders had been building large vessels and were sailing the North Atlantic from the Grand Banks to the Western Islands in search of whales and the valuable oil they yielded.  After the start of the war, all this came to a stop, and the whaling industry did not make a real recovery until the early 1820s, when many of the mariners built their beautiful homes in Edgartown."[56]

"During the 1800s seafaring was one of the few ways for African American men to eke out a living during a socially and politically inhospitable era. Entry into most other industries was severely restricted. Due to the political powerlessness experienced in the oppressive political and social climate of the early 1800s, James Williamson, "a Negro man" who owned seventeen acres of "upland" in Martha's Vineyard's Christiantown, shipped aboard a whaler in 1828, as a means to raise much-needed cash.

The first whaling captain of African descent on Martha's Vineyard was born in Edgartown in July 1830.  Captain William A. Martin was a highly regarded and respected Edgartown whaler.  He mastered many successful whaling voyages and his career spanned in excess of forty years, with journeys on all of the earth's oceans."[57]

"The Civil War brought the end to the Golden Age of Whaling. The Confederate navy captured ships on the high seas. Others were bottled up in the harbors. Either way, it meant financial ruin for the ship owners and the Island.

A new industry was 'God sent' in a very literal way. In 1835 the Edgartown Methodists had held a camp meeting in an oak grove high on the bluffs at the northern end of the town. This was just one of the hundreds of revivals that were being held in outdoor settings at the time. The worshippers and their preachers lived in nine improvised tents and the speakers' platform was made of driftwood. The camp meeting became a yearly affair and one of rapidly growing popularity.

Wesleyan Grove, as the Oak Bluffs Camp Ground was called, rode the crest of the religious and cultural uplift movement. By the mid-1850s the Sabbath meetings here were drawing congregations of 12,000 people. They came for the sunshine and sermonizing in hundreds of individual church groups.  Each group had its own communal tent where the contingent was bedded down in straw purchased from local farmers. Services were held in a large central tent.

The communal tents gave way to "family tents," which reluctant church authorities granted only to "suitable" families. But the vacationers urge could not be checked.  Family tents turned into wooden cottages designed to look like tents. And the cottages multiplied, trying to out-do each other in brightly painted fantasies of gingerbread.  A new all-steel Tabernacle structure replaced the big central tent in 1879. It stands today as a fine memento of the age of ironwork architecture.

------------------------------

[56] http://www.mvy.com/mvhistory.html
[57] http://www.mvy.com/diaspora.html

Within 40 years of the first camp meeting here, there were crowds of 30,000 attending Illumination Night, which marked the end of the summer season with stunning displays of Japanese lanterns and fireworks.

Wesleyan Grove struggled to hold its own against such secular attractions as ocean bathing, berry picking, walking in the woods, fishing, and croquet playing. There were efforts to ban peddlers, especially book peddlers. A high picket fence was built around the Camp Ground proper. By the 1870s, Wesleyan Grove had expanded into "Cottage City" and Cottage City had become the town of Oak Bluffs, with 1,000 cottages plus boarding houses, stores, a lumberyard, and a bakery.

Steam vessels from New York, Providence, Boston, and Portland continued to bring more enthusiastic devotees of the Oak Bluffs way of life. Horse cars had to be employed to take vacationers from the dock to the Tabernacle. The horse cars were later replaced by a steam railroad that ran all the way to Katama.  Among the first passengers on the railroad were President Grant, accompanied by Vice President Wilson, Secretary of State Robeson, Postmaster General Jewel, and Governor Talbot of Massachusetts.

The railroad gave way to an electric trolley line (from Vineyard Haven to the Oak Bluffs wharves), and the trolley gave way to the automobile. The steamers and their throngs of eager rusticators grew fewer. Oak Bluffs retains a charm today that serenely reminds us of earlier times."[58]

There are six towns on Martha's Vineyard; three up-Island towns: Aquinnah, Chilmark and West Tisbury and three down-Island towns: Vineyard Haven, Oak Bluffs and Edgartown (which includes Chappaquiddick). The terms up-Island and down-Island are nautical references to degrees of longitude designated on maps and charts.

Edgartown was the Island's first colonial settlement and has been the county seat since 1642. The town is renowned for its stately, white Greek Revival and Federal houses built by whaling captains. The distinctive, museum-piece architecture preserves the ambience of the 19th century seaport to the present day.

The town of Tisbury, also known as Vineyard Haven, was one of New England's busiest ports in the 1800s.  At that time, the area around the harbor was known as Holmes Hole and was a convenient anchorage for ships traveling between the East Coast of the United States and Europe. In those days, most of the coastwise shipping traveled through Vineyard Sound. In 1845 13,814 vessels were counted.

Oak Bluffs, formerly known as Cottage City from the many gingerbread cottages which are still found there, is also home to the Flying Horses Carousel, the oldest operating merry-go-round in the United States. The horses were hand-carved in New York City in 1876. This historic landmark is maintained by the Martha's Vineyard Preservation Trust that manages this and several other historic sites on the Island.

West Tisbury, incorporated in 1892, was the 'industrial' heart of the Island, as it was home to the Island's grist mill, a clay works, a salt works, extensive trap fishing operations and a manufacturing center for satinet, a heavy, Island-made, woolen fabric used to make whalemen's jackets.

Aquinnah (formerly known as Gay Head) is home to the Wampanoag Tribe, the only federally recognized Native American tribe in Massachusetts. This recognition has resulted in a government-to-government relationship between the United States and the Wampanoag Tribal

---

[58] http://www.mvy.com/obinfo.html

Cape Cod & Islands                                    193

Council. On May 14, 1997 voters in the town of Gay Head decided to change the name of the town to Aquinnah. This change was signed into law on May 7, 1998.

Chilmark is known for its rolling hills and unmatched coastline. Before the days when the Coastguard looked out for shipwrecked vessels, Vineyarders took it upon themselves to form volunteer groups that provided assistance to sailors in times of need. The open dories, one of which was provided by the Massachusetts Humane Society, were launched into stormy seas from Squibnocket Landing, the only beach on the south shore shallow enough for boats to be landed or launched in heavy weather.

Chilmark was also noteworthy for its population of deaf. "For almost three centuries, due to an inbred recessive gene, the population of Martha's Vineyard had an unusual proportion of profoundly deaf people. Modern mobility and population diversity have virtually erased the Vineyard's deaf community, but in 1854, when the incidence of deafness on the island peaked, the national average was one deaf person in 5,728; on the Vineyard, it was one in 155. In Chilmark it was one in 25, and in Squibnocket, a section of Chilmark, one in four babies born in the mid-19th-century was deaf.

Families in Chilmark and West Tisbury earned their living farming or fishing or both, often supplemented with another trade such as wood-cutting or trapping. Families stayed in the same village, often even the same house, for two or even three centuries. Sons followed fathers into their fields and fishing boats.

Yet the isolation was also a blessing. For 250 years these rural Vineyarders never heard the mainland idea that an inability to hear or speak could be a handicap. "Practical in all things," a reporter in 1895 went on, "they began to build on a signing system their ancestors had used in England. In the stores, on the farms, and up the creek, Martha's Vineyard sign language was the only language that everybody knew."

Children learned to sign "from the crib," at the same time they learned to speak. At town meetings, hearing signers would stand in front and translate the goings-on for the deaf. The same thing went on in church. If a deaf person . . . had something to say to the congregation, he or she would stand up and sign; if someone didn't know sign fluently, chances were that the person next to him did and could translate."[59]

Martha's Vineyard is part of the Dukes County, which also includes the Elizabeth Islands and Noman's Land. There are seven towns in Dukes County, the six Vineyard towns and the town of Gosnold on Cuttyhunk Island, the most southerly of the Elizabeth Islands. The population of Martha's Vineyard is approximately 14,248 year round and 105,625 during the summer."[60]

---

[59] http://www.mvy.com/spokehand.html
[60] http://www.mvy.com/minute_guide.html

194                                      Cape Cod & Islands

Community Profiles
Dukes County
Cape Cod & the Islands Sub-region

## 5.4.2.1. Vineyard Haven (Tisbury)

### Background

"When ships were powered by wind and canvas, Vineyard Haven was one of New England's busiest ports. Most of the coastwise shipping traveled through Vineyard Sound (13,814 vessels were counted in 1845). Holmes Hole, as this harbor community was called, provided a convenient anchorage. Here a ship and its crew could lay over comfortably to wait out bad weather, pick up provisions, or take on a pilot who could negotiate the rips and shoals that were the special perils of this sea route."[61]

Today, Vineyard Haven is home to a vibrant local fishery that thrives on an influx of summer tourists. As the primary port of Martha's Vineyard, Vineyard Haven is reached by ferry from Woods Hole, and contains many of the elements of gentrification typical of the most famous tourist sites in New England. Six dockside hotels and inns, interspersed with numerous trendy retail shops, restaurants and marinas, are complemented by historic homes on an island dotted with fishing coves and shellfish flats with a small but sustained commercial fishing presence.

Unlike other gentrified sites, such as Newport, the fishing infrastructure here is not antithetical to gentrification but blended with it. Fishermen are viewed as welcome contributors to the local cultural capital. Importantly, fishermen provide desired seafood products year-round to the four seafood restaurants and two seafood processors/retailers in town. In general, residents of Martha's Vineyard tend to be tolerant, accepting fellow inhabitants and their occupations as part of the island community:

*"Folks here are all pretty much respectful of each other – there are a lot of rich folks that have money and of course the summer tourist crowd, but people support each other here and help out when necessary- we're all part of one community…"*

Despite the description of the fishing industry as "very important" to Vineyard Haven and Martha's Vineyard, it is notable that only 2 percent of the dock space is utilized by the small commercial fleet. When demand for finfish is down in the fall/winter season, some fishermen compensate by clamming, or working in carpentry and house maintenance for the many homes that are summer "cottages." There is little new development on the Island, what occurs more frequently is renovation of already existing houses rather than new construction.

### Governance

Town meeting and Board of Selectmen

### Demography

#### Population

The population according to the 1990 Census was 1778, 795 male and 983 female.

#### Age Structure

In 1989 there were 464 children (under 21), 917 adults (21 to 64 years) and 397 seniors (65 and older).

#### Education

Of persons 25 or older, 171 had no high school diploma, 357 had graduated from high school, 399 had some college and 315 had a Bachelor's or higher degree.

---

[61] http://www.mvy.com/vhinfo.html

Housing
There were 1338 housing units, 850 of which were occupied and 488 were vacant.  Of the
occupied units, 542 were owner-occupied and 308 were rented.  The median year housing
structures were built was 1943.  The median value of owner-occupied housing units was
$167,500.


Racial and Ethnic Composition
Eighty-eight percent of the population was white (1574 individuals) with 63 Blacks, 51 American
Indian/Eskimo/Aleut, and 38 Asian.  English, Irish and Portuguese ancestries were the most
frequently cited.


*Economic Context*
Income
Median household income in 1989 was $25,965; per capita income was $16,679.

Employment
INDUSTRY
Universe: Employed persons 16 years and over

| | |
|---|---:|
| **Agriculture, forestry, and fisheries (000-039)...** | **36** |
| Mining (040-059)... | 0 |
| Construction (060-099)... | 100 |
| Manufacturing, nondurable goods (100-229)... | 16 |
| Manufacturing, durable goods (230-399)... | 28 |
| Transportation (400-439)... | 52 |
| Communications and other public utilities (440-499)... | 16 |
| Wholesale trade (500-579)... | 20 |
| Retail trade (580-699)... | 230 |
| Finance, insurance, and real estate (700-720)... | 42 |
| Business and repair services (721-760)... | 24 |
| Personal services (761-799)... | 59 |
| Entertainment and recreation services (800-811)... | 7 |
| Professional and related services (812-899): | |
|   Health services (812-840)... | 106 |
|   Educational services (842-860)... | 17 |
|   Other professional and related services (841, 861-899)... | 89 |
| Public administration (900-939)... | 35 |


OCCUPATION
Universe: Employed person's 16 years and over

| | |
|---|---:|
| Managerial and professional specialty occupations (000-202): | |
|   Executive, administrative, and managerial occupations (000-042)... | 80 |
|   Professional specialty occupations (043-202)... | 98 |
| Technical, sales, and administrative support occupations (203-402): | |
|   Technicians and related support occupations (203-242)... | 11 |
|   Sales occupations (243-302)... | 95 |
|   Administrative support occupations, including clerical (303-402)... | 132 |
| Service occupations (403-472): | |
|   Private household occupations (403-412)... | 5 |
|   Protective service occupations (413-432)... | 7 |
|   Service occupations, except protective and household (433-472)... | 156 |
| **Farming, forestry, and fishing occupations (473-502)...** | **43** |
| Precision production, craft, and repair occupations (503-702)... | 151 |
| Operators, fabricators, and laborers (703-902): | |

| | |
|---|---|
| Machine operators, assemblers, and inspectors (703-802)... | 25 |
| Transportation and material moving occupations (803-863)... | 44 |
| Handlers, equipment cleaners, helpers, and laborers (864-902)... | 30 |

CLASS OF WORKER
Universe: Employed persons 16 years and over

| | |
|---|---|
| Private for profit wage and salary workers... | 520 |
| Private not-for-profit wage and salary workers.. | 81 |
| Local government workers... | 24 |
| State government workers... | 21 |
| Federal government workers... | 13 |
| Self-employed workers... | 218 |
| Unpaid family workers... | 0 |

## Transportation and Access

Ferries to the Island sail from Woods Hole, Falmouth, Hyannis, New Bedford, New London, Montauk (Long Island) and Nantucket. The ferries from Woods Hole carry both passenger and cars, and sail every day, year-round. Reservations for cars are recommended. The ferries from Falmouth, Hyannis, and New Bedford carry passengers only, and operate during the spring, summer, and fall. Passenger ferries from Nantucket run during the summer and the ferry from Montauk runs on selected weekends in July.

There is year-round scheduled airplane service to the Martha's Vineyard Airport from Boston, Hyannis, Nantucket, New Bedford, and Providence. Charter services also are available, and the airport has facilities for private planes.  A grass field (general aviation) airport is also located at Katama.

Bus service to Woods Hole is provided from Boston and from New York (stopping in Providence) daily, year-round, by Bonanza Bus Line.

Marina and mooring services are available in the harbors at Edgartown, Menemsha, Oak Bluffs, and Vineyard Haven.

## Hospitals, schools, libraries

Vineyard Haven Public Library

## Fisheries Profile

Commercial fishing and fisheries-related employment

### Harvesting structure
Approximately five trawlers/scallopers and six lobster boats fish out of Vineyard Haven, with about the same number fishing out of Edgartown on the other side of the island. Locals also fish seasonally for clams and other shellfish in inshore shoals and may also go after lobster ('ten potters'). This local harvest follows seasonal pulses, and can also involve some small-scale finfishing with gill nets and other gear by locals to either provide for friends and family, or take advantage of good prices available in local fish markets.

### Processing structure
Two processors process and fillet fish for local sale.   The prices charged for the fillets are usually several dollars higher than elsewhere. For example, codfish at $2.10 a pound in a mainland wholesale market/fish auction could be sold here for $3 to $4/pound. Price is clearly related to the forces of supply and demand. Because residents are a boat ride way from other sources of seafood products, they rely on the local fish markets to provide them with fresh produce.

Moreover, the economic capital available to many of the wealthier residents makes quality more important than price.

*Support Services*
Despite the high degree of gentrification and upper-class residents associated with the community, there is an adequate supporting infrastructure to support the local fishing activity. In addition to the fish processors, there is a marine railway, ice house, and marine supply house. The two docking facilities are shared with recreational fishermen, but local commercial fishermen are part of the "island color" and key respondents indicated there was no competition for space for most of the year. This is partly because the number of residents drops by several thousand as fall approaches and mooring sites and summer homes are deserted by the more affluent community members.

Fishermen's supplies are available, but usually at a premium, since they are primarily geared to recreational fishing and because they must be imported via the ferry. Marine supplies are more affordable in New Bedford and Chatham.

There are two sources of dockside diesel fuel, and three trucking operations, and a bait house and one national/ international seafood broker, but no air fill stations, boat yards, boat dealers, fish auctions, NMFS extension office, or fishing monuments. The bait house also provides significant seasonal support to the fishing excursion boats, of which there are six in town. The fishermen's association, or Seaman's Bethel, also has a social service as well as fishery function.

Because of the well-developed recreational fishery, there is a boat insurance agency, a marine haul out facility that services local boats of small to moderate size, and two boat welders in town. There are also three recreational boat dealers to go along with two marinas. In line with the tourist character of the port, there are boat tour operations.

*Employment (year-around and seasonal)*
A key respondent estimated that besides 30 households island-wide directly dependent on fishing, there are at least another 50 households in the area that are indirectly dependent, ranging from owners of retail businesses and seafood restaurants to those who buy seafood for the dinner table. The actual number of those indirectly dependent through the restaurant trade goes up in the summer to an estimated 200, most of these holding jobs in the restaurant and recreational fishing sectors.

*Species, Seasonality*
The local catch of fish and shellfish species is quite diverse, and includes cod, fluke, scup, winter flounder, yellowtail, haddock, pollock, squid, lobster, swordfish, tuna, monkfish, scallop, and sea clams. If a particular fish is not available (e.g. monkfish), but there is a demand for it from a high paying customer, calls may be made to a boat at sea or fish may be brought in by truck on the ferry.

While the summer is a boon time for fish produce, a resident population that includes many retired persons maintains the demand throughout the year. Fish produce is brought in from local catches and from boats from New Bedford, Edgartown, and Chatham.

There are no alternative fisheries that people are switching over to, but fishermen may alternately pursue lobstering, finfishing and shellfishing depending upon the season and demand.

Recreational fishing and employment

*Fishing Charters & Parties*
ABC - Atta Boy Charters (Oak Bluffs), Banjo Charters (Oak Bluffs), Big Eye Charters (Edgartown), Book-a-Boat (Menemsha), Capt. Porky's Bait & Tackle (Edgartown),

198                                      Cape Cod & Islands

Conomo Charters (Aquinnah), Coop's Bait & Tackle (Edgartown), Great Harbour Sport
Fishing Charters (Edgartown), Island Fly Fishing Guides (West Tisbury), The Island Lure
Charter Fishing (Chilmark), Larry's Tackle Shop, (Edgartown
 Machaca Charters (Edgartown), Osprey Custom Rods & Tackle (West Tisbury), Party
Boat "Skipper" (Oak Bluffs), Sharks Landing Bait, Tackle & Charter Co. (Oak Bluffs),
Sortie Charters (Menemsha, Chilmark)

<u>Cultural role of fishing</u>

*History and museums*
Vineyard Seaman's Society / Martha's Vineyard Seafaring Center, The Bethel Collection (Old
Schoolhouse Building, owned by the Martha's Vineyard Preservation Trust). For over 100 years,
the Bethel served seafarers who visit the Island as well as those who live here. Many of those
seamen and their family members gave the Bethel gifts in appreciation of its work and the
services provided. These gifts have been preserved and today constitute the core of The Bethel
Maritime Collection. It includes: models of schooners in bottles, whale tooth and walrus tusk
carvings, early photographs and drawings of Vineyard Haven, shells from Island beaches, a
lifebelt from the Titanic, a beautiful quilt, paintings, plus a wide variety of other "sailor souvenirs."
It is operated in cooperation with the Vineyard Maritime Co. which offers Coast Guard licensed
training.

## Perceptions of the Fishing Community[62]

**<u>Importance of fishing to the community</u>**
Key respondents indicated that local fisheries are "very important," a sustainable and important
"island tradition."  Seafood is important on restaurant menus but is also an important part of the
diet of year round locals, many of whom now are retired.

**<u>Boundaries</u>**
The community with which the people of Martha's Vineyard have the most contact is Woods Hole.
Although with the summer influx, people from all over New England arrive by plane, car or ferry.
One quality of life issue that arises in the summer is the impact of cars.  Restrictions on the
numbers of cars that would be allowed on the Island were being contemplated.

Capital contacts can be divided up into those encompassing social capital (e.g., visit friends, go
for recreation, go for vacation, visit relatives, socialize, go to church); economic (e.g., sell fish,
offload fish, buy fishing gear, haul out for boat repairs, go to the bank, go shopping), and human
(e.g., go to school, go for childcare, go for health care, go for retraining).

| Sell Fish | Martha's Vineyard, New Bedford, Chatham |
|---|---|
| Offload Fish | Martha's Vineyard |
| Buy Fishing Gear | New Bedford |
| Buy Ice | Martha's Vineyard |
| Buy Fuel/ Oil | Martha's Vineyard |
| Haul out Boat Repairs | Martha's Vineyard, New Bedford |
| Book Keeping | Martha's Vineyard |
| Banking | Martha's Vineyard |
| Shopping | Martha's Vineyard, Woods Hole |
| Go to Church | Martha's Vineyard |
| Got to School | Martha's Vineyard |

---

[62] Based on key informant interviews

| Go for Health Care | Woods Hole |
| Go for Childcare | Martha's Vineyard |
| Visit Relatives | Martha's Vineyard, out of state, elsewhere |
| Visit Friends | Martha's Vineyard |
| Go for Vacation | Florida, White Mountains |
| Go for Recreation | Martha's Vineyard- party boats, restaurants, shops |
| Socialize | Martha's Vineyard-restaurants, home, dockside |

## Communication Issues

Concern was voiced over the declining local lobster harvest, especially since occasional animals were showing up with shell rot disease. Nevertheless, there was also optimism that groundfish catches and local stocks are on the rebound, and that communication with management is overall a success.

On a one to five scale, communication with local fishery managers was rated as "very good," with state managers as "excellent," and with regional federal managers as "very good."

## Assessments

Fishermen "strongly disagree" with the assessment of stocks, but the 88 days at sea quota, given the high prices that a good quality catch brings, are still adequate for the local fleet to survive. In general, key respondents believe that nearby fish stocks are better off than management indicates. They maintain that if catch and DAS restrictions were lifted there would be no significant harm to the local resource and fishermen would benefit.

## Economic Change

Ten years ago the fishery was noted as being "very good," five years ago as "good," and today is rated as "good," with a mark of "very good" anticipated five years from now. Today, increased prices for quality fishery products, and a price structure that exceeds mainland prices, has meant more money coming in, compensating for the increasingly complex and constantly shifting regulatory climate. Because of the high local demand for seafood, and the limited local competition among fishermen, the present small fleet will probably remain stable far into the future.

## Effects of recent management

No specific regulations were noted as having had a significant impact on recent fishing conditions.

## Characteristics of local fishermen

*Job satisfaction*

Even though they have a tenuous hold on dock space, fishermen are perceived by key respondents to be "very satisfied with their work." Good prices and little competition allow the small fleet of vessels to make ends meet.

Exhibit B
(Part 5)

Boston Area Sub-region
Plymouth County

## 5.5.2.1.  Plymouth

### Background

Long before the Pilgrims landed in New England and settled in Plymouth, the area was home to the Wampanoag, called "people of the dawn" because they lived in the east.[17] The Wampanoag farmed, fished, hunted and gathered. In the spring, whole villages moved to the seashore to fish and plant crops—corn, squash and beans. Since their homes were often made of woven mats stretched over wood frames, they would carry the mats with them leaving the wooden structures behind for their return. In the fall and winter they moved inland to the forests of oak, maple and pine where they hunted deer, wolf, bear, beaver, moose, wild turkey, raccoon, otter, and wildcat. From the streams, rivers, lakes and ocean they took fresh and saltwater fish; in winter they ice fished.

Pilgrims arrived on the *Mayflower* in 1620 and Plymouth was incorporated as a town the same year. William Bradford, who helped establish Plymouth Colony, was its governor for more than 30 years.[18] His *History of Plymouth Plantation, 1620-1647*, first printed in full in 1856, is a minor classic, reflecting the unusual qualities of the man and the values of the small group of English separatists who became known as Pilgrims. Bradford was born in March 1590 in Austerfield, Yorkshire, the son of a yeoman farmer. He was self-taught. As a young man, he joined Puritan groups that met illegally in nearby Scrooby and was a member of that congregation when it separated from the Church of England in 1606. Bradford was among the 125 Scrooby separatists who sought (1608) religious sanctuary in Holland. When the congregation decided (1617) to seek refuge in America, Bradford took major responsibility for arranging the details of the emigration.

The term Pilgrim is derived from his description of himself and his co-religionists as they left Holland (July 22,1620) for Southampton, where they joined another group of English separatists on the *Mayflower*. When John Carver, Plymouth Colony's first governor, died suddenly in April 1621, Bradford was unanimously elected to replace him. He was re-elected 30 times. In 1640, Bradford and the group of original settlers known as the "old comers" turned over to the colony the proprietary rights to its lands, which had been granted (1630) to him by the Warwick Patent and then shared by him with the old comers. During the period of his governorship, and especially during the first few years, Bradford provided the strong, steady leadership that kept the tiny community alive. He strove to sustain the religious ideals of the founders and to keep the colony's settlements compact and separate from the larger neighboring colonies. Bradford died on May 9 or 19, 1657.

Plymouth is a coastal community in southeastern Massachusetts, approximately 5 miles north of the Cape Cod Canal.[19] It is the seat of Plymouth County, and has the largest area of any town in the Commonwealth. For most of its existence, Plymouth was an isolated seacoast area where economic fortunes were linked to the sea and shipping.  The site of the original 1620 settlement is now a portion of today's Downtown/Harbor District.

Today, Plymouth's character is reflected in monuments and buildings celebrating a vibrant past preserved by a conservation ethic. The wide curving shore of Plymouth is fronted by a sea wall behind which is a tabloid of hotels, restaurants, novelty shops, and tourist businesses, situated in a well-preserved front of historic buildings. While Plymouth attracts thousands of tourists at the height of the summer season, the town maintains a diverse fishery sustained in part by the protection of docking space for the local fleet.

---

[17] http://pilgrims.net/native_americans/index.htm
[18] http://pilgrims.net/plymouth/history/#alden
[19] http://www.state.ma.us/dhcd/iprofile/239.htm#NARRATIVE

218                                    Boston

The South Shore's accessibility to the Boston metropolitan area has greatly influenced the growth rates of its communities. Desirability in terms of land prices, tax rates and residential amenities further influenced community growth and Plymouth's population mushroomed from 18,606 in 1970 to 45,608 in 1990, an increase of 145% in just 20 years. Also of significance during the period was the development of a healthy industrial and commercial base. The Town of Plymouth is committed to controlling its residential growth while welcoming industrial and commercial expansion.

## Fishing Dependency

There are two piers at Plymouth. The Mayflower and an excursion boat use the state-owned pier in season, no commercial fishing vessels are allowed to dock there. The 1000-feet long town pier, where commercial vessels tie-up, was built in the late 1800s and is, so far, protected from development. The dock integrates the local fishing culture directly into the cultural flavor of the port. Dockside restaurants are positioned to give patrons a water view of the commercial fishing activities, and summertime tourists stroll the docks to take photos of the fishing fleet unloading their catch. One of the first questions visitors ask is, "what time do the boats come in?" The well-maintained dock space makes Plymouth an attractive berthing spot for local and regional fishermen. Local community support insures this space will be preserved for commercial use, even though it still amounts to only about 15% of the total dockage space, with the other 85% representing recreational marina berths.

Plymouth ranks 17th (18th overall out of 36 ports) for fishing infrastructure differentiation in the New England NRR. Fishing infrastructure is concentrated at the main commercial dock just south of the famous Plymouth Rock memorial. The commercial space is surrounded by boutiques, restaurants, and gift shops adorned with fishing, whaling, sea life, and related motifs. A restaurant is perched at an angle overlooking the commercial dock, which juts out into the water in a line of well-maintained berthing spaces. Locals look on fishing as integral part of the historic setting, but the weakness of the industry is reflected in the lack of interest or opportunity for local youth to enter the occupation and an overall decline in the place and space dedicated to the cultural capital of fishing.

## Governance

Board of Selectmen, Town Manager, Representative Town Meeting

## Demography[20]

Population
The town's population in 1989 was 45,608 with 22,393 male and 23,215 female.

Age Structure
According to the 1990 U.S. Census, 14,302 were children (under 21 years); 25,796 were adults (21-64 years) and 5,510 were seniors (over 65).

Education
Of persons over 25, 4,571 had no high school diploma; 9755 had graduated from high school; 8156 had some college; and 6461 had a Bachelor's or higher degree.

Housing
There were 19,658 housing units, of which 15,875 were occupied and 3,783 were vacant. Of the occupied housing units, 11,667 were occupied by their owners and 4,208 units were rented. The median year structures were built was 1971 and the median value of owner-occupied housing was $146,200.

---

[20] U.S. Census 1990

Racial and Ethnic Composition
According to the 1990 U.S. Census, 44,132 were white.  There were also 760 Blacks, 90 American Indians, 262 Asian and 364 "other race."  Irish, Italian and English ancestry was noted by almost 25% of the population, German, Portuguese and French were also noted frequently.

## Economic Context

Income
Median household income in 1989 was $39,886 and the per capita income was $15,882.

Employment
INDUSTRY
Universe: Employed persons 16 years and over

| | |
|---|---:|
| **Agriculture, forestry, and fisheries (000-039).** | **364** |
| Mining (040-059).. | 16 |
| Construction (060-099).. | 1781 |
| Manufacturing, nondurable goods (100-229).. | 1180 |
| Manufacturing, durable goods (230-399). | 1304 |
| Transportation (400-439). | 1002 |
| Communications and other public utilities (440-499). | 900 |
| Wholesale trade (500-579). | 911 |
| Retail trade (580-699)... | 4411 |
| Finance, insurance, and real estate (700-720).. | 1962 |
| Business and repair services (721-760). | 911 |
| Personal services (761-799)... | 648 |
| Entertainment and recreation services (800-811).. | 301 |
| Professional and related services (812-899): | |
|   Health services (812-840).. | 2259 |
|   Educational services (842-860). | 1490 |
|   Other professional and related services (841, 861-899)... | 1388 |
| Public administration (900-939).. | 1093 |

OCCUPATION
Universe: Employed persons 16 years and over

| | |
|---|---:|
| Managerial and professional specialty occupations (000-202): | |
|   Executive, administrative, and managerial occupations (000-042) | 2783 |
|   Professional specialty occupations (043-202 | 3081 |
| Technical, sales, and administrative support occupations (203-402): | |
|   Technicians and related support occupations (203-242). | 821 |
|   Sales occupations (243-302).. | 3326 |
|   Administrative support occupations, including clerical (303-402). | 3692 |
| Service occupations (403-472): | |
|   Private household occupations (403-412). | 45 |
|   Protective service occupations (413-432)... | 577 |
|   Service occupations, except protective and household (433-472). | 2485 |
| **Farming, forestry, and fishing occupations (473-502)..** | **327** |
| Precision production, craft, and repair occupations (503-702).. | 2497 |
| Operators, fabricators, and laborers (703-902): | |
|   Machine operators, assemblers, and inspectors (703-802).. | 771 |
|   Transportation and material moving occupations (803-863).. | 877 |
|   Handlers, equipment cleaners, helpers, and laborers (864-902) | 639 |

220                                                    Boston

CLASS OF WORKER
Universe: Employed persons 16 years and over
Private for profit wage and salary workers...                    15873
Private not-for-profit wage and salary workers.                   1473
Local government workers..                                        1899
State government workers.                                          641
Federal government workers.                                        458
Self-employed workers...                                          1534
Unpaid family workers.                                              43

## Transportation and Access

Plymouth is in southeastern Massachusetts, bordered by Bourne on the south, Wareham on the southwest, Carver on the west, Kingston on the north, and the Atlantic Ocean on the east.  Plymouth lies in the heart of the Old Colony Region between Boston and Cape Cod. The major highways are the Southeast Expressway (State Route 3) and Interstate 495, which give access to the airport, port and intermodal facilities of the Greater Boston Region.  U.S. Route 44 runs E-W between Plymouth and Providence, Rhode Island.

Commuter rail service exists between South Station, Boston and Kingston with limited passenger service from Plymouth. The Bay Colony Railroad provides freight rail service to North Plymouth. Plymouth is a member of the Greater Attleboro-Taunton Regional Authority (GATRA), which provides Dial-A-Ride service to the elderly and disabled. The Plymouth and Brockton Street Railway Company provides commuter bus service to Braintree and Boston, with limited service to Rockland, Kingston, Sagamore Circle, Barnstable, and Hyannis.  The Plymouth Municipal Airport, a General Aviation (GA) facility has 2 asphalt runways and non-precision instrument approaches are available.

## Hospitals, libraries, museums

- Jordan Hospital
- Plymouth Public Library
- Plymouth Antiquarian Society
- 1749 Court House Museum—Built in 1749, this is the oldest wooden courthouse in the country.
- Forefathers Monument—Monument to the pilgrims made out of solid granite. It's the largest of its kind in the United States.
- Harlow Old Fort House—This Pilgrim home was built in 1677.
- Hedge House—Built in 1809, this was the home of a merchant and shipowner. 19th century home furniture is on display.
- Jabez Howland House—This colonial was built in 1667 and features historic furnishings and household items.
- Jenney Grist Mill—A replica of the mill used by the Pilgrims. The original was built in 1636.
- Mayflower II—A reproduction of the original Mayflower, the ship in which the Pilgrims journeyed to America. Visitors will get a sample of what life was like during their voyage in 1620.
- Mayflower Society Museum—This house, built in 1754, features exhibits of 18th century furniture and household items, as well as a formal garden.
- Pilgrim Hall Museum—This museum is set in a Greek Revival building, and features artwork and historic furniture.
- Plimoth Plantation—Journey back in time, as actors recreate life in 1627 Plymouth. The outdoor museum is a replica of the original settlement.
- Plymouth Rock—The real thing. Plymouth Rock commemorates the site where the Pilgrims first came ashore in 1620.
- Richard Sparrow House—Exhibits focus on crafts and 17th century pottery. Built in 1640, this is the oldest house in Plymouth.
- Spooner House—Built in 1749, the Spooner family occupied this house for over 2 centuries.

## Fisheries Profile
### Commercial fishing and fisheries-related employment

#### Harvesting structure

Fishery dependence centers on the lobster fleet with its 50 operating vessels. There are also four stern draggers and four gillnetters concentrating on dogfish, but this effort represents a significant decline from about 30 boats that were dogfishing less than five years ago. Lobster boats range from 19 to 42 feet in length, and draggers 45 to 55 feet in length.

#### Support Services

Fishing infrastructure is adequate to maintain the local fleet, and includes air fill stations and back yard bait houses. A couple of trucks also make bait available, one coming in daily from Boston or Sandwich. The docking facilities include draggers at the town dock and lobster boats on moorings. Originally the town dock was reserved for boats over 40 feet in length, now there are a few offshore lobster boats that over-winter. The majority of the lobster fleet heads up to nearby Brant Rock in winter because the harbor does not freeze.

There are five boat yards dedicated to the recreational fleet, but there are no commercial boat builders in town. One key respondent indicated that his father, grandfather and great grandfather used to build boats locally. Boat repair is carried out by a local welding service with two professional boat welders. There are two marine railways/haul-out facilities but no local commercial boat dealers. Local lobster fishermen can search for boats in the Massachusetts Lobstermen's Association journal or through other trade papers for used craft. One fishermen's association represents the industry in town meetings, and fishing supplies are available through two dealers. Two diesel fuel stations plus a diesel truck keep the fleet fueled.

Evidence of fishing heritage shows in two local fishing monuments, but there are no fish processors, fish auctions, fish brokers, or icehouses. Nearby Hull has a bookkeeper specializing in the fishing industry.

The local catch can be sold to three fish and lobster retailers. However, few sell directly to them unless they bring in a catch that is too small to bother shipping out, or it includes at least 40 lbs. of scallops for the local restaurant trade. Local draggers used to sell the whole lot but now that the amount they catch is relatively small, they truck it themselves in order to make an extra $.25/lb profit. There are two trucking operations from Boston that will also pick up product. Two wholesale companies purchase seafood from Plymouth's fleet. Reliable Fish Company buys both fish and lobster, The Lobster Pound buys lobster only. Both also supply bait to the fishermen who regularly sell to them.

Five fish and tackle dealers support recreational fishing, with the target species being striped bass. Two hotels /inns front the water, and a total of approximately 450 recreational craft fill the local marina. Twelve seafood restaurants also grace the town, and visitors can take advantage of the ten local boating tours and six whale watching tour operations.

Although, it closed for reasons unassociated with fishing, fishermen miss the 1620 Restaurant where fishermen used to gather. There are no places now near the pier where you "can walk in with your boots on," no longer is there a place that provides a "working man's setting." The prices of drinks are higher, "that's Dukakis' fault, he outlawed 'happy hours'!" In addition, because of the fishing ground closures, boats from outside Plymouth rarely come in anymore. It used to be that the inshore fishing grounds would open on November 1st and the Cape Cod Bay fleet would assemble. An unfortunate side effect is that fishermen have little opportunity to meet and relax with fishermen from other communities or fishermen who use other gear, etc. in a social setting. Conflicts that may have been worked out in the past over a beer cannot be easily resolved. There are in general, fewer opportunities for social interaction among the fishermen and their families.

222                                    Boston

*Employment (year-around and seasonal)*
Key respondents estimated that there are 200 households directly dependent on the fishery and another 50 to 100 indirectly dependent, with 75% of fishermen living in the immediate town area.

Besides fishing, tourism employs many local residents, as does a nearby industrial park.

*Species, Seasonality*
Lobster makes up the primary catch in Plymouth today, with finfish species remaining important, though many fewer boats purse finfish than did so in the past. Local species fished include cod, flounders, dabs, winter flounder, yellowtail, gray sole, tuna, striped bass, dogfish, skate, monkfish, bluefish, scallops, and seaweeds (rockweed and Irish moss). The market for lobster has remained steady and the market for crab has improved.

Key respondents noted that the mix of species caught in lobster traps has changed over the years. These days one is more apt to see "southern" species such as scup and butterfish, and there seem to be more monkfish. "Maybe it's the temperature (global warning) or maybe it's the lack of cod."

The annual round is to fish virtually all year, weather and DAS permitting, perhaps taking one month off. It used to be that most fishermen would do some cod fishing, gillnetting, even jigging, when not lobstering, but restrictions have meant that most fishermen rely solely on lobsters now.

One fisherman harvested mussels, but that has not been commercially done since 1994. There is no commercial shellfishing in Plymouth. The fishermen commented that it is a lot easier to enforce closed areas than to monitor compliance with regulations in open areas. Evidently, there has not been a request to the state to test the shellfish areas, so they remain closed.

<u>Recreational fishing and employment</u>
Recreational fishing and boat excursions (ten local boating tours and six whale watching tour operations) are popular tourist attractions. The boat ramp has a constant stream of recreational boats using it in the summer.

<u>Cultural role of fishing</u>

*Kinship & family*
The majority of fishermen in Plymouth were born to fishing families, or at least families involved in some aspect of the industry. Fewer children seem to be going into the business now, however. Parents are encouraging their children to finish high school, pursue some higher education, than decide.

*"Fishing is not as fun as it used to be – is changed a lot. My father, grandfather and great grandfather used to build boats out of here, but no one does that anymore. Where there used to be lots of local bars and places where people went after fishing there is only one left now, and I don't see any local generation coming up from behind to keep it going."*

One respondent did point out that further education would also help with collaborative research. Fishermen would find it easier to understand the scientists and the research results if they had more formal education.

*Sharing*
There are small groups of friends who will regularly share information, perhaps 8 or 9 groups in Plymouth. If there are hazards, however, such as a submerged log, "we'll throw it on the radio. We do look out for each other, even those we don't particularly like or get along with."

This sense of community sharing and helping may be diminishing with the younger generation. One respondent pointed out that it could be that with the safer gear, etc., "they haven't gotten themselves into a hard fix yet." Another said that he can't see any younger guys bringing him fish once he's retired, as he has done for some of the old fishermen. It's not that there is such a lack of fish, it seems to have more to do with a change in society, and "you don't give anything away."

## Perceptions of the Fishing Community[21]

### Importance of fishing to the community

The local harbor master responded that fishing was "very important" to Plymouth, but several key fishermen respondents said it is "not important", claiming that it was more significant in Provincetown *"where it's a pride thing and people come out for a blessing of the fleet."* [22] Other fishermen respondents pointed out that fishing is "very important" to Plymouth because of its role in attracting tourists. One said, "the bycatch of commercial fishing is tourism!"

### Boundaries

Capital contacts can be divided up into those encompassing social capital (e.g., visit friends, go for recreation, go for vacation, visit relatives, socialize, go to church); economic (e.g., sell fish, offload fish, buy fishing gear, haul out for boat repairs, go to the bank, go shopping), and human (e.g., go to school, go for childcare, go for health care, go for retraining).

| Sell Fish | Plymouth-2 buyers at the Town dock |
|-----------|-------------------------------------|
| Offload Fish | Town dock |
| Buy Fishing Gear | Plymouth, Maine, Rhode Island, Cape Cod |
| Buy Ice | Trucked into Plymouth |
| Buy Fuel/ Oil | Plymouth |
| Haul out Boat Repairs | Plymouth |
| Bookkeeping | Plymouth |
| Banking | Plymouth (95%) |
| Shopping | Plymouth |
| Go to Church | Plymouth |
| Got to School | Plymouth |
| Go for Health Care | Plymouth |
| Go for Childcare | Plymouth |
| Visit Relatives | Close by |
| Go for Vacation | Atlantic City, Florida, hunting/skiing |
| Go for Recreation | Local bar |
| Socialize | Local bar |

### Communication Issues

Communication with local and state officials is noted to be "*Very good; they are accessible. They do not do a lot but they are here.*" Communication with federal officials is rated as "good" or "very good," but infrequent, since most local fishing areas are in state waters:

---

[21] Based on key informant interviews
[22] Perhaps this a case of the "grass being greener on the other side." The Provincetown fleet is in poor physical shape, and the fishing community there claims they get little support from the town to maintain the industry.

224                                    Boston

*"I don't know if I ever saw a fed here. I called the Feds the other day to ask if I needed to renew my permit. "'No you don't have to do it. Why? Is it good through today? It might be good through tomorrow.'   At least they have a sense of humor."*

One respondent commented that any lack of communication with local and state managers or representatives have to be blamed on the fishermen.  *"Most guys, especially the younger ones, won't go to meetings."*

## Assessments

Key respondents indicate that fishermen and scientists "strongly disagree" with fisheries data:

*"In the last 5 years, we have seen more eggers than we have in a long time. Scientists play with numbers too much; it's one or two.  You can make numbers look like anything you want. There is a scientist, "Bob", who actually comes down and get his hands dirty, maybe I like him because he says what I want to hear.  The others just crunch numbers.  They look at catch reports.  I got into a disagreement with Andy Rosenberg of NMFS.  Draggers catch lobster but NMFS says that it is only .01%.  It is the difference between being reported and not being reported (suggesting draggers used to not report any lobsters caught). I think lobstermen are pretty honest.  The new program (the special pots where lobsters are tallied once per month) makes sense.  I told the state for years that I would take them out lobstering."*

Grant money for cooperative research is one key to improving the assessments.  Now the scientists have to talk to fishermen if they want to obtain research funds, one respondent noted.

## Local management practices

The enduring presence of lobstering in Plymouth has resulted in some local folk traditions aimed at conserving stocks and reducing fishing conflict. For example, both fishermen and lobstermen use the middle of the bay off Plymouth during whiting season, and they have a gentleman's agreement to not fish in each other's area during peak harvest season.  But this agreement was derailed when the state went to a licensing system and was then slow in getting whiting permits out. When permits were finally issued, they overlapped with the peak lobster season and the informal folk management system broke down. Before this interference, lobster fishermen reported:

*"We accommodated each other, the whiting boats just sat inshore and waited for the permits instead of going out (and making things hectic for us)."*

## Economic Change

Ten years ago, stocks were up but prices down, and one respondent noted, *"There is more money now than ten years ago because prices are higher.  There is a smaller season (May to November) but people are still making a living. It was kind of a different fishery 20 years ago, nobody really lobstered all year round, they switched fisheries."*

Five years ago, the condition of stocks was in-between ten years ago and now, but today the stocks and economic conditions related to their harvest are consider "good," "*as long as we can keep fishing."*

*"Canada shuts down its fishery and pays for the people to stay home.  If I was offered a buyout, I would take it, a temporary buyout (say for five years).  Yeah, if they pay me $35-50,000 and move me to a non- fishing occupation, I won't street clean though.  I don't want a free handout.  At 40 years old, what can I do besides fish?"*

*"The other day, the Feds sent me a 165 manual on the new lobster management plan.  I have not read 165 pages in many years.  I read the book, read it in 20 minutes.  I read what I*

*found interesting. (About the language): If you dazzle the brains, dazzle it with bullshit (i.e., the language was too technical)."*

Today life is considered by key respondents to be better than five years ago because of the higher prices they get for their product. Life is "worse" than five years ago because there is less satisfaction in the act of fishing due to the multiplicity of rules and "government indecision."

Five years from now, respondents suggested that fishing would still be "good." People are more conscientious now than in the past. They are more aware of conservation practices; little things like not throwing plastic overboard are adhered to.

## Effects of recent management

Recent fishery regulations having the most impact are groundfish closures, which has forced some fishermen into the lobster fishery.

The impact of regulations are wearing on those in the local fishery and the reaction is expressed by this key respondent:

*"I enjoy fishing but capriciousness of regulations are making some tired of lobstering. I don't mind the fishing part, I don't mind not catching anything, I don't mind the price, and I don't mind losing gear. It is just that you don't know what is right or wrong anymore. You don't know what tomorrow will bring. Do I go out and buy hooks for dogfish? They might close the fishery next year. Lobster is the same way. They are going to close lobster down, I don't care what anybody says. Those that say it won't happen to us; draggers are at 88 days. Nobody would have believed that. Scallops at 34. They say it won't happen, bullshit. [Others say] It cannot happen to me. Good, we will get rid of that fishery, well guess what? When they get done with them, we are next."*

There is some concern about the marine mammal protection regulations for lobstering. Sinking ground lines have to be used and a 500 pound breakaway buoy. There are several means to comply, (6 or 7 devices have been approved), but each requires retrofitting, some added expense and some anxiety about the potential impacts on the management of gear (i.e., if it increases the risk of recreational boats cutting off buoys and thus trawls being lost).

## Characteristics of local fishermen

Love of the sea, natural ability, instinct, perseverance, the acceptance of the good with the bad and a sense of humor are some of the characteristics of "good" fishermen. Fishermen are very good at what they do; they know everything about adapting, hands-on learning, survival in rough weather.

*"When people get shut down, they are in trouble. Dragger crews don't have any social skills. They are not going to work in a factory. They have been with the same group of guys since they were fourteen. They know their job really well. They, if you tell them that they have to be punctual, forget it. If my sterny is a little late, I yell at him but he is not fired. It is not the end of the world; tomorrow I may be late. You gotta take this into consideration."*

*Job satisfaction*

Most are satisfied with their work, and most fishermen were born here. *"Satisfied, yeah, you don't get laid off; you don't have to put up with a boss. There are good sides too. Most of us are uneducated so there is not much else we can do. I threaten to leave but I would end up in Seattle and fish anyway."*

## Fishing families

Many more spouses are also working outside the home than five years ago to pay the bills, and some respondents believe that the quality of family life has therefore diminished. But,

226                                          Boston

most agree that most spouses work for "benefits," and that this choice probably has more to do with today's society than anything to do with fishing.

A consequence of the decline in the number of fishing families is the breakdown and reorganization of social capital.   Ten years ago fishing families could socialize within a network comprised mostly of other fishing families. Now, they report, they are socializing much more with groups outside the industry.

County Profiles
Gloucester/North Shore Sub-region

## 5.6. Gloucester/North Shore Sub-region

## 5.6.1. Essex County

### Background[1]

Essex County, created in 1643, is located on the Atlantic coast, in northeastern Massachusetts. Its neighboring counties are the Massachusetts counties of Suffolk to the south and Middlesex to the west, with the New Hampshire County of Rockingham at its northern boundary.

The county seat is Salem.

Cities, Towns & Communities include: Amesbury, Andover, Beverly, Boxford, Byfield, Danvers, Essex, Georgetown, Gloucester, Groveland, Hamilton, Haverhill, Ipswich, Lawrence, Lynn, Lynnfield, Manchester-by-the-Sea, Marblehead, Merrimac, Methuen, Middleton, Nahant, Newbury, Newburyport, North Andover, Peabody, Rockport, Rowley, Salem, Salisbury, Saugus, Swampscott, Topsfield, Wenham and West Newbury.

### Fishing Dependency

Gloucester and the North Shore Sub-region is ranked, according to the employment indices used herein, eighth (out of eleven) for fisheries dependency. The reason for its low ranking compared to the other sub-regions is the availability of alternative employment in the area. This ranking is countered by the other indices we have been using in the study and confirms our intuition that employment indices tell only a portion of the story. Furthermore, the employment figures themselves are questionable. The 1990 Equal Employment Opportunity figures for Essex County, Massachusetts listed 81 fishing vessel captains and 645 "fishers" (19 Hispanic and 626 white), far greater numbers than indicated in the general U.S. 1990 Census data.[2]

Significantly, Gloucester itself ranks third (following New Bedford and Portland) in the index of fishing infrastructure differentiation. Furthermore, it is 21st (out of 36) on the gentrification scale. The profile of Gloucester describes a community that is committed to its fishing industry, whose cultural, human and economic capital are all linked to the industry.

Pure numbers of fish landed and the value of those landings also indicate the significance of the fishing industry to Gloucester. *Fisheries of the U.S., 1999*[3] reports that Gloucester landed 107.1 million pounds of fish in 1998 (11th of the 50 major U.S. ports) and 49.7 million pounds in 1999. Though the lower weight slid the port down to a ranking of 22, the value of the landings per pound doubled in 1999. In 1998, the landings were worth $28.4 million whereas in 1999, the landings were worth $25.9 million.

---

[1] http://home.att.net/~Local_History/MA-Essex-Co.htm
[2] http://sasquatch.library.orst.edu/
[3] *Fisheries of the United States*, 1999. U.S. Dept of Commerce, NOAA, NMFS. Prepared by Fisheries Statistics Division. Available at http://www.st.nmfs.gov/st1/fus/fus99/index.html

Community Profiles
Essex County, Massachusetts
Gloucester / North Shore sub-region

## 5.6.1.1. Gloucester

### Background

Gloucester's beauty and bounty was described by the French explorer Samuel de Champlain in 1606. Later, Captain John Smith followed Champlain and filled his hold with cod which he sent to Spain for sale. Rumors of the ease of catching fish in what is now known as the Gulf of Maine began to spread.

Gloucester's history is inextricably tied up with commercial fishing. Indeed, it was founded in 1623 by competing fish companies from Dorchester and Gloucester, England who sent fishermen, salters and a ship's carpenter to exploit the rich cod resource off what was later called Cape Ann. It was during the 1800's that Gloucester became renown for its "uniquely beautiful two-masted schooners [that] sailed forth to the northwest Atlantic fishing grounds from Virginia to Greenland."[4] Fishing in the "glory days" was immortalized in books such as *Gloucestermen*, revealed in stories about legendary figures such as Howard Blackburn, and depicted in the oils of Fitz Hugh Lane, the film *Captains Courageous*, the statute of the Man at the Wheel and the Gloucester Fishermen's Wives Memorial.[5] The harsh reality of those years is memorialized by the plaque in Town Hall that lists the thousands of fishermen who never returned from their fishing trips. In 2000 the Cenotaph Memorial was erected beside the Man at the Wheel listing over 5000 names of Gloucester fishermen "who went down to the sea."

Cod and haddock fished from dories with hook and line was salted.[6] Mackerel fishermen jigged for their prey until seine nets became popular after the 1860's. Swordfish was harpooned when possible. Halibut, a flat fish that could weigh 600 pounds, was iced and sold fresh, before it was over-fished to commercial extinction before the turn of the 20th century. Gloucester was also noted for fish glue made from cooked skins in the late 1800's.[7]

Newfoundlanders, Danes, Swedes and Portuguese were prominent fishermen in Gloucester before the Civil War. Italian fishermen were fishing out of Gloucester by the early 1900's.[8] Later immigration waves from Sicily brought additional fishermen to the city. Finns first came to quarry granite later some turned to lobster fishing.

The famed New England shipbuilding industry developed as fishermen sought prey further offshore. The lush, nearby forests of the North Shore provided the timbers; planking and the faultless masts to help fishing vessels grow in size and numbers. By 1720, the small early boats had evolved to fore-and-aft rigged craft, later to be called schooners. At the same time the fishing vessels were enlarged, support services grew to provide the increased need for ice, salt, sails, and other requisite gear and provisions. Shoreside support services providing transportation, processing and marketing paralleled the growth of the vessels and increased catch.

---

[4] Joseph E. Garland. 1995. Gloucester on the Wind, American's Greatest Fishing Port in the Days of Sail. Dover, NH: Arcadia Publishing.
[5] James Brendan Connolly authored *Gloucestermen* as well as numerous other novels and stories depicting the Gloucester fishing industry. Sebastian Junger wrote *The Perfect Storm*. The Gloucester Fishermen's Wives Memorial is not yet installed, but the full-size model has been created and fund-raising is almost complete. The dedication is scheduled for August 2001.
[6] http://www.downtosea.com/
[7] Joseph E. Garland. 1995. Gloucester on the Wind, American's Greatest Fishing Port in the Days of Sail. Dover, NH: Arcadia Publishing.
[8] Joseph E. Garland. 1995. Gloucester on the Wind, American's Greatest Fishing Port in the Days of Sail. Dover, NH: Arcadia Publishing.

By the 1940's Gloucester fishermen were dragging for redfish as far away as the Grand Bank from eastern-rigged side trawlers.[9] When the price of fine-grain white oak soared after World War II, fishing vessels were most often constructed from steel. In the late '60's and early '70's, Gloucester boats were competing for fish with a huge array of distant water fleets. "In the '80's whale cod disappeared from inside."[10]

Slade Gorton started out in the textile business in Rockport, but a fire that destroyed the Annisquam Cotton Mill in 1833 eventually led him to fishing and preparing salt cod and mackerel for sale.[11] As his sons joined the business, the company started packing salt cod in wooden boxes and mackerel in kegs. In 1906 Slade Gorton & Company merged with John Pew & Son, David B. Smith & Co. and Reed & Gamage to form Gorton-Pew Fisheries Co. The new company had a fleet of 39 vessels, the largest fleet operated by any company on the Atlantic Coast. The company grew to 55 vessels with a thousand crewmembers, 15 wharves and 35 buildings with 6 other plants along the coast employing another 1000 ashore. In 1922, the Italian government purchased a million-dollar shipment of salt cod, but when Mussolini overthrew the government, the cod was confiscated and never paid for so Gorton's was forced into bankruptcy. The company survived however and in 1954 became Gorton's of Gloucester, then the Gorton Corporation in 1964.

Gloucester native, Clarence Birdseye developed techniques to freeze fish and vegetables for home storage and consumption. He founded General Seafood Company, predecessor to General Foods. As freezers became popular, Gorton's expanded its frozen fish business with Birdseye's help.[12] In 1995-96, Gorton's was purchased by General Mills, then sold to Unilever. Today, Gorton's is among the top ten seafood suppliers in North America according to WorldCatch News, with $350 million in sales in 2000.

For many years, a portion of Gloucester's fleet landed pelagic species in great quantity. A rendering plant provided a place for the gurry and other waste products of fish processing. Eventually, Gloucester's fleet started focusing on the "cleaner" groundfish species for the fresh fish market, the processing plants started to use imported frozen fish blocks to produce their breaded products and the city began to diversify its economy. While Gloucester's fishing industry still contributes a significant portion to the city's economy, light manufacturing and tourism are considered growth industries for the city. With easy rail and highway access to Boston, Gloucester also serves as a bedroom community for many Boston workers.

In addition, artists have long been attracted to Gloucester's picturesque working waterfront. "Since the mid-nineteenth century, wind-weathered Rocky Neck, a small peninsula across the harbor on Cape Ann, has been one of America's oldest art colonies. Here, with the breathtaking views of the sea and town, famous painters like John Singer Sargeant, Fitz Hugh Lane, Edward Hooper and Winslow Homer came to work in the many buildings that date back to the Civil War. The dozens of galleries, studios and a traditional air of authenticity keep Rocky Neck a veritable working art colony."[13] "In addition, Cape Ann Symphony makes its home in Gloucester as does the critically acclaimed Gloucester Theatre Company, whose director and playwright, Israel Horovitz, is known on and off Broadway."[14]

*Governance*
Mayor and City Council

---

[9] Peter K. Prybot. 1998. White-Tipped Orange Masts, Gloucesters Fishing Draggers. Gloucester, MA: The Curious Traveller Press.
[10] Key respondent interview.
[11] http://www.gortons.com/lore/lore_gortonstory.html
[12] Ibid.
[13] http://www.northshorechamber.org/
[14] http://www.state.ma.us/dhcd/profile/107.HTM#DEMOGRAPHICS

238                          Gloucester & NS Sub-region

*Demography*[15]
Population
According to the 1990 census, there were 28,716 individuals in Gloucester, 13,827 male and 14,889 female.  The population had grown to 29,267 by 1996.

Age Structure
Under 5 comprised 6.6 percent of the population (1,888 persons), 5-14 years old comprised 11.8 percent (3,386), 15-44 years 45.5 percent (13,079), 45-64 years 20.7 percent (5,936) and 65 and over 15.4 percent (4,427).

Education
There were 4,283 enrolled students in the 1991-92 school year.  According to the 1990 Census, 75.1 percent had a high school diploma or higher.  Nineteen percent had a Bachelor's degree or higher.

In addition to Gloucester high school, students could enroll in the North Shore Regional Vocational school or Essex County.  Colleges nearby include: Salem State College, Salem; Merrimack College, Andover; North Shore Community College, Danvers; Essex Agricultural Institute; and Bradford College, Haverhill.

Housing
There were 13,125 housing units with a median value of $178,056.  Owner occupied units were 57.8 percent of the housing.

Racial and Ethnic Composition
The census indicates that 28,273 persons (98.52 percent of Gloucester's population) was white, 272 (1.04 percent) Hispanic, 65 Blacks, 25 American Indians and 73 Asians.

*Economic Context*
Income
Per capita Income in 1989 was $16,044 and the median household income was $32,690.

Employment
According to DET data, there were 15,541 employed in 1987 out of a labor force of 16,734 (unemployment rate of 7.1 percent).  Unemployment soared to 14.2 percent in 1992, then fell steadily to 4.4% in 1999 when 15,313 out of 16,011 were employed.

The largest employers paying unemployment compensation in 1992 were the City of Gloucester (950 employees); Gorton's, seafood processing (650 employees); Addison Gilbert Hospital (600 employees); Varian, computer chips manufacturer (450); and Gloucester Engineering (300).[16]

From the 1990 Census:[17]
INDUSTRY
Universe: Employed persons 16 years and over

| | |
|---|---:|
| **Agriculture, forestry, and fisheries (000-039)...** | **548** |
| Mining (040-059)... | 11 |
| Construction (060-099)... | 790 |
| Manufacturing, nondurable goods (100-229)... | 1462 |
| Manufacturing, durable goods (230-399)... | 1742 |
| Transportation (400-439)... | 746 |
| Communications and other public utilities (440-499)... | 249 |
| Wholesale trade (500-579)... | 687 |

---

[15] http://govinfo.library.orst.edu/cgi-bin/  and http://state.ma.us/dhcd/iprofile/107.htm
[16] http://state.ma.us/dhcd/iprofile/107.htm
[17] http://venus.census.gov/cdrom/lookup/979329826

| | |
|---|---|
| Retail trade (580-699)... | 2338 |
| Finance, insurance, and real estate (700-720)... | 751 |
| Business and repair services (721-760)... | 748 |
| Personal services (761-799)... | 446 |
| Entertainment and recreation services (800-811)... | 202 |
| Professional and related services (812-899): | |
| Health services (812-840)... | 1128 |
| Educational services (842-860)... | 917 |
| Other professional and related services (841, 861-899)... | 1197 |
| Public administration (900-939)... | 508 |

OCCUPATION

Universe: Employed persons 16 years and over

| | |
|---|---|
| Managerial and professional specialty occupations (000-202): | |
| Executive, administrative, and managerial occupations (000-042). | 1967 |
| Professional specialty occupations (043-202)... | 1912 |
| Technical, sales, and administrative support occupations (203-402): | |
| Technicians and related support occupations (203-242)... | 479 |
| Sales occupations (243-302)...1405 | |
| Administrative support occupations, including clerical (303-402)... | 2169 |
| Service occupations (403-472): | |
| Private household occupations (403-412)... | 32 |
| Protective service occupations (413-432)... | 207 |
| Service occupations, except protective and household (433-472)... | 1796 |
| **Farming, forestry, and fishing occupations (473-502)...** | **406** |
| Precision production, craft, and repair occupations (503-702)... | 1882 |
| Operators, fabricators, and laborers (703-902): | |
| Machine operators, assemblers, and inspectors (703-802)... | 934 |
| Transportation and material moving occupations (803-863)... | 538 |
| Handlers, equipment cleaners, helpers, and laborers (864-902)... | 743 |

By 1999, according to the Massachusetts Division of Employment and Training, the numbers employed in the category of "agriculture, forestry, fishing" has slipped to 238. The categories that showed increases in employees included: Transportation, Communication & Public Utilities, Finance, Insurance & Real Estate, and Services.

## Transportation and Access

Gloucester is the northeastern terminus of State route 128, the highway that circles the Boston metropolitan area. State routes 127 and 133 also serve the city. The closest international airport is in Boston, about 35 miles away, though nearby Beverly has a Municipal Airport.

Commuter rail service to Boston is available and a fixed route bus service runs between Gloucester and Rockport.

## Hospitals, museums, libraries

- Addison Gilbert Hospital
- The Sawyer Free Library maintains an excellent collection of fiction and nonfiction pertaining to the fishing industry.
- Cape Ann Historical Museum has a permanent exhibit devoted to the Gloucester fishing industry. In addition there is a library/research center with historic maps/charts of fishing grounds and a variety of out-of-print books on early fisheries-related research.
- North Shore Arts Association
- *Adventure*, 1926 Gloucester fishing schooner, is used for educational outreach. It is currently being renovated.

- The Man at the Wheel and the Fishermen's Memorial Cenotaph—The well-known Man at the Wheel statue now has a companion memorial, a series of granite and bronze plaques surrounding the statue that list 5,368 Gloucester fisherman lost at sea between the years 1623 and 2000.
- Gloucester Fishermen's Wives Memorial is an acknowledgement of the important roles women have traditionally played in the fishing industry. Though not yet erected on its base on the opposite side of the drawbridge from the Man at the Wheel statue, a full-size model of the statue has been constructed and fund raising is on target.[18]

## Fisheries Profile
### Community
Gloucester fulfills the definition of a fishing community on the basis of central place theory. Fish are legally sold ex-vessel to a dealer, processor or the public; fishing support services are provided; there are public facilities providing dockage; fishing people satisfy their daily and weekly social and/or economic needs here, and some fishermen and their representatives participate in fisheries resource management.

Furthermore, "everyone in Gloucester knows a fisherman. That makes a tight-knit community. Everyone is devastated if someone is lost at sea. The fishermen's wives all know each other, share the same hardships and advise each other."

For many years, Gloucester's fishing community was divided by ethnic group and gear type. Gillnetters, predominantly "Yankee," and trawlers, who were predominantly Sicilian, had numerous gear conflicts. Each group blamed the other for the conflicts. Each claimed the other did not care about the resource or about anything except catching as much fish as they could. Gillnetters were said to be greedy for bottom, setting up nets to reserve their territory even when they could not possibly pull all the nets they set within a reasonable time frame. When there were reports and/or rumors about net liners, about tows through fixed gear, and other violations of regulations or etiquette, the offending trawlers were harshly criticized and the whole group was stigmatized. Negative stereotypes about the Gloucester fleet were voiced in ports all along the East Coast. By 1998, however, the stereotype had radically changed. "Some of the guys have turned around 100% in their attitude." Gloucester fishermen of both gear types and ethnic groups said that the majority of fishermen who remain in fishing are "real fishermen" who want long-term sustainability of the industry.

Whether or not Gloucester should be classified as "fisheries-dependent' is not consistently answered in the affirmative. Several respondents noted that the city is sufficiently diversified to survive even if the fishing industry does not. However, the image of Gloucester as a fishing community remains very prominent. The fishing industry is also well represented in public policy debates so to-date those with opposing interests have not successfully changed zoning regulations and other restraints on property use that might affect maritime businesses. For example, a proposal for the development of a mall on waterfront property that had long been vacant was defeated, as was a proposal to create condominiums out of a waterfront former paint factory. Those who argue for opting out of the "designated port area" status say that the economy should dictate the best use of the waterfront, that with the diminishment of the fishing fleet, the whole harbor does not need to be saved for the fishing industry.

For a time, complaints were voiced that the mayor was too enthusiastically endorsing growth in the tourist trade and light industry while ignoring the importance of the fishing industry to Gloucester. One respondent noted that the mayor should have more consistently appeared at New England Fishery Management Council meetings, for example, to point out the impacts of regulations on the "infrastructure, oil businesses and groceries, all the things we subsidize and use." Another respondent noted that the mayor came very close to

---

[18] The statue was unveiled and dedicated in August 2001.

losing his reelection campaign and was thereby reminded that the community values the fishing industry. He then realized that he had to be perceived as supportive of the industry if he wanted to continue serving as mayor. While the city is strengthened economically by its diversity, clearly the working waterfront remains a core value that might be underestimated by simple arithmetic.

One respondent expressed a fear that Gloucester will become a bedroom community for Boston where newcomers can buy a waterfront house, yet still be close enough to attend cultural events in the larger city.

<u>Commercial fishing and fisheries-related employment</u>

*Harvesting structure*[19]
The federal permit files for 1997 list 226 vessels for Gloucester. Sixty to seventy groundfish boats remained in Gloucester in the summer of 1999, perhaps 15 percent of which lobster in the summer. Seventy-five to 80 lobster boats fish in federal waters, 50-60 in state water. A half-dozen urchin boats worked out of Gloucester for awhile, but have since left, presumably for other ports. The midwater fleet consists of 4 to 6 vessels that go herring fishing. "Longliners are pretty well out of business with the Jeffrey's closure."

"Some of the lobstermen are "heavy hitters," typically averaging 800 to 1000 pots and stocking a half million dollars annually." There are a couple of boats offshore crabbing.

Estimates of numbers of harvesters varied widely ranging from 250 to 300 for Gloucester, 400 to 800 for Cape Ann (including Gloucester, Beverly, and Essex).

*Processing structure*
Original home to the founder of frozen fish, it is fitting that Gloucester has retained a sizable presence in the frozen fish processing and marketing sector. The plants do not rely on fish landed in Gloucester, instead many import frozen blocks of fish primarily from Canada, Iceland, and Norway. The blocks are cut, breaded, and packed for sale as fish sticks and fish portions. These are sold locally and nationally to schools and other institutions, supermarkets and fast-food restaurants.

Some of the plants are partially owned by vertically integrated, international companies. One of these relies on its own vessels to provide individually quick frozen (IQF) pollock for some of their products. New Zealand whiting, cod and haddock are also used, purchased from dealers, not directly from fishing vessels. Typically, this company produces 40,000 pounds of fish sticks and another 10-30,000 pounds of other products per day. Products are sold to retail businesses (supermarkets) and to food service. The company also has co-pack arrangements with some larger companies.

When running at capacity, there are 125 employees per day, but only two percent of these are permanent, full-time. Only a few of the managers are from Gloucester. The line workers are usually recruited by an employment service in Chelsea. Nevertheless, a majority of the workers are loyal to the company and typically have been working there for seven years for minimum wage. All of the line workers are Hispanic, predominantly Guatemalan and Salvadoran. The gender mix of workers changes with the season. In the summer women are in the majority because many of the men work at construction, but men predominate in the winter. Few people in Gloucester are willing to work for minimum wage. Only Gorton's, that is unionized, pays significantly higher wages for fish packing and processing.

Quality is considered extremely important to this company. A HACCP plan is operative and key employees have been trained (using Spanish tapes as necessary). Workers are required to wear hairnets and uniforms, neither jewelry nor gum is allowed and there are daily inspections to assure compliance.

---

[19] From key respondent interviews

> The challenge of the future as seen by this company is diversification. Consumption of seafood is down and the fish industry has not been as creative as the chicken and beef industries. Value-added seafood may resolve some of the problems, but given the lack of product globally, business success is likely to remain a struggle.

With a few exceptions, fresh fish processors now cut fish primarily for local customers, shipping the rest of their whole fish to Boston for processing.[20]  One exception is a company with 18 employees that specializes in the highest quality fish for the high-end natural foods market. Herring is another exception since it is generally sold whole as bait to lobster fishermen.

When it looked like herring was going to make a "come-back" in Gloucester, several plants began to upgrade their facilities to comply with HAACP standards so that the herring could be sold as food for humans. One dilapidated plant was bought and renovations begun to service two herring vessels, one a 130-foot boat, rigged for pair trawling and converted to refrigerated seawater (RSW). Two foreign companies had expressed an interest in herring and the company also expected to sell to canneries and wholesale lobster bait dealers. Tote by tote sales of salted bait was not what was intended. Nevertheless, when Gloucester fractured over competing visions of what was the proper use of the Jodfrey State Fish Pier and how herring should be caught, handled and sold, and fishermen had difficulty locating the volumes of herring that had been anticipated, the company was forced to sell herring bit by bit.[21]

Herring processors were not the only companies affected by fishing regulations. One small company that was trying to expand it's services to include groundfish processing paid $80,000 to upgrade its facilities for HAACP certification just before the cod quotas were instituted.

*Wholesalers and other Support Services*
<u>Gloucester Display Auction</u>
Opened in December 1997, Gloucester Seafood Display Auction was modeled on the Portland Fish Exchange. The higher prices generated for higher quality fish at the auction has helped sustain the Gloucester harvesting community despite regulatory pressures. Fish sold through the auction is bought for distribution nation-wide. "Now we are getting the prices our fish deserve!"  "The scales are accurate and you pay 5 cents per pound for the amount of fish you take out, regardless of what price you obtain for the fish. It didn't used to work that way. The more expensive the fish was, the more it cost you to take it out."[22]

However, some disgruntled wharf owners complain that they cannot compete with government subsidized services such as the State Fish Pier and the auction. One respondent noted that the auction was undercutting not only the wharf owners, but also the ice company and trucking companies as well. Others however had an opposing view. Space in the newly constructed "Stalls Building" on the State Fish Pier is intended for small, start-up businesses. This is supposed to serve as an incubator to help seafood companies and others so that the local companies reap the benefit of value-added processing, for example. Unfortunately, rents in the Stalls Building are high, so some small companies are not willing to risk moving into the building.

---

[20] Daniel Georgianna. 2000. *The Massachusetts Marine Economy.* Dartmouth, MA: University of Massachusetts.
[21] Fuller description of the Gloucester Herring Corporation's rise and fall can be found in these articles in *Commercial Fisheries News* by Hall-Arber: "Gloucester Display Auction Now in Business," January 1998; "Herring, Mackerel-What's the Opportunity," December 1997; "Visions of the Future Clash over Gloucester Herring Proposal, Factory Trawlers," June 1997; "Gloucester Herring Plant Proposal Draws Fire," May 1997; "Herring and Gloucester: Hope for the Future," October 1996; "Gloucester Pursues Fish Auction Development," October 1996
[22] The price has since gone up to 7 cents per pound.

In June 2000, Global Food Exchange bought the Gloucester auction. "It is the largest daily auction of fresh seafood in North America with annual volume in excess of 20 million pounds (and current annual gross transaction value in excess of $20 million.[23] According to one respondent, fishermen (in 2001) are starting to complain that buyers are not paying fair prices and some have stopped going to the auction.[24]

Americold is a cold storage facility that handles frozen fish products for local, regional and national companies.

Oil companies that specialized in fuel for fishing vessels for as long as 40 years have had to diversify since the fleet contracted and DAS restrictions limit fuel use of the remaining vessels. Fifty percent of the business of at least one of these companies is now provision of home heating oil.

Dealers who once exclusively handled finfish are now buying and selling lobsters. Shellfish is also handled, bought, shucked and packed. HAACP must be routinely followed, as well as state and interstate sanitation and tracking guidelines. Shellfish commonly handled include surf clams, steamers, propellers, little necks, cherrystones, oysters, scallops, razors and sea urchins.

Trucking
Each of the dealers owns or leases a truck or two for product distribution.

Infrastructure
Gloucester's inner harbor is a "designated port area" and thus is legally bound to maintain marine-dependent use. The Jodfrey State Fish Pier also insures that the fishing industry will continue to have at least some access to waterfront amenable to loading and landing, etc. Nevertheless, fishing industry participants express concern about the condition of the city's piers and wharves. Many are quite old and suffer from a lack of maintenance. The wooden piers cost as much as $60,000 annually to repair.

Some owners complain that the display auction has attracted the majority of the vessels so that the wharf owners are no longer able to charge 10-14 cents a pound landing fees (the auction currently charges 7 cents). Since there are fewer vessels and limits on fishing days, the fuel sales are down, as are all the other support services. Consequently, the wharf owners are unable to earn sufficient profit to pay for upkeep on the wharves with only marine-related business. These owners are lobbying for the right to diversify their property, selling or leasing to non-marine-dependent users. The harvesting sector fears that such diversification will lead to gentrification and will price fishing-dependent use out of business. Once the access to the waterfront is lost, when the fish stocks rebound, there will be nowhere for the fleet to go.

Privately owned wharves typically provided free dockage, storage facilities for gear and trash removal. Some are now charging for dockage, though at least one respondent noted that he could not charge to tie-up to his poorly maintained pier.

Employment (year-around and seasonal)
Estimates of employment and earnings in seafood processing and wholesaling in Gloucester in 1997 were 1,581 employees earning $53 million.[25] These numbers could be low since some workers are self-employed and therefore not included in DET (Massachusetts Division of Employment and Training) data and because the plant workers are often supplied by contracts with employment services.

DET lists 281 employees in the category "agriculture, forestry, fishing" in 1997, a marked

---

[23] http://www.fishfacts.com/sfdpriv/news1/20000614GAGA.html
[24] Key respondent interview
[25] Ibid.

contrast to the 532 noted for 1989, the year of the Census.  The data for 1999 shows only 238 employees in this category.  Again, these numbers are not strictly reliable for estimating the numbers of fishermen, both because the category includes agriculture and forestry and because many, if not most, fishermen are self-employed.

Respondents estimated that there were 700-800 households directly dependent on fishing (including lobstering) and 1000 to 1200 indirectly dependent.

Most of fishermen are full-time though with the restrictions some supplement their income with such work as automotive mechanics, snowplowing, and construction.  A few have been retrained for computer work or truck driving.  Some still work in the fishing industry, in sectors other than harvesting.  Rowe's Machine Shop and the cab company employ a number of former fishermen.  Another former fisherman opened dry-cleaners and one a restaurant.

Nevertheless, fishing has proved to be an honorable occupation for a wide array of individuals.  Furthermore, some of those who were unable to pursue a formal education have become excellent fishermen.  Certain respondents also pointed out that the small boat inshore fishery should be encouraged both because it usually is a smaller-scale fishery (less damaging to habitat and the stocks) and because the individuals involved are often family-oriented.

*Species, Seasonality*
Niche fisheries include hagfish (slime eels), shrimp, whiting, and herring.  Urchins and dogfish were targeted but availability and regulations (respectively) have eliminated the option to do so.  Some of the lobstermen have tried bringing in crab as well, but the infrastructure doesn't exist.  In Maine, spouses developed a cottage-industry picking crab for lobstermen, but this has not happened in Gloucester.  Some do hire recent immigrants (often Asian or Hispanic) to pick the crab.

Hooking is a winter fishery because dogfish are here in the summer.  At $.15 per pound, dogfish aren't worth the bait and hooks.  Furthermore, dogfish has been closed to fishing, except for a limited bycatch, in an effort to increase its biomass.

The majority of fishermen are full-time groundfish fishermen or lobstermen.  A handful of lobster fishermen are civil servants or teachers who lobster part time or only in the summer. Others snowplow in the winter.

As the regulations became stricter, some fishermen went scalloping for 3 to 8 weeks, just to stay busy.  The problem is that all the little fisheries that used to be used to make a year's pay are gone, either because the stocks have moved off, been fished out or the regulations have made them inaccessible.

Nevertheless, among the day boats, there is still quite a bit of gear and target species switching.  One vessel, for example, will fish for whiting for a time, switch to groundfishing, then back to whiting.  Another boat will drag from January to May, then go lobstering, another switches day-to-day, dragging one day, pulling lobster pots the next.

Whiting is labor intensive and the returns are poor.  Typically the price is as little as 15 to 20 cents a pound, with an occasional spike up to 65 or 70 cents per pound.  "It takes a lot out of the boat and engine, because it's the constant 'go.'  It's a hard way to make $300 to $400 a week."

Landed species include:
Groundfish:  cod, dabs, winter flounder, yellowtail, haddock, pollock, hake, halibut, Grey sole
Small mesh: whiting, squid, shrimp
Pelagics: herring, mackerel
Crustaceans: crab (as bycatch), lobster

HMS: bluefin tuna, swordfish
Others: stripped bass, dogfish, skate, sea urchins (few), monkfish, bluefish, slime eels, sea cucumbers, menhaden (when around).
Other shellfish: conch/whelks (few), soft-shell clam, mahogany clams (not money-makers), quahogs, periwinkles (not commercially), mussels (small quantities), razors, oysters
Seaweeds are being harvested by a few, but "they're keeping it real quiet."

*Form of ownership (e.g., owner/operator; corporation)*
Trawlers tend to be owner-operated or family-owned and operated. Two herring vessels are run by hired captains.

<u>Recreational fishing and employment</u>
Recreational fishing has increased along with marinas and leisure craft. In addition, whale watching is an active business. Head and charter boats are allowed to fish in some areas that are closed to commercial fishermen. This engenders considerable resentment, especially among the small boat commercial fleet that has no alternative fishing ground that is feasible to reach.

There are quite a few well-to-do people who come up from Long Island and elsewhere to chase tuna.

<u>Cultural role of fishing</u>

*History and museums*
Cape Ann Historical Society has a permanent exhibit that focuses on the history of fishing out of Gloucester. In addition, there is a small library in the building for research.

*Ethnicity in the fisheries*
Gloucester's fisheries have always reflected waves of immigration. Initially, the fleet was English. Later, immigrants from Norway, Ireland, Newfoundland became fishermen. Evidence of the Portuguese legacy remains in some of the city's place names and in both the name of one of the Catholic churches, Our Lady of the Good Voyage and in its prominent statue that depicts Our Lady holding a fishing vessel. The trawler fleet of Gloucester is now predominantly Sicilian. Gillnetters and hook fishermen tend to be mixed "Yankee" stock.

Respondents estimated that ninety percent of the fleet was born in the area, 60 percent have fishing backgrounds.

*Religion*
Among the Sicilian population, the Roman Catholic Church is extremely important. Annual events such as Saint Peter's Fiesta and the Blessing of the fleet are city-wide celebrations that extend beyond the boundaries of Catholicism, but publicly declare the association of fishing with the earliest founders of the religion. Less public, but nevertheless significant for their role in the flow of social capital, are the annual Novenas practiced by various fishermen's wives. Friends and relatives participate in nine days of prayer and singing to favored patron saints. The culmination of the Novena is a feast for which participants contribute food and share in eating.

*Kinship & family*
Since its founding, Gloucester has been a fishing community. Several generations of each ethnic group who moved through the fishing industry continued the tradition. Some of the members of the fishing community in Gloucester can count eight generations of forebearers who were in the industry, here and in Sicily.

As in other communities, the children of fishermen today are obtaining more education and most are opting for careers other than fishing. There are a few examples of individuals who have gone on to obtain college degrees, but have been drawn back to the way of life they

grew up with. Nevertheless, the regulations, the public's negative image of fishermen coupled with the expense and uncertainty associated with fishing constrains growth in the harvesting sector. A common lament among those who worked hard to build up their business for their children is that they have had to face extreme hardship due to restrictive regulations only to confront a corresponding lack of enthusiasm for continuing the business among their offspring.

*Where fishermen go for coffee*
The Dory Café
Dunkin Donuts

*Where fishermen go for beer*
St. Peter's Club is popular among the Sicilian fleet members. The Crow's Nest gained renown as the gathering place for swordfish boats' crews when Sebastian Junger published his book *The Perfect Storm*. Now many tourists go there.

Fishing related organizations and their roles in the community and fishery
*Commercial fishing associations*
**Massachusetts Fishermen's Partnership** (State-wide membership)
The Partnership takes on issues that fishermen of different ports, gear and target species can support. One of their first tasks was to respond to the identified need of health care for fishermen and their families. The Fishing Partnership Health Plan was developed with some federal and state aid and the support of Caritas Christi, the Roman Catholic health organization. Fishermen and their families on the plan are served by Tufts Medical.

While remaining actively involved in maintaining the health plan, the Partnership continues to seek cross-cutting issues. Encouraging collaborative research between fishermen and scientists and facilitating discussions among fishermen and other stakeholders about the reauthorization of the Magnuson-Stevens Act are just two of the tasks they have undertaken lately.

Cape Ann Lobstermen's Association
Cape Ann Vessel Association
Gloucester Fishermen's Association
Gloucester Inshore Fishermen's Association
Gulf of Maine Fishermen's Alliance (was Cape Ann Gillnetter's Association)

*Fishermen's Wives associations*
Gloucester Fishermen's Wives Association, founded in 1969, lobbies for the interests of the fishing industry (e.g., against oil-drilling on Georges Bank and ocean dumping, as well as for regulations that protect fishing communities) and promotes innovation in the industry (e.g., value-added seafood, cookbook). Schlesinger Library at the Radcliffe Institute of Harvard University maintains the records of the GFWA as part of its permanent collection.

*Other*
**Gloucester Fisheries Commission** was established by the City Council in 1956 to support the fishing industry. The Mayor, a City Councilor, 4 at-large community members and 7 members of the fishing community are named Commissioners.

**Massachusetts Fisheries Recovery Commission** created by Gloucester State Senator Bruce Tarr, Representative Anthony Verga and New Bedford State Senator Mark Montigny—promotes collaborative research

**Gloucester Initiatives** is a grassroots organization comprised of fishing industry members, local activists, and concerned citizens that was formed initially to investigate the pros and cons of allowing the 300+ feet factory trawler *Atlantic Star* to be based in Gloucester and the building of a foreign-owned plant on the State Fish Pier.

*Unions*
Gorton's is unionized.[26]

<u>Fishing-related programs and services</u>
*Other NGOs*
**Gloucester Fishermen and Families Assistance Center** is overseen by Commonwealth
Corporation (formerly the Corporation for Business, Work and Learning), a semi-private,
workforce and economic development agency.  The Assistance Center began when
emergency funds were allocated to help fishermen and their families affected by groundfish
regulations in 1994.  Then, as now, the Center directs fishing families to various services
including retraining programs, GED tutoring and English as a second language classes.

**Greenpeace** maintains an office in Gloucester specifically to focus on fisheries issues.

**Cape Ann Commercial Fishermen's Loans** provides money to qualified fishermen who
have been refused by two commercial lending institutions.[27]

*Extension programs*
**Massachusetts Coastal Zone Management Program** maintains an office on the Fish Pier.
The program most frequently interacts with the fishing industry during the harbor planning
process.

*Training institutes*
**Gloucester Fishing Families Assistance Center** helps fishing family members obtain
training for alternative employment.

*Coast Guard*
Gloucester's **Coast Guard** station is part of the U.S. Coast Guard's First District and the Coast
Guard Group Boston.


# Perceptions of the Fishing Community[28]


<u>Importance of fishing to the community</u>
Opinions ranged from "slightly" to "very important."  Most acknowledged that the city would
"go on" even if fishing disappeared, but most of the key respondents noted the city's long
history of fishing as well as considering fishing important to the community's image and,
consequently, to its attraction as a picturesque destination for tourists, summer residents and
artists.  (See discussion under "community" above for a fuller discussion.)


<u>Boundaries</u>
The people of Gloucester tend to maintain most of their contacts within Gloucester.
Exceptions include the fishermen's representatives who attend Council meetings and
NEFMC Committee meetings all over the region and members of the Gloucester
Fishermen's Wives Association who travel the region and beyond to speak on behalf of the
industry and/or to offer cooking demonstrations.  Some young people joke about not being
able to get anyone from their parent's generation to "go over the bridge."  There is also a
sense of community in both Rockport and Pigeon Cove.  But Gloucester is the market and
supplier for the industry in the area.

---

[26] One respondent recalled being paid $3/hour for packing fish sticks when the minimum wage
was $1.50.  Her mother and aunts also worked in the plant. Middle-aged to older women
dominated the fish-packing jobs.
[27] Fishermen, bankers and businessmen are on the Board.  Loans carry a 4 percent interest
rate, with boats and homes used as collateral. $2.5 million was loaned out for five years; there
have been no delinquencies in repayment.
[28] Based on key informant interviews

Gloucester & NS Sub-region

Capital contacts can be divided up into those encompassing social capital (e.g., visit friends, go for recreation, go for vacation, visit relatives, socialize, go to church); economic (e.g., sell fish, offload fish, buy fishing gear, haul out for boat repairs, go to the bank, go shopping), and human (e.g., go to school, go for childcare, go for health care, go for retraining).

Selected capital contacts typical of Gloucester harvesters are charted below:

| | |
|---|---|
| Sell Fish | Gloucester |
| Offload Fish | Gloucester |
| Buy Fishing Gear | Gloucester, occasionally Boston |
| Buy Ice | Gloucester |
| Buy Fuel/ Oil | Gloucester |
| Haul out Boat Repairs | Gloucester/Pigeon Cove |
| Book Keeping | Gloucester |
| Banking | Gloucester/Rockport |
| Shopping | Gloucester |
| Go to Church | Gloucester/Rockport |
| Got to School | Gloucester/Rockport |
| Go for Health Care | Gloucester |
| Go for Childcare | Gloucester/Rockport |
| Go for Retraining | Gloucester |
| Visit Relatives | Gloucester/Rockport/Italy |
| Visit Friends | Gloucester/Rockport |
| Go for Vacation | Worldwide/Florida |
| Go for Recreation | All New England |
| Socialize | Gloucester |

Contacts between buyers and sellers of lobsters are usually reciprocal. Harvesters generally buy bait and sometimes fuel and other supplies from the company that buys their lobsters.

Marketing of product by independent dealers and/or the auction may be local, regional, national and international. Live product, sea urchins and tuna are often sold to Japanese buyers. Shellfish may be sold to domestic shippers out of Boston, New York or Philadelphia. Ethnic markets are also significant purchasers of shellfish and species less favored by the average supermarket such as mackerel, squid and codfish roe.

Employees of shoreside seafood companies come from as close as Gloucester, Salem or Lynn or as far as Boston.

**Communication Issues**
Communication with both local officials and federal managers/representatives was said to be "poor" to "fair" or, in one case, "nonexistent." One respondent, however, ranked communication with state managers/representatives, as "good" or "very good". Others ranked it as "fair." "They 'yes' you to death!"

Respondents often blamed the Council for poor management. While most agree that regulations are necessary, they often feel cheated by the system. For example, "they use the agenda to their own benefit. They'll deal with namby-pamby issues and they'll wait till everybody is just about dead and ready to go home and then they zing you . . .Fishermen have no confidence in them and they have no confidence in us. Communication is so poor."

Communication with friends and fellow fishermen is maintained at sea for safety's sake. Information about one's catch or favored grounds is commonly shared only with one or two close friends or relatives. Some fishermen, however, do make friends with party boat captains and they might share information.

## Assessments
All respondents said that fishermen and scientists "strongly disagree" on fish assessments, particularly with respect to groundfish. "The groundfish stock is cyclical. One year there are a lot of flounders, the next couple of years, the cod are back because the sand eels are back."

## Local management practices
Long before Amendment 5 to the groundfish plan was implemented, fishermen of Gloucester made suggestions about incremental changes that would have begun to protect the groundfish stocks. NMFS would not do anything, though, until the whole plan was completed, a process that took years.

The Massachusetts Fishermen's Partnership and the Gulf of Maine Fishermen's Alliance have designed a variety of regulations that they proposed to NMFS. "They have not been listened to." Even before the Alliance, there was a "Gloucester Plan" that had been hashed out and refined over a couple of years. It was "very far-reaching and revolutionary because it addressed habitat, stewardship of bottom, and area stakeholders. It got hacked to pieces."

## Economic Change
Ten years ago, respondents said that the economic condition of the industry was "average" to "excellent." "There were fish and high prices, everything to look forward to!" In the 1980's it was easier to see the effects of the good economic condition, fishermen were "showier, buying fancy cars and houses." Even for those whose economic condition was self-reported as "average," the small boat exemption to many of the regulations was a benefit.

Five years ago, it was still "excellent" to "fair."

Today, for those not constrained by the closed areas (i.e., the larger vessels), the economics are "average" to "good," but the small boats are suffering. "The auction is giving premium prices, we're finally getting paid what the fish is worth." Fewer men are being carried as crew, and fewer fish are being landed, so the prices are higher. Many vessels no longer carry insurance, either because they have obtained financing outside the usual banking channels or because they've already paid off their boat. So, for the few big boats going, the fishermen are likely to make a good living. Especially since they are able to fish far enough out to avoid the closed areas. The small vessels, though, see the situation only as "worse and worse."

Five years from now, economic conditions for the big boats will still be good, but as now, the condition is "poor" for the small boats. "There's no future for the small boats." One respondent commented that they had faith that the cod would reproduce and that the economic condition would be "average."

One respondent commented that "if a fisherman is allowed to work at all, he can earn a living."

For other sides of the business, dealers and processors, for example, the industry is considered a "frontier business with a boom or bust mentality." "There are always risks, always change, never wholly predictable, you have to be able to adapt."

## Changes in fishing effort
Estimates of change in effort depend principally on the individual respondent's point of view, sense of success or failure, and impact of regulations on their personal fishing

operation.  Those who are severely restricted see effort in the operations that circumvent the closures as having increased.  Those who used to fish in groups of 8 or 10 on distant grounds see a fall in effort that leaves only one or two vessels within hailing distance.

One respondent suggested that effort has probably doubled.  "Gillnetters used to get by with 60 nets, now they need 100."  Hook fishermen used to fish principally for haddock, cod, and cusk.  "Cusk are residential, but they are gone now.  The change started 10 years ago (around 1987)."

The most significant changes in the industry, according to some respondents, are the regulations and the increased costs of a fishing operation.   The closures and changes in technology that allow "anyone" to fish top the list of changes for other respondents.  However, the numbers of fishermen and vessels have severely diminished in the last decade.

## Effects of recent management
Pigeon Cove Fishermen's Cooperative closed their retail business as a result of the cod regulations and closed areas, though it was re-opened under independent management.  Year around closures affect gillnetters and longliners.  "You need hard bottom for successful hooking."  The closures have eliminated access to the hard bottom for small boats.  Those small boats that have tried to fish outside (further offshore) are compromising their safety.

Limiting entry has had the most impact on the fisheries for the Gloucester fleet, according to some respondents.  "Mesh regulations and scaling back of the fleet have done a lot of help to the stocks.  The frustration is that it never seems to stop.  It's like the Russians, they throw in a 5-year plan and it fails in 2, so they throw in another one.  They never put anything in and let it stay long enough to see the results."

Quotas and closures have had equally negative impact on finfishing, according to some.  "Throwing away millions of pounds of cod is a mortal sin.  You can't regulate the catch as though the fishermen were farming!"

Some report an increase in drinking among fishermen, less patience and a sense of frustration at not being able to provide for their families' basic needs.  Fishermen become depressed when they can't fish.

## Characteristics of local fishermen
"A good fishermen works hard, doesn't forget his mistakes, and knows where he is going tomorrow," (i.e., he has a business plan.)  A good fisherman is "intelligent, knows about fishing, is concerned about the environment and aware."

*Safety*
Life rafts, survival suits, Loran, GPS and EPIRG all help make fishing safer.  However, as some respondents pointed out, though the gear is safer,  "opportunity dictates when you go out.  You don't look at the weather, you have to go when you can go (due to the regulations)."

*Job satisfaction*
One common view was expressed as, "Absolutely, fishermen are satisfied with their work.  Anyone who is fishing today is doing it because he wants to."  "Anyone that's left now is left because they love the life…it's been so difficult in recent years and financial rewards have gone down so fast that people who are going to get out have gotten out."

An opposing view, also frequently expressed was, "None are satisfied because of the regulations.  They are being regulated to death…and the paperwork!"

**Fishing families**

Spouses of fishermen are working outside the home even if they have children.  This is a sign of the times as much as it is an effect of the insecurity of fishing today. However, the fact that many women do have full-time jobs with benefits has allowed fishermen to survive... "Enabled them to still be doing this."  "The wives have become a very big part of this, a buttress."  It is also a sign of the high cost of health insurance.  One aspect that seems to be different is that women who were working part-time feel compelled to work fulltime or seek a second part-time job.

One negative side of their working fulltime is that women no longer have as much time to devote to helping their spouses with fishing-related tasks (bookkeeping, arranging for replacement parts, shopping for groceries, etc.).  Gloucester Fishermen's Wives Association (GFWA) used to have afternoon meetings.  Now they must meet at night or on weekends and fewer members have time to volunteer.  Consequently, GFWA is far less visible now at New England Fishery Management Council meetings.

At least one of the key respondents mentioned that he and his wife did not have children because of the instability of the fishing industry, "we couldn't afford them."  Another fisherman who retrained as a mechanic said, "now, I can afford to get married."

Children of families involved in fishing-related businesses are not as likely to go into the business as they once were.  They no longer want to work on the docks, for example, for $10/hour when they can find cleaner, easier work for equal or even higher wages.

252                         Gloucester & NS Sub-region

Community Profiles
Essex County, Massachusetts
Gloucester / North Shore sub-region

# 5.6.1.2. Rockport

*Background*

Reminisces of Captain Sylvanus Smith recorded in April 1913 related what he knew about Rockport:  "'Sandy Bay' was a prosperous fishing center, in fact, one of the most important centers for this industry in New England. Our records of the early fisheries of old Sandy Bay are woefully incomplete. . .

History tells us that in the year 1695 John Babson received a grant of land at Straitsmouth Point to set up a fish house and an old cellar still marks the site this house was located" . . ."The point of land called Bear Skin Neck, tradition tells us, received its name from the fact that Babson killed a bear there, drying the skin upon the rocks; his weapon, it is related, was an old fish knife and it was a common expression when I was a boy, if one had an old knife, to remark, 'this is the knife with which Babson killed the bear.' (It is quite probable that this tradition is founded upon some actual happening, for there were families living upon the Neck at that time and without doubt bears often came down from the woods attracted by the smell of fish.)"

"Without doubt the fisheries were conducted or carried on from Long Cove and small boats were used which were easily pulled up on the shore out of danger from the sea."[29]

"In the early 1800's fishing was the mainstay of the small town of Rockport.  It is said that parents would suspend a cod-line from an attic window and attached to this would be a dried codfish and here the small boys had their first lessons in hauling in fish. Many of the families had in the yards an old dory and the children would play in this, throwing out the anchor or playing at rowing, but this pastime was soon left for the greater sport of fishing fur cunners and pollock from the rocks about the shore. At the age of nine or ten these boys would be in the boats with the men, preparing their simple meals and while very young would often be numbered among the crew."[30]  In 1816, the jig hook was invented by Mr. Abraham Lurvey of Pigeon Cove.[31]

"While in the early fisheries very small boats were employed, with the increase in the industry larger craft were built and as these later craft were too cumbersome to be easily hauled up on the beach or upon the shore, moorings were put down in Long Cove and the boats were thus anchored."[32]

"In 1836, the needs of greater protection for the large increase being apparent, the national government was induced to build a breakwater.  At this time there were some 12 vessels engaged in carrying fish to New York, Boston, and other places, some going as far even as to southern ports and the West Indies."

"With the building of the breakwater the fleet largely increased both in size and numbers and there were some 80 craft kept at the moorings of the cove.  When the breakwater was finished, long wharves were built and a new and better class of vessels, craft of 30 to 40 tons burden, took the place of the smaller craft."

"In 1840, after completion of the breakwater, the winter fishery was engaged in many of the craft taking their fish to Boston while fish landed as Sandy Bay was often hauled over the road to Gloucester in teams, and from there to Boston. This winter fishery became quite

[29] http://www.downtosea.com/1901-1925/ssmith.htm
[30] http://www.downtosea.com/1901-1925/ssmith.htm
[31] http://www.downtosea.com/1876-1900/firsttrips.htm
[32] http://www.downtosea.com/1901-1925/ssmith.htm

prosperous and many men were employed during the winter months who had previously to the beginning of this branch of the industry had found nothing to do this season, between fall and spring."[33]

Winter weather-enforced idleness led to prodigious drinking.  In 1856, as the temperance and women's rights movements arose, the women of Rockport under the leadership of Hannah Jumper, raided the men's alcohol reserves.  In the words of Ebenezer Pool, an eyewitness, "...On finding any keg, jug, or cask having spirituous liquor in it...with their hatchets broke or otherways destroyed it..."[34] Today, Rockport remains a dry town.

"By 1850, Pigeon Cove was a small village with a broadly-based economy.  Fishing and granite quarrying were traditional mainstays, and tourism began to flourish as the Cape Ann coast became extremely fashionable and boasted numerous hotels and resorts.  Several were in or near Pigeon Cove, and by 1876 steamers from New York regularly called there.  Artists have also frequented the cove, capturing its beauty and spirit on canvas.  Another local industry with a profound future impact was a small blacksmith shop that would eventually become the Cape Ann Tool company."[35]

"The granite that gave Rockport its name is no longer quarried but the 100 years of its history lives on in the Scandinavian communities that dot the hillsides above the coastline."[36]

Today, the "town of Rockport is known for its art galleries, fishing community, and picturesque views. Its population of 7,000 doubles in the summer as visitors flock to the town to stroll the shops on Bearskin Neck, scuba dive off the rocky shoreline, or enjoy some of the best seafood in New England."[37]

Rockport's proximity to Gloucester and its fishing industry infrastructure makes it easier for Rockport to maintain a viable, if modest, fleet. Furthermore, some traditional fishing paraphernalia have been maintained for its artistic appeal. Motif #1, a fishing shack in Rockport harbor, for example, has been the subject of countless painters.  In early December, the holiday season is introduced with Santa's arrival by fishing boat.

A proliferation of gift shops and such attractions as sea kayaking, whale watching, Thacher's Island lighthouses, deep-sea fishing and special lobstering cruises make Rockport much more geared to the tourist industry than the fishing industry.  Nevertheless, there is a core group of fishermen who make up Pigeon Cove Fishermen's Cooperative.

## Governance
Rockport has a 5-member Board of Selectmen that meets weekly and an Open Town Meeting.

## Demography
### Population
The population of Rockport during the 1990 Census was 7,482 people, 3,382 male and 4,100 female.  This population could swell to 20,000 in the summer.[38]

### Age Structure
According to the 1990 Census, 432 persons were under 5 years, 782 were 5 to 14, 3,102

---

[33] Ibid.
[34] http://www.rockportusa.com/aboutrockport/hannah/hannah2.html
[35] Carl Masi, personal communication, 2001.
[36] http://www.footprintsofrockport.com/
[37] http://www.rockportlobster.com/rockport.shtml
[38] http://www.state.ma.us/dhcd/iprofile/252.HTM . The numbers at this site differ slightly from numbers generated by the U.S. Census site, but are the ones cited in public information, so I've used these unless otherwise indicated.

were 15 to 44, 1,527 were 45 to 64 and 1,639 were 65 and over.

Education
According to the Census, 1499 had a Bachelor's degree or higher, 1019 graduated from high school, 1014 had some college, and 447 had no high school diploma. Massachusetts' profile gave the statistics as: high school graduate or higher 90 percent and Bachelor's Degree of higher 34.9 percent.

Housing
There were a total of 2475 households in 1989 and 4,202 housing units.[39] Of these 3,354 were occupied, and 1,955 were occupied by owners. The median year the units were built was 1939 with a median value of $222,000.

Racial and Ethnic Composition
Most of the people of Rockport were white (7,392) in 1989, with 17 Blacks and 8 American Indians, 27 Asian, 35 Hispanic and 3 "other."
The majority was of English-Irish-Scottish ancestry. Italians, German, French and Scandinavian (Swedish, Finnish and Danish) number in the 3-400 range (each).

*Economic Context*
Income
The median household income in 1989 was $34,195 and the per capita income was $19,882.

Employment
The largest employer in Rockport is the Town of Rockport with 200 employees.

From the 1990 Census:
INDUSTRY
Universe: Employed persons 16 years and over

| | |
|---|---:|
| Agriculture, forestry, and fisheries (000-039)... | 50 |
| Mining (040-059)... | 0 |
| Construction (060-099)... | 139 |
| Manufacturing, nondurable goods (100-229)... | 197 |
| Manufacturing, durable goods (230-399)... | 323 |
| Transportation (400-439)... | 83 |
| Communications and other public utilities (440-499)... | 73 |
| Wholesale trade (500-579)... | 105 |
| Retail trade (580-699)... | 533 |
| Finance, insurance, and real estate (700-720)... | 111 |
| Business and repair services (721-760)... | 136 |
| Personal services (761-799)... | 67 |
| Entertainment and recreation services (800-811)... | 99 |
| Professional and related services (812-899): | |
|   Health services (812-840)... | 233 |
|   Educational services (842-860)... | 281 |
|   Other professional and related services (841, 861-899)... | 179 |
| Public administration (900-939)... | 89 |

OCCUPATION
Universe: Employed persons 16 years and over

| | |
|---|---:|
| Managerial and professional specialty occupations (000-202): | |
|   Executive, administrative, and managerial occupations (000-042)... | 382 |
|   Professional specialty occupations (043-202)... | 637 |
| Technical, sales, and administrative support occupations (203-402): | |
|   Technicians and related support occupations (203-242)... | 132 |

---

[39] http://venus.census.gov/cdrom/lookup/979317288

| | |
|---|---|
| Sales occupations (243-302)... | 406 |
| Administrative support occupations, including clerical (303-402)... | 441 |
| Service occupations (403-472): | |
| Private household occupations (403-412)... | 11 |
| Protective service occupations (413-432)... | 17 |
| Service occupations, except protective and household (433-472)... | 220 |
| Farming, forestry, and fishing occupations (473-502)... | 50 |
| Precision production, craft, and repair occupations (503-702)... | 230 |
| Operators, fabricators, and laborers (703-902): | |
| Machine operators, assemblers, and inspectors (703-802)... | 82 |
| Transportation and material moving occupations (803-863)... | 53 |
| Handlers, equipment cleaners, helpers, and laborers (864-902)... | 37 |

## Transportation and Access

Rockport is at the tip of Cape Ann, surrounded on three sides by the Atlantic Ocean and on the fourth by Gloucester. It is about 40 miles from Boston, accessible by Route 128 and 127. Rail service is available to Boston. Nearby Beverly has a municipal airport.

## Hospitals, schools, libraries, museums

There is one school that includes K-12, eight churches and a former school building is being renovated for a new library.[40] Museums include the Rockport Art Association and the Sandy Bay Historical Society and Museums.

There is no hospital but there is one long-term care facility.

## Fisheries Profile

### Community

For many years, the town of Rockport leased Pigeon Cove wharf and breakwater from its owner, Pigeon Cove Land Corporation, and then subleased the wharf to commercial fishermen and recreational boat owners. Fishermen had shanties and coolers for storing catch, bait and gear on the premises. In 1993, the Land Corporation decided to lease to a new developer instead of allowing the town to renew its lease. The developer raised rents by 800 percent, effectively denying access to commercial fishermen. The developer erected barriers that also prevented townspeople from accessing the waterfront. Fishermen, recreational boaters and other townspeople joined forces in opposition to this effort. Eventually, the developer abandoned the lease and the Land Corporation agreed to sell the Pigeon Cove wharf and breakwater to the town of Rockport.

Pigeon Cove commercial fishermen and recreational boat owners established a non-profit corporation named The Pigeon Cove Boatowners Association Inc. that agreed to purchase the wharf, breakwater, and attached buildings and structures from the Land Corporation.

The association immediately leased the breakwater and wharf to the Town of Rockport, so that the Town could be in a position of controlling, insuring, and maintaining the property and thereby qualifying for public funding to repair previous storm damage. Repairs to the breakwater, funded by FEMA, were completed during 1995, the first major investment in the property since the Army Corps of Engineers dredged the harbor in the late 1980's, when it was designated a federal anchorage.

### Commercial fishing and fisheries-related employment

#### Harvesting

The 1997 federal permit files listed 46 vessels for Rockport and Pigeon Cove.

---

[40] http://www.state.ma.us/dhcd/iprofile/252.HTM

256                              Gloucester & NS Sub-region

*Support Services*

**Pigeon Cove Fishermen's Co-operative**

The coop ran a store from 1996 to July 1999.  A poor shrimping season, slow business, federal regulations, and the demands of running a retail store while trying to carry on as full-time fishermen, led to the store's closure.  "What happened was over the last year, as the fishing restrictions kept affecting the financial stability of the co-op, we decided to reduce our expenses and focus on our core business," said Carl Masi, one of the co-founders of the coop.[41] The store has since been reopened by entrepreneur Bill Linn and renamed Pigeon Cove Lobster Co. The coop is still the principal supplier for the store.

**Pigeon Cove Boatowners Association**

A non-profit corporation formed by commercial fishermen and recreational boaters to purchase the wharf and breakwater, buildings and structures of Pigeon Cove formerly owned by Pigeon Cove Land Corporation.

---

[41] http://www.rockportlobster.com/gdt.shtml

Exhibit B
(Part 6)

## 6.0 Summary

## 6.1. Defining the Community

The traditional definition of a "fishing community" as a parochial place is rarely reality now. Even the most isolated settlements in Downeast Maine have some capital networks that lead in and out of the community for regional, national and international exchange. Indeed, the stereotype of an independent, self-sufficient fishing community may never truly have been accurate. Some portion of the harvest has always moved outside the community in exchange for products and services otherwise unavailable. It is true that at one time fishing-dependent communities more uniformly recognized the importance of the industry to their community and valued each sector. Furthermore, when fishing was viewed as a prosperous industry, more children in fishing families naturally gravitated to some aspect of the industry. Today, parents are encouraging children to finish high school and attend college so that varied career options are open to them. In rural areas such as Downeast Maine the consequence has been that children out-migrate.

Economies of communities have purposely been diversified so that no single industry dominates. Facing the loss of young educated people, Maine is actively engaged in economic development of alternative industries. Nevertheless, the fishing industry continues to contribute to the viability of coastal communities. Contributions are not always easily traced to the fishing industry since they may be indirect. For example, it is obvious that gear suppliers, vessel services (e.g., repair), fuel suppliers, grocers and ice producers generate income from the harvesting and processing sectors. But what value does a community place on the existence of competing oil companies? In some places, a community has more reasonable-priced heating oil because the existence of the fishing vessels' fuel needs is sufficient to support more than one oil supplier, so the competition keeps prices from sky-rocketing.

One of the ways that reductions in fishing days has affected communities is that there has been a net loss of jobs in the industry. The reductions also resulted in a lower demand for services and supplies. Consequently, the numbers of suppliers at the community level have been reduced and there is less competition acting as a price check. In some cases, the loss of locally available supplies has driven fishing industry participants to broaden their networks to seek supplies regionally, nationally and even internationally.

Some of the fishing industry services have concentrated in urban settings, enabling the suppliers improved access to labor supply and to a more diversified network of total capital flows. For example, except for minimal quantities for local restaurants, the bulk of fresh fish processing moved to Boston. These processors not only have access to a diverse labor pool, but they can obtain product from vessels all along the coast, and importantly, they can ship their product nationally and internationally out of Boston's airport.

While the urban based fisheries services may not be sufficiently grand to make that urban area dependent on fishing, the fishing industry may be dependent upon the urban area and the fisheries services available there.

## 6.2. Themes

Different levels of fisheries dependency for each of the eleven sub-regions we considered in this research were suggested by indices of occupational dependency, infrastructure differentiation, levels of gentrification, and descriptive profiles. What was particularly intriguing, however, was that not every sub-region with similar statistics evaluated their fisheries in the same way. In some cases, the historical association with fishing is appreciated and enlarged upon, incorporated even while change is embraced. In others, it is abandoned for newer, cleaner pursuits. There were common themes, however, that arose throughout the region.

### SCIENCE & MANAGEMENT

Communication issues and assessments
Fishermen were virtually unanimous in their agreement that communication with federal managers was less than ideal.   Stock assessments were also almost universally considered wrong (i.e., fishermen and scientists "strongly disagree" about stock assessments). Fishermen signaled very clearly that they do not understand the way scientists assess stocks. The lack of interaction among scientists, managers and fishermen has contributed to misunderstandings as well as suspicion about managers' and scientists' motives. The research team commends recent efforts to promote collaborative research and suggests that all avenues for increasing interaction and communication among scientists, managers and fishermen be explored.

Despite the disagreements with scientists about the assessments, fishermen almost universally agreed that some regulation is necessary and that some of the management measures have been effective in helping the stocks recover. Conservation is now considered rational and many of the fishermen's complaints about management revolved around the inability of the existing system to react quickly (real time) to observed changes or situations. Many are hopeful that collaborative research will lead to improvements in management.

Sustainability
Fishermen frequently point out that traditionally fishing was pursued cyclically. Particularly among the inshore and smaller vessels, flexibility was key to making a year's pay. The gear used or species targeted by a given vessel often changed seasonally or annually. Prices, availability of target species and skills of the individual fishermen would influence the choices made. Furthermore, some fishermen did not fish year round, but had other trades they pursued at different times of the year.

Today, the reliance on single species management with license limitations is criticized as severely hampering the resilience of the fleet and fishermen's communities. Those communities with small but active fleets indicate that fishing contributes to the overall productivity and total capital flow of the community, even if it is not necessarily a dominant feature in the community. Most fishermen do agree that regulation is necessary and that there must be some controls on access.

Environmental factors
Some fishermen are concerned that there are anthropogenic sources of environmental impacts that are ignored because they are complicated or difficult to assess. Instead, fishermen and overfishing are blamed for every problem. Chlorine and the plethora of other cleaning products, nutrient run-off, sewage outfall pipes, antibiotics, etc. are all possible contributors to the downturns in stocks. Like overfishing, these are believed to be part of the problem and therefore, should be considered when solutions are sought.

Equity

Fairness is a constant theme in fishermen's discussions of fisheries management. A perception of inequity in regulations has been cited as contributing to a breakdown in a sense of community among fishermen even within ports. Fishermen within a port may use different gear and target a variety of species, but with a few exceptions, most tolerate other's choices and criticize management for unfairly benefiting one type of fishing over another, or one sub-region over another.

## COMMUNITY

Working Waterfront

As our nation's working capital growth increasingly is bound to the service sector and white-collar pursuits, a working waterfront devoted to fishing is appealing as an exotic, little understood enterprise. Like any primary producer of food, though, the fishing industry is also messy and smelly. A community with a small population that is highly dependent on small-scale fishing may successfully combine housing and working waterfronts, especially in those places where fishing is valued as a "way of life" that has been passed on family to family. In larger communities, especially where the associated vessels are also large, the working waterfront is fascinating, but like any industrial zone, is not meant to be residential.

When the harvesting sector was bringing in larger quantities of fish, the shoreside services expanded. Waterfront property owners generated income from the harvesters that used their services based on the quantity landed. They also made a profit from the supplies they offered. As fishing days were restricted, the income of the waterfront property owners fell. At the same time, the tourist industry expanded. Economic growth that generated an increase in disposable income has led to the inflation of coastal property values.

Except where the waterfront property is protected by zoning laws or special legislation (Massachusetts' Chapter 91 and Designated Port Areas), the demand for housing, restaurants and other non-water-dependent use has increased. Because much of the demand is for seasonal property, where the community has allowed unfettered sales of waterfront property, they have sometimes effectively lost their off-season community "center." Seasonal property is often shuttered in winter and businesses once used as gathering places for year round residents are transformed to appeal to tourists. In addition, areas available to the harvesting and processing sectors have become less convenient, crowded and more expensive.

As demand increases from "wash ashores," people "from away," people with sufficient funds to buy second homes, or those who can afford seasonal business ownership competing for limited waterfront property, the prices escalate. Some of the waterfront property owners find their taxes have leaped or the costs of repairing old wharves has become prohibitive. Where the waterfront property is not confined by zoning or other restrictions to water-dependent use, the fishing industry tends to be squeezed into narrow confines with higher costs.

Nevertheless, there are some communities that have decided that support of their fishing industry is beneficial, both because it provides year round productivity and because it can be used to attract additional commerce in season.

Ethnicity and/or religion

Where ethnic or religious associations are identified with the fishing industry, there seems to be a greater inclination to replicate the social and human capital invested in the industry.

Children

Most of the key respondents who were harvesters indicated a high level of satisfaction with their job. Nevertheless, most questioned the wisdom of selecting fishing as an occupation for the future. Few recommend the industry to their children, particularly as harvesters since

the both the conditions of the stocks and the management regime are unpredictable. Thus the social capital is not being replicated. Children are not going into fishing due to anxiety, attraction other pursuits, and because there are fewer opportunities (fewer crew sites).

Education
Key respondents in at least two ports noted that fisheries educational programs had been an important source of reliable entrants into the industry. In one case, it was a high school vocational program and the other case it was a college program. When these ended, it immediately became more difficult to find and hire reliable and knowledgeable crewmembers.

Education is acknowledged as playing a more important role than was recognized in the past. Gloucester Fishing Family Assistance Center is helping fishermen to obtain their captain's license. All the members of the first class succeeded in obtaining their 100-ton license from the Coast Guard after the course. The license is attractive both because the Coast Guard and other fisheries agents treat the holder with more respect and because it allows the holder to compete for collaborative research funds. (On the research projects, the boat is paid and thus is considered "for hire" which means the captain must be licensed.)

Ties that bind
Fishing has an attraction that sometimes lasts through college or retraining, causing individuals to return to fishing even after trying other occupations. A majority of the key respondents argued that fishing is "very important" to their community, though many added that those outside the industry might not necessarily agree.

Nevertheless, some of the camaraderie that used to exist among fishermen has disappeared. Fishermen comment that they now have little opportunity to meet and relax with fishermen from other communities or fishermen who use other gear, etc. in a social setting. Conflicts that may have been worked out in the past over a beer cannot be easily resolved. There are, in general, fewer opportunities for social interaction among the fishermen and their families both within communities and between communities.

Women
Traditionally, spouses of fishermen acted as "shore captains," often providing such services as keeping the books, contacting marine supply houses for parts, delivering food, etc. In addition, several of the ports have well-organized groups of fishermen's wives who attend, or send representatives, to fisheries management meetings to provide input to the managers and return with information for their community. Some women also worked as sternmen or crewmembers (especially on day boats). Spouses of Maine lobstermen developed a "value-added" industry of crab picking, but HAACP regulations have all but eliminated this cottage industry.

Changes in the economy of both fishing and the society at large, perhaps also changes in values, have affected this pattern. More women now work outside their homes in jobs unrelated to fishing. Key respondents noted, however, that the primary motivation for many is to work in order to obtain health care benefits.

## BEYOND THE OBVIOUS

Importance of the networks-subsidiary occupations
While the frozen fish sector of the fishing industry, with its imported blocks of fish (i.e., "borrowed" biophysical capital), does not directly support the harvesting sector of the New England NRR, some of the sector's inputs do derive from local suppliers. Packaging, dry ice, equipment maintenance and labor are just some of the inputs often purchased locally. Trucking and some supplies associated with batter and breading may be purchased

regionally or nationally.  As with some of the communities that have been found by this research to be "essential providers," it may be that the frozen fish sector of the industry plays an unrecognized role in assuring the viability of secondary industries that in turn contribute to the success of the fresh fish sectors.

In addition, some of the larger frozen fish processing plants are unionized, thus offering higher wages and a more stable work force than similar plants. In contrast, some of the non-unionized firms rely on a handful of salaried employees and contract labor for working the line.  The unionized companies thus have a greater impact on the local economies through workers' expenditures and taxes than via raw product purchase.

## CAUTION

Fail Safe Fisheries
Lobstering has been the fishery that groundfishermen have turned to when restrictions on days, on gear (gillnets), and catch quotas have made it difficult to continue "paying the bills."

## 6.3.  Sub-region Summaries

<u>Connecticut</u>
Connecticut's fishing industry is smaller in number and boats are more widely dispersed among communities characterized by a devotion to the tourist industry than is true for most of the New England NRR.  Neither the sub-region, nor the ports profiled appear to be fisheries dependent since other industries predominate.  Nevertheless, the industry makes an important contribution to several coastal communities.

Lobsters, some groundfish and whiting are currently the primary target species for Connecticut's fleet.  One of the most intractable problems for the fishing industry in Connecticut seems to be waterfront access.  Gentrification of the coast has driven up prices and made fishing industry-related businesses unwelcome in some areas.  For even the current level of modest fishing effort to continue, protection of existing infrastructure should be a priority for coastal communities.

Despite a crisis in the lobster fishery associated with catastrophic event in Long Island Sound (a lobster "die-off"), there are some indications that the numbers of fishermen are actually increasing.  In 2000, there were 497 fishermen listed on the license database, an increase of 100 fishermen since 1999.

<u>Rhode Island</u>
Its location at the southern reach of many Gulf of Maine fish species and the northern reach of mid-Atlantic species has created a fishing industry that is flexible and wide-ranging.  While Rhode Island has become gentrified, relegating the fishing industry to relatively few ports, the port of Point Judith remains strikingly successful. In 1999, Pt. Judith landed 72.5 million pounds worth $51.2 million dollars, second only to New Bedford among New England ports.[1]  It also ranked 8th in value of landings among major U.S. ports in 1999 (9th in 1998).  Rhode Island itself was ranked third among the New England states in both landings and value in 1998 and 1999.

Of the eleven sub-regions this research has identified, Point Judith ranks fifth on the fishing infrastructure differentiation scale, in keeping with the landings and their value.   What is somewhat misleading, however, in considering Rhode Island as a sub-region is the occupational dependency ratio.  Rhode Island ranks 7th out of the eleven sub-regions on this index.  The sheer size and value of the landings in Point Judith would seem to argue for a higher ranking, but since so little of Rhode Island outside of Point Judith has significant fishing employment, the ranking is low.  This is one case where the sub-regional perspective, if considered without reference to the details pertaining to individual ports, could mislead investigators.

The tourism emphasis in Rhode Island affects fishermen most seriously through the competition for land use (water access).  Competition with recreational fishermen was also noted.  And competition for fishing grounds among fixed gear fishermen also exists (lobster pots kept out year round to hold bottom).  The smaller ports of Rhode Island, limited in numbers of boats and infrastructure, rely on Point Judith for supplies and services, Newport relies on New Bedford for whatever is not available in town.

Several niche fisheries are found in Rhode Island, including live-fish fisheries for sea ravens and sea robins.  Shellfishing is also an important part of their annual fishing cycle for some and is particularly noteworthy in Tiverton.

---

[1] *Fisheries of the United States*, 1999.  U.S. Dept of Commerce, NOAA, NMFS.  Prepared by Fisheries Statistics Division.  Available at http://www.st.nmfs.gov/st1/fus/fus99/index.html

New Bedford/South Shore
Ranked second in the nation for the value of its commercial fishery landings in 1999, New
Bedford/Fairhaven continues to play a critical role in the fisheries of the subregion. The
city of New Bedford has experienced periods of boom and bust in a variety of industries
including whaling, textiles and fishing. Though landings fell sharply in 1994 due to severe
restrictions on scallop fishing, the fishing industry showed an unusual willingness to work
together and contributed funds to a research effort that ultimately made it possible to
revamp management regulations for the scallop sector. The success of management and
fishing industry cooperation is reflected in the $129.9 million worth of fishery landings in
New Bedford in 1999.

The New Bedford/Fairhaven fleet has strong ethnic affiliations with the Portuguese
dominating the dragger sector and Norwegian and Yankees most common among scallop-
boat owners. The Portuguese in New Bedford have developed extensive neighborhoods
with shops and services that cater to Portuguese-speaking customers. Consequently,
English language acquisition was not a high priority among immigrants. This hinders some
efforts to move fishermen out of the industry.

Until recently, New Bedford had a relatively depressed economy. The city's median
household income and per capita income were both well below the state average. Fishing
however provides a relatively good income, especially when compared to alternative jobs
requiring similar skills and levels of education. So, while the employment indices we used
ranked New Bedford/South Shore fifth out of the eleven sub-regions for fishing dependency,
the alternative jobs available that theoretically make the city less dependent on fishing
than three Maine sub-regions and Massachusetts' Cape and Islands may not be strictly
equivalent in income and prestige.

New Bedford does tie Portland (Maine) for highest on the fishing infrastructure
differentiation scale. Given the quantities of landings, vessels, etc. this is certainly to be
expected. It also ranks 10th on the gentrification scale. This is consistent with it being a
city with diverse tourist industry-related attractions and services.

In addition to the high level of landings and their value, New Bedford's fishing industry has
a highly developed processing sector. There is diversity in this sector of large international
firms, medium and small firms, including both companies that handle only frozen imported
product and firms that buy local fresh product.

Cape Cod and the Islands
The Cape and Islands is third, following Downeast Maine (1) and Upper Mid-coast Maine
(2), on the fishing dependency index that is based on the employment indices used in this
project. As in Maine, fishing is a natural occupation for those who live in such proximity to
fertile fishing grounds. Furthermore, also similar to Maine, distances to major population
centers with diverse alternative employment are significant. Consequently, only the tourist
industry rivals fishing in importance. Because tourism is limited to the mild or warm
seasons, fishing is often regarded as an appropriate year-round enterprise.

The fishing infrastructure differentiation scale developed for this project looks at individual
ports, but several of the Cape Cod & Islands ports are listed among the top ports. For
example, Chatham has a ranking of four, Vineyard Haven is ranked as nine, and Sandwich
is 14 out of the 36 ranked. On the gentrification scale, Vineyard Haven is ranked 5th and
Provincetown and Chatham are ranked 13th and 14th respectively. Despite gentrification,
these ports are actively engaged in the fishing industry.

Provincetown-Chatham are lumped together by *Fisheries of the United States, 1999.*[2] In
comparison to other major U.S. ports 1998-99, Provincetown-Chatham numbered among

---

[2] *Fisheries of the United States*, 1999. U.S. Dept of Commerce, NOAA, NMFS. Prepared by Fisheries
Statistics Division. Available at http://www.st.nmfs.gov/st1/fus/fus99/index.html

the top 50 ports with landings of 17.8 million pounds in 1998 and 20 million pounds in 1999. The value of these landings was $10.2 million in 1998 and $12.9 million in 1999. While the price per pound was approximately the same as found in Pt. Judith, a port to which Chatham is often compared, the quantities landed were much smaller.

Chatham is the most active port of the Cape Cod & Islands sub-region. Though small, the town has an important longline/hook fleet in addition to gillnetters and lobster fishermen, a thriving shellfish industry and a well-developed support industry. Innovation and flexibility are hallmarks of Chatham fishermen. The development of niche fisheries (e.g., dogfish and now, selling to the live fish market) is something that respondents reported with pride.

Chatham also has a large retired population (almost a third of the whole). As noted elsewhere, increased cost of property and lack of year round rental property is a major concern.

Provincetown with its predominantly Portuguese and Portuguese-American, day-boat dragger fleet has been severely constricted in the past decade or two. A proud history of family boats has not been sufficient to retain more than a modest presence in the town. Nevertheless, the attraction of a working waterfront to the artists and tourists who flock to Provincetown, as well as a few innovators in the industry keep the small numbers of fishermen going.

Vineyard Haven on Martha's Vineyard also boasts historical attachment to the fishing industry, but like Provincetown has diminished in size and importance. Nevertheless, Vineyard Haven does retain adequate fishing infrastructure and has a demanding market in the tourist season.

Boston Area

The city of Boston presents an interesting dilemma for assessing fishing dependency. While once there were thriving harvesting and processing sectors, very few boats tie-up in Boston now. A handful of draggers and a small lobster boat fishery are all that is left of the harvesting sector. Furthermore, Boston is not numbered among the top fifty ports of the U.S. for landings; it is ranked low (10 out of 11) in terms of employment dependency and low for fishing infrastructure differentiation (29 out of 36). It does not, however, rank high in terms of gentrification (26 out of 36).

Boston is a complex urban environment, the metropolitan center of a cluster of neighboring cities and towns, the state capitol with a robust economy featuring a multiplicity of industries ranging from biotech to farmers' markets. The medical industry, higher education facilities, and tourism are just a few of the businesses that engender the flow of all forms of capital in and out of the area. Therefore, fishing-related business is dwarfed by some of the others. Even so, we maintain that it is significant not only for its role as a component of Boston's economy, but also for its importance in serving dispersed, smaller communities that are more obviously dependent upon fishing and fishing-related businesses. Boston remains an **essential provider** of fishing-related support services.

The importance of Boston to the New England region is very significant, since it is a nexus for the international transshipment of fishery products throughout New England. The only other major point of transshipment is from New York through Fulton's Market. However, Boston is more central to the overall flow of produce, and boasts a large number of seafood brokers as well as larger seafood companies with fleets of trucks and major facilities.

In addition to its role in transport, Boston also has an active processing sector, brokers and wholesale marketers.

As far as the other ports in the sub-region are concerned, small but significant activity centers in Plymouth and Scituate. Plymouth has primarily lobstermen.

Gloucester

Gloucester and the North Shore Sub-region is ranked, according to the employment indices used herein, eighth (out of eleven) for fisheries dependency. The reason for its low ranking compared to the other sub-regions is the availability of alternative employment in the area. This ranking is countered by the other indices we have been using in the study and confirms our intuition that employment indices tell only a portion of the story. Significantly, Gloucester itself ranks third (following New Bedford and Portland) in the index of fishing infrastructure differentiation. Furthermore, it is 21st (out of 36) on the gentrification scale. The profile of Gloucester describes a community that is committed to its fishing industry, whose cultural, human and economic capital are all linked to the industry.

Pure numbers of fish landed and the value of those landings also indicate the significance of the fishing industry to Gloucester. *Fisheries of the U.S., 1999*[3] reports that Gloucester landed 107.1 million pounds of fish in 1998 (11th of the 50 major U.S. ports) and 49.7 million pounds in 1999. Though the lower weight slid the port down to a ranking of 22, the value of the landings per pound doubled in 1999. In 1998, the landings were worth $28.4 million whereas in 1999, the landings were worth $25.9 million.

The city of Gloucester is committed to the fishing industry, regarding it almost as a sacred heritage since its founding in 1623. Politicians and other community members also regard the fishing industry as important to their community. A Sicilian and Sicilian-American population is particularly prominent in the dragger finfish fleet.

Other ports in the Gloucester sub-region are important components of the fishing network. Rockport's fleet moored in Pigeon Cove has an unusually good relationship with both the townspeople and recreational boaters with whom they formed a non-profit corporation to retain control and access to the waterfront. Marblehead's very small fleet has a ready market for its product in the local restaurants and markets. The small ports surrounding Gloucester rely on the city's fishing infrastructure to enable their fishing effort to continue. Like Boston and New Bedford, Gloucester should be classified as an essential provider to New England's fishing industry.

New Hampshire

New Hampshire ranks low on the scale of fishing-dependency (9th out of the 11 sub-regions). Nevertheless, the sub-region has a small, but active fleet. The short length of New Hampshire's coastline condenses the marine-dependent uses into a small area, relieved by access to river waterfront areas. Historically, New Hampshire's harvesting sector benefited from proximity to rich fishing grounds, adapting their fishing techniques and patterns accordingly. A recent closure of nearby grounds for management therefore has made fishing less accessible to the moderate-sized boats typical of the area. Fishing more distant grounds demands larger (i.e., safer) vessels and more intense periods of fishing (longer trips) than what the New Hampshire fishermen were accustomed to undertake. Furthermore, closure of familiar grounds makes success in fishing more difficult.

Although none of New Hampshire's ports rank in the top 50 of the major ports of the U.S., Portsmouth's fishing infrastructure is sufficiently developed to rank it 6th out of 36 New England ports whose infrastructure was analyzed for this project. The key element of the infrastructure is a state-owned pier that protects waterfront access and provides the focal point for fishing support services. Such protection of the land-based services is critical since Portsmouth ties Kennebunkport, ME and Plymouth, MA for the most gentrified port in the New England NRR. As long as their necessary service industries are protected, it may be said that the fishing fleet of Portsmouth benefits from the town's gentrification. The product the fleet lands is very fresh and often finds a market in the local restaurants or stores.

---

[3] *Fisheries of the United States*, 1999. U.S. Dept of Commerce, NOAA, NMFS. Prepared by Fisheries Statistics Division. Available at http://www.st.nmfs.gov/st1/fus/fus99/index.html

412                                        Summary

Gillnets and lobster pots are the gear types most often employed by New Hampshire's fleet. In addition to groundfish and lobsters, the fleet also targets shrimp and/or tuna in the appropriate seasons. Before being hemmed in by regulations, more of the fleet counted on being flexible, switching target species and gear as opportunities presented themselves. Now, one company is starting to get more involved in the herring industry.

Southern Maine
Southern Maine ranks 6th on the occupational fisheries dependency scale developed by this project. York ranks 21st on the infrastructure differentiation and Kennebunkport ranks 15th. On the other hand, Kennebunkport is first on the gentrification scale, tying with Plymouth, MA and Portsmouth, NH. York is ranked 17th.

Some respondents noted that some of the ports of Southern Maine could more appropriately be considered as part of the New Hampshire sub-region since their fishermen belong to the Portsmouth Cooperative where they land their fish. They also fish on the same grounds, using similar gear or techniques as the New Hampshire fishermen. While acknowledging the link of the fishermen who are in the Piscataqua River watershed, we retain the separate sub-region to accommodate the structure imposed by our colleagues' MARFIN-funded project in economics (IMPLAN).

Southern Maine is dominated by the lobster industry, but as in Portsmouth and Hampton, fishermen often switch to blue fin tuna in season.

Lower Midcoast
Its geographic location demands that Portland be analyzed as part of Lower Midcoast Maine. Portland's characteristics however set it sharply apart from smaller fishing ports in the sub-region. Midcoast Maine is described by their Chamber of Commerce as primarily "small with annual town meetings, a sense of community, 'Yankee independence,' and rural lifestyles." In contrast, the inhabitants of Portland live in an urban setting, a city (and City Council) with an increasingly diverse population employed in a variety of enterprises. Portland is not the only anomaly in the sub-region. Some of the largest employers (e.g., Bath Iron Works) in the state are located in Lower Midcoast Maine, with jobs in industrial, military and service employment. The availability of alternatives to employment in fishing in the sub-region is sufficient to rank Lower Midcoast as 4th out of the eleven sub-regions for fishing employment dependency.

Portland is a primary fishing port and essential provider to the regional industry. Portland is tied for first place with New Bedford for fishing infrastructure differentiation and 8th out of 36 for gentrification. Portland ranked 21st among major U.S. ports in quantities of fishery products landed in 1999 with 55.6 million pounds but was 11th in value at $42.4 million.[4] The value per pound of landings (about 76 cents) was second only to New Bedford ($1.51) among New England ports (though followed closely by Point Judith at 71 cents).

Portland is perhaps most noteworthy for its role in bringing the first display auction of fish to New England. This caused a paradigm shift in the marketing of sea products with its emphasis on honest weights, purchases of specific lots of fish, quality handling associated with premium prices and fast payment. The Portland area also has several important fish processing plants.

Portland has also signaled its support of the fishing industry by building and maintaining a city-owned pier, creating zoning protections of the working waterfront and by hiring a fisheries program manager.

Gentrification is an issue of importance in the Lower Midcoast for many of the same reasons noted elsewhere, that is, the demand that waterfront property be used for tourist attractions,

---

[4] Ibid.

attractive housing, or other non-water-dependent use drives up prices and concomitantly, taxes, diminishing available infrastructure for fishing- related activities.

The smaller ports in Lower Midcoast rely on fishing to sustain their communities year round. Though many have large summer populations, year round employment opportunities outside of fishing are often limited.  While groundfishing was once an important part of an annual round of fishing activities marked by flexibility and diversification, restrictions have caused more fishermen to specialize in lobstering and shrimping (in season).  Clamming, urchining and hagfish are of varying degrees of importance in the sub-region.  Herring and herring processing are also significant.

<u>Upper Midcoast</u>
While there has been some effort to diversify the economy here, Upper Midcoast Maine is still highly reliant on marine-related enterprise.  In fact, Upper Midcoast was ranked second out of the eleven sub-regions for fishery dependency based on occupational indices.  The majority of coastal communities in this sub-region have significant fishing activity or a significant number of people who fish.

Stonington/Deer Isle (Hancock County) and Rockland (Knox County) were ranked 7th and 8th respectively on the fishing infrastructure differentiation scale.  Furthermore, Rockland ranked 28th among major U.S. fishing ports in 1999 for quantities landed at 35.8 million pounds and 21st for quantities in 1998 with 39 million pounds.  These landings did not, however, have sufficient value to permit Rockland to appear among the top 50 U.S. ports in landings' value in either 1998 or 1999.

Gentrification in this sub-region is both high and low.  Rockland, for example, was 5th (along with Newport, RI and Vineyard Haven, MA) on the gentrification scale while Stonington/Deer Isle was 28th out of 36 ports.

With the downturn in groundfish coupled with severe restrictions on gillnetting, more Stonington/Deer Isle fishermen have turned to fishing almost exclusively for lobsters and crabs.  In addition there is limited scalloping, urchining, shrimping, clamming and one herring purse seiner.  Fishing as a "way of life" is highly valued here and fishermen take pride in their maintenance of a conservation ethic.

Both tourism and service-based industries have increased in Rockland.  Once a significant groundfish port, Rockland's fishing industry has turned to other species.  Lobsters and herring now predominate with landing, marketing and shipping taking precedence over harvesting and processing.  Rockland plays a key role in the distribution chain of both herring for bait and the movement of product to larger markets (Boston and beyond).  Rockland is another example of a community that is probably too diversified to be able to classify it as fisheries-dependent, yet it provides sufficient services to nearby fisheries-dependent communities to be classified as an "essential provider."

<u>Downeast</u>
Downeast Maine has a long history of devotion to the fishing industry and with it, periods of prosperity.  Not all this sub-region's coastal communities are dependent on fishing, but a significant number rely on fishing as one contribution to a sustainable livelihood.

 When sardines were popular, weirs and stop seines were used by fishermen to catch the herring and over 40 canning factories employed residents of Cobscook Bay.  As the sardine industry declined, fishermen turned to urchin harvesting, clam digging, lobstering, finfish fishing and salmon aquaculture.  Niche fisheries for sea cucumbers, elvers and periwinkles provide others with flexibility in their annual cycle.  Blueberry harvesting and forestry products supplement incomes from marine enterprise.  Boat building has also long been a tradition in this region with specific boat designs named for their original builder, e.g., an "Alvin Beal."

414                                                  Summary

Downeast also faces serious constraints on economic prosperity, however. The extreme tides and currents create turbulent water in Passamoquoddy and Cobscook Bays limiting the types of fishing available in nearshore waters. The Hague Line limits access to rich fishing grounds offshore. The proximity to Canada increases competition for markets, supplies for processors, etc. At the same time, Washington County is sufficiently distant from U.S. commercial and urban centers to be at a disadvantage for economic development. In fact, Washington County is the poorest county in New England.

Nevertheless, there are economically successful fishermen, some with several boats that also package, freeze, market and truck their catch and employ a network of family members. Where lobstering is productive, young people are still going in to the fishery. Downeast is also the only subregion in New England to have a substantial aquaculture presence.

Though parents are encouraging their children to pursue education, they fear that this will lead to the children's' out-migration since there are few attractive jobs available in the subregion.

Downeast fishermen also have some concerns related to management that derive from their wanting to protect their more traditional "way of life" that is based on what they view as smaller-scale fishing, flexibility, lower environmental impact. For instance, while local fishermen may pick at a scallop bed all season, landing enough for their family's needs, large vessels may sweep in and devour the bed in a matter of days. Because of the days-at-sea regulations, large vessels that in the past consistently worked offshore grounds attempt to fish closer to shore to minimize steaming time. In some cases, the regulations seem to effectively encourage this. The date that scallop fishing opens off Downeast Maine is earlier than the rest of Maine, so for two weeks or so, all the scallopers in the state can head Downeast.

## 7. 0 Conclusions and Recommendations

We view the research that this report is based upon as a "work in progress." Like the species they depend upon, fishing industry participants and community stakeholders are constantly adapting to change in their lives and livelihood. Static portraits drawn by individual community studies at single points in time cannot convey the dynamic dimensions characteristic of this industry or its people.

We feel very strongly that the collection of socio-economic data should be institutionalized. There is currently no database of consistently gathered information about fishing and fishing-dependent communities in the region. Certainly, there is nothing to correspond to the 30-year biological data that National Marine Fisheries Service has been collecting via their assessment cruises and landings data. Nevertheless, fisheries managers are forced to select among regulatory alternatives, knowing that they are supposed to weigh impacts on communities, but having little or no data upon which to judge potential effects. Furthermore, because of the complex nature of the industry and its complicated network of total capital flow, many coastal communities have limited information about the direction or consequences of change that affect the industry or their own community.

This project made an effort to reflect the goals and concerns of participants in the fishing industry and community members in the development of these profiles, however, we recognize that the generation of more complete profiles would require the active and on-going participation of a broad group of stakeholders. Fishing industry participants, managers, scientists and members of fishing communities could contribute information through participatory research that is not readily accessible to a researcher from outside the community being studied.

A community-based program for gathering and assessing data would be an excellent first step. This study, however, also reminded us that details collected at the community level apply well beyond the arbitrary political and geographic boundaries of any single community. Community studies that are limited in time and space provide some understanding of the impacts of regulatory change, for example, but are unlikely to address either the cumulative impact of multiple regulations, or the impacts of regulations in a wider geographic context. The capital flows must be charted over time at local, sub-regional, regional, national and international levels to trace effects and predict change.

The significance of the social structures and institutions described in the data collection effort may be lost if the data and the analyses are confined to single communities. For example, we have noted that Boston's Logan airport is the predominant air freight center in the region. This could have critical regulatory import affecting both individual state's rules and international agreements. By way of illustration, a lobsterman recently noted that Downeast Maine lobstermen are fighting proposed gauge increases and may decide to ignore interstate rules set by the Atlantic States Marine Fisheries Commission. However, he explained, if the Maine lobstermen do land lobsters that are smaller than those allowed by Massachusetts, they will not be able to air freight their smaller lobsters via Logan. The same restrictions would also apply to Canadian lobsters from the Maritime Provinces. While in theory, Canadians could ship from Halifax and Maine lobstermen out of Portland; neither airport has a significant air freight capacity and opportunities for airfreight distribution would therefore be limited.

Other cross-community impacts stem from both biological trends and regulations, for instance, the migration of vessels from one port to another may be associated with the movement of their target species, better marketing strategies, and/or simply access to fishing grounds unimpeded by regulatory closed areas. The effects of vessel migration are likely to be different for the homeport and the recipient port.

416                                    Summary

We encourage National Marine Fisheries Service to work with communities and regional groups to develop a database for social science that corresponds to their long-term biological database. We applaud recent efforts of the New England Fishery Management Council staff to learn from fishing communities about how they have been affected by amendments to the Multispecies Fishery Management Plan since 1994. The Council staff held a series of 10 meetings in the region during November and December 2000 that attracted about 400 people. Two reports, one on social impacts and the other on economic impacts, have been prepared and will be incorporated into the impact assessment required for the next regulatory change in the management of groundfish.[5]

The ideal is to work towards not only collaborative information gathering but also a review process for the analyses that brings together diverse stakeholders from a variety of communities and social scientists representing multiple disciplines. Again, the review of biological data in NMFS' annual SAW provides precedent.

We anticipate that the work reported here will serve as a baseline for the long-term collection of socio-economic data. The first step has been taken...

---

[5] http://www.nefmc.org/

# 8. Literature[1]

Acheson, James, ed. 1994. *Anthropology and Institutional Economics*. Lanham, MD: University Press of America.

Acheson, James. 1987. The lobster fiefs revisited: economic and ecological effects of territoriality in Maine lobster fishing. In McCay, Bonnie and James Acheson, eds. *The Question of the Commons: The Culture and Ecology of Communal Resources*. Tucson: University of Arizona Press.

Acheson, James. 1975. The Lobster Fiefs: Economic and Ecological Effects of Territoriality in the Maine Lobster Industry. *Human Ecology* 3:183-207.

Acheson, James, ed. 1980. Essays on the Social and Cultural Aspects of New England Fisheries: Report to the National Science Foundation, Vol. 2. Orono, ME: University of Maine Sea Grant College Program.

Acheson, James, Ann Acheson, John Bort, & J. Lello. 1980 The Fishing Ports of Maine and New Hampshire: 1978, Report to the National Science Foundation, Vol. 1A. Orono, ME: University of Maine Sea Grant College Program.

Ahlburg, Dennis A. 1993. "The Census Bureau's New Projections of the US Population (in Data and Perspectives*)." Population and Development Review*, Vol.19, No. 1. (March), pp. 159-174.

Ahlburg, Dennis A. and James W. Vaupel. 1990. "Alternative Projections of the U.S. Population (in Commentary and Comment)." *Demography*, Vol. 27, No. 4. (November), pp. 639-652.

Aihoshi, Terry and Margaret Rodman. 1992. "Narratives of Place, Experience, and Identity." Session presented at the 91st Annual Meeting of the American Anthropological Association, San Francisco, CA.

Auge, Marc. 1995. *Non-Places: Introduction to an Anthropology of Supermodernity*. Trans. John Howe. London: Verso

Baganha, Maria Ioannis Benis. 1991. "The Social Mobility of Portuguese Immigrants in the United States at the Turn of the Nineteenth Century." *International Migration Review* 25 (2): 277-302.

Basch, Linda, Nina Glick-Schiller, and Christina Szanton-Blanc. 1995. *Nations Unbound*. Luxemborg: Gordon & Breach Publishers.

Basso, Keith. 1988. 'Speaking with Names: Language and Landscape among the Western Apache', *Cultural Anthropology* Vol. 3, No 2, pp 99-130

Bennet, J.W. 1969. *Northern Plainsmen: Adaptive Strategy and Agrarian Life*. Chicago, IL: Aldine Press.

Berdoulay, Vincent. 1989. 'Place Meaning and Discourse in French Language Geography', in John A. Agnew and James S. Duncan, eds, The *Power of Place: Bringing Together Geographical and Sociological Imaginations*. London, UK: Unwin Hyman, pp 124-39

---

[1] This does not include the web sites used for the profiles, please see the footnotes for individual port profiles.

418                                    Literature

Berger, Thomas R.  1985. *Village Journey: The Report of the Alaska Native Review Commission*. New York, NY: Wang and Hill.

Berkes, Fikret and Carl Folke.  1994. 'Investing in Cultural Capital for Sustainable Use of Natural Capital' in Ann Marie Jansson et al, eds. *Investing in Natural Capital,* Island Press, Washington, D.C.,  pp. 128-150.

Bestor, Theodore C. 2000.  "How Sushi went Global" in *Foreign Policy*, November.

Brookfield, H.C. and Paula Brown.  1967. *Struggle for Land*. New York, NY: Oxford University Press.

Cape Cod Commission. 1997. <u>CapeTrends</u>, Barnstable County-Cape Cod, 4th edition, 47.
Caritas Christi Health Care System.  1996. *Health Survey of the Fishing Population in Massachusetts*. Boston, MA: Health Care for All.

Casey, Edward.  1996. 'How to get from Space to Place in a Fairly Short Stretch of Time: Phenomenological Prolegomena', in Steven Feld and Keith H. Basso, eds., *Senses of Place*. School of American Research Advanced Seminar Series, Santa Fe, NM, pp. 31.

Catton, William and Robert E. Dunlop.  1980. 'A New Ecological Paradigm for Post-Exuberant Sociology', *The American Behavioral Scientist*, Vol.  24, pp. 15-47.

Christensen, Norman et al. 1996. 'The Report of the Ecological Society of America Committee on the Scientific Basis for Ecosystem Management.' Washington, D.C.

Clay, Patricia. 1993b. "Sociocultural Data in Fisheries Management: Myths and Realities" *American Anthropological Association*. December.

Coase, Robert.  1960. 'The Problem of Social Cost', *The Journal of Law and Economics* 3, pp. 1-44.

Colman, James. 1990. *Foundations of Social Theory*. Cambridge: Harvard University Press.

Colman, James.  1988. Social Capital in the Creation of Human Capital. *American Journal of Sociology* **94**, pp. 95-121.

Contas, John, David Deziel, Tom Frisbie, Glenn Israel, Ken Johnston, Sue Smith, Ann Stockman.  1980. "The Socio-economic Response of Coastal Communities to the Fisheries Conservation and Management Act of 1976.  Durham, NH: UNH/UME Sea Grant College Program, UNH-SG-AB-117.

Costanza, Robert and Carl Folke.  1997. 'Valuing Ecosystem Services with Efficiency, Fairness, and Sustainability as Goals, in Gretchen Daily, ed., *Natures Services: Societal Dependence on Natural Ecosystems*, Island Press, Washington, D.C., pp. 49-68.

Creed, Carolyn F. and Bonnie J. McCay.  1996. 'Property Rights, Conservation and Institutional Authority: Policy Implications of the Magnuson Act re-authorization for the Mid-Atlantic Region,' *Tulane Environmental Law Journal* Vol. 9, No 2, pp. 245-256.

Danowski, Fran. 1980 *Fishermen's Wives: Coping with an Extraordinary Occupation*. University of Rhode Island. Marine Bulletin 37.

Dewar, M., R. Lake, M. Lord, D. Wishner, and J. Wondolleck. 1978. The Fishing Industry of Chatham and its Importance to the Town. Department of Urban Studies and Planning. Cambridge: Massachusetts Institute of Technology.

Dewar, Margaret E. 1983. *Industry in Trouble: The Federal Government and the New England Fisheries*. Philadelphia: Temple University Press.

Dewar, M., & Smith, L. J. 1979. The Fishing Labor Market in Two New England Ports. (November 30). Final Report to NOAA Sea Grant (Grant #NA 79AA-D-00102). [on Gloucester & Chatham]

Dirks, Robert. 1980. Social Responses during Severe Food Shortages and Famine. *Current Anthropology* 21(1), pp. 21-44.

Dobbs, David. 2000. *The Great Gulf*. Washington, DC: The Island Press.

Doeringer, Peter B., Philip I. Moss and David G. Terkla. 1986. *The New England Fishing Economy: Jobs, Income and Kinship*. Amherst: University of Massachusetts Press.

Durrenberger, E. Paul and Thomas D. King. Eds. 2000. *State and Community in Fisheries Management*. Westport, CT: Bergin & Garvey.

Dyer, Christopher. 1993. 'Tradition Loss as Secondary Disaster: Long-Term Cultural Impacts of the Exxon Valdez Oil Spill', *Sociology Spectrum,* Vol. 13, pp. 65-88.

Dyer, Christopher. 1994. 'Proaction versus Reaction: Integrating Applied Anthropology into Fisheries Management', *Human Organization*, Vol. 53, No 1, pp. 83-88.

Dyer, Christopher. In press. 'Punctuated Entropy as Culture Induced Change: the Case of the Exxon Vald Oil Spill', in Suzanna Hoffman and Anthony Oliver-Smith, *The Anthropology of Disasters*. Santa Fe, N School of American Research Press.

Dyer, Christopher, and John Poggie. 2000. "The Natural Resource Region and Marine Policy: A Case Study from the New England Groundfish Fishery," *Marine Policy* 24: 245-255.

Dyer, Christopher, and John J. Poggie, Jr. 1998. 'Integrating Socio-cultural Variables into Large Marine Ecosystems: The Natural Resource Region Model,' paper delivered at the NOAA Workshop on Large Marine Ecosystems, University of Rhode Island. Kingston.

Dyer, Christopher and Richard Leard. 1994. Folk Management in the Oyster Fishery of the U.S. Gulf of Mexico. Dyer, Christopher and James R. McGoodwin, eds. *Folk Management in the World's Fisheries*. Niwot, CO: University Press of Colorado.

Dyer, Christopher and James R. McGoodwin. 1999. "'Tell Them We Are Hurtin': Hurricane Andrew, the Culture of Response, and the Fishing Peoples of South Florida and Louisiana." IN: Anthony Oliver Smith and Suzanne Hoffman, eds. The Angry Earth: Culture and Catastrophe. Routledge. p.213-231.

Dyer, Christopher and James R. McGoodwin. 1994. *Folk Management in the World's Fisheries*. Niwot, CO: University Press of Colorado.

Dyer, Christopher, John Poggie and Madeleine Hall-Arber. 1998. Herring. Report to New England Fishery Management Council.

Dyer, Christopher, Duane A. Gill and J. Steven Picou. 1992. Social Disruption and the *Valdez* Oil Spill: Alaskan Natives in a Natural Resource Community. *Sociological Spectrum* 12:105-126.

Entrikin, Nicholas J. 1989. "Place, Region and Modernity" in John A. Agnew and James S. Duncan, eds., *The Power of Place: Bringing Together Geographical and Sociological Imaginations.* London, UK: Unwin Hyman, pp. 30-43.

Federal Fisheries Investment Task Force. 1999. Report to Congress.
    http://www.nmfs.noaa.gov/sfa/ITF.html

Feld, Steven and Keith H. Basso, eds. 1996. *Senses of Place.* School of American
    Research Advanced Seminar Series. Santa Fe: New Mexico

Firestone, Melvin. 1967. *Brothers and Rivals: Patrilocality in Savage Cove.* St. John's,
    Newfoundland: Memorial University of Newfoundland.

Firth, Raymond. 1946. *Malay Fishermen: Their Peasant Economy.* London: Routledge
    and Kegan Paul.

Fox, Catherine and William Lesser. 1981. Fishery Marketing Cooperatives in Northern New
    England. Ithaca, NY: Cornell University New York Sea Grant Extension Program.

Frankel, Jeffrey A. 1992. "Measuring International Capital Mobility: A Review (in
    International Factor Mobility: New Issues*)." The American Economic Review*, Vol. 82, No.
    2, Papers and Proceedings of the Hundred and Fourth Annual Meeting of the American
    Economic Association. (May), pp. 197-202.

Friends of Chatham Waterways. 1996. "An Economic Study of the Town Chatham,
    Massachusetts," (December).

FXM Associates; Seafood Datasearch; Heaney Edelstein. 1999. New Bedford/Fairhaven
    Harbor Plan. Technical Memorandum: Expanded Economic Analysis. Prepared for
    the Harbor Master Plan Committee.

Gallaher, Art J. and Harland Padfield. 1980. Theory of the Dying Community', in Art J.
    Gallaher and Harland Padfield, eds., *The Dying Community.* A School of American
    Research Book. Santa Fe: University of New Mexico Press, pp. 1-22.

Garland, Joseph E. 1995. *Gloucester on the Wind.* Dover, NH: Arcadia Publishing.

Garland, Joseph E. 1990. *The Gloucester Guide.* Rockport, MA: Protean Press.

Gatewood, John B. and Bonnie J. McCay. 1988. Job Satisfaction and the Culture of
    Fishing: A Comparison of Six New Jersey Fisheries. *MAST/ Maritime Anthropological
    Studies* 1(2): 103-128.

Gelles, Richard. 1974. *The Violent Home: A Study of Physical Aggression Between
    Husbands and Wives.* Beverly Hills: Sage Publications.

Georgianna, Dan. 2000. *The Massachusetts Marine Economy.* Dartmouth, MA: University
    of Massachusetts

Georgianna, Daniel, Alan Cass and Peter Amaral. 1999. *The Cost of Fishing for Sea
    Scallops in Northeastern United States.* North Dartmouth, MA: University of
    Massachusetts Dartmouth. Cooperative Marine Education and Research Program,
    NMFS Contract No. NA67FE0420.Gerdsen. 1997.

Gersuny, Carl, John J. Poggie, Jr., and Robert J. Marshall. 1976. Some Effects of
    Technological Change on New England Fishermen. Mar. Tech. Rep. 42. Marine
    Advisory Service, Univ. R.I., Narragansett.

Giblin, James L.. 1992. *The Politics of Environmental Control in Northeastern Tanzania
    1840-1940,* Philadelphia, PA: University of Pennsylvania Press.

Goulder, Lawrence H. and Donald Kennedy. 1997. 'Valuing Ecosystem Services: Philosophical Bases and Empirical Methods', in Gretchen Daily, ed., *Nature's Services: Societal Dependence on Natural Ecosystems*. Washington, DC: Island Press, pp 23-47.

Greider, William. 1996. *One world Ready or Not: The Manic Logic of Global Capitalism*. New York, NY: Simon & Schuster.

Griffith, David and Dyer, Christopher. 1996. An Appraisal of the Social and Cultural Aspects of the Multispecies Groundfish Fishery in New England and the Mid-Atlantic Regions. Bethesda, MD: Aguirre International/NOAA.

Hall-Arber, Madeleine. 1993. Social Impact Assessment of Amendment #5 to the Northeast Multispecies Fishery Management Plan: Interim Report -- May 1993. MIT Sea Grant College Program Technical Report MITSG 93-25.

Hall-Arber, Madeleine. 1993. "They" Are the Problem: Assessing Fisheries Management in New England. *Nor'Easter* 5:2 (Winter).

Hardin, Garrett. 1968. The Tragedy of the Commons in *Science* 162: 1234-48.

Hennessey, Tim. 1994. 'Governance and Adaptive Management for Estuarine Ecosystems: The Case of Chesapeake Bay', *Coastal Management,* pp 119-145

Hillery, Jr., George. 1982. *A Research Odyssey: Developing and Testing a Community Theory*. New Brunswick, NJ: Transaction Books.

Hirsch, Eric and Michael O'Hanlon, eds. 1991. *The Anthropology of Landscape: Perspectives on Space and Place*. Oxford, UK: Clarendon Press.

Holmsen, Andreas A.1976. Economics of Small Groundfish Trawlers in Iceland, Norway and Southern New England. URI Marine Technical Report No. 53. Kingston, RI: URI.

Horrell, Sara and Jane Humphries. 1992. "Old Questions, New Data, and Alternative Perspectives: Families' Living Standards in the Industrial Revolution." *Journal of Economic History*, Vol. 52, No. 4. (December), pp. 849-880.

Howarth, Robert W. 1988. Nutrient Limitation of Net Primary Production in Marine Ecosystems. *Annual Review of Ecology and Systematics*, Vol. 19. (1988), pp. 89-110

Husing, Onno. 1980. Fisheries Bureaucracy and the 200-Mile Limit: An Anthropological Study of the Effects of Increased Government Regulation in one New England Fishing Community. Unpub. M.A. thesis, Dept. of Anthropology, University of New Brunswick, Fredericton.

Jentoft, Svien. 1995. The Global Fishing Village', paper presented at the Annual Meeting of the American Fisheries Society, 1995, Halifax, Nova Scotia.

Jiang, Lin. 1994. "Parity and Security: A Simulation Study of Old-age Support in Rural China (in Data and Perspectives) *Population and Development Review*, Vol. 20, No. 2. (June), pp. 423-448.

Johnson, Teresa. 2000. "Maine's Small Boat, Near Shore Fishery." Prepared for the Maine Department of Marine Resources.

Johnson, Brett M. and Stephen R. Carpenter. 1994. Functional and Numerical Responses: A Framework for Fish-Angler Interactions? *Ecological Applications*, Vol. 4, No. 4. (November), pp. 808-821.

422                                    Literature

Juda, Lawrence. 1999. 'Considerations in Development: A Functional Approach to the Governance of Large Marine Ecosystems', *Ocean Development and International Law*, Vol. 30(2).

Kahn, Miriam. 1990. 'Stone Faced Ancestors: The Spatial Anchoring of Myth in Watima, Papua New Guinea', *Ethnology* Vol. 29, pp 51-66, 1990

Kaelin, J. 1996. The Maine Sardine Industry. January.

Kaplan, Ilene. 1999. "Suspicion, growth and co-management in the commercial fishing industry: the financial settlers of New Bedford" in *Marine Policy* **23**:3:227-241.

Kroll-Smith, J. Stephen and Stephen Couch. 1991. What is a Disaster? An Ecological Symbolic Approach to Solving the Definitional Debate', *International Journal of Mass Emergencies and Disasters* 9(3), pp 355-366.

Kurlansky, Mark. 1997. *Cod: A Biography of the Fish that Changed the World*. New York, NY: Walker and Company.

Ladner, R., L. J. Smith, S. Peterson and J. Wilson. 1981. Socioeconomic Data Inventory: Northeast Fisheries. Woods Hole, MA: Woods Hole Oceanographic Institution Technical Report. November.

Levitan, Don R. "Community Structure in Time Past: Influence of Human Fishing Pressure on Algal-Urchin Interactions." *Ecology*, Vol. 73, No. 5. (October), pp. 1597-1605.

Livingston, Robert J. 1991. Historical Relationships Between Research and Resource Management in the Apalachicola River Estuary. *Ecological Applications*, Vol. 1, No. 4. (November), pp. 361-382.

Mahady, Francis X. 1983. "The Coordinated Marketing of New England Seafood: Opportunities and Constraints." Report prepared for The National Marine Fisheries Service and The New England Fishing Steering Committee.

Mangel, Marc. 1993. "Effects of High-Seas Drift Net Fisheries on Northern Right Whale Dolphin (Lissodelphis borealis)." Ecological Applications, Vol. 2,no 2, pp 221-229 (May).

Margavio, Anthony. 1992. Comments-Socioeconomic Effects. In*: Proceedings of the Shrimp Trawl Bycatch Workshop, November 22-23, 1991, St. Petersburg, Florida*. Pp. 77-82. Washington, DC: Center for Marine Conservation.

Maslow, A. 1954. *Motivation and Personality*. New York: Harper and Row.

Mason, Andrew. 1988. "Saving, Economic Growth, and Demographic Change." *Population and Development Review*, Vol. 14, No. 1. (March), pp. 113-144.

Massey, Douglas S. 1987. "Understanding Mexican Migration to the United States." *American Journal of Sociology*, Vol. 92, No. 6. (May), pp. 1372-1403.

McCay, Bonnie J. 1980. A Fishermen's Cooperative, Limited: Indigenous Resource Management in a Complex Society. *Anthropological Quarterly* 53: 29-38.

McCay, Bonnie J.1989. Sea Tenure and the Culture of the Commoners. *In A Sea of Small Boats,* John Cordell, ed. Cambridge, MA: Cultural Survival, Inc. Pp. 203-226.

McCay, Bonnie J. and Carolyn F. Creed. 1990 Social Structure and Debates on Fisheries Management in the Mid-Atlantic Surf Clam fishery. *Ocean & Shoreline Management* 13: 199-229.

McGoodwin, James R. 1990. *Crisis in the World's Fisheries*. Stanford, CA: Stanford University Press.

Miller, Marc L. John van Maanen. 1979. "Boats don't fish, people do": some ethnographic notes on the Federal management of fisheries in Gloucester. *Human Organization* 38 (4): 377-385.

Modigliani, Frank. 1986. Life Cycle, Individual Thrift, and the Wealth of Nations. *The American Economic Review*, Vol. 76, No. 3. (June), pp. 297-313.

Molyneaux, Paul. 1999. "Raking in the Urchins" in *National Fisherman*, May.

Munn, Nancy. 1990. 'Constructing Regional Worlds in Experience', *Man*, Vol. 25, pp 1-17.

Myers, Fred. 1991. *Pintupi Country, Pintupi Self: Sentiment, Place, and Politics among Western Desert Aborigines.* Berkeley, CA: University of California Press.

National Research Council (NRC). 1998. Review of Northeast Fishery Stock Assessments. National Academy Press.

Nir, Dov. 1991. *Region as a Socio-environmental System: An Introduction to Systemic Regional Geography*. Geojournal Library Series, Vol. 16, Wolf Teizer, ed. Boston, MA: Kluwer Academic Publishers.

O'Leary, Wayne. 1966. *Maine Sea Fisheries: The Rise and Fall of a Native Industry,1830-1890.* Boston, MA: Northeastern University.

Palmer, Craig. 1994. Are Folk Management Practices Models for Formal Regulations? Evidence from the Lobster Fisheries of Newfoundland and Maine. Dyer, Christopher and James R. McGoodwin, eds. *Folk Management in the World's Fisheries*. Niwot, CO: University Press of Colorado.

Palmer, Craig. 1991. Kin-Selection, Reciprocal Altruism, and Information Sharing among Maine Lobstermen. *Ethology and Sociobiology* 12 (3) 221-235.

Palmer, Craig. 1990. Telling the Truth (up to a Point): Radio Communication Among Maine Lobstermen. *Human Organization* **49 (2) 157-163.**

Pandya, Vishvajit. 1990. , 'Movement and Space: Adamanese Cartography', *American Ethnologist,* Vol. 17, No 4, pp 775-97

Parmentier, Richard. 1987. *The Sacred Remains: Myth, History and Polity in Belau.* Chicago, IL: University of Chicago Press.

Pelto, P.J. and John Poggie. 1974. "Models of Modernization: A Regional Focus". In J. J. Poggie and R. N. Lynch, eds. *Rethinking Modernization*, pp 109-140. Westport, CT: Greenwood Press.

Penrose, Nancy. 1981. *Fishing in the 80s: A New England Industry in Transition*. Narragansett, RI: University of Rhode Island Marine Advisory Service.

Pessolano, Michael J. 2000. "Draft: Vacant Substandard Lot Study." Friends of Chatham Waterways, February 12.

424                                  Literature

Peterson, Susan and Leah Smith. 1981.  Small-Scale Commercial Fishing in Southern New England. Woods Hole, MA: Woods Hole Oceanographic Institution Technical Report. August.

Pinkerton, Evelyn.  1989. "Introduction: Attaining better fisheries management through co-management—Prospects, Problems and Propositions" in *Co-Operative Management of Local Fisheries: New Directions for Improved Management and Community Development*. Evelyn Pinkerton, ed.  Vancouver: University of British Columbia Press.

Poggie, John. 1978. 'Intracultural and intrasocial variability as a tool for policy making in fisheries development and management', in John J. Poggie, Billie DeWalt and Kent Dressler, eds, *Anthropological Research: Process and Applications*. Albany, NY: SUNY Press.

Poggie, John and Richard Pollnac.1980. Small Fishing Ports in Southern New England in James Acheson, ed. Final Report to the National Science Foundation, Vol. 1b. Orono, ME: University of Maine Sea Grant College Program.

Poggie, John and Carl Gersuny.  1978. *Fishermen of Galilee: The Human Ecology of a New England Coastal Community*. University of Rhode Island Marine Bulletin series no. 17. Kingston: University of Rhode Island.

Poggie, John and Richard Pollnac.1988.  Danger and Rituals of Avoidance among New England Fishermen.  *MAST* 1:66-78.

Pollnac, Richard and John Poggie.  1988.  The Structure of Job Satisfaction Among New England Fishermen and Its Application to Fisheries Management Policy in *American Anthropologist*, 90.

Prybot, Peter.  1999. *White-tipped Orange Masts*. Gloucester, MA: The Curious Traveller Press.

Robinson, J., R. Athanisou, and K. Head, 1969.  *Measures of Occupational Attitudes and Occupational Characteristics*. Ann Arbor, MI: Institute for Social Research, University of Michigan.

Ruddle, Kenneth.  1994. Local Knowledge in the Folk Management of Fisheries and Coastal Marine Environments. Dyer, Christopher and James R. McGoodwin, eds. *Folk Management in the World's Fisheries*.  Niwot, CO: University Press of Colorado.

Sheehan, E. and R. Moore.  1998.  "Perspectives from Five Ports." Prepared for the Maine Dept of Marine Resources, May.

Sherman, Kenneth L. et al.  1998.  *Large Marine Ecosystems of the Indian Ocean: Assessment, sustainability, and Management*. Blackwell Science, Malden, MA

Sherman, Kenneth, M. Alexander and B. Gold, eds.  1993. *Large Marine Ecosystems: Stress, Mitigation, and Sustainability*. American Association for the Advancement of Science Press, Washington, D.C.

Sherman, Kenneth L. et al., eds. 1992. *Food Chains, Yields, Models, and the Management of Large Marine Ecosystems*. Boulder, CO: Westview Press.

Sherman, Kenneth L. et al, eds.  1990. *Large Marine Ecosystems: Patterns, Processes, and Yields*. Washington, D.C.  American Association for the Advancement of Science Press.

Shields, Rob.  1991. *Places on the Margin: Alternative Geographies of Modernity*. London, UK: Routledge Chapman Hall.

Slocombe, Scott.  1993. 'Implementing Ecosystem-based Management, *Bioscience*, Vol. 46, pp. 612-622.

Smith, Leah and Susan Peterson. 1977.  The New England Fishing Industry: A Basis for Management. Woods Hole, MA: Woods Hole Oceanographic Institution Technical Report.  August.

Smith, Leah and Susan Peterson. 1979.  New England Fishing, Processing and Distribution.  Woods Hole, MA: Woods Hole Oceanographic Institution Technical Report.  March.

Spencer, Robert F.  1959. *The North Alaskan Eskimo: a Study in Ecology and Society*. U.S. Government Printing Office.

Stewart, Kathleen.  1988. 'Nostalgia - A Polemic', *Cultural Anthropology,* Vol. 3, No 3, pp 227-41.

Strauss, M. 1979 Family Patterns and Child Abuse in a Nationally Representative American Sample. *International Journal of Child Abuse and Neglect* 3:213-225.

Town of Chatham. 1999. <u>Annual Reports of the Town Officers of the Town of Chatham 1999</u>

Tuan, Yi-Fi.  1991. Language and the Making of Place: A Narrative-Descriptive Approach', *Annals of the Association of American Geographers,* Vol. 81, No 4, pp 684-96.

Sutinen, Jon et al.  1998. *A Framework for Monitoring and Assessing Socioeconomics and Governance of Large Marine Ecosystems.* University of Rhode Island and Northeast Fisheries Science Center, NOAA Contract #40ENNF700378, Kingston, RI

Torry, William I.  1978. Bureaucracy, Community and Natural Disasters. *Human Organization,* Vol. 37, pp 302-308.

U.S. Dept of Commerce.  2000.  *Fisheries of the United States, 1999.*, NOAA, NMFS. Prepared by Fisheries Statistics Division.

U.S. Dept of Commerce.  1998.  *Fisheries of the United States, 1997.*  Fisheries Statistics Division, National Marine Fisheries Service, National Oceanic and Atmospheric Administration.

Vogt, William.  1948. *Road to Survival.* New York, NY: William Sloan.

Waddell, Eric.  1976. 'How the Enga Cope with Frost: Responses to Climatic Perturbations in the Central Highlands of New Guinea', *Human Ecology,* Vol. 3, No 4, pp 249-27.

Ward, William and Priscilla Weeks.  1994. Resource Managers and Resource Users: Field Biologists and Stewardship in Christopher Dyer and James McGoodwin, eds.  *Folk Management in the World's Fisheries.*  Niwot, CO: University Press of Colorado.

Wassman, Jung.  1991. The Nyaura Concepts of Space and Time', in Nancy Lutkehaus et al, eds,  *Sepik Heritage: Tradition and Change in Papua New Guinea.* Durham, NC: Carolina Academy Press, pp. 23-35.

Weeks, John R. 1989. Population: An Introduction to Concepts and Issues (4th edition). Belmont, CA: Wadsworth Publishing Co.

Weiner, James.  1991. *The Empty Place: Poetry, Space, and Being among the Foi of Papua New Guinea.* Bloomington, IN: University of Indiana Press.

426                                          Literature

Woods, Tim. 2000.  "Moratorium Talk Prompts Spike in New House Permits", *The Cape Cod Chronicle* 27 April.

Yoon, Hong-Key.  1986. *Maori Mind, Maori Land.* New York, NY: Peter Lang.

Zaman, M.Q.  1991. 'Social Structure and Process in Char Land Settlement in the Bramaputra-Jamuna Floodplain, *Man* 26, Vol. 4, pp 549-566.

# Exhibit C
# (Part 1)

**Commercial Fishing Industry Needs On Gloucester Harbor,
Now And In The Future**


A
Supplement to

A Study of Gloucester's Commercial Fishing Infrastructure:
Interim Report
October 15, 2003



by

Gloucester Community Panel
(Sarah Robinson, JD, SJD, Coordinator)


*Community Panels Project*

*Principal Investigators*:
David Bergeron, Massachusetts Fishermen's Partnership
Madeleine Hall-Arber, PhD, MIT Sea Grant
Bonnie McCay, PhD, Rutgers University


June 2005

**Table of Contents**

A. BACKGROUND TO THIS REPORT............................................... 3

B. BASIC PRINCIPLES AND FACTORS......................................... 5
    1. Gloucester is a full service, regional hub port for the
       commercial fishing industry  ...........................................    5
    2. New England groundfish stocks are of major importance
       to the port of Gloucester and they are rebuilding ......................  ..  6
    3. Gloucester must prepare itself to be ready to participate
       in the rebuilt groundfish fishery of the future.............................. 9
    4. The fishing industry in Gloucester depends on the shoreside
       infrastructure in Gloucester and cannot operate without it ..... ..........11
    5. The City and the Commonwealth should use the flexibility
       provided by the DPA and Chapter 91 rules to promote
       creative ways of supporting the shoreside businesses that
       support the fishing industry (enabling these shoreside
       businesses to support themselves so they can be there
       over the long term for the fishing industry)................................ 11

C. SPECIFIC COMMENTS ON COMMERCIAL FISHING INDUSTRY
NEEDS ON GLOUCESTER HARBOR, NOW AND IN THE FUTURE....... 14
    1. Dock space for commercial vessels...........................................14
    2. Dockside (or 'fringe') dredging................................................. 19
    3. Haul-out facilities................................................................. 19
    4. Services for visiting vessels.................................................... 21
    5. Temporary living quarters for visiting fishermen and skilled
       tradesmen............................................................................ 21
    6. Fresh fish processing & the creation of value-added
       fresh fish products......................................................... ....22
    7. Miscellaneous other commercial fishing industry harbor needs....... 23
    8. Public Investment on the waterfront...........................................24
    9. Other comments on the planning process and the DPA................. 26
    10. Fishing industry needs in Gloucester that do not involve
       the harbor............................................................................ 27

D. COMMENTS ON NON-FISHING INDUSTRY USES OF THE HARBOR .29
    1. Tourism............................................................................... 29
    2. Restaurants................................................................... .... 29
    3. Fresh fish market(s)............................................................ .... 30
    4. The incompatibility of recreational marinas............................... ...30
    5. The incompatibility of residential uses..................................... ... 31

E. GLOUCESTER PANEL MEMBERS CONTRIBUTING TO REPORT .....32

F.  APPENDIX (Tables and Figures)............................................... ..33

## A. BACKGROUND TO THIS REPORT:

1.  The Gloucester Community Panel was created as part of the 'community panels project,' a cooperative research project funded by the Northeast Consortium and the Saltonstall-Kennedy Program with principal investigators David Bergeron (Massachusetts Fishermen's Partnership), Dr. Madeleine Hall-Arber (Massachusetts Institute of Technology Sea Grant Program), and Dr. Bonnie McCay (Rutgers University).  The Gloucester Community Panel is a group of fishing industry experts from Gloucester: some members are commercial fishermen and vessel owners; others are owners of shoreside businesses that support the commercial fishing industry; and a few are both vessel owners and shoreside business owners.[1]

2.  In 2003, the Gloucester Community Panel decided to study the status of the shoreside infrastructure that supports commercial fishing in Gloucester.  There was widespread concern among panel members that the shoreside infrastructure that supports commercial fishing in Gloucester was precarious and in serious danger of becoming more so.

3.  The group prepared a study of Gloucester's shoreside infrastructure that
   - identified infrastructure elements critical to commercial fishing;
   - identified and listed each of the businesses and spaces in Gloucester (as of October 2003) providing services in each of these critical infrastructure areas;
   - provided detail about the history and status of many of the particular businesses; and
   - characterized the port as a whole, and its ability to support commercial fishing.

4.  On October 15, 2003, the panel submitted an interim report of its work to the New England Fishery Management Council.  The report was submitted as comment on the then-pending Amendment 13 to the New England groundfish management plan.  In submitting the report, the panel hoped to focus the Council's attention on the effects of its fishery management decisions on the shoreside infrastructure that supports (and makes possible) commercial fishing.

---

[1]     The panel coordinator, Sarah Robinson, JD, SJD, is a PhD candidate in social anthropology at Harvard University (sprobins@fas.harvard.edu).  A full description of the panel and its members may be found in the panel's earlier report, "A Study of Gloucester's Commercial Fishing Infrastructure" (October 15, 2003) at page 5.  This earlier report is available online, as chapter IV of 'Comments on Amendment 13 by the Community Panels Project,' at www.fishermenspartnership.org (click on 'Community Panels: A Pilot Project'), and at web.mit.edu/seagrant/aqua/cmss/comm%20mtgs/commmtgs .  A stand-alone version of the earlier report is also available in paper or electronic form, from Gloucester Panel coordinator Sarah Robinson (sprobins@fas.harvard.edu), from the office of the Massachusetts Fishermen's Partnership (978-282-4847), or from the Office of the Gloucester Harbor Plan Implementation Coordinator (978-281-8740).  All page citations to the earlier report in this supplemental report are to the stand-alone version of the earlier report.

5.  In the summer of 2004, the Gloucester panel met again to discuss shoreside infrastructure.  The meeting this time was occasioned by the fact that the City of Gloucester was planning a 2004 update and revision of the City's Harbor Plan. The community panel sought to use its combined fishing industry expertise to provide considered input to this harbor planning process.  Moreover, the panel is aware that the City's aim is to write a detailed Designated Port Area ('DPA') master plan as part of this revised harbor plan, and the panel wishes to have its views known and taken into account in this DPA master plan process.

6. The present document focuses on fishing industry needs on Gloucester harbor, now and in the future.  This report is a supplement to the October 2003 report, and should be read in conjunction with that earlier report.  It does not repeat the information in that earlier report; rather, it incorporates and builds upon that earlier information. [2]

7.  There are important limitations to the work of the Gloucester Community Panel's work on commercial fishing infrastructure in Gloucester.  While we aspired to examine the shoreside infrastructure that supports all types of commercial fishing in Gloucester, for a variety of reasons we focused more on groundfish than on other species.  Thus, there is more work to be done to understand the particulars of infrastructure needs, now and in the future, of lobstermen, clammers, tuna fishermen, and others, and how well these needs are being and will be met on the waterfront.  All this is to say that, if anything, our earlier report and this supplement *understate* the infrastructure needs in Gloucester of the commercial fishing industry.   One panel member noted in passing, for example: "*We've never really talked about what kind of contribution lobster boats make to the city, and yet, from a volume standpoint, they probably take up more docking space than the larger boats because there are so many of them . . .*"

---

[2]      For information on obtaining copies of the October 2003 report, "A Study of Gloucester's Commercial Fishing Infrastructure," see footnote 1, above.

## B. BASIC PRINCIPLES AND FACTORS

Several basic factors and principles guide the panel's view of the commercial fishing industry's shoreside needs in Gloucester harbor, now and in the future. These factors and principles inform each of its specific recommendations. These are the following:

## 1. Gloucester is a full service, regional hub port for the commercial fishing industry.

### a. Gloucester is a regional hub.

The work of the Gloucester community panel revealed very plainly that the port of Gloucester is a regional center, or 'hub,' for the commercial fishing industry in the northeast.[3] Gloucester's shoreside infrastructure supports fishermen who live in Gloucester and neighboring communities (Rockport, Beverly etc), but also, to a very important degree, fishermen who live as far afield as Ellsworth, Maine and Cape May, New Jersey.[4] Fishermen who live outside of the Cape Ann area rely on Gloucester in a variety of ways. These include (1) bringing vessels to Gloucester to fish from Gloucester for a temporary period of weeks or months; (2) landing fish in Gloucester while fishing from other ports (e.g., on the South Shore); (3) coming into Gloucester by car (or vessel) to pick up gear and other supplies; (4) coming into Gloucester by vessel for vessel repair and haul-out; and (5) picking up supplies, gear, ice, grub, etc., while in Gloucester to fish, land fish, get a haul out, or for any other reason.[5]

### b. Gloucester is a 'full service' port.

Moreover, the Gloucester panel's work made clear that Gloucester is a 'full service' port: The fishing industry can get (just about) everything it needs to go fishing here in Gloucester. Fishermen can get ice, fuel, gear, bait, and grub; they can get their boats hauled out and worked on; when they return to port they can sell their fish at the auction or directly to buyers; there are settlement agents

---

[3]    See "A Study of Gloucester's Commercial Fishing Infrastructure" at pages 3, 28.

[4]    This is separate from the fact that, as it has through-out its history, Gloucester draws vessels, fishermen, and fishing business entrepreneurs from around the world; some recent examples being the Pacific Northwest, Ireland, and Korea (via Vancouver and Oregon).

[5]    Gloucester's importance as a 'hub' port must not be under-appreciated: The work of the *Community Panels Project* outside of Gloucester has shown plainly that commercial fishing infrastructure in the small 'spoke' ports consists solely of (1) dockage (moorings and dockage with capacity to load and unload), (2) parking spaces, and (3) access to a hub port. If Gloucester ceases to function as a hub port, the industry will be hurt not only in Gloucester, but also along the coast.

and maritime attorneys; there is space at the dock to load and unload boats and to load trucks; and there is space, however limited, to tie up vessels.

There is a direct relationship between Gloucester's being a 'regional hub' and its being a 'full service' port: Gloucester is a regional hub in large part *because* it is a full service port. If Gloucester did not have the full suite of services to support commercial fishing, it is likely that (1) vessels resident elsewhere would cease coming to Gloucester to land fish, to pick up services and supplies, and possibly even to fish (bypassing Gloucester for another port, like New Bedford, where they can meet all of their demands in one place), and (2) vessels resident in Gloucester would migrate out of Gloucester to fish from more fully equipped ports.

**c. Gloucester's status as a full service regional hub port is precarious.**

Finally, while Gloucester is still – in many respects – a full service, regional hub port, it is in danger of ceasing to be so. This is due, in part, to diminished groundfish landings from the late 1980s to the present. As described in our earlier report, in many critical areas of infrastructure there are only one or two businesses supplying services, and many of these businesses are either (1) failing or (2) diversifying away from the fishing industry (or, in the case of fish buying and processing, away from groundfish). These businesses are critical to the future of the industry and the panel is strongly in favor of creative, flexible ways -- within the considerable latitude provided for in Massachusetts' Designated Port Area and other Chapter 91 regulations – of supporting the businesses that support the fishing industry, in order to ensure that they will continue to be able to serve the fishing industry. This is especially important because, as we detail below, regulations are in place to rebuild groundfish populations to levels that can sustainably support substantially increased levels of groundfish landings in the future.

**2. New England groundfish stocks are of major importance to the port of Gloucester and they are rebuilding.**

**a. Groundfish are key species for the port of Gloucester, and a rebuilt groundfish fishery could have a big impact on Gloucester.**

Many species are currently landed in Gloucester: lobster, tuna, hagfish, monkfish, herring, mackerel, whiting, scallops, and others, in addition to cod, haddock, flounder, pollock, and other groundfish species.[6] However, the groundfish species, because of their volume, value, and proximity to the port of

---

[6]     See Gloucester Community Panel, "A Study of Gloucester's Commercial Fishing Infrastructure: Interim Report" at 11.

6

Gloucester, are consistently of major significance to the port.[7] Therefore, the rebuilding of groundfish stocks and the projected increases in New England groundfish landings through the next decade *could be* extremely significant for the port.  They will be, however, only if Gloucester cares for, maintains, and builds up its shoreside infrastructure supporting commercial fishing.

**b.  The National Marine Fisheries Service projects a dramatic rebuilding of groundfish stocks in New England**.

The purpose of Amendment 13 to the Northeast Multispecies Fishery Management Plan (effective May 1, 2004) is to rebuild New England groundfish stocks to levels that will allow them to be fished, sustainably, at much higher levels than they have been fished over the past 18 years.  According to government projections, the Amendment 13 management measures will enable sustainable landings of New England groundfish of 300 million pounds by the year 2015.[8]  New England has not seen landings that high since 1984 (when total groundfish landings were 305.5 million pounds).[9]

The projected landings of 300 million pounds of NE groundfish in 2015 represent slightly more than a three-fold increase over 2003 landings of NE groundfish, which came to 97.4 million pounds. (Total landings figures for NE groundfish for 2004 are not yet available.)[10]

---

[7]      In the period from 1975 to 2002, groundfish revenues accounted for between 78 and 43 percent of the total revenues for all landings in the port.  See "A Study of Gloucester's Commercial Fishing Infrastructure" at pages 10 & 40 (page 40 of the that earlier report shows a graph of Gloucester groundfish revenues as a percent of total Gloucester ex-vessel revenues -- all species combined -- for the years 1975-2002).  In addition, Table 2 of this Supplemental Report, located in the Appendix (beginning on p. 33) contains landings and revenue figures for the port of Gloucester for the years 1975-2004, for groundfish and for all species combined.

[8]      See *Amendment 13 to the Northeast Multispecies Fishery Management Plan, Final Supplemental Environmental Impact Statement* (December 18, 2003), at I-568.  By 2026, when all stocks are fully rebuilt, the sustainable landings figure rises to 320 million pounds annually. *Id.* The Supplemental Environmental Impact Statement for Amendment 13 (along with other Amendment 13 information) is available online at www.nero.noaa.gov/amend13.

[9]      See total New England groundfish landings for 1984 in Table 1 (Appendix).

[10]      See total New England groundfish landings for 2003, Table 1 (Appendix).  In the 'Advance Copy' of this Supplemental Report (dated 5-9-05), we reported the New England Council's and Fisheries Service's projection of 130 million pounds for total NE groundfish landings for 2003 (see *Supplemental Environmental Impact Statement* at 1-568).  Actual 2003 landings of NE groundfish (97.4 million pounds) are now reported to be substantially under that projection.  The reason for this, it has been explained by Council staff, is that the projected figure of 130 million pounds indicated the number of pounds of NE groundfish that would be landed if the fishing mortality rates aimed for in the rules, stock by stock for each stock in the multispecies complex (12 species comprising 20 stocks), were achieved.  However, in 2003, the industry fished certain stocks at rates *under* the permitted fishing mortality rates.  Two stocks in particular that were "under-yielded" were Georges Bank haddock and Georges Bank yellowtail flounder.

7

The rebuilding of stocks, while uneven, has already begun: Haddock is a prime example: In February 2004, the National Marine Fisheries Service reported a so-called "haddock baby boom" on Georges Bank, finding that "spawning haddock on Georges Bank have produced the largest incoming group of young fish in forty years, and perhaps the largest on record for the stock."[11]

### c. Predicting Gloucester's share of a rebuilt groundfish fishery:

It is obviously very difficult to predict the future, let alone to try to shape it. However, we must do the best we can, both to predict the future and to attempt to shape it. In that spirit, we examine past groundfish landings in Gloucester over the period 1975-2003 as a guide to future groundfish landings in Gloucester. The landings figures we use are the official figures collected and maintained by the National Marine Fisheries Service as these are the principal statistics available. In using these figures, however, we are mindful that they may understate past landings as, in the past, the incentives to report landings were not as strong as they are now.

### (i) Gloucester's share of total NE groundfish landings, 1975-2003

In 2003, 15.8 million pounds of groundfish were landed in Gloucester, and this represented 16.2% of the total NE groundfish catch in 2003 (see table 1 and figures 1 & 2).[12] However, in the period 1975-2003 (the period for which we have figures), Gloucester landings of NE groundfish have been as high as 81.3 million pounds (1981) and as low as 11.2 million pounds (1997). Gloucester's percentage of the total NE groundfish landings has also varied considerably during the period from 1975-2003, from a high of 23.5% of the total NE groundfish catch (1981) to a low of 14.1% of the total NE groundfish catch (2002). The average of Gloucester's percentage of the total NE groundfish catch for the period 1975-2003 is 17.9%.

### (ii) Projecting future landings

If we use Gloucester's 1975-2003 average of 17.9% of total NE landings to project Gloucester's future share of total NE groundfish landings, this yields projected landings of 53.5 million pounds in 2015 (or 3.4 times 2003 Gloucester groundfish landings). If we use Gloucester's 1975-2003 high of 23.5% of total NE groundfish landings, this yields projected landings of 70.5 million pounds in 2015 (or 4.5 times 2003 Gloucester groundfish landings); and if we use

---

[11]    "Haddock Baby Boom Detected on Georges Bank," Northeast Fisheries Science Center (National Marine Fisheries Service) Press Release, February 2, 2004. Available online at www.nefsc.noaa.gov/press_release/news04.02.html.

[12]    All landings figures (Gloucester groundfish landings and total New England groundfish landings) are from Table 1 (see Appendix). See also Figures 1 & 2 in the Appendix for graphic representations of these numbers.

Gloucester's 1975-2003 low of 14.1% of total groundfish landings, this yields projected landings of 42.3 million pounds in 2015 (or 2.7 times 2003 Gloucester groundfish landings).  To reiterate, the low projection is an increase of 2.7 times 2003 landings; the average projection is an increase of 3.4 times 2003 landings; and the high projection is an increase of 4.5 times 2003 landings.

To put these projected landings figures into perspective, the low projection of 42.3 million pounds for Gloucester groundfish landings represents a higher level of groundfish landings than has been seen in this port for 18 years: Gloucester groundfish landings in 1986 were 50.8 million pounds; the following year, 1987, Gloucester groundfish landings dropped to 28.9 million pounds and from 1987 until the present they have never reached 2015's low projection of 42.3 million pounds (the closest year was 1990, when Gloucester groundfish landings were at 34.9 million pounds).  (See Table 1.)

**(iii) The potential for Gloucester to *exceed* its 1975-2003 high of 23.5% of total NE groundfish landings, in the future**

Gloucester *could* regain its 1975-2003 high of 23.5% of the total NE groundfish catch; it could even exceed that figure.  Many factors will determine the size of Gloucester's future groundfish landings, not least the steps the City and the Commonwealth take today to ready the port for the projected increase in landings.  The panel believes that the port could regain and even surpass its 1975-2003 high of 23.5% of total groundfish landings.  This former high was achieved during a period in which many more ports were landing groundfish than are doing so today or are likely to in the future.  Both Boston and Rockland, ME, were important ports for the landing of groundfish during the 1980s (when Gloucester had its high 23.5% of total groundfish landings), as were many smaller ports.  Yet Boston and Rockland (and many smaller ports) have lost most of their infrastructure for landing groundfish and are unlikely to regain it.  This leaves Gloucester the potential to land, in the future, an even greater share of total groundfish landings than it did in the period 1975-2003.

**3.  Gloucester must prepare itself to be ready to participate in the rebuilt groundfish fishery of the future.**

**(a)  Regaining and/or exceeding the recent high of 23.5% of total NE groundfish landings would require the return of large (70-100 ft) vessels to Gloucester.**

Before Gloucester could surpass its former high percentage of 23.5 % of total NE groundfish landings, Gloucester would need first to *rebuild* to that former high.  This will require, among other things, rebuilding a diverse groundfish fleet in Gloucester, comprised of large (70-100 ft), medium (40-70 ft), and small (< 40 feet) vessels.  As indicated in our earlier report, the number of Gloucester

vessels has declined sharply since the 1980s.[13]  And, importantly, the number of large (70 –100 ft) vessels in Gloucester has declined disproportionately[14], to the point where Gloucester is presently viewed as a port for small and medium-sized vessels. The panel believes it is critical to rebuild Gloucester's shoreside infrastructure so that larger vessels will once again fish out of Gloucester and Gloucester can once again be home to a diverse and flourishing fleet of groundfish vessels.[15]

**(b) Regaining or exceeding former high landings will require full recognition and support of the fact that Gloucester is a regional hub port that supports fishing vessels throughout the region as well as those from Cape Ann.**

As we emphasized in our earlier report and have reiterated above, Gloucester is a regional hub port for the commercial fishing industry.  This means, among other things, that some of the fish (including groundfish) landed in Gloucester is – and will be, in the future – landed by vessels homeported in ports other than Gloucester. Some of these vessels berth temporarily in Gloucester for a period of weeks or months and fish for that period from Gloucester; others do not berth here but come in to land fish (and sometimes also to pick up supplies). Hence, it is likely that the future increase in 'Gloucester landings' will be comprised both of landings by vessels homeported in Gloucester and by vessels homeported elsewhere.  Both components of Gloucester's fishery – the resident vessels and the non-resident vessels – should be kept in mind as Gloucester plans for the future of its fishery and its port.

**(c) Many more benefits will come to the City with the rebuilding of stocks if it can attract and support more fresh fish processing**

As pointed out in our earlier report, Gloucester has much less fresh fish processing capacity than it has had in the past  (that is, its processing of fish caught in New England waters is greatly diminished over what it once was).[16] Panel members are strongly of the view that a return of more fresh fish processing capacity to the City is very important in order to capture the value of the increased landings of a rebuilt groundfish fishery.  Much of the value of these increased landings will be lost to Gloucester if fresh fish processing capacity in the City does not increase.  One panel member put it this way: "*While* [increased

---

[13]    See "A Study of Gloucester's Commercial Fishing Infrastructure" at 11-14.

[14]    See "A Study of Gloucester's Commercial Fishing Infrastructure" at 11-14.

[15]    See "A Study of Gloucester's Commercial Fishing Infrastructure" at 32 for a discussion of why rebuilding and maintaining a *diverse* fleet of large, medium, and small vessels is key to the health of the port and its commercial fishing infrastructure.

[16]    See "A Study of Gloucester's Commercial Fishing Infrastructure" at 16-18.

landings are] *crucial, success and draw of a port is dramatically enhanced by processing capacity – value added, onshore jobs, etc. . . . Without fish processing capacity,* [Gloucester] *is not a full hub port, or a 'full service' port' . . . erosion of waterfront employment is not just from reduced landings and species changes, but from lack of processing.*"   These processing issues are discussed in more detail below in section C(5).)

**4.  The fishing industry in Gloucester depends on the shoreside infrastructure in Gloucester and cannot operate without it.**

While it nearly goes without saying, the panel would like to emphasize how critical the shoreside infrastructure (everything from space to suppliers) is to the continued existence of the commercial fishing industry in Gloucester (this was the basic point of the earlier report).  To paraphrase an old slogan of the Monsanto Company: without infrastructure, the industry would not be possible. That is why the panel considers this harbor planning process – and the implementation that must follow – to be of utmost importance to the fishing industry.

**5.  The City and the Commonwealth should use the flexibility provided by the DPA and Chapter 91 rules to promote creative ways of supporting the shoreside businesses that support the fishing industry (enabling these shoreside businesses to support themselves so they can be there over the long term for the fishing industry).**

The panel believes that the designation of Gloucester's inner harbor as a 'Designated Port Area' ('DPA') under Massachusetts law is appropriate and should be maintained.  While panel members have many questions about the DPA status (its origin, its significance, its operation, and even, among some, its 'philosophy'), panel members see plainly that Gloucester's Inner Harbor is the right kind of area for 'designated port area' status:  Without question, it is, as the DPA regulations specify, a "*geographic area of particular state, regional, and national significance with respect to the promotion of commercial fishing*" and other water-dependent marine industrial activities.[17]  As the City website proclaims, Gloucester *is* "America's oldest fishing port"[18]; its proximity to fishing grounds, the geography of its harbor, and the fishing knowledge created and passed on by people in this port all contribute to making Gloucester one of the nation's most significant fishing ports.

Panel members believe that the basic policy behind the establishment and maintenance of DPAs – that crucial industrial waterfront areas must be maintained for water-dependent marine industrial use *over the long term* – is a

---

[17]     301 CMR 25.01(2) (emphasis added).

[18]     See Official Website of the City of Gloucester, www.ci.gloucester.ma.us .

good policy.   This policy is critical for the future of the fishing industry in Gloucester (and therefore for the region) and for the future of Gloucester itself. In marine industries subject to fluctuations, spaces and facilities used by the industry (particularly those with waterfront access) can have profound difficulties maintaining themselves in periods of industrial downturn.  This is particularly pronounced in Gloucester, where the principal marine industry is commercial fishing, an industry characterized, even more than others, by fluctuations.  The past two and a half decades of experience with the groundfish industry are a vivid example of the fluctuating fortunes of commercial fishing.  Nor are fluctuations peculiar only to the recent past; rather, fluctuations are endemic to the fishing industry.[19]

With the difficulty of maintaining marine industrial spaces and facilities during the downward turn of an industrial cycle comes the vulnerability of these spaces (particularly those with waterfront access) to uses wholly incompatible with marine industrial uses.  And, as the DPA rules state plainly and embody in their terms (and as experts have articulated[20]), once marine industrial uses are supplanted by wholly incompatible uses, the lost space and waterfront access are "virtually irretrievable."[21]  In Gloucester, when this space and access is lost, the commercial fishing industry itself is lost, because the fishing industry cannot operate without dockage, ice, fuel, suppliers, buyers, and the other critical components of the shoreside infrastructure on the waterfront.   And, when the industry is lost ("irretrievably" lost), what is lost is much of what gives a place its identity, character, history, and culture.  The Preamble to the 1994 DPA rules makes a related point very clearly: "What is permanently eliminated is the gritty character of working places and with it the legitimacy of industrial endeavor in the mind's eye of both the adjoining neighborhood and the community at large."[22]

Panel members, to a person, are wholly committed to the future of the commercial fishing industry and to Gloucester's continuing (and expanded) role

---

[19]     See, e.g., the collection of photographs in William D. Hoyt, *Hanging On: The Gloucester Waterfront in Change 1927-1948* (Chislom & Hunt 1987), and the narrative of change in and on the Gloucester Harbor in Anthony Wilbur & Fara Courtney, "The Environmental History and Current Characteristics of Gloucester Harbor," in *Gloucester Harbor Characterization: Environmental History, Human Influences, and Status of Marine Resources* (Massachusetts Office of Coastal Zone Management Technical Report, May 2004).

[20]     See Marine Law Institute, University of Maine, in association with the Center for Applied Social Science, Boston University, *Guidebook to the Economics of Waterfront Planning and Water Dependent Uses*, pp. 24-26 (1988).

[21]     See the Preamble to the 1994 Designated Port Area Regulations (p. 2), available online at www.mass.gov/czm/regs/25.pdf.  See also 301 CMR 25.01(2) ("Purpose" of DPA rules); and Massachusetts Coastal Zone Management Ports Policy #3.

[22]     Preamble to the 1994 Designated Port Area Regulations (p. 2), available online at www.mass.gov/czm/regs/25.pdf .

in the rebuilt groundfish fisheries of the near future.  To that end, they see very important value in Gloucester's 'Designated Port Area' status.  However, like many Gloucester residents, panel members have many questions about the operation of the DPA and how it could operate better to protect the spaces and facilities that support the commercial fishing industry.   One panel member (a shoreside business owner) stated he was "*struggling to understand what it* [the DPA designation] *means or how it impacts us . . . we know what it means negatively, but what does it or could it mean positively?*"

Panel members are of the view that property holders within the DPA must have flexibility to support their properties and the businesses on them during the downturns in the commercial fishing industry's cycles.  While DPA rules do provide for some flexibility in the use of DPA properties (by providing for supporting, accessory, and temporary uses), these provisions, for the most part, have not been put to use in Gloucester.  This is a huge problem.  Some owners of DPA properties (several of whom serve as panel members) *do not know* what the rules are concerning supporting, accessory, and temporary uses; they do not know who to go to find out what these rules are; they do not know what the relationship is between DPA (and chapter 91) rules and city zoning rules; and they either cannot afford or simply will not pay the large sums required to hire an attorney to sort out for them what should be accessible public information.  Moreover, some DPA property holders are skeptical of what they do know about the DPA rules, stating, for example:  "*You can't take 'temporary uses' to the bank!*"  This lack of knowledge and skepticism has contributed to the current logjam of deferred maintenance, vacant properties, and uses of property undertaken without knowledge of their permissibility.

Panel members feel strongly that the current effort to revise the Gloucester Harbor Plan and to prepare a DPA Master Plan should concentrate on developing ways in which the flexibility afforded by the DPA rules (those providing for supporting, accessory, and temporary uses of DPA properties) can be put to good use in Gloucester.  Put simply, the panel believes that the City (and the Commonwealth) should take greater advantage of the latitude afforded by the DPA and Chapter 91 rules and create ways in which the shoreside businesses that support the commercial fishing industry can support themselves so that they can be there, over the long term, to support the commercial fishing industry.

## C. SPECIFIC COMMENTS ON COMMERCIAL FISHING INDUSTRY NEEDS ON GLOUCESTER HARBOR, NOW AND IN THE FUTURE

1. ***Dock space for commercial vessels***:  As described in our earlier report, the industry needs three basic types of dockage: permanent berths, short-term berths, and transient berths (for off and on loading).  There are shortages in each of these types of dockage.  In Gloucester's past, commercial vessels could be tied one to the other, and as result there could be as many as four or five boats at a single dock space.  However, this kind of system is not tenable today, as the crews working on vessels are so much smaller than they were in the past.  When a single vessel had a crew of 10 or so, its own crew could untie and move around the vessels tied together to free that vessel.  The current crews of 1-4 persons cannot safely move vessels around, and so the former practice of tying vessels together at a single berth to make up for a lack of berths cannot be much used today.

- **The long-term or 'permanent' berths** are for vessels that fish from Gloucester on a regular basis and/or whose owners and operators live on Cape Ann or within easy driving distance (e.g. Beverly, Swampscott).
  - o **There is increased pressure on long-term dockage**: One irony of increasingly strict groundfish regulation in recent years is that it has stimulated a *greater* proportional need for permanent berths: Boats under strict days at sea regulation spend much more time at dock than they did before their days at sea were limited.  Moreover, one successful business strategy to cope with increased days at sea regulation has been for vessel owners to buy a second or even a third vessel, each equipped with its own groundfish permit, so that a fishing business that in the past operated only one vessel now operates two or even three vessels.  To complicate matters, since Amendment 13, some of an owner's vessels may be idle ('dead storage') because vessel owners now have the option of leasing a permit from one of their vessels to another, allowing them (for the first time) to fish more than one groundfish permit on one vessel.  (When and if vessels are permitted to 'consolidate' groundfish permits on one vessel in a manner that creates incentives for people to do so, these practices may change again.)  All of these practices have put pressure on the limited long-term dock space for commercial fishing vessels.  Pressure on this long-term dockage also develops, it should be noted, as smaller harbors in the vicinity lose commercial dockspace and the commercial fishing vessels that had docked in those smaller harbors come to dock in Gloucester.  Finally, in addition to these increased pressures, there are fewer usable wharves than in the past: diminished groundfish landings in recent years have led wharf owners to put off maintaining their docks, making some former dock space simply unusable.

o **More berths are needed for large vessels:** As detailed in the panel's earlier report, Gloucester has lost many of its large (70 – 100 ft) vessels over the past decade.  The panel believes strongly that it is very important to regain a group of large vessels in Gloucester to complement the small and medium sized vessels currently fishing from Gloucester. One panel member (who is himself a fisherman with a small vessel) explained: "*You've got to be geared for big boats.  You can't build a small boat facility that a big boat can't get into, but you can build a big boat facility and the little guys can . . . work their way . . .*" A fleet of large (70-100 ft) offshore vessels is necessary to fish on Georges Bank; without this component of the fleet, Gloucester will not be able to participate fully in the rebuilt fisheries.  Moreover, the large, medium, and small vessels complement one another and together help the port thrive, in the manner described in our earlier report.[23]  Hence, in planning for the future, and expanding dock space for commercial fishing vessels, it is important to create berths for large vessels.

o ***"You provide the berths for commercial fishing, the boats will come."***  The panel was generally of the belief that long-term dockage is critical to the long-term success of the port. Speaking both of long term berths and short term berths (see below), one panel member put it this way: "*You provide the berths for commercial fishing, the boats will come.*"  One panel member, however, expressed skepticism, arguing that the present "*low*" feels "*different*" from past lows.  Referring to the impact of recent groundfish regulatory changes (the 2002 court order and the Amendment 13 regulatory changes), this panel member noted that "dead storage" (for inactive vessels) is not the same as active storage (vessels don't buy gear supplies, ice, etc.), and said: "*This just feels like a deep dive, we haven't pulled out* [of it]."

o **Possible sites for additional long-term dockage**:  The panel recognizes that it may be difficult or impossible for individual property owners to invest the funds necessary to rebuild dilapidated wharves to provide additional dockage.  The panel recommends that the City and the Commonwealth look into the availability of public funds to help reclaim dockage in the city, through any of a number of means (by the City's leasing the dockage on long term leases from the individual property owners, by the City or the Commonwealth providing economic incentives and/or subsidies for individual property owners to reclaim the dockage, etc.).  Some sites that could be developed for more long-term, 'permanent' dockage for homeported vessels include:

   ▪ Americold Facility on East Main Street

---

[23]    See "A Study of Gloucester's Commercial Fishing Infrastructure" at 32.

- Captain Joe's, in East Gloucester (could be developed for long-term or short-term dockage)
- old FBI dock at the Fort, now owned by Neptune Marine

- **The short-term berths** are for visiting vessels, including those from other homeports that come to fish from Gloucester for a period of weeks or months during a certain period of the year. Regulatory changes in the groundfishery over the past 10 years have probably *increased* the proportion of groundfish vessels homeported elsewhere that seek short-term berths in Gloucester: Rules limiting the 'days at sea' that fishermen can fish for groundfish have led fishermen to fish from ports that minimize the distance from port to fishing grounds (because that steaming time counts against 'days at sea' to fish). Similarly, 'rolling closures,' a series of sequential closures of the inshore fishing grounds, from south to north in two month periods from March through June, have led boats to switch ports to be closer to open grounds.
  - o **There is a lack of short-term berths:** There is a serious lack of short-term berths in Gloucester that prevents more commercial fishing vessels from using the port. This lack of short-term berths also creates snarls when vessels from out of town do come in and try to tie up.
    - One panel member reported that over the last six months he had received calls from twenty different groundfish vessels homeported in Maine and New Hampshire seeking short term berths in Gloucester; he was able to place only one of the twenty vessels and the other nineteen were forced, for lack of a short term berth, to bypass Gloucester.
    - Another panel member reported that 10 different scallop vessels from outside Gloucester planned to come to Gloucester in the fall to unload (and settle their trips) but that there was no place for them to dock and so they could not stay in Gloucester: *"There's going to be at least 10 scallop boats in this area that are going to look to unload in Gloucester and they're not going to be able to dock anywhere. I mean, they're going to unload and then they're going to have to leave. And if there was a place for them to dock, they would be spending...or staying here.."*
    - A panel member with a waterfront property in the outer harbor reported an instance in which a large lobster vessel from outside Gloucester that had come into Gloucester to offload lobsters was forced to tie up in Gloucester because of a storm, and the only available place was in front of her property in the outer harbor: *"This winter we had a boat from Maine. He sold us his lobsters. He was hit by the storm. He had nowhere to tie. He tied at my wharf, ok, and that thing got knocked around, but he was a big boat. I was getting nervous that the place was going to fall down. I wish I could*

16

*dock them. But he had no place to go. The [State] Pier was full, the auction . . . there was no place for him to dock.*"

- A Gloucester fisherman panel member who ties up at Rose's reported that out of town boats come in late, land fish, and tie up there, so that when he comes down early in the morning to fish he finds his vessel blocked in by four others ('*you've got four boats on top of you.*) He gave this account of a typical occurrence: "*One boat came to Rosie's Wharf the other day. The guy tied up and he left, and the owner [at Rose's] [said] 'where is this guy?! I don't have space for these people to come and do this.' So, now he's got to run around down the docks all day, to see if the guy shows up.*"

- Another fisherman pointed out that these space problems lead out-of-town fishermen to jump from one inappropriate site to another: "*One night the guy is at the Railways, then he jumps to the [State] Fish Pier, and then in the morning he jumps over here . . .*"

o **There should be more short term berths and their availability and location should be common knowledge**: For example, boats from out of town coming in to unload fish could ask at the Auction where they could find dockage and be answered "*you can call this number and go to this dock..*"

o **Security at short-term berths**: It is important to provide adequate security for short-term berths so that fishermen from out of town can dock their vessels and leave their boats to go into town (to buy supplies, food, etc) or even to return to residences outside of Cape Ann.

- One fishermen panel member from New Hampshire said: "*You know I would probably come here if it was more convenient and easy and I could leave the boat and know it was safe to go home. But I take my fish back to Hampton because I want to be able to sleep at night and not worry about what's going to happen to my boat.*"

o **Oversee or regulate the use of short-term berths so they are not abused**: "*You've got to have good regulations [or] some kind of contract or something that they sign so that if they just dump the boat on you, you can take steps to remove it legally.*"

o **Possible sites for additional short-term berths**: In general, short term berths should be on the western side of the harbor, so that commercial fishermen coming to port by vessel can access the downtown and the services it provides on foot (if they tied up in E Gloucester, they would need to take cabs to get to downtown). ("*As somebody who's likely to be a transient vessel, I'd want to be on the Western side of the harbor because I need access to the grocery store or . . . the restaurants.*") As with long-term, 'permanent' dockage, the panel recognizes that it may be difficult or

impossible for individual property owners to invest the funds necessary to rebuild dilapidated wharves to provide additional dockage. The panel recommends that the City and the Commonwealth look into the availability of public funds to help reclaim dockage in the city, through any of a number of means (by the City's leasing the dockage on long term leases from the individual property owners, by the City or the Commonwealth providing economic incentives and/or subsidies for individual property owners to reclaim the dockage, etc.). Some sites that could be developed for short term dockage include:

- The old Empire Fish (now ARAN Fish, Inc.); during the months when the vessels tied up there have moved south to fish.
- The Building Center, the dock that used to be there has not been used for a long time and is now 'dilapidated'; if considered together with ARAN Fish, landside access could be through the small alleyway on ARAN Fish property.
- Between Ten Pound Island and the Breakwater (floats for moorings could be put in there, and an on-call water taxi service installed to bring people into town).

○ **Additional benefits of short-term berths**:
- "*Every transient boat that comes into town is going to spend money … They're going to get supplies. They're going to buy food, fuel, ice. Their crew is going to go out whooping it up. They're going to spend money, one way or another.*

- **Transient dockage for loading and unloading fish, gear, supplies, etc.**
  ○ As more vessels come to Gloucester to unload their catch, it will be increasingly important to increase the transient dockage for onloading and offloading: "*The Auction will end up being like a tractor trailer rollover on the Southeast Expressway in rush hour, if it ever gets to the volume we're talking about because sometimes it's like that now. At 5:00 in the afternoon if there are two trip boats [larger vessels] and then all the day boats [smaller vessels] show up, they're all out there going in circles . . . And if the volume ever increases, they'll be swamped. . .*"
  ○ The lack of short term berths infringes on the transient dockage. A fisherman panel member described what happens when an out-of-town vessel comes in late to sell his fish at the Auction, ties up his vessel, and then leaves it there: "*A guy will come down and unload . . . he's from another state . . . He's the last boat that comes in and [he] leaves his boat and he doesn't come back for three days, and all of a sudden the guy at the auction has got to scramble and move the boat to keep his loading docks free.*"

- **The development of new dockage (or the recovery of old, dilapidated dockage), both short-term and long-term, may be an appropriate area**

for public investment and/or public ownership. (See discussion of the need for public investment, in section C8 below.)

2. **Dockside (or 'fringe') dredging**:

- **The panel supports dockside or 'fringe' dredging of the harbor in order to make more dockage for large (70-100 ft) groundfish vessels and for other even larger commercial fishing vessels at the wharves.** In order to create more dockage, one panel member explained, "*I would think things really need to start with dredging.*"
  - o Examples were provided of large groundfish vessels (70-100 ft) running aground at several dockside locations on the waterfront, including at the Gloucester Marine Railways (on Rocky Neck), at the Auction, at Oceancrest (on the Fort), and at the State Pier. Among them: "*You need it down at Oceancrest. . . When we had the big boat, we were unloading [at Oceancrest] . . and we got stuck in the mud, a couple of times.*"  "*Even the auction, a couple of times, some of the bigger boats, if they have a big trip and they come in at low tide, they run aground.*"
  - o Examples were also provided of large mackerel vessels from the South having to wait for the tide to get in and out of port by the State Fish Pier.
- **Dockside dredging, like the development of more dockage generally, is a good candidate for public investment, coordinated private investment, and/or coordinated public/private investment**. "*Dredging is an eternal problem in all these harbors . . . and when an individual wharf owner takes it on, it's insurmountable. If the wharf owner, the city and the state and the federal government take it on, it's only moderately insurmountable.*"
- **Dockside dredging will require a solution to the problem of where the dredged materials can be safely disposed.**

3. **Haul-out facilities:**

- **Large (70-100 ft vessels):** As indicated in the earlier report, Gloucester's haul out facilities are losing large vessel (70 – 100 ft ) business to haul-out facilities in other ports: to ProMet in Providence, RI, and to D N Kelley & Sons or Fairhaven Shipyard in Fairhaven.  Regarding groundfish vessels, one panel member put it this way: "*I know a lot of big operators that are going to take their 90 ft steel boats down to ProMet [in Providence, RI] or down to D N Kelley's in Fairhaven or down to Fairhaven Shipyard because they can't get it done here [in Gloucester]. I mean, it's not anybody's fault, but, you know, you hate to see that money spent in New Bedford or in Providence, RI, when it could get spent here . . "* To the extent that vessels go elsewhere, they initiate a downward spiral in available services: the more that vessels go elsewhere for services, the harder it becomes for facilities here to continue to offer services.  Thus, a panel

member voiced the view that when fishermen take their vessels elsewhere, they are "*shooting themselves in the foot.*"

- **Very large vessels**: Even larger vessels, such as the 140 ft herring and mackerel mid water trawlers in Gloucester, have had to use facilities in New London, Connecticut; other vessels along the coast that are in this size class (140 ft) routinely go to Canada: "*Shaftmaster's boats up in New Hampshire . . . O'Hara's boats .. .All those boats, the first place they go to when they get work done is up to Canada.*" These larger vessels "*do the little stuff nearby, but take the big stuff outside*"; this is unfortunate because "*if you don't give us the bigger stuff, we may not be here for the smaller stuff.*"

- **Existing facilities adequate but need to prepare for more work:** The panel was generally of the view that the issue regarding haul-outs was not that additional facilities are necessary in Gloucester (now or in the future when groundfish stocks are rebuilt), but that the existing facilities (Gloucester Marine Railways and Rose's Marine) need (1) to ready themselves to meet increased needs in the future, and (2) to try to capture some of the large boat haul out business going south to Providence and Fairhaven and north to Canada. At the same time, it was also recognized how difficult it is for the existing facilities to handle more business when commercial fishing vessel haul outs are 'bunched up' as a result of fishing being 'bunched up' by regulatory requirements, especially the 'rolling closures.': "*Everybody's on the Railways in April. Nobody's on the Railways in July.*" It's a "*feast or famine*" business.

- **Possible use of recreational haul out facilities**: The panel also explored the idea that some of the facilities servicing recreational vessels in Gloucester could begin to service more of the smaller sized commercial fishing vessels, so as to free up the commercial vessel haul out facilities (Rose's and the Railways) to haul out more of the larger commercial vessels. It was noted, for example, that Cape Ann Marina, a recreational facility, routinely hauls only one (small) commercial groundfishing vessel and a few lobster boats. It was also noted, however, that even the 'small' commercial vessels could be too heavy for the lifts at the recreational facilities.

- **Chamber of Commerce help in advertising the haul out facilities (and other commercial fishing vessel services) in Gloucester:** The panel suggested that the Cape Ann Chamber of Commerce could become more involved in promoting the commercial fishing vessel services in Gloucester: "*They might promote the local facilities . . .: 'come here, get the personal touch,' you know? 'We can haul a good-sized boat . . . [We] won't walk off your boat. [We're] going to be there, attending to your every need. . .*" This could build on the Chamber's annual publication of the Gloucester Seafood Industry Directory, which is produced in connection with the annual International Seafood Industry Show held in Boston every year (**www.bostonseafood.com**), but would need to focus more on the harvesting side of the industry than the processing side (which is the focus

of the annual Boston Seafood Show). One venue for this promotion could be the biannual Fish Expo held in Providence, Rhode Island (**www.fishexpoatlantic.com**).

4. *Services for visiting vessels*: Consistent with the need for short-term berths for visiting vessels, it is important to ensure that there are services for the vessels and the people on them when they come into Gloucester for a period of days, weeks, or months. This is key to the success of Gloucester as a regional hub, or, as articulated by a panel member: "*If we can have a core structure in town, . . . the vessels will come because we've got everything here. Otherwise [boats] [will] need to go to Portland or New Bedford. You know, Boston has nothing . . [except places from which] you order supplies.*" The kinds of services required for visiting vessels include all those required for 'permanent' or homeported vessels (described in our earlier report), but also services focused specifically on visiting vessels and their crew (which likely don't have access to a car): places within walking distance of the docks (likely on the western side of the harbor) to eat, to stay, and to buy food. Food delivery services for vessels grubbing up for trips would also be useful; such services are currently available in New Bedford.

5. *Temporary living quarters for visiting fishermen and skilled tradesmen*: The panel identified a strong need, now and increasing in the future, for temporary living quarters for the captains and crew of visiting vessels and for skilled tradespersons who come into Gloucester to work on vessels while they are in port. As indicated above, in the discussion of the need for short-term berths, there are at present vessels and crew seeking temporary quarters in Gloucester that cannot be accommodated, and this pressure is likely to increase. While visiting fishermen have the option of sleeping on their vessels, it was felt that many would prefer to stay onshore and have basic amenities. A panel member noted: "*At one time we used to have a YMCA in town. You could rent a room, very reasonable, you know, a clean room, a shower. You can't do that now. These guys that come in town seasonally, I'm sure they don't want to stay on their boat all the time.*"[24]

- o **Necessary restrictions on temporary housing:** The panel identified the following restrictions that should likely apply, in order to make temporary housing for crew and skilled tradespersons workable:
  - o Temporary residents could be sponsored by the vessel or shoreside business for which they are working; that would ensure that the facility is being used only by fishing industry members and only in connection with fishing industry business.
  - o There could be a maximum period of time for which temporary quarters could be rented (2 months, 3 months?).
  - o Others, to be developed.

---

[24] In addition, in the past, the Gloucester Fishermen's Institute provided temporary quarters for visiting fishermen. *Cf.*, Martha Oaks, *The Gloucester Fishermen's Institute, 1891-1991* (Gloucester Fishermen's Institute 1991).

Exhibit C
(Part 2)

- ○ **A 'barracks' model:** One idea for temporary housing was a 'barracks' model in which there is "*a room with a bed, a common bathroom, showers, a mess hall where you can get a meal.*" IDs would be checked; it would be "*all done [on the] up-and-up.*"
- ○ **Possible locations for temporary quarters for fishing industry members** include spaces on the Fort that are outside the DPA and spaces in East Gloucester that are in the DPA but outside chapter 91 jurisdiction (because not on filled tidelands).

6. ***Fresh fish processing and the creation of value-added fresh fish products:*** The panel is strongly of the view that the City and the Commonwealth should consider what they can do to help bring back more fresh fish processing to Gloucester. While some amount of processing still takes place in Gloucester (see our earlier report)[25], most of the fish landed and sold in Gloucester is trucked to Boston or elsewhere for processing. When this happens, much of the value of the fish leaves the city. With significantly increased groundfish landings in Gloucester in the future, that much more value will be leaving the city. While the panel recognizes that major new fish processing plants have come 'online' in Boston, it believes that there remains in Gloucester an important role for groundfish processing. Moreover, some fish businesses in Gloucester would like to expand their fish processing/cutting activities.

- **High quality/ value added:** The panel is particularly interested in fish processing for high quality fresh fish and for value-added fresh fish products, and believes it is critical to start developing capacities now, as stocks rebuild. "*You need to capture the markets today as the increases come up.*"
- **A Gloucester or Massachusetts 'brand':** The panel believes that an important way to capture those markets, and start producing for them, is to develop a 'Gloucester' or 'Massachusetts' brand for Gloucester- landed fish. "*Once you produce this again, labeled as a Massachusetts fish . . . you have an incentive for people to buy here . . .*"
- **Capacity issues:** As indicated in our earlier report, three of the key issues that need to be addressed in determining whether and how fish processing can be increased in Gloucester are:
  - ○ **The need for an increase in wastewater pretreatment capacity.** The question of need and options for meeting that need should be examined by the City and Commonwealth.
  - ○ **The question of fresh (or sea) water inputs for processing.** This question should also be examined by the City and the Commonwealth.

---

[25]      In fact, Intershell just won the prize for 'Best New Foodservice Product' at the international seafood show in Boston in March 2005 for its newly developed 'Seafood Naturals,' tubes of 'pate-like steamed seafood,' of which there are seven varieties: scallop, crab, lobster, shrimp, haddock, salmon, and ankimo. Intershell developed these new products in its headquarters facility on Gloucester Harbor.

- o **The possibility of a protein recovery plant to process fish waste.** Sophisticated, odor-free technologies for protein recovery have been developed and are in use in cities around the world. Protein recovery is currently being undertaken on the waterfront, by OceanCrest, in its reduction of groundfish waste into a fertilizer product, 'Neptune's Harvest.' Some members of the industry are looking into ways of bringing additional protein recovery capacity to Gloucester, possibly in a mobile form (on trucks). This additional protein recovery capacity in Gloucester would support and help make possible increased fish processing in Gloucester. Moreover, it would also capture the value produced by protein recovery locally (currently, for example, Cape Seafoods trucks its herring and mackerel waste to Canada).
- **Location**: The panel expressed the view that the State Fish Pier could be a good location for wastewater pre-treatment and for additional fish processing (in the stalls buildings).

7. *Miscellaneous other commercial fishing industry harbor needs (in addition to those listed in our earlier report):*
- o Covered (dry) spaces to work on or rebuild an engine, when a fisherman does it himself, or with help
- o Open space to work on gear
- o Sheds for storing gear
- o A net reel truck

8. *Public investment on the waterfront*: Panel members have mixed views on the question of public investment on the waterfront.
- On the one hand, they are of the view that there should be public investment on the waterfront, both because of the public character of chapter 91 and DPA land and the attending limitations on what private owners can do with such land, and because of the sheer impossibility of small private owners amassing the capital required to make certain publicly beneficial improvements, as, for example, in increasing dockage.
  - o One panel member, a fisherman and a shoreside property owner, expressed it this way: *"Before I was a property owner or before the Auction was ever built, I used to always think – and say – I can't believe the Ciullas, and the Parcos, and the Nicastros, and the Parisis, and everybody would own these properties and are taking hits . . . you know, they're getting taxed as if they've got these lucrative properties, but their hands are tied and they're sticking right with it, and continue to put pilings in and continue to let boats tie there ... that you would think that between the City and the State that [there would be] . . some kind of break to have these property owners maintain their properties for the commercial [fishing industry] use."*

23

- However, panel members also have concerns about public investment on the waterfront. For one, the small businesses that comprise the commercial fishing industry, whether vessel owners or shoreside business owners, are entrepreneurs and, as such, do not want 'handouts'; they want to be able to make the market work for them. *"I'm one of the guys that thinks the industry should support itself . . . from a capitalistic perspective."* For another, there is concern about the efficacy of public investments. This latter concern goes so far as to as create skepticism about public planning processes (such as that currently being undertaken): *"There's a refreshing difference between having bureaucrats design a solution, spend God knows how much money on a planning process; it's so inefficient and it's likely not to hit the target. . . .Compare that to where there's a demand, and investment, and capitalization on that investment."*

  o The public investment for the State Fish Pier stalls buildings is a continuing source of frustration for some: both that the stalls buildings were not used for small fish processors as originally envisioned, and that there were no small fish processors lining up to rent them when they became available.

  o Another unhappy memory of public investment concerns the Gloucester Revolving Loan Fund, Inc., a shoreside revolving loan fund created in 1994 and funded by the City with monies obtained from a grant from the federal Economic Development Administration. In the 1990s, this shoreside loan fund failed to get its money out on the street to the shoreside businesses supporting the commercial fishing industry (the businesses it was created to support). Panel members attribute this failure to the shoreside loan fund's relative lack of knowledge about the fishing industry, its lack of experience making loans to the fishing industry (and hence its turning down of applicants that were in fact good credit risks), and an insufficient number of applicants to the fund. (They also compare it, unfavorably, to the Cape Ann Commercial Fishermen's Loan Fund, the revolving loan fund for fishermen, which has a very good record in making loans and having them paid off.) Further troubles with the shoreside loan fund came when the City failed to provide monies to match the Gloucester Revolving Loan Fund's federal monies, as the EDA grant required.[26] As a result of these failures, the Gloucester Revolving Loan Fund had federal funds taken away from it and deposited with the Mass Development Finance Agency. (One panel member recalling these events suggested that, even now, the Mass Development Finance

---

[26]     See Economic Development Administration, Office of Audits, Atlanta Regional Office, "City of Gloucester, Massachusetts; Northeast Fisheries Initiative; EDA Grant No. 01-19-63004. Audit Report No. ATL-10253-8-XXXX." (March 1998).

Agency "*would love to use that money in Gloucester if the right project came along.*")

- On a happier note, however, panel members note that the Gloucester Revolving Loan Fund (the shoreside loan fund created in 1994) is still in existence and has made at least one recent loan very important to the commercial fishing industry. This was a loan of $60,000 at 3% over a 5-year period, to a shoreside business that supplies critical services to the commercial fishing industry; the loan was for crucial maintenance and repair.

- Given their mixed views on public investment, panel members are keen that public investments in the future be 'smart,' carefully thought out, well-informed, and monitored. Some particular ideas for public investment were put forth:

  o **Commercial vessel dockage**. It was suggested (as indicated above in the section on dockage) that the City consider finding a way to enter into long term leases with the owners of certain waterfront parcels where dockage is dilapidated (eg the Building Center) for the waterfront strip of the parcels and then develop and manage municipal dockage for commercial vessels on those waterfront strips. This may be especially important for the development of short-term berths for visiting commercial vessels as it's near impossible for a private owner to "*go to the bank and get a loan on transient boating . . . because you don't know .. .it's going to come in waves*" and the waves will come and go with changes in fishing regulations and the location and size of fish stocks.

  o **Long term (50-60 year) government loans to enable people committed to the fishing industry to buy, own, and manage waterfront properties for the fishing industry**: Another idea is to create long term government loans for people committed to providing shoreside services to the fishing industry over the long term. These loans could enable people committed to the industry to purchase properties from those no longer participating in the industry (i.e., keeping their parcels idle or developing or renting to non-marine industrial or non-commercial fishing industry uses). These would be loans considered 'too risky' (and too long term!) by banks; however, an informed lender could ensure that loans that seem 'high risk' – to lenders not knowledgeable about the fishing industry – are not in fact high risk (the Cape Ann Commercial Fishermen's Loan Fund serves as a model). Such a system of loans could enable people committed to the fishing industry to buy properties from property owners "*trapped*" with properties in the DPA who have little or no interest in continuing with the fishing industry. These loans could have, as a condition of their issuance, a provision that the land be used to support the commercial fishing industry. It is recognized that, if someone were to hold this kind of

long term loan, "*in essence what I'm doing is I'm leasing it* [the [property] *from the government."* Nonetheless, however, the actual property owner (the one receiving the long-term loan) would remain fully responsible, as the owner, for the burdens, risks, and liabilities of ownership (property taxes, insurance, maintenance, etc.).

o **Other mechanisms that aid shoreside business owners already owning property and using it to support the fishing industry:** "*If you're going to have stringent zoning regulations within the DPA, then built into that needs to be a mechanism that people stifled by those regulations can leverage their property in order to maintain it for industrial use.*"

9. ***Other comments on the planning process and the DPA:***

o **This is an important process:** "*It seems to be there's an awful lot of Gloucester Harbor that's just, you know, over the years, from when I came in the 60s and 70s, it's just kind of gradually falling into the sea.*"

o **Incentives:** The panel recommends that the planning process focus on developing incentives for property owners "*that could be employed to get people to do something with their property that would be of a positive nature rather than sitting on one's land hoping that eventually the City [or the State] will decide to change their ordinances or lightning will strike.*"

o **A 'shopping list' of incentives:** The panel recognized that there are a variety of devices to create incentives (the transfer of development rights concept which could be adapted to consolidate 'supporting uses' on particular parcels; mitigation; tax breaks; favorable financing terms, etc.) and requested that the planners create a list of these different devices, an explanation of them, and some advice about them: "*Can somebody assemble a shopping list of different incentives?. . . if we had them on the table, it's a whole lot easier than trying to reinvent the wheel . . .*"

o **Allowable uses of DPA properties:** Similarly, the panel seeks clear advice for property owners, now and on a continuing basis, about what kinds of uses qualify as supporting, accessory, and temporary DPA uses.

o **'One stop shopping':** The panel seeks a central place for well-informed, accessible, and responsive staff to answer questions and provide information on chapter 91 rules, DPA rules, and City zoning rules.

o **The danger of 'hardening' non-marine industrial uses within the DPA:** The panel discussed the idea that under a scheme similar to a 'transfer of development rights,' the 25% supporting DPA uses might be consolidated in particular parts of the waterfront. The panel was of the view that a scheme like this could be dangerous to the shoreside infrastructure because it could have the effect of permanently removing certain key areas or facilities from uses that support the commercial fishing industry. "*How do you regulate that in advance?*"

o **A compatible use:** Boat building is a compatible use on the harbor.

10. ***Fishing industry needs in Gloucester that do not involve the harbor directly:***
- o **Affordable housing** for the crewmen and captains of fishing vessels and for skilled tradespeople (mechanics, welders, etc.), who work in the shore-side businesses that support the fishing industry.
  - o Regarding skilled persons to work in the shoreside support industries (welders, wood workers, mechanics, etc.): *"There's a lot of skilled labor who would love to come to Gloucester, and live, and work. But guess what? . . . They can't afford to."* The shoreside businesses are, as a result, required to hire people who commute in and out of Gloucester: *"You want to commute here? Would you commute? Would you stick with that? You know, that's a haul. Who can live here?"*
  - o *"If people who work and depend on the fishery can't afford to live here, we lose the political clout and then the people who do live here wouldn't care. . . It's really critical that we make sure housing is affordable for everybody that works here."*
- o **High school programs in the marine trades**: *"Is [the] high school providing the training necessary to turn out the artisans that you're going to need to work in these [boat] yards? The diesel mechanics, the professional painters, the whatever it is, there's a whole list of specialty jobs.."* There is also interest in bringing back the commercial fishing education programs that used to be held at the high school and, perhaps, offering them together with education programs on marine science, to help turn out 'home-grown' fishermen of the future, the next generation of fishermen, who will fish in the sustainable, managed fisheries of the future.
- o **Banks with up-to-date knowledge about the fishing industry:** Two banks that used to do substantial business with the fishing industry are no longer in operation; these were the Cape Ann Bank & Trust Company and the Gloucester National Bank: The first became the Bank of New England, and then called in all its notes on boats. The second became the US Trust Co and then was bought by Citizens Bank; it doesn't do boat loans now. *"Boat owners who have larger boats go out of the area. They go up to New Hampshire or Maine to larger banks and banks that are more experienced. And quite frankly, the banks have no interest in lending money to boat owners around here. . . [In the past] everytime a fisherman would walk into a bank when times were good, that was a valuable customer and the banks competed for the business. And don't you think that the boat owners played one bank against the other: . . . they didn't treat you right, you go across the street."*
  - o Currently, banks in Gloucester generally require real estate as collateral, have trouble with fishing businesses that are S corporations (instead of C corporations), and do not understand the real value of fishing boats with groundfish permits. The latter point was explained: *"Now we're in a different market than we were five years ago. Now, all of a sudden, you've got a boat that's worth*

> some money.  Now you've got a permit that's worth more than the
> boat . . . You're in a whole new realm of things and they don't know
> how to handle that."

- One exception to this trend is the Rockport National Bank, which is making some loans to the local fishing fleet and which, by virtue of its president's participation on the Board of the Cape Ann Commercial Fishermen's Loan Fund and by other means, has specific knowledge of the commercial fishing industry in Gloucester.

- **No more 'redlining' of Gloucester boats seeking insurance!**  A fisherman panel member recounted his recent experience seeking boat insurance for his vessel.  He received a quote from a company, then the company refused to honor the quote.  In the time between his receiving the quote and the company refusing to honor it, someone was hurt on another vessel in Gloucester, similar to his vessel ("*similar operation as mine*").  In inquiring why the company would not honor the quote they had given him, he was told that the company would no longer insure Gloucester vessels: *"No more Gloucester boats."*   The insurance problems in Gloucester are long-standing and stem, at least in part, from a series of sinkings in the 1980s.  But, in 2005, Gloucester continues to have "*a big black eye.*"   Panel members report that insurance costs on Gloucester vessels are routinely higher than on comparable vessels in other ports (when insurance for Gloucester vessels can be purchased at all). Many Gloucester vessels do not carry any insurance (one estimate was that 80% of Gloucester boats lack insurance), and this poses a host of problems: a strong disincentive to use crew for fear that crew will injure themselves (and so a strong incentive for an owner-operator to take his vessel out by himself alone); fear of going out in "*so-so weather*" if one does have crew, again, for fear crew will get injured, and sue; ineligibility for public dockage, the use of which requires evidence of insurance (e.g., the State Fish Pier and the Municipal docks), and, increasingly, ineligibility for private dockage, as more and more private owners of wharves are also requiring vessel insurance; and ineligibility for federally or state funded cooperative research projects, which require participating commercial vessels to carry insurance.

- **Boat (permit) brokers** who are local, or, in any case, more of them, as there are only "one or two brokers" from Portland to Providence.

28

## D. COMMENTS ON NON-FISHING INDUSTRY USES OF THE HARBOR

1. *Tourism*
   - The panel was strongly of the view that tourism in Gloucester need not be incompatible with the fishing industry in Gloucester. The panel's view is that the presence of the fishing industry in Gloucester is a major draw for tourists and that it distinguishes Gloucester from many other coastal destinations. "*The people that come from Kentucky for the summer: all they know about Gloucester is the Gloucester fisherman they see on TV on the Gorton's ad. They want to come here and see a booming, bustling, working waterfront town . . ."*
   - Gloucester fishermen are, in general, accustomed to curious tourists and not averse to them; many fishermen in fact are proud to show off their trade. However, there are some areas of the working waterfront where it is not safe to allow tourists to wander. Further, the City must ensure that the goal of attracting tourists does not overwhelm or interfere with the activity in town largely responsible for drawing tourists in the first place, the commercial fishing industry. Other than that, the principal concern fishermen have about tourists in Gloucester is the same as that of most people in Gloucester: the traffic!
   - Some suggestions for improving tourism in town include:
     - **Access points for tourists to walk down to the working waterfront in certain areas where it is safe for them to do so**. Some possibilities:
       - A safe pathway to walk down to the Fort area.
       - An observation walkway at the State Fish Pier: "*I remember, years ago, in the development of the State Fish Pier, there was talk of a public pathway that would go through the processing plant from start to finish, you know, [from] when the fish first come in all the way to the shipped-out product."*
       - Others, to be determined.
     - **Restaurants** from which to see the commercial vessels; restaurants that feature locally caught fish
     - **Fresh fish market(s) featuring locally caught fish**
     - **The branding of locally caught fish** & the use of such to create high quality fish products
     - Further development of (and better publicity about) **the Maritime Heritage Center, including the 'oceanarium' featuring local species.** "*I'd like to be able to say, look there's a heritage center over there if you want to find out about the herring . . ."*

2. *Restaurants:* Restaurants from which commercial vessels can be seen and that feature locally caught fish are good not only for tourists but for people who live year-round on Cape Ann or the North Shore; they give people a reason to be on the waterfront, seeing and appreciating the commercial fishing work that is

done on the waterfront.  Such restaurants are appropriate for 'supporting uses' under the DPA rules.

*3. Fresh fish market(s)*:  Gloucester suffers for not having markets that feature locally caught fresh fish.  The presence of such markets on the waterfront would help to educate both local residents and tourists about the commercial fishing industry in Gloucester and would supply them with high quality, fresh product caught in New England waters and landed right in town.

4. *The incompatibility of recreational marinas*:
- The panel spent a good deal of time discussing the fact that there is interest in using Gloucester waterfront space for docking of recreational vessels, both locally homeported vessels and visiting or 'transient' vessels.  The panel talked through a variety of options to allow dock owners to use some part of their space to rent to recreational vessels while requiring them to maintain the other part of their space for commercial vessels.  The panel recognized that money from renting to recreational vessels could help owners develop and maintain more dockage for commercial vessels.   However, after an extensive discussion, the panel decided that it could NOT recommend that Gloucester waterfront space be used for recreational dockage (beyond those parts of the Gloucester waterfront, in East Gloucester, that are already being used for recreational dockage, having been 'grandfathered in' to the DPA when it was first created).   Among the reasons were:
    o Commercial fishing vessels need to be able to go out fishing in the early morning hours (whether 2 AM or 5 AM), and when a vessel gets ready to go out, the captain and crew make noise and the vessel itself creates noise and fumes.   This is not tolerable to people on sleeping on recreational vessels (this is also one of the reasons residential uses of the DPA are also incompatible with commercial fishing).  Put bluntly, recreational marina owners and recreational vessel owners who rent berths "*don't want anybody starting up a 'stinky' fishing boat at 5:00 in the morning.*"
    o It is unlikely that recreational vessel owners can tolerate the sights, sounds, and smells of commercial vessels during *day or night.*
    o There is a danger of collisions between commercial and recreational vessels at the same wharf:  "*A little breeze of wind, a guy trying to get fishing, he crushes $700,000 worth of fiberglass.*"
    o Given these incompatibilities, given the demand for recreational berths, and given the willingness and ability of some recreational vessel owners to pay higher rents for berths than commercial vessels can afford to pay, it is likely that wharf owners would rent to recreational vessels over commercial vessels, and then commercial dock space would be lost to recreational vessels.  What's more, once commercial vessel dock space is lost to recreational vessel dock space, there is no likelihood that the commercial dockage

30

would ever be regained.  Experience throughout port communities has been that once recreational vessels are allowed on commercial docks, they take over and push out commercial vessels: *"once it creeps in, the creep starts to become a landslide."* [27]

o  New or expanded development of recreational marinas is not permitted in a DPA, even as a "supporting DPA use" (see 310 CMR 9.02).

5. ***The incompatibility of residential uses***:  The panel believes that residential uses of the waterfront are fully incompatible with the commercial fishing industry infrastructure required to support the commercial fishing industry in Gloucester (moreover, as residential uses are not considered to be "water dependent" uses, they are not permitted under chapter 91 or under DPA rules).   However, the panel believes that temporary quarters for working fishermen and tradespersons on short-term fishing industry business in Gloucester (as described above in section C 4) could be appropriate on parts of the waterfront outside of areas subject to chapter 91 and the DPA rules.

---

[27]        See Marine Law Institute, University of Maine, in association with the Center for Applied Social Science, Boston University, *Guidebook to the Economics of Waterfront Planning and Water Dependent Uses*, pp. 24-26 (1988).

## E. GLOUCESTER PANEL MEMBERS CONTRIBUTING TO THIS REPORT[28]

David Bergeron, Massachusetts Fishermen's Partnership
Corrado Bucchieri, B & N Fishing Gear
Billy Crossen, F/V Odessa
Vito Giacalone, F/V Jenny G & Northeast Seafood Coalition
David Goethel, F/V Ellen Diane
Ellen Goethel, F/V Ellen Diane
Viking Gustafson, Gloucester Marine Railways
David Jackson, F/V Jeopardy
Don King, Homeward Bound Twine
Scott Memhard, Cape Pond Ice Company
Grace Moceri, Gloucester Marine Railways
Gerry O'Neill, Jr., Cape Seafoods
Rosalie Parisi, All Accounts
Sam Parisi, Pier 7
Marc Sandler, Sandler & Laramee
Angela Sanfilippo, fisherman's wife
Joe Scola, F/V Dolores Louise
Chris Sherman, F/V Lady Jane & Northeast Seafood Coalition
Russell Sherman, F/V Lady Jane
Paul Vitale, F/V Angela & Rose

Greg Ketchen, City of Gloucester Harbor Plan Implementation Coordinator[29]

Sarah Robinson, Gloucester Panel Coordinator

---

[28]    Listed members are people who (1) participated in the Summer 2004 meeting in which the Panel met to consider commercial fishing industry needs on Gloucester Harbor in order to make a contribution to the harbor plan and DPA master plan update process, and (2) other panel members who were unable to make the Summer 2004 meeting but who reviewed this report in draft and offered their comment and input.  For a list of all people contributing to the Panel's first report (which made many of the points reiterated and elaborated here), see 'A Study of Gloucester's Commercial Fishing Infrastructure: Interim Report' (October 15, 2003), Appendix A.

[29]    Mr. Ketchen participated, most helpfully, in all of the Panel's Infrastructure meetings, including the Summer 2004 meeting that focused specifically on the need to update Gloucester's harbor plan and DPA masterplan.  However, this Supplemental Report on 'Commercial Fishing Industry Needs on Gloucester Harbor, Now and in the Future' has not been reviewed by Mr. Ketchen.  The panel decided not to consult with Mr. Ketchen on the review of the panel's report only because Mr. Ketchen, in his role as coordinator of the harbor plan and DPA master plan update process, is one of the report's intended recipients.

**APPENDIX**
**(Tables and Figures)**[30]

Table 1:  New England Groundfish Landings, 1975-2003: Gloucester Groundfish Landings & Total NE Groundfish Landings

Figure 1 (prepared with data from Table 1): Gloucester Groundfish Landings v. Total NE Groundfish Landings, 1975-2003

Figure 2 (prepared with data from Table 1): Percent of Total NE Groundfish Landed in Gloucester, 1975-2003

Table 2: Gloucester Landings & (Ex-Vessel) Revenues, 1975-2004: Groundfish // All Species Combined

Figure 3 (prepared with data from Table 2): Gloucester Ex-Vessel Revenues: Groundfish Revenues & Total Revenues (from All Species Combined), 1975-2004, in 2002 Dollars

---

[30]     All tables and figures have been prepared by Sarah Robinson, with data obtained from the National Marine Fisheries Service's Fisheries Statistics website  (**www.st.nmfs.gov/st1** ) and from the Statistics Office of the New England Region Office ( **www.nero.noaa.gov**) in response to specific data requests.

Table 1:

**NE GROUNDFISH LANDINGS, 1975-2003:**
**GLOUCESTER GROUNDFISH LANDINGS & TOTAL NE GROUNDFISH LANDINGS\* \*\***

| Year | Gloucester-Landed Groundfish (pounds) | Total NE Groundfish (pounds) | Percent of Total NE Groundfish Landed in Gloucester |
|------|------|------|------|
| 1975 | 36,280,700 | 208,246,800 | 17.40% |
| 1976 | 40,397,218 | 205,418,200 | 19.70% |
| 1977 | 61,817,769 | 266,507,500 | 23.20% |
| 1978 | 67,716,590 | 301,078,487 | 22.50% |
| 1979 | 63,187,025 | 317,221,114 | 19.90% |
| 1980 | 73,684,623 | 368,317,749 | 20% |
| 1981 | 81,252,607 | 346,422,492 | 23.50% |
| 1982 | 77,666,485 | 363,738,504 | 21.40% |
| 1983 | 66,998,751 | 355,973,026 | 18.80% |
| 1984 | 60,745,588 | 305,503,101 | 19.90% |
| 1985 | 55,744,664 | 260,664,944 | 21.40% |
| 1986 | 50,811,935 | 221,262,772 | 23.00% |
| 1987 | 28,921,257 | 194,493,106 | 14.90% |
| 1988 | 28,749,347 | 186,538,697 | 15.40% |
| 1989 | 24,082,748 | 167,264,108 | 14.40% |
| 1990 | 34,975,064 | 196,434,790 | 17.80% |
| 1991 | 30,631,784 | 186,598,928 | 16.40% |
| 1992 | 23,890,521 | 155,057,268 | 15.40% |
| 1993 | 20,716,690 | 125,744,404 | 16.50% |
| 1994 | 15,210,249 | 93,134,375 | 16.30% |
| 1995 | 13,405,110 | 79,033,606 | 17.00% |
| 1996 | 11,825,701 | 78,935,413 | 15.00% |
| 1997 | 11,246,111 | 78,718,345 | 14.30% |
| 1998 | 14,190,639 | 80,856,542 | 17.60% |
| 1999 | 12,979,087 | 77,035,805 | 16.80% |
| 2000 | 14,257,336 | 93,584,582 | 15.20% |
| 2001 | 16,117,674 | 111,947,729 | 14.40% |
| 2002 | 14,223,912 | 100,784,408 | 14.10% |
| 2003 | 15,806,588 | 97,366,398 | 16.20% |
| AVG |  |  | 17.88% |

\*  "Groundfish" refers to the twelve different species regulated under the NE Multispecies Management Plan (large mesh multispecies); these are: Atlantic cod, windowpane flounder, winter flounder, witch flounder, yellowtail flounder, haddock, white hake, Atlantic halibut, American plaice, pollock, ocean pout, & redfish.

\*\* Table prepared by Sarah Robinson, with data obtained from the National Marine Fisheries Service's Fishery Statistics website ( www.st.nmfs.gov/st1 ) and from the Statistics Office of the New England Region Office ( www.nero.noaa.gov ), in response to requests.



Figure 1 (created with data from Table 1)



Figure 2 (created with data from Table 1)

**Table 2:**
**GLOUCESTER LANDINGS & (EX-VESSEL) REVENUES, 1975-2004:**
**GROUNDFISH // ALL SPECIES COMBINED* ***

| Year | Gloucester Groundfish Landings (pounds) | Gloucester Groundfish Revenue (nominal dollars) | Gloucester Groundfish Revenue (2002 Dollars) | Total Gloucester Landings - All Species Combined (pounds) | Total Gloucester Revenues - All Species Combined (nominal dollars) | Total Gloucester Revenues - All Species Combined (2002 dollars) |
|---|---|---|---|---|---|---|
| 1975 | 36,280,700 | 7,969,503 | 25,197,075 | 122,139,875 | 14,503,977 | 48,499,358 |
| 1976 | 40,397,218 | 10,517,580 | 33,253,927 | 140,655,362 | 17,141,760 | 54,196,883 |
| 1977 | 61,817,769 | 15,880,581 | 47,143,837 | 143,712,805 | 21,517,984 | 63,879,296 |
| 1978 | 67,716,590 | 20,155,434 | 55,612,923 | 181,006,887 | 29,970,865 | 82,695,684 |
| 1979 | 63,187,025 | 21,610,176 | 53,549,183 | 154,113,393 | 31,000,942 | 76,819,139 |
| 1980 | 73,684,623 | 25,053,559 | 54,698,244 | 202,189,188 | 36,551,698 | 79,801,583 |
| 1981 | 81,252,607 | 32,169,030 | 63,665,660 | 166,541,276 | 45,871,918 | 90,785,017 |
| 1982 | 77,666,485 | 32,768,198 | 61,088,070 | 137,012,093 | 43,598,825 | 81,279,053 |
| 1983 | 66,998,751 | 29,007,501 | 52,394,071 | 142,352,929 | 38,041,974 | 68,712,361 |
| 1984 | 60,745,588 | 29,056,686 | 50,310,855 | 168,918,749 | 37,340,805 | 64,654,580 |
| 1985 | 55,744,664 | 27,763,290 | 46,418,363 | 108,962,873 | 37,128,740 | 62,076,769 |
| 1986 | 50,811,935 | 29,542,069 | 48,491,042 | 103,257,369 | 40,815,156 | 66,994,950 |
| 1987 | 28,921,257 | 20,643,793 | 32,692,063 | 87,927,229 | 34,397,075 | 54,472,128 |
| 1988 | 28,749,347 | 17,652,166 | 26,843,826 | 102,288,431 | 30,887,179 | 46,970,444 |
| 1989 | 24,082,748 | 16,642,876 | 24,145,592 | 94,280,768 | 30,848,737 | 44,755,547 |
| 1990 | 34,975,064 | 26,030,924 | 35,829,864 | 118,328,999 | 40,896,208 | 56,290,955 |
| 1991 | 30,631,784 | 26,548,035 | 35,066,017 | 101,232,904 | 39,995,961 | 52,828,733 |
| 1992 | 23,890,521 | 22,152,658 | 28,405,297 | 96,935,764 | 34,621,263 | 44,393,195 |
| 1993 | 20,716,690 | 20,680,616 | 25,747,009 | 63,069,524 | 31,302,670 | 38,971,283 |
| 1994 | 15,210,249 | 15,948,583 | 19,359,987 | 46,279,593 | 27,325,756 | 33,170,739 |
| 1995 | 13,405,110 | 14,837,678 | 17,515,081 | 61,023,981 | 25,541,460 | 30,150,319 |
| 1996 | 11,825,701 | 12,093,393 | 13,866,166 | 73,865,155 | 24,303,060 | 27,865,650 |
| 1997 | 11,246,111 | 11,256,365 | 12,616,947 | 78,646,682 | 23,497,650 | 26,337,864 |
| 1998 | 14,190,639 | 16,195,106 | 17,874,230 | 103,780,717 | 28,394,802 | 31,338,803 |
| 1999 | 12,979,087 | 15,555,750 | 16,797,596 | 46,586,375 | 25,584,082 | 27,626,509 |
| 2000 | 14,257,336 | 17,674,450 | 18,464,771 | 39,940,121 | 41,929,807 | 43,804,717 |
| 2001 | 16,117,674 | 20,590,567 | 20,916,110 | 73,901,973 | 37,961,334 | 38,561,513 |
| 2002 | 14,223,912 | 17,579,896 | 17,579,896 | 73,554,233 | 41,151,682 | 41,151,682 |
| 2003 | 15,806,588 | 18,006,715 | 17,605,478 | 83,756,657 | 37,795,464 | 36,953,282 |
| 2004` | 15,787,007 | 18,734,258 | 17,841,678 | 144,733,909 | 32,663,715 | 31,107,477 |

`2004 figures are preliminary only

* "Groundfish" refers to the twelve different species regulated under the NE Multispecies Management Plan (large mesh multispecies); these are: Atlantic cod, windowpane flounder, winter flounder, witch flounder, yellowtail flounder, haddock, white hake, Atlantic halibut, American plaice, pollock, ocean pout, & redfish. "All species combined" refers to all species landed in Gloucester for which NMFS collected data.

** Table prepared by Sarah Robinson, with data obtained from the National Marine Fisheries Service's Fishery Statistics website ( www.st.nmfs.gov/st1 ) and from the Statistics Office of the New England Region Office ( www.nero.noaa.gov ), in response to requests.

Figure 3 (created with data in Table 2):



Gloucester Ex Vessel Revenues: Groundfish Revenues & Total Ex-Vessel Revenues, 1975-2004, in 2002 Dollars

Exhibit D
(Part 1)

A Study of Gloucester's Commercial Fishing Infrastructure:
**INTERIM REPORT**

by

Gloucester Community Panel (Sarah Robinson, Coordinator)
Community Panels Project

Principal Investigators:
Dr. Madeleine Hall-Arber, MIT Sea Grant
David Bergeron, Massachusetts Fishermen's Partnership
Dr. Bonnie McCay, Rutgers University

*Submitted, as chapter IV of 'Comments on Amendment 13 by the Community Panels Project,'\* to the New England Fishery Management Council, on*

*October 15, 2003*

\* *Full report available at* <u>*www.fishermenspartnership.org*</u> *(click on 'Community Panels, A Pilot Project'), or at* <u>*web.mit.edu/seagrant/aqua/cmss*</u>*(click on 'Community Panels')*

1

# TABLE OF CONTENTS

Summary ........................................................................... 1

I. Introduction........................................................................3
      A. Background
      B. Purpose
      C. Method
      D. Outline

II. Infrastructure Needs for a Commercial Fishing Port....................................6
      A. Businesses, Structures, and Space
      B. People
      C. Intangibles

III. Discussion of Selected Elements of Gloucester's Shoreside Infrastructure..........7
      A. Preliminary Note on Catch and Vessels
      B. Buyers and Processors
      C. Ice Companies
      D. Haul-out and Repair Facilities
      E. Fueling Facilities
      F. Gear and Supply Shops
      G. Mooring Space
      H. Intangibles: Markets, Organizations, and Visions

IV. Some Characteristics of the Shoreside Support Businesses ...........................25

V. Gloucester's Shoreside Infrastructure Today...........................................27

VI. A Vision for the Port of Gloucester.....................................................31


Appendix A (List of Panel Members and Interviewees)

Appendix B (A List of the Businesses, Structures, and Space Comprising
Gloucester's Shoreside Infrastructure in 2003)

Appendix C (Figures 1- 16)

2

**A Study of Gloucester's Commercial Fishing Infrastructure:
Interim Report**

by

Gloucester Community Panel (Sarah Robinson, Coordinator)
Community Panels Project

**Summary**

This is an interim report on a cooperative research study of the shoreside infrastructure supporting commercial fishing in Gloucester in 2003. Gloucester is and has been for a very long time a northeast regional center for the United States fishing industry. Gloucester's fleet is changing, but, as before, the majority of its vessels fish for groundfish. However, some groundfish vessels fish for non-groundfish species as well, and there are also vessels in Gloucester that fish exclusively for non-groundfish species. Gloucester's shoreside support businesses serve Gloucester-based vessels but they also serve vessels from outside Gloucester. Because Gloucester is a regional hub, boats from outside Gloucester come to Gloucester for haul-outs, for machine parts, for gear, to land catch, and so on. They buy these services in Gloucester because they cannot get comparable services where they tie up; because they come to Gloucester to land fish and then pick up services while they are in the city; and/or because they temporarily relocate to Gloucester to be near the fishing grounds off Gloucester.

Gloucester's shoreside infrastructure, and hence its very status as a hub port, is precarious today. This is due, it appears, to the cumulative effects of diminished landings and extensive regulation of fishing throughout the 1990s. Moreover, Gloucester was significantly changed – diminished – by the 1997 federal buyback program which removed a significant proportion of Gloucester's large groundfish vessels, along with their seasoned captains and experienced crews.

At present, the shoreside infrastructure in Gloucester supporting commercial fishing consists of six or seven processors of any size (three for groundfish and other species, and three to four for specialty species); a seafood display auction that sells mainly groundfish; multiple buyers of fish (groundfish, tuna, lobsters, and others); multiple wharves for offloading; one ice company; two repair and haul-out facilities; several fuel services (though only one with a fuel barge); a handful of gear shops (one that sells bottom-trawl gear, one that hangs gill-nets, three that sell lobster and gillnet gear, one that sells mid-water trawl gear); and public and private berthing facilities. These shoreside businesses are tending to one of two directions: Some are sustaining serious financial losses and will likely cease operations, while some are staying solvent by diversifying away from serving the fishing industry. Fish processing businesses that, by their nature, cannot diversify away from the fish business, have either gone out of business or are diversifying away from Gloucester-landed (or even New England-landed)

groundfish. The few waterfront businesses who do not face the choice of diversifying away from the fishing industry or from groundfish are the buyers and processors of some non-groundfish species. Many of the species these businesses deal in, however, cannot support expansion (hagfish, lobsters) and may be short-lived as were dogfish and sea urchins.

This stripped down infrastructure is highly vulnerable to further cuts in fishing activity. As some businesses fail and others turn away from supporting commercial fishing, two things are likely to happen. First, if one or more of the critical elements comprising the fishing industry infrastructure disappears, the others will likely fall like 'dominoes.' If boats are unable to get a full suite of services in Gloucester, they will move to other ports where the full suite of services is available. Gloucester boats that are mobile will leave, and boats from outside Gloucester will cease coming to Gloucester. Second, as the Gloucester waterfront loses the set of services supporting the commercial fishing industry, the pressure to remove the marine industrial zoning restrictions in the waterfront area will mount, and, at some point, presumably succeed. When and if the waterfront is re-zoned (a matter of both city regulation and state law) and non-industrial, non-water dependent uses of the properties are installed, it will be, practically speaking, impossible to re-zone the area for marine industrial uses.[1]

The Gloucester fishermen and shoreside business owners who shared their expertises in this cooperative research project are appalled at the idea that pending measures to rebuild the groundfish fishery could have the effect of bringing down the centuries old commercial fishing infrastructure in the proud port of Gloucester. They fear that when groundfish landings are rebuilt and landings are increased 2.5 – 3x their current rates, there will be no Gloucester infrastructure, and hence no Gloucester industry, to participate in the fishery. This loss will be an economic loss, a loss of identity, a loss of skills, and a loss of a 'way of life' that has inspired and sustained people both inside and outside the industry. These losses will bring in their wake large social restructurings difficult to foresee.

---

[1]    One state law, Massachusetts General Laws, Chapter 91, requires that filled-in tidelands be used for water dependent uses or for a proper public purpose, and this law, which applies throughout the state, is unlikely to change. However, Chapter 91 applies to only the shorefront portions of the waterfront, and, unlike the requirements more vulnerable to change, does not require marine industrial use of such properties.

## I. Introduction

### A. Background

This is an interim report on Gloucester's shoreside infrastructure produced as part of an ongoing cooperative social science research project. The research project is entitled 'Institutionalizing Social Science Data Collection' and is funded by the Northeast Consortium and the Saltonstall-Kennedy federal grant program. The three principal investigators are David Bergeron, Executive Director, Massachusetts Fishermen's Partnership; Dr. Madeleine Hall-Arber, anthropologist at MIT Sea Grant; and Dr. Bonnie McCay, anthropologist at Rutgers University. Prof. David Terkla, economist at U Mass Boston, is a consultant to the project. The purpose of the project is to set up community panels in six fishing ports along the New England coast, and for the community panels to identify and develop critically needed social and economic information about their ports. The six ports in the study are Point Judith, Scituate, New Bedford, Gloucester, Portland, and Jonesport/ Beals Island. This project is one of only a few social science cooperative research projects regarding the fisheries, and it is predicated on the idea that members of the fishing industry (including the allied support industries) are experts in their fields and that their expertise is essential to developing accurate and useful information about the social and economic side of the fisheries.

In Gloucester, the panel is composed of fishermen (owners and operators of small, medium, and large draggers, small and medium gillnet boats, and one small long-lining vessel), owners and operators of shoreside businesses (the seafood display auction, fish processing facilities, the ice company, gear shops, the marine railways), a settlement agent, a maritime attorney, representatives of fishing industry organizations (the Gloucester Fishermen's Wives Association and the Northeast Seafood Coalition), Gloucester's Harbor Plan Implementation Coordinator, and others. Some members represent both the shoreside and the harvesting sector: One fisherman is also a wharf owner, and one gear shop owner is also a lobsterman. The coordinator of the panel is Sarah Robinson, PhD candidate in anthropology at Harvard University. Thirty-four people contributed to this study, either as panel members or through interviews with the panel coordinator. A complete list of panel members and interviewees is appended to this report as Appendix A.

### B. Purpose

The Gloucester panel decided to focus on the status of the commercial fishing infrastructure in the port of Gloucester. Gloucester today is predominantly a groundfish port, and it is a hub for groundfish vessels in the region. (In 2001, 71.4% of the revenues of multi-species vessels homeported in Gloucester were from groundfish; this figure averaged 63% in the period 1994 to 2001.[2]) Panel members wanted to

---

[2]    See Amendment 13 DSEIS, Volume II, p. 1410, Table 542: Fishing Activity for Vessels Homeported in Gloucester (August 21, 2003). This table may overstate the percentage of total Gloucester fishing revenues from groundfish because the table examines only those vessels homeported in Gloucester

determine the effects of increasingly severe federal restrictions on groundfishing (beginning with the emergency closure of Georges Bank in 1993 and continuing through Amendments 5 and 7, various frameworks, and the Interim Rule) and related programs (the buyback program) on the shoreside infrastructure in Gloucester.

Moreover, the pendency of Amendment 13 makes a study of shoreside infrastructure both timely and essential. There is widespread concern that the shoreside infrastructure in Gloucester will not survive the additional cuts in groundfishing that will be mandated by Amendment 13. Moreover, there is concern that a loss of infrastructure will mean the loss of the fishing industry in Gloucester. This is because the industry cannot exist without supporting shoreside infrastructure. Finally, there is concern that this loss of infrastructure and industry, when and if it comes, will be permanent. When and if the offloading facilities, the ice house, the fishing vessel berths, and so on disappear from the waterfront, their place will be taken by other uses (residential, recreational, non-water dependent commercial, etc.), and these other uses will not be easily dislodged in the future. This concern about the practical irreversibility of the loss of commercial fishing infrastructure on waterfronts is supported by basic principles of economics and by case studies of such change.[3]

This scenario is especially disturbing for community panel members because the goal of Amendment 13 is to rebuild groundfish stocks to levels that will permit a two and one-half to three fold increase in permissible landings.[4] The fishery will be rebuilt, and is already rebuilding.[5] The grave and abiding concern is that, in the future, when federal regulations permit the harvesting of these rebuilt stocks, Gloucester will not be able to participate in the fishery because it will have lost its infrastructure and its industry during the rebuilding period, and it will not be able to get them back.

The study of shoreside infrastructure, therefore, was an obvious priority for the Gloucester community panel. The urgency of undertaking the study was underscored by the fact that the New England Fishery Management Council's study of the likely social and economic impacts of Amendment 13 does not include an assessment of the impacts of Amendment 13 on shoreside infrastructure in the New England fishing ports.

---

that have federal multispecies permits. However, the percentage of federally permitted vessels homeported in Gloucester with multispecies permits is very high. Of all federally permitted fishing vessels claiming Gloucester as a primary port, 87 per cent have multispecies permits. See NMFS online permit database (query run in March 2003).

[3]    See Marine Law Institute, University of Maine, in association with Center for Applied Social Science, Boston University, *Guidebook to the Economics of Waterfront Planning and Water Dependent Uses*, p. 24-26 (1988).

[4]    See DSEIS, Section 4.4, Economic Impacts, p. I-516 et seq. (August 21, 2003).

[5]    See DSEIS, Executive Summary, I-v (August 21, 2003).

## C. Method

In order to undertake the study of commercial fishing infrastructure in the port of Gloucester, members of the panel met as a focus group three times. In addition, some panel members gathered information outside of meetings and the panel coordinator conducted a number of interviews. In the first of the three focus group meetings, the group brainstormed in an effort to (1) determine the elements of shoreside infrastructure essential to the support of commercial fishing; (2) assess the status of each of these critical elements in Gloucester today; (3) identify the characteristics of the shoreside support industries in Gloucester today; and (4) characterize the harbor today as a whole. The coordinator prepared a transcript of this extensive (4 hour) brainstorming session and, on the basis of that transcript, prepared a draft report. The second time the group met to review the draft report and to identify further data needs. Following that second meeting, the panel coordinator conducted a series of interviews of local shoreside experts and added to and revised the draft report. The group met one last time to review the information in the report and to recommend further changes and additions. See Appendix A for a list of the 34 people who participated in the project as panel members or interviewees.

It should be noted that, in addition to characterizing the current difficulties on the waterfront, panel members are also working among themselves and with city officials – the Gloucester Harbor Plan Implementation Coordinator (who has been attending all the sessions as a panel member), the Director of Community Development, and others – to suggest ways in which some of Gloucester's shoreside infrastructure difficulties might be addressed. There is a creative energy within the group and a very strong desire to develop means to maintain Gloucester as a key port for the fishing industry.

## D. Outline

This interim report is divided into six sections. The first is this introduction; the second is a list of shoreside infrastructure needs essential to a functioning fishing port; the third is a discussion of selected elements of Gloucester's shoreside infrastructure; the fourth is a discussion of some characteristics of Gloucester's shoreside support businesses; the fifth is an assessment of the Gloucester's infrastructure as a whole; and the sixth sketches the panel's vision for the port. Appendix A to the report is a list of all panel members and interviewees. Appendix B is a list of the businesses, structures, and space that together comprise Gloucester's shoreside infrastructure. Appendix C is a compilation of the graphs referred to throughout the text.

## II.  Infrastructure Needs for a Commercial Fishing Port

The panel identified three different categories of commercial fishing infrastructure critical to a commercial fishing port: businesses, structures, and space; people (labor); and various 'intangibles.'  The list below is still a work in progress and thus should not be read as complete; however, the panel does believe that the following items are critical to a functioning commercial fishing port.

### (A) Businesses, Structures, and Space:

1. Mooring space for fishing vessels
2. Facilities to maintain and repair fishing vessels
3. Gear and supply shops
4. Open space for working on gear
5. Fueling facilities
6. Ice plant(s)
7. Fish buyers/ Auction for fish buyers
8. Fish processors
9. Transportation for fish and fish products
10. Coast Guard/ port security

### (B) People

1. Experienced fishermen, including captains
2. Young fishermen, including young captains
3. Gear technicians: people who understand gear, and can fix and design gear (usually such people are also fishermen)
4. Lumpers
5. Settlement agents
6. Maritime attorneys
7. Skilled trades
   - Welders
   - Electricians
   - Woodworkers
   - Diesel engine mechanics
   - Commercial divers/ underwater welders
   - Electronics specialists
   - Refrigeration specialists

### (C ) Intangibles

1. Markets for fish
2. Financing for shoreside operations
3. Fishing industry organizations
4. A voice for the city in the fishery management process

8

5. A vision for the harbor
6. Positive public relations for the fishing industry
7. Clear lines of communication between the city/industry and government decision-makers

**III.     Discussion of Selected Elements of Gloucester's Shoreside Infrastructure**

This section contains a discussion of selected elements of Gloucester's shoreside infrastructure today. This discussion should be read in conjunction with Appendix B to this report, which is a working list of the existing shoreside businesses that comprise the infrastructure that supports commercial fishing in Gloucester today.

While the panel focused in this project on shoreside infrastructure rather than on the fishing industry itself, it was necessary to consider two aspects of the industry when examining shoreside infrastructure: the number and size of vessels fishing from Gloucester and the types and volumes of species landed in Gloucester. Thus, this discussion of selected elements of Gloucester's shoreside infrastructure begins with a preliminary note on vessels and catch. (It should be noted, moreover, that the panel is well aware of the need to study other aspects of the industry critical to the shoreside infrastructure, most notably labor, but it has not yet undertaken that part of the study.)

**A. Preliminary Note on Catch and Vessels**

*The Size and Composition of the Catch*

Gloucester is, and has been, a groundfish port. In the 'modern,' post-Magnuson era, groundfish revenues have accounted for between 78 percent (1984) and 43 percent (2002) of all landings in Gloucester (see figure 1 showing groundfish revenues as a percent of all Gloucester landings each year from 1975-2002).[6] As is well known, groundfish landings in Gloucester were highest in the late 1970s and early 1980s, fell significantly in the late 1980s, increased in 1990, and then fell again in the 1990s (see figure 2 showing Gloucester's groundfish landings from 1975-2002).[7] Starting in 1993 with the emergency closure of Georges Bank, the past decade has seen increasingly intensive regulation of the groundfishery and an accompanying decrease in landings. In 1981, the year of the highest groundfish landings in the 'modern,' post-Magnuson era, 81 million pounds of groundfish were landed in Gloucester; in 1997, the year of the lowest groundfish landings in Gloucester in this same period, 11 million pounds were landed. And, as the Council has calculated, between 1994 and 2001, groundfish revenues accounted for between 60.5 percent and 71.4 percent of the revenues of multi-species permitted vessels homeported in Gloucester (such vessels account for 87 percent of federally permitted vessels that identify Gloucester as their 'principal port').[8]

---

[6]     All figures are contained in Appendix C

[7]     . Total landings (all species combined) in Gloucester for the period 1975-2002 show the same pattern of decline since the 1980s shown by Gloucester's groundfish landings (a function of the dominance of groundfish). See figure 2.

[8]     DSEIS, Vol II, Table 542. Of 288 federally permitted vessels listing Gloucester as principal port in 2003, 251, or 87 percent, have multi-species permits. NMFS online permit database, query run in March 2003.

Other species currently landed in Gloucester include lobster, monkfish, tuna, hagfish, herring, mackerel, whiting (silver hake), and scallops. Some of these are being landed in increasing quantities in recent years (monkfish, lobster, hagfish, and mackerel, for example). Others are being landed in decreasing quantities in current years (whiting and shrimp, for example). Herring has had a cyclical pattern of landings; landings increased significantly in 2001 but decreased somewhat in 2002. Some species landed in the recent past are now not landed at all or in very small quantities (dogfish, sea urchins, crabs), and some fluctuate, such as swordfish, which was landed in some quantity between 1985 and 1995 but not again until 2001. See the graphs of Gloucester landings, by species, for the years 1975-2002, in Appendix C.

*The Number and Size of the Vessels*

The number of vessels based in Gloucester has declined significantly, as has the average size of a Gloucester vessel.[9] It is difficult, however, to determine the precise number of vessels fishing from Gloucester (or most any port), now, or in the past. Lists of federally and state permitted vessels associated with the port are helpful but can be misleading.[10] First, as is well known, some permitted and registered vessels are not active. Second, even if a vessel is fishing, its 'homeport' or 'hailing port' is often not a good indicator of the port out of which it fishes. In the words of one knowledgeable panel member, an attorney: "It doesn't make any difference where the boat is homeported; it doesn't mean beans." 'Homeport' is a function of the location of the regional Coast Guard office that houses the abstract of the vessel. 'Hailing port' is sometimes the principal place of business of the corporation that owns the vessel and not the port from which the vessel fishes (for this reason there are sometimes vessels with inland hailing ports). Third, some owners of Gloucester vessels specifically avoided registering their vessels in Gloucester in an attempt to obtain lower insurance rates than were available for 'Gloucester vessels' after the insurance crises of the late 70s and the 80s.

Fourth, vessels move around, and do not necessarily fish from a single port. Vessels from outside Gloucester come to fish in Gloucester, and vessels from Gloucester migrate out of Gloucester to fish from other ports. These movements may be temporary, they may be seasonal, or they may be 'permanent.' The extensive regulation of the groundfishery over the past decade has heightened this phenomenon, as boats move around in attempts to avoid closures and to make the most of limited days at sea. Fifth, and relatedly, it is common for boats fishing from one port to land fish in another.

---

[9]     A decline in the number of multi-species permitted vessels fishing is noted in the Council's analysis which shows that, in 1994, 184 of the multi-species permitted vessels homeported in Gloucester were 'active' (landing one or more pounds of fish), while, in 2001, only 159 of the multi-species vessels homeported in Gloucester were active. The number of active multi-species permitted vessels homeported in Gloucester dipped to a low of 143 in 1999. See DESIS, Table 542.

[10]    Historical lists are also difficult to come by; while current year figures are online, historical lists may be obtained only through requests to NMFS, and our requests were unavailing.

For this reason, the number of vessels landing fish in a port is not a good indicator of the number of boats fishing from that port. Boats from Gloucester may land their catch outside of Gloucester, and boats from outside Gloucester may come to Gloucester to land their catch.

That said, the sharp downward trend in the number and size of vessels fishing from Gloucester is evident from a number of sources:

### (i) Historical estimates

A good way to get a sense of the number of boats fishing from a port is to count the number of boats buying ice in that port. With some exceptions, boats need ice to go fishing, and thus the number of boats buying ice in a port is a good proxy for the number of boats fishing from the port. Records of Gloucester's Cape Pond Ice Company show that 182 different vessels bought ice from the company in 1981, the peak year in the 'modern,' post-Magnuson era of commercial fishing in Gloucester. At that time, Cape Pond Ice was one of two ice companies selling ice to vessels on the Gloucester waterfront (the other was the Ice Division of the Gloucester Marine Railways), and the current company president estimates that the two ice companies shared the business roughly 50-50 back in 1981. This would mean that roughly 362 vessels bought ice to go fishing from Gloucester in 1981. This does not mean, however, that all of these vessels were 'Gloucester' vessels or made repeated trips from Gloucester in that year. Some may have been fishing temporarily from Gloucester, some may have been fishing seasonally in Gloucester, and some may have landed fish in Gloucester and picked up ice as they left to go back out fishing.

One fisherman with a keen memory recalls counting the number of vessels that tied up in the Gloucester harbor in 1983 and determining that there were 138 large or medium draggers in the harbor. Most were over 60 feet long and many were in the 75-100 feet range and carried five to eight fishermen. (The same fisherman estimates that there are at present in Gloucester only about 38 draggers 50 feet or larger.)

Doeringer, Moss, and Terkla reported in 1986 that there were "somewhat more than 200 finfish boats, or 'draggers'" in Gloucester.[11]

A.T. Kearney, a management-consulting firm that conducted a study of the Gloucester fishing industry in 1994 for the Massachusetts Land Bank when the latter was deciding the manner in which to continue the development of the Jodrey State Fish Pier in Gloucester reported the following figures, as of 1994:

| Vessel type and size | Number |
|---|---|
| Groundfish trawlers (70-100 ft) | 40-50 |
| Groundfish trawlers (50-70 ft) | 70 |

---

[11]    P. Doeringer, P. Moss & D. Terkla, *The New England Fishing Economy: Jobs, Income, and Kinship* (1986), p. 35.

| Gillnet boats (50-70 ft) | 60 |
| Lobster boats | 100-150 in the region |
| Purse seine vessels (60-100 ft) | 10 transient |
| 'Combination' vessels (tuna, swordfish, others) (45-70 ft) | Number indeterminate but increasing |

*Table adapted from A.T. Kearney, Gloucester State Fish Pier Redevelopment Project: Comprehensive Industry Assessment and Pier Development Plan, p. 3-2 (1994).*

### (ii) Present-day estimates

In 1999, Cape Pond Ice Company became the sole ice company on the Gloucester waterfront.[12] The number of vessels buying ice from Cape Pond Ice Company since it became the sole ice plant in 1999 has fluctuated between (approximately) 91 and (approximately 104).[13] As indicated in the historical discussion of ice sales, these numbers represent the total number of boats buying ice in the port and so include one-time visitors, seasonal visitors, and so on. In addition to these 100-odd vessels buying ice in Gloucester, there are also in Gloucester at present at least eight large vessels that do not buy ice. These are: two 140 ft mid-water trawl herring and mackerel boats using a refrigerated seawater chilling system, two large herring purse seine vessels also using a refrigerated seawater chilling system, and four large freezer-processor vessels that have recently come to Gloucester to fish for hagfish.

Of the 100-odd vessels buying ice, panel members report that only nine are large vessels (70-90 ft), and that these nine large vessels are all that remains of Gloucester's former fleet of large groundfish vessels. Not only has the number of active boats in Gloucester declined, but, just as importantly, the average size of the active vessels has decreased dramatically.

One important factor in this decrease in the number and size of groundfish vessels in Gloucester was the 1997 buyback program that targeted Gloucester's larger groundfish vessels. Thirteen Gloucester vessels were bought back; of these, 12 were over 60 feet (five were between 60 and 70 feet; three were between 70-80 ft, and four were between 80-90 feet). Moreover, the buyback also removed 14 other vessels that fished from Gloucester though they were homeported elsewhere; of these 14, 11 were greater than 60 ft (one was between 60-70 ft, eight were between 70-80 feet, and two were between 80-90 feet). [14] The impact on shoreside infrastructure of the removal of these

---

[12] See the discussion of Gloucester's ice companies, below.

[13] The need to approximate is due to the fact that some vessels are billed directly by the ice company and others are billed through the auction; the ice company, which has provided its records for this analysis, has detailed records of the boats it bills directly and less detailed ones for the boats it bills through the auction.

[14] The list of the vessels and their dimensions is from a report in Commercial Fishing News, March 1998, pp. 1B, 14B-16B, citing National Marine Fisheries Service, Northeast Financial Services Office, as source. The list of the non-Gloucester vessels that had fished in Gloucester is from Cape Pond Ice records.

large vessels should not be underestimated. Larger, offshore vessels buy much more ice, fuel, gear, groceries, and so on than smaller day or two to three day trip boats; they make considerably higher revenues than small or medium vessels; and they consistently undertake major haul-outs in the summer time. One panel member put it this way: "Every boat that is bought back is a business; that [buyback] represents a business closing, and some of those businesses had gross sales of a million dollars, in a million dollar range. That's a significant business to close down, for this community."

## B. Buyers and Processors:

### 1. Groundfish

*The Seafood Display Auction and Groundfish Buyers*

The Gloucester Seafood Display Auction opened at the end of 1997. It is owned and operated by a family that formerly owned and operated a fish processing facility on several locations on the waterfront (Star Fisheries, and, prior to that, Morning Star). The decision to invest in the auction, family members have said, was based partly on the fact that Amendments 5 and 7 to the groundfish management plan were working to rebuild groundfish stocks. The business aimed to position itself as a central site for buying high quality groundfish when the stocks were rebuilt. The Auction has become the focal point for the buying of groundfish for out-of-town processors (either directly or through local brokers). There are about 14 regular buyer/processors from outside Gloucester, and about 10 regular buyers from Gloucester. Of the Gloucester buyers, some are buyer/brokers who buy for others or re-sell as soon as they buy (around six); and some are buyer/processors who process the fish at their facilities on the Gloucester waterfront (three). Of the latter local buyer/ processors, two of the three buy fish directly from boats as well as at the auction. After the auction opened, at least one fish dealer stopped buying groundfish altogether and focused instead on species not handled by the auction (lobsters).

The Auction is a display auction and is credited by many for having helped the development of a market for quality fish, and for having helped boost groundfish prices. It is also credited with bringing a substantial number of boats from outside Gloucester to land fish in Gloucester (in 2001, for example, there were close to twice as many boats landing groundfish in Gloucester as were homeported in Gloucester: 261:149).[15] Many of these boats pick up shoreside services (ice, fuel, etc) when they are here to land fish. The Auction has experimented with auctioning a variety of species – tuna, lobsters, swordfish, hagfish – but its greatest success has been in selling groundfish, and today it is principally a groundfish auction.

---

[15]    DSEIS, Vol II, Tables 541 & 542.

*Groundfish buyer/processors*

There are three groundfish processors on the Gloucester waterfront today: Ocean Crest, Pigeon Cove/ Whole Foods, and Steve Connolly Seafood Co., Inc. Ocean Crest cuts only about 10 percent of what it buys and it acts as a wholesaler for the balance, selling to processors in Boston and New York. The ten percent or so that it cuts it sells locally, to restaurants on Cape Ann. Ocean Crest also makes a fertilizer/ animal feed product from groundfish waste (more oily fish, such as herring or salmon, is not suited to its process); it distributes this product, 'Neptune's Harvest,' throughout the United States and internationally (to Sri Lanka, Mexico, Italy, and elsewhere). This processor employs about 30 employees, including 2-3 hand cutters. Up until the late 1980s, the company was a relatively large groundfish processor, employing 50-60 people, significant numbers of whom were cutters and packers. The company started the fertilizer/ feed product shortly after cutting back its processing capacity.

A second groundfish processor is Pigeon Cove/ Whole Foods. This facility supplies Whole Foods Markets throughout the country with high quality groundfish from NE and processes the groundfish in its 17,000 sq ft facility on the waterfront (using hand cutters). It buys groundfish in Gloucester, but also in Portland and is starting to do so in New Bedford and NYC as well. Pigeon Cove/Whole Foods also buys some non-groundfish species locally (scallops, some mackerel, shad, stripers). The facility also processes a wide variety of species imported or bought elsewhere in the United States, and it acts as a distribution center for a host of value-added products made elsewhere. Only about 33 percent of the total value of this facility's product comes from North Atlantic caught fish, and only a piece of this 33 percent is fish landed in Gloucester. The facility has 35-37 employees and has plans to expand.

The third groundfish processor on the Gloucester waterfront is Steve Connolly Seafood Co., Inc. This is a Boston-based firm with a satellite operation (albeit a sizeable one) on the Gloucester waterfront. Like many Boston processors, Steve Connolly has recently expanded its Boston facility. Steve Connolly buys and processes a wide variety of species worldwide; groundfish is only one of many types of fish bought and processed by Steve Connolly, and Gloucester is only one of many sources of fresh groundfish for the company.

In addition to these three sizeable groundfish processors, there are approximately eight very small businesses that rent space on the waterfront and buy and cut (and in one case smoke) groundfish in Gloucester. Of these, some are 'one or two man bands' that cut 10 boxes of fish and sell it themselves to fish restaurants along the coast in New Hampshire; some sell retail in Gloucester or nearby; and some sell to restaurants in Gloucester and nearby. Four of these very small businesses rent space in the facility of a company, John B Wright, which formerly operated a groundfish processing business but which now is in the business of buying and selling fish (and renting out its facility).

### 2. Non-groundfish species:

There are nine lobster buyers on the waterfront; five tuna buyers; two sea urchin buyers; and three herring buyers. In the case of lobster and tuna, there is no processing involved; as one lobster buyer put it, "I'm basically just a shipping company." In the case of sea urchins, there is processing involved, but the market for sea urchins and the supply of urchins have both decreased significantly. In the case of herring, two of the buyers do not process the herring but sell it for bait (Aram and D & B Bait). A third herring buyer, Cape Seafoods, has a larger operation, operates two of its own vessels (each one 140 ft) and freezes whole herring and mackerel and exports them to Africa as food fish. As Cape Seafoods merely freezes whole fish, it does not do much processing of the fish; however, the owners and plant manager have expressed interest in expanding operations to process these pelagics. They have also expressed their hope and expectation that Gloucester will become, as it once was, a center for small pelagic fishing.

In addition to these buyers, there are three buyer/processors of non-groundfish specialty species on the waterfront. New England Marine Resources focuses on buying and processing hagfish, monkfish, and other species bound for markets in South Korea and Japan. Intershell International focuses on scallops, clams, and various specialty products. And finally, a recent addition to the waterfront's processing capacity is Zeus Packing, which packs whole whiting for Spanish markets.

### Additional Notes on Fresh Fish Processing in Gloucester:

1. There are several large-scale fish businesses in Gloucester, which, until the 1960s or so, caught and processed fresh fish landed in Gloucester. Around that time, however, the large-scale companies began to rely on fish landed outside Gloucester. Much of this fish was imported, and much of it came into the port as frozen product, in large frozen blocks. Today, those large companies or ones evolved from them (Gorton's, Good Harbor Fillet, North Atlantic Fish, etc.) continue to rely exclusively on frozen product landed outside New England or imported into the United States. These frozen fish processors have little to do with commercial fishing in Gloucester. One panel member, a fisherman, said of the large, frozen fish processors, simply: "They don't deal with us." The division between the frozen sector and the fresh sector has been firmly in place since the 1970s.[16] The infrastructure that supports the two sectors – the frozen sector and the fresh sector -- is largely distinct. The commercial fishing industry (that which lands New England caught fish in Gloucester) may derive some benefit from the trucking services within the port used by frozen sector and, recently, has begun using freezers (for the frozen hagfish processed at sea and for the herring and mackerel frozen on the waterfront). Other than these, however, no apparent benefits flow from the frozen imported (or non-New England) sector to the fresh or New England sector. However, it may well be true that the existence of the commercial fishing sector – the 'New England'

---

[16]     D. Terkla & J. Wiggin, "Gloucester Waterfront Study: Land Use and Economics," (Appendix 5 of the Special Resource Study for Gloucester, Massachusetts), p. 55 (1994).

sector – is important to the frozen block sector, as the latter may derive value from being located in, and associated with a working fishing port even though they do not participate in fishing industry at work in the port. 'Gortons of Gloucester' will carry less cachet if Gloucester loses its fishing industry.[17]

2. There has been a large decline in fresh fish processing on the Gloucester waterfront since the late 1980s.  A number of groundfish processors are no longer in business cutting fish (e.g., John B Wright) or have radically cut back their operations (e.g., Ocean Crest).  Empire Fisheries and Star Fisheries, once large scale fish cutting operations for groundfish, whiting, and other species ('We did it all,' said an owner of Star Fisheries), have long since ceased operations.  A shrimp processor that bought from a large number of boats in the eighties and early nineties closed up shop.  So too did a jonah crab processor in the 1990s.  As a result of this substantial decline in processing on the Gloucester waterfront, most groundfish is sent to Boston or New York for cutting.  Boston has become the regional center for fish cutting, with several firms building large new facilities.  Those boats that still fish for whiting typically truck their catch to buyers at Fulton Fish Market in New York (at a cost of 8 cents a pound, a not insignificant cost for a high volume, low value fish).

3. At least two of the newer fish processors that process non-groundfish species use so-called 'workforce labor.'  These are people supplied by temporary agencies, on a temporary basis.  One company uses this labor source for peak periods (bringing in 20 people to add to its regular staff of about eight during busy periods), and the other, a seasonal business, uses this labor source as its sole source of labor.  People who are part of the 'workforce' labor supply generally do not live in Gloucester or Cape Ann but travel into the city to work.

4. Very little fresh fish waste is processed in the port today.  Ocean Crest is the only one doing so.  Another company processed waste (including salmon waste which was trucked in from elsewhere) into oil up until 2002.  At that time, the company, which had been located at John B Wright's, relocated to New Brunswick, Canada.  Cape Seafoods, the herring/mackerel company, trucks its fish waste to Canada.  In 1985, the Lipman 'de-hyde' plant, which had processed herring and menhaden into industrial products, shut down (thereby ending the menhaden fishery in Gloucester).  Many stories are told of the grim last years of this plant, when waste lay in the open air on barges and the smell knocked people over.  A number of members of the fishing industry in town have expressed keen interest in a new, state-of-the-art, sanitary reduction plant on the waterfront, the type, one man explained, that can be found in the middle of cities in Norway where no one knows of its existence (it being so un-obstrusive and un-smelly).

5. Wastewater pretreatment is at capacity locally and without an increase in that capacity it is not possible to increase fish processing in Gloucester.  Fish processing generates a good deal of wastewater and the existing wastewater pretreatment

---

[17]    Moreoever, Gorton's of Gloucester, a mainstay of the frozen block sector, has recently started an online fresh fish business. See www.gortonsfreshseafood.com.

plant cannot handle any increases over what it currently handles. Possible ways around this problem include a plant that has its own wastewater pretreatment facility (a very expensive option) and the pooling of resources of multiple plants to build a facility jointly (a suggestion in the 1999 Gloucester Harbor Plan).

6. There is also an insufficient supply of fresh water in Gloucester to support additional processing of fish (abundant fresh water is required for processing). One suggestion for overcoming this obstacle that has been suggested is the desalinization of seawater.

7. Finally, the concept of 'value-added' is one that has captured the imagination of many waterfront entrepreneurs. A small business incubator for value-added food products (basically a large up-to-code kitchen for multiple users, supervised by knowledgeable persons) has been suggested, as well as means of making 'ready to eat' meals out of fresh seafood much like the frozen processing sector does with frozen seafood.

## C. Ice Companies

*Ice Sales in Gloucester, 1987-2002*

For the past four years, there has been only one ice company in Gloucester – the Cape Pond Ice Company – to provision fishing vessels with ice and to provide a back-up supply of ice to fish handlers and fish processors (or a sole supply in those cases where handlers or processors do not have their own ice machines). Gloucester's other ice facility, the Ice Division of the Gloucester Marine Railways, fell into disrepair in the 1990s and finally closed in 1999.

Since 1990, total fishing-related ice sales in Gloucester have fallen by two-thirds. This can be seen in figure 14, which shows the combined fishing-related ice sales of Cape Pond Ice and the Railways Ice Division for the years 1987-2002 (the years for which data is available). In 1990, 22,780 tons of ice were sold, while, in 2000, 7052 tons were sold. Since 2000, the figure for total fishing-related ice sales in Gloucester has remained steady at just above 7500 tons/year.

Moreover, were data available for an earlier 10 year period (1977-1987), they would show an even steeper decline in total fishing-related ice sales. That earlier decade saw the highest landings in Gloucester in the 'modern', post-Magnuson era. In 1981, for example, total landings in Gloucester were 1.4 times greater than they were in 1990, and total groundfish landings were 2.3 times greater than they were in 1990 (see figures 2 and 3).

This precipitous decline in fishing-related ice sales has had dramatic effects on both ice companies in Gloucester. In the case of the Marine Railways Ice Division, as indicated, its machinery fell into disrepair and it went out of business. The

disrepair was a function of a lack of investment in maintenance and repair of the machinery; an employee of the Railways stated, "I was embarrassed to serve ice [towards the end] – 50 percent of the time it would be a failure." In the case of Cape Pond Ice Company, the business has had to diversify away from fishing-related ice sales in order to survive and to be able to continue to provide ice for fishing related uses.

### Cape Pond Ice Company

Cape Pond Ice has been in business in Gloucester since 1848. It is a small, privately held business that has had only three sets of owners (all three of which have been families) in its 155-year history. The current owners, members of the Memhard family, bought the business (a majority of the shares) in 1983, and they have owned and operated the business for the past 20 years. Scott Memhard, the company's president and an owner of the company is a long time director of, and currently president of, the Cape Ann Chamber of Commerce; a director of the Cape Ann Commercial Fishermen's Loan Fund (since 1985); and a board member of the Gloucester Fisheries Commission (since 1986). He is also past director and past president of the New England Ice Association; a corporator of the Cape Ann Savings Bank, and past board chair of the Unitarian Universalist Church in Gloucester.

Cape Pond Ice has supplied ice to fishing vessels and to fish handler/processors from its inception in 1848. It was the first company in Gloucester to supply boats and processors with ice, as, prior to that, fish had been cured with salt or brine. Cape Pond has had competitors in Gloucester over its many years but none since 1999, when the Railways closed its Ice Division. Since 1999, Cape Pond Ice has been the sole source of supply for vessels, and the sole source of 'back-up' supply for processors. (Most fish processors and handlers have their own ice-making machines, and they buy ice from outside only when they need more than their own machines can make or when their machines break down.)

The current Cape Pond Ice plant, which is located on the waterfront, was 'state of the art' in 1948. It consisted originally of two 150 ton/day block ice-makers (for a total capacity of 300 tons/day). In the 1980s and 1990s, the company spent over two million dollars maintaining, repairing, and modernizing the plant: The company replaced the original cork-lined ice warehouse with a re-insulating refrigeration warehouse; added a 50 ton/day turbo nugget ice-maker to the original two 150 ton/day block ice-makers; maintained the two block ice-makers (replacing compressors, condensers, and other parts); and repaired or replaced roofs and wharves.

The company leveraged itself in 1992 to add the modern 50 ton/day turbo nugget ice-maker. The company made this major investment to ensure redundancy in the facility's ice-making capability. Redundancy in ice-making plants is important because if the ice machine breaks down, boats cannot go fishing. (Moreover, Cape Pond serves as a back-up supply of ice to processors and handlers when their own ice machines break down.) For some years after the 50 ton/day ice maker was added to the facility, Cape Pond Ice had a 350 ton/day capacity (the two original 150 ton/day block ice makers and

the new 50 ton/day turbo nugget ice makers). Recently, however, one of the original 150 ton/day block ice makers broke down, and despite its spending $30-40,000 in an attempt to fix the machine, the company was not able to repair it. The company's investment in the modern, turbo 50 ton/day ice maker, therefore, was prescient if expensive. Today, only the existence of the new ice maker ensures the necessary redundancy in the (now) 200 ton/day ice plant. This focus on maintaining the machines and providing for redundancy has paid off, it should be noted, as the Cape Pond Ice plant has never broken down in the 20 years of its current ownership. The importance of ice plant maintenance was underscored in the month of October 2003 when the sole ice plant on the waterfront in Portland, Maine, broke down. Several Portland vessels called Cape Pond Ice to ensure the availability of ice and then steamed to Gloucester to pick up ice to go fishing.

Cape Pond's fishing related ice sales have followed the pattern of the general decline of ice sales in the city (reviewed above) and the associated decline in landings. Over the past 20 years, Cape Pond Ice's fishing-related ice sales (sales to vessels and processors) have declined from a high of nearly 18,000 tons in 1984 to a low of just under 5000 tons in 1997. (See figure 15). In six of the nine years since Amendment 5 went into effect in 1994, Cape Pond's fishing related ice sales were between 7000-7500 tons/years. The exceptions were in 1997 (when Amendment 7 went into effect and fishing related ice sales fell to just below 5000 tons/year) and in 1998 and 1999 when Cape Pond Ice sold ice to large herring vessels recently arrived in Gloucester. In those two years, the company's fishing related ice sales increased to 11,462 tons (1998) and 9,960 tons (1999). In 2000, these herring vessels changed over to a refrigerated seawater chilling system, and as a result no longer needed ice. In 2000, 2001, and 2002 – years, it should be noted, when Cape Pond Ice has been the sole provider of ice to vessels and sole back-up ice supply for processors and handlers – the company's fishing related ice sales have been 7052 tons (2000), 7633 tons (2001), and 7583 tons (2002). See figure 15.

In order to stay in business, Cape Pond Ice has diversified its ice business to provide ice for non-fishing related uses. During the 'Big Dig' in Boston, the company sold ice to cool concrete pours on the Third Harbor Tunnel and the Central Artery. It provides ice to chill produce and poultry; it sells packaged ice, ice sculptures and shot luges; it sells dry ice for multiple uses, including special effects in locally made films; and, since 1998 when the movie *The Perfect Storm* sent the company's name out into the wider world, it has been selling logo T shirts, sweatshirts, and caps. Sales for fishing-related uses of ice accounted for 77 percent of the business in 1984, but have accounted for only 30-40 percent of the business since 1997. In 2002, fishing-related sales accounted for 36 per cent of the business. See figure 16, which shows the percent of Cape Pond's business from fishing-related ice sales from 1984-2002.

Despite these efforts to diversify, Cape Pond Ice has had to defer maintenance, cut back on staff, and defer salary payments. The continued low sales for fishing-related uses and the instability of the non-fishing related uses (concrete related sales fell by a half from 2001 to 2002 as the need diminished for ice to cool concrete pours in the 'Big Dig') have made these cost-cutting and cost-deferring measures

necessary. The company has high maintenance costs (the machinery must be maintained year-round even though its principal use is in the summer months). The two major inputs in making ice – water and electricity – have both increased in cost by 75 percent over the past four years. And, like other waterfront businesses, the ice company has high insurance costs (rates went up throughout the waterfront after 9/11). As a result, costs that can be deferred – even if they really should not be – have been deferred. The wharves, for example, have not been repaired for two years running, while usually they are repaired every year.

In 2002, the six-foot by twenty-foot 'Now Hiring' banner that the company fixes to its building during the annual hiring season was fixed to the building, but this time it read 'Now Firing.' Two years ago, the number of year-round employees was seven; this past year it dropped to five (a president; a plant manager; a service manager; a maintenance mechanic; and a general helper). Of these five, two were cut to part-time; a sixth, a driver, went from 'part time' to 'on call.' In the summer, when the bulk of the ice company's business takes place, the number of employees fluctuates between 15-25; last summer it was 19. Despite these difficulties, there are long-term relationships between the company and its employees; one young man, for example, has worked at the company for eight years, all through college and then after college.

The capacity of Cape Pond Ice's machines – even at 200 tons/day – is more than is needed for the fishery at present. Scott Memhard remarked: "We don't have those days when the offshore dragger was pulling up, taking 20 tons of ice, and going off for 10, 15, 20 days, coming back, maybe taking a day or two off, and then going back out and doing it again. That's like an ancient dream." Cape Pond has sufficient capacity to provide ice to an expanded fishery in the future, provided it can continue to maintain its wharves, its machines, and its skilled employee base.

### D. Haul-out and Repair Facilities

There are two facilities for haul-outs and repairs of fishing vessels over 40 feet: the Gloucester Marine Railways and Rose's Marine. In addition, there are three other facilities that principally serve recreational vessels but which can and sometimes do service small (40 ft and under) commercial vessels (Cape Ann Marina, Brown's Marina, and Beacon Marine).

*The Gloucester Marine Railways*

The Gloucester Marine Railways was started by a group of five fishermen in 1953 to provide haul-out facilities for their vessels and other vessel services (fuel and ice). The five fishermen bought an existing facility and in time the Railways occupied two key sites on the Gloucester harbor; one large site at the end of Rocky Neck and another, centrally located site on Harbor Cove. The facilities provided maintenance, repair, and haul-outs; settlement services; a place to buy fuel; and a place to buy ice.

21

Today, after two bankruptcies in the 1990s, the Railways occupies only one of the two sites (the Rocky Neck site); it has closed its ice division (its machine having fallen into disrepair in the late 1990s); and it no longer offers settlement services. Of its fuel division sales in the past year, the Railways manager stated: "Fuel is definitely down . . . we're not selling fuel like we used to. That's been a straight line . . .if there's any little ping in it, it's just because fuel costs two dollars a gallon." The repair division has done well, however, and this is in no small part due to, in the Railways' manager's words, "jobs completely unrelated to the fishing industry." She elaborated: "We would not be here if we had to rely on the fishing industry alone." The non-fishing related jobs are repairs and haul-outs of tugboats and marine equipment (a pipeline surveyor, for example). The tugboat work in particular has been very important to the Railways: "We're becoming Towboat Central." The Railways' manager explained in full candor the effect of this change in focus. Addressing fishermen, she said:

> "Now the good news is [due to the tugboat work] we are there. The bad news is you're almost second-class citizens to me right now, you know. You're not the..., you know, where is the bread and butter? I mean, I can't, I'll take this month long job and somebody who needs something is going to be in there first, until we can get to them. We will consider you kind of a priority, but we're not sending somebody down who's been there for a month spending 60 – 70,000 dollars for something that's going to cost 2000. So, you know, even though that facility is there for you, it's not quite there for you like it used to be, I would say."

There is a widely shared view that the current absence of large vessels in the Gloucester fleet accounts for the Railway's necessary change in focus away from the fishing industry. The larger (> 70 ft) vessels now largely absent from the Gloucester fleet are the ones that can afford haul-outs every year (or can't afford not to get them) and are the type of vessel for which the original five fishermen created the Railways in the 1950s. The Railways does service some large vessels, today, it should be noted, including a few large purse seiners from Cape May who come regularly to Gloucester and have work done at the Railways while they are in the city.

Two final points about the Railways, both of which illustrate trends in Gloucester, concern the Railways' second site, at Harbor Cove. The site was sold in connection with the second bankruptcy reorganization in the 1990s. The absence of the second site makes it difficult for the Railways to perform its own maintenance even as it performs maintenance on vessels: "I would say we are not doing our maintenance because you can't put the Railway down, because you can't afford to put it down, because you can't stop working. Otherwise you don't have enough money." The Railways' manager described the pace of the Railways' maintenance work: "We are creeping along, I would say . . . creeping." The absence of the second site, to which work could be shifted, has exacerbated the maintenance problem. In 1999, the movie *The Perfect Storm* was filmed at the Railways' Harbor Cove site and, later in 1999, the Harbor Cove site was sold to a non-profit organization that has since established a Maritime Heritage Center at the site.

*Rose Marine*

At Rose Marine, the second haul-out business, things are both similar and different.  They are similar in that the business was started several decades ago (in the 1960s) by a group of eight fishermen (but now it is owned principally by members of the family of one of those fishermen); in that the business has succeeded by diversifying away from fishing; and in that to the extent that it does serve the fishing industry it serves a far flung industry throughout the New England region.  Rose's is different from the Railways, however, in the ways in which it has diversified, and, to some extent, in the services it offers.

In addition to hauling out and repairing vessels, Rose's sells machine parts and does machine work, and it sells fuel for vessels and for home heating.  It also rents waterfront space to a whale watching business (and has done so for 12 years), rents dockage to vessels that buy fuel at the facility, stores pleasure boats in the winter, and, recently, has begun selling snowplows.  Rose's manager opined that if the company had relied exclusively on fishing business, it would have disappeared "long ago."  Its sales region for machine parts is the whole of New England.  Twelve years ago, sales were local (walk-ins), but now more than 50 percent of sales are made to customers outside of Gloucester.  Rose's manager estimates that 30 percent of Rose's business depends on the fishing industry, whereas ten years ago 75 percent of its business depended on the fishing industry.

Finally, Rose's manager offered a graphic example of the reliance of people in the fishing industry throughout the region on Rose's:  He described someone in Ellsworth (Maine) calling to locate a machine part, and then jumping in his car at midnight to drive down and pick it up in the morning.  The same tale was used to illustrate that the fishing industry in Gloucester has no idea how difficult it is in other harbors that have lost their infrastructure.

## E.  Fueling Facilities

There are four fueling facilities (Felicia's, Rose's, the Gloucester Display Auction, and the Gloucester Marine Railways), two fuel truck services that service small vessels from the State Pier (paying an annual fee to the Pier to do so) (Cape Ann Fuel and Atllantic Discount Fuel), and two latent shoreside facilities (Fishermen's Wharf and Neptune Marine, formerly FBI Wharf).  Only one of the fueling facilities (Rose Marine) has a fuel barge.

## F.  Gear and Supply Shops

There are a handful of gear shops, with each one specializing in a particular gear type: there is a full service bottom trawl gear shop (although it does not

assemble bottom trawl nets and there is no facility in town that does), B& N Fishing Gear; there is a gillnet hanging service, Homeward Bound Twine; there is a new mid-water trawl gear shop separate from but associated with the large mid-water trawl herring vessels newly in Gloucester, Swan Net; and there are three lobster/gillnet/recreational gear shops (Winchesters, Coastal Marine, and New England Marine).

### G. Mooring Space

"There is never enough mooring space." This has become even more the case in recent history: DAS restrictions keep vessels tied up at port, and more vessels are 'home' at one time than has been the case before. Moreover, some families have addressed DAS limitations by buying additional boats (with their associated multi-species permits), and they keep one or more vessels in port while they fish another.

Some shoreside facilities that had offered mooring space free of charge to vessels that used their services began to charge those vessels for the use of mooring space in the summer of 2002. (Others, however, such as the Gloucester Marine Railways, have been charging all along for mooring space). As vessels fished less, they used the shoreside services less, causing the shoreside businesses to attempt to recoup some of their losses by charging for mooring space.

The Jodrey State Pier has 54 berths; all are occupied and there are 21 vessels on a waiting list for berths. Of the 54, about 50% are Gloucester vessels, while 50% are from elsewhere, from as close as Beverly and as far as New Bedford. The Pier requires that vessels berthed there be commercial fishing vessels, but does not require that they be used 100% for commercial fishing. Some fishermen have begun to run charters 'on the side' to supplement their commercial fishing, and these vessels have been allowed to stay at the State Pier, on the condition that their principal use is for commercial fishing. The State Pier charges $5.50 a foot for the berths (in 2000, the price was raised from $5 a foot).

As indicated on the list of dockage facilities in Appendix A, the industry has and needs a variety of types of mooring spaces: long-term dockside, long-term nesting, temporary (for visiting vessels); and transient (for offloading fish and taking on supplies).

### H. Intangibles: Markets, Organizations, and Visions

The panel had the following comments on some of the 'intangibles' required to support the fishing industry, and how well these needs are being met:

*Markets for fish:* When landings are down due to regulatory restrictions, market share can be lost, and a loss of market share can translate into lower prices for fish, even when supply is low (when one would normally expect prices to go up). Market

share lost to other sources of protein (chicken, soy beans, etc) is lost forever.  Market share that *can* be regained (such as that lost to imported fish) can only be regained by offering product at very low prices ('low balling' the competition), and when fish dealers have to offer low prices, they buy from fishermen at very low prices.

*Financing*:  Every business has its own financial 'nut' to crack: This 'nut' has three components: mortgage payments; maintenance costs (many of which are being deferred now); and basic overhead costs.  Low interest loans would help the first of these (refinancing or consolidation of mortgages at low interest rates); working capital (also at low interest rates) would help the second and third.

*The Cape Ann Commercial Fishermen's Loan Fund*, a revolving loan fund, has been an important source of loan funds for fishermen since the 1970s.  It makes loans to fishermen unable to obtain loans from conventional lending sources but who nonetheless are good credit risks; it has provided loans for gear, maintenance, vessel upgrades, etc.  In a few instances, it has loaned money to fishermen for development of shoreside facilities owned and operated by fishermen. The Loan Fund has been working to update its policies and loan conditions (for example, it is in the midst of deciding whether it should collateralize fishing permits) but it is also struggling to stay alive.  A number of factors have contributed to its current difficulties.

*Shoreside Revolving Loan Fund*:  In the mid 90s, a shoreside revolving loan fund was created to make low interest loans to shoreside businesses supporting the fishing industry.  This loan fund was not successful in lending out its money ($580,000 of $750,000 was not loaned out) and the money not loaned out (the $580,000) was removed from the Fund and given to the Massachusetts Finance Development Agency's Seafood Loan Program.

*Fishing industry organization(s)* – In a time when the fishing industry and its infrastructure are threatened it is critical that members of the industry participate in organizations representing their interests, ideas, and visions for the future.  There are such organizations but membership is not what it should be.

*A voice for the city in the fishery management process*:  With the Gloucester Fisheries Commission out of operation, there is no voice for the city participating in the management process, at the Council meetings and even more important at the Committee meetings 'where the real work gets done.'

*A vision for the harbor*:  "What I don't see is a, clear concise vision of this harbor, from our city fathers, as to: do they want to consolidate this [fishing] business into one particular corner of the harbor, or do they want to keep the existing character the way it is and have [it] spread around the harbor . . ."

*Positive public relations*:  "We need some kind of PR to get people interested to stay in the industry.  It's hard to do that right now when all you hear is the sensationalist press that nobody's making any money, the fish are going away, the government's on top of us."

*Clear lines of communication between the city / industry and decision-makers*: The city and the industry need to be able to communicate with the state, regional, and federal decision-makers whose decisions affect the community and the industry. This includes decision- makers on the Fishery Management Council, in the Department of Commerce (the Economic Development Administration, the National Marine Fisheries Service, the Secretary himself).

*Fishing industry health plan.* Health insurance for people in the fishing industry is critical, and many people were unable to find or afford coverage before the creation of the Massachusetts Fishermen's Health Plan in the mid 1990s. The Plan covers 1800 people in the Massachusetts fishing industry, many who had no coverage at all prior to joining the MFP plan. Studies have shown that the plan saves the state money because it decreases the number of uninsured people in the state.

## IV. Some Characteristics of the Shoreside Support Businesses

**The shoreside infrastructure and the commercial fishing businesses are interdependent, to a point**: A fisherman put it this way: "We need the auction, we need the ice company, we need the suppliers. Without them, we are nothing." Shoreside business representatives, on the other hand, said repeatedly that their troubles would be reduced if only the fishermen had more days-at-sea to fish. As one put it: "I can only survive a couple more years if we don't get an increase in days." Moreover, it was claimed that the shoreside and harvesting sectors understand each other's business challenges; a shoreside owner stated: "A boat knows what my headaches are going to be. I know what your headaches are. They're the same." There is, however, a profound exception to this truism: as demonstrated in the discussion of particular businesses above, some shoreside business are diversifying away from commercial fishing (the ice company cooling concrete, the railways servicing tugs, and so on), and to the extent this diversification takes place it works to break the interdependence of boats and the shoreside facilities that serve them. It leads to a situation in which the dependence runs in one direction (from boat to shoreside) and not the other way around.

**Nearly all the shoreside businesses providing support to commercial fishing (especially in the groundfish sector) are small, family-owned and operated businesses that have been on the waterfront for decades**. Many of these businesses were started by former fishermen or members of fishing families who chose to stay in the industry but to work on land rather than at sea. These families derive enormous satisfaction from their participation in the industry. The Gloucester Seafood Display Auction ('the Auction') is family owned and run, and is an outgrowth of that family's earlier decades-old fish buying and processing business, Star Fisheries. Cape Pond Ice has been owned and run by three successive families in its 150-year history; the current owner has owned and run the business since 1982. Felicia's Oil, a fuel business, is a 47-year old family business; it is run today by the son and grandsons of the man who started the business in 1956. It is located in the west end of the harbor, across from 'the fort' where the family lived for many years and where the founder's son was born. Most – but

not all - of the groundfish buyers/processors located on the Gloucester waterfront are family businesses (e.g., Ocean Crest, John B Wright, Capt Joe and Sons). The two facilities that provide vessel maintenance and repair services – the Gloucester Marine Railways and Rose Marine – were both started by groups of fishermen, the former in 1953 and the latter in the 1960s. The Railways is now owned by the descendants of those initial fishermen, while Rose Marine is now owned principally, and operated by, members of the Rose family.

**Like small fishing businesses, these small, family-owned shoreside businesses reinvest in their businesses, and invest their own personal assets in their companies.** When fishermen make money, they invest it in their vessels. A vessel owner described the process: "[People] have got to realize we're not a corporation once we make a profit we don't want to spend it. We have to, we have no choice. [You have] to change a main wire . . . fix your doors . . . change twine on your net, ground cables, your electronics fry out on you . .[there are] breakdowns on the engine, pumps, everything." The point, he stressed, is that money made by fishermen goes directly into the shoreside businesses that support commercial fishing. Similarly, shoreside businesses reinvest in their businesses whenever there is an opportunity to make a return on the investment. This is partly because many shoreside businesses are family businesses with long histories on the waterfront: "These are all pretty much family businesses, still, the ones that are left on the waterfront, that are used to re-investing anything and everything into their business." ." Moreover, shoreside business owners have deferred payments to themselves in lean months in order to make payroll and other costs, and have mortgaged personal assets (homes) to secure business loans.

**Many of the shoreside support businesses rely on volume in order to be profitable, and volume is way down.** Fish and fishing businesses remain in many respects volume businesses, despite the gains in producing a quality fishery, rather than a quantity fishery. Volume is important to the auction, the ice plant, and the gillnet hanging business, among others. This is a double problem for those businesses – like the ice plant – that must maintain their high volume capacity even when volume is low.

**Gear suppliers are operating at 'pathetic' margins**: Gear suppliers are operating at 'pathetic' margins and there is no volume to make up for it. One gear business owner said that he would give his business another two years and if it didn't improve he would give it up. He explained that he had taken losses two of the last three years and he referred to his inventory grimly as his 'souvenirs. A second gear shop owner said he was within months of closing his business, and he explained the lengths he has gone to prop up his gear business: "I go lobstering to pay my payroll so that I can hang nets for guys to keep fishing. And that's stupidity on my part."

**Shoreside businesses and vessels have deferred maintenance of their structures and vessels.** Vessels and shoreside businesses are holding off on making expenditures for maintenance on their vessels and wharves. One of the many bad effects of deferred maintenance is that it leads to the need to spend large sums in order to make up for having deferred maintenance right at a time when monies should probably not be

invested.  Another bad effect is the increased risk to safety:  A fisherman explained that deferred maintenance on fishing vessels "is big on a lot of our minds" because it "can have severe safety implications."  "A minor mechanical breakdown can lead to a sinking that leads to a disaster.

**Costs are up for shoreside businesses (insurance, utilities**):  Insurance rates for shoreside businesses are increasing sharply and insurance companies are requiring improvements to shoreside properties:  A shoreside fuel business just had its insurance rates raised 100 percent.  It was also required by its insurance company to make $15,000 worth of improvements to its piers.  A shoreside building owner, whose building houses fish businesses but is at present only partly occupied, was just visited by the insurance company and given 30 days to install $10,000 worth of improvements in the building (electric exit signs, etc.).  Mass Electric rates have risen by 26%.

## V. Gloucester's Shoreside Infrastructure Today

**Until recently, Gloucester was a 'full service' port for the commercial fishing industry and a 'hub' port for the commercial fishing industry in the region.**  Gloucester has been one of six commercial fishing 'hubs' in New England, supporting the industry not only within its own borders but also in various 'spoke' communities.  (One of Gloucester 'spoke' communities, for example, is Portsmouth, NH.)  Other hubs are or have been Rockland, Portland, Boston, New Bedford, and Point Judith; of these Rockland and Boston have ceased to be hubs.  Gloucester faces a similar danger.  Having only one or two businesses in each of the critical infrastructure areas, it stands to lose its status as a 'hub' if the businesses in any one of these critical areas disappear:  "When you lose any one vital facility, you're no longer a hub.  And when that happens, I would predict, you'll lose most of your boats that are mobile."  "A lot of times we are down to one of these key pieces of infrastructure [and] if that disappears that can be the end of your harbor."

For each of the critical elements of Gloucester's infrastructure, there are only one or two businesses.  Competition among shoreside support businesses is largely a thing of the past.  As described, there is one ice plant (Cape Pond Ice) and one principal locale to sell groundfish (the Gloucester Display Auction).  There are two businesses providing marine repairs and space for haul-outs (Gloucester Marine Railways and Rose's Marine), three places to buy fuel (Felicia's, Rose's, and the Auction), and a handful of gear shops (B & N Fishing Gear, New England Marine & Industrial, and Winchester Fishing Company).  In looking at Gloucester's infrastructure, "what you want to study is presence or absence":  "There used to be competition . . . . Now most of that competition is gone. . . .  What's left now, you're down to the core.  It's not competition any more; it's presence absence.  And so the next step is absence."  There is no question, under current conditions, of trying to increase competition in any of the critical infrastructure areas:  "[If] we start with competition now, it's going to close businesses.  You know, half a loaf for both of them, they're both out of business."  By the same token,

competition in these critical areas (and others) will return "all by itself if there is a market for it."

Some elements of shoreside infrastructure are already missing from Gloucester. As described, fresh fish processing in the city is much diminished. There is no trawl net shop. Fishermen are in short supply, especially new fishermen to enter the industry and young captains to run boats. Various different types of skilled labor (welders, electricians) are absent; even lumpers and other dockside workers are in short supply.

The number of large (> 70 ft) vessels in Gloucester has declined sharply, and this is due in part to the insufficiency of shoreside services for these vessels. The number of 'real offshore boats' operating out of Gloucester now has sunk to 9. The owner of a large vessel elaborated on his decision to relocate his large vessel from Gloucester to New Bedford: Eighteen months ago, he removed a 100-ft vessel from Gloucester to New Bedford, and in so doing took business away from local suppliers (the shoreside facilities that offloaded the boat, the fueling facilities, the ice plant, the gear shop, the settlement agent and others) and the 9 crew members who ran the boat (7 crew and 2 alternating captains). He estimates that the removal of the boat removed 'many hundreds of thousands of dollars' from the city annually. He described his decision and the reasons for it: "It's a Gloucester boat, it's got a Gloucester permit. I hated to do it. But I had no choice for the survival of the boat. I couldn't get welders; I couldn't get electricians. . . . If I needed a welder I had to go outside [to bring a welder up from Westport, MA] . . . it's a hundred mile drive: it cost me 300 dollars to get a welder here and he hadn't even started to do anything yet. Electrician? Forget that: you have to go to New Bedford, you don't even bother trying in Gloucester. . . . If you want to get a generator, you have to go to New Bedford. . . . I couldn't get my crew, and I couldn't get laborers to unload the boat. . . . So for any one of those reasons and all those reasons, I took a boat out of Gloucester that generated a lot of money in this town."

**Throughout the 1990s and early 2000s, there was both public and private investment in the commercial fishing infrastructure, including in the New England groundfish sector**. Much of the public investment in Gloucester's commercial fishing infrastructure has been on the Jodrey State Pier. The 1990s saw substantial changes to the state pier, and these were the results of planning efforts initiated in the 1980s. In 1982, the Commonwealth of Massachusetts took over the management of the state pier from the city-wide association that had managed the pier since 1938 when it first opened. Part of the reason for this transfer of management, controversial at the time, was to facilitate re-investment in the state pier, which was in substantial disrepair. The state (through the Mass Development Finance Agency) undertook a complete renovation of the pier, in three phases, for a total cost of 20 million dollars. Phase one, completed in 1993, saw the demolition of old buildings, the clean-up of diesel fuel contamination, the installation of industrial grade utilities (water, sewer, telephone duct, electrical duct), the dredging of the harbor on the south side of the pier, and, finally, the construction of dockage (45 berths, later expanded to 54 berths) on the south side of the pier. Prior to 1993, when the construction of dockage was completed, the state pier had not provided

29

dockage. Phase two of the redevelopment, completed in 1996, involved the demolition of the old stalls buildings, and the demolition and reconstruction of the wharves on the north side of the pier. Phase three of the redevelopment, completed in 2000 and financed by a combination of public and private investment, was the build-out of new stalls buildings on the north side of the pier.

Other recent public investment in the harbor, on a more modest scale, includes the development of a harbor plan in 1999; studies of harbor dredging needs (dredging has not taken place, however, due to controversies over the disposal of contaminated dredge material); a study of harbor lines (specifying how far out into the water private owners may build piers or floats); the removal of 5 or 6 derelict vessels that had sunk into the harbor; and the repair of seawalls. The harbor plan functions as a designated port area master plan, and, as such, enabled Gloucester to apply for and receive state funds (under the 1996 Seaport Bond Bill) for these harbor-related projects.

Among the private investments made on the waterfront in recent years are the following:

- The Gloucester Seafood Display Auction, described above.
- Cape Seafoods, also described above.
- Pigeon Cove/ Whole Foods, described above. Pigeon Cove/Whole Foods recently expanded its fish processing center at the head of the harbor to a 17,000 sq ft facility, and would like to expand further.
- Fishermen's Wharf. This was a wharf owned by a group of fishermen and their descendants, which suffered damage in a fire and which incurred substantial costs in rebuilding. The wharves were substantially repaired but promised loans were not forthcoming because of difficulties with the Economic Development Agency. Two local families, partners in a construction business, one also a fisherman and a member of a long time Gloucester fishing families, bought the property. The new owners are using the site for dockage and parking and plan to use it to support the fishery in the future when groundfish stocks are rebuilt.

**Despite these recent investments, Gloucester's inner harbor is underutilized.** Panel members offered these comments:

*– The waterfront has many dilapidated and vacant properties.* "Gloucester harbor looks pretty sad right now: the number of vacant parcels of property, dilapidated pieces of real estate, things that are not . . . in use, they're not earning their keep."

*– Shoreside building owners have empty units in their properties and are being required to reduce rents in order to hold onto the tenants they do have.* One 33,000 square foot building has not been fully occupied since 1998-99; at present it is 65% occupied and the owner recently reduced the rent of its fish processor tenant by 37% in order to persuade the tenant not to relocate to Lynn.

*-- Persons who are not part of the commercial fishing industry are poised to take over waterfront properties and dock space and have a good deal of money to do so.* An example given was of an old pier likely to be sold to someone who will tear down the pier and the building, "put the limits of the zoning ordinances in, then . . . just sit back and wait for the zoning laws to change."

**Gloucester's inner harbor is vulnerable to zoning changes.** Throughout Gloucester's history, the inner harbor has been committed to the commercial fishing industry: "Throughout [the city's] history, the inner harbor has been devoted substantially to the fishing industry."[18] This use of the harbor by the fishing industry is protected by several types and layers of statutes and regulations. Since 1927, the city of Gloucester has zoned much of the inner harbor for "marine industrial" use. In 1978, much of the inner harbor was determined to be a "Designated Port Area" under state law. While they differ in important particulars, both the city zoning rules and the state designated port area determination require that the inner harbor be put to marine industrial uses. Under both the city's and the state's regimes, the set of uses considered as 'marine industrial' includes commercial fishing but includes other maritime related industry as well. In addition to the city's zoning rules and the state's designated port area requirements, the shorefront area of the inner harbor is also subject to state law governing the use of tidelands, including tidelands filled in since 1857. As the shorefront area of the inner harbor has been determined to be a filled-in area, it is subject to this law, which requires that such areas be used for water-dependent uses (but not necessarily industrial ones) or for "a proper public purpose."[19]

Of these three levels of law, the first two (city zoning, and the state designated port area determination and regulations) are based on the port being used for marine industrial uses, and so could change if the port can no longer support marine industrial uses. For Gloucester, marine industrial use has always meant the commercial fishing industry and not other types of marine industry. Moreover, given certain characteristics of Gloucester's harbor (its configuration and its depth of water) as well as Gloucester's location at the end of route 128, it is unlikely that other types of marine industrial uses will be well suited to Gloucester. All this adds up to the fact that, in the absence of a commercial fishing industry in Gloucester, the pressure to remove the city's and state's legal protections for marine industrial use of the harbor will become very high. And, if these protections were to be removed, it would be unlikely in the extreme that they, or something like them, could be re-created, no matter how many fish are available for sustainable harvesting off the coast of Gloucester.

---

[18] David G. Terkla and Jack Wiggin, "Gloucester Waterfront Study: Land Use and Economics" (Appendix 5 of the Special Resource Study for Gloucester, Massachusetts) (1994), p. iii.

[19] See Terkla and Wiggin, "Gloucester Waterfront Study" (1994), pp. 34-53. See also Gloucester Harbor Plan Committee, *Gloucester Harbor Plan* (1999), p. 9.

## VI. A Vision for the Port of Gloucester

This grim, inexorable decline is NOT what the Gloucester panel would like to see in Gloucester, nor is it a future that panel members believe is necessary. Instead, panel members believe that Gloucester can remain committed to the fishing industry. All share the view that the Gloucester needs to maintain a diverse fleet of small (<40 ft), medium (40-70'), and large (>70') vessels.

The small and medium day and 2-3 day boats fishing in the inshore and the larger vessels fishing 5-7 days offshore complement each other. The smaller vessels have helped create the 'quality' groundfishery for which Gloucester is now known and in so doing have helped raise the price for all fish sold in Gloucester. Moreover, the small and medium boats have developed practices for maintaining the quality of fish that the larger off-shore boats are also starting to use. In addition, the smaller vessels provide much of the supply of groundfish in the summer months (except during the two months of rolling closures) when they are not kept home by bad weather.

For their part, the larger, offshore vessels keep the market going in the winter time when they tend to use their DAS (prices are higher; the smaller boats are out less; and the bigger boats are equipped to go out in the harsh winter months). A year-round supply of groundfish is essential to maintaining the markets for groundfish and only the small, medium, and large boats working together can provide that year-round supply. In addition, the larger boats demand more shoreside services (more fuel, more ice, more work in haul-outs and repairs) and thus help to support the shoreside services needed by all the boats.

Exhibit D
(Part 2)

**APPENDIX A:**

**GLOUCESTER COMMUNITY PANEL PARTICIPANTS**
**&**
**INFRASTRUCTURE PROJECT INTERVIEWEES**

David Bergeron, Massachusetts Fishermen's Partnership
Corrado Buccheri, B & N Fishing Gear
Maria Churchill, Ocean Crest
Joe Ciaramitaro, F/V Virginia Surf
Laurence Ciulla , Gloucester Seafood Display Auction
Rose Ciulla, Gloucester Seafood Display Auction
Bill Crossen, F/V Odessa
Dave Ellenton, Cape Seafoods, Inc
Vito Giacalone, F/V Jenny G
David Goethel, F/V Ellen Diane
Viking Gustafson, Gloucester Marine Railways
David P. Jackson, F/V Jeopardy
Greg Ketchen, Gloucester Harbor Plan Implementation Coordinator
Don King, Homeward Board Twine
Joe Maccarone, Jodrey State Pier
Grace Maceri, Gloucester Marine Railways
Dave Marciano, F/V Angelica Joseph
Scott Memhard, Cape Pond Ice Company
John B Nicastro, Felicia Oil
Jackie Odell, Northeast Seafood Coalition
Jerry O'Neill, Swan Net & Cape Seafoods
Rosalie Parisi, All Accounts
Sam Parisi, Pier 7
Steve Parkes, Pigeon Cove/ Whole Foods
Nino Randazza, F/V Skimmer
Frank Rose, Rose Marine
Clark Sandler, F/V Sea Farmer
Marc Sandler, Sandler & Laramee
Angela Sanfilippo, Gloucester Fishermen's Wives Association
Joe Scola, F/V Dolores Louise
Chris Sherman, F/V Lady Jane
Russell Sherman, F/V Lady Jane
Brian Tarr, Cape Ann Commercial Fishermen's Loan Fund
Paul Vitale, F/V Angela & Rose

Sarah Robinson, Harvard University (PhD candidate), Gloucester Panel Coordinator

NOTE:  In addition, many other people on the Gloucester waterfront graciously answered questions during informal surveys of waterfront activity conducted by coordinator Sarah Robinson and panel member Chris Sherman.

**APPENDIX B:**
**A List of the Businesses, Structures, and Space Comprising Gloucester's**
**Commercial Fishing Infrastructure in 2003**

**FRESH FISH/SHELLFISH BUYERS AND PROCESSORS**

**Groundfish**

Auction
   Gloucester Seafood Display Auction

Buyer/processors based in Gloucester or with a Gloucester facility
   Pigeon Cove/ Whole Foods
   Steve Connolly (based in Boston but with a large Gloucester facility)
   Ocean Crest (also a wholesaler)

Small buyer/ processors based in Gloucester or with a Gloucester facility; they buy from
other buyers or direct from boats but not at the Auction:
   Cherry Street Market (Based in Danvers; rents space at John B Wright)
   Old Squaw (rents space at John B Wright facility)
   Brian Fulford (rents space at John B Wright facility)
   Fish George and the Fillet Seafoods (rents space at NE Marine Resources)
   Frank's Fresh Fish
   J Turner Seafoods
   Capt Vito's Seafood (mostly or all retail)
   Sasquatch Smokehouse

Wholesale buyers/brokers based in Gloucester (they buy at the Auction or from other
buyers)
   John B Wright (used to be a processor, has a Gloucester facility which it now
      rents to small processors)
   Sea Coast Overland Association
   A B Seafoods Inc
   Nova Seafood Ltd
   Capt Vince
   Cape Ann Seafoods
   Others

Buyers and/or processors from outside Gloucester who buy fish in Gloucester (most but
not all buy at the Auction):
   Legal Seafoods (Boston-based)
   North Coast (Boston-based)
   Captain Marden's (Wellesley-based)
   Sousa Seafood (Boston-based)

Pier Fish Co (Boston & New Bedford-based)
Great Eastern Seafood (Boston-based)
Atlantic Sea Pride
Sea Fresh
New England Marine Resources (buys non-groundfish species)
Fish on Wheels
Cozy Harbor Seafoods (Portland-based)
Channel Fish Processing Co.
South Pier
Agger
Pier 7 (headquarters are in Boston)

Offloading/packing facilities (they handle the fish but do not buy it)
Gloucester Seafood Display Auction
Capt Vince

## Lobsters

Buyers
Capt Joe & Sons
Capt Vince
Mortillaro's
International Lobster (also monkfish)
Island Lobster Ltd
Rockport Lobster Co.
Pigeon Cove Lobster Company
Pier 7 (based in Boston)
Capt Vito

## Other Species

Buyer/ processors
Cape Seafoods (herring, mackerel)
New England Marine Resources (hagfish, monkfish, tuna, and others)
Intershell (scallops, clams, sea urchins, and others)
Zeus Packing (whiting – specialty market)
Atlantic Koam Trading (located at D & B Bait) (hagfish)
Sasquatch Smokehouse (one-person operation; smokes what he catches)

Buyers/ brokers
FWF Inc (tuna)
DFC International (tuna) – facility recently closed down, out of compliance
Cape Ann Tuna
Cape Ann Quality Bluefin

Aram (herring)
D & B Bait (herring)
Fuji Food (sea urchins)
Maguro America (sea urchins, tuna)

Offloading/ handling facilities
Americold – Rogers Street (for frozen hagfish)
Americold – E Gloucester (for frozen hagfish)

**ICE**

**Ice companies**
Cape Pond Ice Company

**Offloading/ processing facilities that make ice for their own use**
Gloucester Seafood Display Auction
Intershell
New England Marine Resources
John B Wright
Steve Connolly
Pigeon Cove/ Whole Foods
Cape Seafoods

**FUEL**

**Facilities on the waterfront:**
Felicia's Oil
Rose Marine (has a fuel barge, the only one in the port)
Gloucester Seafood Display Auction
Gloucester Marine Railways

**Oil trucks only**
Cape Ann Fuel (sells to smaller vessels)
Atlantic Discount Fuel

**Latent shoreside fuel facilities**
Fishermen's Wharf
Neptune Marine (formerly FBI Wharf)

**FACILITIES TO HAUL OUT AND REPAIR FISHING VESSELS:**

**Principal facilities:**
Gloucester Marine Railways
Rose Marine

36

**Other facilities:**
    Cape Ann Marina (occasional, usually small vessels)
    Brown's Marina (for vessels under 40 ft)
    Beacon Marine (for vessels under 40 ft)

## MOORING SPACE

**Long-term (dockside or nesting)**
    Jodrey State Fish Pier (54 berths) ($5.50/ft)
    Town landing (St Peter's Square)
    Gloucester House Restaurant
    I4C2 parcel ($3.75/ft)
    Gloucester Seafood Display Auction
    Rose Marine (4 vessels) (free in return for use of Rose's services)
    Felicia's Oil (10-12 vessels) (free in return for use of FO's services)
    Gloucester Marine Railways (20 vessels) (fee is charged)
    Fishermen's Wharf  (12 vessels) (fee is charged)
    Capt Joe's
    Atlantic Koam (at D & B Bait)
    Others?

**Temporary (for visiting vessels)**
    Jodrey State Fish Pier
    Rose's Marine
    Cape Ann Marina
    Gloucester Marine Railways
    Americold (Rogers St & E Gloucester)
    Gorton's
    Gloucester Seafood Display Auction

**Transient (for offloading fish and onloading gear and ice)**
    Cape Pond Ice
    Gloucester Seafood Display Auction
    Americold – Rogers St & E Gloucester
    Pigeon Cove/ Whole Foods
    Ocean Crest

**Transient (for dockside repair):**
[none at present: potential exists at Gloucester Marine Railways & Rose's]

## GEAR AND SUPPLY SHOPS

    B & N Fishing Gear (full service bottom trawl gear)

New England Marine Industrial (lobster, gillnet, some bottom trawl gear)
Swan Net (mid-water trawl gear and potential for bottom trawl gear)
Coastal Marine (lobster and gillnet)
Winchester's (lobster and sport fishing)
Homeward Bound (gillnets and gillnet hanging service)
Nelsons (jackets, clothing, boots)
Seatronics (marine electronics)


**FOOD AND SUNDRIES**
Stop & Shop
Shaws
White Hen Pantry (day boats)
Scalifano's
Virgilio's


**OPEN SPACE FOR WORKING ON GEAR**
State fish pier (available free of charge for people berthed there, and available at
    $60/ day for people not berthed there; in either case space must be reserved in
    advance)
Felicia's Oil (available, free of charge, for people berthed there)
Fishermen's Wharf?
Gloucester Marine Railways (open space and enclosed space)
Site of the old drive-in movie theatre in West Gloucester
Fishermen's homes (their yards)

A Study of Gloucester's Commercial Fishing Infrastructure:
Interim Report


APPENDIX C:


Figures 1-16:



Figure 1

NOTE: This and all following charts made of Gloucester landings have been prepared with data supplied by the National Marine Fisheries Service. Please note that when values for landings are at zero, this could be because landings in that year were made by three or fewer vessels or because landings were at zero.



Figure 2

40



Figure 3



Figure 4



Figure 5





Figure 6



Figure 7



Figure 8



Figure 9



Figure 10



Figure 11



Figure 12



**Gloucester: Swordfish Landings, 1975-2002**

◆ Gloucester: Swordfish Landings, 1975-2002

*Figure 13*



**Tons of Ice Sold for Fishing and Processing by Gloucester's Two Ice Companies (Cape Pond Ice and Gloucester Marine Railways Ice Division), 1987-2002**

◆ Tons of Ice Sold for Fishing and Processing

*Figure* 14. Note that values for Gloucester Marine Railways' Ice Division have been estimated for 1997and 1998, the last two years of its operation, and that from 1999-2002, values for Railways' ice sales are zero.



Cape Pond Ice: Tons of Ice Sold to Vessels and Processors, 1984-2002

Figure 15



Cape Pond Ice Company: Percent of Business Related to Fish, 1984-2002

Figure 16

Exhibit E
(Part 1)



# Rockport

## Municipal Harbor Plan
### Issues, Goals and Policies

Prepared by
Rockport Harbor Planning Committee
Town of Rockport, Massachusetts

July 2003

# CONTENTS

GLOSSARY                                                          ii

I.      OVERVIEW                                                  1
        A. Introduction
        B. Planning Rationale
        C. Vision for the Harbors                                 2
        D. Organization of the Harbor Plan

II.     SUMMARY OF EXISTING CONDITIONS                           3
        A. Overview
        B. Physical Setting
        C. Environmental Conditions                              8
        D. Regulatory Conditions                                 12
        E. Existing Uses                                         25

III.    GOALS AND POLICIES                                       31
        A. Overview
        B. Harbor Issues
        C. Goals and Policies                                    33

APPENDIX A. Map Data Sources                                     37

# TABLES

Table 1. SB-class Water Quality Standards                        8
Table 2. Special Acts of the Legislature
         and Chapter 91 Licenses                                 19
Table 3. Trends in Rockport Licensing                            27
Table 4. Statewide Lobster Statistics                            27

# MAPS AND FIGURES

Map 1. Harbor Plan Study Area                                    4
Map 2. Rockport Harbor                                           5
Map 3. Granite Pier                                              6
Map 4. Pigeon Cove                                               7
Map 5. Zoning                                                    14
Map 6. Land use                                                  15
Map 7. Special Acts of the Legislature
       and Chapter 91 Licenses                                   22
Map 8. FEMA                                                      23

Figure 1. Bearskin Neck                                          1
Figure 2. Locus Map                                              3
Figure 3. Rockport's Rocky Shoreline                             11
Figure 4. Boats in Rockport Harbor                               28
Figure 5. Sandy Bay                                              29

# GLOSSARY

| | |
|---|---|
| 10A permit | A mooring permit issued under Section 10A of MGL Chapter 91 |
| 21E | MGL 21E governs management of hazardous waste spills and contaminated areas |
| Anadromous | Ocean dwelling fish that spawn in fresh water |
| ArcView, Arc/Info, ArcScan, ArcEdit | Refers to product names of different types of geographical information system software |
| AutoCAD | Product name of a particular computer assisted drafting software. |
| Bathymetry | The measurement of ocean depths |
| Benthic biota | Plants and animals that dwell on the ocean bottom |
| BWSC | Bureau of Waste Site Cleanup, a part of DEP |
| Catadromous | Freshwater fish that spawn in sea water |
| C-CAP | Coastal Change Analysis Program of NOAA |
| Chapter 91 | MGL 91 governs the use of past and present tidelands |
| CMR | Code of Massachusetts Regulations |
| dB | Decibel, a unit of loudness measurement |
| DEM | Department of Environmental Management (of Massachusetts) |
| DEP | Department of Environmental Protection (of Massachusetts) |
| dpi | Dots per inch, specification of the level of resolution of a digital representation of an image (on a computer) |
| DPW | Department of Public Works (of Rockport) |
| DTM | Digital Terrain Model |
| EPA | Environmental Protection Agency (of the U.S.) |
| Fecal coliform | The collective name for bacteria that inhabit the intestinal tract of warm-blooded animals |
| FEMA | Federal Emergency Management Agency |
| FIRM | Flood Insurance Rate Map |
| Geomorphology | Science, nature and origin of the earth's topography |

| | |
|---|---|
| GIS | Geographical information system, computer software used for geographical data processing |
| .High Water Mark | The present mean high tide line, as established by the present arithmetic mean of the water heights observed at high tide over a specific 19-year Metonic Cycle (the National Tidal Datum Epoch), determined using hydrographic survey data of the National Ocean Survey of the U.S. Department of Commerce (see also Historic High Water Mark) |
| Historic High Water Mark | The high water mark which existed prior to human alteration of the shoreline by filling, dredging, excavating, impounding, or other means (see also High Water Mark) |
| Historic Low Water Mark | The low water mark which existed prior to human alteration of the shoreline by filling, dredging, excavating, impounding, or other means (see also Low Water Mark) |
| HPW | High Performance Watercraft, an unmuffled inboard engine speedboat |
| Hydrology | Science dealing with the water of the earth |
| LOMA | Letter of Map Adjustment, may be issued by FEMA to modify a FIRM |
| LOMR-F | Letter of Map Revision based on Fill, may be issued by FEMA to modify a FIRM |
| Low Water Mark | The present mean low tide line, as established by the present arithmetic mean of the water heights observed at low tide over a specific 19-year Metonic Cycle (the National Tidal Datum Epoch), determined using hydrographic survey data of the National Ocean Survey of the U.S. Department of Commerce (see also Historic Low Water Mark) |
| MCP | Massachusetts Contingency Plan, which governs a cleanup of a hazardous waste site |
| Mean Low Water | The level of the water surface when it is at the Low Water Mark |
| MGL | Massachusetts General Law |
| MPN | Most Probable Number, method for counting bacteria colonies whereby counts are obtained by statistical approximation |
| NOAA | National Oceanic and Atmospheric Administration |
| NPDES | National Pollutant Discharge Elimination System |
| Phase II | Second Phase of implementation of EPA's storm water management program |
| PWC | Personal watercraft, such as the Jet Ski |

| | |
|---|---|
| Revetment | A casing usually fabricated of stone or concrete installed to protect against erosion (commonly used for seawalls and embankment protection) |
| Rip-rap | A foundation or wall made of broken stone placed irregularly or loosely |
| SBYC | Sandy Bay Yacht Club |
| SRV | Submersed Rooted Vascular beds, plants requiring sunlight to conduct photosynthesis |
| Substrate | Ocean bottom |
| TIFF | Tagged Image File Format, a particular type of digital coding of images (on a computer) |
| Title V | Refers to DEP's 1995 revisions to Title 5 of the state Environmental Code, 310 CMR 15.000, covering on-site sewage disposal systems |
| UHI | Urban Harbors Institute, University of Massachusetts Boston, provided professional consulting in the development of this document |
| WCP | Wetlands Conservancy Program, part of DEP |

# I.    OVERVIEW

## A.    Introduction

This first phase of the plan for Rockport and its four (4) major harbor areas was developed to ensure growth, prosperity, and preservation of Rockport's important resources through responsible and reasonable future use and management of the harbors and their shorelines. The Plan has been prepared by the Town of Rockport to identify existing problems and to establish consensus about the character and quality of the harbors in the future. The Plan responds to a specific list of issues raised by the Harbor Planning Committee in a participatory planning process.

The Harbor Planning Committee is an ad hoc committee of the Town comprised of a diverse array of stakeholders. Each planning meeting was also posted and open to other interested residents of Rockport. The Urban Harbors Institute at the University of Massachusetts Boston provided professional consulting services for this phase of the plan.



Figure 1. Bearskin Neck

## B.    Planning Rationale

*Economic Growth*
Many of Rockport's most scenic and historic buildings have changed little over time, contributing to the charm of this close-knit community. Less static has been the economic makeup of Rockport, which has evolved considerably over time—as is the case in much of small town New England. The water-dependent timber, granite and fishing industries that once dominated the Town and shaped its waterfront have disappeared or been downscaled, and, over time, eclipsed by tourism.

While not considered water-dependent in the regulatory sense, tourism in Rockport is largely driven by its waterfront locale: it is the ocean environment, the boating opportunities, the active water-based industry of its past, and the scenic quality of the waterfront today that continue to interest and delight visitors to Rockport. In addition to tourism, the Town has managed to maintain a sufficiently large fishing fleet that contributes to both the economy of the Town and to the continued success of tourism.

While both of these industries are equally important to the residents of Rockport, subtle unplanned changes over time can compromise their prosperity. Because the quality and amenities afforded by the waterfront are integral to the success of both tourism and fishing,

1

planning today for the continued evolution of Rockport's harbor areas is the surest way to preserve existing uses and achieve desired changes.

*Quality of Life*
While protecting economic value is a central theme of the harbor plan, developing the waterfront's unique and inspiring qualities for maximum enjoyment by present and future generations is another. Residents of Rockport, for example, are long-time advocates for safe and plentiful public access to and along the Town's shoreline. While the Town's four (4) main harbors have different arrangements of pedestrian and boater access, the Town has expressed interest in providing continuous access, increased view corridors, and more public open spaces. In addition, the Town has expressed a desire to prevent increased traffic congestion in the Town by discouraging future uses that add vehicular traffic. A plan provides a means to characterize access, traffic, and other important cultural and natural resources and express short- and long-term goals that amplify their importance.

## C.    Vision for the Harbors

As an inspired and concise expression of how a community ultimately views its future, a vision statement provides a foundation for discussion in the planning process. A vision is usually arrived at using an open-ended format that encourages participants to be idealistic, to look beyond existing problems, conflicts, and short-term interests, and to think about the choices that are available to them.
The following statement was designed to capture the diverse interests of Rockport residents and is a keystone to the Harbor Plan:

> **HARBOR VISION**
> *Rockport's harbors and waterfront are the defining assets of the community and central to its history, economy, image and quality of life. The harbors are what attracted residents past and present and continue to be a major attraction to visitors who are vital to the Town's economy. The harbors provide a livelihood for fishermen, inspiration for artists, a safe haven for boaters, recreation, and scenic views for residents and visitors. These qualities underlie the goals of the Rockport Harbor Plan and shape the plan's principal objectives which are to: increase and enhance access to the harbor for commercial and recreational purposes, protect the quality of the harbors' resources, and preserve the scenic and historical elements of the harbors and adjacent land, for this and future generations.*

## D.    Organization of the Harbor Plan

The elements of the Rockport Harbor Plan have been organized to facilitate review and reference. Section II paints a picture of the problems and opportunities through a review of existing conditions, including natural resources, regulatory conditions, and existing uses. Section III provides a summary of the issues as identified by the Harbor Planning Committee and lists the goals and corresponding policies for the Town. This section will be expanded during the second phase of the planning process with a list of actions and an implementation strategy.

## II.    SUMMARY OF EXISTING CONDITIONS

### A.    Overview

This study of existing conditions in Rockport provides necessary background information for the planning process. Much of this information was gathered as a result of the issues and concerns identified by the Harbor Planning Committee during the planning process. This evaluation considers environmental conditions such as water quality, wetlands features, bathymetry (science of measuring ocean depths), and anadromous fish (fresh water spawning) habitat. It also considers existing uses of the harbor areas and regulatory conditions. Maps 1 to 4 provide a visual summary of existing conditions discussed in this section.

### B.    Physical Setting

Settled in 1690 and incorporated in 1840, the Town of Rockport is located 40 miles north of Boston on the outer reaches of a rocky headland known as Cape Ann (Figure 2). Rockport is surrounded by the Atlantic Ocean to the north, south, and east and by the City of Gloucester to the west and south. The topography is largely hilly with rocky coastal lowlands. The year-round population is approximately 7,000, expanding to 20,000 during the summer months.

The harbor areas and the rocky and rugged coastline of Rockport provide one of the most picturesque settings from both land and sea that has attracted residents, tourists, fishermen, and industry for decades. Much of Rockport's history, economy, and quality of life are derived from its harbor areas.

When Rockport was first settled, four man made harbors emerged from the needs of the timbering, fishing, and granite quarrying industries, the major economic bases for the Town. Timber structures on the waterfront were replaced with granite, creating much of the landscape still visible today. Rockport also became an important destination for artists, who began frequenting the area in the mid-1850's, drawn by its unique landforms, colorful scenery, and active seascape. Galleries, shops, and an abundance of patrons soon followed, and Rockport now benefits from tourism more than any other industry.



Figure 2. Locus Map

3

Rockport Harbor Plan: 7/24/2003



Rockport Harbor Plan: 7/24/2003



Rockport Harbor Plan: 7/24/2003



Map 3: Granite Pier
HARBOR RESOURCES

note
see disclaimer
in appendix

Granite Pier

Gull Cove

Sandy Bay
Ledge

Rowe
Point

| | Shoreline | | Engineering Infrastructure |
|---|---|---|---|
| | Boat pump out | | streets |
| | Boatramps | | Wetland Resources |
| | 21E sites | | COASTAL BANK BLUFF OR SEA CLIFF |
| | Moorings | | COASTAL BEACH |
| | Channel lines | | OPEN WATER |
| | Eel grass | | ROCKY INTERTIDAL SHORE |
| | Public open space | | |

250    250    500 Feet

6

Rockport Harbor Plan: 7/24/2003



Map 4: Pigeon Cove
HARBOR RESOURCES

⋏⋏  Shoreline

🔲  Marine rail (private)

⚑  21E sites

·  Moorings

⋏⋏  Channel lines

⟋⟋  Anchorage areas

▦  Public open space

Engineering Infrastructure

⋏⋏  streets

⋀⋀  storm drains

Wetland Resources

■  COASTAL BANK BLUFF OR SEA CLIFF

   COASTAL BEACH

   OPEN WATER

■  ROCKY INTERTIDAL SHORE

PIGEON WHARF

Anchorage
3.4 acres

70-foot Channel

BREAKWATER

Pigeon Cove

note
see map disclaimer in
appendix

CATHEDRAL AVE

GREEN STREET

GRANITE STREET

BREAKWATER AVENUE

CURTIS STREET

STORY STREET

CHAPEL LANE

PINGREE PARK

0       250       500 Feet

7

*Harbor Plan Study Area*
The geographic extent of the harbor planning area is Andrews Point to Straitsmouth Light (Map 1), landward to the first public roadway, and seaward to include the waters of Sandy Bay. From north to south, these roads are Long Branch, Point de Chene, Phillips, Cathedral and Breakwater Avenues, Granite, Beach and Main Streets, Dock Square, including all of Bearskin Neck, Mount Pleasant Street, Atlantic and Norwood Avenues, Old Garden Road, Marmion Way, Gap Head Road and the Town waters of:

> Granite Pier Harbor (Gull Cove)
> Pigeon Cove Harbor
> Old Harbor
> Rockport Harbor

## C.     Environmental Conditions

(1)     Coastal Water Quality

The coastal marine waters of Rockport are coded 'SB' according to the Code of Massachusetts Regulation (CMR) 314. SB-coded waters are suitable habitat for fish, other aquatic life, and for primary (prolonged) and secondary (incidental) contact recreation. The Massachusetts Water Quality Standards for SB waters are listed in Table 1.

### Table 1. SB-Class Water Quality Standards

| Analyte | Water Quality Criteria |
|---|---|
| Dissolved oxygen | Not less than 6 milligrams per liter unless background conditions are lower. |
| Temperature | Not to exceed 85 F (29.4 C) or a maximum daily mean of 80 F (26.7 C). Rise in temperature not to exceed 1.5 F (0.8 C) |
| pH | 6.5 to 8.5 standard units |
| Fecal coliforms | Not to exceed most probable number (MPN) of 88 colonies per 100 milliliters in waters approved for restricted shellfishing; no more than 10% of samples can exceed MPN 260 colonies per 100 milliliters.<br>Not to exceed MPN 200 colonies per 100 milliliters in other waters; no more than 10% of samples can exceed 400 colonies per 100 milliliters. |
| Solids | Waters must be free from floating, suspended, and settleable solids in concentrations or combinations that would impair any use assigned to this class, cause aesthetically objectionable conditions, or impair benthic biota (ocean bottom dwelling plants and animals) or degrade the chemical composition of the bottom. |
| Color and Turbidity | Waters must be free from color and turbidity in concentrations or combinations that are aesthetically objectionable or would impair any use assigned to this class. |
| Oil and Grease | Waters must be free from oil, grease, and petrochemicals that produce a visible film on the surface of the water, impart, an oily taste to the water or an oily or other undesirable taste to the edible portions of aquatic life, coat the banks or the bottom, or are deleterious or become toxic to aquatic life. |

*Pollution Sources*
There is limited data available on water quality in Rockport. At present, monthly sampling of storm drains during dry and wet weather events is required through a consent order issued by

8

the Department of Environmental Protection (DEP) (see Storm water System discussion that follows).

Investigations indicated that there may have been fecal coliform bacteria from drains contributing to water quality problems along Rockport's coastline. The outfall pipe from the treatment plant that extends north off of Bearskin Neck has the potential to contribute to bacterial contamination. According to the Massachusetts Department of Fisheries, Wildlife, and Environmental Law Enforcement, this contamination is restricted to within one-half mile offshore. Other perceived contributors to pollution of the harbors include possible contamination from the Cape Ann Tool Company, dog feces deposited on beaches and other land near the water, and snow deposited near the water's edge.

During winter months, snow removed from Rockport streets is deposited on Granite Pier. DEP's March 2001 Snow Disposal Guidelines suggest that areas next to fresh or salt water bodies or areas with a highly porous substrate should not be considered for snow disposal. The rationale is that effective snow disposal requires a location where the snow meltwater can filter into the soil, separating the water from the sand, salt, and other debris commonly found on winter roadways. Under the current disposal practice, given the location and porosity of soil on Granite Pier, it is likely that most of the salt, sand, litter, hydrocarbons, and other pollutants find their way into the harbor where they can be harmful to aquatic life at certain levels. Eelgrass (*Zostera marina*) growing adjacent to Granite Pier, for example, can tolerate salinity ranging from 18-30 parts per thousand (ppt), but salinity exceeding this range can have an adverse impact on the grasses (Katwijk 1999, Kamermans 1996).

*Storm water and Sewage System*

The Town of Rockport sanitary sewers and storm drains are two separate systems. The drainage system collects rain and conveys it to outfalls along the coast without storm water treatment. The sewage system collects and directs sanitary waste to a wastewater treatment facility. Rockport has been conducting storm drain sampling over the past several years. The Town of Rockport Board of Selectmen appointed a Coastal Water Quality Task Force in 1993, implementing a sampling program at potential pollution sites in 1994. The results from the samples taken in 1994 and 1995 led to additional sampling ordered by the Department of Environmental Protection (DEP). The Town of Rockport is currently under a DEP Administrative Consent Order to investigate the sources of pollution to the drain lines and develop a plan to address polluted storm water runoff.

Some common pollutants found in storm water include bacteria, nutrients, suspended solids and sediments, trace metals, pesticides, hydrocarbons and chlorides from salting roads in the winter. The Consent Order mandates a close look at the potential sources of each pollution. Possible sources have been identified and work is being conducted to determine what is contributing to the bulk of the pollution. Private septic systems may fail during very high rain periods, or for a variety of maintenance and design reasons. The public sanitary sewage system encounters problems when subjected to excess flow from sources other than sanitary hookups, such as ground water infiltration, illicit sump connections and other inappropriate fresh water intrusions. Runoff from agricultural and livestock practices includes nutrient rich manure and fertilizers. Runoff from parking lots, roads, and yards also carries pet wastes and wastes from vehicles into streams through the storm sewers.

The Consent Order required the Town to collect and summarize water quality data, use television inspection to determine the origin and severity of pollution problems, sample dry and wet weather discharge in several locations and conduct first flush sampling. Sampling continues to be conducted by Weston & Sampson Engineers. Data from a 1999 Weston & Sampson report indicated several locations with fecal concentrations exceeding acceptable thresholds (200 colonies per 100 milliliters for beaches and 1000 colonies per 100 milliliters for other areas). Rockport has installed and used the television inspection and has done building inspections and smoke testing of storm drains to determine possible sources. Some illicit connections and potential agricultural sources have been eliminated and several Town practices help to eliminate problems.

Efforts to control storm water pollution include regular street sweeping and drain and catch basin cleaning. The Board of Health monitors water quality in several locations to

9

ensure safe recreational use of the waterfront and the Town has installed vortex manholes to reduce pollution by allowing sediments to settle before reaching the discharge locations. Trash removal and recycling, and an organized household hazardous waste and oil collection help Rockport keep trash and toxins out of the storm water system. A leash law has been passed to enforce the control of pets and a public education program was launched to inform residents of the effects of pet waste pollution on receiving waters.

Rockport does not have a regular inspection program for the infrastructure of the drainage system and no Town ordinance currently exists for the use of storm drains. However, the Town also has concentrated on identifying and removing illegal connections into the system by residents or local industry, and the management plan includes recommendations to implement Title V inspections (see Section D-11 for an explanation of Title V) and several structural improvements to the public drain and sewer systems. The town provides a regular opportunity to address storm water impacts associated with new developments.

Rockport is attempting to develop, implement and administer a storm water management plan that is compatible with the Phase II Pollutant Discharge Elimination Program permit process. The six measures of the Phase II permit are public education and outreach, public involvement and participation, illicit discharge detection and elimination, management of construction site runoff, post-construction storm water management, and pollution prevention/good housekeeping for municipal operations. For each measure the storm water management plan will detail the best management practices, establish measurable goals, state the frequency and timing of the implementation actions, and identify the official(s) or board(s) responsible for the action.

(2)    Shoreline/Wetland Features

*Rocky Intertidal*
The shoreline from Andrews Point south to Straitsmouth Light is almost entirely a rocky intertidal ecosystem. Rocky shore plant and animal communities develop on the exposed faces of headlands and on man-made structures such as rock jetties, piers and riprap. Rocky intertidal plants and animals are uniquely adapted to live on a solid substrate that is exposed to the physical stress of wave action and variable tides. Substrates with a steep surface have very rapid drainage, compounding the challenges to marine organisms exposed to low tides. Because of the quick drainage and the tidal and wave energy released against this ecosystem, nutrients are not retained within the community and most of this production taking place fuels life in the neighboring habitats of the sandy beaches or open water. For similar reasons, rocky shores are not as sensitive to pollution as other coastal ecosystems. The movement of water on and against the rocks tends to wash most pollution loads away quickly and only constant exposure to high concentrations of pollution will degrade the rocky intertidal community. The plants and animals adapt to specific zones that meet their respective sensitivity to the tide, ranging from large algae and sea urchins in the submersed areas to the periwinkle, barnacle, and mussel populations that thrive in dryer regions of the shore.

*Eel Grass Beds*
Along the Rockport coast, an eel grass bed is located adjacent to the south side of Granite Pier and into the northwest section of Gull Cove. Eelgrass (*Zostera marina*) is a subtidal marine angiosperm—one of more than 60 species of seagrasses that grow in the oceans around the world. The depth at which eelgrass grows is variable from region to region and determined by light intensity and physical factors such as wave action and ice. In wave-swept coasts with clear water, eelgrass may begin at 3 – 6 feet below Mean Low Water and may grow as deep as 40 – 145 feet. At Granite Pier, it is estimated that the eelgrass grows to a maximum depth of 9 feet.

Eelgrass is an extremely productive and valuable resource. Seagrasses such as eelgrass protect shorelines from erosion, enrich the oxygen supply during photosynthesis, remove excess nitrogen and phosphorous that might otherwise result in abundant and

10

unwanted algal growth, provide food and habitat for waterfowl, fish, shellfish, and invertebrates, and serve as a nursery and refuge for many young or vulnerable species.

The decline of eelgrass has been a pervasive problem in Massachusetts with both man-made and natural disturbances playing a role in regulating its distribution and longevity. The single most important factor in determining the growth and survival of eelgrass is light— if there is not enough, the plants cannot photosynthesize. Suspended sediments (from erosion and runoff), algae, docks, and piers directly affect how much light reaches an eelgrass bed. Nutrients, on the other hand, indirectly affect eelgrass growth by creating excessive algal growth. Other sources of eelgrass degradation include dredging (direct removal), toxic pollution, and changes in salinity.



Figure 3. Rockport's Rocky Shoreline

*Coastal Beaches*

Moving south from Andrews Point, the eight coastal beaches that are situated within the study area of the Rockport Harbor Plan are as follows:
1. Beach to west side of Pigeon Cove Harbor,
2. Small beach north of Granite Pier,
3. Small beach in the southwest corner of Gull Cove,
4. Small beach on the north end of water basin near intersection of Beach and Granite Streets,
5. Larger beach south of Rowe Point, "Back Beach",
6. Larger beach to the west of Old Harbor, "Front Beach",
7. Small beach adjacent to Pier Avenue
8. Old Garden Beach east of Rockport Harbor.

Coastal sandy beaches are the least productive coastal habitats. Most plants cannot find any anchorage in the unstable sand and so only the unicellular algae are capable of producing food for the beach ecosystem. High wave energy, summer drying heat, and extremely rapid drainage are natural stressors to the plants and animals that do survive on sandy beaches. Without a base of food producers, detritus from more productive ecosystems supports most animal life. Where coastal currents, tides and waves import a detrital food base, the beach can support several species. Filter feeders and deposit feeders live below the surface and burrowing organisms like crabs and snails use the sandy beach for shelter. Several insects such as flies, fleas and beetles flourish along the high tide line. Sandy beaches are popular nesting sites for terns, gulls and other sea birds. Seasonal movement of sand with storms and human induced erosion due to vehicle travel and/or coastal development greatly influence sand beach organisms.

(3)    Bathymetry (all measurements at Mean Low Water)

The depths of Rockport Harbor range from exposed tidal mudflats to a depth of 14 feet at mean low water. The entrance to the harbor is between 9 and 15 feet in depth and leads to a depth of 7 feet in the Back Basins. The mean tidal range is 8.6 feet, with a spring range of 10.0 feet and a mean tidal level of 4.6 feet.

Old Harbor is largely exposed tidal mudflats with a water depth of 4 feet at the entrance. Town gangway and float, by Granite Pier, has a depth of 9 to 15 feet while Pigeon Cove Harbor is 15 feet at its entrance and varies between 8 and 9 feet within the cove itself.

(4)    Anadromous Fish Habitat

Since 2000, two (2) rainbow smelt  (*Osmerus mordax*) spawning habitats have been identified in Rockport—one in the Sawmill Brook and one in Mill Brook which both discharge into the Town's coastal waters.  A low number of eggs were found at both brooks in 2000 and even fewer in 2001. At Mill Brook, the eggs were found at the culvert opening as the brook spills out onto Back Beach. These brooks were previously not known to support anadromous fish populations, and it remains unknown whether these spawners are from a remnant population that was never identified or whether they are just beginning to colonize the brooks.

Rainbow smelt are native to the Arctic Ocean and northern portions of the Atlantic and Pacific oceans. They are anadromous, meaning they live in salt water but return to fresh water to spawn. They are also schooling fish and prefer open water where they feed primarily on microscopic animals (zooplankton).  Rainbow smelt commonly reach 6 to 8 inches in length and can live for up to 8 years.

Smelt spawning occurs in Massachusetts Bay from March through May. They are a popular recreational species and an important component of the food chain. Smelt eggs are adhesive and are typically deposited on the substrate of freshwater riffles just upstream of tidal influences.

There is a direct relationship between stream flows and smelt spawning. Discharge data and field observations from the Massachusetts Department of Fisheries, Wildlife, and Environmental Law Enforcement indicate that the present minimum flow at both brooks is just sufficient to attract spawning adults and protect the eggs. Withdrawals below this threshold could jeopardize the habitat, although further investigation is required before any definite characterizations can be made.

Anecdotal evidence from the Division of Marine Fisheries indicates that American eel (*Anguilla rostrata*) also spawn in the freshwaters that drain out of Rockport.

## D.    Regulatory Conditions

The Rockport waterfront is subject to regulatory authority of the local, state, and federal governments. The Town regulates land use, density, and dimensions through its Zoning By-law. It also regulates wetlands through its General Wetlands Ordinance.

The Commonwealth has regulatory authority over the use and alteration of filled and flowed tidelands under Massachusetts General Law Chapter 91. The purpose of this law and its corresponding waterways regulations (310 CMR 9.00) are to protect the public's rights to use the state's waterways for the purposes of fishing, fowling, and navigation. Chapter 91 applies to structures such as piers, wharves, floats, retaining walls, revetments, pilings, and some waterfront buildings. All existing structures not previously authorized and any new construction or change of use of a structure requires Chapter 91 authorization.

The US Army Corps of Engineers regulates shorefront activities including dredging and filling in or near coastal waters below the High Water Mark (Section 404 of the Clean

Water Act and Section 10 of the Rivers and Harbors Act). The Federal Emergency Management Agency (FEMA) is the federal agency responsible for overseeing recovery and relief from natural disasters. FEMA administers the National Flood Insurance Program which produces Flood Insurance Rate Maps (FIRMs). FIRM is the official map of a community on which FEMA has delineated both the special flood hazard areas and the flood risk premium zones applicable to the community.

(1)     Zoning

Maps 5 and 6 illustrate the land use and zoning patterns along the harbors' waterfront. Water-dependent commercial and recreational uses and facilities not situated on Town-owned property are located in either the General District or Residential "A" zoning districts.  All Town owned property used for municipal purposes is exempt from the provisions of the Zoning By-law.

The General District allows by right any use permitted in any residential district, as well as retail and service businesses, office, restaurant, light manufacturing and storage incidental to a permitted use, and boatyards.  Multifamily housing and a broader list of commercial and industrial uses are allowed by special permit from the Board of Appeals. This district covers the commercial waterfront surrounding Rockport Harbor and Pigeon Cove Harbor.

Residential A district allows single-family dwellings, professional offices and businesses in owner occupied residential structures, and accessory uses, by right and minor extensions of these uses by special permit.

(2)     Chapter 21 E

Maps 1 to 4 illustrate the 21E sites in the Rockport Harbor Plan Study Area. These maps were adapted from data obtained from the Department of Environmental Protection (DEP) and MassGIS.

Enacted in 1983, the state Superfund Statute, the Massachusetts Oil and Hazardous Material Release Prevention and Response Act (Massachusetts General Law Chapter 21E), establishes the state's authority to manage contaminated sites and hazardous waste spill emergencies. DEP implements the 21E program through a set of regulations known as the Massachusetts Contingency Plan (MCP). MCP describes the rules for conducting cleanups of contaminated sites. Chapter 21E requires DEP to ensure permanent cleanup of oil and hazardous material releases, to determine who is legally responsible for them, and to ensure responsible parties reimburse the state for cleanup costs. Once designated a 21E site, a property remains so in perpetuity, even after the site has been cleaned up.

(3)     Wetlands

One of the primary responsibilities of the Rockport Conservation Commission is the administration and enforcement of the Massachusetts Wetlands Protection Act (MGL Ch. 131, sec. 40) along with its corresponding Wetlands Regulations (310 CMR 10.00). In addition, Rockport has adopted under general Home Rule powers a municipal wetlands by-law (Ch. 14, Environmental Protection and Public Health).

Rockport Harbor Plan: 7/24/2003



## Map 5: Zoning

Shoreline
Zoning districts
General District (GD)
Residential District
Residential A District
Public property

General District - multiple commercial and residential uses
Residential District - Single family and 2-family
Residential A District - Single family and 2-family conversions
(i.e., single family converted to 2-family)

**note
see map disclaimer
in appendix**

Sandy
Bay

14

Map 6: Land Use
Shoreline
Land use
unknown
mixed commercial and residential
single family
multi-family/multi-houses
commercial
developable
undevelopable
postal service
manufacturing
municipal
charitable
church/synagogue
pier/wharf
The land use data presented on this map was obtained from the Town of Rockport's Assessors Office and subsequently modified by the Harbor Planning Committee to reflect recent changes and more accurate conditions.
Land use data was digitized at a scale of 1:4800. The shoreline was obtained from MassGIS at a scale of 1:25,000. The discrepancy in scale is the reason why the shoreline does not match up exact
note
see map disclaimer
in appendix
Sandy
Bay
Gull Cove
Sandy Bay
Ledge
Front Beach
Rockport Harbor
N
500
0
500 Feet



Under the Wetlands Act and local by-law, the Conservation Commission has authority over projects in or affecting these resource areas: bank, beach, dune, flat, marsh, swamp, freshwater, coastal wetlands or any estuary, creek, river, stream, pond, or lake. The Commission also has jurisdiction for land under water bodies, including docks and piers, land subject to tidal action, land subject to coastal storm flowage, and land subject to flooding. Activities within these resource areas subject to jurisdiction include activities that would remove, fill, dredge, or alter the resource. The Commission also has the right of review for activities within a 100-foot buffer zone around wetlands bordering waterbodies, banks, beaches, and dunes.

(4)     Harbor Regulations

Rockport's Harbor Regulations outline the procedures and rules regarding moorings and also establish harbor speed limits. No one can moor, anchor or set any moored vessel or float within the limits of Rockport Harbor, Granite Pier Harbor, Pigeon Cove Harbor, or Old Harbor without obtaining a 10A Mooring Permit from the Harbormaster. Permits are issued on a first come, first serve basis. The Harbormaster has the authority to reassign mooring locations of any permitted vessels at anytime. If there is no room for the applicant's vessel, they will be put on a waiting list that is maintained by the Harbormaster. No mooring is allowed along Town floats, piers and wharves, or docks designated for commercial fishing or fuel and maintenance.

Mooring holders in the Town of Rockport may not transfer their mooring permits in the event of a death to another vessel or person other than the mooring holder's spouse (Town Bylaws, Chapter 9, Section 2(a)(v)).

If an assigned mooring is not used for at least 30 consecutive days in a boating season, the location is considered abandoned and may be reassigned unless the permit holder has arranged special conditions with the Harbormaster. The boat owner has a one-year grace period to not have a boat on their mooring, but this year off must be discussed and agreed upon by the Harbormaster. Transient permits may be issued by the Harbormaster for up to seven (7) days. Temporary mooring permits also may be issued through the Harbormaster for up to one (1) year. Upon the completion of an application and payment of the designated fee, the mooring permit holder may authorize a non-permit holder to use his mooring for one (1) year with the written approval of the Harbormaster.

The maximum length of any vessel assigned a mooring in Rockport is 50 feet. It is the responsibility of the permit holder to install and maintain appropriate mooring gear. Mooring gear should be inspected by the permit holder once a year and lifted out of the water for inspection if necessary.

Mooring fees are established annually based on vessel length and permits may be revoked by the Harbormaster if any fee is not paid in full within 90 days (Chapter 9, Section 2(b)(iii), Town Bylaws).

The maximum speed of any vessel operating within all Rockport harbors is headway speed or five (5) miles per hour.

(5)     Chapter 91, Public Waterways Act

Massachusetts' principal waterfront regulatory program in tidelands and other waterways is Massachusetts G.L. Chapter 91 (Public Waterways Act, 1866). Chapter 91 and the corresponding waterways regulations (310 CMR 9.00) are administered by the Division of Wetlands and Waterways of the Massachusetts Department of Environmental Protection.

Chapter 91 applies in tidelands, great ponds, and along certain rivers and streams. Tidelands refer to all land presently or formerly beneath the waters of the ocean, including lands that are always submerged as well as those in the intertidal area, i.e., below the Historic High Water Mark. This area is governed by a concept in property law known as the public

trust doctrine which establishes that all rights in tidelands and the water are held by the state "in trust" for the benefit of the public for the purposes of fishing, fowling, and navigation. The Waterways Act and its corresponding regulations codify the public trust doctrine in Massachusetts.

As clarified by the 1983 amendments to the waterways regulations, Chapter 91 jurisdiction extends landward to the Historic High Water Mark and seaward three miles to the limit of state jurisdiction. The Historic High Water Mark is the farthest landward tide line which existed "prior to human alteration" by filling, dredging, impoundment or other means (310 CMR 9.02). Thus, Chapter 91 applies to filled as well as flowed tidelands, so that any filled areas, moving inland to the point of the Historic High Water Mark, are subject to Chapter 91 jurisdiction.

Chapter 91 authorization is generally required for any fill, structure, or use not previously authorized in tidelands, including any changes of use and structural alterations. Types of structures include: piers, wharves, floats, retaining walls, revetments, pilings, bridges, dams, and waterfront buildings (if located on filled lands or over the water).

The benefits that the Chapter 91 program can afford a town are best captured in the five basic objectives of the program: (1) ensure the waterfront is used primarily for water-dependent purposes, (2) provide public access, (3) facilitate other state programs related to shoreline use and conservation, (4) strengthen local controls and encourage harbor planning, and (5) ensure accountability to present and future public interests.

For planning purposes, the location of the Historic High Water Mark (i.e., upland limits of Chapter 91 jurisdiction) must be established through a review of maps that may reliably show the original natural shoreline or through engineering studies. Previously issued Chapter 91 licenses are also a source of information on the Historic High Water Mark for specific parcels. Ultimately, jurisdiction will be determined by DEP on a property-by-property basis at the time of licensing.

A review of the shoreline from Andrews Point to Straitsmouth Light using historic maps as well as a review of Acts of Legislation and existing Chapter 91 licenses indicates that most of the man-made shoreline alteration occurred in the harbors. Outside of the harbors, the absence of licenses, the geology, and distribution of natural resources would suggest a shoreline driven by natural processes. A list of Acts of the Legislature (see below) and Chapter 91 licenses in the Harbor Plan Study Area can be found in Table 2. In addition, Map 7 provides a graphical presentation of those properties that have had an Act or Chapter 91 license issued at some point in time.

Prompted by existing highly desirable vacant and developable land along Pigeon Cove, a group of citizens in Rockport has initiated a request for a determination of applicability of Chapter 91 in the area. At this time, DEP is conducting research to determine the best placement of the historic shoreline around Pigeon Cove. Three studies that attempt to delineate this shoreline exist already, however considerable discrepancies make it difficult for DEP to draw any conclusions from these sources alone.

A DEP public hearing held in May 2001 in Rockport, brought forth the following recommendations and concerns regarding Pigeon Cove: (1) DEP should consider sub-surface core studies to help ratify the historic shoreline debate, (2) the extent to which structures and fill in Pigeon Cove are not licensed needs to be clarified, and (3) the extent to which human alteration of the shoreline in the past has affected the shape of the land and flow of water in the cove today should be considered. To the maximum extent reasonable, DEP will consider these recommendations, which in combination with existing studies, historic maps, and Chapter 91 licenses should enable them to make a reasonable determination of the historic shoreline in Pigeon Cove.

In the case of Pigeon Cove, it was the development opportunities around the cove and citizen concerns that future plans would not benefit the Town that prompted their actions. While the other harbors do not present the same development potential at this time, a determination of Chapter 91 jurisdiction might be beneficial if the Town determines that there are certain public interests, such as access, that it would like to see expanded or protected in the region. Alternatively, the Town might determine that there are certain properties, presumed to lie within jurisdiction, that they would like to target for future water-related

17

public benefits in the event that there is a change of use or redevelopment of the property that would trigger Chapter 91 licensing. All of this information can be specified in the Harbor Plan, which provides the best means for collectively expressing a Town's Chapter 91 objectives.

(6)     Special Acts of the Legislature

Prior to 1866 when Chapter 91 was first promulgated, the Massachusetts legislature issued Special Acts to transfer title of a property from the Commonwealth to a waterfront landowner and to enable particular types of development to take place on the property as specified in the Act. The rights granted within a Special Act are transferred to each successor at the time of sale, but they do not exempt a property owner from Chapter 91 review for a new or modified use of the property.

(7)     Federal Emergency Management Act Regulations

The FEMA Flood Zones Map provides a plan for the various Flood Insurance Zones along the shoreline as established by the Flood Insurance Study of the Town of Rockport. Map 8 delineates the FEMA flood zones in Rockport.

As defined by FEMA, the Old Harbor, Bearskin Neck and some of those properties seaward of Mount Pleasant Street on Rockport Harbor are areas that fall within the coastal floodplain and would be inundated by 100-year flooding with the additional hazards associated with storm waves. The houses along Atlantic Avenue to the southeast of Rockport Harbor are determined to be outside the floodplain. The land along Main Street and Beach Street between the Old Harbor and Rowe Point falls within the floodplain, with the properties seaward of Main Street in the Back Harbor potentially being flooded to a depth of 1-3 feet.

Although the eastern end of Rowe Point is deemed to be safe from flooding, according to the FEMA maps the stretch of Granite Street to the west of the point would be inundated to a depth of 1-3 feet in a 100-year flooding event. This also applies to Granite Pier where the seaward end is safe from flooding but would be cut off from the land in the event of a 100-year flood.

To the north of Granite Pier to Pigeon Cove, a 100-year flood and storm waves would only affect those properties directly on the waterfront. However, such an event would have the same effect on all those properties on the cove itself, seaward of Granite Street and Cathedral Avenue and including Breakwater Avenue.

FEMA periodically updates flood hazard maps by conducting a detailed reevaluation of flood hazards, referred to as a flood study. However, flood studies are time consuming and expensive, so far fewer than needed are done. As an alternative, FEMA has established procedures by which a community may compile appropriate data and request a map revision. Further, if an individual homeowner has technical information to indicate that his or her home has been inadvertently shown within the Special Flood Hazard Area on a Flood Insurance Rate Map, the homeowner may submit that information to FEMA and request that FEMA remove the flood zone designation from the home by issuing a Letter of Map Amendment (LOMA) or a Letter of Map Revision Based on Fill (LOMR-F). Requests for LOMAs/LOMR-F must include the surveyed elevation of the lowest grade adjacent to the structure or the lowest enclosed level of the structure along with certain other information.

Exhibit E
(Part 2)

Rockport Harbor Plan: 7/24/2003

SPECIAL ACTS OF THE LEGISLATURE

| MAP | PARCEL | ADDRESS | CURRENT OWNER | DESCRIPTION | CHAPTER/ LIC. NO. | YEAR | OWNER AT LICENSING | DESCRIPTION |
|-----|--------|---------|---------------|-------------|-------------------|------|--------------------|-------------|
| 16 | 26 | Pigeon Cove Wharf | Pigeon Cove Boat Owners Assoc. | Pigeon Cove Wharf | Ch. 34 | 1830 | Pigeon Cove Harbor Co. | erect or maintain pier or breakwater in Cove |
| 16 | 26A | Granite Street | Old Colony Maritime LLC | former Cape Ann Tool Co. | Chap. 26 | 1826 | Pigeon Cove Pier Co. | build pier |
| 16 | 28A | Granite Street | Old Colony Maritime LLC | Former Cape Ann Tool Co. | Chap. 26 | 1826 | Pigeon Cove Pier Co. | build pier |
| 17 | 8 | 3 Pigeon Hill Wharf | Roger Kellog | single family residence | Chap. 230 | 1871 | Pigeon Hill Granite Co. | construct and maintain wharf |
| 17 | 18 | Off Wharf Road | Town of Rockport | Granite Pier | Chap. 281 | 1855 | 8 individuals listed | construct breakwater, maintain and extend wharf |
| 17 | 19 | Off Wharf Road | Town of Rockport | Granite Pier | Chap. 281 | 1855 | 8 individuals listed | construct breakwater, maintain and extend wharf |
| 17 | 20 | Wharf Road | Town of Rockport | Granite Pier | Chap. 281 | 1855 | 8 individuals listed | construct breakwater, maintain and extend wharf |
| 17 | 40 | 59 Granite Street | Mary Malone | multi-family residence | Chap. 261 | 1855 | W.H. Knowlton | build and maintain wharf in Rowe's Cove |
| 17 | 41 | Rowe Point | | multi-family residence | Chap. 261 | 1855 | W.H. Knowlton | build and maintain wharf in Rowe's Cove |
| 35 | 1A | 21 Old Harbor Rd | Town of Rockport | White Wharf | Chap. 76 | 1810/1811 | Sandy Bay Pier Co. | build Pier off Bearskin Neck |
| 35 | 3 | Old Harbor Rd | Town of Rockport | parkland | Chap. 76 | 1810/1811 | Sandy Bay Pier Co. | build Pier off Bearskin Neck |
| 35 | 5 | 15 Old Harbor Rd | Millicent Bruce | single family residence | Chap. 76 | 1810/1811 | Sandy Bay Pier Co. | build Pier off Bearskin Neck |
| 35 | 6 | Old Harbor Rd | Millicent Bruce | undevelopable | Chap. 76 | 1810/1811 | Sandy Bay Pier Co. | build Pier off Bearskin Neck |
| 35 | 6A | Old Harbor Rd | Town of Rockport | boat slips | Chap. 76 | 1810/1811 | Sandy Bay Pier Co. | build Pier off Bearskin Neck |
| All coastal parcels between Headlands and Old Harbor | | | | | Chap.261 | 1855 | Sandy Bay Pier Co. | Purchase all lands and flats, build breakwaters piers and wharves |

19

Rockport Harbor Plan: 7/24/2003

## CHAPTER 91 LICENSES

| MAP | PARCEL | ADDRESS | CURRENT OWNER | DESCRIPTION | CHAPTER/ LIC. NO. | YEAR | OWNER AT LICENSING | DESCRIPTION |
|---|---|---|---|---|---|---|---|---|
| 16 | 26 | Pigeon Cove Wharf | Town of Rockport | Pigeon Cove Wharf | 163&457 | 1873 | Pigeon Hill Granite Co. | rebuild breakwater |
| 16 | 26&28 | Pigeon Cove Wharf & Breakwater Ave | Town of Rockport & Old Colony Maritime | Pigeon Cove Wharf & former Cape Ann Tool Co. | 1006 | 1887 | Pigeon Cove Harbor Co. | extend north wharf and fill |
| 16 | 28 | Granite St | Old Colony Maritime LLC | former Cape Ann Tool Co. | 1758 | 1895 | Pigeon Cove Harbor Co. | build seawall and fill solid |
| 16 | 28 | Granite St | Old Colony Maritime LLC | former Cape Ann Tool Co. | 2375 | 1941 | Cape Ann Tool Co. | build and maintain seawall and fill solid |
| 17 | 30 | Granite Pier | Lakeview Realty Trust | coded undevelopable | 4401 | 1997 | Lakeview Trust | maintain existing seawall, fill, and 3 floats |
| 17 | 34 | 4 Gull Cove | Bruce W. Levick Trs | residences | 4914 | 1995 | B. Levick | maintain existing seawall, fill, and float |
| 17 | 42 | 27 Beach St | Joseph P. Digiovanni Trs | residences | 2541 | 1901 | D. Newcomb | build dam, seawall [dam & pipe removed 2002] |
| 17 | | Sandy Bay | Town of Rockport | Sewer outlet | 1929 | 1938 | Town of Rockport | Build and maintain sewer outlet |
| 35 | 6A | Old Harbor Rd | Town of Rockport | White Wharf boat slips | 1810 | 1988 | Robert Ramsdell | dredge, fill, piles, utilities, floats, ramp, guard rail |
| 35 | 7A | Old Harbor Flats | Andrew A. Menna | Flats/new lot since 1995 | 3536 | 1953 | M.G. Kenney | maintain seawalls, steps, terrace, boathouse |
| 35 | 10 | 6 Old Harbor Rd | Theodorus Taminiau | Fresh Ketch Restaurant | 3536 | 1953 | M.G. Kenney | maintain seawalls, steps, terrace, boathouse |
| 35 | 11B | 2A Old Harbor Rd | Albert Ruben | mixed use | 3536 | 1953 | M.G. Kenney | maintain seawalls, steps, terrace, boathouse |
| 35 | 11 | 14 Bearskin Neck | Margaret Coonley | The Ice Cream Store | 3536 | 1953 | M.G. Kenney | maintain seawalls, steps, terrace, boathouse |
| 35 | 15 | 4 Bearskin Neck | Helena L. Radi | Tradewinds | 4669 | 1963 | J. T. Fine | maintain existing building on piles and construct an addition |

Rockport Harbor Plan: 7/24/2003

| MAP | PARCEL | ADDRESS | CURRENT OWNER | DESCRIPTION | CHAPTER/LIC. NO. | YEAR | OWNER AT LICENSING | DESCRIPTION |
|---|---|---|---|---|---|---|---|---|
| 35 | 17 | 21 Dock Square | William McLaughlin | Restaurant, shops | 8818 | 2002 | Dock Square Realty Trust | Maintain existing 2 story building on previously filled tidelands |
| 36 | 17 | Atlantic Ave | Town of Rockport | park | 1597 | 1987 | Town of Rockport | retaining wall, rip-rap fill |
| 36 | 26 | Mt. Pleasant | Laurence Bershad | Blacksmith Shop Restaurant, residence | 3634 | 1954 | Blacksmith Shop, Inc. | Maintain & extend building on piles |
| 36 | 26 | Mt. Pleasant. | Laurence Bershad | Blacksmith Shop Restaurant, residence | 4448 | 1961 | Blacksmith Shop, Inc. | extend existing building on piles |
| 36 | 33 | T Wharf | Town of Rockport | T-Wharf | 7918 | 1999 | Town of Rockport | wharf reconstruction, new piles, dredge and fill around T-wharf (and Bradley wharf) |
| 36 | 33A | T Wharf | Sandy Bay YC lease from Town of Rockport | Yacht Club | 153 | 1917 | G. Perkins | build seawall & pile wharf, fill, dredge |
| 36 | 33A | T Wharf | Sandy Bay YC lease from Town of Rockport | Yacht Club | 4104 | 1996 | Sandy Bay YC lease from Town of Rockport | maintain buildings, floats, ramp, and establish marina reconfiguration zone |
| 36 | 69 | Bearskin Neck | Tuna Wharf Condos | shops and living units | 830 | 1884 | Sandy Bay Pier Co. | fill to mean high water and build seawall |
| 36 | 69 | Bearskin Neck | Tuna Wharf Condos | Parking lot | 4065 | 1957 | Rockport Pier Co. | Fill to mean high water and build seawall |
| 36 | 69 | Bearskin Neck | Vaughan Hawley | Tuna Wharf | 2229 | 1990 | V. Hawley | construct and maintain a landing, ramp, and float for commercial landing of excusion passengers |

21



Map 7: Special Acts of Legislature and Chapter 91 Licenses

This map illustrates approximate locations of Special Acts of the Legislature and Chapter 91 licenses, to the best of the ability of the consultant and Harbor Planning Committee.

Chapter 91 licenses are according to DEP historical records. These licenses may no longer be valid. Refer to the Harbor Plan document for more detailed information on Chapter 91 and Special Acts of the Legislature.

Special Acts of the Legislature
Shoreline
Chapter 91 licenses
Town parcel lines

note
see map disclaimer
in appendix

Rockport Harbor Plan: 7/24/2003



Map 8: FEMA Flood Zones

This FEMA data was digitized by Mass GIS from FEMA Flood Insurance Rate Maps.
Zone VE - Area inundated by 100-year flooding with velocity hazard.
Zone AE - Area inundated by 100-year flooding.
Zone AO - Area inundated by 100-year flooding, for which flood depths range from 1 to 3 feet.

Shoreline
FEMA
Zone VE
Zone AE
Zone AO

FEMA flood hazard maps are not frequently updated because of the large time and financial commitment required. However, FEMA has established procedures by which a community may compile appropriate data and request a map revision. Further, if an individual homeowner has technical information to indicate that his or her home has been inadvertently shown within the Special Flood Hazard Area on a Flood Insurance Rate Map, the homeowner may submit that information to FEMA and request that FEMA remove the flood zone designation from the home by issuing a Letter of Map Amendment (LOMA) or a Letter of Map Revision Based on Fill (LOMR-F).

**note**
**see map disclaimer**
**in appendix**

23

(8)      US Army Corps of Engineers Regulations

Section 404 of the Clean Water Act authorizes the Corps to regulate the discharge of dredged or fill material into all waters (including wetlands) of the US. The limit of jurisdiction is the High Water Mark in tidal waters. Regulated activities include the placement of fill for construction, site-development fill, riprap, seawalls, and beach nourishment.

Section 10 of the Rivers and Harbors Act of 1989 authorizes the US Army Corps of Engineers to regulate structures and work in navigable waters of the US. Jurisdiction extends shoreward to the High Water Mark. Regulated activities include construction of piers and wharves, permanent mooring structures such as pilings, intake and outfall pipes, boat ramps, and dredging and disposal of dredged material, excavation, and filling. The Corps' other major responsibility is to plan and carry out water resources projects such as improvements to navigation. Since 1986, the cost for such projects is shared between the federal government and the nonfederal sponsors. An important consideration in the Corps' decision to undertake a project is that its benefits exceed the cost. For projects such as dredging of harbors and navigation channels, highest priority goes to projects that benefit maritime industry such as shipping and fishing.

The channels into Rockport Harbor and Pigeon Cove Harbor are federally created and maintained navigation channels. Rockport Harbor and Old Harbor are both in need of dredging at this time. The breakwaters sheltering Rockport's harbors are all in need of repair.

(9)      Phase II NPDES Storm Water Program

The US EPA's storm water management program, initiated in 1990 under the Clean Water Act, is aimed at preserving, protecting and improving the Nation's water resources from polluted storm water runoff. The first phase of the program focused on the National Pollutant Discharge Elimination System (NPDES) permits to address storm water runoff from larger storm sewer systems serving populations of 100,000 or more, construction activities disturbing five acres or more and certain industrial activities. Phase II, which began in 1999, extended the NPDES permit coverage for storm water discharges from smaller storm sewer systems (under 100,000 population) in urbanized areas and smaller construction sites (activities disturbing between one and five acres of land).

Phase II is an attempt to further reduce adverse impacts to water quality and aquatic habitat through the use of controls such as public educational programs, storm sewer inspections for illegal connections, and ordinances to control construction site runoff.

(10)     Massachusetts Ocean Sanctuary Program

In 1970, Massachusetts passed the Ocean Sanctuaries Act (Ch. 132A, Section 12A), which applies to the area between the Low Water Mark and three miles offshore, except for the area between Lynn and Marshfield. The Ocean Sanctuaries Act is designed to protect coastal waters by prohibiting activities that could be environmentally or aesthetically damaging. The Act prohibits exploitation or development that would seriously alter or endanger the ecology or appearance of the ocean, seabed or the subsoil. Some of these prohibited activities include building on the seabed, drilling, dumping wastes, and commercial advertising. However, fishing, sand extraction, and special projects are still allowed under the act. The Department of Environmental Management (DEM) has jurisdiction over the ocean sanctuaries and DEM must approve all activities that occur on, or in, these areas.

(11)     Title 5

Refers to the Massachusetts Department of Environmental Protection's 1995 revisions to Title 5 of the state Environmental Code, 310 CMR 15.000, covering on-site sewage disposal

systems (septic systems, cesspools, and the like). Title 5 regulations require that on-site systems must comply with state-mandated design and performance standards. The regulations require that private septic systems be inspected upon the conveyance of the property or upon any change in use or expansion of use of the facility that requires issuance of a building or occupancy permit. Title 5 also establishes a comprehensive system for the review and approval of alternative technologies such as recirculating sand filters and humus/composting systems.

## E.    Existing Uses

Rockport's harbors are used for a variety of purposes. Recreation, tourism, fishing, and commercial activities and other uses are discussed below.

(1)     Shoreline Access and Recreational Areas

Rockport is one of the most "access rich" communities in Massachusetts with approximately four miles, or half of the eight-mile coastline either publicly owned or accessible by public rights of way. This is significantly greater than the aggregate statewide percentage of only 19 percent of publicly accessible land.

Pedestrian access to the shoreline is available at all four harbors. Other pedestrian rights of way identified by the Rockport Rights of Way Committee are found at the Headlands off Atlantic Avenue, the Old Boat Ramp off Dock Square, the Old School House Landing at the foot of Jewett Street, the Old Garden Beach foot path and the Atlantic path with numerous associated foot paths. A number of parks, beaches, and designated open space areas can be found including Old Garden Beach, the Headlands, Star Island Park on Atlantic Avenue, Rotary Park, the tip of Bearskin Neck, Inner Harbor Park, Middle, Lumber, and White Wharf, Front Beach, Back Beach, and Granite Pier. Public restrooms are available at T-Wharf and portable facilities at Granite Pier.

Straitsmouth Island, located at the extreme eastern end of the designated Harbor Plan study area, is a bird sanctuary wholly owned by the Massachusetts Audubon Society and is off limits to visitors.

Fishing for striped bass, as well as some other species, takes place along the shoreline.

(2)     Mooring Areas

The four harbor areas of Rockport accommodate a total of 355 boats at slips or on moorings. Approximately one-third of these boats belong to commercial fishermen. Fees for owner maintained moorings and for Town-owned finger piers and slips varied between $7 per foot and $100 per foot for 2002, depending on location and facilities available. Mooring tackle is privately owned but must be approved by the Harbormaster and inspected annually. Over 450 people are currently on a waiting list for a mooring in Rockport.

Until recently White Wharf in Old Harbor was privately owned. The wharf was acquired by the Town in 2001. White Wharf slips provide 32 spaces with restricted water use and limited electricity and parking.

In Rockport Harbor, fore and aft moorings are used in the North, South, and South Outer basins; the North Outer Basin uses swing moorings. There are also 30 slips in the Town leased finger piers in the South Basin. The Sandy Bay Yacht Club maintains its own floats to accommodate Club launches, service boats and sailing school fleets.

The moorings at Granite Pier and Pigeon Cove, with a few exceptions, are all fore and aft.

(3)     Service Facilities

There are no marinas in Town, nor does the zoning bylaw currently provide for them. There is one private fueling facility in Rockport at Pigeon Cove. This is a certified, above ground, 6,000 gallon diesel fuel tank. Diesel fuel is also available from trucks on Granite Pier and T-Wharf. There are no marine gasoline fuel facilities in Rockport, and boaters oftentimes fuel their gasoline engine vessels in the harbors using portable containers. This practice presents a number of environmental and safety concerns to local residents.

There are no vessel repair facilities in Rockport. A private marine railway exists in Pigeon Cove Harbor for commercial vessels. A significant amount of minor maintenance work is carried out afloat, and fishermen at both Granite Pier and Pigeon Cove complete major repairs and maintenance work on shore with the aid of a hydraulic trailer used to haul and launch the boats. There is no formal Town oversight to encourage proper handling and disposal of the materials used and waste generated during boat maintenance.

T-Wharf in Rockport Harbor, Pigeon Cove Harbor, and Granite Pier each have hoists which fishermen use to load and off-load.

The Town has one Pump-out boat to service the harbor areas seasonally. The service is provided on an as-called basis by the Harbormasters. The transfer facility for the Pump-out boat is located at Granite Pier.


(4)     Commercial Fishing

All harbors in Rockport serve a fleet of close to 100 commercial fishing vessels. All harbors are sheltered by breakwaters of Rockport's granite.

The most valuable fishery is lobster, followed by groundfish, and shrimp. All vessels are small and employ one to three persons.

*Lobsters*
Rockport is the home port of 65 lobstermen, ranking Rockport 5th in the state for the size of its lobster fleet. The most recent statistics obtained from the Massachusetts Department of Marine Fisheries indicate that a total of 650,671 lbs of lobster were trapped in 1999, ranking Rockport 8th in the state for total catch. Of this total, 119,576 lbs—approximately 18 percent of the total lobsters landed—were obtained from federal waters. The remaining lobsters were landed inshore within 3 miles of the coastline. Table 3 illustrates trends in lobstering effort in Rockport spanning 10 years. Table 4 illustrates some statewide trends in lobstering over a 13-year period (1987-1999).

During this time, the greatest growth in landings and total value of the lobster industry occurred between 1998 and 1999; the greatest decline was between 1988 and 1989. Additional information on total landings between 1995 and 1999 indicate a 4.35 percent decline and a total value increase of 11.79 percent for lobsters landed in state waters. In federal waters, the total landings rose 6.66 percent and the total value rose 24.66 percent. It should be noted that these figures do not suggest that lobsters harvested from federal waters fetch a higher price.

Table 3. Trends in Rockport Lobstering (1990-1999).

| Year | No. of Lobstermen | Total lbs. Landed | Percent Landed in state waters | Percent Landed in federal waters | Rank in state for total catch |
|------|-------------------|-------------------|--------------------------------|----------------------------------|-------------------------------|
| 1990 | 60 | 450,985 | 95 | 5  | 17 |
| 1991 | 59 | 441,806 | 98 | 2  | 15 |
| 1992 | 59 | 423,316 | 95 | 5  | 15 |
| 1993 | 59 | 374,024 | 90 | 10 | 15 |
| 1994 | 58 | 492,549 | 90 | 10 | 13 |
| 1995 | 60 | 462,586 | 91 | 9  | 12 |
| 1996 | 59 | 503,887 | 84 | 16 | 11 |
| 1997 | 60 | 479,003 | 85 | 15 | 12 |
| 1998 | 64 | 492,243 | 84 | 16 | 10 |
| 1999 | 65 | 650,671 | 82 | 18 | 8  |

Table 4. Statewide Statistics.

| Years | Percent Change in Total Landings | Percent Change in Total Value |
|-------|----------------------------------|-------------------------------|
| 1987-1991 | 19.44  | 7.72  |
| 1991-1995 | -0.24  | 16.94 |
| 1995-1999 | -0.27  | 16.56 |

(5)    Shellfishing

The Massachusetts Division of Marine Fisheries (DMF) has the responsibility for monitoring the water quality in shellfish bed areas and classifying shellfish beds. The shellfish beds immediately offshore in Sandy Bay are classified as Management Closure by DMF using Federal Standards. The Management Closure indicates the maximum area which could be directly impacted by potential bacterial contamination because of total failure of the sewage treatment process. The closure is in effect even if no contamination currently exists. The Town meets current state standards. Recreational and commercial shellfishing is prohibited in a Closure area. However, anecdotal information exists that there is some recreational shellfishing of surf clams (*Spisula solidissima*) by divers off the coast of Rockport. Other shellfish resources in the area include surf clams, blue mussels (*Mytilus edulis*), sea scallops (*Placopecten magellanicus*), and ocean quahogs (*Arctica islandica*).

(6)    Commercial Boats

Depending on economic conditions, there are commercial tour boats that operate out of Rockport Harbor in the summer months for fishing trips, whale watching trips and sail cruises. Small boats are used for deep sea fishing trips in the summer and carry a maximum of six passengers each. A lobster boat is used to take approximately 30 passengers to observe lobstering. It is anticipated that this industry will not expand much due to Rockport's 50 foot boat limitation and the lack of fueling facilities.

27



Figure 4. Boats in Rockport Harbor

(7)     Recreational Boating

*Transient Dockage*
All transient vessel tie-ups in Rockport Harbor are under the direction of the Rockport
Harbormasters. The fee for overnight tie-ups is $1.00 per foot per night. Harbor depth restricts
boats to a six foot draft in Rockport Harbor. Anchorage is also available northwest of
Bearskin Neck off Front and Back beaches, but this area is treacherous in high north,
northeast, and east winds.

*Boat Ramps*
Although boat ramps exist at Rockport Harbor and Granite Pier, the only publicly available
ramp is at Granite Pier. The Pigeon Cove marine railway is available by arrangement with
Pigeon Cove Boat Owners Association, Inc. The ramp in Rockport Harbor is restricted for
emergency use. There is a need for additional trailered boat ramps and launching sites. There
is also a need for storage and launching facilities for hand launched small boats. The "old
ramp" at the eastern end of Granite Pier could be used for launching small boats.

*Marine Recreational Activities*
The normally protected and kindly waters of Sandy Bay attract locally moored, trailered, and
car-topped small power boats and sailboats and, increasingly, sea kayaks. All four harbors
shelter a mix of recreational sail and power boats as well as the commercial fishing fleets with
the greatest concentration of all boats in the main harbor in downtown Rockport. The larger
cruising boats are located on the south side of the harbor while the smaller and principally sail
powered class fleets are located on the north side. Commercial boats are principally moored in
the inner harbor.
        The Sandy Bay Yacht Club (SBYC), which occupies leased Town land on the south
side of T-wharf, is an open membership, self-governing operation similar to a community
boat club. SBYC provides a sailing school for juniors and two classes of small boats for their
training, individual adult sail training in "loaner" boats, and manages weekend fleet races and
regattas.
        SBYC also provides launch service to member boat owners through a member boat
fee assessment and provides free services for visiting boats. Over half the Club's 900
members are "rocking chair" sailors and avail themselves of the seasonal social events and
view of the harbor activities from the porch. Since Rockport is a dry town there is no bar and
food service is restricted to a seasonal snack bar.

28

Both day trip visitors and local residents fish from private boats, charter boats, and from the wharves and breakwaters for seasonally available blue fish, stripers, and groundfish.

Recreational swimming and scuba diving is permitted outside Rockport harbors and their approaches.



Figure 5. Sandy Bay

*Personal Watercraft (PWC) and High Performance Watercraft (HPW)*

Many in Rockport are concerned that the growing numbers of PWCs and HPWs are adversely affecting the quality of life in the harbors and Sandy Bay. Particular concerns are that:

(1) PWC and HPW are much noisier than other types of motor boats. PWC, in particular, present problems with both noise level and duration. While other boats travel over larger areas and disturb one area for a limited amount of time, PWC are operated in a limited area for a prolonged period of time. Their noise is characterized as high-pitched and variable (fluctuating as the PWC bounces on and off the water's surface), in the 85-100 decibel (dB) range. Eighty-five dB is comparable to the noise level of a busy city street.

(2) Reckless operation of these vessels interferes with the recreational enjoyment of the water by other watercraft users, swimmers, and skin divers. PWC, for example, account for 11 percent of all watercraft registered in the country yet produce 35 percent of all watercraft accidents.

(8)    Harbor Administration

The annual fees collected for mooring and slips are deposited in the general fund. In fiscal year 2002, the following revenue was generated from harbor activities:

- User fees Pigeon Cove: $16,702
- User fee T-Wharf SBYC: $15,540
- User fees Granite Pier: $31,600
- User fees Bradley Wharf: $6,000
- Mooring and slip fees all harbors (paid): $137,999
- Mooring and slip fees all harbors (uncollected): $16,921
- Waterways Fund (returned from State): $5,620
- Transient fees Main Harbor: $4,000
- Mooring list fees (projected) based on 452 applicants: $2,260
- Some fees from Town-owned property may not be included

The total Town income from waterfront related revenue is $236,642.

NOTE

> Based on information provided by Town agencies, committees, and Harbor Department on or before July 30, 2002.

In fiscal year 2002, the budget of the Harbormaster and Shellfish department was $81,152 of which $75,964 was expended. In the same year the Granite Pier budget was $11,300 of which $8,727 was expended.

## III. Goals and Policies

### A. Overview

This section presents the core of the first phase of the harbor plan; it documents pertinent issues in Rockport and establishes appropriate goals and policies to tackle these issues. The goals and policies identified in this plan originate from six (6) primary themes: scenic value, public access, water use, natural resource protection, use of municipal waterfront facilities, and harbor administration. This information is central to the next phase, which will make recommendations on appropriate actions to implement each policy.

### B. Harbor Issues

Rockport Harbor issues were identified through open discussions conducted by the Harbor Planning Committee. To a significant degree, the Harbor Plan's content, particularly the goals, policies and recommendations, have been shaped by and are directed toward addressing these issues.

*Geographic extent of the harbor planning area*

The geographic extent of the harbor planning area is Andrews Point to Straitsmouth Light (Map 1), landward to the first public roadway, and seaward to include the waters of Sandy Bay. From north to south, these roads are Long Branch, Point de Chene, Phillips, Cathedral and Breakwater Avenues, Granite, Beach and Main Streets, Dock Square, including all of Bearskin Neck, Mount Pleasant Street, Atlantic and Norwood Avenues, Old Garden Road, Marmion Way, Gap Head Road and the Town waters of:

> Granite Pier Harbor (Gull Cove)
> Pigeon Cove Harbor
> Old Harbor
> Rockport Harbor

*1. Scenic Concerns*

The scenic character of Rockport's harbors is a source of pride and satisfaction for residents and attracts artists, tourists, commercial photographers, and movie companies. The scenic value of the waterfront is subject to degradation through replacement development and architectural updating.

*2. Commercial fishing*

Commercial fishing operates from every harbor in Rockport. The role and benefits of Rockport's commercial fishing fleet should be documented in the plan to provide appropriate support for maintaining this water-dependent use.

- Conflicts exist between the commercial fishing landside operations and abutters, particularly residential uses. The conflicts include noise (engines in early AM), odor (of bait), truck traffic, storage of gear and boats.
- Fishermen need parking spaces on the waterfront for loading and unloading.
- Should the fees charged for mooring permits for commercial vessels be the same rate as mooring permits for recreational boats?
- There is concern that marine industries will not be able to survive on the waterfront under market pressures that favor non-water dependent uses.

3. *Recreational boating*
- Inadequate support facilities (fuel, water, restrooms, electricity, adequate tender tie-ups) for recreational boaters.
- Insufficient dock space and floats to accommodate the transient boaters who come to Rockport for the Town's restaurants and tourist attractions.
- Lack of launching areas and secure storage areas suitable for small non-motorized boats.
- Demand for additional dockage and moorings for residents, non-residents, and transient boaters. There is limited potential for expansion in the harbors.

4. *Town owned waterfronts and infrastructure*
- Most Town owned wharves and piers exhibit a certain amount of physical deterioration.
- Potential purchases of privately owned waterfront areas.
- Public restroom facilities and water are not currently available at all harbors.

5. *Environmental and safety concerns*
- Certain activities, such as boat maintenance, taking place over or adjacent to the water, may adversely affect water quality in the harbors. The extent and severity of these effects is unknown.
- Discharges from boats anchored off swimming beaches may affect public health and the environment.
- The harbors are crowded. Increase in transient boating services will exacerbate problems.
- Certain types of vessels such as PWC and HPW are of particular concern.
- Vehicular traffic around the harbor area is a problem.
- There are not enough parking spaces to accommodate all the water-dependent uses.
- Current waterfront fueling practices raise environmental safety concerns.
- Defective or inadequate private and municipal sanitary sewer systems, as well as contaminated streams and storm drains discharging into the harbors and adjacent waters may affect water quality.
- The practice of disposing of snow near harbors affects water quality.
- Excessive aesthetic and security lighting on the shoreline interferes with navigation and makes harbor approaches hazardous at night.
- Lack of data on the health of inshore plants and animals.
- Potential contamination of harbors and bay from 21E sites (hazardous waste), contaminated sediments, and the disturbance of these sediments.
- Maintain safe and adequate maneuvering room for vessels in all Town harbors.
- Minimize detrimental effects on eel grass by using good environmental practices.
- Shoreline public access areas which are not under direct supervision or frequent scrutiny are subject to the accumulation of trash and refuse from recreational activities as well as human and animal waste from visitors and local users.

6. *Public access and water-dependent uses*
- Lack of plan or policy on siting water-dependent commercial activities (gambling, deep sea fishing and whale watches) that have landside impacts.
- Limited waterfront access for pedestrians, picnickers, visitors, artists, and other water-enhanced recreational activities.
- Inadequate landscaping at Granite Pier and elsewhere along the harbors.
- Loss of public access over Town and private land.
- Question of control and ownership of harbor bottoms.
- Lack of official public awareness of waterfront permitting processes.

- Encroachment on public land and private properties subject to Chapter 91 public access requirements.
- The influx of scuba divers at Front and Back Beaches, Old Garden Beach, Cathedral Rocks and presence of diving classes at Back Beach cause a shortage of parking in these areas.

*7. Harbor administration*
- Decision-making process over future activities and uses needs to be clarified. There is a need to improve coordination among municipal, state, and federal authorities. This includes DPW, Conservation Commission, Board of Selectmen, Harbormaster, Harbor Advisory Committee, Planning Board, Historical District Commission, Fire Department, Police Department, Board of Health, Rights of Way Committee, Granite Pier Committee, Mass. Department of Environmental Protection, Mass. Coastal Zone Management, and the US Army Corps of Engineers.
- Equitable fee structure for public and private moorings, slips, shoreside tie-ups, and other harbor facilities.
- The Town lacks an effective, overall harbor management for managing the harbors and their facilities.

## C.    Goals and Policies

As a guideline, goals are general statements about what a community would like to achieve in the harbor areas.

(1)     Scenic Values

*Goal*
- Preserve and protect the scenic qualities of Rockport harbors and coast as viewed from both the land and water.

*Policies*
- Protect the natural and man-made elements of the harbors and waterfront that contribute to the scenic, historical, and aesthetic qualities that give the community its character and support its economy.
- Ensure that future development or redevelopment is compatible with existing uses and does not detract from the waterfront's historic and scenic qualities and uses.
- Encourage acceptance of only <u>water dependent</u> applications for Chapter 91 permits.

(2)     Public Access and Water-Dependent Uses

*Goals*
- Preserve, increase and enhance access to the Harbor Plan study area for water-dependent commercial and recreational purposes, including public and pedestrian access to and along the waterfront.
- Identify, protect and recover historic Rights of Way.

*Policies*
- Create and support opportunities for public access and enhancement of recreational or commercial boating on waterfront property within  the Harbor Plan study area.
- Ensure Town-owned waterfront property be used only for water-dependent uses related to commercial and recreational boating, access, and passive recreation.

33

- Strive to protect, promote, and further public access under every Chapter 91 license and permit.
- Develop objective standards for the purpose of providing input on Chapter 91 license applications regardless of whether the Town is an abutter.
- Establish a process to monitor and respond to all Chapter 91 license applications in a timely manner.
- Create or set aside additional space for transient boaters to tie-up in locations convenient to commercial areas.
- Provide additional facilities in each of the harbors in support of small, non-motorized boats to include launching areas, secured storage areas for vessels, restrooms, and equipment.
- Address the existing parking shortage as it affects harbor use. Encourage, create, and use satellite parking facilities.
- Create an acceptable historic shoreline base map.
- Actively pursue the possibility of increasing mooring capacity by extending Granite Pier to Sandy Bay Ledge.
- Examine methods for increasing mooring density in all the existing harbors.
- Enhance waterfront access for water-enhanced activities of pedestrians, picnickers, visitors, and artists.
- Improve landscaping, cleanup, and maintenance of all Town and waterfront properties.
- Determine the ownership of harbor bottoms.
- Ensure that private use of the Town's harbors not be expanded beyond that which exists at the time this plan is adopted if such private use will reduce town mooring capacity or displace existing mooring holders.
- Establish a file of Chapter 91 licenses, permits, and acts of legislation relating to waterfront structures within the Harbor Plan area.
- Research and establish a file of information on waterfront structures and floats that lack the appropriate Chapter 91 licenses, permits and tideland determinations.
- Encourage acceptance of only water-dependent applications for Chapter 91 licenses.
- Consider maximizing sticker parking spaces at Town beaches.
- Consider restricting Scuba diving classes and large groups to specific portions of Town beaches and shoreline.


(3)     Water Use

*Goal*
- Protect and maintain existing commercial and recreational water-dependent uses.

*Policies*
- Consider long-term impacts of new development on water-dependent uses when reviewing permit applications.
- Discourage offshore mariculture ventures.
- Support commercial fishing for its economic, cultural and historical contributions.
- Promote water-related youth and adult activities, such as sailing programs, regattas, boater safety classes, and swimming classes.
- Discourage the proliferation of personal watercraft and high performance watercraft in Sandy Bay.


(4)     Natural Resource Protection

*Goals*
- Protect and improve the quality of land and water resources of Rockport harbors and Sandy Bay.

- Minimize the impacts of recreational boating and boat-related activities on water quality. Town waters should be clean enough for safe swimming.

*Policies*

- Reduce potential impacts to water quality by educating waterfront facility managers and users on best practices.
- Establish new regulations consistent with good management practices for activities on the water and waterfront that affect the environment.
- Ensure that the Town of Rockport complies with local, state, and federal regulations regarding outflow from storm drains.
- Control unmuffled marine engine exhaust noise.
- Use available opportunities, such as during regulatory reviews and distribution of annual permits, to provide educational materials on activities that cause pollution and on ways to avoid or minimize these impacts.
- Monitor water quality through periodically published reports. Take action if water quality is not appropriate for swimming.
- Monitor the health of significant populations of indigenous sea plants and animals through formal periodic studies.
- Monitor local and transient "live aboard" vessels to insure sanitary policy compliance.
- Preserve continuing access for existing anadromous and catadromous fish.

(5)    Use of Waterfront Land and Structures

*Goals*

- Ensure that land within the scope of the Harbor Plan is used appropriately for the greatest public good.
- Improve the condition and function of Town-owned waterfront lands and structures.

*Policies*

- Prepare a long-term capital improvement and maintenance plan for municipal waterfront property and facilities.
- Schedule periodic assessments of the physical condition of wharves and breakwaters. Prioritize needs, identify revenue sources, and create an annual budget.
- Seek federal, state, and private funds for capital improvements of Town-owned land and structures.
- The Harbor Advisory Committee and the Harbormasters shall be responsible for reporting any storm related damage in a timely fashion to the Selectmen and DPW Commission so they may secure FEMA or any other available funds for repair of the damage.
- Prevent conflict between land use regulations and waterfront use regulations by using consistent language with specific and distinct definitions.
- Improve visual aspects and use of the waterfront (e.g., landscaping, benches).

(6)    Harbor Administration

*Goals*

- Pursue the goals and policies of the Rockport Harbor Plan.
- Assign all mooring and Town slip facilities to vessels of appropriate size, draft, hull configurations, and similar means of propulsion.

*Policies*

- The Town should complete a Municipal Harbor Plan. After approval of the Plan by the Board of Selectmen and adoption of relevant bylaws by Town Meeting, the Plan should be used to guide and coordinate all decisions made at the local, state and federal levels that affect Rockport's harbors and waterfront.

- The Harbor Plan shall provide guidance to the Department of Environmental Protection for projects that require Chapter 91 licensing.
- The Harbor Advisory Committee shall be responsible for overseeing implementation of the Harbor Plan and for bringing periodic revisions to the Board of Selectmen for appropriate actions.
- Explore the most appropriate structure to manage harbors and implement the Harbor Plan.
- Establish a harbor management matrix to define the authority of Town boards and individuals related to harbor issues.
- Institute a process for ensuring maximum and coordinated participation in Chapter 91 licensing and permitting decisions of the Department of Environmental Protection. Use this process to provide consistent comments to the other state, federal and municipal agencies with decision-making authorities. For each Chapter 91 permit and license, Town officials will request DEP to require the maximum amount of public access provided for by the regulations.
- Periodically review and revise as appropriate the fees charged for use of harbor facilities.
- Develop a schedule for periodic maintenance of all harbor facilities, including walls, wharves, channels, basins, and buildings. Establish an enterprise fund to carry out this maintenance. The enterprise fund should receive an annual appropriation as a line item in the Town budget, whether or not work is scheduled in that year.
- Ensure that the allocated revenue from an Enterprise Fund is dedicated to the waterfront and harbors, and managed by the Harbor Administration.

# Appendix A – Map Data Sources

**DISCLAIMER:** The information presented in the maps in this report represents the best information available at the time the report was prepared.

**Note To GIS User**

The Rockport Harbor Plan maps were produced using ArcView GIS 3.2. The following text describes the sources of information used to produce the visual database. Accuracy of data digitized by Urban Harbors Institute is not guaranteed and is for planning purposes only. These maps should not be reproduced in any form without appropriate reference to the sources.

*Town Parcel Lines*
Source: Town of Rockport Assessor/UHI georeferencing
Parcel sheet maps were obtained in digital TIFF format from the Rockport DPW. Each map was subsequently georeferenced into Massachusetts Mainland State Plane Coordinates 1983 using geographic transformation software. To obtain a best fit and to minimize root mean square error, either first order, second order, or affine polynomial transformations were used on each sheet. These sheets were tiled in ArcView and the parcel lines were digitized on-screen to create the existing parcel line theme. Parcel specific information obtained from the Town's assessors office was added to this theme to create a comprehensive parcel attribute table.

*Rights-Of-Way*
Source: Rockport Right of Way Committee.
Rights-of-way were digitized on-screen by UHI.

*Boat Ramps and Moorings*
Source: Harbormasters
Digitized on-screen by UHI.

*Channel Lines and Anchorage Areas*
Source: National Oceanic and Atmospheric Admin. Charts
Digitized on-screen by UHI.

*Local Dredging Limits*
Source: Army Corps of Engineers
Digitized on-screen by UHI.

*Engineering Infrastructure*
Source: Town DPW/Weston & Sampson Engineers
AutoCAD data layers were obtained from W&S and converted into ArcView by UHI.

*21e Sites.*
Source: MassGIS.
The DEP Tier Classified Oil or Hazardous Material Sites datalayer is a statewide point dataset containing the approximate location of oil or hazardous material disposal sites that have been (1) reported and (2) Tier Classified under M.G.L. Chapter 21E and the Massachusetts Contingency Plan (MCP).  Location types featured in this datalayer include the approximate center of a site, the center of a building on the property where the release occurred, the source of contamination, or the location of an on-site monitoring well.  For the purposes of this document, the terms "DEP Tier Classified oil and hazardous material disposal sites" and "Tier Classified Chapter 21E sites" are synonymous and are often referred to simply as "sites". This STATE library layer is named **C21E**; its coverage name is **BWSC_DEP**.

37

Releases of oil and hazardous materials are reported to the Department of Environmental Protection's (DEP) Bureau of Waste Site Cleanup (BWSC), according to procedures established in the MCP (310 CMR 40.0000). The sites mapped in this datalayer represent only a subset of the total reported Chapter 21E sites tracked by DEP BWSC. Chapter 21E sites that have not yet been Tier Classified are not contained in this datalayer.

*Wetlands*
Source: MassGIS
The wetlands were interpreted from stereo, 1:12000 scale, color-infrared photography by staff at UMASS Amherst. The interpretation is field checked by Department of Environmental Protection (DEP) Wetlands Conservancy Program (WCP). Completed interpretations are then scanned at 250 dpi with a Howtek Scanmaster 3+. The resulting images are converted to ARC/INFO coverages using ARCSCAN with additional processing in ARCEDIT. The distortion from terrain and camera coordinates are removed using a combination of PHOTOGIS, a photogrammetry software program, and a digital terrain model (DTM) derived from 1:5,000 black and white ortho-rectified digital aerial photography. In ARC, the corrected coverages are then mapjoined and clipped by the boundary of a State Plane Coordinate grid cell which represents a 4 kilometer by 4 kilometer orthophoto sheet. Plots are generated at 1:5,000 scale and final quality control is performed at that scale. It should be noted that the resulting wetlands are for planning purposes only; final wetland boundary determination must accord with MA Act M.G.L. c. 131.

*Eelgrass*
Source: MassGIS
The Mass. Department of Environmental Protection (DEP) Wetlands Conservancy Program (WCP) has developed and completed a project to map the SRV resources of the entire Massachusetts' coastline. This mapping effort was conducted with the financial and technical assistance of the National Oceanic and Atmospheric Agency (NOAA) Coastal Change Analysis Program (C-CAP) and the NOAA Coastal Services Center located in Charleston, SC. The project (conducted from 1994 through 1997) acquired aerial photography and conducted photointerpretation and extensive fieldwork to map the coastal SRV resource.

*Flood Data*
Source: MassGIS
FEMA created the Q3 Flood data by scanning current FIRM paper maps and vectorizing the data. Though the scales of the map sheets vary and the original paper FIRMs contain no horizontal control, the data do have horizontal control consistent with 1:24,000 maps. This was accomplished by fitting the flood data to a USGS quadrangle. Edgematching, overlaps and underlaps in data and other problems were not corrected during the conversion process. The data were received from FEMA as ARC/INFO export files which were processed by MassGIS and incorporated into the data library. While FEMA intends to perform bi-annual review of data, the user is advised to confirm that the digital data does indeed represent the most current FIRM.

# Exhibit F
# (Part 1)

10/18/05

# Massachusetts South Shore Commercial Fishing Infrastructure, 2004

South Shore Community Panel:
Cohasset, Hingham, Hull, Marshfield, Plymouth, Sandwich, and Scituate

By

Jay Michaud, Marblehead
Community Panels Project

Principal Investigators:
Dr. Madeleine Hall-Arber, MIT Sea Grant
David Bergeron, Massachusetts Fishermen's Partnership
Dr. Bonnie McCay, Rutgers University

# INTRODUCTION ....................................................................................................................4

## Common themes .........................................................................................................................4

## Project Background and Methods ..............................................................................................5

# COMMUNITIES ..................................................................................................................6

## Cohasset, Massachusetts ............................................................................................................ 6
Mooring .......................................................................................................................................... 7
Access ............................................................................................................................................. 8
Maintenance .................................................................................................................................... 8
Gear Supply ..................................................................................................................................... 8
Fuel ................................................................................................................................................. 8
Bait .................................................................................................................................................. 8
Ice .................................................................................................................................................... 8
Market ............................................................................................................................................. 8

## Hingham, Massachusetts ........................................................................................................... 9
Introduction ..................................................................................................................................... 9
Mooring .......................................................................................................................................... 9
Town Fees ....................................................................................................................................... 9
Private facilities .............................................................................................................................. 9
Gear and supplies .......................................................................................................................... 11
Fuel ............................................................................................................................................... 11
Ice .................................................................................................................................................. 11
Bait ................................................................................................................................................ 11

## Marshfield, Massachusetts ....................................................................................................... 12
Vessels .......................................................................................................................................... 12
Mooring ........................................................................................................................................ 13
Association .................................................................................................................................... 13
Maintenance .................................................................................................................................. 13
Gear and supplies .......................................................................................................................... 14
Fuel ............................................................................................................................................... 14
Ice .................................................................................................................................................. 14
Bait ................................................................................................................................................ 14
Market ........................................................................................................................................... 14
Parking .......................................................................................................................................... 14
Infrastructure Essentials for a Satellite Fishing Port ................................................................... 15

## Plymouth, Massachusetts ......................................................................................................... 16
Vessels .......................................................................................................................................... 16
Access ........................................................................................................................................... 16
Maintenance .................................................................................................................................. 18
Gear and supplies .......................................................................................................................... 18
Fuel ............................................................................................................................................... 18
Ice .................................................................................................................................................. 18
Bait ................................................................................................................................................ 18
Market ........................................................................................................................................... 18
Parking .......................................................................................................................................... 19

3

**Sandwich, Massachusetts** ................................................................................................................. **20**
    Access ................................................................................................................................ 20
    Maintenance ...................................................................................................................... 21
    Gear and supplies ............................................................................................................. 21
    Fuel ................................................................................................................................... 21
    Bait .................................................................................................................................... 21
    Market ............................................................................................................................... 21
    Parking .............................................................................................................................. 22

**Scituate, Massachusetts** ................................................................................................................. **23**
    Past and future of fishing .................................................................................................. 23
    Vessels .............................................................................................................................. 24
    Access ................................................................................................................................ 24
    Ice ...................................................................................................................................... 26
    Market ............................................................................................................................... 26
    Harbormaster .................................................................................................................... 26

**Massachusetts Seaport Council** ..................................................................................................... **27**

**PANELISTS' SUGGESTIONS** ..................................................................................... **28**

**SUMMARY** ....................................................................................................................... **29**

**APPENDICES** ................................................................................................................. **30**
    Fishermen and their representatives participating in this project ...................................... 30
    Harbormasters .................................................................................................................. 30
    Services ............................................................................................................................. 31
    Commonwealth ................................................................................................................ 31
    Local Community Leaders ................................................................................................ 31
    Press ................................................................................................................................. 31

**SUMMARY OF SOUTH SHORE INFRASTRUCTURE ELEMENTS** .................... **32**

**SELECTED FISH-RELATED BUSINESSES, SOUTH SHORE** ................................ **33**
    Fuel ................................................................................................................................... 33
    Marine Repair ................................................................................................................... 33
    Gear and Supplies ............................................................................................................ 33
    Buyer/Processor ............................................................................................................... 34
    Boat Yard .......................................................................................................................... 34
    Marine Surveyors ............................................................................................................. 34
    Diving/Towing .................................................................................................................. 34
    Bait .................................................................................................................................... 34
    Retail, Fish & Food .......................................................................................................... 35

# Introduction

Issues facing the ports along Massachusetts South Shore are similar to those of the larger fishing ports that are part of the Panels Project, but their concerns, in some ways, are even more basic. While the larger ports fear the loss of a wide range of infrastructure needs, those who fish and live along the South Shore are fighting for the survival of the most essential need, that is, physical access to the shoreline. Specifically, access to piers, loading and unloading facilities and mooring or tie-up facilities determines whether or not a fishing industry can remain in these communities.

Few of the South Shore communities that retain fishing as part of their economic base have the diversity of support services characteristic of the dominant Massachusetts ports, Gloucester, New Bedford and Boston. In fact, the importance of retaining the mix of services in these three hub ports for the survival of the industry in the Commonwealth cannot be overstated. Nevertheless, there are a few requisites for fishing activity to take place anywhere, and physical access is clearly the most basic or essential of these.

In the words of Bill Adler, Executive director of the Massachusetts Lobstermen's Association, "The most pressing infrastructure problem is the dock space factor. The ramps, parking, what we had before, and are losing. That is part of the infrastructure, whereas every time I've listened to... the word 'infrastructure' they've talked about wholesalers, factories, suppliers, those type of things as being the infrastructure that would crumble if the fishing industry can't fish, and it's true. But there is that other factor... that probably won't physically crumble or go away. But then again, things like losing access to the parking lot, the pier, the ramp... that is infrastructure."

## *Common themes*

The fishing ports selected for this study are located from the Town of Weymouth to, and including the Town of Sandwich. These communities all have commercial fishing fleets that range in size, gear used, and target species; however, lobster is the predominant species sought. Although each community is unique, this study confirmed that their commercial fleets share similar characteristics.

A theme common to all ports in the study, and indeed all of New England, is the increasing competition for space and access to the waterfront. Escalating shore side real estate values reflect the demand for alternate uses such as for condominiums and second homes, seasonal restaurants, recreational boating and fishing, etc. Adler stated "the recreational (sector) is one of the parts where it's scary. They're kicking everyone out of these areas... they're pricing them out". Loosely referred to as gentrification, towns strapped for funds often regard this demand as the route to a "deep pocket" that will resolve budgetary problems.

In some communities, the fishing industry has responded to this trend by working together to develop a self-supporting physical infrastructure, in others the communities have recognized the benefits to their community of retaining fishing as part of their economic base and have helped subsidize the industry. Limiting the research along the South Shore primarily to an investigation of

the physical access needs of the fishing communities has revealed threats to the survival of fishing in some communities but has also highlighted innovative ways that some communities have chosen to protect the diversity in their economic base.

The brief profiles below of the fishing communities of the South Shore document the major concerns and efforts being made by the fishing sector and others in the communities to address these concerns. It is the hope of the Panels Project that the 52 communities in the state that have fishing fleets can learn from each other to successfully address the problems many face.

## *Project Background and Methods*

The research upon which this report is based is part of a cooperative research project entitled "Institutionalizing Social Science Data Collection," funded by the Northeast Consortium and the Saltonstall-Kennedy federal grant program. David Bergeron, Executive Director, Massachusetts Fishermen's Partnership; Dr. Madeleine Hall-Arber, anthropologist at MIT Sea Grant; and Dr. Bonnie McCay, anthropologist at Rutgers University are the principal investigators. A primary goal of the project is to develop a process by which community members themselves can participate in the identification of major issues of concern to their communities as well as the collection of appropriate social and economic information.

Community panels in six fishing communities have been established. Three of these are important hub ports for the region, Gloucester, New Bedford (Massachusetts) and Portland (Maine). The other three represent the small and medium-sized ports typical of the area: Pt. Judith (Rhode Island), Beals Island (Maine) and Scituate (Massachusetts). This report covers Scituate and the South Shore of Massachusetts.

Panels in the larger hub ports focus on the whole range of infrastructure needs and services provided in each of their ports. Although this portion of the project initially focused on Scituate, panel members, recommended by key advisers to the project, were actually from several different communities of the South Shore. Four small focus group meetings were held and the ensuing discussions raised a wide variety of issues. Panel members conducted personal interviews of about ten fishing industry participants. A graduate student, Lahny Silva, took on the task of coordinating the panel, conducted additional interviews, and commenced an inventory of fishing industry-related businesses.

After considering the small range of services available in the Scituate and the serious concerns fishing industry participants had about the minimal infrastructure and/or waterfront access available in neighboring communities, "Scituate" panel members became interested in learning about approaches being taken to infrastructure issues along the whole South Shore. Fisherman and marine surveyor, Jay Michaud was recruited to the project to focus on the physical infrastructure of the area's fishing communities.

Jay Michaud of Marblehead, sometimes with the help of project PIs, used personal interviews and small focus groups to gather information for the study. Because the interviews were open-ended discussions, rather than based on a set protocol, the same information is not necessarily available for each community. Instead, the profiles focus on the issues and features of the communities

deemed most important by the interviewees. Fishermen, town officials, harbormasters, suppliers and dealers participated in the focus group meetings or were individually interviewed. In addition, vignettes of individuals were based on interviews conducted by panel members early in the project.

The draft report was reviewed at a well-attended Panel meeting that drew representatives from each of the communities profiled. Their comments and edits have been incorporated into this interim report.

## Communities

### *Cohasset, Massachusetts*

Cohasset Massachusetts is a quiet residential town on the Atlantic Ocean and located 20 miles southeast of Boston in Norfolk County. Cohasset Harbor is home to a fleet of approximately forty commercial fishing boats, mostly lobster. In addition, there are about 475 recreational vessels in Cohasset. Fishermen of Cohasset are facing the probable loss of their only buyer and their marine railway; they do not feel valued by their community.

The Cohasset Lobster Pound and the Mill River Marine Railway are located adjacent to the public landing. Both the Lobster Pound and Mill River share the same property and landlord. Both are tenants at will. The commercial fishermen in this harbor depend on both of those facilities for services and sales of product.

As of the writing of this report (May 2004), the property had either been sold or is in the process of changing ownership. The lobster pound has been notified that they will be evicted shortly, and the boatyard has been informed of an eminent 400% rent increase, which the operator considers a de facto eviction notice. The property is zoned for marine-related use, however, it is not specifically zoned for *commercial fishing* marine-related use.

The new owners have appeared before the Town Planning Board several times with plans to rebuild the buildings and make substantial changes to the property. At the April 22, 2004 meeting the applicants were repeatedly pressed by Board members to reveal the use that the applicants intend for the property. They were reticent about their intentions, however, it was clearly understood at the meeting that the continuation of the lease with the Cohasset Lobster Pound, or any lobster facility, is not in their plans. Should the developers get the green light from the Town officials, it appears that this vital facility will be lost to the commercial fishermen of Cohasset.

A grassroots group calling themselves "Friends of Cohasset Harbor" and consisting of interested residents, fishermen, and community leaders has been formed. The goal of the group is to preserve the harbor infrastructure. The "Friends" will attempt to convince the Town to purchase the property and to retain the property's use as a lobster pound and boat yard.

7

The planning board denied the buyer of the property a building permit, but he will appeal.  The buyer/developer. Peter Roy, is said to "own half the harbor," graphically illustrated by his company's signature gray and black paint.  Roy's sister was appointed by Massachusetts Governor Romney to be the Secretary of Environmental Affairs

This property has deteriorated over the years.  The marine railway has been there for 36 years and survived 7 landlords but is due to be evicted by October.   The buyer(s) paid 3-4 million dollars for less than 1/2 acre.  Fishermen Panel members from Cohassett theorize that the owner wants to build condominiums on the property.  With residential slips (for yachts or other recreational vessels), the panel members anticipate that the owner can charge $1 million for each unit.

It is anticipated that the new facility will provide rack storage for recreational vessels, but there are evidently no plans to continue providing a railway for commercial vessels.  The 400 percent leap in rent was thought to be comparable to what happened in Hewitt's Cove, Hingham.  Under the permit application proposal of marina construction, the developers can obtain their Chapter 91 license,[1] then claim hardship if they can't lease the slips (even if it is because the rent is too high) and obtain a variance to lease to recreational boats.  The owner of the lobster pound has already decided to move to Hingham.  The pound's owner was just told to move by the new property owner and didn't want to "take a chance" by fighting the forthcoming eviction.  Hewitt's Cove in Hingham offered him a spot on their pier.[2]

Lack of parking may help block development of the Mill River property. Residents pay $30 per year for parking, but there are only 19 parking spaces for commercial fishermen and 21 trucks, if everyone goes out fishing at the same time.  Moreover, there is little enforcement of no-parking zones where tourists tend to park.  River rapids attract large numbers of kayakers, the Lightkeeper's House hosts various functions including weddings, and the sailing club attracts others.

Panel members said there was no support for the commercial fishing industry in the town.  There is an excise tax exemption for vessels valued under $10,000, but if it is valued at $11,000, the owner must pay for $11,000.  One panel member noted that he pays a user fee for his boat that he ties up at his own dock.

## Mooring
The town has two lists for moorings, one for commercial and one for the other recreational.  A vessel owner with an assigned mooring can pass it on to his or her spouse, but then goes back on the list.  One of the panel members has a boat livery corporation mooring (only one in harbor).  The Town mooring fee is $5 per foot per year.

---

[1] Restricts use of filled tidelands to marine-related use.

[2] Panel members warned the lobster pound owner that Hewitts Cove does not have all the amenities required by law for lobster dealers to ship and pack their product.  Among other things, running water is needed and Hewitts Cove shuts the water off in the winter.

## Access

The Town provides two public landings. Fishermen are allowed to keep their dinghies at the Town Landings at no charge. The commercial fleet competes with the general boating public for access from this landing.

## Maintenance

Gear repair and storage is allowed on private property, most fishermen maintain and store their fishing equipment on their own property.

Most fishing vessels are hauled for maintenance at the Mill River Marine Railway.

## Gear Supply

The primary fishing gear supplier is RNR Marine, in Hingham.

## Fuel

Fuel is delivered to the Town Wharf by truck.

## Bait

Bait is delivered by truck.

## Ice

There is no ice available at Cohasset.

## Market

Most fishermen sell their lobster catch to the Cohasset Lobster pound.

### Hingham, Massachusetts

## Introduction

In Hingham, lobstering is the primary commercial fishing activity and there the infrastructure is limited. To reach the commercial dock, fishermen must pass through a large recreational boat storage facility filled with expensive sail and power craft. At the water's edge, the dock is festooned with lobster fishing paraphernalia and individual storage facilities adjacent to a narrow dock with berths for lobster boats. The marine railway is primarily used by recreational vessels, but the local fishing supply store specializes in lobster fishing supplies. Diesel fuel is available dockside and various trucking operations transport lobsters nationwide. A boat welder is also nearby.

## Mooring

Although no mention of commercial fishing vessel restrictions is contained in the Hingham Town By Laws, it was reported that commercial fishing vessels are not allowed to be berthed on moorings. It is also widely believed that fishing vessels are not allowed to use the public landing for commercial operations. The Town mooring/dockage fee applied to recreational vessels is $2.00 per foot per year for residents, and $4.00 per foot per year for non-residents.

## Town Fees

Panelists also noted that though no commercial loading is permitted at the town pier nor are commercial vessels allowed to use town moorings, nevertheless, the commercial fishermen's vessel excise tax pays for their improvement!

## Private facilities

Hingham is the home base for Sea Chain Marine, owners of Tern Harbor Marina, Cohassett Harbor Marina, Bass River Marina, Landfall Marina and Hewitt's Cove Marina.

Hewitt's Cove Marina is located on property of the former Hingham Shipyard that was used by the US Navy in World War II. It boasts 375 slips, 100 moorings and a huge area of land used for boat storage and parking. Presently this facility is primarily used for recreational vessels. Sea Chain is planning an expansion of the property for mixed use, upscale development. A spokesman for the corporation indicated that it is felt that the commercial fleet offers what he referred to as "value-added" to the permitting process.[3]

The spokesman for Sea Chain indicated that there are no plans to displace the commercial fishing fleet, however a recent series of rate increases appear to have pressured some fishermen to find

---

[3] Some panel members commented that this again is a company manipulating the system or regulations to achieve what it wants without truly complying with the regulations.

other facilities to base their operations, most notably the Cardinal Madieros Dock in South Boston, while others have simply exited the business. Adler stated "Hingham is another example of where the squeeze is taking place. As the yacht people come in and they can afford to pay more money than the fishermen, and then all of a sudden they don't want the fisherman there, even if he could pay, because he smells. Of course he smelled before the other guy came, now all of a sudden 'we don't want you there'..."

*Fees at Hewitt's Cove*
The present fee structure for commercial fishing vessels at Hewitt's Cove is $97 per foot per season (summer) and $33 per foot per off-season (winter). Most fishermen also lease space at the dock for coolers, storage and maintenance. The charge for this lease is $4 per square foot.

Panelists commented that the cost of electricity from Hewitt's Cove for 3 months (for the engine block heater) was higher than a whole year's worth of electricity at home. Hewitt's Cove has its own transformer. One vessel owner noted that originally the rental cost was $2300, but four years later, it had leaped to $8,200 annually to tie-up there. Electricity alone costs $130-$190 per month. It became obvious to some of the fishermen that they were going to be priced out, so they moved to Boston. "This business doesn't support that kind of rent," they said.

In Hewitt's Cove they look at the square footage as having a certain value, they don't seem to care whether the renter is a commercial vessel or a recreational. Panelists said, "We're not asking for a subsidy, but we need to be recognized as having a value." One suggestion was that there be a requirement that a certain percentage of all waterfront developments be reserved for commercial use in perpetuity. Sandwich, for example, has 45 slips reserved for commercial use and they pay a third of what the recreational vessels pay.

The approximately 11 fishing vessels berthed at Hewitt's Cove Marina are all inshore lobster boats. This is down from a reported fleet of as many as 26 vessels in the recent past. Because of state and federal restrictions, there are no longer any lobster vessels supplementing their off season income by targeting groundfish from this harbor.

Fishermen are required to submit evidence of insurance, with a $300,000 liability protection, to the marina. *"You have to insure against those who might break in and hurt themselves."* Marinas are trying to force users to be the primary insurance carriers. For now the pier and planking is the responsibility of the commercial fishermen, otherwise it would have had to conform to handicap-accessibility regulations.

One panelist had paid for dockage there since 1978 and had a good relationship with the previous owners. Now, panelists noted, there are no other small businesses, all the Mom and Pop businesses were driven out when rentals increased by 200%. Under Chapter 91, property owners were obligated to "house" the fishermen in exchange for their development permits, but evidently rent protection was not included in the agreement. A lot of federal money was obtained for dredging on behalf of the commercial industry, but as soon as permits were obtained and dredging completed, rents were raised and the commercial fishing industry participants were "driven off."

Ten or eleven fishermen remain because there is no place else left to go.  Weymouth and Quincy have no commercial fishing facilities and Hull has no more room.

## Gear and supplies

Hingham is the location of RNR Marine, a major supplier of equipment and supplies for South Shore fishermen.  The owner stated that his customers generally come from the Boston and South shore area, with a few "guys from the North Shore area."

## Fuel

Fuel is available at Hewitt's Cove Marina, however most vessels travel to Hull for less expensive fuel that is delivered by truck to the town wharf.

## Ice

There is no ice facility in Hingham.

## Bait

Bait is delivered by truck or picked up in South Boston.  Several fishermen maintain walk-in refrigerated bait coolers at the wharf.

## *Marshfield, Massachusetts*

The Town of Marshfield has three harbors, the North River, the South River, and the main harbor, Green Harbor at Brant Rock. Until recently the harbormaster's was a seasonal position and he worked with a couple of assistants. Today the harbormaster is full-time, a sergeant on the police force, and is overseen by the police chief who is "captain of the port."

The harbor budget is separate from the police budget. The budget is a line item budget and must be approved by Town Meeting annually. The budget is approximately $150,000 per year, however this does not include the Harbormaster's salary, as that is a line item in the police budget. There are no plans at present to establish an enterprise fund for the department because the Town feels the number of vessels in Marshfield is too small to support an enterprise-funding base. The Town recently received a $12,000 grant from the State to install a pump-out station at the wharf for marine sanitation devices. The Harbormaster has a police background and no marine experience.[4] Panelists suggested that the Commonwealth develop an appropriate professional standard for harbormasters, pointing out that they have a lot of power, including the right to carry a gun.

The Town has applied to the Seaport Council for a grant to build a new Harbormaster's office to replace the present temporary trailer office and to make necessary repairs and improvements at the wharf. The Town Wharf was rebuilt several years ago, however the height of the North Pier, which is the commercial fishing section, was increased because of concerns about a "hundred year flood." Unfortunately, the new height imposed a hardship on the commercial fishing community, since it is now difficult to load and unload gear, bait, supplies and catches. The fishermen expect some portion of the grant funds to be used to restore the pier to its former working height and/or provide a means to load and unload the vessels. Funds have been allocated but have not been appropriated at this time.

Green Harbor faces the east. The ocean bottom in the area around the harbor is sandy. The harbor frequently silts up during winter storms, which presents a major difficulty as the channel and mooring area is, at times, not useable at low tide for some of the vessels. Presently the Federal Government funds an annual dredging project which keeps the harbor navigable, however rumors are that the federal funding may not be available to continue ongoing dredging projects. The Harbormaster indicated that the Town fears it may soon become liable for future dredging costs.

### Vessels

The bulk of the commercial fishing fleet are inshore lobster boats, some of which fish for tuna during the season. Some vessels gillnet for groundfish during the winter in addition to lobstering. Also, there are twelve draggers and several dedicated tuna boats in the fleet. According to a technical report from the Massachusetts Division of Marine Fisheries, there are 75 lobster vessel permits citing Marshfield as homeport.[5] Landings of lobster in Marshfield in 2000 weighed

---

[4] Panelists from Plymouth noted that the commercial fishermen in their harbor successfully obtained a hiring requirement for their harbormaster to have experience as a marine professional.
[5] H. M. McBride, M. J. Dean, and T. B. Hoopes 2001. 2000 Massachusetts Lobster Fishery Statistics. Massachusetts Division of Marine Fisheries Technical Report TR-9. (July)

13

1,207,369 pounds. The average price was $3.65 per pound, so the value of the catch was at least $4,406,896.85. Marshfield ranked fourth in the Commonwealth in lobster landings in 2000. Tuna landings in the mid-90's ranked second.

## Mooring

There are approximately 75 to 80 commercial fishing vessels in the harbor on moorings during the warmer months. The Town charges $4.00 per foot per year for moorings, and the fishermen are charged $35.00 per year for space to keep a dinghy at a designated float. In the past, Marshfield Commercial Fishermen's Association owned skiff floats, but the town replaced them, not without controversy. The number of moorings is a limiting factor on potential fleet expansion. Currently, there is a 20- to 30-year wait for moorings. In fact, knowledgeable residents put their newborns on the waiting list.

Some towns have two lists, one for commercial vessels, the other for recreational. In 1991, a Memorandum of Understanding was signed between the planning board, selectmen, town counsel and the industry designating certain rights to the fishermen, including a statement that the number of moorings for commercial vessels would not decrease. There are two marinas situated in Green Harbor, Taylor Marine and Green Harbor Marina. During the winter months most of the fleet docks at the Taylor Marina, which is adjacent to the Town Wharf.

## Association

Seventy fishermen belong to the Marshfield Commercial Fishermen's Association (MCFM). The association owns and maintains a winch (crane) that is located at the wharf; however, the winch is unsuitable for fishermen who operate without a crew. The association serves as liaison with Town officials on local issues that affect commercial fishing interests, a particularly important role since there is no longer a waterways advisory committee or a fishing industry advisory committee to the town's selectmen. The association has also taken positions on state and federal fishing proposals in the past and has become a member of the MFP.

## Maintenance

Taylor Marine allows fishermen to do their own work, or to hire outside help, for vessel repairs and maintenance. Green Harbor Marine's policy is to charge an additional $10.00 per hour surcharge for work done by outside vendors; so most fishermen prefer to use the Taylor Marine services.

Haul-outs are generally provided by hydraulic trailer at the Town ramp. The boats are then trucked to a local boat yard, or to the fisherman's property. The Marshfield Town Charter allows fishermen to store gear and boats on their personal property.

## Gear and supplies

Fishing gear supplies are purchased from New England Industrial & Marine in Brant Rock, Jesse's Marine in Plymouth and RNR Marine Supply in Hingham.

## Fuel

Fuel is delivered by truck to the Town Wharf, and is also available at Taylor Marine.

## Ice

There is no ice facility in Green Harbor. The fishermen agree that it would be "nice to have" ice available, however the needs are not great enough to sustain an ice facility. An ice facility in Scituate or Plymouth may be more feasible.

## Bait

Bait is delivered by truck.

## Market

The lobster catch is sold to Pacific Trade of Quincy, and Ocean Star of South Boston. Both dealers station refrigerated trucks at the wharf in the afternoon during the lobster season. Catches are also sold to Green Harbor Lobster Pound (seasonal), Brant Rock Fish Market and Fourth Cliff Lobster Company, the local dealers.

Tuna buyers are on call and will pick up catches by truck as the fish are landed. There is also a tuna buying station at Green Harbor Marina.

Groundfish are sometimes picked up by truck, however, fishermen also deliver the catches to processors in their own trucks. There are no local groundfish processors in Green Harbor (Marshfield).

## Parking

Parking is a major issue. The Coast Guard has identified the boat ramp as one of the busiest on the East Coast, probably due to the easy access to Stellwagen Bank. When the pier was renovated and paved, parking spaces were identified that included a large number of spots for trailers. Fishermen would use the trailer spots, parking two trucks in each. This has been disallowed and some fishermen receive parking tickets if they use a trailer-designated space. With only 30 spots, parking is inadequate for single vehicles. Although vessel owners can obtain a special permit, crewmembers no longer have access to parking.

## Infrastructure Essentials for a Satellite Fishing Port

Fishermen noted that of the three "infrastructure essentials" for a sustainable fishing community that they had control of in the past, two have been lost. Whereas they once had skiff floats, moorings and parking, only moorings are left. (Town now charges individuals for the skiff tie-up spots).

The other losses that Marshfield has faced due to regulatory change occurred 10 years ago with some of the first major closures. Traditionally, they dragged for three or four months, lobstered or tuna fished the rest of the time, but the closures constrained their ability to qualify for days-at-sea. Flexibility is what has kept many of the small boat harbors viable, but to a large extent has been lost.

The fears of the Harbormaster concerning the possible end of federally funded dredging of the harbor and channels are shared by the fishermen, as it is considered absolutely essential. It was hoped that should the federal government decide to discontinue the practice, perhaps the MFP could assist the Town in identifying potential sources of funding for needed ongoing dredging projects. Marinas are beneficiaries of commercial fleet when it comes to dredging. The inner harbor has not been dredged for over 20 years. It was supposed to be dredged when Scituate was dredged, but it hadn't fulfilled permit requirements at the time.

Gentrification and property taxes are major concerns for Marshfield's fishing industry.

## Plymouth, Massachusetts

Plymouth is a town in southeastern Massachusetts about 34 miles southeast of Boston. The seat of Plymouth County, it was the site of the first permanent European settlement in New England.

Plymouth Harbor is serviced by three wharves. On the southern end of the harbor is a private marina that services pleasure boats during the summer season, several commercial fishing vessels use this facility in the winter months. The Mayflower replica is permanently moored at the central wharf, and most commercial vessels are located at the main wharf, also known as the "T" wharf located on the northern end of the harbor. The "T" wharf is protected by a granite breakwater that forms the eastern boundary of the dredged mooring area. The harbormaster's headquarters are located on the Town Pier, adjacent to the "T" wharf.

The fishermen interviewed appear to be satisfied with the facilities in Plymouth. The harbormaster appears to be very cognizant of the fishermen's needs and does his best to "work with the fishermen."

## Vessels

There are approximately 40 to 50 commercial fishing vessels moored in the harbor on moorings during the warmer months, and 20 to 30 commercial fishing vessels moored at the wharf year-round. The wharf is also home to a large fleet of whale watch and party fishing vessels.

During the boating season, there are about 600 pleasure boats moored in Plymouth Harbor. The Town charges from $4 per foot for moorings, both commercial and pleasure. Boats tied to the pier are charged $10.00 per foot per year.

## Access

The fishermen own and maintain floats that are attached to the pier and are used exclusively for commercial fishing activities. There is a winch located at the end of the pier that is owned, maintained and insured by the Plymouth Lobstermen's Association. At present the fishermen are not charged for the use of the wharf for loading and unloading fish, lobsters, bait and gear, etc. The Lobstermen's Association charges its members dues, which are applied to the winch and float expenses.

### Insurance

The Plymouth Lobstermen's Association insures their area for 1 million dollars for the floats and winch. Insurance remains a "hot button issue" for people tied to a pier. Last year liability insurance and oil pollution insurance was required but there are a lot of old boats without insurance (primarily wooden draggers that are over 20 years old) so the town eased up this year and did not require proof of insurance.

*Town Fees*
The Town hired a consulting firm, Fort Point Associates, to examine the operation of the Harbormaster Department. Fort Point has recommended the Harbormaster Department eventually become self funded through the establishment of an "enterprise funding." Panelists believe that the port will go to enterprise funding, particularly since there is precedent in the town already with the airport and sewer both so funded.

The consulting firm recommended the Harbor Committee review the fee structure that is presently being charged to harbor users. They propose to increase mooring fees to $6.00 per foot for Town residents, and $8.00 per foot for non-residents. They also propose to establish a user fee of $100.00 per year per commercial boat using the pier. The Selectmen are also considering an additional charge to the Plymouth Lobstermen's Association for the lease of the five square feet area at the base of the winch. The lease charge, if any, has not yet been calculated at this time. These proposals were approved at Plymouth's Annual Town Meeting and will commence January 1, 2005. The fishermen are resigned to the fact that the increases in Town fees are inevitable, but noted that had they been made incrementally the increases would have been more acceptable. After 5 years, it is anticipated that the rates may increase another 3%.

Trucks that service the commercial fishermen will be subject to a $500.00 annual user fee under the new fee structure.

*State support*
The "T" wharf which is located at the end of the pier, was found to be structurally unsound and closed down recently (winter, 2004). The Town received a $25,000 grant from the Commonwealth's Waterways Fund to stabilize the "T" wharf, which will allow it to be utilized temporarily from Memorial Day 2004, until a new wharf can be constructed to replace the current one. The wharf was originally a coal wharf, and is almost eighty years old. It will cost 2 to 3 million dollars for a new pier.

The Massachusetts Seaport Advisory Council hopes to focus on the possibility of helping fund a replacement structure and some dredging work in the vicinity of the wharf during their 2005 late spring meeting. The Council has agreed to fund the initial engineering, permitting and design work for the new wharf. The Seaport Bond Bill has authorized $1 million for Plymouth, though the town must submit a proposal for the project.

*Harbormaster*
Commercial fishing participants in Plymouth maintain a very good relationship with their harbormasters, "they fight for us," the fishermen said. "Though the position is political, they are professional and try to help us.

The Town maintains a fleet of four vessels for patrol and pump out duty. The harbormaster is on call 24 hours a day, year round to assist boaters who may be in trouble, although the fishermen themselves "look out for each other", and assist each other if one of them is in need of help on the bay.

18

*Tourism*

During the summer months, there is a substantial fleet of whale watch and party fishing vessels that utilize the facilities in conjunction with the commercial fishing fleet. The harbormaster reports that during the summer of 2003, there were more groundfish boats using the pier than at any other time in his memory. This may be because of the large area of state waters that is accessible from Plymouth. Despite the influx of commercial and party boat activity, there appeared to be relatively few conflicts between the user groups.

## Maintenance

Repairs and haul out facilities are available at Plymouth Boat Yard and at Brewers Marina. In addition, other than the summer, there is room to work on nets and other gear on the Town Pier.

## Gear and supplies

Marine supplies are available at Jesse's Marine, located a short distance from the pier. Jesse's maintains a complete inventory of the usual items needed by the fleet.

## Fuel

The larger vessels in the fleet depend on fuel deliveries by truck. There is a fuel facility located at the pier, Town Wharf Enterprises, that many of the fishermen and lobstermen utilize as it is more convenient than truck delivery.

## Ice

Ice is trucked in from New Bedford on the same vehicles that bring fish back to that port. The fishermen feel that although the system is working, it would be a much better situation if there were an ice machine on the pier. Reliable used to have an ice machine, but a lack of space is apparently the issue now. An ice machine on the pier would accommodate fishing schedules and be more economical.

## Bait

Bait is available at Reliable Fish Company (Mike Secondo) at the pier, and by truck from Costa Bait Company (Danny Costa) of New Bedford.

## Market

The catches are usually sold to Reliable, and are trucked to Boston or New Bedford.

Some fishermen sell their catch to buyers in trucks that meet the boats, others sell to Reliable. The Lobster Pound sends a truck from Manomet Point to Plymouth to pick up catches from approximately ten boats every day.

Parking

At the time of the initial drafting of this report (2004), the Town maintained a parking area at the pier for residents with a parking fee of $20.00 per year. "Parking is fine if you go at 4 am," one of the panel members commented wryly.

In 2005, the town's Economic Development Committee proposed a substantial parking fee be imposed on all users of the pier parking facilities. The Massachusetts Fishermen's Partnership asked Jay Michaud (South Shore Panel Coordinator) to attend a public hearing in Plymouth to request that commercial fishermen be exempted from the fee. He did so and as a result the Committee voted unanimously to exempt commercial fishermen from the proposed fee.

## *Sandwich, Massachusetts*

The Town of Sandwich is a seaside community of about 22,000 residents located in the northwest corner of Cape Cod in Barnstable County, Massachusetts. Incorporated in 1639, Sandwich is the oldest town on Cape Cod and one of the oldest towns in the United States, settled by European immigrants nearly 150 years before the American Revolution.

Sandwich harbor is a small man-made basin located at the eastern end of the Cape Cod Canal. The harbor was created by the US Army Corps of Engineers (the Corps) in 1914. The Town of Sandwich (the Town) accepted the administration of the harbor in 1988.

The Harbormaster Department is operated as an enterprise-funded town department. The department's budget is funded exclusively from the collection of receipts for slip rental, launching ramp revenue, and fuel revenue. All capital improvements are expected to be paid by the department from surplus revenue. The Town general fund receives all of the revenue generated from the boat excise taxes, none of this revenue is returned to the Harbormaster Department. Although the Town is ultimately responsible for the operation of the harbor, the Federal Government owns the property and has final jurisdiction over the management of the harbor through the Corps.

## Access

According to the arrangement with the Corps, the Town must set aside 42 slips for the exclusive use of commercial fishing vessels, that is, for permit holders with at least 50% of their income from commercial fishing. The marina has a gate that locks, winches, parking, electricity and fresh water as well as twenty-four hour security. The vessels using the marina must be documented and insured.

Over the past years, there has been a relatively small turnover of commercial fishing slips, however the harbormaster reported that this year (2004) has seen the opening of 5 slips. The harbormaster stated that one vessel, the "Nabbie" was involved in a grounding at the west end of the canal, and is no longer fishing. One vessel was sold, one is relocating, and the status of two of the vessels is unknown, but assumed to be not returning to the fishery. There is a waiting list of fishing vessels for commercial slips in Sandwich.

The dockage situation for commercial fishermen appears to be secure, since the Corps has required the Town to provide and maintain 42 slips exclusively for the commercial fleet. The commercial fishing vessel rate structure is calculated at approximately 33% of the recreational rate. In 2004, a 32-foot vessel paid about $1200 per year and a 65-foot vessel paid $2200.

Many commercial fishermen utilize the launching ramp at the harbor to haul and launch their vessels for annual maintenance. Private boat haulers are contracted by the fishermen to haul, block and launch the vessels.

The Army Corps of Engineers and the Town of Sandwich plan a major expansion of the harbor and will create a very large number of new recreational slips by converting a man-made wetlands into part of the marina. It is not known as of the writing of this report how many new commercial places will be created by this project.

## Maintenance

There is only one engine service technician/mechanic that is available to repair and maintain the mechanical systems, but he is frequently busy and cannot always respond immediately to the fishermen's needs. This delay translates into lost fishing days. Many fishermen do as much maintenance as possible to save the waiting time as well as the expense.

## Gear and supplies

Sandwich Ship Supply is located in close proximity to the harbor. The store has a sufficient inventory to supply the basic needs of the fishermen. However the owner feels that as a result of poor catches, the commercial supply business is very poor and he appears to be focusing more on the recreational sector to offset the reduction of commercial fishing equipment.

Most of the fishermen travel outside of Sandwich for necessary supplies, price and selection seem to be the deciding factors in their choice. New Bedford/Fairhaven area fishing gear supply companies appear to be the most favored.

## Fuel

Fuel is most commonly delivered by truck. Canal Fuel is the prime supplier, delivering on an on-call basis. The harbormaster maintains a fuel dock supplying gasoline and diesel fuel mostly to the recreational sector, however some commercial vessels also utilize this facility.

## Bait

Danny Costa of Costa Bait delivers bait for the offshore lobster fleet. The inshore bait supply is now beginning to become unreliable, the fishermen have depended on several sources to deliver bait by truck. Channel Fish Company of East Boston was a supplier, however Channel discontinued bait deliveries several years ago because of declining sales. Several fishermen drive to New Bedford to purchase their bait in bulk which they truck back to Sandwich and store in walk-in coolers located at their homes.

## Market

The last fish house at Sandwich was Canal Marine, the facility off loaded fish, supplied ice and bait to the fishing fleet. The facility closed approximately 5 years ago and the property is now in a state of disrepair. The facility was sold several years ago to Mr. Arthur Fournier, Canal Towing & Assistance Co. The buildings are located on Federal property. Bill Norman of the Corps reports that Mr. Fournier has not renewed the lease for the property. The status of this facility is unknown at this time.

22

Mr. Norman reports that the Corps is in initial negotiations with a party that has expressed interest in leasing a portion of the Federal property on the east side of the basin to construct an offloading and wholesale fish company.  Details are not available at this time.

Joe's Lobster Mart is a large retail fish/lobster company located at the bulkhead of the canal on the east side of the harbor.  The market provides no services to the fishing fleet, however the facility does buy lobsters from one offshore lobster boat.  Most of the product sold at Joe's is reportedly trucked in from other New England and Canadian sources.

Fishermen currently truck their catches to various wholesalers in New Bedford and other ports.  In addition, Cold Water Crab buys horseshoe crabs from draggers in the Sound (fluking) and from rakers.  According to Town officials, Sandwich has the largest commercial landings by volume of horseshoe crabs in the nation.

Fishermen have to transport their catch 200 yards away where it can be loaded onto trucks and transported.  Apart from fuel trucks, outside vendors are not permitted to drive up to the vessels.

## Parking

Parking is an issue, depending on where your slip is.  The freezer side is much less well maintained, with "potholes deep enough to lose your truck in." But the other side is paved.  In the past, a section of Corps land was allocated by the harbormaster to commercial fishermen for parking, but the Corps took down the signs indicating that the area was reserved.  Now the commercial fishermen must compete with users of the Canal walkway who park in the area.  In addition, the canal's Pilot boat crew uses some spots.

Another drawback to the marina is that with the exception of a fuel truck, third party trucks are not allowed on the property.  Fishermen pay $25 per month for electricity/light poles.

# Exhibit F
# (Part 2)

### *Scituate, Massachusetts*

The Town of Scituate Harbormaster department is an enterprise–funded department. The revenues collected from mooring, dockage, ramp fees and 50% of vessel excise taxes are the source of funds for the department. The department generates an annual surplus that is used to fund capital improvements to the infrastructure. The Harbormaster reports directly to the Board of Selectmen, however, there is a Waterways Commission that advises the Selectmen on matters pertaining to the harbors and waterways.

There are three harbors in Scituate, the North River, Scituate Harbor and the South River (which borders and is shared with the Town of Marshfield).

## Past and future of fishing

Gentrification is beginning to transform Scituate from its former identity as a commercial fishing community to a tourist-oriented and upscale coastal town. Nevertheless, both a monument and panelists' discussions attest to the continuity of commercial fishing industry in the town. In the past, young people started with mossing, moved to lobstering, gillnetting or dragging. Some panelists would like to see the mossing revived, but they wondered how young people could afford to live anywhere near their work. Lost Days-at-Sea (DAS) for groundfishing make it harder to survive financially. Furthermore, young people want benefits. There are fewer young people in the industry now than there were 10 years ago. But recently, three young guys have come into the industry "because they love fishing and are willing to work hard."

Fishermen note that expenses have skyrocketed in recent years. The lobster industry was said to be "not a problem of pounds, but of price." There is no cost of living raise in the fishing business. The global economy puts more pressure on the industry, since buyers can get supplies from anywhere.

According to reports from the Massachusetts Division of Marine Resources, lobster value, that is, the average price paid to fishermen at the dock in 1994 was about $2.94 per pound for a total of 16,200,000 pounds statewide while in 2002 the average was $3.72 per pound for 13,745,537 pounds statewide.[6] In addition, fuel prices have had major increases.

The fishermen's perceptions about competition in the global market is supported by a 2004 report by Souleymane Diaby, "Trends in U.S. and World Lobster Production, Imports and Exports." He found:

> *Consumer Preferences*
> ➢ *Worldwide:*
> *Lobster is a high -priced food primarily eaten on important*

---

[6] Micah J. Dean, Kimberly A. Lundy and Thomas B. Hoopes. 2003. 2002 Massachusetts Lobster Fishery Statistics. Massachusetts Division of Marine Fisheries Technical Report TR-20 (March).

> *occasions (weddings, family celebrations, and romantic dinners).*
> *Canadian lobster is smaller than what the United States is legally*
> *allowed to produce and therefore is sometimes favored in markets*
> *where lobster is sold by the piece, such as Japan.*

➤ *Japan:*
> *Spiny lobster*

➤ *Europe:*
> *High-priced European lobster preferred over any other lobster.*
> *Spiny lobster preferred in Spain.*
> *E. U. European lobster and American lobster competes with the*
> *Norwegian prawns in EU markets.*

## Vessels

There are sixty to sixty-five commercial fishing vessels in Scituate. The bulk of the commercial fleet is made up of 46 lobster boats on moorings. Fifteen groundfish vessels tie up at the Town Pier. There are also eleven private marinas in Scituate. The town wanted to purchase Young's Boat Yard and Marina (44 boats) for recreational, and conservation purposes. One of the panel members is asking Selectmen to consider putting something in for commercial fleet such as a lift.

## Access

In all three harbors the Town has a total of 673 moorings and 650 slips for both commercial and recreational vessels.

In Scituate Harbor, the Town operates a municipal marina, the Town Pier, and administers the mooring field. The fishermen maintain a public landing for the lobster fleet. Land was donated on condition that fishermen would be allowed to use it as they always have (the covenant has been lost however). Three hundred dollars per boat and a mooring fee are paid to town.

*Town fees*
The Town maintains two launching ramps for which no user fees are charged. However, one is a state ramp and cannot be used for commercial vessels unless permitted by the harbormaster. Furthermore, the town ramp is unusable except at high tide. (A boat hauler can come though.)

The fee schedule is as follows:
Town Pier dockage, commercial fishing vessels:

|  |  |  |  |
|---|---|---|---|
| Residents: | $1,000 | Non-Residents: | $1,500 |

Mooring Fee:

|  |  |  |  |
|---|---|---|---|
| Residents: | $5.00/foot | Non-Residents: | $6.00/foot |

Truck Access Fee for Town Pier:

|  |  |  |  |
|---|---|---|---|
| Residents: | $350 | Non-Residents: | $400 |

Municipal Marina:     $90/foot

In addition, there are user fees of $250 for loading or unloading commercial vessels and $350 to tie a dingy up to the pier.

Half the floats can not be used because the vessels can not get around them at low tide. A number of boats are tied up on the northside, not being used. Three vessels are rafted together with one being used as a fender. Panelists noted that the "operation needs cleaning up."

The Town Pier is exclusively used for the commercial fishing fleet. In addition to the groundfish vessels that are docked at the facility, the entire fishing fleet uses the facility for loading and unloading of supplies and bait. Fuel is trucked to the pier. Trucks utilize the pier for the receipt and transportation of fish to various dealers and processors. Lobster bait is delivered by truck to the Town Pier. Fishermen who pay for dockage at the Town Pier are permitted one parking space on the pier for their own personal vehicle. There are no fees charged for parking vehicles in the municipal parking lot that is about a block away from the Town Pier.

The lobster fleet utilizes a dedicated landing located at the western end of the Cole Parkway Lot, known as the Lucien Rousseau Memorial Landing, for their general access. The lobstermen created this landing utilizing used surplus marina floats donated by the Harbormaster. There is a noticeable lack of water depth at low tide.

Lobstermen are allowed to own and maintain floating lobster cars in the harbor. By agreement with the Harbormaster they are allowed to store these lobster cars on land for a $250 deposit, in the parking lot from 1 November through 14 April of each year.

A commercial fishing needs overview study was reportedly commissioned by the Town several years ago. Vine Associates, a research firm, was to undertake the study at the time of the establishment of the Massachusetts Seaport Council. The Vine Associates' recommendations are unknown at this time. The Harbormaster indicated that he will investigate the existence of the study, and wishes to pursue any grant opportunities to improve the facilities for the commercial fishing fleet.

A walk around inspection of the Town Pier was made with one of the panel members. It was pointed out that in severe northeast storms the seas broach the harbor breakwater and the pier is subject to the effect of the storm heave. Vessels docked at the pier are subject to storm damage.

The general condition of the pier is run down. There are noticeable deficiencies in the electrical shore power supply to the vessels. The system in place now may be out of compliance with accepted electrical standards. The pier fendering system has degraded to the point where it is at the end of its useful life expectancy.

The pier is heavily used. It is the only deep-water facility in town. When the groundfish fleet is preparing to depart in the morning, the lobster fleet is competing for the same space to load bait, and supplies. Congestion and the parking situation are major problems as is competition with all the other businesses including two huge condos. A suggestion to relieve this pressure is to dredge the area around the Lucien Rousseau Memorial Landing, and perhaps construct a bulkhead there to allow easier loading and unloading of the lobster boats.

## Ice

At one time there was an ice-making machine located on the pier, but it was abandoned as there were not enough vessels utilizing the service and accounts payable grew out of hand.[7]  Ice is now trucked in from New Bedford or Gloucester.  Ice is a major problem in Scituate, as it appears to be in most of the fishing ports in the Commonwealth.

## Market

Nautical Mile Seafood, Mullaney's Harborside, and Fourth Cliff buy lobsters from the local fleet.

## Harbormaster

The Harbormaster operates three patrol boats.  The US Coast Guard also maintains a seasonal base of operation in Scituate.   Since the establishment of the Department of Homeland Security, however, the Harbormaster has been forced to become more active in missions that were previously conducted by the Coast Guard.

The annual budget is $422,000, which includes $225,000 for salaries.  The balance covers general expenses, outlays and debt service.  While the public marina generates a lot of funds, it is also quite costly to maintain.

---

[7] Some panelists noted that it did not operate properly, e.g., the cubes froze together.

## Massachusetts Seaport Council

The Governor's Seaport Advisory Council is not an official state agency and has no statutory responsibility. Rather, the Council was created to advise the Governor concerning seaport development policy and coordinate seaport development activities in the Commonwealth. The Council's mission is to assist in the continuing development of Massachusetts' seaports and to provide the ports with the oversight needed to build for the future. The Seaport Council is interested in identifying and facilitating construction or repair of infrastructure that adds to the "overall viability of the port."

The Council reviews requests from the various coastal communities for infrastructure improvements, harbor dredging, and inter-modal transportation facilities. Capital requirements are met through bonding. The Council reviews and recommends approximately ten million dollars worth of projects a year. The bonds are repaid on a revolving basis as part of the Commonwealth's annual state operating budget. Projects must be self-sustaining after capital has been spent. Local enterprise funds are generally established to focus on maintaining the infrastructure.

The Council appears to be developing plans for the 5 deep-water ports, Gloucester, Salem, Boston, Fall River and New Bedford, to facilitate the movement of goods and cargo. The mission statement of the "Port of Massachusetts" is to link all five ports working together to present a diversity of services and opportunities to the global marketplace. The Council is developing a priority focus on what is termed "Short Seas Shipping," a European concept for coastal shipping.

Short Sea Shipping on the United States East Coast is a plan which will attempt to take thousands of trucks off of the I-95 corridor using the *Ocean Highway*. The Council is working on utilizing Fall River, and New Bedford as links to southern ports serving central New England. Gloucester is perceived as a link to the Canadian Maritimes. Salem is not considered a cargo port. Boston is likely to focus on the international shipping. All will be considered a part of the "Port of Massachusetts," and their development will benefit the Commonwealth.

Richard Armstrong, Seaport Council Executive Secretary, stated that small cargo ports cannot exist in and of themselves and need complex infrastructure such as that that supports the fishing industry, the tourist industry, and small cruise ships. He further stated that the ports must develop a constituency around the port to help sustain the cargo portion of the port, as well as the fishing industry. It may be that in the future, commercial fishing interests will be competing for space in Gloucester and New Bedford should the Short Sea Shipping plans become established. This could be a concern, as more demands are placed on the fishing fleet to pick up the real costs of the fisheries-related infrastructure. However, Armstrong noted that the use of the waterfront for cargo is a complementary use that could actually benefit the fishing industry by helping to pay for some of the capital infrastructure costs.

In smaller coastal fishing communities the Council has worked with local authorities to fund the repair of piers, dredge harbors and sustain needed infrastructure. Nineteen piers, for example, across the Commonwealth have been constructed or repaired. Communities identify their needs, then apply to the council for potential funding. The Council reviews the requests, makes site visits,

and consults port professionals and state agencies, to determine what infrastructure support is required to sustain the fishing industry, consistent with port development and commercial fishing's benefit to the port or community. Because these are public funds, it is important that the "public purpose" be identified in the proposal, though the importance of the fishing industry to the state is well-recognized. The Council may recommend funding projects, however until the funding is assured, no projects can be moved forward.

Most small commercial fishing piers belong to the local community. When projects are approved and completed, the local authorities are responsible for the operation, maintenance and fee structure established to sustain the facility. The goal is that ongoing operations, maintenance and management including fees are guided in each case by a business plan that meets commercial fishing needs and other port needs.

A project such as the Provincetown pier may be of such a complex nature, that the Seaport Council is but one of many players. In the case of Provincetown, the Seaport Council involvement was initially in the form of a $25,000 pre-development grant. Later, the Council contributed $7,500,000 to the construction of the pier. In addition, the Council assisted in coordinating local, State and Federal agency participation to actually execute contracts. The Pier Development Corporation was established to execute the business plan for the structure and is responsible for the management of the facility. The primary users of the facility are the whale watch industry, and the secondary user is the fishing fleet.

## Panelists' suggestions

When panelists from each of the communities met together, they had suggestions for the whole South Shore area:

Many panel participants felt that the commercial fishing industry in the area should coordinate so fishermen and municipalities can build on a synergistic strategy. It also might be possible to obtain state and federal funds as an industry, particularly if the MFP and a Coastal Coalition help with organizational issues. In addition, the industry needs to educate legislators and their own communities about coastal issues in general and the fishing industry in particular.

Access to the waterfront "has to do with money." An economic analysis conducted by the Muskie School of Public Policy in Maine found that a working waterfront contributes greater measurable economic returns to communities than residential development. Charles Colgan, professor of public policy and management at the Muskie School and author of the study wrote, "Whichever assumption about real estate development versus working waterfront is used, the economic contribution of working waterfront to the Maine economy exceeds that of real estate development. The gap is large - $15 million – even when the most conservative (lowest) estimate of working waterfront activities is used and when a very high assumption about coastal real estate development is used."[8] There is no reason to believe the results of such a study in Massachusetts ports would not

---

[8] Commercial Fisheries News, August 2004, pg. 15B.

be similar. The commercial fishermen make a living, but they are not rich. A multiplier of economic activity commercial fishermen generate is circulated in the local economy through the purchase of a broad range of goods, services, and consequential taxes. Nevertheless, waterfront developers want to maximize their income per square foot. But if fishermen could communicate the value of their industry to their communities, their towns might be willing to require specific standards or concessions from developers that recognize the multiplier economic value of commercial fishing in the ports. Given the precedent of pipeline companies involvement with the industry, it could become just part of the cost of doing business to take care of fishermen. Towns must take the loopholes away, however. Cardinal Madeiros Wharf in Boston, for example, states that it is for lobster boats with a coastal lobster permit. This could be used as a model.

> After all, "the statehouse has a cod fish, not a shovel. "

The benefits to towns of maintaining a viable fishing industry that were identified by panelists include "bringing in great product that everyone wants to eat." Panelists pointed out that people like to come down to see an active harbor and this offers intrinsic value to the community since people are attracted to a working waterfront.

## Summary

The South Shore ports are experiencing the pressures of gentrification and other development. This is limiting the size of the fleet, and may hamper access to moorings, piers, and public ramps. The explosion of recreational boating, and that sector's need for access is now eclipsing the needs of commercial fishing in an increasing number of places. Where access is available at private wharves and marinas, the space is most likely to be allocated to the highest bidder, in such cases commercial fishermen rarely can compete with the yachting and recreational fishing interests. When access is lost, it is generally not regained.

The smaller community commercial fishing fleets' dependence on the larger hub ports of New Bedford, Gloucester and Boston for fish/lobster buyers, auctions, processors, ice, and suppliers of goods and services illustrates the fragility of the entire commercial fishing network. Should the established infrastructure in the magnet ports become threatened, the domino effect on the smaller ports will be devastating. It is essential that the infrastructure in these hub ports be preserved in order to maintain the various small harbor fleets.

In the words of Adler, "(there are) 52 ports in this state that have lobster fleets of some size. There is an awful lot there that needs to be watched."

## Appendices

Fishermen and their representatives participating in this project

Ed Barrett, President, Massachusetts Fishermen's Partnership, Marshfield
Bernie Feeney, President, Massachusetts Lobstermen's Association, Hingham
Laddie Dexter, Lobsterman, Past President, Massachusetts Lobstermen's Association
Mike Duane, Lobsterman, President, Marshfield Commercial Fishermen's Association
John Carver, Lobsterman, President of South Shore Lobstermen's Association
William Adler, Executive Director, Massachusetts Lobstermen's Association
Bill Kelly, Lobsterman
Bob Figueiredo, Lobsterman, Cohasset
Jim Figueiredo, Lobsterman

**Ed Figueiredo, LobstermanFigure 1:  South Shore Infrastructure Summary**

Paul Figueiredo, Lobsterman, Cohasset
Bill Stone, Lobsterman
Jeff Stone, Lobsterman
Michael Lane, Lobsterman
Dan Graham, Lobsterman
Bob Turner, Lobsterman, Plymouth
John Grey, Lobsterman
Steve Kelley, Lobsterman, Sandwich
Dave Crowell , Scallop, Groundfish (dragger), Lobster
Dave Kandrick, Lobsterman
Dick Gibbs, Scallop. Groundfish (dragger)
Bob Colburt, Lobster (offshore)
Frank Mirarchi, Fisherman (dragger)
Fred Dauphinee, Lobsterman, Scituate
Dave Casoni, Lobsterman, Sandwich
Bob Marcela, Lobsterman, Hull
Steve Welch, Fisherman (gillnetter)
John Haviland, Green Harbor
Frank Carey, Cohasset
Bob MacKinnon, Scituate


Harbormasters

John Muncey, Cohasset
Ken Corson III, Hingham (Assistant Harbormaster)
Sgt. Leonard Laforest, Marshfield
Joseph Ritz, Plymouth
Gregory E. Fayne, Sandwich
Frank C. Regan, Scituate
Mark Patterson, Scituate (Assistant Harbormaster)

## Services

Frank C. Carey, Mill River Marine Railways
Tommy Alioto, Cohasset Lobster Pound
Eric Jesse, Jesse's Marine
Donald Spring, Sandwich Ship Supply
Rich LaLonde, RNR Marine
Reidar Bendiksen, Reidar's Manufacturing
Chris Mullaney, Cohasset
Chuck Haddad

## Commonwealth

Richard S. Armstrong, Governor's Seaport Advisory Council
Kirin Dekas, Governor's Seaport Advisory Council

## Local Community Leaders

Town of Cohasset Planing Board
Peter Pratt, Cohasset Planning Board Member
Richard Karoff, Friends of Cohasset Harbor
Mrs. Richard Karoff, Friends of Cohasset Harbor
Peter J. Lawrence, Citizen Cohasset
Richard Swanborg, Citizen Cohasset

## Press

Samantha Brown, Cohasset Mariner, Staff Reporter
Lisa Campenella, Patriot Ledger, Staff Reporter

32

## Summary of South Shore Infrastructure Elements

| Town | Cohasset | Hingham | Marshfield | Plymouth | Sandwich | Scituate |
|---|---|---|---|---|---|---|
| **Commercial vessels** | 40 (+/-) | 11(+/-) (23-6 yrs ago) | 75-80 | 40-50 | 42+ | 65+ |
| **Recreational vessels** | 475(+/-) | 600+ | 400(+/-) | 600+ | | |
| **Primary catch** | lobster | lobster | lobster | lobster | lobster | lobster |
| **Secondary catch** | groundfish/ tuna | none | groundfish/ tuna | groundfish/tuna | groundfish/tuna | groundfish/tuna |
| **Public wharves** | two | one, restricted, no commercial fishing vessels allowed | one | one | one | two |
| **Moorings** | yes, $5/ft/yr | No commercial vessels allowed | yes, $4/ft/yr | yes, $4/ft/yr | none | yes, $5/ft/yr/res, $6/ft/yr/non res |
| **Slips, wharf tie up** | none | Hewitt's Cove Marina, $130/ft/yr | yes/winter | yes, Town wharf, $20/ft/yr resident; $30/ft non-res | yes, 42 commercial slips | $1000/yr/res, $1500/yr/non res |
| **Dingy tie up** | yes, no charge | none | yes, $35/yr | yes | none | yes |
| **Parking** | yes, but limited | yes | yes, restricted | yes, sticker | yes | yes |
| **Fuel** | Truck | Truck at Hull | Truck, Taylor Marina | Truck, Town Wharf Enterprises | Truck, Town fuel dock | Truck |
| **Bait** | Truck delivery | Truck delivery, coolers @ slips | Truck delivery | Reliable at wharf, Truck delivery | Truck delivery | Truck delivery |
| **Ice** | none | none | none | Trucked from New Bedford | Trucked from New Bedford | Trucked from New Bedford |
| **Haul out facility** | Mill River Boat Yard | Hewitt's Cove Marina | Hydraulic trailer @ Town ramp | Brewer's Marina, Plymouth Boat Yard | Hydraulic trailer @ Town ramp | |
| **Gear & supplies** | RNR | RNR | New England, RNR | Jesse's Marine, RNR, New England, NB | Sandwich Ship Supply, New Bedford | RNR, New England, New Bedford |
| **Shoreside gear storage & maintenance** | private property | Hewitt's Cove Marina, $4/sq. ft/yr | private property | private property | private property | private property |
| **Lobster buyers** | Cohasset Lobster Pound | Trucks at wharf & 2 local dealers | 2 trucks at wharf & 3 local dealers | Trucks at wharf & 2 local dealers | 1 local dealer & truck pick up | 3 local dealers & truck pick up |
| **Fish buyers** | none | none | Tuna buying station, groundfish to NB | Trucked to New Bedford | Trucked to New Bedford | Trucked to New Bedford |

## Selected Fish-related Businesses, South Shore

### Fuel

| | |
|---|---|
| Melia Fuel* | Marshfield |
| Taylor Marine* | Brant Rock |
| DeTully Oil Co. | Hull |
| Reliable Fish Company | Plymouth |

### Marine Repair

| | |
|---|---|
| Commercial Marine Electronics* | Scituate |
| Mobile Marine Services | Scituate |
| North River Marine | Scituate |
| Taylor Marine* | Brant Rock |
| Steve Lynch Marine Services | Marshfield |
| Erickson Marine Services | Marshfield |
| South Shore Dry Dock Marine | Marshfield |
| 3A Marine Service | Hingham |
| Bills Outdoor Motor Service Inc. | Hingham |
| Coastal Marine Service (engine)* | |
| Bruce Diesel Service (engine)* | Duxbury |
| Brewers Marine | Plymouth |

### Gear and Supplies

| | |
|---|---|
| Marine Engine & Gear | Marshfield |
| PM Marine | Marshfield |
| Electra Dyne Co. Inc. | Plymouth |
| Dedham Sportsmen's Center | Plymouth |
| Boaters World Discount Marine | Plymouth |
| Brewers Marine | Plymouth |
| Jesse's Marine* | Plymouth |
| West Marine | Plymouth |
| Minuteman Boat Handling Equipment | Plymouth |
| Turf & Surf Marine | Plymouth |
| Landfall Marine Center | Hingham |
| First Quality Marine, Inc. | Hingham |
| Old Salt Outfitters | Hingham |
| Harbor Auto & Marine Repair, Inc. | Hull |
| South Shore Marine Service | Hull |
| Allerton Boat Works, Inc. | Hull |

## Buyer/Processor

| | |
|---|---|
| Reliable Fish Co.* | Plymouth |
| Hingham Shellfish Co. | Hingham |
| Whaling City Auction (truck)* | New Bedford |
| Atlantic Coast (truck)* | Boston |
| Cohasset Lobster Pound | Cohasset/Hull |

## Boat Yard

| | |
|---|---|
| Mill River Boatyard* | Cohasset |
| Simms Yacht Yard | Scituate |
| Bullocks Boat Yard | Marshfield |
| Taylor Marine* | Brant Rock |
| Green Harbor Marina | Green Harbor |
| Shattuck Yacht Maintenance | Plymouth |
| Jesse's Marine* | Plymouth |
| Turf & Surf Marine | Plymouth |
| Plymouth Boat Yard | Plymouth |
| Atlantic Boat | Plymouth |

## Marine Surveyors

| | |
|---|---|
| New England Marine Surveyors | Scituate |
| Nathaniel Dexter, Marine Surveyor | Marshfield |
| Allied Marine Surveyors | Plymouth |

## Diving/Towing

| | |
|---|---|
| Waterline Diving Services | Scituate |
| Sea Tow Cape Cod Bay | Scituate |

## Bait

| | |
|---|---|
| Belsan Bait & Tackle | Scituate |
| Ferry St. Bait & Tackle | Marshfield |
| Fishermen's Outfitters | Green Harbor |
| C & P Bait (trucked)* | New Bedford |
| Cherry's Bait | Plymouth |
| Tim's Rent a Boat | Plymouth |
| Waynes Seafood Market | Plymouth |
| Lobster Pound | Manomet |
| Hull Bait & Tackle | Hull |
| Hingham Bait & Tackle | Hingham |
| Perberton Bait & Tackle | |

35

Retail, Fish & Food

| | |
|---|---|
| Lower Mills Seafood | Scituate |
| Mullaney's Harborside Fish Market* | Scituate |
| Brant Rock Fish Market | Marshfield |
| Green Harbor Lobster Pound | Green Harbor |
| Duxbury Mussels & Seafood | Kingston |
| Lobster Pound | Manomet |
| Lobster Hut | Plymouth |
| MacGraths Seafood Grille | Plymouth |
| Reliable Fish Company | Plymouth |
| South Shore Seafood Market | Kingston |
| Waynes Seafood Market | Plymouth |
| Weathervane Seafood Restaurant | Plymouth |
| Woods Seafood | Plymouth |
| Captains Bounty | Hingham |
| Sam's Seafood Inc. | Hingham |
| South Shore Lobster | Hingham |
| Jack & Franks | Hingham |

*Noted by more than two commercial fishermen as important to their businesses.