UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RICHARD MAX STRAHAN, <br><br> and <br><br> JEREMY SHUGAR, <br><br> Plaintiffs <br><br> v. <br><br> ELLEN ROY-HERZFELDER, in her official capacity as Secretary of the Massachusetts Executive Office of Environmental Affairs, <br><br> DAVID M. PETERS, in his official capacity as Commissioner of the Massachusetts Department of Fish and Game, <br><br> and <br><br> PAUL DIODATI, in his official capacity As Director of the Massachusetts Division of Marine Fisheries, <br><br> Defendants | Civil Action No. 05-10140-NMG |

**MEMORANDUM OF *AMICUS CURIAE* NEW ENGLAND LEGAL FOUNDATION
IN SUPPORT OF DEFENDANTS AND IN
<u>OPPOSITION TO MOTION FOR AN INJUNCTION</u>**

**INTRODUCTION**

Since the enactment of the Endangered Species Act ("ESA") in 1973, great steps have been taken to protect endangered whales, with Massachusetts leading the charge in the campaign to protect these treasured species. In this action, Richard Max Strahan ("Strahan"), a conservation activist on behalf of endangered species, requests that the Court enjoin the Commonwealth from issuing any further commercial fishing licenses for fixed lobster traps and gillnets in Massachusetts waters. While Strahan's goal is to protect against the entanglement of endangered whales, the effect of such relief would be devastating not only to the commercial fishing industry in Massachusetts, but also to the culture and identity of entire communities. The minimal gains that such extreme measures might yield cannot justify the devastating impact they would have on the lives and livelihoods of thousands of citizens in the coastal communities of this Commonwealth.

Lobster fishing is a bedrock Massachusetts tradition. From the South Shore fishing communities of Plymouth, Sandwich, and Marshfield, to the North Shore fishing communities of Gloucester and Rockport, fishing and, in particular, lobster fishing provide both cultural and economic identity. One need only visit briefly any of these coastal towns to witness the prominence of commercial fishing in their culture and local economies. Local restaurants boast about the "daily catch." Photographs and paintings depict the local harbor, and inevitably include in the scene a buoy, fishing boat, or a lobster trap. Lobster boats take tourists from around the world to view the workings of the lobster industry. Massachusetts fishermen and lobstermen's ethic of hard work at sea is often passed down from generation to generation. If Strahan is successful in halting an entire regional industry, these coastal towns would not only feel a decline in their economic prosperity, but they would lose a piece of their identity.

The importance of preserving local fishing communities should not be misinterpreted as "anti-whale," as pro-fishing and pro-whale need not be mutually exclusive. Protecting endangered whales need not be done at the expense of the commercial lobstering industry and the unique social culture attendant to that industry. Certainly, the ESA mandates that preservation of endangered species be of paramount importance. See 16 U.S.C. § 1538(a)(1)(B). The broad relief requested by Strahan, however, goes beyond the intent of the ESA and exceeds that which is practical and necessary to protect endangered whales. If granted, the relief would devastate the culture of many of the Commonwealth's coastal communities and, consequently, the people who rely on that culture for survival. Included among those who would suffer the most profound impact are the many small businesses that rely on "lobstering" as an identifying culture. Those businesses include, of course, lobstermen. But they also include all the businesses that support the lobster industry, as well as restaurants, hotels, souvenir shops of all kinds, and a host of other related businesses. Many of those small businesses lack the resources to articulate their positions and concerns. This brief is submitted to bring their concerns to the Court's attention.

## STATEMENT OF INTEREST OF *AMICUS CURIAE*

*Amicus Curiae* New England Legal Foundation ("NELF") is a non-profit, public interest law firm that was incorporated in Massachusetts in 1977. It is headquartered in Boston. Its membership consists of corporations, law firms, individuals, and others who believe in NELF's mission of promoting balanced economic growth for New England, protecting the free enterprise system, and defending economic rights. NELF's more than 130 members and supporters include a cross-section of large and small corporations from all parts of New England and the United States. Furthermore, some of NELF's members will be directly affected by the requested injunction because they are located in, or conduct business with, the coastal communities that rely on fishing

and lobstering for sustenance and identity. Massachusetts' fishing heritage is a mark of its regional identity and historical roots, provides needed employment to thousands of Massachusetts residents, and draws thousands of tourists to our coastal fishing communities each year. For these reasons, NELF's members are concerned about the issues presented in this case.

NELF has regularly appeared in state and federal courts, as party or counsel, in cases raising issues of general economic significance to the New England and national business communities. See, e.g., Rapanos v. United States, 126 S.Ct. 2208 (2006); S.D. Warren Co. v. Maine Bd. Of Envtl. Protection, 126 S.Ct. 1843 (2006); Kelo v. City of New London,. 125 S.Ct. 2655 (2005); San Remo Hotel, L.P. v. City of San Francisco, 545 U.S. 323 (2005); Exxon Mobil Corp. v. Saudi Basic Indus. Corp., 544 U.S. 280 (2005); Commissioner v. Banks, 125 S.Ct. 826 (2005); Green Tree Fin. Corp. v. Bazzle, 539 U.S. 444 (2003); EEOC v. Waffle House, Inc., 534 U.S. 279 (2002); Palazzolo v. Rhode Island, 533 U.S. 606 (2001); Crosby v. National Foreign Trade Council, 530 U.S. 363 (2000); Adams v. United States, 391 F.3d 1212 (Fed. Cir. 2004); cert. denied, 126 S.Ct. 330 (2005); Preseault v. United States, 100 F.3d 1525 (Fed. Cir. 1996); Preseault v. United States, 66 F.3d 1190 (Fed. Cir. 1995).

## PROCEDURAL AND FACTUAL BACKGROUND

This action follows nearly identical litigation filed by Strahan against these same defendants (or their predecessor agencies) almost a decade ago. On April 21, 1995, Strahan filed an action in the United States District Court for the District of Massachusetts (Woodlock, J.) alleging that defendants violated the ESA and the Marine Mammal Protection Act (the "MMPA")[1] by issuing licenses authorizing the use of gillnets and lobster gear by commercial fishing boats in Massachusetts waters. Strahan v. Coxe, 939 F. Supp. 963 (D. Mass. 1996). Strahan sought a

---

[1] While, like the ESA, the MMPA prohibits the taking of endangered whales, it does not provide for citizen suit protection. Accordingly, the District Court dismissed Strahan's claims under the MMPA. Strahan, 939 F.Supp. at 965.

preliminary injunction ordering the defendants to revoke all licenses and permits it had issued

authorizing gillnet and lobster pot fishing and barring the defendants from issuing such licenses in

the future unless it received "incidental take" and "small take" permits from National Marine

Fisheries Services ("NMFS") under the ESA and MMPA.

The Court found in favor of Strahan on his claims under the ESA. The Court, however,

declined to issue the far-reaching injunction that Strahan sought, which would have been similar to

the relief sought in this case. Instead the Court ordered defendants to (1) apply for an incidental

take permit under the ESA from NMFS for Northern Right whales,[2] (2) apply for a permit under

the MMPA for Northern Right whales; (3) develop and prepare a proposal to restrict, modify or

eliminate the use of fixed-fishing gear in coastal waters of Massachusetts listed as critical habitat

for Northern Right whales in order to minimize the likelihood additional whales will actually be

harmed by such gear; and (4) convene an Endangered Whale Working Group to engage in

substantive discussions with Strahan, or his representative, as well as with other interested parties,

regarding modifications of fixed-fishing gear and other measures to minimize harm to the

Northern Right whales. See Strahan, 939 F.Supp. at 990-992. In affirming the District Court's

decision,[3] the First Circuit recognized that in fashioning the relief, the District Court was "not

required to go any further than ensuring that any violation would end." Strahan v. Coxe, 127 F.3d

155, 171 (1st Cir. 1997).

In 1997, the Court approved the protective measures that the Endangered Whale Working

Group proposed, and the defendants, the Conservation Law Foundation and Massachusetts

Lobstermen's Association, both of which intervened in the case, entered into a Settlement

---

[2] In compliance with the Court's order, defendants applied for an incidental take permit. The NMFS determined that the request was not appropriate. See n.7, infra.

[3] By order dated October 9, 1997, the First Circuit vacated the District Court's requirement that Defendants apply for a permit under the MMPA, but otherwise affirmed the District Court's decision. See Strahan v. Coxe, 127 F.3d 155 (1st Cir. 1997).

Agreement. In accordance with this Agreement, the Massachusetts Division of Marine Fisheries ("Marine Fisheries") implemented regulations: (1) requiring that gear set in the Cape Cod Bay Critical Habitat during January 1 through May 15 be equipped with a 500 lbs. breakaway link; (2) prohibiting floating ground lines in all of Cape Cod Bay: (3) agreeing to request annual appropriations through FY 2006 to fund an aerial surveillance program and to support disentanglement programs; and (4) requiring an annual review of the results of gear regulations to reduce the risk of entanglements and to publish a report on such findings.[4] Even after the adoption of these regulations, Marine Fisheries continued to develop and implement means to ensure whale safe fishing gear. Indeed, effective January 1, 2007, the Commonwealth will impose a year-round prohibition on floating groundlines in all state waters, a measure which is exceedingly more protective than any current federal regulation.[5]

The District Court monitored defendants' compliance with its Order until 2002, at which time it closed the case demonstrating its satisfaction that the defendants met their obligations. See Stipulation of Dismissal dated January 11, 2002, Strahan v. Coxe, et al., No. 1:95-cv-10927. In 2005, three years after the termination of the 1995 matter, Strahan filed this action, citing alleged entanglements from 2002 and seeking essentially the same relief that the Court rejected in 1996. Specifically, Strahan now seeks to enjoin defendants from any further licensing of fixed fishing gear in Massachusetts coastal waters unless such operations are "Whale Safe," which Strahan defines as "commercial fishing that does not cause a single incident of death or serious injury of a listed species of endangered whale." See Verified Complaint for Declaratory and Injunctive Relief and Request for a Jury Trial ("Verified Complaint") at pp. 1, 13. The absolute guarantee of no death or serious injury that Strahan seeks is beyond the scope of the requirements of the ESA.

---

[4] Declaration of Daniel J. McKiernan, submitted in connection with the Defendants' Opposition to Motion for Preliminary Injunction ("McKiernan Aff.") at ¶¶ 11, 14, 15, 17.
[5] See McKiernan Aff. at ¶ 24.

The ESA as interpreted by the courts addresses the likelihood of a prospective harm, not a guarantee of "no harm."[6] The effect of the relief that Strahan seeks would be to prohibit all commercial lobstering in Massachusetts waters as no such viable completely "Whale Safe" technology currently exists.

Strahan's requested relief would severely hamper the lobster industry, and completely destroy the industry in those small coastal communities that rely primarily on territorial waters for their catch. That is not all, however. The requested relief would not only destroy the livelihood of independent lobstermen, and have a severely adverse impact on those small businesses that provide infrastructure that supports the lobster industry, but it also would obliterate the culture of many local communities that are defined and sustained by the local lobstering industry.

## ARGUMENT

### I.    The Court Should Not Issue An Injunction Where, As Here, The Commonwealth Has Demonstrated That Harm To Endangered Whales Is Not Likely To Occur In The Future.

The ESA protects against the "taking" of endangered whales. See 16 U.S.C. § 1538(a)(1)(B). The ESA defines "take" broadly as to "harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or attempt to engage in any such conduct." See 16 U.S.C. § 1532(19). The Secretary of the Interior further defines "harm" to include "significant habitat modification or degradation where it actually kills or injures wildlife." See 50 C.F.R. § 17.3. The ESA permits citizens to commence civil suits on their own behalf to enjoin any person, including "any individual, corporation, . . . or any officer, employee, department, of instrumentality of . . . any state, municipality, or political subdivision of a State . . . who is alleged to be in violation of any provision of the ESA." See 16 U.S.C. § 1540 (g).

---

[6] See pages 7-8, infra.

In enforcing the ESA, "[c]ourts have granted injunctive relief only where petitioners have shown that the alleged activity has actually harmed the species or if continued will actually, as opposed to potentially, cause harm to the species." Strahan, 939 F.Supp. at 989, quoting American Bald Eagle v. Bhatti, 9 F.3d 163, 166 (1st Cir. 1993). "Federal courts are not obligated to grant an injunction for every violation of the law. The plaintiff must make a showing that a violation of the ESA is at least likely in the future." National Wildlife Federation v. Burlington Northern Railroad, 23 F.3d 1508, 1511 (9th Cir. 1994). What is required is "a definite threat of future harm, not mere speculation." Id. at 1512, n. 8. Where efforts have been undertaken to prevent future takings, and a Court is convinced that such efforts will prove successful, injunctive relief is denied. See id. at 1512. See also Natural Resources Defense Council, Inc. v. U.S. Dept. of Interior, 57 F.3d 1077, 1077 (9th Cir. 1995) (plaintiffs bear burden of showing likelihood of ESA violation in the future); Pulaski v. Chrisman, 352 F.Supp.2d 1105, 1118-1119 (C.D. Cal. 2005) (plaintiffs failed to show that ESA violation was likely to occur in the future so as to warrant issuance of injunction); Center for Biological Diversity v. Bureau of Land Management, 2004 WL 3030209 at *6 (C.D. Cal. 2004) (holding that scope of injunction must be tailored to likelihood of future harm).

In National Wildlife, the National Wildlife Federation ("NWF") claimed that Burlington Northern Railroad ("BNR") violated the ESA by modifying grizzly bear feeding behavior through a series of accidental corn spills along BNR tracks in Montana. NWF also alleged that BNR violated the ESA when its trains struck and killed seven grizzly bears which were allegedly attracted to the food at the spill sites. The Court found that, while the bear fatalities constituted a prohibited taking and thus BNR had violated the ESA, NWF had not carried its burden of demonstrating the likelihood of future harm necessary to warrant the issuance of an injunction.

Thus, notwithstanding that the balance of harms and public interest tip in favor of the endangered species, there was insufficient evidence that future similar takings were likely given that BNR made efforts to clean up the spill and repaired the tracks where the accidents occurred.

Here, as in National Wildlife, the Commonwealth has taken unprecedented measures to prevent future whale entanglements. While some of these measures were instituted before the alleged 2002 takings averred by Strahan in his complaint, many were implemented after the period Strahan discusses and provide even further protections for whales. See McKiernan Aff. at ¶¶15, 23-26. The Commonwealth has promulgated, and continues to develop, stringent measures to prevent any future whale entanglements. See id. There is no basis for this Court to order the sweeping injunctive relief Strahan requests.

**II.    If The Court Is Inclined To Grant Injunctive Relief, The Cases Permit It To Fashion A Remedy That Will Accomplish The Goals Of The ESA While Taking Into Account The Impact Of The Relief On Massachusetts' Commercial Fishing Industry.**

  *A. The Court Should Not Ignore the Devastating Effect The Requested Relief Would Have on the Economy, Culture and Identity of Many Coastal Communities.*

When faced with requests for injunctive relief, Courts have interpreted the ESA to require that "the balance of hardships and the public interest tip[] heavily in favor of protected species." Strahan, 939 F.Supp. at 989 (internal quotations omitted). This does not mean that the Court may simply disregard the hardships present on the other side of the scale. Rather, it means that the sides do not start on equal footing, and the protection of the endangered species starts with the scale tipped in its favor. See Alabama v. U.S. Army Corps. Of Engineers, 441 F.Supp.2d 1123, 1132 (N.D. Ala. 2006) (holding that the traditional four pronged test for an injunction should apply, but "with special deference to be given to Congressional balancing of equities in favor of an endangered species"). Accordingly, while deference must be given to the protection of an endangered species, it is still possible that strong evidence showing a potential negative impact on

the enjoined parties or the general public, or a showing that the proposed remedy will have little practical effect in improving the situation of endangered species, can tip the balance against the grant of injunctive relief.

The First Circuit has recognized this. In <u>Water Keeper Alliance v. United States Department of Defense</u>, 271 F.3d 21 (1st Cir. 2001), the First Circuit found that the balance of harm weighed <u>against</u> the issuance of an injunction. The Court acknowledged that while the precedents direct the Court to give the endangerment of protected species the utmost consideration, they cannot blindly compel injunctive relief where national security was of concern. <u>Id.</u> at 28. The Court in <u>Water Keeper</u> distinguished its conclusion in <u>Strahan</u> by classifying the harm raised by the defendants in <u>Strahan</u> as purely "economical." The harm that will result from the relief that Strahan requests in this case, however, is not purely economical. As set forth below, Strahan's requested relief will impact the cultural fabric of many of Massachusetts' coastal communities. Such irreparable harm is not necessary to achieve the aims of the ESA.

In the context of the ESA, Congress itself recognized that the prohibitions of the ESA must be weighed against their potential negative impacts on individuals, their livelihoods, and native cultural and subsistence rights. The ESA allows for incidental takings of protected species, <u>see</u> 16 U.S.C. § 1539(a)(1)(B), [7] and limited intentional takings by certain native populations, <u>see</u> 16 U.S.C. § 1539(e), even though such takings violate the no "takings" clause found at 16 U.S.C. § 1538(a)(1)(B).

---

[7] The District Court held that the Commonwealth and its departments are subject to the ESA. <u>Strahan</u>, 939 F.Supp. at 990-992. Nevertheless, when the Commonwealth complied with the Court's directive to apply to NMFS for an incidental take permit, NMFS determined that "NMFS does not consider it appropriate for a state or a private party to apply for an Incidental Take Statement under section 7(b)(4) of the ESA as this section applies only to Federal actions." <u>See</u> McKiernan Affidavit at <u>Tab 4A</u>. Thus, while the Commonwealth is apparently subject to the constrictions of the ESA, according to the NMFS, and despite the District Court's mandate, it is not subject to the incidental take exemptions. NMFS has entered into "Cooperative Agreements" with the Commonwealth under the ESA and in doing so has acknowledged that Massachusetts law is adequately protecting endangered species. <u>See</u> 16 U.S.C. § 1329(k) and § 1535.

The earliest example of this Congressional recognition, that limited takings must be allowed in light of cultural and subsistence needs, was the inclusion in the 1973 text of an exemption of Alaskan native populations from the provisions of the ESA.  16 U.S.C. § 1539(e). Additionally, in recognition that the ESA as originally enacted did not provide enough flexibility for incidental takings of protected species, Congress substantially amended the ESA in 1978 and 1982 to provide the Secretary of the Interior with greatly expanded authority to issue exemptions where a "taking is incidental to, and not the purpose of, the carrying out of an otherwise lawful activity." Pub. L. No. 97-304, § 6, 96 Stat. 1411 (1982);  Pub. L. No. 95-632, § 5, 92 Stat. 3760 (1978).  The conference committee report accompanying the 1982 amendments noted specifically that "the Committee fully expects that there will be instances where the regulations allow for the incidental take of experimental populations, such as the inadvertent taking of experimental fish species by those fishing for other species in the same body of water." H. Rep. No. 97-567, § 5 (1982).

The substantial amendments to the ESA in 1978 and 1982 evidence a legislative intent to balance vigorous protection of endangered species against realistic enforcement goals and the needs of the citizenry.  Thus, while there can be no dispute that protection of the whales is of paramount importance, the relief that Strahan requests is overly broad, and less restrictive measures have been, and continue to be, taken which will accomplish the same purpose.  "The district court's equitable powers are broad, and it is within the court's authority to fashion a remedy that fits the particular facts of the case before it." Montana Wilderness Assn. v. Fry, 408 F.Supp.2d 1032, 1034 (D. Mont. 2006).  The Court is not required to go any further than ensuring that any violation will end. Strahan, 127 F.3d at 171.  See also Montana Wilderness, 408 F.Supp.2d at 1034 (refusing to void land leases and instead ordering their suspension until

compliance with NEPA and ESA is shown). Thus, in determining whether to grant an injunction

and, if so, in fashioning the appropriate relief, the Court cannot ignore the ramifications of

Strahan's relief on the local fishing industry and the communities whose histories and cultures are

centered around that industry.

B.     *Commercial Fishing Is An Economic and Cultural Mainstay of Many Coastal*
       *Communities.*

A ban on lobster fishing and gillnetting[8], as requested by Strahan, see Verified Complaint,

would devastate the socioeconomics of the Massachusetts' communities whose identities are

derived from commercial fishing. The Commonwealth has long had one of the most valuable

commercial fishing industries in the nation and, within Massachusetts' territorial waters, the

commercial lobster fishery is "the most economically important fishery." See M.J. Dean, S.R.

Reed, and T.B. Hoopes, 2004 Massachusetts Lobster Fishery Statistics (July 2006) ("2004 Lobster

Fishery Statistics") at p.1, attached to Affidavit of Pamela Zorn Adams, Esq. in Support of

Memorandum of *Amicus Curiae* New England Legal Foundation In Support of Defendants and in

Opposition to Motion for an Injunction ("Adams Aff.") at Tab A.

Unlike other types of commercial fishing, which have been affected by strict state

regulations, lobster fishing has not followed the same pattern of decline in the Commonwealth. In

2004, the Commonwealth issued 2,112 commercial lobster permits, 1,464 of which were coastal

permits, which allows the holder to harvest anywhere, including inside Massachusetts' territorial

waters. Id. at p. 5. That year, commercial lobstermen reported landing 11,784,110 pounds of

lobster in Massachusetts, valued at approximately $53,028,494. Id. at p. 6. Just over sixty percent

(60%) of those landings, approximately seven million pounds of lobster, came from within

Massachusetts territorial waters. Id. The relief that Strahan seeks would obliterate the

---

[8] A gillnet is a type of fishing net in which a fish is caught. Gillnetting is more prevalent in larger commercial fishing
communities such as Gloucester and New Bedford than in smaller lobstering communities such as Rockport.

independent lobster fishermen whose livelihoods rely on territorial waters, severely dampen the careers of those fishermen who depend on both federal and state waters for their catch, and have significant social and economic impacts on coastal communities throughout Massachusetts including, but not limited to, Gloucester, Rockport, Plymouth, Marshfield and Sandwich. If Strahan succeeds and the lobster industry is shut down, the financial loss, while substantial, will be dwarfed by the irreparable impact to the cultural make-up of these coastal communities. In this regard, any shut-down would cause irreparable damage, severely damaging these communities in a way tantamount to a complete eradication of the industry. Once destroyed, the affected culture will not easily be replaced even if completely "Whale Safe" fishing technology is developed in the future. These potentially affected communities range from the large, industrial fishing towns like Gloucester and New Bedford to the small lobstering towns, like Rockport and Cohasset. The following paragraphs focus on certain communities, but there are many other examples that can be identified in the studies and literature.

> 1.    *Commercial Lobstering is an Integral Part of the Fishing Industry in Essex County and, in particular, Gloucester and Rockport.*

Essex County landed 3,103,041 pounds of catches in territorial waters and is ranked first in total pounds of lobster landed in 2004. 2004 Lobster Fishery Statistics at pp. 6, 19 (Adams Aff. at Tab A). The greatest harvest of lobster from territorial waters came from the Cape Ann vicinity, where approximately 22% of the state's territorial harvest was caught. Id. at 9. Essex County also has the most active commercial lobstermen in Massachusetts, with 528, and among the Commonwealth's cities and towns, Gloucester and Rockport ranked first and fourth respectively for number of active lobstermen. Id.

Gloucester is a community whose cultural, human and economic capital are all linked to the fishing industry. See Madeleine Hall-Arber PhD, MIT Sea Grant Program, *New England's*

*Fishing Communities* ("NEFC")[9], § 5.6.1 at p. 235, attached to Adams Aff. at <u>Tab B</u>. While lobstering is only a subset of a large commercial fishing industry in Gloucester, it is undoubtedly a vital subset. In 2004, Gloucester lobstermen caught 1,745,861 pounds of lobster, more than half of which was caught in territorial waters. 2004 Lobster Fishery Statistics at pp. 6, 8 (Adams Aff. at <u>Tab A</u>). Gloucester thus ranked first in Massachusetts for total pounds of lobster landed. <u>Id.</u> at 8. It also ranked first in total number of active lobstermen, with 202. <u>Id.</u>

The fishing industry is only as successful as the infrastructure that supports it. It is therefore not surprising that the port of Gloucester is a full-service, regional center for the commercial fishing industry in the northeast. <u>See</u> Commercial Fishing Industry Needs On Gloucester Harbor, Now and in the Future (Community Panel Project, June 2005) ("Gloucester Report") at 5, attached to Adams Aff. at <u>Tab C</u>. Gloucester's infrastructure includes businesses at which "fishermen can get ice, fuel, gear, bait and grub; they can get their boats hauled out and worked on; when they return to port they can sell their fish at the auction or directly to buyers; there are settlement agents and maritime attorneys; there is space at the dock to load and unload boats and to load trucks; and there is space to tie up vessels." <u>Id.</u> at pp. 5-6. Many of these shoreside businesses are family-owned enterprises with long histories on the waterfront. <u>See</u> A Study of Gloucester's Commercial Fishing Infrastructure: INTERIM REPORT, Gloucester Community Panel (October 15, 2003) ("Gloucester Infrastructure Study"), at p. 27, attached to Adams Aff. at <u>Tab D</u>. "Having only one or two businesses in each of the critical infrastructure areas, it stands to lose its status as a 'hub' if the businesses in any one of these critical areas disappear. . . 'A lot of times we are down to one of these key pieces of infrastructure [and] if that disappears that can be the end of your harbor.'" <u>Id.</u> at p. 28.

---

[9] This report is 426 pages and discusses many communities across New England. NELF has attached to the Adams Aff. at <u>Tab B</u> the introduction, conclusion, and the sections relevant to the communities it has discussed in this Memorandum. If the Court would find it helpful, NELF will certainly make available the entire report.

Just as the fishing industry is only as successful as its infrastructure, the shoreside infrastructure will only survive if the fishing industry has need for support services. If the fishing industry is threatened, then so too is the infrastructure that supports that industry. Given the extensive regulations of the past decade and the consequent decrease in ground fish landings, Gloucester's shore side infrastructure is precarious. See Gloucester Infrastructure Study at p. 3 (Adams Aff. at Tab D); Gloucester Report at p. 6 (Adams Aff. at Tab C). "This stripped down infrastructure is highly vulnerable to further cuts in fishing activity." Gloucester Infrastructure Study at p. 4 (Adams Aff. at Tab D).

> As some businesses fail and others turn away from supporting commercial fishing, two things are likely to happen. First, if one or more of the critical elements comprising the fishing industry infrastructure disappears, the others will likely fall like 'dominoes.' If boats are unable to get a full suite of services in Gloucester, they will move to other ports where the full suite of services is available. Gloucester boats that are mobile will leave, and boats from outside Gloucester will cease coming to Gloucester. Second, as the Gloucester waterfront loses the set of services supporting the commercial fishing industry, the pressure to remove the marine industrial zoning restrictions in the waterfront area will mount, and, at some point, presumably succeed. When and if the waterfront is re-zoned…and non-industrial, non-water dependent uses of the properties are installed, it will be, practically speaking, impossible to re-zone the area for marine industrial uses.

Id. Strahan's proposed ban on lobster fishing could be the straw that breaks the back of an already threatened infrastructure. When the bait shops, fishing vessel berths, fish auctions, etc., disappear from the waterfront, they may well be replaced by non-water dependent development. Thus, even if the injunctive relief requested by Strahan is granted on a temporary basis, with nothing left to sustain the fishing industry, its effects may well be permanent.

Commercial fishing and, in particular, lobstering, is not only a source of economic sustenance for Gloucester. Gloucester's history is "inextricably tied up with commercial fishing." See NEFC, §5.6.1.1 at p. 236 (Adams Aff. at Tab B). The city's long history of fishing is intertwined with the community's image, and to its attractiveness as a picturesque destination for

tourists, summer residents and artists. Id. at p. 247. Gloucester's image is captured in the well-known waterfront statue of the Man at the Wheel, which now has a companion memorial that lists 5,368 Gloucester fishermen lost at sea. Id. at 240. Cape Ann Historical Museum boasts a permanent exhibit devoted to the Gloucester fishing industry. Id. at p. 239. The fishing industry in Gloucester is a "major draw for tourists"; "it distinguishes Gloucester from many other coastal destinations." Gloucester Report at p. 29 (Adams Aff. at Tab C).

Against this backdrop, any depletion in the industry will of course be an economic loss for Gloucester, but it will also be a "loss of identity, a loss of skills, and a loss of a 'way of life' that has inspired and sustained people both inside and outside the industry. These losses will bring in their wake large social restructurings difficult to foresee." Gloucester Infrastructure Study at p. 4 (Adams Aff. at Tab D). When the industry is lost, "what is lost is much of what gives [Gloucester] its identity, character, history and culture." Gloucester Report at p. 12 (Adams Aff. at Tab C). This devastation to the character of the community is the inevitable result of the relief that Strahan seeks.[10]

While Rockport is not a bustling commercial fishing city like Gloucester, it is a "quiet lobstering community" that stands to lose that significant sector of its local community if the relief that Strahan requests is granted.[11] Like Gloucester, Rockport also enjoys a long history of lobstering. That history is seen throughout Rockport today, as the town remains known for its fishing community, art galleries, and picturesque views. See NEFC, § 5.6.1.2 at p. 253 (Adams Aff. at Tab B). Rockport's fishing heritage is exemplified by the maintenance of historic fishing

---

[10] The impact on Gloucester would be broad-based. According to the 2003 impact study, Gloucester's Commercial Fishing Infrastructure includes the following small businesses that directly service lobstermen: lobster buyers (nine companies); ice sellers (eight companies); fuel sellers (eight companies); haul out and repair (five companies); moving space (eleven companies); gear and supply shops (eight companies); food and sundries (five companies); and open space for working on gear (six entities). See Gloucester Infrastructure Study, Appendix B (Adams Aff. at Tab D).
[11] See www.seacapeann.com/see_rockport.html.

paraphernalia, including Motif #1, a lobster shack in Rockport harbor, which is one of the most painted and photographed scenes in America.  Id.  While the lobster shack is no longer in operation, it remains a symbol of the town and its heritage.[12]

Although its fishing fleet has declined over time, Rockport has managed to maintain a sufficiently large fishing fleet that contributes both to the economy of the town and the continued success of tourism.  See Rockport: Municipal Harbor Plan (July 2003) ("Rockport Plan") at p. 1, attached to Adams Aff. at Tab E.  The most valuable fishery in Rockport is the lobster fishery. See id. at p. 26.  According to 2004 statistics, Rockport is the home port to sixty-four active lobstermen, ranking Rockport fourth in the state for the size of its lobster fleet.  2004 Lobster Fishery Statistics at p. 8 (Adams Aff. at Tab A).  A total of 611,604 pounds of lobster were trapped in 2004, ranking Rockport sixth in the state for total catch.  Id.  Of this total, approximately 80% of the lobsters were trapped in state waters.  Id.  Commercial tours operate out of Rockport Harbor each day in season, taking approximately 30 passengers to observe lobstering. Rockport Report at p. 27 (Adams Aff. at Tab E).

The viability of the commercial fishing industry remains possible due to Rockport's proximity to Gloucester's full service infrastructure.  NEFC, § 5.6.1.2 at p. 253 (Adams Aff. at Tab B).  Any threat to Gloucester's infrastructure would have a collateral effect on Rockport's fishing industry.  Moreover, given that the heart of Rockport's fishing industry is lobstering, the relief that Strahan seeks will obliterate Rockport's industry, and inexorably harm Rockport's image as a "quiet lobstering community."  If Rockport ceases to serve as an actual fishing village, it will have an irreversible effect on Rockport, Cape Ann and the Commonwealth.

---

[12] See note 11, supra.

   2.    *Commercial Lobstering is an Integral Part of the Fishing Industry In Many*
         *South Shore Communities.*

The primary catch in the South Shore coastal towns of Plymouth, Cohasset, Hingham,

Marshfield, Sandwich and Scituate is lobster.  Massachusetts South Shore Commercial Fishing

Infrastructure (2004) ("South Shore Report") at p. 32, attached to Adams Aff. at <u>Tab F</u>.  Although

these South Shore communities' commercial fishing fleets differ in size, gear used, and target

species, lobster is the predominant species sought.  <u>Id.</u> at 4.  It follows, therefore, that any threat to

the continued vitality of the lobster industry in these communities is a real threat to the

commercial fishing industry in general, and consequently is a risk to the continued identity of

these communities as "fishing communities."  Being a "fishing community" is more than just a

label, it is an identity that defines a community.  The impact would be felt throughout the

communities.  The chart attached as <u>Exhibit A</u> to the 2004 South Shore Report details the far

ranging impact of the lobster industry on a number of South Shore communities.

Plymouth's fishing dependence[13] centers on the lobster fleet, which is comprised of

approximately 50 operating vessels.  <u>See id.</u> at 32; NEFC at p. 221 (Adams Aff. at <u>Tab B</u>).  In

2004, Plymouth County ranked third in Massachusetts for total pounds of lobster landed and

second for numbers of active fisherman.  2004 Lobster Fishery Statistics at p. 6 (Adams Aff. at

<u>Tab A</u>).  Among the Commonwealth's cities and towns, Plymouth ranks third for the number of

active lobsterman.  <u>Id.</u> at 8.  Plymouth's primary catch is lobster, 95% of which is caught in

Massachusetts' territorial waters.  <u>Id.</u>  Although secondary catches include groundfish and tuna,

because of the tight fishing restrictions, many Plymouth fishermen rely solely on lobster fishing.

<u>See id.</u> at 32; NEFC at 222 (Adams Aff. at <u>Tab B</u>).  Fishing infrastructure in Plymouth is adequate

to maintain the local fleet, and includes air fill stations, back yard bait houses, two fishing supply

---

[13] Plymouth supports a healthy local fishing population and infrastructure, which substantially contributes to the
town's image and tourist trade.

dealers, two diesel fuel stations, and a diesel truck.  Id.  These businesses are reliant on the

safeguarding of the local inshore lobster fleet.

Plymouth's character and its appeal to tourists is derived, at least in part, by its commercial

fishing industry.  Plymouth is serviced by three wharves, one is devoted to pleasure boats during

the summer season and some commercial fishing vessels during the winter months; one houses the

Mayflower; and the other, a 1000-feet long town pier, houses commercial vessels.  See id.,

§ 5.5.2.1 at p. 218; South Shore Report at p. 16 (Adams Aff. at Tab F).  The town pier "integrates

the local fishing culture directly into the flavor of the port."  NEFC, § 5.5.2.1 at p. 218 (Adams

Aff. at Tab B).  "Dockside restaurants are positioned to give patrons a water view of commercial

fishing activities, and summertime tourists stroll the docks to take photos of the fishing fleet

unloading their catch."  Id.  The dock is surrounded by boutiques, restaurants, and gift shops that

capitalize on fishing and other motifs.  Id. at p. 222.  In assessing the importance of commercial

fishing to Plymouth, fishermen questioned "pointed out that fishing is 'very important' to

Plymouth because of its role in attracting tourists....'the bycatch of commercial fishing is

tourism!'"  See id. at p. 223.

Sandwich, the oldest town on Cape Cod, has a long history of fishing and is described by

locals as a "fishing enclave."  See NEFC, § 5.4.1.1 at 146 (Adams Aff. at Tab B).  Despite a

decline in the lobster fishery, the largest contingency of fishermen in Sandwich are lobstermen

who set their traps in territorial Cape waters.  Id. at 149.  As of 2000, Sandwich had approximately

70 commercial fishermen, most of whom were lobstermen.  Id. at 151.  In 2004, Sandwich had

forty active lobstermen.  2004 Lobster Fishery Statistics at p. 32 (Adams Aff. at Tab A).

Approximately 200 households in Sandwich directly depend on the fishing industry for survival,

and another 70 households are indirectly dependent on the industry.  Id.  The infrastructure in

Sandwich is small but adequate to maintain local fishing activities. Id. at 150. Like Plymouth, "with its stabilized meld of gentrified tourism and well-maintained commercial fishing space," Sandwich, "the cultural and economic capital of fishing, has not been usurped by development." Id. at 146. Accordingly, like Plymouth, Sandwich is a community whose fishermen, infrastructure, and identity will suffer tremendously from a lobster fishing ban.

Marshfield's fleet is comprised of 75-80 vessels, the bulk of which are inshore lobster boats. See South Shore Report at pp. 12, 32 (Adams Aff. at Tab F). In 2000, seventy-five lobster vessels cited Marshfield as their homeport. Id. at p. 12. In 2004, Marshfield's lobstermen caught 566,102 pounds of lobster, 82% of which were caught in territorial waters, making Marshfield eighth in the Commonwealth in lobster landings. 2004 Lobster Fishery Statistics at p. 8 (Adams Aff. at Tab A). An inshore lobster fishing restriction will all but destroy what is left of Marshfield's fishing community.

As demonstrated above, the primary catch in these small South Shore coastal communities is lobster, most of which are caught in Massachusetts territorial waters. While these communities do not have the infrastructure of Gloucester or New Bedford, they do have small family-owned enterprises that support the fishing industry. The cessation of the lobster industry resulting from the injunctive relief that Strahan requests, even if such injunction were only granted on a preliminary (and, therefore, possibly a temporary) basis, will upend what little infrastructure there is and drive all commercial fishing away from these communities. This will not only have financial impacts on those whose livelihoods depend, either directly or indirectly, on the fishing industry, but it will have an irreparable impact on the culture and identity of these fishing communities.

## **CONCLUSION**

Lobstering and commercial fishing provide a livelihood for thousands of families in Massachusetts and have important links to tourism and the appeal of coastal life. Not only would fishermen and lobstermen feel the effects of the injunction Strahan seeks, but so too would those businesses that rely for survival on that industry. In addition, the culture and identity of Massachusetts' coastal communities would be seriously damaged, perhaps in ways that could never be repaired. While the ESA requires that the protection of endangered species be a priority, it does not require the issuance of an injunction where, as here, the Commonwealth has taken unprecedented measures to protect endangered whales and Strahan has failed to demonstrate "a definite risk of future harm" as opposed to "mere speculation." See National Wildlife, 23 F. 3d at 1511. Although under the ESA, the balance of harm weighs in favor of the endangered species, the ESA does not mandate that the Court turn a blind eye to the severe impact the requested injunction will have on fishing communities. See, e.g., Alabama v. U.S. Army Corps of Engineers, 441 F.Supp.2d at 1132. As shown in the studies and literature described above, the lobstering and fishing industries are integral to the identity of many Massachusetts coastal communities. The countless small businesses that survive to serve the fishing business rely on that identity. Like family farms, they are both integral to the communities' identity, as well as highly vulnerable to any threat to that identity. The law under the ESA permits the court to consider these impacts in deciding whether to enter the requested relief. See id. See also Water Keeper, 271 F.3d at 28.

Based on the foregoing, the Court should deny the injunctive relief requested by the plaintiff.

Respectfully submitted,

NEW ENGLAND LEGAL FOUNDATION

/s/ Martin J. Newhouse
Martin J. Newhouse BBO #544755
Michael E. Malamut BBO #547610
New England Legal Foundation
150 Lincoln Street
Boston, MA 02111
(617) 695-3660

SPECIAL COUNSEL TO NEW ENGLAND
LEGAL FOUNDATION

/s/ Frank J. Bailey
Frank J. Bailey BBO #026485
Ronald W. Ruth BBO #434740
Pamela Zorn Adams BBO #640800
Sherin and Lodgen LLP
101 Federal Street
Boston, MA 02110
(617) 646-2000

## EXHIBIT A

## Summary of South Shore Infrastructure Elements

| Town | Cohasset | Hingham | Marshfield | Plymouth | Sandwich | Scituate |
|------|----------|---------|------------|----------|----------|----------|
| Commercial vessels | 40(+/-) | 11(+/-) (23-6 yrs ago) | 75-80 | 40-50 | 42+ | 65+ |
| Recreational vessels | 475(+/-) | 600+ | 400(+/-) | 600+ | | |
| Primary catch | lobster | lobster | lobster | lobster | lobster | lobster |
| Secondary catch | groundfish/ tuna | none | groundfish/ tuna | groundfish/tuna | groundfish/tuna | groundfish/tuna |
| Public wharves | two | one, restricted, no commercial fishing vessels allowed | one | one | one | two |
| Moorings | yes, $5/ft./yr | No commercial vessels allowed | yes, $4/ft./yr | yes, $4/ft./yr | none | yes, $5/ft./yr/res, $6/ft/yr/non res |
| Slips, wharf tie up | none | Hewitt's Cove Marina, $130/ft/yr | yes/winter | yes, sticker | yes | yes |
| Dingy tie up | yes, no charge | none | yes, $35/yr | yes | none | yes |
| Parking | yes, but limited | yes | yes, restricted | yes, sticker | yes | yes |
| Fuel | Truck | Truck at Hull | Truck, Taylor Marina | Truck, Town Wharf Enterprises | Truck, Town fuel dock | Truck |
| Bait | Truck delivery | Truck delivery, coolers @ slips | Truck delivery | Reliable at wharf, Truck delivery | Truck delivery | Truck delivery |
| Ice | none | none | none | Trucked from New Bedford | Trucked from New Bedford | Trucked from New Bedford |
| Haul out facility | Mill River Boat Yard | Hewitt's Cove Marina | Hydraulic trailer @ Town ramp | Brewer's Marina, Plymouth Boat Yard | Hydraulic trailer @ Town ramp | |
| Gear & supplies | RNR | RNR | New England, RNR | Jesse's Marine, RNR, New England, NB | Sandwich Ship Supply, New Bedford | RNR, New England, New Bedford |
| Shoreside gear storage & maintenance | private property | Hewitt's Cove Marina, $4/sq. ft/yr | private property | private property | private property | private property |
| Lobster buyers | Cohasset Lobster Pound | Trucks at wharf & 2 local dealers | 2 trucks at wharf & 3 local dealers | Trucks at wharf & 2 local dealers | 1 local dealer & truck pick up | 3 local dealers & truck pick up |
| Fish buyers | none | none | Tuna buying station, groundfish to NB | Trucked to New Bedford | Trucked to New Bedford | Trucked to New Bedford |