UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RICHARD MAX STRAHAN ) | |
| ) | |
| *Plaintiff* ) | |
| ) | Civil Action No. |
| v. ) | |
| ) | 05 – 10140 - NMG |
| SECRETARY, MASSACHUSETTS EXECUTIVE ) | |
| OFFICE OF ENVIRONMENTAL AFFAIRS[1], *et al.* ) | |
| ) | 5 December 2006 |
| *Defendants* ) | |

_____

PLAINTIFF'S NOTICE THAT DEFENDANTS' HAVE BEEN AWARDED TWENTY FOUR
MILLION DOLLARS IN DISCRETIONARY FUNDS BY LNG SHIPPING COMPANY
_____

The Plaintiff notifies the Court of recent developments concerning the Defendants.

Strahan has a pending Preliminary Injunction before the Court asking it to order that the

Defendants license only Whale Safe fishing gear. Recently, the Defendant Executive Office

Environmental Affairs has obtained an agreement ("Agreement") to supply it about $23.5

million dollars in discretionary mitigation funds from commercial interests seeking to build and

operate Liquid Natural Gas ("LNG") deepwater port facilities off the coast of Massachusetts. See

Attachment #1 "LNG Firm will Pay $23.5m in Port Deal: Fisherman, Public to be Compensated

for Impact" 2 December 2006 Boston Globe. This Agreement is formally outlined in a document

authored by Defendant EOEA. See Attachment #2 1 December 2006 "Certificate of the

Secretary of Environmental Affairs on the Final Environmental Impact Report."  The Defendant

---

[1] The original named defendant Ellen Roy-Herzfelder has subsequently left her employment as
the Secretary of the Massachusetts Executive Office of Environmental Affairs and was replaced
subsequently by first one and then another person.  For consistency, Strahan has adopted the
current caption for his civil action.

EOEA is seeking a similar commitment of mitigation funds from a second commercial concern seeking itself to build another LNG deepwater port facility off the Massachusetts coast.[2]

The Defendants' Agreement provides that the Defendant Division of Marine Fisheries will receive millions of dollars to promote the Lobster Pot Fishery that it licenses and regulates under state law. It will also provide millions of dollars to the Massachusetts Lobstermen's Association  to establish a non-profit organization that will be funded by the Agreement to enhance and continue the Massachusetts lobster Pot commercial fishing industry.

Clearly the Defendants have deliberately sought a windfall payment for a commercial marine fishery that is in violation of the Section 9 prohibitions of the Endangered Species Act through its killing and injuring endangered species of whales by causing the entangle of these whales in ropes used in this fishing gear. The Defendants have made no attempt to provide that funds supplied pursuant to the Agreement would be used for engineering work to reduce the likelihood of entanglement of endangered whales in Lobster Pot fishing gear. They are doing this despite the ongoing instant action and the Court's pending consideration of Strahan's request for a preliminary injunction to enjoin the Defendants' license ony Whale Safe fishing gear.

The Court has heard testimony from Dr. Clifford Goudey — a MIT fisheries engineer — that Whale Safe fishing gear for the Lobster Pot fishery is possible. It has heard evidence that ropes and buoys that are used in the Lobster Pot fishery can be engineered to completely eliminate the risk of entangling any large whale of any species in these ropes and buoys, including vertical buoy line. The Court also heard testimony that the Defendants have

---

[2] The LNG deepwater project that is subject to the Agreement is being proposed by a Texas based company, Excelerate Northeast Energy Bridge LLC. A second LNG deepwater port project is being proposed by Neptune LNG LLC.

deliberately ignored this technology and refused to even consider funding any engineering development work on it.

Strahan seeks to point out to the Court that in its deliberation on Strahan's motion for a preliminary injunction that it can order the Defendants to use the funds supplied by the Agreement to fund research and development of Whale Safe fishing gear by Dr. Goudey at MIT. For Strahan this is a possibility of meaningful relief to fulfill Strahan's said request for interlocutory injunctive relief. Strahan will soon be filing with the Court a further request for interlocutory injunctive relief to insure that the Defendants either use the discretionary funds supplied it by the Agreement for engineering the fishing gear it licenses to be Whale Safe or face the obvious consequences of whole sale restraint of its Lobster Pot fishery for its willful refusal to make any attempt to license and regulate its commercial marine fisheries to eliminate their ability to entangle listed species of endangered whales.

For the above reasons the Plaintiff asks the Court to GRANT his requested relief. .

BY:

_____

Richard Max Strahan, Plaintiff
236 West Portal Avenue, #195
San Francisco, CA
617.233.3854

*Pro Se and Proud!*

_____

CERTIFICATION OF CONSULTATION PURSUANT TO LOCAL RULE 7
_____

I certify that I consulted with the attorney for the Defendants on the issue of the Court issuing me the relief requested in the instant motion.

_____
Richard Max Strahan, Plaintiff

_____

CERTIFICATION OF SERVICE
_____

I hereby certify that a copy of this opposition has been served VIA E-mail on the Defendants' attorney on 5 November 2006.

_____
Richard Max Strahan, Plaintiff



THIS STORY HAS BEEN FORMATTED FOR EASY PRINTING

# LNG firm will pay $23.5m in port deal
## Fishermen, public to be compensated for impact

The Boston Globe

By Beth Daley, Globe Staff  |  December 2, 2006

The developers of a proposed liquefied natural gas port 13 miles off Gloucester have agreed to pay $23.5 million to compensate fishermen and the public for environmental impacts anticipated over the project's 25-year lifespan.

The groundbreaking deal paved the way for the state to give its environmental approval for the project, which happened late yesterday. Final approval must still come from Governor Mitt Romney, who has until Dec. 26 to make a decision on the Excelerate Energy project. Romney has said in the past that he would prefer an offshore LNG project to one onshore, but he is still examining the issue.

Excelerate, of Texas, originally predicted that the project would cause just $2.5 million in damage to fishermen and have minimal effect on marine life. But state officials had a different conclusion , and after months of negotiations the company agreed to pay $8 million to New England fishermen to compensate for the loss of fishing grounds.

Excelerate will also pay about $7 million for the use of public waters, $4 million for impacts on marine habitats and resources that may be disturbed, and $4 million to prevent harm to whales and other marine mammals.

The builders of major infrastructure projects often provide compensation for the environmental impacts they are anticipated to cause.

"If you look at the balance between the need for reliable energy and minimizing the impacts on the environment, this is a good outcome," said Environmental Affairs Secretary Robert W. Golledge Jr.

Excelerate's Northeast Gateway project is one of two offshore LNG ports proposed for the waters off Gloucester. The other project, called Neptune, is expected to receive a final state environmental decision in two weeks, and Romney's approval for it is due by Jan. 2. Observers expect the state to work out a similar compensation plan with Neptune.

The two offshore LNG ports would act as permanent floating factories, and public access would be limited for up to four square miles around each. Ships from overseas would dock and turn supercooled liquid into gas before pumping it into a pipe system connected to the mainland. After one of the massive ships, some almost 2 1/2 football fields in length, completed its weeklong unloading, another would take its place.

Each ship could hold enough supercooled gas to heat about 30,000 homes for a year. If the two offshore projects were built, it might negate the need for a controversial LNG terminal proposed for Fall River.

The most unusual piece of the fishermen's compensation package is a $6.3 million payment to help start a Gloucester nonprofit organization. The nonprofit will pay struggling Gloucester-area fishermen who want to quit the business a fee for their fishing permits and allotted fishing days. The nonprofit would then lease the permits to other fishermen. That way, state officials said, fishermen who decide that LNG restrictions undercut their catch too much can be compensated, but those who want to stay in the business can boost income by fishing more days and hauling in more catch.

The balance of the $8 million will go to compensate commercial lobstermen and will be administered by the Massachusetts Lobstermen's Association.

Excelerate will pay:

• $5.3 million for improvements and public transportation to the Boston Harbor islands. The money will be managed by the Island Alliance, a group that promotes the island chain.

• $3.25 million for an acoustic buoy system on the tankers and port that would track marine mammals, so officials

know where they are and if they are being affected by ship traffic or noise.

- $3 million to the state Office of Coastal Zone Management to better map and understand seafloor regions.

- $900,000 to the state Division of Marine Fisheries for a program to mark egg-producing female lobsters in the ocean, so fishermen who catch them know they should be thrown back.

- $750,000 to the state Division of Marine Fisheries to research and develop additional whale acoustic technology in Cape Cod Bay.

- $650,000 to the Massachusetts Fish and Game office to maintain or construct public access ramps.

- $600,000 to New England Aquarium to conduct a study of biological impacts of the exclusion zone around the terminal.

- $600,000 to the Gulf of Maine Ocean Observing System, a weather and oceanographic monitoring project.

Other payments include $150,000 to the Gloucester Maritime Heritage Center to preserve the city's fishing history ; $150,000 to New England Aquarium for research and education about Massachusetts Bay; and $150,000 to Salem Sound Coastwatch to support public access and environmental programs in Salem Sound.

Despite the compensation package, many fishermen said yesterday that they would still prefer that the project not be built.

"We'd prefer they take their money and go away," said Bernie Feeney, president of the Massachusetts Lobstermen's Association, who said he learned of the deal only yesterday. Feeney said a recent project called the HubLine, a gas line under Massachusetts Bay, resulted in permanent changes to the sea floor that lobsters don't like.

"We lost areas forever there, and we're worried about it happening again," Feeney said.

Beth Daley can be reached at bdaley@globe.com. ■

© Copyright 2006 The New York Times Company

*The Commonwealth of Massachusetts*

*Executive Office of Environmental Affairs*

*100 Cambridge Street, Suite 900*

*Boston, MA 02114-2524*

MITT ROMNEY
GOVERNOR

KERRY HEALEY
LIEUTENANT GOVERNOR

ROBERT W. GOLLEDGE, JR.
SECRETARY

Tel. (617) 626-1000
Fax. (617) 626-1181
http://www.mass.gov/envir

December 1, 2006

CERTIFICATE OF THE SECRETARY OF ENVIRONMENTAL AFFAIRS
ON THE
FINAL ENVIRONMENTAL IMPACT REPORT

| | |
|---|---|
| PROJECT NAME | : Northeast Gateway Energy Bridge Deepwater Port /Northeast Gateway Pipeline Lateral |
| PROJECT MUNICIPALITY | : N/A |
| PROJECT WATERSHED | : N/A |
| EOEA NUMBER | : 13473/13474 |
| PROJECT PROPONENT | : **Northeast Gateway** Energy Bridge, LLC/Algonquin Gas Transmission, LLC |
| DATE NOTICED IN MONITOR | : October 25, 2006 |

As Secretary of Environmental Affairs, I hereby determine that the Final Environmental Impact Report (FEIR) submitted for this project **adequately and properly complies** with the Massachusetts Environmental Policy Act (MEPA) (G. L. c. 30, ss. 61-62H) and with its implementing regulations (301 CMR 11.00).

The Northeast Gateway project proposes to develop significant new energy infrastructure in Massachusetts Bay. A similar proposal, the Neptune project, also proposes to develop a deepwater port in the same area; I am currently reviewing and accepting public comment on the FEIR submitted for that project (EOEA #13641). Both projects are subject to federal authority under the Deepwater Port Act of 1974 (DWPA)[1], which grants the Governor the authority to approve or deny either of the projects. As described in previous Certificates, the major issues raised by these projects entail their potential impacts to marine resources and uses, including impacts to the ecology of, and public trust interest in, Massachusetts Ocean Sanctuaries, the

---

[1] P.L. 93-627, Sec. 3, January 3, 1975, 88 Stat. 2127, as amended, 33 U.S.C. 1501-1524.

♻ Printed on Recycled Stock 20% Post Consumer Waste

EOEA #13473/13474                FEIR Certificate                          12/01/06

commercial fishing industry, and marine mammals, particularly endangered whales. While this project may provide significant benefits to the energy needs of Massachusetts, it will also have environmental impacts. As described in greater detail below, I have directed that mitigation address direct and cumulative impacts to habitat and biological resources, public trust interests, the commercial fishing industry, and marine mammals. Accordingly, the proponent will provide mitigation for impacts to the marine resources and human uses of Massachusetts Bay totaling $23,500,000. This comprehensive mitigation package will ensure that the impacts of the project are appropriately mitigated.

Project Description

      The proposed project entails the construction of a Deep Water Port (DWP) in Massachusetts Bay approximately 13 miles south-southeast of Gloucester. The DWP would be located in federal waters in an area bounded by the South Essex Ocean Sanctuary to the west, the North Shore Ocean Sanctuary to the northwest, the Stellwagen Bank National Marine Sanctuary to the east, the Massachusetts Bay disposal Site to the northeast, and the Boston Harbor Channel to the south. The DWP would consist of two submerged buoys that would connect to a 16.4-mile, 24-inch diameter pipeline that would deliver regasified Liquefied Natural Gas (LNG) from the DWP to onshore markets in New England via the existing off-shore HubLine which connects to shore. Approximately 12.5 miles of the pipeline lateral is proposed in commonwealth waters, and 3.9 miles in federal waters. The proponent proposes to use the post-lay plow technique to install the pipeline for nearly its entire route. The buoys would be anchored to the seafloor with eight mooring anchors. Each of the buoys would have three marine traffic management zones which exclude or limit other use of the waters around the deepwater port. The construction period is expected to be seven months.

MEPA Jurisdiction and Permitting Requirements

      The project is undergoing review pursuant to section 11.03(3)(a)(1)(b) of the MEPA regulations for alteration of ten or more acres of any other wetlands, in this case Land Under the Ocean; and section 11.03(7)(a)(3) for construction of a new fuel pipeline more than 10 miles in length.

      The project will require numerous state and federal permits. At the federal level, the DWP will require approvals by the U.S. Coast Guard (USCG), U.S. Department of Transportation (USDOT), the Federal Energy Regulatory Commission (FERC), the U.S. Army Corps of Engineers (USACE), and the U.S. Environmental Protection Agency (EPA). The project will also require consultation by several other federal agencies with resource management responsibilities. The project is undergoing review pursuant to the National Environmental Policy Act (NEPA), with USCG as the lead federal agency.

EOEA #13473/13474                    FEIR Certificate                      12/01/06

At the state level, the project will require the approval of the Governor under the Deepwater Port Act, and a Chapter 91 License and a 401 Water Quality Certification from the Department of Environmental Protection (MassDEP). The project will also require federal consistency review by the Office of Coastal Zone Management (CZM) and Orders of Conditions from local Conservation Commissions, or MassDEP on appeal.

Because the proponent is not seeking financial assistance from the Commonwealth, MEPA jurisdiction extends to those aspects of the project that have the potential to cause significant Damage to the Environment as defined in the MEPA statute and that are within the subject matter of required or potentially required state permits and approvals. In this case, given the large number of state permits required and the comprehensive subject matter of the required state permits, MEPA jurisdiction is equivalent to full scope jurisdiction.

Under MEPA, a Special Review Procedure was established for the review of this project to facilitate coordination among state and federal agencies and to maximize opportunities for public participation. Pursuant to the Special Review Procedure, the project is undergoing coordinated review under MEPA and the National Environmental Policy Act, and this FEIR has been filed as a combined Final Environmental Impact Report/Final Environmental Impact Statement.

MEPA Review Process and Approval Standards

Development of either the Northeast Gateway or Neptune projects will have temporary and permanent impacts to the marine environment and human uses of Massachusetts Bay, including impacts to areas in state waters designated as Ocean Sanctuaries. In the event that both projects are approved under the provisions of the DWPA, the pipelines would run virtually side-by-side through the Ocean Sanctuaries to the existing HubLine. The Certificate on the Draft EIR for Northeast Gateway therefore required that the proponent provide in the FEIR a more detailed assessment of the environmental, engineering, and operational feasibility of constructing one pipeline to serve both projects, and to further evaluate the potential impacts of alternative project-specific pipeline routes #1 and #4. The FEIR provides an analysis of these issues and concludes that, when compared to the proponent's preferred alternative of a project-specific pipeline, a single pipeline is not feasible, for three primary reasons: 1) the environmental benefits are not dramatic, given the larger size of the pipe, longer construction period, and greater area of seafloor construction impacts; 2) the environmental benefits of one versus two pipelines would not be realized in the event that the Neptune project is not permitted, or, if permitted, not constructed; 3) and the additional regulatory review and development logistics associated with a single pipeline would frustrate the project's objective of being operational by the winter of 2007. The FEIR further concludes that the preferred alternative pipeline route #4, while longer than alternative route #1, is not characterized by conditions that render it infeasible or unpermittable.

3

In considering the proponent's response, I am mindful that MEPA review does not permit me to approve or deny a project, but rather requires that I determine whether the FEIR provides adequate information about the project to assist the state permitting agencies in using all feasible means to avoid damage to the environment, or, to the extent it cannot be avoided, to minimize and mitigate damage to the environment to the maximum extent practicable. In this case, I note that the FEIR does not formally identify a preferred alternative but instead carries forward and analyzes a number of alternatives, while basing the emphasis of analysis on the applicant's proposed alternative. In making a determination of adequacy, the MEPA regulations require me to determine that a FEIR is adequate, even if certain aspects of the project or issues require additional analysis of technical details, provided that I find that the aspects and issues have been clearly described and their nature and general elements analyzed in the FEIR or during MEPA review, that the issues can be fully analyzed prior to any agency issuing its Section 61 Findings, and that there will be meaningful opportunities for public review of the additional analysis prior to any agency taking action on the project.

As described in more detail in this Certificate, after examining the record before me, I find that there is enough information on alternatives, impacts, and mitigation to meet that standard. While it appears likely that a single pipeline would have fewer temporary environmental impacts than the construction of individual pipelines constructed to serve both the Northeast Gateway and Neptune projects, and that Northeast Gateway's proposed alternative would have more temporary impacts than alternative route #1, careful review of the FEIR and the comments of the regulatory agencies does not indicate that the proponent's proposed alternative can not be permitted subject to mitigation for those impacts. While comment letters from the state agencies identify several areas where additional analysis of technical details is required, these issues can be addressed in the permitting process. The MEPA review of the project is concluded.

<u>Compensatory Mitigation</u>

The FEIR includes proposals for compensatory mitigation, at a general level of detail, which consider and describe mitigation related to marine mammals, habitat and other biological resources, commercial fishermen, recreational users, and impacts to interests protected by state permit or license conditions. Based on consultation with EOEA, the proponent has further clarified these mitigation measures, and committed to their implementation, in a letter dated November 22, 2006 from the proponent to EOEA. The proponent shall provide the following compensatory mitigation:

*Commercial Fishermen*
- $6,300,000 to capitalize a non-profit organization to buy/lease fisheries permits and Days at Sea for the inshore groundfish fleet with funding managed by the Gloucester Fishing

EOEA #13473/13474                    FEIR Certificate                    12/01/06

Community Preservation Fund[2] (or alternative compensation system, to be determined)

As described in the comments, the program would be administered by a community-based non-profit organization. Funding would be allocated directly to the non-profit organization. Initial establishment of the non-profit would be guided by a group which would include individuals representing the City, elected state officials, the groundfishing industry, and an LNG project representative. The non-profit would be established to ensure narrowly focused use of the resources, investment of principal in permits providing access to days at sea, and development of a sustaining revenue stream derived from leasing days at sea for the benefit of the local groundfishing fleet. It has been represented that between $7 and 12 million is necessary to fully support such a program; however, comments indicate that the program would provide the intended benefits, at a more limited scale, with initial funding of approximately $6 million.

While important details remain to be addressed, I endorse this approach in principle. I recognize that the economic analysis presented in the FEIR calculates an impact to the groundfish industry that is significantly less than the amount the proponent will provide as mitigation. However, after careful consideration of the proposal, review of comments received, and consultation with the City, representatives of the affected industry, and agency staff, I find that this level of mitigation is necessary to effectively address project impacts to the local infrastructure on which the industry depends, impacts to individual fishermen, and the cumulative economic and social impacts to which the deepwater port will contribute. I ask that the City and/or representatives of the affected groundfishing industry provide me in a timely manner with formal materials regarding the terms of incorporation of the non-profit and the ability of the proposed non-profit to address the interests of similarly affected groundfishermen who homeport south of the Northshore. Provided the proposed program is consistent with state and federal fishery management regulations, geographically equitable within the affected industry as that industry is described in comments by the City and others, and subject to a review of the

---

[2]Comments by the City of Gloucester, Gloucester Fishermen Association and Northeast Seafood Coalition state that the deepwater port will have significant impacts not only to individual fishermen but more fundamentally, when considered cumulatively, in the context of the significant restrictions on groundfishing imposed by state and federal fisheries management regimes, to Gloucester's port infrastructure and the small businesses and surrounding fishing communities that rely upon Gloucester as the regional center of the groundfishing industry. I also note comments from the National Marine Fisheries Service, which state that while "the FEIR portrays the anticipated monetary losses to the commercial fishing industry as total number of jobs lost... this conclusion does not accurately assess impacts on the fishing community. Due, in part, to existing fishing effort regulations faced by the industry, a number of participants are currently fishing on the margin of profitability. Thus, even small impacts on certain members of the fishing community may result in significant adverse effects." Commenters therefore recommend that mitigation should be designed to support Gloucester's ability to continue to function as a 'hub' port. To achieve this, the City and industry comments recommend that the proponent capitalize a fund to assist local fisherman in accessing permitted days at sea as an offset to the direct and cumulative impact of the deepwater port. Through a combination of voluntary permit buybacks and leasing of days at sea, the local groundfishing fleet could consolidate and stabilize at a level which would then withstand the current regulatory climate and reductions caused by the LNG projects.

EOEA #13473/13474                FEIR Certificate                        12/01/06

terms of incorporation, Northeast Gateway will provide $6.3 million to establish the Gloucester Fishing Community Preservation Fund. This mitigation includes funds for unanticipated impacts to groundfish gear as a result of construction. If the fund does not materialize, for whatever reason, the proponent shall coordinate with EOEA, state agencies, the City and representatives of the groundfishing industry to develop, prior to the conclusion of the state Chapter 91 permitting process, an alternative vehicle of equal value for mitigating impacts to the affected industry.

- $1,700,000 for compensation for impacts to commercial lobstermen, including funds for unanticipated impacts to lobster gear as a result of construction, with funds to be managed by the Massachusetts Lobstermen's Association[3]

*Public Trust Issues*
- $5,300,000 to support infrastructure improvements to, and public transportation to the Boston Harbor Islands, with funds managed in trust and the project implemented by the Island Alliance on behalf of and subject to the approval and direction of the Boston Harbor Islands Partnership and the public landowners[4]

I note comments from the Department of Conservation and Recreation recommend mitigation for impacts to ocean sanctuaries funds to enhance public enjoyment of the Boston Harbor Islands National Park; DCR's comments also state that such mitigation would continue the investments in the Harbor Islands made through the Hubline mitigation funds. (See EOEA #12355.) I strongly support continued investment in this extraordinary public trust resource, and I expect that these funds will enhance facilities and travel to and among the islands to significant public benefit.

- $600,000 to provide buoys and/or meteorological, hydrodynamic and/or other instrumentation to significantly enhance the Gulf of Maine Ocean Observing System (GoMOOS)[5]

Expansion of the GoMOOS system, through new buoys, or through the instrumentation of the passive acoustic marine mammal buoys also required as mitigation for this project, will significantly enhance the distribution and type of information that can be gathered in Massachusetts waters, with benefits to maritime commerce, commercial and recreational

---

[3] See discussion at page 14.

[4] Congress established the partnership and the Boston Harbor Islands National Recreation Area under section 1029 of P.L. 104-333 (110 Stat. 4235; U.S.C. 460kkk). Among other things, the law sets the boundary of the Recreation Area as well as generally sets forth the role of the Partnership and its partners, including the Island Alliance, a non-profit corporation.

[5] GoMOOS is a non-profit member organization that owns and maintains, under contract, an array of buoys and shore-based sensors that collect and disseminate real-time observations of weather and ocean conditions throughout the Gulf of Maine, from Cape Cod to Nova Scotia. The GoMOOS web site (http://www.gomoos.org/) provides real-time information products that integrate surface winds, currents, and physical, biological and chemical conditions in the Gulf of Maine.

EOEA #13473/13474               FEIR Certificate                    12/01/06

fishermen, recreational boaters, US Coast Guard search and rescue operations, scientific understanding and environmental management of the marine ecosystem, and other interests. This mitigation is designed to enhance the foregoing benefits by requiring that the passive acoustic buoys required as mitigation for impacts to marine mammals (described below), which will be placed in Massachusetts Bay and the shipping channel east of Cape Cod, be used as a platform for additional GoMOOS instrumentation. This will significantly extend GoMOOS coverage in Massachusetts waters.

- $650,000 to maintain and/or construct public access ramps, with funds to be managed by the Massachusetts Department of Fish and Game Office of Fishing and Boating Access

- $150,000 to the Gloucester Maritime Heritage Center to support activities related to its Stellwagen Bank National Marine Sanctuary exhibit and programs to preserve Gloucester's maritime heritage

- $150,000 to the New England Aquarium to support research and educational programs related to marine habitat and the marine environment of Massachusetts Bay

- $150,000 to Salem Sound Coastwatch to support public access and environmental programs in Salem Sound and its tributary environments

*Habitat*
- $3,000,000 for seafloor mapping activities, habitat characterization with funds to be managed by the Office of Coastal Zone Management, in consultation with other resources agencies.

Seafloor mapping is fundamental to understanding and effectively managing the ocean environment. This mapping, which will include bathymetry, shaded relief, and interpretations of seafloor geology, will continue on-going mapping efforts by my Office of Coastal Zone Management, and will leverage additional funding from the US Geologic Survey. Areas to be mapped will include the offshore seafloor, where mapping is now technologically routine, and nearshore environments, where effective mapping technologies are still under development. Habitat characterization will identify and map specific habitat types, which can then be used as the basis for management decisions and long-term ocean resource planning.

- $900,000 to create and administer a female lobster v-notch/catch-and-release program, with the program and funds to be managed by the Division of Marine Fisheries

Comments from the Division of Marine Fisheries (DMF) recommend a five-year lobster v-notching program in cooperation with the Massachusetts commercial lobster industry. The purpose of the project is to lower the harvest rate of sexually mature female lobsters, increase the spawning stock biomass or "brood stock" of lobsters, and increase the total lobster egg

production, in the greater Massachusetts Bay region as partial mitigation for the direct removal of lobster larvae in the Massachusetts Bay region in relation to the operation of the Northeast Gateway deepwater LNG terminal.

- $600,000 to the New England Aquarium to direct and manage a study of the biological impacts of the exclusion zone around the deepwater port

While the exclusion area will be small relative to the size of Massachusetts Bay, over 1,000 acres of seafloor under the deepwater port will not be subject to mobile fishing gear or the effect of the mooring chains. This presents a unique opportunity to study the ecological impact of creating a protected area within Massachusetts Bay. Funds will be managed by the New England Aquarium, who will direct and manage the study in consultation with Northeast Gateway, with the participation of agency and fishing community representatives. The study shall be designed and conducted so as to not affect operation of the deepwater port.

*Marine Mammals*
- $3,250,000 for components of a passive acoustic buoy system, to include buoys, instrumentation, and/or management of the system

The final design of mitigation associated with marine mammals will be influenced by continuing review under the Endangered Species Act and Marine Mammal Protection Act and discussion among the several federal agencies with regulatory and/or management oversight of marine mammals. EOEA agency staff have participated in discussions among the federal agencies and the proponent, and, while the final conditions of acoustic buoy mitigation have not been established by MARAD, I am satisfied through my review of the FEIR, mitigation proposals informally agreed to by the federal agencies and the proponent, and consultation with agencies, that the proposed mitigation measures are appropriate and will be incorporated as conditions in any license issued under the DWPA. While I expect that appropriate mitigation will be developed under the aegis of the federal regulatory process, the proponent has agreed to provide this mitigation under the state framework as insurance against the alternative. The figure is based on materials developed in support of mitigation recommended early in the review process by the Stellwagen Bank National Marine Sanctuary, and will be credited to the proponent on confirmation that the MARAD license contains appropriate conditions as described above.

- $750,000 for right whale management and research and development of acoustic technology in Cape Cod Bay, with funds to be managed by the Division of Marine Fisheries' Right Whale Conservation Program

The purpose of the Massachusetts Right Whale Conservation Program is to protect right whales in state waters through research, management, and education. The cornerstone of the program is the Right Whale Surveillance and Habitat Monitoring Program in Cape Cod Bay. In addition, DMF conducts programs related to fixed-gear research and acoustic monitoring of large whales. Since 2003, the Conservation program has collaborated with the Cornell University

EOEA #13473/13474                FEIR Certificate                12/01/06

Bioacoustics Research Program in the development and deployment of a near real-time acoustic monitoring system in Cape Cod Bay, most of which is designated as right whale Critical Habitat. The passive acoustic buoy program required as mitigation for impacts to marine mammals, described above, was designed, field tested, and developed into operational capability through DMF and Cornell's work. These mitigation funds will be used to continue applied research and development of buoy and instrumentation design, expand the transmission system to inform mariners of the presence of whales, extend the detection capacity of the instrumentation to include other marine species, and to continue to refine monitoring capability by integrating visual, aerial and acoustic data.

This comprehensive mitigation package will provide $23,500,000 to support the commercial fishing industry, important resource management research, significant improvements to recreational area infrastructure, recreational access to the waters of the Commonwealth, educational programs, and resource protection. These mitigation measures will be conditions of MassDEP's Section 61 finding for the project.

Last, I note that while not proposed as part of the environmental mitigation package, the proponent proposes to make additional payments of $50,000 to each of the four communities through which the Pipeline Lateral passes (Salem, Beverly, Marblehead, and Manchester-by-the-Sea).

Alternatives Analysis

The FEIR presented a discussion regarding the balance between the demand for and supply of natural gas in the New England region, including updated available information, to provide context and background for the evaluation of potential project alternatives, including the preferred alternative, no-build alternative, renewable and non-renewable sources of energy, energy conservation, and other means of supplying gas to Massachusetts and New England, including on-shore and off-shore terminals and pipelines. The FEIR also provided an adequate level of detail regarding individual alternatives, as well as a discussion and analysis of long term regional energy needs, forecasted energy growth, and existing and planned energy infrastructure, to facilitate a meaningful cross-comparison of the benefits and impacts of each alternative.

In its comments, the Massachusetts Energy Facilities Siting Board (EFSB) determines that New England will require a new supply of natural gas and associated infrastructure in the 2007-2010 timeframe. Other LNG facilities proposed to serve the Northeastern United States involve less certain and/or later timeframes than the proposed late 2007 start date for the operation of the Northeast Gateway DWP. Moreover, EFSB notes that land-based LNG terminals necessarily pose greater security and public safety risks than offshore terminals, and that New England's only land-based terminal in Everett, Massachusetts is vulnerable to a major supply disruption. EFSB concludes that the proposed Northeast Gateway DWP's projected early completion date, combined with the potential for construction delays at other proposed facilities,

offers the region added reliability and back-up supply capacity, and could serve to reduce the volatility of gas prices in the region. The potential for the Northeast Gateway DWP to be operational by late 2007 will serve to minimize possible gas supply disruptions faced by the region and may avoid the need for land-based facilities.

Several commenters advocate that the siting of major energy facilities should be guided by a regional energy facility siting plan, and that such a plan should precede action on an individual application to construct and operate an energy facility. While I support such an approach in concept, the MEPA regulations require that I act on individual projects when they are submitted. Moreover, the process by which a regional energy facility siting plan would be developed is beyond the scope and capability of any one proponent. I also note that regional energy siting is a component of ocean management. As this office has emphasized in previous Certificates, these projects represent a clear example of the need to proactively manage our ocean resources. Accordingly, I have ensured that the mitigation package for this project contains measures that support the development of baseline ocean management information.

The FEIR summarizes nine other alternative projects, including both on-shore and off-shore natural gas supply projects in New England and eastern Canada that are in various stages of environmental review, permitting and development. The FEIR discusses the status of each project and provides an analysis of its relative merits, based on consistent criteria, including the likely environmental impacts of each project as well as the necessary pipeline infrastructure to deliver natural gas to southern New England, for comparative purposes

The FEIR compared two alternative locations for the deepwater port within Massachusetts Bay. These alternatives correspond to the areas identified as Northeast Gateway's proposed alternative (location #1) and the Neptune project (location #2). The FEIR analyzes each site for:
- Potential impacts to benthic habitat and Essential Fish Habitat
  Marine mammal occurrence
- Commercial fishing use
- Suitability of substrate
  Proximity to marine disposal sites
- Sediment contamination proximity to shipping lanes

The FEIR concludes that both site locations have similar characteristics, and neither site is, overall, a preferable candidate based on potential environmental impacts. The most significant relative impact of the proposed locations is the length of the pipeline lateral required to connect to the HubLine, as described in greater detail below.

Because both projects propose to construct separate pipelines to tie into the existing HubLine and both pipelines would cross portions of the South Essex Ocean Sanctuary and the North Shore Ocean Sanctuary, areas of Massachusetts waters designated to provide for special

protection of the marine environment, the Certificate on the DEIR directed the proponent to consider a single pipeline to serve both projects as an alternative to the proposed separate pipelines.

As required, the FEIR provides an analysis of this issue and adequately describes the engineering, environmental, and operational feasibility of constructing one pipeline and compares its advantages and disadvantages, including cost, permitting and environmental considerations, against constructing two separate pipelines. Currently, the Northeast Gateway and Neptune projects propose to construct two separate pipelines, each 24 inches in diameter, 16.1 and 13.3 miles in length respectively, for a combined total length of 29.4 miles. Each will require a 65-foot wide plowing corridor and result in 1,000 and 793 acres of seafloor impacts, respectively, for a total area of impact of 1,793 acres. The FEIR examined the engineering feasibility of constructing a 7.6-mile 30-inch combined pipeline and a 12.7 mile 36-inch combined pipeline. Installation of both the 30- or 36-inch pipe would require two passes of the burial plow and additional jetting in order to achieve target burial depth and cover. According to the FEIR, a 30-inch combined pipeline would result in a total combined pipeline length of 22.0 miles, a reduction of approximately 7.4 miles, and a total area of impact to seafloor of 1,438 acres, a reduction of 355 acres (20 percent). Likewise, a 36-inch combined pipeline would result in a total combined pipeline length of 20.2 miles, a reduction of approximately 9.2 miles, and a total area of impact to seafloor of 1,382 acres, a reduction of 411 acres (23 percent). The FEIR also evaluated the capability of potential contractors to install a larger diameter pipeline, the availability of construction materials and equipment, the increased construction schedule, and the jurisdictional and operational feasibility of a combined pipeline, including the increased cost of construction, and concluded that a single pipeline would not meet the proponent's objectives.

The FEIR indicates that while there is some variance in the estimates of impacts resulting from a single or individual pipeline, a single pipeline could have fewer environmental impacts than two separate pipelines. The FEIR also states that construction of a single pipeline would also require additional passes of the pipelaying plow, and three additional months of construction, with a concomitant increase in temporary construction impacts to biota and water quality. In their comments, the state resource and permitting agencies state that a single pipeline would minimize overall environmental impacts. As referenced above, the FEIR states that the individual pipelines for the Northeast Gateway and Neptune projects would have 20% to 23% more direct seafloor impact than a single pipeline. MassDEP states that the one pipeline would reduce the number of construction vessels operating in Massachusetts Bay and thereby reduce construction-related impacts associated with marine mammals, recreational and commercial fishing, and would achieve similar benefits by condensing construction impacts from two construction periods to one. MassDEP concludes that these additional impacts strongly support a single pipeline to minimize impacts to tidelands and Ocean Sanctuaries.

However, review of the FEIR and the comments of the regulatory agencies does not clearly indicate that the benefit of a single pipeline would be significant or actual; nor does such

review indicate that the preferred alternative can not be permitted subject to mitigation for temporary construction or Ocean Sanctuary impacts. (See below for additional discussion of Ocean Sanctuaries.) The installation of a larger pipeline will disturb more seafloor and require a longer and more intensive construction period than a smaller project-specific pipeline, and the relative environmental advantage of a larger combined pipeline will only be realized if both single pipeline projects are built. The magnitude and duration of impacts may be greater with project-specific pipelines, but if a single pipeline were required for Northeast Gateway, it could still be the case that the Neptune project would not construct its connecting lateral until another construction season. In that case, it appears that some or all of the benefits of a single pipeline posited by MassDEP would not be realized. In sum, I believe that the proponent has adequately described the alternatives and proposed mitigation for impacts associated with the proposed alternative that may not be avoided. I acknowledge that the agencies have identified technical issues that remain to be addressed, but I am satisfied that these can be addressed in the permitting process.

The FEIR also evaluated four alternative project-specific routes for the pipeline lateral connection between the DWP and the HubLine. These included two relatively short and direct routes that pass through areas of both soft- and hard-bottom habitat, and two longer routes that avoid hard-bottom areas and pass primarily through soft-bottom habitats. Despite their greater length, the two alternative routes passing mostly through soft-bottom habitat appear to offer the greatest potential for avoiding or minimizing significant short- and long-term impacts from construction of the pipeline to benthic habitat and water quality. To the extent that these alternatives avoid hard-bottom areas, they have several advantages over the shorter alternative routes. Specifically, work in soft sediments is likely to progress faster, shortening the construction period and minimizing the duration of the impact and number of species affected. Additionally, soft-bottom habitats are more likely to recover from impacts faster, and the use of a plow through soft sediments has been shown, in the case of the HubLine, to cause localized turbidity impacts.

While the FEIR does not provide a rigorous comparative assessment of alternative pipeline routes 1 and 4, it does adequately analyze the four alternative pipeline routes considered by the proponent. It explains that while alternative routes 1 and 4 are longer than routes 2 and 3, they traverse primarily soft-bottom habitats and would be expected to have less environmental impact than route 2 or 3, which traverse areas of hard bottom. Soft bottom habitat generally support fewer important commercial species and are more resilient to disturbance, so the impacts of a pipeline along route 1 or 4 would be expected to have lesser impacts on fish and other marine resources. According to the FEIR, construction of the pipeline "…within soft bottom area (routes 1 and 4) would entail the simplest, most predictable and least sediment disturbing construction methods" while construction along Route 2 or 3 "…has the highest probability of requiring blasting, dredging or surface armoring" and presents a higher likelihood for construction delays. All routes traverse areas of contamination and alternative routes 1 and 2 both contain shipwrecks that would have to be avoided during construction. The FEIR concludes

that "(a)lthough all four alternative routes have positive and negative attributes associated with them, none has a fatal flaw that would preclude it from being a viable option."

The proponent's proposed alternative (alternative route 4) is 16.1 miles long, including 12.5 miles within state waters. Based on the results of surveys of the ocean floor described in the FEIR, this route avoids exposed bedrock and surface boulders, passes through limited areas of cobble and coarse till, and is characterized by predominately fine-grained sediments. According to the FEIR, alternative route 1 would cross through approximately 9.9 miles of Ocean Sanctuaries, while alternative route 4 would cross through approximately 12.5 miles, a difference of 2.6 miles within Commonwealth waters. The primary difference between the routes is that alternative route 4 travels to Port Site 1, which is the proponent's proposed port site, while the combination of alternative route 1 and Port Site 2 coincides with the proposed location of the Neptune project. Additionally, alternative route 1 would tie in to the HubLine at milepost (MP) 7.6 while alternative route 4 would tie in at MP 8.0.

The FEIR asserts that although the construction of alternative route 4 would cross more area within Ocean Sanctuaries, it would result in overall less environmental impact than alternative route 1, particularly at its proposed tie-in point to the HubLine, where alternative route 1 would cross a known historical waste disposal site. According to the FEIR, the surficial soils along alternative route 1 are predominantly fine marine silts and clay grading to fine sands inshore with depth to bedrock or tills at generally greater than 20 feet. Alternative route 4 follows a longer path than the other alternatives, but would be sited along a broad area largely composed of silt, sand and clay with no surficial bedrock and very limited potential for subsurface rocks or boulders.

While additional analysis of technical details regarding the proposed pipeline route will be required in the permitting process, I find that the proponent has adequately described the alternatives and their potential impacts and has proposed mitigation for impacts associated with the proposed alternative that cannot be avoided or minimized.

<u>Marine Habitat and Fisheries</u>

The proposed location of the DWP and pipeline lies within productive fisheries habitat supporting numerous species of finfish and invertebrates. These areas support historically important commercial fisheries such as lobstering, dragging and gill netting, as well as recreational fishing. Based on consultation with state and federal resource management agencies, the FEIR recommends that construction activities occur between May and November in order to minimize, but not avoid, adverse impacts to the wide variety of shellfish, crustaceans, finfish and mammals that reside in or migrate through the project area, including several species that are endangered or under protection due to their depleted populations. Compliance with time of year restrictions is a core measure of the Project's obligation to minimize its adverse impacts, and these restrictions will be incorporated into MassDEP's permits. The DMF comment letter

recommends a number of conditions regarding pre-construction baseline characterizations, time of year restrictions and monitoring that I expect will be considered permitting process.

The Massachusetts Division of Marine Fisheries (DMF) states that the analysis and evaluation of the project's potential impacts to marine habitats and fisheries resources has been hampered by the limited amount of spatially and temporally comprehensive data available for the project area. As a result, DMF believes that the potential severity of impacts and direct mortality resulting from the project have likely been underestimated, and conversely, that the potential biological benefits to be derived from the exclusion of fishing in the project area have been overestimated. While I note that additional fisheries data was analyzed, as required by the Certificate on the DEIR, I concur that appropriate monitoring studies, to be developed during the permitting process, will be necessary to accurately assess the biological impacts of the project. I expect that the draft Environmental Monitoring Program described in the FEIR, which provides a sound basis for proposed monitoring, will be modified during the permitting process to reflect ongoing discussions between the proponent and the resource and regulatory agencies.

The FEIR identifies the gross economic impact of the project on the Massachusetts fishing industry as $2.4 million over the 25-year life of the project. The FEIR does provide additional information and analysis, as requested by the Certificate on the DEIR, to characterize inshore groundfishing in the vicinity of the project. However, I have received comment letters from DMF, the National Marine Fisheries Service (NMFS), the groundfish industry and representatives of fishing communities on both the Draft and Final EIRs (see footnote #2) that challenge the ability of the data and methodology used to determine this figure to accurately characterize impacts. In addition to significant disagreement over the calculated direct impacts of displacement through loss of catch, potentially increased vessel transit time to and from the grounds, and reallocation of effort to other fishing grounds, commenters assert that the proposed project will have significant indirect and cumulative impacts. After careful review of the Draft and Final EIRs and comment letters, it is clear that there remain significant discrepancies between the impacts calculated by the FEIR and the impacts postulated by state and federal fisheries management agencies and the affected industry. As I discuss in the section above that address mitigation, above, I have determined that significant mitigation is appropriate to effectively address project impacts to the local infrastructure on which the inshore groundfish industry depends, impacts to individual fishermen, and the cumulative economic and social impacts to which the deepwater port will contribute.

The project will also have significant impacts to the commercial lobster industry in the form of temporary impacts from the placement of the pipeline lateral and permanent impacts from the displacement of lobster fishing in the area occupied by the deepwater port. Mitigation for these impacts is described above. I wish to note that in determining the adequacy of mitigation associated with impacts to the inshore groundfish and lobster industries I have carefully considered the distinction between mitigation necessary to preserve the localized infrastructure in support of a regional groundfish industry (preservation of a viable 'hub' port)

and mitigation based on the impact to individual lobstermen within an industry widely dispersed among numerous ports. I believe that the mitigation to be provided by the proponent has been appropriately tailored to address the circumstances unique to the respective industries.

## Ocean Sanctuaries Act

The Ocean Sanctuaries Act calls for jurisdictional sanctuaries to "…be protected from any exploitation, development, or activity that would significantly alter or otherwise endanger the ecology or the appearance of the ocean, the seabed, or subsoil thereof…" (M.G.L. c. 132A, 14) and the regulations prohibit the building of any structure on the seabed or under the subsoil. The Certificate on the DEIR states that the project "…must be found not to seriously alter the seabed and must be found to be of public convenience and necessity in accordance with the Act and its implementing regulations." The proposed pipeline will cross two Ocean Sanctuaries, the North Shore Ocean Sanctuary and the South Essex Ocean Sanctuary, and will necessarily result in impacts to their ecology.

The Massachusetts Department of Conservation and Recreation (DCR) is responsible for administering the Commonwealth's designated Ocean Sanctuaries. In its comments, DCR noted that although the information necessary to apply the test of public convenience and necessity is addressed globally within the FEIR, it was not presented in a discrete discussion or analysis focused on Ocean Sanctuaries. DCR also states that given the project's potential and likely impacts on Ocean Sanctuaries, substantial mitigation will be necessary to comply with the Ocean Sanctuaries Act. A demonstration of compliance with the six factors associated with public convenience and necessity contained in the Ocean Sanctuaries Act will be required before MassDEP can issue a Chapter 91 License and 401 Water Quality Certificate for the project.

## Wetlands Protection Act

As directed in the Scope contained in the Certificate on the DEIR, the FEIR discusses the project's compliance with the Massachusetts Wetlands Protection Act (WPA). The construction of the proposed pipeline will result in impacts to Land Under the Ocean (LUO), and will require Orders of Conditions from several coastal municipalities. According to the FEIR, Algonquin (the pipeline proponent) has filed Notices of Intent (NOIs) with the Conservation Commissions of Marblehead, Salem, and Manchester-by-the-Sea. The Marblehead Conservation Commission has issued an Order of Conditions authorizing construction of a segment of the pipeline. Algonquin must still file NOIs with the Beverly and Weymouth Conservation Commissions.

The FEIR states that the pipeline would be considered a "Limited Project" under the WPA and describes how the pipeline construction would address the standards for utility limited projects in the Wetlands Protection regulation at 310 CMR 10.24(7)(b). The impacts to LUO resulting from the construction of the pipeline consist of the following:
- Direct habitat disturbance resulting from plowing;

- Sediment resuspension (water quality impacts) and deposition (benthic impacts) resulting from plowing; and
- Surficial substrate disruption resulting from anchor chain sweep.

Pipeline Burial

According to the FEIR, the majority of the pipeline will be installed using the post-lay plow construction method, by which the pipe will be buried with three feet of cover from back-plowing the side-cast spoils, with a minimum cover of 18 inches, or a performance standard to be determined during the permitting process. For a 24-inch diameter pipe such as the one proposed here, this would entail the dredging of a trench approximately five feet deep with adequate trench spoils adjacent to the trench for back filling. Achieving the target depth to burial is critical in order for the project to mitigate its benthic impacts.

While the proponent's preferred post-lay plow construction method is likely to have primarily short-term impacts because soft sediment habitats are expected to recover more quickly than hard-bottom habitats, the use of concrete mats or other hard surface materials to cover the pipeline in areas where the necessary burial depth could not be achieved would result in habitat conversion and a long-term impact. The FEIR provides additional detail regarding technical issues that may arise during pipeline installation, and provides options for addressing certain types of construction shortfalls. The FEIR addresses general scenarios including failure to achieve the necessary burial depth due to unforeseen geotechnical conditions or other reasons, and failure to adequately cover the trench assuming proper burial depth is achieved. According to the FEIR, a second plow pass may be effective in achieving adequate burial depth or cover in locations where non-geotechnical issues affect construction. In cases where additional cover is necessary because the pipeline could not be buried sufficiently, the proponent proposes to introduce cover material in the form of diver-placed sand bags, material placed with a tremmie tube, or concrete mats to protect the pipeline.

Comments from CZM state that the conversion of bottom habitat should be avoided wherever possible or, if unavoidable, should be minimized and mitigated. There will likely be locations where adequate burial may be achievable by means of a second pass of the plow to reach desired depths. This is preferable to leaving the pipeline without sufficient sediment cap where there is ample plowable sediment beneath the pipe, because the potential temporary impacts from a second pass of the plow are likely to be significantly less than the impacts resulting from armoring the pipeline and conversion to hard-bottom habitat. Where armoring is determined to be necessary and appropriate, the proponent should consult with the Massachusetts Division of Marine Fisheries (MDMF) to determine if protective material designs could be developed and implemented to function as artificial reefs.

Construction Best Management Practices and Mitigation Measures

The proponent will be required to implement "real time" monitoring of whether the appropriate depth of burial is being achieved, in order to plan for and implement timely and appropriate steps to correct pipeline exposures and depressions so that habitat conversion is avoided and natural topography is restored. In its review of the 401 Water Quality Certificate application for this project, MassDEP will seek additional information regarding these issues in order to preview the appropriate course of action in response to a failure or inability to meet the depth to burial performance standard during construction. The purpose of identifying these scenarios is to determine the most effective means to minimize impacts based, in part, upon a weighing of the benefits of re-establishing the existing habitat against the impacts associated with re-plowing, habitat conversion, and schedule disruptions. Likely factors to be considered in determining the appropriate corrective action will include site-specific information regarding benthic conditions, weather, length of pipeline buried insufficiently, and the potential for intrusions into time-of-year restrictions.

Conditions within the anchor impact zone may be relevant, since each pass of a plow includes barge anchor impacts within a large zone outside of the pipeline corridor. The FEIR offers information on the location of hard bottom habitat within the anchor zone adjacent to the pipeline corridor; this information, in addition to the factors listed above, would be relevant in determining whether pipeline burial with another pass of the plow, or by some other method, results in the fewest impacts. One mitigation measure discussed in the FEIR, but not included in the draft Section 61 Findings, is to fill the pipeline with seawater prior to backfill plowing to ensure the pipeline remains at the prescribed burial depth.

The performance target for the placement of the pipe should be the maximum feasible restoration of the topography and composition of the seafloor with sufficient burial of the pipeline to ensure that sediment is adequately deep for the recolonization of the area and to prevent damage to fishing gear. The amount of cover should also be sufficient to ensure that the pipeline remains buried even if scour effects remove some of the sediment. This standard will inform the evaluation of corrective action alternatives.

In its comments, MassDEP states that it believes that the proposed use of the post-lay plow through predominately soft sediments appears to offer the greatest potential for avoiding or minimizing significant short and long-term impacts. However, based on the experience with the Hubline construction, and acknowledging the deeper waters in which this project is proposed to be constructed, MassDEP expects that unforeseen conditions may arise during construction that may require modifications to the proposed construction procedures. MassDEP recommends, and I concur, that measures be implemented from the start of construction to track progress and address problems as they arise. An integral component would be "real-time" construction monitoring program that would serve as the basis for an exchange of information between the proponent and a standing committee, including representatives of regulatory and resource

agencies having a role in this project. The committee should receive regular updates on construction progress, particularly regarding conditions not foreseen prior to construction, so that solutions may be developed quickly in order to minimize environmental impacts. I concur with MassDEP's recommendation that the project employ a qualified independent observer to report to MassDEP, in conjunction with the standing committee, during the in-state waters construction period and monitor the project's compliance with permit conditions.

Contingency Planning

Closely related to the issue of construction management is the need for contingency planning. The FEIR discusses how the proponent might deal with contingencies, such as weather, equipment failure, and other unforeseeable circumstances during the construction period. The FEIR provides information regarding preparation for contingencies, including the use of separate vessels for laying and plowing of the pipeline; allowances in the schedule for weather delays; and additional vessels for diving support and surveying. The FEIR also appropriately recognizes the value of establishing the standing committee described above, who would be advised regarding construction issues as they arise and respond to requests to implement contingency measures.

The proponent has stressed that its pipeline route selection and geophysical characterization of the construction corridor will avoid the pipeline installation difficulties such as those the HubLine faced due to unexpected subsurface conditions. While I acknowledge the efforts of the proponent to reduce these risks, a shortfall in contingency resource availability will not excuse the proponent's obligation to comply with the conditions contained in the 401 Water Quality Certificate and to mitigate for any consequential environmental impacts.

Water Quality

The FEIR describes proposed water quality monitoring along the portions of the pipeline route adjacent to known deposits of contaminated sediment in the vicinity of the Massachusetts Bay Disposal Site (MBDS) that may be disturbed by barge anchors. The proponent proposes to use Acoustic Doppler Current Profiler technology to identify turbidity plumes that correspond to a significant suspension of sediments, and in turn, serve as a trigger for turbidity sampling. In its comments, MassDEP states that, based on its experience with the post-lay plow technique used for the Hubline project, exceedances of turbidity levels are not expected. However, during the permitting process, MassDEP will consult with the proponent and regulatory agencies to determine whether a similar monitoring regime is warranted along other portions of the pipeline based on species and life cycles present, time-of-year, sediment composition, pollutant levels, and construction techniques. According to the FEIR (p. 4-10) turbidity modeling conducted for this project resulted in significant plumes associated with the use of a jet plow in fine sediments, such as those found at points along the pipeline route.

I note that several commenters have expressed concern about the potential for pipeline construction activities to disturb industrial wastes, including hazardous and radioactive materials, which have been disposed of ad hoc in Massachusetts Bay. While the FEIR has identified known locations of waste or dredged material disposal sites, and characterizes the alternative pipeline routes for the presence or absence of such sites, I recommend that this issue be addressed by MassDEP in the permitting process through a review of materials provided in comment letters and, if appropriate, the development of a contingency plan for handling such materials if encountered in the field.

While the FEIR did not fully explain the proposed Spill Prevention, Control, and Countermeasures (SPCC) Plan, it indicated that it would be developed in conjunction with the selected contractor's work program. I expect that the development and implementation of an SPCC plan will be a requirement of the 401 Water Quality Certificate issued by MassDEP for this project.

Chapter 91 Waterways

The pipeline lateral component of the project, which is proposed to be located in Commonwealth waters, is subject to the Chapter 91 Waterways Regulations at 310 CMR 9.00. The pipeline proponent has filed an application for a Chapter 91 License with MassDEP, which discusses the DWP's conformance with the applicable regulations. The Waterways Regulations protect existing water-dependent uses such as commercial fishing and navigation. The draft Section 61 Findings presented in the FEIR include necessary mitigation measures such as issuing a Notice to Mariners during the construction period; demarcating the construction zone and deepwater port to prevent fishing gear losses; setting up a compensation fund for lost gear; and standard navigational procedures to be followed by the LNG tankers. Based on comments received during the public comment period on the Chapter 91 license application for this project, MassDEP will determine whether additional mitigation measures, including any related to access to the Massachusetts Bay Disposal Site, are necessary.

The project will also have impacts on marine uses that extend beyond the Port structures. The project also entails the establishment of a Safety Zone with a diameter of 0.54 nautical miles (nm) around each buoy, within which only EBRVs, service vessels, and law enforcement ships would be allowed, whether an EBRV is present or not. According to the FEIR, the Safety Zone may be expanded when a tanker is present. Furthermore, a 1.1 nm diameter No Anchoring Area overlapping the Safety Zone around each buoy would be established, within which all vessels may pass but not drop anchor or use bottom trawling equipment.

Marine Mammals

The proposed DWP would be located in an area important to marine mammals, including endangered North Atlantic right, humpback and fin whales. The construction and operation of

this DWP would place these species in increased jeopardy of direct mortality from ship strike as well as disruption from increased noise levels and the loss of the waters that will be occupied by this DWP. The FEIR identifies measures intended to minimize and mitigate potential impacts. Of particular concern are the DWP's potential impacts to the North Atlantic right whale: the species is so critically endangered that the loss of even a single individual is unacceptable; the coast of Massachusetts provides very important foraging habitat for a large portion of the population; and the proposed location of the DWP is in an area of high use by right whales. Comments for the Natural Heritage and Endangered Species Program on the Draft EIR stated that the operation of the DWP will render the area it occupies, as well as its immediate surroundings, unavailable for foraging by right whales, other endangered whales, and marine turtles.

The FEIR provides additional data and analysis for marine mammals, and includes proposed measures by which impacts may be avoided, minimized and mitigated. The FEIR included additional information on noise propagation and impacts. Comments from The Whale Center of New England are critical of both the data and conclusions in the FEIR regarding marine mammal populations and behavior and the potential impacts of the project to marine mammals. The Whale Center states that the proposed project cannot be made compatible with conservation of endangered whales, other marine mammals, and the marine environment overall. Comments from the National Marine Sanctuary Program/Stellwagen Bank National Marine Sanctuary (NMSP) state that the information and conclusions in the FEIR are not consistent with plans developed through consultation under the National Marine Sanctuaries Act to mitigate increased risk to marine mammals from noise and ship strikes. NMSP recommends additional analysis of noise impacts. NMSP recommends a 10 knot year-round vessel speed limit within the marine sanctuary for the LNG vessels and an integrated management approach to minimize vessel-whale interactions. Comments from the National Marine Fisheries Service state that the project is currently under review pursuant to the Endangered Species Act and the Marine Mammal Protection Act, with formal decisions forthcoming in January, 2007.

The FEIR states that " in recognition of the potential added risk of ship strikes within the Boston Traffic Separation Scheme, MARAD [the U.S. Maritime Administration] will require, as a condition of any DWPA [Deepwater Port Act] license issued for this Project, that the applicant install and operate an array of near-real-time acoustic detection buoys…the number, duration and specific location for which will be approved in advance by MARAD and NOAA [the National Oceanic and Atmospheric Administration] as part of a detailed monitoring and mitigation plan prepared by MARAD." EOEA agency staff have participated in discussions among the federal agencies and the proponent, and, while the final conditions of acoustic buoy mitigation have not been established by MARAD, I am satisfied through my review of the FEIR, mitigation proposals informally agreed to by the federal agencies and the proponent, and consultation with agencies, that the proposed mitigation measures are appropriate and will be incorporated as conditions in any license issued under the DWPA.

EOEA #13473/13474                FEIR Certificate                12/01/06

Air Quality

The FEIR adequately describes the project's air quality impacts, both during construction and long-term operation.  The FEIR indicates that the project will result in an approximately 67-ton reduction in noxious oxide (NOx) emissions and an 11-ton reduction in volatile organic compound (VOC) emissions from those reviewed in the DEIR, which would lower the project's VOC emissions below the 50-ton threshold required for a Conformity Determination. The proponent has initiated the applicable federal and state air quality permit approval processes, including the acquisition of certified emission reduction credits to fully offset its NOx emissions.

Non-Compensatory Mitigation

The FEIR presents draft Section 61 Findings for use by state permitting agencies that include a comprehensive summary of the potential environmental impacts associated with the construction and operation of the Northeast Gateway DPW as well as proposed mitigation measures to minimize these impacts where they cannot be avoided.  These mitigation measures will be incorporated into state agency permits issued for the project and include:

- Construction phase mitigation measures to minimize impacts as they apply to construction of the DPW, the Pipeline Lateral, and both the DPW and Pipeline Lateral;
  Operational mitigation measures focused on minimizing impacts on air quality, water quality, marine mammals, the fishing industry, marine traffic and other resources in Massachusetts Bay; and
- Mitigation measures related to the decommissioning of the DPW.

I expect that the state agencies will incorporate these mitigation measures into Section 61 Findings and permits, as appropriate. I note that in its comments, MassDEP states that it will require additional mitigation measures, including water quality testing for turbidity related impacts, and an unanticipated discoveries plan, consistent with historical preservation agencies' guidelines, if any cultural resources are discovered.

Conclusion

The proposed project requires no further review under MEPA and may proceed to permitting.  The permitting agencies shall forward a copy of their final Section 61 Findings to the MEPA Office for completion of the project file.

EOEA #13473/13474          FEIR Certificate                    12/01/06

__December 1, 2006__
Date                             Robert W. Golledge, Jr

Comments received:

| | |
|---|---|
| 11/21/06 | U.S. Rep. Michael Capuano |
| 11/24/06 | Honorable John Bell, City of Gloucester |
| 11/09/06 | Mass. Board of Underwater Archaeological Resources |
| 11/21/06 | Mass. Department of Conservation and Recreation |
| 11/22/06 | Mass. Division of Energy Resources |
| 11/22/06 | Mass. Office of Coastal Zone Management |
| 11/22/06 | U.S. Environmental Protection Agency |
| 11/24/06 | Mass. Energy Facilities Siting Board |
| 11/27/06 | Mass. Department of Environmental Protection |
| 11/28/06 | U.S. National Oceanographic and Atmospheric Administration |
| 11/30/06 | Mass. Division of Marine Fisheries |
| 11/21/06 | Gulf of Maine Ocean Observing System |
| 11/21/06 | Massachusetts Marine Trades Association |
| 11/21/06 | Northeast Seafood Coalition |
| 11/21/06 | Northeast Gas Association |
| 11/22/06 | Associated Industries of Massachusetts |
| 11/22/06 | Metropolitan Area Planning Council |
| 11/22/06 | City of Boston Environmental and Energy Services |
| 11/22/06 | New England Energy Alliance |
| 11/24/06 | Conservation Law Foundation |
| 11/24/06 | Gloucester Fishermen Association |
| 11/24/06 | The Whale Center of New England |
| 11/27/06 | Island Alliance |
| 11/27/06 | Cetacean Society International |
| 11/22/06 | Excelerate Energy and Algonquin Gas Transmission |
| 11/22/06 | Bruce F. Kiely, Attorney for Weaver's Cove Energy, LLC |
| 11/07/06 | Salvator Genovese, Ph.D., President, (Nahant SWIM, Inc.) |
| 11/14/06 | Susan Waller |
| 11/14/06 | Esta Nickas |
| 11/06/06 | MediaWire (unsigned) |
| 11/17/06 | Melissa Gallant |
| 11/17/06 | Kathi Duffy |
| 11/17/06 | Debra A. Troutman |
| 11/20/06 | Mehmet Oktay Kaya |
| 11/20/06 | Jen Urbach |
| 11/20/06 | Dolores A. Czarnecki |

22

EOEA #13473/13474              FEIR Certificate                    12/01/06

| | |
|---|---|
| 11/20/06 | Teresa M. Costello |
| 11/20/06 | Capt. Marc. Cunningham |
| 11/20/06 | Capt. Jeff Eagan |
| 11/16/06 | Raquel Williams |
| 11/13/06 | Helen C. Kennedy |
| 11/15/06 | Carolyn A. Kirk |
| 11/21/06 | Peg Hinrichs M.,Ed. |
| 11/22/06 | Alessandro and Kathy Cagiati |
| 11/17/06 | Mitch Williams |
| 11/21/06 | Janet L. Pippin |
| 11/17/06 | Robert M. Heineman and Susan B. Field |
| 11/17/06 | Fredric C. Heys |
| 11/17/06 | Andrea G. Heys |
| Undated | Walt Disney Elementary School Students (24 petition and letters) |
| 11/20/06 | Rob and Beth Mulhern |
| 11/20/06 | Lauren Fritzsche |
| 11/20/06 | Janice M. Paik |
| 11/22/06 | Capt. James Douglass (Cape Ann Whale Watch) |
| 11/22/06 | Karen Falat |
| 11/22/06 | Nancy Hodgson Smith |
| 11/21/06 | Philip Bogden, CEO (GoMOOS) |
| 11/22/06 | Polly Bradley, (Nahant SWIM, Inc. (3 letters) |
| 11/21/06 | Jasmine Buzinski |
| 11/27/06 | Pat Price |
| 11/27/06 | Meadowlark Elementary School |
| 11/27/06 | Emily Kowalczyk |
| 11/27/06 | Helen McNulty |
| 11/27/06 | Wendy Riggs-Smith |
| 11/27/06 | Ann Hennett |
| 11/27/06 | Miho Nakanishi |
| 11/27/06 | Gerard Foley |
| 11/27/06 | Barbara Mitchell |
| 11/27/06 | Jocelyn Steel |
| 11/27/06 | Carl Sjoquist |
| 11/28/06 | Ruth Leader |
| 11/30/06 | Animal Welfare Institute |

RWG/DBB/rab