UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____
)
RICHARD MAX STRAHAN,            )
                                )
    Plaintiff                   )
                                )       Civil Action
v.                              )       No. 05-10140-NMG
                                )
STEVEN PRITCHARD, in his        )
official capacity as Secretary of the )
Massachusetts Executive Office  )
of Environmental Affairs,       )
                                )
DAVID M. PETERS, in his official )
capacity as Commissioner of the )
Massachusetts Department of     )
Fish and Game,                  )
                                )
and                             )
                                )
PAUL DIODATI, in his official capacity )
as Director of the Massachusetts )
Division of Marine Fisheries,   )
                                )
    Defendants                  )
_____)

**DEFENDANTS' SUPPLEMENTAL MEMORANDUM OF LAW
IN OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

The Secretary of the Massachusetts Executive Office of Environmental Affairs, the Commissioner of the Massachusetts Department of Fish and Game, and the Director of the Massachusetts Division of Marine Fisheries (together, the "State Defendants"), at the invitation of the Court (Gorton, J.) upon the close of the evidentiary hearing on November 28, 2006, hereby file this supplemental memorandum of law in opposition to the motion of the plaintiff, Richard Max Strahan ("Strahan"), for entry of a preliminary injunction in this matter.

**Procedural Background**

Strahan commenced this litigation in early 2005, seeking a declaration that the State Defendants had committed, and were likely to continue committing, ongoing violations of the

Endangered Species Act, 16 U.S.C. § 1538, et seq. (the "Act"), insofar as they issued permits to Massachusetts fishermen to deploy fixed fishing gear in state waters that was likely to cause the entanglement of endangered large whales (Northern right whales, humpback whales and fin whales). In December, 2005, Strahan filed a motion for a preliminary injunction, enjoining the State Defendants from issuing or renewing permits for such gear. Consistent with the Court's scheduling order, the State Defendants filed their timely opposition to this motion on June 30, 2006.

Over a three-day period commencing on November 17, 2006, and concluding on November 28, 2006, the Court conducted an evidentiary hearing with respect to the motion, at which the Court heard live testimony from seven witnesses, accepted over 20 exhibits into evidenced, and heard closing arguments from both parties. At the close of the hearing, the Court invited the parties to submit a supplemental memorandum, of no more than ten pages' length, in support of their respective positions.

## ARGUMENT

**STRAHAN'S REQUEST FOR A PRELIMINARY**
 **INJUNCTION SHOULD BE DENIED.**

"In considering a request for a preliminary injunction, a trial court must weigh several factors: (1) the likelihood of success on the merits, (2) the potential for irreparable harm to the movant, (3) the balance of the movant's hardship if relief is denied versus the nonmovant's hardship if relief is granted, and (4) the effect of the decision on the public interest." Phillip Morris, Inc. v. Harshbarger, 159 F.3d 670, 673 (1st Cir. 1998); accord Water Keeper Alliance v. United States Department of Defense, 271 F.3d 21, 30 (1st Cir. 2001). Among these four factors, "[t]he 'sine qua non' of a preliminary injunction analysis is whether the plaintiff is likely to succeed on the merits of its claim." Securities & Exchange Commission v. Fife, 311 F.3d 1, 8 (1st Cir. 2002). Because Strahan cannot meet his burden with respect to any of these factors, his

request for a preliminary injunction should be denied.

   A. **<u>Strahan is Not Likely to Prevail on the Merits of his Claim.</u>**

  As Judge Woodlock recognized in the 1996 predecessor to this suit, in order to prove a violation of the Act, a plaintiff must establish both an historical record of unlawful "takes" within the meaning of the Act, and a likelihood that such takes will continue in the future, thereby necessitating injunctive relief to prevent the ongoing violation of federal law. <u>Strahan v. Coxe</u>, 939 F.Supp. 963, 989 (D. Mass. 1996), <u>quoting</u> <u>National Wildlife Federation v. Burlington Norther Railroad, Inc.</u>, 23 F.3d 1508, 1511 (9th Cir. 1994). In the instant case, Strahan has offered scant evidence, at best, that actual takes of endangered whales have been effected in Massachusetts state waters by fixed gear licensed by the State Defendants in the period since the dismissal of the prior litigation. Moreover, he has failed utterly to meet his burden of proving that such takes are likely to occur in the future, notwithstanding the pervasive regulatory changes the Commonwealth of Massachusetts have implemented since 1996. Accordingly, he cannot satisfy the requirement that he demonstrate a likelihood that he will prevail on the merits of his claim.

  Regarding the historical incidence of whale entanglements in Massachusetts state waters (and, by implication, in state-licensed gear), Strahan introduced evidence of only one right whale entanglement in Massachusetts-licensed gear: that of right whale No. 2212, which arrived in Massachusetts waters in September, 1998, having previously been seen entangled in Canadian waters, then twice became entangled (and subsequently disentangled) while in Cape Cod Bay. Sharon Young, the expert in right whale behavior from the Humane Society of the United States, testified that No. 2212 was the only right whale entanglement in Massachusetts waters of which she was aware. The annual NMFS Atlantic Large Whale Entanglement Reports, entered into

evidence by Strahan, do not document any other such incidents.[1] Daniel McKiernan, deputy director of the Massachusetts Division of Marine Fisheries ("DMF"), testified that this was the only incident of right whale entangled in Massachusetts-licensed gear in state waters during the ten-plus years he had served as DMF's point-person on marine mammal issues.

It is worth noting that this lone right whale entanglement occurred in 1998, when the prior case before Judge Woodlock was still open, and therefore cannot serve as a factual predicate for a finding that the State Defendants have violated the Act in this case. Moreover, McKiernan testified that the lessons learned from the serial entanglements of right whale No. 2212 served as an impetus for the State Defendants to transform their seasonal ban on floating groundline in Cape Cod Bay (as first implemented on a January-through-May basis in response to the earlier litigation) into a year-round proscription.

Strahan also alleged in his Complaint that at least four humpback whales had been entangled in Massachusetts waters by Massachusetts-licensed gear, but three of these allegations are contradicted by the 2002 NMFS Atlantic Large Whale Report, which notes that the origin of gear taken off of entangled whales <u>found swimming</u> in Massachusetts waters was unknown. This comports with the testimony of both Young and disentanglement specialist Scott Landry that the locus of an entanglement often cannot be discerned from the line itself, and cannot be assumed to correlate with the location where an entangled whale is first spotted.

Indeed, Strahan only brought to the attention of the Court the incident of October 1-3, 2002, when a humpback whale was reported entangled in waters off of Plymouth. A dead humpback whale, free of line, washed up on the beaches of Provincetown the next day. Michael

---

[1] In his Complaint, Strahan alleges that a right whale became entangled in Massachusetts state waters off Gloucester in August, 2002. However, according to the 2002 NMFS Atlantic Large Whale Entanglement Report, case no. E20-02, neither the species of the whale in question nor the origin of the entangling line was ever identified.

Moore, the Woods Hole veterinarian who performed the necropsy on that whale, testified that investigators assumed, but could not state definitively, that this was the same animal previously seen off of Plymouth.  Moore testified that the whale died either from drowning (because it could not reach the surface) or of hyperthermia brought on by its struggles.  The 2002 NMFS Atlantic Large Whale Entanglement Report stated that polypropylene fibers (characteristic of floating, but not sinking, line) were found in the whale's wounds, supporting the inference that the entanglement was caused by floating groundline.  As Moore testified, this entanglement took place three months before the State Defendants' year-round ban on floating groundline in Cape Cod Bay went into effect.

There was no record evidence of a fin whale becoming entangled in Massachusetts waters or in Massachusetts-licensed gear.

The only evidence proffered of a Massachusetts-licensed gillnet causing an entanglement of an endangered whale was a photograph Strahan exhibited for the first time during his closing argument, which appeared to depict a humpback whale wrapped in the remnants of a gillnet. Though no testimony was offered to lay foundational support for the photograph, a nautical chart on the same slide appeared to indicate that the entangled whale was found in federal, not state, waters.  McKiernan testified that there had been no known endangered-whale entanglements in Massachusetts-licensed gillnets during the previous ten years.

In substance, the argument Strahan attempts to prove in this case reduces to a three-part syllogism:  1) That whale entanglements continue to happen in North Atlantic waters, notwithstanding the good-faith efforts of the scientific community to prevent them; 2) That lines taken off of entangled whales provide few if any clues to the identity or location of the gear responsible; and 3) That, therefore, Massachusetts-licensed gear can be presumed to be responsible for a proportional share of endangered whale entanglements, thereby placing the State Defendants in violation of the Act.  While the first two statements in the syllogism are

shown by the record to be correct, they do not support the conclusion Stahan asks the Court to draw from them.

As to the first statement, Young testified that, in its ten-year existence, the Atlantic Large Whale Take Reduction Team has not succeeded in reducing the takes of endangered whales to below their Potential Biological Reduction ("PBR") levels, and that, coastwide, gear entanglement still occur "with some regularity." As to the second statement, numerous witnesses, including Young, Landry, and Scott Kraus, the right whale expert from the New England Aquarium, testified that it is usually impossible for scientists to determine where a given whale first became entangled, as the ropes used in fixed-gear fisheries rarely have identifiable characteristics.

However, numerous witnesses allowed that Massachusetts, because of its unique regulations requiring sinking groundline, was decidedly less likely to be the source of line entangling whales. Kraus testified that the Massachusetts regulations "dramatically reduced the risk" of entanglements in state waters, made the likelihood of groundline entanglements "nearly nonexistent," and placed Massachusetts ahead of all other regulators, including the federal government, "by a couple of years." Moore characterized the regulation making sinking groundline mandatory statewide, effective January 1, 2007, "absolutely" a great step forward. Landry called sinking groundline "the most risk-averse line that we can come up with." Many witnesses noted that even the federally-administered Seasonal and Dynamic Area Management closures ("SAMs" and "DAMs," respectively), which otherwise close large segments of the ocean to fixed-gear fishing when whales are present in sufficient density, permit lobstermen using sinking groundline to leave their gear in the water, presumably because such gear is deemed by federal regulators to be whale-safe.

This key distinction between Massachusetts and all other fishery regulators along the Eastern Seaboard undermines the inference Strahan asks the Court to draw that, historically,

Massachusetts has been responsible for a proportional share of large-whale gear entanglements. Also, perhaps more significantly, it defeats his prognostic claim that Massachusetts is likely to entangle such whales <u>in the future</u>, thus necessitating injunctive relief.[2] Once the statewide restriction goes into effect on January 1, 2007, McKiernan testified, 80 to 95 percent of the ropes involved in the lobster-pot fishery will have been removed from the water column, thus rendering the likelihood of future groundline entanglements, in Kraus's words, "nearly nonexistent." McKiernan, in consultation with other members of the Take Reduction Team, is now turning to ways to reconfigure vertical buoy lines to make them whale-safe; while neither Massachusetts nor any other jurisdiction has yet fully solved this component of the problem, Kraus testified that "We're approaching technology that would be almost completely whale-safe." McKiernan testified that Massachusetts is committed to implementing such solutions in its state waters, once they have been identified.

      These developments, coupled with the other regulations adopted by Massachusetts in the wake of the earlier litigation,[3] render it increasingly unlikely that Massachusetts-licensed gear, set in Massachusetts state waters, will be the source of endangered-whale entanglements going forward. In short, the record in this case, both historically and prognostically, is vastly different from the one which Judge Woodlock confronted in 1996. Accordingly, Strahan has not demonstrated that he is likely to prevail on the merits of his claim under the Act.

---

[2] As Judge Woodlock recognized in the prior litigation, injunctive relief may only be granted under the Act upon a showing that defendants have actually harmed an endangered species "and are likely to continue doing so." 939 F.Supp. at 989, citing <u>American Bald Eagle v. Bhatti</u>, 9 F.3d 163, 166 (1st Cir. 1993).

[3] These include the banning of gillnets in the Cape Cod Critical Habitat area from January 1 through May 15 each year, and the "weak-link" components required on all Massachusetts gillnets.

  **B.**  **The Balance of the Potential Harms, and the Public
Interest, Both Favor Denial of the Requested Injunction.**

  In order to prevail on his request for injunctive relief, Strahan must also demonstrate that he would suffer more irreparable harm in the absence of an injunction than the State Defendants would suffer if it were granted, and that granting the requested injunction would advance the public interest. Because Strahan prosecutes this suit under the Act, in furtherance of the putative public interest (i.e., the conservation of endangered species), these analyses essentially collapse into a single inquiry: Will the public interest be advanced, or harmed, by entry of the requested injunction? The evidence in connection with this question weighs heavily in favor of denying the motion.

  It is first necessary to pinpoint the scope of the injunctive relief Strahan is seeking. In his Complaint and in his motion for a preliminary injunction, Strahan requests an order enjoining the State Defendants from issuing or renewing licenses to set fixed lobster gear and/or gillnets in state waters. In his closing argument, he suggested for the first time that the Court might consider a lesser form of injunctive relief, such as setting a future date by which the State Defendants must certify that all of its licensed gear was "whale-safe," with any failure to do so punishable by the Court's contempt sanctions. While this Court, sitting as a chancellor, remains free to tailor injunctive relief as it sees fit, Strahan's suggested eleventh-hour modification is illusory. No evidence has been adduced to suggest that there presently exists "whale-safe" gear that the State Defendants have failed to adopt or require. While Professor Clifford Goudey testified that he has developed a prototype of a buoy that would reduce the likelihood of fluke- and flipper entanglements in vertical lines, Scott Kraus testified that scientists on the Take Reduction Team, having conducted simulations with the Goudey buoy, were skeptical about its efficacy, and that the buoy (and, for that matter, the restricted-curvature rope of which Strahan spoke during closing arguments) was but one of numerous technological solutions the Take

Reduction Team was studying, none of which was ready for near-term deployment in the fishery. Thus, it would be impracticable for this Court to set a deadline for the State Defendants to adopt "whale-safe" gear that, at this time, does not exist.

Regarding the relief for which Strahan's motion actually asks -- enjoining the licensing of fixed gear in state waters -- its entry would have a ruinous impact upon the Massachusetts lobster fishery, and would inflict severe harm upon Massachusetts gillnetters who lack the capacity to convert promptly to other forms of fishing gear. As the New England Legal Foundation ("NELF") detailed in its amicus curiae brief, the closing of state waters to lobstermen (which would be the practical effect of enjoining the issuance of state-water licensing) would eliminate at least 60 percent of the state's annual lobster landings, collectively valued at over $53 million, and would have a derivative effect upon shoreside businesses dependent upon lobster landings. See NELF Brief at 11-12. Perhaps more critically, the evisceration of the in-shore lobster fleet would have profound social and cultural impacts upon Massachusetts fishing communities where the fleet is prevalent, including Gloucester, Rockport, Plymouth, Marshfield, and Sandwich. See NELF Brief at 12-19. Moreover, the closing of the Massachusetts fishery would foreseeably cause dually-licensed lobstermen to deploy all of their gear in federal waters, where endangered whales are more prevalent, more lenient regulations permit the use of floating groundline, and where the risks of entanglements are therefore heightened. Such a development would not only fail to serve, but would materially detract from, the public interest in protecting endangered whales.

By contrast, if the requested injunction is denied, fixed-gear fishermen in Massachusetts will remain subject to the most restrictive suite of regulatory measures on the Eastern Seaboard. As discussed above, the likelihood of whales becoming entangled in Massachusetts state waters

is increasingly remote, and declining over time, as a result of these measures. Accordingly, even given the presumption in favor of endangered-species conservation under the Act, see <u>Alabama v. U.S. Army Corps of Engineers</u>, 441 F.Supp.2d 1123, 1132 (N.D. Ala. 2006), the balance of harms and the public interest in this case marshal strongly against granting the requested injunction.

## CONCLUSION

For the reasons discussed above, this Court should <u>deny</u> Strahan's motion for a preliminary injunction.

    Respectfully submitted,

    STEPHEN R. PRITCHARD, in his official capacity as Massachusetts Secretary of Environmental Affairs;

    DAVID M. PETERS, in his official capacity as Massachusetts Commissioner of the Department of Fish and Game;

    and

    PAUL DIODATI, in his official capacity as Director of the Massachusetts Division of Marine Fisheries

    By their attorney,

    THOMAS F. REILLY
    ATTORNEY GENERAL

    /s/Daniel J. Hammond
    Bryan G. Killian
    BBO # 271640
    Daniel J. Hammond
    BBO # 559475
    Assistant Attorneys General
    Government Bureau
    One Ashburton Place, Room 2019
    Boston, Massachusetts 02108
    (617) 727-2200, ext. 2078

Date:  December 8, 2006