UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| RICHARD MAX STRAHAN | ) | |
| | ) | |
| *Plaintiff* | ) | |
| | ) | Civil Action No. |
| v. | ) | |
| | ) | 05 – 10140 - NMG |
| SECRETARY, MASSACHUSETTS EXECUTIVE | ) | |
| OFFICE OF ENVIRONMENTAL AFFAIRS[1], *et al.* | ) | |
| | ) | 18 December 2006 |
| *Defendants* | ) | |

_____

PLAINTIFF'S MEMORANDUM IN SUPPORT OF HIS MOTION FOR A PRELIMINARY
INJUNCTION AND IN RESPONSE TO DEFENDANTS AND AMICUS' OPPOSITIONS

_____

**Introduction**

It is not necessary to kill a whale in order to catch a fish. Any fool knows this fact.

Current and emergent technologies exist that can turn Lobster Pot Fishing into a perfectly Whale

Safe fishery with no possibility of hurting any endangered wildlife — except Lobsters.[2]

However, the Defendants ruthlessly refuse to change the ancient fishery practices that they

license/ Since 1996 they continue to kill, injure and other wise violate the Section 9 take

prohibitions of the Endangered Species Act from their licensing and regulating the deployment

of fixed fishing gear ("MDMF Fixed Gear") in U. S. coastal water that routinely entangle

endangered species of Federally Protected Whales. They have NOT funded any meaningful

_____

[1] The original named defendant Ellen Roy-Herzfelder has subsequently left her employment as
the Secretary of the Massachusetts Executive Office of Environmental Affairs and was replaced
subsequently by first one and then another person. For consistency, Strahan has adopted the
current caption for his civil action.
[2] Gill Nets are inherently dangerous and cannot be made Whale Safe with any possible present or
future technology. It makes no sense of rthe Court not to enjoin the Defendants licensing of Gill
Nets, since their only 125 individuals licensed to use Gill Nets by the Defendants and many of
these individuals posses Lobster Pot fishery permits and other kind of fisheries permits.

effort to engineer Whale Safe fishing gear. They falsely urge the Court to believe the situation is
"all or nothing": that the Court only has the two choices of either destroying the Massachusetts'
Lobster fishery or letting it continue to kill endangered whales. The Court must reject this
desperately offered "lose-lose" scenario. The Court can require that the Defendants must make
their licensed commercial fisheries Whale Safe by a specified date and — using its full equitable
powers — coerce them into doing so successfully.[3]

This is what the Court in 1996 should have done but did not. This is why the Defendants
ten years after being found guilty in 1996 of unlawfully entangling whales in its licensed fishing
gear still fails to license Whale Safe fishing gear and still refuses to require as a government
agency that it only licenses fishing gear in compliance with the ESA's prohibitions. With the
requested order serving as the "necessary mother" to invention, the necessary technological
innovations will be inspired and result in commercially available Whale Safe fishing gear to
allow the Defendants to be in compliance with the ESA's prohibitions and the Court's order for
its licensed Fixed Gear fisheries to become Whale Safe. There is no question that the predictable
result of the Court refusing the Plaintiff's request for a preliminary injunction will be not merely
more years of Federally Protected Whales being entangled in the Defendants' licensed Fixed
Gear, but a precedent will be set that will encourage a flaunting of the ESA's prohibitions by
state and federal commercial fisheries. The Court granting the Plaintiff's requested order instead
no more endangered whales or sea turtles being caught in the Defendants fishing gear. The ESA
requires that the Court chose this result.

---

[3] The Defendants have adequate funding to fund meaningful engineering efforts for Whale Safe
Lobster Pot gear. Recently the Defendant Secretary, EOEA entered into agreement with
Excelerate LNG LLC and Northeast Energy Gateway LLC that had these two companies agree
to give the Defendants $23.5 million dollars in environmental mitigation costs for their
establishing deepwater port off Gloucester MA to unload Liquefied Natural Gas off their ships.

In 2006 and under no court ordered mandate, the Defendants are still licensing the nearly

same identical Fixed Gear[4] that they did in 1996, when this Court found them guilty of violating

the prohibitions of the Endangered Species Act for licensing Fixed Gear that entangles Federally

Protected Whales.[5]  In 2006 the Defendants' licensed fishing gear continues to entangle as many

if not more Federally Protected Whales and Sea Turtles then it did in 1996. In 2006 as in 1996,

the Defendants simply refuse to implement any internal policy that requires their fisheries

activities to comply with the ESA's prohibitions against taking endangered species. The

Defendants make no pretense to doing anything at all to stop their licensed Fixed Gear

entangling Humpback Whales, Fin Whales and endangered Sea Turtles in their fishing gear —

they only maintain that they are making some efforts to prevent Northern Right Whales from

being entangled in MDMF Fixed Gear. This claim is owed to the simple fact the Court in 1996

restricted its attention only to only Northern Right Whales. This is *prima facia* evidence for

evasion. The Defendants response to the 1996 Order was not compliance with the ESA's

prohibitions but deliberate evasion of being compelled to be in such compliance.

The Defendants themselves do not seriously challenge the reality that the Fixed Gear that

they license in 2006 still entangles Federally Protected Whales in its vertical buoy lines and in

Gill Nets.[6]  Federally Protected Sea Turtles also get entangled in the Defendants fishing gear.[7]

---

[4] "Fixed Gear" is Lobster Pot gear, Gill Nets, Crab Pot gear, and other types of fishing gear that
usually has gear placed on the Ocean floor attached to lines that verticallu rise to the surface
where they are attached to buoys.
[5] See *Strahan v. Coxe*, 939 F. Supp. 963, (D. Mass 1996), aff'd in part and vacated in part, 127 F.
3d 155 (1st Cir. 1997) cert. denied 525 U. S. 978 (1998).
[6] In fact, their representative testified that these entanglements were occurring at the evidentiary
hearing on 27 November 2006.
[7] Strahan in his sixty day notice of intent to the Defendants, included a claim of their violationb
of ESA take prohibitions by their fishing gear entangling endangered Leatherback Sea Turtles
and other listed species of sea turtles. The Court rejected Strahan's attempts to add these claims
to the instant action. It is indicative of the Defendants intent not to comply with the ESA

The Defendants only offer a concession to make their Fixed Gear less likely to entangle Northern

Right Whales is their promised requirement that all the 'ground lines" between Lobster pots to

be made of line that sinks in seawater and will tend to lie on the seafloor. This modest

concession does nothing about the whales getting entangled in vertical buoy lines and Gill Nets,

which is known to be the most significant source of entanglement of Federally Protected

Whales.[8] The Defendants witness admitted that there was no scientific report, no document

produced by NOAA nor any other published study that raised a concern that ground line was

significant source of initial entanglement for any Federally Protected Whale. The Defendants

cannot offer "sinking ground line" as any evidence that they have done anything meaningful to

lower the number of Federally Protected Whales that annually become entangled in MDMF

Fixed Gear.

   In the 22 August 2006 Federal Register National Oceanographic and Atmospheric

Agency ("NOAA") published its annual "List of Fisheries for 2006"("2006 LOF") that it found

to cause serious injury and mortality to marine mammals from entanglements. 71 FR 48802, See

Attachment #1, The 2006 LOF listed MDMF's Lobster Pot fishery and any fishery using Sink

Gill Nets in the Northeast as a Category I fishery under Section 118 of the MMPA that routinely

kills and seriously injures through entanglement Federally Protected Whales. As a Category I

---

prohibitions unless ordered by the Court that the Defendants make no attempt whatsoever to
mitigate the ongoing entanglement of endangered Sea Turtles by fishing gear they license.
Without a lawsuit, the Defendants ignore the environmental impact of their fisheries activities.
[8] The reality is that ground lines have never been seen as a serious source of entanglement for
whales or sea turtles. There is not one written study that claims it is or describes such possible
entanglements as a serious problem for marine wildlife. The only reason for explaining why the
Defendants' claim sinking ground lines as an entanglement risk is to encourage the Court to
forget about the well documented problem that the Defendants have with Gill Nets and vertical
lines entangling whales. Requiring sinking ground lines has no impact on commercial fishing so
the Defendants do this as a smoke screen  to pretend to the Court that they truly seek to eliminate
entanglements of at least Right Whales in their fishing gear (they completely ignore Humpback
Whales, Fin Whales and Minke Whales).

fishery NOAA found that MDMF's Fixed Gear fisheries caused an "Annual mortality and
serious injury [by entanglement] of a stock [populations of Federally Protected Whales] in a
given fishery is greater than or equal to 50 percent of the PBR level." See Id at 48803. PBR
stands for "Possible Biological Removal" and is defined pursuant to the MMPA and basically
represents the tolerable loss of whales annually in a species that will not cause a permanent
decline in the size of the remaining population of any species of Federally Protected Whale.  It is
not possible to consider the MDMF Fixed gear fisheries as not entangling federally protected
Whales when NOAA itself has formally ruled that in 2006 the MDMF's licensed Fixed Gear
continues to kill and seriously injure Federally Protected Whales from entanglement.

Strahan alleges that the following are incidents of Federally Protected Whales being
entangled in MDMF Fixed Gear —

1.       On 23 August 2006 a Humpback Whale was sighted off of Cape Cod Bay
entangled in an inshore vertical buoy line and a single lobster pot. The Court's quashing
subpoenas and otherwise preventing discovery has made it impossible for the Plaintiff to obtain
the name of the fisherman off the license tags that were affixed to the Lobster pot that was
entangled on this whale.

2.       On 2 August 2006, a Humpback Whale was discovered in Massachusetts coastal
waters off Plymouth MA entangled in vertical buoy line from a Lobster Pot gear owned by a
Massachusetts fisherman under a MDMF Fixed Gear license. Agents of NOAA pulled the gear
off the whale on 2 August 2006. The gear was found with a Massachusetts' fishing a MDMF
permit number on it. Eventually a Massachusetts licensed commercial fisherman was identified
as being the owner of the gear. This gear is essentially the same Lobster Pot gear licensed by the
Defendants in 1996. See Attachment #2.

3.      On 9 July 2006 a Humpback Whale was sighted off the Massachusetts coast in Massachusetts Bay entangled in a Gill Net. Agents of NOAA removed the Gill Net without any tag found identifying the owner.  MDMF does not require that Gill Nets licensed by it have identifying tags on its ropes and mesh net. This gear must be seen as seen as deployed under MDMF license because all Gill Nets off the Massachusetts coast even in federal waters are licensed by the MDMF.

4.      On 23 April 2004 a Minke Whale was sighted entangled in Fixed Gear and anchored to the sea floor just in the out part of Gloucester harbor. Agents of NOAA removed the Fixed Gear. There is no question that the Fixed Gear was deployed by an individual licensed by the MDMF. While this was not an entanglement of an endangered Federally Protected Whale, the fact that the Fixed Gear entangled the Minke Whale is undisputable proof that is poses a significant risk to entangle any endangered Federally Protected Whale also.[9]

5.      On 11 July 2004 a Basking Shark — that feeds on plankton with its mouth open similar to Northern Right Whale — was sighted entangled in vertical buoy line from MDMF Lobster Pot gear in the middle of Provincetown Harbor. While this was not an entanglement of an endangered Federally Protected Whale, the fact that the Fixed Gear entangled the Basking Shark is undisputable proof that is poses a significant risk to entangle any endangered Federally Protected Whale also.[10] It should be noted that the Basking Shark was caught in vertical buoy line and not ground line, showing that it is buoy line and not ground line that entangles Federally Protected Whales. See Attachment #3 Report Center for Coastal Studies.

---

[9] The Defendants' witness McKiernan testified at the 27 November 2006 hearing to this under oath. He called the entanglement of Minke Whales as a "canary in the coal mine" warning that such gear is expected to entangle endangered Federally protected Whales also.

[10] The Defendants' witness McKiernan testified at the 27 November 2006 hearing to this under oath. He called the entanglement of Basking Sharks as a "canary in the coal mine" warning that such gear is expected to entangle endangered Federally protected Whales also.

Northern Right Whales are year round residents of Massachusetts coastal waters. The Defendants falsely allege that Right Whales are only winter residents of Cape Cod Bay and leave by the beginning of May. As this is written, a herd of Northern Right Whales is currently residing in the Gulf of Maine. On 4 December 2006 NOAA further extended restraints on Fixed Gear in the Gulf of Maine to protect the currently residing population of Northern Right Whales. See 71 FR 70319. See Attachment #4, 17 December 2006 NOAA Letter to Fixed Gear Fishermen.

In summary, The Court should rule that the Defendants in 2006 — at least since 1996 — are in continuing violation of the Section 9 take prohibitions of the ESA and have failed to meet their burden of proof that in 2006 they are otherwise. In 2006 Federally Protected Whales become entangled in MDMF Fixed Gear as much or more than they did in 1996. Many more Federally Protected Whales — including Northern Right Whales — will become entangled in MDMF Fixed Gear in the ensuing months unless the Court immediately acts to coerce the Defendants to make MDMF Fixed Gear complaint with the ESA's Section 9 prohibitions.

**Requested Procedure in Ruling on His Preliminary Injunction Motion**

As requested during oral arguments on 28 November 2006, the Plaintiff requests that the Court should bifurcate the proceedings into a liability phase and a separate following remedy phase. The scope of the hearing was necessarily focused on the issue of the liability of the Defendants for the continuing entanglement of Federally Protected Whales from 1996 through 2006 and beyond. There was little opportunity to present to the Court evidence of existing and emergent technologies that would allow Lobster Pot Fishing to made completely Whale Safe. There was no other real discussion on how the Defendants — if the Court found them still liable

for the entanglement of Federally Protected Whales — could be coerced into adopting

Whale Safe Fixed Gear and other fishing practices.

With the discovery restrictions imposed on Strahan by the Court and its allowing him

only to present six witnesses at its prior hearing, Strahan has been unable to present to the Court

all the possible existing and emergent technologies that will allow the Defendants to go Whale

Safe in the near future. For the same reasons, he was unable to present the issue to the Court on

how the various forms of available equitable remedies could be used to coerce the Defendants to

go Whale Safe in the immediate future.

The Court should hold another hearing say within thirty days from its issuing its initial

judgment of liability against the Defendants in order to provide the time for the Defendants to

discuss settlement options and to prepare comments on how the Court should go about coercing

the Defendants into complying with the ESA's Section 9 prohibitions in the course of their

licensing and regulating MDMF Fixed Gear.  At the requested hearing the Court could take

further sworn testimony on the subject of what kind of remedy could successfully coerce the

Defendants into only licensing Whale Safe fishing gear and the parties would be allowed to

submit more evidence and file written memos to the Court on the issue of appropriate remedy.

Strahan also request that the Court appoint a Master to assist the Court in determining

any proposals subsequently made by the Defendants for MDMF Fixed gear to be Whale Safe are

in fact Whale Safe.

### Retraction of Any Perceived Request for Consolidation of Decision into Final Judgment

Strahan notifies the Court that he has retracted any prior request that the Court would

construe to consolidate the decision of on his motion for a preliminary injunction into a final

judgment on the merits pursuant to Rule 65 of the fed. R. Civ. Proc.  Any such prior apparent

request was based on an agreement with the Defendants that they have long since violated and

openly abandoned. Strahan reminds the Court as of this date that it has failed to provide the

required written notice to the parties that it intends to seriously consider such a consolidation.

Having failed to make said written notification to the parties, Rule 65 prevents the Court at

present from making such a said ruling and issuing any final judgment at this stage of the

proceedings. Because the Court has not afforded Strahan any opportunity for meaningful

discovery, Strahan has been fatally impaired in his ability to collect the necessary evidentiary

material from the Defendants and involved non-parties for him to be able to fully argue case for

his requested relief to the Court.

Strahan is also asking for the Court to order the Defendants to pay for proactive recovery

efforts for Federally Protected Whales. He is asking this to compensate for the enhanced

prospects of extinction that the Defendants have created for these said endangered species of

whales as a result of their many decades of killing and injuring members of species of Federally

Protected Whales pursuant to their causing their entanglement I MDMF Fixed Gear. This issue

has not been presented to the Court at all and waits its being offered to the Court at the trial on

the merits.

## Prior Litigation

In 1996 the defendants were found in violation of the Section 9 prohibitions of the

Endangered Species Act[11] in a prior case brought by Plaintiff Strahan over the same issue of its

licensing and regulating MDMF Fixed Gear fisheries.  See Strahan v. Coxe, 939 F. Supp. 963,

(D. Mass 1996), aff'd in part and vacated in part, 127 F. 3d 155 (1st Cir. 1997) cert. denied 525

U. S. 978 (1998). The First Circuit in its decision in Strahan at 171 ruled that the Court was

---

[11] Section 9 of the ESA found that outlaw the killing and injuring of endangered whales
occurring incidental to otherwise legal activity.

required to ensure that "any violation would end." In 2006 they are still at it and now it is time

for this Court to finally put the long history of the Defendants' unlawful killing and injuring of

endangered marine wildlife to an end.

   This litigation terminated without any permanent injunctive relief and without any further

ruling by the court on any aspect of the Defendants' licensing of Fixed Gear. Strahan dismissed

his claims after the court ordered that the proceedings stayed for a year. This came after Strahan

was refused any opportunity by the court for discover and refused any real opportunity to

prosecute his claims. The Defendants then entered into a settlement agreement with a Trojan

Horse plaintiff-intervener (i. e. it was really a friend of the Defendants and commercial

fisherman) who then simply dismissed its phony claims against the Defendants. The court in no

way approved or even commented on any activity of the Defendants beyond its published

opinion. For these reasons, the MDMF Fixed Gear is the same in 2006 as it was in 1996 in

regards to its capacity to entangle Federally Protected Whales.

### The Lack of Meaningful Discovery Has Greatly Injured
### Strahan's Ability to Prosecute his Claims

   This is alas quite true.

### The Entanglement of Whales by Fixed Gear Licensed by Defendants

   As evidenced above, there is absolutely no question — its not even seriously opposed by

the Defendants — that Federally Protected Whales continue to be routinely entangled in MDMF

Fixed Gear. The Defendants have admitted this in response to Rule 36 requests for admissions

made to them.  MDMF Fixed Gear and other similar state and federally licensed Fixed Gear.[12]

Entanglements of Federally Protected Whales on the Atlantic Coast are proceeding at historical

levels or the rate of them is actually increasing despite the adoption of Take Reduction Plans by

---

[12] The Defendants actually claim that there is "no such thing as whale safe gear" in their second
Opposition  oppose Strahan's request for an order

state and federal fishing agencies. See Attachments #5, #6, and #7.  NOAA's "2004 Report on

Whale Takings," "2003 Report on Whale Takings," and 1999-2001 Report on Whale Takings."

Entanglements in the Gulf of Maine are proceeding at historical levels or the rate of them is

increasing. See Attachment #8  "North Atlantic Right Whales in Crisis." Scott Kraus, *et al*.

*Science* Vol. 39 pp. 561-562 22 July 2005.

> "The risk of fishing gear entanglement has been addressed by selective area
> closures and gear modifications. These closures do not adequately encompass the
> seasonal movements of right whales, and gear modifications implemented thus far
> have not reduced entanglement rates." *Id*. at 562.

> "[T]he amount of fishing gear in the water column should be eliminated or
> minimized. There are many steps that could be taken to do this, including (i)
> mandating changes in the pot-fishing industry (lobster, crab, hagfish, etc.) that
> will reduce gear in the water … [and] developing and implementing fishing
> methods that do not use vertical buoy lines attached to surface buoys … ." *Id*. at
> 562.

The MDMF Fishermen deploy MDMF Fix Gear in federal waters many miles off the

Massachusetts coast and not just in Massachusetts state waters. Additionally, MDMF Fishermen

do not deploy their MDMF Fixed Gear in federal waters off the Maine coast and Maine

fishermen don not deploy their Fixed Gear in federal waters off the Massachusetts coast. Both of

these states also license who can "land" their catch at a port in their state, and not just the

deployment of Fixed Gear in their state coastal waters. Massachusetts state law only allows

MDMF Fisherman to land their catches in Massachusetts, including catches from federal waters

off the Massachusetts coast. Maine fishermen cannot obtain a license from the MDMF to land

their catches from federal waters at a Massachusetts port.

As a result of these said above practices. It must be seen that any Federally Protected

Whale sighted entangled in fishing gear off the coast of Massachusetts — even in federal waters

— is likely to caught in MDMF Fixed Gear.  The MDMF Fishermen that fish in federal waters

off Massachusetts use the same MDMF Fixed Gear in federal waters that they do in

Massachusetts state waters. See Young Testimony.

Among the incidents of entanglements in these above cited NOAA reports —

1.      On 22 August 2004 Fin Whale was sighted entangled in Fixed Gear in Massachusetts Bay off Race Point, Provincetown MA.  See NOAA's "2004 Report on Whale Takings" at E17-04.

2.      On 30 August 2004 Humpback Whale was sighted entangled in vertical buoy lines of MDMF Fixed Gear in Massachusetts state waters off of Wellfleet MA The buoy line was anchored to the seafloor and was restraining the whale in place. The buoy line consisted of sink buoy line and weak links that failed to break and descended to a single Lobster Pot. See NOAA's "2004 Report on Whale Taking" at E19-04.

3.      On 16 July 2004 a Humpback Whale was sighted entangled in Fixed Gear in Massachusetts state waters off Martha's Vineyard. See NOAA's "2004 Report on Whale Taking" at E14-04.

4.      On 23 June 2003, A Humpback Whale was sighted entangled in MDMF Gill Net in Massachusetts' coastal waters outside of Gloucester Harbor. NOAA agents removed the gear and the name of the MDMF Fisherman was obtained, he was interviewed and he admitted to having placed the Gill Net that was removed from the whale. See NOAA's "2003 Report on Whale Takings at E10-03.

5.      1 July 2003 a Humpback Whale was sighted entangled in MDMF fishing gear in Massachusetts state waters off of Chatham, MA. The gear was partially removed by NOAA agents. See NOAA's 2003 Report on Whale Takings at E12-03

6.      9 July 2003 a Humpback Whale was sighted entangled in MDMF Lobster Pot gear in Massachusetts state waters off of Chatham, MA. The gear was partially removed by NOAA agents. See NOAA's 2003 Report on Whale Takings at E14-03

7.      11 July 2003 a Humpback Whale was sighted entangled in MDMF Fixed Gear in Massachusetts state waters off of Race Point, Provincetown MA. On subsequent sightings the whale was seen without the said gear. See NOAA's 2003 Report on Whale Takings at E17-03

8.      14 July 2003 a Humpback Whale was sighted entangled in MDMF Lobster Pot gear in Massachusetts' waters off of Race Point, MA. NOAA agents removed the gear. The owner was identified as a MDMF Fisherman and he was interviewed by NOAA agents. See NOAA's 2003 Report on Whale Takings E19-03

13

9.    19 August 2003 a Humpback Whale was sighted entangled in MDMF Gill Net in Massachusetts' waters off of Chatham, MA. The gear was partially removed by NOAA agents and identified to be Gill Net. No identification of the owner was possible owing to the lack of any tag on the gear identifying the owner. The event was photographed from a blimp with observers from WHOI and Stellwagen's Bank National Marine Sanctuary. See NOAA's 2003 Report on Whale Takings at E28-03

10.    26 August 2003 a Fin Whale was sighted entangled in MDMF Fixed Gear in Massachusetts' coastal waters off of Chatham, MA. See NOAA's 2003 Report on Whale Takings at E14-03

11.    6 June 1999 an unidentified Federally Protected Whale was sighted entangled in MDMF Fixed Gear in Massachusetts state waters off of Race Point, Provincetown MA. See NOAA's 1999-2001 Report on Whale Takings at E8-99

A single entanglement of a member of ANY whale species demonstrates that Fixed Gear in that same area generically entangles ALL species of Federally Protected Whales present in that same area. As long as these whales and Fixed Gear are occupying the same habitat there will be routine entanglement of whales in this Fixed Gear over a period of time.  See McKiernan Testimony.

Unfortunately, the vast majority of entanglements of Federally Protected Whales go completely unreported. Reported sightings of whales entangled in fishing gear are literally just the "tip of the ice berg" of the numbers of whales annually entangled by fishing gear off the Atlantic coastline.  As the Court explained in *Strahan v. Coxe* —

> "It is also quite likely that this number is higher because of the infrequency of observations, because the whale is not anchored to one location by the fishing gear, and because identifying parts of the gear do not remain attached to the whale. Id. ¶¶ 23, 24, 36. The Defendants do not dispute any of this evidence. Based upon the scientific affidavits, therefore, there is sufficient evidence to support Strahan's factual allegations that endangered whales have been taken through entanglement in fishing gear permitted by the Defendants in Massachusetts waters. "*Id* at 985.

Entanglements in Fixed gear leave scarring on the soft skin of Federally Protected Whales. See Moore Testimony and Moore's Paper #1 and Paper #2.  Analysis has been done on the degree of entanglement on whales based on the presence of scarring on these whales arising from Fixed Gear entanglements. These reports show that over ninety per cent of Humpback Whales and Right Whales have been entangled at least once in their lives. These reports also

maintain that about ten per cent of Right Whale and Humpback Whales are entangled each year in fishing gear.  <u>See</u> Report on Right Whale Scarring and Report on Humpback Whale Scarring.

The NOAA annual stock assessment reports ("SAR") for Federally Protected Whales assess the size of the Gulf of Maine population of Humpback Whales as 820 and the Northern Right Whale population as 427, These said SAR also estimate from reported sightings that the annual rate of Humpback Whales seriously injured and killed from Fixed Gear entanglement is 3.8, for Right Whales it is 2.6 and for Fin Whales it is 12.4.  <u>See</u> Attachments #9,  #10 and #11, 2005 NOAA SAR for Humpback Whale, 2005 NOAA SAR for Right Whale and 2005 NOAA SAR for Fin Whale.

An analysis of Fixed Gear found on Humpback Whales and Northern Right Whales. The published report made the claims that vertical buoy lines and Gill Nets were overwhelmingly dominant gear type to entangle these Federally Protected Whales. Vertical buoy lines using sinking line — as required by MDMF regulations — was discovered to entangle whales more readily than vertical buoy line using floating line.  <u>See</u> Attachment #12, Report on Fish Gear Found on Whales.

It is clear that the removal of ground lines entirely from Massachusetts coastal waters would have no significant impact on the rate of rate entanglement of Federally Protected Whales in MDMF Fixed Gear.  No reports exist that makes any claim that ground lines are a significant source of direct and "first entanglement" of Federally Protected Whales in MDMF Fixed Gear.[13] See Testimony of Kraus, Moore, and McKiernan. Moore testified that it is NOT likely that Right Whales feed near the seafloor and are not likely entangled directly by ground lines in Massachusetts coastal waters. <u>See</u> Moore Testimony.

The Defendants regulations actually require that fishermen use Fixed Gear that enhances the possibility of entangling whales. A licensed fisherman is prohibited from using Whale Safe gear like the Goudey Buoy. They also must use sink lines on in their vertical buoy lines that are demonstrated by field studies are more likely to entangle whales than if they were used in floating line.

### Requested Findings of Fact

---

[13] Ground lines found on entangled whales are the result of a whale first being first entangled in a vertical buoy line and then dragging lobster pots and their connecting ground line away. The lobster pots and ground lines become involved in the entanglement as a secondary event resulting from the first and original entanglement caused by the vertical buoy lines.

1.    The Defendants have not developed a Whale Safe requirement towards licensing their fishing gear and have not internally accepted the need to comply with the ESA.

2.    Vertical buoy lines of the Defendants Fixed Gear routinely entangle Federally Protected Whales.

3.    The Defendants' licensed Gill Nets routinely entangle Federally Protected Whales and there is no practical way to make them Whale Safe.

4.    There is no scientific evidence that ground lines are a significant cause of initial entanglement Federally Protected Whales or that these whales spend much time near the sea floor to encounter this gear.

5.    Emergent technologies exist to make Lobster gear Whale Safe.

6.    The Defendants have practiced evasion and not conservation, including forcing the MDFW to abandon its jurisdiction endangered species in the Ocean.

7.    Any gear that entangles one species of whale will entangle all species of whales for the same reasons.

### Requested Findings of Law

1.    Since 1996 and continuing to the present the MDMF Fixed Gear poses a continuing and significant threat to entangle Federally Protected Whales in U. S. coastal waters — state and federal — in violation of the Section 9 take prohibitions of the ESA.

2.    Since at least 1996 the Defendants are in continuing violation of the section 9 take prohibitions of the ESA and the burden of proof has shifted to them to conclusive show that they will not entangle whales in the future.

3.    The termination of *Strahan v. Coxe* in 2001 does not provide any basis through the principles of *res judicata and collateral estoppel* to impede Strahan from raising claims the Defendants in 2006 any historical incidents of violations application of in proving a continuing and repeating past violations.   Strahan yielded no decision by the Court that in any way sanctioned current or past alleged *ultra vires* conduct of the Defendant. The continuing historical *ultra vires* conduct of the Defendants is not subject to *res judicata* doctrine.

### The Defendants are Liable for All Unlawful Entanglement of Whales by Fixed Gear

Strahan v. Secretary, EOEA et al, 05-10140-NMG: Memorandum in Support of Motion for a
Preliminary Injunction and Response to Defendants' and Amicus Opposition                    16

**Licensed by Any Atlantic Coastal State or NOAA Fisheries**

It is very difficult to identify the state or federal fisheries agency that might have licensed
the Fixed Gear sighted on any given whale. This fact rests on the underlying reality that all Fixed
Gear deployed in along the U. S. Atlantic coastline is virtually identical in construction and
layout. Fixed Gear from Maine is just like the same gear from Massachusetts and just like Fixed
Gear licensed by NOAA. This is no accidental coincidence. Apart from the observation that a
"fishing hook is just like any other fishing hook," all Atlantic coastal state fisheries agencies are
members of a voluntary compact that manages several coastal fisheries in a uniform manner and
requires individual member state agencies to comply with the universal management plan that
has been adopted by the compact.

The Atlantic States Marine Fisheries Commission ("ASMFC") is a compact of fifteen
coastal states that is organized pursuant to federal statute that regulates selected commercial
marine fisheries in a uniform manner among the member states. The ASMFC was established by
an act of Congress — The Atlantic Coastal Fisheries Management Act ("ACFMA") – which
authorizes the ASMFC to adopt coastal fisheries management plan for a specific marine fishery
that is binding on all its member states. See 16 U. S. C. §§ 5101 *et seq*. Massachusetts — and the
Defendants — are a member of the ASMFC. Therefore, the manner that the Defendants license
and regulate their Fix Gear fisheries is done in cooperation with Maine — and other coastal
states — and in a uniform manner as dictated by the ASMFC.[14] This is why MDMF Fixed Gear
is nearly indistinguishable from Fixed Gear licensed by the state of Maine.

ASMFC manages the American Lobster Pot fishery along the U. S. Atlantic coastline as
well as fisheries that employ Gill Nets. The Defendants Lobster Pot fisheries regulations are
based on implementing the American Lobster Pot fishery plan adopted and enforced by the

---

[14] The ACFMA states at 16 U. S. C. § 5104(a)(1) —

"The Commission shall prepare and adopt coastal fishery management plans to provide for
the conservation of coastal fishery resources. In preparing a coastal fishery management
plan for a fishery that is located in both State waters and the exclusive economic zone, the
Commission shall consult with appropriate Councils to determine areas where such
coastal fishery management plan may complement Council fishery management plans.
The coastal fishery management plan shall specify the requirements necessary for States
to be in compliance with the plan. Upon adoption of a coastal fishery management plan,
the Commission shall identify each State that is required to implement and enforce that
plan."

ASMFC. Maine, New York, Rhode Island, and Connecticut are also members of the ASMFC

and their Lobster Pot fisheries management plans are implementations of the ASMFC's said plan

also.

      For purposes of liability arising from the entanglement of Federally Protected Whales in

Fixed Gear, the ACMFC has a similar position as the Defendants do to the individuals who

license and regulate the Fixed Gear that they deploy in U. S. coastal waters that then entangles

Federally Protected Whales and in so doing violates the Section 9 take prohibitions of the ESA.

In addition, since Massachusetts is in a conspiracy with the other coastal state members of the

ACMFC to have the ACMFC adopt management plans for Fixed Gear that result in the unlawful

entanglement of whales in Fixed Gear. As a member of a conspiracy whose individually licensed

Fixed Gear is equally capable of entangling Federally Protected Whales, the Defendants share

liability with the other state members of the ACMFC.[15]

      Courts have consistently ruled that possible partners in crime share an equal liability for

injury done to a party that one of them was actually capable of doing. See *Summers v. Tice*, 33

Cal. 2d 80, 199 P. 2d 1, 5 A. L. R. 2d 91 (Cal. 1948); *McCormack v. Abbot Laboratories*, 617 F.

Supp. 1521(D. Mass. 1985).

      Regardless of which state or federal fishery actually licensed the Fixed Gear that

entangles a specific Federally Protected Whale, they all have shared liability for *any* Federally

Protected Whale entangled by Fixed Gear licensed any member state of the ACMFC. Therefore,

the Defendants are liable for every incident of an entangled Federally Protected Whale in Fixed

---

[15] An example illustrates the problem. A detective enters a room with 12 people and a dead body
with a gun sitting on the corpse's stomach. Each of the twelve people maintained their innocence
and refuse to rat out which one of them pulled the trigger and killed the dead guy. This is a
scenario of the perfect crime. There is no way to prosecute any one of the suspects because of the
reasonable possibility that one of the other 11 did the crime. While the DA will have a near
impossibility to prosecute any one of the twelve for murder, the dead guys children could bring a
civil suit against all twelve based on *Summers'* shared tort liability principle which allows each
of the twelve to be sued for a shared liability for the killing, because they each had an equal
opportunity to commit the crime.

Gear on the Atlantic coastline because that Fixed Gear absolutely was licensed by only a

member state of the ACMFC.

### Standard for Issuing Preliminary Inunctions Under the Endangered Species Act

The standard of review by a court in issuing a preliminary injunction is the familiar four-

part test: 1) likelihood of success on the merits, 2) the threat of irreparable harm to the petitioner

without the issuance of the requested injunction, 3) the balance of the relative harm to the parties

from issuing the requested injunction favors the petitioner and 4) the Public Interest is protected

by the issuing of the requested injunction. See *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*,

102 F. 3d 12, 15 (1st Cir. 1996) and *Narragansett Indian Tribe v. Gilbert*, 934 F. 2d 4, 6 (1st Cir.

1991).

The last two tests are not applicable or — more importantly — are required to be decided

in the favor of the petitioner for requests for injunctive relief under the ESA, especially to

enforce its Section 9 prohibitions to stop the unlawful "taking" of members of a listed species.

See *Sierra Club v. Marsh*, 816 F. 2d 1376, 1383 (9th Cir. 1987) (holding that the courts may not

use equity's scales to strike a difference balance) citing TVA *v. Hill*, 437 U. S. 153, 194, 98 S.

Ct. 2279 (1978); *Strahan v. Coxe*, 127 F, 2d 155, 160 (1st Cir. 1997); *National Wildlife*

*Federation v. Burlington Northern Railroad*, 23 F. 3d 1508, 1510-11 (9th Cir. 1994) —

> "In cases involving the ESA, Congress removed from the courts their traditional
> equitable discretion in injunction proceedings of balancing the parties' competing
> interests. The language, history, and structure of the ESA demonstrates Congress'
> determination that the balance of hardships and the public interest tips heavily in
> favor of protected species."

The purpose of the ESA is to prevent the extinction of species of wildlife. The ESA

protections scheme is based on the reality that when populations of wildlife become small and

the rate of births decline the probability of these species becoming extinct in the course of the

next hundred years is significant and unacceptable. The purpose of the ESA is to eliminate the

possibility of extinction for a listed protected species by protecting its ability to increase its

remaining numbers to a regular population size where it no longer needs to be listed as

endangered under the Act because it no longer faces a threat of extinction.  "Recovery" is the

name of this process of increasing the size of the remaining number of a listed species to a

population size where the species is not endangered. Any endangered species that stays

endangered for too long faces the significant danger of extinction from nothing more than "small

numbers," without any additional killing or habitat loss caused by people. The Act's ultimately

purpose is to protect the ability of a species to recover as quickly as possible from its endangered

status. Thus the killing or injury to a single member of a listed endangered species is an

unacceptable setback to the ESA's protected recovery of the species. The speedy recovery of a

listed species is protected by the use of an extremely broad definition of taking.

The federal regulatory scheme for protecting endangered wildlife is in two parts: 1) broad

prohibitions against taking members of listed species and 2) the imposition of mandatory and

non-discretionary duties on federal agencies to insure that agency actions will not jeopardize a

species survival and to develop conservation plans to use the agency' lawful authority to

conserve and protect listed species to assist their recovery.

*ESA Prohibits Taking of Members of Endangered Species Listed Under the ESA*

Section 9 of the ESA prohibits the "taking" of listed species of wildlife. 16 U. S. C. §

1538(a) and (g).  The ESA defines taking very broadly "Take" to include "harming, harassing,

trapping, capturing, wounding, or killing" a protected species either directly on its members or

by degrading its habitat sufficiently to impair essential behavior patterns.  16 U. S. C. §

1532(19). The prohibition extends to incidental as well as direct taking, meaning that anyone

who assists in any way another to cause a taking is liable for the taking also.

The ESA not only bans the acts of parties directly causing a take, but also bans the acts of third parties whose acts bring about the taking.  Strahan v. Coxe, 127 F. 3d 155, 163 (1st Cir. 1997), cert. denied, 119 S. Ct. 81 (1998) ("We believe that . . . a governmental third party pursuant to whose authority an actor directly exacts a taking of an endangered species may be deemed to have violated the provisions of the ESA.").  See also Babbitt v. Sweet Home Chapter of Communities for a Great Oregon, 515 U.S. 687, 704 (1995)("Congress intended 'take' to apply broadly to cover indirect as well as purposeful actions."); Palila v. Hawaii Dept. of Land and Natural Resources, 852 F. 2d 1106, 1108 (9th Cir. 1988), citing S. Rep. No. 93-307, at 7 (1973) ("'Take' is defined... in the broadest possible manner to include every conceivable way in which a person can 'take' or attempt to 'take' any fish or wildlife.").

Proof of a taking requires a showing "that the alleged activity has actually harmed the species or if continued will actually, as opposed to potentially, cause harm to the species." *American Bald Eagle v. Bhatti*, 9 F. 3d 163, 166 (1st Cir. 1993) (citing cases); *see also Strahan*, 127 F. 3d at 162. A movant can make a showing of actual harm by proving that significant modification or damage to the habitat of an endangered or threatened species is likely to occur so as to injure that species. See *TVA v. Hill*, 437 U. S. at 172, 98 S. Ct. 2279.

There is no requirement by statute that injunctive relief is only required to stop an act of "injury to the species" that would precipitate imminent extinction. In fact the ESA only prohibits the injuring of individuals and no where prohibits an "injury to the species." It would seem odd that a court could see in a read of the Act any language that requires injunctive relief to stop an 'injury to the species" but allows an "injury to an individual" member of a listed endangered species.  See *National Wildlife Federation*, 23 F. 3d at 1511 n8.

"We are not saying that a threat of extinction to the species is required before an injunction may issue under the ESA. This would be contrary to the spirit of the

Strahan v. Secretary, EOEA et al, 05-10140-NMG: Memorandum in Support of Motion for a
Preliminary Injunction and Response to Defendants' and Amicus Opposition

21

statute, whose goal of preserving threatened and endangered species can also be achieved through incremental steps."

Similarly, in *Forest Conservation Council v. Rosboro Lumber Co.*, 50 F. 3d 781 (9th Cir. 1995), the Ninth Circuit emphasized that injury to a single member of a listed species was irreparable:

> "Once a member of an endangered species has been injured, the task of preserving that species becomes all the more difficult. As the Supreme Court noted, "environmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.,* irreparable." *Amoco Production Co. v. Gambell,* 480 U.S. 531, 545, 94 L. Ed. 2d 542, 107 S. Ct. 1396 (1987). "*Id*. at 785

In *Fund for Animals v. Turner*, 1991 U.S. Dist. LEXIS 13426, at * 26 (D. D. C. Sept. 27, 1991) the Court rejected an argument that the killing of one or two endangered Grizzly bears did not require a court issuing injunctive relief to stop it, ruling —

> "In light of this Congressional mandate, the loss even of the relatively few grizzly bears that are likely to be taken through a sport hunt during the time it will take to reach a final decision in this case is a significant, and undoubtedly irreparable, harm."

First, the Ninth Circuit has repeatedly held that irreparable injury is *presumed* given a substantial violation of the ESA. *See, e.g. Thomas v. Peterson*, 753 F. 2d 754, 754 (9th Cir. 1985)(faced with a substantial procedural violation of the ESA, "the remedy *must* be an injunction of the project pending compliance with the ESA.") (emphasis added).

The unlawful taking of a single member of a listed endangered species under the ESA constitutes irreparable harm. There is no need for a prosecutor of a taking violation under the Act to show that a further said taking will induce a threat of imminent extinction for the listed species. Otherwise, the repeated killings of members of a species would not be enjoinable until these killings reduced the viability of the species to the point where a single killing would threaten it with imminent extinction. The latter interpretation is completely against the Congressional intent for implementing the Act. It would eviscerate any possible practical

protection the Act would afford an endangered species. The Court has no choice but to reject

such an offered interpretation.

Economic adverse impacts are not to be used by a Court in deciding or not to issue

injunctive relief to enjoin an unlawful taking in violation of the prohibitions of the Act. In *United

States v. the Town of Plymouth*, 6 F. Supp. 2d 81 (D. Mass. 1998) the court ruled —

> "The Town points out that Plymouth Long Beach has experienced an increase in
> the number of nesting pairs of piping plovers from one in 1991 to nine in 1997,
> and that the piping plover population is "flourishing" under the Town's
> "upgraded" management of the beach under the 1992 Plan. … This failure to act
> quickly and decisively resulted, in all probability, in the June 13, 1996 taking of
> the plover chick. While the Town maintains that no conclusions can be drawn
> about the cause of the death of the recently hatched plover--observed healthy in
> the morning and found dead in vehicle tracks just hours later--the reasonable
> inference to be drawn in this whodunit is that the chick was killed by an ORV.
> Although the Selectmen perceive Long Beach as a multipurpose beach where
> ORV users and piping plovers can happily co-exist, the expert evidence proves
> that the large vehicle-free zones are essential to protect this threatened species
> from takes, and will often be inconsistent with ORV use during the summer
> months." Id at 81.

> "In *TVA v. Hill,* the Supreme Court stated that "some" may find it "curious" that
> an endangered three-inch fish, the snail darter, could stop a $100 million dam
> under the ESA, but that "the explicit provisions of the [ESA] require precisely
> that result." *Id. at 172-73, 98 S.Ct. 2279*. Similarly, here a 2.5 inch piping plover
> can stop a behemoth ORV if the government proves a taking under the ESA." Id
> at 90.

The language, history, and structure of the ESA demonstrates Congress' determination

that the balance of hardships and the public interest tips heavily in favor of protected species."

*National Wildlife Federation*, 23 F. 3d at 1510-11(internal citations omitted); *see also Sierra

Club v. Marsh*, 816 F. 2d 1376, 1387 (9th Cir. 1987)("The act does not permit courts to consider

the hardship an injunction may impose on the project if endangered species' habitat is likely to

be destroyed.").

Courts have also found it unpersuasive when an agency makes that they cannot be held

liable for ESA Section 9 violations because they were simply unaware that the takings were

ongoing. In *Greenpeace Foundation v. Mineta* 122 F. Supp. 2d 1123 (D. Hawai'i 2000)

> "The ruling does not assure victory for NMFS. NMFS's position is essentially that
> it is innocent of Section 9 violations because it is not aware of any data that
> confirms that it is in violation of Section 9; such is a head-in-the-sand attitude we
> do not condone. It is also a position in *1135 conflict with the underlying
> philosophy of the ESA."

Under the ESA, the Court is afforded full jurisdiction necessary to issue injunctive relief

to compel compliance with ESA Section 9 prohibitions, even if a significant economic cost must

be borne by a violator in order to do so, However, history has shown that such claims of

economic hardship have turned out to be specious and compliance achieved with minimum

burdens actually imposed on the defendant. It has been shown that these hardship claims are

simply an act of a self-serving scofflaw seeking to evade the law.

Congress took account of the possibility of unreasonable economic hardship when

implementing the provisions of the ESA. It provided numerous provided exceptions based on

claims of unreasonable hardships — including the provision of the infamous "God Committee"

(so called because the Committee is authorized to decide the fate of an endangered species when

a party petitions it for an exemption from application of the protective prohibitions of the ESA.

An excellent law review article discussing the enforcement of the ESA's Section 9 taking

prohibitions is Professor Frederico Cheevers' "The Take Prohibitions in the Section 9 of the

Endangered Species Act: Contradictions, Ugly Ducklings, and Conservation of Species," 34

Envtl L. 363 (2004). See Attachment 13.

### The Court Should Grant Strahan Request for a Preliminary Injunction

This is case is, at its core, a simple case involving the application of clear and settled law to undisputed facts. Strahan is simply asking the Court to require that the Defendants make their Fixed gear fisheries Whale Safe at some point in the future, a date that he is letting the Court to chose as being reasonable. The Court can use its full equitable powers to bring the Defendants currently unlawful Fixed Gear fisheries into compliance with the ESA's Section 9 protective prohibitions.

Clearly what is necessary here is for the Court to issue an order that coerces the technological innovations necessary for the unwilling Defendants to be able to license and regulate Lobster Pot fishing gear that does not pose a significant risk to entangle Federally Protected Whales. The precedent establishing the Court's jurisdiction to do such is massive. See Chapter 15 of Professor Zygmunt J. B. Plater's[16] excellent treatise *Environmental Law and Policy: Nature, Law, and Society* entitled "Technology Forcing Standards." See Attachment 14.

In order to protect the *status quo*, Strahan needs the Court to immediately grant him his requested interlocutory injunctive relief in order to prevent him from suffering further irreparable harm from the Defendants' unlawful taking of Federally Protected Whales. Each further entanglement of a federally Protected Whale in MDMF fixed gear will expose Strahan's interest in Federally Protected Whales to further irreparable harm by the Defendants, The death of a single member of a listed species of Federally Protected Whale will set back the possible recovery of these endangered species flaunting the Congressional intent and purpose of the ESA. See 31 August 1995 Federal Register (60 FR 45399). NOAA has reaffirmed its said past ruling in its 2006 Stock Assessment Report on the status of populations of the Federally Protected

---

[16] Professor Plater was the attorney of record for the respondents in TVA v. Hill and made the oral argument to the Supreme Court on their behalf.

**Strahan v. Secretary, EOEA et al, 05-10140-NMG: Memorandum in Support of Motion for a Preliminary Injunction and Response to Defendants' and Amicus Opposition**

25

Whales. It found that the current number of killings and serious injuries annually inflicted on these species just from the known killing and serious injuries resulting from entanglements in fishing gear and ship strikes exceeds its allowed Possible Biological Removal value ("PBR") that it has determined for each species. This means that NOAA a single further killing and serious injury to any member of Northern Right Whales, Humpback Whales or Fin Whales threatens the survival of their species.

Strahan clearly meets all requirements for the Court to grant him his requested interlocutory injunctive relief. Strahan is almost certain to prevail on the merits. Strahan has convincingly demonstrated that the MDMF Fixed Gear since 1996 has continued to entangle Federally Protected Whales and can be expected to do so into the indeterminable future unless the Court acts to stop it. Further the Defendants — and not Strahan — have the burden of proof on them to show that MDMF Fixed Gear is no longer entangling Federally Protected Whales, since the Court already found the Defendants in *Strahan v. Coxe* liable for the unlawful entangling of endangered whales in their MDMF Fixed Gear. In point of fact, the Defendants' witness McKiernan at the Court's evidentiary hearing testified that vertical buoy lines used in the MDMF Fixed Gear still entangles whales and that Federally Protected Whales regularly entangle in Gill Nets licensed by the Defendants (although he called it 'bumping into Gill Nets").

There is no question that the Defendants Fixed Gear has routinely entangles Federally Protected Whales. There is no serious question that it will continue to do so into the future. Some of these entanglements have been sighted. As shown *supra*, most entanglements go unreported, deliberately so sometimes, and Fixed Gear is deliberatively removed from entangled federally

Protected Whales by unknown parties in order to thwart the possibility of entanglements being
reported to NOAA.[17]

Strahan certainly is suffering irreparable harm from these entanglements as proven *supra*.
Since the ESA jurisprudence requires that the protection of Federally Protected Whales is always
in the Public Interest and the "balancing of the interests" test always favors the protection of
federally Protected Whales, the Court is compelled to grant Strahan's motion for a preliminary
Injunction.[18]

The question now is before the Court is whether it will to stop the further entanglement of
a Federally Protected Whale by the MDMF Fixed Gear. Judge Saris' ruling in *U. S. v. Town of
Plymouth* requires reflection —

> "In *TVA v. Hill,* the Supreme Court stated that "some" may find it "curious" that
> an endangered three-inch fish, the snail darter, could stop a $100 million dam
> under the ESA, but that "the explicit provisions of the [ESA] require precisely
> that result." *Id*. at 172-73, 98 S.Ct. 2279. Similarly, here a 2.5 inch piping plover
> can stop a behemoth ORV if the government proves a taking under the ESA." *Id*.
> at 90.

Paradoxically, the question now before the Court is "Can a 100,000 pound endangered
whale stop a single fisherman from putting a single lobster pot in the water? In 1996 in *Strahan*

---

[17] The fact that sightings of entangled Northern Right Whales in Massachusetts waters has not
gone up with increased sighting effort is more than suspicious of deliberate lack of reporting by
the sighting effort.  It could also be illustrative of the reality that few entanglements occur in
Massachusetts in the winter when the fishing effort is exponentially lower than in the Summer.

[18] The Defendants cannot maintain they would be injured as state agencies from the Court
ordering that they must license only Whale Safe Fixed Gear. The Defendants duty is to obey the
law, protect the Public interest and comply with the ESA 9 prohibitions. Additionally,
Massachusetts has voluntarily entered into an ESA Section 6 agreement with NOAA to conserve
and recover Federally Protected Whales and to enforce the federal regulatory scheme for the
conservation and protection of endangered species. All the Court is doing is requiring that the
Defendants faithfully comply with Agreement that they entered into with NOAA and pursuant to
this Agreement have been the recipients of millions of dollars from NOAA, The Defendants
failure to use any of this money to actually engineer Whale Safe Fixed Gear, prevents them from
raising the argument that there is no "Whale Safe" technology for them to adopt.

*v. Coxe* the answer to this question was no. If history has taught the Court anything, in 2006 the question will be answered in the affirmative.

### Requested Remedy

Strahan's sought after injunctive relief from the Court is to coerce the Defendants into full compliance with the Section 9 prohibitions of the ESA in regards to their licensing and regulation of Fixed Gear. The Court can do this by judicious use of its full equitable powers,

Strahan is not asking the Court at this time to enjoin the MDMF Fixed Gear fisheries. Instead — as requested above — he is asking the Court for the kind of injunctive relief that will incrementally coerce the Defendants into full compliance with the ESA's Section 9 take prohibitions in regards to their licensing and regulating the deployment of Fixed Gear in a manner that does not result in the further entanglement of Federally Protected Whales in said fishing gear.

Whale Safe fishing as practiced is based on a methodology of management as well as the use of appropriate technology to insure the deployed fishing gear does not entangle or otherwise injure endangered marine wildlife.  There is ample precedent for the Court to use injunctive relief to force the technological innovations necessary to achieve Whale Safe commercial marine fisheries.  See *Boomer v. Atlantic Cement*, 26 N. Y. 2d 219, 257 N. E. 2d 870, 309 N. Y. S. 2d 312 (N. Y.  Court of Appeals 1970). In *Boomer* the court was asked to enjoin the operation of a cement plant, which was polluting the air of the neighboring area with cement dust. The court declined to issue the requested injunction — preferring to require compensatory damages in lieu of the requested injunction. However, this choice was based on facts specific to that case. The lasting opinion of that court was expressed in the dissenting in part opinion —

"    I would enjoin the defendant cement company from continuing the discharge of dust particles upon its neighbors' properties unless, within 18 months, the cement company abated this nuisance.  It is not my intention to cause the removal of the cement plant from the      Albany area, but to recognize the urgency of the

problem stemming from this    stationary source of air pollution, and to allow the company a specified period of time to develop a means to alleviate this nuisance.

I am aware that the trial court found that the most modern dust control devices available have been installed in defendant's plant, but, I submit, this does not mean that better and more effective dust control devices could not be developed within the time allowed to abate the pollution. Moreover, I believe it is incumbent upon the defendant to develop such devices, since the cement company, at the time the plant commenced production (1962), was well aware of the plaintiffs' presence in the area, as well as the probable consequences of its contemplated operation. Yet, it still chose to build and operate the plant at this site.

In a day when there is a growing concern for clean air, highly developed industry should not expect acquiescence by the courts, but should, instead, plan its operations to eliminate contamination of our air and damage to its neighbors. Accordingly [I would] grant an injunction to take effect 18 months hence, unless the nuisance is abated by improved techniques prior to said date."

The *Boomer* decision set a precedent that was commented on in *The Story of Boomer:*

*Pollution and the Common Law*, Daniel Farber 32 Ecology Law Quarterly. 113 at 125,

"The second case cited by the *Boomer* court involved massive pollution of a stream by a salt manufacturer. *Again, the relief was not a shutdown order. Instead, the court was careful to outline more flexible injunctive relief*: It does not follow from these views that, if upon another trial the facts are unchanged, the defendant and the other salt manufacturers will be compelled to make such terms as they can, for *a court of equity, with its plastic powers, can require, as a condition of withholding a permanent injunction*, [flexible remedy-conditioned relief] the construction of a reservoir on the upper sources of the stream, to accumulate water when it is plentiful for use in times of scarcity, and thus neutralize the diminution caused by the manufacture of salt. The court may also require, on the like condition, greater care in preventing the escape of salt water and salt substances into the stream, as the defendant attempted to do during the trial, and thus prevent or minimize the pollution."

**"In modern terms, what both of these decisions require is that the defendant uses the best available technology, not that the plant be shut down."**

See *Weinberger v. Romero-Barceló*, 456 U.S. 305, 102 S. Ct. 1798 (1982) at n. 7 and 12

(A case discussing injunctive relief under the ESA and citing *Boomer*):

"The objective of this statute [Clean Water Act] is in some respects similar to that sought in nuisance suits, where courts have fully exercised their equitable discretion and ingenuity in ordering remedies. "The discharge of 'pollutants' into water is unlawful without a permit issued by the Administrator of the EPA or, if a State has developed a program that complies with the FWPCA, by the State." *Train v. Colorado.*" *Id.*

See also Escobar v. Continental Baking Company, 33 Mass. App. Ct. 104, 596 N.E.2d 394

(Mass 1992); *McCormack v. Abbot Laboratories*, 617 F. Supp. 1521 (D. Mass. 1985).

The *Boomer* court declined to issue the requested injunction for only one reason, it

deemed the cost to the community of shutting down the cement plant — with the loss of jobs —

to be inequitable. The Court does not have that issue before it. The ESA requires that the balance

of the equities be found in favor of protecting the endangered Federally Protected Whales. The

Court is compelled to instead follow the steps outlined in the *Boomer* dissenting opinion to use

its equitable powers in granting injunctive relief to directly and successfully coerce the

Defendants' licensing Fixed Gear into full compliance with the ESA's Section 9 prohibitions.

Strahan's offers the following options to the Court for granting his request for interlocutory

injunctive relief to stop the MDMF Fixed Gear from entangling any more Federally Protected

Whales —

1.      Issue a declaratory finding that the Defendants are currently in violation of the

section 9 take prohibitions for their licensing and regulation of Fixed Gear that entangles

Federally Protected Whales and degrades the designated listed critical habitat of the Northern

Right Whale in Massachusetts Bay

2      Order the Defendants to require that the Fix Gear that they license must be clearly

marked throughout its length to be readily identifiable as gear licensed by the MDMF.

If the Court just issued the relief requested in #1 and #2, this would act to coerce the

Defendants and the Massachusetts government into taking meaningful steps into making the

MDMF Fixed Gear Whale Safe.

3.      Order the Defendants to license only Whale Safe Fixed Gear by a date in the

future that the Court seems as reasonable ("Order").

4.      Appoint a Master to act as a technical expert for the Court who would evaluate the Defendants efforts — if any — to adopt and develop as necessary Whale Safe regulatory standards for the Fixed Gear that they would license in the future after the date set by the Court for them to license only Whale Safe Fixed Gear and make recommendations to the Court on necessary steps that the Defendants need to make.

5.      If the Defendants fail to comply with the court's Order in #3 and if the Master reports to the Court by the said date that the Defendants are failing to make good faith efforts to comply with its said order, then the Court should find the Defendants in contempt of the said Order and assess it a fine of at least $2000 per day it remains in violation of said order.

The Court acting as requested in #3, #4, and #5 would obviously be acting reasonably and effectively in coercing the Defendants into licensing only fishing gear that does not entangle Federally Protected Whales.

6.      After an extended period of time in violation of the Court's Order (e. g. a calendar year), and with the Master reporting to the Court that the Defendants are still not acting in good faith to comply with the Order, the Court should enter an order directly enjoining the Defendants from further licensing MDMF Fixed Gear fisheries until it can demonstrate that the fishing gear it intends to license from then on is Whale Safe, as reported to the Court by the Master.

Clearly the Defendants should be seen as willing to comply given the opportunity with the Court #3 requested Order to go Whale Safe in order to avoid the eventual shutdown of their Fixed gear fisheries by the Court for its willful refusal to comply with the Order. Even if the Court is forced to take step #6 and enjoin the Defendants' Fixed gear fisheries, the Defendants can still seek relief at any time from the Court's Order by applying to NOAA for a ESA Section 10 permit to allow it to deploy MDMF Fixed Gear — with whatever alteration from current

Strahan v. Secretary, EOEA et al, 05-10140-NMG: Memorandum in Support of Motion for a
Preliminary Injunction and Response to Defendants' and Amicus Opposition

31

design its chooses — that would allow their MDMF Fixed Gear to entangle on occasion

Federally Protected Whales but only if these said entanglements will not be seen to result in

serious injury or the death of any endangered whale.  They can also seek a hardship exemption

that is provided by the provisions of the ESA.

      The reality is that existing and emerging technology exists that can make Lobster Pot

fishing Whale Safe. Professor Goudey from Massachusetts Institute of Technology testified to

the Court at its evidentiary hearing testified to the Court of his success in designing and testing

Whale Safe buoys for use on vertical buoy lines. He also testified that technology could be

readily adopted to make Lobster Pot fishing Whale Safe. He also informed the Court that their

was emerging technology that could result in commercially available rope for use in vertical

buoy lines and ground lines that is designed so that no marine mammal can become entangled in

it (i. e. restricted radius of curvature line). Goudey testified that the Defendants have been

offered this technology and rebuked it.

      The Defendants have access to ample funds to finance a reasonable research and

development program for engineering Whale Safe fishing gear. They simply have historically

refused to do so. The NOAA supplies the MDMF over $500,000 a year in ESA Section 6

funding that is completely discretionary. Sales by Massachusetts Registry of Motor Vehicles of

its Right Whale License Vanity Plate generate over a million dollars annually to the Defendant

EOEA. Yet this defendant has refused to use the majority of funds for any program to directly

benefit any Federally Protected Whale. The Court 's Order can now force them to fund the

engineering of Whale Safe fishing gear. The Defendant EOEA has recently coerced about

$50,000,000 in discretionary environmental mitigation fees out of two Liquid Natural Gas

("LNG") companies seeking to build deep seaports off Gloucester MA to deliver LNG from

Strahan v. Secretary, EOEA et al, 05-10140-NMG: Memorandum in Support of Motion for a
Preliminary Injunction and Response to Defendants' and Amicus Opposition

32

ships to local pipelines. They failed to appropriate one cent to the protection of Federally

Protected Whales from MDMF Fixed Gear and are intending to use millions of dollars from this

windfall to increase the Lobster Pot fishery in Massachusetts state waters, which will kill more

Federally Protected Whales

The Defendants have the money to engineer Whale Safe fishing gear. The technology

exists to do so. What the Defendants don't have is a single good reason to do so. The Court

needs to give them one. If it fails to do so — if the Court declines to grant Strahan's Motion for a

Preliminary Injunction — then they will actually become embolden to continue to deploy the

same MDMF Fixed Gear as they always have done without a single fear that they face any

possible punishment in the future.

### Response to Defendants Two Oppositions and that of the Amicus

Time is an environmental resource that is not renewable. No one can get back an

endangered whale that is lost to MDMF Fixed Gear. This fact does not bother the Defendants.

The Defendants make no effort to claim that Federally Protected Whales are not entangled in

MDMF Fixed Gear. They even admit it. The Defendants oppositions consists most of a simple

senseless argument that they did nothing that the Court didn't make them do in 1996, and they

want the Court to continue allowing them to do nothing till they get it right.

In order to avoid being ordered to license only Whale Safe fishing gear, the Defendants

desperately offer up their requiring "sinking" ground line in Lobster gear. With this token

offering they expect the Court to ignore their admitted to entangling of Federally Protected

Whales in vertical buoy lines and Gill Nets. The Court must turn a deaf ear to this nonsense.

Otherwise, they bemoan the lost income to the commercial fisheries from the shut down of

the Fixed Gear fisheries. They want the Court to believe that thus is the only possibility to stop

Federally Protected Whales from being entangled and killed by the MDMF Fixed gear fisheries.

The Court must also reject this self-serving argument. If push comes to shove, the Court is

required to enjoin the further licensing of the MDMF Fixed Gear in order to uphold the ESA's Section 9 taking prohibitions. The Court needs to call the bluff of the Defendants. Using its full equitable powers it can coerce the Defendants to make their commercial marine fisheries Whale Safe. The Defendants will "crack" well before the Court is required to use its full authority against them.

BY:

_____

Richard Max Strahan, Plaintiff
236 West Portal Avenue, #195
San Francisco, CA
617.233.3854

*Pro Se and Proud!*

_____

CERTIFICATION OF SERVICE

_____

I hereby certify that a copy of this opposition has been served VIA E-filing on the Defendants' attorney on 18 December 2006.

_____

Richard Max Strahan, Plaintiff

Strahan v. Secretary, EOEA et al, 05-10140-NMG: Memorandum in Support of Motion for a
Preliminary Injunction and Response to Defendants' and Amicus Opposition

34

**Table of Cited Evidence in Support of Motion for a Preliminary Injunction**

*Strahan attaches the following documents to this memo in support of his request for a
preliminary injunction. He has provided the Court a CD-R disk with all these documents as PDF
files. He has also electronically filed all the attached documents smaller than the 2 MB in size
limit imposed by the Court.*

## Scientific Papers

1.   "Morphometry, Gross Morphology, and Available Histopathology in Northern Right
     Whale (*Eubalaena glacialis*) Mortalities (1970-2002)," M. Moore *et al.* (2004).

2.   3 October 2002 Necropsy Report on Humpback Whale Stranded on Beach at race Point,
     Provincetown MA, Michael Moore, Scott Landry *et al.*

3.   "Northern Right Whales in Crisis," Scot Kraus, *et al.  Science* 22 July 2005.

4.   "Fishing Gear Involved in Entanglements of Right and Humpback Whales," Amanda
     Johnson *et al.  Marine Mammal Science* October 2005.

5.   "Impacts of Biodiversity Loss on Ocean Ecosystem Services," Boris Worm, et al. *Science*
     6 November 2006.

## Reports by National Oceanographic and Atmospheric Agency ("NOAA")

6.   Mortality and Serious Injury Determinations for Northwest Atlantic Ocean large Whale
     Stocks (1999-2003), Tim Cole et al. December 2005.

7.   Mortality and Serious Injury Determinations for Northwest Atlantic Ocean large Whale
     Stocks (2000-2004), Tim Cole et al. April 2006.

8.   Entanglement Data and Gear Investigation 1999 Report, Dana Hartley and John Kenney
     January, 2000.

9.   Large Whale Entanglement Reports 2000 (Update June 2001),

10.  Large Whale Entanglement Report 2001 (Updated February 2003), Dana Hartley *et al.*
     2001

11.  Large Whale Entanglement Report 2003, Dana Hartley *et al.*

12.  Draft Atlantic Large Whale Entanglement and Ship Strike Report 2004 (Updated July
     2006), John Kenney, *et al.*

13.  Identification of Seasonal Area Management Zones for Northern Right Whale
     Conservation, Richard Merrick, Richard Pace, *et al.* October 2001

14.    Defining Triggers for Temporary Area Closures to Protect Right Whales from Entanglements: Issues and Options, Richard Pace, *et al.* April 2001.

15.    1999 Stock Assessment Report for Humpback Whale in North Atlantic

16.    2005 Stock Assessment Report for Humpback Whale in North Atlantic

17.    1999 Stock Assessment Report for Northern Right Whale in North Atlantic

18.    2005 Stock Assessment Report for Northern Right Whale in North Atlantic

19.    1999 Stock Assessment Report for Fin Whale in North Atlantic

20.    2005 Stock Assessment Report for Fin Whale in North Atlantic

21.    Analysis of Scarring on Northern Right Whales (*Eubalaena glacialis*): Monitoring Rates of Entanglement Interactions: 1980 – 2002, Scott Kraus, et al.  February 2005.

22.    Monitoring Entanglements of Humpback Whales (*Megaptera novaeangliae*) in Gulf of Maine on the Basis of Caudal Peduncle Scarring, Jooke Robbins, et al. 2001

**NOAA Agency Actions**

23.    22 April 2006 Federal Register Notice "List of Fisheries for 2006."

24.    6 April 2006 Federal Register Notice Imposing DAM Restraints on Commercial Fishing off Cape Code MA.

25.    26 August 2003 Federal Register Notice Establishing Types of Fishing Gear Usable in DAMs

26.    15 November 2006 Federal Register Notice Imposing An Emergency Ban on Gill Net Fisheries off Southeast Coast to Protect Northern Right Whale.

27.    15 November 2006 Federal Register Notice Proposing to Permanently Ban Gill Net Fisheries off Southeast Coast to Protect Northern Right Whale.

28.    13 November 2006 Letter Notifying Commercial Fishermen of "Dam Zone South of Portland Maine," including information sheet attachment and attached map.

29.    13 November 2006 Letter Notifying Commercial Fishermen of "Dam Zone East of Portland Maine," with information sheet attachment and attached map.

## Massachusetts Department of Fish and Game Items

30.     2004 Massachusetts Lobster Fishery Statistics, M. J. Dean *et al.* July, 2006

31.     Massachusetts Division of Marine Fisheries Right Whale Conservation Program: 2005 Projects and Accomplishments, Erin Burke, *et al.* 1 February 2006

32.     Code of Massachusetts Regulation for Marine Fisheries, 322 C. M. R. § 12.00

33.     Code of Massachusetts Regulation for Marine Fisheries, 322 C. M. R. § 4.00

34.     12 January 1994 Memorandum Agreement Between the Division of Marine Fisheries and the Division of Fish and Wildlife within the Massachusetts Department of Fisheries, Wildlife, and Environmental law Enforcement Regarding Jurisdictional Responsibilities, Listing Procedures, and designation of Significant Habitat for Endangered, Threatened, and Species Concern Species.

## PART 3035—RESEARCH AND DEVELOPMENT CONTRACTING

### 3035.003    [Amended]

■ 23. Amend § 3035.003(b) in the last sentence by removing ''OEs'' and adding ''Components'' in its place.

### 3035.017    [Amended]

■ 24. Amend § 3035.017(a) in the last sentence by removing ''OEs'' and adding ''Components'' in its place.

## PART 3042—CONTRACT ADMINISTRATION AND AUDIT SERVICES

### 3042.1502    [Amended]

■ 25. Amend § 3042.1502(a) by removing ''OEs'' and adding ''Components'' in its place.

## PART 3052—SOLICITATION PROVISIONS AND CONTRACT CLAUSES

### 3052.101    [Amended]

■ 26. Amend § 3052.101 as follows:

■ a. In paragraph (b)(2)(i)(A), in the second sentence, by removing ''OEs'' and adding ''Components'' in its place.

■ b. In paragraph (b)(2)(i)(B), in the first sentence, by removing ''OE'' and adding ''Component'' in its place.

### 3052.204–70    [Amended]

■ 27. Amend § 3052.204–70(d) in the last sentence by removing ''Organizational elements'' and adding ''Components'' in its place.

### 3052.204–71    [Amended]

■ 28. Amend § 3052.204–71, ALTERNATE I as follows:

■ a. In paragraph (i) in the first sentence by removing ''OE'' and adding ''Component'' in its place.

■ b. In paragraph (k) in the first sentence by removing ''Organizational Element'' and adding ''Component'' in its place.

## PART 3053—FORMS

### 3053.101    [Amended]

■ 29. Amend § 3053.101 by removing ''OEs'' and adding ''Components'' in its place.

[FR Doc. 06–7035 Filed 8–21–06; 8:45 am]
**BILLING CODE 4410–10–P**

## DEPARTMENT OF THE INTERIOR

### Fish and Wildlife Service

### 50 CFR Part 20

### Migratory Bird Hunting

*CFR Correction*

In Title 50 of the Code of Federal Regulations, parts 18 to 199, revised as of October 1, 2005, on page 36, § 20.21 is corrected by reinstating paragraphs (j)(2) and (3) to read as follows:

### § 20.21    What hunting methods are illegal?

\*    \*    \*    \*    \*

(j)    \*    \*    \*

(2) Each approved shot type must contain less than 1 percent residual lead (see § 20.134).

(3) This shot type restriction applies to the taking of ducks, geese (including brant), swans, coots (Fulica americana), and any other species that make up aggregate bag limits with these migratory game birds during concurrent seasons in areas described in § 20.108 as nontoxic shot zones.

[FR Doc. 06–55526 Filed 8–21–06; 8:45 am]
**BILLING CODE 1505–01–D**

## DEPARTMENT OF COMMERCE

### National Oceanic and Atmospheric Administration

### 50 CFR Part 229

### [Docket No. 060330090–6212–02, I.D. 021506B]

### RIN 0648–AU19

### List of Fisheries for 2006

**AGENCY:** National Marine Fisheries Service (NMFS), National Oceanic and Atmospheric Administration (NOAA), Department of Commerce.

**ACTION:** Final rule.

**SUMMARY:** The National Marine Fisheries Service (NMFS) is publishing its final List of Fisheries (LOF) for 2006, as required by the Marine Mammal Protection Act (MMPA). The final LOF for 2006 reflects new information on interactions between commercial fisheries and marine mammals. NMFS must categorize each commercial fishery on the LOF into one of three categories under the MMPA based upon the level of serious injury and mortality of marine mammals that occurs incidental to each fishery. The categorization of a fishery in the LOF determines whether participants in that fishery are subject to certain provisions of the MMPA, such as registration, observer coverage, and take reduction plan requirements.

**DATES:** This final rule is effective September 21, 2006.

The California sardine purse seine fishery, the Chesapeake Bay inshore gillnet fishery, and the Mid-Atlantic menhaden purse seine fishery are considered to be Category II fisheries on September 21, 2006, and are required to comply with all requirements of Category II fisheries (i.e., complying with applicable registration requirements, complying with applicable take reduction plan requirements, and carrying observers, if requested) on that date.

**ADDRESSES:** See **SUPPLEMENTARY INFORMATION** for a listing of all Regional offices.

For collection-of-information requirements subject to the Paperwork Reduction Act, please contact the Office of Management and Budget, Attn: David Rostker, fax: 202–395–7285 or *David_Rostker@omb.eop.gov*.

**FOR FURTHER INFORMATION CONTACT:** Melissa Andersen, Office of Protected Resources, 301–713–2322; David Gouveia, Northeast Region, 978–281–9328; Vicki Cornish, Southeast Region, 727–824–5312; Christina Fahy, Southwest Region, 562–980–4023; Brent Norberg, Northwest Region, 206–526–6733; Bridget Mansfield, Alaska Region, 907–586–7642; Lisa Van Atta, Pacific Islands Region, 808–973–2937. Individuals who use a telecommunications device for the hearing impaired may call the Federal Information Relay Service at 1–800–877–8339 between 8 a.m. and 4 p.m. Eastern time, Monday through Friday, excluding Federal holidays.

**SUPPLEMENTARY INFORMATION:**

### Availability of Published Materials

Information regarding the LOF and the Marine Mammal Authorization Program, including registration procedures and forms, current and past LOFs, observer requirements, and marine mammal injury/mortality reporting forms and submittal procedures, may be obtained at: *http://www.nmfs.noaa.gov/pr/interactions/mmap*, or from any NMFS Regional Office at the addresses listed below.

NMFS, Northeast Region, One Blackburn Drive, Gloucester, MA 01930–2298, Attn: Marcia Hobbs;

NMFS, Southeast Region, 263 13th Avenue South, St. Petersburg, FL 33701, Attn: Teletha Mincey;

NMFS, Southwest Region, 501 W. Ocean Blvd., Suite 4200, Long Beach, CA 90802–4213, Attn: Lyle Enriquez;

NMFS, Northwest Region, 7600 Sand Point Way NE, Seattle, WA 98115, Attn: Permits Office;

NMFS, Alaska Region, Protected Resources, P.O. Box 22668, 709 West 9th Street, Juneau, AK 99802; or

NMFS, Pacific Islands Region, Protected Resources, 1601 Kapiolani Boulevard, Suite 1100, Honolulu, HI, 96814–4700.

**What is the List of Fisheries?**

Section 118 of the MMPA requires NMFS to place all U.S. commercial fisheries into one of three categories based on the level of incidental serious injury and mortality of marine mammals occurring in each fishery (16 U.S.C. 1387(c)(1)). The categorization of a fishery in the LOF determines whether participants in that fishery may be required to comply with certain provisions of the MMPA, such as registration, observer coverage, and take reduction plan requirements. NMFS must reexamine the LOF annually, considering new information in the Stock Assessment Reports and other relevant sources and publish in the **Federal Register** any necessary changes to the LOF after notice and opportunity for public comment (16 U.S.C. 1387 (c)(1)(c)).

**How Does NMFS Determine in which Category a Fishery is Placed?**

The definitions for the fishery classification criteria can be found in the implementing regulations for section 118 of the MMPA (50 CFR 229.2). The criteria are also summarized here.

*Fishery Classification Criteria*

The fishery classification criteria consist of a two-tiered, stock-specific approach that first addresses the total impact of all fisheries on each marine mammal stock, and then addresses the impact of individual fisheries on each stock. This approach is based on consideration of the rate, in numbers of animals per year, of incidental mortalities and serious injuries of marine mammals due to commercial fishing operations relative to the potential biological removal (PBR) level for each marine mammal stock. The MMPA (16 U.S.C. 1362 (20)) defines the PBR level as the maximum number of animals, not including natural mortalities, that may be removed from a marine mammal stock while allowing that stock to reach or maintain its optimum sustainable population. This definition can also be found in the implementing regulations for section 118 of the MMPA (50 CFR 229.2).

*Tier 1:* If the total annual mortality and serious injury of a marine mammal stock, across all fisheries, is less than or equal to 10 percent of the PBR level of the stock, all fisheries interacting with the stock would be placed in Category III (unless those fisheries interact with other stock(s) in which total annual mortality and serious injury is greater than 10 percent of PBR). Otherwise, these fisheries are subject to the next tier (Tier 2) of analysis to determine their classification.

*Tier 2, Category I:* Annual mortality and serious injury of a stock in a given fishery is greater than or equal to 50 percent of the PBR level.

*Tier 2, Category II:* Annual mortality and serious injury of a stock in a given fishery is greater than 1 percent and less than 50 percent of the PBR level.

*Tier 2, Category III:* Annual mortality and serious injury of a stock in a given fishery is less than or equal to 1 percent of the PBR level.

While Tier 1 considers the cumulative fishery mortality and serious injury for a particular stock, Tier 2 considers fishery-specific mortality and serious injury for a particular stock. Additional details regarding how the categories were determined are provided in the preamble to the final rule implementing section 118 of the MMPA (60 FR 45086, August 30, 1995).

Since fisheries are categorized on a per-stock basis, a fishery may qualify as one Category for one marine mammal stock and another Category for a different marine mammal stock. A fishery is typically categorized on the LOF at its highest level of classification (e.g., a fishery qualifying for Category III for one marine mammal stock and for Category II for another marine mammal stock will be listed under Category II).

*Other Criteria That May Be Considered*

In the absence of reliable information indicating the frequency of incidental mortality and serious injury of marine mammals by a commercial fishery, NMFS will determine whether the incidental serious injury or mortality qualifies for Category II by evaluating other factors such as fishing techniques, gear used, methods used to deter marine mammals, target species, seasons and areas fished, qualitative data from logbooks or fisher reports, stranding data, and the species and distribution of marine mammals in the area, or at the discretion of the Assistant Administrator for Fisheries (50 CFR 229.2).

**How Do I Find Out if a Specific Fishery is in Category I, II, or III?**

This final rule includes two tables that list all U.S. commercial fisheries by LOF Category. Table 1 lists all of the fisheries in the Pacific Ocean (including Alaska). Table 2 lists all of the fisheries in the Atlantic Ocean, Gulf of Mexico, and Caribbean.

**Am I Required to Register Under the MMPA?**

Owners of vessels or gear engaging in a Category I or II fishery are required under the MMPA (16 U.S.C. 1387(c)(2)), as described in 50 CFR 229.4, to register with NMFS and obtain a marine mammal authorization from NMFS in order to lawfully incidentally take a marine mammal in a commercial fishery. Owners of vessels or gear engaged in a Category III fishery are not required to register with NMFS or obtain a marine mammal authorization.

**How Do I Register?**

Vessel or gear owners must register with the Marine Mammal Authorization Program (MMAP) by contacting the relevant NMFS Regional Office (see **ADDRESSES**) unless they participate in a fishery that has an integrated registration program (described below). Upon receipt of a completed registration, NMFS will issue vessel or gear owners an authorization certificate. The authorization certificate, or a copy, must be on board the vessel while it is operating in a Category I or II fishery, or for non-vessel fisheries, in the possession of the person in charge of the fishing operation (50 CFR 229.4(e)).

**What is the Process for Registering in an Integrated Fishery?**

For some fisheries, NMFS has integrated the MMPA registration process with existing state and Federal fishery license, registration, or permit systems. Participants in these fisheries are automatically registered under the MMPA and are not required to submit registration or renewal materials or pay the $25 registration fee. The following section indicates which fisheries are integrated fisheries and has a summary of the integration process for each Region. Vessel or gear owners who operate in an integrated fishery and have not received an authorization certificate by January 1 of each new year must contact their NMFS Regional Office (see **ADDRESSES**). Although efforts are made to limit the issuance of authorization certificates to only those vessel or gear owners that participate in Category I or II fisheries, not all state and Federal permit systems distinguish between fisheries as classified by the LOF. Therefore, some vessel or gear owners in Category III fisheries may receive authorization certificates even though they are not required for Category III fisheries. Individuals

fishing in Category I and II fisheries for which no state or Federal permit is required must register with NMFS by contacting their appropriate Regional Office (see **ADDRESSES**).

## Which Fisheries Have Integrated Registration Programs?

The following fisheries have integrated registration programs under the MMPA:

1. All Alaska Category II fisheries;
2. All Washington and Oregon Category II fisheries;
3. Northeast Regional fisheries for which a state or Federal permit is required;
4. All Southeast Regional fisheries for which a Federal permit is required, as well as fisheries permitted by the states of North Carolina, South Carolina, Georgia, Florida, Alabama, Mississippi, Louisiana, and Texas; and
5. The Hawaii Swordfish, Tuna, Billfish, Mahi Mahi, Wahoo,Oceanic Sharks Longline/Set line Fishery.

## How Do I Renew My Registration Under the MMPA?

Vessel or gear owners that participate in fisheries that have integrated registration programs (described above) are automatically renewed and should receive an authorization certificate by January 1 of each new year. Vessel or gear owners who participate in an integrated fishery and have not received authorization certificates by January 1 must contact the appropriate NMFS Regional Office (see **ADDRESSES**). Vessel or gear owners that participate in fisheries that do not have integrated registration programs and that have previously registered in a Category I or II fishery will received a renewal packet from the appropriate NMFS Regional Office at least 30 days prior to January 1 of each new year. It is the responsibility of the vessel or gear owner in these fisheries to complete their renewal form and return it to the appropriate NMFS Regional Office at least 30 days in advance of January 1. Individuals who have not received a renewal packet by January 1 or are registering for the first time must request a registration form from the appropriate Regional Office (see **ADDRESSES**).

## Am I Required to Submit Reports When I Injure or Kill a Marine Mammal During the Course of Commercial Fishing Operations?

In accordance with the MMPA (16 U.S.C. 1387(e)) and 50 CFR 229.6, any vessel owner or operator, or gear owner or operator (in the case of non-vessel fisheries), participating in a Category I, II, or III fishery must report to NMFS all incidental injuries and mortalities of marine mammals that occur during commercial fishing operations. "Injury" is defined in 50 CFR 229.2 as a wound or other physical harm. In addition, any animal that ingests fishing gear or any animal that is released with fishing gear entangling, trailing, or perforating any part of the body is considered injured, regardless of the presence of any wound or other evidence of injury, and must be reported. Injury/mortality report forms and instructions for submitting forms to NMFS can be downloaded from: *http://www.nmfs.noaa.gov/pr/pdfs/interactions/mmap_reporting_form.pdf*. Reporting requirements and procedures can be found in 50 CFR 229.6.

## Am I Required to Take an Observer Aboard My Vessel?

Fishers participating in a Category I or II fishery are required to accommodate an observer aboard vessel(s) upon request. Observer requirements can be found in 50 CFR 229.7.

## Am I Required to Comply With Any Take Reduction Plan Regulations?

Fishers participating in a Category I or II fishery are required to comply with any applicable take reduction plans. Take reduction plan requirements can be found at 50 CFR 229.30–34.

## Sources of Information Reviewed for the Proposed 2006 LOF

NMFS reviewed the marine mammal incidental serious injury and mortality information presented in the Stock Assessment Reports (SARs) for all observed fisheries to determine whether changes in fishery classification were warranted. NMFS' SARs are based on the best scientific information available at the time of preparation, including the level of serious injury and mortality of marine mammals that occurs incidental to commercial fisheries and the PBR levels of marine mammal stocks. The information contained in the SARs is reviewed by regional scientific review groups (SRGs) representing Alaska, the Pacific (including Hawaii), and the U.S. Atlantic, Gulf of Mexico, and Caribbean. The SRGs were created by the MMPA to review the science that informs the SARs, and to advise NMFS on population status and trends, stock structure, uncertainties in the science, research needs, and other issues.

NMFS also reviewed other sources of new information, including marine mammal stranding data, observer program data, fisher self-reports, and other information that may not be included in the SARs.

The LOF for 2006 was based, among other things, on information provided in the final SARs for 1996 (63 FR 60, January 2, 1998), the final SARs for 2001 (67 FR 10671, March 8, 2002), the final SARs for 2002 (68 FR 17920, April 14, 2003), the final SARs for 2003 (69 FR 54262, September 8, 2004), the final SARs for 2004 (70 FR 35397, June 20, 2005), and the final SARs for 2005 (71 FR 26340, May 4, 2006). All SARs are available at: *http://www.nmfs.noaa.gov/pr/sars/*.

## Comments and Responses

NMFS received 5 comment letters on the proposed 2006 LOF (71 FR 20941, April 24, 2006) from environmental, commercial fishing, and Federal and state interests. Comments on issues outside the scope of the LOF are noted, but are not responded to in this final rule.

### General Comments

*Comment 1:* One commenter commended NMFS on the addition of detailed descriptions of the basis of classification decisions for each fishery on the 2006 LOF.

*Response:* In this final rule, NMFS provides additional information on the basis for classification of each fishery as Category I or II. The 2006 LOF identifies which stock(s) is responsible for a fishery's Category I classification, and indicates whether a fishery is classified as Category II based on serious injury or mortality of a marine mammal stock(s) or classified by analogy with another fishery (based on the definition of a "Category II fishery" in 50 CFR 229.2).

*Comment 2:* One commenter stated that in cases where the distribution of a marine mammal species overlaps with fisheries using gear types known to interact with that species, the fishery should be categorized with the presumption that a likelihood of interactions exists. Also, the commenter stated it is inappropriate to assume that interactions do not occur based only on fisher self-reporting.

*Response:* NMFS considers many factors in classifying fisheries, as directed by the implementing regulations for section 118 of the MMPA (50 CFR 229.2). In the absence of reliable information indicating the frequency of mortality and serious injury of marine mammals by a commercial fishery, the Assistant Administrator determines whether the incidental serious injury or mortality is "occasional" by evaluating other factors such as fishing techniques, gear used, methods used to deter marine mammals, target species, seasons and areas fished, qualitative data from logbooks or fisher

**Federal Register** / Vol. 71, No. 162 / Tuesday, August 22, 2006 / Rules and Regulations **48805**

reports, stranding data, and the species and distribution of marine mammals in the area, or at the discretion of the Assistant Administrator (50 CFR 229.2).

*Comment 3:* One commenter stated that a species should not be deleted from the list of species incidentally killed or injured for a particular fishery based on a lack of evidence of interactions within the last 5 years, as the risk of interactions continues to exist.

*Response:* The LOF is intended to inform the public of the current status of commercial fisheries with respect to marine mammal serious injuries and mortalities. It was never intended that the LOF serve as a comprehensive document detailing the history of a fishery in terms of marine mammal interactions. NMFS recognizes that fisheries change over time and species/ stocks should not remain on the list of species/stocks killed/injured in a certain fishery if there are no longer data to support inclusion. If observer information for interactions over the past 5 years is insufficient, NMFS uses the best available information (including stranding reports and fisher self-reports) to determine when to delete species/stocks from the list of species or stocks incidentally killed/injured. Historical information on a fishery's interactions with a marine mammal stock is presented in the SARs. Therefore, this information should not be duplicated in the LOF.

*Comment 4:* One commenter reiterated a previous recommendation on the 2005 LOF, in which the commenter requested that NMFS describe the level of observer coverage for each fishery listed on the LOF. The commenter stated that without this information the reader cannot discern whether ''no interactions were documented'' means that no interactions actually occurred or observer coverage was inadequate to determine interaction levels. Also, such a description would allow readers to evaluate classifications based on ''analogy''. The comment used as an example the classification of the CA sardine purse seine fishery due to its similarity to the CA anchovy, mackerel, tuna purse seine fishery.

*Response:* Section 118(c) of the MMPA requires that NMFS include an explanation of changes to the LOF, the approximate number of vessels or persons actively involved in a fishery, and the marine mammal stocks interacting with a fishery in a particular LOF. The best available information on the level of observer coverage for each fishery and the spatial and temporal distribution of marine mammal

interactions observed is presented in the SARs. NMFS refers readers to the SARs for the most current information on the level of observer coverage for each fishery. Copies of the SARs are available on the NMFS Office of Protected Resource's Web site at: *http:// www.nmfs.noaa.gov/pr/sars/.* Additional information on observer coverage in commercial fisheries can be found on the National Observer Program's Web site: *http:// www.st.nmfs.gov/st4/nop/.*

NMFS has not included detailed information on the level, or percentage, of observer coverage in the LOF because it is generally of limited use without also including information on the confidence associated with mortality/ serious injury estimates generated from observer data. Information regarding the Coefficient of Variation (CV) for stock-specific mortality/serious injury estimates are instead reported in the SARs.

The example used in the comment is noteworthy because the ''analogy'' upon which classification of the CA sardine purse seine fishery was based does not require observer data as its basis. This fishery is similar in many characteristics to other purse seine fisheries in the general area, and these other fisheries are in Category II (based upon the best available information from observer data from 1990–1992). Category II is the default classification for new fisheries on the LOF when there is little or no information upon which to base classification; a Category II classification requires participants to register and carry observers if requested, so that baseline information regarding incidental mortality and serious injury levels in the fishery can be determined. Thus, Category II has been identified as the appropriate classification for those fisheries with insufficient or unreliable data to support classification.

General information on observer coverage in the LOF could be useful for the public. For that reason, NMFS will consider adding relevant information to future LOFs on recently observed fisheries, or fisheries the agency intends to observe in the near term, in such a way as to avoid misinterpretation of the information.

*Comment 5:* One commenter recommended NMFS review all cases where serious injury or mortality occurred, but where the involved fishery, the affected stock, or both, was unknown, to determine if potential misallocation of take could result in misclassification of the relevant fisheries. If misclassifications are possible, NMFS should develop alternatives for classifications that

ensure the potential risks to marine mammals are evaluated in a precautionary manner.

*Response:* If a misclassification were to occur, it is more likely to err on the conservative side as to minimize potential risks to marine mammals. For example, evidence of a possible fishery take through records of stranded animals would alert NMFS to potential problems with fisheries in the area. NMFS would then evaluate spatial and temporal cues to discern overlap between stranding reports and fishing activity, as well as net or gear marks or any other evidence that might indicate fishery interaction. NMFS would use this information in determining which fisheries might be involved. Most often, NMFS has enough indication from fisheries in the area to gauge potential for certain gear to be a risk to marine mammals, and uses this information to classify fisheries by analogy to other fisheries with similar gear in Category II. NMFS may also place observers in these fisheries to gather data on fisheries for which there is not yet sufficient information to determine the level of serious injury and mortality in a given fishery and/or which stocks interact with the fishery. NMFS continues to collect additional information on marine mammal stock structure and distribution and potential fishery interactions, through research on stranded and free-swimming marine mammals to identify the potential fishery involved and improvements to observer programs.

*Comment 6:* One commenter supported observer coverage as the best way to monitor interactions between fisheries and marine mammals.

*Response:* NMFS will continue to observe Category I and II fisheries for monitoring marine mammal interactions. However, NMFS notes that self-reporting of injuries and mortalities of marine mammals by fishers is required by the MMPA. For this purpose, NMFS developed the MMAP Mortality/Injury Report Form, which is available at: *http://www.nmfs.noaa.gov/ pr/pdfs/interactions/ mmap_reporting_form.pdf.*

*Comment 7:* One commenter urged NMFS to prioritize resources for observer coverage and ensure that resources are allocated to observe fisheries that have the most interactions with marine mammals and interactions with the most imperiled species.

*Response:* As required by section 118(d)(4) of the MMPA, the highest priority for allocating observers among fisheries would be for those commercial fisheries that have incidental mortality or serious injury of marine mammals

from stocks listed as endangered or threatened under the Endangered Species Act (ESA). To the extent practicable, the next highest priority for allocation would be for those Category I and Category II commercial fisheries that have incidental mortality and serious injury of marine mammals from strategic stocks. NMFS also places observers in fisheries where a take reduction plan (TRP) is in place to monitor incidental interactions to assess progress toward reducing interactions, to monitor compliance with the TRP, and to provide information useful to further reduce serious injury and mortality. NMFS also has observer coverage in fisheries for other fishery management purposes. In these cases, the information gathered may also be helpful in determining mortality and serious injury levels for fisheries that would otherwise not be a high priority for observer coverage under the MMPA (e.g., the American Samoa longline fishery).

NMFS will continue to allocate its limited resources for observer coverage to meet MMPA requirements according to these priorities. NMFS will also try to make the best use of available resources by using existing research programs, programs operated by states or other authorities, or alternative programs where statistically reliable information can be obtained.

In addition, NMFS has begun work on a National Bycatch Report that will provide a comprehensive summary of regional and national bycatch estimates in United States commercial fisheries based on observer data and fisher reports. The first edition of this report will discuss impacts and bycatch for fish, marine mammals, sea turtles, and sea birds in a subset of selected U.S. commercial fisheries where data and estimation procedures are available to support the development of bycatch estimates. NMFS plans to release the first edition in 2008. Subsequent editions will expand upon the number of fisheries included.

*Comments on Fisheries in the Pacific Ocean*

*Comment 8:* The list of marine mammals that interact with fisheries in Alaska includes threatened and endangered species. One commenter believes NMFS should convene a Take Reduction Team consisting of the Alaska Bering Sea/ Aleutian Islands (BSAI) flatfish trawl, BSAI pollock trawl, BSAI Greenland turbot longline, BSAI Pacific cod longline, and Bering Sea sablefish pot fishery to examine the impacts of commercial fisheries on marine mammals, including direct

bycatch as well as other impacts such as those to predator-prey relationships.

*Response:* Section 118(f) of the MMPA contains provisions for convening a Take Reduction Team, based on the need for developing and implementing a Take Reduction Plan (TRP) for individual strategic marine mammal stocks according to levels of serious injury and mortality to that stock as a direct result of incidental take. Ideally, a TRP for each strategic stock that interacts with a Category I or II fishery would be developed; however, when resources are limited, the MMPA provides a set of priorities in determining the need for convening such teams. NMFS resources for developing TRPs are allocated according to these priorities. The highest priorities specified in the MMPA are for species or stocks where PBR is exceeded, those with small population sizes, and those which are declining most rapidly. In the Alaska Region, there are no Category I fisheries and none of the strategic stocks that interact with Category II fisheries meet these highest priorities. Therefore, NMFS does not have plans at this time to develop a TRP for any marine mammal stocks in Alaska.

*Comment 9:* One commenter noted that most gillnet fisheries in Alaska have little or no observer coverage, and reliance on fishers to report serious injury and mortality in those fisheries is likely to result in underestimates of serious injury and mortality. Of particular concern are humpbacks, which are known to occur in areas in which these fisheries operate. Anecdotal and documented reports of whales being caught in gillnets occur. Additionally, a humpback entangled in Alaska fishing gear has been documented in Hawaii. These reports, together with the gear's risk of incidentally taking marine mammals being analogous to East coast fisheries, should cause NMFS to elevate gillnets and purse seine fisheries to higher categories to enable observer coverage in those fisheries and more properly evaluate their risk to a variety of cetaceans, including some endangered species.

*Response:* With the implementation of Section 118 of the 1994 Amendments to the MMPA (60 FR 45086, August 30, 1995), all U.S. commercial fisheries were evaluated and re-categorized under the revised two-tier scheme currently used for fishery categorization for the annual LOF. At that time, very little information was available on marine mammal-fishery interactions for most of the nearshore fisheries in Alaska, including gillnet and purse seine fisheries. Reports by fishermen indicated some level of interaction.

However, NMFS considers this type of information to provide only a minimum estimate of interactions, and therefore considers it a less reliable indicator of the level of interaction than observer data. Due to the scarcity of reliable information, the Alaska set and drift gillnet fisheries were placed in Category II, based on analogy to gillnets in other regions of the U.S. known to incidentally entangle marine mammals, particularly cetaceans. The rationale in placing those fisheries in Category II was to preserve the ability to place observers in the fisheries to obtain more reliable estimates of the level of marine mammal serious injury and mortality, because NMFS may only place observers in Category III fisheries in voluntary programs or under compelling circumstances.

The NMFS/Alaska Regional Office's Marine Mammal Observer Program (AMMOP) places observers in each of the Category II nearshore, state-managed salmon fisheries for two-year periods. Due to limited resources, only one or two fisheries can be observed at any given time. Once a fishery is observed, data are analyzed to evaluate the serious injury and mortality levels and potential risk to marine mammals and appropriately classify the fishery on the LOF. That fishery will not be observed again until all the remaining unobserved Category II fisheries have been observed.

Since 1995, three Category II gillnet fisheries have been observed: the Cook Inlet set gillnet (1999–2000), Cook Inlet drift gillnet (1999–2000), and Kodiak set gillnet (2002, 2005) fisheries. Observer data collected in those fisheries have resulted in the retention of the Kodiak set gillnet and the Cook Inlet drift gillnet fisheries in Category II, and the re-categorization of the Cook Inlet set gillnet fishery to Category III. The Yakutat set gillnet fishery will be observed in 2007–2008.

The Alaska Regional Office maintains a record of marine mammals, including humpbacks, reported or observed entangled in fishing gear. This information is useful in monitoring the level of marine mammal-fishery interactions, but is not as statistically reliable as observer data. None of the currently available information indicates that reclassifying any of the Category II gillnet fisheries to Category I is warranted. The existing Category II fisheries are already eligible for observer coverage, and NMFS intends to place observer coverage in those fisheries as resources become available.

*Comment 10:* One commenter recommended NMFS undertake a more complete investigation of interactions with marine mammals in the Western

Pacific squid jig fishery and reclassify the fishery if warranted.

*Response:* There are no documented marine mammal serious injuries or mortalities incidental to the Western Pacific squid jig fishery, and the fishery currently has only 6 participants. NMFS will continue to consider information about this fishery's potential to interact with marine mammals, as available. Per the MMPA, NMFS will consider reclassification options for this fishery as future information warrants. Further justification for this fishery's classification as Category III is presented in the proposed rule for the 2006 LOF (71 FR 20941, April 24, 2006).

*Comment 11:* Two commenters supported the addition of the American Samoa longline fishery. However, both commenters suggested that the fishery be classified as Category II, instead of Category III, in order to ensure that sufficient funds and incentives exist to initiate an observer program to gather information on the level of interactions with marine mammals.

*Response:* Although this fishery is classified as Category III, an observer program for this fishery was initiated in April 2006 under the Magnuson-Stevens Fishery Conservation and Management Act. For more information, see 50 CFR part 665, which requires vessels participating in this fishery that are greater than 40 ft (12.2 m) in length to carry observers, if requested by NMFS. These regulations also establish a limited entry system for pelagic longline vessels fishing in waters of the U.S. exclusive economic zone (EEZ) around American Samoa. Observers have already completed several trips and, to date, there have been no observed marine mammal serious injuries or mortalities incidental to this fishery. NMFS anticipates that observer coverage will reach 20 percent of the qualifying vessels (i.e., those greater than 40 ft (12.2 m) in length) by January 2007. NMFS will reevaluate this fishery's classification as new information, including that gathered by the observer program, becomes available.

*Comment 12:* NMFS proposes to add three new Category III aquaculture fisheries in the Pacific Ocean. Two commenters suggested NMFS monitor aquaculture fisheries operations to characterize the rate and impact of interactions with marine mammals. Specifically, one commenter indicated a need for on-site observers for net pen fisheries due to past deliberate killings of marine mammals by net pen fishery operators, and for grow out pens due to the potential entanglement risks to cetaceans.

*Response:* NMFS plans to further evaluate aquaculture facilities operating in coastal and offshore areas, especially off California, to characterize the fisheries, including potential or known interactions with marine mammals. Based on the characterization of grow out pen fisheries, grow out pens occurring in deep water may pose a risk to cetaceans. Possible monitoring approaches for aquaculture fisheries include volunteer or mandatory reporting requirements by facilities to NMFS or the relevant state fishery management agency. NMFS will continue to investigate intentional killings of marine mammals in commercial fishery operations, as prohibited in implementing regulations for section 118 of the MMPA (50 CFR 229.3(f)).

### Comments on Fisheries in the Atlantic Ocean, Gulf of Mexico, and Caribbean

*Comment 13:* Four commenters supported the proposed reclassification of the Chesapeake Bay inshore gillnet fishery and the Mid-Atlantic menhaden purse seine fishery.

*Response:* Reclassification of the Chesapeake Bay inshore gillnet fishery and the Mid-Atlantic menhaden purse seine fishery from Category III to Category II is warranted, based on information presented in the 2006 proposed LOF.

*Comment 14:* One commenter stated that the Atlantic Ocean, Caribbean, Gulf of Mexico large pelagics longline fishery came under limited access in 1999 and overall effort has diminished since 1996. The commenter suggested NMFS revise the estimated number of active participants in the to 94, the number of actively fishing vessels reported in 2005.

*Response:* NMFS has updated the number of participants in the fishery to 94.

*Comment 15:* One commenter commended NMFS for recognizing interactions in the Atlantic Ocean, Caribbean, Gulf of Mexico commercial passenger fishing vessel fishery and recommended NMFS begin an observer program in this fishing sector, as there are likely additional species of marine mammals incidentally killed or injured than those listed in the LOF.

*Response:* NMFS has initiated an at-sea data collection program aboard a limited number of commercial passenger fishing vessels as a pilot program. The results of this program will help NMFS to better determine the appropriate sampling design and resources required for increased coverage of this fishery.

*Comment 16:* One commenter suggested that NMFS subdivide the Atlantic Ocean, Caribbean, Gulf of Mexico large pelagics longline fishery into three regional fisheries in the LOF to reflect variations in geographic region, target species, vessel size, area-specific regulations, and fishing season. The commenter noted specifically that the Atlantic portion of the longline fishery should be divided into northern and southern components with a boundary line at the Florida/Georgia boundary. This division would be consistent with classifications of other fisheries in Alaska, the Pacific, and the Atlantic.

*Response:* NMFS acknowledges the information provided by the commenter on potential subdivisions of this fishery and notes that we addressed similar comments in the final LOF for 1996 (see Comment/Response 31 in 60 FR 249, December 28, 1995), the final LOF for 1997 (see Comment/Response 37 in 62 FR 33, January 2, 1997), the final LOF for 1999 (see Comment/Response 18 in 64 FR 9067, February 24, 1999), the final LOF for 2001 (see Comment/ Response 16 in 66 FR 42784, August 15, 2001), and the final LOF for 2003 (see Comment/Response 29 in 68 FR 41732, July 15, 2003).

NMFS generally characterizes fisheries on the LOF consistent with the current management structure for the fishery. NMFS will, whenever possible, define fisheries the way they are defined in Federal, regional, or state fishery management programs. The pelagic longline fishery is managed by NMFS as one fishery encompassing all longline fishing effort targeting highly migratory species that may occur throughout the Atlantic Ocean, Caribbean, and Gulf of Mexico. The development of management measures to reduce serious injuries and mortalities of marine mammals in the longline fishery has focused primarily on those areas where interactions pose particular risk to marine mammals, without unduly affecting fishery operations in other areas.

*Comment 17:* One commenter recommended deleting the Western North Atlantic (WNA) stock of Atlantic spotted dolphins and the WNA stock of Pantropical spotted dolphins from the list of stocks that interact with the Atlantic Ocean, Caribbean, Gulf of Mexico large pelagics longline fishery. The draft 2005 SARs state no mortalities or serious injuries have been documented in this fishery, and incidental takes have not been documented by observers.

*Response:* The species list for this fishery should include only those

species that have been documented as injured or killed in the fishery for the period 1999–2003. NMFS will review observer data, bycatch reports, and other relevant data sources for this fishery and propose any warranted changes to the list of species incidentally injured/ killed in the proposed LOF for 2007.

*Comment 18:* One commenter stated that NMFS uses speculative data to assign mortality, and the SARs use an unproven ''pooling'' method based on data from 1999–2003 to extrapolate estimated annual interactions in 2006 in the Atlantic Ocean, Caribbean, Gulf of Mexico large pelagics longline fishery. NMFS further applies a percentage to all extrapolated estimates based on observer comments, leading to a distortion of impacts and over-estimates of incidental take based on random and rare events.

*Response:* NMFS uses observer data to assign marine mammal mortality and serious injury to this fishery. The analytical methods used to extrapolate observed serious injuries and mortalities to annual estimates of mortality and serious injury are widely accepted and have been peer reviewed. The 2005 SAR uses 1999–2003 observer data because it is consistent with the NMFS guidelines for preparing marine mammal stock assessments. These guidelines are available at: *http://www.nmfs.noaa.gov/ pr/pdfs/sars/gamms2005.pdf.*

*Comment 19:* One commenter disagreed with NMFS' proposal to remove the WNA stock of fin whales from the list of species killed/injured in the Mid-Atlantic gillnet fishery. A lack of documented observations should not be used to state that interactions do not occur. Also, given that fin whales occur in the same waters as this fishery and have been found entangled in gear of unknown origin, the gear could belong to any fixed-gear fishery.

*Response:* Observer coverage was placed in this fishery during the period 1999–2003. To date, NMFS does not have any confirmed, observer documented interactions between this stock and this fishery. Therefore, NMFS has removed the WNA stock of fin whales from the list of species killed/ injured in the Mid-Atlantic gillnet fishery.

*Comment 20:* One commenter supported the reclassification of the Mid-Atlantic menhaden purse seine fishery and encouraged NMFS to implement an observer program for this fishery.

*Response:* NMFS has reclassified the Mid-Atlantic menhaden purse seine fishery as a Category II fishery, effective September 21, 2006. As a Category II fishery, NMFS may place observers in

the fishery; however, initiation of observer coverage is dependent on resources. Also see response to comment 7.

*Comment 21:* One commenter recommended NMFS expedite investigations of Gulf of Mexico bottlenose dolphin stock structure and reevaluate which fisheries' classifications may be affected by the updated information.

*Response:* Bottlenose dolphin stock structure in the Gulf of Mexico needs to be further defined in order to re-evaluate classification of the blue crab trap/pot and menhaden purse seine fisheries, as well as other fisheries that may be interacting with bottlenose dolphins in this area. NMFS research in the Gulf of Mexico in 2005–2006, as well as future planned research in this area, will assist in furthering our understanding of bottlenose dolphin stock structure in the Gulf of Mexico so as to better evaluate impacts of these and other fisheries. NMFS will consider these research results in analysis for future LOFs.

*Comment 22:* One commenter suggested NMFS compare the distribution of fishing effort in the Southeast Atlantic inshore gillnet fishery with the distribution of marine mammals (especially bottlenose dolphins) in the region, and reclassify the fishery as Category II if overlap occurs to an appreciable degree.

*Response:* NMFS will continue to monitor fishing effort and evaluate bottlenose dolphin strandings for evidence of gillnet-related fishery interactions in and around inshore waters of the Southeast to determine the need for future reclassification of the fishery.

*Comment 23:* Three commenters recommended NMFS reclassify gillnet fisheries operating in the Southeast Atlantic, specifically the Southeast Atlantic gillnet fishery, as Category I because of their potential involvement in the January 2006 death of a North Atlantic right whale calf and to enable NMFS to fully assess their level of interaction with marine mammals. *Response:* NMFS determined the January 2006 death of a right whale calf was the result of entanglement and injury to the whale by gillnet gear in the Southeast U.S. Restricted Area; however, NMFS has not determined which specific gillnet fishery was responsible for the interaction. There are two gillnet fisheries that traditionally operate in this Southeast Atlantic: the Southeast Atlantic gillnet fishery and the Southeastern U.S. Atlantic shark gillnet fishery. Both are currently classified as Category II

fisheries. A fishery classified as Category I is one that is by itself responsible for the annual removal of 50 percent or more of any stock's potential biological removal level (50 CFR 229.2). Without definitive information regarding which fishery was involved, NMFS did not attribute the death of this right whale calf to either fishery. Therefore, elevation of the Southeast Atlantic gillnet fisheries to Category I is not warranted at this time. NMFS continues to classify these fisheries as a Category II, where they are subject to observer coverage.

Management measures were implemented following the January 2006 entanglement death of a right whale calf. NMFS issued a temporary rule effective February 15, 2006, through March 31, 2006 (71 FR 8223, February 16, 2006), restricting gillnet use in the area as required by the implementing regulations for the Atlantic Large Whale Take Reduction Plan (ALWTRP; 50 CFR 229.32(g)(1)). Specifically, the regulations state that if a serious injury or mortality of a right whale occurs in the Southeast U.S. Restricted Area during the North Atlantic right whale calving season (November 15 through March 31) as a result of an entanglement by gillnet gear, NMFS shall close that area to gillnet gear for the remainder of the time period (March 31). The regulations state NMFS shall also close that area to gillnet gear that same time period in each subsequent year, unless NMFS' Assistant Administrator revises the restricted period in accordance with 50 CFR 229.32(g)(2) or unless alternate measures are implemented.

*Comment 24:* Two commenters recommended that NMFS add North Atlantic right whales to the list of species killed/injured in the Southeast Atlantic gillnet fishery, as a result of the possibility this fishery was responsible for the January 2006 death of a right whale calf. In addition, one commenter recommended that humpback whales be added to the list of species killed/ injured for all fixed gear fisheries in their range because most gear found on entangled whales cannot be attributed to a specific fishery.

*Response:* Right and humpback whales may become entangled in fixed gears. However, NMFS has not documented any marine mammal mortalities or serious injuries incidental to any other fixed gears that have not already been described in this annual LOF. Without reasonable information regarding which fishery is involved in entanglements of right and humpback whales, NMFS does not identify all fixed gear fisheries as being responsible

for injuries and/or mortalities. However, NMFS will continue to classify these fisheries as Category II by analogy.

**Summary of Changes to the LOF for 2006**

The following summarizes changes to the LOF in 2006 in fishery classification, fisheries listed on the LOF, the number of participants in a particular fishery, and the species and/or stocks that are incidentally killed or seriously injured in a particular fishery. The placement and definition of U.S. commercial fisheries for 2006 are identical to those provided in the LOF for 2005 with the following exceptions.

*Commercial Fisheries in the Pacific Ocean*

Fishery Classification

The "AK Bering Sea and Aleutian Islands Greenland turbot longline fishery" is reclassified from Category II to Category III.

The "CA sardine purse seine fishery" is elevated from Category III to Category II. The proposed 2006 LOF stated that this fishery was elevated in part by analogy "to other Category II purse seine fisheries (e.g., CA anchovy)." Specifically, the fishery is elevated in part by analogy with the CA anchovy, mackerel, tuna purse seine fishery and the CA squid purse seine fishery.

Addition of Fisheries to the LOF

The "American Samoa longline fishery" is added to the LOF as a Category III fishery.

The "Western Pacific squid jig fishery" is added to the LOF as a Category III fishery.

The "HI Kona crab loop net fishery" is added to the LOF as a Category III fishery.

The "HI offshore pen culture fishery" is added to the LOF as a Category III fishery.

The "CA marine shellfish aquaculture fishery" is added to the LOF as a Category III fishery.

The "CA white seabass enhancement net pen fishery" is added to the LOF as a Category III fishery.

Removal of Fisheries from the LOF

The "HI net unclassified fishery" is removed from the LOF.

The "AK miscellaneous finfish pair trawl" is removed from the LOF. This was a new fishery in Alaskan waters in 1996 and was classified as Category II pending additional information on interactions with marine mammals. It was classified as Category II by analogy with pair trawl fisheries in the North Atlantic, particularly the U.S. North Atlantic large pelagics pair trawl

fishery, which demonstrated high levels of mortality and serious injury for some marine mammal species. NMFS did not propose to remove this fishery in the proposed LOF for 2006 (71 FR 78, April 24, 2006). NMFS has since learned that there have been no reported mortalities or serious injuries of marine mammals in this fishery since its addition to the LOF. In addition, the fishery is not currently in operation, with the exception of two currently inactive permits issued by the Alaska Department of Fish and Game. NMFS will reevaluate the removal of this fishery if new information on interactions with marine mammals is presented.

Fishery Name and Organizational Changes and Clarifications

The "HI tuna fishery" is renamed the "HI tuna handline fishery."

The "HI deep sea bottomfish fishery" is renamed the "HI Main Hawaiian Islands and Northwest Hawaiian Islands deep sea bottomfish fishery."

The "HI coral diving fishery" is renamed the "HI black coral diving fishery."

The "HI other fishery" is renamed the "HI charter vessel fishery."

Number of Vessels/Persons

The estimated number of participants in the "HI gillnet fishery" is updated to 35.

The estimated number of participants in the "HI opelu/akule net fishery" is updated to 12.

The estimated number of participants in the "HI purse seine fishery" is updated to 23.

The estimated number of participants in the "HI fish pond fishery" is updated to N/A. NMFS is retaining this fishery on the LOF as there may be participants in the near future.

The estimated number of participants in the "HI throw net, cast net fishery" is updated to 14.

The estimated number of participants in the "HI trolling, rod and reel fishery" is updated to 1,321.

The estimated number of participants in the "HI lobster trap fishery" is updated to 0. Fourteen permits are available if this fishery reopened.

The estimated number of participants in the "HI aku boat, pole and line fishery" is updated to 4.

The estimated number of participants in the "HI inshore handline fishery" is updated to 307.

The estimated number of participants in the "HI tuna handline fishery" (proposed name change from the "HI tuna fishery", see Fishery Name and Organizational Changes and Clarifications section) is updated to 298.

The estimated number of participants in the "HI main Hawaiian Islands and Northwest Hawaiian Islands deep sea bottomfish fishery" (proposed name change from the "HI deep sea bottomfish fishery", see Fishery Name and Organizational Changes and Clarifications section) is updated to 387.

The estimated number of participants in the "HI black coral diving fishery" (proposed name change from the "HI coral diving fishery", see Fishery Name and Organizational Changes and Clarifications section) is updated to 1.

The estimated number of participants in the "HI handpick fishery" is updated to 37.

The estimated number of participants in the "HI lobster diving fishery" is updated to 19.

The estimated number of participants in the "HI squiding, spear fishery" is updated to 91.

The estimated number of participants in the "AK BSAI Greenland turbot longline fishery" is updated to 12.

List of Species That are Incidentally Injured or Killed

*California Squid Purse Seine Fishery*

Common dolphins, stock unknown, are added to the list of marine mammal species and stocks incidentally injured or killed by the CA squid purse seine fishery.

*HI Swordfish, Tuna, Billfish, Mahi Mahi, Wahoo, and Oceanic Sharks Longline/Set Line Fishery*

The Hawaiian stocks of Blaineville's beaked whales and Pantropical spotted dolphins are added to the list of marine mammal species and stocks incidentally injured or killed by the HI swordfish, tuna, billfish, mahi mahi, wahoo, and oceanic sharks longline/set line fishery.

*HI Inshore Handline Fishery*

The Hawaiian stock of bottlenose dolphins is removed from the list of marine mammal species and stocks incidentally injured or killed by the HI inshore handline fishery.

*HI Tuna Handline Fishery*

The Hawaiian stocks of bottlenose dolphins and rough tooth dolphins are removed from the list of marine mammal species and stocks incidentally injured or killed by the Hawaii tuna handline fishery (proposed name change from "Hawaii tuna fishery", see Fishery Name and Organizational Changes and Clarifications section).

*CA/OR Thresher Shark/Swordfish Drift Gillnet Fishery*

Corrections are made to errors in the list of marine mammal species and

stocks incidentally injured or killed by the CA/OR thresher shark/swordfish drift gillnet fishery. Specifically, the CA/OR/WA Pacific coast stock of killer whales is changed to the Eastern North Pacific offshore stock, and the CA/OR/WA stock of long-beaked common dolphins is changed to the CA stock. Additionally, the Northern and Southern species of Pacific white-sided dolphins are combined to reflect how these species are currently characterized in the SARs.

*WA, OR, CA Groundfish Trawl Fishery*

Corrections are made to errors in the list of marine mammal species and stocks injured or killed incidental to the WA, OR, CA groundfish trawl fishery. Specifically, the Central North Pacific stock of Pacific white-sided dolphins is changed to the CA/OR/WA stock, and the Western stock of Steller sea lions is changed to the Eastern stock.

Alaska Fisheries

The 2004 LOF revised the Federally managed fisheries in Alaska into more discrete fisheries according to area, gear, and target species in order to more accurately reflect the fisheries as managed under Federal Fishery Management Plans. At that time, the marine mammal stocks associated with the newly delineated fisheries in the LOF were not revised accordingly. The following marine mammal stocks are added to the list of species and stocks incidently injured or killed in the following Federal fisheries.

*AK Bering Sea, Aleutian Islands Flatfish Trawl Fishery*

The Eastern North Pacific stock of Northern fur seals, the Bering Sea stocks of harbor porpoise and harbor seals, and the Alaska stocks of bearded seals, spotted seals, and walruses are added to the list of marine mammal species and stocks injured or killed incidental to the AK BSAI flatfish trawl fishery.

*AK Bering Sea, Aleutian Islands Pollock Trawl Fishery*

The Bering Sea stock of harbor seals and the Alaska stocks of Dall's porpoise, minke whales, ribbon seals, and spotted seals are added to the list of marine mammal species and stocks injured or killed incidental to the AK BSAI pollock trawl fishery.

*AK Bering Sea, Aleutian Islands Pacific Cod Longline Fishery*

The Alaska stock of ribbon seals and the Western U.S. stock of Steller sea lions are added to the list of marine mammal species and stocks injured or

killed incidental to the AK BSAI Pacific cod longline fishery.

*AK Gulf of Alaska Sablefish Longline Fishery*

The Eastern U.S. stock of Steller sea lions and the North Pacific stock of sperm whales are added to the list of marine mammal species and stocks injured or killed incidental to the AK GOA sablefish longline fishery.

*AK Bering Sea, Aleutian Islands Pacific Cod Trawl Fishery*

The Western U.S. stock of Steller sea lions and the Bering Sea stock of harbor seals are added to the list of marine mammal species and stocks injured or killed incidental to the AK BSAI Pacific cod trawl fishery.

*AK Gulf of Alaska Pacific Cod Trawl Fishery*

The Western U.S. stock of Steller sea lions is added to the list of marine mammal species and stocks injured or killed incidental to the AK GOA Pacific cod trawl fishery.

*AK Gulf of Alaska Pollock Trawl Fishery*

The Western U.S. stock of Steller sea lions, the Northeast Pacific stock of fin whales, and the North Pacific stock of Northern elephant seals are added to the list of marine mammal species and stocks injured or killed incidental to the AK GOA pollock trawl fishery.

*AK Gulf of Alaska Pacific Cod Pot Fishery*

The GOA stock of harbor seals are added to the list of marine mammal species and stocks injured or killed incidental to the AK GOA Pacific cod pot fishery.

*AK, WA, OR, CA Commercial Passenger Fishing Vessel Fishery*

The Eastern and Western U.S. stocks of Steller sea lions and an unknown stock of killer whales are added to the list of marine mammal species and stocks injured or killed incidental to the AK, WA, OR, CA commercial passenger fishing vessel fishery.

*AK Southeast Alaska Crab Pot Fishery*

The Central North Pacific (Southeast AK) stock of humpback whales is added to the list of marine mammal species and stocks injured or killed incidental to the AK Southeast Alaska crab pot fishery.

*AK Southeast Alaska Shrimp Pot Fishery*

The Central North Pacific (Southeast AK) stock of humpback whales is added to the list of marine mammal species

and stocks injured or killed incidental to the AK Southeast Alaska shrimp pot fishery.

*AK Yakutat Salmon Set Gillnet Fishery*

The Central North Pacific (Southeast AK) stock of humpback whales is added to the list of marine mammal species and stocks injured or killed incidental to the AK Yakutat salmon set gillnet fishery.

*AK Kodiak Salmon Set Gillnet Fishery*

The Western U.S. stock of Steller sea lions is added to the list of marine mammal species and stocks injured or killed incidental to the AK Kodiak salmon set gillnet fishery.

*Alaska Bering Sea, Aleutian Islands Flatfish Trawl Fishery*

The Eastern North Pacific transient stock of killer whales is removed from the list of marine mammals species and stocks injured or killed in the Alaska BSAI flatfish trawl fishery.

*Alaska Bering Sea, Aleutian Islands Pollock Trawl Fishery*

The Eastern North Pacific resident stock of killer whales is removed from the list of marine mammals species and stocks incidentally injured or killed in the Alaska BSAI pollock trawl fishery.

*Commercial Fisheries in the Atlantic Ocean, Gulf of Mexico, and Caribbean*

Fishery Classification

The ''Chesapeake Bay inshore gillnet fishery'' is elevated from Category III to Category II.

The ''Mid-Atlantic menhaden purse seine fishery'' is elevated from Category III to Category II.

Addition of Fisheries to the LOF

The ''Southeast Atlantic inshore gillnet fishery'' is added to the LOF as a Category III fishery.

Fishery Name and Organizational Changes and Clarifications

The list of target species associated with the ''Southeast Atlantic gillnet fishery'' is expanded to include the following target species: king mackerel, Spanish mackerel, whiting, bluefish, pompano, spot, croaker, little tunny, bonita, jack crevalle, and cobia. Atlantic sturgeon are listed as a species of concern under the ESA and are also managed under a fishery management plan. A moratorium on possession and harvest of this species currently exists throughout the U.S. East Coast. Additionally, fishing for shad in ocean waters is prohibited by Southeast coastal states and is therefore no longer

included as a target species of the Southeast Atlantic gillnet fishery.

Number of Vessels/Persons

The estimated number of participants in the ''Atlantic Ocean, Caribbean, Gulf of Mexico large pelagics longline fishery'' is updated to 94.

List of Species That are Incidentally Injured or Killed

*Mid-Atlantic Gillnet Fishery*

The Western North Atlantic stock of fin whales is removed from the list of marine mammal species and stocks incidentally injured or killed incidental to the Mid-Atlantic gillnet fishery.

*Atlantic Ocean, Gulf of Mexico, Caribbean Commercial Passenger Fishing Vessel Fishery*

Several bottlenose dolphin stocks are added to the list of marine mammal species and stocks incidentally injured or killed incidental to the Atlantic Ocean, Gulf of Mexico, Caribbean commercial passenger fishing vessel fishery. These bottlenose dolphin stocks include the Western North Atlantic coastal, Eastern Gulf of Mexico coastal, Northern Gulf of Mexico coastal, and Western Gulf of Mexico coastal.

*Northeast Bottom Trawl Fishery*

The Western North Atlantic offshore stock of bottlenose dolphins and the Western North Atlantic stock of striped dolphins are removed from the list of marine mammal species and stocks injured or killed incidental to the Northeast bottom trawl fishery.

**List of Fisheries**

The following two tables list U.S. commercial fisheries according to their assigned categories under section 118 of the MMPA. The estimated number of vessels/participants is expressed in terms of the number of active participants in the fishery, when possible. If this information is not available, the estimated number of vessels or persons licensed for a particular fishery is provided. If no recent information is available on the number of participants in a fishery, the number from the most recent LOF is used.

The tables also list the marine mammal species and stocks that are incidentally killed or injured in each fishery based on observer data, logbook data, stranding reports, and fisher reports. This list includes all species or stocks known to experience injury or mortality in a given fishery, but also includes species or stocks for which there are anecdotal records of interaction. Additionally, species identified by logbook entries may not be verified. Not all species or stocks identified are the reason for a fishery's placement in a given category. NMFS has designated those stocks that are responsible for a current fishery's classification by a ''[1].

There are several fisheries classified in Category II that have no recently documented interactions with marine mammals, or interactions that did not result in a serious injury or mortality. Justifications for placement of these fisheries, which are greater than 1 percent of a stock's PBR level, are by analogy to other gear types that are known to cause mortality or serious injury of marine mammals, as discussed in the final LOF for 1996 (60 FR 67063, December 28, 1995), and according to factors listed in the definition of a ''Category II fishery'' in 50 CFR 229.2. NMFS has designated those fisheries originally listed by analogy in Tables 1 and 2 by a ''[2] after that fishery's name.

Table 1 lists commercial fisheries in the Pacific Ocean (including Alaska); Table 2 lists commercial fisheries in the Atlantic Ocean, Gulf of Mexico, and Caribbean.

TABLE 1.—LIST OF FISHERIES COMMERCIAL FISHERIES IN THE PACIFIC OCEAN

| Fishery Description | Estimated # of vessels/ persons | Marine mammal species and stocks incidentally killed/injured |
|---|---|---|
| Category I | | |
| GILLNET FISHERIES: | | |
| CA angel shark/halibut and other species set gillnet (> 3.5 in. mesh) | 58 | California sea lion, U.S. Harbor seal, CA Harbor porpoise, Central CA[1] Long-beaked common dolphin, CA Northern elephant seal, CA breeding Sea otter, CA Short-beaked common dolphin, CA/OR/WA |

TABLE 1.—LIST OF FISHERIES COMMERCIAL FISHERIES IN THE PACIFIC OCEAN—Continued

| Fishery Description | Estimated # of vessels/ persons | Marine mammal species and stocks incidentally killed/injured |
|---|---|---|
| CA/OR thresher shark/swordfish drift gillnet (≥ 14 in. mesh) | 85 | Baird's beaked whale, CA/OR/WA<br>Bottlenose dolphin, CA/OR/WA offshore<br>California sea lion, U.S.<br>Cuvier's beaked whale, CA/OR/WA<br>Dall's porpoise, CA/OR/WA<br>Fin whale, CA/OR/WA<br>Gray whale, Eastern North Pacific<br>Humpback whale, CA/OR/WA-Mexico<br>Killer whale, Eastern North Pacific offshore<br>Long-beaked common dolphin, CA<br>Mesoplodont beaked whale, CA/OR/WA<br>Northern elephant seal, CA breeding<br>Northern fur seal, San Miguel Island<br>Northern right-whale dolphin, CA/OR/WA<br>Pacific white-sided dolphin, CA/OR/WA<br>Pygmy sperm whale, CA/OR/WA<br>Risso's dolphin, CA/OR/WA<br>Short-beaked common dolphin, CA/OR/WA<br>Short-finned pilot whale, CA/OR/WA[1]<br>Sperm whale, CA/OR/WA<br>Steller sea lion, Eastern U.S.<br>Striped dolphin, CA/OR/WA |
| LONGLINE/SET LINE FISHERIES: | | |
| HI swordfish, tuna, billfish, mahi mahi, wahoo, oceanic sharks longline/set line | 140 | Blainville's beaked whale, HI<br>Bottlenose dolphin, HI<br>False killer whale, HI[1]<br>Humpback whale, Central North Pacific<br>Pantropical spotted dolphin, HI<br>Risso's dolphin, HI<br>Short-finned pilot whale, HI<br>Spinner dolphin, HI<br>Sperm whale, HI |
| Category II | | |
| GILLNET FISHERIES: | | |
| AK Bristol Bay salmon drift gillnet[2] | 1,903 | Beluga whale, Bristol Bay<br>Gray whale, Eastern North Pacific<br>Harbor seal, Bering Sea<br>Northern fur seal, Eastern Pacific<br>Pacific white-sided dolphin, North Pacific<br>Spotted seal, AK<br>Steller sea lion, Western U.S.[1] |
| AK Bristol Bay salmon set gillnet[2] | 1,014 | Beluga whale, Bristol Bay<br>Gray whale, Eastern North Pacific<br>Harbor seal, Bering Sea<br>Northern fur seal, Eastern Pacific<br>Spotted seal, AK |
| AK Cook Inlet salmon drift gillnet | 576 | Beluga whale, Cook Inlet<br>Dall's porpoise, AK<br>Harbor porpoise, GOA[1]<br>Harbor seal, GOA<br>Steller sea lion, Western U.S. |
| AK Kodiak salmon set gillnet | 188 | Harbor porpoise, GOA[1]<br>Harbor seal, GOA<br>Sea otter, Southwest AK<br>Steller sea lion, Western U.S. |
| AK Metlakatla/Annette Island salmon drift gillnet[2] | 60 | None documented |

TABLE 1.—LIST OF FISHERIES COMMERCIAL FISHERIES IN THE PACIFIC OCEAN—Continued

| Fishery Description | Estimated # of vessels/ persons | Marine mammal species and stocks incidentally killed/injured |
|---|---|---|
| AK Peninsula/Aleutian Islands salmon drift gillnet[2] | 164 | Dall's porpoise, AK<br>Harbor porpoise, GOA<br>Harbor seal, GOA<br>Northern fur seal, Eastern Pacific |
| AK Peninsula/Aleutian Islands salmon set gillnet[2] | 116 | Harbor porpoise, Bering Sea<br>Steller sea lion, Western U.S. |
| AK Prince William Sound salmon drift gillnet | 541 | Dall's porpoise, AK<br>Harbor porpoise, GOA[1]<br>Harbor seal, GOA<br>Northern fur seal, Eastern Pacific<br>Pacific white-sided dolphin, North Pacific<br>Steller sea lion, Western U.S.[1] |
| AK Southeast salmon drift gillnet | 481 | Dall's porpoise, AK<br>Harbor porpoise, Southeast AK<br>Harbor seal, Southeast AK<br>Humpback whale, Central North Pacific[1]<br>Pacific white-sided dolphin, North Pacific<br>Steller sea lion, Eastern U.S. |
| AK Yakutat salmon set gillnet[2] | 170 | Gray whale, Eastern North Pacific<br>Harbor seal, Southeast AK<br>Humpback whale, Central North Pacific (Southeast AK) |
| CA yellowtail, barracuda, white seabass, and tuna drift gillnet fishery (mesh size > 3.5 inches and < 14 inches)[2] | 24 | California sea lion, U.S.<br>Long-beaked common dolphin, CA<br>Short-beaked common dolphin, CA/OR/WA |
| WA Puget Sound Region salmon drift gillnet (includes all inland waters south of US-Canada border and eastward of the Bonilla-Tatoosh line-Treaty Indian fishing is excluded) | 210 | Dall's porpoise, CA/OR/WA<br>Harbor porpoise, inland WA[1]<br>Harbor seal, WA inland |
| PURSE SEINE FISHERIES: | | |
| AK Southeast salmon purse seine | 416 | Humpback whale, Central North Pacific[1] |
| CA anchovy, mackerel, tuna purse seine | 110 | Bottlenose dolphin, CA/OR/WA offshore[1]<br>California sea lion, U.S.<br>Harbor seal, CA |
| CA sardine purse seine[2] | 110 | California sea lion, U.S. |
| CA squid purse seine | 65 | Common dolphin, unknown<br>Short-finned pilot whale, CA/OR/WA[1] |
| TRAWL FISHERIES: | | |
| AK Bering Sea, Aleutian Islands flatfish trawl | 26 | Bearded seal, AK<br>Harbor porpoise, Bering Sea<br>Harbor seal, Bering Sea<br>Killer whale, AK resident[1]<br>Northern fur seal, Eastern North Pacific<br>Spotted seal, AK<br>Steller sea lion, Western U.S.[1]<br>Walrus, AK |
| AK Bering Sea, Aleutian Islands pollock trawl | 120 | Dall's porpoise, AK<br>Harbor seal, AK<br>Humpback whale, Central North Pacific[1]<br>Humpback whale, Western North Pacific[1]<br>Killer whale, Eastern North Pacific, GOA, Aleutian Islands, and Bering Sea transient[1]<br>Minke whale, AK<br>Ribbon seal, AK<br>Spotted seal, AK<br>Steller sea lion, Western U.S.[1] |

TABLE 1.—LIST OF FISHERIES COMMERCIAL FISHERIES IN THE PACIFIC OCEAN—Continued

| Fishery Description | Estimated # of vessels/ persons | Marine mammal species and stocks incidentally killed/injured |
|---|---|---|
| LONGLINE/SET LINE FISHERIES: | | |
| AK Bering Sea, Aleutian Islands Pacific cod longline | 114 | Killer whale, AK resident[1]<br>Killer whale, Eastern North Pacific, GOA, Aleutian Islands, and Bering Sea transient[1]<br>Ribbon seal, AK<br>Steller sea lion, Western U.S. |
| CA pelagic longline[2] | 6 | California sea lion, U.S.<br>Risso's dolphin, CA/OR/WA |
| OR swordfish floating longline[2] | 0 | None documented |
| OR blue shark floating longline[2] | 1 | None documented |
| POT, RING NET, AND TRAP FISHERIES: | | |
| AK Bering Sea sablefish pot | 6 | Humpback whale, Central North Pacific[1]<br>Humpback whale, Western North Pacific[1] |
| Category III | | |
| GILLNET FISHERIES: | | |
| AK Cook Inlet salmon set gillnet | 745 | Beluga whale, Cook Inlet<br>Dall's porpoise, AK<br>Harbor porpoise, GOA<br>Harbor seal, GOA<br>Steller sea lion, Western U.S. |
| AK Kuskokwim, Yukon, Norton Sound, Kotzebue salmon gillnet | 1,922 | Harbor porpoise, Bering Sea |
| AK miscellaneous finfish set gillnet | 3 | Steller sea lion, Western U.S. |
| AK Prince William Sound salmon set gillnet | 30 | Harbor seal, GOA<br>Steller sea lion, Western U.S. |
| AK roe herring and food/bait herring gillnet | 2,034 | None documented |
| CA set and drift gillnet fisheries that use a stretched mesh size of 3.5 in or less | 341 | None documented |
| Hawaii gillnet | 35 | Bottlenose dolphin, HI<br>Spinner dolphin, HI |
| WA Grays Harbor salmon drift gillnet (excluding treaty Tribal fishing) | 24 | Harbor seal, OR/WA coast |
| WA, OR herring, smelt, shad, sturgeon, bottom fish, mullet, perch, rockfish gillnet | 913 | None documented |
| WA, OR lower Columbia River (includes tributaries) drift gillnet | 110 | California sea lion, U.S.Harbor seal, OR/WA coast |
| WA Willapa Bay drift gillnet | 82 | Harbor seal, OR/WA coast<br>Northern elephant seal, CA breeding |
| PURSE SEINE, BEACH SEINE, ROUND HAUL AND THROW NET FISHERIES: | | |
| AK Metlakatla salmon purse seine | 10 | None documented |
| AK miscellaneous finfish beach seine | 1 | None documented |
| AK miscellaneous finfish purse seine | 3 | None documented |
| AK octopus/squid purse seine | 2 | None documented |
| AK roe herring and food/bait herring beach seine | 8 | None documented |

TABLE 1.—LIST OF FISHERIES COMMERCIAL FISHERIES IN THE PACIFIC OCEAN—Continued

| Fishery Description | Estimated # of vessels/ persons | Marine mammal species and stocks incidentally killed/injured |
|---|---|---|
| AK roe herring and food/bait herring purse seine | 624 | None documented |
| AK salmon beach seine | 34 | None documented |
| AK salmon purse seine (except Southeast Alaska, which is in Category II) | 953 | Harbor seal, GOA |
| CA herring purse seine | 100 | California sea lion, U.S. Harbor seal, CA |
| HI Kona crab loop net | 42 | None documented |
| HI opelu/akule net | 12 | None documented |
| HI purse seine | 23 | None documented |
| HI throw net, cast net | 14 | None documented |
| WA (all species) beach seine or drag seine | 235 | None documented |
| WA, OR herring, smelt, squid purse seine or lampara | 130 | None documented |
| WA salmon purse seine | 440 | None documented |
| WA salmon reef net | 53 | None documented |
| DIP NET FISHERIES: | | |
| CA squid dip net | 115 | None documented |
| WA, OR smelt, herring dip net | 119 | None documented |
| MARINE AQUACULTURE FISHERIES: | | |
| CA marine shellfish aquaculture | unknown | None documented |
| CA salmon enhancement rearing pen | >1 | None documented |
| CA white seabass enhancement net pens | 13 | California sea lion, U.S. |
| HI offshore pen culture | 2 | None documented |
| OR salmon ranch | 1 | None documented |
| WA, OR salmon net pens | 14 | California sea lion, U.S. Harbor seal, WA inland waters |
| TROLL FISHERIES: | | |
| AK North Pacific halibut, AK bottom fish, WA, OR, CA albacore, groundfish, bottom fish, CA halibut non-salmonid troll fisheries | 1,530 (330 AK) | None documented |
| AK salmon troll | 2,335 | Steller sea lion, Eastern U.S. Steller sea lion, Western U.S. |
| American Samoa tuna troll | < 50 | None documented |
| CA/OR/WA salmon troll | 4,300 | None documented |
| Commonwealth of the Northern Mariana Islands tuna troll | 50 | None documented |
| Guam tuna troll | 50 | None documented |
| HI trolling, rod and reel | 1,321 | None documented |
| LONGLINE/SET LINE FISHERIES: | | |
| AK Bering Sea, Aleutian Islands Greenland turbot longline | 12 | Killer whale, AK resident Killer whale, Eastern North Pacific, GOA, Aleutian Islands, and Bering Sea transient |

TABLE 1.—LIST OF FISHERIES COMMERCIAL FISHERIES IN THE PACIFIC OCEAN—Continued

| Fishery Description | Estimated # of vessels/ persons | Marine mammal species and stocks incidentally killed/injured |
|---|---|---|
| AK Bering Sea, Aleutian Islands rockfish longline | 17 | None documented |
| AK Bering Sea, Aleutian Islands sablefish longline | 63 | None documented |
| AK Gulf of Alaska halibut longline | 1,302 | None documented |
| AK Gulf of Alaska Pacific cod longline | 440 | None documented |
| AK Gulf of Alaska rockfish longline | 421 | None documented |
| AK Gulf of Alaska sablefish longline | 412 | Sperm whale, North Pacific<br>Steller sea lion, Eastern U.S. |
| AK halibut longline/set line (State and Federal waters) | 3,079 | Steller sea lion, Western U.S. |
| AK octopus/squid longline | 7 | None documented |
| AK state-managed waters groundfish longline/setline (including sablefish, rockfish, and miscellaneous finfish) | 731 | None documented |
| American Samoa longline | 138 | None documented |
| WA, OR, CA groundfish, bottomfish longline/set line | 367 | None documented |
| WA, OR North Pacific halibut longline/set line | 350 | None documented |
| TRAWL FISHERIES: | | |
| AK Bering Sea, Aleutian Islands Atka mackerel trawl | 8 | Steller sea lion, Western U.S. |
| AK Bering Sea, Aleutian Islands Pacific cod trawl | 87 | Harbor seal, Bering Sea<br>Steller sea lion, Western U.S. |
| AK Bering Sea, Aleutian Islands rockfish trawl | 9 | None documented |
| AK Gulf of Alaska flatfish trawl | 52 | None documented |
| AK Gulf of Alaska Pacific cod trawl | 101 | Steller sea lion, Western U.S. |
| AK Gulf of Alaska pollock trawl | 83 | Fin whale, Northeast Pacific<br>Northern elephant seal, North Pacific<br>Steller sea lion, Western U.S. |
| AK Gulf of Alaska rockfish trawl | 45 | None documented |
| AK food/bait herring trawl | 3 | None documented |
| AK miscellaneous finfish otter or beam trawl | 6 | None documented |
| AK shrimp otter trawl and beam trawl (statewide and Cook Inlet) | 58 | None documented |
| AK state-managed waters of Cook Inlet, Kachemak Bay, Prince William Sound, Southeast AK groundfish trawl | 2 | None documented |
| WA, OR, CA groundfish trawl | 585 | California sea lion, U.S.<br>Dall's porpoise, CA/OR/WA<br>Harbor seal, OR/WA coast<br>Northern fur seal, Eastern Pacific<br>Pacific white-sided dolphin, CA/OR/WA<br>Steller sea lion, Eastern U.S. |
| WA, OR, CA shrimp trawl | 300 | None documented |
| POT, RING NET, AND TRAP FISHERIES: | | |
| AK Aleutian Islands sablefish pot | 8 | None documented |
| AK Bering Sea, Aleutian Islands Pacific cod pot | 76 | None documented |
| AK Bering Sea, Aleutian Islands crab pot | 329 | None documented |

TABLE 1.—LIST OF FISHERIES COMMERCIAL FISHERIES IN THE PACIFIC OCEAN—Continued

| Fishery Description | Estimated # of vessels/ persons | Marine mammal species and stocks incidentally killed/injured |
| --- | --- | --- |
| AK Gulf of Alaska crab pot | unknown | None documented |
| AK Gulf of Alaska Pacific cod pot | 154 | Harbor seal, GOA |
| AK Southeast Alaska crab pot | unknown | Humpback whale, Central North Pacific (Southeast AK) |
| AK Southeast Alaska shrimp pot | unknown | Humpback whale, Central North Pacific (Southeast AK) |
| AK octopus/squid pot | 72 | None documented |
| AK snail pot | 2 | None documented |
| CA lobster, prawn, shrimp, rock crab, fish pot | 608 | Sea otter, CA |
| OR, CA hagfish pot or trap | 25 | None documented |
| WA, OR, CA crab pot | 1,478 | Gray whale, Eastern North Pacific |
| WA, OR, CA sablefish pot | 176 | None documented |
| WA, OR shrimp pot/trap | 254 | None documented |
| HI crab trap | 22 | None documented |
| HI fish trap | 19 | None documented |
| HI lobster trap | 0 | Hawaiian monk seal |
| HI shrimp trap | 5 | None documented |
| HANDLINE AND JIG FISHERIES: | | |
| AK miscellaneous finfish handline and mechanical jig | 100 | None documented |
| AK North Pacific halibut handline and mechanical jig | 93 | None documented |
| AK octopus/squid handline | 2 | None documented |
| American Samoa bottomfish | <50 | None documented |
| Commonwealth of the Northern Mariana Islands bottomfish | <50 | None documented |
| Guam bottomfish | <50 | None documented |
| HI aku boat, pole and line | 4 | None documented |
| HI Main Hawaiian Islands, Northwest Hawaiian Islands deep sea bottomfish | 387 | Hawaiian monk seal |
| HI inshore handline | 307 | None documented |
| HI tuna handline | 298 | Hawaiian monk seal |
| WA groundfish, bottomfish jig | 679 | None documented |
| Western Pacific squid jig | 6 | None documented |
| HARPOON FISHERIES: | | |
| CA swordfish harpoon | 30 | None documented |
| POUND NET/WEIR FISHERIES: | | |
| AK herring spawn on kelp pound net | 452 | None documented |
| AK Southeast herring roe/food/bait pound net | 3 | None documented |
| WA herring brush weir | 1 | None documented |
| BAIT PENS: | | |

TABLE 1.—LIST OF FISHERIES COMMERCIAL FISHERIES IN THE PACIFIC OCEAN—Continued

| Fishery Description | Estimated # of vessels/ persons | Marine mammal species and stocks incidentally killed/injured |
|---|---|---|
| WA/OR/CA bait pens | 13 | California sea lion, U.S. |
| DREDGE FISHERIES: | | |
| Coastwide scallop dredge | 108 (12 AK) | None documented |
| DIVE, HAND/MECHANICAL COLLECTION FISHERIES: | | |
| AK abalone | 1 | None documented |
| AK clam | 156 | None documented |
| WA herring spawn on kelp | 4 | None documented |
| AK dungeness crab | 3 | None documented |
| AK herring spawn on kelp | 363 | None documented |
| AK urchin and other fish/shellfish | 471 | None documented |
| CA abalone | 111 | None documented |
| CA sea urchin | 583 | None documented |
| HI black coral diving | 1 | None documented |
| HI fish pond | N/A | None documented |
| HI handpick | 37 | None documented |
| HI lobster diving | 19 | None documented |
| HI squiding, spear | 91 | None documented |
| WA, CA kelp | 4 | None documented |
| WA/OR sea urchin, other clam, octopus, oyster, sea cucumber, scallop, ghost shrimp hand, dive, or mechanical collection | 637 | None documented |
| WA shellfish aquaculture | 684 | None documented |
| COMMERCIAL PASSENGER FISHING VESSEL (CHARTER BOAT) FISHERIES: | | |
| AK, WA, OR, CA commercial passenger fishing vessel | >7,000 (1,107 AK) | Killer whale, stock unknown Steller sea lion, Eastern U.S. Steller sea lion, Western U.S. |
| HI charter vessel | 114 | None documented |
| LIVE FINFISH/SHELLFISH FISHERIES: | | |
| CA finfish and shellfish live trap/hook-and-line | 93 | None documented |

List of Abbreviations and Symbols Used in Table 1: AK - Alaska; CA - California; GOA - Gulf of Alaska; HI - Hawaii; OR - Oregon; WA - Washington; [1] - Fishery classified based on serious injuries and mortalities of this stock are greater than 1 percent, but less than 50 percent of the stock's PBR; [2] - Fishery classified by analogy.

TABLE 2—LIST OF FISHERIES COMMERCIAL FISHERIES IN THE ATLANTIC OCEAN, GULF OF MEXICO, AND CARIBBEAN

| Fishery Description | Estimated # of vessels/persons | Marine mammal species and stocks incidentally killed/injured |
|---|---|---|
| Category I | | |
| GILLNET FISHERIES: | | |

TABLE 2—LIST OF FISHERIES COMMERCIAL FISHERIES IN THE ATLANTIC OCEAN, GULF OF MEXICO, AND CARIBBEAN—Continued

| Fishery Description | Estimated # of vessels/persons | Marine mammal species and stocks incidentally killed/injured |
|---|---|---|
| Mid-Atlantic gillnet | >655 | Bottlenose dolphin, WNA coastal[1]<br>Bottlenose dolphin, WNA offshore[1]<br>Common dolphin, WNA<br>Gray seal, WNA<br>Harbor porpoise, GME/BF[1]<br>Harbor seal, WNA<br>Harp seal, WNA<br>Humpback whale, Gulf of Maine[1]<br>Long-finned pilot whale, WNA<br>Minke whale, Canadian east coast[1]<br>Short-finned pilot whale, WNA<br>White-sided dolphin, WNA |
| Northeast sink gillnet | 341 | Bottlenose dolphin, WNA offshore<br>Common dolphin, WNA<br>Fin whale, WNA<br>Gray seal, WNA<br>Harbor porpoise, GME/BF[1]<br>Harbor seal, WNA<br>Harp seal[1], WNA<br>Hooded seal, WNA<br>Humpback whale, WNA[1]<br>Minke whale, Canadian east coast[1]<br>North Atlantic right whale, WNA[1]<br>Risso's dolphin, WNA<br>White-sided dolphin, WNA |
| LONGLINE FISHERIES: | | |
| Atlantic Ocean, Caribbean, Gulf of Mexico large pelagics longline | 94 | Atlantic spotted dolphin, Northern GMX<br>Atlantic spotted dolphin, WNA<br>Bottlenose dolphin, GMX outer continental shelf<br>Bottlenose dolphin, GMX, continental shelf edge and slope<br>Bottlenose dolphin, WNA offshore<br>Common dolphin, WNA<br>Cuvier's beaked whale, WNA<br>Long-finned pilot whale, WNA[1]<br>Mesoplodon beaked whale, WNA<br>Pantropical spotted dolphin, Northern GMX<br>Pantropical spotted dolphin, WNA<br>Pygmy sperm whale, WNA[1]<br>Risso's dolphin, Northern GMX<br>Risso's dolphin, WNA<br>Short-finned pilot whale, Northern GMX<br>Short-finned pilot whale, WNA[1] |
| TRAP/POT FISHERIES: | | |
| Northeast/Mid-Atlantic American lobster trap/pot | 13,000 | Fin whale, WNA<br>Harbor seal, WNA<br>Humpback whale, WNA[1]<br>Minke whale, Canadian east coast[1]<br>North Atlantic right whale, WNA[1] |
| TRAWL FISHERIES: | | |
| Mid-Atlantic mid-water trawl (including pair trawl) | 620 | Bottlenose dolphin, WNA offshore<br>Common dolphin, WNA[1]<br>Long-finned pilot whale, WNA[1]<br>Risso's dolphin, WNA<br>Short-finned pilot whale, WNA[1]<br>White-sided dolphin, WNA[1] |
| Category II | | |
| GILLNET FISHERIES: | | |
| Chesapeake Bay inshore gillnet[2] | 45 | None documented |

TABLE 2—LIST OF FISHERIES COMMERCIAL FISHERIES IN THE ATLANTIC OCEAN, GULF OF MEXICO, AND CARIBBEAN—Continued

| Fishery Description | Estimated # of vessels/persons | Marine mammal species and stocks incidentally killed/injured |
|---|---|---|
| Gulf of Mexico gillnet[2] | 724 | Bottlenose dolphin, Eastern GMX coastal<br>Bottlenose dolphin, GMX bay, sound, and estuarine<br>Bottlenose dolphin, Northern GMX coastal<br>Bottlenose dolphin, Western GMX coastal |
| North Carolina inshore gillnet | 94 | Bottlenose dolphin, WNA coastal[1] |
| Northeast anchored float gillnet[2] | 133 | Harbor seal, WNA<br>Humpback whale, WNA<br>White-sided dolphin, WNA |
| Northeast drift gillnet2 | unknown | None documented |
| Southeast Atlantic gillnet[2] | 779 | Bottlenose dolphin, WNA coastal |
| Southeastern U.S. Atlantic shark gillnet | 6 | Atlantic spotted dolphin, WNA<br>Bottlenose dolphin, WNA coastal[1]<br>North Atlantic right whale, WNA |
| TRAWL FISHERIES: | | |
| Mid-Atlantic bottom trawl | >1,000 | Common dolphin, WNA[1]<br>Long-finned pilot whale, WNA[1]<br>Short-finned pilot whale, WNA[1] |
| Northeast mid-water trawl (including pair trawl) | 17 | Harbor seal, WNA<br>Long-finned pilot whale, WNA[1]<br>Short-finned pilot whale, WNA[1]<br>White-sided dolphin, WNA |
| Northeast bottom trawl | 1,052 | Common dolphin, WNA<br>Harbor porpoise, GME/BF<br>Harp seal, WNA[1]<br>Long-finned pilot whale, WNA<br>Short-finned pilot whale, WNA<br>White-sided dolphin, WNA[1] |
| TRAP/POT FISHERIES: | | |
| Atlantic blue crab trap/pot | >16,000 | Bottlenose dolphin, WNA coastal[1]<br>West Indian manatee, FL[1] |
| Atlantic mixed species trap/pot[2] | unknown | Fin whale, WNA<br>Humpback whale, Gulf of Maine |
| PURSE SEINE FISHERIES: | | |
| Gulf of Mexico menhaden purse seine | 50 | Bottlenose dolphin, Eastern GMX coastal<br>Bottlenose dolphin, GMX bay, sound, estuarine<br>Bottlenose dolphin, Northern GMX coastal[1]<br>Bottlenose dolphin, Western GMX coastal |
| Mid-Atlantic menhaden purse seine[2] | 22 | Bottlenose dolphin, WNA coastal |
| HAUL/BEACH SEINE FISHERIES: | | |
| Mid-Atlantic haul/beach seine | 25 | Bottlenose dolphin, WNA coastal[1]<br>Harbor porpoise, GME/BF |
| North Carolina long haul seine | 33 | Bottlenose dolphin, WNA coastal[1] |
| STOP NET FISHERIES: | | |
| North Carolina roe mullet stop net | 13 | Bottlenose dolphin, WNA coastal[1] |
| POUND NET FISHERIES: | | |
| Virginia pound net | 187 | Bottlenose dolphin, WNA coastal[1] |

TABLE 2—LIST OF FISHERIES COMMERCIAL FISHERIES IN THE ATLANTIC OCEAN, GULF OF MEXICO, AND CARIBBEAN—Continued

| Fishery Description | Estimated # of vessels/persons | Marine mammal species and stocks incidentally killed/injured |
|---|---|---|
| Category III | | |
| GILLNET FISHERIES: | | |
| Caribbean gillnet | >991 | Dwarf sperm whale, WNA<br>West Indian manatee, Antillean |
| Delaware River inshore gillnet | 60 | None documented |
| Long Island Sound inshore gillnet | 20 | None documented |
| Rhode Island, southern Massachusetts (to Monomoy Island), and New York Bight (Raritan and Lower New York Bays) inshore gillnet | 32 | None documented |
| Southeast Atlantic inshore gillnet | unknown | None documented |
| TRAWL FISHERIES: | | |
| Atlantic shellfish bottom trawl | 972 | None documented |
| Gulf of Mexico butterfish trawl | 2 | Bottlenose dolphin, Northern GMX outer continental shelf<br>Bottlenose dolphin, Northern GMX continental shelf edge and slope |
| Gulf of Mexico mixed species trawl | 20 | None documented |
| Southeastern U.S. Atlantic, Gulf of Mexico shrimp trawl | >18,000 | Bottlenose dolphin, Eastern GMX coastal<br>Bottlenose dolphin, Western GMX coastal<br>Bottlenose dolphin, GMX bay, sound, estuarine<br>West Indian Manatee, FL |
| MARINE AQUACULTURE FISHERIES: | | |
| Finfish aquaculture | 48 | Harbor seal, WNA |
| Shellfish aquaculture | unknown | None documented |
| PURSE SEINE FISHERIES: | | |
| Gulf of Maine Atlantic herring purse seine | 30 | Harbor porpoise, GME/BF<br>Harbor seal, WNA<br>Gray seal, WNA |
| Gulf of Maine menhaden purse seine | 50 | None documented |
| Florida west coast sardine purse seine | 10 | Bottlenose dolphin, Eastern GMX coastal |
| U.S. Atlantic tuna purse seine | 5 | Long-finned pilot whale, WNA<br>Short-finned pilot whale, WNA |
| U.S. Mid-Atlantic hand seine | >250 | None documented |
| LONGLINE/HOOK-AND-LINE FISHERIES: | | |
| Northeast/Mid-Atlantic bottom longline/hook-and-line | 46 | None documented |
| Gulf of Maine, U.S. Mid-Atlantic tuna, shark swordfish hook-and-line/harpoon | 26,223 | Humpback whale, WNA |
| Southeastern U.S. Atlantic, Gulf of Mexico, and Caribbean snapper-grouper and other reef fish bottom longline/hook-and-line | >5,000 | None documented |
| Southeastern U.S. Atlantic, Gulf of Mexico shark bottom longline/hook-and-line | <125 | None documented |
| Southeastern U.S. Atlantic, Gulf of Mexico, and Caribbean pelagic hook-and-line/harpoon | 1,446 | None documented |

TABLE 2—LIST OF FISHERIES COMMERCIAL FISHERIES IN THE ATLANTIC OCEAN, GULF OF MEXICO, AND CARIBBEAN—Continued

| Fishery Description | Estimated # of vessels/persons | Marine mammal species and stocks incidentally killed/injured |
|---|---|---|
| TRAP/POT FISHERIES | | |
| Caribbean mixed species trap/pot | >501 | None documented |
| Caribbean spiny lobster trap/pot | >197 | None documented |
| Florida spiny lobster trap/pot | 2,145 | Bottlenose dolphin, Eastern GMX coastal |
| Gulf of Mexico blue crab trap/pot | 4,113 | Bottlenose dolphin, Western GMX coastal<br>Bottlenose dolphin, Northern GMX coastal<br>Bottlenose dolphin, Eastern GMX coastal<br>Bottlenose dolphin, GMX Bay, Sound, & Estuarine<br>West Indian manatee, FL |
| Gulf of Mexico mixed species trap/pot | unknown | None documented |
| Southeastern U.S. Atlantic, Gulf of Mexico golden crab trap/pot | 10 | None documented |
| Southeastern U.S. Atlantic, Gulf of Mexico stone crab trap/pot | 4,453 | None documented |
| U.S. Mid-Atlantic eel trap/pot | >700 | None documented |
| STOP SEINE/WEIR/POUND NET FISHERIES: | | |
| Gulf of Maine herring and Atlantic mackerel stop seine/weir | 50 | Gray seal, Northwest North Atlantic<br>Harbor porpoise, GME/BF<br>Harbor seal, WNA<br>Minke whale, Canadian east coast<br>White-sided dolphin, WNA |
| U.S. Mid-Atlantic crab stop seine/weir | 2,600 | None documented |
| U.S. Mid-Atlantic mixed species stop seine/weir/pound net (except the North Carolina roe mullet stop net) | 751 | None documented |
| DREDGE FISHERIES: | | |
| Gulf of Maine mussel | >50 | None documented |
| Gulf of Maine, U.S. Mid-Atlantic sea scallop dredge | 233 | None documented |
| U.S. Mid-Atlantic/Gulf of Mexico oyster | 7,000 | None documented |
| U.S. Mid-Atlantic offshore surf clam and quahog dredge | 100 | None documented |
| HAUL/BEACH SEINE FISHERIES: | | |
| Caribbean haul/beach seine | 15 | West Indian manatee, Antillean |
| Gulf of Mexico haul/beach seine | unknown | None documented |
| Southeastern U.S. Atlantic, haul/beach seine | 25 | None documented |
| DIVE, HAND/MECHANICAL COLLECTION FISHERIES: | | |
| Atlantic Ocean, Gulf of Mexico, Caribbean shellfish dive, hand/mechanical collection | 20,000 | None documented |
| Gulf of Maine urchin dive, hand/mechanical collection | >50 | None documented |
| Gulf of Mexico, Southeast Atlantic, Mid-Atlantic, and Caribbean cast net | unknown | None documented |
| COMMERCIAL PASSENGER FISHING VESSEL (CHARTER BOAT) FISHERIES: | | |

TABLE 2—LIST OF FISHERIES COMMERCIAL FISHERIES IN THE ATLANTIC OCEAN, GULF OF MEXICO, AND CARIBBEAN—Continued

| Fishery Description | Estimated # of vessels/persons | Marine mammal species and stocks incidentally killed/injured |
|---|---|---|
| Atlantic Ocean, Gulf of Mexico, Caribbean commercial passenger fishing vessel | 4,000 | Bottlenose dolphin, Eastern GMX coastal Bottlenose dolphin, Northern GMX coastal Bottlenose dolphin, Western GMX coastal Bottlenose dolphin, WNA coastal |

List of Abbreviations and Symbols Used in Table 2: FL - Florida; GA - Georgia; GME/BF - Gulf of Maine/Bay of Fundy; GMX - Gulf of Mexico; NC - North Carolina; SC - South Carolina; TX - Texas; WNA - Western North Atlantic; [1] - Fishery classified based on serious injuries and mortalities of this stock are greater than 1 percent, but less than 50 percent of the stock's PBR; [2] - Fishery classified by analogy.

## Classification

The Chief Counsel for Regulation of the Department of Commerce certified to the Chief Counsel for Advocacy of the Small Business Administration that this rule would not have a significant economic impact on a substantial number of small entities. For convenience, the factual basis leading to the certification is repeated below.

Under existing regulations, all fishers participating in Category I or II fisheries must register under the MMPA, obtain an Authorization Certificate, and pay a fee of $25 (with the exception of those in regions with a registration integrated with existing state and Federal permitting processes). Additionally, fishers may be subject to a take reduction plan and requested to carry an observer. The Authorization Certificate authorizes the taking of marine mammals incidental to commercial fishing operations. NMFS has estimated that approximately 41,730 fishing vessels, most of which are small entities, operate in Category I or II fisheries, and therefore, are required to register. However, registration has been integrated with existing state or Federal registration programs for the majority of these fisheries so that the majority of fishers do not need to register separately under the MMPA. Currently, approximately 600 fishers register directly with NMFS under the MMPA authorization program.

Though this rule would affect approximately 500 small entities, the $25 registration fee, with respect to anticipated revenues, is not considered a significant economic impact. If a vessel is requested to carry an observer, fishers will not incur any economic costs associated with carrying that observer. As a result of this certification, an initial regulatory flexibility analysis was not prepared. In the event that reclassification of a fishery to Category I or II results in a take reduction plan, economic analyses of the effects of that plan will be summarized in subsequent rulemaking actions.

This rule contains collection-of-information requirements subject to the Paperwork Reduction Act. The collection of information for the registration of fishers under the MMPA has been approved by the Office of Management and Budget (OMB) under OMB control number 0648–0293 (0.15 hours per report for new registrants and 0.09 hours per report for renewals). The requirement for reporting marine mammal injuries or mortalities has been approved by OMB under OMB control number 0648–0292 (0.15 hours per report). These estimates include the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding these reporting burden estimates or any other aspect of the collections of information, including suggestions for reducing burden, to NMFS and OMB (see **ADDRESSES** and **SUPPLEMENTARY INFORMATION**).

Notwithstanding any other provision of law, no person is required to respond to nor shall a person be subject to a penalty for failure to comply with a collection of information subject to the requirements of the Paperwork Reduction Act unless that collection of information displays a currently valid OMB control number.

This rule has been determined to be not significant for the purposes of Executive Order 12866.

An environmental assessment (EA) was prepared under the National Environmental Policy Act (NEPA) for regulations to implement section 118 of the MMPA (1995 EA). NMFS revised that EA relative to classifying U.S. commercial fisheries on the LOF in December 2005. Both the 1995 EA and the 2005 EA concluded that implementation of MMPA section 118 regulations would not have a significant impact on the human environment. This rule would not make any significant change in the management of reclassified fisheries, and therefore, this rule is not expected to change the analysis or conclusion of the 2005 EA. If NMFS takes a management action, for example, through the development of a Take Reduction Plan (TRP), NMFS will first prepare an environmental document, as required under NEPA, specific to that action.

This rule would not affect species listed as threatened or endangered under the Endangered Species Act (ESA) or their associated critical habitat. The impacts of numerous fisheries have been analyzed in various biological opinions, and this rule will not affect the conclusions of those opinions. The classification of fisheries on the LOF is not considered to be a management action that would adversely affect threatened or endangered species. If NMFS takes a management action, for example, through the development of a TRP, NMFS would conduct consultation under ESA section 7 for that action.

This rule would have no adverse impacts on marine mammals and may have a positive impact on marine mammals by improving knowledge of marine mammals and the fisheries interacting with marine mammals through information collected from observer programs, stranding and sighting data, or take reduction teams.

This rule would not affect the land or water uses or natural resources of the coastal zone, as specified under section 307 of the Coastal Zone Management Act.

Dated: August 15, 2006.

**Samuel D. Rauch, III,**

*Deputy Assistant Administrator for Regulatory Programs, National Marine Fisheries Service.*

[FR Doc. 06–7071 Filed 8–21–06; 8:45 am]

**BILLING CODE 3510–22–S**



# Provincetown
## Center for Coastal Studies

Home  |  Contact Us  |  Sitemap

Who We Are    What We Do    Our Environment    Resources    Publications    Search

### GET INVOLVED!

**Support scientists and rescuers in the field whose work can make a real difference to the lives of endangered whales.**

- **Become a Friend of PCCS**
- **Give a Gift**
- **Volunteer**

Introduction  |  Latest Disentanglement  |  Rescue Techniques  |  Tagging  |  Disentanglement Network  |  FAQ  |  Summary of Season  |  Scar-based Study  |  Take Reduction Team  |  Gillnet Diagram  |  Lobster Pot Diagram  |  Previous Disentanglements

## Basking shark freed in Provincetown Harbor - 7/11/04

A lobster fisherman working in Provincetown Harbor reported a large animal caught in his lobster set today, 7/11/04. The fisherman stood by the animal while the PCCS team gathered gear and made their way out to the site. After a relatively short struggle the team managed to fully disentangle a 10-12-foot basking shark.

The animal was caught in a buoy line, near the surface, that lead to two lobster traps resting on the seafloor. The buoy line was wrapped around the head and lower jaw (indicating that the animal was likely entangled as it fed on plankton by swimming with the mouth agape). The leading edges of the dorsal fin and tail had pink abrasions but the animal appeared to be healthy otherwise.

The team used a grappling hook and tether to gain access to the lobster buoy and gear that the shark continually pulled down. Using buoys and the drag of the boat, the team was able to keep the animal at the surface long enough to cut the entangling lines, leaving a short (1m) length of line in the mouth that would likely be shed at the next feeding bout. While not a whale, this shark species is poorly understood and the disentanglement was a good opportunity to gather more information.

**click here to read about previous entanglements**

Schematic of entanglement

© 2006 Provincetown Center for Coastal Studies



**UNITED STATES DEPARTMENT OF COMMERCE**
**National Oceanic and Atmospheric Administration**
NATIONAL MARINE FISHERIES SERVICE
NORTHEAST REGION
One Blackburn Drive
Gloucester, MA 01930-2298

December 13, 2006

## DAM ZONES SOUTH AND EAST OF PORTLAND, MAINE

Dear Commercial Lobster Trap/Pot and Gillnet Fishermen:

This is a follow-up to a letter sent on November 29, 2006, that informed you of the extension of two Dynamic Area Management (DAM) zones south and east of Portland, Maine, effective from 0001 hours December 3, 2006, through 2400 hours December 17, 2006, with required gear modifications for lobster trap/pot and anchored gillnet fishing gear. This letter is to inform you that NOAA's National Marine Fisheries Service (NMFS) has further extended these DAM zones, in these same areas south and east of Portland, Maine, totaling approximately 1,549 square nautical miles, and 1,809 (nm$^2$), respectively, as subsequent surveys in these areas indicate that the DAM zone trigger continues to be met. Thus, the required gear modifications for lobster trap/pot and anchored gillnet gear will be effective for an additional 15 days. In addition, NMFS requires that no additional gear be set in the DAM zones during the restricted period unless that gear has been modified accordingly. This action is being taken to respond to reported aggregations of endangered Northern right whales (right whales).

Therefore, NMFS is announcing required gear modifications for the extended DAM zones past the current 2400 hours December 17, 2006, expiration. **Effective 0001 hours December 18, 2006, through 2400 hours January 1, 2007**, anchored gillnet and lobster trap/pot gear in the DAM zones must comply with the required gear modifications. The required gear modifications and the coordinates for the DAM zones are found in the enclosure to this letter. **Special note for gillnet fisherman: a portion of the DAM zone south of Portland, Maine, overlaps the year-round Western Gulf of Maine Closure Area for Northeast Multispecies found at 50 CFR 648.81(e). Due to this closure, sink gillnet gear is prohibited from this portion of the DAM zone.**

To obtain the DAM regulations in their entirety, please call 978-281-9300 x6503. In addition, these regulations are available by accessing the ALWTRP web page (http://www.nero.nmfs.gov/whaletrp/). If you have any questions regarding these regulations, please call 978-281-9300 x6503.

Sincerely,

for Patricia A. Kurkul
Regional Administrator

Enclosure





**DAM Zone from December 11, 2006**
**Sighting of 7 Northern right whales south of Portland, ME**

Coordinates for the DAM Zone effective from 0001 hours December 18, 2006, through 2400 hours January 1, 2007, are as follows, are as follows:

43° 29´N,  70° 23´W (NW Corner)
43° 29´N,  69° 44´W
42° 47´N,  69° 44´W
42° 47´N,  70° 38´W
43° 08´N,  70° 38´W and follow the coastline northeast to
43° 29´N,  70° 23´W (NW Corner)



**DAM Zone from December 11, 2006**
**Sighting of 18 Northern right whales east of Portland, ME**

Coordinates for the DAM Zone effective from 0001 hours December 18, 2006, through 2400 hours January 1, 2007, are as follows, are as follows:

43° 52´N,  68° 56´W (NW Corner)
43° 52´N,  67° 58´W
43° 09´N,  67° 58´W
43° 09´N,  68° 56´W
43° 52´N,  68° 56´W (NW Corner)

**DAM Program Gear Requirements**

In addition to those gear modifications currently implemented under the ALWTRP at 50 CFR 229.32, the following gear modifications are required in the DAM zone.  If the requirements and exceptions for gear modification in the DAM zone, as described below, differ from other ALWTRP requirements for any overlapping areas and times, then the more restrictive requirements will apply in the DAM zone.  Please note that the below provides a summary of the DAM Program gear requirements and is not a substitute for the ALWTRP regulations.

Lobster Trap/Pot Gear
Fishermen utilizing lobster trap/pot gear within the portion of the Northern Inshore State Lobster Waters, Northern Nearshore Lobster Waters, and Stellwagen Bank/Jeffreys Ledge Restricted Area that overlap with the DAM zone are required to utilize all of the following gear modifications while the DAM zone is in effect:

1. Groundlines must be made of either sinking or neutrally buoyant line.  Floating groundlines are prohibited;
2. All buoy lines must be made of either sinking or neutrally buoyant line, except the bottom portion of the line, which may be a section of floating line not to exceed one-third the overall length of the buoy line;
3. Fishermen are allowed to use two buoy lines per trawl; and
4. A weak link with a maximum breaking strength of 600 lb (272.4 kg) must be placed at all buoys.

Fishermen utilizing lobster trap/pot gear within the portion of the Offshore Lobster Waters Area that overlap with the DAM zone are required to utilize all of the following gear modifications while the DAM zone is in effect:
1. Groundlines must be made of either sinking or neutrally buoyant line.  Floating groundlines are prohibited;
2. All buoy lines must be made of either sinking or neutrally buoyant line, except the bottom portion of the line, which may be a section of floating line not to exceed one-third the overall length of the buoy line;
3. Fishermen are allowed to use two buoy lines per trawl; and
4. A weak link with a maximum breaking strength of 1,500 lb (680.4 kg) must be placed at all buoys.

Anchored Gillnet Gear
Fishermen utilizing anchored gillnet gear within the portions of the Other Northeast Gillnet Waters Area and Stellwagen Bank/Jeffreys Ledge Restricted Area that overlap with the DAM zone are required to utilize all the following gear modifications while the DAM zone is in effect:

1. Groundlines must be made of either sinking or neutrally buoyant line.  Floating groundlines are prohibited;
2. All buoy lines must be made of either sinking or neutrally buoyant line, except the bottom portion of the line, which may be a section of floating line not to exceed one-third the overall length of the buoy line;
3. Fishermen are allowed to use two buoy lines per string;
4. Each net panel must have a total of five weak links with a maximum breaking strength of 1,100 lb (498.8 kg).  Net panels are typically 50 fathoms (91.4 m) in length, but the weak link requirements would apply to all variations in panel size.  These weak links must include three floatline weak links.  The placement of the weak links on the floatline must be: one at the center of the net panel and one each as close as possible to each of the bridle ends of the net panel.  The remaining two weak links must be placed in the center of each of the up and down lines at the panel ends;
5. A weak link with a maximum breaking strength of 1,100 lb (498.8 kg) must be placed at all buoys; and
6. All anchored gillnets, regardless of the number of net panels, must be securely anchored with the holding power of at least a 22 lb (10.0 kg) Danforth-style anchor at each end of the net string.

DAM ZONE EAST OF PORTLAND, MAINE

**DAM Program Gear Requirements**

In addition to those gear modifications currently implemented under the ALWTRP at 50 CFR 229.32, the following gear modifications are required in the DAM zone.  If the requirements and exceptions for gear modification in the DAM zone, as described below, differ from other ALWTRP requirements for any overlapping areas and times, then the more restrictive requirements will apply in the DAM zone.  Please note that the below provides a summary of the DAM Program gear requirements and is not a substitute for the ALWTRP regulations.

Lobster Trap/Pot Gear
Fishermen utilizing lobster trap/pot gear within the portion of the Northern Inshore State Lobster Waters and Northern Nearshore Lobster Waters  that overlap with the DAM zone are required to utilize all of the following gear modifications while the DAM zone is in effect:

1. Groundlines must be made of either sinking or neutrally buoyant line.  Floating groundlines are prohibited;
2. All buoy lines must be made of either sinking or neutrally buoyant line, except the bottom portion of the line, which may be a section of floating line not to exceed one-third the overall length of the buoy line;
3. Fishermen are allowed to use two buoy lines per trawl; and
4. A weak link with a maximum breaking strength of 600 lb (272.4 kg) must be placed at all buoys.

Fishermen utilizing lobster trap/pot gear within the portion of the Offshore Lobster Waters Area that overlap with the DAM zone are required to utilize all of the following gear modifications while the DAM zone is in effect:
1. Groundlines must be made of either sinking or neutrally buoyant line.  Floating groundlines are prohibited;
2. All buoy lines must be made of either sinking or neutrally buoyant line, except the bottom portion of the line, which may be a section of floating line not to exceed one-third the overall length of the buoy line;
3. Fishermen are allowed to use two buoy lines per trawl; and
4. A weak link with a maximum breaking strength of 1,500 lb (680.4 kg) must be placed at all buoys.

Anchored Gillnet Gear
Fishermen utilizing anchored gillnet gear within the portions of the Other Northeast Gillnet Waters Area that overlap with the DAM zone are required to utilize all the following gear modifications while the DAM zone is in effect:

1. Groundlines must be made of either sinking or neutrally buoyant line.  Floating groundlines are prohibited;
2. All buoy lines must be made of either sinking or neutrally buoyant line, except the bottom portion of the line, which may be a section of floating line not to exceed one-third the overall length of the buoy line;
3. Fishermen are allowed to use two buoy lines per string;
4. Each net panel must have a total of five weak links with a maximum breaking strength of 1,100 lb (498.8 kg).  Net panels are typically 50 fathoms (91.4 m) in length, but the weak link requirements would apply to all variations in panel size.  These weak links must include three floatline weak links.  The placement of the weak links on the floatline must be: one at the center of the net panel and one each as close as possible to each of the bridle ends of the net panel.  The remaining two weak links must be placed in the center of each of the up and down lines at the panel ends;
5. A weak link with a maximum breaking strength of 1,100 lb (498.8 kg) must be placed at all buoys; and
6. All anchored gillnets, regardless of the number of net panels, must be securely anchored with the holding power of at least a 22 lb (10.0 kg) Danforth-style anchor at each end of the net string.

# POLICY FORUM

ECOLOGY

# North Atlantic Right Whales in Crisis

Scott D. Kraus,[1]* Moira W. Brown,[1] Hal Caswell,[2] Christopher W. Clark,[3] Masami Fujiwara,[4] Philip K. Hamilton,[1] Robert D. Kenney,[5] Amy R. Knowlton,[1] Scott Landry,[6] Charles A. Mayo,[6] William A. McLellan,[7] Michael J. Moore,[2] Douglas P. Nowacek,[8] D. Ann Pabst,[7] Andrew J. Read,[9] Rosalind M. Rolland[1]

**D**espite international protection from commercial whaling since 1935, the North Atlantic right whale (*Eubalaena glacialis*) remains one of the most endangered whales in the world (*1*). Whaling for almost 1000 years brought this species close to extinction in the early 20th century (*2*). Right whales range in the coastal waters of eastern North America from Florida to the Canadian Maritimes, regions that are heavily used by the shipping and fishing industries and by the military. A low reproductive rate and recently declining survival probabilities (*1*, *3*), particularly for breeding females (*4*), appear to have prevented this population from recovering over the last 25 years (*5*). Most right whale mortalities are due to collisions with ships and entanglements in fishing gear (*5*). The right whale population growth rate has declined since 1980, and the total population now appears to be diminishing in size (*4*). This is in stark contrast with southern hemisphere right whales (*Eubalaena australis*), whose population is estimated to be over 10,000 animals and appears to be increasing at 7.2% per year (*6*).

Recent mortalities demonstrate the serious problem facing the North Atlantic right whale. In the past 16 months, there have been eight recorded deaths, including six adult females (three were carrying near-term fetuses). Four of these whales were killed by human activities (three by ships and one by fishing gear), a fifth whale was probably killed by a ship, two whales were offshore and could not be retrieved for examination, and a young calf died on the beach in Florida. The loss of this number of whales, and particularly this number of reproductive females, in such a short period, is unprecedented in 25 years of study of this species (*7*). Four of these females were just starting to bear calves, and since the average lifetime calf production is 5.25 calves (*4*), the deaths of these females represent a lost reproductive potential of as many as 21 animals.

The most recently published estimates of right whale survival (*4*, *8*) suggest that the mortality rate increased between 1980 and 1998 to a level of 4 (±1%). From recent population estimates of 350 right whales (*1*), a 4% mortality rate implies 14 animals dying per year. In the last 20 years, an average of 2.4 dead whales has been reported each year, representing a detection rate of 17%. The eight deaths reported in the last 16 months is 2.9 times the average annual rate. Calculations based on demographic data through 1999 (*4*) show that this increase in mortality would reduce population growth by 3.5 to 12% per year. (The range reflects different choices in the details of model selection; the best model implies a reduction in population growth rate of 10% per year.) This dramatic increase in reported deaths may be partly due to improved sighting efforts and reporting awareness but is not a natural variation in mortality. If the 17% mortality detection rate from the last 20 years has remained



constant, as many as 47 right whales could have died in the last 16 months.

Of the 50 dead right whales reported since 1986, at least 19 were killed by vessel collisions, and at least six were killed by fishing gear entanglements (*7*). Also during this period, there were 61 confirmed cases of whales carrying fishing gear, including the mortalities. Outcomes of the remaining cases and the fate of individual whales varied. Death is suspected in 12 cases, because of an animal's subsequent disappearance and/or the extremely poor health condition observed at the time of last sighting. Another eight animals are still entangled; their fate is uncertain. Thirty-three animals either shed the gear or were disentangled, and the remaining cases involved unidentifiable individuals. Chronically entangled whales lose weight, so they sink after death, unlike healthy animals that float if killed. Thus, right whale mortality from fishing gear is probably underestimated to a greater degree than ship kills (*5*).

Calf production has increased recently, raising doubts in some quarters about the urgency of the mortality problem. Annual calf production averaged 12 calves up until 2000 (*1*), but totaled 31, 21, 19, 16, and 28 in 2001 to 2005, respectively. However, the increase in the birth rate will have a small positive impact on population growth rate, as a hypothetical doubling of the per capita birth rate would increase population growth rate by at most 1.6% per year. The population is estimated to have been declining at about 2% per year before 2000 (*3*, *4*, *8*). Thus, the effects of recent increases in birth rate are too small to overcome this decline.

Federal managers in the National Oceanic and Atmospheric Administration (NOAA) Fisheries are charged by the Endangered Species Act and the Marine Mammal Protection Act to ensure that there is no human-induced mortality of right whales. There have been efforts to minimize the risk of ship strikes with mandatory ship location reporting, extensive aerial survey efforts, and mariner education. But without requiring changes in the operation of ships within right whale habitats and migratory corridors, this increased awareness has not

Enhanced online at www.sciencemag.org/cgi/content/full/309/5734/561

[1]Edgerton Research Laboratory, New England Aquarium, Boston, MA 02110–3399, USA. [2]Biology Department, Woods Hole Oceanographic Institution, Woods Hole, MA 02543–1049, USA. [3]Cornell Laboratory of Ornithology, Cornell University, Ithaca, NY 14850–1923, USA. [4]Department of Ecology, Evolution and Marine Biology, University of California, Santa Barbara, CA 93106–9610, USA. [5]Graduate School of Oceanography, University of Rhode Island, Narragansett, RI 02882–1197, USA. [6]Provincetown Center for Coastal Studies, Provincetown, MA, 02657–1911, USA. [7]Biological Sciences, University of North Carolina Wilmington, Wilmington, NC 28403–3201, USA. [8]Oceanography Department, Florida State University, Tallahassee, FL 32306–4320, USA. [9]Marine Laboratory, Duke University, Beaufort, NC 28516–8648, USA.
*Author for correspondence. E-mail: skraus@neaq.org

led to a reduction in ship strike mortalities. The risk of fishing gear entanglement has been addressed by selective area closures and gear modifications (9). These closures do not adequately encompass the seasonal movements of right whales, and gear modifications implemented thus far have not reduced entanglement rates. Eight dead right whales in the past 16 months provide clear evidence that management efforts have been woefully inadequate, and much stronger measures are needed to reverse the right whale's decline.

Accordingly, we urge immediate changes to the management of right whales, focusing on reducing human-induced mortality. Some of the following recommendations will also benefit other marine species that face similar threats, such as the endangered leatherback sea turtle (*Dermochelys coriacea*) (10). First, emergency measures should be implemented to reduce speeds and reroute commercial and military ships as recommended in the NOAA Fisheries Advanced Notice of Proposed Rule-Making

(11). Second, the amount of fixed fishing gear in the water column should be eliminated or minimized. There are many steps that could be taken to do this, including (i) mandating changes in the pot-fishing industry (lobster, crab, hagfish, etc.) that will reduce gear in the water column; (ii) requiring use of alternative rope types (e.g., sinking ground lines) to minimize entanglement deaths; (iii) developing and implementing fishing methods that do not use vertical lines attached to surface buoys; and (iv) developing a fast-track process for permitting and experimenting with conservation-focused fishing gear modifications and implementation. This means streamlining the current rule-making and National Environmental Policy Act (NEPA) process for right whale research and gear modifications, which now takes years.

Given the slow speed of the regulatory process, interim emergency measures to reduce shipping and fishing mortality in right whales should be implemented immediately. Delays in implementation would be

ignoring both scientific and legal mandates and could consign North Atlantic right whales to extinction.

### References and Notes

1. S. D. Kraus, P. K. Hamilton, R. D. Kenney, A. R. Knowlton, C. K. Slay, *J. Cetacean Res. Manage. Spec. Issue* **2**, 231 (2001).
2. R. R. Reeves, *J. Cetacean Res. Manage. Spec. Issue* **2**, 187 (2001).
3. H. Caswell, M. Fujiwara, S. Brault, *Proc. Natl. Acad. Sci. U.S.A.* **96**, 3308 (1999).
4. M. Fujiwara, H. Caswell, *Nature* **414**, 537 (2001).
5. A. R. Knowlton, S. D. Kraus, *J. Cetacean Res. Manage. Special Issue* **2**, 193 (2001).
6. P. Best, A. Brandao, D. Butterworth, *J. Cetacean Res. Manage. Spec. Issue* **2**, 161 (2001).
7. M. J. Moore, A. R. Knowlton, S. D. Kraus, W. A. McLellan, R. K. Bonde, *J. Cetacean Res. Manage.* **6** (3), 199 (2005); available at www.whoi.edu/hpb/viewPage.do?id=1432.
8. M. Fujiwara, dissertation, Massachusetts Institute of Technology–Woods Hole Oceanographic Institution (2002).
9. U.S. Code of Federal Regulation (C.F.R.) **50**, Part 229.32
10. M. C. James, C. A. Ottensmeyer, R. A. Myers, *Ecol. Lett.* **8**, 195 (2005).
11. *Fed. Regist.* **69** (105), 30857 (1 June 2004).

10.1126/science.1111200

---

SUSTAINABILITY

# Millennium Assessment of Human Behavior

**Paul R. Ehrlich\* and Donald Kennedy**

A growing scientific consensus says that global society is under increasing threat from the impact of human activities: Climate change, loss of biological diversity and ecosystem services, and changes in patterns of land use and land cover are among the more troublesome problems (1–3). Some of these problems require attention from governments and other social institutions. But it is the collective actions of individuals that lie at the heart of the dilemma. Analysis of individual motives and values should be critical to a solution. Yet society has no prominent international forum in which such issues (like how we should treat our environment and each other) are publicly discussed.

In some countries, quite different views have surfaced recently about the ethics of governmental restrictions on the rights of landowners designed to protect endangered species and about legal provisions that permit "open space" set-asides of long duration. Even in nations with cultures as similar

as those of the United States and the United Kingdom, issues of land care, debates over related subsidies, and the responsibilities of private citizens versus their governments can take very different shapes. In approaching sustainability, one needs to determine how the rights of people in the current generation to consume natural capital should be balanced against the rights of future generations. Preservation of animal life and the ethics of various kinds of human interference with "natural" systems are viewed differently by those whose cultural traditions differ. The steps that most members of the relevant scientific community believe are necessary (e.g., reduction of human-caused greenhouse gas emissions, establishment of marine reserves, limiting human population growth and per capita consumption) are disconnected from those measures the rest of society, and especially politicians, are willing to undertake.

We propose to promote the establishment of an ongoing global discussion of key ethical issues related to the human predicament—a Millennium Assessment of Human Behavior (MAHB). The time seems ripe, with the experience gained from the Intergovernmental Panel on Climate Change (IPCC) and the Millennium

Ecosystem Assessment (MEA), to start discussing what to do. In the IPCC and the MEA, sociopolitical issues and policy changes that might lessen the chances of catastrophic consequences are considered. But we need an institution to conduct an ongoing examination and public airing of what is known about how human cultures (especially their ethics) evolve, and about what kinds of changes might permit transition to an ecologically sustainable, peaceful, and equitable global society.

Such a process could begin by asking behavioral scientists and laypeople to explore how their own values relate to environmental sustainability and to ask themselves whether their values, if shared by 6.4 billion people, would really lead to the sort of world they want for their descendents. Citizens of the rich nations should ask themselves whether their "way of life" should really be, as the first President Bush once said to Americans, "not negotiable" (4). They need to discuss possible lifestyle changes in a framework not limited merely to what is possible for citizens of powerful nations, but enlarged to evaluate what is ethical with respect to a more global view of needs and opportunities.

The MAHB could consist of an ongoing series of open, transparent forums. The MAHB would be modeled on the IPCC but would be focused mainly in the social sciences. It would include a deeper consideration of the ethical dimensions of how we treat each other and our life-support systems. It would also involve broader participation than the IPCC, encourage the involvement of politicians, and focus on public outreach at

P. R. Ehrlich is in the Department of Biological Sciences, D. Kennedy is at the Institute for International Studies, Stanford University, Stanford, CA 94305, USA.\*Author for correspondence. E-mail: pre@stanford.edu

*Published by AAAS*

December 2005

# HUMPBACK WHALE  (*Megaptera novaeangliae*):
# Gulf of Maine Stock

**STOCK DEFINITION AND GEOGRAPHIC RANGE**

In the western North Atlantic, humpback whales feed during spring, summer and fall over a range which encompasses the eastern coast of the United States (including the Gulf of Maine), the Gulf of St. Lawrence, Newfoundland/Labrador, and western Greenland (Katona and Beard 1990). Other North Atlantic feeding grounds occur off Iceland and northern Norway, including off Bear Island and Jan Mayen (Christensen *et al.* 1992; Palsbøll *et al.* 1997). These six regions represent relatively discrete subpopulations, fidelity to which is determined matrilineally (Clapham and Mayo 1987). Genetic analysis of mitochondrial DNA (mtDNA) has indicated that this fidelity has persisted over an evolutionary timescale in at least the Icelandic and Norwegian feeding grounds (Palsbøll *et al.* 1995; Larsen *et al.* 1996).

Previously, the North Atlantic humpback whale population was treated as a single stock for management purposes (Waring *et al.* 1999). Indeed, earlier genetic analyses (Palsbøll *et al.* 1995), based upon relatively small sample sizes, had failed to discriminate among the four western North Atlantic feeding areas. However, genetic analyses often reflect a timescale of thousands of years, well beyond those commonly used by managers. Accordingly, the decision was recently made to reclassify the Gulf of Maine as a separate feeding stock; this was based upon the strong fidelity by individual whales to this region, and the attendant assumption that, were this subpopulation wiped out, repopulation by immigration from adjacent areas would not occur on any reasonable management timescale. This reclassification has subsequently been supported by new genetic analysis based upon a much larger collection of samples than those utilized by Palsbøll *et al.* (1995). These analyses have found significant differences in mtDNA haplotype frequencies of the four western feeding areas, including the Gulf of Maine (Palsbøll *et al.* 2001). During the recent Comprehensive Assessment of North Atlantic humpback whales, the International Whaling Commission acknowledged the evidence for treating the Gulf of Maine as a separate stock for the purpose of management (IWC 2002).

During the summers of 1998 and 1999, the Northeast Fisheries Science Center conducted surveys for humpback whales on the Scotian Shelf. The objective of these surveys was to establish the occurrence and population identity of the animals found in this region, which lies between the well-studied populations of the Gulf of Maine and Newfoundland. Photographs from both surveys have now been compared to the overall North Atlantic Humpback Whale Catalogue and a large regional catalogue from the Gulf of Maine (maintained by the College of the Atlantic and the Center for Coastal Studies, respectively); this work is summarized in Clapham *et al.* (2003). The match rate between the Scotian Shelf and the Gulf of Maine was 27% (14 of 52 Scotian Shelf individuals from both years). Comparable rates of exchange were obtained from the southern (26%, n=10 of 36 whales) and northern (27%, *n*=4 of 15 whales) ends of the Scotian Shelf, despite the additional distance of nearly 100 nautical miles (one whale was observed in both areas). In contrast, all (36 of 36) humpback whales identified by the same NMFS surveys elsewhere in the Gulf of Maine (including Georges Bank, southwestern Nova Scotia and the Bay of Fundy) had been previously observed in the Gulf of Maine region. The sighting histories of the 14 Scotian Shelf whales matched to the Gulf of Maine suggested that many of them were transient through the latter area. There were no matches between the Scotian Shelf and any North Atlantic feeding ground, except the Gulf of Maine; however, instructive comparisons are compromised by the often low sampling effort in other regions in recent years. Overall, while it is not possible to define the Gulf of Maine population by drawing a strict geographical boundary, it appears that the effective range of many members of this stock does not extend onto the Scotian Shelf. Further work on the Scotian Shelf was conducted in August 2002 and August 2003; this sampling extended further north and east as far as the Laurentian Channel, and the results are expected to further clarify the issue of stock identity from this region. The very low match rate between the two sampled years (only one animal was resighted in the region in both 1998 and 1999) suggests that the Scotian Shelf is host to a larger population of humpback whales than was previously thought. However, preliminary analysis of photographs collected in 2002 and 2003 revealed a number of inter-annual matches; it is not yet clear whether a suitably precise abundance estimate can be calculated from these data.

In winter, whales from all feeding areas (including the Gulf of Maine) mate and calve primarily in the West Indies, where spatial and genetic mixing among subpopulations occurs (Clapham *et al.* 1993; Katona and Beard 1990; Palsbøll *et al.* 1997; Stevick *et al.* 1998). A few whales of unknown northern origin migrate to the Cape Verde Islands (Reiner *et al.*, 1996). In the West Indies, the majority of whales are found in the waters of the Dominican Republic, notably on Silver Bank, on Navidad Bank, and in Samana Bay (Balcomb and Nichols 1982; Whitehead and Moore 1982; Mattila *et al.* 1989, 1994). Humpback whales are also found at much lower densities throughout the remainder of the Antillean arc, from Puerto Rico to the coast of Venezuela (Winn *et al.* 1975; Levenson and Leapley 1978; Price 1985; Mattila and Clapham 1989).

It is apparent that not all whales migrate to the West Indies every winter, and that significant numbers of animals are found in mid- and high-latitude regions at this time (Clapham *et al.* 1993; Swingle *et al.* 1993). An increased number of sightings of humpback whales in the vicinity of the Chesapeake and Delaware Bays occurred in 1992 (Swingle *et al.* 1993). Wiley *et al.* (1995) reported 38 humpback whale strandings which occurred during 1985-1992 in the U.S. Mid-

Atlantic and southeastern states. Humpback whale strandings increased, particularly along the Virginia and North Carolina coasts, and most stranded animals were sexually immature; in addition, the small size of many of these whales strongly suggested that they had only recently separated from their mothers. Wiley *et al.* (1995) concluded that these areas are becoming an increasingly important habitat for juvenile humpback whales and that anthropogenic factors may negatively impact whales in this area. There have also been a number of wintertime humpback sightings in coastal waters of the southeastern U.S. (NMFS unpublished data; New England Aquarium unpublished data; Florida DEP unpublished data). Whether the increased sightings represent a distributional change, or are simply due to an increase in sighting effort and/or whale abundance, is presently unknown.

A key question with regard to humpback whales off the southeastern and Mid-Atlantic states is their population identity. This topic was recently investigated using fluke photographs of living and dead whales observed in the region (Barco *et al.* 2002). In this study, photographs of 40 whales (live or dead) were of sufficient quality to be compared to catalogues from the Gulf of Maine (the closest feeding ground) and other areas in the North Atlantic. Of 21 live whales, 9 (42.9%) matched to the Gulf of Maine, 4 (19.0%) to Newfoundland and 1 (4.8%) to the Gulf of St Lawrence. Of 19 dead humpbacks, 6 (31.6%) were known Gulf of Maine whales. Although the population composition of the Mid-Atlantic is apparently dominated by Gulf of Maine whales, lack of recent photographic effort in Newfoundland makes it likely that the observed match rates under-represent the true presence of Canadian whales in the region. Barco *et al.* (2002) suggested that the Mid-Atlantic region primarily represents a supplemental winter feeding ground that is used by humpbacks for more than one purpose.

Feeding is the principal activity of humpback whales in New England waters, and their distribution in this region has been largely correlated to prey species and abundance, although behavior and bottom topography are factors in foraging strategy (Payne *et al.* 1986, 1990). Humpback whales are frequently piscivorous when in these waters, feeding on herring (*Clupea harengus*), sand lance (*Ammodytes* spp.), and other small fishes. In the northern Gulf of Maine, euphausiids are also frequently taken (Paquet *et al.* 1997). Commercial depletion of herring and mackerel led to an increase in sand lance in the southwestern Gulf of Maine in the mid 1970's with a concurrent decrease in humpback whale abundance in the northern Gulf of Maine. Humpback whales were densest over the sandy shoals in the southwestern Gulf of Maine favored by the sand lance during much of the late 1970's and early 1980's, and humpback distribution appeared to have shifted to this area (Payne *et al.* 1986). An apparent reversal began in the mid 1980's, and herring and mackerel increased as sand lance again decreased (Fogarty *et al.* 1991). Humpback whale abundance in the northern Gulf of Maine increased dramatically during 1992-1993, along with a major influx of herring (P. Stevick, pers. comm.). Humpback whales were few in nearshore Massachusetts waters in the 1992-1993 summer seasons. They were more abundant in the offshore waters of Cultivator Shoal and the Northeast Peak on Georges Bank, and on Jeffreys Ledge; these latter areas are more traditional locations of herring occurrence. In 1996 and 1997, sand lance, and thus humpback whales, were once again abundant in the Stellwagen Bank area. However, unlike previous cycles, where an increase in sand lance corresponded to a decrease in herring, herring remained relatively abundant in the northern Gulf of Maine, and humpbacks correspondingly continued to occupy this portion of the habitat, where they also fed on euphausiids (unpublished data, Center for Coastal Studies and College of the Atlantic).

In early 1992, a major research initiative known as the Years of the North Atlantic Humpback (YONAH) (Smith *et al.* 1999) was initiated. This project was a large-scale, intensive study of humpback whales throughout almost their entire North Atlantic range, from the West Indies to the Arctic. During two primary years of field work, photographs for individual identification and biopsy samples for genetic analysis were collected from summer feeding areas and from the breeding grounds in the West Indies. Additional samples were collected from certain areas in other years. Results pertaining to the estimation of abundance and to genetic population structure are summarized below.

## POPULATION SIZE

The overall North Atlantic population (including the Gulf of Maine) was estimated from genetic tagging data collected by the YONAH project in the breeding range at 4,894 males (95% CI=3,374-7,123) and 2,804 females (95% CI=1,776-4,463) (Palsbøll *et al.* 1997). Since the sex ratio in this population is known to be even (Palsbøll *et al.* 1997), the excess of males is presumed to be a result of sampling bias, lower rates of migration among females or sex-specific habitat partitioning in the West Indies; whatever the reason, the combined total is an underestimate of overall population size in this ocean. Photographic mark-recapture analyses from the YONAH project gave an ocean-basin-wide estimate of 11,570 for 1992/1993 (CV=0.068, Stevick *et al.* 2003), and an additional genotype-based analysis yielded a similar but less precise estimate of 10,400 (95% CI=8,000 to 13,600) (Smith *et al.* 1999). The estimate of 11,570 (CV=0.068) is regarded as the best available estimate for the North Atlantic, although because YONAH sampling was not spatially representative in the feeding grounds, this figure is negatively biased. In the northeastern North Atlantic, Øien (2001) estimated from sighting survey data that there were 889 (CV=0.32) humpback whales in the Barents and Norwegian Seas region.

Estimating abundance for the Gulf of Maine stock has proved problematic. Three approaches have been investigated: mark-recapture estimates, minimum population size, and line-transect estimates. Most of the mark-recapture estimates were affected by heterogeneity of sampling, which was heavily focused on the southwestern Gulf of Maine. However, an

estimate of 652 (CV=0.29) derived from the more extensive and representative YONAH sampling in 1992 and 1993 was probably less subject to this bias.

The second approach uses photo-identification data to establish the minimum number of humpback whales known to be alive in a particular year, 1997. By determining the number of identified individuals seen either in that year, or in both a previous and subsequent year, it is possible to determine that at least 497 humpbacks were alive in 1997. This figure is also likely to be negatively biased, again because of heterogeneity of sampling. A similar calculation for 1992 (which would correspond to the YONAH estimate for the Gulf of Maine) yields a figure of 501 whales.

In the third approach, data were used from a 28 July to 31 August 1999 line-transect sighting survey conducted by a ship and airplane covering waters from Georges Bank to the mouth of the Gulf of St. Lawrence. Total track line length was 8,212km. However, in light of the information on stock identity of Scotian Shelf humpback whales noted above, only the portions of the survey covering the Gulf of Maine were used; surveys blocks along the eastern coast of Nova Scotia were excluded. Shipboard data were analyzed using the modified direct duplicate method (Palka 1995) that accounts for school size bias and $g(0)$, the probability of detecting a group on the track line. Aerial data were not corrected for $g(0)$ (Palka 2000). These surveys yielded an estimate of 816 humpbacks (CV=0.45). However, given that the rate of exchange between the Gulf of Maine and both the Scotian Shelf and Mid-Atlantic region is not zero, this estimate is likely to be somewhat conservative. Accordingly, inclusion of data from 25% of the Scotian Shelf survey area (to reflect the match rate of 25% between the Scotian Shelf and the Gulf of Maine) gives an estimate of 902 whales (CV=0.41). Since the mark-recapture figures for abundance and minimum population size given above falls above the lower bound of the CV of the line transect estimate, and given the known exchange between the Gulf of Maine and the Scotian Shelf, we have chosen to use the latter as the best estimate of abundance for Gulf of Maine humpback whales.

**Minimum Population Estimate**

The minimum population estimate is the lower limit of the two-tailed 60% confidence interval of the log-normally distributed best abundance estimate. This is equivalent to the 20th percentile of the log-normal distribution as specified by Wade and Angliss (1997). The best estimate of abundance for Gulf of Maine humpback whales is 902 (CV=0.41). The minimum population estimate for this stock is 647.

Table 1. Summary of abundance estimates for Gulf of Maine humpback whales. CCS = Center for Coastal Studies. COA = College of the Atlantic.

| Month/Year | Type | N | CV | Source |
|---|---|---|---|---|
| 1992/93 | Mark-recapture estimate | 652 | 0.29 | Clapham *et al.* (2003) |
| 1997 | Minimum known to be alive | 497 | - | CCS + COA data |
| July/August 1999 | Line transect, including a portion of the Scotian Shelf stratum | 902 | 0.41 | Palka 2000, Clapham *et al.* 2003 |

**Current Population Trend**

As detailed below, current data suggest that the Gulf of Maine humpback whale stock is steadily increasing in size. This is consistent with an estimated average trend of 3.1% (SE=0.005) in the North Atlantic population overall for the period 1979-1993 (Stevick *et al.* 2003), although there are no other feeding-area-specific estimates.

**CURRENT AND MAXIMUM NET PRODUCTIVITY RATES**

Barlow and Clapham (1997) applied an interbirth interval model to photographic mark-recapture data and estimated the population growth rate of the Gulf of Maine humpback whale stock at 6.5% (CV=0.012). Maximum net productivity is unknown for this population, although a theoretical maximum for any humpback population can be calculated using known values for biological parameters (Brandão *et al.* 2000; Clapham *et al.* 2001). For the Gulf of Maine, data supplied by Barlow and Clapham (1997) and Clapham *et al.* (1995) gives values of 0.96 for survival rate, 6 years as mean age at first parturition, 0.5 as the proportion of females, and 0.42 for annual pregnancy rate. From this, a maximum population growth rate of 0.072 is obtained according to the method described by Brandão *et al.* (2000). This suggests that the observed rate of 6.5% (Barlow and Clapham 1997) was close to the maximum for this stock.

Clapham *et al.* (2003) updated the Barlow and Clapham (1997) analysis using data from the period 1992 to 2000. The estimate was either 0% (for a calf survival rate of 0.51) or 4.0% (for a calf survival rate of 0.875). Although confidence limits are not available (because maturation parameters could not be estimated), both estimates of population growth rate are outside the 95% confidence intervals of the previous estimate of 6.5% for the period 1979 to 1991 (Barlow and Clapham 1997). It is unclear whether this apparent decline is an artifact resulting from a shift in distribution; indeed, such a shift occurred during exactly the period (1992-1995) in which survival rates declined. It is possible that this shift

resulted in calves born in those years imprinting on (and thus subsequently returning to) areas other than those in which intensive sampling occurs. If the decline is a real phenomenon it may be related to known high mortality among young-of-the-year whales in the waters of the U.S. Mid-Atlantic states. However, calf survival appears to have increased since 1996, presumably accompanied by an increase in population growth.

In light of the uncertainty accompanying the more recent estimate of population growth rate for the Gulf of Maine, for purposes of this assessment the maximum net productivity rate was assumed to be the default value for cetaceans of 0.04 (Barlow *et al.* 1995).

Current and maximum net productivity rates are unknown for the North Atlantic population overall. As noted above, Stevick *et al.* (2003) calculated an average population growth rate of 3.1% (SE=0.005) for the period 1979-1993.

## POTENTIAL BIOLOGICAL REMOVAL

Potential Biological Removal (PBR) is the product of minimum population size, one-half the maximum productivity rate, and a "recovery" factor (MMPA Sec. 3. 16 U.S.C. 1362; Wade and Angliss 1997). The minimum population size is 647. The maximum productivity rate is the default value of 0.04. The "recovery" factor, which accounts for endangered, depleted, threatened stocks, or stocks of unknown status relative to optimum sustainable population (OSP) is assumed to be 0.10 because this stock is listed as an endangered species under the Endangered Species Act (ESA). PBR for the Gulf of Maine humpback whale stock is 1.3 whales.

## ANNUAL HUMAN-CAUSED SERIOUS INJURY AND MORTALITY

For the period 1999 through 2003, the total estimated human-caused mortality and serious injury to the Gulf of Maine humpback whale stock is estimated as 3.8 per year (U.S. waters, 2.8; Canadian waters, 0.6; St. Vincent and the Grenadines, 0.4). This average is derived from three components: 1) incidental fishery interaction records, 2.8 (U.S. waters, 2.2; Canadian waters, 0.6); 2) records of vessel collisions, 0.6 (U.S. waters, 0.6; Canadian waters, 0), and directed takes from the Bequian harvest in St. Vincent and the Grenadines (0.4). There were additional humpback mortalities and serious injuries that occurred in the southeastern and Mid-Atlantic states that could not be confirmed as involving members of the Gulf of Maine stock. These records represent an additional minimum annual average of 1.8 human-caused mortalities and serious injuries to humpbacks over the time period, of which 1.2 per year are attributable to incidental fishery interactions and 0.6 per year are attributable to vessel collisions.

Beginning with the 2001 Stock Assessment Report, Canadian records were incorporated into the mortality and serious injury rates, to reflect the effective range of this stock as described above. In addition, records from the southeastern and Mid-Atlantic states involving individuals that could not be identified as members of the Gulf of Maine stock were tallied separately. Conversely, records involving unidentified individuals reported between New York and the Bay of Fundy were assumed to be whales from the Gulf of Maine stock. It is also important to stress that serious injury determinations are made based upon the best available information at the time of writing; these determinations may change with the availability of new information. For the purposes of this report, discussion is primarily limited to those records considered confirmed human-caused mortalities or serious injuries.

To better assess human impacts (both vessel collision and gear entanglement), and considering the number of decomposed and incompletely or unexamined animals in the records, there needs to be greater emphasis on the timely recovery of carcasses and complete necropsies. The literature and review of records described here suggest that there are significant human impacts beyond those recorded in the fishery observer data. For example, a study of entanglement-related scarring on the caudal peduncle of 134 individual humpback whales in the Gulf of Maine suggested that between 48% and 65% had experienced entanglements (Robbins and Mattila 2001). Decomposed and/or unexamined animals (e.g., carcasses reported but not retrieved or necropsied) represent 'lost data', some of which may relate to human impacts.

'Serious injury' was defined in 50 CFR part 229.2 as an injury that was likely to lead to mortality. We therefore limited the serious injury designation to only those reports that had substantiated evidence that the injury, whether from entanglement or vessel collision, was likely to lead to the whale's death. Determinations of serious injury were made on a case by case basis following recommendations from the workshop conducted in 1997 on differentiating serious and non-serious injuries (Angliss and DeMaster 1998). Injuries that impeded the whale's locomotion or feeding were not considered serious injuries unless they were likely to be fatal in the foreseeable future. There was no forecasting of how the entanglement or injury may increase the whale's susceptibility to further injury, namely from additional entanglements or vessel collisions. For these reasons, the human impacts listed in this report are a minimum estimate.

## Background

As with right whales, human impacts (vessel collisions and entanglements) are factors which may be slowing recovery of the humpback whale population. There is an average of 4 to 6 entanglements of humpback whales a year in waters of the southern Gulf of Maine and additional reports of vessel-collision scars (unpublished data, Center for Coastal Studies). Of 20 dead humpback whales (principally in the Mid-Atlantic, where decomposition did not preclude examination for human impacts), Wiley *et al.* (1995) reported that 6 (30%) had major injuries possibly attributable to ship strikes, and 5 (25%) had injuries consistent with possible entanglement in fishing gear. One whale displayed scars that

may have been caused by both ship strike and entanglement. Thus, 60% of the whale carcasses which were suitable for examination showed signs that anthropogenic factors may have contributed to, or been responsible for, their death. Wiley *et al.* (1995) further reported that all stranded animals were sexually immature, suggesting a winter or migratory segregation and/or that juvenile animals are more susceptible to human impacts.

An updated analysis of humpback whale mortalities from the Mid-Atlantic states region has recently been produced by Barco *et al.* (2002). Between 1990 and 2000, there were 52 known humpback whale mortalities in the waters of the U.S. Mid-Atlantic states. Length data from 48 of these whales (18 females, 22 males and 8 of unknown sex) suggested that 39 (81.2%) were first-year animals, 7 (14.6%) were immature and 2 (4.2%) were adults. However, sighting histories of 5 of the dead whales indicate that some were small for their age, and histories of live whales further indicate that the population contains a greater percentage of mature animals than is suggested by the stranded sample.

In their study of entanglement rates estimated from caudal peduncle scars, Robbins and Mattila (2001) found that males were more likely to be entangled than females. The scarring data also suggested that yearlings were more likely than other age classes to be involved in entanglements. Finally, female humpbacks showing evidence of prior entanglements produced significantly fewer calves, suggesting that entanglement may significantly impact reproductive success.

Humpback whale entanglements also occur in relatively high numbers in Canadian waters. Reports of collisions with fixed fishing gear set for groundfish around Newfoundland averaged 365 annually from 1979 to 1987 (range 174-813). An average of 50 humpback whale entanglements (range 26-66) was reported annually between 1979 and 1988, and 12 of 66 humpback whales that were entangled in 1988 died (Lien *et al.* 1988). Volgenau *et al.* (1995) also summarized existing data and concluded that in Newfoundland and Labrador, cod traps caused the most entanglements and entanglement mortalities (21%) of humpbacks between 1979 and 1992. They also reported that gillnets are the gear that has been the primary cause of entanglements and entanglement mortalities (20%) of humpbacks in the Gulf of Maine between 1975 and 1990.

Disturbance by whale watching may prove to be an important habitat issue in some areas of this population's range, notably the coastal waters of New England where the density of whale watching traffic is seasonally high. No studies have been conducted to address this question, and its impact (if any) on habitat occupancy and reproductive success is unknown.

**Fishery-Related Serious Injuries and Mortalities**

A description of Fisheries is provided in Appendix III. Two mortalities were observed in the pelagic drift gillnet fishery since 1989. In winter 1993, a juvenile humpback was observed entangled and dead in a pelagic drift gillnet along the 200m isobath northeast of Cape Hatteras; in early summer 1995, a humpback was entangled and dead in a pelagic drift gillnet on southwestern Georges Bank.

Additional reports of mortality and serious injury relevant to comparison to PBR, as well as description of total human impacts, are contained in records maintained by NMFS. A number of these records (11 entanglements involving lobster pot/trap gear) from the 1990-1994 period were cause to reclassify the lobster fishery (62 FR 33, Jan. 2, 1997).

For this report, the records of dead, injured, and/or entangled humpbacks (found either stranded or at sea) for the period 1999 through 2003 were reviewed. Out of 169 records, 144 were eliminated from further consideration due to an absence of any evidence of human impact or, in the case of an entangled whale, it was documented that the animal had become disentangled (10 were disentangled in 2003 alone). Of the remaining records, the Gulf of Maine stock sustained 5 mortalities attributable to fishery interactions and 9 cases of serious injuries - 14 records in the five-year period (Table 2). In addition, 3 mortalities and 3 serious injuries were documented in the southeastern and Mid-Atlantic states that involved interactions with fisheries. At the time of this writing, no genetic results were available to identify which of these cases may have involved whales from the Gulf of Maine stock. While these records are not statistically quantifiable in the same way as the observed fishery records, they provide some indication of the frequency of entanglements.

Table 2.  Summarized records of mortality and serious injury likely to result in mortality, for North Atlantic  humpback whales, January 1999 - December 2003.  Causes of mortality or injury, assigned as primary or secondary, are based on records maintained by NMFS.  Records counted as from the Gulf of Maine humpback whale stock are indicated by an asterisk (*) following the date.  Stock identification of the remaining records are awaiting genetic analysis results.  These may identify additional Gulf of Maine whales.

| Date | Report Type | Length, sex, age, ID | Location | Assigned Cause: P=primary, S=secondary | | Notes |
|------|-------------|----------------------|----------|-------|-------|-------|
| | | | | Ship strike | Entang./ Fsh.inter | |
| 1/12/99* | mortality | 9.7m male | Martha's Vineyard, MA | | P | Fresh and extensive rope marks on carcass with associated hemorrhaging |
| 3/6/99* | mortality | 13.8m female and calf | Bequia, St. Vincent and the Grenadines | | | Two whales taken by the Bequian harpoon fishery |
| 8/2/99* | serious injury | 9.4m estimated | Bay of Fundy, Canada | | P | Single wrap of ½ inch poly line pinning flippers |
| 9/23/99* | serious injury | unknown | off Chatham, MA | | P | Line out of mouth and several wraps around body; possibly anchored |
| 1/8/00 | serious injury | 9.9m estimated | 30mi east Cape Lookout, NC | | P | whale swam off with 600' of sea trout sink gillnet, a chain anchor and a high flyer in tow |
| 8/4/00* | serious injury | 10.7m estimated | Bay of Fundy, Canada | | P | line wrapped on head with weighted trailing line giving tension |
| 9/6/00* | serious injury | <1 yr old, calf of "Giraffe" | Stellwagen Bank, MA | | P | single line wrapped across back; constriction will increase as whale grows |
| 10/14/00 | serious injury | 9.9m estimated | off Ocean City Inlet, MD | | P | Heavily entangled; constrictive--fresh wounds noted |
| 10/20/00* | serious injury | 10 yr old male "Tribble" | Stellwagen Bank, MA | | P | Entangled in green poly line on multiple body parts; appears constrictive |
| 1/25/01 | mortality | 6.9m estimated | Avon, NC | P | | extensive hemorrhaging along left thoracic, clean cut through center of vertebrae; ship strike |
| 4/7/01 | mortality | 7.9m juvenile male | Myrtle Beach, SC | S | P | pre-mortem evidence of chronic line entanglement; severe prop wounds |
| 4/7/01 | mortality | 7.6m juvenile male | Emerald Isle, NC | | P | entanglement around peduncle caused extensive edema, hemorrhaging |

| Date | Type | Size | Location | | | Notes |
|------|------|------|----------|---|---|-------|
| 4/9/01* | mortality | 8.8m juvenile female "Inland" | offshore of Sandbridge, Virginia Beach | | P | found anchored in gillnet gear; line wraps around rostrum had immobilized the whale |
| 7/29/01* | mortality | 8.5m juvenile female | floating south of Verrazano Bridge, NY | P | | large laceration on left side of head, extensive fracturing of skull |
| 10/1/01* | mortality | 11.4m 3 yr old female "Pitfall" | Duxbury Beach, MA | P | | massive fracturing to skull, focal bruising indicative of pre-mortem ship strike |
| 2/8/02 | mortality | 8.4m juvenile female | off Cape Henry, VA | P | | three large lacerations, hemorrhaging, broken bones |
| 3/24/02 | mortality | 8.0m juvenile male | off Virginia Beach, VA | | P | deep cuts on caudal peduncle and tail indicative of embedded line |
| 6/3/02* | mortality | 9.9m | off Cape Elizabeth, ME | | P | deep cuts on caudal peduncle indicative of embedded line |
| 6/17/02* | serious injury | 10.2m estimated | Cape Cod Bay, MA | | P | fluke severely damaged by line, whale emaciated |
| 8/1/02* | mortality | 9.3m male | Long Island, NY | P | | large hematoma posterior to blow holes |
| 10/1/02* | mortality | 7.5m female calf | Plymouth, MA | | P | Extensive line chafing and bruising on carcass; no gear recovered |
| 6/6/03 | mortality | 8.3m female | Chesapeake Bay mouth, VA | P | | Major trauma to right side of head, hematoma |
| 7/9/03* | serious injury | calf of Shockwave | Bay of Fundy, Canada | | P | Constricting entanglement on a young whale |
| 7/12/03 | serious injury | unknown | Oregon Inlet, NC | | P | Entangled in substantial amount of gear |
| 8/16/03* | serious injury | unknown | off Cape Cod, MA | | P | Poor body condition; line deeply embedded |
| 8/18/03* | serious injury | unknown | off Cape Cod, MA | | P | Extensive entanglement |

NOTE: Notes: The date sighted and location provided in the table are not necessarily when or where the serious injury or mortality occurred; rather, this information indicates when and where the whale was first reported beached, entangled, or injured.
National guidelines for determining what constitutes a serious injury have not been finalized. Interim criteria as established by NERO/NMFS (62 FR 33, Jan. 2, 1997) have been used here. Some assignments may change as new information becomes available and/or when national standards are established.

**Other Mortality**

Between November 1987 and January 1988, at least 14 humpback whales died after consuming Atlantic mackerel containing a dinoflagellate saxitoxin (Geraci *et al.* 1989). The whales subsequently stranded or were recovered in the

vicinity of Cape Cod Bay and Nantucket Sound, and it is highly likely that other mortalities occurred during this event which went unrecorded. In July 2003, another Unusual Mortality Event was recorded in offshore waters when an estimated minimum of 12-15 humpback whales died in the vicinity of the Northeast Peak of Georges Bank. Preliminary tests of samples taken from some of these whales tested positive for domoic acid at low levels, but it is currently unknown what levels would affect the whales and therefore no definitive conclusions can yet be drawn regarding the cause of this event. Its effect on the status of the Gulf of Maine humpback whale population is currently unknown.

During the first six months of 1990, seven dead juvenile (7.6 to 9.1m long) humpback whales stranded between North Carolina and New Jersey. The significance of these strandings is unknown, but is a cause for some concern.

As reported by Wiley *et al.* (1995), injuries possibly attributable to ship strikes are more common and probably more serious than those from entanglements. In the NMFS records for 1999 through 2003, 15 records had some evidence of a collision with a vessel. Of these, 6 were mortalities as a result of the collision, and 8 did not have sufficient information to confirm the collision as the cause of death. The remaining incident occurred on 10/4/01 and involved a whale-watch vessel. Photos taken at the time of the collision confirmed that the injury was minor and follow-up documentation provided evidence that the injury sustained had healed. Three out of the 6 cases of mortality from a vessel collision involved whales identified as members of the Gulf of Maine stock (7/29/01, 10/1/01 and 8/1/02; see Table 2).

On 6 March 1999, a 46-foot female and what was likely her calf (20-23 feet in length) were taken by the Bequian harvest in St. Vincent and the Grenadines. The larger whale was identified as a Gulf of Maine whale (J. Robbins, pers. comm.).

## STATUS OF STOCK

The status of the North Atlantic humpback whale population was the topic of an International Whaling Commission Comprehensive Assessment in June 2001, and again in May 2002; these meetings conducted a detailed review of all aspects of this population (IWC 2002). Although the most recent estimates of abundance indicate continued population growth, the size of the humpback whale stock may be below OSP in the U.S. Atlantic EEZ. This is a strategic stock because the humpback whale is listed as an endangered species under the ESA. A Recovery Plan has been published and is in effect (NMFS 1991). There are insufficient data to reliably determine current population trends for humpback whales in the North Atlantic overall. The average annual rate of population increase was estimated at 3.1% (SE=0.005, Stevick *et al.* 2003). As noted above, a recent analysis of demographic parameters for the Gulf of Maine (Clapham *et al.* 2003) suggested a lower rate of increase than the 6.5% reported by Barlow and Clapham (1997), but results may have been confounded by distribution shifts. The total level of human-caused mortality and serious injury is unknown, but current data indicate that it is significant. In particular, the continued high level of mortality among humpback whales off the U.S. Mid-Atlantic states (Barco *et al.* 2002), is cause for considerable concern given that at least some of these animals are known to be from the Gulf of Maine. This is a strategic stock because the average annual fishery-related mortality and serious injury exceeds PBR, and because the North Atlantic humpback whale is an endangered species.

A new large-scale assessment called More of North Atlantic Humpbacks (MoNAH) project is currently underway. This two-year study will attempt to estimate abundance and refine knowledge of population structure with extensive sampling in the Gulf of Maine/Scotian Shelf region and on the primary wintering ground on Silver Bank; additional research will focus on the U.S. Mid-Atlantic states. The work is intended to update the YONAH assessment of North Atlantic humpback whales in preparation for a possible status review under the Endangered Species Act.

## REFERENCES

Angliss, R.P., and D.P. DeMaster. 1998. Differentiating serious and non-serious injury of marine mammals taken incidental to commercial fishing operations: report of the serious injury workshop 1-2 April 1997, Silver Spring, Maryland. NOAA Tech. Memo. NMFS-OPR-13, January 1998.

Balcomb, K.C. and G. Nichols. 1982. Humpback whale censuses in the West Indies. Rep. Int. Whal. Commn. 32: 401-406.

Barco, S., W.A. McLellan, J. Allen, R. Asmutis, R. Mallon-Day, E. Meagher, D.A. Pabst, J. Robbins, R. Seton, R.M. Swingle, M.T. Weinrich and P.J. Clapham. 2002. Population identity of humpback whales in the waters of the U.S. Mid-Atlantic states. J. Cetacean Res. Manage. 4: 135-141.

Barlow, J. and P.J. Clapham. 1997. A new birth-interval approach to estimating demographic parameters of humpback whales. Ecology 78: 535-546.

Barlow, J., S.L. Swartz, T.C. Eagle and P.R. Wade. 1995. U.S. Marine mammal stock assessments: Guidelines for preparation, background, and a summary of the 1995 assessments. U.S.Dep. Commer., NOAA Tech. Memo. NMFS-OPR-6, 73 pp.

Brandão, A., D.S. Butterworth and M.R. Brown. 2000. Maximum possible humpback whale increase rates as a function of biological parameter values. J. Cetacean Res. Manage. 2 (supplement): 192-193.

Christensen, I., T. Haug, and N. Øien. 1992. Seasonal distribution, exploitation and present abundance of stocks of large baleen whales (Mysticeti) and sperm whales (*Physeter macrocephalus*) in Norwegian and adjacent waters. ICES J. Mar. Sci. 49: 341-355.

Clapham, P.J. and C.A. Mayo. 1987. Reproduction and recruitment of individually identified humpback whales, *Megaptera novaeangliae*, observed in Massachusetts Bay, 1979-1985. Can. J. Zool. 65: 2853-2863.

Clapham, P.J., L.S. Baraff, C.A. Carlson, M.A. Christian, D.K. Mattila, C.A. Mayo, M.A. Murphy, and S. Pittman. 1993. Seasonal occurrence and annual return of humpback whales, *Megaptera novaeangliae*, in the southern Gulf of Maine. Can. J. Zool. 71: 440-443.

Clapham, P.J., Bérubé, M.C. and Mattila, D.K. 1995. Sex ratio of the Gulf of Maine humpback whale population. Mar. Mamm. Sci. 11: 227-231.

Clapham, P.J., J. Barlow, T. Cole, D.K. Mattila, R. Pace, D. Palka, J. Robbins and R. Seton. 2003. Stock definition, abundance and demographic parameters of humpback whales from the Gulf of Maine. J. Cetacean Res. Manage. 5: 13-22.

Clapham, P.J., J. Robbins, M. Brown, P. Wade, and K. Findlay. 2001. A note on plausible rates of population growth for humpback whales. J. Cetacean Res. Manage. 3 (suppl.): 196-197.

Fogarty, M. J., E. B. Cohen, W. L. Michaels, and W. W. Morse. 1991. Predation and the regulation of sand lance populations: An exploratory analysis. ICES Mar. Sci. Symp. 193: 120-124.

Geraci, J.R., D.M. Anderson., R.J. Timperi, D.J. St. Aubin., G.A. Early, J.H. Prescott and C.A. Mayo. 1989 Humpback whales (*Megaptera novaeangliae*) fatally poisoned by dinoflagellate toxins. Can. J. Fish. Aquat. Sci. 46: 1895-1898.

IWC. 2002. Report of the Scientific Committee. Annex H: Report of the Sub-committee on the Comprehensive Assessment of North Atlantic humpback whales. J. Cetacean Res. Manage. 3 (suppl.) 209-228.

Katona, S.K., and J.A. Beard. 1990. Population size, migrations, and feeding aggregations of the humpback whale (*Megaptera novaeangliae*) in the western North Atlantic Ocean. Rep. Int. Whal. Commn., Special Issue 12: 295-306.

Larsen, A.H., J. Sigurjónsson, N. Øien, G. Vikingsson, and P.J. Palsbøll. 1996. Population genetic analysis of mitochondrial and nuclear genetic loci in skin biopsies collected from central and northeastern North Atlantic humpback whales (*Megaptera novaeangliae*): population identity and migratory destinations. Proceedings of the Royal Society of London B 263: 1611-1618.

Levenson, C. and W.T. Leapley, 1978. Distribution of humpback whales (*Megaptera novaeangliae*) in the Caribbean determined by a rapid acoustic method. J. Fish. Res. Bd. Can. 35: 1150-1152.

Lien, J., W. Ledwell, and J. Naven. 1988. Incidental entrapment in inshore fishing gear during 1988: A preliminary report to the Newfoundland and Labrador Department of Fisheries and Oceans, 15 pp.

Mattila, D.K. and P.J. Clapham. 1989. Humpback whales and other cetaceans on Virgin Bank and in the northern Leeward Islands, 1985 and 1986. Can. J. Zool. 67: 2201-2211.

Mattila, D.K., P.J. Clapham, S.K. Katona and G.S. Stone. 1989. Population composition of humpback whales on Silver Bank. Can. J. Zool. 67: 281-285.

Mattila, D.K., P.J. Clapham, O.Vásquez, and R. Bowman. 1994. Occurrence, population composition and habitat use of humpback whales in Samana Bay, Dominican Republic. Can. J. Zool. 72: 1898-1907.

NMFS [National Marine Fisheries Service]. 1991. Recovery plan for the humpback whale (*Megaptera novaeangliae*). Prepared by the Humpback Whale Recovery Team for the National Marine Fisheries Service, Silver Spring, MD, 105 pp.

Øien, N. 2001. Humpback whales in the Barents and Norwegian Seas. Paper SC/53/NAH21 presented to the International Whaling Commission Scientific Committee. Available from IWC, 135 Station Road, Impington, Cambridge, UK.

Palka, D. 1995. Abundance estimate of the Gulf of Maine harbor porpoise. Rep. Int. Whal. Commn., Special issue 16: 27-50.

Palka, D. 2000. Abundance of the Gulf of Maine/Bay of Fundy harbor porpoise based on shipboard and aerial surveys during 1999. NMFS, Northeast Fisheries Science Center Ref. Doc. 00-07; 29 pp. Available from: National Marine Fisheries Service, 166 Water Street, Woods Hole, MA 02543.

Paquet, D., C. Haycock and H. Whitehead. 1997. Numbers and seasonal occurrence of humpback whales (*Megaptera novaeangliae*) off Brier Island, Nova Scotia. Can. Field Nat. 111: 548-552.

Palsbøll, P. J., J. Allen,, M. Bérubé, P. J. Clapham, T. P. Feddersen, P. Hammond, H. Jørgensen, S. Katona, A. H. Larsen, F. Larsen, J. Lien, D. K. Mattila, J. Sigurjónsson, R. Sears, T. Smith, R. Sponer, P. Stevick and N. Øien. 1997. Genetic tagging of humpback whales. Nature 388: 767-769.

Palsbøll, P.J., P.J. Clapham, D.K. Mattila, F. Larsen, R. Sears, H.R. Siegismund, J. Sigurjónsson, O. Vásquez and P. Arctander. 1995. Distribution of mtDNA haplotypes in North Atlantic humpback whales: the influence of behavior on population structure. Marine Ecology Progress Series 116: 1-10.

Palsbøll, P.J., J. Allen, T.H. Anderson, M. Bérubé, P.J. Clapham, T.P. Feddersen, N. Friday, P. Hammond, H. Jørgensen, S.K. Katona, A.H. Larsen, F. Larsen, J. Lien, D.K. Mattila, F.B Nygaard, J. Robbins, R. Sponer, R. Sears, J. Sigurjónsson, T.D. Smith, P.T. Stevick, G. Vikingsson, and N.Øien. 2001. Stock structure and composition of the North Atlantic humpback whale, *Megaptera novaeangliae*. Paper SC/53/NAH11 presented to the

International Whaling Commission Scientific Committee. Available from IWC, 135 Station Road, Impington, Cambridge, UK.

Payne, P. M., J.R. Nicholas, L. O'Brien, and K.D. Powers. 1986. The distribution of the humpback whale, *Megaptera novaeangliae*, on Georges Bank and in the Gulf of Maine in relation to densities of the sand eel, *Ammodytes americanus*. Fish. Bull., U.S. 84: 271-277.

Payne, P.M., D.N. Wiley, S.B. Young, S. Pittman, P.J. Clapham, and J.W. Jossi. 1990. Recent fluctuations in the abundance of baleen whales in the southern Gulf of Maine in relation to changes in selected prey. Fish. Bull., U.S. 88(4): 687-696.

Price, W.S. 1985. Whaling in the Caribbean: historical perspective and update. Rep. Int. Whal. Commn. 35: 413-420.

Reiner, F., M.E. Dos Santos, and F.W. Wenzel. 1996. Cetaceans of the Cape Verde archipelago. Mar. Mamm. Sci. 12: 434-443.

Robbins, J. and D.K. Mattila. 2001. Monitoring entanglements of humpback whales (*Megaptera novaeangliae*) in the Gulf of Maine on the basis of caudal peduncle scarring. Paper SC/53/NAH25 presented to the International Whaling Commission Scientific Committee. Available from IWC, 135 Station Road, Impington, Cambridge, UK.

Smith, T.D., J. Allen, P.J. Clapham, P.S. Hammond, S. Katona, F. Larsen, J. Lien, D. Mattila, P.J. Palsbøll, J. Sigurjónsson, P.T. Stevick and N. Øien. 1999. An ocean-basin-wide mark-recapture study of the North Atlantic humpback whale (*Megaptera novaeangliae*). Mar. Mamm. Sci. 15(1):1-32.

Stevick, P.T., J. Allen, P.J. Clapham, N. Friday, S.K. Katona, F. Larsen, J. Lien, D.K. Mattila, P.J. Palsbøll, J. Sigurjónsson, T.D. Smith, N. Øien, and P.S. Hammond. 2003. North Atlantic humpback whale abundance and rate of increase four decades after protection from whaling. Marine Ecology Progress Series 258: 263-273.

Stevick, P., N. Øien and D.K. Mattila. 1998. Migration of a humpback whale between Norway and the West Indies. Mar. Mamm. Sci. 14: 162-166.

Swingle, W.M., S.G. Barco, T.D. Pitchford, W.A. McLellan and D.A. Pabst. 1993. Appearance of juvenile humpback whales feeding in the nearshore waters of Virginia. Mar. Mamm. Sci. 9: 309-315.

Volgenau, L., S.D. Kraus, and J. Lien. 1995. The impact of entanglements on two substocks of the western North Atlantic humpback whale, *Megaptera novaeangliae*. Can. J. Zool. 73: 1689-1698.

Wade, P.R., and R.P. Angliss. 1997. Guidelines for assessing marine mammal stocks: Report of the GAMMS Workshop, April 3-5, 1996, Seattle, Washington. NOAA Tech. Memo. NMFS-OPR-12. U.S. Dept. of Commerce, Washington, DC. 93 pp.

Waring, G. T., D.L. Palka, P.J. Clapham, S. Swartz, M.C. Rossman, T. V. N. Cole, K. D. Bisack and L. J. Hansen. 1999. U.S. Atlantic marine mammal stock assessment reports : 1998. NOAA Tech. Memo. NMFS-NE-116, 182 pp.

Whitehead, H. and M.J. Moore. 1982. Distribution and movements of West Indian humpback whales in winter. Can. J. Zool. 60: 2203-2211.

Wiley, D.N., R.A. Asmutis, T.D. Pitchford, and D.P. Gannon. 1995. Stranding and mortality of humpback whales, *Megaptera novaeangliae*, in the Mid-Atlantic and southeast United States, 1985-1992. Fish. Bull., *U.S.* 93: 196-205.

Winn, H.E., R.K. Edel and A.G. Taruski. 1975. Population estimate of the humpback whale (*Megaptera novaeangliae*) in the West Indies by visual and acoustic techniques. J. Fish. Res. Bd. Can. 32: 499-506.

December 2005

# NORTHERN RIGHT WHALE (*Eubalaena glacialis*):
## Western Atlantic Stock

### STOCK DEFINITION AND GEOGRAPHIC RANGE

Individuals of the western northern right whale population range from wintering and calving grounds in coastal waters of the southeastern United States to summer feeding and nursery grounds in New England waters and northward to the Bay of Fundy and the Scotian Shelf. Knowlton *et al.* (1992) reported several long-distance movements as far north as Newfoundland, the Labrador Basin, and southeast of Greenland; in addition, recent resightings of photographically identified individuals have been made off Iceland, arctic Norway and in the old Cape Farewell whaling ground east of Greenland. The Norwegian sighting (in September 1999) represents one of only two sightings this century of a right whale in Norwegian waters, and the first since 1926. Together, these long-range matches indicate an extended range for at least some individuals and perhaps the existence of important habitat areas not presently well described. Similarly, records from the Gulf of Mexico (Moore and Clark 1963, Schmidly *et al.* 1972) represent either geographic anomalies or a more extensive historic range beyond the sole known calving and wintering ground in the waters of the southeastern United States. Whatever the case, the location of most of the population is unknown during the winter. Offshore (greater than 30 miles) surveys flown off the coast of northeastern Florida and southeastern Georgia from 1996 to 2001 had 3 sightings in 1996, 1 in 1997, 13 in 1998, 6 in 1999, 11 in 2000 and 6 in 2001 (within each year, some were repeat sightings of previously recorded individuals). The frequency with which right whales occur in offshore waters in the southeastern U.S. remains unclear.

Research results to date suggest the existence of 6 major habitats or congregation areas for western Atlantic northern right whales; these are the coastal waters of the southeastern United States, the Great South Channel, Georges Bank/Gulf of Maine, Cape Cod and Massachusetts Bays, the Bay of Fundy, and the Scotian Shelf. However, movements within and between habitats may be more extensive than is sometimes thought. Results from satellite tags clearly indicate that sightings separated by perhaps two weeks should not necessarily be assumed to indicate a stationary or resident animal. Instead, telemetry data have shown rather lengthy and somewhat distant excursions, including into deep water off the continental shelf (Mate *et al.* 1997). Systematic surveys conducted for the first time off the coast of North Carolina in winter of 2001 and 2002 sighted 8 calves, suggesting the calving grounds may extend as far north as Cape Fear. Four of the calves were not sighted by surveys conducted further south. One of the cows photographed was new to researchers, having effectively eluded identification over the period of its maturation (McLellan *et al.* 2004). The Northeast Fisheries Science Center is conducting an extensive multi-year aerial survey program throughout the Gulf of Maine region; this program is intended to better establish the distribution of right whales, including inter-annual variability in their occurrence in previously poorly studied habitats.

New England waters are a primary feeding habitat for the right whale, which appears to feed primarily on copepods (largely of the genera Calanus and Pseudocalanus) in this area. Research suggests that right whales must locate and exploit extremely dense patches of zooplankton to feed efficiently (Mayo and Marx 1990). These dense zooplankton patches are likely a primary characteristic of the spring, summer, and fall right whale habitats (Kenney *et al.* 1986, 1995). Acceptable surface copepod resources are limited to perhaps 3% of the region during the peak feeding season in Cape Cod and Massachusetts Bays (C. Mayo pers. comm.). While feeding in the coastal waters off Massachusetts has been better studied than in most areas, feeding by right whales has also been observed on the margins of Georges Bank, in the Gulf of Maine, in the Bay of Fundy, and over the Scotian Shelf. The characteristics of acceptable prey distribution in these areas are not well known. In addition, New England waters serve as a nursery for calves and perhaps also as a mating ground. NOAA Fisheries and Center for Coastal Studies aerial surveys in the spring of 1999, 2000, 2001 and 2002 found substantial numbers of right whales along the Northern Edge of Georges Bank, in Georges Basin, and in various locations in the Gulf of Maine including Cashes Ledge, Platts Bank and Wilkinson Basin. The predictability with which right whales occur in such locations remains unclear, and these new data highlight the need for more extensive surveys of habitats which have previously received minimal coverage.

Genetic analyses based upon direct sequencing of mitochondrial DNA (mtDNA) have identified five mtDNA haplotypes in the western Atlantic northern right whale (Malik *et al.* 1999). Schaeff *et al.* (1997) compared the genetic variability of northern and southern right whales (E. australis), and found the former to be significantly less diverse, a finding broadly replicated from sequence data by Malik *et al.* (2000). These findings might be indicative of inbreeding in the population, but no definitive conclusion can be reached using current data. Additional work comparing modern and historic genetic population structure in right whales, using DNA extracted from museum and archaeological specimens of baleen and bone, is also underway (Rosenbaum *et al.* 1997, 2000). Preliminary results suggest that the eastern and western North Atlantic populations were not genetically distinct (Rosenbaum *et al.* 2000). However, the virtual

extirpation of the eastern stock and its lack of recovery in the last hundred years strongly suggests population subdivision over a protracted (but not evolutionary) timescale. Results also suggest that, as expected, the principal loss of genetic diversity occurred during major exploitation events prior to the 20th century.

To date, skin biopsy sampling has resulted in the compilation of a DNA library of almost 300 North Atlantic right whales. When work is completed, a genetic profile will be established for each individual, and an assessment provided on the level of genetic variation in the population, the number of reproductively active individuals, reproductive fitness, the basis for associations and social units in each habitat area, and the mating system. Tissue analysis has also aided in sex identification: the sex ratio of the photo-identified and catalogued population does not differ significantly from parity. Analyses based on both genetics and sighting histories of photographically identified individuals also suggest that approximately one-third of the females with calves population utilizes summer feeding grounds other than the Bay of Fundy. As described above, a related question is where individuals other than calving females and a few juveniles overwinter. One or more additional wintering and summering grounds may exist in unsurveyed locations, although it is also possible that "missing" animals simply disperse over a wide area at these times. Identification of such areas, and the possible threats to right whales there, is recognized as a priority for research efforts.

## POPULATION SIZE

Based on a census of individual whales identified using photo-identification techniques combined with the assumption of mortality of whales not seen for 7 years, the western North Atlantic stock size was estimated to be 295 individuals in 1992 (Knowlton *et al.* 1994); an updated analysis using the same method gave an estimate of 299 animals in 1998 (Kraus *et al.* 2001). Because this was a nearly complete census, it is assumed that this represents a minimum population size estimate. However, no estimate of abundance with an associated coefficient of variation has been calculated for this population. Calculation of a reliable point estimate is likely to be difficult given the known problem of heterogeneity of distribution in this population. An IWC workshop on status and trends of western North Atlantic right whales gave a minimum direct-count estimate of 263 right whales alive in 1996 and noted that the true population was unlikely to be substantially greater than this (Best *et al.* 2001).

### Historical Abundance

An estimate of pre-exploitation population size is not available. Basque whalers may have taken substantial numbers of right whales at times during the 1500's in the Strait of Belle Isle region (Aguilar 1986), and the stock of right whales may have already been substantially reduced by the time whaling was begun by colonists in the Plymouth area in the 1600's (Reeves and Mitchell 1987). A modest but persistent whaling effort along the coast of the eastern U.S. lasted three centuries, and the records include one report of 29 whales killed in Cape Cod Bay in a single day during January 1700. Based on incomplete historical whaling data, Reeves and Mitchell (1987) could conclude only that there were at least some hundreds of right whales present in the western North Atlantic during the late 1600's. In a later study (Reeves *et al.* 1992), a series of population trajectories using historical data and an estimated present population size of 350 were plotted. The results suggest that there may have been at least 1,000 right whales in this population during the early to mid-1600's, with the greatest population decline occurring in the early 1700's. The authors cautioned, however, that the record of removals is incomplete, the results were preliminary, and refinements were required. Based on back calculations using the present population size and growth rate, the population may have numbered fewer than 100 individuals by the time international protection for right whales came into effect in 1935 (Hain 1975, Reeves *et al.* 1992, Kenney *et al.* 1995). However, too little is known about the population dynamics of right whales in the intervening years to state anything with confidence.

### Minimum Population Estimate

The western North Atlantic population size was estimated to be 299 individuals in 1998 (Kraus *et al.* 2001), based on a census of individual whales identified using photo-identification techniques. A bias that might result from including catalogued whales that had not been seen for an extended period of time and therefore might be dead, was addressed by assuming that an individual whale not sighted for five or more years was dead (Knowlton *et al.* 1994). It is assumed that the census of identified and presumed living whales represents a minimum population size estimate. The true population size in 1998 may have been higher if: 1) there were animals not photographed and identified, and/or 2) some animals presumed dead were not.

### Current Population Trend

The population growth rate reported for the period 1986-1992 by Knowlton *et al.* (1994) was 2.5% (CV=0.12), suggesting that the stock was showing signs of slow recovery. However, work by Caswell *et al.* (1999) has suggested that crude survival probability declined from about 0.99 in the early 1980's to about 0.94 in the late 1990's. The decline was

statistically significant.  Additional work conducted in 1999 was reviewed by the IWC workshop on status and trends in this population (Best *et al.* 2001); the workshop concluded based on several analytical approaches that survival had indeed declined in the 1990's.  Although heterogeneity of capture could negatively bias survival estimates, the workshop concluded that this factor could not account for all of the observed decline, which appeared to be particularly marked in adult females.  Another workshop was convened by NOAA Fisheries in September 2002, and after reviewing several approaches to survival estimation reached similar conclusions regarding the decline in this population (Clapham 2002).

## CURRENT AND MAXIMUM NET PRODUCTIVITY RATES

During 1980-1992, 145 calves were born to 65 identified cows.  The number of calves born annually ranged from 5 to 17, with a mean of 11.2 (SE=0.90).  The reproductively active female pool was static at approximately 51 individuals during 1987-1992.  Mean calving interval, based on 86 records, was 3.67 years.  There was an indication that calving intervals may have been increasing over time, although the trend was not statistically significant (P=0.083) (Knowlton *et al.* 1994).

Since that report, total reported calf production in 92/93 was 8; 93/94, 9; 94/95, 7; 95/96, 22; 96/97, 20; 97/98, 6; 98/99, 4; 99/00, 1; 00/01, 31; 01/02, 21; and 02/03, 19 [mean 13.6 SE=2.9)].  However, this total calf production should be reduced by reported calf mortalities: 2 mortalities in 1993, 3 in 1996, 1 in 1997, 1 in 1998, 4 in 2001 and 2 in 2002.  During 2002, 2 mortalities and 1 serious injury involved what were likely calves from 00/01.  Of the three calf mortalities in 1996, available data suggested one was not included in the reported 24 mother/calf pairs, resulting in a total of 25 calves born.  Eleven of the 21 mothers in 1996 were observed with calves for the first time (i.e., were "new" mothers) that year.  Three of these were at least 10 years old, 2 were 9 years old, and 6 were of unknown age.  An updated analysis of calving interval through the 1997/1998 season suggests that mean calving interval increased since 1992 from 3.67 years to more than 5 years, a significant trend (Kraus *et al.* 2001).  This conclusion is supported by modeling work reviewed by the IWC workshop on status and trends in this population (Best *et al.* 2001); the workshop agreed that calving intervals had indeed increased and further that the reproductive rate was approximately half that reported from studied populations of E. australis.  The low calf production in subsequent years (4 in 1999 and only 1 in 2000) gives added cause for concern, although a record 31 calves were born in 2001.  A workshop on possible causes of reproductive failure was held in April 2000 (Reeves *et al.* 2001).  Factors considered included contaminants, biotoxins, nutrition/food limitation, disease and inbreeding problems.  While no conclusions were reached, a research plan to further investigate this topic was developed.

The annual population growth rate during 1986-1992 was estimated to be 2.5% (CV=0.12) using photo-identification techniques (Knowlton *et al.* 1994).  A population increase rate of 3.8% was estimated from the annual increase in aerial sighting rates in the Great South Channel, 1979-1989 (Kenney *et al.* 1995).  However, as noted above, more recent work indicated that the population was in decline in the 1990's (Caswell *et al.* 1999, Best *et al.* 2001).

An analysis of the age structure of this population suggests that it contains a smaller proportion of juvenile whales than expected (Hamilton *et al.* 1998a, Best *et al.* 2001), which may reflect lowered recruitment and/or high juvenile mortality.  In addition, it is possible that the apparently low reproductive rate is due in part to unstable age structure or to reproductive senescence on the part of some females.  However, data on either factor are poor; senescence has been demonstrated in relatively few mammals (including humans, pilot whales, and killer whales) and is currently undocumented for any baleen whale.

## POTENTIAL BIOLOGICAL REMOVAL

Potential biological removal (PBR) is specified as the product of minimum population size, one-half the maximum net productivity rate and a "recovery" factor for endangered, depleted, threatened stocks, or stocks of unknown status relative to OSP (MMPA Sec. 3. 16 U.S.C. 1362, Wade and Angliss 1997).  The recovery factor for right whales is 0.10 because this species is listed as endangered under the Endangered Species Act (ESA).  However, in view of the population decline indicated by recent demographic analyses (Caswell *et al.* 1999, Best *et al.* 2001), the PBR for this population is set to zero.

## ANNUAL HUMAN-CAUSED SERIOUS INJURY AND MORTALITY

For the period 1999 through 2003, the total estimated human-caused mortality and serious injury to right whales is estimated at 2.6 per year (U.S. waters, 1.6; Canadian waters, 1.0).  This is derived from two components: 1) non-observed fishery entanglement records at 1.6 per year (U.S. waters, 0.8; Canadian waters, 0.8), and 2) ship strike records at 1.0 per year (U.S. waters, 0.8; Canadian waters, 0.2).  Note that in the 1996 and 1998 stock assessment reports, a six-year time frame was used to calculate these averages.  A five-year period has since been used to be consistent with the time frames used for calculating the averages for other species.  Beginning with the 2001 Stock Assessment Report, Canadian records were incorporated into the mortality and serious injury rates of this report to reflect the effective range of this stock.  It is also important to stress that serious injury determinations are made based upon the best available information; these

determinations may change with the availability of new information. For the purposes of this report, discussion is primarily limited to those records considered confirmed human-caused mortalities or serious injuries.

**Background**

The details of a particular mortality or serious injury record often require a degree of interpretation. The assigned cause is based on the best judgment of the available data; additional information may result in revisions. When reviewing Table 1 below, several factors should be considered: 1) a ship strike or entanglement may occur at some distance from the reported location; 2) the mortality or injury may involve multiple factors; for example, whales that have been both ship struck and entangled are not uncommon; 3) the actual vessel or gear type/source is often uncertain; and 4) in entanglements, several types of gear may be involved.

The serious injury determinations are most susceptible to revision. There are several records where a struck and injured whale was re-sighted later, apparently healthy, or where an entangled or partially disentangled whale was re-sighted later free of gear. The reverse may also be true: a whale initially appearing in good condition after being struck or entangled is later re-sighted and found to have been seriously injured by the event. Entanglements of juvenile whales are typically considered serious injuries because the constriction on the animal is likely to become increasingly harmful as the whale grows.

"Serious injury" was defined in 50 CFR part 229.2 as an injury that was likely to lead to mortality. We therefore limited the serious injury designation to only those reports that had substantiated evidence that the injury, whether from entanglement or vessel collision, was likely to lead to the whale's death. Determinations of serious injury were made on a case by case basis following recommendations from the workshop conducted in 1997 on differentiating serious and non-serious injuries (Angliss and DeMaster 1998). Injuries that impeded the whale's locomotion or feeding were not considered serious injuries unless they were likely to be fatal in the foreseeable future. There was no forecasting of how the entanglement or injury may increase the whale's susceptibility to further injury, namely from additional entanglements or vessel collisions. This conservative approach likely underestimates serious injury rates.

With these caveats, the total estimated annual average human-induced mortality and serious injury incurred by this stock (including fishery and non-fishery related causes) was 2.6 right whales per year (U.S. waters 1.6; Canadian waters, 1.0). As with entanglements, some injury or mortality due to ship strikes almost certainly passes undetected, particularly in offshore waters. Decomposed and/or unexamined animals (e.g., carcasses reported but not retrieved or necropsied) represent "lost data", some of which may relate to human impacts. For these reasons, the figure of 2.6 right whales per year must be regarded as a minimum estimate.

Further, the small population size and low annual reproductive rate suggest that human sources of mortality may have a greater effect relative to population growth rates than for other whales. The principal factors believed to be retarding growth and recovery of the population are ship strikes and entanglement with fishing gear. Between 1970 and 1999, a total of 45 right whale mortalities were recorded (IWC 1999, Knowlton and Kraus 2001). Of these, 13 (28.9%) were neonates that are believed to have died from perinatal complications or other natural causes. Of the remainder, 16 (35.6%) were determined to be the result of ship strikes, 3 (6.7%) were related to entanglement in fishing gear (in two cases lobster gear, and one gillnet gear), and 13 (28.9%) were of unknown cause. At a minimum, therefore, 42.2% of the observed total for the period, and 50% of the 32 non-calf deaths, were attributable to human impacts (calves accounted for three deaths from ship strike).

Young animals, ages 0-4 years, are apparently the most impacted portion of the population (Kraus 1990). Finally, entanglement or minor vessel collisions may not kill an animal directly, but may weaken or otherwise affect it so that it is more likely to become vulnerable to further injury. Such was apparently the case with the two-year-old right whale killed by a ship off Amelia Island, Florida, in March 1991 after having carried gillnet gear wrapped around its tail region since the previous summer (Kenney and Kraus 1993). A similar fate befell right whale #2220, found dead on Cape Cod in 1996.

For waters of the northeastern USA, a present concern not yet completely defined, is the possibility of habitat degradation in Massachusetts and Cape Cod Bays due to a Boston sewage outfall, which came on-line in September 2000.

**Fishery-Related Serious Injury and Mortality**

Reports of mortality and serious injury relative to PBR as well as total human impacts are contained in records maintained by the New England Aquarium and the NMFS Northeast and Southeast Regional Offices (Table 1). From 1999 through 2003, 8 of 13 records of mortality or serious injury (including records from both USA and Canadian waters) involved entanglement or fishery interactions. The reports often do not contain the detail necessary to assign the entanglements to a particular fishery or location. Over time, however, additional sightings of entangled whales often provide the information needed.

Although disentanglement is either unsuccessful or not possible for the majority of cases, during the period 1999 through 2003, there were at least six documented cases of entanglements for which the intervention of disentanglement

teams averted a likely serious injury determination. On 6/5/99, a two-year-old female, #2753, was found with a line through the mouth and trailing a Norwegian ball and highflyer. The nature of the entanglement would likely not have allowed the whale to shed the gear, and over a prolonged period, the rope's chafing likely would have caused systemic infection. Another two-year-old female, #2710, was sighted on 7/21/1999 wrapped in Canadian pot gear. A line passed through the mouth and around at least the right flipper. This entanglement would have become more constrictive as the whale grew. On 7/9/00, #2746, a three-year-old of unknown gender was seen with a line running through either side of the mouth and bridled behind the blowholes, while another portion of the line pinned the left flipper to the whale's flank. A nine-year-old female, #2223, was sighted on 8/18/00 with line tightly wrapped across her back, running through the mouth, and possibly wrapped on the left flipper. Subsequent sightings prior to the disentanglement revealed that the line across the back was beginning to tighten. On 7/20/01, #2427, a seven-year-old male was sighted off Portsmouth, New Hampshire, with line wrapped tightly around the rostrum and through the mouth. The whale was disentangled later that day, and subsequent resightings indicated that the injuries were healing. However, observers also noted that the whale's baleen was damaged, and that the whale was holding its head high out of the water and not diving nearly as frequently as other whales in the area. Lastly, an unidentified right whale was disentangled off Campobello Island, Canada on 7/09/03. The gear was tentatively identified as US lobster gear and other unknown gear.

In January 1997, NMFS changed the classification of the Gulf of Maine and U.S. Mid-Atlantic lobster pot fisheries from Category III to Category I based on examination of stranding and entanglement records of large whales from 1990 to 1994 (62 FR 33, Jan. 2, 1997).

Bycatch of a right whale has been observed by NMFS Sea Samplers in the pelagic drift gillnet fishery, but no mortalities or serious injuries have been documented in any of the other fisheries monitored by NOAA Fisheries. The only bycatch of a right whale documented by NMFS Sea Samplers was a female released from a pelagic drift gillnet in 1993.

In a recent analysis of the scarification of right whales, a total of 61.6% of the whales bore evidence of entanglements with fishing gear (Hamilton *et al.* 1998b). Further research using the North Atlantic Right Whale Catalogue has indicated that, each year, between 10% and 28% of right whales are involved in entanglements (Knowlton *et al.* 2001). Entanglement records maintained by NMFS Northeast Regional Office (NOAA Fisheries, unpublished data) from 1970 through 2000 included at least 72 right whale entanglements or possible entanglements, including right whales in weirs, entangled in gillnets, and trailing line and buoys. An additional record (M. J. Harris, pers. comm.) reported a 9.1-10.6m right whale entangled and released south of Ft. Pierce, Florida, in March 1982 (this event occurred during a sampling program and was not related to a commercial fishery). Incidents of entanglements in groundfish gillnet gear, cod traps, and herring weirs in waters of Atlantic Canada and the U.S. east coast were summarized by Read (1994). In 6 records of right whales becoming entangled in groundfish gillnet gear in the Bay of Fundy and Gulf of Maine between 1975 and 1990, the right whales were either released or escaped on their own, although several whales have been observed carrying net or line fragments. A right whale mother and calf were released alive from a herring weir in the Bay of Fundy in 1976. For all areas, specific details of right whale entanglement in fishing gear are often lacking. When direct or indirect mortality occurs, some carcasses come ashore and are subsequently examined, or are reported as "floaters" at sea; however, the number of unreported and unexamined carcasses is unknown, but may be significant in the case of floaters. More information is needed about fisheries interactions and where they occur.

**Other Mortality**

Ship strikes are a major cause of mortality and injury to right whales (Kraus 1990, Knowlton and Kraus 2001). Records from 1999 through 2003 have been summarized in Table 1. For this time frame, the average reported mortality and serious injury to right whales due to ship strikes was 1.0 whale per year (U.S. waters, 0.8; Canadian waters, 0.2). In 2004, two ship strike mortalities had been confirmed at the time of this writing. The first was found on 2/7/04 on Virginia Beach, VA, with major blunt trauma to the head and body. The second was reported struck by a troop transport ship off the Chesapaeke Bay entrance, and then seen again alive in the same area with a severed fluke on 11/17/04. It washed ashore dead on 11/24/04 in Ocean Sands, NC. Both of these events involved adult females carrying calves.

In 2000, two right whales were sighted in the Bay of Fundy with large open wounds that were likely the result of collisions with vessels. Right whale #2820, a male of unknown age, was first seen injured on 7/9/00. He was sighted intermittently throughout the remainder of that summer, and was seen again in the Bay of Fundy in 2001. The second whale, #2660, is a five-year-old female who was sighted with a wound on the left side of her head, just forward of the blowholes. She has not been resighted since. Although both of these injuries have a gruesome appearance, in the absence of a chronic stressor (i.e., entangling fishing gear), they are not likely to be fatal.

Table 1. Confirmed human-caused mortality and serious injury records of northern right whales, January 1999 through December 2003.

| Date | Report Type | Length, sex, age, ID | Location | Assigned Cause: P=primary, S=secondary | | Notes |
|------|-------------|----------------------|----------|--------------|--------------|-------|
| | | | | Ship strike | Entang./ Fsh inter | |
| 4/20/99 | mortality | 27+ yr. old female #1014 | Cape Cod, MA | P | | Fractures to mandible and vertebral column, abrasion and edema around right flipper |
| 5/10/99 | mortality | Adult female #2030 | 80mi east of Cape Cod, MA | | P | Constricting sink gillnet gear created deep, extensive lacerations |
| 3/01/00 | serious injury | Adult male #1130 | 6mi east of Manomet, MA | | P | Line apparently constricting left flipper; flipper discolored; abnormal cyamid distribution; bullet buoy trailing, line weighted down between whale and buoy |
| 3/17/01 | mortality | Male calf | Assateague, VA | P | | Large fresh propeller gashes on dorsal caudal and acute muscular hemorrhage |
| 6/8/01 | serious injury | Adult male #1102 | 58mi east of Cape Cod, MA | | P | Entangling line deeply embedded; whale showing numerous signs of poor health including emaciation, skin discoloration, and abnormal cyamid distribution |
| 6/18/01 | mortality | female calf | Long Island, NY | P | | Dorsal propeller wounds, sub-dermal hemorrhage |
| 11/3/01 | mortality | Adult male #1238 14 m | Magdellen Islands, Canada | | P | Thoroughly wrapped up in gear, whale seen alive and well five months earlier |
| 7/6/02 | mortality | 11.0m (est) female #3107 | off Briar Island, NS Canada | | P | carcass ashore on Nantucket, MA; caudal peduncle severely lacerated where entangled |
| 8/22/02 | serious injury | Adult female #1815 | Scotian Shelf, Canada | | P | line tightly wrapped around head and tail stock |
| 8/22/02 | mortality | 12.6m female 1"y.o. | off Ocean City, MD | P | | large laceration on dorsal surface |
| 8/30/02 | serious injury | #3210 age & sex unknown | off Cape Cod, MA | | P | line tightly wrapped around rostrum, resighted in 2004 in poor condition |
| 1/14/03 | serious injury | Adult female #2240 | Jacksonville, FL | | P | Body condition poor, gear possibly ingested |
| 10/02/03 | mortality | Adult female #2150 | off Digby, NS | P | | Large fracture in skull, sub-dermal hemorrhage |

**STATUS OF STOCK**

The size of this stock is considered to be extremely low relative to OSP in the U.S. Atlantic EEZ, and this species is listed as endangered under the ESA. The northern right whale is considered one of the most critically endangered populations of large whales in the world (Clapham *et al.* 1999). A Recovery Plan has been published and is in effect (NMFS 1991), and a revised plan is under review. Three critical habitats, Cape Cod Bay/Massachusetts Bay, Great South

Channel, and the Southeastern U.S., were designated by NMFS(59 FR 28793, June 3, 1994). The NMFS ESA 1996 Northern Right Whale Status Review concluded that the status of the western North Atlantic population of the northern right whale remains endangered [Note that 'northern right whale' is nomenclature that is now outdated in the scientific literature but not yet modified in rule makings. Scientific literature recognizes north Atlantic and north Pacific right whales as two distinct species]; this conclusion was reinforced by the International Whaling Commission (Best *et al.* 2001), which expressed grave concern regarding the status of this stock. The total level of human-caused mortality and serious injury is unknown, but reported human-caused mortality and serious injury has been a minimum of 2.6 right whales per year from 1999 through 2003. Given that PBR has been set to zero, no mortality or serious injury for this stock can be considered insignificant. This is a strategic stock because the average annual fishery-related mortality and serious injury exceeds PBR, and because the North Atlantic right whale is an endangered species. Relative to populations of southern right whales, there are also concerns about growth rate, percentage of reproductive females, and calving intervals in this population.

**REFERENCES**

Aguilar, A. 1986. A review of old Basque whaling and its effect on the right whales of the North Atlantic. Rep. Int. Whal. Commn., Special Issue 10: 191-199.

Angliss, R. P., and D. P. DeMaster. 1998. Differentiating serious and non-serious injury of marine mammals taken incidental to commercial fishing operations: report of the serious injury workshop 1-2 April 1997, Silver Spring, Maryland. NOAA Tech. Memo. NOAA Fisheries-OPR-13.

Best, P.B., J.L Bannister, R. L. Brownell Jr., G.P. Donovan, (eds.) 2001. Right whales: worldwide status. J. Cetacean Res. Manage. (Special Issue) 2. 309pp.

Caswell, H., S. Brault, and M. Fujiwara. 1999. Declining survival probability threatens the North Atlantic right whale. Proc. Natl. Acad. Sci. USA 96: 3308-3313.

Clapham, P.J. (ed.) 2002. Report of the working group on survival estimation for North Atlantic right whales. Available from the Northeast Fisheries Science Center, 166 Water Street, Woods Hole, MA 02543.

Clapham, P. J., S. B. Young and R. L. Brownell, Jr. 1999. Baleen whales: conservation issues and the status of the most endangered populations. Mammal Review 29: 35-60.

Hain, J. H. W. 1975. The international regulation of whaling. Marine Affairs J. 3: 28-48.

Hamilton, P. K., A. R. Knowlton, M. K. Marx and S. D. Kraus. 1998a. Age structure and longevity in North Atlantic right whales *Eubalaena glacialis* and their relation to reproduction. Marine Ecology Progress Series 171: 285-292.

Hamilton, P. K., M. K. Marx, and S. D. Kraus. 1998b. Scarification analysis of North Atlantic right whales (*Eubalaena glacialis*) as a method of assessing human impacts. Final report to the Northeast Fisheries Science Center, Contract No. 4EANF-6-0004.

IWC. 1999. Report of the workshop on the comprehensive assessment of right whales worldwide. J. Cetacean Res. Manage. 1 (supplement): 119-120.

Kenney, R. D., M. A. M. Hyman, R. E. Owen, G. P. Scott, and H. E. Won. 1986. Estimation of prey densities required by western North Atlantic right whales. Mar. Mamm. Sci. 2(1): 1-13.

Kenney, R. D. and S. D. Kraus. 1993. Right whale mortality: a correction and an update. Mar. Mamm. Sci. 9:445-446.

Kenney, R. D., H. E. Won, and M. C. Macaulay. 1995. Cetaceans in the Great South Channel, 1979-1989: right whale (*Eubalaena glacialis*). Cont. Shelf Res. 15: 385-414.

Knowlton, A. R., J. Sigurjonsson, J. N. Ciano, and S. D. Kraus. 1992. Long-distance movements of North Atlantic Right whales (*Eubalaena glacialis*). Mar. Mamm. Sci. 8(4): 397-405.

Knowlton, A. R. and S. D. Kraus. 2001. Mortality and serious injury of North Atlantic right whales (*Eubalaena glacialis*) in the North Atlantic Ocean. J. Cetacean Res. Manage. Special Issue 2: 193-208.

Knowlton, A. R., S. D. Kraus, and R. D. Kenney. 1994. Reproduction in North Atlantic right whales (*Eubalaena glacialis*). Can. J. Zool. 72: 1297-1305.

Knowlton, A.R., M.K. Marx, H.M. Pettis, P.K. Hamilton and S.D. Kraus. 2001. Scarification analysis of North Atlantic right whales (*Eubalaena glacialis*): monitoring rates of entanglement interaction. Report to the National Marine Fisheries Service. Available from: New England Aquarium, Central Wharf, Boston, MA 02110.

Kraus, S. D. 1990. Rates and potential causes of mortality in North Atlantic right whales (*Eubalaena glacialis*). Mar. Mamm. Sci. 6(4): 278-291.

Kraus, S. D., P. K. Hamilton, R. D. Kenney, A. Knowlton and C. K. Slay. 2001. Reproductive parameters of the North Atlantic right whale. J. Cetacean Res. Manage. (Special Issue) 2: 231-236.

Malik, S., M. W. Brown, S. D. Kraus, A. Knowlton, P. Hamilton and B. N. White. 1999. Assessment of genetic structuring and habitat philopatry in the North Atlantic right whale (*Eubalaena glacialis*). Can. J. Zool. 77: 1217-1222.

Malik, S., M. W. Brown, S. D. Kraus and B. N. White. 2000. Analysis of mitochondrial DNA diversity within and between North and South Atlantic right whales. Mar. Mamm. Sci. 16: 545-558.

Mate, B. M., S. L. Nieukirk and S. D. Kraus. 1997. Satellite-monitored movements of the northern right whale. J. Wildl. Manage. 61: 1393-1405.

Mayo, C. A. and M .K. Marx. 1990. Surface foraging behaviour of the North Atlantic right whale, Eubalaena glacialis, and associated zooplankton characteristics. Can. J. Zool. 68: 2214-2220.

McLellan, W. A., E. Meagher, L. Torres, G. Lovewell, C. Harper, K. Irish, B. Pike, and A. D. Pabst. 2004. Winter right whale sightings from aerial surveys of the coastal waters of the US Mid-Atlantic. Presented at the 15th Biennial Conference on the Biology of Marine Mammals.

Moore, J. C. and E. Clark. 1963. Discovery of right whales in the Gulf of Mexico. Science 141(3577): 269.

NMFS [National Marine Fisheries Service]. 1991. Recovery plan for the northern right whale (Eubalaena glacialis). Prepared by the Right Whale Recovery Team for the National Marine Fisheries Service, Silver Spring, Maryland, 86 pp.

Read, A. J. 1994. Interactions between cetaceans and gillnet and trap fisheries in the northwest Atlantic. Rep. Int. Whal. Commn., Special Issue 15: 133-147.

Reeves, R.R., R. Rolland, and P. Clapham (eds.). 2001. Report of the workshop on the causes of reproductive failure in North Atlantic right whales: new avenues of research. NOAA-NOAA Fisheries-NEFSC Ref. Doc. 01-16. 46p. Available from: NOAA Fisheries, Northeast Fisheries Science Center, 166 Water St., Woods Hole, MA 02543.

Reeves, R. R. and E. Mitchell. 1987. Shore whaling for right whales in the northeastern United States. Contract Report No. NA85-WCC-06194, Southeast Fisheries Science Center, Miami, FL, 108 pp. Available from: NOAA Fisheries, Southeast Fisheries Science Center, 75 Virginia Beach Dr., Miami, FL, 33149.

Reeves, R. R., J. M. Breiwick and E. Mitchell. 1992. Pre-exploitation abundance of right whales off the eastern United States. Pages 5-7 in: J. Hain (ed.). The right whale in the western North Atlantic: A science and management workshop, 14-15 April 1992, Silver Spring, Maryland. NOAA-NOAA Fisheries-NEFSC Ref. Doc. No. 92-05. 88 pp. Available from: NOAA Fisheries, Northeast Fisheries Science Center, 166 Water St., Woods Hole, MA 02543.

Rosenbaum, H.C., M. Egan, P.J. Clapham, R.L. Brownell Jr. and R. DeSalle. 1997. An effective method for isolating DNA from non-conventional museum specimens. Mol. Ecol. 6: 677-681.

Rosenbaum, H.C., M.S. Egan, P.J. Clapham, R.L. Brownell Jr., S. Malik, M.W. Brown, B.N. White, P. Walsh, and R. DeSalle, 2000. Utility of North Atlantic right whale museum specimens for assessing changes in genetic diversity. Conservation Biology 14: 1837-1842.

Schaeff, C. M., S. D. Kraus, M. W. Brown, J. Perkins, R. Payne and B. N. White. 1997. Comparison of genetic variability of North and South Atlantic right whales (Eubalaena) using DNA fingerprinting. Can. J. Zool. 75: 1073-1080.

Schmidly, D. J., C. O. Martin and G. F. Collins. 1972. First occurrence of a black right whale (Balaena glacialis) along the Texas coast. Southw. Nat. 17(2): 214-215.

Wade, P. R., and R. P. Angliss. 1997. Guidelines for assessing marine mammal stocks: Report of the GAMMS Workshop, April 3-5, 1996, Seattle, Washington. NOAA Tech. Memo. NOAA Fisheries-OPR-12. U.S. Dept. of Commerce, Washington, D.C. 93 pp.

December 2005

# FIN WHALE (*Balaenoptera physalus*):
## Western North Atlantic Stock

### STOCK DEFINITION AND GEOGRAPHIC RANGE

The Scientific Committee of the International Whaling Commission (IWC) has proposed stock boundaries for North Atlantic fin whales. Fin whales off the eastern U.S. north to Nova Scotia and the southeastern coast of Newfoundland are believed to constitute a single stock under the present IWC scheme (Donovan 1991). However, the stock identity of North Atlantic fin whales has received relatively little attention, and whether the current stock boundaries define biologically isolated units has long been uncertain. The existence of a subpopulation structure was suggested by local depletions that resulted from commercial overharvesting (Mizroch *et al.* 1984).

A genetic study conducted by Bérubé *et al.* (1998) using both mitochondrial and nuclear DNA provided strong support for an earlier population model proposed by Kellogg (1929) and others. This postulates the existence of several subpopulations of fin whales in the North Atlantic and Mediterranean, with limited gene flow among them. Bérubé *et al.* (1998) also proposed that the North Atlantic population showed recent divergence due to climatic changes (i.e. postglacial expansion), as well as substructuring over even relatively short distances. The genetic data are consistent with the idea that different subpopulations use the same feeding ground, a hypothesis that was also originally proposed by Kellogg (1929).

Fin whales are common in waters of the U.S. Atlantic Exclusive Economic Zone (EEZ), principally from Cape Hatteras northward (figure 1). Fin whales accounted for 46% of the large whales and 24% of all cetaceans sighted over the continental shelf during aerial surveys (CETAP 1982) between Cape Hatteras and Nova Scotia during 1978-82. While a great deal remains unknown, the magnitude of the ecological role of the fin whale is impressive. In this region fin



**Figure 1.** *Distribution of fin whale sightings from NEFSC and SEFSC shipboard and aerial surveys during the summer in 1990-1998. Isobaths are at 100 m and 1,000 m.*

whales are probably the dominant large cetacean species in all seasons, with the largest standing stock, the largest food requirements, and therefore the largest impact on the ecosystem of any cetacean species (Kenney *et al.* 1997; Hain *et al.* 1992).

There is little doubt that New England waters represent a major feeding ground for the fin whale. There is evidence of site fidelity by females, and perhaps some segregation by sexual, maturational or reproductive class on the feeding range (Agler *et al.* 1993). Seipt *et al.* (1990) reported that 49% of identified fin whales on Massachusetts Bay area feeding grounds were resighted within the same year, and 45% were resighted in multiple years. While recognizing localized as well as more extensive movements, these authors suggested that fin whales on these grounds exhibited patterns of seasonal occurrence and annual return that are in some respects similar to those shown for humpback whales. This was reinforced by Clapham and Seipt (1991), who showed maternally directed site fidelity by fin whales in the Gulf of Maine. Information on life history and vital rates is also available in data from the Canadian fishery, 1965-1971 (Mitchell 1974). In seven years, 3,528 fin whales were taken at three whaling stations. The station at Blandford, Nova Scotia, took 1,402 fin whales.

Hain *et al.* (1992), based on an analysis of neonate stranding data, suggested that calving takes place during approximately four months from October to January in latitudes of the U.S. Mid-Atlantic region; however, it is unknown where calving, mating, and wintering for most of the population occurs. Results from the Navy's SOSUS program (Clark 1995) indicate a substantial deep-ocean component to fin whale distribution. It is likely that fin whales occurring in the U.S. Atlantic EEZ undergo migrations into Canadian waters, open-ocean areas, and perhaps even subtropical or tropical regions. However, the popular notion that entire fin whale populations make distinct annual migrations like some other mysticetes has questionable support in the data; in the North Pacific, year-round monitoring of fin whale calls found no evidence for large-scale migratory movements (Watkins *et al.* 2000).

**POPULATION SIZE**

Two estimates of abundance from line-transect surveys are available. An abundance of 2,200 (CV=0.24) fin whales was estimated from a July to September 1995 sighting survey conducted by two ships and an airplane that covered waters from Virginia to the mouth of the Gulf of St. Lawrence. Data collection and analysis methods used were described in Palka (1995).

A more recent estimate of 2,814 (CV=0.21) fin whales was derived from a 28 July to 31 August 1999 line-transect sighting survey conducted by a ship and airplane covering waters from Georges Bank to the mouth of the Gulf of St. Lawrence. Shipboard data were analyzed using the modified direct duplicate method (Palka 1995) that accounts for school size bias and *g(0)*, the probability of detecting a group on the track line. Aerial data were not corrected for *g(0)* (Palka 2000).

The latter abundance estimate is considered the best available for the western North Atlantic fin whale because it is relatively recent. However, this estimate must be considered extremely conservative in view of the known range of the fin whale in the entire western North Atlantic, the uncertainties regarding population structure and exchange between surveyed and unsurveyed areas, and aerial data having not been corrected for *g(0)*.

**Minimum Population Estimate**

The minimum population estimate is the lower limit of the two-tailed 60% confidence interval of the log-normally distributed best abundance estimate. This is equivalent to the 20th percentile of the log-normal distribution as specified by Wade and Angliss (1997). The best estimate of abundance for fin whales is 2,814 (CV=0.21). The minimum population estimate for the western North Atlantic fin whale is 2,362.

**Current Population Trend**

There are insufficient data to determine population trends for this species.

**CURRENT AND MAXIMUM NET PRODUCTIVITY RATES**

Current and maximum net productivity rates are unknown for this stock. Based on photographically identified fin whales, Agler *et al.* (1993) estimated that the gross annual reproduction rate was at 8%, with a mean calving interval of 2.7 years.

For purposes of this assessment, the maximum net productivity rate was assumed to be 0.04. This value is based on theoretical modeling showing that cetacean populations may not grow at rates much greater than 4% given the constraints of their reproductive life history (Barlow *et al.* 1995).

**POTENTIAL BIOLOGICAL REMOVAL**

Potential Biological Removal (PBR) is the product of minimum population size, one-half the maximum productivity rate, and a "recovery" factor (MMPA Sec. 3. 16 U.S.C. 1362; Wade and Angliss 1997). The minimum population size is 2,362. The maximum productivity rate is 0.04, the default value for cetaceans. The "recovery" factor, which accounts for endangered, depleted, threatened stocks, or stocks of unknown status relative to optimum sustainable population (OSP) is assumed to be 0.10 because the fin whale is listed as endangered under the Endangered Species Act (ESA). PBR for the western North Atlantic fin whale is 4.7.

**ANNUAL HUMAN-CAUSED MORTALITY AND SERIOUS INJURY**

The number of fin whales taken at 3 whaling stations in Canada from 1965 to 1971 totaled 3,528 whales (Mitchell 1974). Reports of non-directed takes of fin whales are fewer over the last two decades than for other endangered large whales such as right and humpback whales. There was no reported fishery-related mortality or serious injury to fin whales in fisheries observed by NMFS during 1999 through 2003. A review of NMFS records from 1999 through 2003 yielded an average of 1.4 human-caused mortalities per year - 0.4 per year resulting from fishery interactions/entanglements (U.S. waters, 0.2; Bermudian waters, 0.2), and 1.0 due to vessel collisions - all in U.S. waters (Table 1).

**Fishery-Related Serious Injury and Mortality**

No confirmed fishery-related mortality or serious injury of fin whales was reported in the NMFS Sea Sampling bycatch database.  A review of the records of stranded, floating or injured fin whales for the period 1999 through 2003 on file at NMFS found two records with substantial evidence of fishery interactions causing mortality (Table 1), which results in an annual rate of serious injury and mortality of 0.4 fin whales from fishery interactions.  While these records are not statistically quantifiable in the same way as the observed fishery records, they give a minimum estimate of the frequency of entanglements for this species.  In addition to the records above, there are were 5 records of entanglement within the period that either lacked substantial evidence for a serious injury determination, or that did not provide the detail necessary to determine if an entanglement had been a contributing factor in the mortality.

Table 1.  Summarized records of mortality and serious injury likely to result in mortality, Western North Atlantic fin whale stock, January 1999 - December 2003.  Causes of mortality or injury, assigned as primary or secondary, are based on records maintained by NMFS.

| Date | Report Type | Length, sex, age, ID | Location | Assigned Cause: P=primary, S=secondary | | Notes |
|------|------|------|------|------|------|------|
| | | | | Ship strike | Entang./ Fsh.inter | |
| 2/10/99 | mortality | 15.5m male | Virginia Beach, VA | P | | large external wound, extensive fractures to vertebral column, hemorrhaging |
| 11/5/99 | mortality | 16.2m male | Elizabeth, NJ | P | | large wound anterior of the blowhole, severed left flipper, shattered bones |
| 12/11/00 | mortality | 10.9m female | New York harbor | P | | hemorrhage and fractured bones on right side |
| 1/2/01 | mortality | 18.1m female | New York harbor | P | | dorsal abrasion marks, hematoma |
| 2/1/01 | mortality | 14.5m female | Port Elizabeth, NJ | P | | very fresh carcass hung on ship's bow |
| 9/19/01 | mortality | 10.7m unknown | off Bermuda | | P | extensive fresh entanglement marks |
| 7/28/02 | mortality | unknown | Georges Bank | | P | heavy line seen on tail stock, appeared embedded |

Notes: The date sighted and location provided in the table are not necessarily when or where the serious injury or mortality occurred; rather, this information indicates when and where the whale was first reported beached, entangled, or injured.  National guidelines for determining what constitutes a serious injury have not been finalized.  Interim criteria as established by NERO/NMFS  (62 FR 33, Jan. 2, 1997) have been used here.  Some assignments may change as new information becomes available and/or when national standards are established.

Assigned cause based on best judgement of available data.  Additional information may result in revisions.

**Other Mortality**

After reviewing NMFS records for 1999 through 2003, 5 were found that had sufficient information to confirm the cause of death as collisions with vessels (Table 1).  One record (8/4/97) had been omitted from previous reports, but is inserted here following an examination of the exhumed skeletal remains which found a broken jaw and cracked scapula which had partially healed.  The partial healing indicates the whale was alive at the time of the incident.

These records constitute an annual rate of serious injury or mortality of 1.0 fin whales from collisions with vessels.  NMFS data holdings include four additional records of fin whale collisions with vessels, but the available supporting documentation was insufficient to determine if the whales sustained mortal injuries from the encounters.

**STATUS OF STOCK**

The status of this stock relative to OSP in the U.S. Atlantic EEZ is unknown, but the species is listed as endangered under the ESA. There are insufficient data to determine the population trend for fin whales. The total level of human-caused mortality and serious injury is unknown. The records on hand at NMFS represent coverage of only a portion of the area surveyed for the population estimate for the stock. The total fishery-related mortality and serious injury for this stock derived from the available records is not less than 10% of the calculated PBR, and therefore cannot be considered insignificant and approaching the ZMRG. This is a strategic stock because the fin whale is listed as an endangered species under the ESA. A Recovery Plan for fin whales has been prepared and is currently awaiting legal clearance.

**REFERENCES**

Agler, B. A., R. L. Schooley, S. E. Frohock, S. K. Katona, and I. E. Seipt. 1993. Reproduction of photographically identified fin whales, *Balaenoptera physalus*, from the Gulf of Maine. J. Mamm. 74(3): 577-587.

Barlow, J., S. L. Swartz, T. C. Eagle, and P. R. Wade. 1995. U.S. Marine Mammal Stock Assessments: Guidelines for preparation, background, and a summary of the 1995 assessments. NOAA Tech. Memo. NMFS-OPR-6. U.S. Department of Commerce, Washington, DC. 73 pp.

Bérubé, M., A. Aguilar, D. Dendanto, F. Larsen, G. Notarbartolo di Sciara, R. Sears, J. Sigurjónsson, J. Urban-R. and P. J. Palsbøll. 1998. Population genetic structure of North Atlantic, Mediterranean and Sea of Cortez fin whales, *Balaenoptera physalus* (Linnaeus 1758): analysis of mitochondrial and nuclear loci. Mol. Ecol. 15: 585-599.

CETAP. 1982. A characterization of marine mammals and turtles in the mid- and north Atlantic areas of the U.S. outer continental shelf. Cetacean and Turtle Assessment Program, University of Rhode Island. Final Report #AA551-CT8-48 to the Bureau of Land Management, Washington, DC, 538 pp.

Clapham, P. J. and I. E. Seipt. 1991. Resightings of independent fin whales, *Balaenoptera physalus*, on maternal summer ranges. J. Mamm. 72: 788-790.

Clark, C. W. 1995. Application of U.S. Navy underwater hydrophone arrays for scientific research on whales. Rep. Int. Whal. Commn. 45: 210-212.

Donovan, G. P. 1991. A review of IWC stock boundaries. Rep. Int. Whal. Commn., Special Issue 13: 39-68.

Hain, J. H. W., M. J. Ratnaswamy, R. D. Kenney, and H. E. Winn. 1992. The fin whale, *Balaenoptera physalus*, in waters of the northeastern United States continental shelf. Rep. Int. Whal. Commn. 42: 653-669.

Kellogg, R. 1929. What is known of the migration of some of the whalebone whales. Ann. Rep. Smithsonian Inst. 1928: 467-494.

Kenney, R. D., G. P. Scott, T. J. Thompson, and H. E. Winn. 1997. Estimates of prey consumption and trophic impacts of cetaceans in the USA northeast continental shelf ecosystem. J. Northw. Atl. Fish. Sci. 22: 155-171.

Mizroch, A. A., D. W. Rice and J. M. Breiwick. 1984. The fin whale, *Balaenoptera physalus*. Mar. Fisheries Rev. 46: 20-24.

Mitchell, E. 1974. Present status of northwest Atlantic fin and other whale stocks. Pages 109-169. *In:* W. E. Schevill (ed), The whale problem: A status report. Harvard University Press, Cambridge, Massachusetts, 419 pp.

Palka, D. 1995. Abundance estimate of the Gulf of Maine harbor porpoise. Rep. Int. Whal. Commn., Special Issue 16: 27-50.

Palka, D. 2000. Abundance of the Gulf of Maine/Bay of Fundy harbor porpoise based on shipboard and aerial surveys during 1999. NMFS, Northeast Fisheries Science Center Ref. Doc. 00-07; 29 pp. Available from: National Marine Fisheries Service, 166 Water Street, Woods Hole, MA 02543.

Seipt, I. E., P. J. Clapham, C. A. Mayo and M. P. Hawvermale. 1990. Population characteristics of individually identified fin whales, *Balaenoptera physalus*, in Massachusetts Bay. Fish. Bull., U.S. 88(2): 271-278

Wade, P. R. and R. P. Angliss. 1997. Guidelines for assessing marine mammal stocks: Report of the GAMMS Workshop, April 3-5, 1996, Seattle, Washington. NOAA Tech. Memo. NMFS-OPR-12. U.S. Dept. of Commerce, Washington, DC. 93 pp.

Watkins, W.A., M.A. Daher, G.M. Reppucci, J.E. George, D.L. Martin, N.A. DiMarzio and D.P. Gannon. 2000. Seasonality and distribution of whale calls in the North Pacific. Oceanography 13: 62-67.

MARINE MAMMAL SCIENCE, 21(4):635–645 (October 2005)
© 2005 by the Society for Marine Mammalogy

# FISHING GEAR INVOLVED IN ENTANGLEMENTS OF RIGHT AND HUMPBACK WHALES

AMANDA JOHNSON[1]

Duke University Marine Laboratory, 135 Duke Marine Lab Road,
Beaufort, North Carolina 28516, U.S.A.
E-mail: amanda.johnson@noaa.gov

GLENN SALVADOR

National Marine Fisheries Service, Northeast Region,
12 Gosling Drive, Lewes, Delaware 19958, U.S.A.

JOHN KENNEY

National Marine Fisheries Service,
Northeast Region, Fisheries Engineering Group,
P. O. Box 1692, North Kingstown, Rhode Island 02852, U.S.A.

JOOKE ROBBINS

Provincetown Center for Coastal Studies,
P. O. Box 1036, Provincetown, Massachusetts 02657, U.S.A.

SCOTT KRAUS

New England Aquarium, Edgerton Research Laboratory,
Central Wharf, Boston, Massachusetts 02110, U.S.A.

SCOTT LANDRY

Provincetown Center for Coastal Studies,
P. O. Box 1036, Provincetown, Massachusetts 02657, U.S.A.

PHIL CLAPHAM

Alaska Fisheries Science Center,
National Marine Mammal Laboratory,
7600 Sand Point Way NE, Building 4, Seattle, Washington 98115, U.S.A.

ABSTRACT

Interactions between marine mammals and fishing gear are an issue of global concern. Entanglements in the western North Atlantic are a major source of injury and mortality for endangered large whales. In this study, entanglements of 31 right whales (*Eubalaena glacialis*) and 30 humpback whales (*Megaptera novaeangliae*) were analyzed to determine the types and parts of gear involved. When gear was identified, 89% ($n = 32$) of the entanglements were attributed to pot and gill net gear; however,

[1] Current address: National Marine Fisheries Service, Northeast Region, Protected Resources Division, One Blackburn Drive, Gloucester, MA 01930.

a wide range of specific gear types were implicated. Despite gear recovery, gear type was not identified in 20% ($n = 9$) of the cases. Although pot gear was recovered from both species equally, gill net gear was less frequently retrieved from right whales ($n = 2$) than humpback whales ($n = 11$). When gear part was identified, 81% ($n = 21$) involved entanglements in buoy line and/or groundline. For right whales, the most common point of gear attachment was the mouth (77.4%); for humpback whales, the tail (53%) and the mouth (43%) were common attachment sites. Four right and three humpback whales in this sample were known to have died subsequent to entanglement. However, when identified, the gear types and parts involved in lethal cases were not substantially different from entanglements with non-lethal outcomes. Large whales can become entangled in a wide variety of fishing gear types and parts, and additional insight will depend on continued efforts to document entanglements and recover associated gear.

Key words: entanglement, entanglement risk, mortality, fisheries, bycatch, gear type, North Atlantic right whale, *Eubalaena glacialis*, humpback whale, *Megaptera novaeangliae*.

Entanglement in fishing gear is a significant cause of injury and mortality to many marine mammal populations throughout the world. Large whale populations along the U.S. east coast remain susceptible to entanglement, despite management efforts to reduce overfishing of lobster and groundfish species.

Mortality from entanglements in fishing gear, in particular fixed gear, is a factor inhibiting the recovery of the critically endangered North Atlantic right whale (*Eubalaena glacialis*) (IWC 1999). Despite nearly 70 yr of protection from commercial whaling, this population of approximately 300 individuals has shown little sign of recovery (IWC 2001). Recent statistical data suggest that this population is declining, and reducing human-caused mortality is necessary to prevent extinction (Caswell *et al.* 1999). Right whale scarification studies conducted by the New England Aquarium indicate that 71.9% of the population has been entangled at least once, and there appears to be an increasing trend in the annual rate of entanglement (Knowlton *et al.* 2003[2], see also Knowlton and Kraus 2001). These findings indicate that documented entanglements are only a fraction of the animals that actually become entangled, and identifying recovered gear is important for developing mitigation strategies.

Entanglements are also a significant problem for North Atlantic humpback whales (*Megaptera novaeangliae*) under U.S. jurisdiction (Waring *et al.* 2003). This endangered species was also subject to historic commercial exploitation. Although its recovery status is not known, the Gulf of Maine stock of humpback whales is believed to number in the high hundreds, and is experiencing positive population growth (Barlow and Clapham 1997, Clapham *et al.* 2003). However, a scar-based study of Gulf of Maine humpback whale entanglement rates indicated that more than half of the population had experienced a previous entanglement, and 8%–25% received new injuries each year (Robbins and Mattila 2004).[3]

[2] Knowlton, A. R., M. K. Marx, H. M. Pettis, P. K. Hamilton and S. D. Kraus. 2003. Analysis of scarring on North Atlantic right whales (*Eubalaena glacialis*): Monitoring rates of entanglement interaction. Final report to the US National Marine Fisheries Service (unpublished). Available from the New England Aquarium, Central Wharf, Boston, MA 02110. 18 pp.

[3] Robbins, J., and D. K. Mattila. 2004. Estimating humpback whale (*Megaptera novaeangliae*) entanglement rates on the basis of scar evidence. Final report to the US National Marine Fisheries Service (unpublished). Available from the Center for Coastal Studies, Box 1036, Provincetown, MA 02657. 22 pp.

As awareness of marine mammal entanglement increases, mitigation efforts focus on disentanglement, gear modification, and deterrent devices such as pingers. However, for large whales, successful development of strategies to reduce or eliminate entanglement is contingent upon a better understanding of what type and part of the gear creates the greatest entanglement risk, and of how whales become entangled.

Here we examine entanglements of right and humpback whales to determine the types and parts of gear involved and where they tend to attach on the body. We also evaluate whether gear type or part affects the persistence of an entanglement, as well as the ultimate fate of the entangled animal.

## METHODS

We examined records of North Atlantic right and humpback whale entanglements on file with the National Marine Fisheries Service (NMFS). For right whales, reported entanglements ranged from the Magdalen Islands, Canada (Gulf of St. Lawrence) to Amelia Island, Florida, and for humpback whales, Grand Manan Island, Canada (Bay of Fundy) to Cape Lookout, North Carolina. Entanglement cases of right whales date back to 1993, including eight whales reported as entangled in 2002. We began with two humpback whale entanglements in 1997, and examined all other incidents up to and including eight of the eleven animals reported as entangled in 2002. Data availability has been greatly facilitated by a large whale entanglement reporting and response network for the east coast of the United States, implemented by the Provincetown Center for Coastal Studies (PCCS) under the authority of NMFS. The network has produced detailed information on entanglements in the region, including the recovery of part or all of the entangling gear in many cases.

Analyses focused on entanglements from which gear was recovered and examined by gear specialists or other sources considered reliable, as well as cases from which gear type and/or part was identified (*e.g.*, by fishermen or biologists) but not recovered. In some instances, gear removed during a necropsy was included. When documentation was at least sufficient to examine points of attachment of entangling gear, we included cases in which gear was not recovered or identified. We also evaluated whether photographs alone could be of any value in assessing gear type or part. Photographs of entangled animals were obtained from the North Atlantic Right Whale Catalog, which is curated by the New England Aquarium (NEA), and from the PCCS Gulf of Maine humpback whale catalog; all were digitally scanned for analysis. These long-term photographic catalogs were also the source of sighting information about all entangled animals and individual characteristics, such as age and sex. For each incident, we examined types of gear, parts of gear, line type, points of gear attachment on the body, and what is known about the eventual outcome for the entangled animal.

We examined five entanglement variables, as defined below.

*Entanglement outcome (at last sighting)*—Alive and gear-free (life-threatening gear was shed or removed, includes animals with non-life-threatening entanglements); alive and entangled (life-threatening entanglement retained); dead (recovery of a carcass); potentially dead (right whales only, see below); and status unknown (could not determine whether or not the entanglement was life-threatening). Some right whales have been categorized as "potentially dead" based largely on a NEA visual health assessment (Pettis *et al.* 2004). A comparable health assessment technique does not exist for humpback whales; therefore, the potentially dead category was not used for this species.



*Figure 1.* Generalized configuration of pot gear and associated parts, not drawn to scale (source: Provincetown Center for Coastal Studies).

*Gear type*—Pot: inshore lobster pot, offshore lobster pot, lobster pot unknown location, unknown pot, crab pot, conch/whelk, and slime eel; gill net: sink gill net and gill net unknown type; other: tuna handline, Danish seine, aquaculture, and vessel anchoring system.

*Part of gear*—Fixed fishing gear can be broken down into four or five components or parts: buoy line, end line, groundline, float line, and lines involved with the surface system (Fig. 1, 2).[4] Buoy and end lines connect bottom gear to the surface and terminate in a surface system, which is sometimes regarded as a separate portion of the gear. We combined buoy line and end line (termed "buoy line"), since both lines connect the bottom gear to the surface system and can be used interchangeably. Groundlines connect traps to each other, forming strings or trawls, and are also used in gill nets to connect a string of net panels to anchors. Floating groundline, used in both pot and gill net gear, forms an arc of line that can float 15–20 ft (approximately 4.6–6.1 m) into the water column. Float lines run across the top of gill nets, holding net panels upright. The surface system includes buoys and high flyers, as well as the lines that connect these components to the buoy line. The fact that many of these lines rise into the water column presents an entanglement risk to large whales. In addition, these lines are made with durable synthetic materials, such as polypropylene and polyester, with characteristics that are meant to withstand extremely harsh fishing conditions.

---

[4] Fixed fishing gear is defined in the Code of Massachusetts Regulations (322 CMR 12.00) as any bottom or sink gill nets or pots that are set on the ocean bottom or in the water column and are usually connected to lines that extend to the water's surface.



*Figure 2.*   Generalized configuration of gill net gear and associated parts, not drawn to scale (source: Provincetown Center for Coastal Studies).

*Line type*—Characterized as either floating or sinking. Also included were buoy and surface system lines that had both floating and sinking line spliced together.

*Point of attachment of entangling gear*—Mouth, flipper(s), body, tail, and unknown/uncertain. For example, a whale with line originating at its mouth and draping over its back was considered to have a mouth entanglement only. PCCS or NEA generally made this assessment, either during a disentanglement event or after examination of photographic documentation. These assessments should be considered conservative because the full extent of the entanglement may not have been visible to observers. For example, observation of the flippers and mouth was not possible in all cases and the configuration of an entanglement may have changed over time. However, secondary evidence of the attachment site, such as scarring and chafing of the skin, was not used when determining points of attachment.

We recorded sex, age (in years), age class (calf, juvenile, adult), and the location of the entangled whale at the first observation (not to be understood as the location of encounter with the gear) for individual right and humpback whales who could be identified. For right whales, "juveniles" included animals from 1 to <9 yr old, and for humpback whales, animals from 1 to <5 yr old. When reported, the straight length of dead animals was collected by members of the Northeast or Southeast Region Stranding Networks, and provided by NMFS.

RESULTS

A total of 61 entanglements (31 right whales and 30 humpback whales) were examined. Four right and three humpback whales had died, five right whales were deemed potentially dead, 12 right and 20 humpback whales were alive and gear-free, six right and five humpback whales were alive and entangled, and four whales (two

*Table 1.* Entangling gear type for 20 right and 25 humpback whales where gear was either recovered or otherwise reliably identified. UN = unknown/unidentified gear; LI = inshore lobster pot; LO = offshore lobster pot; LU = lobster pot unknown location; Pot = unknown pot; CR = crab pot; CW = conch/whelk; SE = slime eel; SG = sink gill net; GU = gill net unknown type; TU = tuna handline; Seine = Danish seine; Anchor = vessel anchoring system; AQ = aquaculture.

|  | UN | LI | LO | LU | Pot | CR | CW | SE | SG | GU | TU | Seine | Anchor | AQ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Right whales | 6 | 3 | 3 | 2 | 1 | 1 | 0 | 0 | 1 | 1 | 0 | 1 | 0 | 1 |
| Humpback whales | 3 | 5 | 0 | 0 | 1 | 1 | 1 | 1 | 11 | 0 | 1 | 0 | 1 | 0 |

of each species) had unknown outcomes.[5] Gear type was determined in 45% ($n = 14$) of right and 73% ($n = 22$) of humpback whale cases. Scanned photographs (representing nine right and seven humpback whales) yielded no useful information about gear type or part because only line was visible on most of these animals. Photographs of five of these whales (three right and two humpback) allowed for their inclusion in the points of gear attachment analysis.

*Types and Parts of Gear Involved in Entanglements*

Of the 61 entanglements, we examined 20 right whale and 25 humpback whale entanglements where gear was recovered or where gear was identified but not recovered (Table 1). One right whale (#2212, a juvenile male) was entangled three times, and all recovered gear was analyzed. For analysis, gear types were divided into four categories: pot (*e.g.*, inshore and offshore lobster, crab), gill net (all gill net types), other (*e.g.*, tuna handline, Danish seine), and unknown. Eighty percent (36 of 45) of the entangling gear that was identified could be attributed to particular fisheries. Eighty-nine percent of identified gear was attributed to pot and gill net fisheries (Table 1). Pot gear was identified on 10 right and nine humpback whales, gill net gear on two right and 11 humpback whales, and other gear on four whales (two of each species). All but one of the humpback whale entanglements reported in the mid-Atlantic ($n = 6$) involved gill net gear, while entanglements reported in the Northeast involved a wide variety of gear types.

Of 14 juvenile right whale entanglements (involving 12 individuals) where gear was recovered, eight events involved pot gear (three inshore lobster pot, two offshore lobster pot, two unknown lobster pot, and one unknown pot), one involved other gear (aquaculture), and five involved unknown gear types. Five adult right whale entanglement events were analyzed, where one involved offshore lobster pot gear, two involved gill net gear, one involved other gear (Danish seine), and one involved unknown gear. Also, a whale of unknown age class was entangled in crab pot gear. Life history data are presently insufficient to compare humpback whale entanglements on the basis of age class.

Despite gear recovery from 45 entanglements, the parts of the gear were identified in only 25 of those cases (12 right and 13 humpback whales). Buoy line and groundline were recovered in 49% of these cases, whereas float line and surface system lines were recovered in 11% (Table 2). Two whales were entangled in more than one part of the gear. A right whale was reported entangled in two parts of the same gear,

[5] The total number of outcomes described do not equal 61 because right whale #2212, entangled three separate times, was assigned to one final outcome of potentially dead.

*Table 2.* Entangling gear types and associated parts of the gear. This table contains one right and one humpback whale that were entangled in both buoy line and groundline associated with pot gear. The numbers in parentheses indicate the percent occurrence of that gear part relative to the total number of gear parts that were identified for that gear type. "Other" types of gear were not included, as the parts of the gear discussed here are only associated with fixed fishing gear. RW = right whales; HW = humpback whales.

| | Pot | | Gill net | | Unknown | | Total |
|---|---|---|---|---|---|---|---|
| | RW | HW | RW | HW | RW | HW | Both species |
| Buoy line | 6 (55%) | 6 (60%) | 0 | 1 (9%) | 1 (17%) | 0 | 14 (33%) |
| Groundline | 3 (27%) | 3 (30%) | 1 (50%) | 0 | 0 | 0 | 7 (16%) |
| Float line | — | — | 0 | 4 (36%) | 0 | 0 | 4 (9%) |
| Surface system line | 1 (9%) | 0 | 0 | 0 | 0 | 0 | 1 (2%) |
| Unknown | 1 (9%) | 1 (10%) | 1 (50%) | 6 (55%) | 5 (83%) | 3 (100%) | 17 (40%) |

both buoy line and groundline associated with crab pot gear, and a humpback whale was entangled in buoy line and groundline associated with pot gear.

Buoy line associated with pot gear was recovered from 85.7% (12 of 14) of the right and humpback whales entangled in buoy line, and groundline associated with pot gear was recovered from 85.7% (six of seven) of entanglements in groundline (Table 2). Gill net gear was recovered from more humpback whales than right whales, but in approximately half of the cases, the part of the entangling gear could not be identified.

For both species combined, 64.3% (nine of 14) of buoy line entanglements involved floating and sinking line spliced together, 28.6% (four of 14) involved only sinking line, and one was unknown. Also, 85.7% (six of seven) of groundline entanglements involved floating line, and one was unknown. One surface system entanglement involved floating and sinking line, and one was unknown. Gill net float line, by nature, consists of floating line or line that is made buoyant by floats.

For right whales the most common point of attachment was the mouth (77.4%), with 51.6% involving only this body part. For humpback whales, the most common points of attachment were the tail (53%) and the mouth (43%). Thirty percent involved the tail only and 20% involved the mouth only.

Buoy line entanglements involved the mouth on three right whales and one humpback whale; the mouth, flipper, and tail on one right whale; the mouth and tail on two humpback whales; the flipper on one right whale; the tail on one right and three humpback whales; and an unknown location on one humpback whale. One right whale entanglement in the surface system line involved the mouth, and the other involved the mouth, flipper, and body. Groundline entanglements involved the mouth on two whales (one of each species); the mouth and body on one right whale; the flipper and body of one right whale; and an unknown location on one humpback whale. Float line involved the mouth and/or tail of all four humpback whale entanglements in this part of the gear. For the two whales entangled in multiple parts of the gear (buoy line and groundline), the right whale entanglement involved the tail and the humpback whale entanglement involved the mouth. In summary, buoy line entanglements involved the mouth in a total of eight cases (four of each species), the tail in eight cases (three right and five humpback), and the flippers in two cases (both right whales).

*Influence of Gear Type on Entanglement Outcome*

Overall, entanglement outcomes were considered positive (*i.e.*, the animal was alive and gear-free, either by successful disentanglement or shedding the gear itself) in 71% ($n = 12$) of pot and 62% ($n = 8$) of gill net cases. Right whale #2212 was not included in these gear analyses. Entanglement outcome was considered positive in 75% ($n = 3$) of cases involving the four other gear types. It was not possible to draw firm conclusions about disentanglement success with regard to the parts of the gear involved because reliable gear part identification depended on successful gear retrieval. However, pot, gill net, and Danish seine gear were all involved in known or suspected lethal entanglements. Out of 17 entanglements of both species in pot gear (not including right whale #2212), 18% ($n = 3$) were known or suspected to have resulted in death, and out of 13 gill net entanglements, a similar number, 23% ($n = 3$), had a comparable outcome. When age class was known, lobster pot gear was involved in the known or suspected lethal entanglement of two juvenile right whales, and gill net gear was involved in the known lethal entanglement of one adult right whale. In addition, one dead adult right whale was entangled in Danish seine gear. Based on their reported lengths (8.6–9.85 m), the three humpback whales known to have died were likely juveniles (Clapham *et al.* 1999).

A wide range of fixed gear parts were involved in entanglements known to have been lethal. Float line was documented on a dead humpback whale. Buoy line was documented on a dead right whale (sinking line) and a dead humpback whale (floating and sinking spliced), and floating groundline was documented on one dead right whale. Right whale #2212, considered potentially dead, was entangled two separate times where gear part could be identified; one event involved buoy line (floating and sinking spliced) and the other involved floating groundline. Similarly, any part of a whale's body can be involved in lethal and non-lethal entanglements. However, five out of the nine (55.6%) dead or potentially dead right whales had entanglements that involved the mouth; similarly, all three humpback whale deaths involved the mouth. The tail was involved in entanglements of one humpback and four right whales that are dead or potentially dead.

DISCUSSION

The 1994 amendments to the U.S. Marine Mammal Protection Act (MMPA) were designed to address bycatch of marine mammals in U.S. commercial fisheries. A study by Read and Wade (2000) concluded that in general, the MMPA and Endangered Species Act (ESA) have been successful in aiding the recovery of many species, but some, such as the North Atlantic right whale, continue to face conservation problems despite protective measures. Cetaceans continue to be taken in fisheries such as the Japanese North Pacific drift net fishery for salmon, Italian and Spanish drift net fisheries for swordfish in the Mediterranean Sea, and coastal gill net fisheries in Europe (Reeves *et al.* 2003). Growing international concern about the effects of entanglements on marine mammal and sea turtle populations has led to research and management measures to mitigate entanglements.

On the east coast of the U.S. and Canada, both right and humpback whales were entangled in all major types of fixed fishing gear, and any part of that gear. Out of the combined 36 entanglement cases where gear was examined and identified, pot and gill net fisheries were implicated in 32 (89%). Both pot (18%) and gill net (23%)

gear were involved in known or suspected lethal entanglements. Conservatively, all fixed gear types should be considered potentially dangerous to these species.

For pot gear, 80% and 56% of right and humpback whale entanglements, respectively, occurred in lobster pot gear, despite management measures to reduce effort in this fishery, such as setting a cap on the number of traps allowed per fisherman and limiting entry into the fishery. When gear type was identified, right whales were found to be entangled in pot gear 71% of the time and gill net gear 14% of the time as compared to other gear types, while humpback whales were entangled in pot gear 41% of the time and sink gill nets 50% of the time. Although humpback whales appear to encounter gill net gear more often than right whales, without a measure of whale encounter rates with gear, we are unable to generalize this finding to the population. Although the location of the reported entanglement is not necessarily the location where the whale encountered the gear, 55% ($n = 6$) of humpback whale gill net entanglements were reported in the mid-Atlantic, where gill nets made up 86% ($n = 6$) of identified gear from humpback whales reported entangled in this region.

The entanglement outcomes of many whales were considered positive; 71% of whales entangled in pot gear and 62% entangled in gill net gear were alive and gear-free, primarily due to successful disentanglement. The determination of both gear types and gear parts involved in these entanglements depended in large part on the successful recovery of gear.

Fifty-six percent of the entanglements for both species involved buoy line, providing evidence that buoy lines present entanglement risk regardless of line type. Sinking (all or part) buoy line was found on more entangled animals than floating buoy line, which may indicate that sinking buoy line creates more entanglement risk than floating buoy line. However, it is possible that the gear observed on or removed from an animal may not accurately reflect the entire history of an entanglement, since some or all gear can be shed by the whale, lost during disentanglement, or change position over time. NMFS gear specialists report that some fishermen do use purely floating buoy line, but most lobster pot and gill net fishermen use buoy line consisting of both floating and sinking line, with floating line near the bottom end to prevent it from chafing on the seafloor. Therefore, sinking buoy line that was removed from an animal may have once been spliced to floating line. However, a relatively large number of entangling gear types and gear parts were unidentifiable, especially when gear was not recovered.

Whether buoy and surface system lines represent more of an entanglement risk than groundline is currently difficult to determine due to unknown biases associated with entanglement reporting effort, as well as lack of information about the types and amounts of gear used. For example, buoy and surface system lines may be identified at sea more frequently than groundline, since buoy and surface system lines are easier to identify when an attached buoy or high flyer is present. In contrast, groundline does not have any distinguishing characteristics that indicate that it is in fact groundline. Out of 14 entanglement events involving buoy line, nine (64.3%) involved the presence of buoys and/or high flyers. Thus, buoy line may appear to represent a greater entanglement risk than groundline, which is usually identified only when gear is removed from an entangled animal. Interestingly, only two whales (both right whales) were documented with surface system entanglements, which may indicate that entanglements commonly occur below the surface.

This analysis highlighted an apparent difference between floating and sinking groundline in terms of potential entanglement risk. The use of sinking groundline (line in contact with the ocean floor) could be taken as providing some measure of

entanglement risk reduction, since no entanglements of either species involved this type of line. However, we have no knowledge of the relative frequency with which lines of different types are employed throughout the fishing regions concerned and this information would be extremely difficult to obtain; consequently, any comparison of entanglement rates by line type without knowledge of effort may be misleading.

Several body parts were involved in entanglements, both lethal and non-lethal. Right whale entanglements frequently involved the mouth, indicating that many of these entanglements probably occurred during foraging, since open mouth behavior is generally associated with feeding only. Most right whales (78%) that died or were considered potentially dead were commonly entangled by the mouth and/or the tail. Mouth entanglements were also common among humpback whales, although the incidence may be underestimated given that the mouth is somewhat more difficult to observe in this species. However, all three humpback whale deaths involved at least a portion of the entangling gear in the mouth, indicating that humpback whale entanglements also occur during foraging. Humpback whale entanglements were more likely to involve the tail than right whale entanglements, but the reason for this interspecific difference is unclear.

In both species, the mouth and/or tail regions were involved in nearly all buoy line entanglements and all four float line entanglements. Groundline and surface system lines were documented on all body parts. However, without knowledge of the whale's behavior leading up to and following an entanglement, it is difficult to draw conclusions about how different parts of the gear are linked to points of gear attachment on an animal's body.

This analysis did not highlight any trends in gear types and parts that are commonly involved in lethal and non-lethal entanglements of juvenile versus adult right whales. Overall, more juvenile right whale entanglements were analyzed than those of adults, making it difficult to compare age classes. Fifty-five percent of the right whales that died or were deemed potentially dead were juveniles. Right whale #2212 was a special case in that three separate entanglements were documented. Although this whale is considered potentially dead, this outcome cannot be attributed to any one particular entanglement event; rather, the debilitating effects of multiple entanglements, combined with the ingestion of line from an unknown type of gear, most likely lead to this determination.

This analysis confirms that any line rising into the water column poses a significant entanglement risk for these two species. Consequently, reducing the occurrence of line in the water column—for example, by using sinking or neutrally buoyant groundline—could reduce entanglement risk (although it should be noted that the occurrence of benthic foraging by these species is still poorly understood).

The risk presented by buoy and surface system lines might be mitigated by the correct placement of weak links with sufficiently low breaking strengths. However, the efficacy of weak links remains to be demonstrated, and may be countered by the behavior or strength of the whale in conjunction with the entanglement configuration. More information on the specifics of entanglements is required and may be aided by the application of standardized marking of lines used in fixed fishing gear.

Currently, gear removal provides the only reliable information about the nature of large whale entanglements. Gear experts more readily identify buoy line due to the presence of a buoy or high flyer, while groundline is usually identifiable only if it is removed from a whale. Color-coding gear would allow for identification of gear parts both at sea and through photographic documentation.

ACKNOWLEDGMENTS

This study would not have been possible without the efforts of the PCCS Disentanglement Team and the Atlantic Large Whale Disentanglement Network. Dr. Andy Read of the Duke University Marine Laboratory provided guidance and insightful comments. The authors thank the following individuals for their contributions to or assistance with this work: Diane Borggaard, Dana Hartley, Amy Knowlton, David Mattila, Ed Lyman, Stormy Mayo, David Morin, Bob Bowman, and Melissa Mooney. Diane Borggaard, Brian Hopper, Carolyn Woodhead, Jack Batchelder, Fred Serchuk, Richard Merrick, Michael Moore, and two anonymous reviewers provided useful comments on the draft manuscript.

LITERATURE CITED

BARLOW, J., AND P. J. CLAPHAM. 1997. A new birth interval approach to estimating demographic parameters of humpback whales. Ecology 78:535–546.

CASWELL, H., M. FUJIWARA AND S. BRAULT. 1999. Declining survival probability threatens the North Atlantic right whale. Proceedings of the National Academy of Science 96:3308–3313.

CLAPHAM, P. J., S. E. WETMORE, T. D. SMITH AND J. G. MEAD. 1999. Length at birth and at independence in humpback whales. Journal of Cetacean Research and Management 1:141–146.

CLAPHAM, P. J., J. BARLOW, M. BESSINGER, T. COLE, D. MATTILA, R. PACE, D. PALKA, J. ROBBINS AND R. SETON. 2003. Abundance and demographic parameters of humpback whales from the Gulf of Maine, and stock definition relative to the Scotian Shelf. Journal of Cetacean Research and Management 5:13–22.

IWC. 1999. Report of the Workshop on the Comprehensive Assessment of Right Whales Worldwide. Journal of Cetacean Research and Management 1 (supplement):119–120.

IWC. 2001. Report of the Workshop on Status and Trends of Western North Atlantic Right Whales. Journal of Cetacean Research and Management (Special Issue) 2:61–87.

KNOWLTON, A. R., AND S. D. KRAUS. 2001. Mortality and serious injury of northern right whales (*Eubalaena glacialis*) in the western North Atlantic Ocean. Journal of Cetacean Research and Management (Special Issue) 2:193–208.

PETTIS, H. M., R. M. ROLLAND, P. K. HAMILTON, S. BRAULT, A. R. KNOWLTON AND S. D. KRAUS. 2004. Visual health assessment of North Atlantic right whales (*Eubalaena glacialis*) using photographs. Canadian Journal of Zoology 82:8–19.

READ, A. J., AND P. R. WADE. 2000. Status of marine mammals in the United States. Conservation Biology 14:929–940.

REEVES, R. R., B. D. SMITH, E. CRESPO AND G. NOTARBARTOLO DI SCIARA. 2003. Dolphins, whales, and porpoises: 2003–2010 conservation action plan for the world's cetaceans. Species Survival Commission, IUCN, Gland, Switzerland. 147 pp.

WARING, G. T., R. M. PACE, J. M. QUINTAL, C. P. FAIRFIELD AND K. MAZE-FOLEY, EDS. 2003. U.S. Atlantic and Gulf of Mexico marine mammal stock assessments—2003. U.S. Department of Commerce, NOAA Technical Memorandum NMFS-NE-182. 287 pp.

Received: 16 June 2004
Accepted: 1 February 2005

# Chapter 15

# TECHNOLOGY-FORCING STANDARDS

    A.   *Reducing Auto Emissions Through Technology-Forcing*
    B.   *International Technology-Forcing: The Phaseout of Ozone-Depleting Substances*

Any of the regulatory strategies analyzed in this coursebook, if sufficiently stringent, might operate to force the development of new technology. This chapter focuses on standards set by legislatures with the direct intent to force the development of new technology — either by limiting releases of a target substance to lower amounts than can be achieved with currently available technology or by banning some or all uses of a substance to force the invention of substitutes. Insofar as government seeks to achieve technology-forcing through a complete prohibition on manufacture or use (sometimes referred to as "sunsetting" a dangerous substance), technology-forcing simultaneously acts as a roadblock to continuation of the commercial activity (see Chapter 16) while encouraging the development of new alternatives. Like roadblock statutes, product bans are crude, blunt instruments that frequently contain mitigating devices in order to gain acceptance by the regulated public. Some of these flexibility mechanisms are lead times for product phaseout, waivers, hardship variances, and sympathetic enforcement. In addition, market-based approaches noted in Chapter 14, such as the use of marketable permits, excise taxes, and governmental purchasing power, can effectively support technology-forcing.

    Because the U.S. legal system discourages potential curtailment of economic activity, technology-forcing is often a last regulatory resort. Judge Jasen's recommendation in *Boomer* that the defendant be forced to develop and adopt new pollution control technology was rejected by the majority. The following statement by the Fifth Circuit Court of Appeals in Corrosion Proof Fittings v. EPA, 947 F.2d 1201 (1991),[1] typifies the prevailing judicial skepticism regarding technology-forcing:

> As a general matter we agree with the EPA that a product ban can lead to great innovation, and it is true that an agency [under the Toxic Substances Control Act] as under other regulatory statutes, is empowered to issue safety standards which require improvements in existing technology or which require the development of new technology. As even the EPA acknowledges, however, when no adequate substitutes currently exist, the EPA cannot fail to consider this lack when formulating its own guidelines. Under ToSCA, therefore, the EPA must present a stronger case to justify the ban, as opposed to regulation, of products with no substitutes. 947 F.2d at 1221.

---

1. In this case, the court overturned EPA's ban on the use of asbestos in almost all products.

It appears that administrative technology-forcing will be judicially condoned only where a regulatory agency has exhausted all other regulatory alternatives for controlling a demonstrably intolerable material. See Ethyl Corp. v. EPA, 541 F.2d 1 (D.C. Cir. 1976) (upholding EPA's phaseout of lead in gasoline).

In the relatively few situations where technology-forcing has been attempted, industry has been successful in developing innovative technology that has significantly reduced the environmental threat. In addition to the auto emissions reduction and CFC phaseout case studies presented below, the following regulatory efforts are examples of effective technology-forcing: EPA's prohibition of the commercial distribution and manufacture of PCBs, EPA's phased reduction leading to a prohibition on the use of lead in gasoline (see Ethyl Corp. v. EPA above.), OSHA's drastic reduction in the occupational exposure standard for lead, and the prohibition of phosphate detergents by many state and local governments.[2] It may be that technology-forcing has generally been successful because legislatures and regulatory agencies "hedge their bets" when forcing technology. For example, when Congress enacted the strict 1970 reductions in permissible tailpipe emissions, it was aware that the catalytic converter technology had been developed and subjected to limited testing.

## A.  REDUCING AUTO EMISSIONS THROUGH TECHNOLOGY-FORCING

The most ambitious and controversial use of technology-forcing as a regulatory strategy to achieve environmental protection goals was the 1970 CAA's Title II, a remarkable example of a drastic, direct, numerical regulatory standard stipulated by the legislature itself, declaring that —

> emissions of carbon monoxide and hydrocarbons from light duty vehicles…manufactured during or after model year 1975 shall…require a reduction of at least 90 per centum from emissions allowable…in model year 1970.[3] CAA §202(b)(1)(a) (1970).

### International Harvester v. Ruckelshaus
United States Circuit Court of Appeals
for the District of Columbia Circuit, 1973
478 F.2d 615

LEVENTHAL, C.J.… These consolidated petitions of International Harvester and the three major auto companies, Ford, General Motors, and Chrysler, seek review of a decision by the Administrator [of EPA] denying petitioners' applications…for one year suspensions of the 1975 emissions standards prescribed under the statute for light duty vehicles.…

The tension of forces presented by the controversy over automobile emission standards may be focused by two central observations: (1) the automobile is an essential pillar of the American economy. Some 28 per cent of the nonfarm workforce draws its livelihood from the automobile and its products; (2) The automobile has had a devastating impact on the American

---

2. See, e.g., Procter & Gamble Corp. v. Chicago, 509 F.2d 69 (7th Cir. 1975), cert. denied, 421 U.S. 978 (1976) (upholding Chicago's phosphate detergent ban against a dormant Commerce Clause challenge).
3. The Act applied the same specific rollback to nitrogen oxides starting in the 1976 model year.

A. TECH-FORCING ON AUTO EMISSIONS 745



FIGURE 15-1

*A modern urban scene with air pollution caused by automobile emissions. This could be any one of the more than four dozen American cities that are consistently in violation of federal air quality standards due to hydrocarbons, nitrogen oxides, and carbon monoxide produced by automobiles.*

environment. As of 1970, authoritative voices stated that "automotive pollution constitutes in excess of 60% of our national air pollution problem" and more than 80 per cent of the air pollutants in concentrated urban areas.

Congressional concern over the problem of automotive emissions dates back to the 1950s, but it was not until the passage of the Clean Air Act in 1965 that Congress established the principle of Federal standards for auto emissions. Under the 1965 act and its successor, the Air Quality Act of 1967, the [Federal authorities] were authorized to promulgate emission limitations commensurate with existing technological feasibility.

The development of emission control technology proceeded haltingly. The Secretary of Health, Education, and Welfare testified in 1967 that "the state of the art has tended to meander along until some sort of regulation took it by the hand and gave it a good pull.... There has been a long period of waiting for it, and it hasn't worked very well."

The legislative background must also take into account the fact that in 1969 the Department of Justice brought suit against the four largest automobile manufacturers on the grounds that they had conspired to delay the development of emission control devices.

On December 31, 1970, Congress grasped the nettle and amended the Clean Air Act to set a statutory standard for required reductions in levels of hydrocarbons (HC) and carbon monoxide (CO) which must be achieved for 1975 models of light duty vehicles. Section 202(b) of the Act...provides that, beginning with the 1975 model year, exhaust emission of HC and CO from light duty vehicles must be reduced at least 90 per cent from the permissible emission levels in the 1970 year. In accordance with the Congressional directives, the Administrator...promulgated regulations limiting HC and CO emissions from 1975 model light duty vehicles to .41 and 3.4 grams per mile respectively....[4]

---

4. This was a default standard; some car models that were cleaner had even tougher standards. The same regulation also prescribed an interim 3.0 grams per mile 1975 standard for nitrogen oxides (NOx). HC and NOx combine with sunlight to produce photochemical oxidants (ozone), also known as "smog." [Eds.]

Congress was aware that these 1975 standards were "drastic medicine" designed to "force the state of the art." There was, naturally, concern whether the manufacturers would be able to achieve this goal. Therefore, Congress provided…a "realistic escape hatch": the manufacturers could petition the EPA for a one-year suspension of the 1975 requirements, and Congress took the precaution of directing the National Academy of Sciences to undertake an ongoing study of the feasibility of compliance with the emission standards. The "escape hatch" provision addressed itself to the possibility that the NAS study or other evidence might indicate that the standards would be unachievable despite all good faith efforts at compliance.[5] This provision was limited to a one-year suspension.…

[The EPA Administrator rejected petitioners' applications for suspensions on the ground that petitioners had not established the unavailability of control technology that could meet the stricter standards. The NAS Report concluded that the necessary control technology was not available.]

Two principal considerations compete for our attention. On the one hand, if suspension is not granted, and the prediction of the EPA that effective technology will be available is proven incorrect, grave economic consequences could ensue.… On the other hand, if suspension is granted, and it later is shown that the Administrator's prediction of feasibility was achievable in 1975 there may be irretrievable ecological costs. It is to this second possibility to which we first turn.

The most authoritative estimate in the record of the ecological costs of a one-year suspension is that of the NAS Report. [The NAS concluded that]

…the effect on total emissions of a one-year suspension with no additional interim standards appears to be small. The effect is not more significant because the emission reduction now required of model year 1974 vehicles, as compared with uncontrolled vehicles (80 percent for HC and 69 percent for CO), is already so substantial.

[The court added that because the technology being tested to meet the 1975 standards would cause fuel economy, acceleration, and "driveability" problems, while adding significantly to the cost of new motor vehicles, "a drop-off in purchase of 1975 cars will result in a prolonged use of older cars with less efficient pollution control devices.… It might even come to pass that total actual emissions (of all cars in use) would be greater under the 1975 than the 1974 standards."]

We also note that it is the belief of many experts — both in and out of the automobile industry — that air pollution cannot be effectively checked until the industry finds a substitute for the conventional automotive power plant — the reciprocating internal combustion (i.e., "piston") engine. According to this view, the conventional unit is a "dirty" engine. While emissions from such a motor can be "cleaned" by various thermal and catalytic converter devices, these devices do nothing to decrease the production of emissions in the engine's combustion chambers. The automobile industry has a multi-billion-dollar investment in the conventional engine, and it has been reluctant to introduce new power plants or undertake major modifications of the conventional one. Thus the bulk of the industry's work on emission control has focused narrowly on converter devices. It is clear from the legislative history that Congress expected the Clean Air Act Amendments to force the industry to broaden the scope of its research — to study new types of engines and new control systems. Perhaps even a one-year suspension may give the industry sufficient time to develop a new approach to emission control and still meet the absolute deadline of 1976. If so, there will be ample time for the EPA

5. The suspension provision also included a criterion that the suspension must be "essential to the public interest or the public health and welfare of the United States." [Eds.]

and Congress, between now and 1976 to reflect on changing the statutory approach. This kind of cooperation, a unique three-way partnership between the legislature, executive, and judiciary, was contemplated by the Congress and is apparent in the provisions of the Act....

If the automobiles of Ford, General Motors and Chrysler cannot meet the 1975 standards..., the Administrator of EPA has the theoretical authority...to shut down the auto industry, as was clearly recognized in the Congressional debate. We cannot put blinders on the facts before us so as to omit awareness of reality that this authority would undoubtedly never be exercised, in light of the fact that approximately 1 out of every 7 jobs in this country is dependent on the production of the automobile. Senator Muskie, the principal sponsor of the bill, stated quite clearly in the debate on the Act that he envisioned the Congress acting if an auto industry shutdown were in sight....

This case is haunted by the irony that what seems to be Ford's technological lead may operate to its grievous detriment, assuming the relaxation-if-necessary [of the standards]. If...any one of the three major companies cannot meet the 1975 standards, it is a likelihood that standards will be set to permit the higher level of emission control achievable by the laggard. This will be the case whether or not the leader has or has not achieved compliance with the 1975 standards. Even if the relaxation is later made industry-wide, the Government's action, in first imposing a standard not generally achievable and then relaxing it, is likely to be detrimental to the leader who has tooled up to meet a higher standard than will ultimately be required.

In some contexts high achievement bestows the advantage that rightly belongs to the leader, of high quality. In this context before us, however, the high achievement in emission control results, under systems presently available, in lessened car performance — an inverse correlation. The competitive disadvantage to the ecological leader presents a forbidding outcome...for which we see no remedy.... [The court remanded the case to EPA for reconsideration of its denial of suspension.]

**COMMENTARY & QUESTIONS**

1. **Was this really technology-forcing?** Is technology-forcing legislation credible when the bill's sponsor assures his colleagues that the "hammer" (shutdown of large auto manufacturers) will never be allowed to fall? Is it any wonder that the auto industry did not take the threat seriously and instead continued to tinker with add-on devices that would require little modification of existing automobiles and could later be abandoned if Congress changed its mind? In fact, the "three-way partnership" among the legislature, executive branch, and judiciary acted to postpone compliance far beyond the one-year suspension. On remand, EPA granted the extension for both the HC and the CO standards, but promulgated interim standards for 1975 of 1.4 and 15 gpms (grams per mile) respectively.

EPA granted a one-year suspension of the 1976 NOx (nitrogen oxides) standard of 0.2 gpms and set an interim standard of 2 gpms. Through a combination of congressional extensions and congressionally authorized EPA suspensions, the HC and CO standards, based on a 90% rollback, were not finally met until 1980 and 1983 respectively. Congress abandoned the 0.2 gpm NOx standard in 1977 and, in its place, imposed a 1 gpm standard to be met in 1984. By the mid-1980s, the auto industry was willing to accept the standards because market demand was moving toward smaller, less-polluting, and more fuel-efficient vehicles.

Was this an example of successful technology-forcing? Or was the final attainment of the 1975 and 1976 standards merely accidental?[6] Was attainment "too little, too late"?

2. **Why the denial?** Why did EPA deny the one-year suspension, knowing that its decision was in conflict with the prestigious NAS Report and sensing the lack of congressional support for strict deadlines and draconian enforcement? EPA must have realized that its denial would be overturned by a court or Congress (or both, as it turned out). Is it possible that although EPA wanted to censure the auto industry for its failure to make a genuine effort to consider new technology and its alleged conspiracy to suppress new technology, the agency believed that it would have been politically inexpedient to try to prove that the auto industry had violated the requirement of making "all good faith efforts" to meet the standards?

3. **Rewarding the laggard and the risks of leading the way.** Was the court correct in its assumption that a company making good faith efforts to comply with the standards would inevitably be disadvantaged by a standard relaxation dictated by the overall public interest? Whenever standards are set and then reset at different levels, parties that comply quickly may suffer unintended penalties. What if standards are tightened after a company has invested in new technology in order to meet the first change in the standard? What if a rollback approach is taken after one firm has already reduced its emissions? Both situations pose serious interpolluter equity problems that a regulatory scheme should address. (Another approach to this problem is found in §306(d) of the CWA, which provides that a new source of water pollution that has achieved its New Source Performance Standards cannot be subject to stricter standards for ten years or the depreciation or amortization period of the facility, whichever ends first.) What about using incentives such as tax deductions or preferential governmental purchasing to add inducements to early compliance?

4. **The court's balancing test.** Note that the court's cost-benefit analysis followed Talbot Page's recommendation in Chapter 1 that the costs of false negatives be weighed against the costs of false positives in making environmental regulatory decisions. In this case, as analyzed by the court, the cost of a false negative (not granting the suspension when it should have been granted) was relatively high in economic terms, while the cost of a false positive (granting the suspension when it should not have been) was relatively low in environmental terms. Given the broad "public interest" test articulated by Congress, balancing the costs of potential erroneous decisions appears to have been justified. But did the court conduct the balance fairly in light of the fact that the one-year extension was not a firm one, making further slippage predictable?

5. **Types of technology-forcing mechanisms.** Note that, in the case of auto emission controls, Congress itself set the standards based on technology-forcing, instead of delegating standard setting to the experts at EPA. With regard to the phaseout of lead in gasoline, on the other hand, Congress generally delegated to EPA the authority to control or prohibit fuel additives (42 U.S.C. §7545(c)), and EPA did the rest. Why did Congress retain direct control of auto emission standard setting? Because it wanted to

---

6. One serendipitous result of the standards was the EPA phaseout of leaded gasoline; lead poisons the catalytic converter. [Eds.]

ensure that the standards could be modified quickly if they proved to be unachievable? Because it was afraid that EPA would be unable to resist the political power of the auto industry? Because it wanted to take primary credit for responding to this important issue?

6. **The 1990 CAA Amendments, technology-forcing, and auto pollution.** By 1987, emissions of HC, CO, and lead from new cars had dropped by over 95% from uncontrolled levels, and emissions of NOx dropped by over 75%, but increases in automobile use caused ambient air quality standards for ozone to be exceeded in many urban areas.[7] With the lessons of its 1970 technology-forcing effort firmly in mind, in 1990 Congress adopted a more sophisticated but still aggressive technology-forcing strategy to cope with ozone nonattainment problems.

> **Henry Waxman, Gregory Wetstone, and Phillip Barnett, Cars, Fuels and Clean Air: A Review of Title II of the Clean Air Act Amendments of 1990**
> 21 Environmental Law 1947, 1991–2004 (1991)

A major innovation in Title II is the clean-fuel vehicle program, contained in new part C. This program requires the use of a new generation of "clean fuel vehicles" in the most heavily polluted cities. These vehicles, which must meet emission standards eighty percent below today's standards, will often run on clean alternative fuels, such as natural gas, ethanol, or even electricity....

The clean-fuel requirements for light-duty vehicles and light-duty trucks in the final legislation have three central components. First, new sections 242 through 245 establish special emission standards for clean-fuel vehicles. Second, new §246 establishes a program to require the use of clean-fuel vehicles in centrally fueled fleets in polluted cities. Finally, new §249 establishes a large-scale program to introduce clean-fuel vehicles to the passenger car market in California.

Section 242 of the Act requires EPA to set emission standards for clean-fuel vehicles in two years. These standards...mandate a [sixty and later an] eighty percent reduction in exhaust emissions of organic gasses and NOx from today's already controlled levels. They are intended to develop a new generation of clean vehicles, in a fuel-neutral manner. The most heavily polluted cities must reduce aggregate emissions of VOCS [volatile organics] and NOx by sixty to eighty percent from today's levels — and keep them there notwithstanding future economic and population growth — to attain the federal health standard for ozone. This is an immense undertaking, made more immense by the fact that most polluted cities have already adopted most of the obvious control measures. It cannot be accomplished unless vehicle emissions are cut drastically. Indeed, Los Angeles, the most polluted city in the country, cannot achieve attainment by 2010 without the widespread use of zero-emission, electric vehicles.

The standards for clean-fuel vehicles reflect this imperative.... In percent terms, this [eighty percent reduction] is equivalent to the level of technology-forcing required by the 1970 amendments. Under the new clean-fuel standards, organic gas and NOx emissions will be reduced ninety-eight percent below uncontrolled levels.

Meeting these standards will necessitate major advances in vehicles and fuels. Unlike any standards previously established, the final standards appear unachievable by vehicles running on conventional gasoline. They probably can be met by vehicles that use reformulated gasoline,

---

7. Nearly 50% of the U.S. population lives in areas with unhealthy levels of ozone, and approximately half of all ozone is produced by automobiles. [Eds.]

but only if manufacturers develop an additional "preheated" catalyst to capture the emissions that occur during the first seconds of operation. Vehicles built to run on alternative fuels like natural gas, ethanol, or methanol are also likely to meet the standards....

The 1990 amendments establish two programs to require the use of clean-fuel vehicles meeting the [emissions] standards.... One is for fleet vehicles and one is for passenger cars in California.

The fleet program...requires clean-fuel vehicles to be used by the owners of centrally fueled fleets of ten or more vehicles in serious, severe, and extreme ozone nonattainment areas. Examples of centrally fueled fleets are fleets of delivery vans, taxicabs, or school buses that regularly refuel at a common location. When the program is fully phased in, it is expected to cover 250,000 vehicles per year.... By model year 2000, seventy percent of the new vehicles purchased by covered fleet operators must be clean-fuel vehicles.... To ensure that the clean-fuel vehicles run on the clean fuels for which they are designed, the [fleet owners must] fuel the vehicles exclusively with clean fuels....

Ultimately, clean-fuel vehicles must penetrate the passenger-car market to achieve major reductions in air pollution. For this reason, the second clean-fuel program in part C establishes a mandatory pilot program in California that will introduce clean-fuel vehicles to the passenger-car market....

Developing a successful alternative fuels program is often said to pose a "chicken and egg" problem. Car makers argue that they should not be forced to make clean-fuel vehicles until clean fuels are widely available. Oil companies argue the converse: they should not be forced to make clean fuels until clean-fuel vehicles are widely available. Both sides argue that even if the vehicles and fuels are available, there is no guarantee that the consumer will buy them.

The fleet program...tackles this problem through a demand-side approach: it requires fleet operators to buy clean-fuel vehicles and to refuel them with clean fuels. These requirements create a built-in demand that overcomes the "chicken and egg" issue. In the case of the passenger car market, however, it is not practical to mandate that a certain percentage of consumers buy only clean-fuel vehicles. Instead, the California pilot program takes a supply-side approach to ensuring the use of both clean-fuel vehicles and clean fuels.

The California pilot program mandates that vehicle manufacturers produce and sell minimum volumes of clean-fuel vehicles in California. [The California Air Resources Board has determined that two percent of the cars offered for sale in the 1998 model year must be electric, rising to five percent in 2001 and ten percent in 2003.]

The "production mandate" in the California program makes it the obligation of the vehicle manufacturer to ensure that the vehicles find their way into the consumer's garage. The program thus capitalizes on the enormous capacity of manufacturers to influence vehicle purchases. Car companies control the most important factors that affect consumer purchases: they determine how well the vehicle will perform, what its styling will look like, how the vehicle is advertised, and at what price the vehicle will sell. The production mandate forces manufacturers to develop and market a vehicle that consumers will want to buy — which is exactly the incentive that is needed to make the clean-fuel program a success.

### COMMENTARY & QUESTIONS

1. **Auto emissions control since 1990.** Once again, implementation of technology-forcing legislation in the auto emissions control area has not gone smoothly. The CAA preempts state regulation of emissions from new automobiles except for California — the only "extreme" ozone nonattainment area — which can

petition EPA for a preemption waiver. Other states may "piggyback" on the California standards under certain conditions.[8] Most of the judicial activity in this area has involved the attempt by several of the 12 northeastern states and the District of Columbia, organized as the Ozone Transport Commission (OTC), to adopt the California standards in whole or part. As indicated above, the California Air Resources Board (CARB) initially determined that 2% of the cars offered for sale in California in the 1998 model year had to be Zero Emission Vehicles (ZEVs) powered by electricity, rising to 5% in 2001 and 10% in 2003 (model year 2004). New York and Massachusetts adopted this program (called California-Low-Emission Vehicle, or CAL-LEV) virtually intact. In 1996, however, CARB, accepting the arguments of the automobile manufacturers that advanced battery technology for practicably fueling electric vehicles was unavailable, repealed the 1998 and 2001 requirements, while retaining the requirement that the manufacturers include ZEVs as 10% of their California sales in 2003. This CAL-LEV modification left New York and Massachusetts, which had adopted the original CARB standards, out on a limb. See, e.g., American Auto. Mfrs. Ass'n v. New York Dep't of Envtl. Protection, 152 F.3d 196 (2d Cir. 1998) (New York's ZEV quotas, replicating California's initial quotas, do not satisfy the "identicality" requirement because California modified its quotas for 1998-2002).

In 2001, CARB, concerned about the marketability of battery-powered electric vehicles, again modified its requirement that major auto manufacturers include ZEVs as 10% of their California auto fleets in 2003. The 2001 rules retained the 10% ZEV target for 2003 but changed the ways by which auto manufacturers could meet it: 2% were required to be full-sized ZEVs, powered by electric batteries or hydrogen fuel cells; another 2% could be natural gas-powered or hybrid vehicles; while the remaining 6% could be a mixture of gasoline-powered Ultra Low-Emission Vehicles (ULEVs). Under pressure from a federal preemption lawsuit brought by automobile manufacturers against the 2001 CAL-LEV modifications, CARB adopted new 2003 ZEV regulations offering two new compliance paths: (1) a "base path" in which 10% of auto fleets sold in California, from 2005 through 2008, must be ZEVs (i.e., a mixture of cars powered by hydrogen or electricity, hybrid electric-gas and hydrogen-gas vehicles, and ULEVs), with a ZEV quota increasing to 11% for the 2009–2011 model years and to 16% in the 2018 model year; and (2) an "alternate path" obligating manufacturers to offer fixed minimum annual quotas of hydrogen fuel cell vehicles in the California market — 250 between 2005 and 2008, 2500 between 2009 and 2011, 25,000 between 2012 and 2014, and 50,000 between 2015 and 2017. Despite CARB's vacillation regarding CAL-LEV standards, four of the OTC states — Maine, Massachusetts, New York, and Vermont — have opted to follow the California regulations.

Has the California preemption waiver created a chaotic implementation climate with regard to the technology-forcing strategies in the 1990 CAA Amendments? Is CARB

8. The California preemption waiver and other state "piggyback" provisions can be found at 42 U.S.C. §§7543 and 7589. See also Motor Vehicle Mfrs. Ass'n of the U.S. v. New York State Dep't of Conservation, 15 F.3d 521 (2d Cir. 1993) (substantially upholding New York's adoption of the California program), and Association of Int'l Auto. Mfrs. Inc. v. Massachusetts Dep't of Envtl. Protection, 208 F.3d 1 (1st Cir. 2000) (striking down Massachusetts's adoption of the California ZEV mandates for 1998-2002 for lack of "identicality"). See the discussion of the latter decision and other cases of preemption of state automobile regulations, in Chapter 6.

merely reacting to technological change rather than stimulating it? Will the confusing demands caused by this "moving target" be counterproductive? Should the preemption waiver be repealed? Or has CARB's resolute but mercurial approach to auto pollution control been one factor in persuading the auto industry to develop an entirely new technology — the hydrogen car?

2. **The hydrogen car is approaching: Does it need a push?** Or is it going too fast? In the long run, automobiles probably will be powered by fuel cells, made with platinum-coated membranes that convert hydrogen and oxygen into electricity and emit only water vapor and hydrogen as residuals. Many of the technological obstacles to introducing an environmentally benign hydrogen-powered internal combustion engine into the commercial automobile market have already been surmounted, except for designing relatively clean hydrogen production systems and viable distribution networks. Hydrogen will be manufactured initially from gasoline or natural gas, which might result in exacerbated greenhouse gas emissions as well as development of natural gas resources located in sensitive environmental areas. (Hydrogen can be created by first producing electricity and then running it through water using a process called electrolysis, which separates the oxygen and hydrogen molecules.)

In his 2003 State of the Union speech, President George W. Bush announced a "FreedomFUEL" initiative to assist in researching and developing technologies for hydrogen fuel production and distribution infrastructure. This new initiative supplements the "FreedomCAR" program, announced in 2002, which was intended to facilitate the development of hydrogen-powered vehicles. The announced goal of these federal subsidy (nearly $2 billion over five years) programs is to make affordable fuel cell vehicles available to the public by 2020.

The Bush II Administration proposals, however, do not guarantee that these vehicles will in fact be available by 2020. Should technology-forcing, in addition to governmental research and development subsidies, be employed in order to develop hydrogen-powered automobiles more quickly? The answer appears to be that technology-forcing is unnecessary because the automobile industry has accepted the inevitable transition from petroleum to hydrogen-powered automobiles. Previous technology-forcing lawmaking has convinced the auto manufacturers (as has the inexorable rise in ozone levels in the cities of the developing world) to abandon their inveterate opposition to technological change in automobile design and instead to maximize the commercial opportunities inherent in hydrogen car development. There is currently fierce international competition to produce and demonstrate hydrogen-powered cars, with every major auto manufacturer — either alone or in consortium with other companies — demonstrating a hydrogen-powered prototype vehicle.

Critics of the Bush II Administration proposals argue that ignoring the emissions and energy use involved in producing and delivering hydrogen fuel undervalues the environmental advantages of hybrid petroleum-electric powered vehicles (HEVs), which are now available. At least until we learn to extract hydrogen from water through the use of green technologies, such as wind and solar power, contend these critics, a hydrogen fuel-cell vehicle is no better than a diesel hybrid in terms of total energy use and

greenhouse gas emissions. Moreover, some scientists are concerned that apart from the process of manufacturing hydrogen, the leakage of hydrogen fuel from automobile use might have major adverse environmental impacts. The hydrogen cycle is incompletely understood. Researchers at California Institute of Technology have warned that

> the widespread use of hydrogen fuel cells could have hitherto unknown impacts due to unintended emissions of molecular hydrogen, including an increase in the abundance of water vapor in the stratosphere.... This would cause atmospheric cooling, enhancement of the heterogeneous chemistry that destroys ozone, an increase in noctilucent clouds, and changes in tropospheric chemistry and atmosphere-biosphere interactions. Tromp et al., Potential Environmental Impact of a Hydrogen Economy on the Stratosphere, 300 Science 1740–1742 (2003).

In the short term, perhaps we need technology-forcing and subsidies for the further development and introduction of HEVs, while performing research on (1) "the emissions that could be produced by a hydrogen economy," (2) ways in which "such emissions could be limited and made negligible, although at some cost against which potential environmental impacts must be balanced," and (3) the possibility that soil uptake of increased hydrogen emissions "could entirely compensate for new anthropogenic emissions." Id.

3. **Technology-forcing for fuel efficiency.** Until a hydrogen-powered automobile is widely available, reductions in auto emissions, decreased dependence on foreign oil imports, and petroleum extraction in environmentally sensitive areas can be achieved not only by emissions controls but also by increasing automobile fuel efficiency. During the 1970s, when OPEC placed an oil export embargo on the United States because of political unrest in the Middle East, Congress enacted Corporate Average Fuel Economy (CAFÉ) standards, which required passenger car fleets to achieve an average of 27.5 mpg and light trucks and sport utility vehicles (SUVs) 20.7 mpg. Since Middle Eastern oil has again become abundant and America has become enamored of the SUV (which is classified as a light truck for fuel-efficiency purposes), the average mileage of vehicles sold in the United States has steadily declined. In 1995, after intense lobbying by the auto and petroleum industries and autoworker unions, Congress enacted a ban on federally funded research on increasing automobile fuel efficiency. This ban was lifted in the 2002 appropriations process, at the behest of the Bush II Administration.

In 2001, the National Research Council released a report entitled "Effectiveness and Impacts of Corporate Average Fuel Efficiency Standards," which recommended that the CAFÉ standards be made stricter because the technology exists to significantly improve vehicle fuel efficiency without reducing vehicle size or sacrificing performance. The NRC also recommended that technology-forcing be implemented with a lead time of 10 to 15 years. Opponents of stricter CAFÉ standards argue that past increases in fuel economy have led to smaller, lighter cars with decreased "crashworthiness." Other opponents predict that a tightening of CAFÉ standards would be counterproductive from a pollution control standpoint because benefits would be offset by an increase in vehicle miles traveled caused by lowering the cost of driving.

On April 1, 2003, the National Highway Traffic Safety Administration promulgated a regulation tightening the CAFÉ standard for light trucks by 1.5 mpg over three years —

i.e., from the current 20.7 mpg to 21.0 mpg for model year 2005, 21.6 for model year 2006, and 22.2 mpg for model year 2007. Is this modest change in the fuel-efficiency requirement sufficient to make a difference, or is it relatively cosmetic?

4. **Technology-forcing: the auto verdict?** The congressionally dictated 90% rollbacks in auto emissions certainly caused major disruptions in the automobile industry by derailing ongoing investment planning, rewarding laggards, forcing the companies into expensive last-minute attempts to retool the old design engines rather than being able to take the time to design new ones, and costing as much as $18 billion.[9] On balance, was it a good idea? What would the air in traffic jams probably look like today had Congress imposed a more typical harm-based or technology-based review-and-permit standard? Michael Walsh, former EPA Director of Motor Vehicle Emissions Regulation, has said that "Title II was blunt, but it was the only thing that would work.... Forcing technological development through a 'regulatory hammer' has been and continues to be the only demonstrated way to succeed." Telephone interview, Oct. 16, 1991. It is doubtful whether any regulatory device but the blunt, powerful instrument of technology-forcing would have ultimately achieved results that were virtually unthinkable during the 1970s: the advent of an entirely different, nonpetroleum fuel system for powering automobiles.

### B.  INTERNATIONAL TECHNOLOGY-FORCING: THE PHASEOUT OF OZONE-DEPLETING SUBSTANCES

The auto emissions case study shows that technology-forcing, which is inherently problematic as a regulatory strategy, becomes increasingly difficult when multiple jurisdictions are involved in setting and implementing standards. If this has been true in the United States, where Congress can preempt state legislation, it is almost inconceivable that technology-forcing could be effective in the international arena, where there is no universal legislature (see Chapters 8 and 26). The improbability of successful international technology-forcing, therefore, underscores the magnificent diplomatic and legal accomplishments of those individuals and nations that negotiated the Montreal Protocol on Substances that Deplete the Ozone Layer.

In 1974 scientists hypothesized that the stratospheric ozone layer protecting the earth from destructive solar ultraviolet radiation was being destroyed by human-generated CFCs (chlorofluorocarbons from refrigeration systems, air conditioners, and other pressurized products). A decade later a huge "hole" — a dramatic seasonal thinning in the ozone layer not predicted by computer models — appeared over Antarctica. Domestic and international environmental law reacted to this threat in three principal legal initiatives:

- Domestic national regulations implementing the international agreements; Amendments to the CAA were adopted in 1977 and 1990 to implement the Protocol in the United States, with other countries adopting analogous policies;

---

9. L. White, The Regulation of Air Pollutant Emissions from Motor Vehicles 64 (1982).

- The 1985 Vienna Convention for the Protection of the Ozone Layer, a so-called framework or umbrella agreement designed to facilitate exchange of information and cooperation in research and to create a setting for further policy discussions among states; and
- The 1987 Montreal Protocol on Substances that Deplete the Ozone Layer, an ancillary agreement to the Vienna Convention that contains substantive regulatory measures to protect the ozone layer.

Despite numerous impediments and setbacks, the legal history of stratospheric ozone has largely been a success story. The U.S. National Oceanic and Atmospheric Administration now reports that the ozone layer is expected to recover by the middle of the twenty-first century. The following excerpt describes both the international negotiation of the Montreal Protocol and the tensions between the U.S. Congress and Executive Branch over the terms of the agreement.

### Steven Shimberg, Stratospheric Ozone and Climate Protection: Domestic Legislation and the International Process
21 Environmental Law 2175 (1991)

Ozone is a toxic compound consisting of three oxygen atoms. It is also the only gas in the atmosphere that prevents harmful solar ultraviolet radiation from reaching the surface of the Earth…. Most of the Earth's atmosphere resides in the stratosphere — the region extending from approximately six miles to thirty miles above the Earth's surface. It is this stratospheric ozone layer that serves as Earth's main shield against harmful solar radiation. A decrease in stratospheric ozone produces an increase in the amount of ultraviolet radiation that reaches the Earth. Increased exposure to solar radiation results in increased incidence of skin cancer, cataracts, and may cause suppression of the immune system. Increased ultraviolet radiation has also been shown to damage crops and marine resources.[10]

Prior to anthropogenic influences, the destruction and creation of stratospheric ozone occurred as part of a natural continuing process that maintained a relatively constant amount of ozone in the stratosphere. The introduction of CFCs and similar manufactured substances, however, upset the natural balance of nature. These persistent, stable compounds are not destroyed in the troposphere but survive and rise up into the atmosphere, where the sun's radiation breaks them apart, releasing the chlorine atoms that are integral parts of the molecules. The released chlorine then reacts with ozone to form chlorine monoxide and oxygen, and in the process, destroys ozone molecules.

In addition to the role CFCs play in destroying the stratospheric ozone layer, CFCs are also connected to the global climate change that is predicted to occur as a result of an intensified greenhouse effect…. CFCs are estimated to account for a substantial portion of the problem — from fifteen to twenty percent….

In 1974, Drs. Sherwood Rowland and Mario Molina, from the University of California, published a paper demonstrating how CFCs destroy ozone in the atmosphere.[11] In this country, the original scientific theory prompted Congress to include, in the Clean Air Act Amendments

---

10. At ground level, ozone is a criteria pollutant, regulated as such under the CAA as discussed in Chapter 11. The problem of protecting the stratospheric ozone should be distinguished from that of combating photochemical smog at the Earth's surface. [Eds.]

11. Molina & Rowland, Stratospheric Sink for Chlorofluoromethanes: Chlorine Atom-Catalysed Destruction of Ozone, 249 Nature 810 (1974). Drs. Molina and Rowland received the 1995 Nobel Prize in chemistry for this research. [Eds.]

of 1977, a provision authorizing the Administrator of EPA to regulate "any substance...which in his judgment may reasonably be anticipated to affect the stratosphere, especially ozone in the stratosphere, and such effect may reasonably be anticipated to endanger public health or welfare." In 1978, the EPA and the Food and Drug Administration promulgated a ban on the use of CFCs in most aerosols [e.g., in cans of hair spray or deodorant]. There were [then] no measurements of actual ozone loss, just the scientific theory.

Recognizing the problem, industry began to look for safe substitutes. Progress was being made when, in the early 1980s, Ronald Reagan became President of the United States; the threat of further government regulation subsided; the search for substitutes came to a virtual stand-still; and worldwide use of CFCs continued to grow. Despite the aerosol ban in the United States, nonaerosol uses of CFCs in this country [e.g., in refrigerators and automobile air-conditioners] grew to record high levels and per capita use of CFCs in the United States reached levels that were among the highest in the world. By the middle of the 1980s, the United States was producing approximately 700 million pounds of CFCs each year, roughly one-third of the world total.

In 1985, scientists discovered a significant loss of stratospheric ozone over a large portion of the southern hemisphere. The affected area was approximately the size of North America. This collapse of the stratospheric ozone layer was not predicted by any of the scientific theories or models. Measurements of what had become a seasonal phenomenon revealed losses of greater than fifty percent in the total column of stratospheric and tropospheric ozone and greater than ninety-five percent in stratospheric ozone between an altitude of fifteen to twenty kilometers — nine to twelve miles. The discovery of this "hole" in the stratospheric ozone layer over Antarctica gave renewed impetus to international and domestic efforts to understand and protect the ozone layer….

A new round of international negotiations was scheduled to begin in December 1986…. On February 19, 1987, legislation was introduced in the Senate to impose unilateral controls on the production and use of CFCs and related compounds such as methyl chloroform, carbon tetra-chloride, and hydrochlorofluorocarbons (HCFCs). Trade restrictions were included in the bill as a means of forcing other nations to adopt comparable programs to curb CFCs and to avoid placing the domestic industries that would be subject to controls at a competitive disadvantage in the world marketplace [in a manner similar to the Pelly and Packwood Amendments discussed in Chapter 8 – Eds.].

As the international negotiations progressed through the spring and summer of 1987, congressional pressure and the attention of the national news media remained focused on the activities of the U.S. delegation. At a May 1987 congressional hearing, the U.S. negotiators were reminded that they were being watched carefully, encouraged to resist efforts to weaken the U.S. negotiating position, and urged to continue to press for virtual elimination of CFCs. At that hearing, representatives of EPA reviewed the results of a six volume risk assessment that had been prepared by the Agency. They also presented the results of recent studies that showed the overwhelming positive cost-benefit ratio associated with elimination of CFCs and related compounds.

The date of May 29, 1987 represents a watershed for proponents of stringent CFC controls. On that day, the news media published reports of recent efforts by Secretary of the Interior Donald Hodel to revoke the authority of the U.S. delegation to negotiate significant reductions in the production and use of ozone-destroying compounds. The Washington Post's front page headline read: "Administration Ozone Policy May Favor Sunglasses, Hats; Support for Chemical Cutbacks Reconsidered."… The public outcry was prompt and furious. The opponents of mandated reductions in the production and use of ozone destroying compounds had created a backlash that virtually guaranteed the imposition of stringent controls….

In accordance with Article 2, section 2 of the U.S. Constitution, the international negotiations that led to the September 1987 signing of the Montreal Protocol on Substances that Deplete the Ozone Layer (the Protocol) and the June 1990 agreement in London to strengthen the Protocol were conducted by the Executive Branch of the United States Government. Throughout the negotiations, however, the U.S. Congress was proceeding on a parallel track with domestic legislative proposals designed to protect the stratospheric ozone layer — the thin atmospheric shield that safeguards life on Earth from dangerous ultraviolet radiation.

On September 16, 1987, more than two dozen nations concluded negotiations and signed the Montreal Protocol on Substances that Deplete the Ozone Layer. Signatories to the Protocol, including the United States, agreed to respond to the threat of global ozone depletion by imposing limits on consumption — defined as production plus imports minus exports of bulk quantities — of CFCs....

Within two weeks after the Protocol was negotiated and signed..., the causal link between CFCs and the Antarctic ozone "hole" was substantiated. Efforts to reopen the negotiations and strengthen the terms of the agreement began almost immediately. These efforts, and efforts to impose stringent unilateral controls, received an additional push just one day after the Senate voted to approve ratification of the Protocol. On March 15, 1988, the Ozone Trends Panel, a group of more than one hundred scientists from around the world, released an international study on global ozone trends. The Panel's report demonstrated that destruction of the ozone layer was not limited to remote uninhabited portions of Antarctica. Scientists observed and measured losses of ozone on a global scale, including significant losses over densely populated portions of the northern hemisphere. This and similar scientific reports created a new sense of urgency and highlighted the need for controls that went beyond those agreed to as part of the original Protocol.

The Protocol was ratified by a sufficient number of countries to enter into force on the scheduled date of January 1, 1989. Momentum for an international agreement to eliminate CFCs began to build during the spring of 1989. Several nations, including the United States, pledged to support a rapid international phase-out of CFCs. At the same time, momentum was building for the imposition of more stringent unilateral domestic controls.[12]...

In preparation for a diplomatic conference scheduled to be held in London at the end of June 1990, international negotiations to strengthen the Protocol were initiated in the summer of 1989. At the June 1990 diplomatic conference, the second meeting of the parties to the Protocol, an international agreement to strengthen the Protocol was reached.... Despite the new international agreement, Congress proceeded to enact domestic legislation that was more stringent than the newly strengthened Protocol....

The legislative proposals under consideration were more stringent than the proposed Protocol provisions that were being supported by the U.S. delegation to the international negotiations, and were designed to accomplish several objectives: first, to encourage the U.S. delegation to support a more stringent Protocol than it was otherwise prepared to support by creating a serious, viable threat of congressional enactment of more stringent domestic legislation; second, to encourage the delegations of other nations to support a more stringent protocol...by creating a...threat of [U.S.] trade sanctions; third, to eliminate the disproportionately large U.S. contribution to the problems of ozone depletion and global climate change that are created by emissions of chlorofluorocarbons (CFCs) and other ozone-destroying compounds and reestablish the United States as a world leader in matters relating to environmental protection; and finally, to

---

12. In March 1989, the Federal Republic of Germany's Bundestag unanimously decided to proceed with unilateral action and adopted legislation mandating a 95% reduction in production and use of CFCs by 1995.

force domestic industries to develop safe alternatives more quickly than would be required under the terms of the protocol.

The signing of the Protocol on September 16, 1987 was an historic event. It was, however, only "a major half-step forward." Even after the international agreement to strengthen the Protocol was reached at the Second Meeting of the Parties to the Montreal Protocol in London on June 29, 1990, the U.S. Congress proceeded to enact more stringent domestic legislation....

Throughout the effort to enact domestic legislation, [industry] opponents of unilateral action argued that such action would do nothing to help the environment; would put domestic industries at a competitive disadvantage; and would tie the hands of the U.S. government [negotiators].... These arguments were soundly rejected when the [U.S. Congress]...passed the 1990 [CAA] Amendments, and on November 15, 1990 President Bush signed the bill that became Public Law 101-549....

The 1990 Amendments include provisions that are more stringent than the Protocol in three major areas: first, the Amendments include an accelerated phase-out schedule for CFCs, halons, and methyl chloroform; second, the new law includes provisions to control and ultimately eliminate production and use of HCFCs;[13] and third, it includes provisions to eliminate emissions of ozone-destroying compounds and substitute compounds....

### COMMENTARY & QUESTIONS

1. **Lessons from ozone.** The legal history of stratospheric ozone holds many crucial lessons for the future of Earth. The underlying problem originally seemed intractable and immensely costly to tackle. Alternatives to cheap and useful CFCs were not readily at hand, necessitating a leap of faith in industry's innovative capacity to identify substitutes. Crafting a solution required a global bargain, delicately balancing the needs of industrialized and developing countries. Fraught with scientific uncertainty, saving the ozone layer required governmental negotiators and scientists to communicate with each other in new and unfamiliar ways. Connections to apparently unrelated issues such as trade created additional complications. Since no state had domestic mechanisms in place adequate to the task, all the participating governments were simultaneously creating new domestic environmental law as well. The interplay among all these factors without doubt will characterize the next generations of environmental treaties.

The stratospheric ozone negotiations also invigorated a public culture of global lawmaking. Extensive press coverage of threats to the ozone layer created an unprecedented sense of public apprehension and urgency. As one of the first major environmental agreements with serious consequences for industry, the ozone negotiations became a policy battleground to an extent never before experienced on the international level.[14] The ozone negotiations were also a watershed for vastly expanded

---

13. Some of the compounds that are being promoted as substitutes for CFCs, such as hydrofluorocarbons, may be safe for the ozone layer due to lack of a chlorine molecule, but due to radioactive forcing properties, are expected to contribute to an intensified greenhouse effect....

14 In opposing enhanced controls on CFCs, an industry representative publicly opined that automobile air-conditioners had "come to be regarded" as essential and therefore were untouchable as a matter of public policy. During the drafting sessions on the Protocol, a U.S. negotiator even accused one of the authors, then representing an environmental advocacy organization, of "trying to take refrigerators away from our grandchildren."

participation in international negotiations by environmental organizations — in international parlance NGOs (nongovernmental organizations). Governmental negotiators accustomed to working largely behind closed doors faced new demands for accountability and transparency. Although all of this might go without saying in the United States, active public involvement in international environmental policymaking had been infrequent and sporadic before the ozone negotiations. Now that the debate is largely concluded, and resolved in favor of strict environmental controls, it is all too easy to forget how contentious this issue was during the 1980s — a cautionary lesson about currently controversial threats such as climate warming.

2. **Kick-starting the negotiations into the upper atmosphere.** As noted in the Shimberg excerpt, at the time of the negotiations of the Montreal Protocol, the CAA contained a provision, §157, added in the 1977 Amendments, that expressly anticipated and encouraged cooperative international action on protection of the stratospheric ozone layer.

> §157(b). The Administrator [of EPA] shall propose regulations for the control of any substance which in his judgment may reasonably be anticipated to affect the stratosphere, especially ozone in the stratosphere, if such effect on the stratosphere may reasonably be anticipated to endanger public health or welfare.... Not later than three months after the proposal of such regulations the Administrator shall promulgate such regulations in final form.

In 1980, the Carter Administration, after banning nonessential aerosol uses of CFCs, published an "advance notice of proposed rulemaking" stating that EPA was considering additional controls on other uses of these chemicals. In that notice, EPA stated that "continued world emissions of CFCs (chlorofluorocarbons) are still considered a significant threat to human health and the environment." 45 Fed. Reg. 66726 (Oct. 7, 1980). In 1984, the Natural Resources Defense Council, dissatisfied with the slow pace of further action under the subsequent Reagan Administration, brought suit under this provision to compel domestic regulatory action by EPA. How would you frame the complaint against the Administrator of EPA on behalf of this plaintiff? EPA proposed to settle the lawsuit and subsequently did, publishing a "stratospheric ozone protection plan" in partial response. See 51 Fed. Reg. 1257 (Jan. 10, 1986). How would you structure the settlement agreement to encourage the Executive Branch to obtain the strongest possible international agreement without relinquishing your leverage to require domestic action if international negotiations collapse or produce a poor result? How would you expect this suit and its settlement to affect the international negotiation?

3. **"Frameworking" — the road to Montreal began in Vienna.** Beginning in the late 1970s, ozone negotiators under the auspices of the United Nations Environment Program (UNEP) decided on a two-component process. One piece of work product was a so-called framework multilateral convention. Ancillary agreements, known as "protocols," containing substantive regulatory measures would be appended to the convention. The ozone umbrella treaty evolved into the Vienna Convention for the Protection of the Ozone Layer concluded in March 1985. 26 I.L.M. 1516 (1987). The Vienna Convention itself contains no substantive requirements for regulatory action to protect stratospheric ozone. The negotiation of the Vienna Convention attracted little

public attention, and the agreement might be barely worth notice if the Montreal Protocol had not followed. Negotiations on a CFC protocol, which eventually became the Montreal Protocol, proceeded simultaneously with deliberations on the Convention up to the adoption of the Convention itself in early 1985. The United States even called for a mandatory CFC protocol that all parties to the Convention would have to accept. The principal point of disagreement was a difference in regulatory approach between the European Community (now the European Union) and the so-called Toronto Group of countries, including the United States, Canada, and the Nordic countries. Each side argued that the approach it had already implemented ought to be adopted internationally to the exclusion of the other. The EU limited total production capacity for all uses of CFCs to a level thought to be safe for the ozone layer, approximately a third higher than existing capacity in the mid-1980s. The Toronto Group, on the other hand, had banned nonessential aerosol uses.

Can you make principled arguments for each of these approaches? What are the benefits and disadvantages of each?

When negotiations on the CFC protocol broke down, the Convention alone was adopted. Renegotiation of the protocol after a scheduled one-year cooling off period coincided with an upsurge in public concern about the Antarctic ozone hole, which broke the deadlock and facilitated adoption of the Montreal Protocol in September 1987. In the end, the Montreal Protocol, by requiring substantive reductions in, and ultimately the elimination of, production and consumption of CFCs, proved to be more stringent than either — a case of genuine policymaking on the international level, not just "harmonization" of national regulatory approaches. In structural and legal terms, the legacy of the stratospheric ozone negotiations has been deeply internalized by international policymakers. While not legally required, the framework convention plus protocols model adopted for stratospheric ozone has been routinely, if sometimes slavishly, followed in subsequent multilateral environmental negotiations.

4. **Science in international diplomacy.** Scientific understanding of the stratospheric ozone problem was and is central to the task of crafting a responsive international policy, but diplomatic negotiators rarely have technical scientific training. Consequently, UNEP organized a Coordinating Committee on the Ozone Layer (CCOL) as an institutional link to provide scientific and technical advice to the ozone negotiations. The members of CCOL were scientific experts appointed in their individual and personal capacities. Although some of the individual members might have been employees of national governments, they were expected to operate in a purely collegial, scientific mode. The goal was to create a body that could provide objective and neutral advice on the underlying science to the negotiators who would interpret its policy significance in negotiating instruments such as the Vienna Convention and the Montreal Protocol. The Shimberg excerpt describes subsequent scientific input into the multilateral process, which continues to this day. If you were the chairperson of CCOL, how would you resolve the disputes that inevitably arise between scientists? How would you deal with a scientist who disputed the Rowland-Molina theory and hence the existence of the problem? With a scientist who asserted that the problem was much more severe than the majority view? Despite the potential tensions in such a role, the model

largely worked, with the scientific explanation for such phenomena as the ozone hole, whether provided through CCOL or otherwise, a principal driver in the ozone negotiations, then as now.

5. **Hats, sunglasses, sunscreen, and checks on the Executive Branch.** Initially the Executive Branch was aggressive in the resumed international negotiations on the CFC protocol, advocating deep cuts in production and consumption of compounds that deplete ozone in the stratosphere. As described in the Shimberg excerpt, at a crucial moment the Reagan Administration began to do an about-face. Secretary of the Interior Donald Hodel questioned the need for regulatory interventions, advocating instead that individuals protect themselves from elevated ultraviolet radiation by making use of hats, sunglasses, and sunscreen.[15] This provided an opportunity for some memorable quips — for example, calling the administration's policy the "Ray-Ban Plan," and asking "What does Secretary Hodel want, an entire country that looks like the Blues Brothers?" The President's constitutional role in treaty negotiations puts him in the driver's seat, in the sense that he crafts international law, a function reserved on the domestic level exclusively to the Congress. If that is so, what incentive did Ronald Reagan, or any other President for that matter, have to listen to popular outcry over his conduct of international negotiations?

6. **The delicate interplay between international treaty-making and domestic legislation.** Throughout this case study, Congress was seen as favoring stricter controls on ozone-depleting substances than the Reagan Administration. International agreements, in and of themselves, are not binding on signatory nations; they must be implemented by domestic legislation (see Chapter 8). The U.S. Constitution places the responsibility for negotiating treaties in the Executive Branch but requires ratification by a two-thirds vote of the Senate before a treaty can have the full force and effect of domestic law. In this case, the Senate first ratified the Montreal Protocol and then Congress passed strengthening legislation, which was subsequently signed by a more sympathetic President, George H. W. Bush. One might also imagine a converse situation — like the global warming conventions of the late 1990s — where an administration was more favorably inclined toward a particular treaty than the sitting Congress. In that case, the Senate might refuse to ratify an entire treaty, or else might ratify part of it and reject the rest. Congress might then enact weaker legislation to replace the rejected aspects of the treaty, but the President might veto the bill. Implementing treaties adds another level of complexity to our already elaborate system of checks and balances. Two other valuable studies of the evolution of the Montreal Protocol and national reactions to this process are Benedick, Ozone Diplomacy, Enlarged Edition (1998), and Rowland, Atmospheric Changes Caused by Human Activities: From Science to Regulation, 27 Ecology L.Q. 1261 (2001).

7. **EPA's ambivalent position.** EPA found itself caught between the President and Congress. EPA, along with the FDA, had banned the use of CFCs in consumer aerosol products, but it had not otherwise carried out the broad regulatory authority over

---

15. Peterson, Administration Ozone Policy May Favor Sunglasses, Hats; Support for Chemical Cutbacks Reconsidered, Washington Post, May 29, 1987, at A1.

ozone-depleting substances given to it by Congress in the 1977 CAA Amendments. Most of EPA's efforts in this area had gone into supporting the Executive Branch team attempting to negotiate a Protocol. But, as the scientific evidence supporting the Rowland-Molina thesis mounted, and as Congress and the media began to criticize the Reagan Administration for its timidity regarding ozone-destroying substances, EPA took another tack. At a 1987 congressional hearing, EPA officials testified that the benefits of eliminating CFCs and related compounds would clearly outweigh the costs.

8. **Domestic implementation of the Montreal Protocol.** During the negotiations, the Protocol was expected to be implemented by regulations adopted by EPA under the authority of §157 of the CAA (since repealed and replaced by the 1990 Amendments to the CAA, which are the current legal authority for EPA's regulation of CFCs). Under its Stratospheric Ozone Protection Plan, EPA accepted public comment during the negotiations and prepared an environmental impact statement. Article 2, paragraph 11 of the Montreal Protocol reserves the right to take more stringent measures than provided in that instrument. In responding to the argument of some commenters on EPA's proposed rule that the CAA contained more demanding requirements for the regulation of ozone-depleting chemicals than the Montreal Protocol, the Agency made the following assertion:

> EPA...believes that in deciding whether and how to regulate under §157(b) it may consider other countries' effect on stratospheric ozone and the effect of United States action on other countries' willingness to take regulatory action.... To assess the risk of ozone depletion and the need for regulatory action, EPA must consider other nations' actions affecting the stratosphere. A logical next step in this analysis is what effect United States action could have on other nations' actions now and in the future.... EPA judged that the obvious need for broad international adherence to the Protocol counseled against the United States' deviating from the Protocol, because any significant deviation could lessen other countries' motivation to participate.... Industry commenters also generally agreed with EPA's concern that deviating from the Protocol risked undermining it. They...shared EPA's concern that implementation of more stringent controls would yield little, if any, additional stratospheric protection, while possibly reducing other countries' incentive to join the Protocol. 53 Fed. Reg. 30,566, 30,569, 30,573–74 (Aug. 12, 1988).

What do you think of this argument against unilateral national action as a matter of international strategy? Can you identify counterarguments that might be made by an environmental group advocating stricter unilateral action than required by the Protocol as a domestic strategy? Suppose you are a judge on the U.S. Court of Appeals for the District of Columbia Circuit faced with a petition for review from an environmental organization alleging that EPA's final rule is illegal because it does not require reductions sufficiently stringent to satisfy §157. How, if at all, would the existence of the Montreal Protocol affect your treatment of this petition? Would it make any difference to you that the agreement had or had not entered into force? Would the likelihood of subsequent revisions to the agreement affect your thinking?

9. **International technology-forcing.** The basic approach of the Protocol as adopted in 1987 was to reduce and, in light of the subsequent amendments and adjustments, eventually eliminate production and consumption of CFCs. Because at the time there were

no known substitutes for these cheap, useful, and nontoxic (at least at ground level) chemicals, the Protocol is often cited as an example of a ban designed to create incentives for technological innovation. The 1987 Protocol, however, did not eliminate these chemicals entirely but instead required a 50% reduction in consumption by 1999. Soon after the adoption of the Protocol, the ozone "hole" over Antarctica was connected to CFCs, adding momentum to demands for further reductions and ultimately elimination of these compounds. To some extent, Congress's position was enhanced by Germany's decision, in 1989, to virtually "sunset" all CFCs by 1995 — a far more dramatic reduction than required by the Protocol at that time and on an accelerated schedule by comparison with the international standard. (In 1992, the United States and the remainder of the European Economic Community announced that they would advance their phaseout deadlines to the end of 1995.) In fact, Germany and Japan have utilized technology-forcing to compel the development of "green technologies" that will both prevent domestic pollution and satisfy a growing international demand for minimally polluting industrial processes. See Moore, Green Revolution in the Making, Sierra, Jan./Feb. 1995, at 50. A number of American companies, e.g., Robinair and Trane Company, have also increased their profits by exporting substitutes for CFCs. There has been some discussion in the United States about encouraging technological innovation for pollution prevention through a national "Industrial Policy," but no comprehensive legislation has been enacted on this subject.

10. **Supervising the development of substitutes.** Congress did not leave the development of substitutes entirely to industry. EPA is authorized to certify acceptable substitutes and to prohibit unacceptable ones. Also, industries developing substitutes for banned ozone-depleting substances must notify EPA before introducing substitutes into commerce and also furnish EPA with health and safety data on the substitutes. These notice and reporting requirements were based on provisions in the Federal Insecticide, Fungicide, and Rodenticide Act and the Toxic Substances Control Act (see Chapter 17).

11. **Federal procurement as an incentive.** The federal government is a major consumer of a variety of products, from automobiles to ashtrays. The CAA requires federal agencies to revise their procurement regulations to further the policies of Title VI. Another section of the CAA provides incentives to federal agencies to purchase clean fuel vehicles for their fleets, even if clean fuel vehicles are more expensive than ordinary vehicles (42 U.S.C. §7588). The Resource Conservation and Recovery Act (see Chapter 18) requires federal agencies to procure items composed of the highest percentage of recovered materials practicable or explain why this has not been done (42 U.S.C. §6962). With regard to ozone-depleting chemicals, the U.S. Department of Defense revised its procurement "specs" first to allow, and then to require, use of alternatives to CFC-113 cleaning solvents. See Wexler, New Marching Orders, in Ozone Protection in the United States (Cook ed., 1996).

12. **The judicious use of variances and exemptions.** Congress authorized EPA to grant variances and exemptions to temper the harsh effects of technology-forcing in worthwhile cases (e.g., with regard to essential applications of methyl chloroform where no

substitutes are available) and to allow the production of limited quantities of Class I and II substances for use in medical devices and for export to developing countries that are parties to the Montreal Protocol. Wherever a variance or exemption is authorized, however, it is closely circumscribed as to both the maximum amounts that can be produced for this purpose, as well as the duration of the variance or exemption.

13. **Interpollutant trading and a CFC tax.** Title VI of the 1990 CAA Amendments provides for interpollutant trading in order to achieve reductions of ozone-depleting substances in a least-cost manner. In addition, Congress has imposed an excise tax on these substances, graduated according to the destructive potential of the substance (26 U.S.C. §§4682 et seq.). Pollutant trading and pollution taxes are discussed in Chapter 14. The operation of the interpollutant trading system has helped U.S. companies to meet Protocol requirements without major economic disruptions and at a lower cost than anticipated. Along with environmental benefits, the excise tax has brought in some $2.9 billion in federal revenue in its first five years.

14. **Industry's reaction to technology-forcing.** At first, the Alliance for Responsible CFC Policy, the industrial trade association representing CFC manufacturers and users, argued strongly against a CFC phaseout. But the Alliance reversed its stand after the ozone "hole" was substantiated, and then actually supported the Montreal Protocol. A Texas Instruments plant in McKinney, Texas, which had used CFCs as a solvent to clean lead solder from its circuit boards, achieved compliance with the phaseout by "borrowing" a new soldering process that had been used extensively in Europe but had not yet been adopted in the United States. Using the phaseout as an opportunity to evaluate and install the new technology, the TI engineers found that the new process would leave the circuit boards clean, thus obviating both CFC use and also the disposal of lead-contaminated hazardous wastes. TI's turning of a technology-forcing mandate into a pollution prevention opportunity was facilitated by a unique industry-government coordinating committee entitled the International Cooperative for Ozone Layer Protection (ICOLP). Initiated by EPA, ICOLP's mission was to "promote and coordinate the worldwide exchange of non-proprietary information on alternative technologies, processes, and substances for ozone-depleting solvents." With ICOLP's assistance, other large companies such as Digital Equipment Corp., Ford Motor Co., and IBM were able to phase out their use of CFCs at a relatively modest cost. See Hinrichsen, Fixing the Ozone Hole Is a Work in Progress, The Amicus Journal, Fall 1996, at 35.

E.I. Du Pont de Nemours and Co. discovered the CFC group of chemicals in 1928 and, under the trade name Freon, was its largest manufacturer. Du Pont earned $600 million in revenues from its Freon business in 1987. At the height of its Freon operations, Du Pont maintained 11 Freon plants, including 6 in Europe, Japan, and Latin America, and 5 in the United States. After the 1978 ban on CFC use in consumer aerosols, Du Pont lost one-third of its CFC business and closed several of its Freon manufacturing plants. During the late 1970s, after the publication of Rowland and Molina's findings, Du Pont devoted $3 to $4 million per year to attempts to identify substitutes. However, in the first Reagan Administration years (1980–1984), Du Pont's expenditures for research into Freon substitutes fell to virtually nothing. Since the signing of the Montreal Protocol, Du Pont has reversed course and invested steadily increasing amounts in this

area. For example, in 1988 Du Pont spent more than $30 million on research into potential Freon substitutes. Also during that year, Du Pont announced that it would phase out CFC production by 1997. Much of Du Pont's research has focused on HCFCs, which are less stable than — and only 2% as destructive to the ozone layer as — CFCs. But the CAA Amendments of 1990 require a phaseout of HCFCs by 2030, and in 1995, following the United States' lead, the parties to the Protocol agreed that the developed world would phase out HCFC production by 2020, with the developing world to follow by 2040. There are currently no economically achievable substitutes available for HCFCs, but it is widely believed that Du Pont is feverishly conducting research in order to recapture this potentially massive market. See Buchholz et al., Managing Environmental Issues 261 (1992).

Notice the fundamental difference between the cooperative approach to technology-sharing exemplified by ICOLP and the proprietary search for patents illustrated by Du Pont. Both strategies must be pursued if the search for alternatives to ozone-depleting substances is to be successful.

15. **Enforcing technology-forcing.** Technology-forcing creates economic opportunities not only for enterprising entrepreneurs but for unscrupulous criminals as well. Smuggling illegal CFCs into the United States has become a lucrative business because 90% of automobiles in the United States have air-conditioning, compared to about 10% in Europe. Since the late 1980s, new automobiles have utilized an HCFC substitute for CFCs in their air-conditioning systems, but over 50 million older automobile air-conditioning systems still rely on CFCs, which are becoming scarce and thus expensive. Also, there is a network of small users, such as garages, among which controls on ozone-depleting substances are difficult to promote, monitor, and enforce. In addition, the U.S. excise tax on CFCs has created an incentive for tax avoidance. It has been widely reported that contraband CFCs are the second largest smuggling problem — next to drugs — for U.S. customs agents along the Mexican border.[16]

16. **Laggards, holdouts, and free riders.** A persistent structural impediment in international law, heavily tilted toward consent and consensus, is how to deal with states that are not parties to a particular agreement. Any state may avoid the obligations of the Montreal Protocol, or any other agreement, merely by refraining from signing and ratifying. In the case of the Montreal Protocol, the problem of nonparties was particularly acute because the parties to the agreement were undertaking expensive obligations in purely economic terms. Nonparties would not incur those costs, putting parties to the agreement at a competitive disadvantage. Article 4 of the Montreal Protocol, entitled "Control of Trade with Non-Parties," addresses this issue. The agreement's trade provisions require parties to the Protocol to prohibit imports from and exports to nonparties of bulk CFCs; products containing CFCs, such as refrigerators and air-conditioners; and products manufactured with CFCs that do not contain them, such as computer chips. At the same time, trade in those products was freely permitted among

---

16. On August 29, 1997, a Florida company was fined $37 million by a federal court for smuggling 4000 tons of CFCs into the United States. Jail sentences were also imposed on three company officials. 28 BNA Env't Rep. Curr. Dev. 839 (1997). At the Ninth Meeting of the Parties to the Montreal Protocol, the parties agreed on a new international licensing system to track trade in CFCs.

parties during the phaseout period. Can you explain why negotiators believed this provision was essential? What would you expect the effect of these requirements to be on relations among parties and nonparties? What beneficial results would you expect for the environment?

17. **COPs and MOPs.** Like its predecessor, the Vienna Convention, the Montreal Protocol is an organic instrument that sets out a framework for future cooperative action by the parties to the instrument. Article 6, entitled "Assessment and Review of Control Measures," specifies periodic reviews of the science with an eye to revising the Protocol. Article 11 calls for regular meetings of the parties to the Protocol (MOPs), which in practice are held simultaneously with the conferences of the parties to the Vienna Convention (COPs). As described in the Shimberg excerpt, the first revisions to the Protocol were adopted in 1990. Even before that, at the first MOP held in 1989, the parties to the then-new Protocol, which had just entered into force, adopted a decision entitled the "Helsinki Declaration on the Protection of The Ozone Layer." This document states that the Protocol parties "agree to phase out the production and the consumption of CFC's controlled by the Montreal Protocol as soon as possible but not later than the year 2000." In other words, the Helsinki Declaration states the same goal as the London amendments and adjustments of a year later. What do you think is the purpose of the Helsinki Declaration? What is the Declaration's legal status? If the Helsinki Declaration accomplished this goal in 1989, what need was there for the London amendments and adjustments? Why would Shimberg not even mention the Helsinki Declaration? Can you identify a legal relationship among the Protocol, the Declaration, and the London adjustments and amendments?

18. **Revising the Protocol and a novel twist.** To date, the periodic reexamination of the Protocol has resulted in five revisions: in 1990 in London, in 1992 in Copenhagen, in 1994 in Vienna, in 1997 in Montreal, and in 1999 in Beijing. Customary international law specifies that an amendment to a multilateral treaty is binding only on those states that indicate their affirmative intent to accept those new obligations, ordinarily through ratification or acceptance of the amendment. In effect, an amendment is a new agreement under international law. The drafters of the Protocol, however, saw that the customary rule is an unattractive option for issues such as stratospheric ozone depletion, in which the scientific knowledge underlying treaty provisions is in a constant state of evolution and reassessing international obligations is often desirable, if not necessary. Under the customary rule, there is a serious risk that repeated amendment of an agreement in light of new scientific developments will result in classes of parties, each with its own configuration of obligations depending upon the amendments to which it has acceded. This danger is particularly grave in the case of complex, delicately balanced regulatory regimes such as the Montreal Protocol, where the costs to state parties are high.

## IMPACT OF INTERNATIONAL AGREEMENTS ON CHLORINE LEVELS IN THE STRATOSPHERE



FIGURE 15-2

*This figure shows that, because of the long atmospheric lifetimes of CFCs, the 50% reductions called for in the unamended 1987 Protocol would have been useful but insufficient to protect the ozone layer. The assessment and review procedure in the Protocol provided a basis for the parties to the agreement to take the further, more aggressive action incorporated in subsequent revisions.*

*See http://www.uwmc.uwc.edu/geography/globcat/CL-agreement-impact.htm. See also http://www.niwa.co.nz/shared/faquv8_large.jpg/view.*

In a "sleeper" provision little noticed at the time of its drafting, Article 2, Paragraph 9 of the Montreal Protocol modifies the customary rule by providing for "adjustments" — a term otherwise unknown to international law — that are binding on all parties to be adopted by a two-thirds majority vote. There is no opt-out provision, as with the Whaling Convention discussed in Chapter 8. True majority voting of this sort is virtually unknown to the international legal system, which almost always operates by "consensus" or unanimity. Can you see why there is a preference in international relations for acquiescence by every state, in effect giving every country a veto? What drawbacks can you see to the adjustment process? In an approach worthy of Solomon, but understandable in light of the international bias in favor of consensus, the parties to the Protocol split the difference, adopting adjustments on the streamlined, nonconsensus model for those substances already covered by the agreement, but requiring full-blown amendments to add new substances. As of this writing, 185 states are party

Chapter 15_NLS3d  2/18/04  10:02 PM  Page 768

to the Vienna Convention, 184 to the Protocol, and 164, 145, 91, and 47 to the amendments adopted, respectively, in 1990, 1992, 1997, and 1999.

19. **Developing countries.** On the one hand, the widespread phaseout of CFCs has been a major environmental success story and a triumph of international cooperation for environmental protection. Despite the odds against such a result — CFCs were stable, nonflammable, nontoxic, cheap to manufacture, and easy to store; were an essential component of over $100 billion worth of equipment, including refrigerators, building and automobile air-conditioners, and factories producing products from solvents to insulation to medical instruments; and were chemicals for which no acceptable alternative was readily available — CFCs are no longer being used in many nations of the world.[17] On the other hand, the CFC phaseout has been incomplete:

> The biggest challenge of all may lie in the developing world and Russia. Most of th[e] remaining production of CFCs is being used in Russia and the newly independent states of the former Soviet Union — in violation of their treaty obligations. Third World Countries, which account for a smaller share, have another decade to phase out CFCs. And their use is predicted to grow enormously as countries like China continue to develop toward a consumer-oriented industrial economy; expanding in population size all the while. Household appliance companies in both China and India, for instance, are planning to produce millions of refrigerators and freezers using CFCs, as well as HCFCs, over the next few decades....
>
> The problem in both regions is lack of resources to make the transition. ICOLP, of course, is sharing its technological breakthroughs with developing countries. But despite the multiple advantages and relatively short payback periods of many of these advances, eliminating CFCs requires some hefty upfront investments....
>
> Many companies in developing countries cannot raise that kind of capital in the span of a few years. In theory, there is a mechanism in place to help them do it.... One of the provisions hammered out during the [Montreal Protocol negotiating sessions] was a special Multilateral Fund, to be paid for by the industrialized world, which would help poorer countries offset the costs of the phaseout.
>
> To date, the Fund has financed more than 1,000 projects at a total cost of $440 million. These projects, which are already in place and working, will eliminate 30 percent of all ozone depleters used in the Third World by the turn of the century. Much of the investment has been used to finance suitable alternatives to CFCs, especially as coolants, solvents, and degreasers. "In 1995, we approved $205 million worth of projects to phase out 22,000 metric tons of these chemicals in Third World countries," says Omar El-Arini, head of the fund. "If we kept that up, we could replace all the chemicals the developing countries are committed to phase out by 2010, if they continue their current rate of consumption."
>
> That last qualification, however, is a big one. It is virtually a given that developing countries will increase their rate of consumption, and that they will need even more help than the framers of the Montreal Protocol originally envisioned. But as the ozone emergency has dropped off the front pages and out of the public's

---

17. According to reliable estimates, global production of CFCs declined from more than one million tons in 1986 to about 250,000 tons in 1995; and production of halons decreased from about 200,000 tons in 1986 to about 40,000 tons in 1995; but production of HCFCs rose sharply during that period. 28 BNA Env't Rep. Curr. Dev. 837–838 (1997) [Eds.].

> consciousness, the resolve of the signatories has wavered. The multilateral Fund has been receiving about 20 percent less money than was pledged for 1996. Hinrichsen, Fixing the Ozone Hole Is a Work in Progress, The Amicus Journal, Fall 1996, at 38.

Article 5 of the Protocol responds to the demands of developing countries by giving them a 10-year grace period for implementing the obligations in the Protocol. Why do you think the negotiators might have chosen this particular formula? From the point of view of environmental efficacy, is this a helpful provision or a harmful one? Does it reflect an appropriate balance of competing factors?

Assuming that the international phaseout proceeds according to plan, what will be the ultimate effect on the ozone layer?

> Because it can take up to a decade for a CFC molecule to reach the stratosphere, the ozone that is being destroyed today is very probably, in part, being destroyed by CFCs put into the atmosphere before the first ozone hole was discovered. As a result, CFC concentrations in the stratosphere are expected to double from 1989 to 2000, and decades will pass before we feel effects of the resultant five to twenty percent increase in u.v. radiation. Another source claims that half of the total amount of CFCs produced since 1930 will be produced from now until the phase-out is complete, and yet another source predicts increasing ozone destruction for some 20 years and a return to pre-ozone layer hole concentrations around 2050.... One of the most worrisome aspects of the ozone-hole problem is that the worst is yet to come.... We simply do not know how much damage we have done (or will do) to ourselves, to other species, and to the natural balance among the forces that control the biosphere. We know that some destruction will happen, indeed is happening, but the effects are presently impossible to calculate. Newton and Dillingham, Watersheds 155, 165, 167 (1994).

And finally, the most commonly utilized substitutes for CFCs — HCFCs — are themselves less potent ozone-destroying substances, as well as "greenhouse gases."

Studies by the United Nations Environment Programme and the World Meteorological Organization conclude that the Montreal Protocol has been effective in reducing stratospheric ozone depletion. Ozone depletion is expected to peak over the next several decades but will thereafter begin to abate, and ozone levels should return to levels normal in the mid-1950s by the middle of this century. But these agencies caution that the ozone layer will remain particularly vulnerable for the next decade, and that failure to implement the Montreal Protocol and its successor agreements will delay or even prevent recovery of the ozone layer.

At the Fourteenth Meeting of the Parties to the Montreal Protocol, in November 2002, developed nations agreed to a funding package worth approximately $500 million for reducing the use of ozone depletors in developing nations. China, the world's largest manufacturer and consumer of CFCs, has promised to dismantle its 37 CFC manufacturing plants by 2010. In the United States, EPA promulgated regulations in 2003 (68 Fed. Reg. 2819) to phase out HCFCs in a manner similar to the CFC phaseout program.

20. **The rule of law: confronting scofflaws.** Article 8 of the Protocol directs the MOP to adopt noncompliance procedures "for treatment of Parties found to be in non-compliance." In recognition of the fact that there is little to be done if a state party chooses

flagrantly to violate its international obligations, the Protocol prefers the term "compliance" to the stronger concept of "enforcement." Can you imagine why that might be so? In 1992, the MOP adopted a compliance mechanism, administered by an Implementation Committee, that can be triggered either by a third party or by the noncomplying state itself. Why might a state choose to, in effect, accuse itself of noncompliance? If you were the diplomatic representative of a party admittedly not in compliance, how would you frame your presentation to the Implementation Committee? The first two cases considered by the Implementation Committee concerned Russia and Bulgaria, both of which identified serious impediments to compliance. Nonetheless, the Committee declined to recommend cutting off multilateral aid or trade sanctions, probably the two most serious punishments available to the Committee. Can you imagine why the Implementation Committee might have taken such a lenient approach? If you were representing Russia or Bulgaria, can you make an argument that it would be environmentally counterproductive to sanction your client in that manner?

21. **Technology-forcing reconsidered, and pollution prevention.** Technology-forcing can be a viable mechanism for coping with environmental threats if some or all of the following are features of the problem context or regulatory strategy:

- a substantial, and comparatively clear, environmental threat, and especially a direct threat to public health;
- a credible "hammer" limiting the use of, or banning, a dangerous substance;
- substitutes that are at least theoretically recognized and comparable with regard to costs;
- variance and exemption procedures that are flexible, fair, limited, predictable, and enforceable;
- effective market-enlisting mechanisms, such as tax incentives or disincentives, trading systems, preferential governmental purchasing, and opportunities for private industry;
- clear, generally applicable standards without opt-out possibilities, such as the California preemption waiver;
- supervision of the introduction of substitutes in order to avoid adverse unintended consequences;
- adequate enforcement at all stages of the process;
- agreement between the Executive and Legislative Branches with regard to the need for and the structure of the technology-forcing system finally adopted;
- adequate lead time for compliance;[18]

---

18. See Natural Res. Def. Council v. EPA, 655 F.2d 318, 329 (D.C. Cir. 1981) ("the presence of substantial lead time for development before manufacturers will have to commit themselves to mass production of a chosen prototype gives the agency greater leeway to modify its standards if the actual future course of technology diverges from expectation"). In this case, the court upheld EPA's emissions standards for light-duty diesel vehicles based on "trap-oxidizer" technology, even though a durable model of this device was unavailable. This was not a technology-forcing decision, but one regarding the lead time for compliance with a technology-based standard (see Chapter 12).

- on the international level, differential standards for developed and developing nations, technology-sharing and funding assistance by developed nations for the benefit of developing nations, and effective trade restrictions to track and prevent smuggling.

And note the linkage in both international and domestic environmental law between technology-forcing and pollution prevention strategies: As noted earlier, the more rigorous and predictable that environmental protection standards become, the more industry will be motivated to cut back on the use of polluting processes and the volume of pollutants released to the environment.