UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| RICHARD MAX STRAHAN | ) LEAVE TO FILE GRANTED |
| | ) 19 December 2006 |
| *Plaintiff* | ) |
| | )     Civil Action No. |
| v. | ) |
| | )     05 – 10140 - NMG |
| SECRETARY, MASSACHUSETTS EXECUTIVE | ) |
| OFFICE OF ENVIRONMENTAL AFFAIRS[1], *et al.* | ) |
| | )     2 January 2007 |
| *Defendants* | ) |

———————————————————————

PLAINTIFF'S MEMORANDUM IN SUPPORT OF HIS MOTION FOR A PRELIMINARY INJUNCTION[2] AND IN RESPONSE TO DEFENDANTS AND AMICUS' OPPOSITIONS

———————————————————————

**Introduction**

It is not necessary to kill a whale in order to catch a fish.  Any fool knows this fact.

Current and emergent technologies exist that can turn Lobster Pot Fishing into a perfectly Whale

Safe fishery with no possibility of hurting any endangered wildlife — except Lobsters.[3]

However, the Defendants ruthlessly refuse to change the ancient fishery practices that they have

licensed and regulated for many decades that routinely entangle endangered species of whales

and sea turtles.  In 2006 they continue to kill, injure and otherwise violate the Section 9 take

---

[1] The original named defendant Ellen Roy-Herzfelder has subsequently left her employment as the Secretary of the Massachusetts Executive Office of Environmental Affairs and was replaced subsequently by first one and then another person.  For consistency, Strahan has adopted the current caption for his civil action.

[2] The 18 April 2006 "Plaintiff's Motion for a Preliminary Injunction and Evidentiary Hearing" ("Plaintiff's Motion") docketed as item #80.

[3] Gill Nets are inherently dangerous and cannot be made Whale Safe with any possible present or future technology. It makes no sense for Court not to enjoin the Defendants licensing of Gill Nets, since their only 125 individuals licensed to use Gill Nets by the Defendants and many of these individuals posses Lobster Pot fishery permits and other kind of fisheries permits.

prohibitions of the Endangered Species Act ("ESA")[4] from their licensing and regulating the deployment of fixed fishing gear ("MDMF Fixed Gear")[5] in U. S. coastal water that routinely entangle endangered species of Federally Protected Whales[6].  On 4 December 2006, the federal government once again found the MDMF Fixed Gear routinely kills and seriously injure Federally Protected Whales.[7]Since 1996, the Defendants have not meaningfully changed how they regulate marine fisheries when the Court in a prior civil action[8] first found them in violation of the ESA's Section 9[9] protective prohibition for their licensing Fixed Gear that entangles Federally Protected Whales. Since then they have NOT funded any meaningful effort to engineer Whale Safe fishing gear.

Commercial fishing is currently devastating the ecology of the marine environment causing widespread loss of abundance and diversity in marine wildlife. See Attachment #1, "Impacts of Biodiversity Loss on Ocean Ecosystem Services," Boris Worm et al., *Science* 3 November 2006. There is no question that the enforcement of the Section 9 Prohibitions against the Defendants to make the Massachusetts marine fishing industry Whale Safe will have

---

[4] See 16 U. S. C. §§ 1531 *et seq.*

[5] The Massachusetts Division of Marine Fisheries ("MDMF") licenses and regulates the deployment of Gill Nets ad Lobster Pot fishing gear ("Fixed Gear") in Massachusetts state coastal waters and the ability to land at a Massachusetts port any catch of Lobsters and other species of commercially caught fish

[6] For the purposes of this civil action, the phrase? Federally Protected Whales" includes the following species of whales: Northern Right Whale (*Eubalaena glacialis*); the Humpback Whale (*Megaptera novaeangliae*); the Fin Whale (*Balaenoptera physalus*); and the Blue Whale (*Balaenoptera musculus*) See 50 C. F. R. § 17.3. and Plaintiff's Complaint at ¶ 1.

[7] On 4 December 2006, NOAA published in the Federal Register its 2007 List of Fisheries pursuant to its duties under Section 118 of the MMPA. See 71 FR 70339.  In its 2006 LOF NOAA again classified the MDMF Fixed Gear fisheries as "Category I" fisheries that routinely kill and injure Federally Protected Whales from entanglement.

[8] *Strahan v. Coxe*, 95 – 10927 — DPW (D. Mass. 1995)

[9] See 16 U. S. C. § 1538(a and g).

the direct result of making the Defendant commercial fishing safe for seals, sea turtles, and all other wildlife species currently devastated by commercial fishing in United States coastal waters.

The Defendants openly claim to ignore the entanglement of Federally Protected Whales except for the Right Whale. The Right Whale is the sole target of their alleged "conservation" efforts in regards to the problem of whale entanglement in their licensed fishing gear. They openly admit to doing nothing to stop Humpback Whales and other Federally Protected Whales in their licensed fishing gear. See Attachment #2, 1 February 2006 "Massachusetts Division of Marine Fisheries *Right Whale* Conservation Program: 2005 Projects and Accomplishments" by Erin Burke, Massachusetts Division of Marine Fisheries.  In 2006 — as in 1996 — its simply business as usual for them, forcing commercial fisherman to deploy Fixed Gear under their license that is guaranteed to kill and injure Federally Protected Whales from entanglement.

The Defendants falsely urge the Court in their opposition to believe the situation is "all or nothing": that the Court has only the choice of either destroying the Massachusetts' Lobster fishery or letting it continue to kill endangered whales. The Court must reject this desperately offered "lose-lose" scenario.  The Defendants have deliberately acted since 1996 to do nothing to encourage the development of Whale Safe fishing technology in order to argue to a court that Whale Safe gear does not exist and for it that to enforce the ESA offers only a draconian choice of enjoining an entire state fishing industry. This is simply evidence of their constant attempt to evade compliance with the ESA. The Court must ignore the Defendants specious claims and require that they make their licensed commercial fisheries Whale Safe by a specified date and — using its full equitable powers — coerce them into doing so successfully.[10] There is no need for

---

[10] The Defendants have adequate funding to fund meaningful engineering efforts for Whale Safe Lobster Pot gear. Recently the Defendant Secretary, EOEA entered into agreement with Excelerate LNG LLC and Northeast Energy Gateway LLC that had these two companies agree

the Court to shut down commercial fishing in Massachusetts unless the Defendants' continuing

resistance forces the Court to do so.

In 2006 the Court must do what it should have done but did not do in 1996. It must

require that the Defendants make MDMF Fixed Gear Whale Safe by some specified date in the

immediate future. The lack of said court order in the past is why, is why the Defendants are still

licensing MDMF Fixed Gear that is still entangling Federally Protected Whales ten years after

being found guilty in 1996 in *Strahan* of being in violation of the ESA's Section 9 take

prohibitions. As executives of state agencies, the Defendants in 2006 still refuse to adopt internal

regulations for the MDMF as a state agency requiring that it only license fishing gear in

compliance with the ESA's Section 9 prohibitions.[11]  The Court's failure to succeed in 1996 in

forcing the Defendants into compliance with the ESA Section 9 prohibitions was in not

appreciating that the Defendants have an entrenched vested interest in not complying with the

ESA. The Defendants will never license Whale Safe fishing gear unless directly ordered by the

Court to do so. This is the only history lesson to be gotten from observing the Defendants'

evasive antics over the least ten years.

In 2006 and under no court ordered mandate, the Defendants are still licensing the nearly

same identical Fixed Gear[12] that they did in 1996, when this Court found them guilty of violating

the prohibitions of the Endangered Species Act for licensing Fixed Gear that entangles Federally

---

to give the Defendants $23.5 million dollars in environmental mitigation costs for their
establishing deepwater port off Gloucester MA to unload Liquefied Natural Gas off their ships.
[11] This is a very telling reality. The Defendants to this day refuse to simply agree that the MDMF
will require that it will only license fishing gear that is complaint with ESA prohibitions. The
MDMF cannot be expected on its own ever to license fishing gear complaint with ESA
prohibitions when it still *refuses* to adopt this requirement as an internal agency requirement.
[12] "Fixed Gear" is Lobster Pot gear, Gill Nets, Crab Pot gear, and other types of fishing gear that
usually has gear placed on the Ocean floor attached to lines that vertically rise to the surface
where they are attached to buoys.

Protected Whales.[13]  In 2006 the Defendants' licensed fishing gear continues to entangle as many

if not more Federally Protected Whales and Sea Turtles then it did in 1996. In 2006 as in 1996,

the Defendants simply refuse to implement any internal policy that requires their fisheries

activities to comply with the ESA's prohibitions against taking endangered species. The

Defendants make no pretense to doing anything at all to stop their licensed Fixed Gear

entangling Humpback Whales, Fin Whales and endangered Sea Turtles in their fishing gear —

they only maintain that they are making some efforts to prevent Northern Right Whales from

being entangled in MDMF Fixed Gear. This claim is owed to the simple fact the Court in 1996

restricted its attention only to only Northern Right Whales. This is *prima facia* evidence for

evasion. The Defendants response to the 1996 Order was not compliance with the ESA's

prohibitions but deliberate evasion of being compelled to be ordered into such compliance by the

Court at any time in the future.

    The Defendants in their two memos filed in opposition ("Defendants' Opposition")[14] to

the Plaintiff's Motion themselves do not seriously challenge the reality that the Fixed Gear that

they license in 2006 still entangles Federally Protected Whales in its vertical buoy lines and in

Gill Nets.[15]  The Defendants make no opposition to Strahan's claims that Federally Protected Sea

Turtles also get entangled in the Defendants Fixed Gear.[16] The Defendants' Opposition makes no

---

[13] See *Strahan v. Coxe*, 939 F. Supp. 963, (D. Mass 1996), aff'd in part and vacated in part, 127
F. 3d 155 (1st Cir. 1997) cert. denied 525 U. S. 978 (1998).

[14] See 30 June 2006, "State Defendants; Opposition to Plaintiff's Motion for a Preliminary
Injunction" and the subsequent 8 December 2006 "Defendants' Supplemental Memorandum of
Law in Opposition to Plaintiff's Motion for a Preliminary Injunction."

[15] In fact, the Defendants' witness — Dan McKiernan — testified at the evidentiary hearing on
27 November 2006 that Federally Protected Whales continue to be entangled in the vertical buoy
lines and Gill Nets licensed by the MDMF for deployment in U. S. coastal waters as fishing gear.

[16] Strahan in his sixty day notice of intent to the Defendants, included a claim of their violations
of ESA take prohibitions by their fishing gear entangling endangered Leatherback Sea Turtles
and other listed species of sea turtles. The Court rejected Strahan's attempts to add these claims

claim that they have deliberately done anything since 1996 to the present prevent Humpback

Whales or Fin Whales from being entangled in their Fixed Gear in 2006 and beyond.  They only

claim that they have only acted — if at all — to deal with issue of the entanglement of Northern

Right Whales in fishing gear. The Defendants witness at the Court's 27 November 2006 hearing

testified that Federally Protected Whales still get entangled in the vertical buoy lines in MDMF

Fixed Gear. He also testified that Federally Protected Whales still get entangled in the

Defendants' licensed Gill Nets.[17]

The Defendants in their Defendants' Opposition only make a claim that that their Fixed

Gear in 2006 is less likely to entangle a single species — Northern Right Whales —  from their

requiring "ground lines" between Lobster pots to be made of line that tends to sink in seawater

and tends to float closer to the seafloor. This modest claim does nothing to challenge Strahan's

claim that in 2006 Federally Protected Whales are getting entangled in vertical buoy lines and

Gill Nets licensed by the Defendants.  Vertical buoy lines and Gill Nets are known to be the most

significant source of entanglement of Federally Protected Whales.[18] The Defendants' Opposition

in no way disputes this claimed fact. During its testimony at the 27 November 2006 evidentiary

---

to the instant action. It is indicative of the Defendants intent not to comply with the ESA
prohibitions unless ordered by the Court that the Defendants make no attempt whatsoever to
mitigate the ongoing entanglement of endangered Sea Turtles by fishing gear they license.
Without a lawsuit, the Defendants ignore the environmental impact of their fisheries activities.
[17] The witness McKiernan testified to the entanglements by admitting under oath that whales still
"bump into" the Defendants' licensed Gill Nets.
[18] The reality is that ground lines have never been seen as a serious source of entanglement for
whales or sea turtles. There is not one written study that claims it is or describes such possible
entanglements as a serious problem for marine wildlife. The only reason for explaining why the
Defendants' claim sinking ground lines as an entanglement risk is to encourage the Court to
forget about the well documented problem that the Defendants have with Gill Nets and vertical
lines entangling whales. Requiring sinking ground lines has no impact on commercial fishing so
the Defendants do this as a smoke screen to pretend to the Court that they truly seek to eliminate
entanglements of at least Right Whales in their fishing gear (they completely ignore Humpback
Whales, Fin Whales and Minke Whales).

hearing, the Defendants witness admitted under questioning that there was no scientific report, no document produced by NOAA nor any other published study that raised a concern that ground line was either a significant source of initial entanglement for any Federally Protected Whale or that the universal use of sinking ground line would significantly reduce the current rate of entanglement of Federally Protected Whales in Fixed Gear. The Defendants cannot offer "sinking ground line" as any evidence that they have done anything meaningful to lower the number of Federally Protected Whales that annually become entangled in MDMF Fixed Gear.

The Court's issuing the Plaintiff's requested interlocutory injunctive relief will provide the "necessary mother" to invention, to inspire the research and development of necessary technological innovations that will result in commercially available Whale Safe fishing gear that will allow the Defendants to be in compliance with the ESA's prohibitions. The alternative — the Court denying the Plaintiff's Motion — will yield the predictable result of more years of Federally Protected Whales being entangled in the Defendants' licensed Fixed Gear. It will also set a precedent for court's to refuse to enforce the ESA that will encourage and increase the flaunting of the ESA's prohibitions by both state and federal commercial fisheries. By the Court granting the Plaintiff's Motion, there simply will be no more endangered whales or sea turtles being caught in MDMF Fixed Gear. It will set a precedent for courts not to tolerate state agency action that violates the ESA's Section 9 take prohibitions and will save the lives of hundreds of endangered whales and sea turtles in the immediate future. The ESA requires that the Court to chose this result.

*2006-2007 Takings of Federally Protected Whales in MDMF Fixed Gear*

Strahan v. Secretary, EOEA et al, 05-10140-NMG: Memorandum in Support of Motion for a Preliminary Injunction and Response to Defendants' and Amicus Opposition

8

The National Oceanographic and Atmospheric Administration ("NOAA")[19] has made formal determinations pursuant to its duties under Section 118 of the Marine Mammal Protection Act that the Defendants' Fixed Gear marine fisheries in 2006 are "Category I" fisheries that routinely kill and seriously injure Federally Protected Whales through entanglement and are expected to continue to do so in 2007. The Defendants' Opposition makes no attempt to refute this reality.  At no point has the Defendants made any attempt to petition NOAA to make a finding that MDMF Fixed Gear does not deserve to be classified by NOAA as a Category I fishery or in any way offers less of a threat to entangle Federally Protected Whales than any other state Fixed Gear fishery. At the 27 November Evidentiary hearing the Defendants' witness — Dan McKiernan — testified to this failure under oath.

In the 22 August 2006 Federal Register National Oceanographic and Atmospheric Agency ("NOAA") published its annual "List of Fisheries for 2006" ("2006 LOF") that lists all the state and federal fisheries in U. S. coastal waters that are known to entangle marine mammals and cause serious injury and mortality to marine mammals from entanglements. 71 FR 48802, See Attachment #3, The 2006 LOF listed MDMF's Lobster Pot fishery and any Massachusetts' fishery using Sink Gill Nets in the Northeast as a "Category I" fishery under Section 118 of the MMPA that routinely kills and seriously injures through entanglement Federally Protected Whales. As a Category I fishery NOAA found that MDMF's Fixed Gear fisheries caused an "Annual mortality and serious injury [by entanglement] of a stock [populations of Federally Protected Whales] in a given fishery is greater than or equal to 50 percent of the PBR level." See Id at 48803. PBR stands for "Possible Biological Removal" and is defined pursuant to the MMPA and basically represents the tolerable loss of whales annually in a species that will not

---

[19] See http://www.noaa.gov

Strahan v. Secretary, EOEA et al, 05-10140-NMG: Memorandum in Support of Motion for a
Preliminary Injunction and Response to Defendants' and Amicus Opposition

9

cause a permanent decline in the size of the remaining population of any species of Federally

Protected Whale.  It is not possible to consider the MDMF Fixed gear fisheries as not entangling

federally protected Whales when NOAA itself has formally ruled that in 2006 the MDMF's

licensed Fixed Gear continues to kill and seriously injure Federally Protected Whales from

entanglement.

Strahan alleges that the following are incidents of Federally Protected Whales being

entangled in MDMF Fixed Gear and that are listed as entanglements on the web site of the

Center for Coastal Studies[20] — NOAA'a licensed agent to disentangle Federally Protected

Whales —

1.      On 23 August 2006 a Humpback Whale was sighted off of Cape Cod Bay

entangled in an inshore vertical buoy line and a single lobster pot. The Court's quashing

subpoenas and otherwise preventing discovery has made it impossible for the Plaintiff to obtain

the name of the fisherman off the license tags that were affixed to the Lobster pot that was

entangled on this whale.

2.      On 2 August 2006, a Humpback Whale was discovered in Massachusetts coastal

waters off Plymouth MA entangled in vertical buoy line from a Lobster Pot gear owned by a

Massachusetts fisherman under a MDMF Fixed Gear license. Agents of NOAA pulled the gear

off the whale on 2 August 2006. The gear was found with a Massachusetts' fishing a MDMF

permit number on it. See Testimony S. Landry ay 17 November 2006 evidentiary hearing.

Eventually, a Massachusetts' licensed commercial fisherman was identified by NOAA as being

the owner of the gear and a statement affirming this was produced under subpoena to NOAA and

was entered as an exhibit for the Plaintiff during the 27 November 2006 evidentiary hearing.

---

[20] http://www.coastalstudies.org

Strahan v. Secretary, EOEA et al, 05-10140-NMG: Memorandum in Support of Motion for a
Preliminary Injunction and Response to Defendants' and Amicus Opposition

10

This gear is essentially the same Lobster Pot gear licensed by the Defendants in 1996. See
Attachment #4.

3.　　　On 9 July 2006 a Humpback Whale was sighted off the Massachusetts coast in
Massachusetts Bay entangled in a Gill Net. Agents of NOAA removed the Gill Net without any
tag found identifying the owner.  MDMF does not require that Gill Nets licensed by it have
identifying tags on its ropes and mesh net. This gear must be seen as seen as deployed under
MDMF license because all Gill Nets off the Massachusetts coast even in federal waters are
licensed by the MDMF.

4.　　　On 23 April 2004 a Minke Whale was sighted entangled in Fixed Gear and
anchored to the sea floor just in the out part of Gloucester harbor. Agents of NOAA removed the
Fixed Gear. There is no question that an individual licensed by the MDMF deployed this Fixed
Gear. While this was not an entanglement of an endangered Federally Protected Whale, the fact
that the Fixed Gear entangled the Minke Whale is undisputable proof that is poses a significant
risk to entangle any endangered Federally Protected Whale also.[21]

5.　　　On 11 July 2004 a Basking Shark — that feeds on plankton with its mouth open
similar to Northern Right Whale — was sighted entangled in vertical buoy line from MDMF
Lobster Pot gear in the middle of Provincetown Harbor. While this was not an entanglement of
an endangered Federally Protected Whale, the fact that the Fixed Gear entangled the Basking
Shark is undisputable proof that is poses a significant risk to entangle any endangered Federally

---

[21] The Defendants' witness McKiernan testified at the 27 November 2006 hearing to this under
oath. He called the entanglement of Minke Whales as a "canary in the coal mine" warning that
such gear is expected to entangle endangered Federally protected Whales also.

Strahan v. Secretary, EOEA et al, 05-10140-NMG: Memorandum in Support of Motion for a
Preliminary Injunction and Response to Defendants' and Amicus Opposition

11

Protected Whale also.[22] It should be noted that the Basking Shark was caught in vertical buoy line and not ground line, showing that it is buoy line and not ground line that entangles Federally Protected Whales. See Attachment #5 Report on Entangled Basking Shark by CCS.

The Defendants Fixed Gear further violates the ESA's Section 9 take prohibitions by destroying the listed designated critical habitat of the Northern Right Whale and causing an unlawful "harm" to these whales. [23] See *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687, 704 (1998) and *Palila v. Hawaii Dep't of Land and Natural Resources*, 639 F. 2d 495, 497-98 (9th Cir. 1981) (*Palila I*) (state department's practice of maintaining feral goats and sheep in endangered bird's critical habitat constituted unlawful taking). On 3 June 1994, NOAA designated most of Cape Cod Bay as critical habitat for the Northern Right Whale. See 59 FR 28793. The deployment by the Defendants of millions of pounds of plastic fishing gear into Cape Cod Bay "harms" the Northern Right Whale. In addition annually about 15% of all deployed Fixed Gear is lost and is permanently dumped into the critical habitat of the Right Whale. This accumulating "derelict gear" routinely entangles Right Whales and impairs their ability to feed and otherwise fully utilize their essential marine habitat designated as critical habitat. The Court must require that Defendants annually remove derelict gear from Right Whale critical habitat if the MDMF Fixed Gear fisheries are to be construed as Whale Safe.

---

[22] The Defendants' witness McKiernan testified at the 27 November 2006 hearing to this under oath. He called the entanglement of Basking Sharks as a "canary in the coal mine" warning that such gear is expected to entangle endangered Federally protected Whales also.

[23] "Harm" can include "an act which actually kills or injures wildlife.  Such act may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C. F. R. § 17.3(c).

Strahan v. Secretary, EOEA et al, 05-10140-NMG: Memorandum in Support of Motion for a
Preliminary Injunction and Response to Defendants' and Amicus Opposition

12

The Defendants have falsely claimed the Right Whales are only winter residents of
Massachusetts and are rarely seen before January and after April. The truth is that Northern
Right Whales are year round residents of Massachusetts coastal waters. As this is written, a herd
of Northern Right Whales is currently residing in the Gulf of Maine. On 4 December 2006
NOAA further extended restraints on Fixed Gear in the Gulf of Maine to protect the currently
residing population of Northern Right Whales. See 71 FR 70319. See Attachment #6, 17
December 2006 NOAA Letter to Fixed Gear Fishermen.

In summary, The Court should rule that the Defendants in 2006 — at least since 1996  —
are in continuing violation of the Section 9 take prohibitions of the ESA and have failed to meet
their burden of proof that in 2006 they are otherwise.  In 2006 Federally Protected Whales
become entangled in MDMF Fixed Gear as much or more than they did in 1996. Many more
Federally Protected Whales — including Northern Right Whales — will become entangled in
MDMF Fixed Gear in the ensuing months unless the Court immediately acts to coerce the
Defendants to make MDMF Fixed Gear complaint with the ESA's Section 9 prohibitions.

## Requested Procedure in Ruling on His Preliminary Injunction Motion

As requested during oral arguments on 28 November 2006, the Plaintiff asks the Court to
bifurcate the proceedings on his Motion for interlocutory injunctive relief into a liability phase
and then a separate following remedy phase. The scope of the Court's evidentiary hearing was
necessarily focused on the issue of the liability of the Defendants for their continuing
entanglement of Federally Protected Whales from 1996 through 2006 and beyond.  There was
little opportunity during the evidentiary hearing to present to the Court evidence of existing and
emergent technologies that would allow Lobster Pot Fishing to made completely Whale Safe.
There was no other real discussion on how the Defendants — if the Court found them still liable

for the entanglement of Federally Protected Whales — could be coerced into adopting
Whale Safe Fixed Gear and other fishing practices.

With the discovery restrictions imposed on Strahan by the Court and its allowing him
only to present six witnesses at the evidentiary hearing. Strahan has been unable to present to the
Court all the possible existing and emergent technologies that will allow the Defendants to go
Whale Safe in the near future. For the same reasons, he was unable to present the issue to the
Court on how the various forms of available equitable remedies that could be used to coerce the
Defendants to go Whale Safe in the immediate future.

The Court should first make a finding on Strahan's claim that the MDMF Fixed Gear
continues to entangle Federally Protected Whales, remains a significant threat to entangle these
whales in the future and is in active violation of the ESA's Section 9 take prohibitions. The Court
should then schedule another evidentiary hearing say within thirty days of initial liability finding
to hear arguments and receive evidence on the issue of remedy. The thirty day period will allow
the parties to discuss settlement options and to prepare comments on how the Court should go
about coercing the Defendants into complying with the ESA's Section 9 prohibitions in the
course of their licensing and regulating MDMF Fixed Gear.  At the requested hearing the Court
could take further sworn testimony on the subject of what kind of remedy could successfully
coerce the Defendants into only licensing Whale Safe fishing gear and the parties would be
allowed to submit more evidence and file written memos to the Court on the issue of appropriate
remedy.

Strahan also asks the Court to appoint a Master to assist the Court in determining in the
future whether or not the MDMF Fixed Gear is Whale Safe.  The Master can also serve as a "go
between" the parties and assist them in evaluating technical means and methods for MDMF

Fixed Gear being made Whale Safe.   Eventually the Master can assist the Court in determining

at some point in the future whether or not the Defendants have succeeded in engineering their

Fixed Gear into being Whale Safe.

### Retraction of Any Perceived Request for Consolidation of Decision into Final Judgment

Strahan notifies the Court that he retracts any presumed prior request to the Court for it to

consolidate the decision of on his motion for a preliminary injunction into a final judgment on

the merits pursuant to Rule 65 of the fed. R. Civ. Proc.  Any such apparent prior request was

based on an agreement between Strahan and the Defendants' attorney. This agreement was

violated and openly abandoned by the Defendants a long time ago. The Court cannot deny

Strahan's withdrawal of this request and allow the Defendants to profit off their violation of their

prior agreement with Strahan.

Strahan reminds the Court as of this date that it has failed to provide the required written

notice to the parties pursuant to Rule 65 expressing its intent to seriously consider a

consolidation. Having failed to make said written notification to the parties, Rule 65 prevents the

Court at present from consolidating a decision on Strahan's Motion for a preliminary injunction

into a final judgment on the merits at this stage of the proceedings. Additionally, the Court's

refusal to afforded Strahan any opportunity for meaningful discovery has fatally impaired his

ability to collect the necessary evidentiary material from the Defendants and involved non-

parties for him to be able to fully argue case to the Court for his full relief requested from the

Court in his complaint.

For example, Strahan is asking the Court to order the Defendants to pay for proactive

recovery efforts for Federally Protected Whales. He is asking this to compensate for the

enhanced prospects of extinction that the Defendants have created for these said endangered

species of whales as a result of their many decades of killing and injuring members of species of

Federally Protected Whales pursuant to their causing their entanglement I MDMF Fixed Gear.

This issue has not been presented to the Court at all and waits its being offered to the Court at the

trial on the merits.

### Prior Litigation

In 1995 Strahan first brought a suit against the MDMF for licensing Fixed Gear in

violation of the ESA's Section 9 take prohibitions ("1995 Action") In 1996 the Court in the 1995

Action found the MDMF in violation of the Section 9 prohibitions of the Endangered Species

Act[24] in the 1995 Action over the same issue of its licensing and regulating MDMF Fixed Gear

fisheries.  See *Strahan v. Coxe*, 939 F. Supp. 963, (D. Mass 1996), aff'd in part and vacated in

part, 127 F. 3d 155 (1st Cir. 1997) cert. denied 525 U. S. 978 (1998). The First Circuit in its

decision in *Strahan* at 171 ruled that the Court was required to ensure that "any violation would

end." The Court in the 1995 Action in no way approved or even commented on any activity of

the Defendants beyond its said published opinion in 1996.

The 1995 Action terminated without any permanent injunctive relief and without any

further ruling by the court after the 1996 *Strahan* decision concerning any aspect of the MDMF's

licensing of Fixed Gear. In 2001, Strahan sought dismissal of his claims after the court stayed the

proceedings for a year and because of its refusal from the commencement of the 1995 Action to

allow Strahan any opportunity for discovery. Strahan's motion for dismissal came after Strahan

was denied any opportunity by the Court to further prosecute his claims against the defendants

and the interveners after its 1996 decision. In his motion, Strahan stated he was seeking dismissal

because he had no expectation of getting any meaningful relief from the Court. He stated that he

---

[24] Section 9 of the ESA prohibits the killing and injuring of endangered whales occurring
incidental to otherwise legal activity.

was seeking an appeal to the First Circuit of the Court's refusal to let him have any discovery and its refusal after 1996 to let him prosecute his claims against the MDMF. By 2001, Strahan was indigent and had no resources to be involved in a civil action where he had zero expectation of obtaining any meaningful relief.

The Defendants entered into a settlement agreement — with a Trojan Horse plaintiff-intervener (i. e. it was really a friend of the Defendants and commercial fisherman) and the Massachusetts Lobstermen's Association ("MLA") (a defendant-intervener) — and then simply dismissed its phony claims against the Defendants with prejudice. In doing so the MDMF entered into a contractual agreement with the Trojan Horse intervener and the MLA that was binding to 2006. <u>See</u> Attachment #7. The contract required the MDMF to give millions of dollars to the Center for Coastal Studies to look for entangled Right Whales in Massachusetts' waters. This agreement did not require that the MDMF spend one dollar on research to make MDMF Fixed Gear less likely to entangle Federally Protected Whales. The said settlement contract agreed to let the MDMF license Fixed Gear that was essentially the same as the Fixed Gear it licensed prior to Strahan's commencing his 1995 civil action against the MDMF. This is why the MDMF Fixed Gear in 2006 is the same as it was in 1996 in regards to its capacity to entangle Federally Protected Whales.

As a result of the dismissals, the underlying issues in the 1996 civil action were never fully adjudicated and there is no bar pursuant to *res judicata* or *collateral estoppel* to stop Strahan in 2006 from fully prosecuting the Defendants in the instant action for all their past unlawful takings of Federally Protected Whales from entanglement in MDMF Fixed Gear. Strahan is no restrained by any outcome of the 1995 Action from using evidence of these past takings to justify his request in the instant action for injunctive relief against the Defendants.

### The Lack of Meaningful Discovery Has Greatly Injured
### Strahan's Ability to Prosecute his Claims

The Court has consistently denied Strahan any opportunity to obtain relevant evidence against the Defendants through discovery. It has refused to grant his motions to compel the Defendants to produce the documents that he has requested pursuant to discovery. It has quashed most of his subpoenas for documents from business associates of the Defendants and non-parties that are directly involved in the underlying issues of the instant action.  For example, the most comprehensive database on reports of entangled whales is in the possession of the center for Coastal Studies, who is a paid contractee of the Defendants and NOAA and jointly own the said entanglement data archived by CCS. The Court has refused all of Strahan's efforts to compel the production of this said database.[25] The Court has quashed all of Strahan's subpoenas to CCS requiring the production of this said database.  Considering that CCS receives most reports of entanglements of whales along the Atlantic coast, the Court has effectively insured that the most comprehensive evidence of whale entanglements in fishing gear is not available for its consideration.  This means that the most compelling evidence showing that MDMF Fixed Gear entangles Federally Protected Whales has been kept out of Strahan's hands and is currently not available for his use to prove his claims against the Defendants.

Given the opportunity for meaningful discovery, Strahan claims that he can easily providence material evidence to prove his claims against the Defendants. He is currently

---

[25] The CCS was willing only to supply files associated with a "secret" web site that its attorney claimed contained all information on whale entanglements in CCS' possession. Strahan claims that the attorney was not telling the truth. A CCS employee — Scott Landry — testified under oath at the 17-27 November 2006 evidentiary hearings that in fact all CCS' entanglement information was kept in a special database that was not published on any web site. He testified that the CCS' "secret website" on whale entanglement contains only some of the whale entanglement information in possession of CCS. He testified that he did not consider the said website a "database" of any kind.

pursuing the production of this evidence through the means independent of Court ordered

discovery. The Court cannot consider that most of available evidence of whale entanglements by

the Defendants is currently in possession of Strahan.

### Current and Past Entanglement of Whales in Fixed Gear Licensed by Defendants

In 2006 there is absolutely no question — its not even seriously opposed by the

Defendants' Opposition or offered testimony at the Court's evidentiary hearing — that Federally

Protected Whales continue to be routinely entangled in MDMF Fixed Gear in U. S. coastal

waters off Massachusetts — in both state and federal waters. The Defendants have admitted in

their response to Rule 36 requests for admissions that Humpback Whales are still being

entangled in MDMF Fixed Gear.  In fact, the Defendants' Opposition claims that MDMF Fixed

Gear entangles whales just like similar fixed gear licensed by other states and the federal

government and other similar state and federally licensed Fixed Gear.[26] While NOAA has

adopted self-described "Take Reduction Plans", these plans were coerced by MMPA's mandate

and NOAA has never required substantive changes in Fixed Gear fisheries.  Entanglements of

Federally Protected Whales on the Atlantic Coast are proceeding at historical levels or the rate of

them is actually increasing.

NOAA produces annual reports documenting reported takings of Federally Protected

Whales from ship strikes and entanglements in fishing gear ("Report on Whale Takings"). These

annual NOAA reports on the taking of whales clearly show a rise in entanglement of these

whales from 1999 – 2006. See Attachments #8(a-c), NOAA's 1999-2001 Report on Whale

Takings; Attachment #9(a-c), NOAA's 2003 Report on Whale Takings; and, Attachment #10(a-

b), NOAA's 2004 Report on Whale Takings.  These reports show that entanglements in the Gulf

---

[26] The Defendants actually claim that there is "no such thing as whale safe gear" in their 8
December 2006 supplemental opposition.

of Maine are proceeding at historical levels or the rate of them is increasing. The continuing

killing and injuring of whales in fishing gear is currently of great concern to most NOAA

permitted researcher on whales.  See Attachment #11  "North Atlantic Right Whales in Crisis."

Scott Kraus, *et al*. *Science* Vol. 39 pp. 561-562 22 July 2005.

> "The risk of fishing gear entanglement has been addressed by selective area
> closures and gear modifications. These closures do not adequately encompass the
> seasonal movements of right whales, and gear modifications implemented thus far
> have not reduced entanglement rates." *Id*. at 562.

> "[T]he amount of fishing gear in the water column should be eliminated or
> minimized. There are many steps that could be taken to do this, including (i)
> mandating changes in the pot-fishing industry (lobster, crab, hagfish, etc.) that
> will reduce gear in the water … [and] developing and implementing fishing
> methods that do not use vertical buoy lines attached to surface buoys … ." *Id*. at
> 562.

It must be seen that any Federally Protected Whale sighted entangled in fishing gear off

the coast of Massachusetts — even out of state waters in federal waters — is likely to have been

caught in MDMF Fixed Gear.  The only commercial fishermen who use Fixed Gear off the

Massachusetts coast — either in state or federal waters — are fisherman licensed by the

Defendants.  The MDMF Fishermen that fish in federal waters off Massachusetts use the same

MDMF Fixed Gear in federal waters that they do in Massachusetts state waters. The MDMF

Fishermen deploy MDMF Fix Gear in federal waters many miles off the Massachusetts coast —

and not just in Massachusetts state waters. This is because fishermen who are licensed by

MDMF also obtain federal permits. See S. Young Testimony at 17 November 2006 Evidentiary

Hearing. MDMF Fishermen also do not deploy their MDMF Fixed Gear in federal waters off the

Maine coast and Maine fishermen do not deploy their Fixed Gear in federal waters off the

Massachusetts coast. This "home field" loyalty reflects the reality both of these states also

license who can "land" their catch at a port in their respective state, and not just who can deploy

Fixed Gear in their respective state coastal waters. Massachusetts state law only allows MDMF

Fisherman to land their catches in Massachusetts, this includes fishermen with NOAA permits. Maine fishermen cannot obtain a license from the MDMF to land their catches from federal waters at a Massachusetts port so the only Fixed Gear fishermen fishing anywhere off the Massachusetts coast are MDMF licensed Fixed Gear fishermen.

Among the incidents of entanglements in these above cited NOAA reports —

1.      On 22 August 2004 Fin Whale was sighted entangled in Fixed Gear in Massachusetts Bay off Race Point, Provincetown MA.  See NOAA's "2004 Report on Whale Takings" at E17-04.

2.      On 30 August 2004 Humpback Whale was sighted entangled in vertical buoy lines of MDMF Fixed Gear in Massachusetts state waters off of Wellfleet MA The buoy line was anchored to the seafloor and was restraining the whale in place. The buoy line consisted of sink buoy line and weak links that failed to break and descended to a single Lobster Pot. See Attachment #12 and NOAA's "2004 Report on Whale Takings" at E19-04.

3.      On 16 July 2004 a Humpback Whale was sighted entangled in Fixed Gear in Massachusetts state waters off Martha's Vineyard. See NOAA's "2004 Report on Whale Taking" at E14-04.

4.      On 23 June 2003, A Humpback Whale was sighted entangled in MDMF Gill Net in Massachusetts' coastal waters outside of Gloucester Harbor. NOAA agents removed the gear and the name of the MDMF Fisherman was obtained, he was interviewed and he admitted to having placed the Gill Net that was removed from the whale. See NOAA's "2003 Report on Whale Takings" at E10-03.

5.      1 July 2003 a Humpback Whale was sighted entangled in MDMF fishing gear in

Massachusetts state waters off of Chatham, MA. The gear was partially removed by NOAA

agents. See NOAA's "2003 Report on Whale Takings" at E12-03

6.      9 July 2003 a Humpback Whale was sighted entangled in MDMF Lobster Pot

gear in Massachusetts state waters off of Chatham, MA. The gear was partially removed by

NOAA agents. See NOAA's "2003 Report on Whale Takings" at E14-03

7.      11 July 2003 a Humpback Whale was sighted entangled in MDMF Fixed Gear in

Massachusetts state waters off of Race Point, Provincetown MA. On subsequent sightings the

whale was seen without the said gear. See NOAA's 2003 "Report on Whale Takings" at E17-03

8.      14 July 2003 a Humpback Whale was sighted entangled in MDMF Lobster Pot

gear in Massachusetts' waters off of Race Point, MA. NOAA agents removed the gear. NOAA

agents interviewed the owner and NOAA identified him as a MDMF Fisherman. See NOAA's

2003 Report on Whale Takings E19-03

9.      19 August 2003 a Humpback Whale was sighted entangled in MDMF Gill Net in

Massachusetts' waters off of Chatham, MA. The gear was partially removed by NOAA agents

and identified to be Gill Net. No identification of the owner was possible owing to the lack of

any tag on the gear identifying the owner. The event was photographed from a blimp with

observers from WHOI and Stellwagen's Bank National Marine Sanctuary. See NOAA's

"2003 Report on Whale Takings" at E28-03

10.     26 August 2003 a Fin Whale was sighted entangled in MDMF Fixed Gear in

Massachusetts' coastal waters off of Chatham, MA. See NOAA's "2003 Report on Whale

Takings" at E14-03

11.      6 June 1999 an unidentified Federally Protected Whale was sighted entangled in

MDMF Fixed Gear in Massachusetts state waters off of Race Point, Provincetown MA. See

NOAA's "1999-2001 Report on Whale Takings" at E8-99

A single entanglement of a member of ANY whale species by Fixed Gear demonstrates

that Fixed Gear in that same area generically entangles ALL species of Federally Protected

Whales that are present in that same area. As long as these whales and Fixed Gear are occupying

the same habitat there will be routine entanglement of whales in this Fixed Gear over a period of

time.  See D. McKiernan Testimony at the 27 November 2006 Evidentiary Hearing.[27]

Unfortunately, the vast majority of entanglements of Federally Protected Whales go

completely unreported. Reported sightings of whales entangled in fishing gear are literally just

the "tip of the ice berg" of the numbers of whales annually entangled by fishing gear off the

Atlantic coastline.  As the Court explained in *Strahan v. Coxe* —

> "It is also quite likely that this number is higher because of the infrequency of
> observations, because the whale is not anchored to one location by the fishing
> gear, and because identifying parts of the gear do not remain attached to the
> whale. Id. ¶¶ 23, 24, 36. The Defendants do not dispute any of this evidence.
> Based upon the scientific affidavits, therefore, there is sufficient evidence to
> support Strahan's factual allegations that endangered whales have been taken
> through entanglement in fishing gear permitted by the Defendants in
> Massachusetts waters. "*Id* at 985.

Entanglements of Federally Protected Whales in Fixed Gear leave lasting scarring on

their soft skin. See M. Moore's Testimony at 17 November 2006 Hearing. Because Humpback

Whales and Right Whales can be identified as recognized individual whales, studies have been

---

[27] The Defendants' witness McKiernan compared Minke Whales and Basking Sharks found
entangled in Fixed Gear in Massachusetts to "canaries in the coal mine" (birds used to detect the
presence of deadly gases in coal mines because they are more sensitive to the presence of these
gases and therefore their death gives a warning to miners to "get the hell out now"). He
explained that this meant that if a Minke Whale or Basking Shark was caught in Fixed Gear in
Massachusetts this was a warning that Federally Protected Whales will probably got caught in
the same Fixed Gear.

**Strahan v. Secretary, EOEA et al, 05-10140-NMG: Memorandum in Support of Motion for a Preliminary Injunction and Response to Defendants' and Amicus Opposition**

23

done using entanglement scarring that can estimate the annual rate of entanglement in fishing gear for members of these two species. One such report has been done on fishing gear scars on Right Whales. <u>See</u> Attachment #13, February 2005 "Analysis of Scarring on Northern Right Whales (*Eubalaena glacialis*): Monitoring Rates of Entanglement Interactions: 1980 – 2002" ("Report Right Whale Scarring") by Scott Kraus, et al. Another report concerns fishing gear scarring on Humpback Whales. <u>See</u> Attachment # 14, the 2001 "Monitoring Entanglements of Humpback Whales (*Megaptera novaeangliae*) in Gulf of Maine on the Basis of Caudal Peduncle Scarring" (Report Humpback Whale Scarring") by Jooke Robbins, *et al.* [28] These documents report on analysis conducted by the authors to assess the degree of entanglement experienced by their respective whale species based on the presence of scarring on these whales arising from Fixed Gear entanglements.

The Report on Right Whale Scarring and the Report on Humpback Whale Scarring both claim that over ninety per cent of Humpback Whales and Right Whales have been entangled in Fixed Gear at least once in their lives. These two reports also maintain that about ten per cent of Right Whale and Humpback Whales are entangled each year in Fixed Gear. In 2006 it is a demonstrated reality that Federally Protected Whales are routinely entangled in MDMF Fixed Gear.

Fisherman and others also routinely remove fishing gear from entangled whales and otherwise attempt to cover up entanglements of Federally Protected Whales. There would be many more documented entanglements of Federally Protected Whales if fisherman did not routinely remove fishing gear from entangled whales and otherwise "tamper with the evidence."

---

[28] This attachment was not filed electronically with the Court because its file size exceeds the limits imposed by the Court for filing documents electronically. It has instead been filed as a paper document.

The fisherman remove the gear to prevent an injured whale as being reported as entangled and also to remove any evidence of the type of fishing gear that actually entangled the whale. This "tampering with evidence" prevents NOAA from identifying and certifying commercial fisheries that entangle whales in order to prepare its annual List of Fisheries and Stock Assessment Reports prepared pursuant to the provisions of the MMPA.  See M. Moore testimony at 17 November 2006 Hearing.  Moore prepared reports on two necropsies on Federally Protected Whales whose deaths were attributed to entanglement but in each case the gear had been deliberately removed from each carcass prior to the necropsy by an unknown agent, See Attachments #15 and #16[29], 7 March 2006, "Final Case Report EgNEFL0603" and Undated Report on 3 October 2002 Necropsy of Humpback Whale #CCSN 02-255.

The NOAA's annual stock assessment reports ("SAR") for Federally Protected Whales assess the size of the Gulf of Maine population of Humpback Whales as 820 and the Northern Right Whale population as 427, These said SARs also estimate from reported sightings that the annual rate of Humpback Whales seriously injured and killed from Fixed Gear entanglement is 3.8, for Right Whales it is 2.6 and for Fin Whales it is 12.4.  See Attachments #17,  #18 and #19, 2005 NOAA SAR for Humpback Whale, 2005 NOAA SAR for Right Whale and 2005 NOAA SAR for Fin Whale.

An analysis of Fixed Gear found on Humpback Whales and Northern Right Whales. The published report made the claims that vertical buoy lines and Gill Nets were overwhelmingly dominant gear type to entangle these Federally Protected Whales. Vertical buoy lines using sinking line — as required by MDMF regulations — was discovered to entangle whales more

---

[29]This attachment was not filed electronically with the Court because its file size exceeds the limits imposed by the Court for filing documents electronically. It has instead been filed as a paper document.

readily than vertical buoy line using floating line.  See Attachment #20, October 2005 "Fishing

Gear Involved in Entanglements of Right and Humpback Whales," by Amanda Johnson *et al.*

("Johnson Report").[30]

The Defendants regulations actually require that fishermen use Fixed Gear that enhances

the possibility of entangling whales apart from what would simply constitutes regular Fixed

Gear. MDMF regulations require that MDMF licensed fishermen must use sinking rope in their

vertical buoy lines. Field studies show that the use of sinking rope in vertical buoy lines are more

likely to entangle whales than if floating rope was used instead.  Well-established Whale Safe

fishing technology is banned by MDMF regulation. A licensed fisherman is prohibited from

using Whale Safe gear like the Goudey Buoy.  See 17 November 2006 Hearing Testimony of C.

Goudey.

It is clear that the removal of ground lines entirely from Massachusetts coastal waters

would have no significant impact on the rate of rate entanglement of Federally Protected Whales

in MDMF Fixed Gear.  No reports exist that makes any claim that ground lines are a significant

source of direct and "first entanglement" of Federally Protected Whales in MDMF Fixed Gear.[31]

See Testimony of Kraus, Moore, and McKiernan. Moore testified that it is NOT likely that Right

Whales feed near the seafloor and are not likely entangled directly by ground lines in

Massachusetts coastal waters. See Moore Testimony.  The Johnson Report expresses similar

---

[30] The Johnson Report states —
    "Fifty-six percent of the entanglements for both species involved buoy line. ....
    Sinking (all or part) buoy line was found on more entangled animals than floating
    buoy line, which may indicate that sinking buoy line creates more entanglement risk
    than floating buoy line." *Id*, at 663.
[31] Ground lines found on entangled whales are the result of a whale first being first entangled in a
vertical buoy line and then dragging lobster pots and their connecting ground line away. The
lobster pots and ground lines become involved in the entanglement as a secondary event
resulting from the first and original entanglement caused by the vertical buoy lines.

reservations on the efficacy on the use of weak links and sinking ground lines in having any effect on reducing the likelihood of Federally Protected Whales of being entangled in Fixed Gear.[32]

**Requested Findings of Fact**

1.    The Defendants have not developed a Whale Safe requirement towards licensing their fishing gear and have not internally accepted as a state agency the need to comply with the ESA.

2.    The Defendants have entered into an ESA Section 6 cooperative agreement with NOAA that requires that they regulate their agency actions in compliance with the ESA's Section 9 take prohibitions, even at great cost.

3.    Vertical buoy lines of the Defendants Fixed Gear routinely entangle Federally Protected Whales.

4.    The Defendants' licensed Gill Nets routinely entangle Federally Protected Whales and there is no practical way to make them Whale Safe.

5.    There is no scientific evidence that ground lines are a significant cause of initial entanglement Federally Protected Whales or that these whales spend much time near the sea floor to encounter this gear.

6.    Emergent technologies exist to make Lobster gear Whale Safe.

7.    The Defendants have practiced evasion and not conservation, including forcing the MDFW to abandon its jurisdiction endangered species in the Ocean.

---

[32] The Johnson Report states —
      "Whether buoy and surface system lines represent more of an entanglement risk than ground line is currently difficult to determine due to unknown biases associated with entanglement reporting effort. .... In contrast, ground line does not have any distinguishing characteristics that indicate that it is in fact ground line." *Id* at 663.

8.    Any gear that entangles one species of whale will entangle all species of whales
      for the same reasons.

## Requested Findings of Law

1.    Since 1996 and continuing to the present the MDMF Fixed Gear poses a
      continuing and significant threat to entangle Federally Protected Whales in U. S.
      coastal waters — state and federal — in violation of the Section 9 take
      prohibitions of the ESA.

2.    Since at least 1996 the Defendants are in continuing violation of the section 9 take
      prohibitions of the ESA and the burden of proof has shifted to them to conclusive
      show that they will not entangle whales in the future.

3.    The termination of *Strahan v. Coxe* in 2001 does not provide any basis through
      the principles of *res judicata and collateral estoppel* to impede Strahan from
      raising claims the Defendants in 2006 any historical incidents of violations
      application of in proving a continuing and repeating past violations.   Strahan
      yielded no decision by the Court that in any way sanctioned current or past
      alleged *ultra vires* conduct of the Defendant. The continuing historical *ultra vires*
      conduct of the Defendants is not subject to *res judicata* doctrine.

## The Defendants are Liable for All Unlawful Entanglement of Whales by Fixed Gear Licensed by Any Atlantic Coastal State or NOAA Fisheries

It is very difficult to identify the state or federal fisheries agency that might have licensed

the Fixed Gear sighted on any given whale. This fact rests on the underlying reality that all Fixed

Gear deployed in along the U. S. Atlantic coastline is virtually identical in construction and

layout. Fixed Gear from Maine is just like Fixed Gear from Massachusetts and just like Fixed

Gear licensed by NOAA. This is no accidental coincidence. Apart from the observation that a

"fishing hook is just like any other fishing hook," all Atlantic coastal state fishing agencies are members of a voluntary compact that manages several coastal fisheries in a uniform manner and requires individual member state agencies to comply with the universal management plan that has been adopted by the compact.

The Atlantic States Marine Fisheries Commission ("ASMFC") is a compact of fifteen coastal states that is organized pursuant to federal statute that regulates selected commercial marine fisheries in a uniform manner among the member states. The ASMFC was established by an act of Congress — The Atlantic Coastal Fisheries Management Act ("ACFMA") – which authorizes the ASMFC to adopt coastal fisheries management plan for a specific marine fishery that is binding on all its member states. See 16 U. S. C. §§ 5101 *et seq*. Massachusetts — and the Defendants — are a member of the ASMFC. Therefore, the manner that the Defendants license and regulate their Fix Gear fisheries is done in cooperation with Maine — and other coastal states — and in a uniform manner as dictated by the ASMFC.[33] This is why MDMF Fixed Gear is nearly indistinguishable from Fixed Gear licensed by the state of Maine.

ASMFC manages the American Lobster Pot fishery along the U. S. Atlantic coastline as well as fisheries that employ Gill Nets. The Defendants Lobster Pot fisheries regulations are based on implementing the American Lobster Pot fishery plan adopted and enforced by the ASMFC. Maine, New York, Rhode Island, and Connecticut are also members of the ASMFC

---

[33] The ACFMA states at 16 U. S. C. § 5104(a)(1) —

"The Commission shall prepare and adopt coastal fishery management plans to provide for the conservation of coastal fishery resources. In preparing a coastal fishery management plan for a fishery that is located in both State waters and the exclusive economic zone, the Commission shall consult with appropriate Councils to determine areas where such coastal fishery management plan may complement Council fishery management plans. The coastal fishery management plan shall specify the requirements necessary for States to be in compliance with the plan. Upon adoption of a coastal fishery management plan, the Commission shall identify each State that is required to implement and enforce that plan."

and their Lobster Pot fisheries management plans are implementations of the ASMFC's said plan also.

For purposes of liability arising from the entanglement of Federally Protected Whales in Fixed Gear, the ASMFC has a similar position as the Defendants do to the individuals who license and regulate the Fixed Gear that they deploy in U. S. coastal waters that then entangles Federally Protected Whales and in so doing violates the Section 9 take prohibitions of the ESA. In addition, since Massachusetts is in a conspiracy with the other coastal state members of the ASMFC to have the ASMFC adopt management plans for Fixed Gear that result in the unlawful entanglement of whales in Fixed Gear. As a member of a conspiracy whose individually licensed Fixed Gear is equally capable of entangling Federally Protected Whales, the Defendants share liability with the other state members of the ASMFC.[34]

Courts have consistently ruled that possible partners in crime share an equal liability for injury done to a party that one of them was actually capable of doing. See *Summers v. Tice*, 33 Cal. 2d 80, 199 P. 2d 1, 5 A. L. R. 2d 91 (Cal. 1948); *McCormack v. Abbot Laboratories*, 617 F. Supp. 1521(D. Mass. 1985).

Regardless of which state or federal fishery actually licensed the Fixed Gear that entangles a specific Federally Protected Whale, they all have shared liability for *any* Federally Protected Whale entangled by Fixed Gear licensed any member state of the ASMFC. Therefore, the Defendants are liable for every incident of an entangled Federally Protected Whale in Fixed Gear

---

[34] An example illustrates the problem. A detective enters a room with 12 people and a dead body with a gun sitting on the corpse's stomach. Each of the twelve people maintained their innocence and refuse to rat out which one of them pulled the trigger and killed the dead guy. This is a scenario of the perfect crime. There is no way to prosecute any one of the suspects because of the reasonable possibility that one of the other 11 did the crime. While the DA will have a near impossibility to prosecute any one of the twelve for murder, the dead guys children could bring a civil suit against all twelve based on *Summers'* shared tort liability principle which allows each of the twelve to be sued for a shared liability for the killing, because they each had an equal opportunity to commit the crime.

on the Atlantic coastline because that Fixed Gear absolutely was licensed by only a member state
of the ASMFC.

### Standard for Issuing Preliminary Inunctions Under the Endangered Species Act

The standard of review by a court in issuing a preliminary injunction is the familiar four-
part test: 1) likelihood of success on the merits, 2) the threat of irreparable harm to the petitioner
without the issuance of the requested injunction, 3) the balance of the relative harm to the parties
from issuing the requested injunction favors the petitioner and 4) the Public Interest is protected
by the issuing of the requested injunction. See *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.,*
102 F. 3d 12, 15 (1st Cir. 1996) and *Narragansett Indian Tribe v. Gilbert,* 934 F. 2d 4, 6 (1st Cir.
1991).

The last two tests are not applicable or — more importantly — are required to be decided
in the favor of the petitioner for requests for injunctive relief under the ESA, especially to
enforce its Section 9 prohibitions to stop the unlawful "taking" of members of a listed species.
See *Sierra Club v. Marsh,* 816 F. 2d 1376, 1383 (9th Cir. 1987) (holding that the courts may not
use equity's scales to strike a difference balance) citing TVA *v. Hill,* 437 U. S. 153, 194, 98 S.
Ct. 2279 (1978); *Strahan v. Coxe,* 127 F, 2d 155, 160 (1st Cir. 1997); *National Wildlife
Federation v. Burlington Northern Railroad,* 23 F. 3d 1508, 1510-11 (9th Cir. 1994) —

> "In cases involving the ESA, Congress removed from the courts their traditional
> equitable discretion in injunction proceedings of balancing the parties' competing
> interests. The language, history, and structure of the ESA demonstrates Congress'
> determination that the balance of hardships and the public interest tips heavily in
> favor of protected species."

The purpose of the ESA is to prevent the extinction of species of wildlife. The ESA
protections scheme is based on the reality that when populations of wildlife become small and
the rate of births decline the probability of these species becoming extinct in the course of the
next hundred years is significant and unacceptable. The purpose of the ESA is to eliminate the

possibility of extinction for a listed protected species by protecting its ability to increase its

remaining numbers to a regular population size where it no longer needs to be listed as

endangered under the Act because it no longer faces a threat of extinction. "Recovery" is the

name of this process of increasing the size of the remaining number of a listed species to a

population size where the species is not endangered. Any endangered species that stays

endangered for too long faces the significant danger of extinction from nothing more than "small

numbers," without any additional killing or habitat loss caused by people. The Act's ultimately

purpose is to protect the ability of a species to recover as quickly as possible from its endangered

status. Thus the killing or injury to a single member of a listed endangered species is an

unacceptable setback to the ESA's protected recovery of the species. The speedy recovery of a

listed species is protected by the use of an extremely broad definition of taking.

       The federal regulatory scheme for protecting endangered wildlife is in two parts: 1) broad

prohibitions against taking members of listed species and 2) the imposition of mandatory and

non-discretionary duties on federal agencies to insure that agency actions will not jeopardize a

species survival and to develop conservation plans to use the agency' lawful authority to

conserve and protect listed species to assist their recovery.

*ESA Prohibits Taking of Members of Endangered Species Listed Under the ESA*

       Section 9 of the ESA prohibits the "taking" of listed species of wildlife. 16 U. S. C. §

1538(a) and (g).  The ESA defines taking very broadly "Take" to include "harming, harassing,

trapping, capturing, wounding, or killing" a protected species either directly on its members or

by degrading its habitat sufficiently to impair essential behavior patterns.  16 U. S. C. §

1532(19). The prohibition extends to incidental as well as direct taking, meaning that anyone

who assists in any way another to cause a taking is liable for the taking also.

Strahan v. Secretary, EOEA et al, 05-10140-NMG: Memorandum in Support of Motion for a
Preliminary Injunction and Response to Defendants' and Amicus Opposition

32

The ESA not only bans the acts of parties directly causing a take, but also bans the acts of

third parties whose acts bring about the taking.  Strahan v. Coxe, 127 F. 3d 155, 163 (1st Cir.

1997), cert. denied, 119 S. Ct. 81 (1998) ("We believe that . . . a governmental third party

pursuant to whose authority an actor directly exacts a taking of an endangered species may be

deemed to have violated the provisions of the ESA.").  See also Babbitt v. Sweet Home Chapter

of Communities for a Great Oregon, 515 U.S. 687, 704 (1995)("Congress intended 'take' to

apply broadly to cover indirect as well as purposeful actions."); Palila v. Hawaii Dept. of Land

and Natural Resources, 852 F. 2d 1106, 1108 (9th Cir. 1988), citing S. Rep. No. 93-307, at 7

(1973) ("'Take' is defined... in the broadest possible manner to include every conceivable way in

which a person can 'take' or attempt to 'take' any fish or wildlife.").

Proof of a taking requires a showing "that the alleged activity has actually harmed the

species or if continued will actually, as opposed to potentially, cause harm to the species."

American Bald Eagle v. Bhatti, 9 F. 3d 163, 166 (1st Cir. 1993) (citing cases); see also Strahan,

127 F. 3d at 162. A movant can make a showing of actual harm by proving that significant

modification or damage to the habitat of an endangered or threatened species is likely to occur so

as to injure that species. See TVA v. Hill, 437 U. S. at 172, 98 S. Ct. 2279.

There is no requirement by statute that injunctive relief is only required to stop an act of

"injury to the species" that would precipitate imminent extinction. In fact the ESA only prohibits

the injuring of individuals and nowhere prohibits an "injury to the species." It would seem odd

that a court could see in a read of the Act any language that requires injunctive relief to stop an

'injury to the species" but allows an "injury to an individual" member of a listed endangered

species.  See National Wildlife Federation, 23 F. 3d at 1511 n8.

"We are not saying that a threat of extinction to the species is required before an
injunction may issue under the ESA. This would be contrary to the spirit of the

statute, whose goal of preserving threatened and endangered species can also be
achieved through incremental steps."

Similarly, in *Forest Conservation Council v. Rosboro Lumber Co.*, 50 F. 3d 781 (9th Cir.
1995), the Ninth Circuit emphasized that injury to a single member of a listed species was
irreparable:

> "Once a member of an endangered species has been injured, the task of preserving
> that species becomes all the more difficult. As the Supreme Court noted,
> "environmental injury, by its nature, can seldom be adequately remedied by
> money damages and is often permanent or at least of long duration, *i.e.,*
> irreparable." *Amoco Production Co. v. Gambell,* 480 U.S. 531, 545, 94 L. Ed. 2d
> 542, 107 S. Ct. 1396 (1987). "*Id*. at 785

In *Fund for Animals v. Turner*, 1991 U.S. Dist. LEXIS 13426, at * 26 (D. D. C. Sept. 27,
1991) the Court rejected an argument that the killing of one or two endangered Grizzly bears did
not require a court issuing injunctive relief to stop it, ruling —

> "In light of this Congressional mandate, the loss even of the relatively few grizzly
> bears that are likely to be taken through a sport hunt during the time it will take
> to reach a final decision in this case is a significant, and undoubtedly irreparable,
> harm."

First, the Ninth Circuit has repeatedly held that irreparable injury is *presumed* given a
substantial violation of the ESA. *See, e.g. Thomas v. Peterson*, 753 F. 2d 754, 754 (9th Cir.
1985)(faced with a substantial procedural violation of the ESA, "the remedy *must* be an
injunction of the project pending compliance with the ESA.") (Emphasis added).

The unlawful taking of a single member of a listed endangered species under the ESA
constitutes irreparable harm. There is no need for a prosecutor of a taking violation under the Act
to show that a further said taking will induce a threat of imminent extinction for the listed
species. Otherwise, the repeated killings of members of a species would not be enjoinable until
these killings reduced the viability of the species to the point where a single killing would
threaten it with imminent extinction. The latter interpretation is completely against the
Congressional intent for implementing the Act. It would eviscerate any possible practical

Strahan v. Secretary, EOEA et al, 05-10140-NMG: Memorandum in Support of Motion for a
Preliminary Injunction and Response to Defendants' and Amicus Opposition

34

protection the Act would afford an endangered species. The Court has no choice but to reject

such an offered interpretation.

Economic adverse impacts are not to be used by a Court in deciding or not to issue

injunctive relief to enjoin an unlawful taking in violation of the prohibitions of the Act. In *United

States v. the Town of Plymouth*, 6 F. Supp. 2d 81 (D. Mass. 1998) the court ruled —

> "The Town points out that Plymouth Long Beach has experienced an increase in
> the number of nesting pairs of piping plovers from one in 1991 to nine in 1997,
> and that the piping plover population is "flourishing" under the Town's
> "upgraded" management of the beach under the 1992 Plan. ... This failure to act
> quickly and decisively resulted, in all probability, in the June 13, 1996 taking of
> the plover chick. While the Town maintains that no conclusions can be drawn
> about the cause of the death of the recently hatched plover--observed healthy in
> the morning and found dead in vehicle tracks just hours later--the reasonable
> inference to be drawn in this whodunit is that the chick was killed by an ORV.
> Although the Selectmen perceive Long Beach as a multipurpose beach where
> ORV users and piping plovers can happily co-exist, the expert evidence proves
> that the large vehicle-free zones are essential to protect this threatened species
> from takes, and will often be inconsistent with ORV use during the summer
> months." Id at 81.

> "In *TVA v. Hill,* the Supreme Court stated that "some" may find it "curious" that
> an endangered three-inch fish, the snail darter, could stop a $100 million dam
> under the ESA, but that "the explicit provisions of the [ESA] require precisely
> that result." *Id. at 172-73, 98 S. Ct. 2279*. Similarly, here a 2.5 inch piping plover
> can stop a behemoth ORV if the government proves a taking under the ESA." *Id.*
> at 90.

The language, history, and structure of the ESA demonstrates Congress' determination

that the balance of hardships and the public interest tips heavily in favor of protected species."

*National Wildlife Federation*, 23 F. 3d at 1510-11(internal citations omitted); *see also Sierra

Club v. Marsh*, 816 F. 2d 1376, 1387 (9th Cir. 1987)("The act does not permit courts to consider

the hardship an injunction may impose on the project if endangered species' habitat is likely to

be destroyed.").

Courts have also found it unpersuasive when an agency makes that they cannot be held liable for ESA Section 9 violations because they were simply unaware that the takings were ongoing. In *Greenpeace Foundation v. Mineta* 122 F. Supp. 2d 1123 (D. Hawai'i 2000)

> "The ruling does not assure victory for NMFS. NMFS's position is essentially that it is innocent of Section 9 violations because it is not aware of any data that confirms that it is in violation of Section 9; such is a head-in-the-sand attitude we do not condone. It is also a position in *1135 conflict with the underlying philosophy of the ESA."

Under the ESA, the Court is afforded full jurisdiction necessary to issue injunctive relief to compel compliance with ESA Section 9 prohibitions, even if a significant economic cost must be borne by a violator in order to do so, However, history has shown that such claims of economic hardship have turned out to be specious and compliance achieved with minimum burdens actually imposed on the defendant. It has been shown that these hardship claims are simply an act of a self-serving scofflaw seeking to evade the law.

Congress took account of the possibility of unreasonable economic hardship when implementing the provisions of the ESA. It provided numerous provided exceptions based on claims of unreasonable hardships — including the provision of the infamous "God Committee" (so called because the Committee is authorized to decide the fate of an endangered species when a party petitions it for an exemption from application of the protective prohibitions of the ESA.

An excellent law review article discussing the enforcement of the ESA's Section 9 taking prohibitions is Professor Frederico Cheevers' "The Take Prohibitions in the Section 9 of the Endangered Species Act: Contradictions, Ugly Ducklings, and Conservation of Species," 34 Envtl L. 363 (2004). See Attachment 21.

### The Court Should Grant Strahan Request for a Preliminary Injunction

This is case is, at its core, a simple case involving the application of clear and settled law to undisputed facts. Strahan is simply asking the Court to require that the Defendants make their Fixed Gear fisheries Whale Safe at some point in the future, a date that he is letting the Court chose as being reasonable. The Court can use its full equitable powers to bring the Defendants currently unlawful Fixed Gear fisheries into compliance with the ESA's Section 9 protective prohibitions.

Clearly, what is necessary here is for the Court to issue an order that coerces the technological innovations necessary for the unwilling Defendants to be able to license and regulate Lobster Pot fishing gear that does not pose a significant risk to entangle Federally Protected Whales.  Gill Nets cannot be made Whale Safe as should be banned by the Court. The precedent establishing the Court's jurisdiction to do such is massive. See Chapter 15 of Professor Zygmunt J. B. Plater's[35] excellent treatise *Environmental Law and Policy: Nature, Law, and Society* entitled "Technology Forcing Standards." <u>See</u> Attachment #22.

### *Strahan Satisfies All the Requirements for a Preliminary Injunction*

In order to protect the *status quo*, Strahan needs the Court to immediately grant him his requested interlocutory injunctive relief. The Defendants continued entanglement of Federally Protected Whales is inflicting continuing irreparable harm on him. Every death and serious injury to a member of Federally Protected Whales constitutes irreparable harm to Strahan. The killing or serious injury of a single Federally Protected Whale irreparably sets back the recovery of these species from their endangered status. In order to prevent him from suffering further irreparable harm from the Defendants' unlawful taking of Federally Protected Whales. Each

---

[35] Professor Plater was the attorney of record for the respondents in TVA v. Hill and made the oral argument to the Supreme Court on their behalf.

further entanglement of a federally Protected Whale in MDMF fixed gear will expose Strahan's

interest in Federally Protected Whales to further irreparable harm by the Defendants, NOAA

itself has ruled that the death of a single member of a listed species of Federally Protected Whale

will set back the possible recovery of these endangered species flaunting the Congressional

intent and purpose of the ESA. See 31 August 1995 Federal Register (60 FR 45399). NOAA has

reaffirmed its said past ruling in its 2006 Stock Assessment Report on the status of populations

of the Federally Protected Whales. It found that the current number of killings and serious

injuries annually inflicted on these species just from the known killing and serious injuries

resulting from entanglements in fishing gear and ship strikes exceeds its allowed Possible

Biological Removal value ("PBR") that it has determined for each species. This means that

NOAA has determined that a single further killing and serious injury to any member of Northern

Right Whales, Humpback Whales or Fin Whales threatens the survival of their species.

Strahan clearly meets all requirements for the Court to grant him his requested

interlocutory injunctive relief. Strahan is almost certain to prevail on the merits. Strahan is likely

to prevail on the merits. He convincingly demonstrates that the MDMF Fixed Gear since 1996

has continued to entangle Federally Protected Whales and can be expected to do so into the

indeterminable future unless the Court acts to stop it. Further the Defendants — and not Strahan

— have the burden of proof on them to show that MDMF Fixed Gear is no longer entangling

Federally Protected Whales, since the Court already found the Defendants in *Strahan v. Coxe*

liable for the unlawful entangling of endangered whales in their MDMF Fixed Gear. In point of

fact, the Defendants' witness McKiernan at the Court's evidentiary hearing testified that vertical

buoy lines used in the MDMF Fixed Gear still entangles whales and that Federally Protected

Whales regularly entangle in Gill Nets licensed by the Defendants (although he called it 'bumping into Gill Nets").

There is no question that the Defendants Fixed Gear has routinely entangles Federally Protected Whales. There is no serious question that it will continue to do so into the future. Some of these entanglements have been sighted. As shown *supra*, most entanglements go unreported, deliberately so sometimes, and Fixed Gear is deliberatively removed from entangled federally Protected Whales by unknown parties in order to thwart the possibility of entanglements being reported to NOAA.[36]

Strahan certainly is suffering irreparable harm from these entanglements as proven *supra*. Since the ESA jurisprudence requires that the protection of Federally Protected Whales is always in the Public Interest and the "balancing of the interests" test always favors the protection of federally Protected Whales, the Court is compelled to grant Strahan's motion for a preliminary Injunction.[37]

The question now is before the Court is whether it will to stop the further entanglement of a Federally Protected Whale by the MDMF Fixed Gear. Judge Saris' ruling in *U. S. v. Town of Plymouth* requires reflection —

---

[36] The fact that sightings of entangled Northern Right Whales in Massachusetts waters has not gone up with increased sighting effort is more than suspicious of deliberate lack of reporting by the sighting effort. It could also be illustrative of the reality that few entanglements occur in Massachusetts in the winter when the fishing effort is exponentially lower than in the Summer.

[37] The Defendants cannot maintain they would be injured as state agencies from the Court ordering that they must license only Whale Safe Fixed Gear. The Defendants duty is to obey the law, protect the Public interest and comply with the ESA 9 prohibitions. Additionally, Massachusetts has voluntarily entered into an ESA Section 6 agreement with NOAA to conserve and recover Federally Protected Whales and to enforce the federal regulatory scheme for the conservation and protection of endangered species. All the Court is doing is requiring that the Defendants faithfully comply with Agreement that they entered into with NOAA and pursuant to this Agreement have been the recipients of millions of dollars from NOAA, The Defendants failure to use any of this money to actually engineer Whale Safe Fixed Gear, prevents them from raising the argument that there is no "Whale Safe" technology for them to adopt.

"In *TVA v. Hill,* the Supreme Court stated that "some" may find it "curious" that an endangered three-inch fish, the snail darter, could stop a $100 million dam under the ESA, but that "the explicit provisions of the [ESA] require precisely that result." *Id*. at 172-73, 98 S. Ct. 2279. Similarly, here a 2.5 inch piping plover can stop a behemoth ORV if the government proves a taking under the ESA." *Id*. at 90.

Paradoxically, the question now before the Court is "Can a 100,000 pound endangered whale stop a single fisherman from putting a single lobster pot in the water? In 1996 in *Strahan v. Coxe* the answer to this question was no. If history has taught the Court anything, in 2006 the question will be answered in the affirmative.

## Requested Remedy

Strahan's sought after interlocutory injunctive relief from the Court is for it to directly coerce the Defendants by some specified future date into full compliance with the Section 9 prohibitions of the ESA in regards to their licensing and regulation of Fixed Gear ("Compliance Relief"). The Court can do this by judicious use of its full equitable powers.  However, the Plaintiff also seeks a lesser form of relief if the Court is unwilling to provide him Compliance Relief at this time. For example, Strahan seeks and would accept a simple finding by the Court that the Defendants remaining in continuing violation of the ESA's Section 9 prohibitions. This interlocutory declaratory relief could then be used by Strahan to persuade the Massachusetts Attorney General to take enforcement actions against the MDMF. Strahan could also then petition NOAA to deny the Defendants any further ESA Section 6 funding until they licensed only Whale Safe fishing gear.

Strahan is not asking the Court at this time to enjoin the MDMF Fixed Gear fisheries. Instead — as requested above — he is asking the Court for the kind of interlocutory injunctive relief that will incrementally coerce the Defendants into full compliance with the ESA's Section 9 take prohibitions in regards to their licensing and regulating the deployment of Fixed Gear in a

manner that does not result in the further entanglement of Federally Protected Whales in said

fishing gear.

　　　Whale Safe fishing as practiced is based on a methodology of management as well as the

use of appropriate technology to insure the deployed fishing gear does not entangle or otherwise

injure endangered marine wildlife.  There is ample precedent for the Court to use injunctive

relief to force the technological innovations necessary to achieve Whale Safe commercial marine

fisheries.  See *Boomer v. Atlantic Cement*, 26 N. Y. 2d 219, 257 N. E. 2d 870, 309 N. Y. S. 2d

312 (N. Y.  Court of Appeals 1970). In *Boomer* the court was asked to enjoin the operation of a

cement plant, which was polluting the air of the neighboring area with cement dust. The court

declined to issue the requested injunction — preferring to require compensatory damages in lieu

of the requested injunction. However, this choice was based on facts specific to that case. The

underlying reasoning of the *Boomer* court was expressed in a concurring opinion of one of its

justices —

> "   I would enjoin the defendant cement company from continuing the discharge
> of dust particles upon its neighbors' properties unless, within 18 months, the
> cement company abated this nuisance.   It is not my intention to cause the removal
> of the cement plant from the      Albany area, but to recognize the urgency of the
> problem stemming from this     stationary source of air pollution, and to allow
> the company a specified period of time to develop a means to alleviate this
> nuisance.
> 　　I am aware that the trial court found that the most modern dust control
> devices available have been installed in defendant's plant, but, I submit, this does
> not mean that better and more effective dust control devices could not be
> developed within the time allowed to abate the pollution. Moreover, I believe it is
> incumbent upon the defendant to develop such devices, since the cement
> company, at the time the plant commenced production (1962), was well aware of
> the plaintiffs' presence in the area, as well as the probable consequences of its
> contemplated operation. Yet, it still chose to build and operate the plant at this
> site.
> 　　In a day when there is a growing concern for clean air, highly developed
> industry should not expect acquiescence by the courts, but should, instead, plan its
> operations to eliminate contamination of our air and damage to its neighbors.
> Accordingly [I would] grant an injunction to take effect 18 months hence, unless
> the nuisance is abated by improved techniques prior to said date."

　　　The *Boomer* decision set a precedent that was commented on in *The Story of Boomer:*

*Pollution and the Common Law*, Daniel Farber 32 Ecology Law Quarterly. 113 at 125,

"The second case cited by the *Boomer* court involved massive pollution of a stream by a salt manufacturer. *Again, the relief was not a shutdown order. Instead, the court was careful to outline more flexible injunctive relief*: It does not follow from these views that, if upon another trial the facts are unchanged, the defendant and the other salt manufacturers will be compelled to make such terms as they can, for *a court of equity, with its plastic powers, can require, as a condition of withholding a permanent injunction*, [flexible remedy-conditioned relief] the construction of a reservoir on the upper sources of the stream, to accumulate water when it is plentiful for use in times of scarcity, and thus neutralize the diminution caused by the manufacture of salt. The court may also require, on the like condition, greater care in preventing the escape of salt water and salt substances into the stream, as the defendant attempted to do during the trial, and thus prevent or minimize the pollution."

**"In modern terms, what both of these decisions require is that the defendant uses the best available technology, not that the plant be shut down."**

See <u>Escobar</u> *v. Continental Baking Company*, 33 Mass. App. Ct. 104, 596 N. E. 2d 394 (Mass 1992); *McCormack v. Abbot Laboratories*, 617 F. Supp. 1521 (D. Mass. 1985); *Weinberger v. Romero-Barceló*, 456 U.S. 305, 102 S. Ct. 1798 (1982) at n. 7 and 12 (A case discussing injunctive relief under the ESA and citing *Boomer*):

"The objective of this statute [Clean Water Act] is in some respects similar to that sought in nuisance suits, where courts have fully exercised their equitable discretion and ingenuity in ordering remedies. "The discharge of 'pollutants' into water is unlawful without a permit issued by the Administrator of the EPA or, if a State has developed a program that complies with the FWPCA, by the State." *Train v. Colorado*." *Id.*

The *Boomer* court declined to issue the requested injunction for only one reason, it deemed the cost to the community of shutting down the cement plant — with the loss of jobs — to be inequitable. The Court does not have that issue before it. The ESA requires that the balance of the equities be found in favor of protecting the endangered Federally Protected Whales. The Court is compelled to instead follow the steps outlined in the *Boomer* dissenting opinion to use its equitable powers in granting injunctive relief to directly and successfully coerce the Defendants' licensing Fixed Gear into full compliance with the ESA's Section 9 prohibitions.

Strahan's offers the following options to the Court for granting his request for
interlocutory injunctive relief to stop the MDMF Fixed Gear from entangling any more Federally
Protected Whales —

1.      Issue a declaratory finding that the Defendants are currently in violation of the
section 9 take prohibitions for their licensing and regulation of Fixed Gear that entangles
Federally Protected Whales and degrades the designated listed critical habitat of the Northern
Right Whale in Massachusetts Bay

2      Order the Defendants to require that the Fix Gear that they license must be clearly
marked throughout its length to be readily identifiable as gear licensed by the MDMF.

If the Court just issued the relief requested in #1 and #2, this would act to coerce the
Defendants and the Massachusetts government into taking meaningful steps into making the
MDMF Fixed Gear Whale Safe.

3.      Enjoin the Defendants from licensing Gill Nets. This remedy will serve as a "shot
across the bow" and alert the Defendants that final injunctive relief against their Lobster Pot
fishery is likely unless they make it Whale Safe during the rest of these proceedings. Another
requested form partial injunctive relief that would serve the "shot across the bow" purpose is to
ban year round all MDMF Fixed Gear in Right Whale critical habitat in Cape Cod Bay. This
would protect Federally Protected Whales and inspire the Defendants to adopt total Whale Safe
fishing practices by the end of these proceedings.

4.      Order the Defendants to license only Whale Safe Fixed Gear by a date in the
future that the Court seems as reasonable ("Order").

5.      Along with #4, appoint a Master to act as a technical expert for the Court who
would evaluate the Defendants efforts — if any — to adopt and develop as necessary Whale Safe

regulatory standards for the Fixed Gear that they would license in the future after the date set by the Court for them to license only Whale Safe Fixed Gear and make recommendations to the Court on necessary steps that the Defendants need to make.

6.    If the Defendants fail to comply with the court's Order in #3 and if the Master reports to the Court by the said date that the Defendants are failing to make good faith efforts to comply with its said order, then the Court should find the Defendants in contempt of the said Order and assess it a fine of at least $2000 per day it remains in violation of said order.

The Court acting as requested in #3, #4, #5 and #6 would obviously be acting reasonably and effectively in coercing the Defendants into licensing only fishing gear that does not entangle Federally Protected Whales.

7.    After an extended period of time in violation of the Court's Order (e. g. a calendar year), and with the Master reporting to the Court that the Defendants are still not acting in good faith to comply with the Order, the Court should enter an order directly enjoining the Defendants from further licensing MDMF Fixed Gear fisheries until it can demonstrate that the fishing gear it intends to license from then on is Whale Safe, as reported to the Court by the Master.

Clearly the Defendants should be seen as willing to comply given the opportunity with the Court #3 requested Order to go Whale Safe in order to avoid the eventual shutdown of their Fixed gear fisheries by the Court for its willful refusal to comply with the Order. Even if the Court is forced to take step #6 and enjoin the Defendants' Fixed gear fisheries, the Defendants can still seek relief at any time from the Court's Order by applying to NOAA for a ESA Section 10 permit to allow it to deploy MDMF Fixed Gear — with whatever alteration from current design its chooses — that would allow their MDMF Fixed Gear to entangle on occasion Federally Protected Whales but only if these said entanglements will not be seen to result in

serious injury or the death of any endangered whale. They can also seek a hardship exemption that is provided by the provisions of the ESA.

The reality is that existing and emerging technology exists that can make Lobster Pot fishing Whale Safe. Professor Goudey from Massachusetts Institute of Technology testified to the Court at its evidentiary hearing testified to the Court of his success in designing and testing Whale Safe buoys for use on vertical buoy lines. He also testified that technology could be readily adopted to make Lobster Pot fishing Whale Safe. He also informed the Court that their was emerging technology that could result in commercially available rope for use in vertical buoy lines and ground lines that is designed so that no marine mammal can become entangled in it (i. e. restricted radius of curvature line). Goudey testified that the Defendants were offered this technology and rebuked it.

The Defendants have access to ample funds to finance a reasonable research and development program for engineering Whale Safe fishing gear. They simply have historically refused to do so. The NOAA supplies the MDMF over $500,000 a year in ESA Section 6 funding that is completely discretionary. Sales by Massachusetts Registry of Motor Vehicles of its Right Whale License Vanity Plate generate over a million dollars annually to the Defendant EOEA. Yet this defendant has refused to use the majority of funds for any program to directly benefit any Federally Protected Whale. The Court 's Order can now force them to fund the engineering of Whale Safe fishing gear. The Defendant EOEA has recently coerced about $50,000,000 in discretionary environmental mitigation fees out of two Liquid Natural Gas ("LNG") companies seeking to build deep seaports off Gloucester MA to deliver LNG from ships to local pipelines. They failed to appropriate one cent to the protection of Federally Protected Whales from MDMF Fixed Gear and are intending to use millions of dollars from this

windfall to increase the Lobster Pot fishery in Massachusetts state waters, which will kill more

Federally Protected Whales

The Defendants have the money to engineer Whale Safe fishing gear. The technology

exists to do so. What the Defendants don't have is a single good reason to do so. The Court

needs to give them one. If it fails to do so — if the Court declines to grant Strahan's Motion for a

Preliminary Injunction — then they will actually become embolden to continue to deploy the

same MDMF Fixed Gear as they always have done without a single fear that they face any

possible punishment in the future.

### Response to Defendants Two Oppositions and that of the Amicus

Time is an environmental resource that is not renewable. No one can get back an

endangered whale that is lost to MDMF Fixed Gear. This fact does not bother the Defendants.

The Defendants make no effort to claim that Federally Protected Whales are not entangled in

MDMF Fixed Gear. They even admit it. The Defendants oppositions consists most of a simple

senseless argument that they did nothing that the Court didn't make them do in 1996, and they

want the Court to continue allowing them to do nothing till they get it right.

In order to avoid being ordered to license only Whale Safe fishing gear, the Defendants

desperately offer up their requiring "sinking" ground line in Lobster gear. With this token

offering they expect the Court to ignore their admitted to entangling of Federally Protected

Whales in vertical buoy lines and Gill Nets. The Court must turn a deaf ear to this nonsense.

Otherwise, they bemoan the lost income to the commercial fisheries from the shut down of

the Fixed Gear fisheries. They want the Court to believe that thus is the only possibility to stop

Federally Protected Whales from being entangled and killed by the MDMF Fixed gear fisheries.

The Court must also reject this self-serving argument. If push comes to shove, the Court is

required to enjoin the further licensing of the MDMF Fixed Gear in order to uphold the ESA's

Section 9 taking prohibitions. The Court needs to call the bluff of the Defendants. Using its full

equitable powers it can coerce the Defendants to make their commercial marine fisheries Whale

Safe. The Defendants will "crack" well before the Court is required to use its full authority against them.

### Summary

For the above reasons, Strahan asks the Court to grant his interlocutory relief. The Court should find that the Defendants are in continuing violation of the ESA's Section 9 prohibitions in regards to MDMF Fixed Gear' continuing to entangle Federally Protected Whales and order them to tag MDMF gear with distinctive markings to identify it as gear licensed by them. The Court is asked to either of the following: 1) enjoin the Defendants from fully licensing Fixed Gear by banning either their licensure of Gill Nets entirely or their licensing the deployment of any Fixed Gear into NOAA designated critical habitat for the Right Whale in Cape Cod Bay year round, 2) Order the Defendants to license only Whale Safe fishing by a specified date in the near future and appoint a Master to assist the Court in monitoring their compliance with this order or 3) any other interlocutory injunctive relief that the Court finds appropriate.

BY:

_____

Richard Max Strahan, Plaintiff
236 West Portal Avenue, #195
San Francisco, CA
617.233.3854

*Pro Se and Proud!*

_____

### CERTIFICATION OF SERVICE

_____

I hereby certify that a copy of this opposition has been served VIA E-filing on the Defendants' attorney on 2 January 2006.

_____

Richard Max Strahan, Plaintiff

### Table of Cited Evidence in Support of Motion for a Preliminary Injunction

*Strahan attaches the following documents to this memo in support of his request for a preliminary injunction. He has provided the Court a CD-R disk with all these documents as PDF files. He has also electronically filed all the attached documents smaller than the 2 MB in size limit imposed by the Court.*

**Scientific Papers**

1.   "Morphometry, Gross Morphology, and Available Histopathology in Northern Right Whale (*Eubalaena glacialis*) Mortalities (1970-2002)," M. Moore *et al.* (2004).

2.   3 October 2002 Necropsy Report on Humpback Whale Stranded on Beach at race Point, Provincetown MA, Michael Moore, Scott Landry *et al.*

3.   "Northern Right Whales in Crisis," Scot Kraus, *et al.  Science* 22 July 2005.

4.   "Fishing Gear Involved in Entanglements of Right and Humpback Whales," Amanda Johnson *et al.  Marine Mammal Science* October 2005.

5.   "Impacts of Biodiversity Loss on Ocean Ecosystem Services," Boris Worm, et al. *Science* 6 November 2006.

**Reports by National Oceanographic and Atmospheric Agency ("NOAA")**

6.   Mortality and Serious Injury Determinations for Northwest Atlantic Ocean large Whale Stocks (1999-2003), Tim Cole et al. December 2005.

7.   Mortality and Serious Injury Determinations for Northwest Atlantic Ocean large Whale Stocks (2000-2004), Tim Cole et al. April 2006.

8.   Entanglement Data and Gear Investigation 1999 Report, Dana Hartley and John Kenney January, 2000.

9.   Large Whale Entanglement Reports 2000 (Update June 2001),

10.  Large Whale Entanglement Report 2001 (Updated February 2003), Dana Hartley *et al.* 2001

11.  Large Whale Entanglement Report 2003, Dana Hartley *et al.*

12.  Draft Atlantic Large Whale Entanglement and Ship Strike Report 2004 (Updated July 2006), John Kenney, *et al.*

13.  Identification of Seasonal Area Management Zones for Northern Right Whale Conservation, Richard Merrick, Richard Pace*, et al.* October 2001

14.   Defining Triggers for Temporary Area Closures to Protect Right Whales from Entanglements: Issues and Options, Richard Pace, *et al.* April 2001.

15.   1999 Stock Assessment Report for Humpback Whale in North Atlantic

16.   2005 Stock Assessment Report for Humpback Whale in North Atlantic

17.   1999 Stock Assessment Report for Northern Right Whale in North Atlantic

18.   2005 Stock Assessment Report for Northern Right Whale in North Atlantic

19.   1999 Stock Assessment Report for Fin Whale in North Atlantic

20.   2005 Stock Assessment Report for Fin Whale in North Atlantic

21.   Analysis of Scarring on Northern Right Whales (*Eubalaena glacialis*): Monitoring Rates of Entanglement Interactions: 1980 – 2002, Scott Kraus, et al.  February 2005.

22.   Monitoring Entanglements of Humpback Whales (*Megaptera novaeangliae*) in Gulf of Maine on the Basis of Caudal Peduncle Scarring, Jooke Robbins, et al. 2001

**NOAA Agency Actions**

23.   22 April 2006 Federal Register Notice "List of Fisheries for 2006."

24.   6 April 2006 Federal Register Notice Imposing DAM Restraints on Commercial Fishing off Cape Code MA.

25.   26 August 2003 Federal Register Notice Establishing Types of Fishing Gear Usable in DAMs

26.   15 November 2006 Federal Register Notice Imposing An Emergency Ban on Gill Net Fisheries off Southeast Coast to Protect Northern Right Whale.

27.   15 November 2006 Federal Register Notice Proposing to Permanently Ban Gill Net Fisheries off Southeast Coast to Protect Northern Right Whale.

28.   13 November 2006 Letter Notifying Commercial Fishermen of "Dam Zone South of Portland Maine," including information sheet attachment and attached map.

29.   13 November 2006 Letter Notifying Commercial Fishermen of "Dam Zone East of Portland Maine," with information sheet attachment and attached map.

## Massachusetts Department of Fish and Game Items

30.    2004 Massachusetts Lobster Fishery Statistics, M. J. Dean *et al.*  July, 2006

31.    Massachusetts Division of Marine Fisheries Right Whale Conservation Program: 2005 Projects and Accomplishments, Erin Burke, *et al.* 1 February 2006

32.    Code of Massachusetts Regulation for Marine Fisheries, 322 C. M. R. § 12.00

33.    Code of Massachusetts Regulation for Marine Fisheries, 322 C. M. R. § 4.00

34.    12 January 1994 Memorandum Agreement Between the Division of Marine Fisheries and the Division of Fish and Wildlife within the Massachusetts Department of Fisheries, Wildlife, and Environmental law Enforcement Regarding Jurisdictional Responsibilities, Listing Procedures, and designation of Significant Habitat for Endangered, Threatened, and Species Concern Species.

## Reports by Michael Moore, DVM.

35.    7 March 2006, "Final Case Report EgNEFL0603"

36.    Undated Report on 3 October 2002 Necropsy of Humpback Whale #CCSN 02-255

RESEARCH ARTICLE

# Impacts of Biodiversity Loss on Ocean Ecosystem Services

Boris Worm,[1]* Edward B. Barbier,[2] Nicola Beaumont,[3] J. Emmett Duffy,[4]
Carl Folke,[5,6] Benjamin S. Halpern,[7] Jeremy B. C. Jackson,[8,9] Heike K. Lotze,[1]
Fiorenza Micheli,[10] Stephen R. Palumbi,[10] Enric Sala,[8] Kimberley A. Selkoe,[7]
John J. Stachowicz,[11] Reg Watson[12]

Human-dominated marine ecosystems are experiencing accelerating loss of populations and species, with largely unknown consequences. We analyzed local experiments, long-term regional time series, and global fisheries data to test how biodiversity loss affects marine ecosystem services across temporal and spatial scales. Overall, rates of resource collapse increased and recovery potential, stability, and water quality decreased exponentially with declining diversity. Restoration of biodiversity, in contrast, increased productivity fourfold and decreased variability by 21%, on average. We conclude that marine biodiversity loss is increasingly impairing the ocean's capacity to provide food, maintain water quality, and recover from perturbations. Yet available data suggest that at this point, these trends are still reversible.

What is the role of biodiversity in maintaining the ecosystem services on which a growing human population depends? Recent surveys of the terrestrial literature suggest that local species richness may enhance ecosystem productivity and stability (1–3). However, the importance of biodiversity changes at the landscape level is less clear, and the lessons from local experiments and theory do not seem to easily extend to long-term, large-scale management decisions (3). These issues are particularly enigmatic for the world's oceans, which are geographically large and taxonomically complex, making the scaling up from local to global scales potentially more difficult (4). Marine ecosystems provide a wide variety of goods and services, including vital food resources for millions of people (5, 6). A large and increasing proportion of our population lives close to the coast; thus the loss of services such as flood control and waste detoxification can have disastrous consequences (7, 8). Changes in marine biodiversity are

directly caused by exploitation, pollution, and habitat destruction, or indirectly through climate change and related perturbations of ocean biogeochemistry (9–13). Although marine extinctions are only slowly uncovered at the global scale (9), regional ecosystems such as estuaries (10), coral reefs (11), and coastal (12) and oceanic fish communities (13) are rapidly losing populations, species, or entire functional groups. Although it is clear that particular

species provide critical services to society (6), the role of biodiversity per se remains untested at the ecosystem level (14). We analyzed the effects of changes in marine biodiversity on fundamental ecosystem services by combining available data from sources ranging from small-scale experiments to global fisheries.

**Experiments.** We first used meta-analysis of published data to examine the effects of variation in marine diversity (genetic or species richness) on primary and secondary productivity, resource use, nutrient cycling, and ecosystem stability in 32 controlled experiments. Such effects have been contentiously debated, particularly in the marine realm, where high diversity and connectivity may blur any deterministic effect of local biodiversity on ecosystem functioning (1). Yet when the available experimental data are combined (15), they reveal a strikingly general picture (Fig. 1). Increased diversity of both primary producers (Fig. 1A) and consumers (Fig. 1B) enhanced all examined ecosystem processes. Observed effect sizes corresponded to a 78 to 80% enhancement of primary and secondary production in diverse mixtures relative to monocultures and a 20 to 36% enhancement of resource use efficiency (Fig. 1, A and B).

Experiments that manipulated species diversity (Fig. 1B) or genetic diversity (Fig. 1C) both found that diversity enhanced ecosystem stability, here defined as the ability to withstand recurrent perturbations. This effect was linked

[1]Department of Biology, Dalhousie University, Halifax, NS, Canada B3H 4J1. [2]Department of Economics and Finance, University of Wyoming, Laramie, WY 82071, USA. [3]Plymouth Marine Laboratory, Plymouth PL1 3DH, UK. [4]Virginia Institute of Marine Sciences, Gloucester Point, VA 23062–1346, USA. [5]Department of Systems Ecology, Stockholm University, Stockholm, SE-106 91 Sweden. [6]Beijer International Institute of Ecological Economics, Royal Swedish Academy of Sciences, SE-104 05, Stockholm, Sweden. [7]National Center for Ecological Analysis and Synthesis, Santa Barbara, CA 93101, USA. [8]Center for Marine Biodiversity and Conservation, Scripps Institution of Oceanography, La Jolla, CA 92093–0202, USA. [9]Smithsonian Tropical Research Institute, Box 2072, Balboa, Republic of Panama. [10]Hopkins Marine Station, Stanford University, Pacific Grove, CA 93950, USA. [11]Section of Evolution and Ecology, University of California, Davis, CA 95616, USA. [12]Fisheries Centre, University of British Columbia, Vancouver, BC, Canada V6T 1Z4.

*To whom correspondence should be addressed. E-mail: bworm@dal.ca



**Fig. 1.** Marine biodiversity and ecosystem functioning in controlled experiments. Shown are response ratios [ln(high/low diversity)] ±95% confidence interval (CI)] of ecosystem processes to experimental manipulations of species diversity of (**A**) primary producers (plants and algae), and (**B**) consumers (herbivores and predators). Increased diversity enhanced all examined ecosystem functions ($0.05 > P > 0.0001$). The number of studies is given in parentheses. (**C**) Genetic diversity increased the recovery of seagrass ecosystems after overgrazing (solid circles) and climatic extremes (open circles). (**D**) Diet diversity enhanced reproductive capacity in zooplankton over both the average- and best-performing monocultures.

to either increased resistance to disturbance (16) or enhanced recovery afterward (17). A number of experiments on diet mixing further demonstrated the importance of diverse food sources for secondary production and the channeling of that energy to higher levels in the food web (Fig. 1D). Different diet items were required to optimize different life-history processes (growth, survival, and fecundity), leading to maximum total production in the mixed diet. In summary, experimental results indicate robust positive linkages between biodiversity, productivity, and stability across trophic levels in marine ecosystems. Identified mechanisms from the original studies include complementary resource use, positive interactions, and increased selection of highly performing species at high diversity.

**Coastal ecosystems.** To test whether experimental results scale up in both space and time, we compiled long-term trends in regional biodiversity and services from a detailed database of 12 coastal and estuarine ecosystems (10) and other sources (15). We examined trends in 30 to 80 (average, 48) economically and ecologically important species per ecosystem. Records over the past millennium revealed a rapid decline of native species diversity since the onset of industrialization (Fig. 2A). As predicted by experiments, systems with higher regional species richness appeared more stable, showing lower rates of collapse and extinction of commercially important fish and invertebrate taxa over time (Fig. 2B, linear regression, $P <$ 0.01). Overall, historical trends led to the present depletion (here defined as >50% decline over baseline abundance), collapse (>90% decline), or extinction (100% decline) of 91, 38, or 7% of species, on average (Fig. 2C). Only 14% recovered from collapse (Fig. 2C); these species were mostly protected birds and mammals.

These regional biodiversity losses impaired at least three critical ecosystem services (Fig. 2D): number of viable (noncollapsed) fisheries (−33%); provision of nursery habitats such as oyster reefs, seagrass beds, and wetlands (−69%); and filtering and detoxification services provided by suspension feeders, submerged vegetation, and wetlands (−63%). Loss of filtering services probably contributed to declining water quality (18) and the increasing occurrence of harmful algal blooms, fish kills, shellfish and beach closures, and oxygen depletion (Fig. 2E). Increasing coastal flooding events (Fig. 2E) are linked to sea level rise but were probably accelerated by historical losses of floodplains and erosion control provided by coastal wetlands, reefs, and submerged vegetation (7). An increased number of species invasions over time (Fig. 2E) also coincided with the loss of native biodiversity; again, this is consistent with experimental results (19). Invasions did not compensate for the loss of native biodiversity and services, because they comprised other species groups, mostly microbial, plankton, and small invertebrate taxa (10). Although causal relation-

ships are difficult to infer, these data suggest that substantial loss of biodiversity (Fig. 2, A and C) is closely associated with regional loss of ecosystem services (Fig. 2D) and increasing risks for coastal inhabitants (Fig. 2E). Experimentally derived predictions that more species-rich systems should be more stable in delivering services (Fig. 1) are also supported at the regional scale (Fig. 2B).

**Large marine ecosystems.** At the largest scales, we analyzed relationships between biodiversity and ecosystem services using the global catch database from the United Nations Food and Agriculture Organization (FAO) and other sources (15, 20). We extracted all data on fish and invertebrate catches from 1950 to 2003 within all 64 large marine ecosystems (LMEs) worldwide. LMEs are large (>150,000 km²) ocean regions reaching from estuaries and coastal areas to the seaward boundaries of continental shelves and

the outer margins of the major current systems (21). They are characterized by distinct bathymetry, hydrography, productivity, and food webs. Collectively, these areas produced 83% of global fisheries yields over the past 50 years. Fish diversity data for each LME were derived independently from a comprehensive fish taxonomic database (22).

Globally, the rate of fisheries collapses, defined here as catches dropping below 10% of the recorded maximum (23), has been accelerating over time, with 29% of currently fished species considered collapsed in 2003 (Fig. 3A, diamonds). This accelerating trend is best described by a power relation ($y = 0.0168x^{1.8992}$, $r = 0.96$, $P < 0.0001$), which predicts the percentage of currently collapsed taxa as a function of years elapsed since 1950. Cumulative collapses (including recovered species) amounted to 65% of recorded taxa (Fig. 3A, triangles; regression fit: $y = 0.0227x^{2.0035}$,



**Fig. 2.** Regional loss of species diversity and ecosystem services in coastal oceans. (**A**) Trends of collapse (circles, >90% decline) and extinction (triangles, 100% decline) of species over the past 1000 years. Means and standard errors are shown ($n = 12$ regions in Europe, North America, and Australia). (**B**) Percentage of collapsed (circles) and extinct (triangles) fisheries in relation to regional fish species richness. Significant linear regression lines are depicted ($P < 0.01$). (**C** to **E**) Relative losses or gains in (C) biodiversity, (D) ecosystem services, and (E) risks that are associated with the loss of services. The number of studies is given in parentheses; error bars indicate standard errors.

$r = 0.96$, $P < 0.0001$). The data further revealed that despite large increases in global fishing effort, cumulative yields across all species and LMEs had declined by 13% (or 10.6 million metric tons) since passing a maximum in 1994.

Consistent with the results from estuaries and coastal seas (Fig. 2B), we observed that these collapses of LME fisheries occurred at a higher rate in species-poor ecosystems, as compared with species-rich ones (Fig. 3A). Fish diversity



**Fig. 3.** Global loss of species from LMEs. (**A**) Trajectories of collapsed fish and invertebrate taxa over the past 50 years (diamonds, collapses by year; triangles, cumulative collapses). Data are shown for all (black), species-poor (<500 species, blue), and species-rich (>500 species, red) LMEs. Regression lines are best-fit power models corrected for temporal autocorrelation. (**B**) Map of all 64 LMEs, color-coded according to their total fish species richness. (**C**) Proportion of collapsed fish and invertebrate taxa, (**D**) average productivity of noncollapsed taxa (in percent of maximum catch), and (**E**) average recovery of catches (in percent of maximum catch) 15 years after a collapse in relation to LME total fish species richness. (**F**) Number of fished taxa as a function of total species richness. (**G**) Coefficient of variation in total catch and (**H**) total catch per year as a function of the number of fished taxa per LME.

varied widely across LMEs, ranging from ~20 to 4000 species (Fig. 3B), and influenced fishery-related services in several ways. First, the proportion of collapsed fisheries decayed exponentially with increasing species richness (Fig. 3C). Furthermore, the average catches of non-collapsed fisheries were higher in species-rich systems (Fig. 3D). Diversity also seemed to increase robustness to overexploitation. Rates of recovery, here defined as any post-collapse increase above the 10% threshold, were positively correlated with fish diversity (Fig. 3E). This positive relationship between diversity and recovery became stronger with time since a collapse (5 years, $r = 0.10$; 10 years, $r = 0.39$; 15 years, $r = 0.48$). Higher taxonomic units (genus and family) produced very similar relationships as species richness in Fig. 3; typically, relationships became stronger with increased taxonomic aggregation. This may suggest that taxonomically related species play complementary functional roles in supporting fisheries productivity and recovery.

A mechanism that may explain enhanced recovery at high diversity is that fishers can switch more readily among target species, potentially providing overfished taxa with a chance to recover. Indeed, the number of fished taxa was a log-linear function of species richness (Fig. 3F). Fished taxa richness was negatively related to the variation in catch from year to year (Fig. 3G) and positively correlated with the total production of catch per year (Fig. 3H). This increased stability and productivity are likely due to the portfolio effect (24, 25), whereby a more diverse array of species provides a larger number of ecological functions and economic opportunities, leading to a more stable trajectory and better performance over time. This portfolio effect has independently been confirmed by economic studies of multispecies harvesting relationships in marine ecosystems (26, 27). Linear (or log-linear) relationships indicate steady increases in services up to the highest levels of biodiversity. This means that proportional species losses are predicted to have similar effects at low and high levels of native biodiversity.

**Marine reserves and fishery closures.** A pressing question for management is whether the loss of services can be reversed, once it has occurred. To address this question, we analyzed available data from 44 fully protected marine reserves and four large-scale fisheries closures (15). Reserves and closures have been used to reverse the decline of marine biodiversity on local and regional scales (28, 29). As such, they can be viewed as replicated large-scale experiments. We used meta-analytic techniques (15) to test for consistent trends in biodiversity and services across all studies (Fig. 4).

We found that reserves and fisheries closures showed increased species diversity of target and nontarget species, averaging a 23% increase in species richness (Fig. 4A). These increases in biodiversity were associated with large increases in fisheries productivity, as seen in the

fourfold average increase in catch per unit of effort in fished areas around the reserves (Fig. 4B). The difference in total catches was less pronounced (Fig. 4B), probably because of restrictions on fishing effort around many reserves. Resistance and recovery after natural disturbances from storms and thermal stress tended to increase in reserves, though not significantly in most cases (Fig. 4C). Community variability, as measured by the coefficient of variation in aggregate fish biomass, was reduced by 21% on average (Fig. 4C). Finally, tourism revenue measured as the relative increase in dive trips within 138 Caribbean protected areas strongly increased after they were established (Fig. 4D). For several variables, statistical significance depended on how studies were weighted (Fig. 4, solid versus open circles). This is probably the result of large variation in sample sizes among studies (15). Despite the inherent variability, these results suggest that at this point it is still possible to recover lost biodiversity, at least on local to regional scales; and that such recovery is generally accompanied by increased productivity and decreased variability, which translates into extractive (fish catches around reserves) and nonextractive (tourism within reserves) revenue.

**Conclusions.** Positive relationships between diversity and ecosystem functions and services were found using experimental (Fig. 1) and correlative approaches along trajectories of diversity loss (Figs. 2 and 3) and recovery (Fig. 4). Our data highlight the societal consequences of an ongoing erosion of diversity that appears to be accelerating on a global scale (Fig. 3A). This trend is of serious concern because it projects the global collapse of all taxa currently fished by the mid–21st century (based on the extrapolation of regression in Fig. 3A to 100% in the year 2048).

Our findings further suggest that the elimination of locally adapted populations and species not only impairs the ability of marine ecosystems to feed a growing human population but also sabotages their stability and recovery potential in a rapidly changing marine environment.

We recognize limitations in each of our data sources, particularly the inherent problem of inferring causality from correlation in the larger-scale studies. The strength of these results rests on the consistent agreement of theory, experiments, and observations across widely different scales and ecosystems. Our analysis may provide a wider context for the interpretation of local biodiversity experiments that produced diverging and controversial outcomes (1, 3, 24). It suggests that very general patterns emerge on progressively larger scales. High-diversity systems consistently provided more services with less variability, which has economic and policy implications. First, there is no dichotomy between biodiversity conservation and long-term economic development; they must be viewed as interdependent societal goals. Second, there was no evidence for redundancy at high levels of diversity; the improvement of services was continuous on a log-linear scale (Fig. 3). Third, the buffering impact of species diversity on the resistance and recovery of ecosystem services generates insurance value that must be incorporated into future economic valuations and management decisions. By restoring marine biodiversity through sustainable fisheries management, pollution control, maintenance of essential habitats, and the creation of marine reserves, we can invest in the productivity and reliability of the goods and services that the ocean provides to humanity. Our analyses suggest that business as usual would foreshadow serious threats to global food securi-

ty, coastal water quality, and ecosystem stability, affecting current and future generations.

### References and Notes

1. M. Loreau et al., Science 294, 804 (2001).
2. M. Palmer et al., Science 304, 1251 (2004).
3. D. U. Hooper et al., Ecol. Monogr. 75, 3 (2005).
4. I. E. Hendriks, C. M. Duarte, C. H. R. Heip, Science 312, 1715 (2006).
5. C. H. Peterson, J. Lubchenco, in Nature's Services: Societal Dependence on Natural Ecosystems, G. C. Daily, Ed. (Island Press, Washington, DC, 1997), pp. 177–194.
6. C. M. Holmlund, M. Hammer, Ecol. Econ. 29, 253 (1999).
7. F. Danielsen et al., Science 310, 643 (2005).
8. W. N. Adger, T. P. Hughes, C. Folke, S. R. Carpenter, J. Rockstrom, Science 309, 1036 (2005).
9. N. K. Dulvy, Y. Sadovy, J. D. Reynolds, Fish Fish. 4, 25 (2003).
10. H. K. Lotze et al., Science 312, 1806 (2006).
11. J. M. Pandolfi et al., Science 301, 955 (2003).
12. J. B. C. Jackson et al., Science 293, 629 (2001).
13. B. Worm, M. Sandow, A. Oschlies, H. K. Lotze, R. A. Myers, Science 309, 1365 (2005).
14. D. Raffaelli, Science 306, 1141 (2004).
15. Details on methods and data sources are available as supporting material on Science Online.
16. A. R. Hughes, J. J. Stachowicz, Proc. Natl. Acad. Sci. U.S.A. 101, 8998 (2004).
17. T. B. H. Reusch, A. Ehlers, A. Hämmerli, B. Worm, Proc. Natl. Acad. Sci. U.S.A. 102, 2826 (2005).
18. R. Dame et al., Aquat. Ecol. 36, 51 (2002).
19. J. J. Stachowicz, R. B. Whitlatch, R. W. Osman, Science 286, 1577 (1999).
20. R. Watson, A. Kitchingman, A. Gelchu, D. Pauly, Fish Fish. 5, 168 (2004).
21. K. Sherman, A. Duda, Mar. Ecol. Prog. Ser. 190, 271 (1999).
22. R. Froese, D. Pauly, Eds., FishBase (www.fishbase.org, version 12/2004).
23. R. Froese, K. Kesner-Reyes, Impact of Fishing on the Abundance of Marine Species [ICES Council Meeting Report CM 12/L:12, International Council for the Exploration of the Sea (ICES), Copenhagen, Denmark, 2002].
24. D. Tilman, Ecology 80, 1455 (1999).
25. D. Tilman, P. B. Reich, J. M. H. Knops, Nature 441, 629 (2006).
26. H. Wacker, Res. Energy Econ. 21, 89 (1999).
27. D. Finnoff, J. Tschirhart, J. Environ. Econ. Manage. 45, 589 (2003).
28. C. M. Roberts, J. P. Hawkins, Fully-Protected Marine Reserves: A Guide (World Wildlife Fund, Washington, DC, 2000), pp. 241–246.
29. S. R. Palumbi, in Marine Community Ecology, M. D. Bertness, S. D. Gaines, M. E. Hay, Eds. (Sinauer, Sunderland, MA, 2001), pp. 510–530.
30. This work was conducted as part of the Linking Marine Biodiversity and Ecosystem Services Working Group, supported by the National Center for Ecological Analysis and Synthesis funded by NSF, the University of California, and the Santa Barbara campus. The project was stimulated by N. Loder after discussion at the conference Marine Biodiversity: The Known, Unknown, and Unknowable, funded by the Sloan Foundation. The authors thank D. Pauly and the Sea Around Us Project (http://seaaroundus.org), supported by the the Pew Charitable Trusts, for access to global catch data; W. Blanchard and M. Sandow for technical support; E. Green for dive trip data; and N. Baron, P. Kareiva, R. A. Myers, U. Sommer, and D. Tittensor for helpful comments.

**Supporting Online Material**
www.sciencemag.org/cgi/content/full/314/5800/787/DC1
Methods and Data Sources
Tables S1 to S5
References

10 July 2006; accepted 3 October 2006
10.1126/science.1132294



**Fig. 4.** Recovery of diversity and ecosystem services in marine protected areas and fisheries closures. Shown are the response ratios (inside versus outside the reserve or before and after protection ±95% CI) of (**A**) species diversity and (**B** to **D**) ecosystem services that correspond to fisheries productivity, ecosystem stability, and tourism revenue, respectively. Positive values identify increases in the reserve relative to the control; error bars not intersecting zero indicate statistical significance (P < 0.05). Solid circles represent unweighted averages; open circles are weighted by sample size (see supporting online methods for details). The number of studies is shown in parentheses. CPUE, catch per unit of effort.

# Massachusetts Division of Marine Fisheries Right Whale Conservation Program
## 2005 Projects and Accomplishments

**Submitted to:**

**National Marine Fisheries Service**
**National Fish and Wildlife Foundation**
**Massachusetts Environmental Trust**



Photo by Erin Burke

**February 1, 2006**

**by**
**Erin Burke, Protected Species Specialist**
**Daniel McKiernan, Deputy Director**
**Division of Marine Fisheries**
**251 Causeway St., Suite 400**
**Boston, MA 02114**

**Mitt Romney,** *Governor*
**Kerry Healy,** *Lieutenant Governor*
**Ellen Roy Herzfelder,** *Secretary of Executive Office of Environmental Affairs*
**David Peters,** *Commissioner of Department of Fish and Game*
**Paul Diodati,** *Director of Division of Marine Fisheries*

## EXECUTIVE SUMMARY

The Massachusetts Division of Marine Fisheries (*MarineFisheries*) has executed their Right Whale Conservation Program for the eighth consecutive year. The purpose of the program is to protect right whales in Massachusetts state waters through research, management, and outreach efforts. In 2005, the program received funding from a number of sources including the National Fish and Wildlife Foundation, the National Marine Fisheries Service, and the Massachusetts Environmental Trust. Through these grants, we conducted a range of cooperative projects related to right whale conservation including aerial surveillance, habitat monitoring, acoustic monitoring, and fixed fishing gear research.

During spring and winter 2005, *MarineFisheries* and the Provincetown Center for Coastal Studies completed the eighth season of the Right Whale Surveillance and Habitat Monitoring program in Cape Cod Bay. Information collected throughout this program reveals seasonal trends in population demographics, habitat usage, and distribution and abundance patterns. *MarineFisheries* also continued to collaborate with Dr. Chris Clark from Cornell University to establish an acoustic monitoring system for right whales in Cape Cod Bay. These listening stations will permit managers to more efficiently monitor right whales and address potential threats by looking at their movement patterns in real-time and over a broader time scale. Another important project, conducted jointly with the Atlantic Offshore Lobstermen's Association, focuses on the development of durable non-buoyant groundline (lines connecting traps). After completing the machine-testing portion of this study and determining which lines performed best, the offshore lobster industry was supplied with samples of those lines for field-testing. In addition, *MarineFisheries* and AOLA are collaborating with a rope engineering company to evaluate the mechanics underlying rope failure. The Commonwealth also continues to establish pro-active, yet practical, regulations for fixed-gear fisheries in state waters to reduce the risk of entanglement of large whales. Effective on January 1, 2007, it shall be unlawful for any person to fish, store, or abandon any fixed gear in waters under jurisdiction of the Commonwealth with positively buoyant groundline.

All of the research, management, and education actions accomplished by the Commonwealth of Massachusetts are aimed at developing practical solutions to reduce human-caused mortality and injury of right whales. With the ultimate goal of co-existence between endangered marine mammals and maritime industries. In 2006, *MarineFisheries* will continue its efforts to conserve right whales in state waters, particularly through the development of an acoustic monitoring system and the development of a durable non-buoyant groundline for use in the lobster fishery. We are grateful to our funding sources for their support of our endeavors.

**INTRODUCTION**

This report summarizes the Massachusetts Division of Marine Fisheries (*MarineFisheries*) 2005 North Atlantic Right Whale Conservation Program and its support of the federal Atlantic Large Whale Take Reduction Plan. The Right Whale Conservation Program (RWCP) has continued to broaden the scope of its efforts since 1996, when the Commonwealth of Massachusetts developed a plan to address the threats to North Atlantic right whales in state waters. The Commonwealth now has a comprehensive and cooperative program, supported by several funding sources, that is integrated with other jurisdictions and programs that have similar goals of protecting right whales. Thus, rather than providing separate reports to each funding agency on the various efforts that they supported, a comprehensive report is provided to encompass program efforts and accomplishments.

**FUNDING SOURCES**

Due to the scope of the program, funding for the 2005 calendar year was obtained from a variety of sources. These include the National Fish and Wildlife Foundation, National Marine Fisheries Service, and the Massachusetts Environmental Trust.

National Fish and Wildlife Foundation (NFWF)
The NFWF provided $151,776 to support the Commonwealth's Right Whale Conservation Program (# 2003-0170-031). This included support for a collaborative effort with Cornell University's Bioacoustics Research Program (BRP), the International Fund for Animal Welfare (IFAW) and the Woods Hole Oceanographic Institute (WHOI) to provide additional real-time, passive, acoustic monitoring of right whales in CCB; the profiling of fixed-fishing gear; funding for a Protected Species Specialist to oversee the program; and outreach. Some of the NFWF-funded projects discussed in this report are multi-year investigations covering different grant cycles. Thus these projects will be identified by their grant number.

National Marine Fisheries Service (NMFS)
NMFS supported three separate projects in 2005 -- $421,854 to fund the Right Whale Surveillance and Monitoring Program in Cape Cod Bay (CCB) and $24,975 to support *MarineFisheries* response to off-season aggregations of right whales in Massachusetts and Cape Cod Bays. Most of the funding from these two projects was awarded under contract to the Provincetown Center for Coastal Studies (PCCS). In addition, NMFS awarded $24,950 to a joint *MarineFisheries* and the Atlantic Offshore Lobstermen's Association study of the mechanics underlying the degradation of sinking groundline.

Massachusetts Environmental Trust (MET)
The Massachusetts Environmental Trust awarded $38,000 to *MarineFisheries* to tag basking sharks as surrogates to right whales in the hope of learning more about the right whales distribution patterns. The funding from MET was awarded in 2004, but the project was still on-going in 2005. This report will provide a synopsis of the work accomplished through the end of 2005 for this project.

## Projects and Accomplishments of the Right Whale Conservation Program

During the period January 1 – December 31, 2005 *MarineFisheries* completed the following activities in implementation of the Right Whale Conservation Program:

# 1) RIGHT WHALE SURVEILLANCE AND HABITAT MONITORING

For the eighth consecutive year, *MarineFisheries* conducted a surveillance and habitat monitoring program for North Atlantic Right Whales in Cape Cod Bay and adjacent waters from January 1 - May 15. This program was executed through a contract with the Provincetown Center for Coastal Studies (PCCS) and involves aerial and vessel-based surveillance, as well as habitat monitoring of right whale food resources. All right whale sightings were communicated to the NMFS Sightings Advisory System and the University of Rhode Island, home of the right whale distribution database. Photo documentation of right whales was sent to the New England Aquarium (NEAq), curators of the right whale photo-identification catalog. For the fourth year, near real-time habitat reports were combined with whale distribution data to forecast likelihood of right whale presence and residency in CCB. All aspects of the surveillance and monitoring program aid in the effective management of this highly endangered species. See report by Jaquet *et al* 2005 for complete details.

### Aerial Surveillance in Cape Cod Bay

The program effectively monitored for the presence of right whales in Cape Cod Bay and adjacent state waters during winter and spring months. Right whale photo-documentation obtained from aerial surveys was used to reveal seasonal trends in population demographics, habitat usage, and distribution and abundance patterns.

During the 2005 season, PCCS observers completed 39 aerial surveys, totaling 175 hours of flight time over Cape Cod Bay and adjacent waters. Right whales were observed in Cape Cod Bay for 86 days, from January 30 through April 26. This period of occupation is slightly shorter than in 2004 (n=90 days), although in 2004 zooplankton counts were substantially higher than in 2005 (by a factor of two). In 2005, 45 individual right whales visited CCB and their average individual residency time was 13 days. Both these estimates are lower than the average for previous field seasons. Based on data from 1998-2004, the average number of right whales present was 60 individuals and the average individual residency time was 21 days. The shorter residency time in 2005 was likely related to the low zooplankton density throughout the season. 10 mother and calf pairs were sighted in CCB and adjacent waters during the 2005 season. The residency time of mother and calf pairs was substantially longer than that of single males. This result was consistent with that of previous years (1998-2004) suggesting that CCB is an important nursery area and that the habitat is more intensively used by females than by males (Jaquet *et al*. 2005).



**Figure 1.**  Aerial photo of right whale feeding (PCCS).

Right whale abundance patterns were similar to previous years.   The number of right whales increased slowly from late January to late March, peaked from late March through late April, and dropped off to zero at the end of April, characterized by an abrupt "en masse" departure of right whales from Cape Cod Bay.  The acoustic buoy listening system in Cape Cod Bay confirmed this departure through call detections.  Breaks in the sighting history of individually identified whales over the course of the season suggest that some animals periodically leave the bay for short periods, perhaps traveling to adjacent areas beyond detection by this aerial survey. Almost half of the individuals that were seen within CCB have been observed there during only 1 year of the project (1998-2005), suggesting that for many individuals there is little site fidelity for CCB (Jaquet *et al*. 2005).



**Figure 2**.  Total number of individual right whales identified within CCB each year (PCCS data).

The pattern of slow increase, peak in numbers and "en masse" departure at the end of April is consistent with that observed in all previous years of the study.  Although this pattern roughly mimics the rise and subsequent fall of zooplankton density, the latter cannot fully explain whale movements (Jaquet *et al*. 2005).  Right whales usually leave Cape Cod Bay before zooplankton densities fall below feeding threshold levels (~3,750 org/m$^3$) (Mayo et al. 2004).  Similarly, in

2005, the decline in zooplankton density happened slightly after the departure of whales. This suggests that the decline in copepod concentration in CCB is not the only factor which triggers the departure of whales and it is possible that, in late April and early May, the presence of higher food resources in adjacent habitats (likely Great South Channel) makes it more optimal for right whales to leave CCB despite sufficient forage still available in the Bay (Jaquet *et al.* 2005).



**Figure 3.** Number of individual right whales identified within CCB in 2005 per 100 nautical miles of aerial survey effort (PCCS data).

The results of the 2005 surveillance continue to reveal that Cape Cod Bay is an important habitat for right whales during winter and early spring, and that this habitat is especially important for single females and mother/calf pairs.

## Habitat Monitoring in Cape Cod Bay

In addition to aerial surveys, *MarineFisheries* contracts PCCS to conduct habitat monitoring of Cape Cod Bay from January through mid May, during the time right whales typically frequent the Bay. This monitoring explores the association between the spatial-temporal distribution of right whales and zooplankton, their main prey species. It also examines the biotic and abiotic habitat variables that affect zooplankton density, useful for developing a predictive model of right whale movements based on prey resources. A crucial product of the habitat monitoring program are the cruise assessments, which provide near real-time reports about zooplankton and right whale distribution. All of this provides management agencies with a better understanding of whale location and potential overlap with human activities such as fishing and shipping. The CCS Habitat Monitoring report, as well as the near real-time cruise reports are published in Jaquet *et al.* 2005.



**Figure 4.** PCCS researchers emptying plankton net (PCCS).

In 2005, PCCS conducted physical and biological oceanographic sampling of the Bay during 22 cruises, between Jan 5 and May 14, 2005, totaling over 170 hours at sea.  Sampling took place aboard the *R/V Shearwater*.  The vessel is equipped with oceanographic and biological sampling equipment including a CTD (conductivity, temperature, and depth) profiler, plankton nets, a vertical plankton pump, and beginning in 2005, an Optical Plankton Counter contributed by *MarineFisheries*.  Zooplankton samples were collected at eight fixed stations in Cape Cod Bay, as well as in the vicinity of whales, using both horizontal and oblique tows taken with a standard 333-micrometer mesh conical net, 30 or 60 cm in diameter.  Vertical samples were obtained from a pump sampler deployed in the CTD frame.  A total of 434 zooplankton samples were collected from surface tows, oblique tows, and vertical pump casts (Jaquet *et al.* 2005).

Consistent with previous years, low initial zooplankton densities increased slowly during the months of February and March to reach highest values in April, then dropped off quickly and remained low through the end of sampling on May 14.  However, results from all zooplankton sampling methods showed 2005 as a year of substantially lower zooplankton densities than many prior years.  In addition, no individual station or quadrant showed mean seasonal densities that were measurably higher or lower than the bay-wide average.  This relatively uniform distribution of zooplankton in the bay is not a typical annual occurrence (Jaquet *et al.* 2005).  Generally, areas of higher zooplankton density are associated with a higher rate of right whale sightings.  During the 2005 season, while the average zooplankton density was rather uniform throughout the bay, whale distribution was discretely clumped in the eastern and southern portion of the bay.  The long-held view that the zooplankton resource in the eastern two-thirds of the bay is a controlling factor of whale presence is supported by these comparisons.  However, the data from 2005 also show that the zooplankton sampling methods do not fully capture the controlling influence of the food resource, failing to fully represent the apparent importance of deep layers (1-3 meters above the substrate) of plankton on the aggregation of whales (Jaquet *et al.* 2005).



**Figure 5**.  Daily mean surface layer zooplankton densities in Cape Cod Bay 2000-2005 (CCS data). (Julian Day 0 represents the first day of the year).

The 2005 season was an important trial period for the Optical Plankton Counter (OPC).  PCCS and *MarineFisheries* staff hoped to integrate the device into the existing zooplankton sampling and assessment methods.  The OPC sampling method, in conjunction with other oceanographic sensors, will yield greater sampling resolution, in a more readily accessible and interpretable format for managers.  However, many unforeseen difficulties arose during the trial season. Problems with software, equipment configuration, and data stream communication greatly limited the ability of researchers to fully utilize the OPC as a sampling tool.   Despite the setbacks, the OPC was deployed on-station during every habitat cruise after March 18 and results showed the potential of these instruments to detect temporal and spatial trends on a fine scale.

## Acoustic Detection and Monitoring of Right Whales in Cape Cod Bay  (#2003-0170-031)

*MarineFisheries* has collaborated with Dr.Chris Clark of Cornell University's Bio-acoustic Research Program (BRP) since 2003 to monitor right whales in Cape Cod Bay using passive acoustic detection.  In Cape Cod Bay, a strong correlation has been shown between right whale sightings from aerial surveillance and acoustic detections by archival pop-up buoys.



**Figure 6.**  Location of real-time listening buoys in Cape Cod Bay.

In 2004 and 2005, *MarineFisheries* assisted Dr. Clark in developing and deploying a real-time acoustic listening system in Cape Cod Bay. Scientists at Cornell, Woods Hole Oceanographic Institution and International Fund for Animal Welfare developed and built moored buoys installed with electronics and software that continuously analyze sounds from an attached hydrophone. These devices will improve the ability of the Right Whale Conservation Program to detect the presence of right whales -- year-round, in real-time, and independent of weather conditions that impede aerial sighting success. The buoys will assist in reducing ship strikes by providing acoustic coverage of the high-use areas in Cape Cod Bay canal, especially at the west end near the Canal and the approaches to Provincetown. In addition, the buoys may help improve efficiency of the Right Whale Conservation Program. If right whales are not heard in CCB, then *MarineFisheries* and PCCS may opt to fly in the Bay or divert flights to other known or suspected right whale habitats, thus increasing coverage and photo-ID opportunities.

Another key component of this project is the development of a public-access website. This website will alert maritime industry users, scientists, and managers to the presence and spatial-temporal distribution of right whales in Cape Cod Bay, based on vocalizations detected by the buoys. Real-time knowledge of right whale locations will aid in the reduction of ship strikes.



**Figure 7.** Real-time passive acoustic listening buoy off Provincetown.

On October 29, 2004, three real-time, auto-detection buoys were deployed in Cape Cod Bay and one to the east of the Truro highlands. NFWF provided *MarineFisheries* funding to support two of the CCB real-time buoys. The other buoys are funded by NMFS Right Whale Grant Program. Woods Hole Oceanographic Institute researchers carried out maintenance on the CCB units. Unfortunately, the real-time buoys failed in January due to extreme weather conditions; freezing temperatures, ice build-up, and strong winds. On April 1, the three buoys in CCB were replaced and continued to operate until May 31, 2005 when irregular transmissions started to occur due to exhausted batteries and operational hardware. During the month of April, the buoys detected right whale calls inside Cape Cod Bay, until around April 15, after which the frequency of calls dropped off, limited only to calls detected off Truro, on the backside of the Cape.



**Figure 8.** Location and date of detected contact calls during April 2005 (Cornell University data).

In response to the operational problems encountered during deployment in late winter/spring 2005, the hardware and battery systems of all four buoys were serviced and upgraded by Cornell's Bio-Acoustics Lab in fall/early winter 2005. These modifications are designed to improve operation and longevity of the acoustic recording systems.



**Figure 9.** Massachusetts Environmental Police, *MarineFisheries*, and Chris Clark servicing buoy (July 2005).

Dr. Clark and Cornell University continue to work on their interactive website as a means to provide daily reports, and hope to have the website fully operational in mid-January 2006. To date, the Bio-Acoustics Lab has implemented most of the software that allows public users to access and interact with the vocalizations database via the internet. After the buoys are operational, adjustments will be made to this software throughout spring 2006 as feedback is received from users. *MarineFisheries* has requested and been awarded funds by NFWF in 2006 to continue to support the development of a real-time listening system and the interactive website.

## Locating potential right whale habitat by tagging basking sharks

In 2004, *MarineFisheries* tested an innovative method for identifying potential right whale habitat. *MarineFisheries* biologist Greg Skomal, in collaboration with researchers at the University of New England, received funding from the Massachusetts Environmental Trust to tag basking sharks. Basking sharks and right whales both feed on zooplankton, and are often foraging in the same areas during summer/fall. This study hopes to answer questions about the enigmatic distribution of right whales during late fall and winter months when most whales are unaccounted for by gathering telemetry information about large-scale basking shark movement patterns. In addition, valuable information is gathered about basking sharks life history and distribution.

PAT tags (pop-up archival transmitting tags) were used to collect temperature, depth, and light level data at specific time intervals. After a predetermined length of time, the tags detach from the animal, float to the surface, and transmit recorded data to an Argos satellite, which relays them to the researcher. The tag not only provides the location of the animal at the time of the pop-up, but also enables the re-creation of the shark's movements based on physical data including temperature, depth, and light level. In September 2004, two basking sharks were tagged approximately 40 miles east of Nantucket. The tags detached on schedule in January 2005 and began transmitting data. One shark traveled to Jacksonville, Florida, where it spent most of its time near the surface. It is interesting to note that the area off Jacksonville, Florida is Right Whale Critical Habitat. The other shark traveled to an area between Jamaica and Haiti where it spent most of its time at depths in excess of 1,600 feet. Both sharks, despite their different locations, preferred to stay in waters of 55-66 °F.

In 2005, 17 other PAT tags were deployed. Some of these tags have yet to transmit, despite passing their pre-determined detachment period. *MarineFisheries* and University of New England are investigating issues related to the potential failure of these tags. However, 12 other tags are scheduled to detach over the months of January, February, April, and June of 2006. *MarineFisheries* and University of New England researchers are hopeful that these devices will reveal exciting information about basking sharks providing potential clues about right whale habitat.

## Monitoring off-season aggregations of right whales in Massachusetts state waters

In the summer of 2005, *MarineFisheries* received a small grant from NMFS to monitor off-season aggregations of right whales in Massachusetts state and adjacent waters. Right whales typically inhabit state waters during late winter and early spring. However, it is not uncommon for right whales to occasionally reside in the Stellwagen Bank area, as well as Massachusetts Bay and Cape Cod Bay in the summer months. Because this is an active boating and fishing season, risk to right whales from vessel strike and entanglement in fishing gear is elevated. Managing around right whales requires knowledge of their distribution and forecast of their likely residency. Federal and state managers need to improve their real-time knowledge of right whale aggregations and the local risks associated with their discrete locations.

Due to the 500 yard rule, most whale watch companies are able to report the presence of right

whales, but unable to photograph them sufficiently for management purposes. Under this grant, *MarineFisheries* biologists will respond to off-season aggregations of right whales in Massachusetts and adjacent federal waters during the summer/fall months when maritime activity is high in local waters and risk of human interactions proportionally greater. Project personnel will attempt to coordinate sightings information from whale watch companies and other researchers to determine right whale counts and locations of sightings. *MarineFisheries* will dispatch teams when available to survey areas where right whales were reported. If aggregations of feeding right whales are found, plankton sampling may be conducted to determine if whales are likely to remain in the area due to high densities of preferred prey. On-scene monitoring of aggregations will be requested of appropriate agencies. *MarineFisheries* will consult and coordinate all responses with NOAA Fisheries to determine the appropriateness of any responses to a particular event.

In July of 2005, whale watch vessels reported seeing a number of right whales in the Stellwagen Bank and Massachusetts Bay areas. Based on these repeated sightings, NMFS established a Dynamic Area Management zone (DAM) in this area. While the DAM is in place, lobster trap/pot and anchored sink gillnet gear fishermen must comply with gear restrictions designed to reduce the risk of fishery interaction with right whales. *MarineFisheries* and PCCS responded to this off-season aggregation by photographing one of the mother/calf pairs in the area and conducting zooplankton tows near where the whales were feeding to gauge the extent of the forage resource and the potential residency time. Our plankton tows revealed dense patches of copepods about 10 meters below the surface. The mother, identified by PCCS staff as Slash, and her calf were spotted repeatedly by local whale watch vessels.



**Figure 9.** Copepod sample collected on July 29, 2005 in vicinity of Slash and calf.

## 2) ANALYZING ROPE FAILURE IN NON-BUOYANT GROUNDLINE

Lobstermen traditionally use floating groundline to connect their traps on the ocean floor. Line that floats off the bottom reduces hang-downs, line-fouling, and rope degradation caused by contact with the seafloor. However, line that floats off the bottom also creates more obstacles in the water column for large whales, increasing the risk of entanglement. For this reason, many scientists and management agencies have advocated the use of non-buoyant groundline to reduce the profile in the water column and thus reduce the risk of entanglement to large whales, particularly the North Atlantic right whale. In the federal Seasonal Area Management (SAM) and Dynamic Area Management (DAM) zones, all groundlines must be made entirely of sinking

or neutrally buoyant line. In Cape Cod Bay, sinking groundline or neutrally buoyant groundline is required year-round. Nevertheless, non-buoyant groundline has its drawbacks. Fishermen have pointed out that this type of line is more expensive, causes more hang-downs, and the integrity of the line breaks down faster due to abrasion from the substrate. And they have found the lifespan of non-buoyant groundlines to be unacceptably short. The premature failure of non-buoyant groundline appears to be caused by sediment embedded in the line fibers, which occurs when groundline lies on the sea bottom and then sediment is ground into the rope by the hauling equipment when traps are pulled to the surface under strain.

### Using a simulator to test groundline durability on sand bottom  (#1999-0110-013)

Since 2003, *MarineFisheries* and the Atlantic Offshore Fishing Association (AOLA) have engaged in a cooperative study with the cordage industry, fishermen, and NMFS on a multi-year study to develop an "optimal" non-buoyant line for use by the offshore lobster industry. For the lobster industry, optimal lines are those that do not degrade due to substrate abrasion, are strong enough to withstand hauling loads, and are not substantially more expensive than currently used rope products. However, it would take years to field test the various brands of non-buoyant groundline on the market in order to determine which line functions best in the offshore lobster fishery. In response to those claims, *MarineFisheries* and AOLA built a line-testing machine to simulate the wear and tear that lobster groundlines experience in the field. Test runs were performed on the machine to determine what load strength, cycle speed, and test duration were needed to approximate the wear experienced the field. The line-testing machine is comprised of a 16" hauler working against an 11" diameter drum to simulate the hauling of line under load. The line then drops into a 12-foot long basin of sand and water in a relaxed state to simulate line laying on the sea floor. After the line is cycled through the machine, it is tension-tested in order to quantify the impact of the wear on hauling strength.



**Figure 10.** Line testing machine

The laboratory testing phase of the project was completed in July 2005. Ten lines provided by seven different manufacturers/ distributors were successfully tested on the line-testing machine.

Wide variability was found in the characteristics and performance of currently available ropes. Lines that were considered to have performed the best were those that exhibited the least wear and loss in breaking strength.  The final report on this phase of the project is now available on-line at:  http://www.mass.gov/dfwele/dmf/programsandprojects/nfwf_report_on_aola_study.pdf. Groundline that performed best on the machine were distributed to the offshore lobster industry for field-testing in fall 2005.  The field-component of the study will continue throughout the remainder of 2005 and 2006.


**Microscopic analysis of the causes of rope failure**

After completing the machine-testing of lines in the aforementioned study, *MarineFisheries* and AOLA took the next step toward understanding exactly *how* and *why* line degraded, by initiating a project to explore the mechanics underlying rope failure.  They sought the assistance of Hank McKenna, President of Tension Technologies Inc, a rope testing and engineering firm.  Hank has served as an advisor to several large rope manufacturers and fiber producers, consulted to several offshore contractors, designed barge and supply boat moorings and riser protection systems, and conducted many accident investigations involving rope failure.



**Figure 11**.  Dissection of rope strands and yarns


Samples of the lines that performed best on the machine were sent to the Tension Technology facility in Scotland.  In their analysis, Tension Technology will visually and microscopically examine wear on the ropes to identify different types of damage.  This will aid them in understanding the causes of wear and the differences in rope construction that contribute to it. They will also determine the strength of tested and untested specimens by performing whole rope and yarn tests.  Finally, they will examine the presence of sediment in ropes tested on the machine and consider a test to quantify sediment density.  These investigations may also identify specific components of the lobster trap hauling system that contribute to line wear in the field. With this analysis *MarineFisheries* and AOLA hope to look at the characteristics of line degradation for the purpose of improving rope design and increasing the serviceability of non-buoyant groundline.  We believe that a systematic engineering analysis will be instrumental in guiding efforts to improve the construction of non-buoyant groundlines.

# 3) ACTIONS TO ADDRESS THE THREAT OF WHALE ENTANGLEMENT IN FISHING GEAR

## Fixed-gear management in Massachusetts state waters

The Commonwealth continues to establish pro-active, yet practical, regulations for fixed-gear fisheries in state waters to reduce the risk of entanglement of large whales.  Since 2004, the use of floating groundline has been prohibited year-round in the lobster fishery in Cape Cod Bay.  In Cape Cod Bay Critical Habitat from January 1 – May 15, all groundline must be negatively buoyant and all buoylines must be comprised of negatively buoyant line, except the bottom 1/3 of the length of the line.  In state waters other than the CCBCH, all lobster fishermen must comply with at least one of the following gear restrictions: 1) all buoys must be attached to surface lines by a 600 lb weaklink, 2) all buoylines composed entirely of sinking line, and 3) all groundlines must be composed entirely of negatively buoyant line.  More detail on Massachusetts regulations related to protection of North Atlantic right whales can be found within the Code of Massachusetts Regulations (322 CMR 12:00).
http://www.mass.gov/dfwele/dmf/commercialfishing/cmr.htm

In 2005, the Commonwealth continued to pursue ways to broaden the use of non-buoyant groundlines in the pot fishery throughout state waters.  In October 2005, a regulatory proposal was put forth to prohibit the use of floating groundline between lobster traps in all state waters year-round.  This rule will minimize entanglements of all large whales found in Commonwealth waters.  This proposed regulation was approved by the Massachusetts Marine Fisheries Advisory Commission.  Effective on January 1, 2007, it shall be unlawful for any person to fish, store, or abandon any fixed gear in waters under jurisdiction of the Commonwealth with positively buoyant groundline.

## Profiling the dynamic character of fixed-gear groundlines (#2003-0170-014)

The spatial overlap of whales and fishing gear is directly related to the risk of entanglement for whales.  To minimize that risk, it is necessary to understand two key features related to this overlap: 1) where is the fishing gear and 2) where are the whales.  This project seeks to address the question of where fishing gear is located in the water column.  In 2004, *MarineFisheries* received funding from NFWF to attach pressure sensors to fixed gear in order to document the profile of lines in the water column.  These pressure sensors, DST Milli loggers by Star-Oddi are referred to as mini-loggers.   These devices have permitted *MarineFisheries* to calculate the height of floating groundline off the bottom, under various gear configurations and environmental conditions, over an extended period of time.



**Figure 12.** Mini-logger and protective covering.

During 2004, 28 mini-loggers have been deployed for over 315 days in 49 different sets (27 inshore; 22 offshore). The loggers confirmed that there is a large degree of variation in the groundline profile depending on gear configuration and environmental conditions, such as sea state, tidal current, and depth. On average, floating groundline rise 7 feet off the bottom in inshore sets and 13 feet off the bottom in offshore sets. A wide range of groundline heights were observed. Inshore floating groundlines heights range from 0 to 21 feet off the bottom, while offshore ranges from 0 to 45 feet.



**Figure 13**. Logger data showing two traps on a lobster trawl – notice one trap "walking" downhill. (Cyclical oscillations are tidal-driven changes in depth)

In the spring of 2005, *MarineFisheries* staff sent programmed loggers to colleagues in Rhode Island and Maine for use in profiling the dynamics of fixed-gear in those areas. The loggers were then deployed on lobster trawls before being returned to us for analysis. The examination of this data is in progress. The information gathered by the loggers over the entire course of this project provided crucial insight into the dynamic nature of fixed gear over time. In the end, we

have a better understanding and more precise view of gear profiles in the water column and the potential threat of entanglement they pose to large whales.  A technical report is currently being prepared about this project.

## Profiling the dive pattern and orientation of right whales  (#2003-0170-014)

The spatial overlap between fishing gear and whales is directly related to the risk of entanglement.  The distribution of whales on the horizontal plane has been studied using sightings data, telemetry, and acoustic monitoring.  However, whale distribution in the vertical plane -- the water column -- is less well known.  Typically, information about this dimension has relied indirectly on mapping of the food resource and directly on telemetry data gathered from tagged whales.  By pinpointing how whale behavior overlaps with fishing gear in the water column, we can identify the gear configurations that are the greatest risk of entanglement.  Dr. Mark Baumgartner from Woods Hole Oceanographic Institution has been using suction cup tags on right whales to profile their use of the water column.  These tags document the dive profile and spatial orientation of the whale, including pitch, roll and yaw (angle).  This information is uploaded into a software program which provides 4-D data imaging, giving researchers a unique perspective on how the whales are moving underwater.

In 2004 *MarineFisheries* received funding to help Dr. Baumgartner cover the cost of vessel charters used in the tagging cruises.  These tagging events are heavily dependent on good weather conditions and whale presence.  The tagging work from this grant was scheduled for completion in fall 2005; however this work will continue in spring 2006.

## Scale Modeling of Fixed-Gear Buoyline Configurations

In 2004, *MarineFisheries* used scale models of fixed fishing gear to compare, quantify, and investigate buoyline profiles in order to address the entanglement threat they may pose to large whales.  The results showed that buoyline configurations and scope affected buoyline profiles, and that different current loads also affected profile.  A technical report was completed on for project in March 2005.  MarineFisheries received funding from NFWF to continue this scaled modeling study in 2006.   We will examine how changes in scope of the buoyline will affect the profile and the potential risk of entanglement to whales.  This work will continue at the flume tank at Memorial University, St. Johns, Newfoundland.



**Figure 14**.  1:10 scaled model with A3 polyball and 100% sinkline.

**Buy-back program for floating groundline**

*MarineFisheries* collaborated with the International Fund for Animal Welfare (IFAW) and the Massachusetts Lobstermen's Association (MLA) in the first-ever lobster gear replacement program. The project sought to address the problem of whale entanglements through an innovative partnership with commercial lobstermen to provide them with financial assistance to replace floating groundline with non-buoyant, "whale-safe" alternative. Sinking line is heavier than floating line and more expensive, making the cost of switching over a considerable financial burden for fishermen. The estimated total cost of replacing floating ground lines for all eligible Massachusetts inshore lobstermen was $1.4 million. The project, funded by a NFWF grant to IFAW, provided fishermen with vouchers covering 75% of the change-over costs.



**Figure 15.** A fisherman and Erin Heskett (IFAW) pictured with returned floating line in Sept 2004

For six days in September 2004, gear exchanges were carried out from Gloucester to Sandwich. A final exchange took place in January and March 2005 to accommodate lobstermen who were unable to exchange their rope during the September events. Overall, 270 fishermen participated in the buy-back program by turning in 300,000 pounds of rope. *MarineFisheries* staff contributed support to this program by performing mailings, designing databases, inputting and compiling data, and providing advice and logistical support. In January 2005, IFAW contracted with Conigliaro Industries to handle the collection and recycling of the rope collected during the exchange events. IFAW and *MarineFisheries* believe that most inshore lobstermen in Massachusetts, who were still fishing with floating line, have switched to sinking groundline thanks to this highly successful project benefiting both fishermen and large whales.

**Support of the Atlantic Large Whale Disentanglement Network**

The Right Whale Conservation Program continues to support the efforts of the Disentanglement Network. Erin Burke, the *MarineFisheries'* Protected Species Specialist, is a Level 2 Network member, trained to actively assist with the location and documentation of entanglements. In spring 2006, she will begin an apprenticeship to obtain Level 3 status, authorizing her to attach tags and give hands-on assistance during simple entanglements. The Massachusetts Office of Law Enforcement (OLE) has offered to assist disentanglement efforts by providing on-the-water support to respond to reports of entangled whales and transport rescue team members.

## 4)  OUTREACH, PUBLIC EDUCATION, AND TRAINING

Throughout 2005 *MarineFisheries'* staff continued ongoing public education efforts regarding the Right Whale Conservation Program by meeting with industry groups, fielding calls, and lecturing in public forums.  *MarineFisheries*' staff attended various fishermen's meetings, trade shows, and conservation meetings promoting the Conservation Plan.  Dan McKiernan, the Deputy Director, is a member of the Atlantic Large Whale Take Reduction Team (ALWTRT).  During 2005, Dan McKiernan and the Protected Species Specialist attended numerous meetings related to large whale conservation and fishery interaction.  Prior to leaving the Protected Species Specialist position in July 2005, Ed Lyman attended many of these meetings and presented information about projects related to the RWCP.  In December 2005, Erin Burke and Ed Lyman attended the Society for Marine Mammalogy Biennial Conference in San Diego, CA.  They presented a poster on the projects and accomplishments of the Commonwealth's Right Whale Conservation Program.  During the summer and fall of 2005, Erin Burke received training in *MarineFisheries* lobster sampling protocols and right whale photo documentation and cataloguing procedures.  Outreach efforts are listed in <u>Attachment  E</u>.

## 5)  ACTION PLAN AND FUNDING SOURCES FOR 2006

The Commonwealth, along with its contractor PCCS are working to improve upon the 2005 Right Whale Surveillance and Habitat Monitoring Program.  For the 2006 season, *MarineFisheries* and PCCS have been awarded $390,919 by NMFS to support the aerial surveillance and habitat monitoring of Cape Cod Bay.  NMFS also awarded funding to *MarineFisheries* in late 2005 to support two projects in the coming fiscal year.  They provided $24,975 to support *MarineFisheries* response to off-season aggregations of right whales in Massachusetts and Cape Cod Bays, as well as $24,950 to a joint *MarineFisheries* and Atlantic Offshore Lobstermen's Association study of the mechanics underlying the degradation of sinking groundline.

*MarineFisheries* has received $187,590 from NFWF for the Right Whale Conservation Program in 2006 to continue support of the Protected Species Specialist, outreach program, gear modification work, and collaborations with Cornell University on passive acoustics.  This funding will support real-time buoy maintenance and web-based dissemination of right whale detections from the real-time passive acoustic listening buoys.  In addition, the Right Whale Conservation Program will continue collaborating with the Atlantic Offshore Lobstermen's Association to finish research into the development of an optimal line for the offshore lobster industry.  The remaining funds will go towards project related to the configuration of buoylines and a fixed-gear compliance program.  Training and outreach will continue to be a priority for the Right Whale Conservation Program.  In 2006, Erin Burke, the Protected Species Specialist, will receive training in aircraft ditch procedures and participate in a Disentanglement Network apprenticeship to obtain Level 3 status.

*MarineFisheries* will also work with Dr, Mark Baumgartner in 2006 to quantify the use of the water column by right whales in order to identify the gear types and components which may pose the greatest risk of entanglement to the North Atlantic right whale.

## References

Jaquet et al. 2005.  Surveillance, Monitoring and Management of North Atlantic Right Whales in Cape Cod Bay and Adjacent Waters in 2005.  Final report submitted to the Division of Marine Fisheries, Commonwealth of Massachusetts, Boston, MA.  October 2005

Mayo et al.  2004.  Surveillance, Monitoring and Management of North Atlantic Right Whales in Cape Cod Bay and Adjacent Waters in 2004.  Final report submitted to the Division of Marine Fisheries, Commonwealth of Massachusetts, Boston, MA.  December 2004.

## List of Attachments

**Attachment A**          **Code of Massachusetts Regulations (322 CMR 12.00) regarding fishing gear regulations in Cape Cod Bay related to right whales.**

**Attachment B**          **Advisories and notices posted by Commonwealth regarding Cape Cod Bay Critical Habitat and right whales.**

**Attachment C**          **Commercial Fisheries News article and DMF newsletter.**

**Attachment D**          **Outline of outreach efforts.**

# ATTACHMENT A

**Regulations as of December 31, 2005. Note: changes approved for 2007 not included (e.g. state-wide prohibition on floating groundline.**

Code of Massachusetts Regulations 322 CMR 12.00: Northern right whales
Section
12.01: Purpose
12.02: Definitions
12.03: Surface Floating Line Ban
12.04: Inshore Lobster Technology List
12.05: Critical Habitat and Adjacent Waters Gear Restrictions during January 1 through April 30
12.06: Critical Habitat Restrictions during May through December
12.07: Cape Cod Bay Restrictions Year-round
12.08: Gillnet Breakaway Requirements
12.09: Buffer Zone
12.10: Harassment and Harm
12.11: Entanglement Reporting
12.12: Exceptions
12.13: Permit for Surface or Drifting Gillnets
12.14: Critical Habitat Map


12.01  Purpose
    The northern right whale is the rarest of the world's great whales. Despite international protection by the International Whaling Commission established pursuant to the 1946 International Convention for the Regulation of Whaling and national protection afforded by the Marine Mammal Protection Act of 1972 and the Endangered Species Act of 1973 the northern right whale is listed as endangered and its population remains dangerously low in the Atlantic.
    In response to this threat the Massachusetts Legislature passed a Resolve in 1985 requesting the Department of Fisheries, Wildlife and Environmental Law Enforcement to study the right whale in Massachusetts waters and make recommendations for its conservation. That study recommended, among other measures, a 500 yard buffer zone between right whales and vessels within Massachusetts waters.
    The purpose of 322 CMR 12.00 is to:
 (1)  implement the 500 yard buffer zone recommendation and, in addition, prohibit activities of vessels that affect right whales within Massachusetts waters. 322 CMR 12.00 exempts vessels with federal or state Right Whale scientific study permits and commercial fishing vessels in the act of hauling back or towing gear. In addition, 322 CMR 12.00 applies only to the territorial and inland waters of the Commonwealth.
 (2)  minimize the risk of right whale entanglement in Cape Cod Bay, especially in the Critical Habitat, during the period of right whale high use, January 1 through April 30 -- the period of most right whale sightings in Massachusetts waters.
12.00
12.02  Definitions
    For the purposes of 322 CMR 12.00:
 (1)  Bottom or Sink Gillnet means a gillnet, anchored or otherwise, that is designed to be, capable of being, or is fished on or near the bottom in the lower third of the water column.
 (2)  Buffer Zone means an area outward from a right whale a distance of 500 yards in all directions.
 (3)  Cape Cod Bay means the area that encompasses the state waters portion of the Cape Cod Bay Critical Habitat plus an additional area to the west of the Critical Habitat south of a line that runs east and west at 42 [degrees] 05' and that terminates at the Brant Rock shoreline in the town of Marshfield.
 (4)  Critical Habitat means those waters in Cape Cod Bay under the jurisdiction of the Commonwealth that fall within the federally designated critical habitat area listed in the federal Right Whale Recovery Plan and found in 322 CMR 12.10.

(5)  Double means a two pot string with a single line attached.

(6)  Fixed Fishing Gear means any bottom or sink gillnets or pots that are set on the ocean bottom or in the water column and are usually connected to lines that extend to the water's surface.

(7)  Gillnet means anchored, or surface or drifting vertical walls of webbing, buoyed on top and weighted at the bottom, designed to capture fish by entanglement, gilling, or wedging.

(8)  Groundlines means the lines connecting pots on a pot trawl.

(9)  Harass means to approach, pursue, chase, follow, interfere with, observe, threaten, harm in any fashion, turn in any manner to intercept or attempt to engage in any such conduct.

(10)  Negatively Buoyant Line means line that has a specific gravity greater than that of seawater, 1.03, and does not float up in the water column.

(11)  Pot means any lobster or fish trap placed on the ocean bottom.

(12)  Pot Trawls or Strings means single pots tied together in a series and buoyed at both ends.

(13)  Right Whale means that species of marine mammal known as Eubalaena (Balaena) glacialis.

(14)  Single Pots means individual pots buoyed at the surface.

(15)  To Abandon means to knowingly leave fixed gear in the Critical Habitat during January 1 through April 30 that fails to comply with the gear restrictions in 322 CMR 12.05.

(16)  To Fish means to use, set, maintain, leave in the water or haul gillnets or pots to harvest, catch, or take any species of fish or lobster.

(17)  To Store means to leave fixed gear in the water and fail to haul it for more than 30 days.

(18)  Vessel means any waterborn craft.

(19)  Weak Buoy Link means a breakable section or device that will part when subjected to 500 lbs. or less of pull pressure and after parting, will result in a knot-less end, no thicker than the diameter of the line, the so-called "bitter end" to prevent lodging in whale baleen.

12.00

12.03  Surface Floating Line Ban

   It shall be unlawful for fishermen to fish, store, or abandon fixed fishing gear with lines floating at the water's surface.

12.00

12.04  Inshore Lobster Technology List

   Any lobster pots fished in waters of the Commonwealth must be rigged with at least one of the configurations defined in 322 CMR 12.04(1) through (3).

(1)  All buoy lines attached to the buoy with a weak link of 600 lbs. breaking strength;

(2)  All buoy lines composed entirely of negatively buoyant line;

(3)  Groundlines composed of negatively buoyant line.

12.00

12.05  Critical Habitat and Adjacent Waters Gear Restrictions during January 1 through May 15

(1)  Seasonal Gillnet Closure. It is unlawful to fish, store, or abandon gillnets in Critical Habitat and in waters of Cape Cod Bay west of the Critical Habitat south of 42 [degrees] during the period January 1 through May 15. 322 CMR 12.04 may be amended in a future rulemaking, with notice and opportunity for public comment, if gillnet specifications are developed and demonstrated that will minimize risk of entanglement to right whales

(2)  Single Pots and Pot Trawls in Critical Habitat. To minimize the number of vertical buoy lines during the period January 1 through May 15, in the Critical Habitat, fishermen may fish them in either multiple pot trawls of four pots or more with vertical buoy lines on each end or may set doubles.

   It is unlawful to fish, store, or abandon:

(a)  (a) single pots, or

(b)  a trawl with less than four pots with vertical lines on the first and last pot of the trawl.

(c)  a trawl with four or more pots having other than a single vertical line attached to the first and last pot of the trawl.

(d)  a double with more than one vertical buoy line.

(3)  Break-away Buoy Lines Fitted with Weak Buoy Links in Critical Habitat. During January 1 through May 15, all buoy lines attached to trawls or doubles shall be equipped with a Weak Buoy Link along the buoy line. A list of DMF approved weak-buoy links is available from DMF and furnished to fishermen upon request.

(4)  Line Restrictions in Critical Habitat

(a)  During the period January 1 through May 15, it shall be unlawful to fish lobster pot strings in Critical Habitat unless all ground lines in a trawl are negatively buoyant line.

(b) All buoy lines are comprised of negatively buoyant line except the bottom portion of the line which may be a section of floating line, not to exceed 1/3 of overall length of the buoy line.

(5) Special Marking Scheme for Fixed Gear in Critical Habitat. During January 1 through May 15 lobster-gear fished in Critical Habitat shall be marked in accordance with 322 CMR 4.13(3)(d).

(6) Modifications. The Director may amend by emergency authority the gear time and area restrictions in response to changes in right whale migrations and distributions. The Director may suspend the fixed gear rules if whales depart the Bay early in the season. If at least three full surveys of Cape Cod Bay are successfully completed after April 1 yielding no right whale sightings, and if corroborating evidence supports whales' departure from the Critical Habitat, the Director may suspend the fixed gear restrictions beginning on April 21 or thereafter.

(7) Experimental Fishery Permits for Gear Testing. The Director may issue experimental fishery permits to authorize a person to fish fixed gear that does not conform with the specifications set in 322 CMR 12.03 for the purposes of developing and testing new gear designs to minimize risk of right whale entanglement in Critical Habitat.

12.00

12.06  Critical Habitat Restrictions during May through December

(1) Groundline Restrictions for 2003 and beyond. During the period May 1 through December 31, it shall be unlawful to fish pot trawls in Critical Habitat unless all ground lines in a trawl are negatively buoyant line.

(2) Additional Closures. The Director may amend by emergency authority the areas and time restrictions to fixed fishing gear, based on verifiable reports of right whale occurrences.

12.00

12.07  Cape Cod Bay Restrictions Year-round

Prohibition on Floating Groundline for 2004 and beyond. For 2004 and beyond, during the period January 1 through December 31, it shall be unlawful to fish pot trawls in Cape Cod Bay as defined in 322 CMR 12.02 unless all ground lines are comprised of negatively buoyant line.

12.00

12.08  Gillnet Breakaway Requirements

It is unlawful to fish any gillnet in any waters under the jurisdiction of the Commonwealth unless the net is rigged with the following breakaway features:

(1) Knot-less weak link at the buoy with a breaking strength of 600 lbs.

(2) Weak links with a breaking strength of up to 1,100 lbs. are installed in the float rope between net panels.

(3) Anchoring system for the gillnets must be comprised of one of the following on each end:

(a) dead weights weighing at least 50 lbs.

(b) anchors with the holding power of at least 22 lbs. Danforth anchor.

(c) lead-line weighing at least 100 lb. per 300 ft. for each net panel in the string.

12.00

12.09  Buffer Zone

Except as otherwise provided for in 322 CMR 12.08, it is unlawful:

(1) for any vessel to enter a right whale buffer zone,

(2) for any vessel to approach or intercept a right whale within a buffer zone;

(3) for any vessel not to depart immediately from a buffer zone, or;

(4) for any commercial fishing vessel which has completed a haul back, a tow of its gear or otherwise completed its fishing operation and is no longer at anchor not to depart immediately from a buffer zone;

12.00

12.10  Harassment and Harm

It is unlawful for any vessel to harass or to harm any right whale at any time or place.

12.00

12.11  Entanglement Reporting

It is unlawful for any commercial or recreational vessel to fail to report the entanglement of a right whale in its gear or lines.

12.00

12.12  Exceptions

(1) Federal Permit. Any person issued a permit from any federal department, agency or instrumentality having authority to issue permits for the scientific research, observation, or management of the right whale, may conduct the activity authorized by such permit.

(2) State Permit. Any person issued a permit in accordance with 322 CMR 7.01(4)(d) for the scientific research,

observation, or management of the right whale may conduct the activity authorized by such permit.

(3)  Commercial Fishing. Commercial fishing vessels in the act of hauling back, towing gear or engaged in fishing operations at anchor within a buffer zone created by the surfacing of a right whale, may complete the haul, tow or fishing operation provided it does so with a minimum of disruption to the right whale, hauls, tows or conducts it fishing operation in a direction away from the right whale, and departs form the buffer zone immediately after the haul, tow or fishing operation. In no event may 322 CMR 12.08(3) be construed to authorize a commercial fishing vessel to begin to haul, tow or conduct its fishing operation in or into a buffer zone.

(4)  Disentanglement.

(a)  To assist federally approved disentanglement efforts for northern right whales, any vessel that reports to the National Marine Fisheries Service, the Division of Environmental Law Enforcement, the Coast Guard, or to designees of those agencies, that it has sighted an entagled right whale may operate in the buffer zone to assist those agencies in locating and tracking the whale if requested to do so by those agencies.

(b)  Any vessel operating in the buffer zone under 322 CMR 12.08(4) shall:

1.  operate so as to minimize disruption to the right whale, and

2.  immediately depart the buffer zone once the dientanglement effort begins, or when requested to do so by the agencies or their designees.

(c)  When conducting activities within the scope of 322 CMR 12.08(4), vessels shall make every effort to comply with 322 CMR 12.00.

12.00

12.13  Permit for Surface or Drifting Gillnets

It is unlawful for any fisherman to fish, store or abandon, surface or drifting gillnets in waters under the jurisdiction of the Commonwealth without a regulated fishery permit issued in accordance with 322 CMR 7.01(4)(a).

12.00

12.14  Critical Habitat Map

**The following map depicts the Cape Cod Bay Critical Habitat and its coordinates.**



## **Attachment B**

**Advisories and notices posted by Commonwealth regarding Cape Cod Bay Critical Habitat and right whales.**





*Commonwealth of Massachusetts*

# Division of Marine Fisheries

251 Causeway Street, Suite 400
Boston, MA 02114
(617) 626.1520
Fax (617) 626.1509

**Paul J. Diodati**
*Director*

FOR IMMEDIATE RELEASE:
May 10, 2005

CONTACT:
Division of Marine Fisheries
Dan McKiernan (617) 626-1536 or
Ed Lyman (978) 282-0308 x 157

Center for Coastal Studies
Dr. Charles (Stormy) Mayo (508) 487-3623

## RIGHT WHALE AGGREGATION DEPARTS CAPE COD BAY – ADVISORY LIFTED

Recent survey and monitoring activity by the Commonwealths' Right Whale Conservation Program has determined that the large aggregation of right whales observed in Cape Cod Bay (CCB) over the last several weeks have departed. Plankton densities measured by the Center for Coastal Studies (CCS) Habitat Monitoring Program also indicate a great decline in the right whales' food resource suggesting that right whale aggregations are not likely to return in the near future. With the departure of these animals the state is lifting the April 13th advisory warning mariners operating in Cape Cod Bay to be on the lookout for this highly endangered species. *MarineFisheries* would like to thank fishermen and other mariners for their assistance and compliance with measures to protect this highly endangered animal.

During the last several weeks an aggregation of right whales, including at least four mother/calf pairs have been monitored in CCB by the Commonwealth's Right Whale Monitoring Program, a combination of habitat monitoring, aerial surveys, and real-time passive acoustic monitoring. The presence of these especially vulnerable mother/ calf pairs feeding on a rich food resource in the Bay resulted in the state taking action to protect this highly endangered species. Scientists believe feeding right whales may be oblivious to their surroundings, and thus vulnerable to vessel traffic. Ship strikes, believed to be the primary cause of human-induced mortality in right whales, have attributed to four right whale deaths along the U.S. East Coast over the last year. Of additional concern was the number of mother and calves documented in the Bay. Right whales calves are only 15 – 20 feet long this time of year and can be especially difficult to spot.

The Right Whale Conservation Program is a cooperative effort between *MarineFisheries*, CCS, and Cornell University's Bio-acoustic Research Program to study and protect right whales in Cape Cod Bay. Use of vessel/aerial–based surveillance, passive acoustic monitoring, and forecasting of right whale presence through habitat analysis has resulted in the most comprehensive conservation program throughout the species' range. CCS has conducted bay-wide whale surveys two to three times per week in Cape Cod Bay and adjacent waters since mid-December. A cooperative venture between Cornell University and *MarineFisheries* that uses real-time passive acoustic buoys has been listening for right whale vocalizations in the Bay since

November of 2004. Hydrophones mounted on the buoys detect right whales through their vocalizations that are then reported in updates every few hours using cell phone technology.

The National Marine Fisheries Service (NOAA Fisheries) issues warnings to mariners and others via the Northern Right Whale Sighting Advisory System (SAS). Advisories regarding Cape Cod Bay and surrounding waters can be viewed at the NOAA Fisheries Northeast Region web site (http://www.nero.noaa.gov/ro/doc/whale.htm) and are broadcast over NOAA weather radio (http:// 205.156.54.206/nwr/).

For more information, visit the *MarineFisheries* website at http://www.mass.gov/marinefisheries or the Center for Coastal Studies  at www.coastal studies.org.

### ###





*Commonwealth of Massachusetts*
# Division of Marine Fisheries
251 Causeway Street, Suite 400
Boston, MA 02114
(617) 626.1520
Fax (617) 626.1509

**Paul J. Diodati**
*Director*

September 23, 2005
*MarineFisheries* Advisory

### NOTICE OF PUBLIC HEARINGS
### SCHEDULED FOR OCTOBER 24 & 25, 2005

Under the provisions of M.G.L. Ch 30A and pursuant to the authority found in M.G.L. Ch. 130 ss. 17, 17A, 80, 100A and 104, Division of Marine Fisheries (DMF) and the Marine Fisheries Advisory Commission (MFAC) have scheduled hearings on the following regulatory proposals:

1. **DMF proposal to make owner-operator requirements consistent for all fish pot fishery permit holders (322 CMR 6.12 & 7.09);**
2. **DMF proposal to amend dealer reporting requirements by replacing requirement to weight fish at time of purchase with requirement to label and number containers used per species (322 CMR 6.20 & 7.07);**
4. **DMF proposal to amend current escape vent specifications for the scup and black sea bass pot fisheries (322 CMR 6.12) in compliance with the interstate plan by requiring:**
   i. **At least two escape vents in the parlor section of the pot;**
   ii. **An increase in the minimum size of circular escape vents for pots used to harvest black sea bass from 2 3/8" to 2 1/2" (pots used in the scup fishery would retain the status quo 3.1" circular escape vent minimum size);**
3. **DMF proposal to enact remaining portions of the ASMFC-approved effort control plan in the Outer Cape lobster fishery, including:**
   i. **prohibit lobster fishing with traps from January through March (322 CMR 6.02);**
   ii. **allocate traps to qualified SCUBA divers (322 CMR 6.13 & 7.03); and**
   iii. **take comments on a proposal to eliminate the Area 1/Outer Cape overlap zone (322 CMR 6.33).**
5. **DMF proposal to prohibit the use of floating groundline between pots/traps in all of state waters year-round to reduce entanglement risk for large whales (322 CMR 12.00);**
6. **DMF proposal to prohibit the harvest of cod from a portion of Massachusetts Bay as a conservation measure during late fall /early winter months (322 CMR 8.15);**
7. **DMF proposal to prohibit the take of river herring from all waters under jurisdiction of the Commonwealth and to prohibit the use of river herring as bait (322 CMR 6.17);**
8. **DMF proposal to amend season-specific trip limits and to reserve half of the winter quota to the late fall period (Nov. – Dec.) in the commercial summer flounder (fluke) fishery (322 CMR 6.22);**
9. **DMF proposal to establish a formal declaratory process to allow for in-season adjustments of winter-time commercial possession limits of scup to complement federal adjustments (322 CMR 6.28).**

10. **DMF proposal to clarify the daily commercial and recreational possession limits for Tautog by replacing reference to "at any one time" with "per 24-hour day" (322 CMR 8.06);**

11. **DMF proposal to repeal state regulations for billfish. The fishery is primarily conducted in federal waters and managed under federal rules (322 CMR 6.11);**

12. **Take comments on recent emergency action to restrict shellfish landings due to biotoxin contamination (322 CMR 6.38).**

**Two public hearings have been scheduled:**

**Monday, October 24, 2005 (7PM) at the Annisquam River Marine Fisheries Stations (30 Emerson Ave., Gloucester) &**

**Tuesday, October 25, 2005 (7PM) at the Plymouth Harbor Radisson Hotel (180 Water St., Plymouth)**

Comments received by e-mail (marinefisheries@state.ma.us), fax (617.626.1509), or mail (251 Causeway St., Suite 400; Boston, MA 02114) will be accepted until 5PM on Friday, October 28, 2005.

Contact DMF for draft regulations and further details or visit our website at www.mass.gov/marinefisheries.





*Commonwealth of Massachusetts*

# Division of Marine Fisheries
251 Causeway Street, Suite 400
Boston, MA 02114
(617) 626.1520
Fax (617) 626.1509

**Paul J. Diodati**
*Director*

**November 14, 2005**
*MarineFisheries* **Advisory**

### MASSACHUSETTS MARINE FISHERIES ADVISORY COMMISSION
### APPROVES NEW REGULATIONS –
### December Cod Conservation Zone & Moratorium on River Herring Fishery

At a November 9, 2005 business meeting, the Marine Fisheries Advisory Commission (MFAC) approved several Division of Marine Fisheries (*MarineFisheries*) proposals including a two-year seasonal cod prohibition in a portion of Massachusetts Bay and a three-year moratorium on the harvest, possession, and sale of river herring. Other approved actions impact rules governing dealer reporting, fish pot escape vent sizes, Outer Cape Cod lobster trap haul-out period, ban on the use of floating groundline, winter-period commercial summer flounder (fluke) trip limits, procedures to amend commercial scup trip limits,  tautog possession limits, billfish regulations, and procedures to close shellfish areas due to biotoxins. Details on each of approved regulatory changes are provided below.

No action was taken on the public petition to eliminate the commercial lobster Area 1/Outer Cape overlap zone. Additionally, the MFAC voted to delay action pending further discussion on the *MarineFisheries* proposal to require all fish pot permit holders be owner/operators and the proposal to allocate eligible SCUBA divers in the Outer Cape lobster fishery an Individual Trap Allocation commensurate with fishing history.

<u>Regulatory Actions Approved by MFAC:</u>
**1) Mass. Bay Cod Conservation Zone Established during December – January 15 for two years (322 CMR 8.15):**



To protect predictable aggregations of cod, a portion of Mass. Bay has been designated a Cod Conservation Zone. The harvest of cod by any person from waters under the jurisdiction of the Commonwealth north of latitude 42º 20'and south of 42º 30' latitude will be prohibited during the period December 1 through January 15. With the exception of lobster traps and drags for scallops and sea urchins, it will also be unlawful for any person to fish, set, or abandon any gear capable of harvesting cod in this Cod Conservation Zone during the restricted season. *This prohibition shall apply to all gillnets, otter trawls, mid-water trawls, seines, and all hook-and-line gears including longlines, rod-and-reel, and handlines.* This seasonal prohibition shall remain in effect through January 16, 2007.

**2) Three-Year River Herring Moratorium on Harvest, Possession, & Sale (322 CMR 6.17):**
In response to recent drastic declines of many river herring spawning runs, the harvest, possession or sale of river herring in the Commonwealth or in the waters under the jurisdiction of the Commonwealth by any person is prohibited through 2008. To accommodate the bait harvesting fisheries, the MFAC approved a slight tolerance (up to 5%, by count, of a batch of fish may be comprised of river herring species).

**3) Dealer Reporting Requirements (322 CMR 6.20 & 7.07):**
To accommodate seafood dealers accepting fish at ports distant from their processing facilities, the dealer reporting requirements were amended to relax the requirement that fish be weighed upon landing. Although weighing of fish will still be encouraged, dealer reporting requirements will mandate that dealers label and record the number of containers of fish purchased. Effective January 1, 2006, all labels and records must include the number of containers per species, date, time, fishermen's name, and fishermen's DMF ID number.

**4) Fish Pot Escape Vent Specifications (322 CMR 6.12):**
In compliance with the Interstate plan, the MFAC approved the following specifications for all fish pots fished in waters under the jurisdiction of the Commonwealth:
  i.   at least two escape vents in the parlor section of the pot; and
  ii.  an increase in the minimum size of circular escape vents for pots used to harvest black sea bass from 2 3/8" to 2 1/2" (pots used in the scup fishery would retain the status quo 3.1" circular escape vent minimum size).
These measures will not go into effect until the next fishing year on January 1, 2007.

**5) Outer Cape Lobster Trap Haul-out Period (322 CMR 6.02):**
Beginning in 2006, fishing for lobster with traps is prohibited in the Outer Cape LCMA from January 15th through March 15th. Fishermen are required to remove all lobster traps from waters of the Outer Cape LCMA as defined in 322 CMR 6.33 during this closed period. This measure is a part of the effort control plan for the Outer Cape lobster fishery approved by the Atlantic States Marine Fisheries Commission.

**6) Prohibition on the Use of Floating Groundline (322 CMR 12.00):**
Effective next fishing year on January 1, 2007, it shall be unlawful for any person to fish, store, or abandon any fixed fishing gear in waters under the jurisdiction of the Commonwealth with positively buoyant groundline (lines connecting traps in a string). Any recreational or commercial fishermen using fixed gear will be required to use neutrally or negatively buoyant groundline Neutrally and negatively buoyant groundline is defined as line that has a specific gravity greater than that of seawater, 1.03, and does not float up in the water column.

**7) Commercial Summer Flounder (Fluke) Trip Limits (322 CMR 6.22)**
The MFAC approved sub-dividing the winter-period fluke quota to better manage harvest within the 70/30  summer/winter quota split. Effective January 1, 2006, the following are the approved periods and their associated possession limits:
  **i.   Winter I period** (January 1 - April 22) would begin at a 2,500 lb daily trip limit and reduce to a 100-lb. trip limit when 10% or more of the annual quota has been reached. This is the current trip limit and trigger for the current January – April "winter" period.
  **ii.  Summer period** (April 23 - October 31) would be essentially unchanged and begin during the squid season (April 23rd through June 9th) at a 100-lb daily trip limit then increase on June 10th to a 300 (nets)/200 (hooks) lb. daily trip limit. When the

summer period landings reaches 70% of the annual quota, the fishery would be closed until November 1.

    iii. **Winter II period** (November 1 - December 31) would begin on November 1st designed to consume the balance of the quota. Daily trip limit will be 2,000 lb. until 100% of the annual quota is reached at which point the landing and possession of fluke would be prohibited.

**8) Declaration of Commercial Scup Specifications during the Winter I & II Periods (322 CMR 6.28):**

To allow for more efficient and timely trip limit changes in line with ASMFC/Federal approved rules, the MFAC approved the use of a declaratory process to set rules governing the manner and times of taking scup, the legal size limits, and the numbers and/or quantities of scup to be taken during the Winter I (January – April) and Winter II (November – December) commercial scup fishery periods. Prior to implementing annual specifications, *MarineFisheries* will hold a two-week comment period. Notices of final annual specifications will be provided in the *Massachusetts Register*, local newspaper, *MarineFisheries* email Listserv and posted on the *MarineFisheries* website (www.mass.gov/marinefisheries). *MarineFisheries* will begin utilizing the declaratory process to set annual specifications on January 1, 2006.

**9) Commercial and Recreational Tautog Possession Limits (322 CMR 8.06):**

Effective January, 1, 2006, the MFAC approved clarifying the commercial and recreational possession limits for Tautog by establishing both the 40-fish commercial possession limit and 3-fish recreational limit **as possession limits per 24-hour day.**

**10) Repeal of State Billfish Rules (322 CMR 6.11):**

Effective January 1, 2006, all rules governing the harvest of billfish in state waters will be repealed. These state rules had been implemented at a time when there were no federal rules. However, federal rules are now in existence and effectively manage the primarily federal waters fisheries. Although the harvest of billfish in state waters is uncommon, federal rules will apply for all fishing activity in state and federal waters. Consult the National Marine Fisheries Service for permitting and reporting requirements (www.nmfs.noaa.gov/sfa/hms).

**11) Shellfish Harvest & Landing Restrictions Due to Marine Biotoxins (322 CMR 6.11)**

This action allows *MarineFisheries* to restrict shellfish harvest and landings from all waters under the jurisdiction of the Commonwealth as necessitated by the presence of marine biotoxins. In addition to closures enacted within waters under the jurisdiction of the Commonwealth, the Director may restrict the taking of certain shellfish species and the landing of those products by any vessel registered under the laws of the Commonwealth from areas determined to contain levels of toxic phytoplankton, including waters within the Exclusive Economic Zone, that may place the public health at risk from consumption of shellfish products. This action shall take effect on January 1, 2006.

The recent red-tide event in Massachusetts affected the Commonwealth on an unprecedented scale. In the past red-tide has primarily been limited to near-shore waters where the Commonwealth can act in conjunction with local officials to restrict harvest and landing of shellfish due to the presence of marine biotoxins as needed. The spread of red-tide offshore beyond town waters necessitated emergency action to enable *MarineFisheries* to fully restrict shellfish landings and harvest to protect public health.

For further information please visit our website at www.mass.gov/marinefisheries.

# ATTACHMENT C

## NEWS ARTICLES

# 2005 Saltwater Sport Fishing Guide Now Available!

The Massachusetts Division of Marine Fisheries has produced this year's edition of our Saltwater Sport Fishing Guide (SFG). As in previos years, the guide contains current information on boat-launch sites, tackle shops, charter and party boats, fish profiles, and fishing tournaments to assist you in enjoying our spectcular array of fishing opportunities from shore or by boat. The guide has a long successful history; it has been a traditional publication of our agency for over 20 years.

Designed to provide basic information about the Commonwealth's recreational fishing opportunities, the Sport Fishing Guide is a useful tool for the novice or visiting angler to become acquainted with what Massachusetts has to offer, although many long-time resident anglers call for it regularly.

Please contact one of our offices for a copy of the Guide, or you can download a copy from our website (www.mass.gov/marinefisheries). Those interested in listing their business in the next SFG should contact John Chicholm at 508.910.6329 or John.Chisholm@state.ma.us.



**Massachusetts Saltwater Recreational Fishing Guide**

Photo courtesy of Randy Sigler

Marine Fisheries

*Brooke Miles with her winning 35 lb. 6 0z. Cod.*

Photo courtesy of the Miles family

# Proposed Federal Whale Rules on the Horizon ...

### Draft Environmental Impact Statement details new whale-safe gear proposals

After two years of preparation, NOAA Fisheries has revealed new proposals to reduce entanglements of large whales. Hearings are scheduled in Massachusetts in late March. With the help of the Atlantic Large Whale Take Reduction Team, these proposed amendments are intended to reduce mortalities and serious injuries to right, humpback, fin and minke whales in U.S waters.

These changes would revise the federal Take Reduction Plan, a plan that dates back to 1997 and includes regulatory and non-regulatory programs, including gear modifications, time-area closures, expanded disentanglement efforts, extensive outreach efforts in key areas, gear research, and an expanded right whale surveillance. *MarineFisheries* has played a prominent role in development of the federal plan since it was based largely on the state's own Conservation plan that was developed in 1996.

Fishermen should pay close attention to these proposed amendments since the Marine Mammal Protection Act rules affect **all** commercial fishermen fishing in both state and federal waters – even those who do not have a federal permit. While the Commonwealth could be more restrictive than federal whale protection rules, it can't be less restrictive. The scheduled hearings are designed to take comments on the Draft Environmental Impact Statement, a stunningly comprehensive 783 page document that presents six alternatives (status quo and 5 new scenarios).

The most substantive change proposed is the requirement by 2008 that lobstermen and gillnetters use "non-buoyant" (sinking groundline) in broad areas where floating line is allowed now. Massachusetts lobstermen in Cape Cod Bay have already switched over to sinking line in 2001, and many of the non-Cape Cod Bay lobstermen recently have replaced their line capitalizing on the "floating line buyback" spearheaded by the International Fund for Animal Welfare (IFAW) this past winter. The most contentious debate is expected regarding how far the floating line prohibition extends. Will it extend through out the U.S range of the right whale from Maine to Florida? And are there logical areas (inshore or very deep offshore waters) to exempt where large whales are not expected to occur?

These proposals could eliminate the so-called DAM closures. For the past four years lobstermen and gillnetters have been required to remove their gear – on short notice – from areas and during times that three or more right whales were seen aggregated. These closures have been unpredictable and disruptive but were considered the best way to allow fishermen flexibility to continue fishing while dodging requirements to modify their gear. Finally, proposals may extend current gear restrictions beyond lobster gear and gillnets to include other similar gears, such as hagfish pot, fish pot, crab pot, and conch pot.

- Monday, March 28, 2005    Plymouth, MA (6 - 9 PM)
  Radisson Hotel - Plymouth Harbor
  180 Water Street, Plymouth, MA 02360

- Thursday, March 31, 2005 - Gloucester, MA (6 - 9 PM)
  Massachusetts Division of Marine Fisheries
  30 Emerson Avenue, Gloucester, MA 01930

# Basking Shark Tagging Update

In the last issue of *DMF News*, *MarineFisheries* reported on a novel method for improving knowledge of endangered North Atlantic right whale (*Eubalaena glacialis*) movements and habitat use (see *Basking Sharks May Help Identify Unknown Right Whale Habitats* in *DMF News*, Second Quarter - Third Quarter 2004). *MarineFisheries* biologists in collaboration with researchers Stephan Zeeman and Erin Estrada of the University of New England (UNE) are tagging basking sharks, *Cetorhinus maximus,* with high technology pop-up archival tags.

Basking sharks are often found in aggregations with right whales, feeding on the same dense patches of planktonic copepods, and it is likely that they exhibit the same seasonal movement patterns as the North Atlantic right whale. The multifaceted study, funded with a grant from the Massachusetts Environmental Trust, hopes to shed light on important questions of biology, distribution, migration, and essential habitat for both species and preliminary data is in.

Pop-up Archival Transmitting (PAT) tags used in this study collect temperature, depth, and light level data at user-defined intervals. At a time pre-programmed by the researcher, tags detach from the animal and float to the surface where data relays through an Argos satellite to the researcher. Tags not only provide fixed locations of animals at the time of pop-up, but researchers may also re-create dynamic movements of the shark based on light level data. In late September 2004, UNE and *MarineFisheries* biologists tagged two basking sharks approximately 40 nautical miles east of Nantucket Island. The tags were applied by harpooner Captain Bill Chaprales from the F/V Ezyduzit with the assistance of his spotter pilot Tim (Wilderness Dave) Voorheis.

On January 31, 2005, the tags detached from the sharks as scheduled, floated to the surface, and began transmitting four months of data. The recovered tags, despite being attached on sharks within four nautical miles of each other back in September, were found in January very far apart. One of the sharks traveled 870 nautical miles SW, about 30 nautical miles east of Jacksonville, FL where it spent most of its time in the surface waters. The other shark traveled over 1,400 miles SSE to an area between the Caribbean islands of Haiti and Jamaica. This latter shark is the first known record of this species in the Caribbean. Remarkably, this shark spent most of its time at depths in excess of 1,600 feet while in this area.

It appears that the depth of these sharks is highly correlated with water temperature because both sharks preferred to remain in water that was 55-66°F, regardless of the location.

The early results from these two tags are both intriguing and encouraging. It appears that the deep waters of the Caribbean may be newly discovered over-wintering habitat of the basking shark. Will these data provide new insights into unknown winter migration patterns of the right whale? *MarineFisheries'* efforts have just begun and the team is looking to tag another group of animals in 2005. We'll keep you posted.

*by Gregory Skomal*



Photo courtesy of Tim Voorheis

***Cpt. Chaprales (on prow) uses harpoon to tag basing shark.***

# DMF Reviews Fishery Impacts of Proposed Cape Wind Farm

Projected to occupy 24 square miles of Nantucket Sound, the Cape Wind Energy Project would result in the construction and operation of 130 wind turbine generators on Horseshoe Shoal. The proposed alternative energy project continues to be under the local and even national spotlight, as a wide range of constituents from area residents, environmental groups, and industry representatives add to the discussion surrounding state and federal permitting reviews.

The Army Corps of Engineers, the federal agency with lead jurisdiction, released a Draft Environmental Impact Statement (DEIS) in November of 2004, which also served as the Draft Environmental Impact Report (DEIR) for the necessary state MEPA review. In keeping with *MarineFisheries'* mission to manage and protect the Commonwealth's marine resources, staff biologists reviewed the Cape Wind DEIS/DEIR to evaluate its potential impacts and provided comments to the Corps and Secretary of Environmental Affairs.

Nantucket Sound provides very important feeding, spawning, and/or nursery grounds for many species of finfish and invertebrates, including bluefish, striped bass, scup, summer flounder, winter flounder, black sea bass, tautog, squid, and whelks. Further, historic migration patterns suggest that spawning and juvenile development activities in the Sound may impact abundance levels for some species as far down as the mid-Atlantic. Commercial and recreational fishing in Nantucket Sound provides significant revenue to the local economy and is an integral, indeed traditional, part of life in many Cape Cod and Island towns.

As a result of our review, *MarineFisheries* is concerned about the possibility of significant impacts to fisheries resources, habitat, and harvest activities in Nantucket Sound. *MarineFisheries* has recommended that applicants provide additional information to effectively evaluate potential



***Over 1,400 miles separated one tagging site and pop-up location.***

Map by Greg Skomal

**ATTACHMENT D**

**OUTREACH EFFORTS OF THE RIGHT WHALE CONSERVATION PROGRAM**

| Date | Event | Location | Topic |
|------|-------|----------|-------|
| 2/3-2/5 | MLA Annual Meeting | Hyannis, MA | Booth and poster on DMF gear work |
| 4/25-4/27 | ALWTRT Meeting | Baltimore, MD | Presented on mini-logger project |
| | Entanglement and Gear Modification Workshop | Durham, NH | Presented |
| 9/21-9/22 | Low-profile Groundline Workshop | NH and ME | Attended |
| 9/23-9/26 | Visit to New England Aquarium field station | Lubec, ME | Intro to right whale photo-ID and catalogue. |
| 10/25 | DMF Public Hearing on proposed rule | Gloucester, MA | Proposed rule to ban floating groundline |
| 11/2-11/3 | Right Whale Consortium Meeting | New Bedford, MA | Attended |
| 11/4 | Acoustics Workshop | New Bedford, MA | Attended |
| 12/11-12/17 | Society for Marine Mammalogy conference | San Diego, CA | Oral presentation on mini-logger project Present poster on state's right whale plan |

## PART 3035—RESEARCH AND DEVELOPMENT CONTRACTING

### 3035.003    [Amended]

■ 23. Amend § 3035.003(b) in the last sentence by removing "OEs" and adding "Components" in its place.

### 3035.017    [Amended]

■ 24. Amend § 3035.017(a) in the last sentence by removing "OEs" and adding "Components" in its place.

## PART 3042—CONTRACT ADMINISTRATION AND AUDIT SERVICES

### 3042.1502    [Amended]

■ 25. Amend § 3042.1502(a) by removing "OEs" and adding "Components" in its place.

## PART 3052—SOLICITATION PROVISIONS AND CONTRACT CLAUSES

### 3052.101    [Amended]

■ 26. Amend § 3052.101 as follows:

■ a. In paragraph (b)(2)(i)(A), in the second sentence, by removing "OEs" and adding "Components" in its place.

■ b. In paragraph (b)(2)(i)(B), in the first sentence, by removing "OE" and adding "Component" in its place.

### 3052.204–70    [Amended]

■ 27. Amend § 3052.204–70(d) in the last sentence by removing "Organizational elements" and adding "Components" in its place.

### 3052.204–71    [Amended]

■ 28. Amend § 3052.204–71, ALTERNATE I as follows:

■ a. In paragraph (i) in the first sentence by removing "OE" and adding "Component" in its place.

■ b. In paragraph (k) in the first sentence by removing "Organizational Element" and adding "Component" in its place.

## PART 3053—FORMS

### 3053.101    [Amended]

■ 29. Amend § 3053.101 by removing "OEs" and adding "Components" in its place.

[FR Doc. 06–7035 Filed 8–21–06; 8:45 am]
**BILLING CODE 4410–10–P**

## DEPARTMENT OF THE INTERIOR

### Fish and Wildlife Service

### 50 CFR Part 20

### Migratory Bird Hunting

*CFR Correction*

In Title 50 of the Code of Federal Regulations, parts 18 to 199, revised as of October 1, 2005, on page 36, § 20.21 is corrected by reinstating paragraphs (j)(2) and (3) to read as follows:

### § 20.21    What hunting methods are illegal?

\* \* \* \* \*

(j) \* \* \*

(2) Each approved shot type must contain less than 1 percent residual lead (see § 20.134).

(3) This shot type restriction applies to the taking of ducks, geese (including brant), swans, coots (Fulica americana), and any other species that make up aggregate bag limits with these migratory game birds during concurrent seasons in areas described in § 20.108 as nontoxic shot zones.

[FR Doc. 06–55526 Filed 8–21–06; 8:45 am]
**BILLING CODE 1505–01–D**

## DEPARTMENT OF COMMERCE

### National Oceanic and Atmospheric Administration

### 50 CFR Part 229

### [Docket No. 060330090–6212–02, I.D. 021506B]

### RIN 0648–AU19

### List of Fisheries for 2006

**AGENCY:** National Marine Fisheries Service (NMFS), National Oceanic and Atmospheric Administration (NOAA), Department of Commerce.

**ACTION:** Final rule.

**SUMMARY:** The National Marine Fisheries Service (NMFS) is publishing its final List of Fisheries (LOF) for 2006, as required by the Marine Mammal Protection Act (MMPA). The final LOF for 2006 reflects new information on interactions between commercial fisheries and marine mammals. NMFS must categorize each commercial fishery on the LOF into one of three categories under the MMPA based upon the level of serious injury and mortality of marine mammals that occurs incidental to each fishery. The categorization of a fishery in the LOF determines whether participants in that fishery are subject to certain provisions of the MMPA, such as registration, observer coverage, and take reduction plan requirements.

**DATES:** This final rule is effective September 21, 2006.

The California sardine purse seine fishery, the Chesapeake Bay inshore gillnet fishery, and the Mid-Atlantic menhaden purse seine fishery are considered to be Category II fisheries on September 21, 2006, and are required to comply with all requirements of Category II fisheries (i.e., complying with applicable registration requirements, complying with applicable take reduction plan requirements, and carrying observers, if requested) on that date.

**ADDRESSES:** See **SUPPLEMENTARY INFORMATION** for a listing of all Regional offices.

For collection-of-information requirements subject to the Paperwork Reduction Act, please contact the Office of Management and Budget, Attn: David Rostker, fax: 202–395–7285 or *David__Rostker@omb.eop.gov*.

**FOR FURTHER INFORMATION CONTACT:** Melissa Andersen, Office of Protected Resources, 301–713–2322; David Gouveia, Northeast Region, 978–281–9328; Vicki Cornish, Southeast Region, 727–824–5312; Christina Fahy, Southwest Region, 562–980–4023; Brent Norberg, Northwest Region, 206–526–6733; Bridget Mansfield, Alaska Region, 907–586–7642; Lisa Van Atta, Pacific Islands Region, 808–973–2937. Individuals who use a telecommunications device for the hearing impaired may call the Federal Information Relay Service at 1–800–877–8339 between 8 a.m. and 4 p.m. Eastern time, Monday through Friday, excluding Federal holidays.

**SUPPLEMENTARY INFORMATION:**

### Availability of Published Materials

Information regarding the LOF and the Marine Mammal Authorization Program, including registration procedures and forms, current and past LOFs, observer requirements, and marine mammal injury/mortality reporting forms and submittal procedures, may be obtained at: *http://www.nmfs.noaa.gov/pr/interactions/mmap*, or from any NMFS Regional Office at the addresses listed below.

NMFS, Northeast Region, One Blackburn Drive, Gloucester, MA 01930–2298, Attn: Marcia Hobbs;

NMFS, Southeast Region, 263 13th Avenue South, St. Petersburg, FL 33701, Attn: Teletha Mincey;

NMFS, Southwest Region, 501 W. Ocean Blvd., Suite 4200, Long Beach, CA 90802–4213, Attn: Lyle Enriquez;

NMFS, Northwest Region, 7600 Sand Point Way NE, Seattle, WA 98115, Attn: Permits Office;

NMFS, Alaska Region, Protected Resources, P.O. Box 22668, 709 West 9th Street, Juneau, AK 99802; or

NMFS, Pacific Islands Region, Protected Resources, 1601 Kapiolani Boulevard, Suite 1100, Honolulu, HI, 96814–4700.

## What is the List of Fisheries?

Section 118 of the MMPA requires NMFS to place all U.S. commercial fisheries into one of three categories based on the level of incidental serious injury and mortality of marine mammals occurring in each fishery (16 U.S.C. 1387(c)(1)). The categorization of a fishery in the LOF determines whether participants in that fishery may be required to comply with certain provisions of the MMPA, such as registration, observer coverage, and take reduction plan requirements. NMFS must reexamine the LOF annually, considering new information in the Stock Assessment Reports and other relevant sources and publish in the **Federal Register** any necessary changes to the LOF after notice and opportunity for public comment (16 U.S.C. 1387 (c)(1)(c)).

## How Does NMFS Determine in which Category a Fishery is Placed?

The definitions for the fishery classification criteria can be found in the implementing regulations for section 118 of the MMPA (50 CFR 229.2). The criteria are also summarized here.

### Fishery Classification Criteria

The fishery classification criteria consist of a two-tiered, stock-specific approach that first addresses the total impact of all fisheries on each marine mammal stock, and then addresses the impact of individual fisheries on each stock. This approach is based on consideration of the rate, in numbers of animals per year, of incidental mortalities and serious injuries of marine mammals due to commercial fishing operations relative to the potential biological removal (PBR) level for each marine mammal stock. The MMPA (16 U.S.C. 1362 (20)) defines the PBR level as the maximum number of animals, not including natural mortalities, that may be removed from a marine mammal stock while allowing that stock to reach or maintain its optimum sustainable population. This definition can also be found in the implementing regulations for section 118 of the MMPA (50 CFR 229.2).

*Tier 1:* If the total annual mortality and serious injury of a marine mammal stock, across all fisheries, is less than or equal to 10 percent of the PBR level of the stock, all fisheries interacting with the stock would be placed in Category III (unless those fisheries interact with other stock(s) in which total annual mortality and serious injury is greater than 10 percent of PBR). Otherwise, these fisheries are subject to the next tier (Tier 2) of analysis to determine their classification.

*Tier 2, Category I:* Annual mortality and serious injury of a stock in a given fishery is greater than or equal to 50 percent of the PBR level.

*Tier 2, Category II:* Annual mortality and serious injury of a stock in a given fishery is greater than 1 percent and less than 50 percent of the PBR level.

*Tier 2, Category III:* Annual mortality and serious injury of a stock in a given fishery is less than or equal to 1 percent of the PBR level.

While Tier 1 considers the cumulative fishery mortality and serious injury for a particular stock, Tier 2 considers fishery-specific mortality and serious injury for a particular stock. Additional details regarding how the categories were determined are provided in the preamble to the final rule implementing section 118 of the MMPA (60 FR 45086, August 30, 1995).

Since fisheries are categorized on a per-stock basis, a fishery may qualify as one Category for one marine mammal stock and another Category for a different marine mammal stock. A fishery is typically categorized on the LOF at its highest level of classification (e.g., a fishery qualifying for Category III for one marine mammal stock and for Category II for another marine mammal stock will be listed under Category II).

### Other Criteria That May Be Considered

In the absence of reliable information indicating the frequency of incidental mortality and serious injury of marine mammals by a commercial fishery, NMFS will determine whether the incidental serious injury or mortality qualifies for Category II by evaluating other factors such as fishing techniques, gear used, methods used to deter marine mammals, target species, seasons and areas fished, qualitative data from logbooks or fisher reports, stranding data, and the species and distribution of marine mammals in the area, or at the discretion of the Assistant Administrator for Fisheries (50 CFR 229.2).

## How Do I Find Out if a Specific Fishery is in Category I, II, or III?

This final rule includes two tables that list all U.S. commercial fisheries by LOF Category. Table 1 lists all of the fisheries in the Pacific Ocean (including Alaska). Table 2 lists all of the fisheries in the Atlantic Ocean, Gulf of Mexico, and Caribbean.

## Am I Required to Register Under the MMPA?

Owners of vessels or gear engaging in a Category I or II fishery are required under the MMPA (16 U.S.C. 1387(c)(2)), as described in 50 CFR 229.4, to register with NMFS and obtain a marine mammal authorization from NMFS in order to lawfully incidentally take a marine mammal in a commercial fishery. Owners of vessels or gear engaged in a Category III fishery are not required to register with NMFS or obtain a marine mammal authorization.

## How Do I Register?

Vessel or gear owners must register with the Marine Mammal Authorization Program (MMAP) by contacting the relevant NMFS Regional Office (see **ADDRESSES**) unless they participate in a fishery that has an integrated registration program (described below). Upon receipt of a completed registration, NMFS will issue vessel or gear owners an authorization certificate. The authorization certificate, or a copy, must be on board the vessel while it is operating in a Category I or II fishery, or for non-vessel fisheries, in the possession of the person in charge of the fishing operation (50 CFR 229.4(e)).

## What is the Process for Registering in an Integrated Fishery?

For some fisheries, NMFS has integrated the MMPA registration process with existing state and Federal fishery license, registration, or permit systems. Participants in these fisheries are automatically registered under the MMPA and are not required to submit registration or renewal materials or pay the $25 registration fee. The following section indicates which fisheries are integrated fisheries and has a summary of the integration process for each Region. Vessel or gear owners who operate in an integrated fishery and have not received an authorization certificate by January 1 of each new year must contact their NMFS Regional Office (see **ADDRESSES**). Although efforts are made to limit the issuance of authorization certificates to only those vessel or gear owners that participate in Category I or II fisheries, not all state and Federal permit systems distinguish between fisheries as classified by the LOF. Therefore, some vessel or gear owners in Category III fisheries may receive authorization certificates even though they are not required for Category III fisheries. Individuals

**48804** **Federal Register** / Vol. 71, No. 162 / Tuesday, August 22, 2006 / Rules and Regulations

fishing in Category I and II fisheries for which no state or Federal permit is required must register with NMFS by contacting their appropriate Regional Office (see **ADDRESSES**).

**Which Fisheries Have Integrated Registration Programs?**

The following fisheries have integrated registration programs under the MMPA:

1. All Alaska Category II fisheries;
2. All Washington and Oregon Category II fisheries;
3. Northeast Regional fisheries for which a state or Federal permit is required;
4. All Southeast Regional fisheries for which a Federal permit is required, as well as fisheries permitted by the states of North Carolina, South Carolina, Georgia, Florida, Alabama, Mississippi, Louisiana, and Texas; and
5. The Hawaii Swordfish, Tuna, Billfish, Mahi Mahi, Wahoo,Oceanic Sharks Longline/Set line Fishery.

**How Do I Renew My Registration Under the MMPA?**

Vessel or gear owners that participate in fisheries that have integrated registration programs (described above) are automatically renewed and should receive an authorization certificate by January 1 of each new year. Vessel or gear owners who participate in an integrated fishery and have not received authorization certificates by January 1 must contact the appropriate NMFS Regional Office (see **ADDRESSES**). Vessel or gear owners that participate in fisheries that do not have integrated registration programs and that have previously registered in a Category I or II fishery will received a renewal packet from the appropriate NMFS Regional Office at least 30 days prior to January 1 of each new year. It is the responsibility of the vessel or gear owner in these fisheries to complete their renewal form and return it to the appropriate NMFS Regional Office at least 30 days in advance of fishing. Individuals who have not received a renewal packet by January 1 or are registering for the first time must request a registration form from the appropriate Regional Office (see **ADDRESSES**).

**Am I Required to Submit Reports When I Injure or Kill a Marine Mammal During the Course of Commercial Fishing Operations?**

In accordance with the MMPA (16 U.S.C. 1387(e)) and 50 CFR 229.6, any vessel owner or operator, or gear owner or operator (in the case of non-vessel fisheries), participating in a Category I, II, or III fishery must report to NMFS all incidental injuries and mortalities of marine mammals that occur during commercial fishing operations. "Injury" is defined in 50 CFR 229.2 as a wound or other physical harm. In addition, any animal that ingests fishing gear or any animal that is released with fishing gear entangling, trailing, or perforating any part of the body is considered injured, regardless of the presence of any wound or other evidence of injury, and must be reported. Injury/mortality report forms and instructions for submitting forms to NMFS can be downloaded from: *http://www.nmfs.noaa.gov/pr/pdfs/interactions/mmap_reporting_form.pdf*. Reporting requirements and procedures can be found in 50 CFR 229.6.

**Am I Required to Take an Observer Aboard My Vessel?**

Fishers participating in a Category I or II fishery are required to accommodate an observer aboard vessel(s) upon request. Observer requirements can be found in 50 CFR 229.7.

**Am I Required to Comply With Any Take Reduction Plan Regulations?**

Fishers participating in a Category I or II fishery are required to comply with any applicable take reduction plans. Take reduction plan requirements can be found at 50 CFR 229.30–34.

**Sources of Information Reviewed for the Proposed 2006 LOF**

NMFS reviewed the marine mammal incidental serious injury and mortality information presented in the Stock Assessment Reports (SARs) for all observed fisheries to determine whether changes in fishery classification were warranted. NMFS' SARs are based on the best scientific information available at the time of preparation, including the level of serious injury and mortality of marine mammals that occurs incidental to commercial fisheries and the PBR levels of marine mammal stocks. The information contained in the SARs is reviewed by regional scientific review groups (SRGs) representing Alaska, the Pacific (including Hawaii), and the U.S. Atlantic, Gulf of Mexico, and Caribbean. The SRGs were created by the MMPA to review the science that informs the SARs, and to advise NMFS on population status and trends, stock structure, uncertainties in the science, research needs, and other issues.

NMFS also reviewed other sources of new information, including marine mammal stranding data, observer program data, fisher self-reports, and other information that may not be included in the SARs.

The LOF for 2006 was based, among other things, on information provided in the final SARs for 1996 (63 FR 60, January 2, 1998), the final SARs for 2001 (67 FR 10671, March 8, 2002), the final SARs for 2002 (68 FR 17920, April 14, 2003), the final SARs for 2003 (69 FR 54262, September 8, 2004), the final SARs for 2004 (70 FR 35397, June 20, 2005), and the final SARs for 2005 (71 FR 26340, May 4, 2006). All SARs are available at: *http://www.nmfs.noaa.gov/pr/sars/*.

**Comments and Responses**

NMFS received 5 comment letters on the proposed 2006 LOF (71 FR 20941, April 24, 2006) from environmental, commercial fishing, and Federal and state interests. Comments on issues outside the scope of the LOF are noted, but are not responded to in this final rule.

*General Comments*

*Comment 1:* One commenter commended NMFS on the addition of detailed descriptions of the basis of classification decisions for each fishery on the 2006 LOF.

*Response:* In this final rule, NMFS provides additional information on the basis for classification of each fishery as Category I or II. The 2006 LOF identifies which stock(s) is responsible for a fishery's Category I classification, and indicates whether a fishery is classified as Category II based on serious injury or mortality of a marine mammal stock(s) or classified by analogy with another fishery (based on the definition of a "Category II fishery" in 50 CFR 229.2).

*Comment 2:* One commenter stated that in cases where the distribution of a marine mammal species overlaps with fisheries using gear types known to interact with that species, the fishery should be categorized with the presumption that a likelihood of interactions exists. Also, the commenter stated it is inappropriate to assume that interactions do not occur based only on fisher self-reporting.

*Response:* NMFS considers many factors in classifying fisheries, as directed by the implementing regulations for section 118 of the MMPA (50 CFR 229.2). In the absence of reliable information indicating the frequency of mortality and serious injury of marine mammals by a commercial fishery, the Assistant Administrator determines whether the incidental serious injury or mortality is "occasional" by evaluating other factors such as fishing techniques, gear used, methods used to deter marine mammals, target species, seasons and areas fished, qualitative data from logbooks or fisher

reports, stranding data, and the species and distribution of marine mammals in the area, or at the discretion of the Assistant Administrator (50 CFR 229.2).

*Comment 3:* One commenter stated that a species should not be deleted from the list of species incidentally killed or injured for a particular fishery based on a lack of evidence of interactions within the last 5 years, as the risk of interactions continues to exist.

*Response:* The LOF is intended to inform the public of the current status of commercial fisheries with respect to marine mammal serious injuries and mortalities. It was never intended that the LOF serve as a comprehensive document detailing the history of a fishery in terms of marine mammal interactions. NMFS recognizes that fisheries change over time and species/stocks should not remain on the list of species/stocks killed/injured in a certain fishery if there are no longer data to support inclusion. If observer information for interactions over the past 5 years is insufficient, NMFS uses the best available information (including stranding reports and fisher self-reports) to determine when to delete species/stocks from the list of species or stocks incidentally killed/injured. Historical information on a fishery's interactions with a marine mammal stock is presented in the SARs. Therefore, this information should not be duplicated in the LOF.

*Comment 4:* One commenter reiterated a previous recommendation on the 2005 LOF, in which the commenter requested that NMFS describe the level of observer coverage for each fishery listed on the LOF. The commenter stated that without this information the reader cannot discern whether "no interactions were documented" means that no interactions actually occurred or observer coverage was inadequate to determine interaction levels. Also, such a description would allow readers to evaluate classifications based on "analogy". The comment used as an example the classification of the CA sardine purse seine fishery due to its similarity to the CA anchovy, mackerel, tuna purse seine fishery.

*Response:* Section 118(c) of the MMPA requires that NMFS include an explanation of changes to the LOF, the approximate number of vessels or persons actively involved in a fishery, and the marine mammal stocks interacting with a fishery in a particular LOF. The best available information on the level of observer coverage for each fishery and the spatial and temporal distribution of marine mammal

interactions observed is presented in the SARs. NMFS refers readers to the SARs for the most current information on the level of observer coverage for each fishery. Copies of the SARs are available on the NMFS Office of Protected Resource's Web site at: *http://www.nmfs.noaa.gov/pr/sars/.* Additional information on observer coverage in commercial fisheries can be found on the National Observer Program's Web site: *http://www.st.nmfs.gov/st4/nop/.*

NMFS has not included detailed information on the level, or percentage, of observer coverage in the LOF because it is generally of limited use without also including information on the confidence associated with mortality/serious injury estimates generated from observer data. Information regarding the Coefficient of Variation (CV) for stock-specific mortality/serious injury estimates are instead reported in the SARs.

The example used in the comment is noteworthy because the "analogy" upon which classification of the CA sardine purse seine fishery was based does not require observer data as its basis. This fishery is similar in many characteristics to other purse seine fisheries in the general area, and these other fisheries are in Category II (based upon the best available information from observer data from 1990–1992). Category II is the default classification for new fisheries on the LOF when there is little or no information upon which to base classification; a Category II classification requires participants to register and carry observers if requested, so that baseline information regarding incidental mortality and serious injury levels in the fishery can be determined. Thus, Category II has been identified as the appropriate classification for those fisheries with insufficient or unreliable data to support classification.

General information on observer coverage in the LOF could be useful for the public. For that reason, NMFS will consider adding relevant information to future LOFs on recently observed fisheries, or fisheries the agency intends to observe in the near term, in such a way as to avoid misinterpretation of the information.

*Comment 5:* One commenter recommended NMFS review all cases where serious injury or mortality occurred, but where the involved fishery, the affected stock, or both, was unknown, to determine if potential misallocation of take could result in misclassification of the relevant fisheries. If misclassifications are possible, NMFS should develop alternatives for classifications that

ensure the potential risks to marine mammals are evaluated in a precautionary manner.

*Response:* If a misclassification were to occur, it is more likely to err on the conservative side as to minimize potential risks to marine mammals. For example, evidence of a possible fishery take through records of stranded animals would alert NMFS to potential problems with fisheries in the area. NMFS would then evaluate spatial and temporal cues to discern overlap between stranding reports and fishing activity, as well as net or gear marks or any other evidence that might indicate fishery interaction. NMFS would use this information in determining which fisheries might be involved. Most often, NMFS has enough indication from fisheries in the area to gauge potential for certain gear to be a risk to marine mammals, and uses this information to classify fisheries by analogy to other fisheries with similar gear in Category II. NMFS may also place observers in these fisheries to gather data on fisheries for which there is not yet sufficient information to determine the level of serious injury and mortality in a given fishery and/or which stocks interact with the fishery. NMFS continues to collect additional information on marine mammal stock structure and distribution and potential fishery interactions, through research on stranded and free-swimming marine mammals to identify the potential fishery involved and improvements to observer programs.

*Comment 6:* One commenter supported observer coverage as the best way to monitor interactions between fisheries and marine mammals.

*Response:* NMFS will continue to observe Category I and II fisheries for monitoring marine mammal interactions. However, NMFS notes that self-reporting of injuries and mortalities of marine mammals by fishers is required by the MMPA. For this purpose, NMFS developed the MMAP Mortality/Injury Report Form, which is available at: *http://www.nmfs.noaa.gov/pr/pdfs/interactions/mmap_reporting_form.pdf.*

*Comment 7:* One commenter urged NMFS to prioritize resources for observer coverage and ensure that resources are allocated to observe fisheries that have the most interactions with marine mammals and interactions with the most imperiled species.

*Response:* As required by section 118(d)(4) of the MMPA, the highest priority for allocating observers among fisheries would be for those commercial fisheries that have incidental mortality or serious injury of marine mammals

from stocks listed as endangered or threatened under the Endangered Species Act (ESA). To the extent practicable, the next highest priority for allocation would be for those Category I and Category II commercial fisheries that have incidental mortality and serious injury of marine mammals from strategic stocks. NMFS also places observers in fisheries where a take reduction plan (TRP) is in place to monitor incidental interactions to assess progress toward reducing interactions, to monitor compliance with the TRP, and to provide information useful to further reduce serious injury and mortality. NMFS also has observer coverage in fisheries for other fishery management purposes. In these cases, the information gathered may also be helpful in determining mortality and serious injury levels for fisheries that would otherwise not be a high priority for observer coverage under the MMPA (e.g., the American Samoa longline fishery).

NMFS will continue to allocate its limited resources for observer coverage to meet MMPA requirements according to these priorities. NMFS will also try to make the best use of available resources by using existing research programs, programs operated by states or other authorities, or alternative programs where statistically reliable information can be obtained.

In addition, NMFS has begun work on a National Bycatch Report that will provide a comprehensive summary of regional and national bycatch estimates in United States commercial fisheries based on observer data and fisher reports. The first edition of this report will discuss impacts and bycatch for fish, marine mammals, sea turtles, and sea birds in a subset of selected U.S. commercial fisheries where data and estimation procedures are available to support the development of bycatch estimates. NMFS plans to release the first edition in 2008. Subsequent editions will expand upon the number of fisheries included.

*Comments on Fisheries in the Pacific Ocean*

*Comment 8:* The list of marine mammals that interact with fisheries in Alaska includes threatened and endangered species. One commenter believes NMFS should convene a Take Reduction Team consisting of the Alaska Bering Sea/ Aleutian Islands (BSAI) flatfish trawl, BSAI pollock trawl, BSAI Greenland turbot longline, BSAI Pacific cod longline, and Bering Sea sablefish pot fishery to examine the impacts of commercial fisheries on marine mammals, including direct

bycatch as well as other impacts such as those to predator-prey relationships.

*Response:* Section 118(f) of the MMPA contains provisions for convening a Take Reduction Team, based on the need for developing and implementing a Take Reduction Plan (TRP) for individual strategic marine mammal stocks according to levels of serious injury and mortality to that stock as a direct result of incidental take. Ideally, a TRP for each strategic stock that interacts with a Category I or II fishery would be developed; however, when resources are limited, the MMPA provides a set of priorities in determining the need for convening such teams. NMFS resources for developing TRPs are allocated according to these priorities. The highest priorities specified in the MMPA are for species or stocks where PBR is exceeded, those with small population sizes, and those which are declining most rapidly. In the Alaska Region, there are no Category I fisheries and none of the strategic stocks that interact with Category II fisheries meet these highest priorities. Therefore, NMFS does not have plans at this time to develop a TRP for any marine mammal stock in Alaska.

*Comment 9:* One commenter noted that most gillnet fisheries in Alaska have little or no observer coverage, and reliance on fishers to report serious injury and mortality in those fisheries is likely to result in underestimates of serious injury and mortality. Of particular concern are humpbacks, which are known to occur in areas in which these fisheries operate. Anecdotal and documented reports of whales being caught in gillnets occur. Additionally, a humpback entangled in Alaska fishing gear has been documented in Hawaii. These reports, together with the gear's risk of incidentally taking marine mammals being analogous to East coast fisheries, should cause NMFS to elevate gillnets and purse seine fisheries to higher categories to enable observer coverage in those fisheries and more properly evaluate their risk to a variety of cetaceans, including some endangered species.

*Response:* With the implementation of Section 118 of the 1994 Amendments to the MMPA (60 FR 45086, August 30, 1995), all U.S. commercial fisheries were evaluated and re-categorized under the revised two-tier scheme currently used for fishery categorization for the annual LOF. At that time, very little information was available on marine mammal-fishery interactions for most of the nearshore fisheries in Alaska, including gillnet and purse seine fisheries. Reports by fishermen indicated some level of interaction.

However, NMFS considers this type of information to provide only a minimum estimate of interactions, and therefore considers it a less reliable indicator of the level of interaction than observer data. Due to the scarcity of reliable information, the Alaska set and drift gillnet fisheries were placed in Category II, based on analogy to gillnets in other regions of the U.S. known to incidentally entangle marine mammals, particularly cetaceans. The rationale in placing those fisheries in Category II was to preserve the ability to place observers in the fisheries to obtain more reliable estimates of the level of marine mammal serious injury and mortality, because NMFS may only place observers in Category III fisheries in voluntary programs or under compelling circumstances.

The NMFS/Alaska Regional Office's Marine Mammal Observer Program (AMMOP) places observers in each of the Category II nearshore, state-managed salmon fisheries for two-year periods. Due to limited resources, only one or two fisheries can be observed at any given time. Once a fishery is observed, data are analyzed to evaluate the serious injury and mortality levels and potential risk to marine mammals and appropriately classify the fishery on the LOF. That fishery will not be observed again until all the remaining unobserved Category II fisheries have been observed.

Since 1995, three Category II gillnet fisheries have been observed: the Cook Inlet set gillnet (1999–2000), Cook Inlet drift gillnet (1999–2000), and Kodiak set gillnet (2002, 2005) fisheries. Observer data collected in those fisheries have resulted in the retention of the Kodiak set gillnet and the Cook Inlet drift gillnet fisheries in Category II, and the re-categorization of the Cook Inlet set gillnet fishery to Category III. The Yakutat set gillnet fishery will be observed in 2007–2008.

The Alaska Regional Office maintains a record of marine mammals, including humpbacks, reported or observed entangled in fishing gear. This information is useful in monitoring the level of marine mammal-fishery interactions, but is not as statistically reliable as observer data. None of the currently available information indicates that reclassifying any of the Category II gillnet fisheries to Category I is warranted. The existing Category II fisheries are already eligible for observer coverage, and NMFS intends to place observer coverage in those fisheries as resources become available.

*Comment 10:* One commenter recommended NMFS undertake a more complete investigation of interactions with marine mammals in the Western

Pacific squid jig fishery and reclassify the fishery if warranted.

*Response:* There are no documented marine mammal serious injuries or mortalities incidental to the Western Pacific squid jig fishery, and the fishery currently has only 6 participants. NMFS will continue to consider information about this fishery's potential to interact with marine mammals, as available. Per the MMPA, NMFS will consider reclassification options for this fishery as future information warrants. Further justification for this fishery's classification as Category III is presented in the proposed rule for the 2006 LOF (71 FR 20941, April 24, 2006).

*Comment 11:* Two commenters supported the addition of the American Samoa longline fishery. However, both commenters suggested that the fishery be classified as Category II, instead of Category III, in order to ensure that sufficient funds and incentives exist to initiate an observer program to gather information on the level of interactions with marine mammals.

*Response:* Although this fishery is classified as Category III, an observer program for this fishery was initiated in April 2006 under the Magnuson-Stevens Fishery Conservation and Management Act. For more information, see 50 CFR part 665, which requires vessels participating in this fishery that are greater than 40 ft (12.2 m) in length to carry observers, if requested by NMFS. These regulations also establish a limited entry system for pelagic longline vessels fishing in waters of the U.S. exclusive economic zone (EEZ) around American Samoa. Observers have already completed several trips and, to date, there have been no observed marine mammal serious injuries or mortalities incidental to this fishery. NMFS anticipates that observer coverage will reach 20 percent of the qualifying vessels (i.e., those greater than 40 ft (12.2 m) in length) by January 2007. NMFS will reevaluate this fishery's classification as new information, including that gathered by the observer program, becomes available.

*Comment 12:* NMFS proposes to add three new Category III aquaculture fisheries in the Pacific Ocean. Two commenters suggested NMFS monitor aquaculture fisheries operations to characterize the rate and impact of interactions with marine mammals. Specifically, one commenter indicated a need for on-site observers for net pen fisheries due to past deliberate killings of marine mammals by net pen fishery operators, and for grow out pens due to the potential entanglement risks to cetaceans.

*Response:* NMFS plans to further evaluate aquaculture facilities operating in coastal and offshore areas, especially off California, to characterize the fisheries, including potential or known interactions with marine mammals. Based on the characterization of grow out pen fisheries, grow out pens occurring in deep water may pose a risk to cetaceans. Possible monitoring approaches for aquaculture fisheries include volunteer or mandatory reporting requirements by facilities to NMFS or the relevant state fishery management agency. NMFS will continue to investigate intentional killings of marine mammals in commercial fishery operations, as prohibited in implementing regulations for section 118 of the MMPA (50 CFR 229.3(f)).

*Comments on Fisheries in the Atlantic Ocean, Gulf of Mexico, and Caribbean*

*Comment 13:* Four commenters supported the proposed reclassification of the Chesapeake Bay inshore gillnet fishery and the Mid-Atlantic menhaden purse seine fishery.

*Response:* Reclassification of the Chesapeake Bay inshore gillnet fishery and the Mid-Atlantic menhaden purse seine fishery from Category III to Category II is warranted, based on information presented in the 2006 proposed LOF.

*Comment 14:* One commenter stated that the Atlantic Ocean, Caribbean, Gulf of Mexico large pelagics longline fishery came under limited access in 1999 and overall effort has diminished since 1996. The commenter suggested NMFS revise the estimated number of active participants in the to 94, the number of actively fishing vessels reported in 2005.

*Response:* NMFS has updated the number of participants in the fishery to 94.

*Comment 15:* One commenter commended NMFS for recognizing interactions in the Atlantic Ocean, Caribbean, Gulf of Mexico commercial passenger fishing vessel fishery and recommended NMFS begin an observer program in this fishing sector, as there are likely additional species of marine mammals incidentally killed or injured than those listed in the LOF.

*Response:* NMFS has initiated an at-sea data collection program aboard a limited number of commercial passenger fishing vessels as a pilot program. The results of this program will help NMFS to better determine the appropriate sampling design and resources required for increased coverage of this fishery.

*Comment 16:* One commenter suggested that NMFS subdivide the Atlantic Ocean, Caribbean, Gulf of Mexico large pelagics longline fishery into three regional fisheries in the LOF to reflect variations in geographic region, target species, vessel size, area-specific regulations, and fishing season. The commenter noted specifically that the Atlantic portion of the longline fishery should be divided into northern and southern components with a boundary line at the Florida/Georgia boundary. This division would be consistent with classifications of other fisheries in Alaska, the Pacific, and the Atlantic.

*Response:* NMFS acknowledges the information provided by the commenter on potential subdivisions of this fishery and notes that we addressed similar comments in the final LOF for 1996 (see Comment/Response 31 in 60 FR 249, December 28, 1995), the final LOF for 1997 (see Comment/Response 37 in 62 FR 33, January 2, 1997), the final LOF for 1999 (see Comment/Response 18 in 64 FR 9067, February 24, 1999), the final LOF for 2001 (see Comment/Response 16 in 66 FR 42784, August 15, 2001), and the final LOF for 2003 (see Comment/Response 29 in 68 FR 41732, July 15, 2003).

NMFS generally characterizes fisheries on the LOF consistent with the current management structure for the fishery. NMFS will, whenever possible, define fisheries the way they are defined in Federal, regional, or state fishery management programs. The pelagic longline fishery is managed by NMFS as one fishery encompassing all longline fishing effort targeting highly migratory species that may occur throughout the Atlantic Ocean, Caribbean, and Gulf of Mexico. The development of management measures to reduce serious injuries and mortalities of marine mammals in the longline fishery has focused primarily on those areas where interactions pose particular risk to marine mammals, without unduly affecting fishery operations in other areas.

*Comment 17:* One commenter recommended deleting the Western North Atlantic (WNA) stock of Atlantic spotted dolphins and the WNA stock of Pantropical spotted dolphins from the list of stocks that interact with the Atlantic Ocean, Caribbean, Gulf of Mexico large pelagics longline fishery. The draft 2005 SARs state no mortalities or serious injuries have been documented in this fishery, and incidental takes have not been documented by observers.

*Response:* The species list for this fishery should include only those

species that have been documented as injured or killed in the fishery for the period 1999–2003. NMFS will review observer data, bycatch reports, and other relevant data sources for this fishery and propose any warranted changes to the list of species incidentally injured/killed in the proposed LOF for 2007.

*Comment 18:* One commenter stated that NMFS uses speculative data to assign mortality, and the SARs use an unproven ''pooling'' method based on data from 1999–2003 to extrapolate estimated annual interactions in 2006 in the Atlantic Ocean, Caribbean, Gulf of Mexico large pelagics longline fishery. NMFS further applies a percentage to all extrapolated estimates based on observer comments, leading to a distortion of impacts and over-estimates of incidental take based on random and rare events.

*Response:* NMFS uses observer data to assign marine mammal mortality and serious injury to this fishery. The analytical methods used to extrapolate observed serious injuries and mortalities to annual estimates of mortality and serious injury are widely accepted and have been peer reviewed. The 2005 SAR uses 1999–2003 observer data because it is consistent with the NMFS guidelines for preparing marine mammal stock assessments. These guidelines are available at: *http://www.nmfs.noaa.gov/pr/pdfs/sars/gamms2005.pdf.*

*Comment 19:* One commenter disagreed with NMFS' proposal to remove the WNA stock of fin whales from the list of species killed/injured in the Mid-Atlantic gillnet fishery. A lack of documented observations should not be used to state that interactions do not occur. Also, given that fin whales occur in the same waters as this fishery and have been found entangled in gear of unknown origin, the gear could belong to any fixed-gear fishery.

*Response:* Observer coverage was placed in this fishery during the period 1999–2003. To date, NMFS does not have any confirmed, observer documented interactions between this stock and this fishery. Therefore, NMFS has removed the WNA stock of fin whales from the list of species killed/injured in the Mid-Atlantic gillnet fishery.

*Comment 20:* One commenter supported the reclassification of the Mid-Atlantic menhaden purse seine fishery and encouraged NMFS to implement an observer program for this fishery.

*Response:* NMFS has reclassified the Mid-Atlantic menhaden purse seine fishery as a Category II fishery, effective September 21, 2006. As a Category II fishery, NMFS may place observers in

the fishery; however, initiation of observer coverage is dependent on resources. Also see response to comment 7.

*Comment 21:* One commenter recommended NMFS expedite investigations of Gulf of Mexico bottlenose dolphin stock structure and reevaluate which fisheries' classifications may be affected by the updated information.

*Response:* Bottlenose dolphin stock structure in the Gulf of Mexico needs to be further defined in order to re-evaluate classification of the blue crab trap/pot and menhaden purse seine fisheries, as well as other fisheries that may be interacting with bottlenose dolphins in this area. NMFS research in the Gulf of Mexico in 2005–2006, as well as future planned research in this area, will assist in furthering our understanding of bottlenose dolphin stock structure in the Gulf of Mexico so as to better evaluate impacts of these and other fisheries. NMFS will consider these research results in analysis for future LOFs.

*Comment 22:* One commenter suggested NMFS compare the distribution of fishing effort in the Southeast Atlantic inshore gillnet fishery with the distribution of marine mammals (especially bottlenose dolphins) in the region, and reclassify the fishery as Category II if overlap occurs to an appreciable degree.

*Response:* NMFS will continue to monitor fishing effort and evaluate bottlenose dolphin strandings for evidence of gillnet-related fishery interactions in and around inshore waters of the Southeast to determine the need for future reclassification of the fishery.

*Comment 23:* Three commenters recommended NMFS reclassify gillnet fisheries operating in the Southeast Atlantic, specifically the Southeast Atlantic gillnet fishery, as Category I because of their potential involvement in the January 2006 death of a North Atlantic right whale calf and to enable NMFS to fully assess their level of interaction with marine mammals.

*Response:* NMFS determined the January 2006 death of a right whale calf was the result of entanglement and injury to the whale by gillnet gear in the Southeast U.S. Restricted Area; however, NMFS has not determined which specific gillnet fishery was responsible for the interaction. There are two gillnet fisheries that traditionally operate in this Southeast Atlantic: the Southeast Atlantic gillnet fishery and the Southeastern U.S. Atlantic shark gillnet fishery. Both are currently classified as Category II

fisheries. A fishery classified as Category I is one that is by itself responsible for the annual removal of 50 percent or more of any stock's potential biological removal level (50 CFR 229.2). Without definitive information regarding which fishery was involved, NMFS did not attribute the death of this right whale calf to either fishery. Therefore, elevation of the Southeast Atlantic gillnet fisheries to Category I is not warranted at this time. NMFS continues to classify these fisheries as a Category II, where they are subject to observer coverage.

Management measures were implemented following the January 2006 entanglement death of a right whale calf. NMFS issued a temporary rule effective February 15, 2006, through March 31, 2006 (71 FR 8223, February 16, 2006), restricting gillnet use in the area as required by the implementing regulations for the Atlantic Large Whale Take Reduction Plan (ALWTRP; 50 CFR 229.32(g)(1)). Specifically, the regulations state that if a serious injury or mortality of a right whale occurs in the Southeast U.S. Restricted Area during the North Atlantic right whale calving season (November 15 through March 31) as a result of an entanglement by gillnet gear, NMFS shall close that area to gillnet gear for the remainder of the time period (March 31). The regulations state NMFS shall also close that area to gillnet gear that same time period in each subsequent year, unless NMFS' Assistant Administrator revises the restricted period in accordance with 50 CFR 229.32(g)(2) or unless alternate measures are implemented.

*Comment 24:* Two commenters recommended that NMFS add North Atlantic right whales to the list of species killed/injured in the Southeast Atlantic gillnet fishery, as a result of the possibility this fishery was responsible for the January 2006 death of a right whale calf. In addition, one commenter recommended that humpback whales be added to the list of species killed/injured for all fixed gear fisheries in their range because most gear found on entangled whales cannot be attributed to a specific fishery.

*Response:* Right and humpback whales may become entangled in fixed gears. However, NMFS has not documented any marine mammal mortalities or serious injuries incidental to any other fixed gears that have not already been described in this annual LOF. Without reasonable information regarding which fishery is involved in entanglements of right and humpback whales, NMFS does not identify all fixed gear fisheries as being responsible

for injuries and/or mortalities. However, NMFS will continue to classify these fisheries as Category II by analogy.

**Summary of Changes to the LOF for 2006**

The following summarizes changes to the LOF in 2006 in fishery classification, fisheries listed on the LOF, the number of participants in a particular fishery, and the species and/or stocks that are incidentally killed or seriously injured in a particular fishery. The placement and definition of U.S. commercial fisheries for 2006 are identical to those provided in the LOF for 2005 with the following exceptions.

*Commercial Fisheries in the Pacific Ocean*

Fishery Classification

The "AK Bering Sea and Aleutian Islands Greenland turbot longline fishery" is reclassified from Category II to Category III.

The "CA sardine purse seine fishery" is elevated from Category III to Category II. The proposed 2006 LOF stated that this fishery was elevated in part by analogy "to other Category II purse seine fisheries (e.g., CA anchovy)." Specifically, the fishery is elevated in part by analogy with the CA anchovy, mackerel, tuna purse seine fishery and the CA squid purse seine fishery.

Addition of Fisheries to the LOF

The "American Samoa longline fishery" is added to the LOF as a Category III fishery.

The "Western Pacific squid jig fishery" is added to the LOF as a Category III fishery.

The "HI Kona crab loop net fishery" is added to the LOF as a Category III fishery.

The "HI offshore pen culture fishery" is added to the LOF as a Category III fishery.

The "CA marine shellfish aquaculture fishery" is added to the LOF as a Category III fishery.

The "CA white seabass enhancement net pen fishery" is added to the LOF as a Category III fishery.

Removal of Fisheries from the LOF

The "HI net unclassified fishery" is removed from the LOF.

The "AK miscellaneous finfish pair trawl" is removed from the LOF. This was a new fishery in Alaskan waters in 1996 and was classified as Category II pending additional information on interactions with marine mammals. It was classified as Category II by analogy with pair trawl fisheries in the North Atlantic, particularly the U.S. North Atlantic large pelagics pair trawl

fishery, which demonstrated high levels of mortality and serious injury for some marine mammal species. NMFS did not propose to remove this fishery in the proposed LOF for 2006 (71 FR 78, April 24, 2006). NMFS has since learned that there have been no reported mortalities or serious injuries of marine mammals in this fishery since its addition to the LOF. In addition, the fishery is not currently in operation, with the exception of two currently inactive permits issued by the Alaska Department of Fish and Game. NMFS will reevaluate the removal of this fishery if new information on interactions with marine mammals is presented.

Fishery Name and Organizational Changes and Clarifications

The "HI tuna fishery" is renamed the "HI tuna handline fishery."

The "HI deep sea bottomfish fishery" is renamed the "HI Main Hawaiian Islands and Northwest Hawaiian Islands deep sea bottomfish fishery."

The "HI coral diving fishery" is renamed the "HI black coral diving fishery."

The "HI other fishery" is renamed the "HI charter vessel fishery."

Number of Vessels/Persons

The estimated number of participants in the "HI gillnet fishery" is updated to 35.

The estimated number of participants in the "HI opelu/akule net fishery" is updated to 12.

The estimated number of participants in the "HI purse seine fishery" is updated to 23.

The estimated number of participants in the "HI fish pond fishery" is updated to N/A. NMFS is retaining this fishery on the LOF as there may be participants in the near future.

The estimated number of participants in the "HI throw net, cast net fishery" is updated to 14.

The estimated number of participants in the "HI trolling, rod and reel fishery" is updated to 1,321.

The estimated number of participants in the "HI lobster trap fishery" is updated to 0. Fourteen permits are available if this fishery reopened.

The estimated number of participants in the "HI aku boat, pole and line fishery" is updated to 4.

The estimated number of participants in the "HI inshore handline fishery" is updated to 307.

The estimated number of participants in the "HI tuna handline fishery" (proposed name change from the "HI tuna fishery", see Fishery Name and Organizational Changes and Clarifications section) is updated to 298.

The estimated number of participants in the "HI main Hawaiian Islands and Northwest Hawaiian Islands deep sea bottomfish fishery" (proposed name change from the "HI deep sea bottomfish fishery", see Fishery Name and Organizational Changes and Clarifications section) is updated to 387.

The estimated number of participants in the "HI black coral diving fishery" (proposed name change from the "HI coral diving fishery", see Fishery Name and Organizational Changes and Clarifications section) is updated to 1.

The estimated number of participants in the "HI handpick fishery" is updated to 37.

The estimated number of participants in the "HI lobster diving fishery" is updated to 19.

The estimated number of participants in the "HI squiding, spear fishery" is updated to 91.

The estimated number of participants in the "AK BSAI Greenland turbot longline fishery" is updated to 12.

List of Species That are Incidentally Injured or Killed

*California Squid Purse Seine Fishery*

Common dolphins, stock unknown, are added to the list of marine mammal species and stocks incidentally injured or killed by the CA squid purse seine fishery.

*HI Swordfish, Tuna, Billfish, Mahi Mahi, Wahoo, and Oceanic Sharks Longline/Set Line Fishery*

The Hawaiian stocks of Blaineville's beaked whales and Pantropical spotted dolphins are added to the list of marine mammal species and stocks incidentally injured or killed by the HI swordfish, tuna, billfish, mahi mahi, wahoo, and oceanic sharks longline/set line fishery.

*HI Inshore Handline Fishery*

The Hawaiian stock of bottlenose dolphins is removed from the list of marine mammal species and stocks incidentally injured or killed by the HI inshore handline fishery.

*HI Tuna Handline Fishery*

The Hawaiian stocks of bottlenose dolphins and rough tooth dolphins are removed from the list of marine mammal species and stocks incidentally injured or killed by the Hawaii tuna handline fishery (proposed name change from "Hawaii tuna fishery", see Fishery Name and Organizational Changes and Clarifications section).

*CA/OR Thresher Shark/Swordfish Drift Gillnet Fishery*

Corrections are made to errors in the list of marine mammal species and

stocks incidentally injured or killed by the CA/OR thresher shark/swordfish drift gillnet fishery. Specifically, the CA/OR/WA Pacific coast stock of killer whales is changed to the Eastern North Pacific offshore stock, and the CA/OR/WA stock of long-beaked common dolphins is changed to the CA stock. Additionally, the Northern and Southern species of Pacific white-sided dolphins are combined to reflect how these species are currently characterized in the SARs.

*WA, OR, CA Groundfish Trawl Fishery*

Corrections are made to errors in the list of marine mammal species and stocks injured or killed incidental to the WA, OR, CA groundfish trawl fishery. Specifically, the Central North Pacific stock of Pacific white-sided dolphins is changed to the CA/OR/WA stock, and the Western stock of Steller sea lions is changed to the Eastern stock.

Alaska Fisheries

The 2004 LOF revised the Federally managed fisheries in Alaska into more discrete fisheries according to area, gear, and target species in order to more accurately reflect the fisheries as managed under Federal Fishery Management Plans. At that time, the marine mammal stocks associated with the newly delineated fisheries in the LOF were not revised accordingly. The following marine mammal stocks are added to the list of species and stocks incidently injured or killed in the following Federal fisheries.

*AK Bering Sea, Aleutian Islands Flatfish Trawl Fishery*

The Eastern North Pacific stock of Northern fur seals, the Bering Sea stocks of harbor porpoise and harbor seals, and the Alaska stocks of bearded seals, spotted seals, and walruses are added to the list of marine mammal species and stocks injured or killed incidental to the AK BSAI flatfish trawl fishery.

*AK Bering Sea, Aleutian Islands Pollock Trawl Fishery*

The Bering Sea stock of harbor seals and the Alaska stocks of Dall's porpoise, minke whales, ribbon seals, and spotted seals are added to the list of marine mammal species and stocks injured or killed incidental to the AK BSAI pollock trawl fishery.

*AK Bering Sea, Aleutian Islands Pacific Cod Longline Fishery*

The Alaska stock of ribbon seals and the Western U.S. stock of Steller sea lions are added to the list of marine mammal species and stocks injured or

killed incidental to the AK BSAI Pacific cod longline fishery.

*AK Gulf of Alaska Sablefish Longline Fishery*

The Eastern U.S. stock of Steller sea lions and the North Pacific stock of sperm whales are added to the list of marine mammal species and stocks injured or killed incidental to the AK GOA sablefish longline fishery.

*AK Bering Sea, Aleutian Islands Pacific Cod Trawl Fishery*

The Western U.S. stock of Steller sea lions and the Bering Sea stock of harbor seals are added to the list of marine mammal species and stocks injured or killed incidental to the AK BSAI Pacific cod trawl fishery.

*AK Gulf of Alaska Pacific Cod Trawl Fishery*

The Western U.S. stock of Steller sea lions is added to the list of marine mammal species and stocks injured or killed incidental to the AK GOA Pacific cod trawl fishery.

*AK Gulf of Alaska Pollock Trawl Fishery*

The Western U.S. stock of Steller sea lions, the Northeast Pacific stock of fin whales, and the North Pacific stock of Northern elephant seals are added to the list of marine mammal species and stocks injured or killed incidental to the AK GOA pollock trawl fishery.

*AK Gulf of Alaska Pacific Cod Pot Fishery*

The GOA stock of harbor seals are added to the list of marine mammal species and stocks injured or killed incidental to the AK GOA Pacific cod pot fishery.

*AK, WA, OR, CA Commercial Passenger Fishing Vessel Fishery*

The Eastern and Western U.S. stocks of Steller sea lions and an unknown stock of killer whales are added to the list of marine mammal species and stocks injured or killed incidental to the AK, WA, OR, CA commercial passenger fishing vessel fishery.

*AK Southeast Alaska Crab Pot Fishery*

The Central North Pacific (Southeast AK) stock of humpback whales is added to the list of marine mammal species and stocks injured or killed incidental to the AK Southeast Alaska crab pot fishery.

*AK Southeast Alaska Shrimp Pot Fishery*

The Central North Pacific (Southeast AK) stock of humpback whales is added to the list of marine mammal species

and stocks injured or killed incidental to the AK Southeast Alaska shrimp pot fishery.

*AK Yakutat Salmon Set Gillnet Fishery*

The Central North Pacific (Southeast AK) stock of humpback whales is added to the list of marine mammal species and stocks injured or killed incidental to the AK Yakutat salmon set gillnet fishery.

*AK Kodiak Salmon Set Gillnet Fishery*

The Western U.S. stock of Steller sea lions is added to the list of marine mammal species and stocks injured or killed incidental to the AK Kodiak salmon set gillnet fishery.

*Alaska Bering Sea, Aleutian Islands Flatfish Trawl Fishery*

The Eastern North Pacific transient stock of killer whales is removed from the list of marine mammals species and stocks injured or killed in the Alaska BSAI flatfish trawl fishery.

*Alaska Bering Sea, Aleutian Islands Pollock Trawl Fishery*

The Eastern North Pacific resident stock of killer whales is removed from the list of marine mammals species and stocks incidentally injured or killed in the Alaska BSAI pollock trawl fishery.

*Commercial Fisheries in the Atlantic Ocean, Gulf of Mexico, and Caribbean*

Fishery Classification

The ''Chesapeake Bay inshore gillnet fishery'' is elevated from Category III to Category II.

The ''Mid-Atlantic menhaden purse seine fishery'' is elevated from Category III to Category II.

Addition of Fisheries to the LOF

The ''Southeast Atlantic inshore gillnet fishery'' is added to the LOF as a Category III fishery.

Fishery Name and Organizational Changes and Clarifications

The list of target species associated with the ''Southeast Atlantic gillnet fishery'' is expanded to include the following target species: king mackerel, Spanish mackerel, whiting, bluefish, pompano, spot, croaker, little tunny, bonita, jack crevalle, and cobia. Atlantic sturgeon are listed as a species of concern under the ESA and are also managed under a fishery management plan. A moratorium on possession and harvest of this species currently exists throughout the U.S. East Coast. Additionally, fishing for shad in ocean waters is prohibited by Southeast coastal states and is therefore no longer

included as a target species of the Southeast Atlantic gillnet fishery.

Number of Vessels/Persons

The estimated number of participants in the "Atlantic Ocean, Caribbean, Gulf of Mexico large pelagics longline fishery" is updated to 94.

List of Species That are Incidentally Injured or Killed

*Mid-Atlantic Gillnet Fishery*

The Western North Atlantic stock of fin whales is removed from the list of marine mammal species and stocks incidentally injured or killed incidental to the Mid-Atlantic gillnet fishery.

*Atlantic Ocean, Gulf of Mexico, Caribbean Commercial Passenger Fishing Vessel Fishery*

Several bottlenose dolphin stocks are added to the list of marine mammal species and stocks incidentally injured or killed incidental to the Atlantic Ocean, Gulf of Mexico, Caribbean commercial passenger fishing vessel fishery. These bottlenose dolphin stocks include the Western North Atlantic coastal, Eastern Gulf of Mexico coastal, Northern Gulf of Mexico coastal, and Western Gulf of Mexico coastal.

*Northeast Bottom Trawl Fishery*

The Western North Atlantic offshore stock of bottlenose dolphins and the Western North Atlantic stock of striped dolphins are removed from the list of marine mammal species and stocks injured or killed incidental to the Northeast bottom trawl fishery.

**List of Fisheries**

The following two tables list U.S. commercial fisheries according to their assigned categories under section 118 of the MMPA. The estimated number of vessels/participants is expressed in terms of the number of active participants in the fishery, when possible. If this information is not available, the estimated number of vessels or persons licensed for a particular fishery is provided. If no recent information is available on the number of participants in a fishery, the number from the most recent LOF is used.

The tables also list the marine mammal species and stocks that are incidentally killed or injured in each fishery based on observer data, logbook data, stranding reports, and fisher reports. This list includes all species or stocks known to experience injury or mortality in a given fishery, but also includes species or stocks for which there are anecdotal records of interaction. Additionally, species identified by logbook entries may not be verified. Not all species or stocks identified are the reason for a fishery's placement in a given category. NMFS has designated those stocks that are responsible for a current fishery's classification by a "[1].

There are several fisheries classified in Category II that have no recently documented interactions with marine mammals, or interactions that did not result in a serious injury or mortality. Justifications for placement of these fisheries, which are greater than 1 percent of a stock's PBR level, are by analogy to other gear types that are known to cause mortality or serious injury of marine mammals, as discussed in the final LOF for 1996 (60 FR 67063, December 28, 1995), and according to factors listed in the definition of a "Category II fishery" in 50 CFR 229.2. NMFS has designated those fisheries originally listed by analogy in Tables 1 and 2 by a "[2]" after that fishery's name.

Table 1 lists commercial fisheries in the Pacific Ocean (including Alaska); Table 2 lists commercial fisheries in the Atlantic Ocean, Gulf of Mexico, and Caribbean.

TABLE 1.—LIST OF FISHERIES COMMERCIAL FISHERIES IN THE PACIFIC OCEAN

| Fishery Description | Estimated # of vessels/ persons | Marine mammal species and stocks incidentally killed/injured |
|---|---|---|
| Category I | | |
| GILLNET FISHERIES: | | |
| CA angel shark/halibut and other species set gillnet (> 3.5 in. mesh) | 58 | California sea lion, U.S. Harbor seal, CA Harbor porpoise, Central CA[1] Long-beaked common dolphin, CA Northern elephant seal, CA breeding Sea otter, CA Short-beaked common dolphin, CA/OR/WA |

TABLE 1.—LIST OF FISHERIES COMMERCIAL FISHERIES IN THE PACIFIC OCEAN—Continued

| Fishery Description | Estimated # of vessels/ persons | Marine mammal species and stocks incidentally killed/injured |
|---|---|---|
| CA/OR thresher shark/swordfish drift gillnet (≥ 14 in. mesh) | 85 | Baird's beaked whale, CA/OR/WA<br>Bottlenose dolphin, CA/OR/WA offshore<br>California sea lion, U.S.<br>Cuvier's beaked whale, CA/OR/WA<br>Dall's porpoise, CA/OR/WA<br>Fin whale, CA/OR/WA<br>Gray whale, Eastern North Pacific<br>Humpback whale, CA/OR/WA-Mexico<br>Killer whale, Eastern North Pacific offshore<br>Long-beaked common dolphin, CA<br>Mesoplodont beaked whale, CA/OR/WA<br>Northern elephant seal, CA breeding<br>Northern fur seal, San Miguel Island<br>Northern right-whale dolphin, CA/OR/WA<br>Pacific white-sided dolphin, CA/OR/WA<br>Pygmy sperm whale, CA/OR/WA<br>Risso's dolphin, CA/OR/WA<br>Short-beaked common dolphin, CA/OR/WA<br>Short-finned pilot whale, CA/OR/WA[1]<br>Sperm whale, CA/OR/WA<br>Steller sea lion, Eastern U.S.<br>Striped dolphin, CA/OR/WA |
| LONGLINE/SET LINE FISHERIES: | | |
| HI swordfish, tuna, billfish, mahi mahi, wahoo, oceanic sharks longline/set line | 140 | Blainville's beaked whale, HI<br>Bottlenose dolphin, HI<br>False killer whale, HI[1]<br>Humpback whale, Central North Pacific<br>Pantropical spotted dolphin, HI<br>Risso's dolphin, HI<br>Short-finned pilot whale, HI<br>Spinner dolphin, HI<br>Sperm whale, HI |
| Category II | | |
| GILLNET FISHERIES: | | |
| AK Bristol Bay salmon drift gillnet[2] | 1,903 | Beluga whale, Bristol Bay<br>Gray whale, Eastern North Pacific<br>Harbor seal, Bering Sea<br>Northern fur seal, Eastern Pacific<br>Pacific white-sided dolphin, North Pacific<br>Spotted seal, AK<br>Steller sea lion, Western U.S.[1] |
| AK Bristol Bay salmon set gillnet[2] | 1,014 | Beluga whale, Bristol Bay<br>Gray whale, Eastern North Pacific<br>Harbor seal, Bering Sea<br>Northern fur seal, Eastern Pacific<br>Spotted seal, AK |
| AK Cook Inlet salmon drift gillnet | 576 | Beluga whale, Cook Inlet<br>Dall's porpoise, AK<br>Harbor porpoise, GOA[1]<br>Harbor seal, GOA<br>Steller sea lion, Western U.S. |
| AK Kodiak salmon set gillnet | 188 | Harbor porpoise, GOA[1]<br>Harbor seal, GOA<br>Sea otter, Southwest AK<br>Steller sea lion, Western U.S. |
| AK Metlakatla/Annette Island salmon drift gillnet[2] | 60 | None documented |

**Federal Register** / Vol. 71, No. 162 / Tuesday, August 22, 2006 / Rules and Regulations    **48813**

TABLE 1.—LIST OF FISHERIES COMMERCIAL FISHERIES IN THE PACIFIC OCEAN—Continued

| Fishery Description | Estimated # of vessels/ persons | Marine mammal species and stocks incidentally killed/injured |
|---|---|---|
| AK Peninsula/Aleutian Islands salmon drift gillnet[2] | 164 | Dall's porpoise, AK<br>Harbor porpoise, GOA<br>Harbor seal, GOA<br>Northern fur seal, Eastern Pacific |
| AK Peninsula/Aleutian Islands salmon set gillnet[2] | 116 | Harbor porpoise, Bering Sea<br>Steller sea lion, Western U.S. |
| AK Prince William Sound salmon drift gillnet | 541 | Dall's porpoise, AK<br>Harbor porpoise, GOA[1]<br>Harbor seal, GOA<br>Northern fur seal, Eastern Pacific<br>Pacific white-sided dolphin, North Pacific<br>Steller sea lion, Western U.S.[1] |
| AK Southeast salmon drift gillnet | 481 | Dall's porpoise, AK<br>Harbor porpoise, Southeast AK<br>Harbor seal, Southeast AK<br>Humpback whale, Central North Pacific[1]<br>Pacific white-sided dolphin, North Pacific<br>Steller sea lion, Eastern U.S. |
| AK Yakutat salmon set gillnet[2] | 170 | Gray whale, Eastern North Pacific<br>Harbor seal, Southeast AK<br>Humpback whale, Central North Pacific (Southeast AK) |
| CA yellowtail, barracuda, white seabass, and tuna drift gillnet fishery (mesh size > 3.5 inches and < 14 inches)[2] | 24 | California sea lion, U.S.<br>Long-beaked common dolphin, CA<br>Short-beaked common dolphin, CA/OR/WA |
| WA Puget Sound Region salmon drift gillnet (includes all inland waters south of US-Canada border and eastward of the Bonilla-Tatoosh line-Treaty Indian fishing is excluded) | 210 | Dall's porpoise, CA/OR/WA<br>Harbor porpoise, inland WA[1]<br>Harbor seal, WA inland |
| PURSE SEINE FISHERIES: | | |
| AK Southeast salmon purse seine | 416 | Humpback whale, Central North Pacific[1] |
| CA anchovy, mackerel, tuna purse seine | 110 | Bottlenose dolphin, CA/OR/WA offshore1<br>California sea lion, U.S.<br>Harbor seal, CA |
| CA sardine purse seine[2] | 110 | California sea lion, U.S. |
| CA squid purse seine | 65 | Common dolphin, unknown<br>Short-finned pilot whale, CA/OR/WA[1] |
| TRAWL FISHERIES: | | |
| AK Bering Sea, Aleutian Islands flatfish trawl | 26 | Bearded seal, AK<br>Harbor porpoise, Bering Sea<br>Harbor seal, Bering Sea<br>Killer whale, AK resident[1]<br>Northern fur seal, Eastern North Pacific<br>Spotted seal, AK<br>Steller sea lion, Western U.S.[1]<br>Walrus, AK |
| AK Bering Sea, Aleutian Islands pollock trawl | 120 | Dall's porpoise, AK<br>Harbor seal, AK<br>Humpback whale, Central North Pacific[1]<br>Humpback whale, Western North Pacific[1]<br>Killer whale, Eastern North Pacific, GOA, Aleutian Islands, and Bering Sea transient[1]<br>Minke whale, AK<br>Ribbon seal, AK<br>Spotted seal, AK<br>Steller sea lion, Western U.S.[1] |

TABLE 1.—LIST OF FISHERIES COMMERCIAL FISHERIES IN THE PACIFIC OCEAN—Continued

| Fishery Description | Estimated # of vessels/ persons | Marine mammal species and stocks incidentally killed/injured |
|---|---|---|
| LONGLINE/SET LINE FISHERIES: | | |
| AK Bering Sea, Aleutian Islands Pacific cod longline | 114 | Killer whale, AK resident[1]<br>Killer whale, Eastern North Pacific, GOA, Aleutian Islands, and Bering Sea transient[1]<br>Ribbon seal, AK<br>Steller sea lion, Western U.S. |
| CA pelagic longline[2] | 6 | California sea lion, U.S.<br>Risso's dolphin, CA/OR/WA |
| OR swordfish floating longline[2] | 0 | None documented |
| OR blue shark floating longline[2] | 1 | None documented |
| POT, RING NET, AND TRAP FISHERIES: | | |
| AK Bering Sea sablefish pot | 6 | Humpback whale, Central North Pacific[1]<br>Humpback whale, Western North Pacific[1] |
| Category III | | |
| GILLNET FISHERIES: | | |
| AK Cook Inlet salmon set gillnet | 745 | Beluga whale, Cook Inlet<br>Dall's porpoise, AK<br>Harbor porpoise, GOA<br>Harbor seal, GOA<br>Steller sea lion, Western U.S. |
| AK Kuskokwim, Yukon, Norton Sound, Kotzebue salmon gillnet | 1,922 | Harbor porpoise, Bering Sea |
| AK miscellaneous finfish set gillnet | 3 | Steller sea lion, Western U.S. |
| AK Prince William Sound salmon set gillnet | 30 | Harbor seal, GOA<br>Steller sea lion, Western U.S. |
| AK roe herring and food/bait herring gillnet | 2,034 | None documented |
| CA set and drift gillnet fisheries that use a stretched mesh size of 3.5 in or less | 341 | None documented |
| Hawaii gillnet | 35 | Bottlenose dolphin, HI<br>Spinner dolphin, HI |
| WA Grays Harbor salmon drift gillnet (excluding treaty Tribal fishing) | 24 | Harbor seal, OR/WA coast |
| WA, OR herring, smelt, shad, sturgeon, bottom fish, mullet, perch, rockfish gillnet | 913 | None documented |
| WA, OR lower Columbia River (includes tributaries) drift gillnet | 110 | California sea lion, U.S.Harbor seal, OR/WA coast |
| WA Willapa Bay drift gillnet | 82 | Harbor seal, OR/WA coast<br>Northern elephant seal, CA breeding |
| PURSE SEINE, BEACH SEINE, ROUND HAUL AND THROW NET FISHERIES: | | |
| AK Metlakatla salmon purse seine | 10 | None documented |
| AK miscellaneous finfish beach seine | 1 | None documented |
| AK miscellaneous finfish purse seine | 3 | None documented |
| AK octopus/squid purse seine | 2 | None documented |
| AK roe herring and food/bait herring beach seine | 8 | None documented |

TABLE 1.—LIST OF FISHERIES COMMERCIAL FISHERIES IN THE PACIFIC OCEAN—Continued

| Fishery Description | Estimated # of vessels/ persons | Marine mammal species and stocks incidentally killed/injured |
|---|---|---|
| AK roe herring and food/bait herring purse seine | 624 | None documented |
| AK salmon beach seine | 34 | None documented |
| AK salmon purse seine (except Southeast Alaska, which is in Category II) | 953 | Harbor seal, GOA |
| CA herring purse seine | 100 | California sea lion, U.S. Harbor seal, CA |
| HI Kona crab loop net | 42 | None documented |
| HI opelu/akule net | 12 | None documented |
| HI purse seine | 23 | None documented |
| HI throw net, cast net | 14 | None documented |
| WA (all species) beach seine or drag seine | 235 | None documented |
| WA, OR herring, smelt, squid purse seine or lampara | 130 | None documented |
| WA salmon purse seine | 440 | None documented |
| WA salmon reef net | 53 | None documented |
| DIP NET FISHERIES: | | |
| CA squid dip net | 115 | None documented |
| WA, OR smelt, herring dip net | 119 | None documented |
| MARINE AQUACULTURE FISHERIES: | | |
| CA marine shellfish aquaculture | unknown | None documented |
| CA salmon enhancement rearing pen | >1 | None documented |
| CA white seabass enhancement net pens | 13 | California sea lion, U.S. |
| HI offshore pen culture | 2 | None documented |
| OR salmon ranch | 1 | None documented |
| WA, OR salmon net pens | 14 | California sea lion, U.S. Harbor seal, WA inland waters |
| TROLL FISHERIES: | | |
| AK North Pacific halibut, AK bottom fish, WA, OR, CA albacore, groundfish, bottom fish, CA halibut non-salmonid troll fisheries | 1,530 (330 AK) | None documented |
| AK salmon troll | 2,335 | Steller sea lion, Eastern U.S. Steller sea lion, Western U.S. |
| American Samoa tuna troll | < 50 | None documented |
| CA/OR/WA salmon troll | 4,300 | None documented |
| Commonwealth of the Northern Mariana Islands tuna troll | 50 | None documented |
| Guam tuna troll | 50 | None documented |
| HI trolling, rod and reel | 1,321 | None documented |
| LONGLINE/SET LINE FISHERIES: | | |
| AK Bering Sea, Aleutian Islands Greenland turbot longline | 12 | Killer whale, AK resident Killer whale, Eastern North Pacific, GOA, Aleutian Islands, and Bering Sea transient |

TABLE 1.—LIST OF FISHERIES COMMERCIAL FISHERIES IN THE PACIFIC OCEAN—Continued

| Fishery Description | Estimated # of vessels/persons | Marine mammal species and stocks incidentally killed/injured |
|---|---|---|
| AK Bering Sea, Aleutian Islands rockfish longline | 17 | None documented |
| AK Bering Sea, Aleutian Islands sablefish longline | 63 | None documented |
| AK Gulf of Alaska halibut longline | 1,302 | None documented |
| AK Gulf of Alaska Pacific cod longline | 440 | None documented |
| AK Gulf of Alaska rockfish longline | 421 | None documented |
| AK Gulf of Alaska sablefish longline | 412 | Sperm whale, North Pacific<br>Steller sea lion, Eastern U.S. |
| AK halibut longline/set line (State and Federal waters) | 3,079 | Steller sea lion, Western U.S. |
| AK octopus/squid longline | 7 | None documented |
| AK state-managed waters groundfish longline/setline (including sablefish, rockfish, and miscellaneous finfish) | 731 | None documented |
| American Samoa longline | 138 | None documented |
| WA, OR, CA groundfish, bottomfish longline/set line | 367 | None documented |
| WA, OR North Pacific halibut longline/set line | 350 | None documented |
| TRAWL FISHERIES: | | |
| AK Bering Sea, Aleutian Islands Atka mackerel trawl | 8 | Steller sea lion, Western U.S. |
| AK Bering Sea, Aleutian Islands Pacific cod trawl | 87 | Harbor seal, Bering Sea<br>Steller sea lion, Western U.S. |
| AK Bering Sea, Aleutian Islands rockfish trawl | 9 | None documented |
| AK Gulf of Alaska flatfish trawl | 52 | None documented |
| AK Gulf of Alaska Pacific cod trawl | 101 | Steller sea lion, Western U.S. |
| AK Gulf of Alaska pollock trawl | 83 | Fin whale, Northeast Pacific<br>Northern elephant seal, North Pacific<br>Steller sea lion, Western U.S. |
| AK Gulf of Alaska rockfish trawl | 45 | None documented |
| AK food/bait herring trawl | 3 | None documented |
| AK miscellaneous finfish otter or beam trawl | 6 | None documented |
| AK shrimp otter trawl and beam trawl (statewide and Cook Inlet) | 58 | None documented |
| AK state-managed waters of Cook Inlet, Kachemak Bay, Prince William Sound, Southeast AK groundfish trawl | 2 | None documented |
| WA, OR, CA groundfish trawl | 585 | California sea lion, U.S.<br>Dall's porpoise, CA/OR/WA<br>Harbor seal, OR/WA coast<br>Northern fur seal, Eastern Pacific<br>Pacific white-sided dolphin, CA/OR/WA<br>Steller sea lion, Eastern U.S. |
| WA, OR, CA shrimp trawl | 300 | None documented |
| POT, RING NET, AND TRAP FISHERIES: | | |
| AK Aleutian Islands sablefish pot | 8 | None documented |
| AK Bering Sea, Aleutian Islands Pacific cod pot | 76 | None documented |
| AK Bering Sea, Aleutian Islands crab pot | 329 | None documented |

TABLE 1.—LIST OF FISHERIES COMMERCIAL FISHERIES IN THE PACIFIC OCEAN—Continued

| Fishery Description | Estimated # of vessels/ persons | Marine mammal species and stocks incidentally killed/injured |
|---|---|---|
| AK Gulf of Alaska crab pot | unknown | None documented |
| AK Gulf of Alaska Pacific cod pot | 154 | Harbor seal, GOA |
| AK Southeast Alaska crab pot | unknown | Humpback whale, Central North Pacific (Southeast AK) |
| AK Southeast Alaska shrimp pot | unknown | Humpback whale, Central North Pacific (Southeast AK) |
| AK octopus/squid pot | 72 | None documented |
| AK snail pot | 2 | None documented |
| CA lobster, prawn, shrimp, rock crab, fish pot | 608 | Sea otter, CA |
| OR, CA hagfish pot or trap | 25 | None documented |
| WA, OR, CA crab pot | 1,478 | Gray whale, Eastern North Pacific |
| WA, OR, CA sablefish pot | 176 | None documented |
| WA, OR shrimp pot/trap | 254 | None documented |
| HI crab trap | 22 | None documented |
| HI fish trap | 19 | None documented |
| HI lobster trap | 0 | Hawaiian monk seal |
| HI shrimp trap | 5 | None documented |
| HANDLINE AND JIG FISHERIES: | | |
| AK miscellaneous finfish handline and mechanical jig | 100 | None documented |
| AK North Pacific halibut handline and mechanical jig | 93 | None documented |
| AK octopus/squid handline | 2 | None documented |
| American Samoa bottomfish | <50 | None documented |
| Commonwealth of the Northern Mariana Islands bottomfish | <50 | None documented |
| Guam bottomfish | <50 | None documented |
| HI aku boat, pole and line | 4 | None documented |
| HI Main Hawaiian Islands, Northwest Hawaiian Islands deep sea bottomfish | 387 | Hawaiian monk seal |
| HI inshore handline | 307 | None documented |
| HI tuna handline | 298 | Hawaiian monk seal |
| WA groundfish, bottomfish jig | 679 | None documented |
| Western Pacific squid jig | 6 | None documented |
| HARPOON FISHERIES: | | |
| CA swordfish harpoon | 30 | None documented |
| POUND NET/WEIR FISHERIES: | | |
| AK herring spawn on kelp pound net | 452 | None documented |
| AK Southeast herring roe/food/bait pound net | 3 | None documented |
| WA herring brush weir | 1 | None documented |
| BAIT PENS: | | |

TABLE 1.—LIST OF FISHERIES COMMERCIAL FISHERIES IN THE PACIFIC OCEAN—Continued

| Fishery Description | Estimated # of vessels/persons | Marine mammal species and stocks incidentally killed/injured |
|---|---|---|
| WA/OR/CA bait pens | 13 | California sea lion, U.S. |
| DREDGE FISHERIES: | | |
| Coastwide scallop dredge | 108 (12 AK) | None documented |
| DIVE, HAND/MECHANICAL COLLECTION FISHERIES: | | |
| AK abalone | 1 | None documented |
| AK clam | 156 | None documented |
| WA herring spawn on kelp | 4 | None documented |
| AK dungeness crab | 3 | None documented |
| AK herring spawn on kelp | 363 | None documented |
| AK urchin and other fish/shellfish | 471 | None documented |
| CA abalone | 111 | None documented |
| CA sea urchin | 583 | None documented |
| HI black coral diving | 1 | None documented |
| HI fish pond | N/A | None documented |
| HI handpick | 37 | None documented |
| HI lobster diving | 19 | None documented |
| HI squiding, spear | 91 | None documented |
| WA, CA kelp | 4 | None documented |
| WA/OR sea urchin, other clam, octopus, oyster, sea cucumber, scallop, ghost shrimp hand, dive, or mechanical collection | 637 | None documented |
| WA shellfish aquaculture | 684 | None documented |
| COMMERCIAL PASSENGER FISHING VESSEL (CHARTER BOAT) FISHERIES: | | |
| AK, WA, OR, CA commercial passenger fishing vessel | >7,000 (1,107 AK) | Killer whale, stock unknown Steller sea lion, Eastern U.S. Steller sea lion, Western U.S. |
| HI charter vessel | 114 | None documented |
| LIVE FINFISH/SHELLFISH FISHERIES: | | |
| CA finfish and shellfish live trap/hook-and-line | 93 | None documented |

List of Abbreviations and Symbols Used in Table 1: AK - Alaska; CA - California; GOA - Gulf of Alaska; HI - Hawaii; OR - Oregon; WA - Washington; [1] - Fishery classified based on serious injuries and mortalities of this stock are greater than 1 percent, but less than 50 percent of the stock's PBR; [2] - Fishery classified by analogy.

TABLE 2—LIST OF FISHERIES COMMERCIAL FISHERIES IN THE ATLANTIC OCEAN, GULF OF MEXICO, AND CARIBBEAN

| Fishery Description | Estimated # of vessels/persons | Marine mammal species and stocks incidentally killed/injured |
|---|---|---|
| Category I | | |
| GILLNET FISHERIES: | | |

TABLE 2—LIST OF FISHERIES COMMERCIAL FISHERIES IN THE ATLANTIC OCEAN, GULF OF MEXICO, AND CARIBBEAN—Continued

| Fishery Description | Estimated # of vessels/persons | Marine mammal species and stocks incidentally killed/injured |
|---|---|---|
| Mid-Atlantic gillnet | >655 | Bottlenose dolphin, WNA coastal[1]<br>Bottlenose dolphin, WNA offshore[1]<br>Common dolphin, WNA<br>Gray seal, WNA<br>Harbor porpoise, GME/BF[1]<br>Harbor seal, WNA<br>Harp seal, WNA<br>Humpback whale, Gulf of Maine[1]<br>Long-finned pilot whale, WNA<br>Minke whale, Canadian east coast[1]<br>Short-finned pilot whale, WNA<br>White-sided dolphin, WNA |
| Northeast sink gillnet | 341 | Bottlenose dolphin, WNA offshore<br>Common dolphin, WNA<br>Fin whale, WNA<br>Gray seal, WNA<br>Harbor porpoise, GME/BF[1]<br>Harbor seal, WNA<br>Harp seal[1], WNA<br>Hooded seal, WNA<br>Humpback whale, WNA[1]<br>Minke whale, Canadian east coast[1]<br>North Atlantic right whale, WNA[1]<br>Risso's dolphin, WNA<br>White-sided dolphin, WNA |
| LONGLINE FISHERIES: | | |
| Atlantic Ocean, Caribbean, Gulf of Mexico large pelagics longline | 94 | Atlantic spotted dolphin, Northern GMX<br>Atlantic spotted dolphin, WNA<br>Bottlenose dolphin, GMX outer continental shelf<br>Bottlenose dolphin, GMX, continental shelf edge and slope<br>Bottlenose dolphin, WNA offshore<br>Common dolphin, WNA<br>Cuvier's beaked whale, WNA<br>Long-finned pilot whale, WNA[1]<br>Mesoplodon beaked whale, WNA<br>Pantropical spotted dolphin, Northern GMX<br>Pantropical spotted dolphin, WNA<br>Pygmy sperm whale, WNA[1]<br>Risso's dolphin, Northern GMX<br>Risso's dolphin, WNA<br>Short-finned pilot whale, Northern GMX<br>Short-finned pilot whale, WNA[1] |
| TRAP/POT FISHERIES: | | |
| Northeast/Mid-Atlantic American lobster trap/pot | 13,000 | Fin whale, WNA<br>Harbor seal, WNA<br>Humpback whale, WNA[1]<br>Minke whale, Canadian east coast[1]<br>North Atlantic right whale, WNA[1] |
| TRAWL FISHERIES: | | |
| Mid-Atlantic mid-water trawl (including pair trawl) | 620 | Bottlenose dolphin, WNA offshore<br>Common dolphin, WNA[1]<br>Long-finned pilot whale, WNA[1]<br>Risso's dolphin, WNA<br>Short-finned pilot whale, WNA[1]<br>White-sided dolphin, WNA[1] |
| Category II | | |
| GILLNET FISHERIES: | | |
| Chesapeake Bay inshore gillnet[2] | 45 | None documented |

TABLE 2—LIST OF FISHERIES COMMERCIAL FISHERIES IN THE ATLANTIC OCEAN, GULF OF MEXICO, AND CARIBBEAN—Continued

| Fishery Description | Estimated # of vessels/persons | Marine mammal species and stocks incidentally killed/injured |
|---|---|---|
| Gulf of Mexico gillnet[2] | 724 | Bottlenose dolphin, Eastern GMX coastal<br>Bottlenose dolphin, GMX bay, sound, and estuarine<br>Bottlenose dolphin, Northern GMX coastal<br>Bottlenose dolphin, Western GMX coastal |
| North Carolina inshore gillnet | 94 | Bottlenose dolphin, WNA coastal[1] |
| Northeast anchored float gillnet[2] | 133 | Harbor seal, WNA<br>Humpback whale, WNA<br>White-sided dolphin, WNA |
| Northeast drift gillnet2 | unknown | None documented |
| Southeast Atlantic gillnet[2] | 779 | Bottlenose dolphin, WNA coastal |
| Southeastern U.S. Atlantic shark gillnet | 6 | Atlantic spotted dolphin, WNA<br>Bottlenose dolphin, WNA coastal[1]<br>North Atlantic right whale, WNA |
| TRAWL FISHERIES: | | |
| Mid-Atlantic bottom trawl | >1,000 | Common dolphin, WNA[1]<br>Long-finned pilot whale, WNA[1]<br>Short-finned pilot whale, WNA[1] |
| Northeast mid-water trawl (including pair trawl) | 17 | Harbor seal, WNA<br>Long-finned pilot whale, WNA[1]<br>Short-finned pilot whale, WNA[1]<br>White-sided dolphin, WNA |
| Northeast bottom trawl | 1,052 | Common dolphin, WNA<br>Harbor porpoise, GME/BF<br>Harp seal, WNA[1]<br>Long-finned pilot whale, WNA<br>Short-finned pilot whale, WNA<br>White-sided dolphin, WNA[1] |
| TRAP/POT FISHERIES: | | |
| Atlantic blue crab trap/pot | >16,000 | Bottlenose dolphin, WNA coastal[1]<br>West Indian manatee, FL[1] |
| Atlantic mixed species trap/pot[2] | unknown | Fin whale, WNA<br>Humpback whale, Gulf of Maine |
| PURSE SEINE FISHERIES: | | |
| Gulf of Mexico menhaden purse seine | 50 | Bottlenose dolphin, Eastern GMX coastal<br>Bottlenose dolphin, GMX bay, sound, estuarine<br>Bottlenose dolphin, Northern GMX coastal[1]<br>Bottlenose dolphin, Western GMX coastal |
| Mid-Atlantic menhaden purse seine[2] | 22 | Bottlenose dolphin, WNA coastal |
| HAUL/BEACH SEINE FISHERIES: | | |
| Mid-Atlantic haul/beach seine | 25 | Bottlenose dolphin, WNA coastal[1]<br>Harbor porpoise, GME/BF |
| North Carolina long haul seine | 33 | Bottlenose dolphin, WNA coastal[1] |
| STOP NET FISHERIES: | | |
| North Carolina roe mullet stop net | 13 | Bottlenose dolphin, WNA coastal[1] |
| POUND NET FISHERIES: | | |
| Virginia pound net | 187 | Bottlenose dolphin, WNA coastal[1] |

TABLE 2—LIST OF FISHERIES COMMERCIAL FISHERIES IN THE ATLANTIC OCEAN, GULF OF MEXICO, AND CARIBBEAN—Continued

| Fishery Description | Estimated # of vessels/persons | Marine mammal species and stocks incidentally killed/injured |
|---|---|---|
| Category III | | |
| GILLNET FISHERIES: | | |
| Caribbean gillnet | >991 | Dwarf sperm whale, WNA<br>West Indian manatee, Antillean |
| Delaware River inshore gillnet | 60 | None documented |
| Long Island Sound inshore gillnet | 20 | None documented |
| Rhode Island, southern Massachusetts (to Monomoy Island), and New York Bight (Raritan and Lower New York Bays) inshore gillnet | 32 | None documented |
| Southeast Atlantic inshore gillnet | unknown | None documented |
| TRAWL FISHERIES: | | |
| Atlantic shellfish bottom trawl | 972 | None documented |
| Gulf of Mexico butterfish trawl | 2 | Bottlenose dolphin, Northern GMX outer continental shelf<br>Bottlenose dolphin, Northern GMX continental shelf edge and slope |
| Gulf of Mexico mixed species trawl | 20 | None documented |
| Southeastern U.S. Atlantic, Gulf of Mexico shrimp trawl | >18,000 | Bottlenose dolphin, Eastern GMX coastal<br>Bottlenose dolphin, Western GMX coastal<br>Bottlenose dolphin, GMX bay, sound, estuarine<br>West Indian Manatee, FL |
| MARINE AQUACULTURE FISHERIES: | | |
| Finfish aquaculture | 48 | Harbor seal, WNA |
| Shellfish aquaculture | unknown | None documented |
| PURSE SEINE FISHERIES: | | |
| Gulf of Maine Atlantic herring purse seine | 30 | Harbor porpoise, GME/BF<br>Harbor seal, WNA<br>Gray seal, WNA |
| Gulf of Maine menhaden purse seine | 50 | None documented |
| Florida west coast sardine purse seine | 10 | Bottlenose dolphin, Eastern GMX coastal |
| U.S. Atlantic tuna purse seine | 5 | Long-finned pilot whale, WNA<br>Short-finned pilot whale, WNA |
| U.S. Mid-Atlantic hand seine | >250 | None documented |
| LONGLINE/HOOK-AND-LINE FISHERIES: | | |
| Northeast/Mid-Atlantic bottom longline/hook-and-line | 46 | None documented |
| Gulf of Maine, U.S. Mid-Atlantic tuna, shark swordfish hook-and-line/harpoon | 26,223 | Humpback whale, WNA |
| Southeastern U.S. Atlantic, Gulf of Mexico, and Caribbean snapper-grouper and other reef fish bottom longline/hook-and-line | >5,000 | None documented |
| Southeastern U.S. Atlantic, Gulf of Mexico shark bottom longline/hook-and-line | <125 | None documented |
| Southeastern U.S. Atlantic, Gulf of Mexico, and Caribbean pelagic hook-and-line/harpoon | 1,446 | None documented |

TABLE 2—LIST OF FISHERIES COMMERCIAL FISHERIES IN THE ATLANTIC OCEAN, GULF OF MEXICO, AND CARIBBEAN— Continued

| Fishery Description | Estimated # of vessels/persons | Marine mammal species and stocks incidentally killed/injured |
|---|---|---|
| TRAP/POT FISHERIES | | |
| Caribbean mixed species trap/pot | >501 | None documented |
| Caribbean spiny lobster trap/pot | >197 | None documented |
| Florida spiny lobster trap/pot | 2,145 | Bottlenose dolphin, Eastern GMX coastal |
| Gulf of Mexico blue crab trap/pot | 4,113 | Bottlenose dolphin, Western GMX coastal<br>Bottlenose dolphin, Northern GMX coastal<br>Bottlenose dolphin, Eastern GMX coastal<br>Bottlenose dolphin, GMX Bay, Sound, & Estuarine<br>West Indian manatee, FL |
| Gulf of Mexico mixed species trap/pot | unknown | None documented |
| Southeastern U.S. Atlantic, Gulf of Mexico golden crab trap/pot | 10 | None documented |
| Southeastern U.S. Atlantic, Gulf of Mexico stone crab trap/pot | 4,453 | None documented |
| U.S. Mid-Atlantic eel trap/pot | >700 | None documented |
| STOP SEINE/WEIR/POUND NET FISHERIES: | | |
| Gulf of Maine herring and Atlantic mackerel stop seine/weir | 50 | Gray seal, Northwest North Atlantic<br>Harbor porpoise, GME/BF<br>Harbor seal, WNA<br>Minke whale, Canadian east coast<br>White-sided dolphin, WNA |
| U.S. Mid-Atlantic crab stop seine/weir | 2,600 | None documented |
| U.S. Mid-Atlantic mixed species stop seine/weir/pound net (except the North Carolina roe mullet stop net) | 751 | None documented |
| DREDGE FISHERIES: | | |
| Gulf of Maine mussel | >50 | None documented |
| Gulf of Maine, U.S. Mid-Atlantic sea scallop dredge | 233 | None documented |
| U.S. Mid-Atlantic/Gulf of Mexico oyster | 7,000 | None documented |
| U.S. Mid-Atlantic offshore surf clam and quahog dredge | 100 | None documented |
| HAUL/BEACH SEINE FISHERIES: | | |
| Caribbean haul/beach seine | 15 | West Indian manatee, Antillean |
| Gulf of Mexico haul/beach seine | unknown | None documented |
| Southeastern U.S. Atlantic, haul/beach seine | 25 | None documented |
| DIVE, HAND/MECHANICAL COLLECTION FISHERIES: | | |
| Atlantic Ocean, Gulf of Mexico, Caribbean shellfish dive, hand/mechanical collection | 20,000 | None documented |
| Gulf of Maine urchin dive, hand/mechanical collection | >50 | None documented |
| Gulf of Mexico, Southeast Atlantic, Mid-Atlantic, and Caribbean cast net | unknown | None documented |
| COMMERCIAL PASSENGER FISHING VESSEL (CHARTER BOAT) FISHERIES: | | |

TABLE 2—LIST OF FISHERIES COMMERCIAL FISHERIES IN THE ATLANTIC OCEAN, GULF OF MEXICO, AND CARIBBEAN—
Continued

| Fishery Description | Estimated # of vessels/persons | Marine mammal species and stocks incidentally killed/injured |
|---|---|---|
| Atlantic Ocean, Gulf of Mexico, Caribbean commercial passenger fishing vessel | 4,000 | Bottlenose dolphin, Eastern GMX coastal<br>Bottlenose dolphin, Northern GMX coastal<br>Bottlenose dolphin, Western GMX coastal<br>Bottlenose dolphin, WNA coastal |

List of Abbreviations and Symbols Used in Table 2: FL - Florida; GA - Georgia; GME/BF - Gulf of Maine/Bay of Fundy; GMX - Gulf of Mexico; NC - North Carolina; SC - South Carolina; TX - Texas; WNA - Western North Atlantic; [1] - Fishery classified based on serious injuries and mortalities of this stock are greater than 1 percent, but less than 50 percent of the stock's PBR; [2] - Fishery classified by analogy.

## Classification

The Chief Counsel for Regulation of the Department of Commerce certified to the Chief Counsel for Advocacy of the Small Business Administration that this rule would not have a significant economic impact on a substantial number of small entities. For convenience, the factual basis leading to the certification is repeated below.

Under existing regulations, all fishers participating in Category I or II fisheries must register under the MMPA, obtain an Authorization Certificate, and pay a fee of $25 (with the exception of those in regions with a registration integrated with existing state and Federal permitting processes). Additionally, fishers may be subject to a take reduction plan and requested to carry an observer. The Authorization Certificate authorizes the taking of marine mammals incidental to commercial fishing operations. NMFS has estimated that approximately 41,730 fishing vessels, most of which are small entities, operate in Category I or II fisheries, and therefore, are required to register. However, registration has been integrated with existing state or Federal registration programs for the majority of these fisheries so that the majority of fishers do not need to register separately under the MMPA. Currently, approximately 600 fishers register directly with NMFS under the MMPA authorization program.

Though this rule would affect approximately 500 small entities, the $25 registration fee, with respect to anticipated revenues, is not considered a significant economic impact. If a vessel is requested to carry an observer, fishers will not incur any economic costs associated with carrying that observer. As a result of this certification, an initial regulatory flexibility analysis was not prepared. In the event that reclassification of a fishery to Category I or II results in a take reduction plan, economic analyses of the effects of that plan will be summarized in subsequent rulemaking actions.

This rule contains collection-of-information requirements subject to the Paperwork Reduction Act. The collection of information for the registration of fishers under the MMPA has been approved by the Office of Management and Budget (OMB) under OMB control number 0648–0293 (0.15 hours per report for new registrants and 0.09 hours per report for renewals). The requirement for reporting marine mammal injuries or mortalities has been approved by OMB under OMB control number 0648–0292 (0.15 hours per report). These estimates include the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding these reporting burden estimates or any other aspect of the collections of information, including suggestions for reducing burden, to NMFS and OMB (see **ADDRESSES** and **SUPPLEMENTARY INFORMATION**).

Notwithstanding any other provision of law, no person is required to respond to nor shall a person be subject to a penalty for failure to comply with a collection of information subject to the requirements of the Paperwork Reduction Act unless that collection of information displays a currently valid OMB control number.

This rule has been determined to be not significant for the purposes of Executive Order 12866.

An environmental assessment (EA) was prepared under the National Environmental Policy Act (NEPA) for regulations to implement section 118 of the MMPA (1995 EA). NMFS revised that EA relative to classifying U.S. commercial fisheries on the LOF in December 2005. Both the 1995 EA and the 2005 EA concluded that implementation of MMPA section 118 regulations would not have a significant impact on the human environment. This rule would not make any significant change in the management of reclassified fisheries, and therefore, this rule is not expected to change the analysis or conclusion of the 2005 EA. If NMFS takes a management action, for example, through the development of a Take Reduction Plan (TRP), NMFS will first prepare an environmental document, as required under NEPA, specific to that action.

This rule would not affect species listed as threatened or endangered under the Endangered Species Act (ESA) or their associated critical habitat. The impacts of numerous fisheries have been analyzed in various biological opinions, and this rule will not affect the conclusions of those opinions. The classification of fisheries on the LOF is not considered to be a management action that would adversely affect threatened or endangered species. If NMFS takes a management action, for example, through the development of a TRP, NMFS would conduct consultation under ESA section 7 for that action.

This rule would have no adverse impacts on marine mammals and may have a positive impact on marine mammals by improving knowledge of marine mammals and the fisheries interacting with marine mammals through information collected from observer programs, stranding and sighting data, or take reduction teams.

This rule would not affect the land or water uses or natural resources of the coastal zone, as specified under section 307 of the Coastal Zone Management Act.

Dated: August 15, 2006.

**Samuel D. Rauch, III,**

*Deputy Assistant Administrator for Regulatory Programs, National Marine Fisheries Service.*

[FR Doc. 06–7071 Filed 8–21–06; 8:45 am]

**BILLING CODE 3510–22–S**

Attachment #4 on NOAA Memo on 2 August 2006 Humpback Whale entangled off Plymouth MA filed previously by Plaintiff as exhibit in 27 November 2006 evidentiary hearing and attached subsequent 3 January 2006 Notice by Plaintiff of paper filings.

Provincetown Center for Coastal Studies :: Whale Rescue :: Basing shark freed in Provincetown Harbor 12/18/2006 03:03 AM

# Provincetown
## Center for Coastal Studies

Home  |  Contact Us  |  Sitemap

Who We Are    What We Do    Our Environment    Resources    Publications    Search

## GET INVOLVED!

**Support scientists and rescuers in the field whose work can make a real difference to the lives of endangered whales.**

- **Become a Friend of PCCS**
- **Give a Gift**
- **Volunteer**

Introduction | Latest Disentanglement | Rescue Techniques | Tagging | Disentanglement Network | FAQ | Summary of Season

| Scar-based Study | Take Reduction Team | Gillnet Diagram | Lobster Pot Diagram | Previous Disentanglements

## Basking shark freed in Provincetown Harbor - 7/11/04

A lobster fisherman working in Provincetown Harbor reported a large animal caught in his lobster set today, 7/11/04. The fisherman stood by the animal while the PCCS team gathered gear and made their way out to the site. After a relatively short struggle the team managed to fully disentangle a 10-12-foot basking shark.

The animal was caught in a buoy line, near the surface, that lead to two lobster traps resting on the seafloor. The buoy line was wrapped around the head and lower jaw (indicating that the animal was likely entangled as it fed on plankton by swimming with the mouth agape). The leading edges of the dorsal fin and tail had pink abrasions but the animal appeared to be healthy otherwise.

The team used a grappling hook and tether to gain access to the lobster buoy and gear that the shark continually pulled down. Using buoys and the drag of the boat, the team was able to keep the animal at the surface long enough to cut the entangling lines, leaving a short (1m) length of line in the mouth that would likely be shed at the next feeding bout. While not a whale, this shark species is poorly understood and the disentanglement was a good opportunity to gather more information.

**click here to read about previous entanglements**



Schematic of entanglement

© 2006 Provincetown Center for Coastal Studies

Case 1:05-cv-10140-NMG    Document 131-6    Filed 01/02/2007    Page 2 of 2



**UNITED STATES DEPARTMENT OF COMMERCE**
**National Oceanic and Atmospheric Administration**
NATIONAL MARINE FISHERIES SERVICE
NORTHEAST REGION
One Blackburn Drive
Gloucester, MA 01930-2298

December 13, 2006

## DAM ZONES SOUTH AND EAST OF PORTLAND, MAINE

Dear Commercial Lobster Trap/Pot and Gillnet Fishermen:

This is a follow-up to a letter sent on November 29, 2006, that informed you of the extension of two Dynamic Area Management (DAM) zones south and east of Portland, Maine, effective from 0001 hours December 3, 2006, through 2400 hours December 17, 2006, with required gear modifications for lobster trap/pot and anchored gillnet fishing gear.  This letter is to inform you that NOAA's National Marine Fisheries Service (NMFS) has further extended these DAM zones, in these same areas south and east of Portland, Maine, totaling approximately 1,549 square nautical miles, and 1,809 (nm$^2$), respectively, as subsequent surveys in these areas indicate that the DAM zone trigger continues to be met.  Thus, the required gear modifications for lobster trap/pot and anchored gillnet gear will be effective for an additional 15 days.  In addition, NMFS requires that no additional gear be set in the DAM zones during the restricted period unless that gear has been modified accordingly.  This action is being taken to respond to reported aggregations of endangered Northern right whales (right whales).

Therefore, NMFS is announcing required gear modifications for the extended DAM zones past the current 2400 hours December 17, 2006, expiration.  **Effective 0001 hours December 18, 2006, through 2400 hours January 1, 2007**, anchored gillnet and lobster trap/pot gear in the DAM zones must comply with the required gear modifications.  The required gear modifications and the coordinates for the DAM zones are found in the enclosure to this letter.  **Special note for gillnet fisherman:  a portion of the DAM zone south of Portland, Maine, overlaps the year-round Western Gulf of Maine Closure Area for Northeast Multispecies found at 50 CFR 648.81(e). Due to this closure, sink gillnet gear is prohibited from this portion of the DAM zone.**

To obtain the DAM regulations in their entirety, please call 978-281-9300 x6503.  In addition, these regulations are available by accessing the ALWTRP web page (http://www.nero.nmfs.gov/whaletrp/). If you have any questions regarding these regulations, please call 978-281-9300 x6503.

Sincerely,

for Patricia A. Kurkul
Regional Administrator

Enclosure



**DAM Zone from December 11, 2006**
**Sighting of 7 Northern right whales south of Portland, ME**



Coordinates for the DAM Zone effective from 0001 hours December 18, 2006, through 2400 hours January 1, 2007, are as follows, are as follows:

43° 29´N,  70° 23´W (NW Corner)
43° 29´N,  69° 44´W
42° 47´N,  69° 44´W
42° 47´N,  70° 38´W
43° 08´N,  70° 38´W and follow the coastline northeast to
43° 29´N,  70° 23´W (NW Corner)

**DAM Zone from December 11, 2006**
**Sighting of 18 Northern right whales east of Portland, ME**



Coordinates for the DAM Zone effective from 0001 hours December 18, 2006, through 2400 hours January 1, 2007, are as follows, are as follows:

43° 52´N,  68° 56´W (NW Corner)
43° 52´N,  67° 58´W
43° 09´N,  67° 58´W
43° 09´N,  68° 56´W
43° 52´N,  68° 56´W (NW Corner)

**DAM Program Gear Requirements**

In addition to those gear modifications currently implemented under the ALWTRP at 50 CFR 229.32, the following gear modifications are required in the DAM zone. If the requirements and exceptions for gear modification in the DAM zone, as described below, differ from other ALWTRP requirements for any overlapping areas and times, then the more restrictive requirements will apply in the DAM zone. Please note that the below provides a summary of the DAM Program gear requirements and is not a substitute for the ALWTRP regulations.

Lobster Trap/Pot Gear
Fishermen utilizing lobster trap/pot gear within the portion of the Northern Inshore State Lobster Waters, Northern Nearshore Lobster Waters, and Stellwagen Bank/Jeffreys Ledge Restricted Area that overlap with the DAM zone are required to utilize all of the following gear modifications while the DAM zone is in effect:

1. Groundlines must be made of either sinking or neutrally buoyant line. Floating groundlines are prohibited;
2. All buoy lines must be made of either sinking or neutrally buoyant line, except the bottom portion of the line, which may be a section of floating line not to exceed one-third the overall length of the buoy line;
3. Fishermen are allowed to use two buoy lines per trawl; and
4. A weak link with a maximum breaking strength of 600 lb (272.4 kg) must be placed at all buoys.

Fishermen utilizing lobster trap/pot gear within the portion of the Offshore Lobster Waters Area that overlap with the DAM zone are required to utilize all of the following gear modifications while the DAM zone is in effect:
1. Groundlines must be made of either sinking or neutrally buoyant line. Floating groundlines are prohibited;
2. All buoy lines must be made of either sinking or neutrally buoyant line, except the bottom portion of the line, which may be a section of floating line not to exceed one-third the overall length of the buoy line;
3. Fishermen are allowed to use two buoy lines per trawl; and
4. A weak link with a maximum breaking strength of 1,500 lb (680.4 kg) must be placed at all buoys.

Anchored Gillnet Gear
Fishermen utilizing anchored gillnet gear within the portions of the Other Northeast Gillnet Waters Area and Stellwagen Bank/Jeffreys Ledge Restricted Area that overlap with the DAM zone are required to utilize all the following gear modifications while the DAM zone is in effect:

1. Groundlines must be made of either sinking or neutrally buoyant line. Floating groundlines are prohibited;
2. All buoy lines must be made of either sinking or neutrally buoyant line, except the bottom portion of the line, which may be a section of floating line not to exceed one-third the overall length of the buoy line;
3. Fishermen are allowed to use two buoy lines per string;
4. Each net panel must have a total of five weak links with a maximum breaking strength of 1,100 lb (498.8 kg). Net panels are typically 50 fathoms (91.4 m) in length, but the weak link requirements would apply to all variations in panel size. These weak links must include three floatline weak links. The placement of the weak links on the floatline must be: one at the center of the net panel and one each as close as possible to each of the bridle ends of the net panel. The remaining two weak links must be placed in the center of each of the up and down lines at the panel ends;
5. A weak link with a maximum breaking strength of 1,100 lb (498.8 kg) must be placed at all buoys; and
6. All anchored gillnets, regardless of the number of net panels, must be securely anchored with the holding power of at least a 22 lb (10.0 kg) Danforth-style anchor at each end of the net string.

**DAM Program Gear Requirements**

In addition to those gear modifications currently implemented under the ALWTRP at 50 CFR 229.32, the following gear modifications are required in the DAM zone.  If the requirements and exceptions for gear modification in the DAM zone, as described below, differ from other ALWTRP requirements for any overlapping areas and times, then the more restrictive requirements will apply in the DAM zone.  Please note that the below provides a summary of the DAM Program gear requirements and is not a substitute for the ALWTRP regulations.

Lobster Trap/Pot Gear

Fishermen utilizing lobster trap/pot gear within the portion of the Northern Inshore State Lobster Waters and Northern Nearshore Lobster Waters  that overlap with the DAM zone are required to utilize all of the following gear modifications while the DAM zone is in effect:

1. Groundlines must be made of either sinking or neutrally buoyant line.  Floating groundlines are prohibited;
2. All buoy lines must be made of either sinking or neutrally buoyant line, except the bottom portion of the line, which may be a section of floating line not to exceed one-third the overall length of the buoy line;
3. Fishermen are allowed to use two buoy lines per trawl; and
4. A weak link with a maximum breaking strength of 600 lb (272.4 kg) must be placed at all buoys.

Fishermen utilizing lobster trap/pot gear within the portion of the Offshore Lobster Waters Area that overlap with the DAM zone are required to utilize all of the following gear modifications while the DAM zone is in effect:
1. Groundlines must be made of either sinking or neutrally buoyant line.  Floating groundlines are prohibited;
2. All buoy lines must be made of either sinking or neutrally buoyant line, except the bottom portion of the line, which may be a section of floating line not to exceed one-third the overall length of the buoy line;
3. Fishermen are allowed to use two buoy lines per trawl; and
4. A weak link with a maximum breaking strength of 1,500 lb (680.4 kg) must be placed at all buoys.

Anchored Gillnet Gear

Fishermen utilizing anchored gillnet gear within the portions of the Other Northeast Gillnet Waters Area that overlap with the DAM zone are required to utilize all the following gear modifications while the DAM zone is in effect:

1. Groundlines must be made of either sinking or neutrally buoyant line.  Floating groundlines are prohibited;
2. All buoy lines must be made of either sinking or neutrally buoyant line, except the bottom portion of the line, which may be a section of floating line not to exceed one-third the overall length of the buoy line;
3. Fishermen are allowed to use two buoy lines per string;
4. Each net panel must have a total of five weak links with a maximum breaking strength of 1,100 lb (498.8 kg).  Net panels are typically 50 fathoms (91.4 m) in length, but the weak link requirements would apply to all variations in panel size.  These weak links must include three floatline weak links.  The placement of the weak links on the floatline must be: one at the center of the net panel and one each as close as possible to each of the bridle ends of the net panel.  The remaining two weak links must be placed in the center of each of the up and down lines at the panel ends;
5. A weak link with a maximum breaking strength of 1,100 lb (498.8 kg) must be placed at all buoys; and
6. All anchored gillnets, regardless of the number of net panels, must be securely anchored with the holding power of at least a 22 lb (10.0 kg) Danforth-style anchor at each end of the net string.

Attachment #7 Settlement Agreement dismissing claims of plaintiff-intervener in *Strahan v. Coxe*, 95-10827-DPW (D. Mass. 1995) between Conservation law Foundation, the Defendants, and the Massachusetts Lobstermen's Association. This attachment was filed as paper document with Plaintiff's 3 January 2007 Notice.

**53**

# NMFS – NER

## PROTECTED RESOURCES DIVISION

## ENTANGLEMENT DATA AND GEAR INVESTIGATION
## 1999 REPORT

Prepared by
Dana Hartley and John Kenney
NMFS – Northeast Region – Protected Resources Division

January, 2000

**1597**

# 1999 Large Whale Entanglements

Table 1: Summary of 1999 Large Whale Entanglement Report Status (Confirmed vs. Non Confirmed) by Common Name

| | Report Status | | |
|---|---|---|---|
| Common Name | Unconfirmed | Confirmed | Grand Total |
| Fin | | 3 | 3 |
| Humpback | | 9 | 9 |
| Minke | | 4 | 4 |
| Right | | 6 | 6 |
| Unidentified | 4 | 2 | 6 |
| Grand Total | 4 | 24 | 28 |

Table 2: Key for agency acronyms used in this report

## Agency Acronyms

| | |
|---|---|
| NMFS | National Marine Fisheries Service |
| CCS | Center for Coastal Studies |
| USCG | United States Coast Guard |
| ECE | East Coast Ecosystems - a Canadian Large Whale Disentanglement Team |
| IFAW | International Fund for Animal Welfare - Research crew from vessel "Song of the Whale" |
| NEAq | New England Aquarium Right Whale Research Team |
| GMCRS | Grand Manan Cetacean Research Station |

NOTE:

1.  Some of the reports that follow are still under analysis. Data are represented as accurately as possible with information received as of 12/20/99.

2.  New England Aquarium provided sighting and life history information for right whales

3.  Center for Coastal Studies provided sighting and life history information for humpback whales

**1598**

Table 3: Summary of 1999 disentanglement efforts.  Count by species.

| Species | Disentanglement Attempted | | | | | Disentanglement Not Attempted | | | Totals |
|---|---|---|---|---|---|---|---|---|---|
| | no gear removed | some gear removed | most gear removed | successfully disentangled | not resighted | minimal entanglement | poor conditions | carcass/ stranding | |
| Right | | 1 | 2 | 1 | 2 | | | | 6 |
| humpback | 1 | | 1 | 3 | | 2 | 1 | 1 | 9 |
| Finback | 1 | | 1 | | 1 | | | | 3 |
| minke | | | | | | | | 4 | 4 |
| Unidentified | | | | 2 | | | | | 2 |
| Totals | 2 | 1 | 4 | 6 | 3 | 2 | 1 | 5 | 24 |

Table 4: Summary of 1999 disentanglement efforts.  NMFS "entanglement numbers" (E1 etc.), correspond to entanglement events listed on the following pages.

| Species | Disentanglement Attempted | | | | | Disentanglement Not Attempted | | |
|---|---|---|---|---|---|---|---|---|
| | no gear removed | some gear removed | most gear removed | successfully disentangled | not resighted | minimal entanglement | poor conditions | carcass/ stranding |
| Right | | E4 | E6, E16 | E7 | E5, E10 | | | |
| humpback | E19 | | E25 | E2, E17, E21 | | E14, E28 | E20 | E1 |
| Finback | E24 | | E23 | | E22 | | | |
| minke | | | | E13, E15 | | | | E9, E12, E13, E27 |
| Unidentified | | | | | | | | |

| NMFS No. | E1-99 | |
|---|---|---|
| Date 1st observed entangled | 1/12/99 | |
| Report status | Confirmed | |
| Species | Humpback Whale | |
| No. of animals | 1 | |
| Individual ID | Unknown | |
| Location | Squibnocket Beach, Martha's Vineyard, MA | |
| Latitude/Longitude | 41° 19.23" N | 70°45.75' W |
| Event Description | 1/12/99<br>•     Washed up dead at Squibnocket Beach<br>1/13 & 1/14<br>•     Necropsied & skeleton salvaged | |
| Description of Gear on Whale | None | |
| Description of wounds | line marks on dorsal and ventral surface of tail stock.  Line marks extending  from right side of jaw to ventral grooves, to insertion of right flipper.  Torn flesh and connective tissue on right side of mouth | |
| Gear Type | Unknown | |
| Re-sightings | N/A | |

| NMFS No. | E2-99 |
|---|---|
| Date 1st observed entangled | 3/24/99 |
| Report status | Confirmed |
| Species | Humpback Whale |
| No. of animals | 1 |
| Individual ID | Unknown |
| Location | Cape Lookout, NC |
| Latitude/Longitude | 34° 35.8" N | 76°34.4' W |
| Event Description | 3/24<br>•    reported by fisherman, owner of gear<br>•    CCS & NMFS authorized first responders from NC to assess<br>•    USCG airlifted gear and provided vessel support to first responders<br>•    Whale disentangled by first responders |
| Description of Gear on Whale | Single wraps of net around both flukes; tail stock was free of gear |
| Description of wounds | Whale appeared uninjured |
| Gear Type | Gillnet |
| Re-sightings | Not expected; no tail flukes shots, but video of dorsal fin |

| NMFS No. | E3-99 |
|---|---|
| Report status | Unconfirmed |
| Date 1st observed entangled | 4/25/99 |
| Species | Unidentified Whale, probable right whale |
| No. of animals | 1 |
| Individual ID | Unknown |
| Location | 2 miles N of Sesuit Harbor, Cape Cod Bay |
| Latitude/Longitude | 41° 42' N approx.  70°10' W approx. |
| Event Description | 4/25<br>• Whale sighted from the air by private pilot<br>• CCS investigated via vessel, but coordinates were off; whale not located<br>4/26<br>Pilot was interviewed by CCS<br>• description of whale suggests right whale (no dorsal fin, no long pectoral flippers, callosities)<br>• gear described as line and buoys with what appeared to be netting dragging behind<br>• Subsequent aerial surveys in the area could not locate the whale |
| Description of Gear on Whale | Line attached to whale; point of attachment unknown |
| Description of wounds | None noted |
| Gear Type | No gear recovered |
| Re-sightings | Not expected |

| NMFS No. | E4-99 |
|---|---|
| Report status | Confirmed |
| Date 1st observed entangled | 5/10/99 |
| ꞓecies | Right Whale |
| No. of animals | 1 |
| Individual ID | 2030 |
| Location | Cultivator Shoal |
| Latitude/Longitude | 41° 35.6' N | 68°23.7' W |

| Event Description | 5/10 | • | Sighted by NMFS aerial survey team |
|---|---|---|---|
| | | • | Seas too heavy for vessel support/tagging attempt |
| | 9/3-9/5 | • | Sighted by CCS aerial survey team |
| | | • | Disentanglement attempted by CCS in Bay of Fundy, Canada |
| | | • | 2 wraps cut away |
| | | • | satellite buoy applied |
| | 9/12-9/13 | • | Disentanglement attempted by CCS in Bay of Fundy, Canada; unapproachable |
| | ~ 9/24 | • | Satellite tag lost off of New Jersey |
| | 10/20 | • | Floating dead five miles E of Cape May, NJ |
| | 10/21 - 10/23 | • | Necropsy and salvage of skeleton at Cape May USCG |

| Description of Gear on Whale | 5/12 |
|---|---|
| | • Aerial survey team noted multiple strands of line and netting wrapped 3X around body and line wrapped on left pectoral flipper |
| | 9/15 |
| | • One tight wrap remaining forward of pectoral flippers |
| | • at least 4 wraps on left and 2 wraps on right pectoral flipper |

| Description of wounds | 5/10 |
|---|---|
| | • Tight wraps; forward wrap broken through skin |
| | 9/3-9/15 |
| | • One tight wrap that is deeply imbedded in blubber layer |
| | • bleeding - line may have reached muscle |
| | 10/20 |
| | • Necropsy report pending |

| Gear Type | Sink gillnet gear - 7.0" mesh |
|---|---|
| Sighting prior to entanglement | September 9, 1997 Bay of Fundy, Canada |

| Re-sightings | 9/2/99 |
|---|---|
| | • Sighted in Bay of Fundy, Canada by CCS aerial survey crew |
| | 9/2-9/16 |
| | • Repeatedly sighted in Bay of Fundy, Canada |
| | 9/16-9/24 |
| | • tracked by satellite buoy moving south - lost tag off of New Jersey |
| | 10/20 |
| | • Floating dead five miles E of Cape May, NJ |

| Life History Information | Adult female, approximately 45 ft in length, never sighted with calf |
|---|---|
| Determination | Tentative diagnosis: Massive traumatic injury induced by entanglement in fishing gear. Starvation |

| NMFS No. | E5-99 | |
|---|---|---|
| Report status | Confirmed | |
| Date 1st observed entangled | 5/12/99 | |
| Species | Right Whale | |
| No. of animals | 1 | |
| Individual ID | Unknown; nicknamed "tug and tow" for discussion purposes | |
| Location | Great South Channel | |
| Latitude/Longitude | 41° 03.9' N | 69°06.4' W |
| Event Description | 5/12/99<br>• Sighted by NMFS aerial survey team<br>• No support vessel/daylight for tagging attempt<br>• Not re-sighted | |
| Description of Gear on Whale | Thin line attached to hi flyer may have been wrapped on left fluke | |
| Description of wounds | none observed | |
| Gear Type | No gear recovered | |
| Re-sightings | Future sighting possible | |

| NMFS No. | E6-99 |
|---|---|
| Report status | Confirmed |
| Date 1st observed entangled | 5/19/99 |
| Species | Right Whale |
| No. of animals | 1 |
| Individual ID | 1158 |
| Location | Great South Channel |
| Latitude/Longitude | 41° 27.44' N | 68°49.9' W |

| Event Description | 5/19 |
|---|---|
| | •     Entangled whale observed by crew on IFAW research vessel |
| | •     sea conditions no good for satellite tag attachment |
| | 5/22 |
| | •     Whale re-sighted by NMFS aerial survey team |
| | •     USCG airlifted Stormy Mayo to USCG support vessel; NMFS planes assisted |
| | •     Tagging attempted, unsuccessful |
| | |
| | 5/23 |
| | •     Mayo succeeded in satellite tagging the gear on the whale; CCS plane assisted |
| | 5/28 |
| | •     CCS team arrives in R/V Shearwater |
| | •     IFAW picks up VHF signal from buoy; buoy not attached to whale; some entangling gear assumed to be shed with buoy (i.e. some gear was shed from whale; gear not found) |
| | •     CCS plane & vessel find 1158 |
| | •     attempts to satellite tag were unsuccessful |
| | •     CCS reassess situation & decides to stand down |
| | |
| | 9/27/99 |
| | •     NEAq team partially disentangled whale |

| Description of Gear on Whale | 5/19 |
|---|---|
| | •     wraps of line around right pectoral flipper attached to metal pole with buoys and a mesh flag, line trailing |
| | 9/27 |
| | •     NEAq team removed pole, buoy and 3 ft of heavy line forward of the pole. Wraps of line around right pectoral flipper remaining; may come off |

| Description of wounds | none observed |
|---|---|
| Gear Type | Owner identified -- Analysis continuing |
| Sighting prior to entanglement | 3/3/99 in Cape Cod Bay |
| Re-sightings: | 5/29<br>Re-sighted by IFAW in the great south channel<br><br>6/19 - 9/25<br>Re-sighted in the Bay of Fundy, Canada |
| Life History Information | Adult female, approximately 45 ft in length |

| NMFS No. | E7-99 | |
|---|---|---|
| Report status | confirmed | |
| Date 1st observed entangled | 6/5/99 | |
| Species | Right Whale | |
| No. of animals | 1 | |
| Individual ID | 2753 | |
| Location | Bay of Fundy, Canada, 12 miles off Tiverton, NS | |
| Latitude/Longitude | 44° 25.1' N | 66°28.3' W |
| Event Description | 6/5 <br> •         sighted and successfully disentangled by CCS and ECE crew | |
| Description of Gear on Whale | Line on both sides of mouth forming a bridle. Line from left side of mouth attached to buoy, high flyer and about 300 ft of line | |
| Description of wounds | none observed | |
| Gear Type | Owner identified -- Said he'd lost the gear 2 years prior to incident | |
| Sighting prior to entanglement | 8/6/98 in Bay of Fundy, Canada | |
| Re-sightings: | future sightings likely | |
| Life History Information | Young female; age 2 | |

| | |
|---|---|
| NMFS No. | E8-99 |
| Report status | Unconfirmed |
| Date 1st observed entangled | 6/6/99 |
| Species | Unidentified large whale (blow seen) |
| No. of animals | 1 |
| Individual ID | Unknown |
| Location | 2 nm north of Race Point |
| Latitude/Longitude | 42° 05.7' N | 70°14.5' W |
| Event Description | • Reported by 2 different fishing vessels to whale watch vessels<br>• No one stood by<br>• CCS could not relocate the whale |
| Description of Gear on Whale | Line and buoy trailing behind the whale, point of attachment not known |
| Description of wounds (if any) | Not given |
| Gear Type | No gear recovered |
| Re-sightings: | Not expected |

| NMFS No. | E9-99 |
|---|---|
| Report status | Confirmed |
| Date 1st observed entangled | 6/14/99 |
| Species | Minke Whale |
| No. of animals | 1 |
| Individual ID | no |
| Location | Floating 3 miles E of Wellfleet, MA (ocean side), washed up at Nauset 6/16 |
| Latitude/Longitude | 41° 58.32' N     69°56.78' W |
| Event Description | 6/14/99<br>•     Floating carcass sighted by fisherman<br>6/16<br>•     Washed up at Nauset Beach: 41°47.81' N   69°56.18' W<br>•     Necropsied by Cape Cod Stranding Network |
| Description of Gear on Whale | none |
| Description of wounds | Line marks on left gape of mouth, extending from left lateral to dorsal surface, looping around the base of the dorsal fin on the right side then back down the left side of the peduncle to the flukes.  Deep line marks at base of flukes |
| Gear Type | No gear recovered |
| Re-sightings | Not expected |

| NMFS No. | E10-99 |
|---|---|
| Report status | Confirmed |
| Date 1st observed entangled | 6/18/99 |
| Species | Right Whale, nicknamed Bay of Fundy, Canada "tri buoy" for discussion purposes |
| No. of animals | 1 |
| Individual ID | Unknown |
| Location | Bay of Fundy, Canada, 16 miles off of Boar's Head, Digby Neck, Nova Scotia |
| Latitude/Longitude | 44° 30.3' N | 66°35.1' W |
| Event Description | • Fishermen reported entangled whale to ECE<br>• ECE and Canadian Coast Guard attempted to respond; could not relocate the whale |
| Description of Gear on Whale | 3 buoys sighted near the whale's head |
| Description of wounds | None observed |
| Gear Type | Unknown |
| Re-sightings: | Future sighting possible |

| NMFS No. | E11-99 |
|---|---|
| Report status | Unconfirmed |
| Date 1st observed entangled | 6/26/99 |
| Species | Unidentified small whale |
| No. of animals | 2 described as mother-calf pair.  "mother" entangled |
| Individual ID | Unknown |
| Location | Cape Cod Canal |
| Latitude/Longitude | 41° 46.4' N | 70°30.5' W |
| Event Description | • 15 - 17 ft entangled whale accompanied by 5-6 ft "calf"reported by Army Corps of Engineers<br>• Whales were escorted through the canal traveling west to east<br>• Whales were difficult to follow and Army Corps staff couldn't stand by |
| Description of Gear on Whale | polyester line and possibly netting trailing - point of attachment not clear |
| Description of wounds | none observed |
| Gear Type | No gear recovered |
| Re-sightings: | Not expected |

**1610**

Page 13 of 30

| NMFS No. | E12-99 |
|---|---|
| Report status | confirmed |
| Date 1st observed entangled | 7/3/99 |
| Species | Minke Whale |
| No. of animals | 1 |
| Individual ID | no |
| Location | Sakonnet River, RI |
| Latitude/Longitude | 41°48.4' N | 71°12' W |
| Event Description | 7/3/99<br>•    USCG responded to report of floating dead whale; described whale, took photos and samples of entangling gear<br>7/5/99<br>•    Whale washed up, NMFS gear specialist investigated<br>•    Mystic staff performed necropsy |
| Description of Gear on Whale | Webbing around rostrum |
| Description of wounds | Wounds on rostrum |
| Gear Type | Probable trawl gear; 4-inch mesh |
| Re-sightings: | N/A |

| NMFS No. | E13-99 |
|---|---|
| Report status | event confirmed, species unconfirmed |
| Date 1st observed entangled | 7/4/99 |
| Species | Probable Minke Whale |
| No. of animals | 1 |
| Individual ID | no |
| Location | 6 miles south of Great Duck Island, ME |
| Latitude/Longitude | approx. 44.°02.73 N    approx. 68°12.23' W |
| Event Description | 7/4/99<br>• Entangled whale reported by boater to USCG<br>• Boater disentangled whale |
| Description of Gear on Whale | line through mouth, pot gear and buoys, and line trailing |
| Description of wounds | None given |
| Gear Type | Analysis continuing |
| Re-sightings: | N/A |

| | |
|---|---|
| NMFS No. | E14-99 |
| Report status | Confirmed |
| Date 1st observed entangled | 7/5/99 |
| Species | Humpback Whale |
| No. of animals | 1 |
| Individual ID | Crevasse |
| Location | 20 miles southeast of Southwest Harbor, ME |
| Latitude/Longitude | 44°06.47 N      67°53.33' W |
| Event Description | •     Reported by whale watch vessel<br>•     CCS and USCG staff investigated<br>•     Entanglement determined to be minimal; no disentanglement attempted |
| Description of Gear on Whale | Line and buoy trailing assumed to be attached at right flipper or right side of mouth |
| Description of wounds | none observed |
| Gear Type | No gear recovered. |
| Re-sightings: | re-sighted free of gear Aug 10 & Aug 23, 1999 |
| Life History Information | Probable male; adult; approximately 45 ft in length; at least 15 years of age |

| NMFS No. | E15-99 |
|---|---|
| Report status | Event confirmed; species unconfirmed; analysis continuing |
| Date 1st observed entangled | 7/15/99 |
| Species | Probable minke whale |
| No. of animals | 1 |
| Individual ID | Unknown |
| Location | Billingsgate Shoal |
| Latitude/Longitude | 41°49 N approx. | 70°11' W approx. |
| Event Description | •     Reported by charter boat captain to USCG to CCS<br>•     Individual reports disentangling a 12-15 ft whale |
| Description of Gear on Whale | Line caught between mouth and wrapped around tail |
| Description of wounds | None observed |
| Gear Type | Gear collected; analysis continuing |
| Re-sightings: | Not expected |

| | |
|---|---|
| NMFS No. | E16-99 |
| Report status | confirmed |
| Date 1st observed entangled | 7/21/98 |
| Species | Right Whale |
| No. of animals | 1 |
| Individual ID | 2710 |
| Location | Bay of Fundy, Canada |
| Latitude/Longitude | 44° 40.2' N        66°30.5' W |
| Event Description | 7/21<br>•     Entangled whale sighted by NEAq team<br>9/1/99<br>•     NEAq tagged the whale (implanted VHF tag)<br>9/19<br>•     NEAq and IFAW teams attached a telemetry buoy to trailing gear (satellite and VHF)<br>9/20<br>•     Whale lost telemetry buoy<br>9/27<br>•     telemetry buoy retrieved; much of the entangling gear attached to buoy<br>10/2<br>•     Aerial survey in area of VHF transmission produced 40+ right whales<br>•     None of the whales appeared to have gear - several whales with callosity patterns like 2710 were sighted. |
| Description of Gear on Whale | line in mouth, possibly wrapped around right flipper and trailing on right side |
| Description of wounds | fresh wounds on caudal peduncle |
| Gear Type | Canadian pot gear |
| Sighting prior to entanglement | April, 1999 in Cape Cod Bay |
| Re-sightings: | Likely sighted 10/2.  No gear seen |
| Life History Information | Young female, minimum age: 2 |

| NMFS No. | E17-99 | |
|---|---|---|
| Report status | Confirmed | |
| Date 1st observed entangled | 7/29/99 | |
| Species | Humpback Whale | |
| No. of animals | 1 | |
| Individual ID | Unknown | |
| Location | Platts Bank | |
| Latitude/Longitude | 43° 11.21' N | 69°40.0' W |
| Event Description | 7/29/99<br>•     Reported by crew from fishing vessel to USCG<br>•     Fishing vessel stood by until replaced by USCG<br>•     Whale immobilized but not anchored<br>•     CCS staff disentangled whale | |
| Description of Gear on Whale | Line in mouth | |
| Description of wounds | Some fresh scuffs at leading edges of flukes | |
| Gear Type | Sink gillnet - 10" mesh | |
| Re-sightings: | Future sighting possible - whale did not fluke so no individual ID was made; dorsal fin shots may eventually lead to ID | |

| | | |
|---|---|---|
| NMFS No. | E18-99 | |
| Report status | Confirmed | |
| Date 1st observed entangled | 8/2/99 | |
| Species | Minke | |
| No. of animals | 1 | |
| Individual ID | no | |
| Location | Between Point Judith Light and Scarborough Beach, RI | |
| Latitude/Longitude (approx.) | 41°22.31' N | 71°30.94' W |
| Event Description | •     Dead floating whale reported by USCG<br>•     Mystic Aquarium staff investigated & documented entanglement<br>•     Whale did not beach | |
| Description of Gear on Whale | mesh wrapped around rostrum | |
| Description of wounds | broken rostrum | |
| Gear Type | Trawl gear; 6-inch mesh | |
| Re-sightings: | N/A | |

| | |
|---|---|
| NMFS No. | E19-99 |
| Report status | Confirmed |
| Date 1st observed entangled | 8/3/99 |
| Species | Humpback |
| No. of animals | 1 |
| Individual ID | Unknown |
| Location | Bay of Fundy, Canada |
| Latitude/Longitude (approx.) | 44°28.8 N | 66°24.4 W |
| Event Description | •     Entangled whale reported by ECE<br>•     ECE attempted to disentangle the whale; unsuccessful |
| Description of Gear on Whale | single wrap of line pinning both flippers to the side of the animal |
| Description of wounds | 2" deep fresh cut around body |
| Gear Type | No gear recovered |
| Re-sightings: | Future sightings possible due to nature of entanglement |

| NMFS No. | E20-99 |
|---|---|
| Report status | Confirmed |
| Date 1st observed entangled | 8/4/99 |
| Species | Humpback Whale |
| No. of animals | 1 |
| Individual ID | Unknown |
| Location | 10 nm southeast of Chatham, MA |
| Latitude/Longitude | 41° 38.7' N | 69° 43.1' N |
| Event Description | 8/4<br>•      Entangled whale reported by pilot of tuna spotter<br>•      No one could stand by<br>•      Daylight, distance from shore, and weather precluded disentanglement attempt<br>8/6<br>•      sighted by a different tuna spotter @ 42° 23.2' N 69° 54.1' N<br>•      not enough daylight for a response |
| Description of Gear on Whale | trailing 150 ft of line from flukes |
| Description of wounds | none observed |
| Gear Type | No gear recovered |
| Re-sightings: | From description of gear:<br>8/6 sighted by a different tuna spotter @ 42° 23.2' N 69° 54.1' N |

| NMFS No. | E21-99 | |
|---|---|---|
| Report status | Confirmed | |
| Date 1st observed entangled | 8/23/98 | |
| Species | Humpback Whale | |
| No. of animals | 1 | |
| Individual ID | Unknown | |
| Location | 4-5 miles E of Mt. Desert Rock, ME | |
| Latitude/Longitude | 44 00.2 N | 68 02.79 W |
| Event Description | 8/23/98<br>•     Successfully disentangled by CCS staff | |
| Description of Gear on Whale | line from both sides of the whales mouth, twisted together posterior to the blowholes and ran down the left dorsal side of the whale tangling in the flukes | |
| Description of wounds | Deep diagonal crease along the whales back and left flank | |
| Gear Type | Lobster gear | |
| Re-sightings: | Future sightings possible due to scarring from entanglement.  did not lift tail flukes for ID | |

| | |
|---|---|
| [Field Title] | E22-99 |
| [Report Status] | Confirmed. Further information pending |
| [Date 1st observed entangled] | 8/27/99 |
| [Species] | Fin Whale |
| [No. of animals] | 1 |
| [Individual ID] | Unknown |
| [Location] | Canada |
| [Latitude/Longitude] | xx°xx' N | xx°xx' W |
| [Broad Description] | • |
| [Description of Gear on Whale] | |
| [Description of wounds] | Whale emaciated |
| [Gear Type] | |
| [Employment] | |

| NMFS No. | E23-99 |
|---|---|
| Report status | Confirmed |
| Date 1st observed entangled | 8/30/99 |
| Species | Fin Whale |
| No. of animals | 1 |
| Individual ID | Unknown |
| Location | North of Campobello Island, New Brunswick, Canada |
| Latitude/Longitude | 44°55' N | 66°49' W |
| Event Description | •     Entangled whale reported by whale watch vessels which stood by<br>•     ECE and NEAq attempted disentanglement<br>•     most of the gear was removed |
| Description of Gear on Whale | line around the head, blowholes and flukes |
| Description of wounds | None observed |
| Gear Type | Identified by Canada Department of Fisheries and Oceans staff as Canadian crab pot gear |
| Re-sightings: | Not expected |

| NMFS No. | E24-99 |
|---|---|
| Report status | Confirmed |
| Date 1st observed entangled | 9/2/99 |
| Species | Fin Whale |
| No. of animals | 1 |
| Individual ID | Unknown |
| Location | Bay of Fundy, Canada |
| Latitude/Longitude | 44° 49.8' N   \| 66°48.2' W |
| Event Description | • Entangled whale reported<br>• ECE, NEAq, GMCRS responded<br>• Disentanglement attempted, unsuccessful |
| Description of Gear on Whale | line with buoy trailing from flukes; line wrapped on flukes |
| Description of wounds | None reported |
| Gear Type | No gear recovered |
| Re-sightings: | Not expected |

**1623**

| NMFS No. | E25-99 |
|---|---|
| Report status | Confirmed |
| Date 1st observed entangled | 9/5/99 |
| Species | Humpback Whale |
| No. of animals | 1 |
| Individual ID | Unknown, whale did not lift flukes |
| Location | Stellwagen |
| Latitude/Longitude | 42° 09' N | 70°20' W |
| Event Description | • Entangled whale reported by vessel crew<br>• CCS staff responded; whale watch vessel helped to re-locate whale<br>• Buoy was cut loose & loops of remaining line loosened<br>• Gear recovered |
| Description of Gear on Whale | single line with buoy around right flipper |
| Description of wounds | None reported |
| Gear Type | Gear unknown |
| Re-sightings: | Not expected; no individual ID made from tail flukes; skin collected |

| NMFS No. | E26-99 |
|---|---|
| Report status | Unconfirmed |
| Date 1st observed entangled | 9/23/99 |
| Species | Unidentified; Probable humpback |
| No. of animals | 1 |
| Individual ID | Unknown |
| Location | 19 miles south southeast of Chatham, MA |
| Latitude/Longitude | 41° 28.74' N     69° 44.51' N |
| Event Description | 9/23<br>•     Reported by fisherman<br>•     No disentanglement attempted due to weather<br>•     Subsequent interview with fisherman revealed that whale may have been anchored<br>9/24<br>•     Coast Guard overflight of area of entanglement report revealed nothing |
| Description of Gear on Whale | Line wrapped in mouth and around mid-section |
| Description of wounds | Not given |
| Gear Type | Not expected |
| Re-sightings: | Unknown |

| NMFS No. | E27-99 |
|---|---|
| Report status | Confirmed |
| Date 1st observed entangled | 10/2/99 |
| Species | Minke Whale |
| No. of animals | 1 |
| Individual ID | no |
| Location | initially seen floating 5 miles W of Race Point, Provincetown, MA; washed up at Herring Cove Beach, Provincetown, MA |
| Latitude/Longitude | 42° 03.35' N | 70°21.27' W |
| Event Description | 10/2<br>• Floating carcass sighted by boaters<br>• USCG and CCS verified species & signs of entanglement<br>10/3<br>• Washed up at Herring Cove, Beach (national Park Service Land)<br>• Examined by Cape Cod Stranding Network<br>10/4<br>• Necropsied by Cape Cod Stranding Network / NEAq |
| Description of Gear on Whale | none |
| Description of wounds | Line marks on left gape of mouth, left pectoral fin, caudal peduncle and dorsal and ventral surfaces of fluke blades |
| Gear Type | No gear recovered |
| Re-sightings | N/A |

Page 29 of 30

| NMFS No. | E28-99 | |
|---|---|---|
| Report status | Confirmed | |
| Date 1st observed entangled | 10/28/99 | |
| Species | Humpback Whale | |
| No. of animals | 2 (mother and calf; mother entangled) | |
| Individual ID | Compass | |
| Location | Stellwagen Bank | |
| Latitude/Longitude | 42° 18.8' N | 70°23.9' W |
| Event Description | 10/28<br>•    Entangled whale sighted by whale watch vessel crew<br>•    CCS responded<br>•    Behavior described as normal<br>•    Entanglement determined non-life threatening | |
| Description of Gear on Whale | several feet of line extending from left side of whale's mouth.  Longer line extending from the right side of the whale's mouth - almost a body length long | |
| Description of wounds | None noted | |
| Gear Type | No gear recovered | |
| Re-sightings | Future sightings possible | |
| Life History Information | Adult female | |

66

# Large Whale Entanglement Reports 2000
## *updated June 2001*



Right whale #2746 was disentangled in the Bay of Fundy (July 2000)

## National Marine Fisheries Service
## Protected Resources Division
## 1 Blackburn Drive
## Gloucester, MA 01930-2298

# 2000 Large Whale Entanglement Reports
*Last updated June 23, 2001*

Table 1:  Summary of 2000 large whale entanglement reports for live entangled whales: confirmed vs. non confirmed by common name.

**Live Entangled Whales**

| Common name | Confirmed | Probable | Unconfirmed | Total |
|---|---|---|---|---|
| Right Whale | 6 | | 2 | 8 |
| Humpback Whale | 14 | 1 | | 15 |
| Fin Whale | | | | |
| Minke Whale | 3 | | 1 | 4 |
| Unidentified Whale | | | 5 | 5 |
| Total | 23 | 1 | 8 | 32 |

Table 2:  Summary of 2000 large whale entanglement reports dead, stranded or floating whales: confirmed vs. non confirmed by common name.

**Dead Entangled Whales**

| Common name | Confirmed | Probable | Unconfirmed | Total |
|---|---|---|---|---|
| Right Whale | 1 | | | 1 |
| Humpback Whale | 1 | | | 1 |
| Fin Whale | | | | |
| Minke Whale | 1 | 1 | | 2 |
| Unidentified Whale | 1 | | 1 | 2 |
| Total | 4 | 1 | 1 | 6 |

\* *Confirmed* means that gear was seen on a live whale by a reliable observer or that gear was photo documented or retrieved.  For dead whales, confirmed means that gear, or marks from gear, were documented on the carcass.

NOTE:

1.    Some of the reports that follow are still under analysis.  Data are represented as accurately as possible with information received as of June, 2001.
2.    New England Aquarium provided sighting and life history information for right whales.
3.    Center for Coastal Studies provided sighting and life history information for humpback whales.
4.    Biological information is given for the whale at the time of the entanglement (Date 1st observed entangled)

Table 3: Key for agency acronyms used in this report

Acronyms

| | |
|---|---|
| CCS | Center for Coastal Studies |
| CCS/MADMF | Center for Coastal Studies and Massachusetts Division of Marine Fisheries |
| CCSN | Cape Cod Stranding Network |
| ECE | East Coast Ecosystems - a Canadian Large Whale Disentanglement Team |
| GMWSS | Grand Manan Whale and Seabird Research Station |
| IFAW | International Fund for Animal Welfare - Research crew from vessel "Song of the Whale" |
| NAIB | National Aquarium in Baltimore |
| NEAq | New England Aquarium Right Whale Research Team |
| NMFS | National Marine Fisheries Service |
| NMFS PSB | NMFS Protected Species Branch, Northeast Fisheries Science Center |
| NMFS DEII | NMFS Research Vessel Delaware II |
| NMFS SAS | NMFS Sightings Advisory System, Protected Resources Div., Northeast Regional Office |
| USCG | United States Coast Guard |
| VMSM | Virginia Marine Science Museum |

2148

Table .. ummary of confirmed, live large whale entanglement reports for the United States East Coast and Canada 2000.

| Species | Date, ID (if any) and Area first sighted | Response | Event Description | Status | Action |
|---|---|---|---|---|---|
| **Right** | 1. 3/1/00, #1130, Zebra, off Manomet, MA | Yes | Unable to tag or disentangle during six-hour attempt. Not relocated despite extensive effort throughout season. | Entangled | Intervene |
| | 2. 3/27/00, #1167, 15 nm SW of Martha's Vineyard, MA | Yes | 5/8 Wilkinson Basin: Whale was temporarily tagged with telemetry buoy. | 8/1/00 Gear shed | None |
| | 3. 5/3/00, #1720, Rodgers Canyon | Yes | 5/31 and 6/20 no one stood by and too far from shore. | Minor entanglement | Monitor |
| | 4. 7/9/00, #2746, Bay of Fundy | Yes | Extended effort to tag and disentangle - Successful | Disentangled | None |
| | 5. 8/18/00, #2223, "Calvin" Bay of Fundy | Yes | Sighted by plane crew. Vessel & aerial efforts to relocate were unsuccessful. Relocated 5/01 tagged w/ buoy | 5/8/01 Gear shed | None |
| | 6. 8/18/00, Bay of Fundy | Yes | Entanglement sighted briefly by vessel survey crew; whale not re-sighted | Lost/Unidentifiable | None |
| **Humpback** | 1. 1/8/00, VA/NC Border | Yes | Assessed and tagged by first responder. Next day, tag and some gear remained but were unable to locate whale | Lost/Unidentifiable | None |
| | 2. 4/11/00, #14, Off Truro, Cape Cod Bay, MA | Yes | Unable to tag or disentangle the whale. Unable to relocate | 5/1/01 Gear shed | None |
| | 3. 4/25/00, 18 miles E of Chatham, MA | Yes | 4/25, 4/28 and 5/6 no one stood by; too far from shore. | Lost/Unidentifiable | None |
| | 4. 5/1/00, Mauro, Race Point, Provincetown, MA | Yes | 5/2 unable to tag or disentangle the whale, decision was made to monitor | 10/4/00 Gear shed | None |
| | 5. 5/12/00, Onyx's Calf, Southern Stellwagen | Yes | No one stood by, Unable to relocate | 6/21/00 Gear shed | None |
| | 6. 6/4/00, calf, 62 miles E of Nantucket, MA | Yes | Too far from shore for vessel response | Minor entanglement | Monitor |
| | 7. 7/1/00, Northern Stellwagen Bank | Yes | No one stood by, Unable to relocate | Lost/Unidentifiable | None |
| | 8. 8/4/00, Off of Long Island, Nova Scotia | Yes | East Coast Ecosystems, Canada (ECE) attempted to tag whale - unsuccessful | Entangled | Intervene |
| | 9. 8/19/00, Southwest Stellwagen | Yes | No one stood by, Unable to relocate | Lost/Unidentifiable | None |
| | 10. 8/25/00, Stellwagen | Yes | Vessels stood by, Whale was successfully disentangled | Disentangled | None |
| | 11. 9/6/00, Giraffe's Calf, Southern Stellwagen | Yes | Unable to tag or disentangle the whale, decision was made to monitor | Minor entanglement | Monitor |
| | 12. 10/14/00, 5 nm SE of Ocean City, MD | Yes | Unable to attempt tagging due to darkness. | Lost/Unidentifiable | None |
| | 13. 10/20/00, Tribble, Southern Stellwagen | Yes | No one stood by, Unable to relocate | Entangled | Intervene |
| | 14. 11/21/00, 1 mile E of Frisco Pier, Cape Hatteras, NC | Yes | Tagged, Some gear removed | Lost/Unidentifiable | None |
| **Minke** | 1. 8/4/00, Frenchman's Bay, ME | Yes | Entanglement sighted briefly by fishermen; whale not re-sighted | Lost/Unidentifiable | None |
| | 2. 8/25/00, Jeffreys Ledge | Yes | Standby vessel reported to Network, but lost sight of the whale and could not relocate it. | Lost/Unidentifiable | None |
| | 3. 8/26/00, Off of Baker Island, ME | Yes | Vessels stood by, Whale was successfully disentangled | Disentangled | None |

**Explanation of Terms:**

**Response** means initial assessment was made that triggered Network action ranging from aerial searching and documenting to vessel deployment and disentangling

**Status** terms (based on last known description of the entanglement, the whale and information gained from any retrieved gear)

Entangled - assessed as life-threatening entanglement

Minor entanglement - assessed as non-life-threatening entanglement (could indicate a change of assessment due to partial disentanglement)

Disentangled - whale is gear free as result of disentanglement efforts

Gear shed - whale is gear free without intervention

Lost/Unidentifiable - entanglement reported but lost; inadequate documentation

**Action** terms are defined as follows:

Intervene - most recent assessment indicates that action is necessary to prevent mortality

Monitor - current assessment does not indicate intervention; status is subject to change on re-assessment

None - whale status is Disentangled, Gear shed, or Lost/Unidentifiable

2149

| | |
|---|---|
| NMGS No. | E1-00 |
| Report status | Confirmed |
| Date first observed entangled | 1/8/00 |
| Species | Humpback Whale |
| No. of animals | 1 |
| Individual ID | Unknown |
| Location | 5 nm offshore of the Virginia/North Carolina border |
| Latitude/Longitude | 36° 43.056" N          75°50.287' W |
| Event Description | 1/8/00 |
| | • Reported by crew from a recreational fishing vessel |
| | • CCS-trained first responder investigated & documented entanglement |
| | • Whale was anchored to gear |
| | • First responder tagged entangling gear with VHF tag |
| | 1/9/00 |
| | • CCS staff flew to VA to attempt disentanglement |
| | • Whale was not relocated |
| | • Fisherman appeared on scene & hauled his gear |
| | • Netting was parted and tag remained on gear that was hauled |
| | • CCS staff interviewed the fisherman |
| | • Subsequent efforts to relocate the whale were unsuccessful. |
| Description of Gear on Whale | Netting around tail stock and possibly the pectoral flippers |
| Description of wounds | Fresh wound reported near the dorsal fin |
| Gear Type | Sink Gillnet - - 4" mesh - - Target species: Sea Trout |
| Sighting prior to entanglement | Unknown |
| Re-sightings | Not expected; no photos of tail flukes;  video & still photos of dorsal fin were taken |
| Life History Information | young whale, approximately 30-35 ft in length |

2150

| NMFS No. | E2-00 |
|---|---|
| Report status | Confirmed |
| Date first observed entangled | 1/19/00 |
| Type | Right Whale (dead, floating) |
| No. of animals | 1 |
| Individual ID | 2701 |
| Location | 10 nm SE of Block Island, RI |
| Latitude/Longitude | 41° 03" N        71°30' W |
| Event Description | 1/19/00<br>•         reported by fisherman<br>1/20/00<br>•         USCG Falcon jet crew videotaped whale<br>•         Whale was identified as a right whale<br>•         Winter storm prevented carcass recovery efforts<br>1/21/00 & 1/22/00<br>•         Weather too poor for aerial search<br>1/23/00<br>•         Whale relocated by falcon Jet crew with CCSN observer<br>•         NMFS observer accompanied USCG helicopter crew to video/photograph<br>•         Weather too poor to attempt satellite tagging the whale or a tow in<br>1/24/00<br>•         USCG searched for, but did not find the whale<br>1/25/00<br>•         Weather too poor for aerial search<br>1/26/00<br>•         USCG searched for, but did not find the whale<br>1/27/00<br>•         USCG searched for, but did not find the whale; sighting conditions terrible<br>1/28/00<br>•         Search efforts suspended as no reliable search pattern could be determined based on last position whale was sighted & time elapsed |
| Description of Gear on Whale | line around tail stock |
| Description of wounds | none noted |
| Gear type | Unknown - no gear recovered |
| Sighting prior to entanglement | 9/12/99 in the Bay of Fundy |
| Re-sightings | 1/23/00 Photo/video taken of carcass |
| Biological information | 3 year old female |

2151

| | |
|---|---|
| | E3-00 |
| Report Status | Unconfirmed |
| Date First Observed/entangled | 2/25/00 |
| | Unidentified Large Whale |
| Total Animals | 1 |
| Individual ID | Unknown |
| Location | 1 nm offshore of VA/NC border |
| Latitude/Longitude | 36° 36.02' N          75°51.1' W |
| Event Description | 2/25<br>• Reported by a boater<br>• Vessel crew did not stand by and whale was not relocated<br>• Vessel crew could not be contacted for follow up |
| Description of Gear on Whale | Unknown |
| Description of wounds | Unknown |
| Gear Type | Unconfirmed entanglement |
| Sighting prior to entanglement | Unknown |
| Re-sightings | Not expected |
| Life History Information | Unknown |

2152

| NMFS ID | E4-00 |
|---|---|
| Field Status | Confirmed |
| Date Observed entangled | 3/1/00 |
| Species | Right Whale |
| No. Animals | 1 |
| Individual ID | 1130; "Zebra" |
| Location | 5 nm northeast of Manomet Point, Cape Cod Bay, MA |
| Latitude/Longitude | 41° 58.1' N          70°26.6' W |
| Event Description | 3/1/00<br>• Sighted by CCS/MADMF Aerial survey team<br>• CCS attempted to disentangle whale but were unable<br>• Later attempts to relocate the whale were unsuccessful |
| Description of Gear on Whale | • Left pectoral flipper may be point of attachment |
| Description of wounds | • Flukes appeared to have entanglement wounds<br>• Discoloration of left pectoral flipper |
| Gear type | Unknown - no gear recovered |
| Sighting prior to entanglement | March 14, 1999 in Cape Cod Bay<br>July 18 and August 2 & 19, 1999 in Bay of Fundy |
| Re-sightings | None to date |
| Biological Information | Adult male |

**2153**

| | |
|---|---|
| MRI No. | E5-00 |
| Report Status | Unconfirmed |
| Date 1st observed entangled | 3/5/00 |
| Species | Unidentified Large Whale, Probable Humpback |
| No. of animals | 1 |
| Individual ID | Unknown |
| Location | 300 yards S of Rudee Inlet, VA |
| Latitude/Longitude | 36° 44' N          75° 57.5' W |
| Event Description | 3/5/00<br>• Reported by crew from recreational vessel<br>• Vessel did not stand by or leave any contact information<br>• Investigated by VMSM staff who found both humpback & finback whales in the area, but no entangled whale was seen. |
| Description of Gear on Whale | Unknown |
| Description of wounds | Unknown |
| Gear Type | Unconfirmed entanglement |
| Sighting prior to entanglement. | Unknown |
| Re-sightings | Not likely |
| Biological Information | Unknown |

2154

| NMFS No. | E6-00 |
|---|---|
| Report Status | Unconfirmed |
| Date 1st observed/entangled | 3/23/00 |
| Species | Right Whale |
| No. of animals | 1 |
| Individual ID | 1301 |
| Location | Off of Wood End near Provincetown, MA |
| Latitude/Longitude | 42° 00.8' N        70 ' 11.8' W |
| Event Description | 3/23/00, 3/25/00 and 3/27/00<br>•    whale viewed and photographed by CCS/MADMF survey crew in Cape Cod Bay<br>4/4/00<br>•    slides were analyzed by NEAq staff and scar/gear was noted<br>5/3/00 and 5/26/00<br>•    whale re-sighted by NMFS SAS aerial survey team in the Great South Channel<br>•    Team spent time viewing from air and were almost certain it is a scar |
| Description of Gear on Whale | Hoop-like scar or gear encircling whale just behind the pectoral flippers |
| Description of wounds | Hoop-like scar or gear encircling whale just behind the pectoral flippers |
| Gear Type | Unconfirmed entanglement |
| Sighting prior to entanglement | July 18 & 21, 1999 in Bay of Fundy - seen & photographed without scar/ gear |
| Re-sightings | March 25 in Cape Cod Bay; 5/3/00 and 5/26/00 in Great S. Channel; Also sighted by NEAQ in early December 2000 in the Southeast US off the northern coast of Florida |
| Biological Information | 17 year old female |

2155

| | |
|---|---|
| File No. | E7-00 |
| Report Status | Confirmed |
| Dates observed entangled | 3/27/00 |
| Species | Right Whale |
| No. of animals | 1 |
| Individual ID | 1167 |
| Location | 15 nm SW of Martha's Vineyard, MA |
| Latitude/Longitude | 41° 05.3' N          70° 58' W |
| Event Description | 3/27/00<br>•     Viewed and photographed by NMFS/SAS aerial survey team<br>•     Entanglement not noted by observers at that time<br>5/8/00<br>•     Sighted by NMFS/PSB aerial survey team in Wilkinson Basin<br>•     NMFS/SAS plane relieved NMFS/PSB and assisted in response effort<br>•     CCS disentanglement team responded, assessed the entanglement and<br>      attached VHF/satellite telemetry buoy to entangling gear<br>•     PLAN: to attempt disentanglement when weather improved<br>~5/10/00<br>•     VHF/satellite telemetry buoy came off the whale<br>5/12/00<br>•     VHF/satellite telemetry buoy was retrieved - no gear was attached<br>8/1/00<br>•     Whale photographed in Bay of Fundy free of all gear |
| Description of Gear on Whale | 50-70 feet of light line trailing behind flukes w/ red buoy at terminus. Line trails from the right side of the whale, possibly from the mouth. |
| Description of wounds | None noted |
| Gear Type | Unknown - no gear recovered |
| Sighting prior to entanglement | 8/20/99 in Bay of Fundy |
| Re-sightings: | 5/8/00 - when CCS disentanglement team responded<br>8/1/00, 8/11/00, 8/22/00 - Whale sighted free of all gear |
| Biological Information | Adult male first seen in 1981 |

**2156**

| | |
|---|---|
| | E8-00 |
| | Unconfirmed |
| | 3/28/00 |
| | Unidentified Large Whale, Probable humpback |
| | 1 |
| | Unknown |
| | Just offshore of Virginia Beach, VA |
| | 36° 52' N          75° 58' W |
| | 3/28/00<br>• Reported by boater<br>• Described as dragging something and flopping around<br>• Reporting vessel left scene<br>• 30 min later VMSM staff arrived after and found a humpback whale with no entanglement |
| Description of Gear on whale | 200 ft of line and red buoy trailing |
| Description of wounds | None noted |
| Gear type | Unconfirmed entanglement |
| Sighting prior to entanglement | Unknown |
| Resightings | Unknown |
| Biological information | Unknown |

2157

| NMFS No. | E9-00 |
|---|---|
| Report status | Unconfirmed |
| Date 1st observed entangled | 4/7/00 |
| Species | Right Whale |
| No. of animals | 1 |
| Individual ID | 2920 |
| Location | Cape Cod Bay |
| Latitude/Longitude | 41° 53.1' N        70° 10.7' W |
| Event Description | 4/7/00<br>•        whale viewed and photographed by CCS/MADMF survey crew in Cape Cod Bay<br>~June 2000<br>•        slides were analyzed by NEAq staff and scar/gear was noted<br>5/28/00<br>•        Whale sighted in Great S. Channel by NMFS SAS aerial survey team<br>•        Evidence of scar was still visible, but there was no evidence of line |
| Description of Gear on Whale | Hoop-like scar or gear apparent on dorsal side |
| Description of wounds | Hoop-like scar apparent on dorsal side |
| Gear Type | Unconfirmed entanglement |
| Sighting prior to entanglement | March 27, 2000 in Cape Cod Bay at 41° 57.9' N and 70° 07.6' W |
| Re-sightings: | 5/28/00 By NMFS SAS team in Great South Channel at 41° 02.1' N  69° 06.2' W |
| Biological Information | 40-45 feet in length, unknown age and gender |

2158

| | |
|---|---|
| NMFS No. | E10-00 |
| Report Status | Confirmed |
| Date(s) observed entangled | 4/11/00 |
| Species | Humpback Whale |
| No. of animals | 1 |
| Individual ID | "fourteen" |
| Location | 3.5 nm southwest of Pamet River Inlet, Truro, MA, Cape Cod Bay |
| Latitude/Longitude | 41° 57.21' N        70°08.3' W |
| Event description | 4/11/00<br>•    Entangled whale sighted by CCS staff<br>•    CCS attempted to tag or disentangle but were unable to; approach was difficult<br>•    Sea state worsened, whale was lost and attempts to relocate were unsuccessful<br>5/17/00<br>•    Whale was sighted by whale watch vessel crew on Stellwagen Bank<br>•    Vessel stood by until response team arrived<br>•    Attempts to attach a tag to the trailing gear were unsuccessful<br>5/1/01<br>•    Whale sighted and photographed gear-free at loran bearing 13843.3 44156.0 |
| Description of Gear on Whale | Dark line balled up on the whale's back forward of the dorsal fin. Two small white floats visible on line |
| Description of wounds | 4 and 5/2000<br>•    No wounds noted. Chafe marks observed<br>5/1/01<br>•    white marks noted on dorsal side of the tail flukes |
| Gear Type | Unknown - no gear recovered |
| Sighting prior to entanglement | |
| Re-sightings | 5/17/00 and 5/1/01 |
| Biological Information | Unknown age and gender, was estimated to be 38 ft in length at time of entanglement |

2159

| NMFS No. | E11-00 |
|---|---|
| Report Status | Confirmed |
| Date 1st observed entangled | 4/25/00 |
| Species | Humpback |
| No. of animals | 1 |
| Individual ID | Unknown |
| Location | 18 nm east of Chatham, MA |
| Latitude/Longitude | 41° 38.7' N        69° 34.7' W |
| Event Description | 4/25/00<br>• Sighted by NMFS/SAS aerial survey team<br>• Seas were rough and the aerial survey team saw the whale at the surface only twice before they lost track of it<br>• No response was made due to rough seas and no one standing by<br>4/28/00<br>• Sighted by NMFS/SAS aerial survey team 14.5 nm E of Chatham, MA<br>• response not attempted due to distance from shore and vessel trouble<br>5/6/00<br>• Whale was re-sighted by NMFS/SAS aerial survey team<br>• Located too far from shore (22 miles east of Chatham) and too late in the day to respond<br>5/8/00<br>• Plan: CCS rescue team & vessel were operating near area where whale was last sighted and aerial survey team flew the area in search of the entangled whale<br>• Effort was shifted to an entangled right whale (Wilkinson Basin) |
| Description of Gear on Whale | 4/25/00: light colored line wrapped on tail stock with about fifty ft trailing behind the whale<br>5/6/00: line appeared more frayed at the end then at the 4/25 sighting |
| Description of wounds | 4/25/00: Scarring/cuts noted on the base of the tail stock<br>5/6/00: white wounds noted on tail flukes |
| Gear Type | Unknown - no gear recovered |
| Sighting prior to entanglement | Unknown |
| Re-sightings: | 4/25/00 and  5/6/00 (see above) |
| Biological Information | Unknown |

| NMFS | E12-00 |
|---|---|
| Status | Confirmed |
| Date observed entangled | 5/1/00 |
| Species | Humpback Whale |
| Animals | 1 |
| Reported by | Mauro |
| Location | Off of Race Point, Provincetown, MA |
| Latitude/Longitude | 42° 03.44' N        70° 14.74' W |
| Event Description | 5/1/00<br>• Sighted by crew on whale watch vessel<br>• Vessel did not stand by<br>• CCS disentanglement team searched for but could not relocate the whale<br>5/2/00<br>• Whale was sighted from shore at Race Point Beach<br>• CCS disentanglement team responded<br>• The whale was difficult to approach for tagging<br>• CCS staff made the assessment to monitor (minimal entanglement)<br>10/4/00<br>• Whale was sighted free of gear |
| Description of Gear on Whale | 5/1/00: Bullet buoy and line trailing 15 feet behind the whale<br>5/2/00: Single line attached at either the left pectoral flipper or left side of mouth<br>10/4/0: Whale sighted free of gear approximately 15 nm SE of Chatham, MA |
| Description of wounds | None noted |
| Gear Type | Unknown - no gear recovered |
| Sighting prior to entanglement | 4/30/00 observed by whale watch vessel crew free of gear at 42 05.38N, 070 15.92W |
| Resightings | 5/2/00, 10/4/00 (see above) |
| Biological Information | 3 year old female |

**2161**

| NMFS No. | E13-00 |
|---|---|
| Report status | Confirmed |
| Date first observed entangled | 5/12/00 |
| Species | Humpback Whale |
| No. of animals | 1 |
| Individual ID | Calf of Onyx |
| Location | Southern Stellwagen Bank |
| Latitude/Longitude | 42° 10' N        70° 15' W |
| Event Description | 5/12/00<br>• Sighted by crew from whale watch vessel<br>• Vessel did not stand by<br>• CCS disentanglement team searched for, but did not locate the whale<br>6/21/00<br>• Whale re-sighted, no gear was noted<br>7/12/00<br>• Whale re-sighted and photographed (good body coverage) and no gear was noted |
| Description of Gear on Whale | 5/12/00<br>• light colored line appears to pin right pectoral flipper to the whale's body<br>• line running over the back of the whale and trailing beneath the left tail fluke<br>• Two bullet buoys attached to the trailing line |
| Description of wounds | 5/12/00: none noted<br>6/21/00: scars on tail stock |
| Gear Type | Unknown - no gear recovered |
| Sighting prior to entanglement | Not sighted prior to entanglement |
| Re-sightings | 6/21/00 (see above) |
| Biological Information | Present year calf of Onyx, approximately 25-30 feet in length |

| NMFS No. | E14-00 |
|---|---|
| Report Status | Confirmed |
| Date first observed entangled | 5/20/00 |
| Species | Unknown large whale (Balaenopterid), (dead, floating) |
| No. of animals | 1 |
| Location | Unknown |
| Area | Southeast of Nantucket Lightship Closed Area |
| Latitude/Longitude | 40° 20.4' N        69° ?' W |
| Event description | 5/20/00<br>•     Reported and videotaped by USCG helicopter crew |
| Description of Gear on Whale | Dark line extending from mid-body to below tail stock region |
| Description of wounds | N/A - badly decomposed, scavenged by sharks |
| Gear type | Unknown - no gear recovered |
| Sighting prior to entanglement | Unknown |
| Resightings | No |
| Biological Information | Unknown |

2163

| NMFS No. | E15-00 |
| --- | --- |
| Report status | Confirmed |
| Date first observed/entangled | 5/31/00 |
| Species | Right Whale |
| No. of animals | 1 |
| Individual ID | 1720 |
| Location | Rodgers canyon; 80.5 miles ENE of Race point, Cape Cod, MA |
| Latitude/Longitude | 42° 29.8' N        68° 31.1' W |
| Event Description | 5/31/00<br>•    Sighted by NMFS/SAS aerial survey team<br>•    NMFS/SAS team documented the entanglement from the air<br>•    Given nature of the entanglement (not deemed life threatening), the behavior of the whale, and distance from shore, no response was planned<br>6/20/00<br>•    Sighted by NMFS/SAS aerial survey team at Cashes Ledge (42° 48'N 68° 50' W)<br>•    Due to distance offshore, time of day, and no one to stand by, no response was possible |
| Description of Gear on Whale | 5/31/00<br>•    ~30 feet of dark line trailing beneath whale. Line appears to sink.<br>6/20/00<br>•    Whale entangled in the mouth and trailing 80-90 feet of line |
| Description of wounds | None noted |
| Gear Type | Unknown - no gear recovered |
| Sighting prior to entanglement | 8/30/95 on Browns Bank (SW of Nova Scotia) |
| Re-sightings: | 6/20/00 (see above) |
| Biological Information | Sex is unknown, estimated to be 40 feet in length |

**2164**

| | |
|---|---|
| NMFS # | E16-00 |
| Identification Status | Confirmed |
| Date of Initial Determination | 6/4/00 |
| Species | Humpback |
| Number | 1 |
| Sex | Unknown |
| Region | 62 nm east of Nantucket, MA |
| Latitude/Longitude | 41° 19.3' N        68° 35.4' W |
| History | 6/4/00<br>•      Sighted by NMFS/SAS aerial survey team<br>•      Reported as approximately 15ft calf<br>•      No response was mounted due to distance from shore |
| Description of gear on Whale | Line trailing approximately 150 feet from left tail fluke |
| Description of wounds | Deep wound noted on left tail fluke |
| Gear Types | Unknown - no gear recovered |
| Cause of Death or Entanglement | Unknown |
| Re-sighting | None to date |
| Biological Information | Calf |

**2165**

| | |
|---|---|
| CCS No. | E17-00 |
| Action Status | Confirmed |
| Date first observed entangled | 7/1/00 |
| Species | Humpback Whale |
| No. of animals | 1 |
| Individual ID | Unknown |
| Location | Northern Stellwagen bank |
| Latitude/Longitude | 42° 19.8' N      70° 28.7' W |
| Event Description | 7/1/00<br>• Whale reported by staff from a whale watch vessel<br>• vessel did not stand by<br>• CCS disentanglement team searched for, but did not locate the whale |
| Description of Gear on Whale | 4-5 wraps on tail stock, trailing 50 ft of green line. 2 orange bullet buoys visible |
| Description of wounds | None noted |
| Gear Type | Unknown - no gear recovered |
| Sighting prior to entanglement | Unknown |
| Re-sightings | None to date |
| Biological Information | Unknown |

2166

| NMFS No. | E18-00 |
| --- | --- |
| Report status | Confirmed |
| Date first observed entangled | 7/9/00 |
| Species | Right Whale |
| No. of animals | 1 |
| Individual ID | 2746 |
| Location | Bay of Fundy |
| Latitude/Longitude | 44° 38' N          66° 30' W |
| Event Description | 7/9/00<br>•   Sighted by NMFS/PSB R/V DEII survey team<br>•   DEII team removed some of the entangling gear<br>7/11/00<br>•   Whale watch vessel sighted and photographed the whale<br>7/12/00<br>•   Teams from NEAq, GMWSS, ECE, and DEII searched for and located the whale<br>•   Attempts to tag the whale were unsuccessful<br>7/13/00<br>•   An aerial survey team (CCS and NEAq), and teams from NEAq, GMWSS, ECE, and DEII searched for and located the whale<br>•   Using plane and two inflatables, the whale was successfully tagged<br>7/15/00<br>•   CCS disentanglement team joined teams from ECE, GMWSS on the water with a team from NEAq in air<br>•   CCS disentanglement team was able to cut a large loop of line and adjusted the telemetry buoy<br>•   Soon after the team left the whale, satellite transmissions stopped<br>7/18/00<br>•   VHF transmissions were received by GMWSS team<br>•   GMWSS team located the whale<br>7/20/00<br>•   The aerial survey team located the telemetry buoy, but not the whale<br>•   Telemetry buoy and some attached gear were retrieved by GMWSS team<br>7/21/00<br>•   Extensive aerial and vessel surveys were conducted in the Basin area, Bay of Fundy in search of the whale. None of the right whales sighted had any visible gear<br>9/7/00<br>•   NEAq sighted the whale with no visible gear (Bay of Fundy) |
| Description of Gear on Whale | At least two lines coming from either side of the mouth are crisscrossed across the back. One or more lines from the right side of the mouth entangles the left flipper, pinning it to the whale's body. Two loops are apparent on the whales back. One loop has three yellow, round floats attached. There are two short lines trailing just beyond the tail flukes. |
| Description of wounds | None noted either initially or after the whale was free of gear |
| Gear type | Gear recovered is with D.F.O.   --   Analysis continuing |
| Sighting prior to entanglement | 9/14/99 in the Bay of Fundy at 44° 43.0' N  66° 26.4' W |
| Re-sightings | 7/11/00, 7/12/00, 7/13/00, 7/15/00, 7/18/00, 9/7/00 all in Bay of Fundy |
| Biological Information | 3 year old, gender unknown |

**2167**

| | |
|---|---|
| | E19-00 |
| | Unconfirmed |
| | 7/14/00 |
| | Unknown large whale, possible humpback |
| | 1 |
| | Unknown |
| | 90 miles east of Cape Cod, MA |
| | 41° 53' N        68° 00' W |
| Gear Description | 7/14/00<br>•     Vessel captain reported whale in trawl gear (flat fish)<br>•     Gear may have hung up on bottom<br>•     Gear came free, no whale was seen |
| Description of Gear on Whale | Unknown |
| Description of wounds | Unknown |
| Gear Type | Unconfirmed entanglement |
| Sighting prior to entanglement | Unknown |
| Re-Sightings | Unknown |
| Biological Information | Unknown |

**2168**

| | |
|---|---|
| NMFS Number | E20-00 |
| Confirmation | Unconfirmed |
| Date of Observed Entanglement | 7/23/00 |
| Species | Unidentified Large Whale (dead, floating) |
| Number | 1 |
| Sex | Unknown |
| General Location | 80 miles east of Rockland, Maine in Canadian waters |
| Latitude/Longitude | 44° 02.3' N          67° 14.1' W |
| Narrative Description | 7/23/00<br>• Large whale carcass (~50 feet) sighted by whale biologist from ferry<br>• attempts to relocate the carcass were unsuccessful |
| Description of Gear on Whale | Appeared to have yellow floats on carcass |
| Description of Wounds | Unknown |
| Severity | Unconfirmed entanglement |
| Actions Prior to Entanglement | Unknown |
| Sightings | None |
| Biological Information | Unknown |

**2169**

| | |
|---|---|
| NMFS No: | E21-00 |
| Report status: | Confirmed |
| Date 1st observed entangled: | 8/4/00 |
| Species: | Minke |
| No. of animals: | 1 |
| Individual ID: | Unknown |
| Location: | Two miles south of Turtle Island, Frenchman's Bay, Maine |
| Latitude/Longitude: | 44° 19.4' N        68° 06.44' W |
| Event Description: | 8/4/00<br>•     Whale sighted and reported by fishermen<br>•     Whale was hung up in one set of gear and then became hung up in a second set of gear, dove, and was not seen again (4 foot swell)<br>•     Line and buoy were retrieved from first set of gear (but not pair of traps)<br>•     Entire second set of gear was retrieved |
| Description of Gear on Whale | Buoy and line visible across back |
| Description of wounds: | Blood noted on dorsal fin and tail stock |
| Gear Type: | Lobster gear - inshore |
| Sighting prior to entanglement: | Unknown |
| Re-sightings: | Not likely |
| Biological Information | Unknown |

| NMFS No. | E22-00 |
|---|---|
| Report Status | Confirmed |
| Date first observed/entangled | 8/4/00 |
| Species | Humpback |
| No. of animals | 1 |
| Individual ID | Unknown |
| Location | Off of Long Island, Nova Scotia |
| Latitude/Longitude | 44° 22.2' N          66° 17.9' W |
| Event Description | 8/4/00<br>•          Whale sighted by ECE staff<br>•          ECE responded but were unsuccessful in tagging or disentanglement attempts<br>8/31/00<br>•          Whale sighted by whale watch vessel<br>•          ECE responded but were unable to tag the whale |
| Description of Gear on Whale | Netting over head to behind the blow holes.  Orange line from left of head to tail on right side (tight).  Thinner orange line over right fluke trailing approximately 20 feet |
| Description of wounds | Dorsal fin scuffed and appears whitish |
| Gear type | Unknown - no gear recovered |
| Sighting prior to entanglement | Unknown |
| Re-sightings | 8/31/00 (see above) |
| Biological Information | Estimated length was 35 feet |

**2171**

| | |
|---|---|
| IMES No. | E23-00 |
| Report status | Unconfirmed |
| Date first observed entangled | 8/11/00 |
| Species | Minke |
| No. of animals | 1 |
| Individual ID | Unknown |
| Location | 3.2 nm east of Port Clyde, ME |
| Latitude/Longitude | 43° 55' N        69° 11.1' W |
| Event Description | 8/11/00<br>• Reported by crew from a sailing vessel<br>• They attempted to photograph the entanglement (pictures did not come out)<br>• They lost sight of whale |
| Description of Gear on Whale | Appeared to be entangled through the mouth with line. Lime green, short stem bullet buoy noted near head. Another red, short stem bullet buoy was trailing 10 - 12' behind the dorsal fin. The line is dark in color. |
| Description of wounds | None noted |
| Gear Type | Unconfirmed entanglement |
| Sighting prior to entanglement | Unknown |
| Re-sightings: | Not likely |
| Biological Information | Unknown |

**2172**

| NMFS ID | E24-00 |
|---|---|
| Report Status | Confirmed |
| Date first observed/entangled | 8/18/00 |
| Species | Right Whale |
| Total animals | 1 |
| Description/ID | 2223, "Calvin" |
| Location | Bay of Fundy |
| Latitude/Longitude | 44° 35.1' N        66° 29.5' W |
| Event Description | 8/18/00<br>•   Sighted and photographed by NMFS/PSB aerial survey team<br>•   NMFS PSB DE II searched for but did not locate the whale<br>•   Whale not re-sighted<br>2/2/01<br>•   Sighted and documented at sea by CCS staff off of Wood End, Provincetown, MA<br>3/17/01<br>•   Sighted and documented by CCS/MADMF aerial survey team<br>3/29/01<br>•   Sighted and documented by CCS/MADMF aerial survey team<br>•   CCS Staff were able to grapple the trailing line and attached a telemetry buoy. Some of the trailing line was cut and retrieved.<br>3/29/01 - 5/7/01<br>•   Plan was to attempt to cut line on the whale's back using specialized tools<br>•   Calvin was tracked offshore and only made it back into the Bay (where disentanglement would have been attempted) one evening<br>5/7/01<br>•   Telemetry buoy failed<br>5/8/01<br>•   the buoy and line (98'3") were retrieved by crew of S/V "Song of the Whale". The buoy was damaged<br>6/8/01<br>•   Sighted and photographed by NMFS/SAS aerial survey team in the Great South Channel free of gear. |
| Description of Gear on Whale | ~200 feet of floating, light colored line trailing behind right pectoral flipper and perhaps mouth |
| Description of wounds | None noted |
| Gear Type | Unknown - Approx. 222 ft. of 7/16" Dia. floating rope - blue in color. |
| Sighting prior to entanglement | Pending |
| Disposition | Confirmed to be free of gear, based on photographs and descriptions from a June 8th, 2001 SAS survey flight. |
| Biological Information | Pending |

2173

| NMFS No. | E25-00 |
|---|---|
| Report status | Confirmed |
| Date 1st observed entangled | 8/18/00 |
| Species | Right Whale |
| No. of animals | 1 |
| Individual ID | Unknown |
| Location | Bay of Fundy |
| Latitude/Longitude | 44° 35.1' N          66° 29.5' W |
| Event Description | 8/18/00<br>•     Sighted briefly from the water by NMFS PSB staff while they were searching for the other entangled whale (E24-00, above).<br>•     Whale was not sighted again |
| Description of Gear on Whale | Netting around tail stock |
| Description of wounds | None noted |
| Gear Type | Unknown - no gear recovered |
| Sighting prior to entanglement | Unknown |
| Re-sightings: | Unknown |
| Biological Information | Unknown |

| NMFS # | E26-00 |
|---|---|
| Status | Confirmed |
| Date observed entangled | 8/19/00 |
| Species | Humpback |
| Total animals | 1 |
| Age/Sex | Unknown |
| Location | Southwest corner of Stellwagen Bank |
| Latitude/Longitude | 42° 08.58' N        70° 18.51' W |
| Event description | 8/19/00<br>• Whale reported by whale watch vessel crew<br>• vessel did not stand by<br>• CCS disentanglement team searched for, but did not locate the whale |
| Description of Gear on Whale | Bluish green net around tail trailing approximately 20 feet behind the flukes |
| Description of wounds | None noted |
| Gear Type | Unknown - no gear recovered |
| Sighting prior to entanglement | Unknown |
| Re-sightings | Unknown |
| Biological Information | Unknown |

**2175**

| | |
|---|---|
| IFS No. | E27-00 |
| Status | Confirmed |
| Date first observed entangled | 8/22/00 |
| Species | Minke (dead, floating) |
| No. of animals | 1 |
| Individual ID | Unknown |
| Location | 3 nm offshore of Chatham, MA |
| Latitude/Longitude | 41° 42' N          69° 55.3' W |
| Event Description | 8/22/00<br>•     Dead, floating whale reported by recreational fisherman<br>•     Well documented with digital images |
| Description of Gear on Whale | Black and white line around tail stock |
| Description of wounds | None noted |
| Gear Type | Unknown - no gear recovered |
| Sighting prior to entanglement | Unknown |
| Re-sightings: | Unknown |
| Biological Information | Unknown |

2176

| | |
|---|---|
| | E28-00 |
| | Confirmed |
| | 8/25/00 |
| | Humpback Whale |
| | 1 |
| | Unknown |
| | Stellwagen |
| | 42° 12.74' N       70° 13.42' W |
| | 8/25/00<br>• Whale reported by whale watch vessel crew<br>• Watch was maintained with cooperating whale watch vessels<br>• CCS Disentanglement team responded<br>• Whale was successfully disentangled |
| | Blue, ½" line running through mouth to multiple wraps around tail stock and trailing about 4 feet behind tail flukes |
| | Some scarring on back & tail stock |
| | Unknown |
| | 8/19/00 |
| | 9/20/00 with no gear |
| | ~35 feet in length |

2177

| | |
|---|---|
| NMFS No. | E29-00 |
| Report Status | Confirmed |
| Date is observed entangled | 8/25/00 |
| Species | Minke |
| No. of animals | 1 |
| Individual ID | Unknown |
| Location | Jeffreys Ledge |
| Latitude/Longitude | 43° 03.96' N    70° 03.75' W |
| Event Description | 8/25/00<br>• Whale reported by whale watch vessel crew<br>• Vessel crew attempted to stand by but lost sight of the whale<br>• Attempts to relocate it were unsuccessful |
| Description of Gear on Whale | Line seen in whales mouth and over head. No line trailing |
| Description of wounds | Slight chaffing seen on head |
| Gear Type | Unknown - no gear recovered |
| Sighting prior to entanglement | Unknown |
| Re-sightings: | Unknown |
| Biological Information | Unknown |

**2178**

| | |
|---|---|
| NMFS No. | E30-00 |
| Report Status | Confirmed |
| Date(s) observed entangled | 8/26/00 |
| Species | Minke Whale |
| Number of animals | 1 |
| Individual ID | Unknown |
| Location | Baker Island off of Mt Desert Island, Maine |
| Latitude/Longitude | 44° 11.73' N       68° 09.7' W |
| Event Description | 8/26/00<br>•     Reported by fisherman (a trained Disentanglement Network First Responder)<br>•     Fisherman stood by<br>•     CCS staff responded and successfully disentangled the whale |
| Description of Gear on Whale | Entangled in poly float line and dragged one pair of traps into two more before becoming anchored in place. A single line through the mouth ran back to a tangled mass of buoy lines |
| Description of wounds | None noted |
| Gear type | Lobster gear - inshore |
| Sighting prior to entanglement | Unknown |
| Re-sightings | Unknown |
| Biological Information | Unknown |

2179

| | |
|---|---|
| EDR No. | E31-00 |
| Report status | Confirmed |
| Date(s) observed entangled | 9/6/00 |
| Species | Humpback Whale |
| No. of animals | 1 |
| Individual ID | Calf of Giraffe |
| Location | 8 nm north of Race Pt., Cape Cod, MA. |
| Latitude/Longitude | 42°13' N        70° 13.9' W |
| Event Description | 9/6/00<br>•     Entangled calf with mother photographed by whale watch vessel crew<br><br>9/7/00<br>•     Entangled calf with mother reported by whale watch vessel crew<br>•     CCS Disentanglement team responded<br>•     Attempts to tag or disentangle the whale were unsuccessful.  Both mother and calf were evasive. |
| Description of Gear on Whale | gray line coming from forward of the right flipper and over the back of the whale forward of the dorsal fin...may be a complete body wrap.  Tangle of line and seaweed on left flank |
| Description of wounds | None observed |
| Gear Type | Unknown - no gear recovered |
| Sighting prior to entanglement | 8/7/00 |
| Re-sightings | 9/10/00, 9/11/00, 9/12/00 |
| Biological Information | Calf |

| | |
|---|---|
| NMFS ID | E32-00 |
| Report Status | Confirmed |
| Date Observed (ranged) | 9/18/00 |
| Species | Humpback Whale (dead, beached) |
| # of Animals | 1 |
| Sex/Age | Unknown |
| Location | Duck, NC (Outer Banks) |
| Lat./Long. coordinates | 36° 10' 38" N        75° 44' 54" W |
| Event Description | 9/18/00<br>• Dead whale washed up at Duck<br>• Whale was examined and necropsied. |
| Description of Gear on Whale | N/A |
| Description of Wounds | Line marks on the leading edge of flukes and ventral peduncle. |
| Gear Type | N/A |
| Ruling prior to entanglement | Unknown |
| Resightings | N/A |
| Biological Information | Unknown |

2181

| NMFS No. | E33-00 |
|---|---|
| Report status | Probable |
| Date 1st observed entangled | 10/3/00 |
| Species | Minke Whale (dead, floating) |
| No. of animals | 1 |
| Individual ID | Unknown |
| Location | 1 nm south of Monroe Island off of Rockland, ME |
| Latitude/Longitude | 44°05.1' N        69° 01' W |
| Event Description | 10/3/00<br>• Dead floating whale investigated and photographed by USCG staff<br>• Whale was reported too late in the day for further action<br>• Whale was not re-sighted |
| Description of Gear on Whale | N/A |
| Description of wounds | Line marks on tail stock. |
| Gear Type | Unknown - no gear recovered |
| Sighting prior to entanglement | Unknown |
| Re-sightings: | None |
| Biological Information | Unknown |

**2182**

| NMFS No. | E34-00 |
|---|---|
| Report Status | Confirmed |
| Date last observed entangled | 10/14/00 |
| Species | Humpback Whale |
| No. of animals | 1 |
| Individual ID | Unknown |
| Location | 5 miles southeast Ocean City Inlet, MD |
| Latitude/Longitude | 38° 17.02' N      74° 59.36' W |
| Event Description | 10/14/00<br>•     Reported by fisherman who stood by until Coast Guard arrived.<br>•     Whale was not anchored, it was traveling at about 2-3 knots.<br>•     No rescue attempt was made due to darkness.<br>10/15/00<br>•     NAIB staff flew track lines in search of the whale but did not find it. |
| Description of Gear on Whale | ½" to 5/8" greenish line across the back from the right side forward, possibly from the mouth. Four inch long, oval, greenish buoys and netting noted on back and forward of the dorsal fin. Reported to be wraps of line on the tail stock leading to a possible weight. |
| Description of wounds | Line reported as chaffing the back and dorsal fin and cutting in places. Two foot long gash along the whale's right side forward of the dorsal fin. |
| Gear Type | Unknown - no gear recovered. |
| Sighting prior to entanglement? | Unknown |
| Re-sightings | Unknown |
| Biological Information | Unknown |

**2183**

| NMFS No. | E35-00 |
|---|---|
| Report status | Confirmed |
| Date last observed entangled | 10/20/00 |
| Species | Humpback Whale |
| No. of animals | 1 |
| Individual ID | Tribble |
| Location | Southern Stellwagen Bank |
| Latitude/Longitude | 42° 10.45' N    70° 16.23' W |
| Event Description | 10/20/00<br>•     Reported by a Whale Watch vessel.<br>•     Whale Watch vessel stood by and was relieved by another Whale Watch vessel.<br>•     Second Whale Watch vessel left the scene.<br>•     CCS attempted to relocate but were unable to find whale. |
| Description of Gear on Whale | Light green line over the head and through the mouth with several wraps around the tail stock and left fluke. Approximately 80 feet of line was trailing. |
| Description of wounds | Blood was observed along approximately 3 feet the tail stock. |
| Gear Type | Unknown - no gear recovered |
| Sighting prior to entanglement | 8/23/99 |
| Re-sightings: | None to date |
| Biological Information | Ten year old male. Estimated length 40 feet. |

**2184**

| NMFS # | E36-00 |
|---|---|
| Confirmed? | Unconfirmed |
| Date first reported entangled | 10/27/00 |
| Identification | Unidentified Large Whale |
| Number of whales | 1 |
| Sex and Age | Unknown |
| Location | Between East Barnstable and Dennis, Cape Cod Bay, MA |
| Latitude / Longitude | 41° 49.3' N      70° 15.9' W |
| Event Description | 10/27/00<br>•    Reported by fisherman<br>•    No one stood by<br>•    CCS attempted to relocate but could not find the whale. |
| Description of Gear on Whale | Not given |
| Description of Wounds | Not given |
| Gear type | Unconfirmed entanglement |
| Status prior to entanglement | Unknown |
| Final Status | Unknown |
| Biological Information | Unknown |

2185

| | |
|---|---|
| NMFS No. | E37-00 |
| Report status: | Probable |
| Date first observed entangled | 11/16/00 |
| Species | Probable Humpback Whale |
| No. of animals | 1 |
| Individual ID | Unknown |
| Location | ~1/4 mile offshore of tower at Fort Fisher, Cape Fear, NC |
| Latitude/Longitude | 33° 57.89' N          77° 54.55' W |
| Event Description | 11/16/00<br>   •     Whale reported by a recreational fisherman.<br>   •     Coast Guard assistance was requested.<br>   •     On scene response was not possible before dark.<br>11/17/00<br>   •     Aerial survey team flew area but no whale was seen. |
| Description of Gear on Whale | Reported as badly wrapped in line with a lot of green colored gear trailing. |
| Description of wounds | Fisherman noted blood on whale. |
| Gear Type | Unconfirmed entanglement |
| Sighting prior to entanglement | Unknown |
| Re-sightings: | Unknown |
| Biological Information | Unknown |

**2186**

Page 37 of 38

| | |
|---|---|
| NMFS No. | E38-00 |
| Report status | Confirmed |
| Date first observed entangled | 11/21/00 |
| Species | Humpback Whale |
| No. of animals | 1 |
| Individual ID | Unknown |
| Location | ~1 mile east of Frisco Pier, Cape Hatteras, NC |
| Latitude/Longitude | 35°12.5' N     75° 35.0' W |
| Event Description | 11/21/00<br>• Reported by fisherman who stood by.<br>• Whale attached to fisherman's vessel by gear<br>• USCG and trained responder arrived on scene.<br>• Responder attached telemetry buoy to gear<br>• Responder removed some gear from the whale.<br>• Whale swam away with buoy and remaining gear.<br>11/22/00 - 11/23/00<br>• Whale tracked in offshore area.<br>• Disentanglement planned but delayed due to distance from shore and weather conditions.<br>11/23/00<br>• Telemetry buoy came free of whale in vicinity of northern part of Hatteras Canyon.<br>• Retrieval of telemetry buoy was planned.<br>12/3/00<br>• Satellite transmissions from the telemetry buoy stopped. |
| Description of Gear on Whale | Netting noted on head and tail stock.  Upon release netting noted on tail stock, but whether or not  head was entangled is uncertain. |
| Description of wounds | No wounds noted. |
| Gear type | 5 and  3/4" mesh gillnet with 3/8" green poly line and a 10"-12" poly ball. |
| Sighting prior to entanglement | Unknown |
| Re-sightings | Unknown |
| Biological Information | Unknown |

**2187**

# Large Whale Entanglement Report 2001
## *updated February 2003*

National Marine Fisheries Service
Protected Resources Division
1 Blackburn Drive
Gloucester, MA 01930-2298

**Prepared by**
**Dana Hartley[1], Amy Whittingham[1], John Kenney[1], Tim Cole[2] and Elizabeth Pomfret[2]**

[1] National Marine Fisheries Service
Protected Resources Division
1 Blackburn Drive
Gloucester, MA 01930-2298

[2] National Marine Fisheries Service
Protected Species Branch
166 Water Street
Woods Hole, MA 02543-1026

**Comments or Questions, please contact:**
Amy Whittingham
NER Stranding Program
Email: Amy.Whittingham@noaa.gov
Phone: (508) 495-2005

7129

## 2001 Large Whale Entanglement Reports
### Updated February 2003

Table 1: Summary of 2001 large whale entanglement reports for live entangled whales: confirmed vs. non confirmed by common name.

| Live Entangled Whales | | | |
|---|---|---|---|
| Common name | Confirmed | Unconfirmed | Total |
| Right Whale | 2 | | 2 |
| Humpback Whale | 7 | | 7 |
| Fin Whale | 1 | | 1 |
| Minke Whale | 2 | | 2 |
| Unidentified | | 6 | 6 |
| Total | 12 | 6 | 18 |

Table 2: Summary of 2001 large whale entanglement reports for dead, beached or floating whales: confirmed vs. non confirmed by common name.

| Dead Entangled Whales | | | |
|---|---|---|---|
| Common name | Confirmed | Unconfirmed | Total |
| Right Whale | 2 | | 2 |
| Humpback Whale | 3 | 1 | 4 |
| Fin Whale | 1 | | 1 |
| Minke Whale | 3 | | 3 |
| Unidentified | | | |
| Total | 9 | 1 | 10 |

NOTE:

- Dead/Live status of the whale documents the outcome, if known, of the whale. Therefore, whales initially sighted as live entangled that subsequently died are documented as "dead".
- New England Aquarium provided sighting and life history information for right whales.
- Center for Coastal Studies provided sighting and life history information for humpback whales.
- Live whale entanglements are often dynamic with changes in gear or the condition of the whale reported over time. Therefore some of the reports that follow are still under analysis. Data are represented as accurately as possible with information received as of February 2003.

-ii-

7130

Table 3: Key for agency acronyms used in this report

Acronyms

| | |
|---|---|
| CCS | Center for Coastal Studies |
| MA DMF | Massachusetts Division of Marine Fisheries |
| MMSC | Marine Mammal Stranding Center |
| NEAq | New England Aquarium Right Whale Research Team |
| NMFS | National Marine Fisheries Service |
| NMFS PSB | NMFS Protected Species Branch, Northeast Fisheries Science Center |
| NMFS DEII | NMFS Research Vessel Delaware II |
| NMFS SAS | NMFS Sightings Advisory System, Protected Resources Div., Northeast Regional Office |
| NOAA | National Oceanic and Atmospheric Administration |
| UNC | University of North Carolina |
| USCG | United States Coast Guard |
| VMSM | Virginia Marine Science Museum |
| WHOI | Woods Hole Oceanographic Institution |

-iii-

**7131**

| | |
|---|---|
| **NMFS No.** | E1-01 |
| **Entanglement Classification** | Confirmed |
| **Live/Dead Outcome** | Live |
| **Date 1st Observed Entangled** | 2/12/01 |
| **Species** | Humpback |
| **Species Classification** | Confirmed |
| **No. of Animals** | 1 |
| **Individual ID** | Unknown |
| **Location** | Off Frisco, NC |
| **Latitude/Longitude** | 35° 12.6' N        75° 35.35' W |
| **Event Description** | 2/12/01<br>• Reported by fisherman<br>• Fishing vessel stood by<br>• Fishing vessel (with NMFS observer) documented entanglement<br>• Whale freed itself after approximately 1 hour entangled |
| **Description of Gear on Whale** | Netting on flukes |
| **Description of Wounds** | None noted |
| **Gear Type** | 2 7/8" - 3" monofilament gillnet, target species: trout (weakfish) |
| **Sighting Prior to Entanglement** | Unknown |
| **Re-sightings** | Unknown |
| **Life History Information** | Juvenile; 25 ft in length |

-1-

7132

## FISHERY INTERACTION GEAR ANALYSIS

| NMFS No. | E1-01 | | |
|---|---|---|---|
| Field No. | J021201 | Date 1st Observed Entangled | 2/12/01 |
| Location 1st Observed | 1 nm south of Cape Hatteras, NC. | Type of Event - Observation, Disentanglement, Stranding. Other (describe) | Observation |
| Species | Humpback | Gear Recovered (y/n) | No |
| Individual ID | Unknown | Gear Analysis Conducted (y/n) | See below |

### GEAR DESCRIPTION / ANALYSIS

| Date Gear Retrieved | | | Gear Retrieved By | |
|---|---|---|---|---|
| Date Gear Received | | | Received From | |
| Sources: | USCG | | Date Set | |
| | CCS | | Date Lost | |
| | Fisherman | X | Location | |
| | Other | CCS, NMFS observer | Depth | |
| | | | Bottom Type | |
| Gear Type: | sink gillnet | | Target Species: | trout (weakfish) |

Gear Description:    Sink gillnet, 2 7/8" - 3" mesh.

Comments:

Fisherman found whale in gear. CCS report indicates whale was entangled at flukes by monofilament mesh only. The whale breached and freed itself from the gear. A NMFS observer confirmed that the whale swam off free of gear.

Conclusions:

   Whale freed itself from the gillnet.

| Report By: | J.F.Kenney | Date: | 10-15-01 | Current Location of Gear | NA |
|---|---|---|---|---|---|

**7133**

| NMFS No. | E2-01 |
|---|---|
| Entanglement Classification | Confirmed |
| Live/Dead Outcome | Dead |
| Date 1st Observed Entangled | 4/7/01 |
| Species | Humpback |
| Species Classification | Confirmed |
| No. of Animals | 1 |
| Individual ID | Unknown |
| Location | Emerald Isle, NC |
| Latitude/Longitude | 34.66857' N        76.99572'  W |
| Event Description | 4/7/01<br>• Carcass reported floating outside of Bogue Inlet, NC<br>4/8/01<br>• Carcass landed on Emerald Isle, NC<br>• Investigated by staff from NOAA Fisheries Beaufort Lab and UNC Wilmington<br>• Edema on tail stock at sight of entanglement wounds |
| Description of Gear on Whale | No gear observed |
| Description of Wounds | Line or cable marks/wounds on tail stocks and flukes |
| Gear Type | Unknown - no gear recovered |
| Sighting Prior to Entanglement | Unknown |
| Re-sightings: | None (Mortality) |
| Life History Information | Male; 763 cm in length |

-3-

7134

## FISHERY INTERACTION GEAR ANALYSIS

| NMFS No. | E2-01 | | |
|---|---|---|---|
| Field No. | | Date 1st Observed Entangled | 4/7/01 |
| Location 1st Observed | Emerald Isle, NC | Type of Event - Observation, Disentanglement, Stranding. Other (describe) | Stranding |
| Species | Humpback | Gear Recovered (y/n) | No |
| Individual ID | Unknown | Gear Analysis Conducted (y/n) | No |

### GEAR DESCRIPTION / ANALYSIS

| Date Gear Retrieved | | | Gear Retrieved By | |
|---|---|---|---|---|
| Date Gear Received | | | Received From | |
| Sources: | USCG | | Date Set | |
| | CCS | | Date Lost | |
| | Fisherman | | Location | |
| | Other | | Depth | |
| | | | Bottom Type | |
| Gear Type: | | | Target Species: | |

Gear Description:

Comments:

Conclusions:

No gear recovered.

| Report By: | J.F.Kenney | Date: | 3-2-03 | Current Location of Gear | NA |
|---|---|---|---|---|---|

-4-

| NMFS No. | E3-01 |
|---|---|
| Entanglement Classification | Confirmed |
| Live/Dead Outcome | Dead |
| Date 1st Observed Entangled | 4/8/01 |
| Species | Humpback |
| Species Classification | Confirmed |
| No. of Animals | 1 |
| Individual ID | Unknown |
| Location | Myrtle Beach, SC |
| Latitude/Longitude | 33° 39.67' N      78° 54.88' W |
| Event Description | 4/8/01<br>• Stranded live, emaciated<br>• Investigated by UNC Wilmington<br>• Signs of pre-mortem entanglement and ship strike |
| Description of Gear on Whale | No gear observed |
| Description of Wounds | Deep necrotic wrapping marks on both sides of fluke base.  Seven prop cut wounds on left peduncle and left flipper cut in half with 3 prop marks. |
| Gear Type | Unknown - no gear recovered |
| Sighting Prior to Entanglement | Unknown |
| Re-sightings: | None (Mortality) |
| Life History Information | Male; 790 cm in length |

-5-

**7136**

## FISHERY INTERACTION GEAR ANALYSIS

| NMFS No. | E3-01 | | |
|---|---|---|---|
| Field No. | | Date 1st Observed Entangled | 4/8/01 |
| Location 1st Observed | Myrtle Beach, NC | Type of Event - Observation, Disentanglement, Stranding. Other (describe) | Stranding |
| Species | Humpback | Gear Recovered (y/n) | No |
| Individual ID | Unknown | Gear Analysis Conducted (y/n) | No |

## GEAR DESCRIPTION / ANALYSIS

| Date Gear Retrieved | | | Gear Retrieved By | |
|---|---|---|---|---|
| Date Gear Received | | | Received From | |
| Sources: | USCG | | Date Set | |
| | CCS | | Date Lost | |
| | Fisherman | | Location | |
| | Other | | Depth | |
| | | | Bottom Type | |
| Gear Type: | | | Target Species: | |

Gear Description:

Comments:

Conclusions:

   No gear recovered.

| Report By: | J.F.Kenney | Date: | 3-2-03 | Current Location of Gear | NA |
|---|---|---|---|---|---|

7137

| NMFS No. | E4-01 |
|---|---|
| Entanglement Classification | Confirmed |
| Live/Dead Outcome | Dead |
| Date 1st Observed Entangled | 4/9/01 |
| Species | Humpback |
| Species Classification | Confirmed |
| No. of Animals | 1 |
| Individual ID | Inland |
| Location | Just offshore of Sandbridge area near VA Beach, VA |
| Latitude/Longitude | 36° 43.89' N        75° 55.92' W |
| Event Description | 4/9/01<br>• Resident reported stationary whale just offshore<br>• VMSM responded and discovered dead humpback in gillnet gear<br>4/10/01<br>• Whale and related gear were hauled in<br>• Whale was necropsied<br>• Signs of pre-mortem entanglement noted by necropsy team leader |
| Description of Gear on Whale | Gillnet wrapped 2-3 times around the caudal peduncle at the insertion of the flukes. Net also ran along the left side of the body towards the head. |
| Description of Wounds | Numerous abrasions on rostrum, peduncle, and flukes consistent with line entanglement. Necropsy results state that the entanglement caused the animal to struggle and die. |
| Gear Type | Sink gillnet, 4" mesh, target species: croaker |
| Sighting Prior to Entanglement | 12/28/00<br>01/28/01-Unconfirmed (probable sighting of Inland, but no photos to confirm) |
| Re-sightings: | None (Mortality) |
| Life History Information | Sub-adult female; 879 cm in length |

-7-

**7138**

## FISHERY INTERACTION GEAR ANALYSIS

| | | | |
|---|---|---|---|
| NMFS No. | E4-01 | | |
| Field No. | J 040901 | Date 1st Observed Entangled | 04/09/01 |
| Location 1st Observed | 1/4 mi off Virginia Beach, VA | Type of Event - Observation, Disentanglement, Stranding. Other (describe) | dead whale in gear |
| Species | Humpback | Gear Retrieved (y/n) | Yes |
| Individual ID | Inland | Gear Analysis Conducted (y/n) | Yes |

### GEAR DESCRIPTION / ANALYSIS

| | | | |
|---|---|---|---|
| Date Gear Retrieved | | 4/10/01 | Gear Retrieved By | VMSM / UNC Wilmington |
| Date Gear Received | | 4/13/01 | Received From | Sue Barco VMSM |
| Sources: | USCG | | Date Set | |
| | CCS | | Date Lost | |
| | Fisherman | not owner of gear | Location | |
| | Other | VMSM, UNC | Depth | 20 feet |
| | | | Bottom Type | sand |
| Gear Type: | Sink gillnet | | Target Species: | croaker |

Gear Description:

Sink gillnet gear, target species: croaker. Received from Sue Barco approximately 14 fm of net that was removed from the whale - more gear was recovered but left with the fishermen. Standard 3/8" lead core leadline, 3/8" hollow braided floatline w/hard foam floats every 3 ft. Twine size .029", .72mm. Mesh size 3.9245" between knots, 24.5 meshes deep plus hanging.

Comments:

Sue Barco, VMSM, describes humpback entangled in 100 - 150 ft of gillnet with no anchors or buoys. Bridle was hung on offshore anchor (22 lb danforth) of intact net (not same fishermen). Section of netting received by NMFS had 2 cut ends - no bridle.

Conclusions:

| Report By: | John F. Kenney | Date: | 6/5/01 | Current Location of Gear | Narragansett, D-11 |
|---|---|---|---|---|---|

-8-

7139

| NMFS No. | E5-01 |
|---|---|
| Entanglement Classification | Unconfirmed |
| Live/Dead Outcome | Live |
| Date 1st Observed Entangled | 5/2/01 |
| Species | Unidentified |
| Species Classification | Unconfirmed |
| No. of Animals | 1 |
| Individual ID | Unknown |
| Location | 15 miles SE of Cape Ann |
| Latitude/Longitude | 42° 25.9' N       70° 28' W |
| Event Description | 5/2/01<br>• Reported by anonymous fisherman on opening of gillnet season<br>• Caller reported 2 whales, one in netting and the other staying by the entangled whale<br>• Communication problems delayed search until the following day<br>• Whale was not relocated |
| Description of Gear on Whale | Netting |
| Description of Wounds | None noted |
| Gear Type | Unknown - no gear recovered |
| Sighting Prior to Entanglement | Unknown |
| Re-sightings: | Unknown |
| Life History Information | Unknown |

-9-

**7140**

## FISHERY INTERACTION GEAR ANALYSIS

| NMFS No. | E5-01 | | |
|---|---|---|---|
| Field No. | | Date 1st Observed Entangled | 5/2/01 |
| Location 1st Observed | 15 miles Southeast of Cape Ann, MA | Type of Event - Observation, Disentanglement, Stranding. Other (describe) | Observation Unconfirmed |
| Species | Unidentified | Gear Recovered (y/n) | No |
| Individual ID | Unconfirmed | Gear Analysis Conducted (y/n) | No |

## GEAR DESCRIPTION / ANALYSIS

| Date Gear Retrieved | | | Gear Retrieved By | |
|---|---|---|---|---|
| Date Gear Received | | | Received From | |
| Sources: | USCG | | Date Set | |
| | CCS | | Date Lost | |
| | Fisherman | | Location | |
| | Other | | Depth | |
| | | | Bottom Type | |
| Gear Type: | | | Target Species: | |

Gear Description:

Comments:

Conclusions:

No gear recovered.

| Report By: | J.F.Kenney | Date: | 3-2-03 | Current Location of Gear | NA |
|---|---|---|---|---|---|

-10-

**7141**

| NMFS No. | E6-01 |
|---|---|
| Entanglement Classification | Confirmed |
| Live/Dead Outcome | Dead (presumed dead 9/16/2001) |
| Date 1st Observed Entangled | 6/8/01 |
| Species | Right |
| Species Classification | Confirmed |
| No. of Animals | 1 |
| Individual ID | 1102, "Churchill" |
| Location | Great South Channel, Northwest of Cultivator Shoals |
| Latitude/Longitude | 41° 51.78' N          68°40.30' W |
| Event Description | 6/8/01<br>•     Sighted and documented by NOAA SAS Aerial Survey team<br>6/7/01<br>•     NOAA SAS team (from air) and CCS team (from water) relocated whale<br>•     Whale was assessed (poor condition) and tagged w/ telemetry buoy<br>6/19/01<br>•     Reconnaissance flight checked on the whale and documented from the air<br>6/25/01<br>•     CCS and NOAA Fisheries attempted to locate whale by vessel but fog and an onboard emergency prevented the team from reaching the whale.<br>•     CCS plane flew over whale in the fog and reported strong VHF signal<br>6/26/01<br>•     CCS aerial team located and directed vessel team to whale<br>•     CCS and NOAA Fisheries assessed and attempted to sedate the whale.<br>•     The sedative was administered but dose was apparently too low<br>•     The team shortened the telemetry tether and removed 20 ft of line<br>7/3/01<br>•     Whale documented from air by CCS aerial survey team<br>7/10/01<br>•     CCS aerial team located and directed vessel team to whale<br>•     CCS and NOAA Fisheries assessed and took skin biopsies.<br>•     Choppy seas and fog prevented any attempts at sedation or disentanglement<br>7/14/01<br>•     Vessel and plane teams located the whale<br>•     Sedation was attempted with little behavior changes noted<br>•     Tail harnesses were deployed but were unsuccessful<br>•     Physical restraint was applied to entangling line; entanglement was not altered<br>•     Biopsies taken<br>•     Whale's condition continued to deteriorate<br>8/2/01<br>•     Whale was photographed by Canadian Coast Guard off Magdalene Islands<br>8/29/01<br>•     CCS flight searched for whale and picked up VHF signal (did not see whale)<br>8/30/01<br>•     Vessel and plane teams located the whale<br>•     Sedation was attempted with apparent short term effectiveness<br>•     Tail harnesses were attempted but failed<br>•     Skin biopsies were taken<br>•     Fresh telemetry buoy was applied |

7142

| | |
|---|---|
| | ~ 9/2/01 - 9/10/01<br>•     Telemetry buoy indicated slower speeds and increased surface time (near 100%)<br>9/10/01<br>•     Reconnaissance flight by US Coast Guard Falcon Jet crew confirmed that the whale was alive but apparently inactive and at the surface |
| Event Description (continued) | 9/10/01<br>•     Telemetry buoy indicated that whale had resumed more "normal" activity level<br>9/16/01<br>•     Telemetry transmissions ceased and whale was presumed dead and sunk<br><br>Overall the whale was tracked for 100 days for nearly 5,000 miles. The whale traveled as far north as the Gulf of St Lawrence Canada. The effort to rescue Churchill involved a team of over a dozen researchers, veterinarians and disentanglement experts from the US and Canada. |
| Description of Gear on Whale | A single line that enters one side of the mouth, cinches tightly around the rostrum and exits the other side of the mouth. A knot on the right side prevented the line from slipping through the baleen. |
| Description of Wounds | Deep wound on rostrum with imbedded line causing infection and granulated tissue. Entanglement wounds and scars also present on the tail stock. |
| Gear Type | Unknown - Approximately 35 feet of 5/8" dia. Floating rope was recovered. |
| Sighting Prior to Entanglement | Bay of Fundy, August 1998 |
| Re-sightings | 6/7/01<br>•     from vessel and air; 41° 53.36' N / 68° 31.79' W; Great South Channel<br>6/19/01<br>•     from air; Great South Channel<br>6/26/01<br>•     from vessel and air; Great South Channel<br>7/3/01<br>•     from air; Great South Channel<br>7/10/01<br>•     from vessel and air; Great South Channel<br>7/14/01<br>•     from vessel and air; Great South Channel, 86 miles E of Provincetown, MA<br>8/2/01<br>•     from air: off Magdalene Islands, Canada<br>8/30/0<br>•     from vessel and air; Great South Channel<br>9/10/01<br>•     from air; Great South Channel |
| Life History Information | Adult male; ~22 years old |

**7143**

## FISHERY INTERACTION GEAR ANALYSIS

| | | | |
|---|---|---|---|
| NMFS No. | E6-01 | | |
| Field No. | J060801 | Date 1st Observed Entangled | 06-08-01 |
| Location 1st Observed | Grear South Channel<br><br>41° 51.78'N  68° 40.30'W | Type of Event - Observation, Disentanglement, Stranding. Other (describe) | Observation |
| Species | right whale | Gear Recovered (y/n) | Yes |
| Individual ID | #  1102 | Gear Analysis Conducted (y/n) | Yes |

### GEAR DESCRIPTION / ANALYSIS

| | | | |
|---|---|---|---|
| Date Gear Retrieved | | 6-9-01  & 6-26-01 | Gear Retrieved By | CCS |
| Date Gear Received | | 6-25-01 & 6-26-01 | Received From | CCS,  Mattila & Morin |
| Sources: | USCG | | Date Set | |
| | CCS | | Date Lost | |
| | Fisherman | | Location | |
| | Other | | Depth | |
| | | | Bottom Type | |
| Gear Type: | Unknown | | Target Species: | |

Gear Description:    Floating rope, approximately 35 feet of  5/8" diameter, green with red tracer.

Comments:    The rope removed has no identifying marks.

Conclusions:   Whale was entangled in 5/8" diameter floating rope of unknown origin.

Gear was tagged by Joe Green 8/10/01, # 0073148

| Report By: | John Kenney | Date: | 7-31-01<br>8-20-01 | Current Location of Gear | Kingston, RI |
|---|---|---|---|---|---|

7144

| | |
|---|---|
| NMFS No. | E7-01 |
| Entanglement Classification | Confirmed |
| Live/Dead Outcome | Live |
| Date 1st Observed Entangled | 6/13/01 |
| Species | Minke |
| Species Classification | Confirmed |
| No. of Animals | 1 |
| Individual ID | Unknown |
| Location | Just east of Provincetown, MA; Stellwagen Bank |
| Latitude/Longitude | 42° 06.6' N          70° 08.83' W |
| Event Description | 6/13/01<br>•     Sighted by CCS whale watch personnel<br>•     Photo documented<br>•     Whale watch vessel unable to stand by<br>•     Whale lost |
| Description of Gear on Whale | Tangle of dark line behind blow hole.  Trailing line on left side. |
| Description of Wounds | None noted |
| Gear Type | Unknown - no gear recovered |
| Sighting Prior to Entanglement | Unknown |
| Re-sightings | Unknown |
| Life History Information | Unknown |

-14-

7145

## FISHERY INTERACTION GEAR ANALYSIS

| NMFS No. | E7-01 | | |
|---|---|---|---|
| Field No. | J061301 | Date 1st Observed Entangled | 6/13/01 |
| Location 1st Observed | 4 nm east of Provincetown,   MA | Type of Event - Observation, Disentanglement, Stranding. Other (describe) | Observation |
| Species | Minke | Gear Recovered (y/n) | No |
| Individual ID | Unknown | Gear Analysis Conducted (y/n) | No |

### GEAR DESCRIPTION / ANALYSIS

| Date Gear Retrieved | | | Gear Retrieved By | |
|---|---|---|---|---|
| Date Gear Received | | | Received From | |
| Sources: | USCG | | Date Set | |
| | CCS | | Date Lost | |
| | Fisherman | | Location | |
| | Other | | Depth | |
| | | | Bottom Type | |
| Gear Type: | | | Target Species: | |

Gear Description:

Comments:

Conclusions:

  No gear recovered.

| Report By: | J.F.Kenney | Date: | 10-15-01 | Current Location of Gear | NA |
|---|---|---|---|---|---|

7146

| NMFS No. | E8-01 |
|---|---|
| Entanglement Classification | Confirmed |
| Live/Dead Outcome | Live |
| Date 1st Observed Entangled | 6/29/01 |
| Species | Fin |
| Species Classification | Confirmed |
| No. of Animals | 1 |
| Individual ID | Unknown |
| Location | Scantum Basin, north of Cape Ann, MA |
| Latitude/Longitude | 42° 49.99' N    70° 35.73' W |
| Event Description | 6/29/01<br>• Reported by crew from whale watch vessel<br>• Several whale watch vessels took turns standing by<br>• Final assessment from researcher aboard a whale watch vessel was that the whale was free of gear and that the white buoy was no longer trailing behind. |
| Description of Gear on Whale | Line trailing 10-20 feet behind whale with white buoy at the end. |
| Description of Wounds | None noted |
| Gear Type | Unknown - no gear recovered |
| Sighting Prior to Entanglement | Unknown |
| Re-sightings | Unknown |
| Life History Information | Unknown |

-16-

7147

## FISHERY INTERACTION GEAR ANALYSIS

| NMFS No. | E8-01 | Date 1st Observed Entangled | 6/29/01 |
|---|---|---|---|
| Field No. | J062901 | | |
| Location 1st Observed | 8 nm north of Cape Ann,  MA Scantum Basin | Type of Event - Observation, Disentanglement, Stranding. Other (describe) | Observation |
| Species | Finback | Gear Recovered (y/n) | No |
| Individual ID | Unknown | Gear Analysis Conducted (y/n) | No |

### GEAR DESCRIPTION / ANALYSIS

| Date Gear Retrieved | | Gear Retrieved By | |
|---|---|---|---|
| Date Gear Received | | Received From | |
| Sources: | USCG | Date Set | |
| | CCS | Date Lost | |
| | Fisherman | Location | |
| | Other | Depth | |
| | | Bottom Type | |
| Gear Type: | | Target Species: | |

Gear Description:

Comments:

Conclusions:

   No gear recovered.

| Report By: | J.F.Kenney | Date: | 10-15-01 | Current Location of Gear | NA |
|---|---|---|---|---|---|

7148

| NMFS No. | E9-01 |
|---|---|
| Entanglement Classification | Confirmed |
| Live/Dead Outcome | Live |
| Date 1st Observed Entangled | 7/20/01 |
| Species | Right |
| Species Classification | Confirmed |
| No. of Animals | 1 |
| Individual ID | 2427 |
| Location | East of Jeffreys Ledge |
| Latitude/Longitude | 43° 04.65' N        69° 58.15' W |
| Event Description | 7/20/01<br>•     Reported by crew from whale watch vessel<br>•     Several whale watch vessels took turns standing by<br>•     CCS disentanglement team assessed and disentangled whale<br>7/28/01<br>•     Sighted by boater<br>•     CCS responded and discovered that it was #2427<br>•     CCS documented.  A small bit of rope was left in the baleen<br>•     They reported some healing of the wounds since disentanglement<br>10/16/01<br>•     Sighted by whale watch vessel crew in the Bay of Fundy<br>•     Crew documented and reported that the whale's behavior was abnormal; whale was not showing flukes or back and was holding its head up. |
| Description of Gear on Whale | Multiple wraps through mouth, dislocating some baleen so that it protruded.  Orange poly ball trailing 8-10 feet behind the right side of mouth |
| Description of Wounds | Baleen was dislocated and protruding from mouth.  A few cuts noted on the head and tail stock |
| Gear Type | Offshore lobster gear - Complete surface system with the exception of the high-flyer |
| Sighting Prior to Entanglement | 3/15/01 and 3/17/01 in Cape Cod Bay |
| Re-sightings: | 7/28/01<br>•     Great South Channel at 41° 33' N  69° 16' W<br>10/16/01<br>•     Bay of Fundy at 44° 33' N  66° 23' W |
| Life History Information | Male, born in 1994 |

7149

## FISHERY INTERACTION GEAR ANALYSIS

| NMFS No. | E9-01 | | |
|---|---|---|---|
| Field No. | J072001 | Date 1st Observed Entangled | 7-20-01 |
| Location<br>1st Observed | East Jeffreys Ledge<br><br>GOM | Type of Event - Observation, Disentanglement, Stranding. Other (describe) | disentanglement |
| Species | Right whale | Gear Recovered (y/n) | Yes |
| Individual ID | 2427 | Gear Analysis Conducted (y/n) | Yes |

### GEAR DESCRIPTION / ANALYSIS

| Date Gear Retrieved | | 7-20-01 | Gear Retrieved By | CCS |
|---|---|---|---|---|
| Date Gear Received | | | Received From | CCS |
| Sources: | USCG | | Date Set | 1-7-01 |
| | CCS | | Date Lost | late Jan, 2001 |
| | Fisherman | | Location | GOM, Sewell Ridge |
| | Other | | Depth | 110 fm |
| | | | Bottom Type | edge of mud & gravel |
| Gear Type: | offshore lobster gear | | Target Species: | lobster |

Gear Description:   Gear recovered consisted of a complete surface system with the exception of the high-flyer.  The high-flyer bridle was present, from the bridle ran a 5 fm length of ½" sink rope to an eye of a '3-legger'. The 3-legger is 5/8" polysteel.  To the center eye of the 3-legger was attached an A3 poly ball with ½" sink rope with a steel swivel midway along it's 1 fathom length.  The final leg terminates in an eye and there was nothing attached to it when recovered.  This eye is where the buoy line would be attached.

Comments:   From the markings on the poly ball, the original owner was identified, contacted and interviewed on 7/31/01.  Information from this interview indicated the gear was set in 110 fathoms of water on mud/gravel edge southwest of Crowell Basin in early January, 2001.  In late January, the Capt. discovered 20 traps along with the buoy line and surface system missing.

Conclusions:   The gear recovered from this entanglement is consistent with gear that has been equipped with a weak link.

Gear was tagged by Joe Green 8/10/01, # 24876

| Report By: | John Kenney | Date: | 8-20-01<br>8-24-01 | Current Location of Gear | Kingston,  RI |
|---|---|---|---|---|---|

7150

| | |
|---|---|
| NMFS No. | E10-01 |
| Entanglement Classification | Confirmed |
| Live/Dead Outcome | Live |
| Date 1st Observed Entangled | 7/21/01 |
| Species | Humpback |
| Species Classification | Confirmed |
| No. of Animals | 1 |
| Individual ID | Unknown |
| Location | 20 miles east of Cultivator Shoals; 62 NM off Nantucket, due east |
| Latitude/Longitude | 41° 29.9' N        68° 39.6' W |
| Event Description | 7/21/01<br>•     Reported by fish spotter one day after sighting<br>•     No disentanglement response |
| Description of Gear on Whale | Line over head and caught on pectoral flippers.  Dragging orange poly balls. |
| Description of Wounds | None noted |
| Gear Type | Unknown - no gear recovered |
| Sighting Prior to Entanglement | Unknown |
| Re-sightings: | Unknown |
| Life History Information | Unknown |

-20-

7151

## FISHERY INTERACTION GEAR ANALYSIS

| NMFS No. | E10-01 | | | |
|---|---|---|---|---|
| Field No. | | Date 1st Observed Entangled | | 7/21/01 |
| Location 1st Observed | 62 nm East of Nantucket, MA | Type of Event - Observation, Disentanglement, Stranding. Other (describe) | | Observation |
| Species | Humpback | Gear Recovered (y/n) | | No |
| Individual ID | Unknown | Gear Analysis Conducted (y/n) | | No |

## GEAR DESCRIPTION / ANALYSIS

| Date Gear Retrieved | | | Gear Retrieved By | |
|---|---|---|---|---|
| Date Gear Received | | | Received From | |
| Sources: | USCG | | Date Set | |
| | CCS | | Date Lost | |
| | Fisherman | | Location | |
| | Other | | Depth | |
| | | | Bottom Type | |
| Gear Type: | | | Target Species: | |

Gear Description:

Comments:

Conclusions:

   No gear recovered.

| Report By: | J.F.Kenney | Date: | 3-2-03 | Current Location of Gear | NA |
|---|---|---|---|---|---|

**7152**

| NMFS No. | E11-01 |
|---|---|
| Entanglement Classification | Confirmed |
| Live/Dead Outcome | Live |
| Date 1st Observed Entangled | 7/25/01 |
| Species | Humpback |
| Species Classification | Confirmed |
| No. of Animals | 1 |
| Individual ID | Nile |
| Location | Southwest corner of Stellwagen Bank |
| Latitude/Longitude | 42° 10.30' N     70° 20.93' W |
| Event Description | 7/25/01<br>•    Reported by crew from whale watch vessel<br>•    Several whale watch vessels took turns standing by<br>•    CCS team responded and attempted to disentangle.<br>•    Whale was in a tight group with four other humpbacks that prevented disentanglement<br>10/4/01<br>•    Whale seen by whale watch personnel free of entanglement |
| Description of Gear on Whale | Single rope through mouth, over back and trailing approx. 20 ft behind flukes on the left side and 8 ft behind the flukes on the right side. |
| Description of Wounds | Entanglement wounds noted on tail stock, flukes, and lower jaw |
| Gear Type | Unknown - no gear recovered |
| Sighting Prior to Entanglement | 6/29/01 |
| Re-sightings: | 10/3/01, 10/4/01, 12/7/01 |
| Life History Information | Adult female; 14 years old in 2001; 45 ft in length |

7153

## FISHERY INTERACTION GEAR ANALYSIS

| | | | |
|---|---|---|---|
| NMFS No. | E11-01 | | |
| Field No. | J072501 | Date 1st Observed Entangled | 7/25/01 |
| Location 1st Observed | Southwest corner of Stellwagen Bank Mass Bay,  MA | Type of Event - Observation, Disentanglement, Stranding. Other (describe) | Observation |
| Species | Humpback | Gear Recovered (y/n) | No |
| Individual ID | Nile | Gear Analysis Conducted (y/n) | No |

## GEAR DESCRIPTION / ANALYSIS

| | | | |
|---|---|---|---|
| Date Gear Retrieved | | Gear Retrieved By | |
| Date Gear Received | | Received From | |
| Sources: | USCG | Date Set | |
| | CCS | Date Lost | |
| | Fisherman | Location | |
| | Other | Depth | |
| | | Bottom Type | |
| Gear Type: | | Target Species: | |

Gear Description:

Comments:

Conclusions:

No gear recovered.

| Report By: | J.F.Kenney | Date: | 10-16-01 | Current Location of Gear | NA |
|---|---|---|---|---|---|

-23-

7154

| | |
|---|---|
| NMFS No. | E12-01 |
| Entanglement Classification | Confirmed |
| Live/Dead Outcome | Dead |
| Date 1st Observed Entangled | 7/27/01 |
| Species | Minke |
| Species Classification | Confirmed |
| No. of Animals | 1 |
| Individual ID | Unknown |
| Location | 1 mile south of Beavertail State Park,  RI |
| Latitude/Longitude | 41° 25.87' N        71° 24.96' W |
| Event Description | 7/27/01<br>•        USCG reported dead floating whale with line wrapped behind head and another behind dorsal fin<br>7/30/01<br>•        Whale washed up at Black Point, Narragansett, RI<br>•        Examined by Mystic Aquarium staff, no gear present<br>•        Carcass in advanced decomposition |
| Description of Gear on Whale | Line wrapped behind head and behind dorsal fin. |
| Description of Wounds | None noted |
| Gear Type | Unknown - no gear recovered |
| Sighting Prior to Entanglement | Unknown |
| Re-sightings | None (mortality) |
| Life History Information | Female; 385 cm in length |

7155

## FISHERY INTERACTION GEAR ANALYSIS

| | | | |
|---|---|---|---|
| NMFS No. | E12-01 | | |
| Field No. | | Date 1st Observed Entangled | 7/27/01 |
| Location 1st Observed | 1 nm South of Beavertail Point, Jamestown, RI | Type of Event - Observation, Disentanglement, Stranding. Other (describe) | Stranding |
| Species | Minke | Gear Recovered (y/n) | No |
| Individual ID | Unknown | Gear Analysis Conducted (y/n) | No |

## GEAR DESCRIPTION / ANALYSIS

| | | | |
|---|---|---|---|
| Date Gear Retrieved | | Gear Retrieved By | |
| Date Gear Received | | Received From | |
| Sources: | USCG | Date Set | |
| | CCS | Date Lost | |
| | Fisherman | Location | |
| | Other | Depth | |
| | | Bottom Type | |
| Gear Type: | | Target Species: | |

Gear Description:

Comments:

Conclusions:

No gear recovered.

| Report By: | J.F.Kenney | Date: | 3-2-03 | Current Location of Gear | NA |
|---|---|---|---|---|---|

-25-

**7156**

| NMFS No. | E13-01 |
|---|---|
| Entanglement Classification | Confirmed |
| Live/Dead Outcome | Live |
| Date 1st Observed Entangled | 7/28/01 |
| Species | Humpback |
| Species Classification | Confirmed |
| No. of Animals | 1 |
| Individual ID | Unknown |
| Location | 29 miles offshore SE of Schoodic, ME |
| Latitude/Longitude | 44° 04.09' N        67° 23.02' W |
| Event Description | 7/28/01<br>• Reported by trained observer aboard high speed ferry<br>• Ferry personnel asked whale watch vessel to investigate<br>• Whale was not found |
| Description of Gear on Whale | buoy midway between blowhole and dorsal fin |
| Description of Wounds | None noted |
| Gear Type | Unknown - no gear recovered |
| Sighting Prior to Entanglement | Unknown |
| Re-sightings: | Unknown |
| Life History Information | Unknown |

-26-

7157

## FISHERY INTERACTION GEAR ANALYSIS

| | | | |
|---|---|---|---|
| NMFS No. | E13-01 | | |
| Field No. | | Date 1st Observed Entangled | 7/28/01 |
| Location 1st Observed | 29 nm Southeast of Schoodic, ME | Type of Event - Observation, Disentanglement, Stranding. Other (describe) | Observation |
| Species | Humpback | Gear Recovered (y/n) | No |
| Individual ID | Unknown | Gear Analysis Conducted (y/n) | No |

## GEAR DESCRIPTION / ANALYSIS

| | | | |
|---|---|---|---|
| Date Gear Retrieved | | Gear Retrieved By | |
| Date Gear Received | | Received From | |
| Sources: | USCG | Date Set | |
| | CCS | Date Lost | |
| | Fisherman | Location | |
| | Other | Depth | |
| | | Bottom Type | |
| Gear Type: | | Target Species: | |

Gear Description:

Comments:

Conclusions:

No gear recovered.

| Report By: | J.F.Kenney | Date: | 3-2-03 | Current Location of Gear | NA |
|---|---|---|---|---|---|

7158

| NMFS No. | E14-01 |
|---|---|
| Entanglement Classification | Unconfirmed |
| Live/Dead Outcome | Live |
| Date 1st Observed Entangled | 8/12/01 |
| Species | Unidentified |
| Species Classification | Unconfirmed |
| No. of Animals | 1 |
| Individual ID | Unknown |
| Location | Block Island, RI |
| Latitude/Longitude | 40° 55.5' N        71° 18.3' W |
| Event Description | 8/12/01<br>•     Reported by boater to CCS and USCG<br>•     Boater did not stand by<br>•     Whale lost |
| Description of Gear on Whale | Reported as line through baleen, with 6 ft high flyer trailing about 80-100 feet behind whale. High flyer was submerged when animal dove. |
| Description of Wounds | None noted |
| Gear Type | Unknown - no gear recovered |
| Sighting Prior to Entanglement | Unknown |
| Re-sightings | Unknown |
| Life History Information | Unknown |

7159

## FISHERY INTERACTION GEAR ANALYSIS

| | | | |
|---|---|---|---|
| NMFS No. | E14-01 | | |
| Field No. | | Date 1st Observed Entangled | 8/12/01 |
| Location 1st Observed | Block Island, RI | Type of Event - Observation, Disentanglement, Stranding. Other (describe) | Observation Unconfirmed |
| Species | Unidentified | Gear Recovered (y/n) | No |
| Individual ID | Unconfirmed | Gear Analysis Conducted (y/n) | No |

### GEAR DESCRIPTION / ANALYSIS

| | | | |
|---|---|---|---|
| Date Gear Retrieved | | Gear Retrieved By | |
| Date Gear Received | | Received From | |
| Sources: | USCG | Date Set | |
| | CCS | Date Lost | |
| | Fisherman | Location | |
| | Other | Depth | |
| | | Bottom Type | |
| Gear Type: | | Target Species: | |

Gear Description:

Comments:

Conclusions:

   No gear recovered.

| Report By: | J.F.Kenney | Date: | 3-2-03 | Current Location of Gear | NA |
|---|---|---|---|---|---|

7160

| | |
|---|---|
| NMFS No. | E15-01 |
| Entanglement Classification | Confirmed |
| Live/Dead Outcome | Live |
| Date 1st Observed Entangled | 8/15/01 |
| Species | Humpback |
| Species Classification | Confirmed |
| No. of Animals | 1 |
| Individual ID | Drizzle |
| Location | Southern Stellwagen Bank |
| Latitude/Longitude | 42° 08.02' N        70° 19.5' W |
| Event Description | 8/15/01<br>•      Reported by crew aboard a whale watch vessel<br>•      CCS responded and disentangled the whale |
| Description of Gear on Whale | ~ 75 feet of 5/8" yellow & green polypropylene rope, split into "Y"  wrapped around leading edge of right fluke.  Red/orange poly float attached by carabiner. |
| Description of Wounds | Wounds on leading edge of tail fluke and on tail stock. |
| Gear Type | Probable anchoring system for tuna sportfish vessel |
| Sighting Prior to Entanglement | 8/13/01 at  42° 09.88' N / 070° 18.14' W |
| Re-sightings: | 8/21/01 at  42° 10.20' N / 070° 19.23' W<br>8/22/01 at  42° 10.67' N / 070° 19.62' W<br>8/31/01 at  42° 10.92' N / 070° 10.61' W |
| Life History Information | Male; first catalogued in 1998 - at least 4yrs old in 2001 |

7161

## FISHERY INTERACTION GEAR ANALYSIS

| | | | |
|---|---|---|---|
| NMFS No. | E15-01 | | |
| Field No. | J081501 | Date 1st Observed Entangled | 8/15/01 |
| Location 1st Observed | Southern Stellwagen Bank, 5 nm N.W. of Race Pt., Cape Cod, MA | Type of Event - Observation, Disentanglement, Stranding. Other (describe) | Disentanglement |
| Species | Humpback | Gear Recovered (y/n) | Yes |
| Individual ID | Drizzle | Gear Analysis Conducted (y/n) | Yes |

## GEAR DESCRIPTION / ANALYSIS

| | | | |
|---|---|---|---|
| Date Gear Retrieved | 8/15/01 | Gear Retrieved By | CCS |
| Date Gear Received | Aug. 2001 | Received From | CCS |
| Sources: | USCG | | Date Set | |
| | CCS | | Date Lost | |
| | Fisherman | | Location | |
| | Other | | Depth | |
| | | | Bottom Type | |
| Gear Type: | | | Target Species: | |

Gear Description:

Gear consists of 11 fathoms of 3/8" white sinking rope tied into a spliced eye in 5/8" floating rope (yellow w/green tracer). Also attached to this eye, with a caribiner clip and 2 feet of 5/8" sinking rope, was a low drag poly ball (LD-2). The poly ball has no markings or growth on it. From the eye, the 5/8" float rope runs 14 fm. to an end that appears to have been cut. At a point 9 fm from the eye is a splice and the same 5/8" float rope extends 4 fm to an end that appears to be cut as well.

Comments:

Conclusions:

Gear appears to be some sort of anchoring system, possibly used by one of the dozens of vessels anchored in the area while fishing for tuna.

| Report By: | J.F.Kenney | Date: | 10-16-01 | Current Location of Gear | Kingston, RI |
|---|---|---|---|---|---|

7162

| NMFS No. | E16-01 |
| --- | --- |
| Entanglement Classification | Unconfirmed |
| Live/Dead Outcome | Live |
| Date 1st Observed Entangled | 8/16/01 |
| Species | Unidentified |
| Species Classification | Unconfirmed |
| No. of Animals | 1 |
| Individual ID | Unknown |
| Location | 5-6 miles off Long Branch, Sandy Hook, NJ |
| Latitude/Longitude | 40° 19.5' N        73° 48.0' W |
| Event Description | 8/16/01<br>• Reported by boater to MMSC and USCG<br>• Vessel did not stand by<br>• USCG searched but could not locate whale |
| Description of Gear on Whale | Entangled in "fishing gear"; no other description. |
| Description of Wounds | None noted |
| Gear Type | Unknown - no gear recovered |
| Sighting Prior to Entanglement | Unknown |
| Re-sightings | Unknown |
| Life History Information | Unknown |

-32-

7163

## FISHERY INTERACTION GEAR ANALYSIS

| | | | |
|---|---|---|---|
| NMFS No. | E16-01 | | |
| Field No. | | Date 1st Observed Entangled | 8/16/01 |
| Location 1st Observed | 5 nm off Long Branch, Sandy Hook, NJ | Type of Event - Observation, Disentanglement, Stranding. Other (describe) | Observation Unconfirmed |
| Species | Unidentified | Gear Recovered (y/n) | No |
| Individual ID | Unconfirmed | Gear Analysis Conducted (y/n) | No |

## GEAR DESCRIPTION / ANALYSIS

| | | | | |
|---|---|---|---|---|
| Date Gear Retrieved | | | Gear Retrieved By | |
| Date Gear Received | | | Received From | |
| Sources: | USCG | | Date Set | |
| | CCS | | Date Lost | |
| | Fisherman | | Location | |
| | Other | | Depth | |
| | | | Bottom Type | |
| Gear Type: | | | Target Species: | |

Gear Description:


Comments:




Conclusions:

   No gear recovered.


| Report By: | J.F.Kenney | Date: | 3-2-03 | Current Location of Gear | NA |
|---|---|---|---|---|---|

-33-

7164

| | |
|---|---|
| NMFS No. | E17-01 |
| Entanglement Classification | Confirmed |
| Live/Dead Outcome | Dead |
| Date 1st Observed Entangled | 8/17/01 |
| Species | Minke |
| Species Classification | Confirmed |
| No. of Animals | 1 |
| Individual ID | Unknown |
| Location | Second Beach, Middletown, RI |
| Latitude/Longitude | 41° 28.44' N      71° 14.84' W |
| Event Description | 8/17/01<br>• Reported dead on beach, 9am<br>• Investigated by Mystic Aquarium staff<br>• Cause of death was determined to be starvation and infection |
| Description of Gear on Whale | Rope entangled around right mandible. |
| Description of Wounds | Severe necrosis of rostral maxillary bone with generalized exposure.  25cm x 10cm linear angular ulceration of left commisure epidermis. |
| Gear Type | Unknown - 3/16" and 1/4" dia. rope |
| Sighting Prior to Entanglement | Unknown |
| Re-sightings: | None (Mortality) |
| Life History Information | Sub-adult male, 390 cm in length |

-34-

7165

## FISHERY INTERACTION GEAR ANALYSIS

| NMFS No. | E17-01 | | | |
|---|---|---|---|---|
| Field No. | | Date 1st Observed Entangled | | 8/17/01 |
| Location 1st Observed | Second Beach, Middletown, RI | Type of Event - Observation, Disentanglement, Stranding. Other (describe) | | |
| Species | Minke | Gear Recovered (y/n) | | Yes |
| Individual ID | Unknown | Gear Analysis Conducted (y/n) | | Yes |

### GEAR DESCRIPTION / ANALYSIS

| Date Gear Retrieved | | Unknown | Gear Retrieved By | Mystic Auqqrium |
|---|---|---|---|---|
| Date Gear Received | | 12/10/01 | Received From | T.Binder, Mystic Aq. |
| Sources: | USCG | | Date Set | |
| | CCS | | Date Lost | |
| | Fisherman | | Location | |
| | Other | | Depth | |
| | | | Bottom Type | |
| Gear Type: | Unknown | | Target Species: | |

Gear Description:

Two sizes of orange poly, 3/16" & 1/4", approximately 20 feet each and a shorter length of 5/32 - 3/16" that may be dacron.

Comments:

Conclusions:

| Report By: | J.F.Kenney | Date: | 3-2-03 | Current Location of Gear | Kingston, RI |
|---|---|---|---|---|---|

7166

| NMFS No. | E18-01 |
|---|---|
| Entanglement Classification | Confirmed |
| Live/Dead Outcome | Live |
| Date 1st Observed Entangled | 8/20/01 |
| Species | Humpback |
| Species Classification | Confirmed |
| No. of Animals | 1 |
| Individual ID | Reflection |
| Location | Southern Stellwagen Bank |
| Latitude/Longitude | 42° 09.6' N        70° 20.7' W |
| Event Description | 8/20/01<br>• Sighted by CCS observer aboard Dolphin VI<br>• Minor entanglement, no disentanglement attempt launched. |
| Description of Gear on Whale | Monofilament noted on right fluke blade. |
| Description of Wounds | None noted |
| Gear Type | Unknown - no gear recovered |
| Sighting Prior to Entanglement | 8/19/01 at 42° 10.24' N / 070° 19.47' W |
| Re-sightings: | 8/21/01 at 42° 10.27' N / 070° 19.95' W<br>9/11/01 at 42° 09.40' N / 070° 20.53' W<br>with several other sightings through 10/4/01 |
| Life History Information | Adult female |

-36-

7167

## FISHERY INTERACTION GEAR ANALYSIS

| NMFS No. | E18-01 | | |
|---|---|---|---|
| Field No. | | Date 1st Observed Entangled | 8/20/01 |
| Location 1st Observed | Southern Stellwagen Bank MA | Type of Event - Observation, Disentanglement, Stranding. Other (describe) | Observation |
| Species | Humpback | Gear Recovered (y/n) | No |
| Individual ID | Reflection | Gear Analysis Conducted (y/n) | No |

## GEAR DESCRIPTION / ANALYSIS

| Date Gear Retrieved | | | Gear Retrieved By | |
|---|---|---|---|---|
| Date Gear Received | | | Received From | |
| Sources: | USCG | | Date Set | |
| | CCS | | Date Lost | |
| | Fisherman | | Location | |
| | Other | | Depth | |
| | | | Bottom Type | |
| Gear Type: | | | Target Species: | |

Gear Description:

Comments:

Conclusions:

   No gear recovered.

| Report By: | J.F.Kenney | Date: | 3-2-03 | Current Location of Gear | NA |
|---|---|---|---|---|---|

7168

| NMFS No. | E19-01 |
|---|---|
| Entanglement Classification | Unconfirmed |
| Live/Dead Outcome | Dead |
| Date 1st Observed Entangled | 9/8/01 |
| Species | Humpback |
| Species Classification | Confirmed |
| No. of Animals | 1 |
| Individual ID | Unknown |
| Location | Seaside Heights, NJ |
| Latitude/Longitude | 39° 57.9' N          74° 01.3' W |
| Event Description | 9/8/01<br>•     USCG reported fresh dead whale floating 3 miles E. of Seaside Heights, NJ<br>•     USCG documented with photos<br>9/9/01<br>•     Washed ashore in Belmar, NJ<br>•     Private citizen noted gear present on mouth of whale and removed gear before it could be documented by the Stranding Network.<br>•     Carcass buried before it could be examined by the Stranding Network for signs of entanglement. |
| Description of Gear on Whale | Monofilament webbing, 5" stretch mesh, 0.033" twine diameter. |
| Description of Wounds | Not examined |
| Gear Type | Unknown |
| Sighting Prior to Entanglement | Unknown |
| Re-sightings | None (mortality) |
| Life History Information | ~28 ft in length |

**7169**

## FISHERY INTERACTION GEAR ANALYSIS

| | | | | |
|---|---|---|---|---|
| NMFS No. | E19-01 | | | |
| Field No. | | Date 1st Observed Entangled | | 9/8/01 |
| Location 1st Observed | Seaside Heights, NJ | Type of Event - Observation, Disentanglement, Stranding. Other (describe) | | Stranding |
| Species | Humpback | Gear Recovered (y/n) | | Yes |
| Individual ID | Unknown | Gear Analysis Conducted (y/n) | | Yes |

## GEAR DESCRIPTION / ANALYSIS

| | | | | |
|---|---|---|---|---|
| Date Gear Retrieved | | Unknown | Gear Retrieved By | |
| Date Gear Received | | 2/25/03 | Received From | R.Schoelkopf, MMSC |
| Sources: | USCG | | Date Set | |
| | CCS | | Date Lost | |
| | Fisherman | | Location | |
| | Other | | Depth | |
| | | | Bottom Type | |
| Gear Type: | Unknown | | Target Species: | |

Gear Description:

Monofilament webbing, 5" stretch mesh. 0.033" twine diameter. No floatline or leadline present. 50 meshes deep.

Comments:

Conclusions:

Unknown gear type.

| Report By: | J.F.Kenney | Date: | 3-2-03 | Current Location of Gear | Kingston, RI |
|---|---|---|---|---|---|

7170

| | |
|---|---|
| NMFS No. | E20-01 |
| Entanglement Classification | Confirmed |
| Live/Dead Outcome | Live |
| Date 1st Observed Entangled | 9/13/01 |
| Species | Right |
| Species Classification | Confirmed |
| No. of Animals | 1 |
| Individual ID | Pending, has not yet been identified as a known individual |
| Location | Lower Bay of Fundy |
| Latitude/Longitude | 44° 34.80' N        66° 18.50' W |
| Event Description | 9/13/01<br>• Whale sighted and documented by NEAq whale researchers<br>• The entanglement was determined to be minor and no further action was taken |
| Description of Gear on Whale | 25' of red line running from forward of the left pectoral flipper (no wrap) and trailing back in loose coils to approximately the leading edge of the tail flukes. |
| Description of Wounds | None noted |
| Gear Type | Unknown - no gear recovered |
| Sighting Prior to Entanglement | Unknown |
| Re-sightings: | Unknown |
| Life History Information | ~35 ft in length |

7171

## FISHERY INTERACTION GEAR ANALYSIS

| | | | |
|---|---|---|---|
| NMFS No. | E20-01 | | |
| Field No. | J091301 | Date 1st Observed Entangled | 9/13/01 |
| Location 1st Observed | 12 nm north of Boars Head, NS.  BOF | Type of Event - Observation, Disentanglement, Stranding. Other (describe) | Observation |
| Species | Right whale | Gear Recovered (y/n) | No |
| Individual ID | Unknown | Gear Analysis Conducted (y/n) | No |

### GEAR DESCRIPTION / ANALYSIS

| | | | | |
|---|---|---|---|---|
| Date Gear Retrieved | | | Gear Retrieved By | |
| Date Gear Received | | | Received From | |
| Sources: | USCG | | Date Set | |
| | CCS | | Date Lost | |
| | Fisherman | | Location | |
| | Other | | Depth | |
| | | | Bottom Type | |
| Gear Type: | | | Target Species: | |

Gear Description:


Comments:




Conclusions:

No gear recovered.

| Report By: | J.F.Kenney | Date: | 10-16-01 | Current Location of Gear | NA |
|---|---|---|---|---|---|

-41-

| NMFS No. | E21-01 |
|---|---|
| Entanglement Classification | Confirmed |
| Live/Dead Outcome | Live |
| Date 1st Observed Entangled | 9/17/01 |
| Species | Humpback |
| Species Classification | Confirmed |
| No. of Animals | 1 |
| Individual ID | Overcast (CCS #2029) |
| Location | Southern Stellwagen Bank |
| Latitude/Longitude | 42° 08.75' N        70° 19.13' W |
| Event Description | 9/17/01<br>•     Entangled whale sighted by whale watch personnel<br>•     Entanglement was reported one day later to CCS<br>9/23/01<br>•     Whale was resighted by whale watch personnel - vessel stood by<br>•     CCS responded but whale had been lost<br>•     Whale was relocated by a different whale watch vessel<br>•     CCS team disentangled whale-(temporary id assigned: CCS# 2029) |
| Description of Gear on Whale | Small diameter greenish line reportedly wrapped three times around the body.  Line was also believed to be trailing behind the whale.  Floating and sinking rope. |
| Description of Wounds | Some wounds on the tail stock and on the pectoral flippers. |
| Gear Type | Pot related fishery |
| Sighting Prior to Entanglement | 10/4/00 by researchers |
| Re-sightings: | 9/23/01 (see above) |
| Life History Information | Yearling or Juvenile; ~30-35 ft in length |

7173

## FISHERY INTERACTION GEAR ANALYSIS

| NMFS No. | E21-01 | | |
|---|---|---|---|
| Field No. | J091701 | Date 1st Observed Entangled | 9/17/01 |
| Location 1st Observed | Southern Stellwagen Bank 6 nm NW of Race Pt Cape Cod,  MA | Type of Event - Observation, Disentanglement, Stranding. Other (describe) | Observation (9/17) Disentanglement (9/23) |
| Species | Humpback | Gear Recovered (y/n) | Yes |
| Individual ID | Overcast | Gear Analysis Conducted (y/n) | Yes |

## GEAR DESCRIPTION / ANALYSIS

| Date Gear Retrieved | | 9/23/01 | Gear Retrieved By | CCS |
|---|---|---|---|---|
| Date Gear Received | | 9/01 | Received From | CCS |
| Sources: | USCG | | Date Set | |
| | CCS | | Date Lost | |
| | Fisherman | | Location | |
| | Other | | Depth | |
| | | | Bottom Type | |
| Gear Type: | pot related gear | | Target Species: | |

Gear Description: The following is a description of the gear that appeared to be the buoy line and part of the ground line of trap gear: The buoy line consisted of Approx. 20 fathom of 5/16  easy-haul (sink rope) and 20 fathom of 5/16 black poly(float rope), 2 fathom from the buoy end (no buoy present) of the easy-haul was a 52" poly gangion sliced in to easy haul, this gangion was cut by CCS.  Three fathom from the trap end of the buoy line was a spliced loop , this loop was tied into with a double becket  leading down to the first gangion , the gangion was approx. 3/8 poly 5' long tucked through main line and back spliced. The end of the gangion was still attached to what seems to be a parted off trap bridle (5/16black poly).  The ground line (5/16 black poly ) continues for 12 fathom where another gangion (5' 5/16 yellow poly) is tucked and back spliced into main line with again what appears to be a parted off trap bridle(5/16 black poly). After looking at where CCS had marked gear it appears that the animal was entangled between the 1st and 2nd gangion.  The ground line (5/16 black poly) continues from the 2nd gangion  for 6 fathom where the remaining12 fathom of the ground line was neatly coiled and tied.  Approx. 3' from the bitter end of the ground line was what's left of a green poly gangion tucked and spliced into ground line , this gangion was parted off right at the splice in main line. The third gangion was 18 fathom from the 2nd. I (Glenn) made a cut a few inches in from the bitter end of the line and taped that piece back to main line, all other cuts in line were made by CCS while disentangling animal.

Comments:

Conclusions:

    Pot related gear.

| Report By: | J.F.Kenney | Date: | 10-16-01 | Current Location of Gear | Kingston, RI |
|---|---|---|---|---|---|

7174

| NMFS No. | E22-01 |
|---|---|
| Entanglement Classification | Confirmed |
| Live/Dead Outcome | Dead |
| Date 1st Observed Entangled | 9/19/01 |
| Species | Fin |
| Species Classification | Confirmed |
| No. of Animals | 1 |
| Individual ID | Unknown |
| Location | Off Bermuda |
| Latitude/Longitude | 38° 42.406' N    72° 50.71' W |
| Event Description | 9/19/01<br>• Dead whale sighted and investigated by crew on a WHOI research vessel<br>• High Definition images were taken and reveal a number of entanglement scars |
| Description of Gear on Whale | No gear observed |
| Description of Wounds | Mesh indentation on the flank and tail stock |
| Gear Type | Unknown - no gear recovered |
| Sighting Prior to Entanglement | Unknown |
| Re-sightings: | None (Mortality) |
| Life History Information | Unknown |

7175

## FISHERY INTERACTION GEAR ANALYSIS

| | | | | |
|---|---|---|---|---|
| NMFS No. | E22-01 | | | |
| Field No. | | Date 1st Observed Entangled | | 9-19-01 |
| Location 1st Observed | Off Bermuda | Type of Event - Observation, Disentanglement, Stranding. Other (describe) | | Stranding |
| Species | Fin | Gear Recovered (y/n) | | No |
| Individual ID | Unknown | Gear Analysis Conducted (y/n) | | No |

### GEAR DESCRIPTION / ANALYSIS

| | | | | |
|---|---|---|---|---|
| Date Gear Retrieved | | | Gear Retrieved By | |
| Date Gear Received | | | Received From | |
| Sources: | USCG | | Date Set | |
| | CCS | | Date Lost | |
| | Fisherman | | Location | |
| | Other | | Depth | |
| | | | Bottom Type | |
| Gear Type: | | | Target Species: | |

Gear Description:



Comments:







Conclusions:

No gear recovered.

| Report By: | J.F.Kenney | Date: | 3-2-03 | Current Location of Gear | NA |
|---|---|---|---|---|---|

7176

| | |
|---|---|
| NMFS No. | E23-01 |
| Entanglement Classification | Confirmed |
| Live/Dead Outcome | Live |
| Date 1st Observed Entangled | 10/20/01 |
| Species | Minke |
| Species Classification | Confirmed |
| No. of Animals | 1 |
| Individual ID | Unknown |
| Location | Southeast corner of Stellwagen Bank |
| Latitude/Longitude | 42° 11.4' N        70° 09.51' W |
| Event Description | 10/20/01<br>• Sighted by naturalist aboard whale watch vessel and reported to CCS<br>• Vessel did not stand by<br>• No disentanglement response |
| Description of Gear on Whale | Line and high flyer. |
| Description of Wounds | None noted |
| Gear Type | Unknown - no gear recovered |
| Sighting Prior to Entanglement | Unknown |
| Re-sightings | Unknown |
| Life History Information | Unknown |

-46-

7177

## FISHERY INTERACTION GEAR ANALYSIS

| | | | |
|---|---|---|---|
| NMFS No. | E23-01 | | |
| Field No. | | Date 1st Observed Entangled | 10/20/01 |
| Location 1st Observed | Southeast corner of Stellwagen Bank, MA | Type of Event - Observation, Disentanglement, Stranding. Other (describe) | Observation |
| Species | Minke | Gear Recovered (y/n) | No |
| Individual ID | Unknown | Gear Analysis Conducted (y/n) | No |

## GEAR DESCRIPTION / ANALYSIS

| | | | |
|---|---|---|---|
| Date Gear Retrieved | | Gear Retrieved By | |
| Date Gear Received | | Received From | |
| Sources: | USCG | Date Set | |
| | CCS | Date Lost | |
| | Fisherman | Location | |
| | Other | Depth | |
| | | Bottom Type | |
| Gear Type: | | Target Species: | |

Gear Description:

Comments:

Conclusions:

No gear recovered.

| Report By: | J.F.Kenney | Date: | 3-3-03 | Current Location of Gear | NA |
|---|---|---|---|---|---|

-47-

7178

| NMFS No. | E24 - 01 |
|---|---|
| Entanglement Classification | Unconfirmed |
| Live/Dead Outcome | Live |
| Date 1st Observed Entangled | 10/21/01 |
| Species | Unidentified |
| Species Classification | Unconfirmed |
| No. of Animals | 1 |
| Individual ID | Unknown |
| Location | Southwest corner of Stellwagen Bank |
| Latitude/Longitude | 42° 09.0' N        70° 18.0' W |
| Event Description | 10/21/01<br>• Reported to USCG by fishing vessel<br>• USCG lost contact with the vessel, vessel did not stand by<br>• Event unverified, no disentanglement response. |
| Description of Gear on Whale | Whale reported as wrapped up in line |
| Description of Wounds | None noted |
| Gear Type | Unknown - no gear recovered |
| Sighting Prior to Entanglement | Unknown |
| Re-sightings: | Unknown |
| Life History Information | Unknown |

7179

## FISHERY INTERACTION GEAR ANALYSIS

| NMFS No. | E24-01 | | |
|---|---|---|---|
| Field No. | | Date 1st Observed Entangled | 10/21/01 |
| Location 1st Observed | Southwest corner of Stellwagen Bank, MA | Type of Event - Observation, Disentanglement, Stranding. Other (describe) | Observation Unconfirmed |
| Species | Unidentified | Gear Recovered (y/n) | No |
| Individual ID | Unknown | Gear Analysis Conducted (y/n) | No |

## GEAR DESCRIPTION / ANALYSIS

| Date Gear Retrieved | | Gear Retrieved By | |
|---|---|---|---|
| Date Gear Received | | Received From | |
| Sources: | USCG | Date Set | |
| | CCS | Date Lost | |
| | Fisherman | Location | |
| | Other | Depth | |
| | | Bottom Type | |
| Gear Type: | | Target Species: | |

Gear Description:

Comments:

Conclusions:

   No gear recovered.

| Report By: | J.F.Kenney | Date: | 3-3-03 | Current Location of Gear | NA |
|---|---|---|---|---|---|

**7180**

| | |
|---|---|
| NMFS No. | E25-01 |
| Entanglement Classification | Confirmed |
| Live/Dead Outcome | Dead |
| Date 1st Observed Entangled | 11/3/01 |
| Species | Right |
| Species Classification | Confirmed |
| No. of Animals | 1 |
| Individual ID | 1238 |
| Location | Magdelen Islands, Canada |
| Latitude/Longitude | 47° 15.2' N        -62° 00.7' W |
| Event Description | 11/3/01<br>• Reported by DFO observer<br>• Investigated by DFO, NEAq and WHOI staff<br>• Moderate to advanced decomposition<br>• Necropsy report pending |
| Description of Gear on Whale | 7/8" green poly blend line around flippers and underside of belly. |
| Description of Wounds | None noted |
| Gear Type | Danish seine gear |
| Sighting Prior to Entanglement | 06/25/01 in Great South Channel -NMFS aerial survey |
| Re-sightings | None (mortality) |
| Life History Information | Adult male, 46 ft in length |

-50-

7181

## FISHERY INTERACTION GEAR ANALYSIS

| NMFS No. | E25 -01 | | |
|---|---|---|---|
| Field No. | J102501 | Date 1st Observed Entangled | ~10/25/01 |
| Location 1st Observed | Magdalen Island, Gulf of St. Lawrence, Canada | Type of Event - Observation, Disentanglement, Stranding. Other (describe) | Stranding Dead |
| Species | Right whale | Gear Recovered (y/n) | Yes |
| Individual ID | 1238 | Gear Analysis Conducted (y/n) | Yes |

## GEAR DESCRIPTION / ANALYSIS

| Date Gear Retrieved | | 10/28/01 | Gear Retrieved By | DFO, NEAq, WHOI, CCS |
|---|---|---|---|---|
| Date Gear Received | | March, 2002 | Received From | DFO, Lena Measures |
| Sources: | USCG | | Date Set | |
| | CCS | | Date Lost | |
| | Fisherman | | Location | |
| | Other | | Depth | |
| | | | Bottom Type | |
| Gear Type: | Danish Seine | | Target Species: | dab (American plaice) |

Gear Description:

Rope measured and reported by DFO as 87.79 meters total length ( 7 individual pieces). Size measured 2-9/16"Cir or 13/16" Diameter. Some of the rope has a lead core which makes it sink (Sg = 1.278 ), while the non-leaded sections of rope float (Sg = 0.898 ).

Comments:

This type of rope is consistent with that used in the Danish seine fishery according to DFO's specialist. Around 120 boats participate in a fall fishery targeting dab in the Bay of St. Lawrence.

Conclusions:

Rope is consistent with that used in the Danish seine fishery.

| Report By: | J. F. Kenney | Date: | 9/16/02 | Current Location of Gear | Kingston, RI |
|---|---|---|---|---|---|

-51-

**7182**

| NMFS No. | E26-01 |
|---|---|
| Entanglement Classification | Unconfirmed |
| Live/Dead Outcome | Live |
| Date 1st Observed Entangled | 11/6/01 |
| Species | Unidentified |
| Species Classification | Unconfirmed |
| No. of Animals | 1 |
| Individual ID | Unknown |
| Location | 500 ft off South Side of Boar's Head, Hampton Beach, NH |
| Latitude/Longitude | ~42.913° N        ~ -70.798° W |
| Event Description | 11/6/01<br>• Reported by surfer<br>• Animal was thought to be entangled but gear was never seen.<br>• Surfaced every 3-5 minutes to breathe<br>• Whale was estimated as 12-18 ft in length, with dorsal fin |
| Description of Gear on Whale | No gear observed |
| Description of Wounds | None noted |
| Gear Type | Unknown - no gear recovered |
| Sighting Prior to Entanglement | Unknown |
| Re-sightings | Unknown |
| Life History Information | Unknown |

7183

## FISHERY INTERACTION GEAR ANALYSIS

| NMFS No. | E26-01 | Date 1st Observed Entangled | 11/6/01 |
|---|---|---|---|
| Field No. | | |
| Location 1st Observed | Boar's Head, Hampton Beach, NH | Type of Event - Observation, Disentanglement, Stranding. Other (describe) | Observation Unconfirmed |
| Species | Unidentified | Gear Recovered (y/n) | No |
| Individual ID | Unknown | Gear Analysis Conducted (y/n) | No |

## GEAR DESCRIPTION / ANALYSIS

| Date Gear Retrieved | | | Gear Retrieved By | |
|---|---|---|---|---|
| Date Gear Received | | | Received From | |
| Sources: | USCG | | Date Set | |
| | CCS | | Date Lost | |
| | Fisherman | | Location | |
| | Other | | Depth | |
| | | | Bottom Type | |
| Gear Type: | | | Target Species: | |

Gear Description:

Comments:

Conclusions:

   No gear recovered.

| Report By: | J.F.Kenney | Date: | 3-3-03 | Current Location of Gear | NA |
|---|---|---|---|---|---|

**7184**

| | |
|---|---|
| **NMFS No.** | E27-01 |
| **Entanglement Classification** | Confirmed |
| **Live/Dead Outcome** | Dead |
| **Date 1st Observed Entangled** | 12/13/01 |
| **Species** | Minke |
| **Species Classification** | Confirmed |
| **No. of Animals** | 1 |
| **Individual ID** | Unknown |
| **Location** | 6 miles NE of Provincetown, MA |
| **Latitude/Longitude** | ~42° 21' N          ~70° 43' W |
| **Event Description** | 12/13/01<br>• Reported by boater.<br>• Fresh wounds noted around the tail stock.<br>12/17/01<br>• Reported and documented by MA DMF Aerial Survey.<br>• Photos document entanglement wounds on tail stock. |
| **Description of Gear on Whale** | No gear observed |
| **Description of Wounds** | Deep wound around tail stock. |
| **Gear Type** | Unknown - no gear recovered |
| **Sighting Prior to Entanglement** | Unknown |
| **Re-sightings** | None (mortality) |
| **Life History Information** | ~ 25 ft in length |

-54-

**7185**

## FISHERY INTERACTION GEAR ANALYSIS

| | | | |
|---|---|---|---|
| NMFS No. | E27-01 | | |
| Field No. | | Date 1st Observed Entangled | 12/13/01 |
| Location 1st Observed | 6 nm Northeast of Provincetowm, MA | Type of Event - Observation, Disentanglement, Stranding. Other (describe) | Stranding |
| Species | Minke | Gear Recovered (y/n) | No |
| Individual ID | Unknown | Gear Analysis Conducted (y/n) | No |

## GEAR DESCRIPTION / ANALYSIS

| | | | |
|---|---|---|---|
| Date Gear Retrieved | | Gear Retrieved By | |
| Date Gear Received | | Received From | |
| Sources: | USCG | Date Set | |
| | CCS | Date Lost | |
| | Fisherman | Location | |
| | Other | Depth | |
| | | Bottom Type | |
| Gear Type: | | Target Species: | |

Gear Description:

Comments:

Conclusions:

    No gear recovered.

| Report By: | J.F.Kenney | Date: | 3-3-03 | Current Location of Gear | NA |
|---|---|---|---|---|---|

7186

| NMFS No. | E28-01 |
|---|---|
| Entanglement Classification | Unconfirmed |
| Live/Dead Outcome | Live |
| Date 1st Observed Entangled | 12/28/01 |
| Species | Unidentified |
| Species Classification | Unconfirmed |
| No. of Animals | 1 |
| Individual ID | Unknown |
| Location | Between Duck and Sanderling NC |
| Latitude/Longitude | 36° 10.1' N          75° 45.1' W |
| Event Description | 12/28/01<br>• Reported by boater<br>• Described as having long white flippers and 35-40 ft. in total length<br>• Boater unable to stand by due to rough seas and dusk<br>• Next day, VMSM aerial survey unable to relocate whale |
| Description of Gear on Whale | Reported as multiple wraps around the head.  Beach-set gillnet gear, with orange buoy trailing (unconfirmed). |
| Description of Wounds | None noted |
| Gear Type | Unknown - no gear recovered |
| Sighting Prior to Entanglement | Unknown |
| Re-sightings | Unknown |
| Life History Information | Unknown |

-56-

**7187**

## FISHERY INTERACTION GEAR ANALYSIS

| | | | |
|---|---|---|---|
| NMFS No. | E28-01 | | |
| Field No. | | Date 1st Observed Entangled | 12/28/01 |
| Location 1st Observed | Between Duck and Sanderling, NC | Type of Event - Observation, Disentanglement, Stranding. Other (describe) | Observation Unconfirmed |
| Species | Unidentified | Gear Recovered (y/n) | No |
| Individual ID | Unknown | Gear Analysis Conducted (y/n) | No |

## GEAR DESCRIPTION / ANALYSIS

| | | | |
|---|---|---|---|
| Date Gear Retrieved | | Gear Retrieved By | |
| Date Gear Received | | Received From | |
| Sources: | USCG | Date Set | |
| | CCS | Date Lost | |
| | Fisherman | Location | |
| | Other | Depth | |
| | | Bottom Type | |
| Gear Type: | | Target Species: | |

Gear Description:

Comments:

Conclusions:

   No gear recovered.

| Report By: | J.F.Kenney | Date: | 3-3-03 | Current Location of Gear | NA |
|---|---|---|---|---|---|

-57-

7188

## 2000 Updates

| | |
|---|---|
| NMFS No. | E24-00 (An update on a whale that was first sighted entangled in 2000) |
| Entanglement Classification | Confirmed |
| Live/Dead Outcome | Live |
| Date 1st Observed Entangled | 8/18/00 by NOAA Fisheries staff.  Next seen on 2/2/01 |
| Species | Right |
| Species Classification | Confirmed |
| No. of Animals | 1 |
| Individual ID | 2223, Calvin |
| Location | Off of Wood End, Cape Cod Bay, Provincetown, MA |
| Latitude/Longitude | 42° 00.61' N          70° 10.33' W |
| Event Description | 2/2/01<br>•     Reported by CCS staff from R/V Shearwater<br>•     CCS staff stayed on scene until dark to further document entanglement<br>•     Whale appeared to be behaving normally; feeding with 10+ others, long dives with short time at the surface<br>•     USCG Helicopter crew with MA Env. Police attempted to document the entanglement from the air.<br>2/4/01<br>•     CCS/MA DMF aerial survey team sighted the entangled whale<br>•     Slides and digital images were taken<br>3/17/01<br>•     CCS/MA DMF aerial survey team sighted the entangled whale<br>•     CCS responded and attempted to disentangle but were unsuccessful<br>3/29/01<br>•     CCS applied a telemetry buoy and removed about 100 ft of trailing line<br>•     CCS/MA DMF Aerial Survey team assisted and documented from the air<br>4/30/01 - 5/2 /01<br>•     R/V "Song of the Whale" crew documented from the water.<br>3/29/01 - 5/4/01<br>•     Satellite tag failed after 36 days<br>5/8/01<br>•     R/V "Song of the Whale" located the buoy which was damaged<br>•     27 meters of line was attached to the buoy<br>6/8/01<br>•     NOAA SAS team sighted Calvin free of any entangling line |
| Description of Gear on Whale | Single line wrap on body about 1 meter behind the blow holes.  No gear was seen on the tail stock or trailing behind the whale. |
| Description of Wounds | None noted |
| Gear Type | Blue/green approximately 3/8" in diameter |
| Sighting Prior to Entanglement | 7/25/01 behaving oddly & w/ fresh entanglement scars (ent. may not have been noted)<br>4/7/2000 at 4148.1/7011.6 in Cape Cod Bay apparently without gear |
| Re-sightings | 2/4/01 from the CCS/MA DMF Aerial Survey team (Skymaster)<br>•     12:38  41° 58.3' N / 70° 10.7' W<br>•     13:08  41° 58.1' N / 70° 10.9' W<br>3/17/01 from the CCS/MA DMF Aerial Survey team (Skymaster)<br>•     14:35  42° 01.1' N / 70° 18.32' W<br>3/29/01 Aerial survey<br>•     11:30 42° 05.2' N / 70° 32.8' W<br>4/30 - 5/2/01<br>•     Great South Channel<br>6/8/01 from NOAA SAS plane<br>•     Great South Channel (free of entanglement) |
| Life History and Sighting Information | 40 + feet in length<br>9 year old female (in 2001) |

7189

# Large Whale Entanglement Report 2003

*updated March 2005*

**Prepared by**
**Amy Whittingham, Mendy Garron, John Kenney and Dana Hartley**

NOAA Fisheries Service
Protected Resources Division
1 Blackburn Drive
Gloucester, MA 01930-2298

**Comments or Questions, please contact:**

Mendy Garron
NER Stranding Program
Email: Mendy.Garron@NOAA.gov
Phone: (978)281-9300x6528

# 2003 Large Whale Entanglement Report

Table 1:   Summary of 2003 large whale entanglement reports for live entangled whales.

## Indication of Entanglement* - Live Whales

|  | Yes | No | TOTAL |
|---|---|---|---|
| Right Whale | 4 | 1 | 5 |
| Humpback Whale | 20 | 1 | 21 |
| Fin Whale | 0 |  | 0 |
| Minke Whale | 3 |  | 3 |
| Unknown | 1 | 1 | 2 |
| TOTAL | 28 | 3 | 31 |

Table 2:   Summary of 2003 large whale entanglement reports for dead stranded or floating dead whales.

## Indication of Entanglement*- Dead Whales

|  | Yes | No | TOTAL |
|---|---|---|---|
| Right Whale |  |  | 0 |
| Humpback Whale | 2 |  | 2 |
| Fin Whale | 1 |  | 1 |
| Minke Whale | 7 |  | 7 |
| Bryde's spp. | 1 |  | 1 |
| Unknown | 1 | 1 | 2 |
| TOTAL | 12 | 1 | 13 |

*  "Indication of Entanglement" is marked 'Yes' for cases where one or more of the following applies:
- Gear was reported on a whale by a reliable observer.
- Gear was photo-documented on a whale.
- Gear was retrieved from a whale.
- Marks/wounds from gear were documented on a whale carcass, excluding healed scars.

- Gear was reported on a whale by an inexperienced observer who was interviewed by NOAA Fisheries or CCS staff and the account was descriptive enough to eliminate doubt about whether or not the whale was entangled.

NOTE:
- Some of the reports that follow are still under analysis.  Data are represented as accurately as possible with information received as of March 2005.
- New England Aquarium provided sighting and life history information for right whales.
- Center for Coastal Studies and The Whale Center of New England provided sighting and life history information for humpback whales.
- Detailed records of the entanglement events are provided by the CCS website.

Table 3: Key for acronyms used in this report

| CCS | Center for Coastal Studies |
|---|---|
| CCS/MA DMF | Center for Coastal Studies and Massachusetts Division of Marine |
| CCSN | Cape Cod Stranding Network |
| COA | College of the Atlantic |
| CWR | Campobello Whale Rescue Team |
| DFO | Department of Fisheries and Oceans (Canada) |
| ECE | East Coast Ecosystems (Canada) |
| EWS | Early Warning System |
| FMRI | Florida Marine Research Institute |
| FRC | Fast response craft |
| GMWSS | Grand Manan Whale and Seabird Research Station |
| IFAW | International Fund for Animal Welfare - Research crew from vessel "Song of the Whale" |
| MA DMF | Massachusetts Division of Marine Fisheries |
| ME DMR | Maine Department of Marine Resources |
| MEP | Massachusetts Environmental Police |
| MMP | Maine Marine Patrol |
| MMSC | Marine Mammal Stranding Center |
| NAIB | National Aquarium in Baltimore |
| NEAq | New England Aquarium Right Whale Research Team |
| NMFS | National Marine Fisheries Service |
| NMFS DEII | NMFS Research Vessel Delaware II |
| NMFS PSB | NMFS Protected Species Branch, Northeast Fisheries Science |
| NMFS SAS | NMFS Sightings Advisory System, Protected Resources Div., Northeast Regional Office |
| NOAA | National Oceanic and Atmospheric Administration |
| RI DEM | Rhode Island Department of Environmental Management |
| SAG | Surface active group |
| SBNMS | Stellwagen Bank National Marine Sanctuary |
| UNC - W | University of North Carolina, Wilmington |
| USCG | United States Coast Guard |
| VMSM | Virginia Marine Science Museum |
| WCNE | Whale Center of New England |
| WHOI | Woods Hole Oceanographic Institution |
| WW | Whale watch |

| | |
|---|---|
| NMFS No. | E01-03 |
| Indication of Entanglement | Yes |
| **INITIAL STATUS** | Live |
| **SUBSEQUENT STATUS (AS OF THE DATE THE NMFS ENTANGLEMENT REPORT IS COMPLETED)** | Gear Free |
| Date 1st Observed Entangled | 1/14/03 |
| Species | Right |
| Individual ID | 2240 |
| Location **1st OBSERVED ENTANGLED** | 12.5 NM ESE of Jacksonville Beach, FL |
| Latitude/Longitude **1st OBSERVED ENTANGLED** | 30°13.6'N     81°09.5W |
| Initial Event Description | 01/14/03<br>▪ An aerial survey team reported and documented an entangled right whale.<br>▪ The first report indicated this entanglement was not considered life threatening, and the whale was not a candidate for disentanglement.<br>1/15/03<br>▪ The whale was identified through photographs to be #2240.<br>▪ An action plan for #2240 was developed. Initial plans involved attempting to relocate #2240 during aerial surveys, with emphasis on gaining further documentation of the right mouth line and right pectoral flipper. |
| Description of Gear on Whale **AS REPORTED**<br>    **A. DURING INITIAL SIGHTING** | Gear was described as a single line through mouth, with one end trailing approximately 50 ft behind the flukes. No wraps were visible. |
| **B. SUBSEQUENT DESCRIPTIONS** | 05/15/03<br>▪ #2240 was sighted by NOAA Aerial Survey, apparently gear free, but in poor condition. |
| **C. DIAGRAM OF ENTANGLING GEAR ON WHALE** | |
| Description of Wounds/**CONDITION**<br>    **A. DURING INITIAL SIGHTING** | None noted: no injuries seen, apparently healthy |

| B. SUBSEQUENT DESCRIPTIONS | 05/20/03<br>Animal had orange cyamid coverage on head and fluke.<br>02/12/04<br>Animal had severe white scarring on leading edge of flukes. |
|---|---|
| **NMFS GEAR ANALYSIS**<br>  A. Gear Type<br><br>  **B. GEAR PART/LINE TYPE**<br><br>  **C. LOCATION OF SET**<br><br>  **D. POTENTIAL POINT OF ENCOUNTER WITH GEAR** | Unknown – no gear recovered |
| Sighting prior to entanglement | 05/05/02 in Great South Channel |
| Re-sightings **POST-ENTANGLEMENT** | 02/12/04     41° 55.6'N     70° 13.4'W<br>■   Cape Cod Bay.  Sighting by CCS/Mass DMF aerial survey.  Right Whale #2240 has severe white scarring on the leading edge of flukes. Photos were analyzed by NEAQ: staff states that #2240 looks in better health than in May 2003.  The orange cyamid coverage that was present in May 2003 is almost completely gone.  All observation suggests this whale is in better condition than it was in May 2003.<br>05/31/04     Great South Channel<br>11/18/04     42.855 N/ 70.253 W     Jeffrey's Ledge<br>11/19/04     42.862 N/ 70.233 W     Jeffrey's Ledge<br>11/23/04     42.846 N/ 70.343 W     Jeffrey's Ledge<br>11/27/04     42.643 N/ 70.431 W     Jeffrey's Ledge |
| Life History Information | Adult female, first identified in 1992 |
| **NMFS** Serious Injury/Mortality Determination | Pending |

# FISHERY INTERACTION GEAR ANALYSIS

| NMFS No. | E 01 - 03 | | |
|---|---|---|---|
| Field No. | J011403 | Date 1st Observed Entangled | 1-14-03 |
| Location 1st Observed | 12.5 NM ESE Jacksonville Beach, FL 30°13.6' N, 81°09.5' W | Type of Event - Observation, Disentanglement, Stranding. Other (describe) | Observation |
| Species | right whale | Gear Recovered (y/n) | No |
| Individual ID | 2240 | Gear Analysis Conducted (y/n) | No |

# GEAR DESCRIPTION / ANALYSIS

| | | | |
|---|---|---|---|
| **Date Gear Retrieved** | | **Gear Retrieved By** | |
| **Date Gear Received** | | **Received From** | |
| **Sources:** | **USCG** | **Date Set** | |
| | **CCS** | **Date Lost** | |
| | **Fisherman** | **Location** | |
| | **Other** | **Depth** | |
| | | **Bottom Type** | |
| **Gear Type:** | **Unknown - no gear recovered** | **Target Species:** | |

**Gear Description:**

**Comments:**

**Conclusions:**

   No gear recovered.

| **Report By:** | | **John F. Kenney** | **Date:** | **2/3/05** | **Current Location of Gear** | **N.A.** |
|---|---|---|---|---|---|---|

| | |
|---|---|
| NMFS No. | E02-03 |
| Indication of Entanglement | Yes |
| **INITIAL STATUS** | Dead |
| **SUBSEQUENT STATUS (AS OF THE DATE THE NMFS ENTANGLEMENT REPORT IS COMPLETED)** | Dead |
| Date 1st Observed Entangled | 03/13/03 |
| Species | Bryde's spp. |
| Individual ID | Unknown |
| Location **1st OBSERVED ENTANGLED** | N. end of Carolina Beach, New Hanover, NC |
| Latitude/Longitude **1st OBSERVED ENTANGLED** | 35° 54.768'N     78° 13.116'W |
| Event Description | 03/13/03<br>▪ A fresh dead (code 2) whale carcass was reported on the beach.<br>▪ The carcass was extremely emaciated, with line deeply cutting into the angle of its mouth and across the ventral rostrum mid-line ridge.<br>▪ A necropsy was performed.  Line and histology samples were collected. |
| Description of Gear on Whale **AS REPORTED**<br><br>    **A. DURING INITIAL SIGHTING** | 1/2" braided polypro, wrapped through mouth and cutting into the angle of the mouth and rostrum/vomer.  Additionally there was a ball of line 20-50 m long wrapped together with barnacles growing on it. |
|     **B. SUBSEQUENT DESCRIPTIONS**<br><br>    **C. DIAGRAM OF ENTANGLING GEAR ON WHALE** | |
| Description of Wounds/**CONDITION**<br>    **A. DURING INITIAL SIGHTING**<br><br>    **B. SUBSEQUENT DESCRIPTIONS** | Deep cuts to angle of mouth and across ventral rostrum mid-line ridge. |
| **NMFS GEAR ANALYSIS**<br>    A. Gear Type<br><br>    **B. GEAR PART/LINE TYPE** | Pot related fishery |

| C. LOCATION OF SET | |
|---|---|
| D. POTENTIAL POINT OF ENCOUNTER WITH GEAR | |
| Sighting prior to entanglement | Unknown |
| Re-sightings **POST-ENTANGLEMENT** | None - mortality |
| Life History Information | Male, 1105 cm total length |
| **NMFS** Serious Injury/Mortality Determination | Pending |

## FISHERY INTERACTION GEAR ANALYSIS

| NMFS No. | E 02 - 03 | | |
|---|---|---|---|
| Field No. | J031303 | Date 1st Observed Entangled | 3-13-03 |
| Location 1st Observed | North end Carolina Beach, New Hanover, NC 33° 54.8' N, 78° 13.1' W | Type of Event - Observation, Disentanglement, Stranding. Other (describe) | Carcass |
| Species | Bryde's spp. | Gear Recovered (y/n) | Yes |
| Individual ID | Unknown | Gear Analysis Conducted (y/n) | Yes (SEFSC) |

## GEAR DESCRIPTION / ANALYSIS

| Date Gear Retrieved | | 3/13/03 | Gear Retrieved By | Stranding Network |
|---|---|---|---|---|
| Date Gear Received | | 4/22/03 | Received From | Stranding Network |
| Sources: | USCG | | Date Set | |
| | CCS | | Date Lost | |
| | Fisherman | | Location | |
| | Other | NMFS, Pascagoula, MS | Depth | |
| | | | Bottom Type | |
| Gear Type: | | Pot related fishery | Target Species: | |

**Gear Description:**

Black poly float line 3/8 " (88') 5/16(34'), Bridle with 2 equal 16" equal arms.

**Comments**:

The line was tightly tangled and was covered with marine growth both algal and 1 inch gooseneck barnacles. When completely undone the bundle consisted of 2 pieces of poly float line (3/8"-88')(5/16"-34') No buoy present and 3 lashed cut ends.

**Conclusions**:

       **The gear was capable of fishing in at least 20 fathoms. A piece of the original configuration is missing so positive determination of its use is not possible. The bridle indicates a single trap or storage crate (lobster car) from which the rest could be buoy line. The frayed ends as well as the twist and tangled mass indicate possibly a propeller interaction. No signs of a trap or buoy.**

| Report By: | John F. Kenney (from W.Hoggard) | Date: | 2-3-05 | Current Location of Gear | NMFS, Pascagoula |
|---|---|---|---|---|---|

| | |
|---|---|
| NMFS No. | E03-03 |
| Indication of Entanglement | No |
| **INITIAL STATUS** | Live |
| **SUBSEQUENT STATUS (AS OF THE DATE THE NMFS ENTANGLEMENT REPORT IS COMPLETED)** | Unknown – not resighted |
| Date 1st Observed Entangled | 03/28/03 |
| Species | Right |
| Individual ID | Unknown |
| Location **1st OBSERVED ENTANGLED** | Near Highland Light |
| Latitude/Longitude **1st OBSERVED ENTANGLED** | 41° 55.06'N      69° 44.09'W |
| Event Description | 03/28/03<br>▪ Whale seen by observer aboard CCS aerial survey, who reported they might have seen a single white or light colored line on the whale.<br>▪ The potentially entangled whale was only sighted once when the whale surfaced.<br>▪ No photographs were taken.<br>▪ Bad weather made re-sighting difficult. The qualified observer was not certain of the entanglement, due to the inability to re-sight and confirm that the whale was entangled. |
| Description of Gear on Whale **AS REPORTED**<br>     **A. DURING INITIAL SIGHTING**<br>     **B. SUBSEQUENT DESCRIPTIONS**<br>     **C. DIAGRAM OF ENTANGLING GEAR ON WHALE** | Single white or light colored line going from the right pectoral over and across the back, with no trailing line visible. |
| Description of Wounds/**CONDITION**<br>     **A. DURING INITIAL SIGHTING**<br>     **B. SUBSEQUENT DESCRIPTIONS** | None noted |
| **NMFS GEAR ANALYSIS** | |

| | |
|---|---|
| A. Gear Type | Unknown – no gear recovered |
| **B. GEAR PART/LINE TYPE** | |
| **C. LOCATION OF SET** | |
| **D. POTENTIAL POINT OF ENCOUNTER WITH GEAR** | |
| Sighting prior to entanglement | Unknown |
| Re-sightings **POST-ENTANGLEMENT** | Unknown – animal not resighted |
| Life History Information | Unknown |
| **NMFS** Serious Injury/Mortality Determination | Pending |

# FISHERY INTERACTION GEAR ANALYSIS

| NMFS No. | E 03 - 03 | | |
|---|---|---|---|
| **Field No.** | **J032803** | **Date 1st Observed Entangled** | **3-28-03** |
| **Location 1st Observed** | **Near Highland Light, Cape Cod, MA 41° 55.1' N, 69° 44.1' W** | **Type of Event - Observation, Disentanglement, Stranding. Other (describe)** | **Observation** |
| **Species** | **right** | **Gear Recovered (y/n)** | **No** |
| **Individual ID** | **Unknown** | **Gear Analysis Conducted (y/n)** | **No** |

# GEAR DESCRIPTION / ANALYSIS

| Date Gear Retrieved | | Gear Retrieved By | |
|---|---|---|---|
| **Date Gear Received** | | **Received From** | |
| **Sources:** | **USCG** | **Date Set** | |
| | **CCS** | **Date Lost** | |
| | **Fisherman** | **Location** | |
| | **Other** | **Depth** | |
| | | **Bottom Type** | |
| **Gear Type:** | **Unknown - no gear recovered** | **Target Species:** | |

**Gear Description:**

**Comments:**

**Conclusions:**

**No Indication of Entanglement**

| Report By: | John F. Kenney | Date: | 2-3-05 | Current Location of Gear | N.A. |
|---|---|---|---|---|---|

| | |
|---|---|
| NMFS No. | E04-03 |
| Indication of Entanglement | Yes |
| **INITIAL STATUS** | Dead |
| **SUBSEQUENT STATUS (AS OF THE DATE THE NMFS ENTANGLEMENT REPORT IS COMPLETED)** | Dead |
| Date 1st Observed Entangled | 05/13/03 |
| Species | Minke |
| Individual ID | Unknown |
| Location **1st OBSERVED ENTANGLED** | Back Shore, Gloucester, MA |
| Latitude/Longitude **1st OBSERVED ENTANGLED** | 42° 35.8'N    70° 38.3'W |
| Event Description | 05/13/03<br>▪ A whale carcass came ashore in a precarious spot on the rocks, hindering further investigation.<br>▪ The carcass was relocated to Good Harbor Beach, Gloucester for a necropsy on 5/15/03.<br>05/15/03<br>▪ A necropsy was performed.<br>▪ The carcass was in a moderate state of decomposition, and wounds and marks consistent with entanglement in fishing gear were noted. The stomach contained fish. |
| Description of Gear on Whale **AS REPORTED**<br>    **A. DURING INITIAL SIGHTING** | None Noted |
| **B. SUBSEQUENT DESCRIPTIONS**<br>**C. DIAGRAM OF ENTANGLING GEAR ON WHALE** | |
| Description of Wounds/**CONDITION**<br>    **A. DURING INITIAL SIGHTING** | Fresh looking wounds on mouth and in area of the tail flukes. Some bruising noted. |
| **B. SUBSEQUENT DESCRIPTIONS** | |
| **NMFS GEAR ANALYSIS**<br>    A. Gear Type | Unknown – no gear recovered |

| | |
|---|---|
| **B. GEAR PART/LINE TYPE** | |
| **C. LOCATION OF SET** | |
| **D. POTENTIAL POINT OF ENCOUNTER WITH GEAR** | |
| Sighting prior to entanglement | Unknown |
| Re-sightings **POST-ENTANGLEMENT** | None – mortality |
| Life History Information | Adult female, 7.4m in total length |
| **NMFS** Serious Injury/Mortality Determination | Pending |

## FISHERY INTERACTION GEAR ANALYSIS

| NMFS No. | E 04 - 03 | | |
|---|---|---|---|
| **Field No.** | **J051303** | **Date 1st Observed Entangled** | **5-13-03** |
| **Location 1st Observed** | **Back Shore, Cape Ann, Gloucester, MA 42° 35.8' N, 70° 38.3' W** | **Type of Event - Observation, Disentanglement, Stranding. Other (describe)** | **Carcass** |
| **Species** | **Minke** | **Gear Recovered (y/n)** | **No** |
| **Individual ID** | **Unknown** | **Gear Analysis Conducted (y/n)** | **No** |

## GEAR DESCRIPTION / ANALYSIS

| Date Gear Retrieved | | | Gear Retrieved By | |
|---|---|---|---|---|
| Date Gear Received | | | Received From | |
| Sources: | **USCG** | | Date Set | |
| | **CCS** | | Date Lost | |
| | **Fisherman** | | Location | |
| | **Other** | | Depth | |
| | | | Bottom Type | |
| Gear Type: | **Unknown - no gear recovered** | | Target Species: | |

**Gear Description:**

**Comments:**

**Conclusions:**

No gear recovered.

| Report By: | John F. Kenney | Date: | 2-3-05 | Current Location of Gear | N.A. |
|------------|----------------|-------|--------|--------------------------|------|

| | |
|---|---|
| NMFS No. | E05-03 |
| Indication of Entanglement | Yes |
| **INITIAL STATUS** | Live |
| **SUBSEQUENT STATUS (AS OF THE DATE THE NMFS ENTANGLEMENT REPORT IS COMPLETED)** | Remains entangled |
| Date 1st Observed Entangled | 05/20/03 |
| Species | Right |
| Individual ID | 1430 |
| Location **1st OBSERVED ENTANGLED** | 45 NM E of Race Point, Cape Cod, MA |
| Latitude/Longitude **1st OBSERVED ENTANGLED** | 42° 26.94'N      69° 23.68'W |
| Event Description | 05/20/03<br>▪ The NOAA Aerial survey reported and photo documented an entangled right whale.<br>▪ The R/V Shearwater made its way to the scene, and a second plane tracked the whale until it was lost at ~14:45 as growing seas and glare made tracking difficult.<br>05/21/03<br>▪ The aerial survey plane searched for the whale but whale was not re-sighted. |
| Description of Gear on Whale **AS REPORTED**<br><br>**A. DURING INITIAL SIGHTING** | No body wraps were noted. Reported as a mouth entanglement with two green lines exiting the left side of the mouth and crossing over the back.  One line passes under the right flipper, and then trails as a frayed end approximately 20 feet aft of the flukes. The end of the second line is unseen, but may be weighted. |
| **B. SUBSEQUENT DESCRIPTIONS** | 06/07/03<br>▪ The NOAA Aerial survey sighted #1430  in US waters on the Northern Edge of Georges Bank (42° 09.10' N  67° 35.70' W)<br>▪ The whale was feeding.  1430's skin color looked relatively pale.<br>▪ The line through the mouth was apparent however; trailing line is no longer visible in photos. |

| | |
|---|---|
| **C. DIAGRAM OF ENTANGLING GEAR ON WHALE** | |
| Description of Wounds/**CONDITION** **A. DURING INITIAL SIGHTING** | None noted |
| **B. SUBSEQUENT DESCRIPTIONS** | |
| **NMFS GEAR ANALYSIS** A. Gear Type | Unknown – no gear recovered |
| **B. GEAR PART/LINE TYPE** | |
| **C. LOCATION OF SET** | |
| **D. POTENTIAL POINT OF ENCOUNTER WITH GEAR** | |
| Sighting prior to entanglement | 08/01/02 in the Gulf of St. Lawrence |
| Re-sightings IF **GEAR-FREE** | Unknown – animal not resighted |
| Life History Information | ▪ The whale was identified as #1430; a reproductively active female who last calved in 2002 and was first sighted in 1984 at an unknown age. |
| **NMFS** Serious Injury/Mortality Determination | Pending |

## FISHERY INTERACTION GEAR ANALYSIS

| NMFS No. | E 05 - 03 | | |
|---|---|---|---|
| **Field No.** | **J052003** | **Date 1st Observed Entangled** | **5-20-03** |
| **Location 1st Observed** | **45nm East of Race Point, Cape Cod, MA 42° 26.9' N, 69° 23.7' W** | **Type of Event - Observation, Disentanglement, Stranding. Other (describe)** | **Observation** |
| **Species** | **right** | **Gear Recovered (y/n)** | **No** |
| **Individual ID** | **1430** | **Gear Analysis Conducted (y/n)** | **No** |

# GEAR DESCRIPTION / ANALYSIS

| | | | | |
|---|---|---|---|---|
| **Date Gear Retrieved** | | | **Gear Retrieved By** | |
| **Date Gear Received** | | | **Received From** | |
| **Sources:** | **USCG** | | **Date Set** | |
| | **CCS** | | **Date Lost** | |
| | **Fisherman** | | **Location** | |
| | **Other** | | **Depth** | |
| | | | **Bottom Type** | |
| **Gear Type:** | **Unknown - no gear recovered** | | **Target Species:** | |

**Gear Description:**

**Comments:**

**Conclusions:**

No gear recovered.

| **Report By:** | **John F. Kenney** | **Date:** | **2-3-05** | **Current Location of Gear** | **N.A.** |
|---|---|---|---|---|---|

| NMFS No. | E06-03 |
|---|---|
| Indication of Entanglement | Yes |
| **INITIAL STATUS** | Dead |
| **SUBSEQUENT STATUS (AS OF THE DATE THE NMFS ENTANGLEMENT REPORT IS COMPLETED)** | Dead |
| Date 1st Observed Entangled | 05/22/03 |
| Species | Unknown |
| Individual ID | Unknown |
| Location **1st OBSERVED ENTANGLED** | ¾ mile outside Menemsha Harbor, Martha's Vineyard, MA |
| Latitude/Longitude **1st OBSERVED ENTANGLED** | 41° 21.5'N     70° 48.5'W |
| Event Description | 05/22/03<br>▪ A fishing vessel reported an entangled whale carcass to USCG.  Officials were unable to later contact the F/V, which originally sighted the carcass.<br>05/25/03<br>▪ USCG reported carcass to NMFS and took digital photos on this date.<br>▪ From photos, the carcass appeared to be relatively small and in an advanced state of decomposition. The carcass was entirely white in coloration and skin was missing.<br>▪ The species of the whale was not able to be determined from photos, due to state of decomposition and the fact that the majority of the carcass was submerged.<br>▪ A high flyer and line was visible in the photos, closely associated with the carcass.  The photos show it was likely the carcass was entangled in the gear.<br>▪ The USCG issued a broadcast to mariners to get an updated position on the whale.<br>▪ Whale was not sighted again. |
| Description of Gear on Whale **AS REPORTED**<br>    **A. DURING INITIAL SIGHTING** | High flyer and line closely associated with carcass. |
| **B. SUBSEQUENT DESCRIPTIONS** | |

| | |
|---|---|
| **C. DIAGRAM OF ENTANGLING GEAR ON WHALE** | |
| Description of Wounds/**CONDITION**<br>    **A. DURING INITIAL SIGHTING**<br><br>    **B. SUBSEQUENT DESCRIPTIONS** | None noted |
| **NMFS GEAR ANALYSIS**<br>    A. Gear Type<br><br>    **B. GEAR PART/LINE TYPE**<br><br>    **C. LOCATION OF SET**<br><br>    **D. POTENTIAL POINT OF ENCOUNTER WITH GEAR** | Unknown - no gear recovered |
| Sighting prior to entanglement | Unknown |
| Re-sightings **POST-ENTANGLEMENT** | Unknown – mortality |
| Life History Information | Unknown |
| **NMFS** Serious Injury/Mortality Determination | Pending |

## FISHERY INTERACTION GEAR ANALYSIS

| **NMFS No.** | E 06 - 03 | | |
|---|---|---|---|
| **Field No.** | J052203 | **Date 1st Observed Entangled** | 5-22-03 |
| **Location 1st Observed** | 3/4 NM off Menemsha H, Martha's Vineyard, MA 41° 21.5' N, 70° 48.5' W | **Type of Event - Observation, Disentanglement, Stranding. Other (describe)** | Carcass |
| **Species** | Unknown | **Gear Recovered (y/n)** | No |
| **Individual ID** | Unknown | **Gear Analysis Conducted (y/n)** | No |

## GEAR DESCRIPTION / ANALYSIS

| **Date Gear Retrieved** | | **Gear Retrieved By** | |
|---|---|---|---|
| **Date Gear Received** | | **Received From** | |
| Sources: | **USCG** | **Date Set** | |
| | **CCS** | **Date Lost** | |

| | Fisherman | | Location | |
|---|---|---|---|---|
| | Other | | Depth | |
| | | | Bottom Type | |
| Gear Type: | Unknown - no gear recovered | | Target Species: | |

**Gear Description:**


**Comments:**




**Conclusions:**

No gear recovered.


| Report By: | John F. Kenney | Date: | 2-3-05 | Current Location of Gear | N.A. |
|---|---|---|---|---|---|

| | |
|---|---|
| NMFS No. | E07-03 |
| Indication of Entanglement | Yes |
| **INITIAL STATUS** | Dead |
| **SUBSEQUENT STATUS (AS OF THE DATE THE NMFS ENTANGLEMENT REPORT IS COMPLETED)** | Dead |
| Date 1st Observed Entangled | 05/24/03 |
| Species | Minke |
| Individual ID | Unknown |
| Location **1st OBSERVED ENTANGLED** | Lanes Cove, Gloucester, MA |
| Latitude/Longitude **1st OBSERVED ENTANGLED** | 42° 40.76'N      70°39.60'W |
| Event Description | 05/24/03<br>▪ A moderately decomposed carcass was seen in the surf.<br>05/25/03<br>▪ The carcass washed ashore.<br>05/27/03<br>▪ The carcass was towed and secured to an accessible beach.<br>05/28/03<br>▪ A necropsy was performed by the stranding network.<br>▪ Necropsy team documented a cut across the back anterior to the dorsal fin and histology samples were taken. |
| Description of Gear on Whale **AS REPORTED**<br>    **A. DURING INITIAL SIGHTING** | None noted |
| **B. SUBSEQUENT DESCRIPTIONS**<br>    **C. DIAGRAM OF ENTANGLING GEAR ON WHALE** | |
| Description of Wounds/**CONDITION**<br>    **A. DURING INITIAL SIGHTING** | Cut across the back, anterior to the dorsal fin, ¾ inch in width. |
| **B. SUBSEQUENT DESCRIPTIONS** | |

| NMFS GEAR ANALYSIS | Unknown – no gear recovered |
|---|---|
| A. Gear Type | |
| **B. GEAR PART/LINE TYPE** | |
| **C. LOCATION OF SET** | |
| **D. POTENTIAL POINT OF ENCOUNTER WITH GEAR** | |
| Sighting prior to entanglement | Unknown |
| Re-sightings **POST-ENTANGLEMENT** | None – mortality |
| Life History Information | Adult male, 759 cm in length |
| **NMFS** Serious Injury/Mortality Determination | Pending |

# FISHERY INTERACTION GEAR ANALYSIS

| NMFS No. | E 07 - 03 | | |
|---|---|---|---|
| Field No. | J052403 | Date 1st Observed Entangled | 5-24-03 |
| Location 1st Observed | Lane's Cove, Gloucester, MA 42° 40.8' N, 70° 39.6' W | Type of Event - Observation, Disentanglement, Stranding. Other (describe) | Carcass |
| Species | Minke | Gear Recovered (y/n) | No |
| Individual ID | Unknown | Gear Analysis Conducted (y/n) | No |

# GEAR DESCRIPTION / ANALYSIS

| Date Gear Retrieved | | Gear Retrieved By | |
|---|---|---|---|
| Date Gear Received | | Received From | |
| Sources: | USCG | Date Set | |
| | CCS | Date Lost | |
| | Fisherman | Location | |
| | Other | Depth | |
| | | Bottom Type | |
| Gear Type: | Unknown - no gear recovered | Target Species: | |

**Gear Description:**

      **No gear present.**

**Comments:**

**Conclusions:**

      **No gear recovered.**

| Report By: | John F. Kenney | Date: | 2-3-05 | Current Location of Gear | N.A. |
|---|---|---|---|---|---|

| NMFS No. | E08-03 |
|---|---|
| Indication of Entanglement | Yes |
| **INITIAL STATUS** | Live |
| **SUBSEQUENT STATUS (AS OF THE DATE THE NMFS ENTANGLEMENT REPORT IS COMPLETED)** | Dead |
| Date 1st Observed Entangled | 05/31/03 |
| Species | Minke |
| Individual ID | Unknown |
| Location **1st OBSERVED ENTANGLED** | Lobsterville Beach, Aquinnah, Martha's Vineyard, MA |
| Latitude/Longitude **1st OBSERVED ENTANGLED** | 41° 21.0'N    70° 47.52'W |
| Event Description | 05/31/03<br>▪ A live Minke whale stranded, entangled in netting.<br>▪ The netting was removed by well-intentioned onlookers, who then pushed the whale into deeper water.<br>▪ Stranding network participants and local officials arrived on the scene to find the whale in very poor condition.<br>▪ The bleeding rostrum injury was documented. The netting had reportedly caused a laceration cutting down to the bone.<br>▪ The emaciated and injured whale was euthanized. |
| Description of Gear on Whale **AS REPORTED** | |
| **A. DURING INITIAL SIGHTING** | Approximately 15 feet of 2-3 inch mesh netting. |
| **B. SUBSEQUENT DESCRIPTIONS** | |
| **C. DIAGRAM OF ENTANGLING GEAR ON WHALE** | |
| Description of Wounds/**CONDITION** | |
| **A. DURING INITIAL SIGHTING** | Bleeding rostrum injury where tissue was cut down to the bone |
| **B. SUBSEQUENT DESCRIPTIONS** | |
| **NMFS GEAR ANALYSIS** | |
| A. Gear Type | Probable otter trawl gear |

| | |
|---|---|
| **B. GEAR PART/LINE TYPE** | |
| **C. LOCATION OF SET** | |
| **D. POTENTIAL POINT OF ENCOUNTER WITH GEAR** | |
| Sighting prior to entanglement | Unknown |
| Re-sightings **POST-ENTANGLEMENT** | None – mortality |
| Life History Information | Female calf, 153 inches in total length. |
| **NMFS** Serious Injury/Mortality Determination | Pending |

# FISHERY INTERACTION GEAR ANALYSIS

| NMFS No. | E 08 - 03 | | |
|---|---|---|---|
| Field No. | J053103 | Date 1st Observed Entangled | 5 / 31 / 03 |
| Location 1st Observed | Lobsterville Beach, Aquinnah, Martha's Vineyard, MA 41° 21.0'N, 70°47.52'W | Type of Event - Observation, Disentanglement, Stranding. Other (describe) | Stranding Euthanized |
| Species | Minke | Gear Recovered (y/n) | Yes |
| Individual ID | Unknown | Gear Analysis Conducted (y/n) | Yes |

# GEAR DESCRIPTION / ANALYSIS

| Date Gear Retrieved | | 5/31/03 | Gear Retrieved By | |
|---|---|---|---|---|
| Date Gear Received | | | Received From | |
| Sources: | USCG | | Date Set | |
| | CCS | | Date Lost | |
| | Fisherman | | Location | |
| | Other | | Depth | |
| | | | Bottom Type | |
| Gear Type: | probable otter trawl gear | | Target Species: | |

<u>Gear Description</u>:    Poly netting - approximately 5 ½" stretch mesh.   Green braided twine.

<u>**Comments:**</u>

<u>**Conclusions:**</u>     **Probable otter trawl gear.**

| **Report By:** | | **John Kenney** | **Date:** | **12/12/03** | **Current Location of Gear** | **NMFS, Allen Harbor** |
|---|---|---|---|---|---|---|

| | |
|---|---|
| NMFS No. | E09-03 |
| Indication of Entanglement | Yes |
| **INITIAL STATUS** | Dead |
| **SUBSEQUENT STATUS (AS OF THE DATE THE NMFS ENTANGLEMENT REPORT IS COMPLETED)** | Dead |
| Date 1st Observed Entangled | 06/06/03 |
| Species | Humpback |
| Individual ID | Unknown |
| Location **1st OBSERVED ENTANGLED** | 1 mile E. of Thimble Shoal Light in Chesapeake Bay mouth, VA |
| Latitude/Longitude **1st OBSERVED ENTANGLED** | 36° 59.79'N    76° 04.66'W |
| Event Description | 06/06/03<br>▪ A moderately decomposed dead floating whale with marks around fluke and caudal peduncle was reported to the Stranding Network.<br>▪ USCG towed carcass to shore and a necropsy was planned for the next day.<br>06/07/03<br>▪ At the necropsy, marks on the ventral fluke and peduncle were documented.<br>▪ A severe trauma injury to the right side of the head was also documented. Hemorrhaging was associated with the area, consistent with pre-mortem injury. |
| Description of Gear on Whale **AS REPORTED** | |
|    **A. DURING INITIAL SIGHTING** | None noted |
|    **B. SUBSEQUENT DESCRIPTIONS**<br><br>   **C. DIAGRAM OF ENTANGLING GEAR ON WHALE** | |
| Description of Wounds/**CONDITION** | |
|    **A. DURING INITIAL SIGHTING** | Multiple healed scars as well as fresh wounds to the ventral fluke and peduncle, some cutting through the blubber layer to the underlying muscle. |
|    **B. SUBSEQUENT DESCRIPTIONS** | |

| NMFS GEAR ANALYSIS | |
|---|---|
| A. Gear Type | Unknown – no gear recovered |
| **B. GEAR PART/LINE TYPE** | |
| **C. LOCATION OF SET** | |
| **D. POTENTIAL POINT OF ENCOUNTER WITH GEAR** | |
| Sighting prior to entanglement | Unknown |
| Re-sightings **POST-ENTANGLEMENT** | None- mortality |
| Life History Information | Juvenile Female, 825 cm in length |
| **NMFS** Serious Injury/Mortality Determination | Pending |

## FISHERY INTERACTION GEAR ANALYSIS

| NMFS No. | E 09 - 03 | | |
|---|---|---|---|
| Field No. | J060603 | Date 1st Observed Entangled | 6-6-03 |
| Location 1st Observed | One NM E. Thimble Shoal Light, Cheasapeake Bay, VA 36° 59.8' N, 76° 4.7' W | Type of Event - Observation, Disentanglement, Stranding. Other (describe) | Carcass |
| Species | humpback | Gear Recovered (y/n) | No |
| Individual ID | Unknown | Gear Analysis Conducted (y/n) | No |

## GEAR DESCRIPTION / ANALYSIS

| Date Gear Retrieved | | Gear Retrieved By | |
|---|---|---|---|
| Date Gear Received | | Received From | |
| Sources: | USCG | Date Set | |
| | CCS | Date Lost | |
| | Fisherman | Location | |
| | Other | Depth | |
| | | Bottom Type | |
| Gear Type: | Unknown - no gear recovered | Target Species: | |

**Gear Description:**

      No gear present.

**Comments:**

**Conclusions:**

      No gear recovered.

| Report By: | John F. Kenney | Date: | 2-3-05 | Current Location of Gear | N.A. |
|---|---|---|---|---|---|

| NMFS No. | E10-03 |
|---|---|
| Indication of Entanglement | Yes |
| **INITIAL STATUS** | Live |
| **SUBSEQUENT STATUS (AS OF THE DATE THE NMFS ENTANGLEMENT REPORT IS COMPLETED)** | Gear Free |
| Date 1st Observed Entangled | 06/23/03 |
| Species | Humpback |
| Individual ID | Tanith |
| Location **1st OBSERVED ENTANGLED** | Stellwagen Bank, ~ 10mi E. of Gloucester, MA |
| Latitude/Longitude **1st OBSERVED ENTANGLED** | 42° 49.04' N    70° 19.14' W |
| Event Description | 06/23/03<br>▪ WW vessel reported an entangled and emaciated humpback whale with her calf.<br>▪ An aerial search to relocate the whale was planned for following day .<br>06/24/03<br>▪ A fishing vessel in the area reported a sighting of Tanith.<br>▪ The Disentanglement Team arrived on the scene and found the entanglement to be more complex than initially believed.<br>▪ The disentanglement effort was considered complete approximately 4 hours later after a large amount of line, buoys and some unknown weighted submerged gear had been removed.<br>▪ The team was not able to remove a single piece of line running through the mouth. This was not believed to be life threatening. |
| Description of Gear on Whale **AS REPORTED**<br><br>**A. DURING INITIAL SIGHTING** | Rope exiting both sides of mouth and trailing aft. Some line trails over right fluke blade, with a potential wrap around tailstock.  More than 100 feet of line trailing.  Two buoys are attached to a separate short length of trailing line, one orange with words, one white with a blue flag. |
| **B. SUBSEQUENT DESCRIPTIONS** | |

| C. DIAGRAM OF ENTANGLING GEAR ON WHALE | |
|---|---|
| Description of Wounds/**CONDITION** | |
| **A. DURING INITIAL SIGHTING** | None noted |
| **B. SUBSEQUENT DESCRIPTIONS** | |
| **NMFS GEAR ANALYSIS** | |
| A. Gear Type | Gillnet & unknown ( 2 Gear Types) |
| **B. GEAR PART/LINE TYPE** | |
| **C. LOCATION OF SET** | |
| **D. POTENTIAL POINT OF ENCOUNTER WITH GEAR** | |
| Sighting prior to entanglement | 10/10/2002 |
| Re-sightings **POST-ENTANGLEMENT** | 8/28/03 |
| Life History Information | Adult female born in 1980.  Her last documented calf, prior to this one, was in 1998. |
| **NMFS** Serious Injury/Mortality Determination | Pending |

# FISHERY INTERACTION GEAR ANALYSIS

| NMFS No. | E 10-03 | | |
|---|---|---|---|
| Field No. | J062303 | Date 1st Observed Entangled | 6/23/03 |
| Location 1st Observed | 15nm NE of Gloucester,  MA 42°49.0' N - 70° 19.1' W | Type of Event - Observation, Disentanglement, Stranding. Other (describe) | Disentanglement |
| Species | Humpback | Gear Recovered (y/n) | Yes |
| Individual ID | Tanith | Gear Analysis Conducted (y/n) | Yes |

# GEAR DESCRIPTION / ANALYSIS

| Date Gear Retrieved | 6/24/03 | Gear Retrieved By | CCS |
|---|---|---|---|
| Date Gear Received | | Received From | CCS |
| Sources: | USCG | Date Set | |
| | CCS | Date Lost | early June |

| | Fisherman | Owner interview | | Location | Platts Bank |
|---|---|---|---|---|---|
| | Other | | | Depth | |
| | | | | Bottom Type | |
| **Gear Type:** | **Gillnet & unknown ( 2 Gear Types)** | | | **Target Species:** | **monkfish & Unknown** |

**Gear Description:**

Recovered gear consisted of a pvc buoy stick ~ 9'long with a 9" x 15" float and sash weight. One fm 7/16" poly-dac at the buoy attached to a 3fm length of 5/16" poly. Approximately 4 fm of sinking rope leads form a  9" x 15" toggle to 16 fm of poly.  A green 'buoyline mark' was present about 4 fm below the toggle buoy.  An additional 9 fm of rope appears to be unrelated to this gear.

**Comments:**

The owner of some of the gear was identified and interviewed (6/26/03,J.Higgins).  Target species was monkfish and the gear was fished in 15 net strings.  The owner believed the gear to have been set in early June on Platts Bank, GOM.   The 9 fm or unrelated rope may have been associated with a buoy sighted the  day before the disentanglement but not present at the time of the disentanglement.

**Conclusions:**

The gear recovered and identified was sink gillnet gear set on Platts Bank targeting monkfish. Other unidentified rope was also recovered.

| **Report By:** | **John Kenney** | **Date:** | **12/12/03** | **Current Location of Gear** | **NMFS,   Allen Harbor** |
|---|---|---|---|---|---|

| NMFS No. | E11-03 |
| --- | --- |
| Indication of Entanglement | Yes |
| **INITIAL STATUS** | Dead |
| **SUBSEQUENT STATUS (AS OF THE DATE THE NMFS ENTANGLEMENT REPORT IS COMPLETED)** | Dead |
| Date 1st Observed Entangled | 06/28/03 |
| Species | Minke |
| Individual ID | Unknown |
| Location **1st OBSERVED ENTANGLED** | Outside harbor entrance, Chatham, MA |
| Latitude/Longitude **1st OBSERVED ENTANGLED** | 41° 39.63' N        69° 55.00' W |
| Event Description | 06/28/03<br>▪ An entangled and floating dead whale was reported to the USCG by a recreational boater.<br>▪ The boater did not stand by.<br>▪ The harbormaster ran a grid search by boat and relocated the carcass.<br>▪ With USCG and the harbormaster on site, the gear and carcass were documented.<br>▪ The carcass was disentangled and set adrift.<br>▪ Descriptions from the scene report that the carcass was fairly fresh and had appeared anchored by the entangling gear.<br>07/01/03<br>▪ A carcass, believed to be the same whale, washed ashore at the southernmost end of South Monomoy Island.<br>▪ Due to the remote location of the carcass, the exam was delayed until following day.<br>07/02/03<br>▪ Carcass was examined and photo documented by the stranding network. |
| Description of Gear on Whale **AS REPORTED**<br><br>    **A. DURING INITIAL SIGHTING** | The carcass was reportedly wrapped in black nylon line (reported to be lobster trawl warp) through mouth, around belly, flippers and hanging off flukes. |
| **B. SUBSEQUENT DESCRIPTIONS** | |

| C. DIAGRAM OF ENTANGLING GEAR ON WHALE | |
|---|---|
| Description of Wounds/**CONDITION**<br><br>**A. DURING INITIAL SIGHTING** | Possible large-scale laceration at the right gape of the jaw. |
| **B. SUBSEQUENT DESCRIPTIONS** | |
| **NMFS GEAR ANALYSIS** | |
| A. Gear Type | Lobster |
| **B. GEAR PART/LINE TYPE** | |
| **C. LOCATION OF SET** | |
| **D. POTENTIAL POINT OF ENCOUNTER WITH GEAR** | |
| Sighting prior to entanglement | Unknown |
| Re-sightings **POST-ENTANGLEMENT** | None - mortality |
| Life History Information | Male, 512cm total length |
| **NMFS** Serious Injury/Mortality Determination | Pending |

## FISHERY INTERACTION GEAR ANALYSIS

| NMFS No. | **E 11 - 03** | | |
|---|---|---|---|
| **Field No.** | **J062803** | **Date 1st Observed Entangled** | **6-28-03** |
| **Location 1st Observed** | **Outside Chatham Hbr, Cape Cod, MA 41° 39.6' N, 69° 55.0' W** | **Type of Event - Observation, Disentanglement, Stranding. Other (describe)** | **Carcass** |
| **Species** | **Minke** | **Gear Recovered (y/n)** | **No** |
| **Individual ID** | **Unknown** | **Gear Analysis Conducted (y/n)** | **No** |

## GEAR DESCRIPTION / ANALYSIS

| Date Gear Retrieved | | | Gear Retrieved By | |
|---|---|---|---|---|
| Date Gear Received | | | Received From | |
| Sources: | USCG | | Date Set | |
| | CCS | | Date Lost | |
| | Fisherman | | Location | |
| | Other | Chatham Hbr. Master | Depth | |

|  |  | Bottom Type |  |
|---|---|---|---|
| **Gear Type:** | Lobster | **Target Species:** | Lobster |

**Gear Description:**

**Comments:**

       Based on information from the Chatham Harbor Master describing the gear as "lobster pots/lobster trawl" and the statement that they "hauled up two pots during the event" it seems safe to conclude that it is lobster gear.

**Conclusions:**

       Based on information from the Chatham Harbor Masters office it is concluded this was lobster gear.

| **Report By:** | **John F. Kenney** | **Date:** | **2-10-05** | **Current Location of Gear** | **N.A.** |
|---|---|---|---|---|---|

| | |
|---|---|
| NMFS No. | E12-03 |
| Indication of Entanglement | Yes |
| **INITIAL STATUS** | Live |
| **SUBSEQUENT STATUS (AS OF THE DATE THE NMFS ENTANGLEMENT REPORT IS COMPLETED)** | Gear-free |
| Date 1st Observed Entangled | 07/01/03 |
| Species | Humpback |
| Individual ID | Unknown |
| Location **1st OBSERVED ENTANGLED** | 4.5 NM E. of Chatham, MA |
| Latitude/Longitude **1st OBSERVED ENTANGLED** | 41° 40.8' N    69° 51.107' W |
| Event Description | 07/01/03<br>▪ A commercial fishing vessel reports an entangled humpback whale.<br>▪ The Disentanglement Team arrived at the scene and were able to grapple the trailing line forward of the tangle.<br>▪ As the whale was held near surface, the single tail wrap was cut and remaining line slipped free. |
| Description of Gear on Whale **AS REPORTED**<br><br>    **A. DURING INITIAL SIGHTING**<br><br>    **B. SUBSEQUENT DESCRIPTIONS**<br><br>    **C. DIAGRAM OF ENTANGLING GEAR ON WHALE** | Single wrap of line running back to a tangle of line, followed by a small buoy approximately 25 feet aft of the flukes. |



| Description of Wounds/**CONDITION** | |
|---|---|
| **A. DURING INITIAL SIGHTING** | Tailstock and flukes heavily scarred with loop of rope cutting in on the leading edge of each fluke. |
| **B. SUBSEQUENT DESCRIPTIONS** | |
| **NMFS GEAR ANALYSIS** | Unknown |
| A. Gear Type | |
| **B. GEAR PART/LINE TYPE** | |
| **C. LOCATION OF SET** | |
| **D. POTENTIAL POINT OF ENCOUNTER WITH GEAR** | |
| Sighting prior to entanglement | Unknown |
| Re-sightings **POST-ENTANGLEMENT** | Unknown – animal not resighted |
| Life History Information | Approximately 40 ft in length |
| **NMFS** Serious Injury/Mortality Determination | Pending |

# FISHERY INTERACTION GEAR ANALYSIS

| NMFS No. | E 12 - 03 | | |
|---|---|---|---|
| **Field No.** | **J070103HB** | **Date 1st Observed Entangled** | **7/1/03** |
| **Location 1st Observed** | **4 ½ NM East of Chatham, Cape Cod, MA 41°40.8' N - 69° 51.1' W** | **Type of Event - Observation, Disentanglement, Stranding. Other (describe)** | **Disentanglement** |
| **Species** | **Humpback** | **Gear Recovered (y/n)** | **Yes** |
| **Individual ID** | **Unknown** | **Gear Analysis Conducted (y/n)** | **Yes** |

# GEAR DESCRIPTION / ANALYSIS

| Date Gear Retrieved | | 7/1/03 | Gear Retrieved By | CCS |
|---|---|---|---|---|
| **Date Gear Received** | | | **Received From** | **CCS** |
| **Sources:** | **USCG** | | **Date Set** | |
| | **CCS** | | **Date Lost** | |
| | **Fisherman** | | **Location** | |
| | **Other** | | **Depth** | |

| | | Bottom Type | |
|---|---|---|---|
| Gear Type: | Unknown | Target Species: | |

**Gear Description:**

     8" plastic trawl can.  Into one eye was fastened a 4 ft piece of ½" poly line.  Into the other eye was tied approximately 40 fm of 5/16" poly line.  The trawl can appears to be painted off white.

**Comments:**

     This does not appear to be fixed commercial fishing gear.

**Conclusions:**

     This does not appear to be fixed commercial fishing gear.

| Report By: | John Kenney | Date: | 01/30/04 | Current Location of Gear | NMFS, Allen Harbor |
|---|---|---|---|---|---|

| NMFS No. | E13-03 |
|---|---|
| Indication of Entanglement | No |
| **INITIAL STATUS** | Live |
| **SUBSEQUENT STATUS (AS OF THE DATE THE NMFS ENTANGLEMENT REPORT IS COMPLETED)** | Remains entangled |
| Date 1st Observed Entangled | 07/02/03 |
| Species | Humpback (probable) |
| Individual ID | Unknown |
| Location **1st OBSERVED ENTANGLED** | 52 NM SE of Portland, ME; ~10 NM SE of Platt's Bank |
| Latitude/Longitude **1st OBSERVED ENTANGLED** | 43° 02.5' N    69° 21.7' W |
| Event Description | 07/02/03<br>▪ A report of a humpback whale with rope and net on its head was reported to NOAA from a fishing vessel via a third party.<br>▪ Whale reported to be free swimming and with approximately 50 other whales.<br>▪ No response launched due to travel distance to site, the whale's ability to swim free and the low likelihood of relocating the entangled individual in such a large group.<br>▪ This entanglement is considered unverifiable due to the third party nature of the report and the inability to interview the original reporters for further details. |
| Description of Gear on Whale **AS REPORTED**<br><br>    **A. DURING INITIAL SIGHTING** | Rope and net on head |
|     **B. SUBSEQUENT DESCRIPTIONS**<br><br>    **C. DIAGRAM OF ENTANGLING GEAR ON WHALE** | |
| Description of Wounds/**CONDITION**<br><br>    **A. DURING INITIAL SIGHTING**<br><br>    **B. SUBSEQUENT** | None noted |

| DESCRIPTIONS | |
|---|---|
| **NMFS GEAR ANALYSIS** | Unknown – no gear recovered |
| A. Gear Type | |
| **B. GEAR PART/LINE TYPE** | |
| **C. LOCATION OF SET** | |
| **D. POTENTIAL POINT OF ENCOUNTER WITH GEAR** | |
| Sighting prior to entanglement | Unknown |
| Re-sightings **POST-ENTANGLEMENT** | Unknown - animal not resighted |
| Life History Information | Unknown |
| **NMFS** Serious Injury/Mortality Determination | Pending |

# FISHERY INTERACTION GEAR ANALYSIS

| NMFS No. | E 13 - 03 | | |
|---|---|---|---|
| Field No. | J070203 | Date 1st Observed Entangled | 7-2-03 |
| Location 1st Observed | 52 NM SE of Portland, ME ~10 NM SE of Platt's Bank 43° 2.5' N, 69° 21.7' W | Type of Event - Observation, Disentanglement, Stranding. Other (describe) | Observation |
| Species | humpback | Gear Recovered (y/n) | No |
| Individual ID | Unknown | Gear Analysis Conducted (y/n) | No |

# GEAR DESCRIPTION / ANALYSIS

| Date Gear Retrieved | | | Gear Retrieved By | |
|---|---|---|---|---|
| Date Gear Received | | | Received From | |
| Sources: | USCG | | Date Set | |
| | CCS | | Date Lost | |
| | Fisherman | | Location | |
| | Other | | Depth | |
| | | | Bottom Type | |
| Gear Type: | Unknown - no gear recovered | | Target Species: | |

**Gear Description:**

**Comments:**

**Conclusions:**

      **No gear recovered.**

| Report By: | John F. Kenney | Date: | 2-3-05 | Current Location of Gear | N.A. |
|---|---|---|---|---|---|

| NMFS No. | E14-03 |
|---|---|
| Indication of Entanglement | Yes |
| **INITIAL STATUS** | Live |
| **SUBSEQUENT STATUS (AS OF THE DATE THE NMFS ENTANGLEMENT REPORT IS COMPLETED)** | Gear free |
| Date 1st Observed Entangled | 07/03/03 |
| Species | Humpback |
| Individual ID | Hat Trick |
| Location **1st OBSERVED ENTANGLED** | Georges Bank, 135 NM ESE of Race Point, Cape Cod, MA |
| Latitude/Longitude **1st OBSERVED ENTANGLED** | 41° 29.8' N    67° 22.8' W |
| Event Description | 07/03/03<br>▪ A NOAA aerial survey plane reported an entangled humpback whale.<br>▪ The whale was reportedly hanging vertically in the water and breathing little.<br>▪ The location of the entangled whale was outside the normal First Response operational range for humpbacks, so no on-scene response was mounted.<br>07/09/03<br>▪ A private boater reported an entangled humpback off Chatham, MA.<br>▪ No injuries were apparent but whale was reportedly towing two buoys from its tail, one red and one orange.<br>▪ CCS team, with assistance from the private vessel and the Chatham harbormaster were able to successfully attach a satellite/VHF-transmitting buoy to the trailing gear.<br>07/10/03<br>▪ CCS team re-located the whale and the team removed and recovered all entangling lines. |
| Description of Gear on Whale **AS REPORTED**<br><br>**A. DURING INITIAL SIGHTING**<br><br>**B. SUBSEQUENT DESCRIPTIONS**<br><br>**C. DIAGRAM OF ENTANGLING GEAR ON WHALE** | Two buoys being towed from the tail, one red and the other orange. |

| Description of Wounds/**CONDITION** | |
|---|---|
| **A. DURING INITIAL SIGHTING** | None noted |
| **B. SUBSEQUENT DESCRIPTIONS** | |
| **NMFS GEAR ANALYSIS** | Pot related gear |
| A. Gear Type | |
| **B. GEAR PART/LINE TYPE** | |
| **C. LOCATION OF SET** | |
| **D. POTENTIAL POINT OF ENCOUNTER WITH GEAR** | |
| Sighting prior to entanglement | Unknown |
| Re-sightings **POST-ENTANGLEMENT** | 7/30/03 9/24/04 |
| Life History Information | Approximately 30-35 ft in length |
| **NMFS** Serious Injury/Mortality Determination | Pending |

## FISHERY INTERACTION GEAR ANALYSIS

| NMFS No. | E 14 - 03 | | |
|---|---|---|---|
| Field No. | J070303 | Date 1st Observed Entangled | 7-3-03 |
| Location 1st Observed | 135 NM ESE of Race Pt., Cape Cod, Georges Bank 41° 29.8' N, 67° 22.8' W | Type of Event - Observation, Disentanglement, Stranding. Other (describe) | Obs. 7/3/03 Tagged 7/9/03 Disent. 7/10/03 |
| Species | humpback | Gear Recovered (y/n) | Yes |
| Individual ID | Unknown | Gear Analysis Conducted (y/n) | Yes |

## GEAR DESCRIPTION / ANALYSIS

| Date Gear Retrieved | | 7/10/03 | Gear Retrieved By | CCS |
|---|---|---|---|---|
| Date Gear Received | | | Received From | CCS |
| Sources: | USCG | | Date Set | |
| | CCS | | Date Lost | |
| | Fisherman | | Location | |

| | Other | | Depth | |
|---|---|---|---|---|
| | | | Bottom Type | |
| Gear Type: | Pot related | | Target Species: | Unknown |

**Gear Description**:

Two low drag type scan floats with a total of approximately 166 fathoms of 7/16" & ½" line.  A "G Hook" is located 70 fm below the surface system on an 18" gangion and several remnants of what look like gangions are present further below.

**Comments**:

The scan floats have markings on them but we have not been able to identify or interview the owner.

**Conclusions**:

Based on what appear to be the remains of gangions it is concluded that this is from pot related gear.

| Report By: | John F. Kenney | Date: | 2-3-05 | Current Location of Gear | NNFS, Allen Harbor |
|---|---|---|---|---|---|

| | |
|---|---|
| NMFS No. | E15-03 |
| Indication of Entanglement | Yes |
| **INITIAL STATUS** | Live |
| **SUBSEQUENT STATUS (AS OF THE DATE THE NMFS ENTANGLEMENT REPORT IS COMPLETED)** | Gear free |
| Date 1st Observed Entangled | 07/09/03 |
| Species | Right |
| Individual ID | Unknown |
| Location **1st OBSERVED ENTANGLED** | 2 NM E. of Head Harbor Lighthouse, Campobello, New Brunswick, Canada |
| Latitude/Longitude **1st OBSERVED ENTANGLED** | 44° 58.04' N    66° 50.71' W |
| Event Description | 07/09/03<br>▪ An entangled right whale was reported.<br>▪ The Head Harbor Lighthouse team assessed and satellite/VHF tagged the whale.<br>▪ The whale was heavily entangled, with lines cutting in, and the overall condition of the whale was considered poor.<br>▪ After consultations, the team responded and removed all the entangling gear. |
| Description of Gear on Whale **AS REPORTED**<br><br>**A. DURING INITIAL SIGHTING** | Lines possibly from two separate entanglements. This included a heavy monofilament line wrapped tightly around and cutting into the tailstock and, a lobster-type buoy (blue in the middle and red on each end). Rope wound around tail multiple times and trap dragging. |
| **B. SUBSEQUENT DESCRIPTIONS**<br><br>**C. DIAGRAM OF ENTANGLING GEAR ON WHALE** | |
| Description of Wounds/**CONDITION**<br><br>**A. DURING INITIAL SIGHTING**<br><br>**B. SUBSEQUENT DESCRIPTIONS** | Lines cutting in |

| NMFS GEAR ANALYSIS | |
|---|---|
| A. Gear Type | 2 gear types present: lobster gear and unknown type |
| **B. GEAR PART/LINE TYPE** | |
| **C. LOCATION OF SET** | |
| **D. POTENTIAL POINT OF ENCOUNTER WITH GEAR** | |
| Sighting prior to entanglement | Unknown |
| Re-sightings **POST-ENTANGLEMENT** | Unknown – animal not resighted |
| Life History Information | Unknown |
| **NMFS** Serious Injury/Mortality Determination | Pending |

# FISHERY INTERACTION GEAR ANALYSIS

| NMFS No. | E 15 - 03 | | |
|---|---|---|---|
| Field No. | J070903rw | Date 1st Observed Entangled | 07/09/03 |
| Location 1st Observed | 2 NM E. Head Harbor, Campobello I.  B.O.F. 44 ° 58 ' N   66 ° 50 ' W | Type of Event - Observation, Disentanglement, Stranding. Other (describe) | disentanglement |
| Species | Right Whale | Gear Recovered (y/n) | Yes |
| Individual ID | unknown | Gear Analysis Conducted (y/n) | Yes |

# GEAR DESCRIPTION / ANALYSIS

| Date Gear Retrieved | | 07/09/03 | Gear Retrieved By | CWR Team |
|---|---|---|---|---|
| Date Gear Received | | | Received From | CWR Team |
| Sources: | USCG | | Date Set | |
| | CCS | | Date Lost | |
| | Fisherman | owner interviewed | Location | |
| | Other | CWR Team | Depth | |
| | | | Bottom Type | |
| Gear Type: | Lobster  &  Other unknown | | Target Species: | Lobster  & Unknown |

**Gear Description:**

Gear removed included a buoy, buoyline and lobster trap as well as some very heavy gage monofilament (~ 5/16" dia.).  Gear recovered included surface buoy equipped with 600-pound weak link approximately 7 fathoms of 7/16' sink rope.  The trap was not recovered, nor was any of the monofilament recovered.  Markings on the buoy led to the identification of its owner.

**Comments:**

It is the opinion of the primary disentangler that the lobster gear was of a secondary nature with the monofilament being the primary entanglement.  The monofilament was embedded in the flesh and difficult to release while the lobster buoy line was easily cut and dropped off the animal.  Based on an interview of the owner of the lobster gear (7/16/03, NMFS) it was learned that the gear had been originally set at a location approximately 100 NM west of the disentanglement site.

**Conclusions:**     Two types of gear were involved with this entanglement: heavy monofilament of unknown origin and lobster gear.  The monofilament is suspected as the initial/primary entanglement gear while the lobster gear was probably picked up later.

| Report By: | | J. F. Kenney | Date: | 12-17-03 | Current Location of Gear | Allen Harbor Field Station |
|---|---|---|---|---|---|---|

| NMFS No. | E16-03 |
|---|---|
| Indication of Entanglement | Yes |
| **INITIAL STATUS** | Live |
| **SUBSEQUENT STATUS (AS OF THE DATE THE NMFS ENTANGLEMENT REPORT IS COMPLETED)** | Remains entangled |
| Date 1st Observed Entangled | 07/09/03 |
| Species | Humpback |
| Individual ID | Calf of Shockwave |
| Location **1st OBSERVED ENTANGLED** | 6.7 NM W. of Brier Island, Nova Scotia |
| Latitude/Longitude **1st OBSERVED ENTANGLED** | 44° 17.3' N     66° 26.2' W |
| Event Description | 07/09/03<br>▪ WW vessel reported an entangled humpback calf.<br>▪ The calf was swimming with its mother and gave no indication of being in distress.<br>▪ The calf was entangled with line around the peduncle and trailing with a high flyer.<br>07/10/03<br>▪ The mother and calf were resighted by researcher.<br>▪ The calf was still entangled and reported to have at least two wraps of rope around the tailstock.<br>▪ Photographs documented the entanglement. |
| Description of Gear on Whale **AS REPORTED**<br><br>**A. DURING INITIAL SIGHTING** | Single wrap of line around the peduncle. Approximately 100 fathoms of tangled trailing line and a high flyer. |
| **B. SUBSEQUENT DESCRIPTIONS**<br><br>**C. DIAGRAM OF ENTANGLING GEAR ON WHALE** | 7/10/03<br><br>Reported as two wraps of rope around the tailstock. |
| Description of Wounds/**CONDITION**<br><br>**A. DURING INITIAL SIGHTING**<br><br>**B. SUBSEQUENT DESCRIPTIONS** | None noted |

| NMFS GEAR ANALYSIS | Unknown – no gear recovered |
|---|---|
| A. Gear Type | |
| **B. GEAR PART/LINE TYPE** | |
| **C. LOCATION OF SET** | |
| **D. POTENTIAL POINT OF ENCOUNTER WITH GEAR** | |
| Sighting prior to entanglement | None |
| Re-sightings **POST-ENTANGLEMENT** | Unknown – animal not resighted |
| Life History Information | Calf of Shockwave |
| **NMFS** Serious Injury/Mortality Determination | Pending |

## FISHERY INTERACTION GEAR ANALYSIS

| NMFS No. | E 16 - 03 | | |
|---|---|---|---|
| Field No. | J070903hw | Date 1st Observed Entangled | 7-9-03 |
| Location 1st Observed | 7 NM West of Brier Island, BOF, Nova Scotia 44° 17.3' N, 66° 26.2' W | Type of Event - Observation, Disentanglement, Stranding. Other (describe) | Observation |
| Species | humpback | Gear Recovered (y/n) | No |
| Individual ID | Unknown (calf of Shockwave) | Gear Analysis Conducted (y/n) | No |

## GEAR DESCRIPTION / ANALYSIS

| Date Gear Retrieved | | Gear Retrieved By | |
|---|---|---|---|
| Date Gear Received | | Received From | |
| Sources: | USCG | Date Set | |
| | CCS | Date Lost | |
| | Fisherman | Location | |
| | Other | Depth | |
| | | Bottom Type | |
| Gear Type: | Unknown - no gear recovered | Target Species: | |

**<u>Gear Description</u>:**

**<u>Comments</u>:**

**<u>Conclusions</u>:**

> **No gear recovered.**

| Report By: | John F. Kenney | Date: | 2-3-05 | Current Location of Gear | N.A. |
|---|---|---|---|---|---|

| | |
|---|---|
| NMFS No. | E17-03 |
| Indication of Entanglement | Yes |
| **INITIAL STATUS** | Live |
| **SUBSEQUENT STATUS (AS OF THE DATE THE NMFS ENTANGLEMENT REPORT IS COMPLETED)** | Gear free |
| Date 1st Observed Entangled | 07/11/03 |
| Species | Humpback |
| Individual ID | Barb |
| Location **1st OBSERVED ENTANGLED** | SW Stellwagen Bank: 9 NM NW of Race Point, Cape Cod, MA |
| Latitude/Longitude **1st OBSERVED ENTANGLED** | 42° 11.6'N    70° 22.2' W |
| Event Description | 07/11/03<br>▪ WW vessel reported an entangled humpback whale.<br>▪ Shortly after initial sighting, the whale was lost in the fog.<br>07/13/03<br>▪ The whale is identified as Barb from photos taken on 07/11/03. |
| Description of Gear on Whale **AS REPORTED**<br><br>**A. DURING INITIAL SIGHTING** | Red rope crossing whale's back, aft of the flippers.  No trailing line, nor point of attachment reported. |
| **B. SUBSEQUENT DESCRIPTIONS**<br><br><br>**C. DIAGRAM OF ENTANGLING GEAR ON WHALE** | 07/30/03<br>▪ In the previous days, the whale had been sighted and photo documented several times.<br>▪ Photographs document that whale is gear free. |
| Description of Wounds/**CONDITION**<br><br>**A. DURING INITIAL SIGHTING**<br><br><br>**B. SUBSEQUENT DESCRIPTIONS** | None noted |

| NMFS GEAR ANALYSIS | |
|---|---|
| A. Gear Type | Unknown – no gear recovered |
| **B. GEAR PART/LINE TYPE** | |
| **C. LOCATION OF SET** | |
| **D. POTENTIAL POINT OF ENCOUNTER WITH GEAR** | |
| Sighting prior to entanglement | 5/20/03:Jeffreys Ledge<br>6/28/03 |
| Re-sightings **POST-ENTANGLEMENT** | 7/27/03<br>8/29/04 |
| Life History Information | Adult Male |
| **NMFS** Serious Injury/Mortality Determination | Pending |

## FISHERY INTERACTION GEAR ANALYSIS

| NMFS No. | E 17 - 03 | | |
|---|---|---|---|
| Field No. | J071103 | Date 1st Observed Entangled | 7-11-03 |
| Location 1st Observed | 9 NM NW Race Pt., S.W. Stellwagen Bank, Mass Bay 42° 11.6' N, 70° 22.2' W | Type of Event - Observation, Disentanglement, Stranding. Other (describe) | Observation |
| Species | humpback | Gear Recovered (y/n) | No |
| Individual ID | Barb | Gear Analysis Conducted (y/n) | No |

## GEAR DESCRIPTION / ANALYSIS

| Date Gear Retrieved | | | Gear Retrieved By | |
|---|---|---|---|---|
| Date Gear Received | | | Received From | |
| Sources: | USCG | | Date Set | |
| | CCS | | Date Lost | |
| | Fisherman | | Location | |
| | Other | | Depth | |
| | | | Bottom Type | |
| Gear Type: | Unknown - no gear recovered | | Target Species: | |

**Gear Description:**

**Comments:**

**Conclusions:**

No gear recovered.

| Report By: | John F. Kenney | Date: | 2-3-05 | Current Location of Gear | N.A. |
|---|---|---|---|---|---|

| NMFS No. | E18-03 |
|---|---|
| Indication of Entanglement | Yes |
| **INITIAL STATUS** | Live |
| **SUBSEQUENT STATUS (AS OF THE DATE THE NMFS ENTANGLEMENT REPORT IS COMPLETED)** | Remains entangled |
| Date 1st Observed Entangled | 07/12/03 |
| Species | Humpback |
| Individual ID | Unknown |
| Location **1st OBSERVED ENTANGLED** | ½ mile off the beach, Oregon Inlet, NC |
| Latitude/Longitude **1st OBSERVED ENTANGLED** | 35° 46.8' N      75° 31.8' W |
| Event Description | 07/12/03<br>▪ NMFS reported an entangled humpback, swimming slowly at 1400 hrs.<br>▪ The whale was tracked from shore using a spotting scope, and was seen to swim slowly.<br>▪ The whale was swimming low in the water and did not show much of its body above the surface.<br>▪ USCG arrived on scene in 47' vessel but were unable to get near the whale due to shallow water and breakers.<br>▪ A kayaker was able to paddle near the whale and describe the gear on the animal.<br>▪ Weather was deteriorating and seas were building.<br>▪ Spotter on shore was able to track the animal until 15:45 when whale was lost. |
| Description of Gear on Whale **AS REPORTED**<br><br>   **A. DURING INITIAL SIGHTING** | A buoy near the whale's head and trailing gear including a wooden log. |
|    **B. SUBSEQUENT DESCRIPTIONS**<br><br>   **C. DIAGRAM OF ENTANGLING GEAR ON WHALE** | |
| Description of Wounds/**CONDITION**<br><br>   **A. DURING INITIAL SIGHTING** | None noted |
|    **B. SUBSEQUENT DESCRIPTIONS** | |

| | |
|---|---|
| **NMFS GEAR ANALYSIS** | Unknown – no gear recovered |
| A. Gear Type | |
| **B. GEAR PART/LINE TYPE** | |
| **C. LOCATION OF SET** | |
| **D. POTENTIAL POINT OF ENCOUNTER WITH GEAR** | |
| Sighting prior to entanglement | Unknown |
| Re-sightings **POST-ENTANGLEMENT** | Unknown – animal not resighted |
| Life History Information | Unknown |
| **NMFS** Serious Injury/Mortality Determination | Pending |

# FISHERY INTERACTION GEAR ANALYSIS

| NMFS No. | E 18 - 03 | | |
|---|---|---|---|
| Field No. | J071203 | Date 1st Observed Entangled | 7-12-03 |
| Location 1st Observed | ½ NM off the beach, Oregon Inlet, NC 35° 46.8' N, 75° 31.8' W | Type of Event - Observation, Disentanglement, Stranding. Other (describe) | Observation |
| Species | humpback | Gear Recovered (y/n) | No |
| Individual ID | Unknown | Gear Analysis Conducted (y/n) | No |

# GEAR DESCRIPTION / ANALYSIS

| Date Gear Retrieved | | Gear Retrieved By | |
|---|---|---|---|
| Date Gear Received | | Received From | |
| Sources: | USCG | Date Set | |
| | CCS | Date Lost | |
| | Fisherman | Location | |
| | Other | Depth | |
| | | Bottom Type | |
| Gear Type: | Unknown - no gear recovered | Target Species: | |

**Gear Description:**

**Comments:**

**Conclusions:**

No gear recovered.

| Report By: | John F. Kenney | Date: | 2-4-05 | Current Location of Gear | N.A. |
|---|---|---|---|---|---|

| | |
|---|---|
| NMFS No. | E19-03 |
| Indication of Entanglement | Yes |
| **INITIAL STATUS** | Live |
| **SUBSEQUENT STATUS (AS OF THE DATE THE NMFS ENTANGLEMENT REPORT IS COMPLETED)** | Gear free |
| Date 1st Observed Entangled | 07/14/03 |
| Species | Humpback |
| Individual ID | Ravine |
| Location **1st OBSERVED ENTANGLED** | SE Stellwagen Bank; 8NM NNE of Race Point, Cape Cod, MA |
| Latitude/Longitude **1st OBSERVED ENTANGLED** | 42° 10.8' N    70° 08.6' W |
| Event Description | 07/14/03<br>▪ WW vessel reported an entangled humpback whale.<br>▪ The Disentanglement Team arrived at the scene and attached a control line with a small buoy to the trailing gear.<br>▪ The disentanglement was difficult, due to the whale's continued attempts to dive, and resulting in two cuts to the inflatable which decreased its maneuverability.<br>▪ Despite the difficult circumstances, the team was able to remove all gear. |
| Description of Gear on Whale **AS REPORTED**<br><br>**A. DURING INITIAL SIGHTING**<br><br>**B. SUBSEQUENT DESCRIPTIONS**<br><br>**C. DIAGRAM OF ENTANGLING GEAR ON WHALE** | Buoy trailing eight feet behind flukes, line wrapped tightly around the tailstock and imbedded. |
| Description of Wounds/**CONDITION**<br><br>**A. DURING INITIAL SIGHTING**<br><br>**B. SUBSEQUENT DESCRIPTIONS** | Line cutting into the tail stock |

| NMFS GEAR ANALYSIS | |
|---|---|
| A. Gear Type | Lobster Gear |
| **B. GEAR PART/LINE TYPE** | |
| **C. LOCATION OF SET** | |
| **D. POTENTIAL POINT OF ENCOUNTER WITH GEAR** | |
| Sighting prior to entanglement | 5/10/03 off Race Point, Cape Cod |
| Re-sightings **POST-ENTANGLEMENT** | 7/18/03: Seen East of Stellwagen Bank, Feeding with other humpbacks.<br>7/9/04 |
| Life History Information | Female first seen in 2000. |
| **NMFS** Serious Injury/Mortality Determination | Pending |

## FISHERY INTERACTION GEAR ANALYSIS

| NMFS No. | E 19 - 03 | | |
|---|---|---|---|
| Field No. | J071403hw | Date 1st Observed Entangled | 7/14/03 |
| Location 1st Observed | 8 NM NNE Race Point, Cape Cod, MA, 42° 10.8' N, 70° 8.6' W | Type of Event - Observation, Disentanglement, Stranding. Other (describe) | Disentanglement |
| Species | Humpback | Gear Recovered (y/n) | Yes |
| Individual ID | Ravine | Gear Analysis Conducted (y/n) | Yes |

## GEAR DESCRIPTION / ANALYSIS

| Date Gear Retrieved | | 7/14/03 | Gear Retrieved By | CCS |
|---|---|---|---|---|
| Date Gear Received | | | Received From | CCS |
| Sources: | USCG | | Date Set | |
| | CCS | | Date Lost | |
| | Fisherman | Owner interview | Location | |
| | Other | | Depth | |
| | | | Bottom Type | |
| Gear Type: | | Lobster gear | Target Species: | Lobster |

**Gear Description:   Green & white buoy on a 3" plastic stick with 40 ft 5/16" sink rope attached to 20 ft 5/16" floating rope that terminates at a bridle.**

**Comments:**

**          The owner of the gear is not able to determine where or when it was lost.  He fishes singles, doubles and 15 trap trawls.**

**Conclusions:     Lobster gear.**

| **Report By:** | **John Kenney** | **Date:** | **1/30/04** | **Current Location of Gear** | **NMFS,  Allen Harbor** |
|---|---|---|---|---|---|

| NMFS No. | E20-03 |
|---|---|
| Indication of Entanglement | Yes |
| **INITIAL STATUS** | Live |
| **SUBSEQUENT STATUS (AS OF THE DATE THE NMFS ENTANGLEMENT REPORT IS COMPLETED)** | Remains entangled |
| Date 1st Observed Entangled | 07/24/03 |
| Species | Humpback |
| Individual ID | Unknown |
| Location **1st OBSERVED ENTANGLED** | 1 mile off beach at Fenwick Island, DE/MD border |
| Latitude/Longitude **1st OBSERVED ENTANGLED** | **38° 27.4'N      75° 02.5'W** |
| Event Description | 07/24/03<br>▪ An entangled whale sighted from the beach at Fenwick Island State Park.<br>▪ The whale was tracked south by USCG.<br>▪ The Stranding Network and NMFS responded aboard a USCG vessel.  The team successfully attached a telemetry buoy and removed an acorn buoy and scan float that were trailing behind the whale.<br>▪ Approximately 1 1/2 hrs after the telemetry buoy had been attached, a citizen found it washed ashore.  The line appeared to have been cleanly cut, approximately 3 ft from the buoy. |
| Description of Gear on Whale **AS REPORTED**<br><br>**A. DURING INITIAL SIGHTING** | Heavy yellow poly line trailing approximately 100 ft behind the flukes.  Attached to line was an A3 scan float and from that a smaller diameter piece of nylon with an acorn buoy. |
| **B. SUBSEQUENT DESCRIPTIONS**<br><br>**C. DIAGRAM OF ENTANGLING GEAR ON WHALE** | |
| Description of Wounds/**CONDITION**<br><br>**A. DURING INITIAL SIGHTING**<br><br>**B. SUBSEQUENT DESCRIPTIONS** | None noted |

| NMFS GEAR ANALYSIS | |
|---|---|
| A. Gear Type | Unknown |
| **B. GEAR PART/LINE TYPE** | |
| **C. LOCATION OF SET** | |
| **D. POTENTIAL POINT OF ENCOUNTER WITH GEAR** | |
| Sighting prior to entanglement | Unknown |
| Re-sightings **POST-ENTANGLEMENT** | Unknown – animal not resighted |
| Life History Information | Apparent juvenile, approximately 35 ft in length |
| **NMFS** Serious Injury/Mortality Determination | Pending |

## FISHERY INTERACTION GEAR ANALYSIS

| NMFS No. | E 20 - 03 | | |
|---|---|---|---|
| Field No. | J072403HB | Date 1st Observed Entangled | 7/24/03 |
| Location 1st Observed | 1 NM off beach, Fenwick I. DE / MD border 38° 27.4' N, 75° 2.5' W | Type of Event - Observation, Disentanglement, Stranding. Other (describe) | Partial disentanglement, tagged |
| Species | Humpback | Gear Recovered (y/n) | Yes |
| Individual ID | Unknown | Gear Analysis Conducted (y/n) | Yes |

## GEAR DESCRIPTION / ANALYSIS

| Date Gear Retrieved | | 7/24/03 | Gear Retrieved By | NMFS |
|---|---|---|---|---|
| Date Gear Received | | | Received From | NMFS |
| Sources: | USCG | | Date Set | |
| | CCS | | Date Lost | |
| | Fisherman | | Location | |
| | Other | | Depth | |
| | | | Bottom Type | |
| Gear Type: | Unknown | | Target Species: | |

**Gear Description:**

A-3 poly ball rigged to 5/8" poly.  Also attached to the poly ball with an 8 ft length of sinking rope is a small acorn float.  No markings present on the buoys.

**Comments:**

**Conclusions:**

Origin unknown.

| Report By: | John Kenney | Date: | 8/10/03 | Current Location of Gear | NMFS, Allen Harbor |
|---|---|---|---|---|---|

| | |
|---|---|
| NMFS No. | E21-03 |
| Indication of Entanglement | Yes |
| **INITIAL STATUS** | Live |
| **SUBSEQUENT STATUS (AS OF THE DATE THE NMFS ENTANGLEMENT REPORT IS COMPLETED)** | Remains entangled |
| Date 1st Observed Entangled | 08/06/03 |
| Species | Minke |
| Individual ID | Unknown |
| Location **1st OBSERVED ENTANGLED** | 1.5 NM E of East Bunker Ledge, ME |
| Latitude/Longitude **1st OBSERVED ENTANGLED** | 44° 16.88' N      68° 10.81' W |
| Event Description | 08/06/03<br>• Recreational boaters reported an entangled Minke whale and stood by.<br>• USCG notified CCS and a disentanglement team was underway.<br>• While traveling to the scene, USCG contacted CCS team with information that a lobster boat had arrived on scene and proceeded to cut the whale free.  The whale then swam away.<br>• After the event, State of Maine officials were able to gain more information, under the condition of anonymity.<br>• The lobsterman reported that he saw a rope through the whale's mouth, and there was no rope on the tail or any other part of the whale.<br>• He was able to put one buoy line attached to the whale in his hauler and haul back on it, the whale was evasive and swam under the boat to the stern where it's head was very close to the boat<br>• While using a gaff to hold the rope, his sternman cut the line.<br>• The lobsterman then hauled all the gear in, as it was all balled up.  There were 6 traps (3 pairs) involved. |
| Description of Gear on Whale **AS REPORTED** | |
| **A. DURING INITIAL SIGHTING** | Entangled in pots with a line through the mouth. |
| **B. SUBSEQUENT DESCRIPTIONS** | |

| | |
|---|---|
| **C. DIAGRAM OF ENTANGLING GEAR ON WHALE** | |
| Description of Wounds/**CONDITION** | |
| **A. DURING INITIAL SIGHTING** | None noted |
| **B. SUBSEQUENT DESCRIPTIONS** | |
| **NMFS GEAR ANALYSIS** | Lobster- near shore |
| A. Gear Type | |
| **B. GEAR PART/LINE TYPE** | |
| **C. LOCATION OF SET** | |
| **D. POTENTIAL POINT OF ENCOUNTER WITH GEAR** | |
| Sighting prior to entanglement | Unknown |
| Re-sightings **POST-ENTANGLEMENT** | Unknown – animal not resighted |
| Life History Information | Unknown |
| **NMFS** Serious Injury/Mortality Determination | Pending |

# FISHERY INTERACTION GEAR ANALYSIS

| NMFS No. | E 21 - 03 | | |
|---|---|---|---|
| Field No. | J080603 | Date 1st Observed Entangled | **8-6-03** |
| Location 1st Observed | **2 NM N of Baker Island, Mt Desert Island, ME 44° 16.9' N,  68° 10.8' W** | Type of Event - Observation, Disentanglement, Stranding. Other (describe) | **Disentanglement** |
| Species | **Minke** | Gear Recovered (y/n) | **No** |
| Individual ID | **Unknown** | Gear Analysis Conducted (y/n) | **No** |

# GEAR DESCRIPTION / ANALYSIS

| Date Gear Retrieved | | Gear Retrieved By | |
|---|---|---|---|
| Date Gear Received | | Received From | |
| Sources: | USCG | Date Set | |
| | CCS | Date Lost | |
| | Fisherman | Location | |

|  | Other |  | Depth |  |
|---|---|---|---|---|
|  |  |  | Bottom Type |  |
| Gear Type: | Inshore lobster gear |  | Target Species: | lobster |

**Gear Description:**

      Six traps (3 pairs) involved.

**Comments:**

      Whale was disentangled by a local lobsterman.  Gear presumably returned to water.

**Conclusions:**

      No gear recovered.

| Report By: | John F. Kenney | Date: | 2-4-05 | Current Location of Gear | N.A. |
|---|---|---|---|---|---|

| NMFS No. | E22-03 |
|---|---|
| Indication of Entanglement | Yes |
| **INITIAL STATUS** | Live |
| **SUBSEQUENT STATUS (AS OF THE DATE THE NMFS ENTANGLEMENT REPORT IS COMPLETED)** | Remains entangled |
| Date 1st Observed Entangled | 08/08/03 |
| Species | Humpback |
| Individual ID | Unknown |
| Location **1st OBSERVED ENTANGLED** | ~10 NM E of Chatham, MA |
| Latitude/Longitude **1st OBSERVED ENTANGLED** | 41° 39.5' N    69° 43.0' W |
| Event Description | 08/08/03<br>▪ A fishing vessel reported an entangled humpback whale and stood by.<br>▪ The whale was reportedly free-swimming.<br>▪ USCG was unable to relieve the fishing vessel which, after 1.5 hours of standing by, was forced to leave the scene due to a family emergency at home.<br>▪ After consultation with harbormaster and USCG, the decision was made to cancel the operation due to increasing fog and the unknown location of the whale.<br>▪ The fisherman was interviewed by CCS staff during and after the event and was able to provide a detailed description of the entanglement.<br>▪ **Since no images were taken and no individual ID was made on either this whale or the humpback reported 08/14/03, it remains possible that this is the same whale.** |
| Description of Gear on Whale **AS REPORTED**<br><br>**A. DURING INITIAL SIGHTING** | Single line through the mouth leading back to a buoy trailing 30 ft behind the flukes. |
| **B. SUBSEQUENT DESCRIPTIONS**<br><br>**C. DIAGRAM OF ENTANGLING GEAR ON WHALE** | |

| Description of Wounds/**CONDITION** | |
|---|---|
| **A. DURING INITIAL SIGHTING** | None noted |
| **B. SUBSEQUENT DESCRIPTIONS** | |
| **NMFS GEAR ANALYSIS** | Unknown – no gear recovered |
| A. Gear Type | |
| **B. GEAR PART/LINE TYPE** | |
| **C. LOCATION OF SET** | |
| **D. POTENTIAL POINT OF ENCOUNTER WITH GEAR** | |
| Sighting prior to entanglement | Unknown |
| Re-sightings **POST-ENTANGLEMENT** | Unknown – animal not resighted |
| Life History Information | Unknown |
| **NMFS** Serious Injury/Mortality Determination | Pending |

## FISHERY INTERACTION GEAR ANALYSIS

| **NMFS No.** | E 22 - 03 | | |
|---|---|---|---|
| **Field No.** | J080803 | **Date 1st Observed Entangled** | 8-8-03 |
| **Location 1st Observed** | ~ 100 NM E of Chatham, Cape Cod, MA 41° 39.5' N, 69° 43.0' W | **Type of Event - Observation, Disentanglement, Stranding. Other (describe)** | Observation |
| **Species** | humpback | **Gear Recovered (y/n)** | No |
| **Individual ID** | Unknown | **Gear Analysis Conducted (y/n)** | No |

## GEAR DESCRIPTION / ANALYSIS

| **Date Gear Retrieved** | | | **Gear Retrieved By** | |
|---|---|---|---|---|
| **Date Gear Received** | | | **Received From** | |
| **Sources:** | **USCG** | | **Date Set** | |
| | **CCS** | | **Date Lost** | |
| | **Fisherman** | | **Location** | |
| | **Other** | | **Depth** | |

| | | Bottom Type | |
|---|---|---|---|
| **Gear Type:** | **Unknown - no gear recovered** | **Target Species:** | |

**Gear Description:**


**Comments:**




**Conclusions:**

      **No gear recovered.**


| **Report By:** | **John F. Kenney** | **Date:** | **2-5-05** | **Current Location of Gear** | **N.A.** |
|---|---|---|---|---|---|

| NMFS No. | E23-03 |
|---|---|
| Indication of Entanglement | No |
| **INITIAL STATUS** | Live |
| **SUBSEQUENT STATUS (AS OF THE DATE THE NMFS ENTANGLEMENT REPORT IS COMPLETED)** | Unknown – not resighted |
| Date 1st Observed Entangled | 08/09/03 |
| Species | Unknown |
| Individual ID | Unknown |
| Location **1st OBSERVED ENTANGLED** | N. of Vineyard Haven, Martha's Vineyard, MA |
| Latitude/Longitude **1st OBSERVED ENTANGLED** | 41° 29.8' N      70° 37.6' W |
| Event Description | 08/09/03<br>▪ A Steamship Authority ferry reported sighting a swimming whale, possibly a humpback, which may have been trailing line.<br>▪ No photographs were taken, and the reporter was not qualified to determine entanglement or species.<br>▪ This report is unconfirmed |
| Description of Gear on Whale **AS REPORTED** | |
| **A. DURING INITIAL SIGHTING** | Possible trailing line |
| **B. SUBSEQUENT DESCRIPTIONS** | |
| **C. DIAGRAM OF ENTANGLING GEAR ON WHALE** | |
| Description of Wounds/**CONDITION** | |
| **A. DURING INITIAL SIGHTING** | None noted |
| **B. SUBSEQUENT DESCRIPTIONS** | |
| **NMFS GEAR ANALYSIS** | Unknown |
| A. Gear Type | |
| **B. GEAR PART/LINE TYPE** | |
| **C. LOCATION OF SET** | |

71

| D. POTENTIAL POINT OF ENCOUNTER WITH GEAR | |
|---|---|
| Sighting prior to entanglement | Unknown |
| Re-sightings **POST-ENTANGLEMENT** | Unknown – animal not resighted |
| Life History Information | Unknown |
| **NMFS** Serious Injury/Mortality Determination | Pending |

# FISHERY INTERACTION GEAR ANALYSIS

| NMFS No. | E 23 - 03 | | |
|---|---|---|---|
| Field No. | J080903 | Date 1st Observed Entangled | 8-9-03 |
| Location 1st Observed | North of Vineyard Haven, Martha's Vineyard, MA 41° 29.8' N, 70° 37.6' W | Type of Event - Observation, Disentanglement, Stranding. Other (describe) | Observation |
| Species | Unknown | Gear Recovered (y/n) | No |
| Individual ID | Unknown | Gear Analysis Conducted (y/n) | No |

# GEAR DESCRIPTION / ANALYSIS

| Date Gear Retrieved | | | Gear Retrieved By | |
|---|---|---|---|---|
| Date Gear Received | | | Received From | |
| Sources: | USCG | | Date Set | |
| | CCS | | Date Lost | |
| | Fisherman | | Location | |
| | Other | | Depth | |
| | | | Bottom Type | |
| Gear Type: | Unknown - no gear recovered | | Target Species: | |

**Gear Description:**

| **Comments:** | | | | | |
|---|---|---|---|---|---|
| **Conclusions:**<br><br>    **No gear recovered.** | | | | | |
| **Report By:** | **John F. Kenney** | **Date:** | **2-5-05** | **Current Location of Gear** | **N.A.** |

| NMFS No. | E24-03 |
|---|---|
| Indication of Entanglement | Yes |
| **INITIAL STATUS** | Live |
| **SUBSEQUENT STATUS (AS OF THE DATE THE NMFS ENTANGLEMENT REPORT IS COMPLETED)** | Remains entangled |
| Date 1st Observed Entangled | 08/14/03 |
| Species | Humpback |
| Individual ID | Unknown |
| Location **1st OBSERVED ENTANGLED** | ~7NM E. of Chatham, MA |
| Latitude/Longitude **1st OBSERVED ENTANGLED** | 41° 38.93' N      69° 47.82' W |
| Event Description | 08/14/2003<br>▪ A tuna-spotting plane reported an entangled whale.<br>▪ At the request of the Disentanglement Network, the pilot returned to the area to search for the whale.<br>▪ The account from the pilot was descriptive enough to verify the entanglement.<br>▪ Meanwhile, the Chatham Harbormaster's Office searched for the whale by boat.<br>▪ After 1 hour of coordinated searching, the entangled whale was not relocated.<br>▪ Numerous humpbacks were in the area and, working from two vessels, the CCS team closely checked heads and mouths of 78 individual humpback whales for entanglement. No entangled whales were found.<br>▪ **Since no images were taken and no individual ID was made on either this whale or the humpback reported 08/08/03, it remains possible that this is the same whale** |
| Description of Gear on Whale **AS REPORTED**<br><br>**A. DURING INITIAL SIGHTING** | Line through the mouth with no buoy(s) trailing. Further information from the spotter plane indicated that the line is white in color and trails to a weight, believed to be a pot. |
| **B. SUBSEQUENT DESCRIPTIONS**<br><br>**C. DIAGRAM OF ENTANGLING** | |

| GEAR ON WHALE | |
|---|---|
| Description of Wounds/**CONDITION** | |
| **A. DURING INITIAL SIGHTING** | None noted |
| **B. SUBSEQUENT DESCRIPTIONS** | |
| **NMFS GEAR ANALYSIS** | Unknown – no gear recovered |
| A. Gear Type | |
| **B. GEAR PART/LINE TYPE** | |
| **C. LOCATION OF SET** | |
| **D. POTENTIAL POINT OF ENCOUNTER WITH GEAR** | |
| Sighting prior to entanglement | Unknown |
| Re-sightings **POST-ENTANGLEMENT** | Unknown – animal not resighted |
| Life History Information | Unknown |
| **NMFS** Serious Injury/Mortality Determination | Pending |

# FISHERY INTERACTION GEAR ANALYSIS

| NMFS No. | E 24 - 03 | | |
|---|---|---|---|
| Field No. | J081403 | Date 1st Observed Entangled | 8-14-03 |
| Location 1st Observed | approx. 7nm east of Chatham, MA 41° 38.9' N, 69° 47.8' W | Type of Event - Observation, Disentanglement, Stranding, Other (describe) | Observation |
| Species | humpback | Gear Recovered (y/n) | No |
| Individual ID | Unknown | Gear Analysis Conducted (y/n) | No |

# GEAR DESCRIPTION / ANALYSIS

| Date Gear Retrieved | | Gear Retrieved By | |
|---|---|---|---|
| Date Gear Received | | Received From | |
| Sources: | USCG | Date Set | |
| | CCS | Date Lost | |
| | Fisherman | Location | |

| | Other | | Depth | |
|---|---|---|---|---|
| | | | Bottom Type | |
| Gear Type: | Unknown - no gear recovered | | Target Species: | |

**Gear Description:**


**Comments:**




**Conclusions:**

    No gear recovered.


| Report By: | John F. Kenney | Date: | 2-5-05 | Current Location of Gear | N.A. |
|---|---|---|---|---|---|

| | |
|---|---|
| NMFS No. | E25-03 |
| Indication of Entanglement | Yes |
| **INITIAL STATUS** | Dead |
| **SUBSEQUENT STATUS (AS OF THE DATE THE NMFS ENTANGLEMENT REPORT IS COMPLETED)** | Dead |
| Date 1st Observed Entangled | 08/15/03 |
| Species | Humpback |
| Individual ID | Unknown |
| Location **1st OBSERVED ENTANGLED** | ~16 NM east of Bakers Island, ME |
| Latitude/Longitude **1st OBSERVED ENTANGLED** | 44° 12.0' N      67° 50.5' W |
| Event Description | 08/15/03<br>▪ WW vessel sighted a small whale carcass floating belly-up in the water.<br>▪ The carcass was reported to be entangled in gear, and drifting slowly SW.<br>08/17/03<br>▪ A fishing vessel reported the carcass location.<br>▪ NMFS, COA and CCS consulted and a team member went to scene to document.<br>▪ Whale carcass was found, still entangled.<br>▪ The carcass and indications of entanglement were photo-documented.  Only the ventral side of whale was visible so any additional injuries that may have been present on the dorsal side were not documented.<br>▪ Gear was collected and transferred to NMFS for analysis. |
| Description of Gear on Whale **AS REPORTED**<br><br>**A. DURING INITIAL SIGHTING** | Approximately 10 feet of float line with "football" buoys and small remnants of net trailed down the left side of the carcass, and entered the mouth on the left side.  This line then passed directly through the mouth in a single pass and exited the right side and ran aft to a single, knotted wrap around the right pectoral flipper.  Total length of line recovered from the carcass was 35 feet with seven "football" buoys. |
| **B. SUBSEQUENT DESCRIPTIONS**<br><br>**C. DIAGRAM OF ENTANGLING** | |

| GEAR ON WHALE | |
|---|---|
| Description of Wounds/**CONDITION** **A. DURING INITIAL SIGHTING** | Recent injuries were evident on the tailstock and side of the carcass. |
| **B. SUBSEQUENT DESCRIPTIONS** | |
| **NMFS GEAR ANALYSIS** A. Gear Type | Gillnet |
| **B. GEAR PART/LINE TYPE** | |
| **C. LOCATION OF SET** | |
| **D. POTENTIAL POINT OF ENCOUNTER WITH GEAR** | |
| Sighting prior to entanglement | Unknown |
| Re-sightings **POST-ENTANGLEMENT** | None – mortality |
| Life History Information | Female calf, 28.6 ft in length |
| **NMFS** Serious Injury/Mortality Determination | Pending |

## FISHERY INTERACTION GEAR ANALYSIS

| NMFS No. | E 25 - 03 | | |
|---|---|---|---|
| Field No. | J081503 | **Date 1st Observed Entangled** | |
| Location 1st Observed | 16 NM E of Bakers Island, Mt Desert, ME ~ 44° 12.0' N, 67° 50.5' W | Type of Event - Observation, Disentanglement, Stranding. Other (describe) | Carcass |
| Species | humpback | Gear Recovered (y/n) | Yes |
| Individual ID | Unknown | Gear Analysis Conducted (y/n) | Yes |

## GEAR DESCRIPTION / ANALYSIS

| Date Gear Retrieved | | 8/17/03 | Gear Retrieved By | CCS |
|---|---|---|---|---|
| Date Gear Received | | | Received From | CCS |
| Sources: | USCG | | Date Set | |
| | CCS | | Date Lost | |
| | Fisherman | | Location | |

| | Other | | Depth | |
|---|---|---|---|---|
| | | | Bottom Type | |
| Gear Type: | Gillnet | | Target Species: | Unknown |

**Gear Description:**

       Approximately 6 fm of  5/16" green poly floatline and 7 floats with a small amount of 5 1/4" green mono webbing attached.  Twine diameter is 0.025".

**Comments:**

**Conclusions:**   Gillnet  - type & target species unknown.

| Report By: | John Kenney | Date: | 12/12/03 | Current Location of Gear | NMFS,  Allen Harbor |
|---|---|---|---|---|---|

| NMFS No. | E26-03 |
|---|---|
| Indication of Entanglement | Yes |
| **INITIAL STATUS** | Live |
| **SUBSEQUENT STATUS (AS OF THE DATE THE NMFS ENTANGLEMENT REPORT IS COMPLETED)** | Remains entangled |
| Date 1st Observed Entangled | 08/16/03 |
| Species | Humpback |
| Individual ID | Unknown |
| Location **1st OBSERVED ENTANGLED** | 5 NM NNE of Race Point, Cape Cod, MA |
| Latitude/Longitude **1st OBSERVED ENTANGLED** | 42° 08.84' N    70° 10.78' W |
| Event Description | 08/16/03<br>▪ WW vessel reported an entangled humpback whale and stood by.<br>▪ The Disentanglement Team arrived at the scene.<br>▪ The whale was thin, had a heavy cyamid load and was entangled by the flukes and tailstock.<br>▪ The team attached several buoys to slow the whale's travel.<br>▪ The team was able to remove ~ 300 feet of gear including line, net and buoys.<br>▪ The team was not able to remove the most deeply imbedded line in the tailstock and therefore attached a satellite/VHF telemetry buoy to the remaining gear at the end of the day.<br>08/19/03<br>▪ Satellite fixes were not being generated by the attached tag, likely due to the buoy being held underwater by heavy trailing gear. |
| Description of Gear on Whale **AS REPORTED**<br><br>    **A. DURING INITIAL SIGHTING** | A collar around and imbedded in the peduncle/stock. One line each running across and imbedded within the dorsal surface of  each fluke blade from the insertion corner to the median notch.  3 or 4 lines running from the ventral peduncle down into the water column on the left side and 2 to 3 on the right. |

| B. SUBSEQUENT DESCRIPTIONS | 09/11/03<br>▪ The first high quality fix was received from the satellite tag attached on 08/16/03.<br>▪ Transmissions were patchy, making it difficult to determine the whale's travel speed and direction.<br>09/28/03<br>▪ After 13 days of no fixes transmitted, a signal was finally received.<br>▪ Sea conditions in the area of the fixes were very rough.<br>10/01/03<br>▪ It was determined that the buoy was adrift at this point.<br>▪ It was unknown whether any trailing gear might have still been attached to the buoy.<br>10/02/03<br>▪ NOAA surveyed the area of the buoy's most recent location fixes and did not see the small buoy or a carcass from air. |
| C. DIAGRAM OF ENTANGLING GEAR ON WHALE | |



| Description of Wounds/**CONDITION**<br><br>**A. DURING INITIAL SIGHTING** | **The whale is described as thin with numerous cyamids on the body. The entanglement is limited to the flukes and tailstock with multiple wraps of two different types of line imbedded in the flesh of the tailstock and two lines trailing back over the flukes.** |
| **B. SUBSEQUENT DESCRIPTIONS** | |

| NMFS GEAR ANALYSIS | sink gillnet, vessel anchoring system, surface system w/endline |
|---|---|
| A. Gear Type | |
| **B. GEAR PART/LINE TYPE** | |
| **C. LOCATION OF SET** | |
| **D. POTENTIAL POINT OF ENCOUNTER WITH GEAR** | |
| Sighting prior to entanglement | Unknown |
| Re-sightings **POST-ENTANGLEMENT** | Unknown – animal not resighted |
| Life History Information | Unknown |
| **NMFS** Serious Injury/Mortality Determination | Pending |

## FISHERY INTERACTION GEAR ANALYSIS

| NMFS No. | E 26 - 03 | | |
|---|---|---|---|
| Field No. | J081603 | Date 1st Observed Entangled | 8/16/03 |
| Location 1st Observed | 5 NM NNE Race Point, Cape Cod, MA, 42° 8.8' N, 70° 10.8' W | Type of Event - Observation, Disentanglement, Stranding. Other (describe) | Partial disentanglement |
| Species | humpback | Gear Recovered (y/n) | Yes |
| Individual ID | Unknown | Gear Analysis Conducted (y/n) | Yes |

## GEAR DESCRIPTION / ANALYSIS

| Date Gear Retrieved | | 8/16/03 | Gear Retrieved By | CCS |
|---|---|---|---|---|
| Date Gear Received | | | Received From | CCS |
| Sources: | USCG | | Date Set | |
| | CCS | | Date Lost | |
| | Fisherman | | Location | |
| | Other | | Depth | |
| | | | Bottom Type | |
| Gear Type: | **sink gillnet, vessel anchoring system, surface system w/endline** | | Target Species: | **Unknown** |

**Gear Description:**    Surface system consisting of a high flyer with radar reflector and red flag and a toggle buoy consisting of a double bullet buoy.  Both incorporated 600 pound weak links. The endline from the surface system was 15 fm of 5/16" sinking line tied into 15 fm of 7/16" sinking line which was attached to 33 fm of 3/8" & 7/16" poly.

   Approximately 125 feet of 3/4" nylon rope, parted at the bottom and rigged at the top as a tuna "quick switch" set-up with a 3' eye splice, an open 6" S.S. ring and a carabineer clip on a 2' pennant with shackle for a poly ball (no poly ball was present).

   Also recovered was a short length of gillnet including 4 fm of floatline and 8 fm of leadline with 12" mesh.  Twine size was 0.029".

**Comments:**    No markings of any type were found on the buoys.

Part of a vessel anchoring system was recovered.  It is a type designed to cast off from quickly or to lift off bottom to relocate the vessel without having to haul the anchor or anchor line aboard.

No identifying marks were found on the on the section of gillnet recovered.

**Conclusions:**   The anchoring system is unrelated to the gillnet, and the buoy system may or may not be part of the gillnet gear.

| Report By: | John Kenney | Date: | 1/30/04 | Current Location of Gear | NMFS, Allen Harbor |
|---|---|---|---|---|---|

| | |
|---|---|
| NMFS No. | E27-03 |
| Indication of Entanglement | Yes |
| **INITIAL STATUS** | Live |
| **SUBSEQUENT STATUS (AS OF THE DATE THE NMFS ENTANGLEMENT REPORT IS COMPLETED)** | Remains entangled |
| Date 1st Observed Entangled | 08/18/03 |
| Species | Humpback |
| Individual ID | Unknown |
| Location **1st OBSERVED ENTANGLED** | 17 mi E. of Chatham, MA |
| Latitude/Longitude **1st OBSERVED ENTANGLED** | 41° 42.796' N      69° 33.963' W |
| Event Description | 08/18/03<br>▪ An entangled humpback whale sighted from blimp and photo documented.<br>▪ The entanglement was reported the following day, and therefore no response was mounted. |
| Description of Gear on Whale **AS REPORTED**<br>   **A. DURING INITIAL SIGHTING**<br>   **B. SUBSEQUENT DESCRIPTIONS**<br>   **C. DIAGRAM OF ENTANGLING GEAR ON WHALE** | Line wrapping around pectoral flipper and trailing 50 ft.  A few buoys floating several feet behind. |
| Description of Wounds/**CONDITION**<br>   **A. DURING INITIAL SIGHTING**<br>   **B. SUBSEQUENT DESCRIPTIONS** | None noted |
| **NMFS GEAR ANALYSIS**<br>   A. Gear Type<br>   **B. GEAR PART/LINE TYPE**<br>   **C. LOCATION OF SET**<br>   **D. POTENTIAL POINT OF ENCOUNTER WITH GEAR** | Unknown – no gear recovered |

| Sighting prior to entanglement | Unknown |
|---|---|
| Re-sightings **POST-ENTANGLEMENT** | Unknown – animal not resighted |
| Life History Information | Unknown |
| **NMFS** Serious Injury/Mortality Determination | Pending |

# FISHERY INTERACTION GEAR ANALYSIS

| NMFS No. | E 27 - 03 | | |
|---|---|---|---|
| Field No. | J081803 | Date 1st Observed Entangled | 8-18-03 |
| Location 1st Observed | 17 NM east of Chatham, Cape Cod, MA 41° 42.8' N,  69° 34.0'  W | Type of Event - Observation, Disentanglement, Stranding. Other (describe) | Observation |
| Species | humpback | Gear Recovered (y/n) | No |
| Individual ID | Unknown | Gear Analysis Conducted (y/n) | No |

# GEAR DESCRIPTION / ANALYSIS

| Date Gear Retrieved | | Gear Retrieved By | |
|---|---|---|---|
| Date Gear Received | | Received From | |
| Sources: | USCG | Date Set | |
| | CCS | Date Lost | |
| | Fisherman | Location | |
| | Other | Depth | |
| | | Bottom Type | |
| Gear Type: | Unknown - no gear recovered | Target Species: | |

**Gear Description:**

**Comments:**

**Conclusions:**

      **No gear recovered.**

| Report By: | John F. Kenney | Date: | 2-9-05 | Current Location of Gear | N.A. |
|---|---|---|---|---|---|

| NMFS No. | E28-03 |
|---|---|
| Indication of Entanglement | Yes |
| **INITIAL STATUS** | Live |
| **SUBSEQUENT STATUS (AS OF THE DATE THE NMFS ENTANGLEMENT REPORT IS COMPLETED)** | Gear free |
| Date 1st Observed Entangled | 08/19/03 |
| Species | Humpback |
| Individual ID | Trident |
| Location **1st OBSERVED ENTANGLED** | 8.5 NM NNE of Race Point, Cape Cod, MA |
| Latitude/Longitude **1st OBSERVED ENTANGLED** | 42° 11.58' N      70° 08.58' W |
| Event Description | 08/19/03<br>• WW vessel reported an entangled humpback whale but was unable to stand by.<br>• The Disentanglement Team arrived in the area and relocated the whale.<br>• WHOI and SBNMS scientists aboard a blimp offered tracking and assessment assistance from the air.<br>• The team was able to attach working lines and removed significant amounts of netting and rope.<br>• There was little trailing gear left on the whale, and subsequent attempts to remove the remaining gear or attach a telemetry buoy were unsuccessful.<br>• Whale was later identified as Trident. |
| Description of Gear on Whale **AS REPORTED**<br><br>**A. DURING INITIAL SIGHTING** | Flippers were entangled and pinned to the whale by both netting and rope.  Netting and rope were also visible across the back. |
| **B. SUBSEQUENT DESCRIPTIONS**<br><br><br><br>**C. DIAGRAM OF ENTANGLING GEAR ON WHALE** | 9/01/03<br>• Trident was sighted by several WW vessels and no remaining gear was evident .<br>• CCS team arrived on the scene and confirmed that whale was now gear free. |

| Description of Wounds/**CONDITION** | |
|---|---|
| **A. DURING INITIAL SIGHTING** | None noted |
| **B. SUBSEQUENT DESCRIPTIONS** | |
| **NMFS GEAR ANALYSIS** | Gillnet |
| A. Gear Type | |
| **B. GEAR PART/LINE TYPE** | |
| **C. LOCATION OF SET** | |
| **D. POTENTIAL POINT OF ENCOUNTER WITH GEAR** | |
| Sighting prior to entanglement | 8/18/03 |
| Re-sightings **POST-ENTANGLEMENT** | 9/1/03<br>11/16/04 |
| Life History Information | Adult female, ~45 ft in length |
| **NMFS** Serious Injury/Mortality Determination | Pending |

## FISHERY INTERACTION GEAR ANALYSIS

| NMFS No. | E 28 - 03 | | |
|---|---|---|---|
| **Field No.** | **J081903** | **Date 1st Observed Entangled** | **8/19/03** |
| **Location 1st Observed** | **8.5 NM NNE Race Point, Cape Cod, MA, 42° 11.6'N, 70° 8.6' W** | **Type of Event - Observation, Disentanglement, Stranding. Other (describe)** | **partial disentanglement** |
| **Species** | **Humpback** | **Gear Recovered (y/n)** | **Yes** |
| **Individual ID** | **Trident** | **Gear Analysis Conducted (y/n)** | **Yes** |

## GEAR DESCRIPTION / ANALYSIS

| Date Gear Retrieved | | 8/19/03 | Gear Retrieved By | CCS |
|---|---|---|---|---|
| Date Gear Received | | | Received From | CCS |
| Sources: | USCG | | Date Set | |
| | CCS | | Date Lost | |
| | Fisherman | | Location | |
| | Other | | Depth | |

| | | Bottom Type | |
|---|---|---|---|
| Gear Type: | gillnet | Target Species: | Unknown |

**Gear Description:**

Recovered gear consisted of a section of gillnet:  20 fm of leadline, bottom bridle , 7.5 ft. of 'up & down' line and some 12" blue mono webbing with 0.039" diameter twine.  Attached to the bottom bridle appears to be a bottom bridle and part of an 'up & down' line from a second net.

**Comments:**   No identifying marks were found on the gear.

**Conclusions:**    Gillnet gear.

| Report By: | | John Kenney | Date: | 1/30/04 | Current Location of Gear | NMFS,   Allen Harbor |
|---|---|---|---|---|---|---|

| | |
|---|---|
| NMFS No. | E29-03 |
| Indication of Entanglement | Yes |
| **INITIAL STATUS** | Live |
| **SUBSEQUENT STATUS (AS OF THE DATE THE NMFS ENTANGLEMENT REPORT IS COMPLETED)** | Unknown – not resighted |
| Date 1st Observed Entangled | 08/25/03 |
| Species | Right |
| Individual ID | Unknown |
| Location **1st OBSERVED ENTANGLED** | Southwest of Fippennies Ledge, 51 NM NE of Race Point, Cape Cod, MA |
| Latitude/Longitude **1st OBSERVED ENTANGLED** | 42° 42N     69° 27' W |
| Event Description | 08/25/03<br>▪ A tuna spotter plane sighted an entangled right whale.<br>▪ No photographs were taken, but the spotter was interviewed by CCS staff and offered a detailed description of the whale and the entanglement.<br>▪ No response was mounted due to time of day, distance and no stand by on the scene. |
| Description of Gear on Whale **AS REPORTED**<br><br>    **A. DURING INITIAL SIGHTING** | Swimming with line and two buoys trailing.  A submerged white object attached to the trailing line was also visible. |
|     **B. SUBSEQUENT DESCRIPTIONS**<br><br>    **C. DIAGRAM OF ENTANGLING GEAR ON WHALE** | |
| Description of Wounds/**CONDITION**<br><br>    **A. DURING INITIAL SIGHTING**<br><br>    **B. SUBSEQUENT DESCRIPTIONS** | None noted |
| **NMFS GEAR ANALYSIS**<br><br>    A. Gear Type<br><br>    **B. GEAR PART/LINE TYPE** | Unknown – no gear recovered |

90

| **C. LOCATION OF SET** | |
|---|---|
| **D. POTENTIAL POINT OF ENCOUNTER WITH GEAR** | |
| Sighting prior to entanglement | Unknown |
| Re-sightings **POST-ENTANGLEMENT** | Unknown – animal not resighted |
| Life History Information | ~30-40 feet in length. |
| **NMFS** Serious Injury/Mortality Determination | Pending |

## FISHERY INTERACTION GEAR ANALYSIS

| **NMFS No.** | **E 29 - 03** | | |
|---|---|---|---|
| **Field No.** | **J082503** | **Date 1st Observed Entangled** | **8-25-03** |
| **Location 1st Observed** | **51 NM NE of Race Pt. Cape Cod, MA ~ 42° 42' N,  69° 27'  W** | **Type of Event - Observation, Disentanglement, Stranding. Other (describe)** | **Observation** |
| **Species** | **right** | **Gear Recovered (y/n)** | **No** |
| **Individual ID** | **Unknown** | **Gear Analysis Conducted (y/n)** | **No** |

## GEAR DESCRIPTION / ANALYSIS

| **Date Gear Retrieved** | | **Gear Retrieved By** | |
|---|---|---|---|
| **Date Gear Received** | | **Received From** | |
| Sources: | **USCG** | **Date Set** | |
| | **CCS** | **Date Lost** | |
| | **Fisherman** | **Location** | |
| | **Other** | **Depth** | |
| | | **Bottom Type** | |
| **Gear Type:** | **Unknown - no gear recovered** | **Target Species:** | |

**Gear Description:**

**<u>Comments</u>:**

**<u>Conclusions</u>:**

      **No gear recovered.**

| Report By: | John F. Kenney | Date: | 2-9-05 | Current Location of Gear | N.A. |
|---|---|---|---|---|---|

| | |
|---|---|
| NMFS No. | E30-03 |
| Indication of Entanglement | Yes |
| **INITIAL STATUS** | Live |
| **SUBSEQUENT STATUS (AS OF THE DATE THE NMFS ENTANGLEMENT REPORT IS COMPLETED)** | Unknown – animal not resighted |
| Date 1st Observed Entangled | 08/26/03 |
| Species | Unknown |
| Individual ID | Unknown |
| Location **1st OBSERVED ENTANGLED** | W of Cashes Ledge; 70 NM NE of Race Point, Cape Cod, MA |
| Latitude/Longitude **1st OBSERVED ENTANGLED** | 42° 56' N    69°13' W |
| Event Description | 08/26/03<br>▪ Tuna spotter plane sighted an entangled whale.<br>▪ No photographs were taken.<br>▪ No response was mounted due to time of day, distance offshore and the lack of standby vessels.<br>▪ CCS staff interviewed pilot and he was able to provide a descriptive account of the entanglement.<br>▪ The species of this whale cannot be confirmed from the description, but the pilot believed it was a fin whale. |
| Description of Gear on Whale **AS REPORTED**<br>    **A. DURING INITIAL SIGHTING** | Reported to have a single line trailing a buoy, possibly originating on the flukes. |
| **B. SUBSEQUENT DESCRIPTIONS**<br>    **C. DIAGRAM OF ENTANGLING GEAR ON WHALE** | |
| Description of Wounds**/CONDITION**<br>    **A. DURING INITIAL SIGHTING** | None noted |
| **B. SUBSEQUENT DESCRIPTIONS** | |
| **NMFS GEAR ANALYSIS**<br>    A. Gear Type | Unknown – no gear recovered |
| **B. GEAR PART/LINE TYPE** | |

| C. LOCATION OF SET | |
|---|---|
| **D. POTENTIAL POINT OF ENCOUNTER WITH GEAR** | |
| Sighting prior to entanglement | Unknown |
| Re-sightings **POST-ENTANGLEMENT** | Unknown – animal not resighted |
| Life History Information | Unknown |
| **NMFS** Serious Injury/Mortality Determination | Pending |

# FISHERY INTERACTION GEAR ANALYSIS

| NMFS No. | E 30 - 03 | | |
|---|---|---|---|
| **Field No.** | J082603 | **Date 1st Observed Entangled** | **8-26-03** |
| **Location 1st Observed** | 70 NM NE of Race Pt. Cape Cod, MA ~ 42° 56' N, 69° 13' W | **Type of Event - Observation, Disentanglement, Stranding. Other (describe)** | **Observation** |
| **Species** | fin | **Gear Recovered (y/n)** | **No** |
| **Individual ID** | **Unknown** | **Gear Analysis Conducted (y/n)** | **No** |

# GEAR DESCRIPTION / ANALYSIS

| Date Gear Retrieved | | | Gear Retrieved By | |
|---|---|---|---|---|
| Date Gear Received | | | Received From | |
| Sources: | **USCG** | | Date Set | |
| | **CCS** | | Date Lost | |
| | **Fisherman** | | Location | |
| | **Other** | | Depth | |
| | | | Bottom Type | |
| Gear Type: | **Unknown - no gear recovered** | | Target Species: | |

**Gear Description:**

| **Comments:** | | | | | |
|---|---|---|---|---|---|
| **Conclusions:** | | | | | |
| No gear recovered. | | | | | |
| **Report By:** | **John F. Kenney** | **Date:** | **2-9-05** | **Current Location of Gear** | **N.A.** |

| NMFS No. | E31-03 |
|---|---|
| Indication of Entanglement | Yes |
| **INITIAL STATUS** | Live |
| **SUBSEQUENT STATUS (AS OF THE DATE THE NMFS ENTANGLEMENT REPORT IS COMPLETED)** | Remains entangled (believed to be gear free, but not confirmed) |
| Date 1st Observed Entangled | 08/27/03 |
| Species | Humpback |
| Individual ID | Unknown |
| Location **1st OBSERVED ENTANGLED** | Off Long Island, Nova Scotia |
| Latitude/Longitude **1st OBSERVED ENTANGLED** | 44° 21.5' N     66° 19.6' W |
| Event Description | 08/27/03<br>▪ WW vessel reported an entangled humpback to the Canadian Coast Guard and the report was relayed to US Network.<br>▪ The whale was a thin and apparently weak juvenile, with a single deeply imbedded line around tailstock near flukes.<br>▪ The whale was reported to be making long dives.<br>▪ No photographs were taken. |
| Description of Gear on Whale **AS REPORTED**<br><br>**A. DURING INITIAL SIGHTING** | Single knotted line, very deeply imbedded in tailstock. |
| **B. SUBSEQUENT DESCRIPTIONS** | 09/04/04<br>▪ DFO reports that this whale was seen a few days after the initial report and was believed to be free of gear. (Due to the nature of the original report, photo documentation would be valuable.) |
| **C. DIAGRAM OF ENTANGLING GEAR ON WHALE** | |
| Description of Wounds/**CONDITION**<br><br>**A. DURING INITIAL SIGHTING** | Imbedded line in tailstock. Possible that the young whale had grown into the line over many months. |
| **B. SUBSEQUENT DESCRIPTIONS** | |

| NMFS GEAR ANALYSIS | Unknown – no gear recovered |
|---|---|
| A. Gear Type | |
| **B. GEAR PART/LINE TYPE** | |
| **C. LOCATION OF SET** | |
| **D. POTENTIAL POINT OF ENCOUNTER WITH GEAR** | |
| Sighting prior to entanglement | Unknown |
| Re-sightings **POST-ENTANGLEMENT** | Unknown – no gear recovered |
| Life History Information | Juvenile, ~ 30ft in length |
| **NMFS** Serious Injury/Mortality Determination | Pending |

## FISHERY INTERACTION GEAR ANALYSIS

| NMFS No. | E 31 - 03 | | |
|---|---|---|---|
| Field No. | J082703 | Date 1st Observed Entangled | 8-27-03 |
| Location 1st Observed | 5nm NW of Long Island, Nova Scotia, BOF 44° 21.5' N,  66° 19.6 W | Type of Event - Observation, Disentanglement, Stranding. Other (describe) | Observation |
| Species | humpback | Gear Recovered (y/n) | No |
| Individual ID | Unknown | Gear Analysis Conducted (y/n) | No |

## GEAR DESCRIPTION / ANALYSIS

| Date Gear Retrieved | | Gear Retrieved By | |
|---|---|---|---|
| Date Gear Received | | Received From | |
| Sources: | USCG | Date Set | |
| | CCS | Date Lost | |
| | Fisherman | Location | |
| | Other | Depth | |
| | | Bottom Type | |
| Gear Type: | Unknown - no gear recovered | Target Species: | |

**Gear Description:**

**Comments:**

**Conclusions:**

No gear recovered.

| Report By: | John F. Kenney | Date: | 2-9-05 | Current Location of Gear | N.A. |
|---|---|---|---|---|---|

| | |
|---|---|
| NMFS No. | E32-03 |
| Indication of Entanglement | Yes |
| **INITIAL STATUS** | Live |
| **SUBSEQUENT STATUS (AS OF THE DATE THE NMFS ENTANGLEMENT REPORT IS COMPLETED)** | Gear free |
| Date 1st Observed Entangled | 08/29/03 |
| Species | Humpback |
| Individual ID | Verga |
| Location **1st OBSERVED ENTANGLED** | SE Stellwagen Bank: 10 NM NNE of Race Point, Cape Cod, MA |
| Latitude/Longitude **1st OBSERVED ENTANGLED** | 42° 12.22' N    70° 07.05' W |
| Event Description | 08/29/03<br>▪ A tuna spotter plane sighted an entangled whale and reported it to the Disentanglement Network, via a fishing vessel.<br>▪ The plane stood by until the Disentanglement Team was at the scene.<br>▪ The team successfully attached a telemetry buoy before they were forced to head to shore due to sea conditions.<br>▪ The whale was identified as Verga.<br>08/30/03<br>▪ The telemetry buoy began transmitting high quality fixes of the whale's location, though poor weather conditions in the area precluded a disentanglement attempt. |
| Description of Gear on Whale **AS REPORTED**<br><br>**A. DURING INITIAL SIGHTING** | 30 meters of line trailing from a flipper or mouth and ending at a buoy. |
| **B. SUBSEQUENT DESCRIPTIONS** | 09/08/03<br>▪ In the days since 08/30/03 unfavorable weather conditions persisted and no disentanglement efforts were mounted.<br>▪ NOAA research vessel reported that the telemetry buoy and attachment gear from Verga had been adrift and recovered by a fishing vessel.<br>▪ These observations, together with the amount of recovered gear support the presumption that |

| | |
|---|---|
| | Verga is now gear free. |
| | 09/24/03 |
| | ▪ A tuna spotter equipped with a CCS digital camera sighted and photographed Verga in the Great South Channel, ~ 30 NM E of Nantucket. |
| | ▪ The images suggested that Verga was now gear free. |
| | 10/08/03 |
| | ▪ A CCS research cruise sighted Verga and reported that no remaining gear was apparent. |
| **C. DIAGRAM OF ENTANGLING GEAR ON WHALE** | |
| Description of Wounds/**CONDITION** | |
| **A. DURING INITIAL SIGHTING** | Line scars on the head and tail. |
| **B. SUBSEQUENT DESCRIPTIONS** | |
| **NMFS GEAR ANALYSIS** | |
| A. Gear Type | Unknown & vessel anchoring system |
| **B. GEAR PART/LINE TYPE** | |
| **C. LOCATION OF SET** | |
| **D. POTENTIAL POINT OF ENCOUNTER WITH GEAR** | |
| Sighting prior to entanglement | 6/3/02 |
| Re-sightings **POST-ENTANGLEMENT** | 10/7/03 |
| Life History Information | Adult female |
| **NMFS** Serious Injury/Mortality Determination | Pending |

# FISHERY INTERACTION GEAR ANALYSIS

| NMFS No. | E 32 - 03 | | |
|---|---|---|---|
| **Field No.** | J082903 | **Date 1st Observed Entangled** | **8/29/03** |
| **Location 1st Observed** | **10 NM NNE Race Point, Cape Cod, MA, 42° 12.2' N,  70° 7.0 W** | **Type of Event - Observation, Disentanglement, Stranding. Other (describe)** | **tagged & partial disentangle 8/29 gear recovered 9/8** |
| **Species** | **Humpback** | **Gear Recovered (y/n)** | **Yes** |
| **Individual ID** | **Verga** | **Gear Analysis Conducted (y/n)** | **Yes** |

# GEAR DESCRIPTION / ANALYSIS

| Date Gear Retrieved | | 8/29/03 & 9/8/03 | Gear Retrieved By | CCS , F/V |
|---|---|---|---|---|
| Date Gear Received | | | Received From | CCS |
| Sources: | USCG | | Date Set | |
| | CCS | | Date Lost | |
| | Fisherman | | Location | |
| | Other | | Depth | |
| | | | Bottom Type | |
| Gear Type: | Unknown & vessel anchoring system | | Target Species: | Unknown |

**Gear Description:**

A Danforth style anchor labeled "22 HOOKER" shackled to 12 ft of 1/4" chain and shackled to 5/8" line terminated with a thimble.  A 9/16" nylon line with an eye splice in one end and a back splice in the other - 14.5ft LOA.  Two 5" x 11" bullet buoys on 4 fm of 7/16" sinking rope.  A total of 47 fm of floating poly in three pieces.

**Comments:**

The anchor, chain, 5 ft of anchor line, 14.5 ft dock line and the 2 bullet buoys with the sinking line were recovered during the 8/29 disentanglement effort.  An additional 150 ft of anchor line and the 47 fm of poly were recovered drifting with the telemetry buoy 9/8/03.

**Conclusions:**

Danforth anchor chain & anchor line is consistent with a vessel anchoring system.   The 14.5 ft line also seems to belong to a vessel.

| Report By: | John Kenney | Date: | 1/30/04 | Current Location of Gear | NMFS, Allen Harbor |
|---|---|---|---|---|---|

| | |
|---|---|
| NMFS No. | E33-03 |
| Indication of Entanglement | Yes |
| **INITIAL STATUS** | Live |
| **SUBSEQUENT STATUS (AS OF THE DATE THE NMFS ENTANGLEMENT REPORT IS COMPLETED)** | Gear free |
| Date 1st Observed Entangled | 09/03/03 |
| Species | Humpback |
| Individual ID | Unknown |
| Location **1st OBSERVED ENTANGLED** | 7 NM W of Brier Island, Nova Scotia, Canada |
| Latitude/Longitude **1st OBSERVED ENTANGLED** | 44° 15.4' N     66° 33.7' W |
| Event Description | 09/03/03<br>▪ An entangled humpback whale was reported to have a single wrap of line around the peduncle and a trailing high flyer and balloon.<br>▪ The Canadian Coast Guard arrived at the scene with disentanglement gear and boarded the reporting ship, as the whale remained calm near that ship.<br>▪ From the side of the boat, the line was cut, whale was disentangled and all gear was brought aboard. |
| Description of Gear on Whale **AS REPORTED**<br>　**A. DURING INITIAL SIGHTING**<br>　**B. SUBSEQUENT DESCRIPTIONS**<br>　**C. DIAGRAM OF ENTANGLING GEAR ON WHALE** | Single wrap of line around the peduncle and trailing gear.  Gill net, high flyer, anchor and bladder balloon. |
| Description of Wounds/**CONDITION**<br>　**A. DURING INITIAL SIGHTING**<br>　**B. SUBSEQUENT DESCRIPTIONS** | None noted |
| **NMFS GEAR ANALYSIS**<br>　A. Gear Type | Sink Gillnet |

| B. GEAR PART/LINE TYPE | |
|---|---|
| C. LOCATION OF SET | |
| D. POTENTIAL POINT OF ENCOUNTER WITH GEAR | |
| Sighting prior to entanglement | Unknown |
| Re-sightings **POST-ENTANGLEMENT** | Unknown – animal not resighted |
| Life History Information | Unknown |
| **NMFS** Serious Injury/Mortality Determination | Pending |

# FISHERY INTERACTION GEAR ANALYSIS

| NMFS No. | E 33 - 03 | | |
|---|---|---|---|
| Field No. | J090303 | Date 1st Observed Entangled | 9-3-03 |
| Location 1st Observed | 7nm W of Brier Island, Nova Scotia, BOF 44° 15.4' N,  66° 33.7 W | Type of Event - Observation, Disentanglement, Stranding. Other (describe) | Disentanglement |
| Species | humpback | Gear Recovered (y/n) | Yes |
| Individual ID | unknown | Gear Analysis Conducted (y/n) | No |

# GEAR DESCRIPTION / ANALYSIS

| Date Gear Retrieved | | | Gear Retrieved By | |
|---|---|---|---|---|
| Date Gear Received | | | Received From | |
| Sources: | USCG | | Date Set | |
| | CCS | | Date Lost | |
| | Fisherman | | Location | |
| | Other | | Depth | |
| | | | Bottom Type | |
| Gear Type: | sink gillnet | | Target Species: | Unknown |

**Gear Description:**

**Gear consisted of 200 fm of rope, 100 fathoms of gill net, anchor, high flyer and a low drag scan float.**

**Comments:**

**Conclusions:**

      **Sink gillnet gear.**

| Report By: | John F. Kenney | Date: | 2-9-05 | Current Location of Gear | Canada |
|---|---|---|---|---|---|

| | |
|---|---|
| NMFS No. | E34-03 |
| Indication of Entanglement | Yes |
| **INITIAL STATUS** | Live |
| **SUBSEQUENT STATUS (AS OF THE DATE THE NMFS ENTANGLEMENT REPORT IS COMPLETED)** | Gear free |
| Date 1st Observed Entangled | 09/07/03 |
| Species | Humpback |
| Individual ID | Bally |
| Location **1st OBSERVED ENTANGLED** | 2.5 NM NNE of Swallowtail Light, Grand Manan, New Brunswick, Canada |
| Latitude/Longitude **1st OBSERVED ENTANGLED** | 44° 48' N      66° 42' W |
| Event Description | 09/07/03<br>▪ A boater reported entangled whale and stood by.<br>▪ CWR and CCS teams met at the location of the entangled whale.<br>▪ Disentanglement teams approached the whale and they noted line on the head and assumed the line was also in the mouth.<br>▪ The whale was swimming slowly and did not raise the peduncle, suggesting it may have been weighted.<br>▪ The team was able to disentangle the whale, and reported that the flippers and mouth were completely freed of gear.<br>▪ Recovered gear was collected for further analysis by Canada DFO. |
| Description of Gear on Whale **AS REPORTED**<br><br>     **A. DURING INITIAL SIGHTING** | Monofilament webbing and floatline with "football" buoys in mouth and exiting both sides.  Some line trailing and a weighted object was believed to be submerged below the whale but it was not recovered. |
| **B. SUBSEQUENT DESCRIPTIONS**<br><br><br>     **C. DIAGRAM OF ENTANGLING GEAR ON WHALE** | 09/08/03<br>▪ Whale was sighted and documented during a research cruise, gear free. |

| Description of Wounds/**CONDITION** | Fresh cuts and abrasions from entanglement. Appeared to be lacerations on the tail stock, although no gear was observed in this area. |
|---|---|
| **A. DURING INITIAL SIGHTING** | |
| **B. SUBSEQUENT DESCRIPTIONS** | |
| **NMFS GEAR ANALYSIS** | Gillnet – per CWR |
| A. Gear Type | |
| **B. GEAR PART/LINE TYPE** | |
| **C. LOCATION OF SET** | |
| **D. POTENTIAL POINT OF ENCOUNTER WITH GEAR** | |
| Sighting prior to entanglement | 8/23/2003 |
| Re-sightings **POST-ENTANGLEMENT** | 10/07/03 |
| Life History Information | Juvenile, ~ 30ft in total length |
| **NMFS** Serious Injury/Mortality Determination | Pending |

## FISHERY INTERACTION GEAR ANALYSIS

| NMFS No. | E 34 - 03 | | |
|---|---|---|---|
| Field No. | J090703 | Date 1st Observed Entangled | 9-7-03 |
| Location 1st Observed | 2.5 NM NNE of Swallowtail Light, Grand Manan, NB. BOF ~ 44° 48' N, 66° 42 W | Type of Event - Observation, Disentanglement, Stranding. Other (describe) | Disentanglement |
| Species | humpback | Gear Recovered (y/n) | Yes |
| Individual ID | Unknown | Gear Analysis Conducted (y/n) | No |

## GEAR DESCRIPTION / ANALYSIS

| Date Gear Retrieved | | Gear Retrieved By | |
|---|---|---|---|
| Date Gear Received | | Received From | |
| Sources: | USCG | Date Set | |
| | CCS | Date Lost | |
| | Fisherman | Location | |
| | Other | Depth | |

| | | Bottom Type | |
|---|---|---|---|
| **Gear Type:** | gillnet | **Target Species:** | Unknown |

**Gear Description:**

      Gillnet per CWR

**Comments:**

**Conclusions:**

      Sink gillnet gear.

| **Report By:** | John F. Kenney | **Date:** | **2-9-05** | **Current Location of Gear** | **DFO, Canada** |
|---|---|---|---|---|---|

| | |
|---|---|
| NMFS No. | E35-03 |
| Indication of Entanglement | Yes |
| **INITIAL STATUS** | Live |
| **SUBSEQUENT STATUS (AS OF THE DATE THE NMFS ENTANGLEMENT REPORT IS COMPLETED)** | Gear free |
| Date 1st Observed Entangled | 09/11/03 |
| Species | Minke |
| Individual ID | Unknown |
| Location **1st OBSERVED ENTANGLED** | Off Baileys Island, ME |
| Latitude/Longitude **1st OBSERVED ENTANGLED** | 43° 43' N    69° 58' W |
| Event Description | 09/11/03<br>■ A commercial fishing vessel reported an entangled whale and stood by.<br>■ The CCS-Maine disentanglement team, ME DMR and NMFS were notified.<br>■ ME DMR disentanglement personnel arrived at the scene and identified the whale as a Minke.<br>■ The ME DMR personnel got a disentanglement effort underway.<br>■ The whale was disentangled and all gear was recovered. |
| Description of Gear on Whale **AS REPORTED**<br><br>**A. DURING INITIAL SIGHTING** | A black line ran tightly across the whales back, forward of the dorsal.  Three buoys were associated with the entanglement.  No line apparent on the flippers, tail or mouth.  Retrieved gear described as three separate strings of traps, two strings of five and one pair.  The single line on the whale was float rope. |
| **B. SUBSEQUENT DESCRIPTIONS**<br><br>**C. DIAGRAM OF ENTANGLING GEAR ON WHALE** | |
| Description of Wounds/**CONDITION**<br><br>**A. DURING INITIAL SIGHTING**<br><br>**B. SUBSEQUENT DESCRIPTIONS** | None noted |

| NMFS GEAR ANALYSIS | |
|---|---|
| A. Gear Type | Lobster gear – state waters |
| **B. GEAR PART/LINE TYPE** | |
| **C. LOCATION OF SET** | |
| **D. POTENTIAL POINT OF ENCOUNTER WITH GEAR** | |
| Sighting prior to entanglement | Unknown |
| Re-sightings **POST-ENTANGLEMENT** | Unknown – animal not resighted |
| Life History Information | ~20 ft in length |
| **NMFS** Serious Injury/Mortality Determination | Pending |

# FISHERY INTERACTION GEAR ANALYSIS

| NMFS No. | E 35 - 03 | | |
|---|---|---|---|
| Field No. | J091103 | Date 1st Observed Entangled | 9-11-03 |
| Location 1st Observed | 1.5 NM east of Bailey Island, ME ~ 43° 43' N,  69° 58 W | Type of Event - Observation, Disentanglement, Stranding. Other (describe) | Disentanglement |
| Species | Minke | Gear Recovered (y/n) | Yes |
| Individual ID | Unknown | Gear Analysis Conducted (y/n) | No |

# GEAR DESCRIPTION / ANALYSIS

| Date Gear Retrieved | | | Gear Retrieved By | |
|---|---|---|---|---|
| Date Gear Received | | | Received From | |
| Sources: | USCG | | Date Set | |
| | CCS | | Date Lost | |
| | Fisherman | local fisherman | Location | |
| | Other | Maine DMR | Depth | |
| | | | Bottom Type | |
| Gear Type: | lobster pots | | Target Species: | lobster |

**Gear Description:**

      **From Maine DMR: All gear was recovered, and it was found that three separate strings of traps were involved – two strings of five and one pair.  The single line on the whale was the only piece of float rope (poly) in all the gear -- a groundline between two traps in one of the 5-trap trawls.**

**Comments:**

**Conclusions:**

      **Lobster gear.**

| Report By: | John F. Kenney | Date: | 2-9-05 | Current Location of Gear | Maine DMR |
|---|---|---|---|---|---|

| NMFS No. | E36-03 |
|---|---|
| Indication of Entanglement | Yes |
| **INITIAL STATUS** | Live |
| **SUBSEQUENT STATUS (AS OF THE DATE THE NMFS ENTANGLEMENT REPORT IS COMPLETED)** | Gear free |
| Date 1st Observed Entangled | 09/13/03 |
| Species | Humpback |
| Individual ID | Unknown |
| Location **1st OBSERVED ENTANGLED** | The Wolves, New Brunswick, Canada |
| Latitude/Longitude **1st OBSERVED ENTANGLED** | 44° 54.5' N      66° 45.4' W |
| Event Description | 09/13/03<ul><li>WW vessel reported an entangled humpback, wrapped in gear and struggling at the surface.</li><li>The reporting individual believed he may have seen the whale become entangled, having seen a small humpback in the area a few minutes before he sighted the distressed whale.</li><li>Disentanglement teams were notified and arrived on scene to find the whale trumpeting and struggling at the surface while apparently anchored with a flooding tide.</li><li>The team was able to remove all gear from the whales head down to the peduncle, which was anchored and pulled down ~10 ft below the surface.</li><li>The team notified the fisherman in whose gear the whale was entangled and he came quickly to the scene to haul his gear.</li><li>The fisherman and the disentanglement team worked cooperatively to haul the gear.</li><li>As a result of the end of the gear being hauled in, the whale's flukes were raised to the stern of the boat. From this position the whale was cut free of the gear within seconds.</li><li>The whale, now gear free, lay motionless at the surface, continuing to hang its fluke vertically in the water.</li><li>The team used a hook to prod the whale's flukes toward the surface, at which time the whale arched strongly and swam away.</li><li>The whale was observed raising its flukes as it continued swimming away.</li></ul> |

| Description of Gear on Whale **AS REPORTED** | |
|---|---|
| **A. DURING INITIAL SIGHTING** | ~ 10 wraps of gillnet, including float and lead lines, wrapping the body from front of head to dorsal fin. |
| **B. SUBSEQUENT DESCRIPTIONS** | |
| **C. DIAGRAM OF ENTANGLING GEAR ON WHALE** | |
| Description of Wounds/**CONDITION** | |
| **A. DURING INITIAL SIGHTING** | None noted |
| **B. SUBSEQUENT DESCRIPTIONS** | |
| **NMFS GEAR ANALYSIS** | |
| A. Gear Type | Gillnet |
| **B. GEAR PART/LINE TYPE** | |
| **C. LOCATION OF SET** | |
| **D. POTENTIAL POINT OF ENCOUNTER WITH GEAR** | |
| Sighting prior to entanglement | Unknown |
| Re-sightings **POST-ENTANGLEMENT** | Unknown – animal not resighted |
| Life History Information | Estimated to measure <28ft in length |
| **NMFS** Serious Injury/Mortality Determination | Pending |

# FISHERY INTERACTION GEAR ANALYSIS

| NMFS No. | E 36 - 03 | | |
|---|---|---|---|
| **Field No.** | **J091303hw** | **Date 1st Observed Entangled** | **9-13-03** |
| **Location 1st Observed** | **7 NM N of Grand Manan New Brunswick, BOF 44° 54.5' N,  66° 45.4 W** | **Type of Event - Observation, Disentanglement, Stranding. Other (describe)** | **Disentanglement** |
| **Species** | **humpback** | **Gear Recovered (y/n)** | **No** |
| **Individual ID** | **Unknown** | **Gear Analysis Conducted (y/n)** | **No** |

# GEAR DESCRIPTION / ANALYSIS

| Date Gear Retrieved | | | Gear Retrieved By | |
|---|---|---|---|---|
| Date Gear Received | | | Received From | |
| Sources: | USCG | | Date Set | |
| | CCS | | Date Lost | |
| | Fisherman | | Location | |
| | Other | | Depth | |
| | | | Bottom Type | |
| Gear Type: | gillnet | | Target Species: | Unknown |

**Gear Description:**

**Comments:**

**Conclusions:**

      **Gillnet gear fished out of Campobello Island. (Per CWR)**

| Report By: | John F. Kenney | Date: | 2-9-05 | Current Location of Gear | N.A. |
|---|---|---|---|---|---|

113

| | |
|---|---|
| NMFS No. | E37-03 |
| Indication of Entanglement | Yes |
| **INITIAL STATUS** | Dead |
| **SUBSEQUENT STATUS (AS OF THE DATE THE NMFS ENTANGLEMENT REPORT IS COMPLETED)** | Dead |
| Date 1st Observed Entangled | 09/13/03 |
| Species | Minke |
| Individual ID | Unknown |
| Location **1st OBSERVED ENTANGLED** | ~3 mi offshore Saddleback Ledge, ME |
| Latitude/Longitude **1st OBSERVED ENTANGLED** | ~43° 42' N    ~68° 58' W |
| Event Description | 09/13/03<br>▪ A dead floating whale was reported and the carcass was towed to Halfway Rock.<br>▪ The whale was fresh dead, and appeared to have some red marks behind dorsal and fluke and a distinctive square-shaped cut in abdomen.<br>▪ The location of carcass at Halfway rock was in a relatively inaccessible crevasse.<br>9/14/03<br>▪ A skin sample was taken but heavy surge prevented further samples.<br>09/15/03<br>▪ The carcass washed up on Pebble Beach and was examined and sampled by the stranding network. |
| Description of Gear on Whale **AS REPORTED**<br><br>    **A. DURING INITIAL SIGHTING** | None noted |
| **B. SUBSEQUENT DESCRIPTIONS**<br><br>    **C. DIAGRAM OF ENTANGLING GEAR ON WHALE** | |
| Description of Wounds/**CONDITION**<br><br>    **A. DURING INITIAL SIGHTING**<br><br>    **B. SUBSEQUENT DESCRIPTIONS** | Red marks behind dorsal fin and on flukes |

114

| NMFS GEAR ANALYSIS | Unknown – no gear recovered |
|---|---|
| A. Gear Type | |
| B. GEAR PART/LINE TYPE | |
| C. LOCATION OF SET | |
| D. POTENTIAL POINT OF ENCOUNTER WITH GEAR | |
| Sighting prior to entanglement | Unknown |
| Re-sightings POST-ENTANGLEMENT | None – mortality |
| Life History Information | Juvenile female, 610cm in length |
| NMFS Serious Injury/Mortality Determination | Pending |

# FISHERY INTERACTION GEAR ANALYSIS

| NMFS No. | E 37 - 03 | | |
|---|---|---|---|
| Field No. | J091303mw | Date 1st Observed Entangled | 9-13-03 |
| Location 1st Observed | 7 NM SW of Matinicus Rock, ME ~43° 42' N,  68° 58 W | Type of Event - Observation, Disentanglement, Stranding. Other (describe) | carcass |
| Species | Minke | Gear Recovered (y/n) | No |
| Individual ID | unknown | Gear Analysis Conducted (y/n) | No |

# GEAR DESCRIPTION / ANALYSIS

| Date Gear Retrieved | | Gear Retrieved By | |
|---|---|---|---|
| Date Gear Received | | Received From | |
| Sources: | USCG | Date Set | |
| | CCS | Date Lost | |
| | Fisherman | Location | |
| | Other | Depth | |
| | | Bottom Type | |
| Gear Type: | Unknown - no gear recovered | Target Species: | |

**Gear Description:**

No gear present.

**Comments:**

**Conclusions:**

No gear recovered

| Report By: | | John F. Kenney | Date: | 2-9-05 | Current Location of Gear | N.A. |
|---|---|---|---|---|---|---|

| | |
|---|---|
| NMFS No. | E38-03 |
| Indication of Entanglement | Yes |
| **INITIAL STATUS** | Live |
| **SUBSEQUENT STATUS (AS OF THE DATE THE NMFS ENTANGLEMENT REPORT IS COMPLETED)** | Gear free |
| Date 1st Observed Entangled | 09/14/03 |
| Species | Humpback |
| Individual ID | Reflection |
| Location **1st OBSERVED ENTANGLED** | 5 NM E of Chatham, MA |
| Latitude/Longitude **1st OBSERVED ENTANGLED** | 41° 41.388' N    69° 49.304' W |
| Event Description | 09/14/03<br>▪ A private vessel reported an entangled whale.<br>▪ The whale was reportedly anchored and breathing, spending much time rolled to one side.<br>▪ The reporting vessel stayed in the same general area and repeatedly relocated whale in the same spot, suggesting whale was securely anchored.<br>▪ CCS disentanglement team arrived at the location and documented, assessed and disentangled the whale. |
| Description of Gear on Whale **AS REPORTED**<br><br>  **A. DURING INITIAL SIGHTING**<br><br>  **B. SUBSEQUENT DESCRIPTIONS**<br><br>  **C. DIAGRAM OF ENTANGLING GEAR ON WHALE** | Line wrapped around the blades of the flukes 3 times, with high flyer floating alongside the whale and buoy line going cleanly down to the pots. |



"Reflection" Sept. 14, 2003    Drawing by Scott Landry

| Description of Wounds/**CONDITION** | |
|---|---|
| **A. DURING INITIAL SIGHTING** | The lines were cutting into the leading edge of the flukes by about 1cm but no other wounds were observed. |
| **B. SUBSEQUENT DESCRIPTIONS** | |
| **NMFS GEAR ANALYSIS** | |
| A. Gear Type | Lobster gear |
| **B. GEAR PART/LINE TYPE** | |
| **C. LOCATION OF SET** | |
| **D. POTENTIAL POINT OF ENCOUNTER WITH GEAR** | |
| Sighting prior to entanglement | 08/28/03 on Stellwagen Bank |
| Re-sightings **POST-ENTANGLEMENT** | 09/15/03- feeding in a big aggregation near the GSC. 09/30/03 8/17/04 |
| Life History Information | Adult female, first seen in 1192. ~45 ft in length |
| **NMFS** Serious Injury/Mortality Determination | Pending |

## FISHERY INTERACTION GEAR ANALYSIS

| NMFS No. | E 38 - 03 | | |
|---|---|---|---|
| Field No. | J091403 | Date 1ˢᵗ Observed Entangled | 9/14/03 |

| Location 1st Observed | 5 NM E Chatham, Cape Cod, MA 41° 41.4' N,  69° 49.3 W | Type of Event - Observation, Disentanglement, Stranding. Other (describe) | Disentanglement |
|---|---|---|---|
| Species | humpback | Gear Recovered (y/n) | Yes |
| Individual ID | Reflection | Gear Analysis Conducted (y/n) | Yes |

## GEAR DESCRIPTION / ANALYSIS

| Date Gear Retrieved | | 9/14/03 | Gear Retrieved By | CCS |
|---|---|---|---|---|
| Date Gear Received | | | Received From | CCS |
| Sources: | USCG | | Date Set | |
| | CCS | | Date Lost | |
| | Fisherman | | Location | |
| | Other | CCS | Depth | |
| | | | Bottom Type | |
| Gear Type: | Lobster gear | | Target Species: | lobster |

**Gear Description:**

        Surface system consisting of a high flyer and poly ball.

**Comments:**

**Conclusions:**    Lobster gear

| Report By: | John Kenney | Date: | 1/30/04 | Current Location of Gear | NMFS, Allen Harbor |
|---|---|---|---|---|---|

| NMFS No. | E39-03 |
|---|---|
| Indication of Entanglement | Yes |
| **INITIAL STATUS** | Dead |
| **SUBSEQUENT STATUS (AS OF THE DATE THE NMFS ENTANGLEMENT REPORT IS COMPLETED)** | Dead |
| Date 1st Observed Entangled | 09/17/03 |
| Species | Minke |
| Individual ID | Unkown |
| Location **1st OBSERVED ENTANGLED** | Off Sheep Island, near North Haven, ME |
| Latitude/Longitude **1st OBSERVED ENTANGLED** | 44° 09.39' N      68° 46.68' W |
| Event Description | 09/17/03<br>▪ A fresh dead whale was reported and photo-documented by MMP.<br>▪ The carcass was floating belly up with significant wounds on the tail stock.<br>▪ No gear was present on the carcass. |
| Description of Gear on Whale **AS REPORTED** | |
| **A. DURING INITIAL SIGHTING** | None noted |
| **B. SUBSEQUENT DESCRIPTIONS** | |
| **C. DIAGRAM OF ENTANGLING GEAR ON WHALE** | |
| Description of Wounds/**CONDITION** | |
| **A. DURING INITIAL SIGHTING** | Two cuts out of tail stock, entanglement scars |
| **B. SUBSEQUENT DESCRIPTIONS** | |
| **NMFS GEAR ANALYSIS** | |
| A. Gear Type | Unknown – no gear recovered |
| **B. GEAR PART/LINE TYPE** | |
| **C. LOCATION OF SET** | |

| D. POTENTIAL POINT OF ENCOUNTER WITH GEAR | |
|---|---|
| Sighting prior to entanglement | Unknown |
| Re-sightings **POST-ENTANGLEMENT** | None – mortality |
| Life History Information | Juvenile female, 168 inches in length |
| **NMFS** Serious Injury/Mortality Determination | Pending |

# FISHERY INTERACTION GEAR ANALYSIS

| NMFS No. | E 39 - 03 | | |
|---|---|---|---|
| **Field No.** | **J091703** | **Date 1st Observed Entangled** | **9/17/03** |
| **Location 1st Observed** | **Off Sheep I., near North Haven, ME 44° 9.4' N,  68° 46.7 W** | **Type of Event - Observation, Disentanglement, Stranding. Other (describe)** | **Carcass** |
| **Species** | **Minke** | **Gear Recovered (y/n)** | **No** |
| **Individual ID** | **Unknown** | **Gear Analysis Conducted (y/n)** | **No** |

# GEAR DESCRIPTION / ANALYSIS

| Date Gear Retrieved | | Gear Retrieved By | |
|---|---|---|---|
| **Date Gear Received** | | **Received From** | |
| Sources: | **USCG** | **Date Set** | |
| | **CCS** | **Date Lost** | |
| | **Fisherman** | **Location** | |
| | **Other** | **Depth** | |
| | | **Bottom Type** | |
| **Gear Type:** | **Unknown - no gear recovered** | **Target Species:** | |

**Gear Description:**

        **No gear present**

**Comments:**

**Conclusions:**

    **No gear recovered.**

| Report By: | John Kenney | Date: | 1/30/04 | Current Location of Gear | N.A. |
|---|---|---|---|---|---|

| NMFS No. | E40-03 |
|---|---|
| Indication of Entanglement | Yes |
| **INITIAL STATUS** | Live |
| **SUBSEQUENT STATUS (AS OF THE DATE THE NMFS ENTANGLEMENT REPORT IS COMPLETED)** | Remains entangled |
| Date 1st Observed Entangled | 10/03/03 |
| Species | Humpback |
| Individual ID | Eruption |
| Location **1st OBSERVED ENTANGLED** | 5 NM N of Truro, Peaked Hill, Cape Cod, MA |
| Latitude/Longitude **1st OBSERVED ENTANGLED** | ~42° 09.13' N     ~70° 07.99' W |
| Event Description | 10/03/03<br>▪ WW vessel reported and photo-documented an entangled whale.<br>▪ The CCS Disentanglement Team arrived at the reported location, but no vessels were standing by and whale was not relocated.<br>▪ Increasing sea state and impending darkness precluded further search efforts.<br>▪ The whale was later identified as Eruption, a whale who had been seen by WW vessel in the few days prior to the report of entanglement.  It is unknown whether the whale was gear-free at this time or the entanglement was unnoticed. |
| Description of Gear on Whale **AS REPORTED**<br>   **A. DURING INITIAL SIGHTING** | Line through the mouth and a trailing line down the right side of the body, possibly involving the right flipper.  Also, two buoys trailed approximately 50 ft and 100 ft behind the whale. |
|    **B. SUBSEQUENT DESCRIPTIONS**<br>   **C. DIAGRAM OF ENTANGLING GEAR ON WHALE** | |
| Description of Wounds/**CONDITION**<br>   **A. DURING INITIAL SIGHTING**<br>   **B. SUBSEQUENT DESCRIPTIONS** | None noted |

| NMFS GEAR ANALYSIS | |
|---|---|
| A. Gear Type | Unknown – no gear recovered |
| **B. GEAR PART/LINE TYPE** | |
| **C. LOCATION OF SET** | |
| **D. POTENTIAL POINT OF ENCOUNTER WITH GEAR** | |
| Sighting prior to entanglement | 09/15/03: Great South Channel<br>09/30/03 |
| Re-sightings **POST-ENTANGLEMENT** | 06/4/04<br>07/09/04 in the GSC, and several sightings in October and November of 2004 |
| Life History Information | Female, born in 1999 |
| **NMFS** Serious Injury/Mortality Determination | Pending |

## FISHERY INTERACTION GEAR ANALYSIS

| NMFS No. | E 40 - 03 | | |
|---|---|---|---|
| Field No. | J100303 | Date 1st Observed Entangled | 10/3/03 |
| Location 1st Observed | 7 NM NE of Race Point, Cape Cod, MA 42° 9.1' N,  70° 8.0 W | Type of Event - Observation, Disentanglement, Stranding. Other (describe) | Observation |
| Species | humpback | Gear Recovered (y/n) | No |
| Individual ID | Eruption | Gear Analysis Conducted (y/n) | No |

## GEAR DESCRIPTION / ANALYSIS

| Date Gear Retrieved | | Gear Retrieved By | |
|---|---|---|---|
| Date Gear Received | | Received From | |
| Sources: | USCG | Date Set | |
| | CCS | Date Lost | |
| | Fisherman | Location | |
| | Other | Depth | |
| | | Bottom Type | |
| Gear Type: | Unknown - no gear recovered | Target Species: | |

| **Gear Description:** | | | | | |
|---|---|---|---|---|---|
| **Comments:** | | | | | |
| **Conclusions:**<br><br>No gear recovered. | | | | | |
| **Report By:** | John Kenney | **Date:** | **2/10/03** | **Current Location of Gear** | N.A. |

| NMFS No. | E41-03 |
|---|---|
| Indication of Entanglement | Yes |
| **INITIAL STATUS** | Dead |
| **SUBSEQUENT STATUS (AS OF THE DATE THE NMFS ENTANGLEMENT REPORT IS COMPLETED)** | Dead |
| Date 1st Observed Entangled | 10/20/03 |
| Species | Fin |
| Individual ID | Unknown |
| Location **1st OBSERVED ENTANGLED** | 14 mi SE of York, ME |
| Latitude/Longitude **1st OBSERVED ENTANGLED** | 43° 05.96' N     70° 22.91' W |
| Event Description | 10/20/03<br>▪ A dead floating whale was reported by private vessel.<br>▪ Few details were given and the species was unknown so a NOAA aerial survey team went to the scene to document.<br>▪ The carcass was in moderate decomposition and organs were protruding.<br>▪ A line was visible on the carcass, running across the body. |
| Description of Gear on Whale **AS REPORTED**<br><br>   **A. DURING INITIAL SIGHTING** | A single light green line was visible, running from the left side near the base of the jawbone across the ventral surface and disappearing under the right pectoral. |
|    **B. SUBSEQUENT DESCRIPTIONS**<br><br>   **C. DIAGRAM OF ENTANGLING GEAR ON WHALE** | |
| Description of Wounds/**CONDITION**<br><br>   **A. DURING INITIAL SIGHTING**<br><br>   **B. SUBSEQUENT DESCRIPTIONS** | None noted |

| NMFS GEAR ANALYSIS | Unknown – no gear recovered |
|---|---|
| A. Gear Type | |
| **B. GEAR PART/LINE TYPE** | |
| **C. LOCATION OF SET** | |
| **D. POTENTIAL POINT OF ENCOUNTER WITH GEAR** | |
| Sighting prior to entanglement | Unknown |
| Re-sightings **POST-ENTANGLEMENT** | None – mortality |
| Life History Information | Unknown |
| **NMFS** Serious Injury/Mortality Determination | Pending |

## FISHERY INTERACTION GEAR ANALYSIS

| NMFS No. | E 41 - 03 | | |
|---|---|---|---|
| **Field No.** | J102003 | **Date 1st Observed Entangled** | 10/20/03 |
| **Location 1st Observed** | 14 NM SE of York Maine 43° 6.0' N, 70°22.9 W | **Type of Event - Observation, Disentanglement, Stranding. Other (describe)** | Carcass |
| **Species** | fin | **Gear Recovered (y/n)** | No |
| **Individual ID** | Unknown | **Gear Analysis Conducted (y/n)** | No |

## GEAR DESCRIPTION / ANALYSIS

| Date Gear Retrieved | | Gear Retrieved By | |
|---|---|---|---|
| **Date Gear Received** | | **Received From** | |
| Sources: | **USCG** | **Date Set** | |
| | **CCS** | **Date Lost** | |
| | **Fisherman** | **Location** | |
| | **Other** | **Depth** | |
| | | **Bottom Type** | |
| **Gear Type:** | **Unknown - no gear recovered** | **Target Species:** | |

127

| **Gear Description:** | |
| --- | --- |
| **Comments:** | |
| **Conclusions:**<br><br>    **No gear recovered.** | |

| **Report By:** | **John Kenney** | **Date:** | **2/10/03** | **Current Location of Gear** | **N.A.** |
| --- | --- | --- | --- | --- | --- |

| | |
|---|---|
| NMFS No. | E42-03 |
| Indication of Entanglement | Yes |
| **INITIAL STATUS** | Dead |
| **SUBSEQUENT STATUS (AS OF THE DATE THE NMFS ENTANGLEMENT REPORT IS COMPLETED)** | Dead |
| Date 1st Observed Entangled | 10/29/03 |
| Species | Minke |
| Individual ID | Unknown |
| Location **1st OBSERVED ENTANGLED** | Singing Beach, Manchester by the Sea, MA |
| Latitude/Longitude **1st OBSERVED ENTANGLED** | 42° 34.188' N    70° 45.591' W |
| Event Description | 10/29/03<br>▪ A whale carcass came ashore in a moderate state of decomposition with notable wounds on the tail stock.<br>▪ Stranding Network teams responded, photo-documented and sampled tissue from the carcass.<br>10/30/03<br>▪ A town official relocated the carcass to the landfill, where a full necropsy was performed by Stranding Network personnel. |
| Description of Gear on Whale **AS REPORTED**<br><br>  **A. DURING INITIAL SIGHTING** | None noted |
|   **B. SUBSEQUENT DESCRIPTIONS**<br><br>  **C. DIAGRAM OF ENTANGLING GEAR ON WHALE** | |
| Description of Wounds/**CONDITION**<br><br>  **A. DURING INITIAL SIGHTING** | Linear wounds penetrated into dorsal caudal peduncle and into fluke. |
|   **B. SUBSEQUENT DESCRIPTIONS** | |
| **NMFS GEAR ANALYSIS**<br><br>  A. Gear Type | Unknown – no gear recovered |
|   **B. GEAR PART/LINE TYPE** | |

| | |
|---|---|
| **C. LOCATION OF SET** | |
| **D. POTENTIAL POINT OF ENCOUNTER WITH GEAR** | |
| Sighting prior to entanglement | Unknown |
| Re-sightings **POST-ENTANGLEMENT** | None – mortality |
| Life History Information | Juvenile male, 255 inches in length |
| **NMFS** Serious Injury/Mortality Determination | Pending |

# FISHERY INTERACTION GEAR ANALYSIS

| NMFS No. | E 42 - 03 | | |
|---|---|---|---|
| Field No. | J102903 | Date 1st Observed Entangled | 10/29/03 |
| Location 1st Observed | Singing Beach, Manchester by the Sea, MA 42° 34.2' N,   70°45.6 W | Type of Event - Observation, Disentanglement, Stranding. Other (describe) | Carcass |
| Species | Minke | Gear Recovered (y/n) | No |
| Individual ID | Unknown | Gear Analysis Conducted (y/n) | No |

# GEAR DESCRIPTION / ANALYSIS

| Date Gear Retrieved | | | Gear Retrieved By | |
|---|---|---|---|---|
| Date Gear Received | | | Received From | |
| Sources: | USCG | | Date Set | |
| | CCS | | Date Lost | |
| | Fisherman | | Location | |
| | Other | | Depth | |
| | | | Bottom Type | |
| Gear Type: | Unknown - no gear recovered | | Target Species: | |

**Gear Description:**

**Comments:**

**Conclusions:**

      **No gear recovered.**

| Report By: | John Kenney | Date: | 2/10/03 | Current Location of Gear | N.A. |
|---|---|---|---|---|---|

| | |
|---|---|
| NMFS No. | E43-03 |
| Indication of Entanglement | Yes |
| **INITIAL STATUS** | Dead |
| **SUBSEQUENT STATUS (AS OF THE DATE THE NMFS ENTANGLEMENT REPORT IS COMPLETED)** | Dead |
| Date 1st Observed Entangled | 11/06/03 |
| Species | Minke |
| Individual ID | Unknown |
| Location **1st OBSERVED ENTANGLED** | 1/3 mile SE of Cat Island, 1.5 miles off  Marblehead Neck, Marblehead, MA |
| Latitude/Longitude **1st OBSERVED ENTANGLED** | 42° 29.84' N      70° 50.00' W |
| Event Description | 11/6/03<br>▪ The whale was reported late in the afternoon by a vessel and no pictures or position were taken.<br>11/7/03<br>▪ The carcass stranded some time in the morning at Ocean Avenue, Marblehead Neck.  Stranding Network responded and found an advanced decomposed carcass, with line marks and cut wounds on the leading edge of the fluke at insertion. |
| Description of Gear on Whale **AS REPORTED**<br>**A. DURING INITIAL SIGHTING** | None present |
| **B. SUBSEQUENT DESCRIPTIONS**<br>**C. DIAGRAM OF ENTANGLING GEAR ON WHALE** | |
| Description of Wounds**/CONDITION**<br>**A. DURING INITIAL SIGHTING** | Line marks on fluke at insertion creating a semi circle shape around the base of the fluke where it meets the peduncle |
| **B. SUBSEQUENT DESCRIPTIONS** | |

| NMFS GEAR ANALYSIS | Unknown – no gear recovered |
|---|---|
| A. Gear Type | |
| **B. GEAR PART/LINE TYPE** | |
| **C. LOCATION OF SET** | |
| **D. POTENTIAL POINT OF ENCOUNTER WITH GEAR** | |
| Sighting prior to entanglement | Unknown |
| Re-sightings **POST-ENTANGLEMENT** | None – mortality |
| Life History Information | Juvenile, 455.9 cm in total length |
| **NMFS** Serious Injury/Mortality Determination | Pending |

## FISHERY INTERACTION GEAR ANALYSIS

| NMFS No. | E43-03 | | |
|---|---|---|---|
| Field No. | J110603 | Date 1st Observed Entangled | 11/6/03 |
| Location 1st Observed | 1/3 NM SE of Cat Island, Marblehead, MA 42° 29.8' N,  70° 50.0 W | Type of Event - Observation, Disentanglement, Stranding. Other (describe) | Stranding, Carcass |
| Species | Minke | Gear Recovered (y/n) | No |
| Individual ID | Unknown | Gear Analysis Conducted (y/n) | No |

## GEAR DESCRIPTION / ANALYSIS

| Date Gear Retrieved | | Gear Retrieved By | |
|---|---|---|---|
| Date Gear Received | | Received From | |
| Sources: | USCG | Date Set | |
| | CCS | Date Lost | |
| | Fisherman | Location | |
| | Other | Depth | |
| | | Bottom Type | |
| Gear Type: | | Target Species: | |

**Gear Description:**

**No gear present.**

**Comments:**

**Conclusions:**

**No gear recovered.**

| Report By: | John F. Kenney | Date: | 3/30/05 | Current Location of Gear | N.A. |
|---|---|---|---|---|---|

| NMFS No. | E44-03 |
| --- | --- |
| Indication of Entanglement | No |
| **INITIAL STATUS** | Dead |
| **SUBSEQUENT STATUS (AS OF THE DATE THE NMFS ENTANGLEMENT REPORT IS COMPLETED)** | Unknown-not resighted |
| Date 1st Observed Entangled | 11/7/03 |
| Species | Unknown |
| Individual ID | Unknown |
| Location **1st OBSERVED ENTANGLED** | 7 miles E of Winthrop, MA |
| Latitude/Longitude **1st OBSERVED ENTANGLED** | 42° 22.5' N      70° 47.0' W |
| Event Description | 11/7/03<br>▪ A dead floating whale was reported to the Coast Guard by a boater. The boater reported a whale " wound up in lots of rope". The USCG vessel arrived at reported location and found no carcass.<br>▪ This is considered an unconfirmed report since no pictures or documentation were obtained. |
| **Description of Gear on Whale AS REPORTED**<br><br>    **A. DURING INITIAL SIGHTING**<br><br>    **B. SUBSEQUENT DESCRIPTIONS**<br><br>    **C. DIAGRAM OF ENTANGLING GEAR ON WHALE** | "rope" |
| Description of Wounds/**CONDITION**<br><br>    **A. DURING INITIAL SIGHTING**<br><br>    **B. SUBSEQUENT DESCRIPTIONS** | None noted |
| **NMFS GEAR ANALYSIS**<br><br>    A. Gear Type<br><br>    **B. GEAR PART/LINE TYPE**<br><br>    **C. LOCATION OF SET** | Unknown – no gear recovered |

| D. POTENTIAL POINT OF ENCOUNTER WITH GEAR | |
|---|---|
| Sighting prior to entanglement | Unknown |
| Re-sightings **POST-ENTANGLEMENT** | Unknown – animal not resighted |
| Life History Information | Unknown |
| **NMFS** Serious Injury/Mortality Determination | Pending |

# FISHERY INTERACTION GEAR ANALYSIS

| NMFS No. | **E - 44** | | |
|---|---|---|---|
| **Field No.** | **J110703** | **Date 1st Observed Entangled** | **11/7/03** |
| **Location 1st Observed** | **7 NM East of Winthrop, Mass Bay, MA 42° 22.5' N, 70° 47.0 W** | **Type of Event - Observation, Disentanglement, Stranding. Other (describe)** | **Unconfirmed Observation** |
| **Species** | **Unknown** | **Gear Recovered (y/n)** | **No** |
| **Individual ID** | **Unknown** | **Gear Analysis Conducted (y/n)** | **No** |

# GEAR DESCRIPTION / ANALYSIS

| Date Gear Retrieved | | Gear Retrieved By | |
|---|---|---|---|
| **Date Gear Received** | | **Received From** | |
| Sources: | **USCG** | **Date Set** | |
| | **CCS** | **Date Lost** | |
| | **Fisherman** | **Location** | |
| | **Other** | **Depth** | |
| | | **Bottom Type** | |
| **Gear Type:** | | **Target Species:** | |

**Gear Description:**

**Comments:**

**Conclusions:**

   **No gear recovered.**

| Report By: | John F. Kenney | Date: | 3/30/05 | Current Location of Gear | N.A. |
|---|---|---|---|---|---|

# Atlantic Large Whale Entanglement and Ship Strike Report 2004

*updated 30 October 2006*

## Prepared by
## Jamison Smith, Kristen Koyama and John Kenney

National Marine Fisheries Service
Protected Resources Division
1 Blackburn Drive
Gloucester, MA 01930-2298

**Comments or Questions please contact:**

Jamison Smith
Large Whale Disentanglement Coordinator
Email: Jamison.Smith@NOAA.gov
Phone: (978)281-9336

Kristen Koyama
Ship Strike Coordinator
Email: Kristen.Koyama@NOAA.gov
Phone: (978)281-9300 ext. 6531

# 2004 Atlantic Large Whale Entanglement and Ship Strike Report

This report is designed to summarize all of the entanglement and ship strike reports for the Atlantic coast that are known to the National Marine Fisheries Service (NMFS) and only addresses animals with indications of involvement with fishing gear or interactions with vessel collisions that occurred in the calendar year of 2004. It should be noted that these data are representative of information known as of January 2005 and may change over the course of time as more information is gleaned regarding various entanglement and ship strike cases. The tables listed below are summaries of all of the data available for all large whale entanglements, ship strikes and mortalities that were reports made known to the NMFS. Table one also includes other data not explicitly represented in this report but is included as a reference for better understanding of the severity of the issues. Totals listed in this table of individual animals with previously reported entanglements are reported on in detail in annual entanglement reports for the year that the animal was originally observed as a new entanglement. Table one only refers to reports of live animals, unless otherwise noted.  The preliminary mortality figures listed in Table one include all known large whale mortalities, both floating and stranded dead animals for all known causes of death, including entanglement, ship strike, unknown causes, etc.

Table 1:   Summary of 2004 preliminary entanglement, ship strike and mortality for large whales.

| 2004 Preliminary Large Whale Entanglement, Ship Strike, and Mortality Summary[1,2] United States and Canadian Atlantic Waters | | | |
|---|---|---|---|
| | Individual Animals With Previously Unreported Entanglements | Individual Animals With Previously Reported Entanglements | Individual Animals With Indications of Ship Strike[3] | Total Confirmed Mortalities[4] |
| Right Whale | 3 | 5 | 3 | 4 |
| Humpback Whale | 9 | 0 | 1 | 13 |
| Fin Whale | 3 | 0 | 3 | 9 |
| Minke Whale | 2 | 0 | 1 | 18 |
| Sei Whale | 0 | 0 | 1 | 1 |
| Unknown | 2 | 0 | 1 | 9 |
| TOTAL | 19 | 5 | 10 | 53 |

[1] This is preliminary data which is being released to the Atlantic Large Whale Take Reduction Team (ALWTRT) for purposes of providing the ALWTRT with an initial summary of 2004 large whale entanglement, ship strike and mortality information.  It has not been formally disseminated by the National Marine Fisheries Service.  It does not represent and should not be construed to represent any agency determination or policy.

[2] Unless otherwise noted, these figures are only referring to reports of live animals.

[3] Includes ship strike-related injuries newly observed in calendar year 2004.

[4] These preliminary mortality figures include all known large whale mortalities, both floating and stranded dead animals for all known causes of death, including entanglement, ship strike, unknown causes, etc.

The data represented in Tables two through four are break-outs of the data included in this report and are depicted in such a way as to quickly summarize the reports of individual animals with indications of fishing gear interactions and individuals that have indications of an interaction with a vessel.

Table 2:   Summary of 2004 large whale entanglement reports for live entangled whales.

## Indication of Entanglement* - Live Whales

|  | Yes | No | TOTAL |
|---|---|---|---|
| Right Whale | 3 | 0 | 3 |
| Humpback Whale | 7 | 2 | 9 |
| Fin Whale | 3 | 0 | 3 |
| Minke Whale | 2 | 0 | 2 |
| Unknown | 1 | 1 | 2 |
| TOTAL | 16 | 3 | 19 |

Table 3:   Summary of 2004 large whale entanglement reports for dead stranded or floating dead whales.

## Indication of Entanglement*- Dead Whales

|  | Yes | No | TOTAL |
|---|---|---|---|
| Right Whale | 0 | 0 | 0 |
| Humpback Whale | 2 | 0 | 2 |
| Fin Whale | 1 | 0 | 1 |
| Minke Whale | 6 | 0 | 6 |
| Bryde's spp. | 0 | 0 | 0 |
| Unknown | 0 | 0 | 0 |
| TOTAL | 9 | 0 | 9 |

* "Indication of Entanglement" is marked 'Yes' for cases where one or more of the following applies:
- Gear was reported on a whale by a reliable observer.
- Gear was photo-documented on a whale.
- Gear was retrieved from a whale.
- Marks/wounds from gear were documented on a whale carcass, excluding healed scars.
- Gear was reported on a whale by an inexperienced observer who was interviewed by NMFS or PCCS staff and the account was descriptive enough to eliminate doubt about whether or not the whale was entangled.

Table 4:   Summary of 2004 large whale ship strike reports for live whales.

## Indication of Ship Strike*

|  | Confirmed | Suspected | TOTAL |
|---|---|---|---|
| Right Whale | 3 | 0 | 3 |
| Humpback Whale | 1 | 0 | 1 |
| Fin Whale | 1 | 2 | 3 |
| Minke Whale | 1 | 0 | 1 |
| Sei Whale | 0 | 1 | 1 |
| Unknown | 1 | 0 | 1 |
| TOTAL | 7 | 3 | 10 |

\* "Indication of Ship Strike" is marked 'Confirmed' for cases where one or more of the following applies:

- A vessel reports a collision and visually confirms a whale either before or after the strike, or sights blood in the water following indication of collision.

- A vessel comes into port with a whale on its bow and necropsy or other analysis by a qualified individual indicates the strike was pre-mortem.

- An experienced observer reports witnessing a vessel strike a whale.

- A necropsy concludes that injuries consistent with ship strike were pre-mortem

- An experienced observer sights a live whale with previously unobserved wounds consistent with ship strike, or reviews photographs and indicates that the wounds present are previously unobserved wounds consistent with ship strike.

- An inexperienced observer reports witnessing a vessel strike a whale, and interview by NMFS or PCCS staff reveals the account was descriptive enough to eliminate doubt as to whether or not the whale was struck by a vessel.

"Indication of Ship Strike" is marked 'Suspected' for cases where one or more of the following applies:

- A vessel reports a strike, but either felt a shudder or other indication of collision without seeing whales nearby or saw an injured whale surface nearby with no indication that the vessel struck something.

- A vessel comes into port with a whale on its bow, but it cannot be confirmed that the strike was pre-mortem.

- A carcass bears indications of wounds consistent with ship strike, but it cannot be confirmed by necropsy that the wounds were pre-mortem.

- Any of the above scenarios is described/witnessed by an inexperienced observer, and the event cannot be confirmed via photograph or other means by an experienced individual.

NOTE:

- Some of the reports that follow are still under analysis.  Data are represented as accurately as possible with information received as of January 2005.
- An indication of ship strike marked "confirmed" is not equivalent to a serious injury and mortality determination by the NMFS Northeast Fisheries Science Center.
- New England Aquarium provided sighting and life history information for right whales.
- Provincetown Center for Coastal Studies provided sighting and life history information for humpback whales.

Table 5: Key for acronyms used in this report

| | |
|---|---|
| **CCSN** | Cape Cod Stranding Network |
| **COA** | College of the Atlantic |
| **CWR** | Campobello Whale Rescue |
| **DFO** | Department of Fisheries and Oceans (Canada) |
| **ECE** | East Coast Ecosystems (Canada) |
| **EWS** | Early Warning System |
| **FRC** | Fast response craft |
| **FWC FWRI** | Florida Fish and Wildlife Research Institute |
| **GA DNR** | Georgia Department of Natural Resources |
| **GMWSS** | Grand Manan Whale and Seabird Research Station |
| **IFAW** | International Fund for Animal Welfare - Research crew from vessel "Song of the Whale" |
| **MA DMF** | Massachusetts Division of Marine Fisheries |
| **ME DMR** | Maine Department of Marine Resources |
| **MEP** | Massachusetts Environmental Police |
| **MMP** | Maine Marine Patrol |
| **MMSC** | Marine Mammal Stranding Center |
| **NAIB** | National Aquarium in Baltimore |
| **NEAq** | New England Aquarium Right Whale Research Team |
| **NMFS** | National Marine Fisheries Service |
| **NMFS DEII** | NMFS Research Vessel Delaware II |
| **NMFS PSB** | NMFS Protected Species Branch, Northeast Fisheries Science Center |
| **NMFS SAS** | NMFS Sightings Advisory System, Protected Resources Div., Northeast Regional Office |
| **NOAA** | National Oceanic and Atmospheric Administration |
| **PCCS** | Provincetown Center for Coastal Studies (previously referred to as CCS) |
| **PCCS/MA DMF** | Provincetown Center for Coastal Studies and Massachusetts Division of Marine Fisheries |
| **RI DEM** | Rhode Island Department of Environmental Management |
| **SAG** | Surface active group |
| **SBNMS** | Stellwagen Bank National Marine Sanctuary |
| **UNC - W** | University of North Carolina, Wilmington |
| **USCG** | United States Coast Guard |
| **VMSM** | Virginia Marine Science Museum |
| **WCNE** | Whale Center of New England |
| **WHOI** | Woods Hole Oceanographic Institution |
| **WW** | Whale watch |

Table 6. Table of Contents.

| Entanglement Report Number | Species | Date of Report | Gear Present | Gear Collected | Dead/ Alive | Type of Gear | Country of Origin |
|---|---|---|---|---|---|---|---|
| E01-04 | Fin | 2/12/2004 | Yes | No | Alive | N/A | N/A |
| E02-04 | Right | 3/17/2004 | Yes | Yes | Alive | Lobster Pot | US |
| E03-04 | Minke | 4/23/2004 | Yes | Unk | Alive | Unk | Unk |
| E04-04 | Minke | 5/6/2004 | No | No | Dead | N/A | N/A |
| E05-04 | Minke | 5/20/2004 | No | No | Dead | N/A | N/A |
| E06-04 | Minke | 6/5/2004 | Yes | Yes | Alive | Pending | Pending |
| E07-04 | Minke | 6/5/2004 | No | No | Dead | N/A | N/A |
| E08-04 | Unk | 6/11/2004 | Yes | No | Alive | N/A | N/A |
| E09-04 | Minke | 6/16/2004 | No | No | Dead | N/A | N/A |
| E10-04 | Fin | 6/30/2004 | Yes | No | Dead | N/A | N/A |
| E11-04 | Unk | 7/1/2004 | Yes | No | Alive | N/A | N/A |
| E12-04 | Humpback | 7/6/2004 | No | No | Dead | N/A | N/A |
| E13-04 | Humpback | 7/11/2004 | Yes | No | Alive | N/A | N/A |
| E14-04 | Humpback | 7/16/2004 | No | No | Alive | N/A | N/A |
| E15-04 | Minke | 7/19/2004 | No | No | Dead | N/A | N/A |
| E16-04 | Humpback | 8/5/2004 | Yes | No | Alive | N/A | N/A |
| E17-04 | Fin | 8/22/2004 | Yes | No | Alive | N/A | N/A |
| E18-04 | Humpback | 8/22/2004 | Yes | No | Alive | N/A | N/A |
| E19-04 | Humpback | 8/30/2004 | Yes | No | Alive | N/A | N/A |
| E20-04 | Right | 9/6/2004 | Yes | Yes | Alive | Unk | Unk |
| E21-04 | Fin | 9/11/2004 | Yes | Yes | Alive | Gillnet Buoy Line | CA |
| E22-04 | Humpback | 9/12/2004 | Yes | Unk | Alive | Unk | US |
| E23-04 | Humpback | 9/30/2004 | Yes | No | Alive | N/A | N/A |
| E24-04 | Humpback | 10/3/2004 | Yes | No | Dead | N/A | N/A |
| E25-04 | Minke | 10/5/2004 | No | No | Dead | N/A | N/A |
| E26-04 | Right | 12/6/2004 | Yes | Yes | Alive | Lobster Pot | CA |
| E27-04 | Humpback | 12/11/2004 | Yes | Yes | Alive | Lobster Pot | CA |
| E28-04 | Humpback | 12/21/2004 | Yes | Yes | Alive | Lobster Pot | US |

| Ship Strike Report Number | Species | Date of Report |
|---|---|---|
| SS01-04 | Right | 1/8/04 |
| SS02-04 | Right | 2/7/04 |
| SS03-04 | Fin | 2/25/04 |
| SS04-04 | Sei | 5/21/04 |
| SS05-04 | Minke | 6/1/04 |
| SS06-04 | Fin | 6/13/04 |
| SS07-04 | Fin | 9/26/04 |
| SS08-04 | Unk | 11/17/04 |
| SS09-04 | Right | 11/24/04 |
| SS10-04 | Humpback | 12/19/04 |

# 2004 Entanglements

| NMFS No. | E01-04 |
|---|---|
| Indication of Entanglement | Yes |
| **INITIAL STATUS** | Live |
| **SUBSEQUENT STATUS (AS OF THE DATE THE NMFS ENTANGLEMENT REPORT IS COMPLETED)** | Remains Entangled |
| Date 1st Observed Entangled | 02/12/2004 |
| Species | Fin |
| Individual ID | Unknown |
| Location **1st OBSERVED ENTANGLED** | 5 miles south of Oregon Inlet, ½ mile off beach |
| Latitude/Longitude **1st OBSERVED ENTANGLED** | 35° 67.3'N      75° 45.5'W |
| Event Description | 02/12/04<br>• Researchers from VMSM reported sighting an entangled fin whale.<br>• The whale appeared to be feeding in the area along with a group of approximately 20 animals. |
| Description of Gear on Whale **AS REPORTED** | |
| **A. DURING INITIAL SIGHTING** | Single "lobster" type buoy trailing approximately 15 feet behind the blowholes – no additional trailing gear observed. Two trailing line apparent with one possibly trailing behind the whale. One line appears to be exiting from the right side of the mouth and a tangle of lines at the blowholes with some appearing to coming out of the blowhole. |
| **B. SUBSEQUENT DESCRIPTIONS** | |
| **C. DIAGRAM OF ENTANGLING GEAR ON WHALE** | |
| Description of Wounds/**CONDITION** | |
| **A. DURING INITIAL SIGHTING** | Animal reportedly appeared thin. |
| **B. SUBSEQUENT DESCRIPTIONS** | |
| **NMFS GEAR ANALYSIS** | |
| A. Gear Type | Unknown – no gear recovered |
| **B. GEAR PART/LINE TYPE** | |
| **C. LOCATION OF SET** | |

| D. POTENTIAL POINT OF ENCOUNTER WITH GEAR | |
|---|---|
| Sighting prior to entanglement | Unknown |
| Re-sightings **POST-ENTANGLEMENT** | Unknown – animal not resighted |
| Life History Information | Unknown sex, unknown length |
| **NMFS** Serious Injury/Mortality Determination | Human-caused Serious Injury |

## FISHERY INTERACTION GEAR ANALYSIS

| NMFS No. | E 01 - 04 | | |
|---|---|---|---|
| Field No. | J021204 | Date 1st Observed Entangled | 2/12/04 |
| Location 1st Observed | 1 nm off Pea Island, NC  35E 40.37' N, 75E 27.3' W | Type of Event - Observation, Disentanglement, Stranding. Other (describe) | Observation |
| Species | fin | Gear Recovered (y/n) | No |
| Individual ID | unknown | Gear Analysis Conducted (y/n) | No |

## GEAR DESCRIPTION / ANALYSIS

| Date Gear Retrieved | | | Gear Retrieved By | |
|---|---|---|---|---|
| Date Gear Received | | | Received From | |
| Sources: | USCG | | Date Set | |
| | CCS | | Date Lost | |
| | Fisherman | | Location | |
| | Other | | Depth | |
| | | | Bottom Type | |
| Gear Type: | Unknown - no gear recovered | | Target Species: | |

Gear Description:

No gear recovered.

Comments:

<u>Conclusions</u>:

       No gear recovered.

| Report By: | John F. Kenney | Date: | 10/8/05 | Current Location of Gear | N.A. |
|---|---|---|---|---|---|

Back to Table of Contents.

2004 Large Whale Entanglement and Ship Strike Report

| | |
|---|---|
| NMFS No. | E02-04 |
| Indication of Entanglement | Yes |
| **INITIAL STATUS** | Live |
| **SUBSEQUENT STATUS (AS OF THE DATE THE NMFS ENTANGLEMENT REPORT IS COMPLETED)** | Remains Entangled (non lethal) |
| Date 1st Observed Entangled | 03/17/2004 |
| Species | Right |
| Individual ID | 3346, "Kingfisher" |
| Location **1st OBSERVED ENTANGLED** | 2 NM east of Anastasia Island, SE of St. Augustine, FL |
| Latitude/Longitude **1st OBSERVED ENTANGLED** | 29° 50.4'N          81° 13.4'W |
| Event Description | 03/17/04<br>• A private vessel reports an entangled whale to the U.S. Coast Guard.<br>• Aerial survey teams for NOAA EWS, including NEAq and Wildlife Trust, photo documented the entanglement.<br>• R/V *Jupiter* and an FWC FWRI support vessel responded to the scene.<br>• Telemetry tag attached to the trailing lines behind the whale.<br>03/18/04<br>• NOAA EWS-Wildlife Trust survey team relocated the whale at approximately 45 NM ESE of St. Augustine.<br>• NOAA, PCCS and FWC FWRI team staged but the whale's distance from shore and increasing wind prevented a response.<br>• Poor satellite fixes from telemetry equipment.<br>03/19/04<br>• NOAA EWS-Wildlife Trust survey team relocated the whale at 30° 44.7'N / 79° 55.6'W.<br>• NOAA, PCCS and FWC FWRI team responded out of Mayport, FL on U.S. Coast Guard 78' cutter *Kingfisher*.<br>• Disentanglement team was able to keg the animal and successfully slowed it and kept it at the surface.<br>• Disentanglement team successfully made several cuts to lines on or near both the right and left flippers as well one of the lines crossing over the body.<br>• Team recovered a small amount of the entangling gear from the whale, including a section of plastic-coated wire mesh.<br>03/22/04<br>• Whale was identified by NEAq as the 2003 calf of RW #1946.<br>• Whale dubbed Kingfisher in recognition of the U.S. Coast Guard cutter from response on 03/19/04. |

- Telemetry indicates the whale is estimated to be approximately 2NM from Charleston, SC.

03/24/04

- NOAA, PCCS, FWC FWRI and GA DNR team responded out of Georgetown, SC on U.S. Coast Guard 78' cutter *Yellowfin*.
- NOAA EWS-Wildlife Trust survey team located and directed vessel to the whale 33° 42.2'N / 78° 11.6'W.
- Disentanglement team assessed the whale and obtained a skin biopsy sample.
- Choppy seas and poor conditions prevented any attempts at disentanglement.

03/26/04

- Telemetry and relocation by the NOAA EWS-Wildlife Trust survey team indicates the whale is estimated to be approximately five miles west of the southern tip of Cape Lookout, NC 34° 35.2'N / 76° 38.4'W.
- Distance from staging area prevented any attempts at sedation and disentanglement.
- Small PCCS response team left with U.S. Coast Guard out of Beufort, NC and were able to assess but not attempt any disentanglement action.

04/02/04

- Telemetry buoy and approximately 30' of line was cut off accidentally by a fishing vessel off of Cape May, NJ 38° 25.9'N / 74° 20.7'W.

| | |
|---|---|
| Description of Gear on Whale **AS REPORTED** | |
| **A. DURING INITIAL SIGHTING** | Two body wraps and a buoy close to the animal on the right side were noted. Line described as 3/8" yellow polypropylene. A smaller diameter darker line observed tightly wrapped just aft of the blowholes. |
| **B. SUBSEQUENT DESCRIPTIONS** | 01/11/05 <br>• Right whale #3346 was observed by the NEAq survey team approximately 15 NM east of southern Cumberland Island, GA 30° 44.8'N / 81° 09.8'W. <br>01/12/05 <br>• Right whale #3346 was observed by vessel by the Southeast Disentanglement Network First Response team approximately 15 NM east of southern Cumberland Island, GA. <br><br>05/04/05 <br>• Right whale #3346 was observed by a NOAA aerial survey on the southern end of the Great South Channel Critical habitat area 41° 12.5'N / 69° 23.8'W. <br>• Animal was observed feeding and was associated with two other right whales. <br><br>08/06/05 <br>• Right whale #3346 was observed by the NEAq research team on the southeast corner of Grand Manan Island in the Bay of Fundy, NB 44° 33.4'N / 66° 33.1'W. <br>• Animal reported to look in good health. |

**C. DIAGRAM OF ENTANGLING GEAR ON WHALE**



Drawing by Scott Landry - CCS                    03/31/04

| Description of Wounds/**CONDITION** | |
|---|---|
| **A. DURING INITIAL SIGHTING** | None noted. |
| **B. SUBSEQUENT DESCRIPTIONS** | |
| **NMFS GEAR ANALYSIS** | |
| A. Gear Type | |
| **B. GEAR PART/LINE TYPE** | |
| **C. LOCATION OF SET** | |
| **D. POTENTIAL POINT OF ENCOUNTER WITH GEAR** | |
| Sighting prior to entanglement | 01/30/04<br>• 4 NM east of Cumberland Island, GA 30.79°N / 81.36667°W. |

| Re-sightings POST-ENTANGLEMENT | | | | | | |
|---|---|---|---|---|---|---|
| | Month | Day | Year | Latitude | Longitude | Area |
| | 3 | 24 | 2004 | 33.69 | 78.25 | NC |
| | 3 | 26 | 2004 | 34.59 | 76.64 | NC |
| | 1 | 11 | 2005 | 30.73833 | 81.16167 | GA |
| | 1 | 12 | 2005 | 30.735 | 81.16833 | GA |
| | 1 | 12 | 2005 | 30.78 | 81.215 | GA |
| | 8 | 6 | 2005 | 44.60777 | 66.45623 | BOF |
| | 8 | 6 | 2005 | 44.5568 | 66.552 | BOF |
| | 8 | 7 | 2005 | 44.58567 | 66.5101 | BOF |
| | 8 | 24 | 2005 | 44.65878 | 66.4024 | BOF |

| Life History Information | Juvenile Male, the whale was identified as #3346, the 2003 calf of right whale #1946. Estimated length of 34 feet based on aerial images and also thought to be a yearling whale. |
|---|---|
| **NMFS** Serious Injury/Mortality Determination | Non Human-caused Serious Injury |

## FISHERY INTERACTION GEAR ANALYSIS

| NMFS No. | E 02 - 04 | | |
|---|---|---|---|
| Field No. | J031704 | Date 1st Observed Entangled | 3/17/04 |
| Location 1st Observed | 2 nm E. Anastasia I., FL ~ 5nm SE  St. Augustine 29E50.4' N, 81E13.4' W | Type of Event - Observation, Disentanglement, Stranding. Other (describe) | Partial Disentanglement 3/20/04 |
| Species | right | Gear Recovered (y/n) | Yes |
| Individual ID | Eg # 3346,  *Kingfisher* | Gear Analysis Conducted (y/n) | Yes |

## GEAR DESCRIPTION / ANALYSIS

| Date Gear Retrieved | | 3/20/04 | Gear Retrieved By | PCCS et al |
|---|---|---|---|---|
| Date Gear Received | | 3/26/04 & 4/27/04 | Received From | NMFS-SEFSC |
| Sources: | USCG | | Date Set | unknown |
| | CCS | | Date Lost | unknown |
| | Fisherman | owner | Location | Maine State waters Southern Maine |
| | Other | | Depth | 15 fm |
| | | | Bottom Type | |
| Gear Type: | Multiple types - only lobster identified | | Target Species: | lobster possibly others |

Gear Description:

Only a small portion of the entangling gear has been removed from the whale.  It consists of a piece of 1-1/2" square wire mesh that measures approximately 15" x 23" and includes a plastic escape vent and a 16" length of aluminum wire that may have been a lobster head ring.  Two rope types are present: 5/16" dia and 3/8" dia, both are sinking rope.  A plastic soda type bottle had one of the ropes tied around it.   Also present is a 32 " long manufactured plastic buoy stick with some red paint flaking off.

Comments:

Only a small portion of the entangling gear has been removed from the whale.  A buoy that remains on the whale was traced to its owner.  This individual was not sure if any of the recovered gear belonged to him but was sure that the plastic buoy stick was not his.  The description of some of the gear remaining on the whale was is not consistent with this individual's gear.  This fisherman lobsters with single traps in Maine state waters.   This fisherman lost a significant amount of gear during the first three months of 2004 and attributed the loss to weather and being towed through by local scallop trawlers.

Conclusions:

Some of the entangling gear was identified as belonging to a Maine lobsterman but a significant portion of the gear (most is still on the whale) remains unidentified and of unknown origin.  While the general location that this gear was set is known, the actual location where the whale encountered this gear is unknown.

| Report By: | John F. Kenney | Date: | 10/8/05 | Current Location of Gear | Allan Harbor Field Station NMFS |

Back to Table of Contents.

| | |
|---|---|
| NMFS No. | E03-04 |
| Indication of Entanglement | Yes |
| **INITIAL STATUS** | Live |
| **SUBSEQUENT STATUS (AS OF THE DATE THE NMFS ENTANGLEMENT REPORT IS COMPLETED)** | Gear Free |
| Date 1st Observed Entangled | 04/23/2004 |
| Species | Minke |
| Individual ID | Unknown |
| Location **1st OBSERVED ENTANGLED** | Near Kettle Island, off Magnolia (Gloucester), MA |
| Latitude/Longitude **1st OBSERVED ENTANGLED** | 42° 32.85'N        70° 44.37'W |
| Event Description | 04/23/04<br>• A fishing vessel reports an entangled whale.<br>• Whale surfacing briefly to breathe.<br>• MEP staff along with WCNE responded to stand-by until the PCCS disentanglement team was on-site.<br>• PCCS disentanglement team responded with U. S. Coast Guard Station Gloucester.<br>• The disentanglement team was able to haul on the entangling gear's available buoy line to pull the inflatable close enough to throw a grapple near the flukes of the whale to attempt to attach large floats to buoy the entanglement.<br>• The whale immediately submerged, pulling all of the surface gear down with it, and blowing a fountain of bubbles.  It stayed down seven to ten minutes after which the whale resurfaced carrying only the PCCS work buoys connected to the tether.<br>• The whale was free-swimming at approximately 7-9 knots per hour and more drag was added.<br>• Eventually, all of the entangling gear came free and the whale continued to swim off. |
| Description of Gear on Whale **AS REPORTED** | |
| **A. DURING INITIAL SIGHTING** | Gear described as a bullet-type buoy at surface near whale. Appeared to be entangled by the tail in fixed gear. The whale was struggling against the weight of the gear suspended from the tail and had assumed a vertical position to keep its blowholes clear of the water. |
| **B. SUBSEQUENT DESCRIPTIONS** | |

**C. DIAGRAM OF ENTANGLING GEAR ON WHALE**



| Description of Wounds/**CONDITION** | |
|---|---|
| **A. DURING INITIAL SIGHTING** | Animal had an apparent simple loop of line wrapped around the base of the flukes and had sustained two wounds, one at each insertion on the leading edges of the flukes. |
| **B. SUBSEQUENT DESCRIPTIONS** | |
| **NMFS GEAR ANALYSIS** | |
| A. Gear Type | Unknown – no gear recovered |
| **B. GEAR PART/LINE TYPE** | |
| **C. LOCATION OF SET** | |
| **D. POTENTIAL POINT OF ENCOUNTER WITH GEAR** | |
| Sighting prior to entanglement | Unknown |
| Re-sightings **POST-ENTANGLEMENT** | Unknown – animal not resighted |
| Life History Information | Unknown sex, unknown length |

| **NMFS** Serious Injury/Mortality Determination | Non Human-caused Serious Injury |
|---|---|

## FISHERY INTERACTION GEAR ANALYSIS

| NMFS No. | E 03 - 04 | | |
|---|---|---|---|
| Field No. | J042304 | Date 1st Observed Entangled | 4/23/04 |
| Location 1st Observed | Kettle I.,  off  Magnolia, Gloucester, MA 42E32.85' N, 70E44.37' W | Type of Event - Observation, Disentanglement, Stranding. Other (describe) | Disentanglement |
| Species | minke | Gear Recovered (y/n) | No |
| Individual ID | Unknown | Gear Analysis Conducted (y/n) | No |

## GEAR DESCRIPTION / ANALYSIS

| Date Gear Retrieved | | Gear Retrieved By | |
|---|---|---|---|
| Date Gear Received | | Received From | |
| Sources: | USCG | Date Set | |
| | CCS | Date Lost | |
| | Fisherman | Location | |
| | Other | Depth | |
| | | Bottom Type | |
| Gear Type: | Unknown - no gear recovered | Target Species: | |

Gear Description:

      No gear recovered.

Comments:

Conclusions:

      No gear recovered.

| Report By: | John F. Kenney | Date: | 10/9/05 | Current Location of Gear | N.A. |
|---|---|---|---|---|---|

Back to Table of Contents.

| NMFS No. | E04-04 |
|---|---|
| Indication of Entanglement | Yes |
| **INITIAL STATUS** | Dead |
| **SUBSEQUENT STATUS (AS OF THE DATE THE NMFS ENTANGLEMENT REPORT IS COMPLETED)** | Dead |
| Date 1st Observed Entangled | 05/06/04 |
| Species | Minke |
| Individual ID | Unknown |
| Location **1st OBSERVED ENTANGLED** | Quansoo, West of Great Tisbury Pond, Martha's Vineyard, MA |
| Latitude/Longitude **1st OBSERVED ENTANGLED** | 41° 20.74'N     70° 39.59'W |
| Event Description | 05/06/04<br>• A moderately decomposed carcass was reported to the NEAq stranding response team.<br><br>05/07/04<br>• A necropsy was performed by the the NEAq stranding network staff.<br>• Necropsy team documented line marks around head and line marks on the body leading to line marks in the peduncle region. |
| Description of Gear on Whale **AS REPORTED** | |
| **A. DURING INITIAL SIGHTING** | None noted |
| **B. SUBSEQUENT DESCRIPTIONS** | |
| **C. DIAGRAM OF ENTANGLING GEAR ON WHALE** | |
| Description of Wounds/**CONDITION** | |
| **A. DURING INITIAL SIGHTING** | Line marks around head and line marks on the body leading to line marks in the peduncle region. Puncture between mandibles of lower jaw. |
| **B. SUBSEQUENT DESCRIPTIONS** | |
| **NMFS GEAR ANALYSIS**<br><br>A. Gear Type | Unknown – no gear recovered |

| B. GEAR PART/LINE TYPE | |
| C. LOCATION OF SET | |
| D. POTENTIAL POINT OF ENCOUNTER WITH GEAR | |
| Sighting prior to entanglement | Unknown |
| Re-sightings **POST-ENTANGLEMENT** | None – mortality |
| Life History Information | Adult female, 304 inches in length |
| **NMFS** Serious Injury/Mortality Determination | Human-caused Mortality |

## FISHERY INTERACTION GEAR ANALYSIS

| NMFS No. | E 04 - 04 | | |
|---|---|---|---|
| Field No. | J050604 | Date 1st Observed Entangled | 5/6/04 |
| Location 1st Observed | W. of Great Tisbury Pond, Martha's Vineyard, MA 41E20.7' N, 70E39.6' W | Type of Event - Observation, Disentanglement, Stranding. Other (describe) | Carcass Stranding |
| Species | minke | Gear Recovered (y/n) | No |
| Individual ID | Unknown | Gear Analysis Conducted (y/n) | No |

## GEAR DESCRIPTION / ANALYSIS

| Date Gear Retrieved | | | Gear Retrieved By | |
|---|---|---|---|---|
| Date Gear Received | | | Received From | |
| Sources: | USCG | | Date Set | |
| | CCS | | Date Lost | |
| | Fisherman | | Location | |
| | Other | | Depth | |
| | | | Bottom Type | |
| Gear Type: | Unknown - no gear present | | Target Species: | |

Gear Description:

      No gear present.

| Comments: | | | | | |
|---|---|---|---|---|---|
| | | | | | |
| Conclusions: | | | | | |
| No gear present.  No gear recovered. | | | | | |
| Report By: | John F. Kenney | Date: | 10/8/05 | Current Location of Gear | N.A. |

Back to Table of Contents.

| NMFS No. | E05-04 |
|---|---|
| Indication of Entanglement | Yes |
| **INITIAL STATUS** | Dead |
| **SUBSEQUENT STATUS (AS OF THE DATE THE NMFS ENTANGLEMENT REPORT IS COMPLETED)** | Dead |
| Date 1st Observed Entangled | 05/20/04 |
| Species | Minke |
| Individual ID | Unknown |
| Location **1st OBSERVED ENTANGLED** | Approximately 5 miles southeast of Cape Elizabeth, ME |
| Latitude/Longitude **1st OBSERVED ENTANGLED** | 43° 31.60'N      70° 06.46'W |
| Event Description | 05/20/04<br>• A freshly decomposed carcass was reported to the ME DMR by one of their staff.<br>• Observer reported that the carcass was floating belly-up and had line marks on it. No gear present.<br>• No necropsy was performed. |
| Description of Gear on Whale **AS REPORTED** | |
| **A. DURING INITIAL SIGHTING** | None noted |
| **B. SUBSEQUENT DESCRIPTIONS** | |
| **C. DIAGRAM OF ENTANGLING GEAR ON WHALE** | |
| Description of Wounds/**CONDITION** | |
| **A. DURING INITIAL SIGHTING** | Line marks on ventral surface of the animal. |
| **B. SUBSEQUENT DESCRIPTIONS** | |
| **NMFS GEAR ANALYSIS** | Unknown – no gear recovered |
| A. Gear Type | |
| **B. GEAR PART/LINE TYPE** | |
| **C. LOCATION OF SET** | |
| **D. POTENTIAL POINT OF ENCOUNTER WITH GEAR** | |

| Sighting prior to entanglement | Unknown |
| Re-sightings **POST-ENTANGLEMENT** | None – mortality |
| Life History Information | Unknown sex, estimated to be 26ft in length |
| **NMFS** Serious Injury/Mortality Determination | Non Human-caused Mortality |

## FISHERY INTERACTION GEAR ANALYSIS

| NMFS No. | E 05 - 04 | | |
| Field No. | J052004 | Date 1st Observed Entangled | 5/20/04 |
| Location 1st Observed | ~ 5nm SE of Cape Elizabeth, Maine 43E31.6' N, 70E 6.5' W | Type of Event - Observation, Disentanglement, Stranding. Other (describe) | Carcass Stranding |
| Species | minke | Gear Recovered (y/n) | No |
| Individual ID | Unknown | Gear Analysis Conducted (y/n) | No |

## GEAR DESCRIPTION / ANALYSIS

| Date Gear Retrieved | | Gear Retrieved By | |
| Date Gear Received | | Received From | |
| Sources: | USCG | Date Set | |
| | CCS | Date Lost | |
| | Fisherman | Location | |
| | Other | Depth | |
| | | Bottom Type | |
| Gear Type: | Unknown - no gear present | Target Species: | |

Gear Description:

No gear present.

Comments:

Conclusions:

      No gear present.

| Report By: | John F. Kenney | Date: | 10/22/05 | Current Location of Gear | N.A. |
|------------|----------------|-------|----------|--------------------------|------|

Back to Table of Contents.

| NMFS No. | E06-04 |
| --- | --- |
| Indication of Entanglement | Yes |
| **INITIAL STATUS** | Live |
| **SUBSEQUENT STATUS (AS OF THE DATE THE NMFS ENTANGLEMENT REPORT IS COMPLETED)** | Gear free |
| Date 1st Observed Entangled | 06/05/04 |
| Species | Minke |
| Individual ID | Unknown |
| Location **1st OBSERVED ENTANGLED** | Off Chatham, MA |
| Latitude/Longitude **1st OBSERVED ENTANGLED** | 41° 36.35'N    69° 30.20'W |
| Event Description | 06/05/04<br>• Crew of a scallop fishing vessel out of Chatham, MA reported to have a live, small whale entangled in their gear.<br>• Crew of the fishing vessel was able to gaff the line and pull it free of the mouth and cut it. They were also able to cut both wraps of line on the flukes.<br>• Crew of the fishing vessel observed the whale swim away, free of gear. |
| Description of Gear on Whale **AS REPORTED** | |
| **A. DURING INITIAL SIGHTING** | Gear involved was actively fished gear from scallop fishing vessel reporting the entanglement. Line passing through the mouth of the animal. Two wraps of line present around flukes. |
| **B. SUBSEQUENT DESCRIPTIONS** | |
| **C. DIAGRAM OF ENTANGLING GEAR ON WHALE** | |
| Description of Wounds/**CONDITION** | |
| **A. DURING INITIAL SIGHTING** | None noted |
| **B. SUBSEQUENT DESCRIPTIONS** | |
| **NMFS GEAR ANALYSIS** | |
| A. Gear Type | Scallop fishing gear |
| **B. GEAR PART/LINE TYPE** | |

| C. LOCATION OF SET | |
|---|---|
| **D. POTENTIAL POINT OF ENCOUNTER WITH GEAR** | |
| Sighting prior to entanglement | Unknown |
| Re-sightings **POST-ENTANGLEMENT** | Unknown – animal not resighted |
| Life History Information | Unknown sex, unknown length |
| **NMFS** Serious Injury/Mortality Determination | Non Human-caused Serious Injury |

## FISHERY INTERACTION GEAR ANALYSIS

| NMFS No. | E 06 - 04 | | |
|---|---|---|---|
| Field No. | J060504a | Date 1st Observed Entangled | 6/5/04 |
| Location 1st Observed | 20 nm East of Chatham, MA 41E 36.4' N,  69E 30.2' W | Type of Event - Observation, Disentanglement, Stranding. Other (describe) | Disentanglement |
| Species | minke | Gear Recovered (y/n) | No |
| Individual ID | Unknown | Gear Analysis Conducted (y/n) | No |

## GEAR DESCRIPTION / ANALYSIS

| Date Gear Retrieved | | | Gear Retrieved By | |
|---|---|---|---|---|
| Date Gear Received | | | Received From | |
| Sources: | USCG | | Date Set | |
| | CCS | | Date Lost | |
| | Fisherman | | Location | |
| | Other | | Depth | |
| | | | Bottom Type | |
| Gear Type: | *Pending* | | Target Species: | *Pending* |

Gear Description:

Comments:

Conclusions:

*Pending*

| Report By: | John F. Kenney | Date: | 11/14/05 | Current Location of Gear | N.A. |
|---|---|---|---|---|---|

Back to Table of Contents.

| NMFS No. | E07-04 |
| --- | --- |
| Indication of Entanglement | Yes |
| **INITIAL STATUS** | Dead |
| **SUBSEQUENT STATUS (AS OF THE DATE THE NMFS ENTANGLEMENT REPORT IS COMPLETED)** | Dead |
| Date 1st Observed Entangled | 06/05/04 |
| Species | Minke |
| Individual ID | Unknown |
| Location **1st OBSERVED ENTANGLED** | Approximately 3-4 miles northeast of 'P' buoy outside of Portland, ME |
| Latitude/Longitude **1st OBSERVED ENTANGLED** | 43° 34.3'N     70° 10.9'W |
| Event Description | 06/05/04<br>• An advanced decomposition carcass was reported to the ME DMR.<br>• Stranding network participants responded to document the carcass.<br>• Observer reported that the carcass was floating left-side up and had a deep cut on the base of the tailstock that appeared to be from line pre-mortem. No gear present.<br>• No necropsy was performed. |
| Description of Gear on Whale **AS REPORTED** | |
| **A. DURING INITIAL SIGHTING** | None noted |
| **B. SUBSEQUENT DESCRIPTIONS** | |
| **C. DIAGRAM OF ENTANGLING GEAR ON WHALE** | |
| Description of Wounds/**CONDITION** | |
| **A. DURING INITIAL SIGHTING** | Deep cut at base of tailstock that appeared to be made by line pre-mortem. |
| **B. SUBSEQUENT DESCRIPTIONS** | |
| **NMFS GEAR ANALYSIS** | Unknown – no gear recovered |
| A. Gear Type | |
| **B. GEAR PART/LINE TYPE** | |
| **C. LOCATION OF SET** | |

| D. POTENTIAL POINT OF ENCOUNTER WITH GEAR | |
|---|---|
| Sighting prior to entanglement | Unknown |
| Re-sightings **POST-ENTANGLEMENT** | None – mortality |
| Life History Information | Unknown sex, 809cm in length |
| **NMFS** Serious Injury/Mortality Determination | Non Human-caused Mortality |

# FISHERY INTERACTION GEAR ANALYSIS

| NMFS No. | E 07 - 04 | | |
|---|---|---|---|
| Field No. | J060504b | Date 1st Observed Entangled | 6/5/04 |
| Location 1st Observed | ~ 3nm NE of 'P' buoy, Portland, Maine 43E 34.3' N,   70E 10.9' W | Type of Event - Observation, Disentanglement, Stranding. Other (describe) | Carcass Stranding |
| Species | minke | Gear Recovered (y/n) | No |
| Individual ID | Unknown | Gear Analysis Conducted (y/n) | No |

## GEAR DESCRIPTION / ANALYSIS

| Date Gear Retrieved | | Gear Retrieved By | |
|---|---|---|---|
| Date Gear Received | | Received From | |
| Sources: | USCG | Date Set | |
| | CCS | Date Lost | |
| | Fisherman | Location | |
| | Other | Depth | |
| | | Bottom Type | |
| Gear Type: | Unknown - no gear present | Target Species: | |

Gear Description:

   No gear present.

Comments:

<u>Conclusions</u>:

No gear present.

| Report By: | John F. Kenney | Date: | 10/22/05 | Current Location of Gear | N.A. |
|---|---|---|---|---|---|

Back to Table of Contents.

| NMFS No. | E08-04 |
|---|---|
| Indication of Entanglement | Yes |
| **INITIAL STATUS** | Live |
| **SUBSEQUENT STATUS (AS OF THE DATE THE NMFS ENTANGLEMENT REPORT IS COMPLETED)** | Remains entangled |
| Date 1st Observed Entangled | 06/11/04 |
| Species | Unknown |
| Individual ID | Unknown |
| Location **1st OBSERVED ENTANGLED** | Back Bay, approximately 5 NM north of Head Harbor, New Brunswick |
| Latitude/Longitude **1st OBSERVED ENTANGLED** | 45° 02'N    66° 52'W (approximation) |
| Event Description | 06/11/04<br>• A fishing vessel reports an entangled whale to the Canadian Rescue Co-ordination Centre and the U.S. Disentanglement Network<br>• Whale of unknown species with white bands on the flippers (or long white flippers).<br>• No trained Canadian whale disentanglement responders available.<br>• Reporting vessel reported to cut free the animal from the anchoring gear. Animal swam off with some trailing lines.<br>• Update from DFO after the event thought the animal to be an entangled humpback whale. |
| Description of Gear on Whale **AS REPORTED** | |
| **A. DURING INITIAL SIGHTING** | Animal reported to be anchored in reporting lobster fisherman's gear. |
| **B. SUBSEQUENT DESCRIPTIONS** | |
| **C. DIAGRAM OF ENTANGLING GEAR ON WHALE** | |
| Description of Wounds/**CONDITION** | |
| **A. DURING INITIAL SIGHTING** | None noted |
| **B. SUBSEQUENT DESCRIPTIONS** | |
| **NMFS GEAR ANALYSIS** | Unknown – no gear recovered |
| A. Gear Type | |

| | |
|---|---|
| **B. GEAR PART/LINE TYPE** | |
| **C. LOCATION OF SET** | |
| **D. POTENTIAL POINT OF ENCOUNTER WITH GEAR** | |
| Sighting prior to entanglement | Unknown |
| Re-sightings **POST-ENTANGLEMENT** | Unknown – animal not resighted |
| Life History Information | Unknown sex, unknown length |
| **NMFS** Serious Injury/Mortality Determination | Non Human-caused Serious Injury |

# FISHERY INTERACTION GEAR ANALYSIS

| NMFS No. | E 08 - 04 | | |
|---|---|---|---|
| Field No. | J061104 | Date 1st Observed Entangled | 6/11/04 |
| Location 1st Observed | Back Bay / White Bay, 5nm N of Head Hbr, Campobello 45E 02' N,    66E 52' W | Type of Event - Observation, Disentanglement, Stranding. Other (describe) | Partial Disentanglement |
| Species | Unknown | Gear Recovered (y/n) | No |
| Individual ID | Unknown | Gear Analysis Conducted (y/n) | No |

## GEAR DESCRIPTION / ANALYSIS

| | | | | |
|---|---|---|---|---|
| Date Gear Retrieved | | | Gear Retrieved By | |
| Date Gear Received | | | Received From | |
| Sources: | USCG | | Date Set | |
| | CCS | | Date Lost | |
| | Fisherman | | Location | |
| | Other | | Depth | |
| | | | Bottom Type | |
| Gear Type: | Unknown - no gear recovered | | Target Species: | |

Gear Description:

No gear recovered

| Comments: | | | | | |
|---|---|---|---|---|---|
| | | | | | |
| **Conclusions:** | | | | | |
| No gear recovered | | | | | |
| Report By: | John F. Kenney | Date: | 11/16/05 | Current Location of Gear | N.A. |

Back to Table of Contents.

| | |
|---|---|
| NMFS No. | E09-04 |
| Indication of Entanglement | Yes |
| **INITIAL STATUS** | Dead |
| **SUBSEQUENT STATUS (AS OF THE DATE THE NMFS ENTANGLEMENT REPORT IS COMPLETED)** | Dead |
| Date 1st Observed Entangled | 06/16/04 |
| Species | Minke |
| Individual ID | Unknown |
| Location **1st OBSERVED ENTANGLED** | Mosquito Island, off Tenant's Harbor, ME |
| Latitude/Longitude **1st OBSERVED ENTANGLED** | 43° 55.011'N    69° 12.192'W |
| Event Description | 06/16/04<br>• A moderately decomposed carcass was reported to the ME DMR Whale Hotline.<br>06/18/04<br>• Stranding network participants responded to document the carcass.<br>• Indication of possible entanglement, originating from the right side of the mouth spanning ventral-laterally posterior of the left pectoral flipper.<br>• No gear present.<br>• No necropsy was performed. |
| Description of Gear on Whale **AS REPORTED** | |
| **A. DURING INITIAL SIGHTING** | None noted |
| **B. SUBSEQUENT DESCRIPTIONS** | |
| **C. DIAGRAM OF ENTANGLING GEAR ON WHALE** | |
| Description of Wounds**/CONDITION** | |
| **A. DURING INITIAL SIGHTING** | Indentation, originating from the right side of the mouth spanning ventral-laterally posterior of the left pectoral flipper. |
| **B. SUBSEQUENT DESCRIPTIONS** | |
| **NMFS GEAR ANALYSIS** | Unknown – no gear recovered |
| A. Gear Type | |

| B. GEAR PART/LINE TYPE | |
|---|---|
| C. LOCATION OF SET | |
| D. POTENTIAL POINT OF ENCOUNTER WITH GEAR | |
| Sighting prior to entanglement | Unknown |
| Re-sightings **POST-ENTANGLEMENT** | None – mortality |
| Life History Information | Unknown sex, 725cm in length |
| **NMFS** Serious Injury/Mortality Determination | Non Human-caused Mortality |

# FISHERY INTERACTION GEAR ANALYSIS

| NMFS No. | E 09 - 04 | | |
|---|---|---|---|
| Field No. | J061604 | Date 1st Observed Entangled | 6/16/04 |
| Location 1st Observed | Misquito Island, off Tenant's Harbor, ME 43E 55.0' N, 69E 12.2' W | Type of Event - Observation, Disentanglement, Stranding. Other (describe) | Carcass Stranding |
| Species | minke | Gear Recovered (y/n) | No |
| Individual ID | Unknown | Gear Analysis Conducted (y/n) | No |

## GEAR DESCRIPTION / ANALYSIS

| Date Gear Retrieved | | Gear Retrieved By | |
|---|---|---|---|
| Date Gear Received | | Received From | |
| Sources: | USCG | Date Set | |
| | CCS | Date Lost | |
| | Fisherman | Location | |
| | Other | Depth | |
| | | Bottom Type | |
| Gear Type: | Unknown - no gear present | Target Species: | |
| Gear Description: | | | |

No gear present.

| Comments: | | | | | |
|---|---|---|---|---|---|
| | | | | | |
| Conclusions: | | | | | |
| No gear present. | | | | | |
| Report By: | John F. Kenney | Date: | 10/22/05 | Current Location of Gear | N.A. |

Back to Table of Contents.

2004 Large Whale Entanglement and Ship Strike Report

| | |
|---|---|
| NMFS No. | E10-04 |
| Indication of Entanglement | Yes |
| **INITIAL STATUS** | Dead |
| **SUBSEQUENT STATUS (AS OF THE DATE THE NMFS ENTANGLEMENT REPORT IS COMPLETED)** | Dead |
| Date 1st Observed Entangled | 06/30/04 |
| Species | Fin |
| Individual ID | Unknown |
| Location **1st OBSERVED ENTANGLED** | Between Munson and Powell Canyon and approximately 150 east of Sandy Hook, NJ |
| Latitude/Longitude **1st OBSERVED ENTANGLED** | 40° 29.7'N    67° 12.0'W |
| Event Description | 06/30/04<br>• A moderately decomposed carcass was reported by marine mammal observers on a research cruise to NOAA PSB.<br>• Bloated with a taut line around mid-section.<br>• Series of light lacerations on the back and flanks of the animal.<br>• Blue sharks actively feeding on the carcass.<br>• No necropsy was performed. |
| Description of Gear on Whale **AS REPORTED** | |
| **A. DURING INITIAL SIGHTING** | Single, green, 5/8" sinking line wrapped under the visible flipper and throat grooves. Line appeared to be attached to gear deeper in the water column. |
| **B. SUBSEQUENT DESCRIPTIONS** | |
| **C. DIAGRAM OF ENTANGLING GEAR ON WHALE** | |
| Description of Wounds/**CONDITION** | |
| **A. DURING INITIAL SIGHTING** | None noted |
| **B. SUBSEQUENT DESCRIPTIONS** | |
| **NMFS GEAR ANALYSIS** | |
| A. Gear Type | Unknown – no gear recovered |
| **B. GEAR PART/LINE TYPE** | |
| **C. LOCATION OF SET** | |

| D. POTENTIAL POINT OF ENCOUNTER WITH GEAR | |
|---|---|
| Sighting prior to entanglement | Unknown |
| Re-sightings **POST-ENTANGLEMENT** | None – mortality |
| Life History Information | Unknown sex, 40ft in length (approximation) |
| **NMFS** Serious Injury/Mortality Determination | Human-caused Mortality |

## FISHERY INTERACTION GEAR ANALYSIS

| NMFS No. | E 10 - 04 | | |
|---|---|---|---|
| Field No. | J063004 | Date 1st Observed Entangled | 6/30/04 |
| Location 1st Observed | 150nm East of Sandy Hook, NJ 40E29.7' N, 67E12.0' W | Type of Event - Observation, Disentanglement, Stranding. Other (describe) | Carcass Stranding |
| Species | fin | Gear Recovered (y/n) | No |
| Individual ID | Unknown | Gear Analysis Conducted (y/n) | No |

## GEAR DESCRIPTION / ANALYSIS

| Date Gear Retrieved | | Gear Retrieved By | |
|---|---|---|---|
| Date Gear Received | | Received From | |
| Sources: | USCG | Date Set | |
| | CCS | Date Lost | |
| | Fisherman | Location | |
| | Other | Depth | |
| | | Bottom Type | |
| Gear Type: | Unknown - no gear recovered | Target Species: | |

Gear Description:

      No gear recovered.

Comments:

<u>Conclusions</u>:

No gear recovered.

| Report By: | John F. Kenney | Date: | 10/11/05 | Current Location of Gear | N.A. |
|---|---|---|---|---|---|

Back to Table of Contents.

| | |
|---|---|
| NMFS No. | E11-04 |
| Indication of Entanglement | No |
| **INITIAL STATUS** | Live |
| **SUBSEQUENT STATUS (AS OF THE DATE THE NMFS ENTANGLEMENT REPORT IS COMPLETED)** | Remains entangled |
| Date 1st Observed Entangled | 07/01/04 |
| Species | Unknown |
| Individual ID | Unknown |
| Location **1st OBSERVED ENTANGLED** | 34 NM west northwest of Cape Sable Island, Nova Scotia |
| Latitude/Longitude **1st OBSERVED ENTANGLED** | 43° 34.8'N      66° 25.3'W |
| Event Description | 07/01/04<br>• A fishing vessel reports an entangled whale to the Canadian Rescue Co-ordination Centre.<br>• Canada DFO notified the U.S. Disentanglement Network.<br>• Reporting fisherman was unable to stand-by the animal. |
| Description of Gear on Whale **AS REPORTED** | |
| **A. DURING INITIAL SIGHTING** | Animal reported to be towing a "lobster trawl". |
| **B. SUBSEQUENT DESCRIPTIONS** | |
| **C. DIAGRAM OF ENTANGLING GEAR ON WHALE** | |
| Description of Wounds/**CONDITION** | |
| **A. DURING INITIAL SIGHTING** | None noted |
| **B. SUBSEQUENT DESCRIPTIONS** | |
| **NMFS GEAR ANALYSIS** | Unknown – no gear recovered |
| A. Gear Type | |
| **B. GEAR PART/LINE TYPE** | |
| **C. LOCATION OF SET** | |
| **D. POTENTIAL POINT OF ENCOUNTER WITH GEAR** | |
| Sighting prior to entanglement | Unknown |

| Re-sightings **POST-ENTANGLEMENT** | Unknown – animal not resighted |
| Life History Information | Unknown sex, unknown length |
| **NMFS** Serious Injury/Mortality Determination | Non Human-caused Serious Injury |

# FISHERY INTERACTION GEAR ANALYSIS

| NMFS No. | E 11 - 04 | | |
|---|---|---|---|
| Field No. | J070104 | Date 1st Observed Entangled | 7/1/04 |
| Location 1st Observed | 34 nm WNW Cape Sable Island, Nova Scotia 43E 34.8' N,  66E 25.3' W | Type of Event - Observation, Disentanglement, Stranding. Other (describe) | Observation |
| Species | Unknown | Gear Recovered (y/n) | No |
| Individual ID | Unknown | Gear Analysis Conducted (y/n) | No |

## GEAR DESCRIPTION / ANALYSIS

| Date Gear Retrieved | | Gear Retrieved By | |
|---|---|---|---|
| Date Gear Received | | Received From | |
| Sources: | USCG | Date Set | |
| | CCS | Date Lost | |
| | Fisherman | Location | |
| | Other | Depth | |
| | | Bottom Type | |
| Gear Type: | Unknown - no gear recovered | Target Species: | |

Gear Description:

No gear recovered.

Comments:

Conclusions:

No gear recovered.

| Report By: | John F. Kenney | Date: | 10/22/05 | Current Location of Gear | N.A. |
|---|---|---|---|---|---|

Back to Table of Contents.

| | |
|---|---|
| NMFS No. | E12-04 |
| Indication of Entanglement | Yes |
| **INITIAL STATUS** | Dead |
| **SUBSEQUENT STATUS (AS OF THE DATE THE NMFS ENTANGLEMENT REPORT IS COMPLETED)** | Dead |
| Date 1st Observed Entangled | 07/06/04 |
| Species | Humpback |
| Individual ID | Unknown |
| Location **1st OBSERVED ENTANGLED** | Approximately 5 miles off Newport, RI |
| Latitude/Longitude **1st OBSERVED ENTANGLED** | 41° 22.8'N     71° 18.6'W |
| Event Description | 07/06/04<br>• Stranding Network received a report of a moderately decomposed carcass.<br><br>07/07/04<br>• Beached at Baily's Beach on Ocean Drive, Newport, RI, 41° 27' 38.3"N / 71° 18' 77.6"W<br>• Examined by Stranding Network participants.<br>• Deep laceration on left pectoral flipper penetrating down to bone. Indications of a previous line entanglement around flipper with injury.<br>• No necropsy was performed. |
| Description of Gear on Whale **AS REPORTED** | |
| **A. DURING INITIAL SIGHTING** | None noted |
| **B. SUBSEQUENT DESCRIPTIONS** | |
| **C. DIAGRAM OF ENTANGLING GEAR ON WHALE** | |
| Description of Wounds**/CONDITION** | |
| **A. DURING INITIAL SIGHTING** | Deep laceration on left pectoral flipper penetrating down to bone. Indications of a previous line entanglement around flipper with injury. |
| **B. SUBSEQUENT DESCRIPTIONS** | |
| **NMFS GEAR ANALYSIS** | |

| | |
|---|---|
| A. Gear Type | Unknown – no gear recovered |
| **B. GEAR PART/LINE TYPE** | |
| **C. LOCATION OF SET** | |
| **D. POTENTIAL POINT OF ENCOUNTER WITH GEAR** | |
| Sighting prior to entanglement | Unknown |
| Re-sightings **POST-ENTANGLEMENT** | None – mortality |
| Life History Information | Adult male, 813cm in length |
| **NMFS** Serious Injury/Mortality Determination | Non Human-caused Mortality |

# FISHERY INTERACTION GEAR ANALYSIS

| NMFS No. | E 12 - 04 | | |
|---|---|---|---|
| Field No. | J070604 | Date 1st Observed Entangled | 7/6/04 |
| Location 1st Observed | 5 nm off Newport, RI<br><br>41E 22.8' N,  71E 18.6' W | Type of Event - Observation, Disentanglement, Stranding. Other (describe) | Carcass<br><br>Stranding |
| Species | humpback | Gear Recovered (y/n) | No |
| Individual ID | Unknown | Gear Analysis Conducted (y/n) | No |

## GEAR DESCRIPTION / ANALYSIS

| Date Gear Retrieved | | | Gear Retrieved By | |
|---|---|---|---|---|
| Date Gear Received | | | Received From | |
| Sources: | USCG | | Date Set | |
| | CCS | | Date Lost | |
| | Fisherman | | Location | |
| | Other | | Depth | |
| | | | Bottom Type | |
| Gear Type: | Unknown - no gear present | | Target Species: | |

Gear Description:

       No gear present.

| Comments: | | | | | |
|---|---|---|---|---|---|
| | | | | | |
| Conclusions: | | | | | |
| No gear present. | | | | | |
| Report By: | John F. Kenney | Date: | 10/22/05 | Current Location of Gear | N.A. |

Back to Table of Contents.

2004 Large Whale Entanglement and Ship Strike Report

| NMFS No. | E13-04 |
|---|---|
| Indication of Entanglement | Yes |
| **INITIAL STATUS** | Live |
| **SUBSEQUENT STATUS (AS OF THE DATE THE NMFS ENTANGLEMENT REPORT IS COMPLETED)** | Remains entangled |
| Date 1st Observed Entangled | 07/11/04 |
| Species | Humpback |
| Individual ID | Lucky |
| Location **1st OBSERVED ENTANGLED** | 7.8 NM northwest of Brier Island, Nova Scotia |
| Latitude/Longitude **1st OBSERVED ENTANGLED** | 44° 20.66'N     66° 30.65'W |
| Event Description | 07/11/04<br>• A whale watch vessel reports an entangled whale to the Canadian Division of Fisheries and Oceans.<br><br>07/12/04<br>• Canada DFO notified the U.S. Disentanglement Network.<br>• Animal reported to be free-swimming.<br>• A Canadian government aircraft searched the area of the reported location from 07/11/04 and was unable to locate the entangled animal.<br>• Described to have a wrap of gillnet forward of the dorsal fin. No trailing gear noted. |
| Description of Gear on Whale **AS REPORTED** | |
| **A. DURING INITIAL SIGHTING** | Animal reported to have a wrap of gillnet forward of the dorsal fin. No trailing gear noted. |
| **B. SUBSEQUENT DESCRIPTIONS** | |
| **C. DIAGRAM OF ENTANGLING GEAR ON WHALE** | |
| Description of Wounds/**CONDITION** | |
| **A. DURING INITIAL SIGHTING** | None noted |
| **B. SUBSEQUENT DESCRIPTIONS** | |
| **NMFS GEAR ANALYSIS** | Unknown – no gear recovered |

| A. Gear Type | |
|---|---|
| **B. GEAR PART/LINE TYPE** | |
| **C. LOCATION OF SET** | |
| **D. POTENTIAL POINT OF ENCOUNTER WITH GEAR** | |
| Sighting prior to entanglement | 07/10/03 <br> • Animal sighted gear free at 43.47833°N \ 066.73400°W |
| Re-sightings **POST-ENTANGLEMENT** | 07/11/04 <br> • Animal sighted gear free at 44° 19.39'N \ 066° 34.53'W |
| Life History Information | Immature Male, approximately 2 years old at time of entanglement, animal identified as the 2002 calf of "Veteran", unknown length |
| **NMFS** Serious Injury/Mortality Determination | Human-caused Serious Injury |

## FISHERY INTERACTION GEAR ANALYSIS

| NMFS No. | E 13 - 04 | | |
|---|---|---|---|
| Field No. | J071104 | Date 1st Observed Entangled | 7/11/04 |
| Location 1st Observed | 8 nm NW of Brier Island, Nova Scotia, BOF 44E 20.7' N,   66E 30.7' W | Type of Event - Observation, Disentanglement, Stranding. Other (describe) | Observation |
| Species | | Gear Recovered (y/n) | No |
| Individual ID | | Gear Analysis Conducted (y/n) | No |

## GEAR DESCRIPTION / ANALYSIS

| Date Gear Retrieved | | Gear Retrieved By | |
|---|---|---|---|
| Date Gear Received | | Received From | |
| Sources: | USCG | Date Set | |
| | CCS | Date Lost | |
| | Fisherman | Location | |
| | Other | Depth | |
| | | Bottom Type | |
| Gear Type: | Unknown - no gear recovered | Target Species: | |

Gear Description:

No gear recovered.

| Comments: | | | | | |
|---|---|---|---|---|---|
| | | | | | |
| Conclusions: | | | | | |
| No gear recovered. | | | | | |
| Report By: | John F. Kenney | Date: | 10/22/05 | Current Location of Gear | N.A. |

Back to Table of Contents.

2004 Large Whale Entanglement and Ship Strike Report                    Page 50

| NMFS No. | E14-04 |
|---|---|
| Indication of Entanglement | No |
| **INITIAL STATUS** | Live |
| **SUBSEQUENT STATUS (AS OF THE DATE THE NMFS ENTANGLEMENT REPORT IS COMPLETED)** | Remains entangled |
| Date 1st Observed Entangled | 07/16/04 |
| Species | Humpback (probable) |
| Individual ID | Unknown |
| Location **1st OBSERVED ENTANGLED** | Between red nun and green can # 3, Martha's Vineyard, MA |
| Latitude/Longitude **1st OBSERVED ENTANGLED** | 41° 17.42'N    70° 48.28'W (approximation) |
| Event Description | 07/16/04 <ul><li>A private motor vessel reports an entangled whale to the PCCS Whale Hotline.</li><li>Observer reports wound proximal to the caudal peduncle. Wound appeared white and red.</li><li>Animal reported to be free-swimming.</li></ul> |
| Description of Gear on Whale **AS REPORTED** | |
| **A. DURING INITIAL SIGHTING** | No gear noted. |
| **B. SUBSEQUENT DESCRIPTIONS** | |
| **C. DIAGRAM OF ENTANGLING GEAR ON WHALE** | |
| Description of Wounds/**CONDITION** | |
| **A. DURING INITIAL SIGHTING** | Observer reports wound proximal to the caudal peduncle. Wound appeared white and red. . |
| **B. SUBSEQUENT DESCRIPTIONS** | |
| **NMFS GEAR ANALYSIS** | Unknown – no gear recovered |
| A. Gear Type | |
| **B. GEAR PART/LINE TYPE** | |
| **C. LOCATION OF SET** | |
| **D. POTENTIAL POINT OF** | |

| ENCOUNTER WITH GEAR | |
|---|---|
| Sighting prior to entanglement | Unknown |
| Re-sightings **POST-ENTANGLEMENT** | Unknown – animal not resighted |
| Life History Information | Unknown sex, animal estimated to be 30-40ft in length |
| **NMFS** Serious Injury/Mortality Determination | Non Human-caused Serious Injury |

# FISHERY INTERACTION GEAR ANALYSIS

| NMFS No. | E 14 - 04 | | |
|---|---|---|---|
| Field No. | J071604 | Date 1st Observed Entangled | 7/16/04 |
| Location 1st Observed | ~ 4nm SSW of Gay Head, Martha's Vineyard, MA 41E 17.4' N,   70E 48.3' W | Type of Event - Observation, Disentanglement, Stranding. Other (describe) | Observation |
| Species | humpback   (probable) | Gear Recovered (y/n) | No |
| Individual ID | Unknown | Gear Analysis Conducted (y/n) | No |

## GEAR DESCRIPTION / ANALYSIS

| Date Gear Retrieved | | | Gear Retrieved By | |
|---|---|---|---|---|
| Date Gear Received | | | Received From | |
| Sources: | USCG | | Date Set | |
| | CCS | | Date Lost | |
| | Fisherman | | Location | |
| | Other | | Depth | |
| | | | Bottom Type | |
| Gear Type: | Unknown - no gear recovered | | Target Species: | |

Gear Description:

    No gear recovered.

Comments:

Conclusions:

      No gear recovered.

| Report By: | John F. Kenney | Date: | 10/28/05 | Current Location of Gear | N.A. |
|---|---|---|---|---|---|

Back to Table of Contents.

2004 Large Whale Entanglement and Ship Strike Report

| | |
|---|---|
| NMFS No. | E15-04 |
| Indication of Entanglement | Yes |
| **INITIAL STATUS** | Dead |
| **SUBSEQUENT STATUS (AS OF THE DATE THE NMFS ENTANGLEMENT REPORT IS COMPLETED)** | Dead |
| Date 1st Observed Entangled | 07/19/04 |
| Species | Minke |
| Individual ID | Unknown |
| Location **1st OBSERVED ENTANGLED** | Approximately ½ mile south of Marconi Site, Eastham, MA |
| Latitude/Longitude **1st OBSERVED ENTANGLED** | 41° 54.487'N      69° 58.071'W |
| Event Description | 07/19/04<br>• Stranding Network received a report of a moderately decomposed carcass.<br>• Rolling in surf made it difficult for a thorough examination by Stranding Network participants.<br>• Observed 2-3 line marks across ventral and lateral surface, caudal of the pectoral flippers. Indication of line abrasion at the anterior insertion of the dorsal fin and trailing caudally. Abraded wound into caudal peduncle, ventrally at base of flukes, approximately 3/4 inch into blubber.<br>• No necropsy was performed.<br><br>07/21/04<br>• Resighted by a passing vessel, approximately 10 miles off Chatham, MA, 41° 47.252'N / 69° 51.276'W |
| Description of Gear on Whale **AS REPORTED** | |
| **A. DURING INITIAL SIGHTING** | None noted |
| **B. SUBSEQUENT DESCRIPTIONS** | |
| **C. DIAGRAM OF ENTANGLING GEAR ON WHALE** | |
| Description of Wounds/**CONDITION** | |
| **A. DURING INITIAL SIGHTING** | • Two to three line marks across ventral and lateral surface, caudal of the pectoral flippers. Indication of line abrasion at the anterior insertion of the dorsal fin and trailing caudally. Abraded wound into caudal peduncle, ventrally at base of flukes, approximately 3/4 inch into blubber. |

| **B. SUBSEQUENT DESCRIPTIONS** | |
| --- | --- |
| **NMFS GEAR ANALYSIS** | |
|   A. Gear Type | Unknown – no gear recovered |
|   **B. GEAR PART/LINE TYPE** | |
|   **C. LOCATION OF SET** | |
|   **D. POTENTIAL POINT OF ENCOUNTER WITH GEAR** | |
| Sighting prior to entanglement | Unknown |
| Re-sightings **POST-ENTANGLEMENT** | None – mortality |
| Life History Information | Adult female, 791cm in length |
| **NMFS** Serious Injury/Mortality Determination | Human-caused Mortality |

# FISHERY INTERACTION GEAR ANALYSIS

| NMFS No. | E 15 - 04 | | |
| --- | --- | --- | --- |
| Field No. | J071904 | Date 1st Observed Entangled | 7/9/04 |
| Location 1st Observed | ~ ½ nm S of Marconi Site, Eastham, CC, MA 41E 54.5' N,  69E 58.1' W | Type of Event - Observation, Disentanglement, Stranding. Other (describe) | Carcass Stranding |
| Species | minke | Gear Recovered (y/n) | No |
| Individual ID | Unknown | Gear Analysis Conducted (y/n) | No |

## GEAR DESCRIPTION / ANALYSIS

| Date Gear Retrieved | | Gear Retrieved By | |
| --- | --- | --- | --- |
| Date Gear Received | | Received From | |
| Sources: | USCG | Date Set | |
| | CCS | Date Lost | |
| | Fisherman | Location | |
| | Other | Depth | |
| | | Bottom Type | |
| Gear Type: | Unknown - no gear present | Target Species: | |

Gear Description:

     No gear present.

| Comments: | | | | | |
|---|---|---|---|---|---|
| | | | | | |
| Conclusions: | | | | | |
| | No gear present. | | | | |
| Report By: | John F. Kenney | Date: | 10/22/05 | Current Location of Gear | N.A. |

Back to Table of Contents.

| | |
|---|---|
| NMFS No. | E16-04 |
| Indication of Entanglement | Yes |
| **INITIAL STATUS** | Live |
| **SUBSEQUENT STATUS (AS OF THE DATE THE NMFS ENTANGLEMENT REPORT IS COMPLETED)** | Gear free |
| Date 1st Observed Entangled | 08/05/04 |
| Species | Humpback |
| Individual ID | Calf of "Haze" |
| Location **1st OBSERVED ENTANGLED** | Grand Manan Basin, New Brunswick |
| Latitude/Longitude **1st OBSERVED ENTANGLED** | 44° 27.7'N      66° 36.3'W (approximation) |
| Event Description | 08/05/04<br><br>• Researchers with NEAq report an entangled whale to the GMWSS.<br>• GMWSS relayed the report to the CWR.<br>• Animal reported to be free-swimming. Gear appeared to be one line looped under the animal's chin that is holding the mass of gillnet onto the animal. Line appeared to be the float line from a gillnet. The tangle of gillnet is loose on the whale's body and shifts around from the left shoulder to the right shoulder and backwards onto the back of the animal. Gear is not readily visible.<br>• CWR team attempted to grapple onto and cut free entangling gear but was unsuccessful.<br><br>08/23/04<br><br>• Report from Canada DFO of the animal being observed gear free. |
| Description of Gear on Whale **AS REPORTED** | |
| **A. DURING INITIAL SIGHTING** | Gear appeared to be one line looped under the animal's chin that is holding the mass of gillnet onto the animal. Line appeared to be the float line from a gillnet. The tangle of gillnet is loose on the whale's body and shifts around from the left shoulder to the right shoulder and backwards onto the back of the animal. Gear is not readily visible. |
| **B. SUBSEQUENT DESCRIPTIONS** | |
| **C. DIAGRAM OF ENTANGLING GEAR ON WHALE** | |



Drawing by Scott Landry    © 2004 Center for Coastal Studies

| Description of Wounds/**CONDITION** | |
|---|---|
| **A. DURING INITIAL SIGHTING** | None noted<br>. |
| **B. SUBSEQUENT DESCRIPTIONS** | |
| **NMFS GEAR ANALYSIS** | Unknown – no gear recovered |
| A. Gear Type | |
| **B. GEAR PART/LINE TYPE** | |
| **C. LOCATION OF SET** | |
| **D. POTENTIAL POINT OF ENCOUNTER WITH GEAR** | |
| Sighting prior to entanglement | 07/11/04 |
| | • Animal sighted gear free at 44° 22.53'N \ 066° 45.66'W |
| **Re-sightings POST-ENTANGLEMENT** | 08/22/04 |
| | • Animal sighted gear free at 44° 18.10'N \ 066° 28.97'W |
| | 08/23/04 |
| | • Animal observed by Canada DFO on survey gear free |
| Life History Information | Unknown sex, animal estimated to be 25ft in length |
| **NMFS** Serious Injury/Mortality Determination | Non Human-caused Serious Injury |

## FISHERY INTERACTION GEAR ANALYSIS

| NMFS No. | E 16 - 04 | | |
|---|---|---|---|
| Field No. | J080504 | Date 1st Observed Entangled | 8/5/04 |
| Location<br>1st Observed | Grand Manan Basin,<br>New Brunswick, BOF<br>44E 27.7' N,   66E 36.3' W | Type of Event - Observation,<br>Disentanglement, Stranding. Other<br>(describe) | Observation |
| Species | humpback | Gear Recovered (y/n) | No |
| Individual ID | Unknown - calf of Haze | Gear Analysis Conducted (y/n) | No |

## GEAR DESCRIPTION / ANALYSIS

| Date Gear Retrieved | | | Gear Retrieved By | |
|---|---|---|---|---|
| Date Gear Received | | | Received From | |
| Sources: | USCG | | Date Set | |
| | CCS | | Date Lost | |
| | Fisherman | | Location | |
| | Other | | Depth | |
| | | | Bottom Type | |
| Gear Type: | Unknown - no gear recovered | | Target Species: | |

Gear Description:

No gear recovered.

Comments:

Conclusions:

No gear recovered.

| Report By: | John F. Kenney | Date: | 10/22/05 | Current Location of Gear | N.A. |
|---|---|---|---|---|---|

Back to Table of Contents.

| NMFS No. | E17-04 |
|---|---|
| Indication of Entanglement | Yes |
| **INITIAL STATUS** | Live |
| **SUBSEQUENT STATUS (AS OF THE DATE THE NMFS ENTANGLEMENT REPORT IS COMPLETED)** | Remains entangled |
| Date 1st Observed Entangled | 08/22/04 |
| Species | Fin |
| Individual ID | Unknown |
| Location **1st OBSERVED ENTANGLED** | 14 NM east of Race Point, Cape Cod, MA |
| Latitude/Longitude **1st OBSERVED ENTANGLED** | 42° 05'N    69° 56'W (approximation) |
| Event Description | 08/22/04<br>• A whale watch vessel reports an entangled whale to the PCCS Whale Hotline and agrees to standby until PCCS rescue team arrives.<br>• Animal reported to be free-swimming.<br>• Wrap of line around body. Red buoy visible behind blowhole. No trailing gear reported.<br>• Numerous attempts by the PCCS rescue team at approaching and grappling the trailing line were unsuccessful. |
| Description of Gear on Whale **AS REPORTED** | |
| **A. DURING INITIAL SIGHTING** | Single 3/8" line exiting the right side of the mouth, wraps over the head near blowholes. Line enters the water near the left flipper and may involve the left flipper. Line ends at a red buoy trailing near the dorsal fin. |
| **B. SUBSEQUENT DESCRIPTIONS**<br><br>**C. DIAGRAM OF ENTANGLING GEAR ON WHALE** | <br>August 22, 2004    Scott Landry  © Center for Coastal Studies 2004 |

| Description of Wounds/**CONDITION** | |
|---|---|
| **A. DURING INITIAL SIGHTING** | Some minor scuffing associated with the gear. Animal appeared light in color with patchy skin. Animal appeared slightly emaciated.<br><br>. |
| **B. SUBSEQUENT DESCRIPTIONS** | |
| **NMFS GEAR ANALYSIS** | Unknown – no gear recovered |
| A. Gear Type | |
| **B. GEAR PART/LINE TYPE** | |
| **C. LOCATION OF SET** | |
| **D. POTENTIAL POINT OF ENCOUNTER WITH GEAR** | |
| Sighting prior to entanglement | Unknown |
| Re-sightings **POST-ENTANGLEMENT** | Unknown – animal not resighted |
| Life History Information | Unknown sex, animal estimated to be 40-45ft in length |
| **NMFS** Serious Injury/Mortality Determination | Non Human-caused Serious Injury |

## FISHERY INTERACTION GEAR ANALYSIS

| NMFS No. | E 17 - 04 | | |
|---|---|---|---|
| Field No. | J082204a | Date 1st Observed Entangled | 8/22/04 |
| Location 1st Observed | 14 nm East of Race Pt, CC, MA 42E 5.0' N,  69E 56.0' W | Type of Event - Observation, Disentanglement, Stranding. Other (describe) | Observation |
| Species | fin | Gear Recovered (y/n) | No |
| Individual ID | Unknown | Gear Analysis Conducted (y/n) | No |

## GEAR DESCRIPTION / ANALYSIS

| Date Gear Retrieved | | Gear Retrieved By | |
|---|---|---|---|
| Date Gear Received | | Received From | |
| Sources: | USCG | Date Set | |
| | CCS | Date Lost | |
| | Fisherman | Location | |
| | Other | Depth | |
| | | Bottom Type | |
| Gear Type: | Unknown - no gear recovered | Target Species: | |

Gear Description:

      No gear recovered.

Comments:

Conclusions:

      No gear recovered.

| Report By: | John F. Kenney | Date: | 10/22/05 | Current Location of Gear | N.A. |
|---|---|---|---|---|---|

Back to Table of Contents.

2004 Large Whale Entanglement and Ship Strike Report       Page 62

| | |
|---|---|
| NMFS No. | E18-4 |
| Indication of Entanglement | No |
| **INITIAL STATUS** | Live |
| **SUBSEQUENT STATUS (AS OF THE DATE THE NMFS ENTANGLEMENT REPORT IS COMPLETED)** | Gear free (Probable) |
| Date 1st Observed Entangled | 08/22/04 |
| Species | Humpback |
| Individual ID | Calf of "Horizon" |
| Location **1st OBSERVED ENTANGLED** | Bay of Fundy, New Brunswick |
| Latitude/Longitude **1st OBSERVED ENTANGLED** | None given |
| Event Description | 08/22/04<br>• Report of an entangled whale to the PCCS Disentanglement Network.<br>• Whale reported to have shed gear during observation. |
| Description of Gear on Whale **AS REPORTED** | |
| **A. DURING INITIAL SIGHTING** | Unknown |
| **B. SUBSEQUENT DESCRIPTIONS**<br><br>**C. DIAGRAM OF ENTANGLING GEAR ON WHALE** | |
| Description of Wounds/**CONDITION** | |
| **A. DURING INITIAL SIGHTING**<br><br>**B. SUBSEQUENT DESCRIPTIONS** | None noted<br>. |
| **NMFS GEAR ANALYSIS**<br><br>A. Gear Type<br><br>**B. GEAR PART/LINE TYPE**<br><br>**C. LOCATION OF SET**<br><br>**D. POTENTIAL POINT OF ENCOUNTER WITH GEAR** | Unknown – no gear recovered |
| Sighting prior to entanglement | 08/09/04 |

| | |
|---|---|
| Re-sightings **POST-ENTANGLEMENT** | • Animal sighted gear free at 44° 20.93'N \ 066° 20.10'W<br><br>08/26/04<br>• Animal sighted gear free at 44° 17.62'N \ 066° 27.99'W |
| Life History Information | Unknown sex, unknown length |
| **NMFS** Serious Injury/Mortality Determination | Non Human-caused Serious Injury |

# FISHERY INTERACTION GEAR ANALYSIS

| NMFS No. | E 18 - 04 | | |
|---|---|---|---|
| Field No. | J082204b | Date 1st Observed Entangled | 8/22/04 |
| Location 1st Observed | New Brunswick, BOF General Area | Type of Event - Observation, Disentanglement, Stranding. Other (describe) | Observation |
| Species | humpback | Gear Recovered (y/n) | No |
| Individual ID | Unknown - Calf of Horizon | Gear Analysis Conducted (y/n) | No |

## GEAR DESCRIPTION / ANALYSIS

| Date Gear Retrieved | | | Gear Retrieved By | |
|---|---|---|---|---|
| Date Gear Received | | | Received From | |
| Sources: | USCG | | Date Set | |
| | CCS | | Date Lost | |
| | Fisherman | | Location | |
| | Other | | Depth | |
| | | | Bottom Type | |
| Gear Type: | Unknown - no gear recovered | | Target Species: | |

Gear Description:

    No gear recovered.

Comments:

Conclusions:

       No gear recovered.

| Report By: | John F. Kenney | Date: | 10/22/05 | Current Location of Gear | N.A. |
|---|---|---|---|---|---|

Back to Table of Contents.

| NMFS No. | E19-04 |
|---|---|
| Indication of Entanglement | Yes |
| **INITIAL STATUS** | Live |
| **SUBSEQUENT STATUS (AS OF THE DATE THE NMFS ENTANGLEMENT REPORT IS COMPLETED)** | Gear free |
| Date 1st Observed Entangled | 08/30/04 |
| Species | Humpback |
| Individual ID | Rapier |
| Location **1st OBSERVED ENTANGLED** | 1.5 NM east of South Wellfleet, MA |
| Latitude/Longitude **1st OBSERVED ENTANGLED** | 41° 55.61'N     69° 56.27'W (approximation) |
| Event Description | 08/30/04<br>• A fisherman reports an entangled whale to the PCCS Whale Hotline and agrees to standby as long as possible.<br>• Unknown whether the animal is free-swimming or anchored.<br>• Fisherman standing by relieved by whale watch vessels.<br>• Gear appeared to be two wraps of line through the mouth that then led back and wrapped the tail.<br>• PCCS team successfully disentangled the animal. |
| Description of Gear on Whale **AS REPORTED** | |
|    **A. DURING INITIAL SIGHTING** | Gear appeared to be two wraps of line through the mouth and over the head that then led back and wrapped the tail with two buoys visible. |
|    **B. SUBSEQUENT DESCRIPTIONS**<br><br>   **C. DIAGRAM OF ENTANGLING GEAR ON WHALE** | <br>August 30, 2004   Drawing by Scott Landry   © Center for Coastal Studies 2004 |



Illustration by Scott Landry © Center for Coastal Studies 2004

| Description of Wounds/**CONDITION** | |
|---|---|
| **A. DURING INITIAL SIGHTING** | None noted<br>. |
| **B. SUBSEQUENT DESCRIPTIONS** | |
| **NMFS GEAR ANALYSIS** | Some gear recovered |
| A. Gear Type | |
| **B. GEAR PART/LINE TYPE** | |
| **C. LOCATION OF SET** | |
| **D. POTENTIAL POINT OF ENCOUNTER WITH GEAR** | |
| Sighting prior to entanglement | 08/29/04<br>• Animal sighted gear free at 41.90183°N \ 069.92800°W<br>06/16/05<br>• Animal sighted gear free at 42° 13.38'N \ 070° 21.73'W |
| Re-sightings **POST-ENTANGLEMENT** | |
| Life History Information | Mature Female, unknown length |
| **NMFS** Serious Injury/Mortality Determination | Non Human-caused Serious Injury |

## FISHERY INTERACTION GEAR ANALYSIS

| NMFS No. | E 19 - 04 | | |
|---|---|---|---|
| Field No. | J083004 | Date 1st Observed Entangled | 8/30/04 |
| Location 1st Observed | 1.5 nm E of South Wellfleet, CC, MA<br>41E 55.6' N,   69E 56.3' W | Type of Event - Observation, Disentanglement, Stranding. Other (describe) | Disentanglement |
| Species | humpback | Gear Recovered (y/n) | Yes |
| Individual ID | Rapier | Gear Analysis Conducted (y/n) | Yes |

## GEAR DESCRIPTION / ANALYSIS

| Date Gear Retrieved | | 8/30/04 | Gear Retrieved By | PCCS |
|---|---|---|---|---|
| Date Gear Received | | 9/16/04 | Received From | PCCS |
| Sources: | USCG | | Date Set | Unknown |
| | CCS | | Date Lost | Unknown |
| | Fisherman | owner interview | Location | Back side of Cape Cod, MA |
| | Other | | Depth | |
| | | | Bottom Type | |
| Gear Type: | Lobster Pot | | Target Species: | Lobster |

Gear Description:

      One 6" X 14" foam buoy with "Plant" plastic spindle having eye bolt hole threaded with 3/8" sink line using 3 hog rings as weak link attachment method. 8 fathom of 3/8" sink line (white with blue tracer) running from buoy spliced into 3 fathom 3/8" float rope (black).

Comments:

      This gear was rigged as a single trap.  Buoy line is rigged using one third float rope at bottom tied to  2/3rds sink at surface.  Buoy weak link consisted of 3 hog rings.

Conclusions:

      Entanglement occurred in the endline from a single lobster pot.

| Report By: | John F. Kenney | Date: | 11/9/05 | Current Location of Gear | NMFS, Maine |
|---|---|---|---|---|---|

Back to Table of Contents.

| | |
|---|---|
| NMFS No. | E20-04 |
| Indication of Entanglement | Yes |
| **INITIAL STATUS** | Live |
| **SUBSEQUENT STATUS (AS OF THE DATE THE NMFS ENTANGLEMENT REPORT IS COMPLETED)** | Dead |
| Date 1st Observed Entangled | 09/06/04 |
| Species | Right |
| Individual ID | 2301 |
| Location **1st OBSERVED ENTANGLED** | Northern edge of Browns Bank, Nova Scotia |
| Latitude/Longitude **1st OBSERVED ENTANGLED** | 42° 45'N    65° 35'W (approximation) |
| Event Description | 09/06/04<br>• Researchers with NEAq report an entangled whale to the PCCS Disentanglement Network.<br><br>09/22/04<br>• Disentanglement team from NEAq, CWR and CCS located the entangled whale on Browns Bank.<br>• Due to adverse sea conditions, numerous attempts to get close enough to cut the two entangling wraps on the head were unsuccessful.<br><br>12/08/04<br>• Animal observed approximately two miles off the beach at Nag's Head, North Carolina.<br><br>03/03/05<br>• Animal discovered dead on Ship Shoal Island, Virginia. |
| Description of Gear on Whale **AS REPORTED** | |
| **A. DURING INITIAL SIGHTING** | Two lines exiting the right lip and crossing over the head to the left flipper. |
| **B. SUBSEQUENT DESCRIPTIONS** | 09/22/04<br>• Left flipper condition appears to have deeply embedded lines, but lines are not visible.<br>• Green trailing line observed underneath and extending towards the flukes. Origination of line unknown. |

**C. DIAGRAM OF ENTANGLING GEAR ON WHALE**



Description of Wounds/**CONDITION**

**A. DURING INITIAL SIGHTING**

None noted
.
09/22/04
- Left flipper appears to be completely white in color, possibly indicating severe constriction and associated necrosis of the tissue.
- White coloration extends beyond left flipper to include a portion of the left side of the animal.

**B. SUBSEQUENT DESCRIPTIONS**

**NMFS GEAR ANALYSIS**

A. Gear Type

**B. GEAR PART/LINE TYPE**

**C. LOCATION OF SET**

**D. POTENTIAL POINT OF ENCOUNTER WITH GEAR**

Some gear recovered at necropsy

Sighting prior to entanglement

- Numerous sightings over many years prior to right whale #2301 being observed entangled. Only the most recent sightings are given.

| Month | Day | Year | Latitude | Longitude | Area |
|---|---|---|---|---|---|
| 8 | 21 | 2003 | 44.705 | 66.49 | BOF |
| 8 | 26 | 2003 | 44.60667 | 66.48667 | BOF |
| 9 | 7 | 2003 | 44.61167 | 66.46 | BOF |
| 9 | 7 | 2003 | 44.635 | 66.475 | BOF |
| 9 | 17 | 2003 | 44.58667 | 66.33 | BOF |
| 9 | 18 | 2003 | 44.35 | 66.41167 | BOF |

Re-sightings **POST-ENTANGLEMENT**

Animal found deceased with gear still present on 03/03/05 on Ship Shoal Island, VA

Life History Information

Adult reproductive Female, 12 years old, animal estimated to be 45ft in length.

| **NMFS** Serious Injury/Mortality Determination | Human-caused Mortality |
|---|---|

# FISHERY INTERACTION GEAR ANALYSIS

| NMFS No. | E 20 - 04 | | |
|---|---|---|---|
| Field No. | J090604 | Date 1st Observed Entangled | 9/6/04 |
| Location 1st Observed | Northern edge of Brown's Bank, GOM 42E 45' N, 65E 35' W | Type of Event - Observation, Disentanglement, Stranding. Other (describe) | Observation 3/3/05 found Dead |
| Species | right | Gear Recovered (y/n) | Yes |
| Individual ID | Eg # 2301 | Gear Analysis Conducted (y/n) | Yes |

## GEAR DESCRIPTION / ANALYSIS

| Date Gear Retrieved | | 3/5/05 | Gear Retrieved By | | VMSM,  WHOI |
|---|---|---|---|---|---|
| Date Gear Received | | 3/18/05 | Received From | | VMSM |
| Sources: | USCG | | Date Set | | |
| | CCS | | Date Lost | | |
| | Fisherman | | Location | | |
| | Other | | Depth | | |
| | | | Bottom Type | | |
| Gear Type: | Unknown | | Target Species: | | |

Gear Description:

Five lengths of rope were removed from the whales baleen.  One of the lengths consisted of 2 separate pieces tangled with each other.  Diameters were 3/8" and 7/16" and both floating and sinking types were present.

Comments:

This rope was removed from the left baleen rack.  While previous entanglement sightings documented rope exiting the right side of the mouth and wrapping across the blowhole area and down to the left flipper, this rope was not present when the whale was found stranded.

Conclusions:

 Rope of unknown origin.

| Report By: | John F. Kenney | Date: | 10/25/05 | Current Location of Gear | Allen Harbor Field Station NMFS |
|---|---|---|---|---|---|

Back to Table of Contents.

| NMFS No. | E21-4 |
|---|---|
| Indication of Entanglement | Yes |
| **INITIAL STATUS** | Live |
| **SUBSEQUENT STATUS (AS OF THE DATE THE NMFS ENTANGLEMENT REPORT IS COMPLETED)** | Gear free |
| Date 1st Observed Entangled | 09/11/04 |
| Species | Fin |
| Individual ID | Unknown |
| Location **1st OBSERVED ENTANGLED** | 14.5 NM southeast of Swallowtail Head, Grand Manan Island, New Brunswick |
| Latitude/Longitude **1st OBSERVED ENTANGLED** | 44° 44'N    66° 24'W (approximation) |
| Event Description | 09/11/04<br>• A whale watch vessel reports an entangled whale to the GMWSS, which forwarded the report to the CWR<br>• The whale watch vessel agrees to standby until the CWR rescue team arrives.<br>• CWR rescue team cut the anchor line on the left side of the animal and was able to grapple onto the line with the balloon float on the right side of the animal and successfully pull the line through the baleen, freeing the animal. |
| Description of Gear on Whale **AS REPORTED** | |
| **A. DURING INITIAL SIGHTING** | Reported as a single line, estimated to be 100 fathoms long passing through the mouth of the animal. Appeared to be the entire buoy line system, from anchor to buoy. Orange balloon buoy with a large amount of blue line present and visible when whale slowed. |
| **B. SUBSEQUENT DESCRIPTIONS** | |
| **C. DIAGRAM OF ENTANGLING GEAR ON WHALE** | |
| Description of Wounds/**CONDITION** | |
| **A. DURING INITIAL SIGHTING** | None noted<br>. |
| **B. SUBSEQUENT DESCRIPTIONS** | |
| **NMFS GEAR ANALYSIS** | Gear recovered |
| A. Gear Type | |

| B. GEAR PART/LINE TYPE | |
|---|---|
| C. LOCATION OF SET | As reported by the fisherman the gear was set 2.75 miles west of Southern Wolf Island and marked the northeast end of a set gill net. |
| D. POTENTIAL POINT OF ENCOUNTER WITH GEAR | Animal entangled in the running line, a 25-20 fathom line from the anchor to the lead line of the gill net. |
| Sighting prior to entanglement | Unknown |
| Re-sightings **POST-ENTANGLEMENT** | Unknown – animal not resighted |
| Life History Information | Unknown sex, animal estimated to be 45-50ft in length |
| **NMFS** Serious Injury/Mortality Determination | Non Human-caused Serious Injury |

# FISHERY INTERACTION GEAR ANALYSIS

| NMFS No. | E  21 - 04 | | |
|---|---|---|---|
| Field No. | J091104 | Date 1st Observed Entangled | 9/11/04 |
| Location 1st Observed | 14nm SE Swallowtail Head, Grand Manan, NB 44E 44' N,  66E 24' W | Type of Event - Observation, Disentanglement, Stranding. Other (describe) | Disentanglement |
| Species | fin | Gear Recovered (y/n) | Yes |
| Individual ID | Unknown | Gear Analysis Conducted (y/n) | by CWR |

## GEAR DESCRIPTION / ANALYSIS

| Date Gear Retrieved | | | Gear Retrieved By | CWR |
|---|---|---|---|---|
| Date Gear Received | | | Received From | |
| Sources: | USCG | | Date Set | |
| | CCS | | Date Lost | |
| | Fisherman | | Location | 2.75 nm W. Southern Wolf I |
| | Other | CWR | Depth | |
| | | | Bottom Type | |
| Gear Type: | sink gillnet | | Target Species: | |

Gear Description:

   Approximately 100 fathoms of buoy line and orange balloon buoy.

Comments:    From a narrative account of the event prepared by Mac Greene of the Campobello Whale Rescue Team:

*In talking with the fisherman who owned the buoy line, it was set 2 3/4 miles W of Southern Wolf Island, marking the NE end of a gill net. All he lost was the buoy line, high flyer, balloon and anchor. It seems the running line parted, letting the whale swim free. The running line is a 25-30 fathom line from the anchor to the lead line of the gill net. Everything else was retrieved by the fisherman where he set it.*

Conclusions:

Whale was entangled in a gillnet buoy line.

| Report By: | John F. Kenney | Date: | 10/25/05 | Current Location of Gear | N.A. |
|---|---|---|---|---|---|

[Back to Table of Contents.](#)

| NMFS No. | E22-04 |
|---|---|
| Indication of Entanglement | Yes |
| **INITIAL STATUS** | Live |
| **SUBSEQUENT STATUS (AS OF THE DATE THE NMFS ENTANGLEMENT REPORT IS COMPLETED)** | Remains entangled (non-lethal) |
| Date 1st Observed Entangled | 09/12/04 |
| Species | Humpback |
| Individual ID | Andreas |
| Location **1st OBSERVED ENTANGLED** | 38 NM east northeast of Nantucket Island, MA |
| Latitude/Longitude **1st OBSERVED ENTANGLED** | 41° 28'N    69° 09'W (approximation) |
| Event Description | 09/12/04<br><br>• A tuna spotting pilot reports an entangled whale to the PCCS Whale Hotline.<br><br>• Fishing vessel and aircraft agree to standby until the R/V *Shearwater* arrives on scene.<br><br>• PCCS team successfully removed the majority of gear from the animal, including all weighted gear and all line from the whale's head. A simple loop of line was left on the whale's tail that was considered to be a lethal entanglement. |
| Description of Gear on Whale **AS REPORTED** | |
| **A. DURING INITIAL SIGHTING** | Gear appeared to consist of multiple traps and a large amount of tangled line. The entanglement appeared to be involved with the head, flipper and the tail and is a very complex entanglement. |
| **B. SUBSEQUENT DESCRIPTIONS** | |
| **C. DIAGRAM OF ENTANGLING GEAR ON WHALE** | |



| Description of Wounds/**CONDITION** | |
|---|---|
| **A. DURING INITIAL SIGHTING** | None noted . |
| **B. SUBSEQUENT DESCRIPTIONS** | |
| **NMFS GEAR ANALYSIS** | Some gear recovered |
| A. Gear Type | |
| **B. GEAR PART/LINE TYPE** | |
| **C. LOCATION OF SET** | |
| **D. POTENTIAL POINT OF ENCOUNTER WITH GEAR** | |
| Sighting prior to entanglement | 08/28/04 • Animal sighted gear free at 42.03900°N \ 070.00317°W |
| Re-sightings **POST-ENTANGLEMENT** | 07/21/05 • Animal sighted at 41° 37.83'N \ 069° 41.69'W |
| Life History Information | Male, unknown length |
| **NMFS** Serious Injury/Mortality Determination | Non Human-caused Serious Injury |

## FISHERY INTERACTION GEAR ANALYSIS

| NMFS No. | E 22 - 04 | | |
|---|---|---|---|
| Field No. | J091204 | Date 1st Observed Entangled | 9/12/04 |
| Location 1st Observed | 38 nm ENE Nantucket Island, MA 41E 28' N,   69 E 09' W | Type of Event - Observation, Disentanglement, Stranding. Other (describe) | Partial Disentanglement |
| Species | humpback | Gear Recovered (y/n) | Yes |

| Individual ID | Andreas | Gear Analysis Conducted (y/n) | Yes |

## GEAR DESCRIPTION / ANALYSIS

| Date Gear Retrieved | 9/12/04 | Gear Retrieved By | PCCS |
| Date Gear Received | 9/16/04 | Received From | PCCS |
| Sources: | USCG | | Date Set | ~ 9/8/04 |
| | CCS | | Date Lost | |
| | Fisherman | owner interview | Location | ~ 5nm E. of Chatham, MA |
| | Other | | Depth | 75 feet |
| | | | Bottom Type | Sand / Gravel |
| Gear Type: | Lobster, 15 pot trawl | Target Species: | Lobster |

Gear Description:

Buoy system consist of a single 6"x8" acorn buoy with plastic Plante spindle leading to a mini high flier made up of two 6"x8"acorn foam buoys slid over a 5 ft section of 3/4in PVC pipe equipped with a black plastic mesh flag. There is a 8 foot length of float rope between single buoy and the high flier that serves as a pick up buoy and a 4ft length of float line trailing from the single buoy that ends in a tied eye or loop. All line is 3/8ths inch.

Comments:

The gear was rigged as a 15 pot trawl using float rope ground lines. The owner marks each end of the trawl with an end line made up of 1/3 float rope at bottom and 2/3rds sink line in the upper portion of the water column. The gear was set in 75 feet of water on sandy/gravel bottom in federal waters.

Conclusions:

Entanglement occurred in the endline of lobster gear fished in federal waters.

| Report By: | John F. Kenney | Date: | 10/25/05 | Current Location of Gear | NMFS, Maine |

Back to Table of Contents.

| NMFS No. | E23-04 |
|---|---|
| Indication of Entanglement | Yes |
| **INITIAL STATUS** | Live |
| **SUBSEQUENT STATUS (AS OF THE DATE THE NMFS ENTANGLEMENT REPORT IS COMPLETED)** | Remains entangled |
| Date 1st Observed Entangled | 09/30/04 |
| Species | Humpback |
| Individual ID | Unknown |
| Location **1st OBSERVED ENTANGLED** | 20 NM east of Portsmouth, NH |
| Latitude/Longitude **1st OBSERVED ENTANGLED** | 43° 03'N     70° 14'W (approximation) |
| Event Description | 09/30/04<br>• A whale watch vessel reports an entangled whale to the MMP, which in turn relays the sightings information to the PCCS Whale Hotline.<br>• Whale believed to be free-swimming.<br>• Due to the lateness of the call and the distance of the closest first responder, no response was possible. |
| Description of Gear on Whale **AS REPORTED** | |
|    **A. DURING INITIAL SIGHTING** | Wrap of line on head and flukes, reported to be cutting into the animal. No tailing gear or buoys observed. |
|    **B. SUBSEQUENT DESCRIPTIONS** | |
|    **C. DIAGRAM OF ENTANGLING GEAR ON WHALE** | |
| Description of Wounds/**CONDITION** | |
|    **A. DURING INITIAL SIGHTING** | Lines present on head and flukes of the animal reported to cutting into the animal.<br>. |
|    **B. SUBSEQUENT DESCRIPTIONS** | |
| **NMFS GEAR ANALYSIS** | No gear recovered |
|   A. Gear Type | |

| B. GEAR PART/LINE TYPE | |
|---|---|
| C. LOCATION OF SET | |
| D. POTENTIAL POINT OF ENCOUNTER WITH GEAR | |
| Sighting prior to entanglement | Unknown |
| Re-sightings **POST-ENTANGLEMENT** | Unknown – animal not resighted |
| Life History Information | Unknown sex, unknown length |
| **NMFS** Serious Injury/Mortality Determination | Non Human-caused Serious Injury |

## FISHERY INTERACTION GEAR ANALYSIS

| NMFS No. | E 23 - 04 | | |
|---|---|---|---|
| Field No. | J093004 | Date 1st Observed Entangled | 9/30/04 |
| Location 1st Observed | 20nm East of Portsmouth, NH 43E 03' N,   70E 14' W | Type of Event - Observation, Disentanglement, Stranding. Other (describe) | Observation |
| Species | humpback | Gear Recovered (y/n) | No |
| Individual ID | Unknown | Gear Analysis Conducted (y/n) | No |

## GEAR DESCRIPTION / ANALYSIS

| Date Gear Retrieved | | | Gear Retrieved By | |
|---|---|---|---|---|
| Date Gear Received | | | Received From | |
| Sources: | USCG | | Date Set | |
| | CCS | | Date Lost | |
| | Fisherman | | Location | |
| | Other | | Depth | |
| | | | Bottom Type | |
| Gear Type: | Unknown - no gear recovered | | Target Species: | |

Gear Description:

No gear recovered.

| Comments: | | | | | |
|---|---|---|---|---|---|
| | | | | | |
| Conclusions: | | | | | |
| No gear recovered. | | | | | |
| Report By: | John F. Kenney | Date: | 10/25/05 | Current Location of Gear | N.A. |

Back to Table of Contents.

2004 Large Whale Entanglement and Ship Strike Report

| NMFS No. | E24-04 |
|---|---|
| Indication of Entanglement | Yes |
| **INITIAL STATUS** | Dead |
| **SUBSEQUENT STATUS (AS OF THE DATE THE NMFS ENTANGLEMENT REPORT IS COMPLETED)** | Dead |
| Date 1st Observed Entangled | 10/03/04 |
| Species | Humpback |
| Individual ID | Unknown |
| Location **1st OBSERVED ENTANGLED** | Closed area II in EEZ, approximately 115 east southeast of Chatham, MA |
| Latitude/Longitude **1st OBSERVED ENTANGLED** | 41° 18'N    67° 16'W |
| Event Description | 10/03/04<br>• USCG Falcon jet observed a dead large whale while on patrol.<br>• Gear observed around tail with a radar reflector and buoy present.<br>• No necropsy was performed. |
| Description of Gear on Whale **AS REPORTED** | |
| **A. DURING INITIAL SIGHTING** | Gear observed entangled around the tail was a high-flyer, radar reflector and an orange buoy. |
| **B. SUBSEQUENT DESCRIPTIONS** | |
| **C. DIAGRAM OF ENTANGLING GEAR ON WHALE** | |
| Description of Wounds/**CONDITION** | |
| **A. DURING INITIAL SIGHTING** | None noted |
| **B. SUBSEQUENT DESCRIPTIONS** | |
| **NMFS GEAR ANALYSIS** | |
| A. Gear Type | Unknown – no gear recovered |
| **B. GEAR PART/LINE TYPE** | |
| **C. LOCATION OF SET** | |
| **D. POTENTIAL POINT OF ENCOUNTER WITH GEAR** | |

| Sighting prior to entanglement | Unknown |
| Re-sightings **POST-ENTANGLEMENT** | None – mortality |
| Life History Information | Unknown sex, unknown length |
| **NMFS** Serious Injury/Mortality Determination | Human-caused Mortality |

# FISHERY INTERACTION GEAR ANALYSIS

| NMFS No. | E 24 - 04 | | |
| Field No. | J100304 | Date 1st Observed Entangled | 10/3/04 |
| Location 1st Observed | ~ 123nm East of Nantucket, MA 41E 18' N,  67E 16' W | Type of Event - Observation, Disentanglement, Stranding. Other (describe) | Carcass Stranding |
| Species | humpback | Gear Recovered (y/n) | No |
| Individual ID | Unknown | Gear Analysis Conducted (y/n) | No |

## GEAR DESCRIPTION / ANALYSIS

| Date Gear Retrieved | | Gear Retrieved By | |
| Date Gear Received | | Received From | |
| Sources: | USCG | Date Set | |
| | CCS | Date Lost | |
| | Fisherman | Location | |
| | Other | Depth | |
| | | Bottom Type | |
| Gear Type: | Unknown - no gear recovered | Target Species: | |

Gear Description:

No gear recovered.

Comments:

<u>Conclusions</u>:

No gear recovered.

| Report By: | John F. Kenney | Date: | 10/25/05 | Current Location of Gear | N.A. |
|---|---|---|---|---|---|

Back to Table of Contents.

2004 Large Whale Entanglement and Ship Strike Report                    Page 84

| | |
|---|---|
| NMFS No. | E25-04 |
| Indication of Entanglement | Yes |
| **INITIAL STATUS** | Dead |
| **SUBSEQUENT STATUS (AS OF THE DATE THE NMFS ENTANGLEMENT REPORT IS COMPLETED)** | Dead |
| Date 1st Observed Entangled | 10/05/04 |
| Species | Minke |
| Individual ID | Unknown |
| Location **1st OBSERVED ENTANGLED** | Approximately 1 NM south of Seguin Island, ME |
| Latitude/Longitude **1st OBSERVED ENTANGLED** | 43° 41.1'N    69° 46.2'W (approximation) |
| Event Description | 10/05/04<br>• MMP observed a dead whale and contacted stranding network and NOAA.<br>• Line marks observed around caudal peduncle and flukes.<br>• No gear observed.<br>• No necropsy was performed. |
| Description of Gear on Whale **AS REPORTED** | |
| **A. DURING INITIAL SIGHTING** | None noted |
| **B. SUBSEQUENT DESCRIPTIONS** | |
| **C. DIAGRAM OF ENTANGLING GEAR ON WHALE** | |
| Description of Wounds/**CONDITION** | |
| **A. DURING INITIAL SIGHTING** | Trauma thought to be from interactions with lines was observed on caudal peduncle and flukes. |
| **B. SUBSEQUENT DESCRIPTIONS** | |
| **NMFS GEAR ANALYSIS** | |
| A. Gear Type | Unknown – no gear recovered |
| **B. GEAR PART/LINE TYPE** | |
| **C. LOCATION OF SET** | |
| **D. POTENTIAL POINT OF** | |

| ENCOUNTER WITH GEAR | |
|---|---|
| Sighting prior to entanglement | Unknown |
| Re-sightings **POST-ENTANGLEMENT** | None – mortality |
| Life History Information | Adult male, 228cm in length |
| **NMFS** Serious Injury/Mortality Determination | Non Human-caused Mortality |

# FISHERY INTERACTION GEAR ANALYSIS

| NMFS No. | E 25 - 04 | | |
|---|---|---|---|
| Field No. | J100504 | Date 1st Observed Entangled | 10/5/04 |
| Location 1st Observed | 1 nm South of Seguin Island, ME 43E 41.1' N,  69E46.2' W | Type of Event - Observation, Disentanglement, Stranding. Other (describe) | Carcass |
| Species | minke | Gear Recovered (y/n) | No |
| Individual ID | Unknown | Gear Analysis Conducted (y/n) | No |

## GEAR DESCRIPTION / ANALYSIS

| Date Gear Retrieved | | | Gear Retrieved By | |
|---|---|---|---|---|
| Date Gear Received | | | Received From | |
| Sources: | USCG | | Date Set | |
| | CCS | | Date Lost | |
| | Fisherman | | Location | |
| | Other | | Depth | |
| | | | Bottom Type | |
| Gear Type: | Unknown - no gear recovered | | Target Species: | |

Gear Description:

No gear recovered.

Comments:

Conclusions:

       No gear recovered.

| Report By: | John F. Kenney | Date: | 10/25/05 | Current Location of Gear | N.A. |
|---|---|---|---|---|---|

Back to Table of Contents.

2004 Large Whale Entanglement and Ship Strike Report

| | |
|---|---|
| NMFS No. | E26-04 |
| Indication of Entanglement | Yes |
| **INITIAL STATUS** | Live |
| **SUBSEQUENT STATUS (AS OF THE DATE THE NMFS ENTANGLEMENT REPORT IS COMPLETED)** | Gear free |
| Date 1st Observed Entangled | 12/06/04 |
| Species | Right |
| Individual ID | 3314, "Yellowfin" |
| Location **1st OBSERVED ENTANGLED** | 4 NM southeast of Diamond Shoals, NC |
| Latitude/Longitude **1st OBSERVED ENTANGLED** | 35° 05.28'N     75° 15.2'W (approximation) |
| Event Description | 12/06/04<br><br>• A fisherman reports an entangled whale to the USCG.<br>• USCG responds and locates the entangled whale just before dark.<br>• Species thought to be a right whale but unconfirmed.<br><br>12/07/04<br>• USCG launches an aerial search with a local first responder for the entangled whale.<br>• Search focused near shore (within 10NM) from Diamond Shoals, NC and Cape Lookout, NC.<br>• Sighting conditions were poor and the animal was not relocated.<br><br>12/08/04<br>• USCG launches an aerial search with a local first responder for the entangled whale, but is unable to relocate the animal.<br>• Search by USCG focused from Cape Lookout, NC to Cape Fear, NC, out to 12NM from shore.<br>• Aerial survey team from Wildlife Trust conducted a directed aerial survey focusing on Charleston, SC and north to the USCG search area.<br>• Sightings conditions were excellent, but the animal was not relocated.<br><br>12/09/04<br>• Possible report from a fisherman of a previous sighting of the entangled animal on 12/05/04 off Virginia. |

12/10/04
- Possible report of the entangled animal off the North Carolina coast. Report was unverified.

12/21/04
- An aerial survey team from Wildlife Trust aboard the NOAA Twin Otter spotted the entangled animal at 31° 32.21'N \ 080° 59.80'W, approximately 9 NM northeast of Sapelo Island, GA.
- Whale reported to be swimming in a southwest direction.
- Disentanglement response team from GA DNR, FWC FWRI and NOAA responded and deployed a satellite telemetry tag onto the trailing gear.
- The amount of trailing gear was also shortened.

12/23/04
- Satellite telemetry indicates that the entangled animal is approximately 12 NM east of Fernandina Beach, FL.
- Weather outlook is unfavorable for any type of response in the next few days.

12/25/04
- Satellite telemetry indicates that the entangled animal is approximately 15 NM east of the mouth of the St. Johns River in Jacksonville, FL.
- Weather outlook is unfavorable for any aerial or marine operations.

12/26/04
- Satellite telemetry indicates that the entangled animal is now traveling northeast at approximately 3 knots and is 41 NM east of St. Simons Island, GA.
- Satellite telemetry is unusually poor with only an average of 30 percent surface time providing satellite fixes of poor resolution.
- Weather outlook is poor with seas approximately 10-12 ft in height and winds between 30-40 knots.

12/27/04
- Satellite telemetry indicates that the entangled animal is traveling north between 2 and 3 knots and is approximately 23 NM southeast of Charleston, SC.

12/28/04
- Satellite telemetry indicates that the entangled animal is traveling northeast averaging 2 knots and is approximately 11 NM southeast of Charleston, SC.

12/29/04
- Disentanglement team from PCCS, GA DNR, FWC FWRI, UNC-W and NOAA are staging out of Wilmington, NC for a disentanglement response on 12/30/04.

12/30/04
- Satellite telemetry indicates that the entangled animal changed direction of travel and is now traveling southwest.
- Disentanglement team stages out of Charleston, SC with assistance from the USCG Cutter *Yellowfin.*
- Initial response team from PCCS and FWC FWRI respond on the NOAA RHIB and locate the entangled animal approximately 6.5 NM southeast of Charleston, SC.
- Numerous attempts to get close enough to attempt a cut on the lines crossing over the head of the animal were unsuccessful.
- Aerial survey team from Wildlife Trust documented the whale and the disentanglement attempts.
- The telemetry buoy and large orange buoy were moved forward along the trailing line to limit the length of trailing line and gear behind the animal. Additional buoys were deployed forward of the telemetry buoy to keep the tag at the surface more for better satellite fixes.
- At dusk a strobe light was affixed to the telemetry buoy for tracking through the night for continued disentanglement operations in the morning on 12/31/04.

12/31/04
- A biopsy sample was obtained of inflamed tissue surrounding the embedded line on the head of the animal.
- Additional drag was placed on the animal by the disentanglement team in an attempt to slow it down and allow the team in the combat inflatable to approach closely enough to cut the lines crossing over the head.
- While adding additional drag from the NOAA RHIB the line parted and all of the gear was released from the animal.
- All of the gear was recovered.
- The animal was tracked for an additional 45 minutes to verify that all of the gear was removed and to gain additional documentation.

| | |
|---|---|
| Description of Gear on Whale **AS REPORTED** | |
| **A. DURING INITIAL SIGHTING** | Reported to have heavy amount of netting or 'tackle' and to be towing a length of gear with a poly ball float at the trailing end. |
| **B. SUBSEQUENT DESCRIPTIONS** | 12/21/04<br>- Animal had green line anchored at the mouth and/or flippers, crossing over the nares where the line splits into two lines forming a 'Y' on the left side of the head.<br>- Line appears to come from the left flipper region and trail approximately 4 body lengths (~200ft) to a large orange buoy.<br>- Approximately 40 feet of line trails behind the large orange buoy. |
| **C. DIAGRAM OF ENTANGLING** | |

**GEAR ON WHALE**



**Description of Wounds/CONDITION**

**A. DURING INITIAL SIGHTING**

None noted

**B. SUBSEQUENT DESCRIPTIONS**

**NMFS GEAR ANALYSIS**

Majority of gear recovered

A. Gear Type

**B. GEAR PART/LINE TYPE**

**C. LOCATION OF SET**

**D. POTENTIAL POINT OF ENCOUNTER WITH GEAR**

Sighting prior to entanglement

| Month | Day | Year | Latitude | Longitude | Area |
|-------|-----|------|----------|-----------|------|
| 12 | 23 | 2002 | 31.51667 | 81.13333 | GA |
| 12 | 27 | 2002 | 31.3 | 81.05 | GA |
| 12 | 29 | 2002 | 30.86667 | 81.36667 | GA |
| 12 | 30 | 2002 | 30.79 | 81.3 | GA |
| | | | | | |
| 1 | 18 | 2003 | 29.84333 | 81.23833 | FL |
| 1 | 21 | 2003 | 30.61 | 81.27167 | FL |
| 6 | 29 | 2003 | 42.14167 | 69.85333 | MB |
| 8 | 14 | 2003 | 44.36167 | 66.285 | BOF |
| 8 | 20 | 2003 | 44.65833 | 66.49667 | BOF |
| 8 | 20 | 2003 | 44.68167 | 66.50167 | BOF |
| 8 | 20 | 2003 | 44.68833 | 66.49833 | BOF |
| 8 | 21 | 2003 | 44.71 | 66.495 | BOF |
| 8 | 25 | 2003 | 44.59667 | 66.535 | BOF |

| | | 1 | 30 | 2004 | 30.78667 | 81.33167 | GA | |

| | |
|---|---|
| Re-sightings **POST-ENTANGLEMENT** | 01/03/05<br><br>• Animal observed by Wildlife Trust aerial survey team at 31° 22.17'N \ 081° 06.16'W, 8.5 NM east of Sapelo Island, GA.<br>• No gear observed on the animal.<br><br>06/08/05<br><br>• Animal observed feeding by NOAA aerial survey team at 41° 26.9'N \ 068° 50.9'W in the Great South Channel.<br>• No gear observed on the animal. |
| Life History Information | Unknown sex, the whale was identified as #3314, a 2003 calf, unknown length |
| **NMFS** Serious Injury/Mortality Determination | Non Human-caused Serious Injury |

## FISHERY INTERACTION GEAR ANALYSIS

| NMFS No. | E 26 - 04 | | |
|---|---|---|---|
| Field No. | J120604 | Date 1st Observed Entangled | 12/6/04 |
| Location 1st Observed | 4nm Southeast of Diamond Shoals, NC 35E 5.3' N,   75E 15.2' W | Type of Event - Observation, Disentanglement, Stranding. Other (describe) | Observation<br><br>12/30/04 Disentangled |
| Species | right | Gear Recovered (y/n) | Yes |
| Individual ID | Eg # 3314, aka: Yellowfin | Gear Analysis Conducted (y/n) | Yes |

### GEAR DESCRIPTION / ANALYSIS

| Date Gear Retrieved | | Dec. 30 & 31, 2004 | Gear Retrieved By | PCCS et al |
|---|---|---|---|---|
| Date Gear Received | | 2/2/05 | Received From | SEFSC |
| Sources: | USCG | | Date Set | |
| | CCS | | Date Lost | |
| | Fisherman | Owner interview | Location | |
| | Other | | Depth | |
| | | | Bottom Type | |
| Gear Type: | Lobster trap | | Target Species: | Lobster |

Gear Description:

Endline and buoy system.  Buoy system consists of Scanmarin NB60, 18" diameter balloon style float and a 7"x 14" bullet type pick-up float.  The pick-up buoy and scan float are attached to each other with 4 fathoms of sink rope.   The buoyline was 3/8" polysteel (floatrope) and had 3 foot lengths of gillnet leadline tucked into it approximately every 4 fathoms. Total length of buoyline recovered is approximately 78 fathoms.

Comments:

Marking on the scan float led to the identification of the owner and subsequent interview.  The owner fishes out of Campabello Island, New Brunswick.  He thought that the gear might have been picked up in May or June from a bay near St. John, NB, if not it would have to have been at some point after Nov. 9, 2004.  The buoyline was rigged 120 fathoms long (approx. 78 fm recovered) and had a 35 pound trawl anchor at the bottom.  The fishermen puts the leadline in the buoyline to keep it from floating at the surface.

Conclusions:

Gear recovered was part of lobster gear set near St. John, NB, possibly during May or June or subsequent to Nov. 9, 2004.

| Report By: | John F. Kenney | Date: | 10/25/05 | Current Location of Gear | Allen Harbor Field Station |
|---|---|---|---|---|---|

Back to Table of Contents.

| | |
|---|---|
| NMFS No. | E27-04 |
| Indication of Entanglement | Yes |
| **INITIAL STATUS** | Alive |
| **SUBSEQUENT STATUS (AS OF THE DATE THE NMFS ENTANGLEMENT REPORT IS COMPLETED)** | Gear free |
| Date 1st Observed Entangled | 12/11/04 |
| Species | Humpback |
| Individual ID | Unknown |
| Location **1st OBSERVED ENTANGLED** | 9 NM west of Cape St. Mary, Nova Scotia |
| Latitude/Longitude **1st OBSERVED ENTANGLED** | 44° 03.9'N    66° 24.64'W   (approximation) |
| Event Description | 12/13/04<br>• Fisherman reports to DFO that they successfully disentangled a whale on 12/11/04<br>• Fisherman reported that the animal had long, white pectoral flippers, a dorsal fin and 'bumps' on the head.<br>• Fisherman reports that 5 fishing vessels assisted in the disentanglement of the animal. Fishermen were able to haul-up to the tail of the animal and cut the gear free.<br>• Fisherman thought that the large amount of gear present was from the animal swimming into additional gear after the original entanglement. |
| Description of Gear on Whale **AS REPORTED** | |
| **A. DURING INITIAL SIGHTING** | Gear reported by fisherman to be 57 lobster traps, 8 anchors, 6000 feet of line, 10 bladder balloons and 6 cork buoys. |
| **B. SUBSEQUENT DESCRIPTIONS** | |
| **C. DIAGRAM OF ENTANGLING GEAR ON WHALE** | |
| Description of Wounds/**CONDITION** | |
| **A. DURING INITIAL SIGHTING** | None noted |
| **B. SUBSEQUENT DESCRIPTIONS** | |
| **NMFS GEAR ANALYSIS** | |
| A. Gear Type | Unknown – no gear recovered |

| | |
|---|---|
| **B. GEAR PART/LINE TYPE** | |
| **C. LOCATION OF SET** | |
| **D. POTENTIAL POINT OF ENCOUNTER WITH GEAR** | |
| Sighting prior to entanglement | Unknown |
| Re-sightings **POST-ENTANGLEMENT** | Unknown – animal not resighted |
| Life History Information | Unknown sex, estimated to 35-40 feet in total length |
| **NMFS** Serious Injury/Mortality Determination | Non Human-caused Serious Injury |

# FISHERY INTERACTION GEAR ANALYSIS

| | | | |
|---|---|---|---|
| NMFS No. | E 27 - 04 | | |
| Field No. | J121104 | Date 1st Observed Entangled | 12/11/04 |
| Location 1st Observed | 9 nm West of Cape St. Mary, Nova Scotia 44E 3.9' N,   66E 24.6' W | Type of Event - Observation, Disentanglement, Stranding. Other (describe) | Disentanglement |
| Species | humpback | Gear Recovered (y/n) | No |
| Individual ID | Unknown | Gear Analysis Conducted (y/n) | No |

## GEAR DESCRIPTION / ANALYSIS

| | | | | |
|---|---|---|---|---|
| Date Gear Retrieved | | | Gear Retrieved By | |
| Date Gear Received | | | Received From | |
| Sources: | USCG | | Date Set | |
| | CCS | | Date Lost | |
| | Fisherman | | Location | |
| | Other | Nova Scotia Network member | Depth | |
| | | | Bottom Type | |
| Gear Type: | Lobster pot gear | | Target Species: | Lobster |

Gear Description:

   Information from a Nova Scotia Network member indicated the entanglement involved 57 lobster traps, 8 anchors, 6000 feet line,  10 bladder balloons and 6 cork buoys.

| Comments: | | | | | |
|---|---|---|---|---|---|
| | | | | | |
| Conclusions: | | | | | |
| Entanglement with lobster gear. | | | | | |
| Report By: | John F. Kenney | Date: | 10/25/05 | Current Location of Gear | N.A. |

Back to Table of Contents.

2004 Large Whale Entanglement and Ship Strike Report                          Page 96

| | |
|---|---|
| NMFS No. | E28-04 |
| Indication of Entanglement | Yes |
| **INITIAL STATUS** | Alive |
| **SUBSEQUENT STATUS (AS OF THE DATE THE NMFS ENTANGLEMENT REPORT IS COMPLETED)** | Gear free |
| Date 1st Observed Entangled | 12/21/04 |
| Species | Humpback |
| Individual ID | Unknown |
| Location **1st OBSERVED ENTANGLED** | 4 NM south of Castle Hill, RI |
| Latitude/Longitude **1st OBSERVED ENTANGLED** | 41° 24.02'N    71° 18.96'W   (approximation) |
| Event Description | 12/21/04<br>• Newport Shipping Pilot vessel reports an entangled whale to the USCG.<br>• Whale reported to be restricted in travel by fixed gear.<br>• RI DEM and US Navy were able to respond to get documentation of the entangled whale.<br>• Weather and seas conditions prevented tagging and disentanglement operations.<br><br>12/22/04<br>• A NOAA aerial survey team relocated the entangled whale.<br>• PCCS disentanglement team responded with the assistance of USCG support and a near-by fishing vessel and successfully disentangled the animal. |
| Description of Gear on Whale **AS REPORTED** | |
| **A. DURING INITIAL SIGHTING** | Whale is reported to be entangled by the right flipper in part of the gear system of a multi-pot trawl. A blue and yellow buoy is visible near the whale. |
| **B. SUBSEQUENT DESCRIPTIONS** | 12/22/04<br>• Whale was entangled by a minimum of six wraps of line around the base of the tail that lead to heavy gear at the seafloor and it appeared that the animal could not raise its tail flukes. It was suspected that the gear was also involved with the right flipper. |
| **C. DIAGRAM OF ENTANGLING GEAR ON WHALE** | |



| Description of Wounds/**CONDITION** | |
|---|---|
| **A. DURING INITIAL SIGHTING** | Animal reported to appear thin. No obvious wounds or injuries. |
| **B. SUBSEQUENT DESCRIPTIONS** | |
| **NMFS GEAR ANALYSIS** | |
| A. Gear Type | Some gear recovered |
| **B. GEAR PART/LINE TYPE** | |
| **C. LOCATION OF SET** | |
| **D. POTENTIAL POINT OF ENCOUNTER WITH GEAR** | |
| Sighting prior to entanglement | Unknown |
| Re-sightings **POST-ENTANGLEMENT** | Unknown – animal not resighted |
| Life History Information | Unknown sex, unknown length |
| **NMFS** Serious Injury/Mortality Determination | Non Human-caused Serious Injury |

# FISHERY INTERACTION GEAR ANALYSIS

| | | | |
|---|---|---|---|
| NMFS No. | E 28 - 04 | | |
| Field No. | J122104 | Date 1st Observed Entangled | 12/21/04 |
| Location 1st Observed | 4nm South of Castle Hill, Rhode Island 41E 24' N,   71E 19' W | Type of Event - Observation, Disentanglement, Stranding. Other (describe) | Disentanglement |
| Species | humpback | Gear Recovered (y/n) | Yes |
| Individual ID | Unknown | Gear Analysis Conducted (y/n) | Yes |

## GEAR DESCRIPTION / ANALYSIS

| | | | |
|---|---|---|---|
| Date Gear Retrieved | | 12/22/04 | Gear Retrieved By | PCCS |
| Date Gear Received | | | Received From | |
| Sources: | USCG | | Date Set | |
| | CCS | | Date Lost | within a week of the entanglement |
| | Fisherman | Owners (2 individuals) | Location | within 1 mile of sighting location |
| | Other | | Depth | |
| | | | Bottom Type | # 1 -sand , # 2 - sand |
| Gear Type: | Lobster pot gear | | Target Species: | Lobster |

Gear Description:    Gear from two fishermen were involved.

Gear # 1 consisted of a red & blue 6" x 14" buoy with a wooden stick.  Attached to this buoy was approximately 3 fm of sinking *Locktite* type line.

Gear # 2 consisted of a wire trap with bridle and partial gangion, buoyline comprised of both floating and sinking line attached to the bottom portion of a plastic buoy stick.

Comments:    Both sets of gear were set in RI State waters.  Gear recovered by PCCS was turned over to NMFS Enforcement.

Gear # 1 was rigged as a 15 trap trawl with endlines consisting of 2/3 sink rope at the top and 1/3 float rope at the bottom. Groundline is sink rope with 15 fm between traps.  All that was missing from the original set was the buoy and short length of endline.

Gear # 2 was set as a 10 trap trawl with endlines consisting of 2/3 sink rope at the top and 1/3 float rope at the bottom.  The owner recovered 6 of the traps from this trawl approximately 3/4nm to the southeast of where they'd been set.

Conclusions:

 The entanglement involved lobster pot gear set in RI State waters

| Report By: | John F. Kenney | Date: | 10/27/05 | Current Location of Gear | NA |
|---|---|---|---|---|---|

Back to Table of Contents.

# 2004 Ship Strikes

| NMFS No. | SS01-04 |
|---|---|
| **Indication of Strike** | Confirmed |
| **INITIAL STATUS** | Alive |
| **SUBSEQUENT STATUS**<br>(As of the date the NMFS Strike Report is completed) | Alive |
| **Date of Strike** | Unknown |
| **Date 1st Observed** | 01/08/04 |
| **Species** | Right |
| **Individual ID** | Unknown – could not be matched to catalog |
| **Location 1st OBSERVED** | ~30' off Juno Beach (just south of West Palm Beach), FL. |
| **Latitude/Longitude 1st OBSERVED** | |
| **Location of strike** | Unknown |
| **Event Summary** | Whale sighted with injuries—unknown whether recent or healed. |
| **Event Description** | 1/8/04 – Lifeguard sighted whale just off beach. Whale appeared to be breathing<br><br>1/9/04 – Lifeguard reported sighting to SER stranding coordinator and said the whale was motionless and did not appear to be breathing.<br><br>1/9/04 – FMRI sent crew to verify via air. Photographs taken—whale id'ed as right whale. Whale was clearly alive and moving. |
| **Description of wounds/condition AS REPORTED**<br><br>    **A. DURING INITIAL SIGHTING** | Injuries not noted during initial sighting<br><br>Lifeguard reported that whale was breathing, then motionless on the following day. |
|     **B. SUBSEQUENT DESCRIPTIONS** | 1/9/04 – Photos indicate right half of fluke is missing<br><br>1/9/04 – FMRI verified whale alive and moving.<br><br>Interpretations of photos range from "new injury" to "partially healed" |
| **Vessel Description**<br>    **A. Vessel Type** | Unknown |
|     **B. Speed** | Unknown |
|     **C. Size** | Unknown |
| **Sighting prior to strike** | None |
| **Re-sightings POST- STRIKE** | None |

| Life History Information | Unknown |
|---|---|
| Reports Available | Photographs |
| NMFS Serious Injury/Mortality Determination | Non Human-caused Serious Injury |

Back to Table of Contents.

| NMFS No. | SS02-04 |
|---|---|
| **Indication of Strike** | Confirmed |
| **INITIAL STATUS** | Dead |
| **SUBSEQUENT STATUS** (As of the date the NMFS Strike Report is completed) | N/A |
| **Date of Strike** | Unknown – likely 3-7 days prior to discovery due to condition of carcass. |
| **Date 1st Observed** | 02/07/04 |
| **Species** | Right |
| **Individual ID** | 1004 - Stumpy |
| **Location 1st OBSERVED** | ~ 6 nm SE of Rudee Inlet off Virginia Beach, VA |
| **Latitude/Longitude 1st OBSERVED** | 36 46.925 N, 75 51.195 W |
| **Location of strike** | Unknown – hindcasting not possible |
| **Event Summary** | Floating dead whale spotted by whale watch vessel; carcass towed in and necropsied. |
| **Description of wounds/condition AS REPORTED**<br><br>    **A. DURING INITIAL SIGHTING** | No fresh injuries or signs of human interaction noted during initial sighting. Whale floating ventral side up with flippers almost completely exposed. Very bloated. Skin present. Odor present, but not rotten or unusually strong. Carcass not substantially scavenged. Several healed scars noted. Expelled fetus through mouth. |
| **B. SUBSEQUENT DESCRIPTIONS** | 2/11/04 – Necropsy indicates severe subdermal bruising, multiple small fractures around ears bilaterally, and complete fracture of rostrum involving maxilla, premaxilla and vomer and severe laceration of oral rete. |
| **Vessel Description**<br><br>    **A. Vessel Type** | Unknown |
| **B. Speed** | Unknown |
| **C. Size** | Unknown |
| **Sighting prior to strike** | None |
| **Re-sightings POST- STRIKE** | N/A |
| **Life History Information** | Adult female and near-term fetus<br><br>16 m<br><br>~40 yrs. old |
| **NMFS Serious Injury/Mortality Determination** | Human-caused Mortality |

Back to Table of Contents.

| NMFS No. | SS03-04 |
| --- | --- |
| Indication of Strike | Confirmed |
| INITIAL STATUS | Dead |
| SUBSEQUENT STATUS (As of the date the NMFS Strike Report is completed) | N/A |
| Date of Strike | Unknown – between 2/23 and 2/25/05 |
| Date 1st Observed | 02/25/04 |
| Species | Fin |
| Individual ID | Unknown |
| Location 1st OBSERVED | ~250 yards south of buoy #15, off of Port Elizabeth, NJ |
| Latitude/Longitude 1st OBSERVED | 40 40.04* N, 74 08.00* W (estimated) |
| Location of strike | Unknown – somewhere between Boston (previous port of call) and New Jersey. |
| Event Summary | Whale brought in on bow of ship. Carcass recovered and necropsied. |
| Description of wounds/condition AS REPORTED  A. DURING INITIAL SIGHTING | Whale belly up laying across bow of ship (about 15 feet of belly exposed)  Belly light grey/whitish with ridges  Belly gashed halfway through on the bow; wound was red. When ship backed down, whale rolled off bubble and red blood was evident in the water as the whale sank. |
| B. SUBSEQUENT DESCRIPTIONS | 2/27/04 – Necropsy indicated some asymmetry in bruising on the left side of the jaw at the articulation with the skull. Vertebrae were displaced and the aorta and IVC may have ruptured as well. Carcass was otherwise normal and very fresh. |
| Vessel Description  A. Vessel Type | General cargo/container ship. |
| B. Speed | Unknown at time of strike. At sea speed between Boston and NJ – 18.4 knots. Speed at time whale first seen – 3-5 knots. |
| C. Size | Unknown |
| Sighting prior to strike | None |
| Re-sightings POST- STRIKE | N/A |
| Life History Information | Adult female  16.33 m |
| NMFS Serious Injury/Mortality Determination | Human-caused Mortality |

Back to Table of Contents.

| | |
|---|---|
| **NMFS No.** | SS04-04 |
| **Indication of Strike** | Suspected |
| **INITIAL STATUS** | Dead |
| **SUBSEQUENT STATUS** (As of the date the NMFS Strike Report is completed) | N/A |
| **Date of Strike** | Unknown |
| **Date 1st Observed** | 05/21/04 |
| **Species** | Sei |
| **Individual ID** | Unknown |
| **Location 1st OBSERVED** | Berth 51, Port Elizabeth, NJ |
| **Latitude/Longitude 1st OBSERVED** | 40 41.285N, 74 09.466 W |
| **Location of strike** | Unknown |
| **Event Summary** | Carcass seen floating in Upper New York Bay. Pushed into Port Elizabeth by towing vessel and brought ashore for necropsy. Initially identified as fin whale; later ID'd as sei. |
| **Description of wounds/condition AS REPORTED**  **A. DURING INITIAL SIGHTING** | Moderate decomposition  Head missing with bones protruding  Tail missing with bones protruding  Bones protruding from decayed, small pectoral flippers |
| **B. SUBSEQUENT DESCRIPTIONS** | 5/24/04 – Appeared to have been struck twice. Once behind dorsal fin, ripping off tail. Second between pectoral fins and dorsal fin. |
| **Vessel Description**  **A. Vessel Type** | Unknown |
| **B. Speed** | Unknown |
| **C. Size** | Unknown |
| **Sighting prior to strike** | None |
| **Re-sightings POST- STRIKE** | N/A |
| **Life History Information** | Male  29 ft. 6 in. (8.99 m) |
| **NMFS Serious Injury/Mortality Determination** | Human-caused Mortality |

Back to Table of Contents.

| NMFS No. | SS05-04 |
|---|---|
| **Indication of Strike** | Confirmed |
| **INITIAL STATUS** | Dead |
| **SUBSEQUENT STATUS** <br><br> **(As of the date the NMFS Strike Report is completed)** | N/A |
| **Date of Strike** | Unknown |
| **Date 1st Observed** | 06/01/04 |
| **Species** | Minke |
| **Individual ID** | Unknown |
| **Location 1st OBSERVED** | Sandbar off Chatham, MA |
| **Latitude/Longitude 1st OBSERVED** | 4140.537 N, 6956.36 W |
| **Location of strike** | Unknown |
| **Event Summary** | Floating dead whale sighted then stranded and necropsied. |
| **Description of wounds/condition AS REPORTED** <br> **A. DURING INITIAL SIGHTING** | No external indications of strike noted--no prop wounds, no broken bones. No other indications of poor health or entanglement. |
| **B. SUBSEQUENT DESCRIPTIONS** | 6/3/04 – Necropsy indicated pre-mortem edema and bruising in neck region. |
| **Vessel Description** <br> **A. Vessel Type** | Unknown |
| **B. Speed** | Unknown |
| **C. Size** | Unknown |
| **Sighting prior to strike** | None |
| **Re-sightings POST- STRIKE** | N/A |
| **Life History Information** | Female <br><br> 6.5 m |
| **NMFS Serious Injury/Mortality Determination** | Non Human-caused Mortality |

Back to Table of Contents.

| | |
|---|---|
| **NMFS No.** | SS06-04 |
| **Indication of Strike** | Suspected |
| **INITIAL STATUS** | Live/injured |
| **SUBSEQUENT STATUS** (As of the date the NMFS Strike Report is completed) | Dead - euthanized |
| **Date of Strike** | Unknown |
| **Date 1st Observed** | 06/13/04 |
| **Species** | Fin |
| **Individual ID** | Unknown |
| **Location 1st OBSERVED** | Off Fort Adams State Park, Newport, RI |
| **Latitude/Longitude 1st OBSERVED** | 41 28.243 N, 71 20.199 W |
| **Location of strike** | Unknown |
| **Event Summary** | Live whale trapped in shallow cove in approx. 9 ft. of water. Whale euthanized and necropsied. Prop cuts noted. |
| **Description of wounds/condition AS REPORTED**<br><br>     **A. DURING INITIAL SIGHTING** | - Superficial propeller cuts noted on top of head and dorsal left of fluke<br><br>- Unconfirmed large gash reported on right dorsal<br><br>- Flukes bloody from rubbing against rocks |
| **     B. SUBSEQUENT DESCRIPTIONS** | 6/15/04 – Necropsy indicated heavy parasite load going to and from the kidneys; animal thin; no food in stomach. Prop cuts superficial—probably not cause of stranding. |
| **Vessel Description**<br>     **A. Vessel Type** | Unknown |
| **     B. Speed** | Unknown |
| **     C. Size** | Unknown |
| **Sighting prior to strike** | None |
| **Re-sightings POST- STRIKE** | N/A |
| **Life History Information** | Sub-adult male<br><br>11.27 m |
| **NMFS Serious Injury/Mortality Determination** | Human-caused Mortality |

Back to Table of Contents.

| NMFS No. | SS07-04 |
|---|---|
| **Indication of Strike** | Suspected |
| **INITIAL STATUS** | Dead |
| **SUBSEQUENT STATUS** (As of the date the NMFS Strike Report is completed) | N/A |
| **Date of Strike** | Unknown |
| **Date 1st Observed** | 09/26/04 |
| **Species** | Fin |
| **Individual ID** | Unknown |
| **Location 1st OBSERVED** | Brought into port at St. John, NB, Canada. |
| **Latitude/Longitude 1st OBSERVED** | |
| **Location of strike** | Unknown – somewhere between Quebec City and the Bay of Fundy |
| **Event Summary** | Fresh dead fin whale brought in on bow of ship. Carcass not recovered for necropsy. |
| **Description of wounds/condition AS REPORTED** <br><br>   **A. DURING INITIAL SIGHTING** | Draped across bulbous bow. Appeared fresh dead. |
| **B. SUBSEQUENT DESCRIPTIONS** | N/A |
| **Vessel Description** <br>   **A. Vessel Type** | Large cruise ship |
| **B. Speed** | Unknown at time of strike– capable of 25 kts |
| **C. Size** | 293.22 m |
| **Sighting prior to strike** | None |
| **Re-sightings POST- STRIKE** | N/A |
| **Life History Information** | ~15.24 m |
| **NMFS Serious Injury/Mortality Determination** | Non Human-caused Mortality |

Back to Table of Contents.

| NMFS No. | SS08-04 |
|---|---|
| **Indication of Strike** | Confirmed |
| **INITIAL STATUS** | Alive/injured |
| **SUBSEQUENT STATUS**<br>(As of the date the NMFS Strike Report is completed) | Unknown; could be linked to 11/24/04 dead stranded right whale in Ocean Sands, NC. |
| **Date of Strike** | 11/17/04 |
| **Date 1st Observed** | 11/17/04 |
| **Species** | Unknown |
| **Individual ID** | Unknown |
| **Location 1st OBSERVED** | Inshore of Chesapeake Bay, VA |
| **Latitude/Longitude 1st OBSERVED** | 36 51.2 N, 75 45.6 W |
| **Location of strike** | Same as above |
| **Event Summary** | Navy reported striking a whale. Whale seen crossing bow close aboard from left to right. Minutes later, whale observed 180 relative near the surface. Lookouts reported blood in ship's wake. A recreational vessel later reported an injured whale to VMSM inshore of Chesapeake Bay Light Tower at 36 55N, 75 46W, at 1200. The whale appeared to have a fresh wound to the fluke with a large portion missing and bleeding. |
| **Description of wounds/condition AS REPORTED**<br><br>    **A. DURING INITIAL SIGHTING** | Whale sighted near surface with blood trailing in vessel's wake. |
| **    B. SUBSEQUENT DESCRIPTIONS** | Fresh wound to fluke with large portion missing and bleeding. |
| **Vessel Description**<br>    **A. Vessel Type** | Navy - Amphibious assault ship, Wasp class (LHD) |
| **    B. Speed** | Unknown at time of strike – capable of 20+ kts |
| **    C. Size** | ~253.2 m |
| **Sighting prior to strike** | Seen crossing bow of vessel close aboard from left to right |
| **Re-sightings POST- STRIKE** | 11/17/04 - Seen immediately after strike, close to surface with blood in ship's wake.<br><br>11/17/04 – Seen approximately one hour later swimming slowly but steadily ESE, still bleeding.<br><br>11/24/04 – Whale with missing left tail fluke washes ashore in North Carolina. Possibly same whale, but unconfirmed. Necropsy report of this whale is available. |
| **Life History Information** | Unknown |

| NMFS Serious Injury/Mortality Determination | Human-caused Mortality |
|---|---|

Back to Table of Contents.

| | |
|---|---|
| **NMFS No.** | SS09-04 |
| **Indication of Strike** | Confirmed |
| **INITIAL STATUS** | Dead, ashore |
| **SUBSEQUENT STATUS** (As of the date the NMFS Strike Report is completed) | N/A |
| **Date of Strike** | 11/17/04 (if same as reported Navy strike) |
| **Date 1st Observed** | 11/24/04 |
| **Species** | Right |
| **Individual ID** | 1909 |
| **Location 1st OBSERVED** | Stranded in Ocean Sands, NC |
| **Latitude/Longitude 1st OBSERVED** | 36 30 58 N, 77 80 23 W |
| **Location of strike** | 36 51.2 N, 75 45.6 W (if same as reported Navy strike). Hindcasting suggests this could be the same animal struck by Navy vessel on 11/17/04. |
| **Event Summary** | Whale sighted on beach, necropsied, found to have suffered blood loss from wound to tail fluke. |
| **Description of wounds/condition AS REPORTED**<br><br>**A. DURING INITIAL SIGHTING** | Left fluke blade completely missing. Deep wound on mid-left rostrum. Shallow linear wound on right lip and into right gum. |
| **B. SUBSEQUENT DESCRIPTIONS** | Left fluke lobe completely missing. Tearing of epidermis and connective tissue surrounding vertebral column in fluke. 3-4 caudal vertebrae missing. Large bore arteries torn and exposed along dorsal and ventral midline of fluke blades. Left caudal third of rostrum – deep laceration through epidermis, extended through to premaxilla and maxilla. Dark staining in the dermis trailing back 5 cm from wound – potential hemorrhage. Bleeding cranial wound. Right maxilla fractured on caudal 1st quarter. |
| **Vessel Description**<br>**A. Vessel Type** | Unknown (but see 11/17/04 record) |
| **B. Speed** | Unknown (but see 11/17/04 record) |
| **C. Size** | Unknown (but see 11/17/04 record) |
| **Sighting prior to strike** | None (but see 11/17/04 record) |
| **Re-sightings POST- STRIKE** | N/A |
| **Life History Information** | Young adult female – pregnant with near-term fetus<br><br>14.9 m<br><br>15 yrs. old |

| NMFS Serious Injury/Mortality Determination | Human-caused Mortality |
|---|---|

Back to Table of Contents.

| NMFS No. | SS10-04 |
|---|---|
| **Indication of Strike** | Confirmed |
| **INITIAL STATUS** | Dead, ashore |
| **SUBSEQUENT STATUS** (As of the date the NMFS Strike Report is completed) | N/A |
| **Date of Strike** | Unknown |
| **Date 1st Observed** | 12/19/04 |
| **Species** | Humpback |
| **Individual ID** | Unknown |
| **Location 1st OBSERVED** | Bethany Beach, DE |
| **Latitude/Longitude 1st OBSERVED** | 38 47.55 N, 75 05.30 W |
| **Location of strike** | Unknown |
| **Event Summary** | Whale sighted on beach, necropsied, found to have broken jaw and possible prop wounds. |
| **Description of wounds/condition AS REPORTED**  **A. DURING INITIAL SIGHTING** | Compound fracture of jaw on both right and left sides with bones visible through skin. Two semi-circular cuts on the right side behind the jaw and extending to the base of the right pectoral flipper. Decomposition and significant scavenging evident. |
| **B. SUBSEQUENT DESCRIPTIONS** | Broken left and right jaw; fractured skull on left side, with no lacerations or wounds in surrounding skin; wound measuring 62 cm X 108.8cm located on right side of head behind jaw- green tint to tissue surrounding the wound, possible hemorrhaging; cyst like sack located beneath hinge of right jaw, bluish green in color filled with clear liquid. |
| **Vessel Description**  **A. Vessel Type** | Unknown |
| **B. Speed** | Unknown |
| **C. Size** | Unknown |
| **Sighting prior to strike** | None |
| **Re-sightings POST- STRIKE** | N/A |
| **Life History Information** | Female calf  8.03 m |
| **NMFS Serious Injury/Mortality Determination** | Non Human-caused Mortality |

Back to Table of Contents.

# POLICY FORUM

ECOLOGY

# North Atlantic Right Whales in Crisis

Scott D. Kraus,[1]* Moira W. Brown,[1] Hal Caswell,[2] Christopher W. Clark,[3] Masami Fujiwara,[4] Philip K. Hamilton,[1] Robert D. Kenney,[5] Amy R. Knowlton,[1] Scott Landry,[6] Charles A. Mayo,[6] William A. McLellan,[7] Michael J. Moore,[2] Douglas P. Nowacek,[8] D. Ann Pabst,[7] Andrew J. Read,[9] Rosalind M. Rolland[1]

**D**espite international protection from commercial whaling since 1935, the North Atlantic right whale (*Eubalaena glacialis*) remains one of the most endangered whales in the world (*1*). Whaling for almost 1000 years brought this species close to extinction in the early 20th century (*2*).

Enhanced online at www.sciencemag.org/cgi/content/full/309/5734/561

Right whales range in the coastal waters of eastern North America from Florida to the Canadian Maritimes, regions that are heavily used by the shipping and fishing industries and by the military. A low reproductive rate and recently declining survival probabilities (*1*, *3*), particularly for breeding females (*4*), appear to have prevented this population from recovering over the last 25 years (*5*). Most right whale mortalities are due to collisions with ships and entanglements in fishing gear (*5*). The right whale population growth rate has declined since 1980, and the total population now appears to be diminishing in size (*4*). This is in stark contrast to southern hemisphere right whales (*Eubalaena australis*), whose population is estimated to be over 10,000 animals and appears to be increasing at 7.2% per year (*6*).

Recent mortalities demonstrate the serious problem facing the North Atlantic right whale. In the past 16 months, there have been eight recorded deaths, including six adult females (three were carrying near-term fetuses). Four of these whales were killed by human activities (three by ships and one by fishing gear), a fifth whale was probably killed by a ship, two whales were offshore and could not be retrieved for examination, and a young calf died on the beach in Florida. The loss of this number of whales, and particularly this number of reproductive females, in such a short period, is unprecedented in 25 years of study of this species (*7*). Four of these females were just starting to bear calves, and since the average lifetime calf production is 5.25 calves (*4*), the deaths of these females represent a lost reproductive potential of as many as 21 animals.

The most recently published estimates of right whale survival (*4*, *8*) suggest that the mortality rate increased between 1980 and 1998 to a level of 4 (±1%). From recent population estimates of 350 right whales (*1*), a 4% mortality rate implies 14 animals dying per year. In the last 20 years, an average of 2.4 dead whales has been reported each year, representing a detection rate of 17%. The eight deaths reported in the last 16 months is 2.9 times the average annual rate. Calculations based on demographic data through 1999 (*4*) show that this increase in mortality would reduce population growth by 3.5 to 12% per year. (The range reflects different choices in the details of model selection; the best model implies a reduction in population growth rate of 10% per year.) This dramatic increase in reported deaths may be partly due to improved sighting efforts and reporting awareness but is not a natural variation in mortality. If the 17% mortality detection rate from the last 20 years has remained

constant, as many as 47 right whales could have died in the last 16 months.

Of the 50 dead right whales reported since 1986, at least 19 were killed by vessel collisions, and at least six were killed by fishing gear entanglements (*7*). Also during this period, there were 61 confirmed cases of whales carrying fishing gear, including the mortalities. Outcomes of the remaining cases and the fate of individual whales varied. Death is suspected in 12 cases, because of an animal's subsequent disappearance and/or the extremely poor health condition observed at the time of last sighting. Another eight animals are still entangled; their fate is uncertain. Thirty-three animals either shed the gear or were disentangled, and the remaining cases involved unidentified individuals. Chronically entangled whales lose weight, so they sink after death, unlike



healthy animals that float if killed. Thus, right whale mortality from fishing gear is probably underestimated to a greater degree than ship kills (*5*).

Calf production has increased recently, raising doubts in some quarters about the urgency of the mortality problem. Annual calf production averaged 12 calves up until 2000 (*1*), but totaled 31, 21, 19, 16, and 28 in 2001 to 2005, respectively. However, the increase in the birth rate will have a small positive impact on population growth rate, as a hypothetical doubling of the per capita birth rate would increase population growth rate by at most 1.6% per year. The population is estimated to have been declining at about 2% per year before 2000 (*3*, *4*, *8*). Thus, the effects of recent increases in birth rate are too small to overcome this decline.

Federal managers in the National Oceanic and Atmospheric Administration (NOAA) Fisheries are charged by the Endangered Species Act and the Marine Mammal Protection Act to ensure that there is no human-induced mortality of right whales. There have been efforts to minimize the risk of ship strikes with mandatory ship location reporting, extensive aerial survey efforts, and mariner education. But without requiring changes in the operation of ships within right whale habitats and migratory corridors, this increased awareness has not

[1]Edgerton Research Laboratory, New England Aquarium, Boston, MA 02110–3399, USA. [2]Biology Department, Woods Hole Oceanographic Institution, Woods Hole, MA 02543–1049, USA. [3]Cornell Laboratory of Ornithology, Cornell University, Ithaca, NY 14850–1923, USA. [4]Department of Ecology, Evolution and Marine Biology, University of California, Santa Barbara, CA 93106–9610, USA. [5]Graduate School of Oceanography, University of Rhode Island, Narragansett, RI 02882–1197, USA. [6]Provincetown Center for Coastal Studies, Provincetown, MA, 02657–1911, USA. [7]Biological Sciences, University of North Carolina Wilmington, Wilmington, NC 28403–3201, USA. [8]Oceanography Department, Florida State University, Tallahassee, FL 32306–4320, USA. [9]Marine Laboratory, Duke University, Beaufort, NC 28516–8648, USA.

*Author for correspondence. E-mail: skraus@neaq.org

Published by AAAS

led to a reduction in ship strike mortalities. The risk of fishing gear entanglement has been addressed by selective area closures and gear modifications (9). These closures do not adequately encompass the seasonal movements of right whales, and gear modifications implemented thus far have not reduced entanglement rates. Eight dead right whales in the past 16 months provide clear evidence that management efforts have been woefully inadequate, and much stronger measures are needed to reverse the right whale's decline.

Accordingly, we urge immediate changes to the management of right whales, focusing on reducing human-induced mortality. Some of the following recommendations will also benefit other marine species that face similar threats, such as the endangered leatherback sea turtle (Dermochelys coriacea) (10). First, emergency measures should be implemented to reduce speeds and reroute commercial and military ships as recommended in the NOAA Fisheries Advanced Notice of Proposed Rule-Making

(11). Second, the amount of fixed fishing gear in the water column should be eliminated or minimized. There are many steps that could be taken to do this, including (i) mandating changes in the pot-fishing industry (lobster, crab, hagfish, etc.) that will reduce gear in the water column; (ii) requiring use of alternative rope types (e.g., sinking ground lines) to minimize entanglement deaths; (iii) developing and implementing fishing methods that do not use vertical lines attached to surface buoys; and (iv) developing a fast-track process for permitting and experimenting with conservation-focused fishing gear modifications and implementation. This means streamlining the current rule-making and National Environmental Policy Act (NEPA) process for right whale research and gear modifications, which now takes years.

Given the slow speed of the regulatory process, interim emergency measures to reduce shipping and fishing mortality in right whales should be implemented immediately. Delays in implementation would be

ignoring both scientific and legal mandates and could consign North Atlantic right whales to extinction.

### References and Notes

1. S. D. Kraus, P. K. Hamilton, R. D. Kenney, A. R. Knowlton, C. K. Slay, J. Cetacean Res. Manage. Spec. Issue 2, 231 (2001).
2. R. R. Reeves, J. Cetacean Res. Manage. Spec. Issue 2, 187 (2001).
3. H. Caswell, M. Fujiwara, S. Brault, Proc. Natl. Acad. Sci. U.S.A. 96, 3308 (1999).
4. M. Fujiwara, H. Caswell, Nature 414, 537 (2001).
5. A. R. Knowlton, S. D. Kraus, J. Cetacean Res. Manage. Special Issue 2, 193 (2001).
6. P. Best, A. Brandao, D. Butterworth, J. Cetacean Res. Manage. Spec. Issue 2, 161 (2001).
7. M. J. Moore, A. R. Knowlton, S. D. Kraus, W. A. McLellan, R. K. Bonde, J. Cetacean Res. Manage. 6 (3), 199 (2005); available at www.whoi.edu/hpb/viewPage.do?id=1432.
8. M. Fujiwara, dissertation, Massachusetts Institute of Technology–Woods Hole Oceanographic Institution (2002).
9. U.S. Code of Federal Regulation (C.F.R.) 50, Part 229.32
10. M. C. James, C. A. Ottensmeyer, R. A. Myers, Ecol. Lett. 8, 195 (2005).
11. Fed. Regist. 69 (105), 30857 (1 June 2004).

10.1126/science.1111200

---

# Millennium Assessment of Human Behavior

**Paul R. Ehrlich\* and Donald Kennedy**

A growing scientific consensus says that global society is under increasing threat from the impact of human activities: Climate change, loss of biological diversity and ecosystem services, and changes in patterns of land use and land cover are among the more troublesome problems (1–3). Some of these problems require attention from governments and other social institutions. But it is the collective actions of individuals that lie at the heart of the dilemma. Analysis of individual motives and values should be critical to a solution. Yet society has no prominent international forum in which such issues (like how we should treat our environment and each other) are publicly discussed.

In some countries, quite different views have surfaced recently about the ethics of governmental restrictions on the rights of landowners designed to protect endangered species and about legal provisions that permit "open space" set-asides of long duration. Even in nations with cultures as similar

P. R. Ehrlich is in the Department of Biological Sciences, D. Kennedy is at the Institute for International Studies, Stanford University, Stanford, CA 94305, USA.\*Author for correspondence. E-mail: pre@stanford.edu

as those of the United States and the United Kingdom, issues of land care, debates over related subsidies, and the responsibilities of private citizens versus their governments can take very different shapes. In approaching sustainability, one needs to determine how the rights of people in the current generation to consume natural capital should be balanced against the rights of future generations. Preservation of animal life and the ethics of various kinds of human interference with "natural" systems are viewed differently by those whose cultural traditions differ. The steps that most members of the relevant scientific community believe are necessary (e.g., reduction of human-caused greenhouse gas emissions, establishment of marine reserves, limiting human population growth and per capita consumption) are disconnected from those measures the rest of society, and especially politicians, are willing to undertake.

We propose to promote the establishment of an ongoing global discussion of key ethical issues related to the human predicament—a Millennium Assessment of Human Behavior (MAHB). The time seems ripe, with the experience gained from the Intergovernmental Panel on Climate Change (IPCC) and the Millennium

Ecosystem Assessment (MEA), to start discussing what to do. In the IPCC and the MEA, sociopolitical issues and policy changes that might lessen the chances of catastrophic consequences are considered. But we need an institution to conduct an ongoing examination and public airing of what is known about how human cultures (especially their ethics) evolve, and about what kinds of changes might permit transition to an ecologically sustainable, peaceful, and equitable global society.

Such a process could begin by asking behavioral scientists and laypeople to explore how their own values relate to environmental sustainability and to ask themselves whether their values, if shared by 6.4 billion people, would really lead to the sort of world they want for their descendents. Citizens of the rich nations should ask themselves whether their "way of life" should really be, as the first President Bush once said to Americans, "not negotiable" (4). They need to discuss possible lifestyle changes in a framework not limited merely to what is possible for citizens of powerful nations, but enlarged to evaluate what is ethical with respect to a more global view of needs and opportunities.

The MAHB could consist of an ongoing series of open, transparent forums. The MAHB would be modeled on the IPCC but would be focused mainly in the social sciences. It would include a deeper consideration of the ethical dimensions of how we treat each other and our life-support systems. It would also involve broader participation than the IPCC, encourage the involvement of politicians, and focus on public outreach at

Published by AAAS

| | |
|---|---|
| NMFS No. | E19-04 |
| Indication of Entanglement | Yes |
| **INITIAL STATUS** | Live |
| **SUBSEQUENT STATUS (AS OF THE DATE THE NMFS ENTANGLEMENT REPORT IS COMPLETED)** | Gear free |
| Date 1st Observed Entangled | 08/30/04 |
| Species | Humpback |
| Individual ID | Rapier |
| Location **1st OBSERVED ENTANGLED** | 1.5 NM east of South Wellfleet, MA |
| Latitude/Longitude **1st OBSERVED ENTANGLED** | 41° 55.61'N    69° 56.27'W (approximation) |
| Event Description | 08/30/04<br>• A fisherman reports an entangled whale to the PCCS Whale Hotline and agrees to standby as long as possible.<br>• Unknown whether the animal is free-swimming or anchored.<br>• Fisherman standing by relieved by whale watch vessels.<br>• Gear appeared to be two wraps of line through the mouth that then led back and wrapped the tail.<br>• PCCS team successfully disentangled the animal. |
| Description of Gear on Whale **AS REPORTED** | |
| **A. DURING INITIAL SIGHTING** | Gear appeared to be two wraps of line through the mouth and over the head that then led back and wrapped the tail with two buoys visible. |
| **B. SUBSEQUENT DESCRIPTIONS**<br><br>**C. DIAGRAM OF ENTANGLING GEAR ON WHALE** | <br>August 30, 2004    Drawing by Scott Landry    © Center for Coastal Studies 2004 |



Illustration by Scott Landry © Center for Coastal Studies 2004

| Description of Wounds/**CONDITION** | |
|---|---|
| **A. DURING INITIAL SIGHTING** | None noted . |
| **B. SUBSEQUENT DESCRIPTIONS** | |
| **NMFS GEAR ANALYSIS** | Some gear recovered |
| A. Gear Type | |
| **B. GEAR PART/LINE TYPE** | |
| **C. LOCATION OF SET** | |
| **D. POTENTIAL POINT OF ENCOUNTER WITH GEAR** | |
| Sighting prior to entanglement | 08/29/04<br>• Animal sighted gear free at 41.90183°N \ 069.92800°W<br>06/16/05<br>• Animal sighted gear free at 42° 13.38'N \ 070° 21.73'W |
| Re-sightings **POST-ENTANGLEMENT** | |
| Life History Information | Mature Female, unknown length |
| **NMFS** Serious Injury/Mortality Determination | Non Human-caused Serious Injury |

## FISHERY INTERACTION GEAR ANALYSIS

| NMFS No. | E 19 - 04 | | |
|---|---|---|---|
| Field No. | J083004 | Date 1st Observed Entangled | 8/30/04 |
| Location 1st Observed | 1.5 nm E of South Wellfleet, CC, MA 41E 55.6' N,   69E 56.3' W | Type of Event - Observation, Disentanglement, Stranding. Other (describe) | Disentanglement |
| Species | humpback | Gear Recovered (y/n) | Yes |
| Individual ID | Rapier | Gear Analysis Conducted (y/n) | Yes |

## GEAR DESCRIPTION / ANALYSIS

| Date Gear Retrieved | | 8/30/04 | Gear Retrieved By | PCCS |
|---|---|---|---|---|
| Date Gear Received | | 9/16/04 | Received From | PCCS |
| Sources: | USCG | | Date Set | Unknown |
| | CCS | | Date Lost | Unknown |
| | Fisherman | owner interview | Location | Back side of Cape Cod, MA |
| | Other | | Depth | |
| | | | Bottom Type | |
| Gear Type: | Lobster Pot | | Target Species: | Lobster |

Gear Description:

      One 6" X 14" foam buoy with "Plant" plastic spindle having eye bolt hole threaded with 3/8" sink line using 3 hog rings as weak link attachment method. 8 fathom of 3/8" sink line (white with blue tracer) running from buoy spliced into 3 fathom 3/8" float rope (black).

Comments:

      This gear was rigged as a single trap.  Buoy line is rigged using one third float rope at bottom tied to  2/3rds sink at surface.  Buoy weak link consisted of 3 hog rings.

Conclusions:

      Entanglement occurred in the endline from a single lobster pot.

| Report By: | John F. Kenney | Date: | 11/9/05 | Current Location of Gear | NMFS, Maine |
|---|---|---|---|---|---|

Back to Table of Contents.

**ANALYSIS OF SCARRING ON NORTH ATLANTIC RIGHT WHALES
*(EUBALAENA GLACIALIS)*: MONITORING RATES OF
ENTANGLEMENT INTERACTION: 1980 - 2002**

Final Report to:

National Marine Fisheries Service
166 Water Street
Woods Hole, MA  02543

Submitted by:

Amy R. Knowlton, Marilyn K. Marx, Heather M. Pettis, Philip K. Hamilton, and
Scott D. Kraus
New England Aquarium, Central Wharf
Boston, MA

Contract #43EANF030107

February 2005

**Introduction**

Entanglement of North Atlantic right whales in fixed fishing gear is considered a major source of serious injury and mortality for this critically endangered population (Knowlton and Kraus 2001; Hamilton et al. 1998; Kenney and Kraus 1993; Kraus 1990; Right Whale Consortium unpublished data). Despite increased regulations aimed at mitigating the frequency and seriousness of such interactions (Federal Register 64 (30) - 1999; 65 (246) - 2000; 67 (6), 67(7), 67(63) - 2002), entanglements are still being documented and continue to lead to serious injury and mortality that threatens the recovery of this species.

The evidence that entanglements are occurring frequently in this population is not a new finding. The incidence and frequency of entanglement scarring, particularly around the tail stock area, was first documented by Kraus (1990) when 52% of adequately photographed animals documented by 1989 were identified as having been entangled (only the tailstock was reviewed) at some point during their lives. This initial review of the nature and extent of the entanglement problem prompted a more intensive scarring analysis project wherein all photographed sightings of individual animals were reviewed through 1995 and coded for all types of scars, including entanglement scars. All parts of the body were reviewed for scarring. The analyses adopted by Hamilton et al 1998 allowed for an in-depth examination of the level of entanglement interaction by sex and age class, scarring frequency by body part, and probability analyses of the time frame of occurrence of entanglement events. At that time, data analyzed through 1995 indicated that 61.6% of the population had been involved in an entanglement and that there appeared to be an increasing trend (Hamilton *et al.* 1998). Their report presented two different techniques for determining the probability of entanglement scarring for a given year period; the first technique was computer generated and the second was manually generated. While we have chosen not to use these specific techniques for this report, we will compare some of the findings here with those presented in the 1998 report as appropriate.

In this report we provide the results of a third examination of the scarring data and several new analyses aimed at assessing trends in entanglement rates from 1980-2002. We will evaluate if with these analyses, it may be possible to monitor the effectiveness of future gear modifications and other changes in fishing practice. However, it must be noted that entanglement rates may be influenced by many different factors. When the value of these analyses as monitoring tools are evaluated, there will be discussion in light of their limitations. One important aspect of the entanglement issue that cannot be discerned from this, or any other study, is the geographic location where entanglement interaction occurred.

**Methods**

Background

Right whales have been photographed throughout their known range along the coast from Florida to Nova Scotia (with sporadic sightings further offshore in the western North Atlantic ocean). All photographs and associated data are provided to the New England Aquarium for comparison to,

and inclusion in, the Right Whale Consortium catalog. Each sighting event is entered into an Access database with date, time, location, observer, and comments. If a sighting is matched to a cataloged animal, it receives that animals' four-digit catalog number. There have been 459 animals cataloged of which 447 were used in this study.

The scar coding process involved having a researcher review all available photographs of an individual right whale and assess the type and location of all scars. For coding purposes, the body was divided into 21 sections – five sections on the head, two on the dorsal body, and 14 on the dorsal and ventral tail (see Figure 1). Each body section was assessed and coded for each season/habitat area within each year that an individual was sighted. If a particular section of the body was not seen it was labeled as 'X'.

Figure 1. Body sections used for coding.



The types of scars that were coded for include: entanglement, ship strike, circles, dots, skin lesions (of unknown cause), rake marks (scars near the blowholes), blisters, orca teeth marks, scars from implanted satellite/radio tags and scars of unknown origin. The first time that a scar was detected, it was noted with an asterisk in that given habitat/season/year. The scarring data were entered into a Microsoft Access database with a record for each habitat/season/year an animal was sighted. The record included the time frame during which the animal was seen and scar coding for each body part photographed in that habitat/season/year. The database can be queried by animal number, month/year, habitat area, or scar type and linked to existing tables for age and sex. Although scar coding was done for all scar types, the primary focus of the previous report was on entanglement and ship strike scars (Hamilton *et al.* 1998). This report will focus only on entanglement scarring.

For any animal with entanglement scarring, the photographs of the corresponding body parts were reviewed to determine if the new scar was clearly not previously seen and represented a new interaction for that body part or if a slightly different angle or area coverage of the body part showed scarring that may have been from a previous event. If entanglement scars were detected on different body parts in different habitats or years, the reviewer looked at the combined data and determined, based on previous sightings of these given body parts, whether the scars were likely related to one event or multiple events. Once the minimum number of entanglement events were determined, that animals' records were reviewed to determine the minimum time frame within which each entanglement event happened. Unlike Hamilton *et al.* (1998), we included any animal seen carrying gear in this analysis even if scarring was not detected (some whales were seen with gear, but scars were not documented either because they were covered with line or scarred areas were not photographed, or the area was heavily covered with cyamids obscuring the scars). All entanglement events were put into a summary table with a single record for each animal noting its sex, the year(s) the entanglement(s) was/were detected, the year in which it was previously seen without the entanglement, and the age of the animal in the given year the entanglement was detected. This summary table was queried for many of the analyses presented in this report unless otherwise noted.

<u>Analyses</u>

*Total number of entanglement events*
The summary table was queried to determine the total number of distinct entanglement events documented between 1980 and 2002 for all individuals. These data were further analyzed to determine the number of entanglements per animal and the number of entanglements by sex and age class. The total number of individuals entangled was compared to the total number of animals in the catalog for comparison with previous studies (i.e. Hamilton et al. 1998; Kraus 1990).

*Number of entanglement events versus identified individuals*
A crude analysis of the number of new entanglement detections versus the number of animals identified in each year was carried out. The resulting proportions were graphed to give a general visual assessment of annual variability in entanglement rates.

*Annual Rate of Entanglement*

To further refine the annual rate of entanglement, the data were queried to find all animals sighted in both years of specified consecutive two- year periods. The scar coding was examined to determine whether an animal was adequately photographed in both years and assessed as to whether or not it had become entangled by the second year in that time frame. For an animal to be considered adequately photographed, photographs of the dorsal peduncle and/or at least one of the fluke insertion areas must have been taken in both years to allow for comparison between years. This area of the tail was chosen because data in the previous report (Hamilton *et al.* 1998) showed that the peduncle and fluke insertions were body areas where the majority of entanglement scars have been detected. If an entanglement scar detected on another part of the body in the latter year was determined to have not been there in the previous year, these data were also included. Any calf or 1 year old animals with entanglement scars in the later year were also included in the tally. The number of animals entangled in year two that were not entangled in year one was determined and divided by the total number of animals with adequate photographs for both years (or were a calf or 1 year old by the second year with entanglement scars) to obtain a percentage of the adequately photographed animals entangled in the given two year period. This treatment adjusts for biases in differential photographic effort and whale distribution from year to year.

*Time Frame of Entanglement Detection*

The time frame within which each new entanglement event occurred was determined and tallied. The plot shows, for each year, the total number of entanglements that were first documented in the given year and the breakdown (in percentages) of time frames during which those entanglements occurred. The time frames chosen were from the given year to: 1) within same calendar year; 2) within previous calendar year; 3) within previous two years; 4) within three or more years; and 5) unknown time frame.

*Age at Entanglement Detection*

Previous studies have shown that juveniles (0-9 years old; Kraus *et al.*, 2001) are more likely to become entangled than adults. To investigate this further, we compared the proportion of entanglements that involved juveniles to the proportion of juveniles in the population annually. The frequency of juvenile entanglements was compared to the percentage of the annual cohort represented by this age class. Although the age at *detection* does not indicate the exact age of entanglement, clearly any detection that occurred while the animal was a juvenile represents an entanglement that happened when that animal was a juvenile.

The number of juveniles vs. adult or unknown age animals carrying gear was also reviewed.

*Serious Injuries from Entanglements versus Observed Population*

Not all of the right whales that get entangled are actually seen carrying gear. The majority of them apparently get clear of the gear on their own but are left with minor scars. A limited number of animals have been seen carrying fishing gear or with deep wounds from entanglement and have

been categorized as serious entanglements. The criteria used to define serious injury from entanglement for right whales include any animal seen carrying line and any animal with a cut deeper than 8 cm caused by an entanglement (Knowlton and Kraus, 2001). Serious injuries from entanglements have been further subdivided into non-fatal, potentially fatal, and fatal injuries. The non-fatal and potentially fatal categories are based on the animals' condition at the initial entangled sighting and any subsequent sightings. An entanglement is considered potentially fatal if the animal appears in poor condition or is wrapped in gear that will impede the animals' movements or feeding behavior. If an animal is subsequently resighted free of gear and with no visible decline in its condition, it is considered a non-fatal entanglement. The definition of "serious injury" as used here is slightly different from that used by the National Marine Fisheries Service, where serious injury means "any injury that is likely to lead to mortality" (Angliss and DeMaster, 1998).

The number of serious injuries, independent of outcome, were tallied by year and those sums were divided by the number of individuals identified each year. The number identified each year was an appropriate measure to correct for effort because serious entanglements, by their definition, are obvious. Unlike entanglement scars, whose documentation requires good photographs, serious entanglements will be visible in almost any photograph that allows you to identify the individual. The resulting annual proportion of seriously entangled animals was graphed to allow for visual comparison over the time period.

**Results**

*Total number of entanglement events*

There were a total of 447 individual animals reviewed for this study and 608 separate entanglement interactions were documented between 1980 and 2002. There were 338 of 447 animals (75.6%) entangled at least once. The number of entanglements per individual ranged from 0 to 6 (mean =1.4 entanglements per animal) with 170 animals bearing scars from just one entanglement event and two animals with scars from 6 entanglement events (Figure 2).



Figure 2
Number of entanglement events per individual

The number of individual females and males entangled versus total individuals of each sex in the population was nearly equal (130/171 females, 76.0%; 159/183 males, 86.9%; 49/93 unknown

sex, 52.7%). There was no significant difference in the number of females versus males that carry entanglement scars $p = 0.705$. The breakdown of right whales with entanglement scars by sex of the 608 separate events was also not significant ($p = 1.218$; 257/608 female, 42.3%; 288/608 male, 47.4%; 63/608 unknown sex, 10.4%).

*Number of entanglement events versus identified individuals*
Figure 3 displays the annual proportion of new entanglement detections versus the number of animals identified in the given year. The mean percentage over the 23 year time frame is 15% annually. In some years, this percentage increased dramatically as in 1997 when the level was 33% and 1999 when the level reached 25%.



*Annual Rate of Entanglement*
Figure 4 shows by year the total number of animals seen in both years of consecutive two-year intervals, the number of animals adequately photographed in both years, and the number of animals entangled either within the second year or between the first and second year. The percentage given after each year period on the x-axis represents the number of adequately photographed animals that were entangled. This percentage has ranged from a high of 51% in 1989/1990 to a low of 14% in 1994/1995. In all the two-year periods prior to 1993/1994, the number of adequately photographed animals was lower than 25 per year. This number increased dramatically in 1993/1994 when the number of adequately photographed animals exceeded 50. In most years since 1993/1994, the number of adequately photographed animals has exceeded 100. This higher number of adequately photographed animals provides a more robust indication of

what the whole population may be experiencing.



*Time Frame of Entanglement Detection*

Figure 5 shows the annual tally and timeframe of occurrence (in percentages) of first documented entanglement events for the 447 animals coded. The relatively high number of events categorized as unknown timeframe throughout the 1980's reflects the fact that many individuals were scarred before their first sighting in the early years of this research. These sightings do not allow for a time frame of entanglement to be determined. In the 1990's and the early 2000's, the ability to determine time frame improved with the majority of entanglements detected within 2 years of occurrence.



*Age at Entanglement Detection*

Figure 6 provides a comparison between the percentage of the known number of juveniles within the living population on an annual basis and the percentage of juveniles entangled annually. This graph shows that for all years but one (1988), the proportion of entangled juveniles exceeded their proportion within the population.



*Serious Entanglement Events versus Total Observed*

A total of 55 serious entanglement events of identified individuals have been documented since 1981. Figure 7 shows the annual proportion of seriously entangled animals vs. number of animals photographed in that given year.

At least 25 of the 55 serious entanglement events (45%) involved calves or juveniles of 0-9 years old indicating that this age class is more vulnerable to serious injury from entanglement than adults or unknown age animals.



## DISCUSSION

Entanglements of right whales in fixed fishing gear are a chronic problem facing this severely endangered species. High levels of entanglement interaction have been noted throughout the 25 year-long study of this population. Further, each time the data are analyzed, the proportion of the population with signs of entanglement scarring has increased, with this analysis finding that 75.6% - over three-quarters of this population, has been entangled at least once. When Kraus (1990) looked at a subset of adequately photographed animals, he determined that 52% had indications of entanglement. Hamilton et al. (1998) found that 61.6% of the animals had entanglement scarring when all photographed body parts were reviewed. The increase to 75.6% by 2002 shows that there are increasingly more right whales becoming scarred by fixed fishing gear over time, a worsening situation through three in depth analyses.

There has clearly been much effort focused by the National Marine Fisheries Service, state agencies, fishing industry representatives, whale biologists, and conservation groups to try to understand the nature of the problem facing the species and to develop regulations aimed at reducing the frequency and severity of these entanglements. As these efforts proceed, it will be critical to monitor whether implemented changes to the fishing industry provide benefit to the animals. This report describes three methods of assessing the level and frequency of entanglement interaction in right whales. Each method has strengths and limitations as described below.

The first method, the number of new entanglement detections versus the number of identified individuals annually is a crude but simple method that provides an annual proportion that can be compared from one year to the next.  The method, however, has several limitations and biases. First, it does not account for whether an animal was adequately photographed to detect entanglement scars. Since most entanglement scars are detected around the tail region, animals who were photographed from an aerial platform or whose tail was not photographed during a shipboard sighting may not be tallied as an entanglement detection but would be included in the total tally of individuals for that year. This would lower that year's proportion. The other limitation is that it does not take into account the time frame of the entanglement detection. In years where there is a big influx of individuals into a habitat with intensive shipboard surveys (i.e. Bay of Fundy in the mid 1990's) and some of those animals had not been seen for a couple of years or more, this would increase the number of new entanglement detections thereby increasing the proportion.

The second method of looking at adequately photographed animals eliminates the bias present in the first analysis since it only utilizes animals seen from one year to the next. Thus, the time frame of entanglement is certain which allows for determination of an annual rate. In the early years of this study, there were some biases. The photographic effort in the 1980's was focused on collecting high quality images of the head region for identification purposes. Images of the tail were collected on occasion but at that time, their value for this study was not clearly understood. Observers tended to photograph the tail only if scars were present that would help with the matching process. Therefore, both the number of adequately photographed animals was low and

the number of newly entangled animals was biased upward. By the 1990's, this observer bias was eliminated and tail photos were part of standard protocol during shipboard sighting events. The number of adequately photographed animals doubled by 1992/1993, and by the latter 1990's, the number of adequately photographed animals exceeded 100 per year. This happened concurrently with a shift of right whales into the Bay of Fundy where shipboard efforts have occurred throughout the study period. This method is the most effective for monitoring annual rates of entanglement but requires consistent shipboard effort as well as high numbers of right whales from one year to the next to provide a robust annual rate. For both of the above two methods, efforts to remove gear from the water column would ideally show a reduction in the proportions of newly detected entanglements. If efforts are made to modify gear to reduce the severity of entanglements, there may be no reduction in the level of scarring.

The third method of determining the proportion of seriously entangled animals versus the number of individuals observed in a given year is a useful method for assessing whether gear modifications provide a reduction in entanglement severity. If such gear modifications are effective, we would expect a reduction in the number of animals carrying gear or with deep cuts from an entanglement.

The data presented here indicate that the annual rate of entanglement interaction remains at high levels. In Figure 4, from 1993/1994 onwards, when the number of adequately photographed animals has been consistently over 50 animals, the percentage of those animals entangled has ranged from 14% to 39%. If we extend this range to a population size of approximately 350 animals, the annual number of entanglement interactions could range from 49 to 136 animals. Interestingly, these percentages are similar to those found by Robbins and Mattila (2000) for entanglement scarring of humpback whales. Using a similar technique, they found an annual rate of entanglement ranging from 10 to 31% between 1997 and 1999.

The data presented in Figure 6 show the proportion of serious entanglements has often been 2-3% of the observed population during the 1990's and 2000's and lower in the 1980's. The reasons for this apparent increase in serious entanglements could be related to a number of different scenarios – there may have been a substantial increase in the amount of fixed fishing gear in the water; lines with increased breaking strength and improved durability may be in greater use; whales and/or fishing gear distribution may have shifted thereby increasing the overlap.

The data show that right whales of both sexes are equally vulnerable to entanglements but juveniles become entangled at a higher rate than would be expected if all age groups were equally vulnerable. This has important implications for efforts to reduce the severity of entanglements. Because juveniles are still growing, any entanglement where gear remains on the whale is likely to become embedded and eventually infected. Also, calves and juveniles may not have the strength of an adult to break free from line. Therefore, any efforts to model necessary breaking strengths for lines to provide added protection to right whales need to consider the likely reduced strength and mass of juveniles.

Understanding exactly when and where entanglements are occurring cannot be captured with these scarring analyses. Most of the entanglement events are not witnessed or do not result in an animal carrying gear that could potentially be identified. Therefore, this question needs to be addressed by specifically looking at gear that is taken off animals and events witnessed by fishermen and others.

In summary, the situation facing right whales is dire. Entanglements are frequent and the annual rate has remained high and is increasing. Over three quarters of the population have been entangled at least once. Severe entanglements have also become more common with the highest number (n=8) ever recorded in 2002 with an additional three in 2003 and two in 2004. Disentanglement has been conducted on several of the entangled right whales with varying levels of success (Landry *et al.*, 2003). Right whales are notoriously difficult to disentangle and disentanglement attempts are extremely dangerous to carry out. All of the researchers involved in disentanglement see this as a poor long-term option for protecting right whales and strongly advocate for universal and effective gear modifications.

Continued monitoring is critical as actions are taken to minimize the frequency and severity of entanglements of right whales to document the effectiveness of the measures. However, there may be limitations to our ability to detect potential changes in entanglement levels without further understanding of the overlap between fishing effort and right whales and the level of gear modification changes. If there are efforts to remove the amount of line from the water column, there should be a reduction in the number of new entanglement scars detected. If gear modifications are focused on using weak links or weak line in the vertical line, or some other change to the line parameter, but the amount of vertical line in the water column remains static, the number of scars may not change, but there may be a reduction in the number of animals seen carrying gear and/or a reduction in the severity of the entanglement. Monitoring such changes using the scar coding techniques presented here and evaluating the severity of each entanglement where an animal is carrying gear should provide some insight into the effectiveness of future gear modification efforts.

REFERENCES

Angliss, R.P and DeMaster, D.P. 1998. Differentiating Serious and Non-Serious Injury of Marine Mammals Taken Incidental to Commercial Fishing Operations: Report of the Serious Injury Workshop 1-2 April 1997, Silver Spring, Maryland. U.S. Department of Commerce, NOAA Technical Memorandum NMFS-OPR-13, 48 pp.

Hamilton, P.K. Marx, M.K., and Kraus, S.D. 1998. Scarification Analysis of North Atlantic Right Whales *(Eubalaena glacialis)* as a Method of Assessing Human Impacts. Final Report to NMFS, #46EANF60004.

Knowlton, A.R. and Kraus, S.D. 2001. Mortality and serious injury of northern right whales *(Eubalaena glacialis)* in the western North Atlantic Ocean. J. Cetacean Res. Manage. (Special Issue) 2:193-208.

Kraus, S.D., Hamilton, P.K., Kenney, R.D., Knowlton, A.R. and Slay, C.K. 2001. Reproductive parameters of the North Atlantic right whale. J. Cetacean Res. Manage. (Special Issue) 2: 231-236.

Kraus, S.D. 1990. Rates and potential causes of mortality in North Atlantic right whales *(Eubalaena glacialis).* Marine Mammal Science 6(4):278-291.

Landry, S., Morin, D., Mattila, D., Bowman, R., Hartley, D. 2003. The success of a disentanglement may depend upon the species. Presentation at the 15th Biennial conference on the Biology of Marine Mammals. Greensborough, SC. Dec. 2003.

Robbins, J. and Mattila, D. 2000. Gulf of Maine Humpback Whale Entanglement Scar Monitoring Results 1997-1999. Final Report to NMFS, #40ENNF900253

Attachment #14:  Scarring Report on Humpback Whales by Center for Coastal Studies. Previously filed by Plaintiff as exhibit in 27 November 2006 evidentiary hearing and attached subsequently to  3 January 2006 Notice by Plaintiff of paper filings.

Field Number: **CCSN 02-255**                 Date of Necropsy:  October 03 2002

Location: ~2 miles W of Race Point Ranger Station, Provincetown MA

Species:          Megaptera novaeangliae – Humpback Whale     Sex:      Female          Length: 750 cm

Weight: CBD             Age: Estimate a 2001 calf  Code: 3        Human Interaction: Yes

Date and Time of Death, if known: Unknown

Date Carcass was Discovered   0800 October 1 2001

Prosectors:

Necropsy Team Leader: Michael Moore, Woods Hole Oceanographic Institution mmoore@whoi.edu

On-Site Coordinator: Kathleen Touhey, Cape Cod Stranding Network (CCSN)

Off-Site Coordinator: Dana Hartley, NMFS Woods Hole

Recorder:_Kristen Patchet (CCSN)

Photographer (Digital and slide roll): Landry et al (CCS), Montie (WHOI) Touhey (CCSN)

---

**Brief History:** Background information (initial sighting, how animal was towed to shore?, etc.)

The captain of the fishing vessel "CAPTAIN GEORGE" reported a dead whale belly up entangled and anchored in lobster gear to Dana Hartley, NMFS Woods Hole, 0800 on October 1 2002.  Position was 41 degrees 57.2'N and 70 degrees 31.4"W (just off the Plymouth Power Plant). The species was unknown at the time, but presumed to be either a minke or a humpback. This information was relayed to CCSN at 0815 that same day.

Just after noon on 10/1/02, Dana Hartley called again stating that MA DMF had been on scene, but could no longer stand by.  The MA Env. Police had been sent out. They found the animal free-floating at 41 58.4'N and 70  29.9' W drifting to the ENE.  It was identified as a 20-25 ft long humpback.  MEP got photos and video (unconfirmed).  CCSN and Center for Coastal Studies staff were requested to go out and better document the animal and any signs of entanglement and to sample any entanglement wounds/marks.  CCSN/CCS could not find the animal and prolonged searching was prohibited by weather.

On 2 Oct 2002 at 0945 hrs, the National Park Service at Cape Cod National Seashore reported a dead stranded humpback whale approximately 20-25 feet long at Race Point in Provincetown.  They could not secure the carcass due to surf. CCS headed to the scene to take photos etc. CCSN arrived at Race Point at approximately 1100 hrs, but did not make it to the whale due to an impending mass stranding in Wellfleet, MA. CCS staff examined the whale and photo-documented the entanglement scars. There was no gear on the animal at that time except a few fibers of twisted green, probably polypropylene warp. CCSN returned to the site at approximately 1630 hrs, photographed and sampled the entanglement wounds and secured the carcass.  CCSN et al returned the next day to complete the necropsy on 10/3/02.

**Baleen / Tooth Counts**

| | | | | Photo Y |
| | | | | Histo_____ |
| | | | | Other_____ |

| Institution / Researcher | Quantity (plate #'s) | Collected By | Sent To | Comments |
|---|---|---|---|---|
| Tom French – Mass Wildlife | All baleen | Appeared normal – no suckling notch in midline | | |

**External Examination**

| Photo Y |
| Histo Y |
| Other_____ |

Skin coverage present, 70 %.     Bloated? Marginally     Scavenger Damage? Y

Measurements in cm

Total Length 750

Snout to:
Gape 62
Center of eye 74
Anterior Insertion of pectoral 239
Anterior insertion of dorsal fin 450
Dorsal fin tip 492
Umbilicus 420
Genital 525
Anus center 510
Ventral grooves 445

Girths
Pectoral 608
Ant dorsal fin 330
Anal 240

Appendages
D fin height 17
Pectoral length 224
Pectoral max width 54
Fluke width 230

Fluke notch to anus 198

Axillary blubber thicknesses:
    Dorsal 7.5
    Lateral 6.0
    Ventral 6.0

The animal appeared in good body condition

Cyamids were present – collected in 95% ethanol.

The overwhelming feature of the skin was the multitudinous rope burn marks encircling the body at least 12 times (see last page). One line ran through the right mouth angle running caudally and dorsal to and then around the axilla. Two other lines ran from the left mouth angle to cross the left pectoral lateral surface. Line grooves measured 13mm across. At least three wraps crossed over the dorsal ridge between blowhole and dorsal fin, pinioning both flippers tight to the body wall. These grooves measured 6-7 mm across. At least seven more wraps then extended around the body back to the peduncle and fluke leading edges in a criss-cross pattern of tightly wound line in at least two different windings. A further scar was evident trailing off the ventral surface of the right fluke. Green rope fibers, probably polypropylene, were collected by Scott Landry (CCS) from wounds. No other gear was found or removed. The furrows induced by the rope in some places had: a) spiral patterning suggestive of a three strand rather than braided line, and b) focal surface bruising evident where the skin had worn away. Incision in to these furrows did not show obvious hemorrhage or bruising in the underlying blubber, except at the superficial level. Bite marks by ? small sharks or dogfish were observed along the dorsal peduncle ridge. Some surface bird peck marks were also evident.

**Parasites:** (External and Internal)

Photo_____
Histo_____
Other_Y_____

| Inst./Researcher | Sampled From | Collected By | Sent To | Description / Comments |
|---|---|---|---|---|
| U Utah Bio./ Seger | Skin | M Moore | Jon Seger | 15 cyamids in 95% ethanol |

**Blubber:** Note general condition and any signs of abnormal color and fluids; evidence of edema.
Comments:
Good condition and color except as above on surface.

Photo Y
Histo Y
Other Frozen

| Inst. / Researcher | Sampled From | Collected By | Sent To | Description / Comments |
|---|---|---|---|---|
| CCSN/ Touhey | Wounds see #'s below for sites | Patchett | CCSN | Fixed and Frozen samples of representative rope burn marks |
| 1 | 30 cm caudal to gape – Frame 112 | | | |
| 2 | Middle of leading edge of right pectoral flipper – Frames 110 and 116 | | | |
| 3 | Right Angle of mouth – Frame 111 | | | |
| 4 | Dorsal peduncle ridge, 100cm cranial to fluke insertion – Frames 114 and 115 | | | |
| 5 | At fluke insertion – Frame 117 | | | |
| Rt dorsal blubber ant. to pectoral | Large sample frozen for contaminant analysis | | | |

## MUSCULOSKELETAL

PhotoY
Histo N
Other N

Muscle:  Skeletal muscle was incisable caudo-dorsal to where kidneys should have been. Elsewhere the usual large muscle masses were largely autolysed. An incision through the right medio/dorsal chest wall revealed the thoracic vertebrae cleaned of all muscle – only the ligamentar system had survived the obviously severe autolytic processes. Severe bruising in superficial muscle was observed in the following areas: lower left jaw just cranial to temporomandibular joint, from anus to peduncle on the right side, and mid lateral at the right 7th rib area. These bruises varied from a few cm to more than 40 cm across. A representative image is shown on the final page.

Skeletal: Skeleton was flensed out to individual bones. No evidence of any fractures. Bone quality appeared good.

## RESPIRATORY

Upper: Larynx was partially autolyzed.

Lower: Totally autolyzed

Photo_____
Histo_____
Other_____

## CIRCULATORY

Heart: One atrium partially present

Great vessels: Aorta appeared normal

Blood: No

Photo_____
Histo Aorta & Atrium

## LYMPHATIC

Spleen:  Autolyzed

Photo_____
Histo_____
Other_____

Lymph nodes: Autolyzed

Thymus:  Autolyzed

---

## ENDOCRINE

R. Adrenal: Autolyzed

L. Adrenal: Autolyzed

Thyroid: Autolyzed

Pituitary: Autolyzed

| Photo:_____ |
| Histo:_____ |
| Other:_____ |

---

## URINARY

R. Kidney: Autolysed

L. Kidney: Autolyzed

Bladder: (empty / full / urine saved) : Not found

| Photo:_____ |
| Histo:_____ |
| Other:_____ |

---

## DIGESTIVE

Esophagus: Autolysed

Stomach: Autolyzed

Stomach contents: NA

| Photo: Yes |
| Histo: Colon and small intestine |
| Other:_____ |

Intestines: Small intestine was partially liquified, colon was intact and incisable. Much of the remaining small intestine was in the chest region.

Fecal exam: Colon contained an abundance of a healthy-looking green paste suggesting the animal had been feeding recently.

Liver: 95% autolysed. 5% marginally incisable

Pancreas / Pancreatic ducts: Autolysed

---

## REPRODUCTIVE

R. Gonad: Normal - immature

L. Gonad: Normal - immature

Sperm / Corpora: NA

Uterus: (Vaginal mucus:  **N** )

R. Mammary: Immature

L. Mammary: Immature

Reproductive condition: Immature

| Photo:__Y____ |
| Histo:_Y_____ |
| Other:_____ |

---

**NERVOUS / SENSORY**

Eyes:   Left eye frozen

Spinal Cord: Autolyzed

Peripheral: Sampled in wound histology samples.

Brain: Autolyzed

Ears: Collected and frozen

| |
|---|
| Photo:_____ |
| Histo:Dermis |
| Other:_____ |

---

**Carcass disposition:**

All bones, except one hyoid bone not found, were collected by Tom French, MA Wildlife. Pelvic bones were not ossified.  Soft tissues left on beach to be buried by National Park Service 10 04 02

---

**Comments:**

The distance from the original anchored whale to where a carcass washed ashore is 13 miles to the ENE. It was not observed coming ashore. Given the level of beach going activity on Race Point it had to have come ashore after dusk on October 1st. Thus if both events represent the same whale the assumed drift rate is between 0.6 and 1.6 knots. These data along with the fact that the Cape Cod Bay and Massachusetts Bay whale watch boats are still actively transiting these waters make it entirely reasonable to assume that there was only one carcass involved in the initial sighting off Plymouth and the beached animal in Provincetown. Examination of DMF and MAEP photos should be conducted to confirm this assumption.

The degree of autolysis was markedly variable. It appeared that the primary heat source was in the thorax, in that soft tissues in the ventro caudal abdominal cavity were more intact than in the chest, which, with the exception of the aorta and a small piece of atrium was devoid of the normal contents. It would appear that if the animal had struggled for an extensive period of time prior to death such a focal heat source in the chest would not be unexpected both from cardiopulmonary metabolism, but also that the animal was pinioned around both flippers thus it being a major focus of the struggle. The scarring and bruising would suggest that there was a significant amount of time that the animal was entangled prior to death. For it to have died from the entanglement, after struggling, the assumption has to be made that as it struggled the entanglement worsened, to the extent that the anchoring line then became too short for the animal to surface and breathe at high tide. The way that the ropes pinioned the flippers to the chest would have made it very difficult to breath efficiently, both because rib expansion was curtailed, and in that the animal was trussed up so it could not locomote, thus enhancing the level of anoxia, such that once the blowhole could not be surfaced, the animal died of anoxia.

The sequence of sightings would suggest that after DMF departed the scene, before the MAEP arrived, the owner of the gear found the entangled animal, cut it free of the gear and set it adrift.

Given all of the above it is reasonable to assume that this animal died of hyperthermia and anoxia after progressive entanglement in lobster gear.

## Sample Checklist

| Samples | Photos | Microbio | Histo | Life History | Genetics | Chem Toxins | Biol Toxins | Tracking samples: collected for / sent to |
|---|---|---|---|---|---|---|---|---|
| Blubber | Y | | Y | | | Y | | CCSN |
| Muscle | | | Y | | | Y | | CCSN |
| Bone | Y | | | Y | | | | Tom French |
| Eyes | | | | Y froze | | | | CCSN |
| Ovary | | | L&R | | | | | CCSN |
| Trachea | | | Y | | | | | CCSN |
| Aorta | | | Y | | | | | CCSN |
| Heart | | | Atrium | | | | | CCSN |
| Liver | | | Y | | | | | CCSN |
| Colon | | | Y | | | | | CCSN |
| Small intestine | | | Y | | | | | CCSN |
| Skin | Y | | Y | | Y | | | CCSN |
| Skull | | | | Y | | | | Tom French |
| Skeleton | | | | Y | | | | Tom French |
| Teeth / Baleen | | | | Y | | | | Tom French |
| Uterus | | | Y | | | | | CCSN |
| Rope Burn Lesions | | | | | | | | |
| 1 | Y | | Y | Y | | | | CCSN |
| 2 | Y | | Y | Y | | | | CCSN |
| 3 | Y | | Y | Y | | | | CCSN |
| 4 | Y | | Y | Y | | | | CCSN |
| 5 | Y | | Y | Y | | | | CCSN |
| R Scap bruising | Y | | Y | | | | | CCSN |
| Tail stock bruising | Y | | Y | | | | | CCSN |
| Lower jaw bruising | Y | | Y | | | | | CCSN |
| Cyamids | | | | | Y | | | Moore to Seger (Utah Bio) |
| Ears | | | L&R Froze | | | | | CCSN for Ketten (WHOI) |
| Barnacles | | | | | Y | | | Tom French |

Wounds:

| 1 | 30 cm caudal to gape – Frame 112 |
|---|---|
| 2 | Middle of leading edge of right pectoral flipper – Frames 110 and 116 |
| 3 | Right Angle of mouth – Frame 111 |
| 4 | Dorsal peduncle ridge, 100cm cranial to fluke insertion – Frames 114 and 115 |
| 5 | At fluke insertion – Frame 117 |

Full body:

Wound #1; 30 cm caudal of gape











Attachment #16: March 2006 necropsy report of Northern Right Whale by M. Moore, DVM. Previously filed by Plaintiff as exhibit in 27 November 2006 evidentiary hearing and attached subsequently to  3 January 2006 Notice by Plaintiff of paper filings.

December 2005

# HUMPBACK WHALE  (*Megaptera novaeangliae*):
## Gulf of Maine Stock

**STOCK DEFINITION AND GEOGRAPHIC RANGE**

In the western North Atlantic, humpback whales feed during spring, summer and fall over a range which encompasses the eastern coast of the United States (including the Gulf of Maine), the Gulf of St. Lawrence, Newfoundland/Labrador, and western Greenland (Katona and Beard 1990). Other North Atlantic feeding grounds occur off Iceland and northern Norway, including off Bear Island and Jan Mayen (Christensen *et al.* 1992; Palsbøll *et al.* 1997). These six regions represent relatively discrete subpopulations, fidelity to which is determined matrilineally (Clapham and Mayo 1987). Genetic analysis of mitochondrial DNA (mtDNA) has indicated that this fidelity has persisted over an evolutionary timescale in at least the Icelandic and Norwegian feeding grounds (Palsbøll *et al.* 1995; Larsen *et al.* 1996).

Previously, the North Atlantic humpback whale population was treated as a single stock for management purposes (Waring *et al.* 1999). Indeed, earlier genetic analyses (Palsbøll *et al.* 1995), based upon relatively small sample sizes, had failed to discriminate among the four western North Atlantic feeding areas. However, genetic analyses often reflect a timescale of thousands of years, well beyond those commonly used by managers. Accordingly, the decision was recently made to reclassify the Gulf of Maine as a separate feeding stock; this was based upon the strong fidelity by individual whales to this region, and the attendant assumption that, were this subpopulation wiped out, repopulation by immigration from adjacent areas would not occur on any reasonable management timescale. This reclassification has subsequently been supported by new genetic analysis based upon a much larger collection of samples than those utilized by Palsbøll *et al.* (1995). These analyses have found significant differences in mtDNA haplotype frequencies of the four western feeding areas, including the Gulf of Maine (Palsbøll *et al.* 2001). During the recent Comprehensive Assessment of North Atlantic humpback whales, the International Whaling Commission acknowledged the evidence for treating the Gulf of Maine as a separate stock for the purpose of management (IWC 2002).

During the summers of 1998 and 1999, the Northeast Fisheries Science Center conducted surveys for humpback whales on the Scotian Shelf. The objective of these surveys was to establish the occurrence and population identity of the animals found in this region, which lies between the well-studied populations of the Gulf of Maine and Newfoundland. Photographs from both surveys have now been compared to the overall North Atlantic Humpback Whale Catalogue and a large regional catalogue from the Gulf of Maine (maintained by the College of the Atlantic and the Center for Coastal Studies, respectively); this work is summarized in Clapham *et al.* (2003). The match rate between the Scotian Shelf and the Gulf of Maine was 27% (14 of 52 Scotian Shelf individuals from both years). Comparable rates of exchange were obtained from the southern (26%, n=10 of 36 whales) and northern (27%, *n*=4 of 15 whales) ends of the Scotian Shelf, despite the additional distance of nearly 100 nautical miles (one whale was observed in both areas). In contrast, all (36 of 36) humpback whales identified by the same NMFS surveys elsewhere in the Gulf of Maine (including Georges Bank, southwestern Nova Scotia and the Bay of Fundy) had been previously observed in the Gulf of Maine region. The sighting histories of the 14 Scotian Shelf whales matched to the Gulf of Maine suggested that many of them were transient through the latter area. There were no matches between the Scotian Shelf and any North Atlantic feeding ground, except the Gulf of Maine; however, instructive comparisons are compromised by the often low sampling effort in other regions in recent years. Overall, while it is not possible to define the Gulf of Maine population by drawing a strict geographical boundary, it appears that the effective range of many members of this stock does not extend onto the Scotian Shelf. Further work on the Scotian Shelf was conducted in August 2002 and August 2003; this sampling extended further north and east as far as the Laurentian Channel, and the results are expected to further clarify the issue of stock identity from this region. The very low match rate between the two sampled years (only one animal was resighted in the region in both 1998 and 1999) suggests that the Scotian Shelf is host to a larger population of humpback whales than was previously thought. However, preliminary analysis of photographs collected in 2002 and 2003 revealed a number of inter-annual matches; it is not yet clear whether a suitably precise abundance estimate can be calculated from these data.

In winter, whales from all feeding areas (including the Gulf of Maine) mate and calve primarily in the West Indies, where spatial and genetic mixing among subpopulations occurs (Clapham *et al.* 1993; Katona and Beard 1990; Palsbøll *et al.* 1997; Stevick *et al.* 1998). A few whales of unknown northern origin migrate to the Cape Verde Islands (Reiner *et al.*, 1996). In the West Indies, the majority of whales are found in the waters of the Dominican Republic, notably on Silver Bank, on Navidad Bank, and in Samana Bay (Balcomb and Nichols 1982; Whitehead and Moore 1982; Mattila *et al.* 1989, 1994). Humpback whales are also found at much lower densities throughout the remainder of the Antillean arc, from Puerto Rico to the coast of Venezuela (Winn *et al.* 1975; Levenson and Leapley 1978; Price 1985; Mattila and Clapham 1989).

It is apparent that not all whales migrate to the West Indies every winter, and that significant numbers of animals are found in mid- and high-latitude regions at this time (Clapham *et al.* 1993; Swingle *et al.* 1993). An increased number of sightings of humpback whales in the vicinity of the Chesapeake and Delaware Bays occurred in 1992 (Swingle *et al.* 1993). Wiley *et al.* (1995) reported 38 humpback whale strandings which occurred during 1985-1992 in the U.S. Mid-

Atlantic and southeastern states. Humpback whale strandings increased, particularly along the Virginia and North Carolina coasts, and most stranded animals were sexually immature; in addition, the small size of many of these whales strongly suggested that they had only recently separated from their mothers. Wiley *et al.* (1995) concluded that these areas are becoming an increasingly important habitat for juvenile humpback whales and that anthropogenic factors may negatively impact whales in this area. There have also been a number of wintertime humpback sightings in coastal waters of the southeastern U.S. (NMFS unpublished data; New England Aquarium unpublished data; Florida DEP unpublished data). Whether the increased sightings represent a distributional change, or are simply due to an increase in sighting effort and/or whale abundance, is presently unknown.

A key question with regard to humpback whales off the southeastern and Mid-Atlantic states is their population identity. This topic was recently investigated using fluke photographs of living and dead whales observed in the region (Barco *et al.* 2002). In this study, photographs of 40 whales (live or dead) were of sufficient quality to be compared to catalogues from the Gulf of Maine (the closest feeding ground) and other areas in the North Atlantic. Of 21 live whales, 9 (42.9%) matched to the Gulf of Maine, 4 (19.0%) to Newfoundland and 1 (4.8%) to the Gulf of St Lawrence. Of 19 dead humpbacks, 6 (31.6%) were known Gulf of Maine whales. Although the population composition of the Mid-Atlantic is apparently dominated by Gulf of Maine whales, lack of recent photographic effort in Newfoundland makes it likely that the observed match rates under-represent the true presence of Canadian whales in the region. Barco *et al.* (2002) suggested that the Mid-Atlantic region primarily represents a supplemental winter feeding ground that is used by humpbacks for more than one purpose.

Feeding is the principal activity of humpback whales in New England waters, and their distribution in this region has been largely correlated to prey species and abundance, although behavior and bottom topography are factors in foraging strategy (Payne *et al.* 1986, 1990). Humpback whales are frequently piscivorous when in these waters, feeding on herring (*Clupea harengus*), sand lance (*Ammodytes* spp.), and other small fishes. In the northern Gulf of Maine, euphausiids are also frequently taken (Paquet *et al.* 1997). Commercial depletion of herring and mackerel led to an increase in sand lance in the southwestern Gulf of Maine in the mid 1970's with a concurrent decrease in humpback whale abundance in the northern Gulf of Maine. Humpback whales were densest over the sandy shoals in the southwestern Gulf of Maine favored by the sand lance during much of the late 1970's and early 1980's, and humpback distribution appeared to have shifted to this area (Payne *et al.* 1986). An apparent reversal began in the mid 1980's, and herring and mackerel increased as sand lance again decreased (Fogarty *et al.* 1991). Humpback whale abundance in the northern Gulf of Maine increased dramatically during 1992-1993, along with a major influx of herring (P. Stevick, pers. comm.). Humpback whales were few in nearshore Massachusetts waters in the 1992-1993 summer seasons. They were more abundant in the offshore waters of Cultivator Shoal and the Northeast Peak on Georges Bank, and on Jeffreys Ledge; these latter areas are more traditional locations of herring occurrence. In 1996 and 1997, sand lance, and thus humpback whales, were once again abundant in the Stellwagen Bank area. However, unlike previous cycles, where an increase in sand lance corresponded to a decrease in herring, herring remained relatively abundant in the northern Gulf of Maine, and humpbacks correspondingly continued to occupy this portion of the habitat, where they also fed on euphausiids (unpublished data, Center for Coastal Studies and College of the Atlantic).

In early 1992, a major research initiative known as the Years of the North Atlantic Humpback (YONAH) (Smith *et al.* 1999) was initiated. This project was a large-scale, intensive study of humpback whales throughout almost their entire North Atlantic range, from the West Indies to the Arctic. During two primary years of field work, photographs for individual identification and biopsy samples for genetic analysis were collected from summer feeding areas and from the breeding grounds in the West Indies. Additional samples were collected from certain areas in other years. Results pertaining to the estimation of abundance and to genetic population structure are summarized below.

## POPULATION SIZE

The overall North Atlantic population (including the Gulf of Maine) was estimated from genetic tagging data collected by the YONAH project in the breeding range at 4,894 males (95% CI=3,374-7,123) and 2,804 females (95% CI=1,776-4,463) (Palsbøll *et al.* 1997). Since the sex ratio in this population is known to be even (Palsbøll *et al.* 1997), the excess of males is presumed to be a result of sampling bias, lower rates of migration among females or sex-specific habitat partitioning in the West Indies; whatever the reason, the combined total is an underestimate of overall population size in this ocean. Photographic mark-recapture analyses from the YONAH project gave an ocean-basin-wide estimate of 11,570 for 1992/1993 (CV=0.068, Stevick *et al.* 2003), and an additional genotype-based analysis yielded a similar but less precise estimate of 10,400 (95% CI=8,000 to 13,600) (Smith *et al.* 1999). The estimate of 11,570 (CV=0.068) is regarded as the best available estimate for the North Atlantic, although because YONAH sampling was not spatially representative in the feeding grounds, this figure is negatively biased. In the northeastern North Atlantic, Øien (2001) estimated from sighting survey data that there were 889 (CV=0.32) humpback whales in the Barents and Norwegian Seas region.

Estimating abundance for the Gulf of Maine stock has proved problematic. Three approaches have been investigated: mark-recapture estimates, minimum population size, and line-transect estimates. Most of the mark-recapture estimates were affected by heterogeneity of sampling, which was heavily focused on the southwestern Gulf of Maine. However, an

estimate of 652 (CV=0.29) derived from the more extensive and representative YONAH sampling in 1992 and 1993 was probably less subject to this bias.

The second approach uses photo-identification data to establish the minimum number of humpback whales known to be alive in a particular year, 1997. By determining the number of identified individuals seen either in that year, or in both a previous and subsequent year, it is possible to determine that at least 497 humpbacks were alive in 1997. This figure is also likely to be negatively biased, again because of heterogeneity of sampling. A similar calculation for 1992 (which would correspond to the YONAH estimate for the Gulf of Maine) yields a figure of 501 whales.

In the third approach, data were used from a 28 July to 31 August 1999 line-transect sighting survey conducted by a ship and airplane covering waters from Georges Bank to the mouth of the Gulf of St. Lawrence. Total track line length was 8,212km. However, in light of the information on stock identity of Scotian Shelf humpback whales noted above, only the portions of the survey covering the Gulf of Maine were used; surveys blocks along the eastern coast of Nova Scotia were excluded. Shipboard data were analyzed using the modified direct duplicate method (Palka 1995) that accounts for school size bias and $g(0)$, the probability of detecting a group on the track line. Aerial data were not corrected for $g(0)$ (Palka 2000). These surveys yielded an estimate of 816 humpbacks (CV=0.45). However, given that the rate of exchange between the Gulf of Maine and both the Scotian Shelf and Mid-Atlantic region is not zero, this estimate is likely to be somewhat conservative. Accordingly, inclusion of data from 25% of the Scotian Shelf survey area (to reflect the match rate of 25% between the Scotian Shelf and the Gulf of Maine) gives an estimate of 902 whales (CV=0.41). Since the mark-recapture figures for abundance and minimum population size given above falls above the lower bound of the CV of the line transect estimate, and given the known exchange between the Gulf of Maine and the Scotian Shelf, we have chosen to use the latter as the best estimate of abundance for Gulf of Maine humpback whales.

**Minimum Population Estimate**

The minimum population estimate is the lower limit of the two-tailed 60% confidence interval of the log-normally distributed best abundance estimate. This is equivalent to the 20th percentile of the log-normal distribution as specified by Wade and Angliss (1997). The best estimate of abundance for Gulf of Maine humpback whales is 902 (CV=0.41). The minimum population estimate for this stock is 647.

| Month/Year | Type | N | CV | Source |
|---|---|---|---|---|
|  | Table 1. Summary of abundance estimates for Gulf of Maine humpback whales. CCS = Center for Coastal Studies. COA = College of the Atlantic. | | | |
| 1992/93 | Mark-recapture estimate | 652 | 0.29 | Clapham *et al.* (2003) |
| 1997 | Minimum known to be alive | 497 | - | CCS + COA data |
| July/August 1999 | Line transect, including a portion of the Scotian Shelf stratum | 902 | 0.41 | Palka 2000, Clapham *et al.* 2003 |

**Current Population Trend**

As detailed below, current data suggest that the Gulf of Maine humpback whale stock is steadily increasing in size. This is consistent with an estimated average trend of 3.1% (SE=0.005) in the North Atlantic population overall for the period 1979-1993 (Stevick *et al.* 2003), although there are no other feeding-area-specific estimates.

**CURRENT AND MAXIMUM NET PRODUCTIVITY RATES**

Barlow and Clapham (1997) applied an interbirth interval model to photographic mark-recapture data and estimated the population growth rate of the Gulf of Maine humpback whale stock at 6.5% (CV=0.012). Maximum net productivity is unknown for this population, although a theoretical maximum for any humpback population can be calculated using known values for biological parameters (Brandão *et al.* 2000; Clapham *et al.* 2001). For the Gulf of Maine, data supplied by Barlow and Clapham (1997) and Clapham *et al.* (1995) gives values of 0.96 for survival rate, 6 years as mean age at first parturition, 0.5 as the proportion of females, and 0.42 for annual pregnancy rate. From this, a maximum population growth rate of 0.072 is obtained according to the method described by Brandão *et al.* (2000). This suggests that the observed rate of 6.5% (Barlow and Clapham 1997) was close to the maximum for this stock.

Clapham *et al.* (2003) updated the Barlow and Clapham (1997) analysis using data from the period 1992 to 2000. The estimate was either 0% (for a calf survival rate of 0.51) or 4.0% (for a calf survival rate of 0.875). Although confidence limits are not available (because maturation parameters could not be estimated), both estimates of population growth rate are outside the 95% confidence intervals of the previous estimate of 6.5% for the period 1979 to 1991 (Barlow and Clapham 1997). It is unclear whether this apparent decline is an artifact resulting from a shift in distribution; indeed, such a shift occurred during exactly the period (1992-1995) in which survival rates declined. It is possible that this shift

resulted in calves born in those years imprinting on (and thus subsequently returning to) areas other than those in which intensive sampling occurs. If the decline is a real phenomenon it may be related to known high mortality among young-of-the-year whales in the waters of the U.S. Mid-Atlantic states. However, calf survival appears to have increased since 1996, presumably accompanied by an increase in population growth.

In light of the uncertainty accompanying the more recent estimate of population growth rate for the Gulf of Maine, for purposes of this assessment the maximum net productivity rate was assumed to be the default value for cetaceans of 0.04 (Barlow *et al.* 1995).

Current and maximum net productivity rates are unknown for the North Atlantic population overall. As noted above, Stevick *et al.* (2003) calculated an average population growth rate of 3.1% (SE=0.005) for the period 1979-1993.

## POTENTIAL BIOLOGICAL REMOVAL

Potential Biological Removal (PBR) is the product of minimum population size, one-half the maximum productivity rate, and a "recovery" factor (MMPA Sec. 3. 16 U.S.C. 1362; Wade and Angliss 1997). The minimum population size is 647. The maximum productivity rate is the default value of 0.04. The "recovery" factor, which accounts for endangered, depleted, threatened stocks, or stocks of unknown status relative to optimum sustainable population (OSP) is assumed to be 0.10 because this stock is listed as an endangered species under the Endangered Species Act (ESA). PBR for the Gulf of Maine humpback whale stock is 1.3 whales.

## ANNUAL HUMAN-CAUSED SERIOUS INJURY AND MORTALITY

For the period 1999 through 2003, the total estimated human-caused mortality and serious injury to the Gulf of Maine humpback whale stock is estimated as 3.8 per year (U.S. waters, 2.8; Canadian waters, 0.6; St. Vincent and the Grenadines, 0.4). This average is derived from three components: 1) incidental fishery interaction records, 2.8 (U.S. waters, 2.2; Canadian waters, 0.6); 2) records of vessel collisions, 0.6 (U.S. waters, 0.6; Canadian waters, 0), and directed takes from the Bequian harvest in St. Vincent and the Grenadines (0.4). There were additional humpback mortalities and serious injuries that occurred in the southeastern and Mid-Atlantic states that could not be confirmed as involving members of the Gulf of Maine stock. These records represent an additional minimum annual average of 1.8 human-caused mortalities and serious injuries to humpbacks over the time period, of which 1.2 per year are attributable to incidental fishery interactions and 0.6 per year are attributable to vessel collisions.

Beginning with the 2001 Stock Assessment Report, Canadian records were incorporated into the mortality and serious injury rates, to reflect the effective range of this stock as described above. In addition, records from the southeastern and Mid-Atlantic states involving individuals that could not be identified as members of the Gulf of Maine stock were tallied separately. Conversely, records involving unidentified individuals reported between New York and the Bay of Fundy were assumed to be whales from the Gulf of Maine stock. It is also important to stress that serious injury determinations are made based upon the best available information at the time of writing; these determinations may change with the availability of new information. For the purposes of this report, discussion is primarily limited to those records considered confirmed human-caused mortalities or serious injuries.

To better assess human impacts (both vessel collision and gear entanglement), and considering the number of decomposed and incompletely or unexamined animals in the records, there needs to be greater emphasis on the timely recovery of carcasses and complete necropsies. The literature and review of records described here suggest that there are significant human impacts beyond those recorded in the fishery observer data. For example, a study of entanglement-related scarring on the caudal peduncle of 134 individual humpback whales in the Gulf of Maine suggested that between 48% and 65% had experienced entanglements (Robbins and Mattila 2001). Decomposed and/or unexamined animals (e.g., carcasses reported but not retrieved or necropsied) represent 'lost data', some of which may relate to human impacts.

'Serious injury' was defined in 50 CFR part 229.2 as an injury that was likely to lead to mortality. We therefore limited the serious injury designation to only those reports that had substantiated evidence that the injury, whether from entanglement or vessel collision, was likely to lead to the whale's death. Determinations of serious injury were made on a case by case basis following recommendations from the workshop conducted in 1997 on differentiating serious and non-serious injuries (Angliss and DeMaster 1998). Injuries that impeded the whale's locomotion or feeding were not considered serious injuries unless they were likely to be fatal in the foreseeable future. There was no forecasting of how the entanglement or injury may increase the whale's susceptibility to further injury, namely from additional entanglements or vessel collisions. For these reasons, the human impacts listed in this report are a minimum estimate.

### Background

As with right whales, human impacts (vessel collisions and entanglements) are factors which may be slowing recovery of the humpback whale population. There is an average of 4 to 6 entanglements of humpback whales a year in waters of the southern Gulf of Maine and additional reports of vessel-collision scars (unpublished data, Center for Coastal Studies). Of 20 dead humpback whales (principally in the Mid-Atlantic, where decomposition did not preclude examination for human impacts), Wiley *et al.* (1995) reported that 6 (30%) had major injuries possibly attributable to ship strikes, and 5 (25%) had injuries consistent with possible entanglement in fishing gear. One whale displayed scars that

may have been caused by both ship strike and entanglement. Thus, 60% of the whale carcasses which were suitable for examination showed signs that anthropogenic factors may have contributed to, or been responsible for, their death. Wiley *et al.* (1995) further reported that all stranded animals were sexually immature, suggesting a winter or migratory segregation and/or that juvenile animals are more susceptible to human impacts.

An updated analysis of humpback whale mortalities from the Mid-Atlantic states region has recently been produced by Barco *et al.* (2002). Between 1990 and 2000, there were 52 known humpback whale mortalities in the waters of the U.S. Mid-Atlantic states. Length data from 48 of these whales (18 females, 22 males and 8 of unknown sex) suggested that 39 (81.2%) were first-year animals, 7 (14.6%) were immature and 2 (4.2%) were adults. However, sighting histories of 5 of the dead whales indicate that some were small for their age, and histories of live whales further indicate that the population contains a greater percentage of mature animals than is suggested by the stranded sample.

In their study of entanglement rates estimated from caudal peduncle scars, Robbins and Mattila (2001) found that males were more likely to be entangled than females. The scarring data also suggested that yearlings were more likely than other age classes to be involved in entanglements. Finally, female humpbacks showing evidence of prior entanglements produced significantly fewer calves, suggesting that entanglement may significantly impact reproductive success.

Humpback whale entanglements also occur in relatively high numbers in Canadian waters. Reports of collisions with fixed fishing gear set for groundfish around Newfoundland averaged 365 annually from 1979 to 1987 (range 174-813). An average of 50 humpback whale entanglements (range 26-66) was reported annually between 1979 and 1988, and 12 of 66 humpback whales that were entangled in 1988 died (Lien *et al.* 1988). Volgenau *et al.* (1995) also summarized existing data and concluded that in Newfoundland and Labrador, cod traps caused the most entanglements and entanglement mortalities (21%) of humpbacks between 1979 and 1992. They also reported that gillnets are the gear that has been the primary cause of entanglements and entanglement mortalities (20%) of humpbacks in the Gulf of Maine between 1975 and 1990.

Disturbance by whale watching may prove to be an important habitat issue in some areas of this population's range, notably the coastal waters of New England where the density of whale watching traffic is seasonally high. No studies have been conducted to address this question, and its impact (if any) on habitat occupancy and reproductive success is unknown.

**Fishery-Related Serious Injuries and Mortalities**

A description of Fisheries is provided in Appendix III. Two mortalities were observed in the pelagic drift gillnet fishery since 1989. In winter 1993, a juvenile humpback was observed entangled and dead in a pelagic drift gillnet along the 200m isobath northeast of Cape Hatteras; in early summer 1995, a humpback was entangled and dead in a pelagic drift gillnet on southwestern Georges Bank.

Additional reports of mortality and serious injury relevant to comparison to PBR, as well as description of total human impacts, are contained in records maintained by NMFS. A number of these records (11 entanglements involving lobster pot/trap gear) from the 1990-1994 period were cause to reclassify the lobster fishery (62 FR 33, Jan. 2, 1997).

For this report, the records of dead, injured, and/or entangled humpbacks (found either stranded or at sea) for the period 1999 through 2003 were reviewed. Out of 169 records, 144 were eliminated from further consideration due to an absence of any evidence of human impact or, in the case of an entangled whale, it was documented that the animal had become disentangled (10 were disentangled in 2003 alone). Of the remaining records, the Gulf of Maine stock sustained 5 mortalities attributable to fishery interactions and 9 cases of serious injuries - 14 records in the five-year period (Table 2). In addition, 3 mortalities and 3 serious injuries were documented in the southeastern and Mid-Atlantic states that involved interactions with fisheries. At the time of this writing, no genetic results were available to identify which of these cases may have involved whales from the Gulf of Maine stock. While these records are not statistically quantifiable in the same way as the observed fishery records, they provide some indication of the frequency of entanglements.

Table 2. Summarized records of mortality and serious injury likely to result in mortality, for North Atlantic humpback whales, January 1999 - December 2003. Causes of mortality or injury, assigned as primary or secondary, are based on records maintained by NMFS. Records counted as from the Gulf of Maine humpback whale stock are indicated by an asterisk (*) following the date. Stock identification of the remaining records are awaiting genetic analysis results. These may identify additional Gulf of Maine whales.

| Date | Report Type | Length, sex, age, ID | Location | Assigned Cause: P=primary, S=secondary | | Notes |
|------|-------------|----------------------|----------|--------|--------|-------|
| | | | | Ship strike | Entang./ Fsh.inter | |
| 1/12/99* | mortality | 9.7m male | Martha's Vineyard, MA | | P | Fresh and extensive rope marks on carcass with associated hemorrhaging |
| 3/6/99* | mortality | 13.8m female and calf | Bequia, St. Vincent and the Grenadines | | | Two whales taken by the Bequian harpoon fishery |
| 8/2/99* | serious injury | 9.4m estimated | Bay of Fundy, Canada | | P | Single wrap of ½ inch poly line pinning flippers |
| 9/23/99* | serious injury | unknown | off Chatham, MA | | P | Line out of mouth and several wraps around body; possibly anchored |
| 1/8/00 | serious injury | 9.9m estimated | 30mi east Cape Lookout, NC | | P | whale swam off with 600' of sea trout sink gillnet, a chain anchor and a high flyer in tow |
| 8/4/00* | serious injury | 10.7m estimated | Bay of Fundy, Canada | | P | line wrapped on head with weighted trailing line giving tension |
| 9/6/00* | serious injury | <1 yr old, calf of "Giraffe" | Stellwagen Bank, MA | | P | single line wrapped across back; constriction will increase as whale grows |
| 10/14/00 | serious injury | 9.9m estimated | off Ocean City Inlet, MD | | P | Heavily entangled; constrictive--fresh wounds noted |
| 10/20/00* | serious injury | 10 yr old male "Tribble" | Stellwagen Bank, MA | | P | Entangled in green poly line on multiple body parts; appears constrictive |
| 1/25/01 | mortality | 6.9m estimated | Avon, NC | P | | extensive hemorrhaging along left thoracic, clean cut through center of vertebrae; ship strike |
| 4/7/01 | mortality | 7.9m juvenile male | Myrtle Beach, SC | S | P | pre-mortem evidence of chronic line entanglement; severe prop wounds |
| 4/7/01 | mortality | 7.6m juvenile male | Emerald Isle, NC | | P | entanglement around peduncle caused extensive edema, hemorrhaging |

| 4/9/01* | mortality | 8.8m juvenile female "Inland" | offshore of Sandbridge, Virginia Beach | | P | found anchored in gillnet gear; line wraps around rostrum had immobilized the whale |
|---|---|---|---|---|---|---|
| 7/29/01* | mortality | 8.5m juvenile female | floating south of Verrazano Bridge, NY | P | | large laceration on left side of head, extensive fracturing of skull |
| 10/1/01* | mortality | 11.4m 3 yr old female "Pitfall" | Duxbury Beach, MA | P | | massive fracturing to skull, focal bruising indicative of pre-mortem ship strike |
| 2/8/02 | mortality | 8.4m juvenile female | off Cape Henry, VA | P | | three large lacerations, hemorrhaging, broken bones |
| 3/24/02 | mortality | 8.0m juvenile male | off Virginia Beach, VA | | P | deep cuts on caudal peduncle and tail indicative of embedded line |
| 6/3/02* | mortality | 9.9m | off Cape Elizabeth, ME | | P | deep cuts on caudal peduncle indicative of embedded line |
| 6/17/02* | serious injury | 10.2m estimated | Cape Cod Bay, MA | | P | fluke severely damaged by line, whale emaciated |
| 8/1/02* | mortality | 9.3m male | Long Island, NY | P | | large hematoma posterior to blow holes |
| 10/1/02* | mortality | 7.5m female calf | Plymouth, MA | | P | Extensive line chafing and bruising on carcass; no gear recovered |
| 6/6/03 | mortality | 8.3m female | Chesapeake Bay mouth, VA | P | | Major trauma to right side of head, hematoma |
| 7/9/03* | serious injury | calf of Shockwave | Bay of Fundy, Canada | | P | Constricting entanglement on a young whale |
| 7/12/03 | serious injury | unknown | Oregon Inlet, NC | | P | Entangled in substantial amount of gear |
| 8/16/03* | serious injury | unknown | off Cape Cod, MA | | P | Poor body condition; line deeply embedded |
| 8/18/03* | serious injury | unknown | off Cape Cod, MA | | P | Extensive entanglement |

NOTE: Notes: The date sighted and location provided in the table are not necessarily when or where the serious injury or mortality occurred; rather, this information indicates when and where the whale was first reported beached, entangled, or injured.
National guidelines for determining what constitutes a serious injury have not been finalized. Interim criteria as established by NERO/NMFS (62 FR 33, Jan. 2, 1997) have been used here. Some assignments may change as new information becomes available and/or when national standards are established.

**Other Mortality**

Between November 1987 and January 1988, at least 14 humpback whales died after consuming Atlantic mackerel containing a dinoflagellate saxitoxin (Geraci *et al.* 1989). The whales subsequently stranded or were recovered in the

vicinity of Cape Cod Bay and Nantucket Sound, and it is highly likely that other mortalities occurred during this event which went unrecorded. In July 2003, another Unusual Mortality Event was recorded in offshore waters when an estimated minimum of 12-15 humpback whales died in the vicinity of the Northeast Peak of Georges Bank. Preliminary tests of samples taken from some of these whales tested positive for domoic acid at low levels, but it is currently unknown what levels would affect the whales and therefore no definitive conclusions can yet be drawn regarding the cause of this event. Its effect on the status of the Gulf of Maine humpback whale population is currently unknown.

During the first six months of 1990, seven dead juvenile (7.6 to 9.1m long) humpback whales stranded between North Carolina and New Jersey. The significance of these strandings is unknown, but is a cause for some concern.

As reported by Wiley *et al.* (1995), injuries possibly attributable to ship strikes are more common and probably more serious than those from entanglements. In the NMFS records for 1999 through 2003, 15 records had some evidence of a collision with a vessel. Of these, 6 were mortalities as a result of the collision, and 8 did not have sufficient information to confirm the collision as the cause of death. The remaining incident occurred on 10/4/01 and involved a whale-watch vessel. Photos taken at the time of the collision confirmed that the injury was minor and follow-up documentation provided evidence that the injury sustained had healed. Three out of the 6 cases of mortality from a vessel collision involved whales identified as members of the Gulf of Maine stock (7/29/01, 10/1/01 and 8/1/02; see Table 2).

On 6 March 1999, a 46-foot female and what was likely her calf (20-23 feet in length) were taken by the Bequian harvest in St. Vincent and the Grenadines. The larger whale was identified as a Gulf of Maine whale (J. Robbins, pers. comm.).

## STATUS OF STOCK

The status of the North Atlantic humpback whale population was the topic of an International Whaling Commission Comprehensive Assessment in June 2001, and again in May 2002; these meetings conducted a detailed review of all aspects of this population (IWC 2002). Although the most recent estimates of abundance indicate continued population growth, the size of the humpback whale stock may be below OSP in the U.S. Atlantic EEZ. This is a strategic stock because the humpback whale is listed as an endangered species under the ESA. A Recovery Plan has been published and is in effect (NMFS 1991). There are insufficient data to reliably determine current population trends for humpback whales in the North Atlantic overall. The average annual rate of population increase was estimated at 3.1% (SE=0.005, Stevick *et al.* 2003). As noted above, a recent analysis of demographic parameters for the Gulf of Maine (Clapham *et al.* 2003) suggested a lower rate of increase than the 6.5% reported by Barlow and Clapham (1997), but results may have been confounded by distribution shifts. The total level of human-caused mortality and serious injury is unknown, but current data indicate that it is significant. In particular, the continued high level of mortality among humpback whales off the U.S. Mid-Atlantic states (Barco *et al.* 2002), is cause for considerable concern given that at least some of these animals are known to be from the Gulf of Maine. This is a strategic stock because the average annual fishery-related mortality and serious injury exceeds PBR, and because the North Atlantic humpback whale is an endangered species.

A new large-scale assessment called More of North Atlantic Humpbacks (MoNAH) project is currently underway. This two-year study will attempt to estimate abundance and refine knowledge of population structure with extensive sampling in the Gulf of Maine/Scotian Shelf region and on the primary wintering ground on Silver Bank; additional research will focus on the U.S. Mid-Atlantic states. The work is intended to update the YONAH assessment of North Atlantic humpback whales in preparation for a possible status review under the Endangered Species Act.

## REFERENCES

Angliss, R.P., and D.P. DeMaster. 1998. Differentiating serious and non-serious injury of marine mammals taken incidental to commercial fishing operations: report of the serious injury workshop 1-2 April 1997, Silver Spring, Maryland. NOAA Tech. Memo. NMFS-OPR-13, January 1998.

Balcomb, K.C. and G. Nichols. 1982. Humpback whale censuses in the West Indies. Rep. Int. Whal. Commn. 32: 401-406.

Barco, S., W.A. McLellan, J. Allen, R. Asmutis, R. Mallon-Day, E. Meagher, D.A. Pabst, J. Robbins, R. Seton, R.M. Swingle, M.T. Weinrich and P.J. Clapham. 2002. Population identity of humpback whales in the waters of the U.S. Mid-Atlantic states. J. Cetacean Res. Manage. 4: 135-141.

Barlow, J. and P.J. Clapham. 1997. A new birth-interval approach to estimating demographic parameters of humpback whales. Ecology 78: 535-546.

Barlow, J., S.L. Swartz, T.C. Eagle and P.R. Wade. 1995. U.S. Marine mammal stock assessments: Guidelines for preparation, background, and a summary of the 1995 assessments. U.S.Dep. Commer., NOAA Tech. Memo. NMFS-OPR-6, 73 pp.

Brandão, A., D.S. Butterworth and M.R. Brown. 2000. Maximum possible humpback whale increase rates as a function of biological parameter values. J. Cetacean Res. Manage. 2 (supplement): 192-193.

Christensen, I., T. Haug, and N. Øien. 1992. Seasonal distribution, exploitation and present abundance of stocks of large baleen whales (Mysticeti) and sperm whales (*Physeter macrocephalus*) in Norwegian and adjacent waters. ICES J. Mar. Sci. 49: 341-355.

Clapham, P.J. and C.A. Mayo. 1987. Reproduction and recruitment of individually identified humpback whales, *Megaptera novaeangliae*, observed in Massachusetts Bay, 1979-1985. Can. J. Zool. 65: 2853-2863.

Clapham, P.J., L.S. Baraff, C.A. Carlson, M.A. Christian, D.K. Mattila, C.A. Mayo, M.A. Murphy, and S. Pittman. 1993. Seasonal occurrence and annual return of humpback whales, *Megaptera novaeangliae*, in the southern Gulf of Maine. Can. J. Zool. 71: 440-443.

Clapham, P.J., Bérubé, M.C. and Mattila, D.K. 1995. Sex ratio of the Gulf of Maine humpback whale population. Mar. Mamm. Sci. 11: 227-231.

Clapham, P.J., J. Barlow, T. Cole, D.K. Mattila, R. Pace, D. Palka, J. Robbins and R. Seton. 2003. Stock definition, abundance and demographic parameters of humpback whales from the Gulf of Maine. J. Cetacean Res. Manage. 5: 13-22.

Clapham, P.J., J. Robbins, M. Brown, P. Wade, and K. Findlay. 2001. A note on plausible rates of population growth for humpback whales. J. Cetacean Res. Manage. 3 (suppl.): 196-197.

Fogarty, M. J., E. B. Cohen, W. L. Michaels, and W. W. Morse. 1991. Predation and the regulation of sand lance populations: An exploratory analysis. ICES Mar. Sci. Symp. 193: 120-124.

Geraci, J.R., D.M. Anderson., R.J. Timperi, D.J. St. Aubin., G.A. Early, J.H. Prescott and C.A. Mayo. 1989 Humpback whales (*Megaptera novaeangliae*) fatally poisoned by dinoflagellate toxins. Can. J. Fish. Aquat. Sci. 46: 1895-1898.

IWC. 2002. Report of the Scientific Committee. Annex H: Report of the Sub-committee on the Comprehensive Assessment of North Atlantic humpback whales. J. Cetacean Res. Manage. 3 (suppl.) 209-228.

Katona, S.K., and J.A. Beard. 1990. Population size, migrations, and feeding aggregations of the humpback whale (*Megaptera novaeangliae*) in the western North Atlantic Ocean. Rep. Int. Whal. Commn., Special Issue 12: 295-306.

Larsen, A.H., J. Sigurjónsson, N. Øien, G. Vikingsson, and P.J. Palsbøll. 1996. Population genetic analysis of mitochondrial and nuclear genetic loci in skin biopsies collected from central and northeastern North Atlantic humpback whales (*Megaptera novaeangliae*): population identity and migratory destinations. Proceedings of the Royal Society of London B 263: 1611-1618.

Levenson, C. and W.T. Leapley, 1978. Distribution of humpback whales (*Megaptera novaeangliae*) in the Caribbean determined by a rapid acoustic method. J. Fish. Res. Bd. Can. 35: 1150-1152.

Lien, J., W. Ledwell, and J. Naven. 1988. Incidental entrapment in inshore fishing gear during 1988: A preliminary report to the Newfoundland and Labrador Department of Fisheries and Oceans, 15 pp.

Mattila, D.K. and P.J. Clapham. 1989. Humpback whales and other cetaceans on Virgin Bank and in the northern Leeward Islands, 1985 and 1986. Can. J. Zool. 67: 2201-2211.

Mattila, D.K., P.J. Clapham, S.K. Katona and G.S. Stone. 1989. Population composition of humpback whales on Silver Bank. Can. J. Zool. 67: 281-285.

Mattila, D.K., P.J. Clapham, O.Vásquez, and R. Bowman. 1994. Occurrence, population composition and habitat use of humpback whales in Samana Bay, Dominican Republic. Can. J. Zool. 72: 1898-1907.

NMFS [National Marine Fisheries Service]. 1991. Recovery plan for the humpback whale (*Megaptera novaeangliae*). Prepared by the Humpback Whale Recovery Team for the National Marine Fisheries Service, Silver Spring, MD, 105 pp.

Øien, N. 2001. Humpback whales in the Barents and Norwegian Seas. Paper SC/53/NAH21 presented to the International Whaling Commission Scientific Committee. Available from IWC, 135 Station Road, Impington, Cambridge, UK.

Palka, D. 1995. Abundance estimate of the Gulf of Maine harbor porpoise. Rep. Int. Whal. Commn., Special issue 16: 27-50.

Palka, D. 2000. Abundance of the Gulf of Maine/Bay of Fundy harbor porpoise based on shipboard and aerial surveys during 1999. NMFS, Northeast Fisheries Science Center Ref. Doc. 00-07; 29 pp. Available from: National Marine Fisheries Service, 166 Water Street, Woods Hole, MA 02543.

Paquet, D., C. Haycock and H. Whitehead. 1997. Numbers and seasonal occurrence of humpback whales (*Megaptera novaeangliae*) off Brier Island, Nova Scotia. Can. Field Nat. 111: 548-552.

Palsbøll, P. J., J. Allen,, M. Bérubé, P. J. Clapham, T. P. Feddersen, P. Hammond, H. Jørgensen, S. Katona, A. H. Larsen, F. Larsen, J. Lien, D. K. Mattila, J. Sigurjónsson, R. Sears, T. Smith, R. Sponer, P. Stevick and N. Øien. 1997. Genetic tagging of humpback whales. Nature 388: 767-769.

Palsbøll, P.J., P.J. Clapham, D.K. Mattila, F. Larsen, R. Sears, H.R. Siegismund, J. Sigurjónsson, O. Vásquez and P. Arctander. 1995. Distribution of mtDNA haplotypes in North Atlantic humpback whales: the influence of behavior on population structure. Marine Ecology Progress Series 116: 1-10.

Palsbøll, P.J., J. Allen, T.H. Anderson, M. Bérubé, P.J. Clapham, T.P. Feddersen, N. Friday, P. Hammond, H. Jørgensen, S.K. Katona, A.H. Larsen, F. Larsen, J. Lien, D.K. Mattila, F.B Nygaard, J. Robbins, R. Sponer, R. Sears, J. Sigurjónsson, T.D. Smith, P.T. Stevick, G. Vikingsson, and N. Øien. 2001. Stock structure and composition of the North Atlantic humpback whale, *Megaptera novaeangliae*. Paper SC/53/NAH11 presented to the

International Whaling Commission Scientific Committee.  Available from IWC, 135 Station Road, Impington, Cambridge, UK.

Payne, P. M., J.R. Nicholas, L. O'Brien, and K.D. Powers. 1986.  The distribution of the humpback whale, *Megaptera novaeangliae*, on Georges Bank and in the Gulf of Maine in relation to densities of the sand eel, *Ammodytes americanus*.  Fish. Bull., U.S. 84: 271-277.

Payne, P.M., D.N. Wiley, S.B. Young, S. Pittman, P.J. Clapham, and J.W. Jossi.  1990.  Recent fluctuations in the abundance of baleen whales in the southern Gulf of Maine in relation to changes in selected prey.  Fish. Bull., U.S. 88(4): 687-696.

Price, W.S.  1985.  Whaling in the Caribbean: historical perspective and update.  Rep. Int. Whal. Commn. 35: 413-420.

Reiner, F., M.E. Dos Santos, and F.W. Wenzel.  1996.  Cetaceans of the Cape Verde archipelago.  Mar. Mamm. Sci. 12: 434-443.

Robbins, J. and D.K. Mattila.  2001.  Monitoring entanglements of humpback whales (*Megaptera novaeangliae*) in the Gulf of Maine on the basis of caudal peduncle scarring.  Paper SC/53/NAH25 presented to the International Whaling Commission Scientific Committee.  Available from IWC, 135 Station Road, Impington, Cambridge, UK.

Smith, T.D., J. Allen, P.J. Clapham, P.S. Hammond, S. Katona, F. Larsen, J. Lien, D. Mattila, P.J. Palsbøll, J. Sigurjónsson, P.T. Stevick and N. Øien.  1999.  An ocean-basin-wide mark-recapture study of the North Atlantic humpback whale (*Megaptera novaeangliae*).  Mar. Mamm. Sci. 15(1):1-32.

Stevick, P.T., J. Allen, P.J. Clapham, N. Friday, S.K. Katona, F. Larsen, J. Lien, D.K. Mattila, P.J. Palsbøll, J. Sigurjónsson, T.D. Smith, N. Øien, and P.S. Hammond.  2003.  North Atlantic humpback whale abundance and rate of increase four decades after protection from whaling.  Marine Ecology Progress Series 258: 263-273.

Stevick, P., N. Øien and D.K. Mattila.  1998.  Migration of a humpback whale between Norway and the West Indies.  Mar. Mamm. Sci. 14: 162-166.

Swingle, W.M., S.G. Barco, T.D. Pitchford, W.A. McLellan and D.A. Pabst.  1993.  Appearance of juvenile humpback whales feeding in the nearshore waters of Virginia.  Mar. Mamm. Sci. 9: 309-315.

Volgenau, L., S.D. Kraus, and J. Lien.  1995.  The impact of entanglements on two substocks of the western North Atlantic humpback whale, *Megaptera novaeangliae*.  Can. J. Zool. 73: 1689-1698.

Wade, P.R., and R.P. Angliss.  1997.  Guidelines for assessing marine mammal stocks: Report of the GAMMS Workshop, April 3-5, 1996, Seattle, Washington.  NOAA Tech. Memo. NMFS-OPR-12.  U.S. Dept. of Commerce, Washington, DC.  93 pp.

Waring, G.  T., D.L. Palka, P.J. Clapham, S. Swartz, M.C. Rossman, T. V. N. Cole, K. D. Bisack and L. J. Hansen. 1999.  U.S. Atlantic marine mammal stock assessment reports : 1998.  NOAA Tech. Memo. NMFS-NE-116, 182 pp.

Whitehead, H. and M.J. Moore.  1982.  Distribution and movements of West Indian humpback whales in winter.  Can. J. Zool. 60: 2203-2211.

Wiley, D.N., R.A. Asmutis, T.D. Pitchford, and D.P. Gannon.  1995.  Stranding and mortality of humpback whales, *Megaptera novaeangliae*, in the Mid-Atlantic and southeast United States, 1985-1992.  Fish. Bull., *U.S.* 93: 196-205.

Winn, H.E., R.K. Edel and A.G. Taruski.  1975.  Population estimate of the humpback whale (*Megaptera novaeangliae*) in the West Indies by visual and acoustic techniques.  J. Fish. Res. Bd. Can. 32: 499-506.

December 2005

# NORTHERN RIGHT WHALE (*Eubalaena glacialis*):
## Western Atlantic Stock

### STOCK DEFINITION AND GEOGRAPHIC RANGE

Individuals of the western northern right whale population range from wintering and calving grounds in coastal waters of the southeastern United States to summer feeding and nursery grounds in New England waters and northward to the Bay of Fundy and the Scotian Shelf. Knowlton *et al.* (1992) reported several long-distance movements as far north as Newfoundland, the Labrador Basin, and southeast of Greenland; in addition, recent resightings of photographically identified individuals have been made off Iceland, arctic Norway and in the old Cape Farewell whaling ground east of Greenland. The Norwegian sighting (in September 1999) represents one of only two sightings this century of a right whale in Norwegian waters, and the first since 1926. Together, these long-range matches indicate an extended range for at least some individuals and perhaps the existence of important habitat areas not presently well described. Similarly, records from the Gulf of Mexico (Moore and Clark 1963, Schmidly *et al.* 1972) represent either geographic anomalies or a more extensive historic range beyond the sole known calving and wintering ground in the waters of the southeastern United States. Whatever the case, the location of most of the population is unknown during the winter. Offshore (greater than 30 miles) surveys flown off the coast of northeastern Florida and southeastern Georgia from 1996 to 2001 had 3 sightings in 1996, 1 in 1997, 13 in 1998, 6 in 1999, 11 in 2000 and 6 in 2001 (within each year, some were repeat sightings of previously recorded individuals). The frequency with which right whales occur in offshore waters in the southeastern U.S. remains unclear.

Research results to date suggest the existence of 6 major habitats or congregation areas for western Atlantic northern right whales; these are the coastal waters of the southeastern United States, the Great South Channel, Georges Bank/Gulf of Maine, Cape Cod and Massachusetts Bays, the Bay of Fundy, and the Scotian Shelf. However, movements within and between habitats may be more extensive than is sometimes thought. Results from satellite tags clearly indicate that sightings separated by perhaps two weeks should not necessarily be assumed to indicate a stationary or resident animal. Instead, telemetry data have shown rather lengthy and somewhat distant excursions, including into deep water off the continental shelf (Mate *et al.* 1997). Systematic surveys conducted for the first time off the coast of North Carolina in winter of 2001 and 2002 sighted 8 calves, suggesting the calving grounds may extend as far north as Cape Fear. Four of the calves were not sighted by surveys conducted further south. One of the cows photographed was new to researchers, having effectively eluded identification over the period of its maturation (McLellan *et al.* 2004). The Northeast Fisheries Science Center is conducting an extensive multi-year aerial survey program throughout the Gulf of Maine region; this program is intended to better establish the distribution of right whales, including inter-annual variability in their occurrence in previously poorly studied habitats.

New England waters are a primary feeding habitat for the right whale, which appears to feed primarily on copepods (largely of the genera Calanus and Pseudocalanus) in this area. Research suggests that right whales must locate and exploit extremely dense patches of zooplankton to feed efficiently (Mayo and Marx 1990). These dense zooplankton patches are likely a primary characteristic of the spring, summer, and fall right whale habitats (Kenney *et al.* 1986, 1995). Acceptable surface copepod resources are limited to perhaps 3% of the region during the peak feeding season in Cape Cod and Massachusetts Bays (C. Mayo pers. comm.). While feeding in the coastal waters off Massachusetts has been better studied than in most areas, feeding by right whales has also been observed on the margins of Georges Bank, in the Gulf of Maine, in the Bay of Fundy, and over the Scotian Shelf. The characteristics of acceptable prey distribution in these areas are not well known. In addition, New England waters serve as a nursery for calves and perhaps also as a mating ground. NOAA Fisheries and Center for Coastal Studies aerial surveys in the spring of 1999, 2000, 2001 and 2002 found substantial numbers of right whales along the Northern Edge of Georges Bank, in Georges Basin, and in various locations in the Gulf of Maine including Cashes Ledge, Platts Bank and Wilkinson Basin. The predictability with which right whales occur in such locations remains unclear, and these new data highlight the need for more extensive surveys of habitats which have previously received minimal coverage.

Genetic analyses based upon direct sequencing of mitochondrial DNA (mtDNA) have identified five mtDNA haplotypes in the western Atlantic northern right whale (Malik *et al.* 1999). Schaeff *et al.* (1997) compared the genetic variability of northern and southern right whales (E. australis), and found the former to be significantly less diverse, a finding broadly replicated from sequence data by Malik *et al.* (2000). These findings might be indicative of inbreeding in the population, but no definitive conclusion can be reached using current data. Additional work comparing modern and historic genetic population structure in right whales, using DNA extracted from museum and archaeological specimens of baleen and bone, is also underway (Rosenbaum *et al.* 1997, 2000). Preliminary results suggest that the eastern and western North Atlantic populations were not genetically distinct (Rosenbaum *et al.* 2000). However, the virtual

extirpation of the eastern stock and its lack of recovery in the last hundred years strongly suggests population subdivision over a protracted (but not evolutionary) timescale. Results also suggest that, as expected, the principal loss of genetic diversity occurred during major exploitation events prior to the 20th century.

To date, skin biopsy sampling has resulted in the compilation of a DNA library of almost 300 North Atlantic right whales. When work is completed, a genetic profile will be established for each individual, and an assessment provided on the level of genetic variation in the population, the number of reproductively active individuals, reproductive fitness, the basis for associations and social units in each habitat area, and the mating system. Tissue analysis has also aided in sex identification: the sex ratio of the photo-identified and catalogued population does not differ significantly from parity. Analyses based on both genetics and sighting histories of photographically identified individuals also suggest that approximately one-third of the females with calves population utilizes summer feeding grounds other than the Bay of Fundy. As described above, a related question is where individuals other than calving females and a few juveniles overwinter. One or more additional wintering and summering grounds may exist in unsurveyed locations, although it is also possible that "missing" animals simply disperse over a wide area at these times. Identification of such areas, and the possible threats to right whales there, is recognized as a priority for research efforts.

## POPULATION SIZE

Based on a census of individual whales identified using photo-identification techniques combined with the assumption of mortality of whales not seen for 7 years, the western North Atlantic stock size was estimated to be 295 individuals in 1992 (Knowlton *et al.* 1994); an updated analysis using the same method gave an estimate of 299 animals in 1998 (Kraus *et al.* 2001). Because this was a nearly complete census, it is assumed that this represents a minimum population size estimate. However, no estimate of abundance with an associated coefficient of variation has been calculated for this population. Calculation of a reliable point estimate is likely to be difficult given the known problem of heterogeneity of distribution in this population. An IWC workshop on status and trends of western North Atlantic right whales gave a minimum direct-count estimate of 263 right whales alive in 1996 and noted that the true population was unlikely to be substantially greater than this (Best *et al.* 2001).

### Historical Abundance

An estimate of pre-exploitation population size is not available. Basque whalers may have taken substantial numbers of right whales at times during the 1500's in the Strait of Belle Isle region (Aguilar 1986), and the stock of right whales may have already been substantially reduced by the time whaling was begun by colonists in the Plymouth area in the 1600's (Reeves and Mitchell 1987). A modest but persistent whaling effort along the coast of the eastern U.S. lasted three centuries, and the records include one report of 29 whales killed in Cape Cod Bay in a single day during January 1700. Based on incomplete historical whaling data, Reeves and Mitchell (1987) could conclude only that there were at least some hundreds of right whales present in the western North Atlantic during the late 1600's. In a later study (Reeves *et al.* 1992), a series of population trajectories using historical data and an estimated present population size of 350 were plotted. The results suggest that there may have been at least 1,000 right whales in this population during the early to mid-1600's, with the greatest population decline occurring in the early 1700's. The authors cautioned, however, that the record of removals is incomplete, the results were preliminary, and refinements were required. Based on back calculations using the present population size and growth rate, the population may have numbered fewer than 100 individuals by the time international protection for right whales came into effect in 1935 (Hain 1975, Reeves *et al.* 1992, Kenney *et al.* 1995). However, too little is known about the population dynamics of right whales in the intervening years to state anything with confidence.

### Minimum Population Estimate

The western North Atlantic population size was estimated to be 299 individuals in 1998 (Kraus *et al.* 2001), based on a census of individual whales identified using photo-identification techniques. A bias that might result from including catalogued whales that had not been seen for an extended period of time and therefore might be dead, was addressed by assuming that an individual whale not sighted for five or more years was dead (Knowlton *et al.* 1994). It is assumed that the census of identified and presumed living whales represents a minimum population size estimate. The true population size in 1998 may have been higher if: 1) there were animals not photographed and identified, and/or 2) some animals presumed dead were not.

### Current Population Trend

The population growth rate reported for the period 1986-1992 by Knowlton *et al.* (1994) was 2.5% (CV=0.12), suggesting that the stock was showing signs of slow recovery. However, work by Caswell *et al.* (1999) has suggested that crude survival probability declined from about 0.99 in the early 1980's to about 0.94 in the late 1990's. The decline was

statistically significant. Additional work conducted in 1999 was reviewed by the IWC workshop on status and trends in this population (Best *et al.* 2001); the workshop concluded based on several analytical approaches that survival had indeed declined in the 1990's. Although heterogeneity of capture could negatively bias survival estimates, the workshop concluded that this factor could not account for all of the observed decline, which appeared to be particularly marked in adult females. Another workshop was convened by NOAA Fisheries in September 2002, and after reviewing several approaches to survival estimation reached similar conclusions regarding the decline in this population (Clapham 2002).

## CURRENT AND MAXIMUM NET PRODUCTIVITY RATES

During 1980-1992, 145 calves were born to 65 identified cows. The number of calves born annually ranged from 5 to 17, with a mean of 11.2 (SE=0.90). The reproductively active female pool was static at approximately 51 individuals during 1987-1992. Mean calving interval, based on 86 records, was 3.67 years. There was an indication that calving intervals may have been increasing over time, although the trend was not statistically significant (P=0.083) (Knowlton *et al.* 1994).

Since that report, total reported calf production in 92/93 was 8; 93/94, 9; 94/95, 7; 95/96, 22; 96/97, 20; 97/98, 6; 98/99, 4; 99/00, 1; 00/01, 31; 01/02, 21; and 02/03, 19 [mean 13.6 SE=2.9)]. However, this total calf production should be reduced by reported calf mortalities: 2 mortalities in 1993, 3 in 1996, 1 in 1997, 1 in 1998, 4 in 2001 and 2 in 2002. During 2002, 2 mortalities and 1 serious injury involved what were likely calves from 00/01. Of the three calf mortalities in 1996, available data suggested one was not included in the reported 24 mother/calf pairs, resulting in a total of 25 calves born. Eleven of the 21 mothers in 1996 were observed with calves for the first time (i.e., were "new" mothers) that year. Three of these were at least 10 years old, 2 were 9 years old, and 6 were of unknown age. An updated analysis of calving interval through the 1997/1998 season suggests that mean calving interval increased since 1992 from 3.67 years to more than 5 years, a significant trend (Kraus *et al.* 2001). This conclusion is supported by modeling work reviewed by the IWC workshop on status and trends in this population (Best *et al.* 2001); the workshop agreed that calving intervals had indeed increased and further that the reproductive rate was approximately half that reported from studied populations of E. australis. The low calf production in subsequent years (4 in 1999 and only 1 in 2000) gives added cause for concern, although a record 31 calves were born in 2001. A workshop on possible causes of reproductive failure was held in April 2000 (Reeves *et al.* 2001). Factors considered included contaminants, biotoxins, nutrition/food limitation, disease and inbreeding problems. While no conclusions were reached, a research plan to further investigate this topic was developed.

The annual population growth rate during 1986-1992 was estimated to be 2.5% (CV=0.12) using photo-identification techniques (Knowlton *et al.* 1994). A population increase rate of 3.8% was estimated from the annual increase in aerial sighting rates in the Great South Channel, 1979-1989 (Kenney *et al.* 1995). However, as noted above, more recent work indicated that the population was in decline in the 1990's (Caswell *et al.* 1999, Best *et al.* 2001).

An analysis of the age structure of this population suggests that it contains a smaller proportion of juvenile whales than expected (Hamilton *et al.* 1998a, Best *et al.* 2001), which may reflect lowered recruitment and/or high juvenile mortality. In addition, it is possible that the apparently low reproductive rate is due in part to unstable age structure or to reproductive senescence on the part of some females. However, data on either factor are poor; senescence has been demonstrated in relatively few mammals (including humans, pilot whales, and killer whales) and is currently undocumented for any baleen whale.

## POTENTIAL BIOLOGICAL REMOVAL

Potential biological removal (PBR) is specified as the product of minimum population size, one-half the maximum net productivity rate and a "recovery" factor for endangered, depleted, threatened stocks, or stocks of unknown status relative to OSP (MMPA Sec. 3. 16 U.S.C. 1362, Wade and Angliss 1997). The recovery factor for right whales is 0.10 because this species is listed as endangered under the Endangered Species Act (ESA). However, in view of the population decline indicated by recent demographic analyses (Caswell *et al.* 1999, Best *et al.* 2001), the PBR for this population is set to zero.

## ANNUAL HUMAN-CAUSED SERIOUS INJURY AND MORTALITY

For the period 1999 through 2003, the total estimated human-caused mortality and serious injury to right whales is estimated at 2.6 per year (U.S. waters, 1.6; Canadian waters, 1.0). This is derived from two components: 1) non-observed fishery entanglement records at 1.6 per year (U.S. waters, 0.8; Canadian waters, 0.8), and 2) ship strike records at 1.0 per year (U.S. waters, 0.8; Canadian waters, 0.2). Note that in the 1996 and 1998 stock assessment reports, a six-year time frame was used to calculate these averages. A five-year period has since been used to be consistent with the time frames used for calculating the averages for other species. Beginning with the 2001 Stock Assessment Report, Canadian records were incorporated into the mortality and serious injury rates of this report to reflect the effective range of this stock. It is also important to stress that serious injury determinations are made based upon the best available information; these

determinations may change with the availability of new information. For the purposes of this report, discussion is primarily limited to those records considered confirmed human-caused mortalities or serious injuries.

**Background**

The details of a particular mortality or serious injury record often require a degree of interpretation. The assigned cause is based on the best judgment of the available data; additional information may result in revisions. When reviewing Table 1 below, several factors should be considered: 1) a ship strike or entanglement may occur at some distance from the reported location; 2) the mortality or injury may involve multiple factors; for example, whales that have been both ship struck and entangled are not uncommon; 3) the actual vessel or gear type/source is often uncertain; and 4) in entanglements, several types of gear may be involved.

The serious injury determinations are most susceptible to revision. There are several records where a struck and injured whale was re-sighted later, apparently healthy, or where an entangled or partially disentangled whale was re-sighted later free of gear. The reverse may also be true: a whale initially appearing in good condition after being struck or entangled is later re-sighted and found to have been seriously injured by the event. Entanglements of juvenile whales are typically considered serious injuries because the constriction on the animal is likely to become increasingly harmful as the whale grows.

"Serious injury" was defined in 50 CFR part 229.2 as an injury that was likely to lead to mortality. We therefore limited the serious injury designation to only those reports that had substantiated evidence that the injury, whether from entanglement or vessel collision, was likely to lead to the whale's death. Determinations of serious injury were made on a case by case basis following recommendations from the workshop conducted in 1997 on differentiating serious and non-serious injuries (Angliss and DeMaster 1998). Injuries that impeded the whale's locomotion or feeding were not considered serious injuries unless they were likely to be fatal in the foreseeable future. There was no forecasting of how the entanglement or injury may increase the whale's susceptibility to further injury, namely from additional entanglements or vessel collisions. This conservative approach likely underestimates serious injury rates.

With these caveats, the total estimated annual average human-induced mortality and serious injury incurred by this stock (including fishery and non-fishery related causes) was 2.6 right whales per year (U.S. waters 1.6; Canadian waters, 1.0). As with entanglements, some injury or mortality due to ship strikes almost certainly passes undetected, particularly in offshore waters. Decomposed and/or unexamined animals (e.g., carcasses reported but not retrieved or necropsied) represent "lost data", some of which may relate to human impacts. For these reasons, the figure of 2.6 right whales per year must be regarded as a minimum estimate.

Further, the small population size and low annual reproductive rate suggest that human sources of mortality may have a greater effect relative to population growth rates than for other whales. The principal factors believed to be retarding growth and recovery of the population are ship strikes and entanglement with fishing gear. Between 1970 and 1999, a total of 45 right whale mortalities were recorded (IWC 1999, Knowlton and Kraus 2001). Of these, 13 (28.9%) were neonates that are believed to have died from perinatal complications or other natural causes. Of the remainder, 16 (35.6%) were determined to be the result of ship strikes, 3 (6.7%) were related to entanglement in fishing gear (in two cases lobster gear, and one gillnet gear), and 13 (28.9%) were of unknown cause. At a minimum, therefore, 42.2% of the observed total for the period, and 50% of the 32 non-calf deaths, were attributable to human impacts (calves accounted for three deaths from ship strike).

Young animals, ages 0-4 years, are apparently the most impacted portion of the population (Kraus 1990). Finally, entanglement or minor vessel collisions may not kill an animal directly, but may weaken or otherwise affect it so that it is more likely to become vulnerable to further injury. Such was apparently the case with the two-year-old right whale killed by a ship off Amelia Island, Florida, in March 1991 after having carried gillnet gear wrapped around its tail region since the previous summer (Kenney and Kraus 1993). A similar fate befell right whale #2220, found dead on Cape Cod in 1996.

For waters of the northeastern USA, a present concern not yet completely defined, is the possibility of habitat degradation in Massachusetts and Cape Cod Bays due to a Boston sewage outfall, which came on-line in September 2000.

**Fishery-Related Serious Injury and Mortality**

Reports of mortality and serious injury relative to PBR as well as total human impacts are contained in records maintained by the New England Aquarium and the NMFS Northeast and Southeast Regional Offices (Table 1). From 1999 through 2003, 8 of 13 records of mortality or serious injury (including records from both USA and Canadian waters) involved entanglement or fishery interactions. The reports often do not contain the detail necessary to assign the entanglements to a particular fishery or location. Over time, however, additional sightings of entangled whales often provide the information needed.

Although disentanglement is either unsuccessful or not possible for the majority of cases, during the period 1999 through 2003, there were at least six documented cases of entanglements for which the intervention of disentanglement

teams averted a likely serious injury determination.  On 6/5/99, a two-year-old female, #2753, was found with a line through the mouth and trailing a Norwegian ball and highflyer.  The nature of the entanglement would likely not have allowed the whale to shed the gear, and over a prolonged period, the rope's chafing likely would have caused systemic infection.  Another two-year-old female, #2710, was sighted on 7/21/1999 wrapped in Canadian pot gear.  A line passed through the mouth and around at least the right flipper.  This entanglement would have become more constrictive as the whale grew.  On 7/9/00, #2746, a three-year-old of unknown gender was seen with a line running through either side of the mouth and bridled behind the blowholes, while another portion of the line pinned the left flipper to the whale's flank.  A nine-year-old female, #2223, was sighted on 8/18/00 with line tightly wrapped across her back, running through the mouth, and possibly wrapped on the left flipper.  Subsequent sightings prior to the disentanglement revealed that the line across the back was beginning to tighten.  On 7/20/01, #2427, a seven-year-old male was sighted off Portsmouth, New Hampshire, with line wrapped tightly around the rostrum and through the mouth.  The whale was disentangled later that day, and subsequent resightings indicated that the injuries were healing.  However, observers also noted that the whale's baleen was damaged, and that the whale was holding its head high out of the water and not diving nearly as frequently as other whales in the area.  Lastly, an unidentified right whale was disentangled off Campobello Island, Canada on 7/09/03.  The gear was tentatively identified as US lobster gear and other unknown gear.

In January 1997, NMFS changed the classification of the Gulf of Maine and U.S. Mid-Atlantic lobster pot fisheries from Category III to Category I based on examination of stranding and entanglement records of large whales from 1990 to 1994 (62 FR 33, Jan. 2, 1997).

Bycatch of a right whale has been observed by NMFS Sea Samplers in the pelagic drift gillnet fishery, but no mortalities or serious injuries have been documented in any of the other fisheries monitored by NOAA Fisheries.  The only bycatch of a right whale documented by NMFS Sea Samplers was a female released from a pelagic drift gillnet in 1993.

In a recent analysis of the scarification of right whales, a total of 61.6% of the whales bore evidence of entanglements with fishing gear (Hamilton *et al.* 1998b).  Further research using the North Atlantic Right Whale Catalogue has indicated that, each year, between 10% and 28% of right whales are involved in entanglements (Knowlton *et al.* 2001).  Entanglement records maintained by NMFS Northeast Regional Office (NOAA Fisheries, unpublished data) from 1970 through 2000 included at least 72 right whale entanglements or possible entanglements, including right whales in weirs, entangled in gillnets, and trailing line and buoys.  An additional record  (M. J. Harris, pers. comm.) reported a 9.1-10.6m right whale entangled and released south of Ft. Pierce, Florida, in March 1982 (this event occurred during a sampling program and was not related to a commercial fishery).  Incidents of entanglements in groundfish gillnet gear, cod traps, and herring weirs in waters of Atlantic Canada and the U.S. east coast were summarized by Read (1994).  In 6 records of right whales becoming entangled in groundfish gillnet gear in the Bay of Fundy and Gulf of Maine between 1975 and 1990, the right whales were either released or escaped on their own, although several whales have been observed carrying net or line fragments.  A right whale mother and calf were released alive from a herring weir in the Bay of Fundy in 1976.  For all areas, specific details of right whale entanglement in fishing gear are often lacking.  When direct or indirect mortality occurs, some carcasses come ashore and are subsequently examined, or are reported as "floaters" at sea; however, the number of unreported and unexamined carcasses is unknown, but may be significant in the case of floaters.  More information is needed about fisheries interactions and where they occur.

## Other Mortality

Ship strikes are a major cause of mortality and injury to right whales (Kraus 1990, Knowlton and Kraus 2001).  Records from 1999 through 2003 have been summarized in Table 1.  For this time frame, the average reported mortality and serious injury to right whales due to ship strikes was 1.0 whale per year (U.S. waters, 0.8; Canadian waters, 0.2).  In 2004, two ship strike mortalities had been confirmed at the time of this writing.  The first was found on 2/7/04 on Virginia Beach, VA, with major blunt trauma to the head and body.  The second was reported struck by a troop transport ship off the Chesapaeke Bay entrance, and then seen again alive in the same area with a severed fluke on 11/17/04.  It washed ashore dead on 11/24/04 in Ocean Sands, NC.  Both of these events involved adult females carrying calves.

In 2000, two right whales were sighted in the Bay of Fundy with large open wounds that were likely the result of collisions with vessels.  Right whale #2820, a male of unknown age, was first seen injured on 7/9/00.  He was sighted intermittently throughout the remainder of that summer, and was seen again in the Bay of Fundy in 2001.  The second whale, #2660, is a five-year-old female who was sighted with a wound on the left side of her head, just forward of the blowholes.  She has not been resighted since.  Although both of these injuries have a gruesome appearance, in the absence of a chronic stressor (i.e., entangling fishing gear), they are not likely to be fatal.

Table 1. Confirmed human-caused mortality and serious injury records of northern right whales, January 1999 through December 2003.

| Date | Report Type | Length, sex, age, ID | Location | Assigned Cause: P=primary, S=secondary | | Notes |
|------|-------------|----------------------|----------|------|------|-------|
| | | | | Ship strike | Entang./ Fsh inter | |
| 4/20/99 | mortality | 27+ yr. old female #1014 | Cape Cod, MA | P | | Fractures to mandible and vertebral column, abrasion and edema around right flipper |
| 5/10/99 | mortality | Adult female #2030 | 80mi east of Cape Cod, MA | | P | Constricting sink gillnet gear created deep, extensive lacerations |
| 3/01/00 | serious injury | Adult male #1130 | 6mi east of Manomet, MA | | P | Line apparently constricting left flipper; flipper discolored; abnormal cyamid distribution; bullet buoy trailing, line weighted down between whale and buoy |
| 3/17/01 | mortality | Male calf | Assateague, VA | P | | Large fresh propeller gashes on dorsal caudal and acute muscular hemorrhage |
| 6/8/01 | serious injury | Adult male #1102 | 58mi east of Cape Cod, MA | | P | Entangling line deeply embedded; whale showing numerous signs of poor health including emaciation, skin discoloration, and abnormal cyamid distribution |
| 6/18/01 | mortality | female calf | Long Island, NY | P | | Dorsal propeller wounds, sub-dermal hemorrhage |
| 11/3/01 | mortality | Adult male #1238 14 m | Magdellen Islands, Canada | | P | Thoroughly wrapped up in gear, whale seen alive and well five months earlier |
| 7/6/02 | mortality | 11.0m (est) female #3107 | off Briar Island, NS Canada | | P | carcass ashore on Nantucket, MA; caudal peduncle severely lacerated where entangled |
| 8/22/02 | serious injury | Adult female #1815 | Scotian Shelf, Canada | | P | line tightly wrapped around head and tail stock |
| 8/22/02 | mortality | 12.6m female 1"y.o. | off Ocean City, MD | P | | large laceration on dorsal surface |
| 8/30/02 | serious injury | #3210 age & sex unknown | off Cape Cod, MA | | P | line tightly wrapped around rostrum, resighted in 2004 in poor condition |
| 1/14/03 | serious injury | Adult female #2240 | Jacksonville, FL | | P | Body condition poor, gear possibly ingested |
| 10/02/03 | mortality | Adult female #2150 | off Digby, NS | P | | Large fracture in skull, sub-dermal hemorrhage |

**STATUS OF STOCK**

The size of this stock is considered to be extremely low relative to OSP in the U.S. Atlantic EEZ, and this species is listed as endangered under the ESA. The northern right whale is considered one of the most critically endangered populations of large whales in the world (Clapham *et al.* 1999). A Recovery Plan has been published and is in effect (NMFS 1991), and a revised plan is under review. Three critical habitats, Cape Cod Bay/Massachusetts Bay, Great South

Channel, and the Southeastern U.S., were designated by NMFS(59 FR 28793, June 3, 1994).  The NMFS ESA 1996 Northern Right Whale Status Review concluded that the status of the western North Atlantic population of the northern right whale remains endangered [Note that 'northern right whale' is nomenclature that is now outdated in the scientific literature but not yet modified in rule makings.  Scientific literature recognizes north Atlantic and north Pacific right whales as two distinct species]; this conclusion was reinforced by the International Whaling Commission (Best *et al.* 2001), which expressed grave concern regarding the status of this stock.  The total level of human-caused mortality and serious injury is unknown, but reported human-caused mortality and serious injury has been a minimum of 2.6 right whales per year from 1999 through 2003.  Given that PBR has been set to zero, no mortality or serious injury for this stock can be considered insignificant.  This is a strategic stock because the average annual fishery-related mortality and serious injury exceeds PBR, and because the North Atlantic right whale is an endangered species.  Relative to populations of southern right whales, there are also concerns about growth rate, percentage of reproductive females, and calving intervals in this population.

## REFERENCES

Aguilar, A.  1986.  A review of old Basque whaling and its effect on the right whales of the North Atlantic.  Rep. Int. Whal. Commn., Special Issue 10: 191-199.

Angliss, R. P., and D. P. DeMaster.  1998.  Differentiating serious and non-serious injury of marine mammals taken incidental to commercial fishing operations: report of the serious injury workshop 1-2 April 1997, Silver Spring, Maryland.  NOAA Tech. Memo. NOAA Fisheries-OPR-13.

Best, P.B., J.L Bannister, R. L. Brownell Jr., G.P. Donovan, (eds.)  2001.  Right whales: worldwide status.  J. Cetacean Res. Manage. (Special Issue) 2.  309pp.

Caswell, H., S. Brault, and M. Fujiwara.  1999.  Declining survival probability threatens the North Atlantic right whale.  Proc. Natl. Acad. Sci. USA 96: 3308-3313.

Clapham, P.J. (ed.)  2002.  Report of the working group on survival estimation for North Atlantic right whales.  Available from the Northeast Fisheries Science Center, 166 Water Street, Woods Hole, MA 02543.

Clapham, P. J., S. B. Young and R. L. Brownell, Jr.  1999.  Baleen whales: conservation issues and the status of the most endangered populations.  Mammal Review 29: 35-60.

Hain, J. H. W.  1975.  The international regulation of whaling.  Marine Affairs J. 3: 28-48.

Hamilton, P. K., A. R. Knowlton, M. K. Marx and S. D. Kraus.  1998a.  Age structure and longevity in North Atlantic right whales *Eubalaena glacialis* and their relation to reproduction.  Marine Ecology Progress Series 171: 285-292.

Hamilton, P. K., M. K. Marx, and S. D. Kraus.  1998b.  Scarification analysis of North Atlantic right whales (*Eubalaena glacialis*) as a method of assessing human impacts.  Final report to the Northeast Fisheries Science Center, Contract No. 4EANF-6-0004.

IWC.  1999.  Report of the workshop on the comprehensive assessment of right whales worldwide.  J. Cetacean Res. Manage. 1 (supplement): 119-120.

Kenney, R. D., M. A. M. Hyman, R. E. Owen, G. P. Scott, and H. E. Won.  1986.  Estimation of prey densities required by western North Atlantic right whales.  Mar. Mamm. Sci. 2(1): 1-13.

Kenney, R. D. and S. D. Kraus.  1993.  Right whale mortality: a correction and an update.  Mar. Mamm. Sci. 9:445-446.

Kenney, R. D., H. E. Won, and M. C. Macaulay.  1995.  Cetaceans in the Great South Channel, 1979-1989: right whale (*Eubalaena glacialis*).  Cont. Shelf Res. 15: 385-414.

Knowlton, A. R., J. Sigurjonsson, J. N. Ciano, and S. D. Kraus.  1992.  Long-distance movements of North Atlantic Right whales (*Eubalaena glacialis*).  Mar. Mamm. Sci. 8(4): 397-405.

Knowlton, A. R. and S. D. Kraus.  2001.  Mortality and serious injury of North Atlantic right whales (*Eubalaena glacialis*) in the North Atlantic Ocean.  J. Cetacean Res. Manage. Special Issue 2: 193-208.

Knowlton, A. R., S. D. Kraus, and R. D. Kenney.  1994.  Reproduction in North Atlantic right whales (*Eubalaena glacialis*).  Can. J. Zool. 72: 1297-1305.

Knowlton, A.R., M.K. Marx, H.M. Pettis, P.K. Hamilton and S.D. Kraus.  2001.  Scarification analysis of North Atlantic right whales (*Eubalaena glacialis*): monitoring rates of entanglement interaction.  Report to the National Marine Fisheries Service.  Available from: New England Aquarium, Central Wharf, Boston, MA 02110.

Kraus, S. D. 1990.  Rates and potential causes of mortality in North Atlantic right whales (*Eubalaena glacialis*).  Mar. Mamm. Sci. 6(4): 278-291.

Kraus, S. D., P. K. Hamilton, R. D. Kenney, A. Knowlton and C. K. Slay.  2001.  Reproductive parameters of the North Atlantic right whale.  J. Cetacean Res. Manage. (Special Issue) 2: 231-236.

Malik, S., M. W. Brown, S. D. Kraus, A. Knowlton, P. Hamilton and B. N. White.  1999.  Assessment of genetic structuring and habitat philopatry in the North Atlantic right whale (*Eubalaena glacialis*).  Can. J. Zool. 77: 1217-1222.

Malik, S., M. W. Brown, S. D. Kraus and B. N. White. 2000. Analysis of mitochondrial DNA diversity within and between North and South Atlantic right whales. Mar. Mamm. Sci. 16: 545-558.

Mate, B. M., S. L. Nieukirk and S. D. Kraus. 1997. Satellite-monitored movements of the northern right whale. J. Wildl. Manage. 61: 1393-1405.

Mayo, C. A. and M .K. Marx. 1990. Surface foraging behaviour of the North Atlantic right whale, Eubalaena glacialis, and associated zooplankton characteristics. Can. J. Zool. 68: 2214-2220.

McLellan, W. A., E. Meagher, L. Torres, G. Lovewell, C. Harper, K. Irish, B. Pike, and A. D. Pabst. 2004. Winter right whale sightings from aerial surveys of the coastal waters of the US Mid-Atlantic. Presented at the 15th Biennial Conference on the Biology of Marine Mammals.

Moore, J. C. and E. Clark. 1963. Discovery of right whales in the Gulf of Mexico. Science 141(3577): 269.

NMFS [National Marine Fisheries Service]. 1991. Recovery plan for the northern right whale (*Eubalaena glacialis*). Prepared by the Right Whale Recovery Team for the National Marine Fisheries Service, Silver Spring, Maryland, 86 pp.

Read, A. J. 1994. Interactions between cetaceans and gillnet and trap fisheries in the northwest Atlantic. Rep. Int. Whal. Commn., Special Issue 15: 133-147.

Reeves, R.R., R. Rolland, and P. Clapham (eds.). 2001. Report of the workshop on the causes of reproductive failure in North Atlantic right whales: new avenues of research. NOAA-NOAA Fisheries-NEFSC Ref. Doc. 01-16. 46p. Available from: NOAA Fisheries, Northeast Fisheries Science Center, 166 Water St., Woods Hole, MA 02543.

Reeves, R. R. and E. Mitchell. 1987. Shore whaling for right whales in the northeastern United States. Contract Report No. NA85-WCC-06194, Southeast Fisheries Science Center, Miami, FL, 108 pp. Available from: NOAA Fisheries, Southeast Fisheries Science Center, 75 Virginia Beach Dr., Miami, FL, 33149.

Reeves, R. R., J. M. Breiwick and E. Mitchell. 1992. Pre-exploitation abundance of right whales off the eastern United States. Pages 5-7 *in:* J. Hain (ed.). The right whale in the western North Atlantic: A science and management workshop, 14-15 April 1992, Silver Spring, Maryland. NOAA-NOAA Fisheries-NEFSC Ref. Doc. No. 92-05. 88 pp. Available from: NOAA Fisheries, Northeast Fisheries Science Center, 166 Water St., Woods Hole, MA 02543.

Rosenbaum, H.C., M. Egan, P.J. Clapham, R.L. Brownell Jr. and R. DeSalle. 1997. An effective method for isolating DNA from non-conventional museum specimens. Mol. Ecol. 6: 677-681.

Rosenbaum, H.C., M.S. Egan, P.J. Clapham, R.L. Brownell Jr., S. Malik, M.W. Brown, B.N. White, P. Walsh, and R. DeSalle, 2000. Utility of North Atlantic right whale museum specimens for assessing changes in genetic diversity. Conservation Biology 14: 1837-1842.

Schaeff, C. M., S. D. Kraus, M. W. Brown, J. Perkins, R. Payne and B. N. White. 1997. Comparison of genetic variability of North and South Atlantic right whales (*Eubalaena*) using DNA fingerprinting. Can. J. Zool. 75: 1073-1080.

Schmidly, D. J., C. O. Martin and G. F. Collins. 1972. First occurrence of a black right whale (*Balaena glacialis*) along the Texas coast. Southw. Nat. 17(2): 214-215.

Wade, P. R., and R. P. Angliss. 1997. Guidelines for assessing marine mammal stocks: Report of the GAMMS Workshop, April 3-5, 1996, Seattle, Washington. NOAA Tech. Memo. NOAA Fisheries-OPR-12. U.S. Dept. of Commerce, Washington, D.C. 93 pp.

December 2005

# FIN WHALE (*Balaenoptera physalus*):
## Western North Atlantic Stock

### STOCK DEFINITION AND GEOGRAPHIC RANGE

The Scientific Committee of the International Whaling Commission (IWC) has proposed stock boundaries for North Atlantic fin whales. Fin whales off the eastern U.S. north to Nova Scotia and the southeastern coast of Newfoundland are believed to constitute a single stock under the present IWC scheme (Donovan 1991). However, the stock identity of North Atlantic fin whales has received relatively little attention, and whether the current stock boundaries define biologically isolated units has long been uncertain. The existence of a subpopulation structure was suggested by local depletions that resulted from commercial overharvesting (Mizroch *et al.* 1984).

A genetic study conducted by Bérubé *et al.* (1998) using both mitochondrial and nuclear DNA provided strong support for an earlier population model proposed by Kellogg (1929) and others. This postulates the existence of several subpopulations of fin whales in the North Atlantic and Mediterranean, with limited gene flow among them. Bérubé *et al.* (1998) also proposed that the North Atlantic population showed recent divergence due to climatic changes (i.e. postglacial expansion), as well as substructuring over even relatively short distances. The genetic data are consistent with the idea that different subpopulations use the same feeding ground, a hypothesis that was also originally proposed by Kellogg (1929).

Fin whales are common in waters of the U.S. Atlantic Exclusive Economic Zone (EEZ), principally from Cape Hatteras northward (figure 1). Fin whales accounted for 46% of the large whales and 24% of all cetaceans sighted over the continental shelf during aerial surveys (CETAP 1982) between Cape Hatteras and Nova Scotia during 1978-82. While a great deal remains unknown, the magnitude of the ecological role of the fin whale is impressive. In this region fin



**Figure 1.** *Distribution of fin whale sightings from NEFSC and SEFSC shipboard and aerial surveys during the summer in 1990-1998. Isobaths are at 100 m and 1,000 m.*

whales are probably the dominant large cetacean species in all seasons, with the largest standing stock, the largest food requirements, and therefore the largest impact on the ecosystem of any cetacean species (Kenney *et al.* 1997; Hain *et al.* 1992).

There is little doubt that New England waters represent a major feeding ground for the fin whale. There is evidence of site fidelity by females, and perhaps some segregation by sexual, maturational or reproductive class on the feeding range (Agler *et al.* 1993). Seipt *et al.* (1990) reported that 49% of identified fin whales on Massachusetts Bay area feeding grounds were resighted within the same year, and 45% were resighted in multiple years. While recognizing localized as well as more extensive movements, these authors suggested that fin whales on these grounds exhibited patterns of seasonal occurrence and annual return that are in some respects similar to those shown for humpback whales. This was reinforced by Clapham and Seipt (1991), who showed maternally directed site fidelity by fin whales in the Gulf of Maine. Information on life history and vital rates is also available in data from the Canadian fishery, 1965-1971 (Mitchell 1974). In seven years, 3,528 fin whales were taken at three whaling stations. The station at Blandford, Nova Scotia, took 1,402 fin whales.

Hain *et al.* (1992), based on an analysis of neonate stranding data, suggested that calving takes place during approximately four months from October to January in latitudes of the U.S. Mid-Atlantic region; however, it is unknown where calving, mating, and wintering for most of the population occurs. Results from the Navy's SOSUS program (Clark 1995) indicate a substantial deep-ocean component to fin whale distribution. It is likely that fin whales occurring in the U.S. Atlantic EEZ undergo migrations into Canadian waters, open-ocean areas, and perhaps even subtropical or tropical regions. However, the popular notion that entire fin whale populations make distinct annual migrations like some other mysticetes has questionable support in the data; in the North Pacific, year-round monitoring of fin whale calls found no evidence for large-scale migratory movements (Watkins *et al.* 2000).

**POPULATION SIZE**

Two estimates of abundance from line-transect surveys are available. An abundance of 2,200 (CV=0.24) fin whales was estimated from a July to September 1995 sighting survey conducted by two ships and an airplane that covered waters from Virginia to the mouth of the Gulf of St. Lawrence. Data collection and analysis methods used were described in Palka (1995).

A more recent estimate of 2,814 (CV=0.21) fin whales was derived from a 28 July to 31 August 1999 line-transect sighting survey conducted by a ship and airplane covering waters from Georges Bank to the mouth of the Gulf of St. Lawrence. Shipboard data were analyzed using the modified direct duplicate method (Palka 1995) that accounts for school size bias and *g(0)*, the probability of detecting a group on the track line. Aerial data were not corrected for *g(0)* (Palka 2000).

The latter abundance estimate is considered the best available for the western North Atlantic fin whale because it is relatively recent. However, this estimate must be considered extremely conservative in view of the known range of the fin whale in the entire western North Atlantic, the uncertainties regarding population structure and exchange between surveyed and unsurveyed areas, and aerial data having not been corrected for *g(0)*.

**Minimum Population Estimate**

The minimum population estimate is the lower limit of the two-tailed 60% confidence interval of the log-normally distributed best abundance estimate. This is equivalent to the 20th percentile of the log-normal distribution as specified by Wade and Angliss (1997). The best estimate of abundance for fin whales is 2,814 (CV=0.21). The minimum population estimate for the western North Atlantic fin whale is 2,362.

**Current Population Trend**

There are insufficient data to determine population trends for this species.

**CURRENT AND MAXIMUM NET PRODUCTIVITY RATES**

Current and maximum net productivity rates are unknown for this stock. Based on photographically identified fin whales, Agler *et al.* (1993) estimated that the gross annual reproduction rate was at 8%, with a mean calving interval of 2.7 years.

For purposes of this assessment, the maximum net productivity rate was assumed to be 0.04. This value is based on theoretical modeling showing that cetacean populations may not grow at rates much greater than 4% given the constraints of their reproductive life history (Barlow *et al.* 1995).

**POTENTIAL BIOLOGICAL REMOVAL**

Potential Biological Removal (PBR) is the product of minimum population size, one-half the maximum productivity rate, and a "recovery" factor (MMPA Sec. 3. 16 U.S.C. 1362; Wade and Angliss 1997). The minimum population size is 2,362. The maximum productivity rate is 0.04, the default value for cetaceans. The "recovery" factor, which accounts for endangered, depleted, threatened stocks, or stocks of unknown status relative to optimum sustainable population (OSP) is assumed to be 0.10 because the fin whale is listed as endangered under the Endangered Species Act (ESA). PBR for the western North Atlantic fin whale is 4.7.

**ANNUAL HUMAN-CAUSED MORTALITY AND SERIOUS INJURY**

The number of fin whales taken at 3 whaling stations in Canada from 1965 to 1971 totaled 3,528 whales (Mitchell 1974). Reports of non-directed takes of fin whales are fewer over the last two decades than for other endangered large whales such as right and humpback whales. There was no reported fishery-related mortality or serious injury to fin whales in fisheries observed by NMFS during 1999 through 2003. A review of NMFS records from 1999 through 2003 yielded an average of 1.4 human-caused mortalities per year - 0.4 per year resulting from fishery interactions/entanglements (U.S. waters, 0.2; Bermudian waters, 0.2), and 1.0 due to vessel collisions - all in U.S. waters (Table 1).

**Fishery-Related Serious Injury and Mortality**

No confirmed fishery-related mortality or serious injury of fin whales was reported in the NMFS Sea Sampling bycatch database.  A review of the records of stranded, floating or injured fin whales for the period 1999 through 2003 on file at NMFS found two records with substantial evidence of fishery interactions causing mortality (Table 1), which results in an annual rate of serious injury and mortality of 0.4 fin whales from fishery interactions.  While these records are not statistically quantifiable in the same way as the observed fishery records, they give a minimum estimate of the frequency of entanglements for this species.  In addition to the records above, there are were 5 records of entanglement within the period that either lacked substantial evidence for a serious injury determination, or that did not provide the detail necessary to determine if an entanglement had been a contributing factor in the mortality.

Table 1.  Summarized records of mortality and serious injury likely to result in mortality, Western North Atlantic fin whale stock, January 1999 - December 2003.  Causes of mortality or injury, assigned as primary or secondary, are based on records maintained by NMFS.

| Date | Report Type | Length, sex, age, ID | Location | Assigned Cause: P=primary, S=secondary | | Notes |
|------|-------------|----------------------|----------|----------------------------------------|---|-------|
| | | | | **Ship strike** | **Entang./ Fsh.inter** | |
| 2/10/99 | mortality | 15.5m male | Virginia Beach, VA | P | | large external wound, extensive fractures to vertebral column, hemorrhaging |
| 11/5/99 | mortality | 16.2m male | Elizabeth, NJ | P | | large wound anterior of the blowhole, severed left flipper, shattered bones |
| 12/11/00 | mortality | 10.9m female | New York harbor | P | | hemorrhage and fractured bones on right side |
| 1/2/01 | mortality | 18.1m female | New York harbor | P | | dorsal abrasion marks, hematoma |
| 2/1/01 | mortality | 14.5m female | Port Elizabeth, NJ | P | | very fresh carcass hung on ship's bow |
| 9/19/01 | mortality | 10.7m unknown | off Bermuda | | P | extensive fresh entanglement marks |
| 7/28/02 | mortality | unknown | Georges Bank | | P | heavy line seen on tail stock, appeared embedded |

Notes: The date sighted and location provided in the table are not necessarily when or where the serious injury or mortality occurred; rather, this information indicates when and where the whale was first reported beached, entangled, or injured.  National guidelines for determining what constitutes a serious injury have not been finalized.  Interim criteria as established by NERO/NMFS  (62 FR 33, Jan. 2, 1997) have been used here.  Some assignments may change as new information becomes available and/or when national standards are established.

Assigned cause based on best judgement of available data.  Additional information may result in revisions.

**Other Mortality**

After reviewing NMFS records for 1999 through 2003, 5 were found that had sufficient information to confirm the cause of death as collisions with vessels (Table 1).  One record (8/4/97) had been omitted from previous reports, but is inserted here following an examination of the exhumed skeletal remains which found a broken jaw and cracked scapula which had partially healed.  The partial healing indicates the whale was alive at the time of the incident.

These records constitute an annual rate of serious injury or mortality of 1.0 fin whales from collisions with vessels.  NMFS data holdings include four additional records of fin whale collisions with vessels, but the available supporting documentation was insufficient to determine if the whales sustained mortal injuries from the encounters.

## STATUS OF STOCK

The status of this stock relative to OSP in the U.S. Atlantic EEZ is unknown, but the species is listed as endangered under the ESA. There are insufficient data to determine the population trend for fin whales. The total level of human-caused mortality and serious injury is unknown. The records on hand at NMFS represent coverage of only a portion of the area surveyed for the population estimate for the stock. The total fishery-related mortality and serious injury for this stock derived from the available records is not less than 10% of the calculated PBR, and therefore cannot be considered insignificant and approaching the ZMRG. This is a strategic stock because the fin whale is listed as an endangered species under the ESA. A Recovery Plan for fin whales has been prepared and is currently awaiting legal clearance.

## REFERENCES

Agler, B. A., R. L. Schooley, S. E. Frohock, S. K. Katona, and I. E. Seipt. 1993. Reproduction of photographically identified fin whales, *Balaenoptera physalus*, from the Gulf of Maine. J. Mamm. 74(3): 577-587.

Barlow, J., S. L. Swartz, T. C. Eagle, and P. R. Wade. 1995. U.S. Marine Mammal Stock Assessments: Guidelines for preparation, background, and a summary of the 1995 assessments. NOAA Tech. Memo. NMFS-OPR-6. U.S. Department of Commerce, Washington, DC. 73 pp.

Bérubé, M., A. Aguilar, D. Dendanto, F. Larsen, G. Notarbartolo di Sciara, R. Sears, J. Sigurjónsson, J. Urban-R. and P. J. Palsbøll. 1998. Population genetic structure of North Atlantic, Mediterranean and Sea of Cortez fin whales, *Balaenoptera physalus* (Linnaeus 1758): analysis of mitochondrial and nuclear loci. Mol. Ecol. 15: 585-599.

CETAP. 1982. A characterization of marine mammals and turtles in the mid- and north Atlantic areas of the U.S. outer continental shelf. Cetacean and Turtle Assessment Program, University of Rhode Island. Final Report #AA551-CT8-48 to the Bureau of Land Management, Washington, DC, 538 pp.

Clapham, P. J. and I. E. Seipt. 1991. Resightings of independent fin whales, *Balaenoptera physalus*, on maternal summer ranges. J. Mamm. 72: 788-790.

Clark, C. W. 1995. Application of U.S. Navy underwater hydrophone arrays for scientific research on whales. Rep. Int. Whal. Commn. 45: 210-212.

Donovan, G. P. 1991. A review of IWC stock boundaries. Rep. Int. Whal. Commn., Special Issue 13: 39-68.

Hain, J. H. W., M. J. Ratnaswamy, R. D. Kenney, and H. E. Winn. 1992. The fin whale, *Balaenoptera physalus*, in waters of the northeastern United States continental shelf. Rep. Int. Whal. Commn. 42: 653-669.

Kellogg, R. 1929. What is known of the migration of some of the whalebone whales. Ann. Rep. Smithsonian Inst. 1928: 467-494.

Kenney, R. D., G. P. Scott, T. J. Thompson, and H. E. Winn. 1997. Estimates of prey consumption and trophic impacts of cetaceans in the USA northeast continental shelf ecosystem. J. Northw. Atl. Fish. Sci. 22: 155-171.

Mizroch, A. A., D. W. Rice and J. M. Breiwick. 1984. The fin whale, *Balaenoptera physalus*. Mar. Fisheries Rev. 46: 20-24.

Mitchell, E. 1974. Present status of northwest Atlantic fin and other whale stocks. Pages 109-169. *In:* W. E. Schevill (ed), The whale problem: A status report. Harvard University Press, Cambridge, Massachusetts, 419 pp.

Palka, D. 1995. Abundance estimate of the Gulf of Maine harbor porpoise. Rep. Int. Whal. Commn., Special Issue 16: 27-50.

Palka, D. 2000. Abundance of the Gulf of Maine/Bay of Fundy harbor porpoise based on shipboard and aerial surveys during 1999. NMFS, Northeast Fisheries Science Center Ref. Doc. 00-07; 29 pp. Available from: National Marine Fisheries Service, 166 Water Street, Woods Hole, MA 02543.

Seipt, I. E., P. J. Clapham, C. A. Mayo and M. P. Hawvermale. 1990. Population characteristics of individually identified fin whales, *Balaenoptera physalus*, in Massachusetts Bay. Fish. Bull., U.S. 88(2): 271-278

Wade, P. R. and R. P. Angliss. 1997. Guidelines for assessing marine mammal stocks: Report of the GAMMS Workshop, April 3-5, 1996, Seattle, Washington. NOAA Tech. Memo. NMFS-OPR-12. U.S. Dept. of Commerce, Washington, DC. 93 pp.

Watkins, W.A., M.A. Daher, G.M. Reppucci, J.E. George, D.L. Martin, N.A. DiMarzio and D.P. Gannon. 2000. Seasonality and distribution of whale calls in the North Pacific. Oceanography 13: 62-67.

MARINE MAMMAL SCIENCE, 21(4):635–645 (October 2005)
© 2005 by the Society for Marine Mammalogy

# FISHING GEAR INVOLVED IN ENTANGLEMENTS OF RIGHT AND HUMPBACK WHALES

AMANDA JOHNSON[1]

Duke University Marine Laboratory, 135 Duke Marine Lab Road,
Beaufort, North Carolina 28516, U.S.A.
E-mail: amanda.johnson@noaa.gov

GLENN SALVADOR

National Marine Fisheries Service, Northeast Region,
12 Gosling Drive, Lewes, Delaware 19958, U.S.A.

JOHN KENNEY

National Marine Fisheries Service,
Northeast Region, Fisheries Engineering Group,
P. O. Box 1692, North Kingstown, Rhode Island 02852, U.S.A.

JOOKE ROBBINS

Provincetown Center for Coastal Studies,
P. O. Box 1036, Provincetown, Massachusetts 02657, U.S.A.

SCOTT KRAUS

New England Aquarium, Edgerton Research Laboratory,
Central Wharf, Boston, Massachusetts 02110, U.S.A.

SCOTT LANDRY

Provincetown Center for Coastal Studies,
P. O. Box 1036, Provincetown, Massachusetts 02657, U.S.A.

PHIL CLAPHAM

Alaska Fisheries Science Center,
National Marine Mammal Laboratory,
7600 Sand Point Way NE, Building 4, Seattle, Washington 98115, U.S.A.

## ABSTRACT

Interactions between marine mammals and fishing gear are an issue of global concern. Entanglements in the western North Atlantic are a major source of injury and mortality for endangered large whales. In this study, entanglements of 31 right whales (*Eubalaena glacialis*) and 30 humpback whales (*Megaptera novaeangliae*) were analyzed to determine the types and parts of gear involved. When gear was identified, 89% ($n = 32$) of the entanglements were attributed to pot and gill net gear; however,

[1] Current address: National Marine Fisheries Service, Northeast Region, Protected Resources Division, One Blackburn Drive, Gloucester, MA 01930.

a wide range of specific gear types were implicated. Despite gear recovery, gear type was not identified in 20% ($n = 9$) of the cases. Although pot gear was recovered from both species equally, gill net gear was less frequently retrieved from right whales ($n = 2$) than humpback whales ($n = 11$). When gear part was identified, 81% ($n = 21$) involved entanglements in buoy line and/or groundline. For right whales, the most common point of gear attachment was the mouth (77.4%); for humpback whales, the tail (53%) and the mouth (43%) were common attachment sites. Four right and three humpback whales in this sample were known to have died subsequent to entanglement. However, when identified, the gear types and parts involved in lethal cases were not substantially different from entanglements with non-lethal outcomes. Large whales can become entangled in a wide variety of fishing gear types and parts, and additional insight will depend on continued efforts to document entanglements and recover associated gear.

Key words: entanglement, entanglement risk, mortality, fisheries, bycatch, gear type, North Atlantic right whale, *Eubalaena glacialis*, humpback whale, *Megaptera novaeangliae*.

Entanglement in fishing gear is a significant cause of injury and mortality to many marine mammal populations throughout the world. Large whale populations along the U.S. east coast remain susceptible to entanglement, despite management efforts to reduce overfishing of lobster and groundfish species.

Mortality from entanglements in fishing gear, in particular fixed gear, is a factor inhibiting the recovery of the critically endangered North Atlantic right whale (*Eubalaena glacialis*) (IWC 1999). Despite nearly 70 yr of protection from commercial whaling, this population of approximately 300 individuals has shown little sign of recovery (IWC 2001). Recent statistical data suggest that this population is declining, and reducing human-caused mortality is necessary to prevent extinction (Caswell *et al.* 1999). Right whale scarification studies conducted by the New England Aquarium indicate that 71.9% of the population has been entangled at least once, and there appears to be an increasing trend in the annual rate of entanglement (Knowlton *et al.* 2003[2], see also Knowlton and Kraus 2001). These findings indicate that documented entanglements are only a fraction of the animals that actually become entangled, and identifying recovered gear is important for developing mitigation strategies.

Entanglements are also a significant problem for North Atlantic humpback whales (*Megaptera novaeangliae*) under U.S. jurisdiction (Waring *et al.* 2003). This endangered species was also subject to historic commercial exploitation. Although its recovery status is not known, the Gulf of Maine stock of humpback whales is believed to number in the high hundreds, and is experiencing positive population growth (Barlow and Clapham 1997, Clapham *et al.* 2003). However, a scar-based study of Gulf of Maine humpback whale entanglement rates indicated that more than half of the population had experienced a previous entanglement, and 8%–25% received new injuries each year (Robbins and Mattila 2004).[3]

[2] Knowlton, A. R., M. K. Marx, H. M. Pettis, P. K. Hamilton and S. D. Kraus. 2003. Analysis of scarring on North Atlantic right whales (*Eubalaena glacialis*): Monitoring rates of entanglement interaction. Final report to the US National Marine Fisheries Service (unpublished). Available from the New England Aquarium, Central Wharf, Boston, MA 02110. 18 pp.

[3] Robbins, J., and D. K. Mattila. 2004. Estimating humpback whale (*Megaptera novaeangliae*) entanglement rates on the basis of scar evidence. Final report to the US National Marine Fisheries Service (unpublished). Available from the Center for Coastal Studies, Box 1036, Provincetown, MA 02657. 22 pp.

As awareness of marine mammal entanglement increases, mitigation efforts focus on disentanglement, gear modification, and deterrent devices such as pingers. However, for large whales, successful development of strategies to reduce or eliminate entanglement is contingent upon a better understanding of what type and part of the gear creates the greatest entanglement risk, and of how whales become entangled.

Here we examine entanglements of right and humpback whales to determine the types and parts of gear involved and where they tend to attach on the body. We also evaluate whether gear type or part affects the persistence of an entanglement, as well as the ultimate fate of the entangled animal.

## METHODS

We examined records of North Atlantic right and humpback whale entanglements on file with the National Marine Fisheries Service (NMFS). For right whales, reported entanglements ranged from the Magdalen Islands, Canada (Gulf of St. Lawrence) to Amelia Island, Florida, and for humpback whales, Grand Manan Island, Canada (Bay of Fundy) to Cape Lookout, North Carolina. Entanglement cases of right whales date back to 1993, including eight whales reported as entangled in 2002. We began with two humpback whale entanglements in 1997, and examined all other incidents up to and including eight of the eleven animals reported as entangled in 2002. Data availability has been greatly facilitated by a large whale entanglement reporting and response network for the east coast of the United States, implemented by the Provincetown Center for Coastal Studies (PCCS) under the authority of NMFS. The network has produced detailed information on entanglements in the region, including the recovery of part or all of the entangling gear in many cases.

Analyses focused on entanglements from which gear was recovered and examined by gear specialists or other sources considered reliable, as well as cases from which gear type and/or part was identified (*e.g.*, by fishermen or biologists) but not recovered. In some instances, gear removed during a necropsy was included. When documentation was at least sufficient to examine points of attachment of entangling gear, we included cases in which gear was not recovered or identified. We also evaluated whether photographs alone could be of any value in assessing gear type or part. Photographs of entangled animals were obtained from the North Atlantic Right Whale Catalog, which is curated by the New England Aquarium (NEA), and from the PCCS Gulf of Maine humpback whale catalog; all were digitally scanned for analysis. These long-term photographic catalogs were also the source of sighting information about all entangled animals and individual characteristics, such as age and sex. For each incident, we examined types of gear, parts of gear, line type, points of gear attachment on the body, and what is known about the eventual outcome for the entangled animal.

We examined five entanglement variables, as defined below.

*Entanglement outcome (at last sighting)*—Alive and gear-free (life-threatening gear was shed or removed, includes animals with non-life-threatening entanglements); alive and entangled (life-threatening entanglement retained); dead (recovery of a carcass); potentially dead (right whales only, see below); and status unknown (could not determine whether or not the entanglement was life-threatening). Some right whales have been categorized as "potentially dead" based largely on a NEA visual health assessment (Pettis *et al.* 2004). A comparable health assessment technique does not exist for humpback whales; therefore, the potentially dead category was not used for this species.



*Figure 1.*    Generalized configuration of pot gear and associated parts, not drawn to scale (source: Provincetown Center for Coastal Studies).

*Gear type*—Pot: inshore lobster pot, offshore lobster pot, lobster pot unknown location, unknown pot, crab pot, conch/whelk, and slime eel; gill net: sink gill net and gill net unknown type; other: tuna handline, Danish seine, aquaculture, and vessel anchoring system.

*Part of gear*—Fixed fishing gear can be broken down into four or five components or parts: buoy line, end line, groundline, float line, and lines involved with the surface system (Fig. 1, 2).[4] Buoy and end lines connect bottom gear to the surface and terminate in a surface system, which is sometimes regarded as a separate portion of the gear. We combined buoy line and end line (termed "buoy line"), since both lines connect the bottom gear to the surface system and can be used interchangeably. Groundlines connect traps to each other, forming strings or trawls, and are also used in gill nets to connect a string of net panels to anchors. Floating groundline, used in both pot and gill net gear, forms an arc of line that can float 15–20 ft (approximately 4.6–6.1 m) into the water column. Float lines run across the top of gill nets, holding net panels upright. The surface system includes buoys and high flyers, as well as the lines that connect these components to the buoy line. The fact that many of these lines rise into the water column presents an entanglement risk to large whales. In addition, these lines are made with durable synthetic materials, such as polypropylene and polyester, with characteristics that are meant to withstand extremely harsh fishing conditions.

---

[4] Fixed fishing gear is defined in the Code of Massachusetts Regulations (322 CMR 12.00) as any bottom or sink gill nets or pots that are set on the ocean bottom or in the water column and are usually connected to lines that extend to the water's surface.



*Figure 2.*    Generalized configuration of gill net gear and associated parts, not drawn to scale (source: Provincetown Center for Coastal Studies).

*Line type*—Characterized as either floating or sinking. Also included were buoy and surface system lines that had both floating and sinking line spliced together.

*Point of attachment of entangling gear*—Mouth, flipper(s), body, tail, and unknown/uncertain. For example, a whale with line originating at its mouth and draping over its back was considered to have a mouth entanglement only. PCCS or NEA generally made this assessment, either during a disentanglement event or after examination of photographic documentation. These assessments should be considered conservative because the full extent of the entanglement may not have been visible to observers. For example, observation of the flippers and mouth was not possible in all cases and the configuration of an entanglement may have changed over time. However, secondary evidence of the attachment site, such as scarring and chafing of the skin, was not used when determining points of attachment.

We recorded sex, age (in years), age class (calf, juvenile, adult), and the location of the entangled whale at the first observation (not to be understood as the location of encounter with the gear) for individual right and humpback whales who could be identified. For right whales, "juveniles" included animals from 1 to <9 yr old, and for humpback whales, animals from 1 to <5 yr old. When reported, the straight length of dead animals was collected by members of the Northeast or Southeast Region Stranding Networks, and provided by NMFS.

RESULTS

A total of 61 entanglements (31 right whales and 30 humpback whales) were examined. Four right and three humpback whales had died, five right whales were deemed potentially dead, 12 right and 20 humpback whales were alive and gear-free, six right and five humpback whales were alive and entangled, and four whales (two

*Table 1.* Entangling gear type for 20 right and 25 humpback whales where gear was either recovered or otherwise reliably identified. UN = unknown/unidentified gear; LI = inshore lobster pot; LO = offshore lobster pot; LU = lobster pot unknown location; Pot = unknown pot; CR = crab pot; CW = conch/whelk; SE = slime eel; SG = sink gill net; GU = gill net unknown type; TU = tuna handline; Seine = Danish seine; Anchor = vessel anchoring system; AQ = aquaculture.

|                | UN | LI | LO | LU | Pot | CR | CW | SE | SG | GU | TU | Seine | Anchor | AQ |
|----------------|----|----|----|----|-----|----|----|----|----|----|----|-------|--------|----|
| Right whales   | 6  | 3  | 3  | 2  | 1   | 1  | 0  | 0  | 1  | 1  | 0  | 1     | 0      | 1  |
| Humpback whales| 3  | 5  | 0  | 0  | 1   | 1  | 1  | 1  | 11 | 0  | 1  | 0     | 1      | 0  |

of each species) had unknown outcomes.[5] Gear type was determined in 45% ($n = 14$) of right and 73% ($n = 22$) of humpback whale cases. Scanned photographs (representing nine right and seven humpback whales) yielded no useful information about gear type or part because only line was visible on most of these animals. Photographs of five of these whales (three right and two humpback) allowed for their inclusion in the points of gear attachment analysis.

*Types and Parts of Gear Involved in Entanglements*

Of the 61 entanglements, we examined 20 right whale and 25 humpback whale entanglements where gear was recovered or where gear was identified but not recovered (Table 1). One right whale (#2212, a juvenile male) was entangled three times, and all recovered gear was analyzed. For analysis, gear types were divided into four categories: pot (*e.g.*, inshore and offshore lobster, crab), gill net (all gill net types), other (*e.g.*, tuna handline, Danish seine), and unknown. Eighty percent (36 of 45) of the entangling gear that was identified could be attributed to particular fisheries. Eighty-nine percent of identified gear was attributed to pot and gill net fisheries (Table 1). Pot gear was identified on 10 right and nine humpback whales, gill net gear on two right and 11 humpback whales, and other gear on four whales (two of each species). All but one of the humpback whale entanglements reported in the mid-Atlantic ($n = 6$) involved gill net gear, while entanglements reported in the Northeast involved a wide variety of gear types.

Of 14 juvenile right whale entanglements (involving 12 individuals) where gear was recovered, eight events involved pot gear (three inshore lobster pot, two offshore lobster pot, two unknown lobster pot, and one unknown pot), one involved other gear (aquaculture), and five involved unknown gear types. Five adult right whale entanglement events were analyzed, where one involved offshore lobster pot gear, two involved gill net gear, one involved other gear (Danish seine), and one involved unknown gear. Also, a whale of unknown age class was entangled in crab pot gear. Life history data are presently insufficient to compare humpback whale entanglements on the basis of age class.

Despite gear recovery from 45 entanglements, the parts of the gear were identified in only 25 of those cases (12 right and 13 humpback whales). Buoy line and groundline were recovered in 49% of these cases, whereas float line and surface system lines were recovered in 11% (Table 2). Two whales were entangled in more than one part of the gear. A right whale was reported entangled in two parts of the same gear,

[5] The total number of outcomes described do not equal 61 because right whale #2212, entangled three separate times, was assigned to one final outcome of potentially dead.

*Table 2.* Entangling gear types and associated parts of the gear. This table contains one right and one humpback whale that were entangled in both buoy line and groundline associated with pot gear. The numbers in parentheses indicate the percent occurrence of that gear part relative to the total number of gear parts that were identified for that gear type. "Other" types of gear were not included, as the parts of the gear discussed here are only associated with fixed fishing gear. RW = right whales; HW = humpback whales.

| | Pot | | Gill net | | Unknown | | Total |
|---|---|---|---|---|---|---|---|
| | RW | HW | RW | HW | RW | HW | Both species |
| Buoy line | 6 (55%) | 6 (60%) | 0 | 1 (9%) | 1 (17%) | 0 | 14 (33%) |
| Groundline | 3 (27%) | 3 (30%) | 1 (50%) | 0 | 0 | 0 | 7 (16%) |
| Float line | — | — | 0 | 4 (36%) | 0 | 0 | 4 (9%) |
| Surface system line | 1 (9%) | 0 | 0 | 0 | 0 | 0 | 1 (2%) |
| Unknown | 1 (9%) | 1 (10%) | 1 (50%) | 6 (55%) | 5 (83%) | 3 (100%) | 17 (40%) |

both buoy line and groundline associated with crab pot gear, and a humpback whale was entangled in buoy line and groundline associated with pot gear.

Buoy line associated with pot gear was recovered from 85.7% (12 of 14) of the right and humpback whales entangled in buoy line, and groundline associated with pot gear was recovered from 85.7% (six of seven) of entanglements in groundline (Table 2). Gill net gear was recovered from more humpback whales than right whales, but in approximately half of the cases, the part of the entangling gear could not be identified.

For both species combined, 64.3% (nine of 14) of buoy line entanglements involved floating and sinking line spliced together, 28.6% (four of 14) involved only sinking line, and one was unknown. Also, 85.7% (six of seven) of groundline entanglements involved floating line, and one was unknown. One surface system entanglement involved floating and sinking line, and one was unknown. Gill net float line, by nature, consists of floating line or line that is made buoyant by floats.

For right whales the most common point of attachment was the mouth (77.4%), with 51.6% involving only this body part. For humpback whales, the most common points of attachment were the tail (53%) and the mouth (43%). Thirty percent involved the tail only and 20% involved the mouth only.

Buoy line entanglements involved the mouth on three right whales and one humpback whale; the mouth, flipper, and tail on one right whale; the mouth and tail on two humpback whales; the flipper on one right whale; the tail on one right and three humpback whales; and an unknown location on one humpback whale. One right whale entanglement in the surface system line involved the mouth, and the other involved the mouth, flipper, and body. Groundline entanglements involved the mouth on two whales (one of each species); the mouth and body on one right whale; the flipper and body of one right whale; and an unknown location on one humpback whale. Float line involved the mouth and/or tail of all four humpback whale entanglements in this part of the gear. For the two whales entangled in multiple parts of the gear (buoy line and groundline), the right whale entanglement involved the tail and the humpback whale entanglement involved the mouth. In summary, buoy line entanglements involved the mouth in a total of eight cases (four of each species), the tail in eight cases (three right and five humpback), and the flippers in two cases (both right whales).

*Influence of Gear Type on Entanglement Outcome*

Overall, entanglement outcomes were considered positive (*i.e.*, the animal was alive and gear-free, either by successful disentanglement or shedding the gear itself) in 71% ($n=12$) of pot and 62% ($n=8$) of gill net cases. Right whale #2212 was not included in these gear analyses. Entanglement outcome was considered positive in 75% ($n=3$) of cases involving the four other gear types. It was not possible to draw firm conclusions about disentanglement success with regard to the parts of the gear involved because reliable gear part identification depended on successful gear retrieval. However, pot, gill net, and Danish seine gear were all involved in known or suspected lethal entanglements. Out of 17 entanglements of both species in pot gear (not including right whale #2212), 18% ($n=3$) were known or suspected to have resulted in death, and out of 13 gill net entanglements, a similar number, 23% ($n=3$), had a comparable outcome. When age class was known, lobster pot gear was involved in the known or suspected lethal entanglement of two juvenile right whales, and gill net gear was involved in the known lethal entanglement of one adult right whale. In addition, one dead adult right whale was entangled in Danish seine gear. Based on their reported lengths (8.6–9.85 m), the three humpback whales known to have died were likely juveniles (Clapham *et al.* 1999).

A wide range of fixed gear parts were involved in entanglements known to have been lethal. Float line was documented on a dead humpback whale. Buoy line was documented on a dead right whale (sinking line) and a dead humpback whale (floating and sinking spliced), and floating groundline was documented on one dead right whale. Right whale #2212, considered potentially dead, was entangled two separate times where gear part could be identified; one event involved buoy line (floating and sinking spliced) and the other involved floating groundline. Similarly, any part of a whale's body can be involved in lethal and non-lethal entanglements. However, five out of the nine (55.6%) dead or potentially dead right whales had entanglements that involved the mouth; similarly, all three humpback whale deaths involved the mouth. The tail was involved in entanglements of one humpback and four right whales that are dead or potentially dead.

DISCUSSION

The 1994 amendments to the U.S. Marine Mammal Protection Act (MMPA) were designed to address bycatch of marine mammals in U.S. commercial fisheries. A study by Read and Wade (2000) concluded that in general, the MMPA and Endangered Species Act (ESA) have been successful in aiding the recovery of many species, but some, such as the North Atlantic right whale, continue to face conservation problems despite protective measures. Cetaceans continue to be taken in fisheries such as the Japanese North Pacific drift net fishery for salmon, Italian and Spanish drift net fisheries for swordfish in the Mediterranean Sea, and coastal gill net fisheries in Europe (Reeves *et al.* 2003). Growing international concern about the effects of entanglements on marine mammal and sea turtle populations has led to research and management measures to mitigate entanglements.

On the east coast of the U.S. and Canada, both right and humpback whales were entangled in all major types of fixed fishing gear, and any part of that gear. Out of the combined 36 entanglement cases where gear was examined and identified, pot and gill net fisheries were implicated in 32 (89%). Both pot (18%) and gill net (23%)

gear were involved in known or suspected lethal entanglements. Conservatively, all fixed gear types should be considered potentially dangerous to these species.

For pot gear, 80% and 56% of right and humpback whale entanglements, respectively, occurred in lobster pot gear, despite management measures to reduce effort in this fishery, such as setting a cap on the number of traps allowed per fisherman and limiting entry into the fishery. When gear type was identified, right whales were found to be entangled in pot gear 71% of the time and gill net gear 14% of the time as compared to other gear types, while humpback whales were entangled in pot gear 41% of the time and sink gill nets 50% of the time. Although humpback whales appear to encounter gill net gear more often than right whales, without a measure of whale encounter rates with gear, we are unable to generalize this finding to the population. Although the location of the reported entanglement is not necessarily the location where the whale encountered the gear, 55% ($n = 6$) of humpback whale gill net entanglements were reported in the mid-Atlantic, where gill nets made up 86% ($n = 6$) of identified gear from humpback whales reported entangled in this region.

The entanglement outcomes of many whales were considered positive; 71% of whales entangled in pot gear and 62% entangled in gill net gear were alive and gear-free, primarily due to successful disentanglement. The determination of both gear types and gear parts involved in these entanglements depended in large part on the successful recovery of gear.

Fifty-six percent of the entanglements for both species involved buoy line, providing evidence that buoy lines present entanglement risk regardless of line type. Sinking (all or part) buoy line was found on more entangled animals than floating buoy line, which may indicate that sinking buoy line creates more entanglement risk than floating buoy line. However, it is possible that the gear observed on or removed from an animal may not accurately reflect the entire history of an entanglement, since some or all gear can be shed by the whale, lost during disentanglement, or change position over time. NMFS gear specialists report that some fishermen do use purely floating buoy line, but most lobster pot and gill net fishermen use buoy line consisting of both floating and sinking line, with floating line near the bottom end to prevent it from chafing on the seafloor. Therefore, sinking buoy line that was removed from an animal may have once been spliced to floating line. However, a relatively large number of entangling gear types and gear parts were unidentifiable, especially when gear was not recovered.

Whether buoy and surface system lines represent more of an entanglement risk than groundline is currently difficult to determine due to unknown biases associated with entanglement reporting effort, as well as lack of information about the types and amounts of gear being used. For example, buoy and surface system lines may be identified at sea more frequently than groundline, since buoy and surface system lines are easier to identify when an attached buoy or high flyer is present. In contrast, groundline does not have any distinguishing characteristics that indicate that it is in fact groundline. Out of 14 entanglement events involving buoy line, nine (64.3%) involved the presence of buoys and/or high flyers. Thus, buoy line may appear to represent a greater entanglement risk than groundline, which is usually identified only when gear is removed from an entangled animal. Interestingly, only two whales (both right whales) were documented with surface system entanglements, which may indicate that entanglements commonly occur below the surface.

This analysis highlighted an apparent difference between floating and sinking groundline in terms of potential entanglement risk. The use of sinking groundline (line in contact with the ocean floor) could be taken as providing some measure of

entanglement risk reduction, since no entanglements of either species involved this type of line. However, we have no knowledge of the relative frequency with which lines of different types are employed throughout the fishing regions concerned and this information would be extremely difficult to obtain; consequently, any comparison of entanglement rates by line type without knowledge of effort may be misleading.

Several body parts were involved in entanglements, both lethal and non-lethal. Right whale entanglements frequently involved the mouth, indicating that many of these entanglements probably occurred during foraging, since open mouth behavior is generally associated with feeding only. Most right whales (78%) that died or were considered potentially dead were commonly entangled by the mouth and/or the tail. Mouth entanglements were also common among humpback whales, although the incidence may be underestimated given that the mouth is somewhat more difficult to observe in this species. However, all three humpback whale deaths involved at least a portion of the entangling gear in the mouth, indicating that humpback whale entanglements also occur during foraging. Humpback whale entanglements were more likely to involve the tail than right whale entanglements, but the reason for this interspecific difference is unclear.

In both species, the mouth and/or tail regions were involved in nearly all buoy line entanglements and all four float line entanglements. Groundline and surface system lines were documented on all body parts. However, without knowledge of the whale's behavior leading up to and following an entanglement, it is difficult to draw conclusions about how different parts of the gear are linked to points of gear attachment on an animal's body.

This analysis did not highlight any trends in gear types and parts that are commonly involved in lethal and non-lethal entanglements of juvenile versus adult right whales. Overall, more juvenile right whale entanglements were analyzed than those of adults, making it difficult to compare age classes. Fifty-five percent of the right whales that died or were deemed potentially dead were juveniles. Right whale #2212 was a special case in that three separate entanglements were documented. Although this whale is considered potentially dead, this outcome cannot be attributed to any one particular entanglement event; rather, the debilitating effects of multiple entanglements, combined with the ingestion of line from an unknown type of gear, most likely lead to this determination.

This analysis confirms that any line rising into the water column poses a significant entanglement risk for these two species. Consequently, reducing the occurrence of line in the water column—for example, by using sinking or neutrally buoyant groundline—could reduce entanglement risk (although it should be noted that the occurrence of benthic foraging by these species is still poorly understood).

The risk presented by buoy and surface system lines might be mitigated by the correct placement of weak links with sufficiently low breaking strengths. However, the efficacy of weak links remains to be demonstrated, and may be countered by the behavior or strength of the whale in conjunction with the entanglement configuration. More information on the specifics of entanglements is required and may be aided by the application of standardized marking of lines used in fixed fishing gear.

Currently, gear removal provides the only reliable information about the nature of large whale entanglements. Gear experts more readily identify buoy line due to the presence of a buoy or high flyer, while groundline is usually identifiable only if it is removed from a whale. Color-coding gear would allow for identification of gear parts both at sea and through photographic documentation.

JOHNSON *ET AL.*: FISHING GEAR ENTANGLEMENT          645

## ACKNOWLEDGMENTS

This study would not have been possible without the efforts of the PCCS Disentanglement Team and the Atlantic Large Whale Disentanglement Network. Dr. Andy Read of the Duke University Marine Laboratory provided guidance and insightful comments. The authors thank the following individuals for their contributions to or assistance with this work: Diane Borggaard, Dana Hartley, Amy Knowlton, David Mattila, Ed Lyman, Stormy Mayo, David Morin, Bob Bowman, and Melissa Mooney. Diane Borggaard, Brian Hopper, Carolyn Woodhead, Jack Batchelder, Fred Serchuk, Richard Merrick, Michael Moore, and two anonymous reviewers provided useful comments on the draft manuscript.

## LITERATURE CITED

BARLOW, J., AND P. J. CLAPHAM. 1997. A new birth interval approach to estimating demographic parameters of humpback whales. Ecology 78:535–546.

CASWELL, H., M. FUJIWARA AND S. BRAULT. 1999. Declining survival probability threatens the North Atlantic right whale. Proceedings of the National Academy of Science 96:3308–3313.

CLAPHAM, P. J., S. E. WETMORE, T. D. SMITH AND J. G. MEAD. 1999. Length at birth and at independence in humpback whales. Journal of Cetacean Research and Management 1:141–146.

CLAPHAM, P. J., J. BARLOW, M. BESSINGER, T. COLE, D. MATTILA, R. PACE, D. PALKA, J. ROBBINS AND R. SETON. 2003. Abundance and demographic parameters of humpback whales from the Gulf of Maine, and stock definition relative to the Scotian Shelf. Journal of Cetacean Research and Management 5:13–22.

IWC. 1999. Report of the Workshop on the Comprehensive Assessment of Right Whales Worldwide. Journal of Cetacean Research and Management 1 (supplement):119–120.

IWC. 2001. Report of the Workshop on Status and Trends of Western North Atlantic Right Whales. Journal of Cetacean Research and Management (Special Issue) 2:61–87.

KNOWLTON, A. R., AND S. D. KRAUS. 2001. Mortality and serious injury of northern right whales (*Eubalaena glacialis*) in the western North Atlantic Ocean. Journal of Cetacean Research and Management (Special Issue) 2:193–208.

PETTIS, H. M., R. M. ROLLAND, P. K. HAMILTON, S. BRAULT, A. R. KNOWLTON AND S. D. KRAUS. 2004. Visual health assessment of North Atlantic right whales (*Eubalaena glacialis*) using photographs. Canadian Journal of Zoology 82:8–19.

READ, A. J., AND P. R. WADE. 2000. Status of marine mammals in the United States. Conservation Biology 14:929–940.

REEVES, R. R., B. D. SMITH, E. CRESPO AND G. NOTARBARTOLO DI SCIARA. 2003. Dolphins, whales, and porpoises: 2003–2010 conservation action plan for the world's cetaceans. Species Survival Commission, IUCN, Gland, Switzerland. 147 pp.

WARING, G. T., R. M. PACE, J. M. QUINTAL, C. P. FAIRFIELD AND K. MAZE-FOLEY, EDS. 2003. U.S. Atlantic and Gulf of Mexico marine mammal stock assessments—2003. U.S. Department of Commerce, NOAA Technical Memorandum NMFS-NE-182. 287 pp.

Received: 16 June 2004
Accepted: 1 February 2005

# THE TAKE PROHIBITION IN SECTION 9 OF THE ENDANGERED SPECIES ACT: CONTRADICTIONS, UGLY DUCKLINGS, AND CONSERVATION OF SPECIES

BY

FEDERICO CHEEVER[*]
MICHAEL BALSTER[**]

*The take prohibition in section 9 of the Endangered Species Act should be one of the most important provisions in the Act. Section 9 prohibits most injury to protected species. Unlike most provisions of the Act, section 9 applies to private actions on private land. This Article evaluates case law over the past 15 years and discusses the tensions within the Act that have prevented section 9 from assuming a more prominent role in Endangered Species Act jurisprudence. This Article suggests that two sources embedded in the language and history of the Act are principle causes of the current confusion over the application of section 9. First, section 9's focus on individual species members appears to conflict with the Endangered Species Act's general focus on the conservation of species. Second, the direct, judicially enforceable prohibitions in section 9 are fundamentally different from other significant provisions of the Act, which focus on agency decision making and judicial review of agency decisions in the administrative law tradition. The authors argue that for section 9 to assume its rightful place, courts must consider injury to both individual species members and the population of which they are a part. The authors conclude that the solution to the current arrested development of section 9 is a coherent application of the provision in accordance with the purpose of the Endangered Species Act: conservation of species.*

I.   INTRODUCTION ............................................................................................... 364
II.  INDIVIDUALS AND POPULATIONS ................................................................ 368

[*] © Federico Cheever, 2004. Professor of Law, University of Denver College of Law. I would like to thank my co-author Michael Balster, the efficient staff and editors of *Environmental Law*, and all the participants in and organizers of Lewis and Clark Law School's "The Endangered Species Act Turns 30" Conference, particularly Dan Rohlf, Lin Harmon-Walker, and the incomparable Janice Weis.
[**] © Michael Balster, 2004. J.D. expected 2004, University of Denver College of Law; B.S. 1995, The Ohio State University. Registered Professional Engineer. I would like to thank Professor Federico Cheever for the extraordinary opportunity to co-author this article and his valuable mentoring over the past several years, and above all Jennifer Jeffers for her continued inspiration and encouragement.

[363]

III. UGLY DUCKLING ................................................................................................ 385
IV. SIGNIFICANCE AND PROBABILITY ..................................................................... 394
V. CONCLUSION ................................................................................................... 395

# I. INTRODUCTION

We live during one of the most dramatic periods of mass extinction in the multibillion-year history of life on Earth.[1] While we can only, with difficulty, estimate the extent of the current mass extinction,[2] it appears to rank among the half dozen biggest since the beginning of the fossil record and rivals the extinction that ended the reign of the dinosaurs.[3] It is transforming the fabric of life on the planet. It is, however, different from the mass extinctions that came before it because its cause is different. The current mass extinction results from human disruption of ecosystems.[4]

Thirty years ago the United States took an extraordinary step toward confronting this mass extinction crisis by passing a law "to halt and reverse the trend toward species extinction, whatever the cost."[5] In passing the Endangered Species Act of 1973 (ESA),[6] Congress took a bold step, not out of altruism, but out of self-interest. As Congress observed:

---

[1] EDWARD O. WILSON, THE FUTURE OF LIFE 99 (2002). The rate of extinction is "catastrophically high, somewhere between one thousand and ten thousand times the rate before human beings began to exert a significant pressure on the environment." *Id.*

[2] *Id.* at 101. Biologists use several methods to estimate the rate of species extinction, which consist of successive approximations utilizing "multiple approaches and trial-and-error measurements." *Id. See* Nigel E. Stork, *Measuring Global Biodiversity and Its Decline, in* BIODIVERSITY II, UNDERSTANDING AND PROTECTING OUR BIOLOGICAL RESOURCES 47 (Marjorie L. Reaka-Kudla et al. eds., 1997) ("[A]lmost nothing is known of the distribution and threatened status of most organisms. A global estimate of, for example, 10 million species of all organisms would suggest that nothing is known of the distribution of 86% of species, 7% are known from just one locality, only 7% are known from more than one locality, and the threat of extinction is known for less than 0.5%.").

[3] FRANZ J. BROSWIMMER, ECOCIDE: A SHORT HISTORY OF THE MASS EXTINCTION OF SPECIES 1 (2002). The current rate of extinction is comparable only to three massive extinctions. The first took place "on land and in shallow water environments some 250 million years ago, marking the close of the Permian period." *Id.* at 1. Paleontologists believe the extinction was caused by a slow change in climate and sea level that occurred "when forces of continental drift caused the Earth's great continents to merge together slowly into a single, gigantic super-continent." *Id.* The second major extinction took place about 200 million years ago. *Id.* at 2. "The two main causes are most likely a 1- to 5-mile-wide meteor colliding with the Earth, leaving a 70-mile-wide crater in Quebec, and the eruption of great lava flows beneath what are now the jungles of the Amazon River valley." *Id.* "The third great mass extinction took place 65 million years ago, annihilating the terrestrial dinosaurs along with hundreds of thousands of other land and aquatic species." *Id.* It ended "when a giant, 6-mile-wide asteroid or comet crashed into the surface of the Earth near the Yucatan peninsula." *Id.*

[4] *Id.* at 4. Human impact on the global biosphere is unprecedented. The devastating effect includes "worldwide disruption of biochemical cycles, rapid climate change, massive soil erosion, extensive desertification, and the unchecked release of synthetic toxins and genetically modified organisms." *Id.*

[5] Tenn. Valley Auth. v. Hill, 437 U.S. 153, 184 (1978).

[6] Endangered Species Act of 1973, 16 U.S.C. §§ 1531–1544 (2000).

From the most narrow possible point of view, it is in the best interests of mankind to minimize the losses of genetic variations. The reason is simple: they are potential resources. They are keys to puzzles which we cannot solve, and may provide answers to questions which we have not yet learned to ask.[7]

By passing the ESA, Congress did more than mandate the maintenance of a few specimens of imperiled species on the brink of extinction. Congress mandated "conservation" of species and the ecosystems of which they are a part.[8] Congress defined "conservation" to include "the use of all methods and procedures which are necessary to bring any endangered species or threatened species to the point at which the measures provided pursuant to this chapter are no longer necessary."[9] For a variety of very good reasons, the ESA mandates recovery of species.[10]

By all rights, the take prohibition in section 9[11] should rank among the most important provisions of the ESA. The take prohibition is simple, unambiguous, and breathtaking in its reach and power. Section 9(a)(1)(B)–(C) forbids any "person" to "take" any endangered species of fish or wildlife "within the United States or the territorial sea of the United States" or "upon the high seas[.]"[12] Section 3(13) of the ESA defines "person" broadly to include "an individual, corporation, partnership, trust, association, or any other private entity; or any officer, employee, agent, department, or instrumentality of the Federal Government, of any State, municipality, or political subdivision of a State, or of any foreign government . . . or any other entity subject to the jurisdiction of the United States."[13] Section 3(19) defines "take" as "to harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect, or to attempt to engage in any such conduct."[14] Congress defined "take" explicitly "in the broadest possible manner to include every conceivable way in which a person can 'take' or attempt to 'take' any fish or wildlife."[15]

The United States Fish and Wildlife Service (FWS), responsible for enforcing the ESA for most protected species, has further defined "harass" and "harm" in the definition of "take" to include injury through habitat destruction. FWS defines "harm" to include an act that results in "significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavior patterns."[16] FWS defines

---

[7] H.R. REP. No. 93-412, at 5 (1973).

[8] 16 U.S.C. § 1531(b) (2000).

[9] *Id.* § 1532(3).

[10] *See generally* Federico Cheever, *The Road to Recovery: A New Way of Thinking About the Endangered Species Act*, 23 ECOLOGY L.Q. 1 (1996); *accord* Sierra Club v. United States Fish & Wildlife Serv., 245 F.3d 434 (5th Cir. 2001) (holding that critical habitat outside of area currently occupied by protected species should be set aside for both the survival and recovery of the species).

[11] 16 U.S.C. § 1538 (2000).

[12] *Id.* § 1538(a)(1)(B)–(C).

[13] *Id.* § 1532(13).

[14] *Id.* § 1532(19).

[15] S. REP. No. 93-307, at 7 (1973), *reprinted in* 1973 U.S.C.C.A.N. 2989, 2995.

[16] 50 C.F.R. § 17.3 (2004).

"harass" to include an "intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns."[17]

In *Babbitt v. Sweet Home Chapter of Communities for a Great Oregon* (*Sweet Home*),[18] the United States Supreme Court, relying on the purpose of the ESA, upheld FWS's definition of "harm" within the statutory definition of take against a facial challenge. The Court noted that "Congress' intent to provide comprehensive protection for endangered and threatened species supports the permissibility of the Secretary's 'harm' regulation."[19]

In practical terms, the section 9 take prohibition *must* be an essential component in any national effort to preserve biological diversity. It is the only provision of the ESA that applies without qualification to the private land on which most species, endangered or not, depend. This fact undergirds the United States Court of Appeals for the District of Columbia Circuit ruling on the reach of Commerce Clause jurisdiction under the ESA in *National Ass'n of Home Builders v. Babbitt.*[20]

After *Sweet Home* and other expansive readings of the language in section 9 in the late 1980s and early 1990s, it seemed possible that section 9 would evolve into the bulwark for species protection it was plainly intended to be. This has not happened. In 2004, nine years after *Sweet Home*, the federal courts have yet to put jurisprudential flesh on the statutory bones of the section 9 take prohibition. Issues regarding burden of proof have remained stalled at a rudimentary level.[21]

---

[17] *Id.* In 1999, the National Marine Fisheries Service (NMFS) (now NOAA Fisheries) defined "harm" in a way consistent with established FWS precedent. Endangered and Threatened Wildlife and Plants; Definition of Harm, 64 Fed. Reg. 60,727 (Nov. 8, 1999).

[18] 515 U.S. 687, 708 (1995).

[19] *Id.* at 699.

[20] *See* Nat'l Ass'n of Home Builders v. Babbitt, 130 F.3d 1041, 1057 (D.C. Cir. 1997) (holding that section 9(a)(1) of the ESA is constitutional under the Commerce Clause). Plaintiff brought suit claiming that Congress exceeded its power under the Commerce Clause in its application of section 9(a)(1) to the Delhi Sands flower-loving fly (*Rhaphiomidas terminatus abdominalis*). *Id.* at 1043. The court held that section 9 is within Congress's power, and thus, FWS's application of section 9 to the fly was constitutional. *Id.* at 1057. The court offered two justifications under the test outlined in *United States v. Lopez*, 514 U.S. 549 (1995). First, Congress's power to regulate the channels of interstate commerce provides justification for section 9 because 1) the take prohibition is necessary to allow the government to regulate the transportation of endangered species, and 2) prohibiting illegal take of endangered species is within Congress's authority to "keep the channels of interstate commerce free from immoral and injurious uses." Nat'l Ass'n of Home Builders v. Babbitt, 130 F.3d at 1046 (quoting Heart of Atlanta Motel Inc. v. United States, 379 U.S. 241, 256 (1964)). Secondly, the court held that section 9 affects interstate commerce because it 1) "prevents the destruction of biodiversity and thereby protects the current and future interstate commerce that relies upon it[,]" and 2) "controls adverse effects of interstate competition." *Id.* at 1052. In its discussion of the importance of biodiversity, the court recognized that the loss of species is so widespread that "approximately 521 of the 1082 species in the United States currently designated as threatened or endangered are found in only one state." *Id.*

[21] *See* Paul Boudreaux, *Understanding Take in the Endangered Species Act*, 34 ARIZ. ST. L.J. 733, 762 (2002) (noting the law's shortcoming in providing concrete standards for the burden of proof.) "Which standard should apply in ESA take cases? Remarkably, there has been little analysis of this essential variable in the cases, and little attention paid to the standard of proof

The reasons for the arrested development of section 9 jurisprudence are numerous. Politics certainly has something to do with it. There are, however, fundamental tensions between section 9 and the rest of the ESA, which cannot be separated from its language and history.

First, the ESA, as a whole, is about the conservation of species—in other words, the recovery of populations that interbreed and persist over time.[22] Section 9, on the other hand, prohibits injuring individual species members. These are two different things. While there is certainly a relationship between protecting species members and protecting species as a whole, the nature of that relationship is anything but straightforward. It varies dramatically from species to species. Perhaps, just as significantly, section 9's emphasis on protection of individuals invites lawyers, versed in tort concepts, to apply those concepts in ways completely unrelated to furthering the purpose of the ESA.

Second, the take prohibition in section 9 is a straightforward prohibition set among other substantive provisions which delegate initial decision making to a federal agency. Applying the take prohibition, a federal court may determine whether or not a defendant has injured a protected species member by taking evidence and making a finding of fact. For every other significant provision of the Act—the section 7 jeopardy prohibition, the listing and critical habitat designation in section 4, and the issuance of incidental take statements or permits under section 7(b)(4) or 10(a)—a federal agency must make the initial factual determination. In lawsuits brought for violation of those provisions, courts play only their traditional "administrative law" role—reviewing the adequacy of the agencies' decision making. This bias toward administrative law in the statute creates a bias toward administrative law in ESA practice, even with section 9 claims. Lawyers present administrative findings and administrative law arguments and courts rely on administrative findings in making their decisions. Because most of these findings are not informed by the goal of the ESA, they can broaden the gap between section 9 and the purpose of the Act.

To fashion an effective jurisprudence for the section 9 take prohibition, courts must honestly consider both the evidence of past and probable future injury to individual species members and the effect of that injury on the prospects of the population and species of which that member is a part. We

---

issue in scholarly analysis." *Id.*

[22] The biological definition of "species" is fairly broad. Generally, it is defined as "*a population of organisms whose members are able to interbreed freely under natural circumstances.*" SYLVIA A. EARLE, SEA CHANGE: A MESSAGE OF THE OCEANS 202 (1995). *See also* EDWARD O. WILSON, THE DIVERSITY OF LIFE 38 (1992) (using the same definition). Congress has defined the word in terms of "species," "subspecies," and "distinct population segments." For example, the Wild Bird Conservation Act defines species as "any species, any subspecies, or any distinct population segment of a species or subspecies, and includes hybrids of any species or subspecies." 16 U.S.C. § 4903(7)(A)–(B) (2000). Under the Endangered Species Act, "species" includes "any subspecies of fish or wildlife or plants, and any distinct population segment of any species of vertebrate fish or wildlife which interbreeds when mature." 16 U.S.C. § 1532(16) (2000).

can never forget the prohibition against injury to individuals exists as an instrument to achieve the statute's goal of species conservation.

## II. INDIVIDUALS AND POPULATIONS

The purpose of the ESA is relatively clear: to "conserve" endangered and threatened species. Congress enacted the ESA to "provide for the conservation, protection, restoration, and propagation of *species* of fish, wildlife, and plants facing extinction."[23] In support of the Act, President Richard M. Nixon declared, "Nothing is more priceless and more worthy of preservation than the rich array of animal life with which our country has been blessed."[24] The fate of species *as a whole* and the factors that govern their fate drive application of almost every provision of the ESA.

Most prominent among the factors governing the fate of species as a whole is habitat. The ESA lists five factors that are considered in determining whether a species[25] should be listed as threatened or endangered:

(A) the present or threatened destruction, modification, or curtailment of its *habitat or range*;
(B) overutilization for commercial, recreational, scientific, or educational purposes;
(C) disease or predation;
(D) the inadequacy of existing regulatory mechanisms; or
(E) other natural or manmade factors affecting its continued existence.[26]

The Act lists adequate habitat as the first factor the agency should consider in listing or delisting. Habitat is generally an essential factor in both species survival and recovery. Congress recognized the importance of habitat under the ESA through the designation of critical habitat for recovery,[27] recovery plans that require protection of habitat,[28] protection of critical habitat from "adverse modification,"[29] and habitat conservation

---

[23] S. REP. NO. 93-307, at 1 (1973), *reprinted in* 1973 U.S.C.C.A.N. 2989 (emphasis added).

[24] President Nixon's Statement on Signing the Endangered Species Act of 1973, 374 PUB. PAPERS 1027, 1027–28 (Dec. 28, 1973).

[25] "Species" is defined in terms of "populations" and is restricted to vertebrates, which limits the species, subspecies, or variety of flora or fauna that can be listed under the Act. 16 U.S.C. § 1532(16) (2000).

[26] *Id.* at § 1533(a)(1)(A)–(E) (emphasis added).

[27] Sierra Club v. United States Fish & Wildlife Serv., 245 F.3d 434, 445 (5th Cir. 2001) (holding that critical habitat outside of area currently occupied by species should be set aside for species' survival and recovery).

[28] 16 U.S.C. § 1533(f) (2000). As of February 29, 2004, 1,816 plant and animal species are listed as threatened or endangered, and 1,018 species have approved recovery plans. U.S. FISH & WILDLIFE SERV., SUMMARY OF LISTED SPECIES: SPECIES AND RECOVERY PLANS AS OF 2/29/2004, *at* http://ecos.fws.gov/tess_public/TESSBoxscore?format=display&type=archive&sysdate=2/29/2004.

[29] 16 U.S.C. §1536(a)(2) (2000).

plans.[30] Again and again, the Act recognizes that habitat conservation is necessary for the survival and recovery of species.

The language of the section 9 take prohibition, in what appears to be stark contrast to the rest of the law, focuses on injury to individual species members. The provision prohibits "take." The words in the definition of take—harass, harm, pursue, hunt, shoot, wound, kill, trap, capture, or collect—all describe action generally done to individuals. The potentially broader term "harm" has been defined to include only actions that "actually . . . injures" wildlife.[31] Injury to species and populations plays no explicit role. Indeed, Justice Scalia's dissent in *Sweet Home* argued strenuously that FWS's definition of "harm" did prohibit injury to populations and, therefore, was invalid.[32]

The roots of the linguistic contrast between section 9 and the ESA as a whole are no mystery. The ESA represents the confluence of two distinct bodies of federal law: federal environmental law and federal wildlife law. Both are relative newcomers to the ancient body of wildlife law.[33]

The evolution of federal wildlife law began with the Lacey Act of 1900.[34] It continued with the Migratory Bird Treaty Act of 1918,[35] the Bald and Golden Eagle Protection Act[36] and a bewildering variety of additions and amendments. Generally, these federal wildlife laws were not directly concerned with the protection and recovery of species. They evolved around clear prohibitions—against take and commerce—and were enforceable primarily, often exclusively, by the federal government.[37] The case law that

---

[30] *Id.* § 1539. *See* Nat'l Wildlife Fed'n v. Babbitt, 128 F. Supp. 2d 1274, 1300 (E.D. Cal. 2000) (noting that the ESA requires consideration of the "best scientific and commercial data available" in determining the validity of a habitat conservation plan.).

[31] 50 C.F.R. § 17.3 (2004).

[32] Justice Scalia argued that the statutory construction of the ESA does not accord with injury to a species' populations, but rather the Act is limited to injury of an individual species member. He argued that "harm" in the definition of "take" has no legal force of its own as "'harm' is merely one of 10 prohibitory words in § 1532(19), and the other 9 fit the ordinary meaning of 'take' perfectly." *Sweet Home*, 515 U.S. 687, 729 (1995) (Scalia, J., dissenting). Justice Scalia considered "take" within the meaning of the Act to comport with traditional notions of "take" in federal wildlife law. *Id.* at 717 (Scalia, J., dissenting). Finally, Justice Scalia specifically rejected the argument for evaluating FWS's regulation against the purpose of the Act: "I thought we had renounced the vice of 'simplistically . . . assum[ing] that *whatever* furthers the statue's primary objective must be the law.'" *Id.* at 726 (Scalia, J., dissenting) (quoting Rodriguez v. United States, 480 U.S. 522, 526 (1987)). "'The Act must do everything necessary to achieve its broad purpose' is the slogan of the enthusiast, not the analytical tool of the arbiter." *Id.* (Scalia, J., dissenting).

[33] Thomas Lund, *Nineteenth Century Wildlife Law: A Case Study of Elite Influence*, 33 ARIZ. ST. L.J. 935, 940 (2001); Dale D. Goble and Eric T. Freyfogle, *Wildlife Law: A Coming of Age*, 33 Envtl. L. Rep. (Envtl. L. Inst.) 10,132, 10,132 (2003); Dean Lueck, *The Economic Nature of Wildlife Law*, 18 J. LEGAL STUD. 291, 292–99 (1989); Dean Lueck, *Property Rights and the Economic Logic of Wildlife Institutions*, 35 NAT. RESOURCES J. 625, 651 (1995).

[34] 16 U.S.C. § 701 (2000).

[35] 16 U.S.C. §§ 703–712 (2000).

[36] 16 U.S.C. §§ 668–668d (2000).

[37] There is, however, another series of federal wildlife laws dealing with habitat acquisition. Federal Aid in Wildlife Restoration Act ("Pittman-Robertson Act"), 16 U.S.C. §§ 669–669i (2000) (providing federal aid to states for the management and restoration of wildlife); Federal Aid in

has developed has involved numerous criminal prosecutions.[38] Because the prohibitions are established by statute—occasionally clarified by regulation—civil cases and injunctions are relatively rare.

The evolution of federal environmental law began in the 1960s and exploded between 1969 with the enactment of the National Environmental Policy Act of 1969 (NEPA)[39] and 1980 with the passage of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA).[40] While federal environmental law involves extensive, specific prohibitions on the conduct of individuals, states, and federal agencies, the case law that has grown around it has focused almost exclusively on the numerous agency determinations required to give focus and force to those prohibitions. Unlike federal wildlife law, federal environmental law specifically authorizes citizen litigation with citizen suit provisions which augment or supplant the provisions of the Administrative Procedure Act.[41] The focus on citizen litigation and agency determination

Sport Fish Restoration Act ("Dingell-Johnson Act"), 16 U.S.C. §§ 777–777l (2000) (providing financial assistance for state fish restoration and management projects); Land and Water Conservation Fund Act of 1965, 16 U.S.C. §§ 4601-4 to 4601-11 (2000) (establishing a fund that subsidizes state and federal land acquisitions and waters for recreational and conservation purposes); Fish and Wildlife Conservation Act of 1980, 16 U.S.C. §§ 2901–2911 (2000) (authorizing financial and technical assistance to states for development, revision, and implementation of conservation programs for nongame fish and wildlife); Migratory Bird Hunting and Conservation Stamp Act ("Duck Stamp Act"), 16 U.S.C. §§ 718–718j (2000) (requiring waterfowl hunters 16 years of age and older to purchase a federal hunting stamp, the revenue from which is deposited into the Migratory Bird Conservation Fund).

[38] *See* United States v. Reese, 27 F. Supp. 833, 836 (W.D. Tenn. 1939) (convicting defendants of baiting and killing mourning doves (*Zenaida macoura*) in violation of the Migratory Bird Treaty Act); Cochrane v. United States, 92 F.2d 623, 624 (7th Cir. 1937) (affirming conviction for baiting and hunting wild ducks in violation of the Migratory Bird Treaty Act); United States v. Tarmon, 227 F. Supp. 480, 482 (D. Md. 1964) (convicting defendants for baiting and hunting wild geese in violation of the Migratory Bird Treaty Act); United States v. Chandler 753 F.2d 360, 361 (4th Cir. 1985) (affirming convictions for baiting and hunting wild ducks in violation of the Migratory Bird Treaty Act); United States v. Sohappy, 770 F.2d 816, 825 (9th Cir. 1985) (affirming convictions for catching, transporting, and selling fish in violation of the Lacey Act.); United States v. Lundquist, 932 F. Supp. 1237, 1239 (D. Or. 1996) (convicting defendant of possession of eagle feathers in violation of Bald and Golden Eagle Protection Act).

[39] 42 U.S.C. §§ 4321–4370e (2000).

[40] 42 U.S.C. §§ 9601–9675 (2000).

Two lessons can be drawn from this law explosion. The most serious one is that this tremendous growth in environmental law has coincided with the decline and collapse of ecological systems. The challenge today is not the invention of environmental law but the discovery and application of effective environmental law. One reason that law is placed upon law that is folded over other law that is undergirded by additional law is that earlier efforts to reform agencies, revise business behavior, and rechannel human energies have failed. The challenge for the current generation of environmental lawyers is to discover a version of working law that contributes to the fundamental human behavioral and institutional changes the topic recommends.

WILLIAM H. ROGERS, JR., ENVIRONMENTAL LAW ix (2nd ed. 1994).

[41] Administrative Procedure Act, 5 U.S.C. §§ 551–559, 701–706, 1305, 3105, 3344, 4301, 5335, 5372, 7521 (2000). Several federal environmental law statutes contain "citizen suit" provisions. *See, e.g.,* Endangered Species Act of 1973, 16 U.S.C. § 1540(g) (2000); Federal Water Pollution Control Act, 33 U.S.C. § 1365(a) (2000); Resource Conservation and Recovery Act, 42 U.S.C.

shifts the balance from criminal to civil law and dramatically increases the importance of injunction as a remedy.

The ESA includes elements drawn from both legal traditions. The Act contains a well-developed citizen suit provision,[42] beneficiary of prototypes established in the Clear Air Act of 1970[43] and Clean Water Act of 1972.[44] It imposes specific decision-making obligations on expert agencies and more general obligations on the decision making of other federal agencies. While government criminal prosecutions under the ESA are as frequent as FWS's limited resources will allow, the bulk of the case law—largely initiated by citizens' groups—considers civil violation. Injunction is the preferred remedy.

Congress drew most, if not all, of the language of the section 9 take prohibition directly from the wildlife law tradition.[45] The word "Secretary," so prominent in the other significant provisions of the law, makes only marginal appearances in section 9 as the promulgator of regulations and receiver of reports. Therefore, it is no surprise that the language of section 9 focuses on harm to individual species members.

---

§ 6972 (2000); Noise Control Act, 42 U.S.C. § 4911 (2000); Marine Protection Research and Sanctuaries Act of 1972, 33 U.S.C. § 1415(g) (2000); Deepwater Port Act, 33 U.S.C. § 1515 (2000); Toxic Substances Control Act, 15 U.S.C. § 2619 (2000); Safe Drinking Water Act, 42 U.S.C. § 300(j)(8) (2000); Surface Mining Control and Reclamation Act, 30 U.S.C. § 1270 (2000); Outer Continental Shelf Lands Act, 43 U.S.C. § 1349(a) (2000).

   42  16 U.S.C. § 1540(g) (2000).

   43  42 U.S.C. §§ 7401–7671(q) (2000).

   44  Federal Water Pollution Control Act, 33 U.S.C. §§ 1251–1387 (2000).

   45  A variety of other federal laws, notably the Migratory Bird Treaty Act of 1918, 16 U.S.C. §§ 703–712 (2000), the Bald Eagle Protection Act of 1940, 16 U.S.C. §§ 668–668d (2000), and the Marine Mammal Protection Act of 1972, 16 U.S.C. §§ 1361–1421(h) (2000), prohibit take of various members of various species. However, their scope is much more limited than the scope of the section 9 take prohibition because they apply only to specific species and probably do not protect species members from take caused by habitat destruction. *See also* Wild Free-roaming Horses and Burros Act of 1971, 16 U.S.C. §§ 1331–1340 (2000) (prohibiting destruction of wild free-roaming horses that wander onto private property.). The Migratory Bird Treaty Act of 1918 made it unlawful "to pursue, hunt, take, capture, kill, attempt to take, capture, or kill . . . any migratory bird" protected by a 1916 treaty between the United States and Great Britain (on behalf of Canada). 16 U.S.C. § 703 (2000). The term "take" is not defined in the Act. The Bald Eagle Protection Act of 1940 made it unlawful to "take" any bald eagle (*Haliaeetus leucocephalus*) anywhere subject to the jurisdiction of the United States except Alaska. 16 U.S.C. § 668 (2000). The term "take" was defined as to "pursue, shoot, shoot at, poison, wound, kill, capture, trap, collect, or molest or disturb." *Id.* § 668c. The Marine Mammal Protection Act of 1972, in many ways the direct antecedent of the Endangered Species Act of 1973, makes it unlawful "to take any marine mammal in waters or on lands under the jurisdiction of the United States[.]" 16 U.S.C.          § 1372(a)(2)(A) (2000). "Take" is defined as "to harass, hunt, capture, or kill, or attempt to harass, hunt, capture, or kill any marine mammal." *Id.* § 1362(13). This definition of "take" is not quite as extensive as the definition included in the Endangered Species Act of 1973 (it did not include the terms "harm," "pursue," "shoot," "wound," "trap," or "collect") but it certainly gets the idea across. However, the Marine Mammal Protection Act of 1972 only applies to a very limited number of species. For a more extensive discussion of the evolution of "take," see Michael E. Field, *The Evolution of the Wildlife Taking Concept from its Beginning to its Culmination in the Endangered Species Act*, 21 HOUS. L. REV. 457, 468–74 (1984).

If courts applied the language of section 9 mechanically, without reference to the purpose of the statute of which it is part, they could conceivably hold that the death of a single animal constituted a violation of the statute while the destruction of a continent of habitat—without injuring an individual—did not. They could enjoin an action to capture an individual bird, but declare themselves helpless to stop an action that would drive a species to extinction in a few generations through the reduction of essential migratory paths.[46]

Fortunately, courts have regularly been able to see beyond section 9's focus on the individual and to place the language of section 9 in its statutory context. Injury to an individual remains, justly, the focus of criminal prosecutions.[47] However, in cases in which either the government or, more often, citizen groups seek injunctions against future conduct—most commonly indirect harm through habitat destruction—the actual focus of the judicial inquiry shifts from injury of individual species members to conservation of the entire species or species populations.

Unfortunately, as we shall see, the individual-oriented language in section 9 has prevented courts from clearly articulating how they take the broader goals of the ESA into account in making their decisions. This has stunted the growth of section 9 jurisprudence.

The tension between the language of section 9 and the rest of the ESA has been evident since the formative years of the ESA jurisprudence. Section 9, however, did not begin to develop a discrete line of case law until after the Supreme Court's landmark decision in *Tennessee Valley Authority v. Hill* (*TVA v. Hill*)[48] in 1978.

The palila (*Loxioides bailleui*) is a finch-billed member of the Hawaiian honeycreeper family of birds.[49] The palila was listed as an endangered species in 1967.[50] The only remaining population of the bird lives in the limited remaining mamane-naio (*Myoporum sandwicense*) forest (from

---

[46] This is essentially what the United States Court of Appeals for the District of Columbia Circuit advocated in the opinion overruled in *Sweet Home*. Sweet Home Chapter of Cmtys. for a Great Or. v. Babbitt, 17 F.3d 1463, 1465 (D.C. Cir. 1994). The Circuit Court held that the structure of the Act placed the burden of habitat conservation on the government, not private parties. *Id.* at 1466. The court relied on the maxim *noscitur a sociis* (a word is known by the company it keeps) to conclude that "the nine verbs accompanying 'harm' all involve a substantially direct application of force, which the [FWS's] concept of forbidden habitat modification altogether lacks." *Id.* at 1465.

[47] *See* United States v. McKittrick, 142 F.3d 1170, 1178 (1998) (affirming conviction for "taking, possessing, and transporting a gray wolf in violation of the ESA and the Lacey Act"); United States v. Billie, 667 F. Supp. 1485, 1497 (S.D. Fla. 1987) (holding that taking a Florida panther (*Felis concolor coryi*) was a general intent crime); United States v. St. Onge, 676 F. Supp. 1044, 1045 (D. Mont. 1988) (concluding that illegally taking a grizzly bear (*Ursus arctos horribilis*) was not a specific intent crime).

[48] 437 U.S. 153 (1978). *See also* Federico Cheever, *An Introduction to the Prohibition Against Takings in Section 9 of the Endangered Species Act of 1973: Learning to Live With a Powerful Species Preservation Law*, 62 U. COLO. L. REV. 109, 143–62 (1991) (discussing case law development after 1978).

[49] Palila v. Haw. Dep't of Land & Natural Res., 471 F. Supp. 985, 988 (D. Haw. 1979).

[50] Native Fish and Wildlife Endangered Species, 32 Fed. Reg. 4001 (Mar. 11, 1967).

approximately 6,400 feet to treeline at approximately 9,500 feet)[51] on the slopes of Mauna Kea on the island of Hawaii.[52] The palila depends on the mamane forest for food, shelter, and nest sites.[53] In 1979—six years after the passage of the ESA and one year after *TVA v. Hill*—the palila shared its habitat with, among other creatures, populations of feral sheep and goats maintained by the Hawaii Department of Land and Natural Resources for sport hunting.[54] The feral sheep and goats also used the mamane forest for food.[55] Their browsing on the seedlings and shoots of the mamane trees prevented the shoots and seedlings from growing into mature trees, thereby degrading the habitat on which the palila depended.[56] National and local conservation groups, one individual, and the palila (a species)[57] sued to force the Hawaii Department of Land and Natural Resources to remove the feral sheep and goats from the palila's habitat.

The plaintiffs argued that the Department's maintenance of the feral sheep and goats in palila habitat constituted a take in violation of section 9 of the ESA.[58] In June 1979, the United States District Court for the District of Hawaii ruled on the plaintiffs' motion for summary judgment and held that the defendants had violated section 9 by maintaining feral sheep and goats in the habitat of the palila, despite the fact that the plaintiffs had not established that the palila population was declining.[59] The court's ruling was based largely on analysis of harm to the palila submitted by members of the Palila Recovery Team—independent scientists appointed by FWS.[60] In February, 1981, the Ninth Circuit Court of Appeals affirmed.[61]

In December 1985, the palila once again "wing[ed] its way into the federal court as a plaintiff in its own right."[62] While the feral sheep and goats that had been eating its critical habitat in 1979 had been removed, other sheep—mouflon sheep (*Ovis musimon*)—were still doing the same thing. After new information about the detrimental effects of the mouflon sheep became available, the plaintiffs amended their complaint and sued to have the mouflon sheep removed from palila habitat.[63] On November 18, 1986, after a hearing and expert testimony concerning the effects of the mouflon

---

51 *Palila*, 471 F. Supp. at 988.

52 *Id.*

53 *Id.* at 989.

54 *Id.*

55 *Id.* at 990.

56 *Id.*

57 "Plaintiff Palila . . . a member of the Hawaiian Honeycreeper family, is an endangered endemic Hawaiian bird more particularly described in Paragraphs 12 through 15 below. Plaintiff Palila has no voice of its own, and it therefore brings this action by its next friends, plaintiffs Sierra Club, National Audubon Society, Hawaii Audubon Society, and Alan C. Ziegler." Complaint for Declaratory and Injunctive Relief at 2, Palila v. Hawaii Dep't of Land & Nat. Res., 471 F. Supp. 985 (D. Haw. 1979) (No. 78-0030), *aff'd*, 639 F.2d 495 (9th Cir. 1981).

58 *Id.* at 987.

59 *Id.* at 999.

60 *Id.* at 988–91.

61 Palila v. Haw. Dep't of Land & Nat. Res., 639 F.2d 495, 495 (9th Cir. 1981).

62 Palila v. Haw. Dep't of Land & Nat. Res., 852 F.2d 1106, 1107 (9th Cir. 1988).

63 Palila v. Haw. Dep't of Land & Nat. Res., 631 F. Supp. 787, 788 (D. Haw. 1985).

sheep on palila habitat, the court rendered what was, until 1995, probably the single most important opinion in section 9 law.

The 1986 *Palila v. Hawaii Department of Land & Natural Resources* (*Palila*) district court opinion reconfirmed that there was a cause of action under section 9 based on the destruction of the habitat of an endangered species.[64] Further, it established explicitly that the cause of action did not require evidence of the actual death of members of the species or even evidence of population decline.[65] The Mauna Kea mouflon were maintained by the Hawaii Department of Land and Natural Resources for sport hunting; like the feral sheep and goats that were the subject of the earlier litigation, the mouflon ate the shoots and sprouts of the mamane tree.[66] While the palila's population had been dangerously low in 1979—at the time of the first litigation—by 1985, its population had stabilized or made a slight comeback.[67] The court interpreted FWS's 1981 definition of the term "harm" as used in the definition of "take."[68] It found that the definition prohibited activities that "significantly modify or degrade the habitat, resulting in actual injury to the wildlife species."[69] The court stated that the prohibition "would include activities that significantly impair essential behavioral patterns to the extent that there is an actual negative impact or injury to the endangered species, threatening its continued existence or recovery."[70]

The defendants had argued that the mouflon sheep did not "harm" the palila because the young mamane shoots which they ate were not of any immediate use to the palila.[71] However, the defendants admitted that mouflon sheep were "degrading the mamane forest" and "suppressing the forest's regeneration."[72] Because the palila is completely dependent on the mature mamane forest for its existence, the damage the mouflon sheep were causing might have had dire long-term consequences for the palila. The shoots eaten by the mouflon sheep would never grow into the mature mamane trees the palila required to survive. The court found that the prospect of these long-term consequences was "harm" and therefore a take in violation of section 9.[73] Moreover, the court found that maintenance of the mouflon sheep would be "harm" and, therefore, a take even if it did no more than prevent the recovery of the palila.

A finding of "harm" does not require death to individual members of the species; nor does it require a finding that habitat degradation is presently driving the species further toward extinction. Habitat destruction that prevents the recovery of the species by affecting essential behavioral patterns causes

---

[64] Palila v. Haw. Dep't of Land & Nat. Res., 649 F. Supp. 1070, 1075, 1077 (D. Haw. 1986).

[65] *Id.* at 1077.

[66] *Id.* at 1078–80.

[67] *Id.* at 1073.

[68] *Id.* at 1075.

[69] *Id.*

[70] *Id.*

[71] *Id.*

[72] *Id.*

[73] *See id.* (rejecting argument that "any effect the mouflon has on mamane and indirectly on palila is only a 'potential' injury").

actual injury to the species and effects a taking under section 9 of the [Endangered Species] Act.[74]

The court ordered the Hawaii Department of Land and Natural Resources to remove all the mouflon sheep from the critical habitat of the palila.[75] In July 1988, in a brief opinion, the Ninth Circuit Court of Appeals affirmed.[76]

The palila cases were section 9 take cases. The section 7 jeopardy prohibition did not apply because the plaintiffs did not allege that the action in question was "funded, authorized or carried out by" the federal government.[77] Applying the language of section 9 mechanically, the holdings in the palila cases make little sense. The courts repeatedly failed to mention any evidence of dead individual birds. In fact, the courts seemed completely uninterested in the issue of whether individual birds had been taken. In the mouflon sheep cases, at least, individual bird mortality could not be presumed from aggregate population data. The actual number of birds was either stable or improving.[78]

On the other hand, in terms of the purpose of the ESA—conservation of species—the court did the right thing. Continued degradation of the mamane forest by feral sheep, feral goats, and mouflon sheep was a significant threat to the recovery and, perhaps, survival of the palila. Conservation of species requires stable habitat in the long term.

The district court may have been correct and it may have been courageous, but it was not entirely forthright. In the sentence, "habitat destruction that prevents the recovery of the species by affecting essential behavioral patterns causes actual injury to the species and effects a taking under section 9,"[79] the court makes it appear that the take prohibition always applies to species as a whole. Along similar lines, the court declared "I understand [section 9] to prohibit activities that significantly modify or degrade the habitat, resulting in actual injury to the wildlife *species*."[80] The court simply overlooked the individual injury focus of the section 9 take prohibition. Whether this oversight was intentional is not important, but it is hard to imagine the court believed that Congress intended words like "kill" and "capture" in the statutory definition of take applied primarily to entire species.

In *National Wildlife Federation v. Burlington Northern Railroad* (*Burlington Northern Railroad*),[81] the National Wildlife Federation (NWF) sought a preliminary injunction against the railroad company under the ESA.[82] NWF claimed that Burlington Northern (BN) violated section 9 by

---

[74] *Id.*

[75] *Id.* at 1082–83.

[76] Palila v. Haw. Dep't of Land & Natural Res., 852 F.2d 1106, 1110–11 (9th Cir. 1988).

[77] 16 U.S.C. § 1536(a)(2) (2000).

[78] *Palila*, 649 F. Supp. at 1073.

[79] *Id.* at 1075.

[80] *Id.* (emphasis added).

[81] 23 F.3d 1508 (9th Cir. 1994).

[82] *Id.* at 1509.

"modifying grizzly bear [(*Ursus arctos horribilis*)] feeding behavior through a series of accidental corn spills along BN tracks in northwestern Montana."[83] Three BN trains carrying grain derailed near Glacier National Park during the winter of 1988–1989, spilling nearly 10,000 tons of corn.[84] BN trains struck and killed seven grizzly bears attracted to the food supply at the spill sites, which were located along a four-mile stretch.[85]

The district court found that the killing of seven grizzly bears constituted a take under section 9, but declined to provide injunctive relief for NWF, because NWF failed "to establish 'the possibility' of irreparable injury as a result of the BN's past violation of the ESA."[86] The plaintiffs sought injunctive relief to get BN "to (1) reduce its operating speed around the derailment sites from 25 mph to 15 mph; (2) conduct a feasibility study to determine the possibility of equipping train locomotives with air bags or other bear protective devices; and (3) obtain a permit from the Secretary of Interior authorizing the incidental taking of grizzly bears."[87] The district court declined to issue the injunction and held that the likelihood of future harm had decreased since BN had replaced two affected portions of the track and made improvements to the track design.[88]

On appeal, the Ninth Circuit Court of Appeals considered whether NWF was entitled to injunctive relief for potential future harm to the grizzly bears. The court held that the plaintiffs could establish "harm" if they could "prove that the habitat degradation prevents, or possibly, retards, recovery of the species."[89] The court noted that the ESA does not require a threat of extinction before an injunction may issue because it "would be contrary to the spirit of the statute, whose goal of preserving threatened and endangered species can also be achieved through incremental steps."[90] Despite undisputed past bear mortality and the court's observation that "the operation of a modern railroad in bear country produces some risk to the dwindling population of grizzly bears in the region through which the railroad operates[,]"[91] the court relied on BN's cleanup of the grain spill site and three years without bear mortality.[92]

Although denying the plaintiffs' request for injunction, the court again transcended the individual injury orientation of section 9 and drew its authority from the broader purpose of the ESA. The individual harm case was less than ironclad. Given that BN had "taken" grizzly bears in the past, evidence of direct harm to an individual species member was present, and thus, a tort-style causation analysis would have been proper if the conditions causing the take remained unchanged. BN, however, had upgraded the track

---

[83] *Id.*
[84] *Id.* at 1510.
[85] *Id.*
[86] *Id.*
[87] *Id.*
[88] *Id.*
[89] *Id.* at 1513.
[90] *Id.* at 1512 n.8.
[91] *Id.* at 1511.
[92] *Id.* at 1512.

to decrease the possibility of future derailment. No bears had died in three years. Thus, the court looked to the likelihood of future harm under a new set of conditions.

Significantly for our purposes, the defendants used expert agency opinion effectively to argue that the bear mortality, no matter how real, was insignificant in a larger context. The court noted the finding of independent experts who believed that "the spills had not caused a significant impact on the grizzly bear habitat in the Northern Continental Divide Grizzly Bear Ecosystem"[93] as "the impacts of the corn spill were of a 'localized nature' and 'cannot be characterized as significant.'"[94] This context apparently made it easier for the court to discount the undisputed evidence of individualized harm—seven dead bears. Like the *Palila* district court, it circumvented the statutory emphasis on individual harm to make a determination it believed to be consistent with the goal of the ESA.

In *Marbled Murrelet v. Pacific Lumber Co.*,[95] an environmental group brought action under the ESA against the logging company, seeking to enjoin implementation of a timber harvest plan. After an eight-day bench trial and a lengthy fact-specific opinion, the district court found that the marbled murrelet (*Brachyrampus marmoratus marmoratus*) did, in fact, occupy the proposed timber harvest area, and that Pacific Lumber's implementation of a timber harvest plan would sufficiently "harm" and "harass" the marbled murrelet to constitute a take of the species in violation of the ESA.[96] The court held that *a reasonably certain threat of imminent harm* to a protected species was sufficient for issuance of an injunction under the ESA.[97] The court permanently enjoined Pacific Lumber from implementing the timber harvest plan.[98]

The court based its decision on the specific facts supporting its finding. The court made reference to the traditional "preponderance of the evidence" standard of review, but did not provide much analysis about what that meant.[99] The court held that the environmental group demonstrated that Pacific Lumber's implementation of the timber harvest plan would sufficiently harm and harass the marbled murrelet to constitute a take of the species in violation of section 9.[100]

In *Marbled Murrelet*, the court made a detailed, fact-based decision to satisfy the individual injury orientation of the section 9 take prohibition. The court, however, also took the time to place its ruling in context regarding the Act as a whole. The court noted the significance of the sort of harm at issue for the long-term survival of the species:

---

[93] *Id.* at 1511.

[94] *Id.* (quoting Keith Aune, a grizzly bear expert with the Montana Department of Fish, Wildlife and Parks).

[95] 880 F. Supp 1343 (N.D. Cal. 1995).

[96] *Id.* at 1367–68.

[97] *Id.* at 1367.

[98] *Id.* at 1368.

[99] *Id.* at 1367.

[100] *Id.* at 1368.

> The existing population of the marbled murrelet in the Pacific Northwest is known to be declining rapidly. . . . The two primary reasons for this decline are the bird's very low annual reproductive potential (1 chick per successful breeding pair), which is exacerbated by nest failure due to predation, and the loss of the vast majority of the marbled murrelet's old-growth nesting habitat.[101]

Logging would not only take birds, it would reduce old-growth habitat and the prospects for the species survival and recovery.

In *Forest Conservation Council v. Rosboro Lumber Co. (Rosboro)*,[102] Forest Conservation Council (FCC) filed a citizen suit under the ESA seeking an injunction to prevent proposed logging in the habitat of a pair of northern spotted owls (*Strix occidentalis caurina*). FCC lost the case on summary judgment in the district court.[103] The issue on appeal was the scope of the term "harm." Appellee Rosboro Lumber contended "that 'harm' only includes actions that constitute a past or current injury to an endangered or threatened species, or actions that threaten such species with extinction."[104] FCC argued "that 'harm' includes actions that pose an *imminent threat* of injury to a protected species, including habitat modifications that retard the recovery of such species."[105] The court concluded that "[s]o long as some injury to wildlife occurs, either in the past, present, or future, the injury requirement of the Secretary's new definition would be satisfied,"[106] and thus, a showing of an imminent threat of injury to wildlife is within the scope of "harm."[107]

The court held that habitat modification that is reasonably certain to injure an endangered species by impairing its essential behavior patterns satisfied the actual injury requirement and was sufficient to justify a permanent injunction.[108] The court buttressed its holding with rhetoric based on the individual injury orientation of section 9:

> Once a member of an endangered species has been injured, the task of preserving that species becomes all the more difficult. As the Supreme Court noted, "[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*, irreparable." . . . FCC aptly argues that forcing it to wait until after harm has been inflicted would render their claims moot before they become ripe.[109]

At the same time, like courts before it, the *Rosboro* court looked beyond the individualized harm to shape its decision to grant an injunction.

---

[101] *Id.* at 1347.
[102] 50 F.3d 781 (9th Cir. 1995).
[103] *Id.* at 782.
[104] *Id.* at 783.
[105] *Id.* at 783–84 (emphasis added).
[106] *Id.* at 784.
[107] *Id.*
[108] *Id.* at 787.
[109] *Id.* at 785 (internal citation omitted).

Citing "Congress' [sic] overriding purpose in enacting the ESA,"[110] the court found "[t]he district court's conclusion that the ESA forecloses citizen-suit claims of an imminent threat of harm to protected wildlife . . . contrary to the letter and spirit of the statute's purpose—to *conserve* endangered species."[111]

The take prohibition in section 9 of the ESA made its one and only trip to the United States Supreme Court in 1995.[112] Although significant, the opinions the Court offered fail to resolve the conflict between the individualized injury focus of section 9 and the species conservation focus of the Act as a whole. In *Sweet Home*, the plaintiffs, who were allegedly dependent on the forest product industry, challenged FWS's regulatory definition of "harm" in the definition of "take."[113] This was the same regulation central in the palila cases discussed above. There were no facts. The only issue was whether the Secretary exceeded his authority under the ESA by promulgating the regulation.[114]

The majority opinion gave three reasons why the Secretary's interpretation of the word "harm" was reasonable: 1) the "ordinary understanding of the word 'harm' supports it,"[115] 2) "the broad purpose of the ESA,"[116] and 3) "the provision in the Act's 1982 amendments for issuance of permits for takings that § 9(a)(1)(B) would otherwise prohibit, which contemplate takings through habitat destruction."[117]

The more troublesome issues of what might constitute proof of a violation of the regulation were only addressed by Justice O'Connor's concurrence and Justice Scalia's dissent. Justice O'Connor's concurrence focused, at least initially, on harm to individual species members.[118] She employed tort concepts in considering what might constitute a take under section 9.[119] Justice O'Connor urged that a "proximate cause" analysis should be employed in determining whether a proposed activity that destroys habitat of threatened or endangered species is too attenuated for a court to find a take.[120] She declared there was "no indication that Congress, in enacting [section 9], intended to dispense with ordinary principles of proximate causation."[121] O'Connor argued that the word "actually" in the FWS's regulation "invokes principles of proximate causation."[122] O'Connor further concluded that the Ninth Circuit wrongly decided the appeal of the second round of palila cases because the "[d]estruction of the seedlings did

---

[110] *Id.*

[111] *Id.*

[112] *Sweet Home,* 515 U.S. 687 (1995).

[113] *Id.* at 692.

[114] *Id.*

[115] *Id.* at 697.

[116] *Id.* at 698.

[117] *Id.* at 700. "[Section] 10(a)(1)(B) strongly suggests that Congress understood § 9 to prohibit indirect as well as deliberate takings." *Id.* at 688.

[118] *Id.* at 709 (O'Connor, J., concurring).

[119] *Id.* at 712 (O'Connor, J., concurring).

[120] *Id.* at 713 (O'Connor, J., concurring).

[121] *Id.* at 712 (O'Connor, J., concurring).

[122] *Id.* (O'Connor, J., concurring) (emphasis omitted).

not proximately cause actual death or injury to identifiable birds; it merely prevented the regeneration of forest land not currently sustaining *actual birds*."[123]

However, in a revealing exchange with Justice Scalia, Justice O'Connor came close to transcending the individualized harm standard:

> I do not find it as easy as Justice Scalia does to dismiss the notion that significant impairment of breeding injures living creatures. To raze the last remaining ground on which the piping plover [(*Charadrius melodus*)] currently breeds, thereby making it impossible for any piping plovers to reproduce, would obviously injure the population (causing the species' extinction in a generation).[124]

Justice O'Connor endeavored to shoe-horn her observation about breeding injury into an individualized harm model, asserting that "by completely preventing breeding, [the action] would also injure the individual living bird, in the same way that sterilizing the creature injures the individual living bird."[125] In return, Justice Scalia mocked:

> Justice O'Connor supposes that an "impairment of breeding" intrinsically injures an animal because "to make it impossible for an animal to reproduce is to impair its most essential physical functions and to render that animal, and its genetic material, biologically obsolete." . . . This imaginative construction does achieve the result of extending "impairment of breeding" to individual animals; but only at the expense of also expanding "injury" to include elements beyond *physical harm* to individual animals. For surely the only harm to the individual animal from impairment of that "essential function" is not the failure of issue (which harms only the issue), but the *psychic harm* of perceiving that it will leave this world with no issue (assuming, of course, that the animal in question, perhaps an endangered species of slug, is capable of such painful sentiments).[126]

Even if one accepts Justice O'Connor's model, there is a slippery slope problem. Extinction in one generation is the "obvious" case. How far does Justice O'Connor's logic lead her toward deemphasizing individual harm in favor of the conservation of the species? What if extinction would take place in five generations? What if extinction in five generations were merely a high probability?

Justice O'Connor delegated the business of actually applying some notion of proximate cause in section 9 cases to the lower courts.[127] She declared only that proximate cause "normally eliminates the bizarre,"[128] "inject[s] a foreseeability element,"[129] and "depends to a great extent on

---

123 *Id.* at 714 (O'Connor, J., concurring) (emphasis added).
124 *Id.* at 709–10 (O'Connor, J., concurring).
125 *Id.* at 710 (O'Connor, J., concurring).
126 *Id.* at 734 n.5 (Scalia, J., dissenting).
127 *Id.* at 713 (O'Connor, J., concurring).
128 *Id.* (O'Connor, J., concurring).
129 *Id.* (O'Connor, J., concurring).

considerations of the fairness of imposing liability for remote consequences."[130]

In truth, proximate cause is a malleable concept of doubtful utility in assessing what constitutes a take under section 9 of the ESA. The analytical tools scientists use to determine the significance of threats or potential threats to species have changed dramatically in the past thirty years.[131] Our knowledge and understanding of species and the critical role habitat plays is still developing.[132] Projects affecting habitat are evaluated on a case-by-case basis, and thus, each species and habitat have different characteristics and threats. What can a general notion of "proximate cause" mean under these circumstances?

If one were determined to apply tort concepts in the ESA context,[133] the only sound basis for applying a policy-oriented concept like proximate cause to the take prohibition would be through explicit consideration of the purpose of the ESA—the conservation of species. Any cause of an injury likely to have a significant effect on the long-term prospects of the species as

---

[130] *Id.* (O'Connor, J., concurring).

[131] One method of determining the rate of extinction is Population Viability Analysis (PVA)— the process of identifying the threats faced by a species and evaluating the likelihood that it will exist over a specific period of time. *See* WILSON, *supra* note 1, at 101. ("The likelihood that a threatened species will live or die depends on the size of its population, how widely they are dispersed and exchange individuals, how much they fluctuate through time, and the longevity and reproductive rate of the organisms composing them."). PVA is "still only a weak contributor to the study of whole faunas and floras," but it is "being improved rapidly by biologists and is certain to play a role in the future of conservation forecasts." *Id.* In 1963, E.O. Wilson and Robert MacArthur founded the island biodiversity theory, based on the understanding that large areas of habitat support more species than smaller isolated ones. *See* WILSON, *supra* note 22, at 220. The two men "noticed that faunas and floras of islands around the world show a consistent relation between the areas of the islands and the number of species living on them. The larger the area, the more species." *Id.*

[132] Our understanding of the natural world is extremely limited:

> In the realm of physical measurement, evolutionary biology is far behind the rest of the natural sciences. Certain numbers are crucial to our ordinary understanding of the universe. What is the mean diameter of the earth? It is 12,742 kilometers (7,913 miles). How many stars are there in the Milky Way, an ordinary spiral galaxy? Approximately $10^{11}$, 100 billion. How many genes are there in a small virus? There are 10 (in $\varphi$X174 phage). What is the mass of an electron? It is 9.1 x $10^{-28}$ grams. And how many species of organisms are there on Earth? We don't know, not even to the nearest order of magnitude.

WILSON, *supra* note 22, at 132.

[133] As Professor James Rasband noted regarding the application of proximate cause:

> It appears as though plaintiffs (whether FWS, NMFS, or a citizen) who seek to prove that habitat modification is or will be the proximate cause of harm must prove: 1) that the protected species occupies the habitat that will be modified; and 2) that the habitat modification will: a) cause bodily death or injury to individual member(s) of the occupying species; or b) prevent or make impossible (or perhaps just significantly hinder, if subsequent cases have not supplanted *Marbled Murrelet*) member(s) of the occupying species ability to feed, spawn, breed, or shelter.

James R. Rasband, *Priority, Probability, and Proximate Cause: Lessons from Tort Law About Imposing ESA Responsibility for Wildlife Harm on Water Users and Other Joint Habitat Modifiers*, 33 ENVTL. L. 595, 618 (2003).

a whole should be deemed proximate. Many causes that injure individual members of a species through attenuated causal chains, but have no significant effect on the species, could be considered outside the ambit of "proximate cause."

In *Loggerhead Turtle v. County Council of Volusia County, Florida* (*Loggerhead Turtle I*),[134] the court evaluated whether artificial beachfront lighting and driving motor vehicles upon the beach constituted a take of sea turtle hatchlings.[135] Volusia County had enacted "a lighting ordinance to regulate public street lights and artificial private lighting along the unincorporated beach areas and in the coastal town of Ponce Inlet."[136] The County's ordinance permitted motor vehicles on the beach from one hour before sunrise to one hour after sunrise.[137] The county also created a conservation zone in which vehicles were generally prohibited.[138]

The case did not turn on whether the lighting ordinance amounted to a take. Rather the question was the appropriate test for a preliminary injunction. The issue of causation arose in the context of issuing the injunction. The plaintiffs claimed that the permitted beach driving caused the death and injury of sea turtles, seeking a preliminary injunction to "prevent vehicular access to the County's beaches during turtle nesting season"[139] and to compel the County to enforce the "'Model Lighting Ordinance for Marine Sea Turtle Protection.'"[140]

The court, looking primarily to *Rosboro* and *Burlington Northern Railroad*, concluded that plaintiffs "seeking a preliminary injunction . . . must show: (1) that the wildlife at issue is protected under the [ESA], and (2) that there is a reasonable likelihood that the defendant will commit future violations of the [ESA]."[141] The court noted evidence in the record that "[a]rtificial beachfront lighting significantly increases the incidence of injury to and mortality of sea turtle hatchlings."[142] The court found that beachfront driving leaves tire ruts that prohibit hatchling from reaching the sea,[143] headlights from nighttime driving disorient hatchlings,[144] and vehicles might run over sea turtle hatchlings or females while they are nesting, or damage the nests themselves.[145] The court concluded that, based on the administrative record, beachfront driving, including driving within the conservation zone, caused harm to the sea turtles.[146] Thus, the court enjoined beach driving. The court, however, declined to issue an injunction compelling the County to enforce Florida's "'Model Lighting Ordinance for

---

[134] 896 F. Supp. 1170 (M.D. Fla. 1995).
[135] *Id.* at 1176.
[136] *Id.* at 1173.
[137] *Id.* at 1174.
[138] *Id.*
[139] *Id.* at 1176.
[140] *Id.*
[141] *Id.* at 1180.
[142] *Id.* at 1174.
[143] *Id.* at 1175.
[144] *Id.*
[145] *Id.*
[146] *Id.* at 1180–82.

Marine Turtle Protection.'"[147] The court declined to issue the injunction largely because there was insufficient evidence in the record to show that specific lights for which the County was responsible were responsible for harming the sea turtles.[148]

The district court opinion in *Loggerhead Turtle I* continued the incorporation of tort doctrine into ESA law. The court's opinion focuses on the presence or absence of a culpable act by the defendant and a causal link between that act and the harm done to individual members of the species. Although the test for issuance of a preliminary injunction requires the court to consider the "public interest," *Loggerhead Turtle I* includes no references to the effect of the court's ruling on the fate of the protected turtle species (or even the effect on the turtle population habituated to nesting on Volusia County's beaches) and almost no reference to the purpose of the ESA. The court noted, in passing, that "Volusia County is the sight [sic] of 2.8% of Loggerhead [sea turtle (*Caretta caretta*)] nesting activity in the State of Florida, and 3.1% of Green sea turtle [(*Chelonia mydas*)] nesting activity[,]"[149] but attached no significance to this fact.

In *United States v. Town of Plymouth*,[150] FWS sought a preliminary injunction pursuant to the ESA to prohibit the town from allowing off-road vehicles (ORVs) to drive on the beach unless appropriate precautions were taken to protect piping plovers.[151] The court held that "[a] movant can make a showing of actual harm by proving that significant modification or damage to the habitat of an endangered or threatened species is likely to occur so as to injure that species."[152] In its proof of harm or causation analysis, the court applied an individualized "actual harm" standard. The court looked to several specific instances of actual killing of birds and destruction of nests in the record to find that FWS proved that ORV access to the Plymouth Long Beach had actually harmed piping plovers and would continue to cause harm to the species.[153]

In contrast to *Loggerhead Turtle I*, the *Town of Plymouth* court noted the purpose of the ESA and compared the injunction issued in *TVA v. Hill* to the case before the court. The court likened the ability of a 2.5 inch piping plover to "stop a behemoth ORV if the government proves a taking under the ESA" to a 3-inch snail darter (*Percina tanasi*) stopping "a $100 million dam,"[154] as "the explicit provisions of the [ESA] require precisely that result."[155] At the same time, focusing on individual harm, the court held that to be entitled to injunctive relief, FWS "must demonstrate that the Town of Plymouth has caused, through action or inaction, the illegal taking of the piping plover on Plymouth Long Beach or that future takes will occur if

---

[147] *Id.* at 1181.
[148] *Id.*
[149] *Id.* at 1173 n.1.
[150] 6 F. Supp. 2d 81 (D. Mass. 1998).
[151] *Id.* at 82.
[152] *Id.* at 90.
[153] *Id.* at 90–91.
[154] *Id.* at 90.
[155] *Id.* (quoting *TVA v. Hill*, 437 U.S. 153, 172–73 (1973)).

management of the beach continues on its present course."[156] The court found that the Town of Plymouth stood apart from all private and municipally owned beaches in Massachusetts and other New England states in its failure to manage ORV use.[157] The court granted FWS injunctive relief and prohibited ORVs from traveling on certain sections of the Plymouth Long Beach.[158]

While the holding in *Town of Plymouth* was better for piping plovers than *Loggerhead Turtle I* was for endangered turtles, it also elevated largely unexamined notions drawn from tort doctrine over the conservation of species. One comes away from the case with the impression that Plymouth was found in violation and an injunction issued largely because Plymouth had failed to meet some generally recognized standard of care for beach management in the State of Massachusetts.

In 2000, in *Loggerhead Turtle v. County Council of Volusia County, Florida* (*Loggerhead Turtle II*),[159] the court considered whether Volusia County's adoption of an inadequate beach lighting ordinance was the "proximate cause" of sea turtle take. The court did not engage in a traditional causation analysis, but instead ruled that the county was not responsible under section 9 for the inadequacies of its plan.[160] The court declared that the ESA "requires no affirmative conservation action by states and local governments"[161] and a local regulation that does not conflict with a federal regulation is valid.[162] Thus, because "the Secretary has not promulgated a lighting ordinance to which [Volusia] County's can be compared[,]"[163] the County is not responsible for the take of sea turtles.[164] Again, tort notions of "standard of care" and "failure of a duty to rescue" eclipse considerations of species conservation.

In *Defenders of Wildlife v. Bernal*,[165] environmental groups brought action under the ESA to enjoin construction of a school complex on property that contained potential habitat for endangered cactus ferruginous pygmy-owls (*Glaucidium brasilianum cactorum*). *Bernal* is in many ways the mirror image of *Marbled Murrelet*. Both cases focus on the proof of a take for issuance of an injunction. In both cases the question of proof is relatively unclouded by administrative determinations. In *Marbled Murrelet*, the plaintiffs prevail on the facts. In *Bernal*, the plaintiffs fail.

To prevail in this action, the plaintiffs had to prove by a preponderance of the evidence that the school district's actions would result in an unlawful take of a cactus ferruginous pygmy-owl.[166] To obtain an injunction the

---

[156] *Id.*

[157] *Id.* at 91.

[158] *Id.* at 92–93.

[159] 92 F. Supp. 2d 1296 (M.D. Fla. 2000).

[160] *Id.* at 1307–09.

[161] *Id.* at 1308.

[162] *Id.*

[163] *Id.* at 1308 n.19.

[164] *Id.*

[165] 204 F.3d 920 (9th Cir. 2000).

[166] *Id.* at 925.

plaintiffs needed to establish that future harm was "reasonably certain."[167] After a three-day bench trial, the district court concluded that the evidence supported a finding that an owl or owls used a portion of the property at issue, but a portion that the defendants did not intend to develop.[168] The court concluded owls would not be taken.[169] The circuit court determined that the district judge's findings were not clearly erroneous and affirmed.[170] The *Bernal* court made a factual determination based on consideration of individualized harm *without* considering the long-term effects of the action on the conservation of the tiny Arizona population of cactus ferruginous pygmy-owls.[171]

This aspect of the recent history of section 9 is more than slightly distressing to those of us who wait for section 9 to assume its rightful place as a prominent tool to further the purpose of the ESA. Developments since *Sweet Home* seem to be drawing section 9 farther and farther from the conservation of species. Following the Supreme Court's leadership, courts in the past few years seem more and more inclined to employ unexamined tort doctrine and ignore the effect of their analysis on the fate of the species Congress intended the ESA to protect.

## III. Ugly Duckling

Alas, its focus on individualized harm and the tort concepts imported with it are not the only impediments to the development of the section 9 take prohibition. In 1973, Congress hatched the section 9 take prohibition in a nest with a clutch of other legal mandates—consultation under section 7,[172] listing determinations under section 4,[173] and (late comers) the critical habitat determinations[174] and issuance of incidental take permits under sections 10[175] and 7(b)(4).[176] All of these other ESA sections are primarily—if not entirely—creatures of administrative law.

Creatures of administrative law? What do we mean by that? We mean that, under the other prominent provisions of the ESA, the initial

---

[167] *Id.*

[168] *Id.* at 922.

[169] *Id.*

[170] *Id.* at 927.

[171] *Cf.* Nat'l Ass'n of Home Builders v. Norton, 340 F.3d 835, 852 (9th Cir. 2003) (holding that FWS's finding that the Arizona pygmy-owl population is *discrete* was not arbitrary and capricious, but its finding that the discrete population is *significant* was arbitrary and capricious). In order to be considered a distinct population segment (DPS), the species must be both discrete and significant. Policy Regarding the Recognition of Distinct Vertebrate Population Segments Under the Endangered Species Act, 61 Fed. Reg. 4722, 4725 (Feb. 7, 1996). Congress has instructed the Secretary to exercise its authority to designate DPSs "sparingly and only when the biological evidence indicates that such action is warranted." S. Rep. No. 96-151, at 7 (1979).

[172] 16 U.S.C. § 1536 (2000).

[173] *Id.* § 1533.

[174] *Id.* § 1533(a)(3).

[175] *Id.* § 1539(a)(1)(B).

[176] *Id.* § 1536(b)(4).

determinations of how to best further the goals of the ESA are made by the "Secretary"—FWS or National Marine Fisheries Service.[177] Those decisions—listing determinations, jeopardy biological opinions, issuance of incidental take permits, and the like—are regularly challenged in court. The frame of reference for the court challenge, however, always remains the initial administrative determination and the information that supports it.

On the other hand, by its terms, section 9 affords the Secretary no opportunity to make an initial decision and no opportunity to gather relevant information. The take has happened or it has not. The decision is the court's to make. Section 9 is unlike the other chicks in the nest.

Most endangered species lawyers are, at heart, administrative lawyers, practiced at establishing that the government did or did not make the right decision based on the information before it, and not traditional trial lawyers, practiced at proving that a particular thing is likely enough to be true to satisfy a judicially-imposed burden of proof. If the take prohibition is ever going to become a more effective tool for protecting species and a less terrifyingly vague directive to habitat-controlling landowners, this must change.

In section 9 cases, ESA lawyers express their administrative law bias by readily accepting administrative decision making in place of judicial fact finding. Using administrative determinations relieves courts of the need to articulate the elements of fact finding under section 9.

*Defenders of Wildlife v. Environmental Protection Agency* (*Defenders of Wildlife*)[178] grew out of a long-standing controversy over the approval by the Environmental Protection Agency (EPA) of above-ground use of a variety of pesticides containing strychnine or strychnine sulfate.[179] As early as 1979, FWS had identified 18 endangered species that were "likely to be jeopardized" in violation of section 7 of the ESA by continued above-ground use of strychnine.[180] Yet above-ground use of strychnine continued as EPA slowly proceeded through the process required by the Federal, Insecticide, Fungicide, and Rodenticide Act (FIFRA)[181] for cancellation of pesticide registration.[182] In 1983, EPA announced its intent to limit, but not eliminate, above-ground strychnine use.[183] In 1986, two environmental groups initiated

---

[177] The primary responsibility for administering and enforcing the Act lies with the Secretaries of Commerce and Interior. *Id.* § 1532(15). The Secretaries of Commerce and Interior have delegated this responsibility to NMFS and FWS, respectively. 50 C.F.R. § 402.01(b) (2004). FWS administers the programs for the Secretary of the Interior and the NMFS administers programs for the Secretary of Commerce. NMFS is responsible for administering the ESA with regard to most marine species, and FWS is responsible for marine mammals such as manatees, dugongs, polar bears, sea otters, and walruses, but not whales, seals, and sea lions. FWS is responsible for all other plant and animal species. *See* Reorganization Plan No. 4 of 1970, 35 Fed. Reg. 15,627 (Oct. 6, 1970).

[178] 882 F.2d 1294 (8th Cir. 1989).

[179] *Id.* at 1296.

[180] *Id.* at 1297.

[181] 7 U.S.C. §§ 136–136y (2000).

[182] *Defenders of Wildlife*, 882 F.2d at 1297.

[183] *Id.*

a lawsuit to end the above-ground use of strychnine.[184] The plaintiffs submitted a "non-target kill book" to EPA demonstrating that members of various protected species were dying as a result of strychnine use.[185] EPA did not challenge the information in the non-target kill book.[186]

In April 1988, the United States District Court for the District of Minnesota found that EPA's continued registration of strychnine for above-ground use constituted take under section 9 of the ESA.[187] In August 1989, the Eighth Circuit Court of Appeals affirmed the district court ruling embracing an expansive notion of causation under section 9.[188] The court effectively held that EPA registration of a pesticide "caused" the death of protected species members.[189]

The case involved direct harm, through poisoning, to the protected species, and thus, a traditional causation analysis under tort law was possible. The trail of causation, however, did not lead directly to EPA. The court found EPA liable for take of endangered species under the ESA because strychnine bait "was critical to the resulting poisonings of endangered species,"[190] and thus, "[t]he relationship between the registration decision and the deaths of endangered species is clear."[191] It is important to realize how much the trail of proof was transformed by the availability of the defendant's own, uncontested, non-target kill book. The non-target kill book contained evidence of past direct takes and established that the defendant was aware of them. The court did not need to address the probability component of a future action or intent.

In *House v. United States Forest Service*,[192] individuals and environmental groups brought suit against the Forest Service to prevent a proposed timber sale in the Daniel Boone National Forest.[193] The plaintiffs sought a permanent injunction to prohibit the Forest Service from offering timber for sale on 199 acres in the habitat of the endangered Indiana bat (*Myotis sodalis*).[194] The plaintiffs asserted that the harm to the habitat would occur in the form of the destruction of the forest canopy which would: 1) destroy the Indiana bat's foraging habitat; and 2) destroy potential roosts.[195] As part of the logging project, FWS prepared a biological evaluation, which evaluated the effects of the project on threatened or endangered species.[196] FWS determined that the timber sale would not adversely affect the bats.[197]

---

[184] *Id.* at 1297–98.

[185] *Id.* at 1298.

[186] *Id.*

[187] Defenders of Wildlife v. Envtl. Prot. Agency, 688 F. Supp. 1334, 1354 (D. Minn. 1988).

[188] *Defenders of Wildlife*, 882 F.2d at 1300–01.

[189] *Id.*

[190] *Id.* at 1301.

[191] *Id.*

[192] 974 F. Supp. 1022 (E.D. Ky. 1997).

[193] *Id.* at 1024.

[194] *Id.* at 1024–25.

[195] *Id.* at 1025.

[196] *Id.*

[197] *Id.*

Rather than rely on independent fact finding, the court determined that the scientific evidence in the administrative record supported an injunction.[198]

Embracing the forms of administrative law, the court treated the case as a record review case under principles of administrative law, issuing an injunction based on inadequacies in the Forest Service's studies of the effects of logging on bat habitat.[199] Like the Supreme Court's decisions in *TVA v. Hill* and *Sweet Home*, the court evaluated the administrative record in terms of consistency with the purpose of the ESA.[200] The defendants argued that the ESA allowed them to "balance their obligations to conserve with competing agency interests."[201] The court disagreed and determined that "the ESA mandates that defendants place conservation above any of the agency's competing interests."[202]

In *Strahan v. Coxe*,[203] Richard Max Strahan brought suit against Massachusetts officials for allegedly violating the ESA and the Marine Mammal Protection Act by issuing licenses and permits authorizing gillnet and lobster pot fishing.[204] The case was grounded on undisputed evidence from the National Marine Fisheries Service and the State of Massachusetts that northern right whales (*Balaena glacialis*) had been entangled in fixed fishing gear in Massachusetts waters.[205] As in *Defenders of Wildlife v. Environmental Protection Agency*, the court determined that the state authorized commercial fishing operations to use gillnets and lobster pots in specifically the manner that is likely to cause a take within the meaning of the ESA.[206]

The defendant in *Strahan* specifically raised the issued of "proximate cause" and argued that the state's licensure of permits is too attenuated to constitute a take.[207] The defendants compared a permit by the state to gillnet and lobster pot fish to a license to drive an automobile.[208] The defendants argued that the state's licensure of "a generally permitted activity does not cause the taking any more than its licensure of automobiles and drivers solicits or causes federal crimes, even though automobiles it licenses are surely used to violate federal . . . laws."[209] The court determined that the manner of fishing permitted by the Commonwealth did not involve a superceding intervening cause as it is not possible to use gillnets and lobster pots without taking northern right whales in violation of the ESA.[210]

The court found that the causal link between the state's conduct and the species injury, while indirect, was not so removed that it extended

---

[198] *Id.* at 1032.
[199] *Id.*
[200] *Id.* at 1027.
[201] *Id.* at 1027 n.8.
[202] *Id.* at 1027.
[203] 127 F.3d 155 (1st Cir. 1997).
[204] *Id.* at 158.
[205] *Id.*
[206] *Id.* at 164.
[207] *Id.* at 163.
[208] *Id.* at 163–64.
[209] *Id.*
[210] *Id.* at 164.

outside the realm of causation as understood in common law. Because the type of injury involved direct harm to individual species members, the court's tort analysis of the case was not misplaced since the type of take was in line with the traditional notion of take from wildlife law (i.e., to hunt, capture, or kill). The court held that the state is liable if it issued a permit causing a take and enjoined Massachusetts from issuing permits.[211] While significant in illuminating the analysis of causation, the underlying injury to various marine species had been documented by the National Marine Fisheries Service and was not at issue. Again, administrative determinations established the elements of a take.

In *Bensman v. United States Forest Service*,[212] the plaintiffs argued that the Forest Service had violated the ESA by approving a timber sale which would harm or harass the Indiana bat, thus constituting a take.[213] On March 1, 1997, a windstorm blew down thousands of trees within a twelve-mile corridor, approximately one mile wide.[214] After public comment, "the Forest Service determined that this timber should be salvaged from areas not within the wilderness area."[215] The Forest Service contracted with private contractors to remove trees which were "blown down, leaning, or uprooted."[216] The area near this salvage sale, however, is also a summer home to the endangered Indiana bat.[217] The court, once again transforming the take issue into administrative review, determined that the Forest Service performed little research to determine the exact habitat of the bat, and thus, their decision was arbitrary and capricious.[218]

The court stated that the "prohibition against taking is broadly construed to prohibit nearly any activity which might adversely affect protected species."[219] The court did not use tort language to evaluate the causal link between the Forest Service's approval of the timber salvage sale. Rather, the court effectively used the federal agency administrative process regarding the effect of logging on Indiana bat habitat to shift the burden of proof for the take claim from the plaintiffs to the agency.[220] Interestingly, the court cited *Palila* for the proposition that "[h]abitat destruction that prevents the recovery of the species by affecting essential behavioral patters causes actual injury to the species and effects a taking under section 9 of the Act."[221] Although not explicitly stated, the court in essence looked to the

---

[211] *Id.* at 171.

[212] 984 F. Supp. 1242 (W.D. Mo. 1997).

[213] *Id.* at 1244.

[214] *Id.*

[215] *Id.*

[216] *Id.* at 1245.

[217] *Id.*

[218] *Id.* at 1249.

[219] *Id.* at 1247 (citing Defenders of Wildlife v. Envtl. Prot. Agency, 688 F. Supp. 1334, 1351 n.33 (D. Minn. 1988)).

[220] *See id.* (stating that the importance the ESA and the Forest Service's regulations place on protection of endangered and threatened species mandates affirmative evidence that the agency-authorized salvage would not negatively impact Indiana bats).

[221] *Id.* at 1248 (citing Palila v. Haw. Dep't of Land & Natural Res., 649 F. Supp. 1070, 1076–77 (D. Haw. 1986).

second round of palila litigation for the purpose of species recovery under the ESA—to bring species to the point where they no longer require protection under the Act. The court issued an injunction prohibiting the salvage sale.[222] Although the Administrative Procedure Act's "arbitrary and capricious" standard of review grants deference to agency decision making, it also imposes an obligation on the agency to justify its conduct in the first instance.[223] Here, the court held that the agency failed to meets its obligation.

*Arizona Cattle Growers' Ass'n v. United States Fish & Wildlife Service (ACGA I)*[224] significantly increased the importance of establishing the elements of a take without significantly illuminating what those elements were. The plaintiff challenged FWS's issuance of incidental take statements (ITSs), which precluded cattle grazing in specific areas because potential habitat modification might harm several listed species, including the cactus ferruginous pygmy-owl and the razorback suckers (*Xyrauchen texanus*).[225] The plaintiff claimed that FWS's determination that livestock "takes" members of protected species was arbitrary and capricious.[226] FWS issued ITSs based on its belief that uncurtailed grazing activities would "harm" listed species within the statutory definition of take.[227]

The court, relying on *Sweet Home*, disagreed, noting that the language of the regulation states that "harm" includes habitat modification or degradation only if it results in actual injury or death to wildlife.[228] The court focused heavily on the fact that evidence was lacking that listed species existed in the project area and concluded that because no listed species existed in the project area, FWS was unable to show that habitat modification would "actually kill or injure wildlife."[229] The court also disagreed with FWS's claim that the plaintiff had the burden to show that no listed species existed in the project area.[230]

Because FWS was unable to provide evidence indicating that the listed species even existed on the allotments, they could not show that the habitat modification would actually kill or injure any endangered species. Thus, the issuance of the ITSs constituted an arbitrary and capricious action and was set aside by the court.[231] Since the court found take to be impossible because no species were present, the court was able to avoid any type of causation or tort analysis to evaluate whether a take had actually occurred. Furthermore, even though habitat may be important to species recovery, the court did not look to the purpose of the ESA, which is to allow species to recover to the

---

[222] *Id.* at 1250.
[223] *See* 5 U.S.C. § 706 (2000) (allowing judicial review of federal agency action).
[224] 63 F. Supp. 2d 1034 (D. Ariz. 1998), *aff'd*, 273 F.3d 1229 (9th Cir. 2001).
[225] *Id.* at 1036, 1042.
[226] *Id.* at 1038.
[227] *Id.* at 1042.
[228] *Id.*
[229] *Id.* at 1042–43.
[230] *Id.* at 1044.
[231] *Id.* at 1045.

point where they no longer require protection under the Act.[232] Here, and in the later Arizona Cattle Growers cases, the evidence necessary to prove take becomes conflated with the deferential administrative standard of review applied to FWS's decision to issue an ITS.

In *Arizona Cattle Growers' Ass'n v. United States Fish & Wildlife* (*ACGA II*),[233] the cattle growers challenged FWS's issuance of ITSs, which precluded cattle grazing in specific areas because potential habitat modification might harm listed species.[234] "FWS examined 962 allotments, determining that grazing would have no effect on listed species for 619 of those allotments and cause no adverse effects for 321 of the remaining allotments, leaving 22 allotments."[235] Each of the allotments was approximately 30,000 acres, but several of them were considerably larger.[236]

The court determined that Congress intended one standard for take within both sections 7(b)(4) and 9 and that if the sole purpose of the ITS is to provide shelter from section 9 penalties, it would be nonsensical to require the issuance of an ITS when no take cognizable under section 9 would occur.[237] The court looked to *Burlington Northern Railroad* for the proposition that "habitat degradation that merely retards recovery of a depleted species"[238] does not constitute harm, unless the plaintiff shows the proposed action significantly impairs the breeding or feeding habits of the species.[239]

Yet, in its analysis of the Cow Flat Allotment, the court upheld FWS's issuance of an ITS, relying on the analysis in a biological opinion (BO) as a "reasonable basis" for the agency's assertion that take was likely.[240] "Having determined that loach minnow [(*Tiaroga cobitis*)] exist on the allotment, FWS determined that the loach minnow are vulnerable to direct harms resulting from cattle crossings, such as trampling."[241] "Moreover, because the fish use the spaces between large substrates for resting and spawning, sedimentation resulting from grazing in pastures that settles in these spaces can adversely affect loach minnow habitat."[242] The BO determined that "this indirect effect, along with the direct crushing of loach minnow eggs and the reduction in food availability, will result in take of the loach minnow."[243] "The [ITS], however, does not directly quantify the incidental takings of

---

232 *See* 16 U.S.C. §§ 1531(b), 1532(3) (2000) (defining "conserve" as the use of all methods necessary to bring species to the point where they no longer need ESA protection and stating the purpose of the ESA as providing a means whereby ecosystems and listed species may be conserved).

233 273 F.3d 1229, 1233 (9th Cir. 2001).

234 *Id.* at 1234, 1244–45.

235 *Id.* at 1234.

236 *Id.*

237 *Id.* at 1239–40.

238 *Id.* at 1238.

239 *Id.*

240 *Id.* at 1248–49.

241 *Id.* at 1248.

242 *Id.*

243 *Id.*

loach minnow and determines that such takings 'will be difficult to detect.'"[244]

> We agree with the district court that the issuance of the Cow Flat [ITS] was not arbitrary and capricious. Unlike the other allotments in question, [FWS] provided evidence that the listed species exist on the land in question and that the cattle have access to the endangered species' habitat. Accordingly, [FWS] could reasonably conclude that the loach minnow could be harmed when the livestock entered the river. [245]

The record before the court indicated that several species, including the razorback sucker and the cactus ferruginous pygmy-owl, were at one time present on the project area but are no longer present.[246] The court, however, did not look to the purpose of recovery under the ESA, but followed the district court's requirement for species to be present in the project area as a necessary element of a take analysis.[247]

Administrative law bias can also shape the arguments lawyers make. In *American Bald Eagle v. Bhatti*,[248] citizen groups filed action to enjoin limited deer hunting on a state reservation based on alleged risk to bald eagles.[249] The primary issue was whether allowing deer hunting on a Massachusetts reservation constituted a prohibited take of bald eagles (*Haliaeetus leucocephalus*).[250] Lead shot in deer carcasses can poison eagles who feed on them.[251] The plaintiffs claimed that "some of the deer shot by hunters would not be recovered but would die within the feeding area of the Quabbin bald eagles[.]"[252] The "bald eagles would feed on these unrecovered deer carcasses, consume a portion of the lead in the deer, and be harmed by the lead."[253]

If the plaintiffs' attorneys had evidence of direct harm to an individual species member (i.e., a dead bald eagle in the habitat area), a causation analysis would have been appropriate to determine if the issuance of hunting permits by Massachusetts was killing bald eagles. The court noted that even though bald eagles can be harmed by ingesting lead, "[t]here is no evidence that any eagles at [the reservation] actually ingested lead slug or that any eagles ate deer carrion containing lead slug."[254] Attorneys for the plaintiffs in *Bhatti*, however, likened the appropriate burden of proof for a take to an

---

[244] *Id.*

[245] *Id.*

[246] *Id.* at 1243–45.

[247] *See id.* at 1248–49 (contrasting the court's finding that FWS's issuance of ITSs was arbitrary and capricious in allotments where a species' presence is only speculative to its decision to uphold FWS's issuance of an ITS in an allotment where species are actually present).

[248] 9 F.3d 163 (1st Cir. 1993).

[249] *Id.* at 164.

[250] *Id.* at 165.

[251] *Id.* at 165 n.3.

[252] *Id.* at 164.

[253] *Id.*

[254] *Id.* at 166.

administrative risk analysis of the sort common in administrative environmental law.[255] The court was unconvinced:

> [Plaintiffs] ask that we establish a numerical standard for determining which actions constitute a "taking" of an endangered species. They would have us establish that a one in a million risk of harm is sufficient to trigger the protections of the ESA. . . . Rather than convince us to adopt a restrictive numerical standard for harm under the ESA, [plaintiffs'] analogies to other regulatory regimes demonstrate that the exact numerical standard for permissible harm or risk of harm varies according to the context. . . . [Plaintiffs] have presented no studies that have shown that the use of lead slugs in deer hunts has been scientifically proven to cause harm to bald eagles.[256]

The plaintiffs' attorneys endeavored, without success, to squeeze section 9 into an administrative form. The *Bhatti* court, having rejected the administrative approach, held that the proper standard for establishing a take under the ESA was "actual harm."[257] Since appellants had not shown that bald eagles had "ingested lead slugs nor fragments thereof during past hunts or will ingest lead slugs or fragments thereof during future hunts,"[258] the court determined it had "no reason to consider whether the ingestion of lead slugs or fragments thereof would lead to a disturbance of the eagles' behavior pattern to the extent that it would amount to 'harassment' of the bald eagles."[259] The court specifically rejected any proof based on "potential" harm alone as foundation for an injunction.[260] The court used the rhetoric of individualized harm to avoid the broader issue of the deer hunts' effect on the conservation of bald eagles.

In *American Rivers v. United States Army Corps of Engineers*,[261] American Rivers sued the Army Corps of Engineers (Corps) and FWS, claiming that the manner in which the Corps operated the dam and reservoir system on the Missouri River had adversely affected the least tern (*Sterna antillarum*), the Great Plains piping plover, and the pallid sturgeon (*Scaphirhynchus albus*), all of which are protected under the ESA.[262] FWS did not dispute "harm" to protected species. FWS stated that water releases under the operating plan "would lead to 'inundation after nest initiation' with a predicted loss of up to 121 terns and plovers."[263] Because the evidence of future harm was not disputed, the court was able to find, rather easily, that "the Corps' take of terns and plover is imminent and thus actionable."[264]

---

[255] *Id.* at 165.

[256] *Id.*

[257] *Id.* at 166.

[258] *Id.* at 166 n.4.

[259] *Id.*

[260] *See id.* at 166 ("Clearly, then, for there to be 'harm' under the ESA, there must be actual injury to the listed species.").

[261] 271 F. Supp. 2d 230 (D.D.C. 2003).

[262] *Id.* at 236.

[263] *Id.* at 257.

[264] *Id.* at 257–58.

Still the court managed to blend section 9 proof with agency obligations under section 7, stating:

> Moreover, the undisputed nature of the harm to the three protected species, as well as the degradation of their habitat, that will occur from the Corps' management of river flow under the revised [operating plan] also demonstrates that the Corps is likely to violate its affirmative obligation under ESA Section 7 to "insure" that its actions will not harm the species.[265]

## IV. SIGNIFICANCE AND PROBABILITY

As with any form of injury, the issues regarding injury to a protected species can be divided into those having to do with "significance"—the likelihood that the harm will be dire and have long term consequences—and "probability"—the likelihood that the harm will actually take place. The prospect of nuclear war is high in significance and, currently, relatively low in probability. The prospects of dandruff and traffic delays are high in probability and relatively low in significance.

The emphasis on injury to individual species members under the take prohibition can confuse this analysis. In theory, anything that "actually injures," no matter how insignificant to the conservation of species as a whole, is a violation of the take prohibition. In theory, any possible (but not demonstrably imminent) harm is not, no matter how significant the possibility might be. Running over a red-cockaded woodpecker (*Picoides borealis*) with a truck would be a violation of the ESA. Introducing exotic rodents carrying plague into the habitat of the Preble's meadow jumping mouse (*Zapus hudsonius preblei*) would not be.

This emphasis on individualized harm does not serve the purpose of the ESA. Fortunately, as we have seen, some courts see fit to look beyond the emphasis on individual injury and place it in a broader context. Unfortunately, some courts—following the musing of Justice O'Connor in her *Sweet Home* concurrence—do not.

To make the take prohibition an effective tool to further the purpose of the ESA (outside the criminal context), we must deemphasize the "dead bird" approach to take and the tort concepts that travel with it. Once we reject the "dead bird," individualized harm standard for take, then we can consider what the actual standard should be. The actual standard appears to be something we might call "significant take." Significance must be tied to the long-term prospects of our hypothetical dead bird and to the population of which it is part. If a dead species member is not a sufficient basis to prevail on a take claim, neither is it a necessary element.

The perspective of conservation biologists offers a model of species preservation problems, what we have previously called the "probabilities model."[266] The conceptual underpinning of the probabilities model is that the survival of any species over time is a matter of chance and that the

---

[265] *Id.* at 258.
[266] *See* Cheever, *supra* note 10, at 12.

probabilities are primarily a function of the population and distribution of the species. A specific detrimental action or project may affect the probabilities of species survival and even drive a species to extinction, but its significance can only be understood in terms of the size and distribution of the population it affects.

"Bad luck" comes to every species whether it is protected by the ESA or not. The only effective way to increase the chances that a species will survive its share of bad luck is to help it maintain or regain a sufficient population and distribution. A recovery-oriented approach to the ESA would give federal agencies the authority to take prospective action to increase the chances of survival of protected species. Merely preventing species from disappearing as a result of a particular individualized harm addresses only one part of a larger problem. To afford species a decent chance of long-term survival, regulators must develop a program to "recover" species to the point at which they are sufficiently numerous and sufficiently widespread to survive one of the catastrophic events which are an inevitable part of life on this planet. This is what Congress intended in its definition of conservation.

The *Palila* court was right in enjoining long-term injury to recovery, even in the absence of an evidence of individualized injury. The concept of recovery provides the link between the take prohibition and the "probabilities model" based on the observations of conservation biologists, particularly in the "breeding" context by limiting the reach of the take prohibition to only those breeding disruptions which would affect the recovery prospects of the species. Recognition of that relationship would further the purpose of the ESA. If recovery—or at least significant progress toward recovery—is an essential element in the process of avoiding extinction, then actions that prevent recovery significantly increase the probability of extinction and violate the substantive provisions of the ESA intended to prevent extinction. In other words, recovery injury can be significant injury and, therefore, significant take.

## V. CONCLUSION

Over the past 15 years—half the life of the Endangered Species Act— courts have grappled unsuccessfully with the proper role of the section 9 take prohibition. The current confusion arises from many sources. Two are embedded in the language and history of the Act itself.

First, courts have responded inconsistently to the tension between the emphasis on individual injury in section 9 and the emphasis on species conservation in the Act as a whole. As a result, courts have applied varying standards in determining whether a past or proposed activity constitutes a take under section 9. Second, unlike other significant provisions of the Act, which require courts to fulfill a traditional administrative law review function, section 9 requires courts to evaluate evidence of past and probability of future injury to species in order to make a finding as to whether a take occurred. Plaintiffs' attorneys, experienced in challenging agency findings, have attempted to squeeze section 9 violations into an administrative law rubric.

These consistent sources of confusion have contributed to the apparently arrested development of section 9 jurisprudence. They are, in part, responsible for the fact that section 9 has not become the powerful conservation tool Congress intended it to be.

There is a way out of this mess. The prohibition against injury to individual species members embodied in section 9 exists as an instrument to achieve the Endangered Species Act's goal of species conservation. The primary threat to species survival and the primary limiting factor for species recovery is loss of suitable habitat. Therefore, section 9 cannot be limited to protecting individual species members. As the percentage increase in land development in the United States continues to far exceed its population growth, more and more actual and potential species habitat disappears. Section 9 must protect habitat essential for species conservation.

To make sense of section 9, courts must consider both the evidence of past and likelihood of future injury to individual species members and the effect of that injury on the population of which that member is a part. A coherent application of section 9 starts and ends with courts interpreting it in accordance with the purpose of the ESA—to protect species and the ecosystems upon which they depend in order to allow species to recover to the point where they no longer require protection under the Act.

# Chapter 15

# TECHNOLOGY-FORCING STANDARDS

A. *Reducing Auto Emissions Through Technology-Forcing*
B. *International Technology-Forcing: The Phaseout of Ozone-Depleting Substances*

Any of the regulatory strategies analyzed in this coursebook, if sufficiently stringent, might operate to force the development of new technology. This chapter focuses on standards set by legislatures with the direct intent to force the development of new technology — either by limiting releases of a target substance to lower amounts than can be achieved with currently available technology or by banning some or all uses of a substance to force the invention of substitutes. Insofar as government seeks to achieve technology-forcing through a complete prohibition on manufacture or use (sometimes referred to as "sunsetting" a dangerous substance), technology-forcing simultaneously acts as a roadblock to continuation of the commercial activity (see Chapter 16) while encouraging the development of new alternatives. Like roadblock statutes, product bans are crude, blunt instruments that frequently contain mitigating devices in order to gain acceptance by the regulated public. Some of these flexibility mechanisms are lead times for product phaseout, waivers, hardship variances, and sympathetic enforcement. In addition, market-based approaches noted in Chapter 14, such as the use of marketable permits, excise taxes, and governmental purchasing power, can effectively support technology-forcing.

Because the U.S. legal system discourages potential curtailment of economic activity, technology-forcing is often a last regulatory resort. Judge Jasen's recommendation in *Boomer* that the defendant be forced to develop and adopt new pollution control technology was rejected by the majority. The following statement by the Fifth Circuit Court of Appeals in Corrosion Proof Fittings v. EPA, 947 F.2d 1201 (1991),[1] typifies the prevailing judicial skepticism regarding technology-forcing:

> As a general matter we agree with the EPA that a product ban can lead to great innovation, and it is true that an agency [under the Toxic Substances Control Act] as under other regulatory statutes, is empowered to issue safety standards which require improvements in existing technology or which require the development of new technology. As even the EPA acknowledges, however, when no adequate substitutes currently exist, the EPA cannot fail to consider this lack when formulating its own guidelines. Under ToSCA, therefore, the EPA must present a stronger case to justify the ban, as opposed to regulation, of products with no substitutes. 947 F.2d at 1221.

---

1. In this case, the court overturned EPA's ban on the use of asbestos in almost all products.

It appears that administrative technology-forcing will be judicially condoned only where a regulatory agency has exhausted all other regulatory alternatives for controlling a demonstrably intolerable material. See Ethyl Corp. v. EPA, 541 F.2d 1 (D.C. Cir. 1976) (upholding EPA's phaseout of lead in gasoline).

In the relatively few situations where technology-forcing has been attempted, industry has been successful in developing innovative technology that has significantly reduced the environmental threat. In addition to the auto emissions reduction and CFC phaseout case studies presented below, the following regulatory efforts are examples of effective technology-forcing: EPA's prohibition of the commercial distribution and manufacture of PCBs, EPA's phased reduction leading to a prohibition on the use of lead in gasoline (see Ethyl Corp. v. EPA above.), OSHA's drastic reduction in the occupational exposure standard for lead, and the prohibition of phosphate detergents by many state and local governments.[2] It may be that technology-forcing has generally been successful because legislatures and regulatory agencies "hedge their bets" when forcing technology. For example, when Congress enacted the strict 1970 reductions in permissible tailpipe emissions, it was aware that the catalytic converter technology had been developed and subjected to limited testing.

## A. REDUCING AUTO EMISSIONS THROUGH TECHNOLOGY-FORCING

The most ambitious and controversial use of technology-forcing as a regulatory strategy to achieve environmental protection goals was the 1970 CAA's Title II, a remarkable example of a drastic, direct, numerical regulatory standard stipulated by the legislature itself, declaring that —

> emissions of carbon monoxide and hydrocarbons from light duty vehicles...manufactured during or after model year 1975 shall...require a reduction of at least 90 per centum from emissions allowable...in model year 1970.[3] CAA §202(b)(1)(a) (1970).

### International Harvester v. Ruckelshaus
United States Circuit Court of Appeals
for the District of Columbia Circuit, 1973
478 F.2d 615

LEVENTHAL, C.J.... These consolidated petitions of International Harvester and the three major auto companies, Ford, General Motors, and Chrysler, seek review of a decision by the Administrator [of EPA] denying petitioners' applications...for one year suspensions of the 1975 emissions standards prescribed under the statute for light duty vehicles....

The tension of forces presented by the controversy over automobile emission standards may be focused by two central observations: (1) the automobile is an essential pillar of the American economy. Some 28 per cent of the nonfarm workforce draws its livelihood from the automobile and its products; (2) The automobile has had a devastating impact on the American

---

2. See, e.g., Procter & Gamble Corp. v. Chicago, 509 F.2d 69 (7th Cir. 1975), cert. denied, 421 U.S. 978 (1976) (upholding Chicago's phosphate detergent ban against a dormant Commerce Clause challenge).

3. The Act applied the same specific rollback to nitrogen oxides starting in the 1976 model year.

A. TECH-FORCING ON AUTO EMISSIONS                                        745



FIGURE 15-1

*A modern urban scene with air pollution caused by automobile emissions. This could be any one of the more than four dozen American cities that are consistently in violation of federal air quality standards due to hydrocarbons, nitrogen oxides, and carbon monoxide produced by automobiles.*

environment. As of 1970, authoritative voices stated that "automotive pollution constitutes in excess of 60% of our national air pollution problem" and more than 80 per cent of the air pollutants in concentrated urban areas.

Congressional concern over the problem of automotive emissions dates back to the 1950s, but it was not until the passage of the Clean Air Act in 1965 that Congress established the principle of Federal standards for auto emissions. Under the 1965 act and its successor, the Air Quality Act of 1967, the [Federal authorities] were authorized to promulgate emission limitations commensurate with existing technological feasibility.

The development of emission control technology proceeded haltingly. The Secretary of Health, Education, and Welfare testified in 1967 that "the state of the art has tended to meander along until some sort of regulation took it by the hand and gave it a good pull…. There has been a long period of waiting for it, and it hasn't worked very well."

The legislative background must also take into account the fact that in 1969 the Department of Justice brought suit against the four largest automobile manufacturers on the grounds that they had conspired to delay the development of emission control devices.

On December 31, 1970, Congress grasped the nettle and amended the Clean Air Act to set a statutory standard for required reductions in levels of hydrocarbons (HC) and carbon monoxide (CO) which must be achieved for 1975 models of light duty vehicles. Section 202(b) of the Act…provides that, beginning with the 1975 model year, exhaust emission of HC and CO from light duty vehicles must be reduced at least 90 per cent from the permissible emission levels in the 1970 year. In accordance with the Congressional directives, the Administrator…promulgated regulations limiting HC and CO emissions from 1975 model light duty vehicles to .41 and 3.4 grams per mile respectively….[4]

---

4. This was a default standard; some car models that were cleaner had even tougher standards. The same regulation also prescribed an interim 3.0 grams per mile 1975 standard for nitrogen oxides (NOx). HC and NOx combine with sunlight to produce photochemical oxidants (ozone), also known as "smog." [Eds.]

Congress was aware that these 1975 standards were "drastic medicine" designed to "force the state of the art." There was, naturally, concern whether the manufacturers would be able to achieve this goal. Therefore, Congress provided...a "realistic escape hatch": the manufacturers could petition the EPA for a one-year suspension of the 1975 requirements, and Congress took the precaution of directing the National Academy of Sciences to undertake an ongoing study of the feasibility of compliance with the emission standards. The "escape hatch" provision addressed itself to the possibility that the NAS study or other evidence might indicate that the standards would be unachievable despite all good faith efforts at compliance.[5] This provision was limited to a one-year suspension....

[The EPA Administrator rejected petitioners' applications for suspensions on the ground that petitioners had not established the unavailability of control technology that could meet the stricter standards. The NAS Report concluded that the necessary control technology was not available.]

Two principal considerations compete for our attention. On the one hand, if suspension is not granted, and the prediction of the EPA that effective technology will be available is proven incorrect, grave economic consequences could ensue.... On the other hand, if suspension is granted, and it later is shown that the Administrator's prediction of feasibility was achievable in 1975 there may be irretrievable ecological costs. It is to this second possibility to which we first turn.

The most authoritative estimate in the record of the ecological costs of a one-year suspension is that of the NAS Report. [The NAS concluded that]

...the effect on total emissions of a one-year suspension with no additional interim standards appears to be small. The effect is not more significant because the emission reduction now required of model year 1974 vehicles, as compared with uncontrolled vehicles (80 percent for HC and 69 percent for CO), is already so substantial.

[The court added that because the technology being tested to meet the 1975 standards would cause fuel economy, acceleration, and "driveability" problems, while adding significantly to the cost of new motor vehicles, "a drop-off in purchase of 1975 cars will result in a prolonged use of older cars with less efficient pollution control devices.... It might even come to pass that total actual emissions (of all cars in use) would be greater under the 1975 than the 1974 standards."]

We also note that it is the belief of many experts — both in and out of the automobile industry — that air pollution cannot be effectively checked until the industry finds a substitute for the conventional automotive power plant — the reciprocating internal combustion (i.e., "piston") engine. According to this view, the conventional unit is a "dirty" engine. While emissions from such a motor can be "cleaned" by various thermal and catalytic converter devices, these devices do nothing to decrease the production of emissions in the engine's combustion chambers. The automobile industry has a multi-billion-dollar investment in the conventional engine, and it has been reluctant to introduce new power plants or undertake major modifications of the conventional one. Thus the bulk of the industry's work on emission control has focused narrowly on converter devices. It is clear from the legislative history that Congress expected the Clean Air Act Amendments to force the industry to broaden the scope of its research — to study new types of engines and new control systems. Perhaps even a one-year suspension may give the industry sufficient time to develop a new approach to emission control and still meet the absolute deadline of 1976. If so, there will be ample time for the EPA

---

5. The suspension provision also included a criterion that the suspension must be "essential to the public interest or the public health and welfare of the United States." [Eds.]

and Congress, between now and 1976 to reflect on changing the statutory approach. This kind of cooperation, a unique three-way partnership between the legislature, executive, and judiciary, was contemplated by the Congress and is apparent in the provisions of the Act....

If the automobiles of Ford, General Motors and Chrysler cannot meet the 1975 standards..., the Administrator of EPA has the theoretical authority...to shut down the auto industry, as was clearly recognized in the Congressional debate. We cannot put blinders on the facts before us so as to omit awareness of reality that this authority would undoubtedly never be exercised, in light of the fact that approximately 1 out of every 7 jobs in this country is dependent on the production of the automobile. Senator Muskie, the principal sponsor of the bill, stated quite clearly in the debate on the Act that he envisioned the Congress acting if an auto industry shutdown were in sight....

This case is haunted by the irony that what seems to be Ford's technological lead may operate to its grievous detriment, assuming the relaxation-if-necessary [of the standards]. If...any one of the three major companies cannot meet the 1975 standards, it is a likelihood that standards will be set to permit the higher level of emission control achievable by the laggard. This will be the case whether or not the leader has or has not achieved compliance with the 1975 standards. Even if the relaxation is later made industry-wide, the Government's action, in first imposing a standard not generally achievable and then relaxing it, is likely to be detrimental to the leader who has tooled up to meet a higher standard than will ultimately be required.

In some contexts high achievement bestows the advantage that rightly belongs to the leader, of high quality. In this context before us, however, the high achievement in emission control results, under systems presently available, in lessened car performance — an inverse correlation. The competitive disadvantage to the ecological leader presents a forbidding outcome...for which we see no remedy.... [The court remanded the case to EPA for reconsideration of its denial of suspension.]

## COMMENTARY & QUESTIONS

1. **Was this really technology-forcing?** Is technology-forcing legislation credible when the bill's sponsor assures his colleagues that the "hammer" (shutdown of large auto manufacturers) will never be allowed to fall? Is it any wonder that the auto industry did not take the threat seriously and instead continued to tinker with add-on devices that would require little modification of existing automobiles and could later be abandoned if Congress changed its mind? In fact, the "three-way partnership" among the legislature, executive branch, and judiciary acted to postpone compliance far beyond the one-year suspension. On remand, EPA granted the extension for both the HC and the CO standards, but promulgated interim standards for 1975 of 1.4 and 15 gpms (grams per mile) respectively.

EPA granted a one-year suspension of the 1976 NOx (nitrogen oxides) standard of 0.2 gpms and set an interim standard of 2 gpms. Through a combination of congressional extensions and congressionally authorized EPA suspensions, the HC and CO standards, based on a 90% rollback, were not finally met until 1980 and 1983 respectively. Congress abandoned the 0.2 gpm NOx standard in 1977 and, in its place, imposed a 1 gpm standard to be met in 1984. By the mid-1980s, the auto industry was willing to accept the standards because market demand was moving toward smaller, less-polluting, and more fuel-efficient vehicles.

Was this an example of successful technology-forcing? Or was the final attainment of the 1975 and 1976 standards merely accidental?[6] Was attainment "too little, too late"?

2. **Why the denial?** Why did EPA deny the one-year suspension, knowing that its decision was in conflict with the prestigious NAS Report and sensing the lack of congressional support for strict deadlines and draconian enforcement? EPA must have realized that its denial would be overturned by a court or Congress (or both, as it turned out). Is it possible that although EPA wanted to censure the auto industry for its failure to make a genuine effort to consider new technology and its alleged conspiracy to suppress new technology, the agency believed that it would have been politically inexpedient to try to prove that the auto industry had violated the requirement of making "all good faith efforts" to meet the standards?

3. **Rewarding the laggard and the risks of leading the way.** Was the court correct in its assumption that a company making good faith efforts to comply with the standards would inevitably be disadvantaged by a standard relaxation dictated by the overall public interest? Whenever standards are set and then reset at different levels, parties that comply quickly may suffer unintended penalties. What if standards are tightened after a company has invested in new technology in order to meet the first change in the standard? What if a rollback approach is taken after one firm has already reduced its emissions? Both situations pose serious interpolluter equity problems that a regulatory scheme should address. (Another approach to this problem is found in §306(d) of the CWA, which provides that a new source of water pollution that has achieved its New Source Performance Standards cannot be subject to stricter standards for ten years or the depreciation or amortization period of the facility, whichever ends first.) What about using incentives such as tax deductions or preferential governmental purchasing to add inducements to early compliance?

4. **The court's balancing test.** Note that the court's cost-benefit analysis followed Talbot Page's recommendation in Chapter 1 that the costs of false negatives be weighed against the costs of false positives in making environmental regulatory decisions. In this case, as analyzed by the court, the cost of a false negative (not granting the suspension when it should have been granted) was relatively high in economic terms, while the cost of a false positive (granting the suspension when it should not have been) was relatively low in environmental terms. Given the broad "public interest" test articulated by Congress, balancing the costs of potential erroneous decisions appears to have been justified. But did the court conduct the balance fairly in light of the fact that the one-year extension was not a firm one, making further slippage predictable?

5. **Types of technology-forcing mechanisms.** Note that, in the case of auto emission controls, Congress itself set the standards based on technology-forcing, instead of delegating standard setting to the experts at EPA. With regard to the phaseout of lead in gasoline, on the other hand, Congress generally delegated to EPA the authority to control or prohibit fuel additives (42 U.S.C. §7545(c)), and EPA did the rest. Why did Congress retain direct control of auto emission standard setting? Because it wanted to

---

6. One serendipitous result of the standards was the EPA phaseout of leaded gasoline; lead poisons the catalytic converter. [Eds.]

ensure that the standards could be modified quickly if they proved to be unachievable? Because it was afraid that EPA would be unable to resist the political power of the auto industry? Because it wanted to take primary credit for responding to this important issue?

6. **The 1990 CAA Amendments, technology-forcing, and auto pollution.** By 1987, emissions of HC, CO, and lead from new cars had dropped by over 95% from uncontrolled levels, and emissions of NOx dropped by over 75%, but increases in automobile use caused ambient air quality standards for ozone to be exceeded in many urban areas.[7] With the lessons of its 1970 technology-forcing effort firmly in mind, in 1990 Congress adopted a more sophisticated but still aggressive technology-forcing strategy to cope with ozone nonattainment problems.

> ### Henry Waxman, Gregory Wetstone, and Phillip Barnett, Cars, Fuels and Clean Air: A Review of Title II of the Clean Air Act Amendments of 1990
> 21 Environmental Law 1947, 1991–2004 (1991)

A major innovation in Title II is the clean-fuel vehicle program, contained in new part C. This program requires the use of a new generation of "clean fuel vehicles" in the most heavily polluted cities. These vehicles, which must meet emission standards eighty percent below today's standards, will often run on clean alternative fuels, such as natural gas, ethanol, or even electricity....

The clean-fuel requirements for light-duty vehicles and light-duty trucks in the final legislation have three central components. First, new sections 242 through 245 establish special emission standards for clean-fuel vehicles. Second, new §246 establishes a program to require the use of clean-fuel vehicles in centrally fueled fleets in polluted cities. Finally, new §249 establishes a large-scale program to introduce clean-fuel vehicles to the passenger car market in California.

Section 242 of the Act requires EPA to set emission standards for clean-fuel vehicles in two years. These standards...mandate a [sixty and later an] eighty percent reduction in exhaust emissions of organic gasses and NOx from today's already controlled levels. They are intended to develop a new generation of clean vehicles, in a fuel-neutral manner. The most heavily polluted cities must reduce aggregate emissions of VOCS [volatile organics] and NOx by sixty to eighty percent from today's levels — and keep them there notwithstanding future economic and population growth — to attain the federal health standard for ozone. This is an immense undertaking, made more immense by the fact that most polluted cities have already adopted most of the obvious control measures. It cannot be accomplished unless vehicle emissions are cut drastically. Indeed, Los Angeles, the most polluted city in the country, cannot achieve attainment by 2010 without the widespread use of zero-emission, electric vehicles.

The standards for clean-fuel vehicles reflect this imperative.... In percent terms, this [eighty percent reduction] is equivalent to the level of technology-forcing required by the 1970 amendments. Under the new clean-fuel standards, organic gas and NOx emissions will be reduced ninety-eight percent below uncontrolled levels.

Meeting these standards will necessitate major advances in vehicles and fuels. Unlike any standards previously established, the final standards appear unachievable by vehicles running on conventional gasoline. They probably can be met by vehicles that use reformulated gasoline,

---

7. Nearly 50% of the U.S. population lives in areas with unhealthy levels of ozone, and approximately half of all ozone is produced by automobiles. [Eds.]

but only if manufacturers develop an additional "preheated" catalyst to capture the emissions that occur during the first seconds of operation. Vehicles built to run on alternative fuels like natural gas, ethanol, or methanol are also likely to meet the standards....

The 1990 amendments establish two programs to require the use of clean-fuel vehicles meeting the [emissions] standards.... One is for fleet vehicles and one is for passenger cars in California.

The fleet program...requires clean-fuel vehicles to be used by the owners of centrally fueled fleets of ten or more vehicles in serious, severe, and extreme ozone nonattainment areas. Examples of centrally fueled fleets are fleets of delivery vans, taxicabs, or school buses that regularly refuel at a common location. When the program is fully phased in, it is expected to cover 250,000 vehicles per year.... By model year 2000, seventy percent of the new vehicles purchased by covered fleet operators must be clean-fuel vehicles.... To ensure that the clean-fuel vehicles run on the clean fuels for which they are designed, the [fleet owners must] fuel the vehicles exclusively with clean fuels....

Ultimately, clean-fuel vehicles must penetrate the passenger-car market to achieve major reductions in air pollution. For this reason, the second clean-fuel program in part C establishes a mandatory pilot program in California that will introduce clean-fuel vehicles to the passenger-car market....

Developing a successful alternative fuels program is often said to pose a "chicken and egg" problem. Car makers argue that they should not be forced to make clean-fuel vehicles until clean fuels are widely available. Oil companies argue the converse: they should not be forced to make clean fuels until clean-fuel vehicles are widely available. Both sides argue that even if the vehicles and fuels are available, there is no guarantee that the consumer will buy them.

The fleet program...tackles this problem through a demand-side approach: it requires fleet operators to buy clean-fuel vehicles and to refuel them with clean fuels. These requirements create a built-in demand that overcomes the "chicken and egg" issue. In the case of the passenger car market, however, it is not practical to mandate that a certain percentage of consumers buy only clean-fuel vehicles. Instead, the California pilot program takes a supply-side approach to ensuring the use of both clean-fuel vehicles and clean fuels.

The California pilot program mandates that vehicle manufacturers produce and sell minimum volumes of clean-fuel vehicles in California. [The California Air Resources Board has determined that two percent of the cars offered for sale in the 1998 model year must be electric, rising to five percent in 2001 and ten percent in 2003.]

The "production mandate" in the California program makes it the obligation of the vehicle manufacturer to ensure that the vehicles find their way into the consumer's garage. The program thus capitalizes on the enormous capacity of manufacturers to influence vehicle purchases. Car companies control the most important factors that affect consumer purchases: they determine how well the vehicle will perform, what its styling will look like, how the vehicle is advertised, and at what price the vehicle will sell. The production mandate forces manufacturers to develop and market a vehicle that consumers will want to buy — which is exactly the incentive that is needed to make the clean-fuel program a success.

### COMMENTARY & QUESTIONS

1. **Auto emissions control since 1990.** Once again, implementation of technology-forcing legislation in the auto emissions control area has not gone smoothly. The CAA preempts state regulation of emissions from new automobiles except for California — the only "extreme" ozone nonattainment area — which can

A. TECH-FORCING ON AUTO EMISSIONS                                             751

petition EPA for a preemption waiver. Other states may "piggyback" on the California standards under certain conditions.[8] Most of the judicial activity in this area has involved the attempt by several of the 12 northeastern states and the District of Columbia, organized as the Ozone Transport Commission (OTC), to adopt the California standards in whole or part. As indicated above, the California Air Resources Board (CARB) initially determined that 2% of the cars offered for sale in California in the 1998 model year had to be Zero Emission Vehicles (ZEVs) powered by electricity, rising to 5% in 2001 and 10% in 2003 (model year 2004). New York and Massachusetts adopted this program (called California-Low-Emission Vehicle, or CAL-LEV) virtually intact. In 1996, however, CARB, accepting the arguments of the automobile manufacturers that advanced battery technology for practicably fueling electric vehicles was unavailable, repealed the 1998 and 2001 requirements, while retaining the requirement that the manufacturers include ZEVs as 10% of their California sales in 2003. This CAL-LEV modification left New York and Massachusetts, which had adopted the original CARB standards, out on a limb. See, e.g., American Auto. Mfrs. Ass'n v. New York Dep't of Envtl. Protection, 152 F.3d 196 (2d Cir. 1998) (New York's ZEV quotas, replicating California's initial quotas, do not satisfy the "identicality" requirement because California modified its quotas for 1998-2002).

In 2001, CARB, concerned about the marketability of battery-powered electric vehicles, again modified its requirement that major auto manufacturers include ZEVs as 10% of their California auto fleets in 2003. The 2001 rules retained the 10% ZEV target for 2003 but changed the ways by which auto manufacturers could meet it: 2% were required to be full-sized ZEVs, powered by electric batteries or hydrogen fuel cells; another 2% could be natural gas-powered or hybrid vehicles; while the remaining 6% could be a mixture of gasoline-powered Ultra Low-Emission Vehicles (ULEVs). Under pressure from a federal preemption lawsuit brought by automobile manufacturers against the 2001 CAL-LEV modifications, CARB adopted new 2003 ZEV regulations offering two new compliance paths: (1) a "base path" in which 10% of auto fleets sold in California, from 2005 through 2008, must be ZEVs (i.e., a mixture of cars powered by hydrogen or electricity, hybrid electric-gas and hydrogen-gas vehicles, and ULEVs), with a ZEV quota increasing to 11% for the 2009–2011 model years and to 16% in the 2018 model year; and (2) an "alternate path" obligating manufacturers to offer fixed minimum annual quotas of hydrogen fuel cell vehicles in the California market — 250 between 2005 and 2008, 2500 between 2009 and 2011, 25,000 between 2012 and 2014, and 50,000 between 2015 and 2017. Despite CARB's vacillation regarding CAL-LEV standards, four of the OTC states — Maine, Massachusetts, New York, and Vermont — have opted to follow the California regulations.

Has the California preemption waiver created a chaotic implementation climate with regard to the technology-forcing strategies in the 1990 CAA Amendments? Is CARB

---

8. The California preemption waiver and other state "piggyback" provisions can be found at 42 U.S.C. §§7543 and 7589. See also Motor Vehicle Mfrs. Ass'n of the U.S. v. New York State Dep't of Conservation, 15 F.3d 521 (2d Cir. 1993) (substantially upholding New York's adoption of the California program), and Association of Int'l Auto. Mfrs. Inc. v. Massachusetts Dep't of Envtl. Protection, 208 F.3d 1 (1st Cir. 2000) (striking down Massachusetts's adoption of the California ZEV mandates for 1998-2002 for lack of "identicality"). See the discussion of the latter decision and other cases of preemption of state automobile regulations, in Chapter 6.

merely reacting to technological change rather than stimulating it? Will the confusing demands caused by this "moving target" be counterproductive? Should the preemption waiver be repealed? Or has CARB's resolute but mercurial approach to auto pollution control been one factor in persuading the auto industry to develop an entirely new technology — the hydrogen car?

2. **The hydrogen car is approaching: Does it need a push?** Or is it going too fast? In the long run, automobiles probably will be powered by fuel cells, made with platinum-coated membranes that convert hydrogen and oxygen into electricity and emit only water vapor and hydrogen as residuals. Many of the technological obstacles to introducing an environmentally benign hydrogen-powered internal combustion engine into the commercial automobile market have already been surmounted, except for designing relatively clean hydrogen production systems and viable distribution networks. Hydrogen will be manufactured initially from gasoline or natural gas, which might result in exacerbated greenhouse gas emissions as well as development of natural gas resources located in sensitive environmental areas. (Hydrogen can be created by first producing electricity and then running it through water using a process called electrolysis, which separates the oxygen and hydrogen molecules.)

In his 2003 State of the Union speech, President George W. Bush announced a "FreedomFUEL" initiative to assist in researching and developing technologies for hydrogen fuel production and distribution infrastructure. This new initiative supplements the "FreedomCAR" program, announced in 2002, which was intended to facilitate the development of hydrogen-powered vehicles. The announced goal of these federal subsidy (nearly $2 billion over five years) programs is to make affordable fuel cell vehicles available to the public by 2020.

The Bush II Administration proposals, however, do not guarantee that these vehicles will in fact be available by 2020. Should technology-forcing, in addition to governmental research and development subsidies, be employed in order to develop hydrogen-powered automobiles more quickly? The answer appears to be that technology-forcing is unnecessary because the automobile industry has accepted the inevitable transition from petroleum to hydrogen-powered automobiles. Previous technology-forcing lawmaking has convinced the auto manufacturers (as has the inexorable rise in ozone levels in the cities of the developing world) to abandon their inveterate opposition to technological change in automobile design and instead to maximize the commercial opportunities inherent in hydrogen car development. There is currently fierce international competition to produce and demonstrate hydrogen-powered cars, with every major auto manufacturer — either alone or in consortium with other companies — demonstrating a hydrogen-powered prototype vehicle.

Critics of the Bush II Administration proposals argue that ignoring the emissions and energy use involved in producing and delivering hydrogen fuel undervalues the environmental advantages of hybrid petroleum-electric powered vehicles (HEVs), which are now available. At least until we learn to extract hydrogen from water through the use of green technologies, such as wind and solar power, contend these critics, a hydrogen fuel-cell vehicle is no better than a diesel hybrid in terms of total energy use and

greenhouse gas emissions. Moreover, some scientists are concerned that apart from the process of manufacturing hydrogen, the leakage of hydrogen fuel from automobile use might have major adverse environmental impacts. The hydrogen cycle is incompletely understood. Researchers at California Institute of Technology have warned that

> the widespread use of hydrogen fuel cells could have hitherto unknown impacts due to unintended emissions of molecular hydrogen, including an increase in the abundance of water vapor in the stratosphere.... This would cause atmospheric cooling, enhancement of the heterogeneous chemistry that destroys ozone, an increase in noctilucent clouds, and changes in tropospheric chemistry and atmosphere-biosphere interactions. Tromp et al., Potential Environmental Impact of a Hydrogen Economy on the Stratosphere, 300 Science 1740–1742 (2003).

In the short term, perhaps we need technology-forcing and subsidies for the further development and introduction of HEVs, while performing research on (1) "the emissions that could be produced by a hydrogen economy," (2) ways in which "such emissions could be limited and made negligible, although at some cost against which potential environmental impacts must be balanced," and (3) the possibility that soil uptake of increased hydrogen emissions "could entirely compensate for new anthropogenic emissions." Id.

3. **Technology-forcing for fuel efficiency.** Until a hydrogen-powered automobile is widely available, reductions in auto emissions, decreased dependence on foreign oil imports, and petroleum extraction in environmentally sensitive areas can be achieved not only by emissions controls but also by increasing automobile fuel efficiency. During the 1970s, when OPEC placed an oil export embargo on the United States because of political unrest in the Middle East, Congress enacted Corporate Average Fuel Economy (CAFÉ) standards, which required passenger car fleets to achieve an average of 27.5 mpg and light trucks and sport utility vehicles (SUVs) 20.7 mpg. Since Middle Eastern oil has again become abundant and America has become enamored of the SUV (which is classified as a light truck for fuel-efficiency purposes), the average mileage of vehicles sold in the United States has steadily declined. In 1995, after intense lobbying by the auto and petroleum industries and autoworker unions, Congress enacted a ban on federally funded research on increasing automobile fuel efficiency. This ban was lifted in the 2002 appropriations process, at the behest of the Bush II Administration.

In 2001, the National Research Council released a report entitled "Effectiveness and Impacts of Corporate Average Fuel Efficiency Standards," which recommended that the CAFÉ standards be made stricter because the technology exists to significantly improve vehicle fuel efficiency without reducing vehicle size or sacrificing performance. The NRC also recommended that technology-forcing be implemented with a lead time of 10 to 15 years. Opponents of stricter CAFÉ standards argue that past increases in fuel economy have led to smaller, lighter cars with decreased "crashworthiness." Other opponents predict that a tightening of CAFÉ standards would be counterproductive from a pollution control standpoint because benefits would be offset by an increase in vehicle miles traveled caused by lowering the cost of driving.

On April 1, 2003, the National Highway Traffic Safety Administration promulgated a regulation tightening the CAFÉ standard for light trucks by 1.5 mpg over three years —

i.e., from the current 20.7 mpg to 21.0 mpg for model year 2005, 21.6 for model year 2006, and 22.2 mpg for model year 2007. Is this modest change in the fuel-efficiency requirement sufficient to make a difference, or is it relatively cosmetic?

4. **Technology-forcing: the auto verdict?** The congressionally dictated 90% rollbacks in auto emissions certainly caused major disruptions in the automobile industry by derailing ongoing investment planning, rewarding laggards, forcing the companies into expensive last-minute attempts to retool the old design engines rather than being able to take the time to design new ones, and costing as much as $18 billion.[9] On balance, was it a good idea? What would the air in traffic jams probably look like today had Congress imposed a more typical harm-based or technology-based review-and-permit standard? Michael Walsh, former EPA Director of Motor Vehicle Emissions Regulation, has said that "Title II was blunt, but it was the only thing that would work…. Forcing technological development through a 'regulatory hammer' has been and continues to be the only demonstrated way to succeed." Telephone interview, Oct. 16, 1991. It is doubtful whether any regulatory device but the blunt, powerful instrument of technology-forcing would have ultimately achieved results that were virtually unthinkable during the 1970s: the advent of an entirely different, nonpetroleum fuel system for powering automobiles.

## B. INTERNATIONAL TECHNOLOGY-FORCING: THE PHASEOUT OF OZONE-DEPLETING SUBSTANCES

The auto emissions case study shows that technology-forcing, which is inherently problematic as a regulatory strategy, becomes increasingly difficult when multiple jurisdictions are involved in setting and implementing standards. If this has been true in the United States, where Congress can preempt state legislation, it is almost inconceivable that technology-forcing could be effective in the international arena, where there is no universal legislature (see Chapters 8 and 26). The improbability of successful international technology-forcing, therefore, underscores the magnificent diplomatic and legal accomplishments of those individuals and nations that negotiated the Montreal Protocol on Substances that Deplete the Ozone Layer.

In 1974 scientists hypothesized that the stratospheric ozone layer protecting the earth from destructive solar ultraviolet radiation was being destroyed by human-generated CFCs (chlorofluorocarbons from refrigeration systems, air conditioners, and other pressurized products). A decade later a huge "hole" — a dramatic seasonal thinning in the ozone layer not predicted by computer models — appeared over Antarctica. Domestic and international environmental law reacted to this threat in three principal legal initiatives:

- Domestic national regulations implementing the international agreements; Amendments to the CAA were adopted in 1977 and 1990 to implement the Protocol in the United States, with other countries adopting analogous policies;

---

9. L. White, The Regulation of Air Pollutant Emissions from Motor Vehicles 64 (1982).

B. INTERNATIONAL TECH-FORCING: STRATOSPHERIC OZONE                    755

- The 1985 Vienna Convention for the Protection of the Ozone Layer, a so-called framework or umbrella agreement designed to facilitate exchange of information and cooperation in research and to create a setting for further policy discussions among states; and
- The 1987 Montreal Protocol on Substances that Deplete the Ozone Layer, an ancillary agreement to the Vienna Convention that contains substantive regulatory measures to protect the ozone layer.

Despite numerous impediments and setbacks, the legal history of stratospheric ozone has largely been a success story. The U.S. National Oceanic and Atmospheric Administration now reports that the ozone layer is expected to recover by the middle of the twenty-first century. The following excerpt describes both the international negotiation of the Montreal Protocol and the tensions between the U.S. Congress and Executive Branch over the terms of the agreement.

### Steven Shimberg, Stratospheric Ozone and Climate Protection: Domestic Legislation and the International Process
21 Environmental Law 2175 (1991)

Ozone is a toxic compound consisting of three oxygen atoms. It is also the only gas in the atmosphere that prevents harmful solar ultraviolet radiation from reaching the surface of the Earth.... Most of the Earth's atmosphere resides in the stratosphere — the region extending from approximately six miles to thirty miles above the Earth's surface. It is this stratospheric ozone layer that serves as Earth's main shield against harmful solar radiation. A decrease in stratospheric ozone produces an increase in the amount of ultraviolet radiation that reaches the Earth. Increased exposure to solar radiation results in increased incidence of skin cancer, cataracts, and may cause suppression of the immune system. Increased ultraviolet radiation has also been shown to damage crops and marine resources.[10]

Prior to anthropogenic influences, the destruction and creation of stratospheric ozone occurred as part of a natural continuing process that maintained a relatively constant amount of ozone in the stratosphere. The introduction of CFCs and similar manufactured substances, however, upset the natural balance of nature. These persistent, stable compounds are not destroyed in the troposphere but survive and rise up into the atmosphere, where the sun's radiation breaks them apart, releasing the chlorine atoms that are integral parts of the molecules. The released chlorine then reacts with ozone to form chlorine monoxide and oxygen, and in the process, destroys ozone molecules.

In addition to the role CFCs play in destroying the stratospheric ozone layer, CFCs are also connected to the global climate change that is predicted to occur as a result of an intensified greenhouse effect.... CFCs are estimated to account for a substantial portion of the problem — from fifteen to twenty percent....

In 1974, Drs. Sherwood Rowland and Mario Molina, from the University of California, published a paper demonstrating how CFCs destroy ozone in the atmosphere.[11] In this country, the original scientific theory prompted Congress to include, in the Clean Air Act Amendments

---

10. At ground level, ozone is a criteria pollutant, regulated as such under the CAA as discussed in Chapter 11. The problem of protecting the stratospheric ozone should be distinguished from that of combating photochemical smog at the Earth's surface. [Eds.]

11. Molina & Rowland, Stratospheric Sink for Chlorofluoromethanes: Chlorine Atom-Catalysed Destruction of Ozone, 249 Nature 810 (1974). Drs. Molina and Rowland received the 1995 Nobel Prize in chemistry for this research. [Eds.]

of 1977, a provision authorizing the Administrator of EPA to regulate "any substance...which in his judgment may reasonably be anticipated to affect the stratosphere, especially ozone in the stratosphere, and such effect may reasonably be anticipated to endanger public health or welfare." In 1978, the EPA and the Food and Drug Administration promulgated a ban on the use of CFCs in most aerosols [e.g., in cans of hair spray or deodorant]. There were [then] no measurements of actual ozone loss, just the scientific theory.

Recognizing the problem, industry began to look for safe substitutes. Progress was being made when, in the early 1980s, Ronald Reagan became President of the United States; the threat of further government regulation subsided; the search for substitutes came to a virtual stand-still; and worldwide use of CFCs continued to grow. Despite the aerosol ban in the United States, nonaerosol uses of CFCs in this country [e.g., in refrigerators and automobile air-conditioners] grew to record high levels and per capita use of CFCs in the United States reached levels that were among the highest in the world. By the middle of the 1980s, the United States was producing approximately 700 million pounds of CFCs each year, roughly one-third of the world total.

In 1985, scientists discovered a significant loss of stratospheric ozone over a large portion of the southern hemisphere. The affected area was approximately the size of North America. This collapse of the stratospheric ozone layer was not predicted by any of the scientific theories or models. Measurements of what had become a seasonal phenomenon revealed losses of greater than fifty percent in the total column of stratospheric and tropospheric ozone and greater than ninety-five percent in stratospheric ozone between an altitude of fifteen to twenty kilometers — nine to twelve miles. The discovery of this "hole" in the stratospheric ozone layer over Antarctica gave renewed impetus to international and domestic efforts to understand and protect the ozone layer….

A new round of international negotiations was scheduled to begin in December 1986.... On February 19, 1987, legislation was introduced in the Senate to impose unilateral controls on the production and use of CFCs and related compounds such as methyl chloroform, carbon tetrachloride, and hydrochlorofluorocarbons (HCFCs). Trade restrictions were included in the bill as a means of forcing other nations to adopt comparable programs to curb CFCs and to avoid placing the domestic industries that would be subject to controls at a competitive disadvantage in the world marketplace [in a manner similar to the Pelly and Packwood Amendments discussed in Chapter 8 – Eds.].

As the international negotiations progressed through the spring and summer of 1987, congressional pressure and the attention of the national news media remained focused on the activities of the U.S. delegation. At a May 1987 congressional hearing, the U.S. negotiators were reminded that they were being watched carefully, encouraged to resist efforts to weaken the U.S. negotiating position, and urged to continue to press for virtual elimination of CFCs. At that hearing, representatives of EPA reviewed the results of a six volume risk assessment that had been prepared by the Agency. They also presented the results of recent studies that showed the overwhelming positive cost-benefit ratio associated with elimination of CFCs and related compounds.

The date of May 29, 1987 represents a watershed for proponents of stringent CFC controls. On that day, the news media published reports of recent efforts by Secretary of the Interior Donald Hodel to revoke the authority of the U.S. delegation to negotiate significant reductions in the production and use of ozone-destroying compounds. The Washington Post's front page headline read: "Administration Ozone Policy May Favor Sunglasses, Hats; Support for Chemical Cutbacks Reconsidered."... The public outcry was prompt and furious. The opponents of mandated reductions in the production and use of ozone destroying compounds had created a backlash that virtually guaranteed the imposition of stringent controls….

In accordance with Article 2, section 2 of the U.S. Constitution, the international negotiations that led to the September 1987 signing of the Montreal Protocol on Substances that Deplete the Ozone Layer (the Protocol) and the June 1990 agreement in London to strengthen the Protocol were conducted by the Executive Branch of the United States Government. Throughout the negotiations, however, the U.S. Congress was proceeding on a parallel track with domestic legislative proposals designed to protect the stratospheric ozone layer — the thin atmospheric shield that safeguards life on Earth from dangerous ultraviolet radiation.

On September 16, 1987, more than two dozen nations concluded negotiations and signed the Montreal Protocol on Substances that Deplete the Ozone Layer. Signatories to the Protocol, including the United States, agreed to respond to the threat of global ozone depletion by imposing limits on consumption — defined as production plus imports minus exports of bulk quantities — of CFCs....

Within two weeks after the Protocol was negotiated and signed..., the causal link between CFCs and the Antarctic ozone "hole" was substantiated. Efforts to reopen the negotiations and strengthen the terms of the agreement began almost immediately. These efforts, and efforts to impose stringent unilateral controls, received an additional push just one day after the Senate voted to approve ratification of the Protocol. On March 15, 1988, the Ozone Trends Panel, a group of more than one hundred scientists from around the world, released an international study on global ozone trends. The Panel's report demonstrated that destruction of the ozone layer was not limited to remote uninhabited portions of Antarctica. Scientists observed and measured losses of ozone on a global scale, including significant losses over densely populated portions of the northern hemisphere. This and similar scientific reports created a new sense of urgency and highlighted the need for controls that went beyond those agreed to as part of the original Protocol.

The Protocol was ratified by a sufficient number of countries to enter into force on the scheduled date of January 1, 1989. Momentum for an international agreement to eliminate CFCs began to build during the spring of 1989. Several nations, including the United States, pledged to support a rapid international phase-out of CFCs. At the same time, momentum was building for the imposition of more stringent unilateral domestic controls.[12]...

In preparation for a diplomatic conference scheduled to be held in London at the end of June 1990, international negotiations to strengthen the Protocol were initiated in the summer of 1989. At the June 1990 diplomatic conference, the second meeting of the parties to the Protocol, an international agreement to strengthen the Protocol was reached.... Despite the new international agreement, Congress proceeded to enact domestic legislation that was more stringent than the newly strengthened Protocol....

The legislative proposals under consideration were more stringent than the proposed Protocol provisions that were being supported by the U.S. delegation to the international negotiations, and were designed to accomplish several objectives: first, to encourage the U.S. delegation to support a more stringent Protocol than it was otherwise prepared to support by creating a serious, viable threat of congressional enactment of more stringent domestic legislation; second, to encourage the delegations of other nations to support a more stringent protocol...by creating a...threat of [U.S.] trade sanctions; third, to eliminate the disproportionately large U.S. contribution to the problems of ozone depletion and global climate change that are created by emissions of chlorofluorocarbons (CFCs) and other ozone-destroying compounds and reestablish the United States as a world leader in matters relating to environmental protection; and finally, to

---

12. In March 1989, the Federal Republic of Germany's Bundestag unanimously decided to proceed with unilateral action and adopted legislation mandating a 95% reduction in production and use of CFCs by 1995.

force domestic industries to develop safe alternatives more quickly than would be required under the terms of the protocol.

The signing of the Protocol on September 16, 1987 was an historic event. It was, however, only "a major half-step forward." Even after the international agreement to strengthen the Protocol was reached at the Second Meeting of the Parties to the Montreal Protocol in London on June 29, 1990, the U.S. Congress proceeded to enact more stringent domestic legislation....

Throughout the effort to enact domestic legislation, [industry] opponents of unilateral action argued that such action would do nothing to help the environment; would put domestic industries at a competitive disadvantage; and would tie the hands of the U.S. government [negotiators].... These arguments were soundly rejected when the [U.S. Congress]...passed the 1990 [CAA] Amendments, and on November 15, 1990 President Bush signed the bill that became Public Law 101-549....

The 1990 Amendments include provisions that are more stringent than the Protocol in three major areas: first, the Amendments include an accelerated phase-out schedule for CFCs, halons, and methyl chloroform; second, the new law includes provisions to control and ultimately eliminate production and use of HCFCs;[13] and third, it includes provisions to eliminate emissions of ozone-destroying compounds and substitute compounds....

#### COMMENTARY & QUESTIONS

1. **Lessons from ozone.** The legal history of stratospheric ozone holds many crucial lessons for the future of Earth. The underlying problem originally seemed intractable and immensely costly to tackle. Alternatives to cheap and useful CFCs were not readily at hand, necessitating a leap of faith in industry's innovative capacity to identify substitutes. Crafting a solution required a global bargain, delicately balancing the needs of industrialized and developing countries. Fraught with scientific uncertainty, saving the ozone layer required governmental negotiators and scientists to communicate with each other in new and unfamiliar ways. Connections to apparently unrelated issues such as trade created additional complications. Since no state had domestic mechanisms in place adequate to the task, all the participating governments were simultaneously creating new domestic environmental law as well. The interplay among all these factors without doubt will characterize the next generations of environmental treaties.

The stratospheric ozone negotiations also invigorated a public culture of global lawmaking. Extensive press coverage of threats to the ozone layer created an unprecedented sense of public apprehension and urgency. As one of the first major environmental agreements with serious consequences for industry, the ozone negotiations became a policy battleground to an extent never before experienced on the international level.[14] The ozone negotiations were also a watershed for vastly expanded

---

13. Some of the compounds that are being promoted as substitutes for CFCs, such as hydrofluorocarbons, may be safe for the ozone layer due to lack of a chlorine molecule, but due to radioactive forcing properties, are expected to contribute to an intensified greenhouse effect....

14 In opposing enhanced controls on CFCs, an industry representative publicly opined that automobile air-conditioners had "come to be regarded" as essential and therefore were untouchable as a matter of public policy. During the drafting sessions on the Protocol, a U.S. negotiator even accused one of the authors, then representing an environmental advocacy organization, of "trying to take refrigerators away from our grandchildren."

participation in international negotiations by environmental organizations — in international parlance NGOs (nongovernmental organizations). Governmental negotiators accustomed to working largely behind closed doors faced new demands for accountability and transparency. Although all of this might go without saying in the United States, active public involvement in international environmental policymaking had been infrequent and sporadic before the ozone negotiations. Now that the debate is largely concluded, and resolved in favor of strict environmental controls, it is all too easy to forget how contentious this issue was during the 1980s — a cautionary lesson about currently controversial threats such as climate warming.

2. **Kick-starting the negotiations into the upper atmosphere.** As noted in the Shimberg excerpt, at the time of the negotiations of the Montreal Protocol, the CAA contained a provision, §157, added in the 1977 Amendments, that expressly anticipated and encouraged cooperative international action on protection of the stratospheric ozone layer.

> §157(b). The Administrator [of EPA] shall propose regulations for the control of any substance which in his judgment may reasonably be anticipated to affect the stratosphere, especially ozone in the stratosphere, if such effect on the stratosphere may reasonably be anticipated to endanger public health or welfare.... Not later than three months after the proposal of such regulations the Administrator shall promulgate such regulations in final form.

In 1980, the Carter Administration, after banning nonessential aerosol uses of CFCs, published an "advance notice of proposed rulemaking" stating that EPA was considering additional controls on other uses of these chemicals. In that notice, EPA stated that "continued world emissions of CFCs (chlorofluorocarbons) are still considered a significant threat to human health and the environment." 45 Fed. Reg. 66726 (Oct. 7, 1980). In 1984, the Natural Resources Defense Council, dissatisfied with the slow pace of further action under the subsequent Reagan Administration, brought suit under this provision to compel domestic regulatory action by EPA. How would you frame the complaint against the Administrator of EPA on behalf of this plaintiff? EPA proposed to settle the lawsuit and subsequently did, publishing a "stratospheric ozone protection plan" in partial response. See 51 Fed. Reg. 1257 (Jan. 10, 1986). How would you structure the settlement agreement to encourage the Executive Branch to obtain the strongest possible international agreement without relinquishing your leverage to require domestic action if international negotiations collapse or produce a poor result? How would you expect this suit and its settlement to affect the international negotiation?

3. **"Frameworking" — the road to Montreal began in Vienna.** Beginning in the late 1970s, ozone negotiators under the auspices of the United Nations Environment Program (UNEP) decided on a two-component process. One piece of work product was a so-called framework multilateral convention. Ancillary agreements, known as "protocols," containing substantive regulatory measures would be appended to the convention. The ozone umbrella treaty evolved into the Vienna Convention for the Protection of the Ozone Layer concluded in March 1985. 26 I.L.M. 1516 (1987). The Vienna Convention itself contains no substantive requirements for regulatory action to protect stratospheric ozone. The negotiation of the Vienna Convention attracted little

public attention, and the agreement might be barely worth notice if the Montreal Protocol had not followed. Negotiations on a CFC protocol, which eventually became the Montreal Protocol, proceeded simultaneously with deliberations on the Convention up to the adoption of the Convention itself in early 1985. The United States even called for a mandatory CFC protocol that all parties to the Convention would have to accept. The principal point of disagreement was a difference in regulatory approach between the European Community (now the European Union) and the so-called Toronto Group of countries, including the United States, Canada, and the Nordic countries. Each side argued that the approach it had already implemented ought to be adopted internationally to the exclusion of the other. The EU limited total production capacity for all uses of CFCs to a level thought to be safe for the ozone layer, approximately a third higher than existing capacity in the mid-1980s. The Toronto Group, on the other hand, had banned nonessential aerosol uses.

Can you make principled arguments for each of these approaches? What are the benefits and disadvantages of each?

When negotiations on the CFC protocol broke down, the Convention alone was adopted. Renegotiation of the protocol after a scheduled one-year cooling off period coincided with an upsurge in public concern about the Antarctic ozone hole, which broke the deadlock and facilitated adoption of the Montreal Protocol in September 1987. In the end, the Montreal Protocol, by requiring substantive reductions in, and ultimately the elimination of, production and consumption of CFCs, proved to be more stringent than either — a case of genuine policymaking on the international level, not just "harmonization" of national regulatory approaches. In structural and legal terms, the legacy of the stratospheric ozone negotiations has been deeply internalized by international policymakers. While not legally required, the framework convention plus protocols model adopted for stratospheric ozone has been routinely, if sometimes slavishly, followed in subsequent multilateral environmental negotiations.

4. **Science in international diplomacy.** Scientific understanding of the stratospheric ozone problem was and is central to the task of crafting a responsive international policy, but diplomatic negotiators rarely have technical scientific training. Consequently, UNEP organized a Coordinating Committee on the Ozone Layer (CCOL) as an institutional link to provide scientific and technical advice to the ozone negotiations. The members of CCOL were scientific experts appointed in their individual and personal capacities. Although some of the individual members might have been employees of national governments, they were expected to operate in a purely collegial, scientific mode. The goal was to create a body that could provide objective and neutral advice on the underlying science to the negotiators who would interpret its policy significance in negotiating instruments such as the Vienna Convention and the Montreal Protocol. The Shimberg excerpt describes subsequent scientific input into the multilateral process, which continues to this day. If you were the chairperson of CCOL, how would you resolve the disputes that inevitably arise between scientists? How would you deal with a scientist who disputed the Rowland-Molina theory and hence the existence of the problem? With a scientist who asserted that the problem was much more severe than the majority view? Despite the potential tensions in such a role, the model

largely worked, with the scientific explanation for such phenomena as the ozone hole, whether provided through CCOL or otherwise, a principal driver in the ozone negotiations, then as now.

5. **Hats, sunglasses, sunscreen, and checks on the Executive Branch.** Initially the Executive Branch was aggressive in the resumed international negotiations on the CFC protocol, advocating deep cuts in production and consumption of compounds that deplete ozone in the stratosphere. As described in the Shimberg excerpt, at a crucial moment the Reagan Administration began to do an about-face. Secretary of the Interior Donald Hodel questioned the need for regulatory interventions, advocating instead that individuals protect themselves from elevated ultraviolet radiation by making use of hats, sunglasses, and sunscreen.[15] This provided an opportunity for some memorable quips — for example, calling the administration's policy the "Ray-Ban Plan," and asking "What does Secretary Hodel want, an entire country that looks like the Blues Brothers?" The President's constitutional role in treaty negotiations puts him in the driver's seat, in the sense that he crafts international law, a function reserved on the domestic level exclusively to the Congress. If that is so, what incentive did Ronald Reagan, or any other President for that matter, have to listen to popular outcry over his conduct of international negotiations?

6. **The delicate interplay between international treaty-making and domestic legislation.** Throughout this case study, Congress was seen as favoring stricter controls on ozone-depleting substances than the Reagan Administration. International agreements, in and of themselves, are not binding on signatory nations; they must be implemented by domestic legislation (see Chapter 8). The U.S. Constitution places the responsibility for negotiating treaties in the Executive Branch but requires ratification by a two-thirds vote of the Senate before a treaty can have the full force and effect of domestic law. In this case, the Senate first ratified the Montreal Protocol and then Congress passed strengthening legislation, which was subsequently signed by a more sympathetic President, George H. W. Bush. One might also imagine a converse situation — like the global warming conventions of the late 1990s — where an administration was more favorably inclined toward a particular treaty than the sitting Congress. In that case, the Senate might refuse to ratify an entire treaty, or else might ratify part of it and reject the rest. Congress might then enact weaker legislation to replace the rejected aspects of the treaty, but the President might veto the bill. Implementing treaties adds another level of complexity to our already elaborate system of checks and balances. Two other valuable studies of the evolution of the Montreal Protocol and national reactions to this process are Benedick, Ozone Diplomacy, Enlarged Edition (1998), and Rowland, Atmospheric Changes Caused by Human Activities: From Science to Regulation, 27 Ecology L.Q. 1261 (2001).

7. **EPA's ambivalent position.** EPA found itself caught between the President and Congress. EPA, along with the FDA, had banned the use of CFCs in consumer aerosol products, but it had not otherwise carried out the broad regulatory authority over

---

15. Peterson, Administration Ozone Policy May Favor Sunglasses, Hats; Support for Chemical Cutbacks Reconsidered, Washington Post, May 29, 1987, at A1.

ozone-depleting substances given to it by Congress in the 1977 CAA Amendments. Most of EPA's efforts in this area had gone into supporting the Executive Branch team attempting to negotiate a Protocol. But, as the scientific evidence supporting the Rowland-Molina thesis mounted, and as Congress and the media began to criticize the Reagan Administration for its timidity regarding ozone-destroying substances, EPA took another tack. At a 1987 congressional hearing, EPA officials testified that the benefits of eliminating CFCs and related compounds would clearly outweigh the costs.

8. **Domestic implementation of the Montreal Protocol.** During the negotiations, the Protocol was expected to be implemented by regulations adopted by EPA under the authority of §157 of the CAA (since repealed and replaced by the 1990 Amendments to the CAA, which are the current legal authority for EPA's regulation of CFCs). Under its Stratospheric Ozone Protection Plan, EPA accepted public comment during the negotiations and prepared an environmental impact statement. Article 2, paragraph 11 of the Montreal Protocol reserves the right to take more stringent measures than provided in that instrument. In responding to the argument of some commenters on EPA's proposed rule that the CAA contained more demanding requirements for the regulation of ozone-depleting chemicals than the Montreal Protocol, the Agency made the following assertion:

> EPA...believes that in deciding whether and how to regulate under §157(b) it may consider other countries' effect on stratospheric ozone and the effect of United States action on other countries' willingness to take regulatory action.... To assess the risk of ozone depletion and the need for regulatory action, EPA must consider other nations' actions affecting the stratosphere. A logical next step in this analysis is what effect United States action could have on other nations' actions now and in the future.... EPA judged that the obvious need for broad international adherence to the Protocol counseled against the United States' deviating from the Protocol, because any significant deviation could lessen other countries' motivation to participate.... Industry commenters also generally agreed with EPA's concern that deviating from the Protocol risked undermining it. They...shared EPA's concern that implementation of more stringent controls would yield little, if any, additional stratospheric protection, while possibly reducing other countries' incentive to join the Protocol. 53 Fed. Reg. 30,566, 30,569, 30,573–74 (Aug. 12, 1988).

What do you think of this argument against unilateral national action as a matter of international strategy? Can you identify counterarguments that might be made by an environmental group advocating stricter unilateral action than required by the Protocol as a domestic strategy? Suppose you are a judge on the U.S. Court of Appeals for the District of Columbia Circuit faced with a petition for review from an environmental organization alleging that EPA's final rule is illegal because it does not require reductions sufficiently stringent to satisfy §157. How, if at all, would the existence of the Montreal Protocol affect your treatment of this petition? Would it make any difference to you that the agreement had or had not entered into force? Would the likelihood of subsequent revisions to the agreement affect your thinking?

9. **International technology-forcing.** The basic approach of the Protocol as adopted in 1987 was to reduce and, in light of the subsequent amendments and adjustments, eventually eliminate production and consumption of CFCs. Because at the time there were

no known substitutes for these cheap, useful, and nontoxic (at least at ground level) chemicals, the Protocol is often cited as an example of a ban designed to create incentives for technological innovation. The 1987 Protocol, however, did not eliminate these chemicals entirely but instead required a 50% reduction in consumption by 1999. Soon after the adoption of the Protocol, the ozone "hole" over Antarctica was connected to CFCs, adding momentum to demands for further reductions and ultimately elimination of these compounds. To some extent, Congress's position was enhanced by Germany's decision, in 1989, to virtually "sunset" all CFCs by 1995 — a far more dramatic reduction than required by the Protocol at that time and on an accelerated schedule by comparison with the international standard. (In 1992, the United States and the remainder of the European Economic Community announced that they would advance their phaseout deadlines to the end of 1995.) In fact, Germany and Japan have utilized technology-forcing to compel the development of "green technologies" that will both prevent domestic pollution and satisfy a growing international demand for minimally polluting industrial processes. See Moore, Green Revolution in the Making, Sierra, Jan./Feb. 1995, at 50. A number of American companies, e.g., Robinair and Trane Company, have also increased their profits by exporting substitutes for CFCs. There has been some discussion in the United States about encouraging technological innovation for pollution prevention through a national "Industrial Policy," but no comprehensive legislation has been enacted on this subject.

10. **Supervising the development of substitutes.** Congress did not leave the development of substitutes entirely to industry. EPA is authorized to certify acceptable substitutes and to prohibit unacceptable ones. Also, industries developing substitutes for banned ozone-depleting substances must notify EPA before introducing substitutes into commerce and also furnish EPA with health and safety data on the substitutes. These notice and reporting requirements were based on provisions in the Federal Insecticide, Fungicide, and Rodenticide Act and the Toxic Substances Control Act (see Chapter 17).

11. **Federal procurement as an incentive.** The federal government is a major consumer of a variety of products, from automobiles to ashtrays. The CAA requires federal agencies to revise their procurement regulations to further the policies of Title VI. Another section of the CAA provides incentives to federal agencies to purchase clean fuel vehicles for their fleets, even if clean fuel vehicles are more expensive than ordinary vehicles (42 U.S.C. §7588). The Resource Conservation and Recovery Act (see Chapter 18) requires federal agencies to procure items composed of the highest percentage of recovered materials practicable or explain why this has not been done (42 U.S.C. §6962). With regard to ozone-depleting chemicals, the U.S. Department of Defense revised its procurement "specs" first to allow, and then to require, use of alternatives to CFC-113 cleaning solvents. See Wexler, New Marching Orders, in Ozone Protection in the United States (Cook ed., 1996).

12. **The judicious use of variances and exemptions.** Congress authorized EPA to grant variances and exemptions to temper the harsh effects of technology-forcing in worthwhile cases (e.g., with regard to essential applications of methyl chloroform where no

substitutes are available) and to allow the production of limited quantities of Class I and II substances for use in medical devices and for export to developing countries that are parties to the Montreal Protocol. Wherever a variance or exemption is authorized, however, it is closely circumscribed as to both the maximum amounts that can be produced for this purpose, as well as the duration of the variance or exemption.

13. **Interpollutant trading and a CFC tax.** Title VI of the 1990 CAA Amendments provides for interpollutant trading in order to achieve reductions of ozone-depleting substances in a least-cost manner. In addition, Congress has imposed an excise tax on these substances, graduated according to the destructive potential of the substance (26 U.S.C. §§4682 et seq.). Pollutant trading and pollution taxes are discussed in Chapter 14. The operation of the interpollutant trading system has helped U.S. companies to meet Protocol requirements without major economic disruptions and at a lower cost than anticipated. Along with environmental benefits, the excise tax has brought in some $2.9 billion in federal revenue in its first five years.

14. **Industry's reaction to technology-forcing.** At first, the Alliance for Responsible CFC Policy, the industrial trade association representing CFC manufacturers and users, argued strongly against a CFC phaseout. But the Alliance reversed its stand after the ozone "hole" was substantiated, and then actually supported the Montreal Protocol. A Texas Instruments plant in McKinney, Texas, which had used CFCs as a solvent to clean lead solder from its circuit boards, achieved compliance with the phaseout by "borrowing" a new soldering process that had been used extensively in Europe but had not yet been adopted in the United States. Using the phaseout as an opportunity to evaluate and install the new technology, the TI engineers found that the new process would leave the circuit boards clean, thus obviating both CFC use and also the disposal of lead-contaminated hazardous wastes. TI's turning of a technology-forcing mandate into a pollution prevention opportunity was facilitated by a unique industry-government coordinating committee entitled the International Cooperative for Ozone Layer Protection (ICOLP). Initiated by EPA, ICOLP's mission was to "promote and coordinate the worldwide exchange of non-proprietary information on alternative technologies, processes, and substances for ozone-depleting solvents." With ICOLP's assistance, other large companies such as Digital Equipment Corp., Ford Motor Co., and IBM were able to phase out their use of CFCs at a relatively modest cost. See Hinrichsen, Fixing the Ozone Hole Is a Work in Progress, The Amicus Journal, Fall 1996, at 35.

E.I. Du Pont de Nemours and Co. discovered the CFC group of chemicals in 1928 and, under the trade name Freon, was its largest manufacturer. Du Pont earned $600 million in revenues from its Freon business in 1987. At the height of its Freon operations, Du Pont maintained 11 Freon plants, including 6 in Europe, Japan, and Latin America, and 5 in the United States. After the 1978 ban on CFC use in consumer aerosols, Du Pont lost one-third of its CFC business and closed several of its Freon manufacturing plants. During the late 1970s, after the publication of Rowland and Molina's findings, Du Pont devoted $3 to $4 million per year to attempts to identify substitutes. However, in the first Reagan Administration years (1980–1984), Du Pont's expenditures for research into Freon substitutes fell to virtually nothing. Since the signing of the Montreal Protocol, Du Pont has reversed course and invested steadily increasing amounts in this

area. For example, in 1988 Du Pont spent more than $30 million on research into potential Freon substitutes. Also during that year, Du Pont announced that it would phase out CFC production by 1997. Much of Du Pont's research has focused on HCFCs, which are less stable than — and only 2% as destructive to the ozone layer as — CFCs. But the CAA Amendments of 1990 require a phaseout of HCFCs by 2030, and in 1995, following the United States' lead, the parties to the Protocol agreed that the developed world would phase out HCFC production by 2020, with the developing world to follow by 2040. There are currently no economically achievable substitutes available for HCFCs, but it is widely believed that Du Pont is feverishly conducting research in order to recapture this potentially massive market. See Buchholz et al., Managing Environmental Issues 261 (1992).

Notice the fundamental difference between the cooperative approach to technology-sharing exemplified by ICOLP and the proprietary search for patents illustrated by Du Pont. Both strategies must be pursued if the search for alternatives to ozone-depleting substances is to be successful.

15. **Enforcing technology-forcing.** Technology-forcing creates economic opportunities not only for enterprising entrepreneurs but for unscrupulous criminals as well. Smuggling illegal CFCs into the United States has become a lucrative business because 90% of automobiles in the United States have air-conditioning, compared to about 10% in Europe. Since the late 1980s, new automobiles have utilized an HCFC substitute for CFCs in their air-conditioning systems, but over 50 million older automobile air-conditioning systems still rely on CFCs, which are becoming scarce and thus expensive. Also, there is a network of small users, such as garages, among which controls on ozone-depleting substances are difficult to promote, monitor, and enforce. In addition, the U.S. excise tax on CFCs has created an incentive for tax avoidance. It has been widely reported that contraband CFCs are the second largest smuggling problem — next to drugs — for U.S. customs agents along the Mexican border.[16]

16. **Laggards, holdouts, and free riders.** A persistent structural impediment in international law, heavily tilted toward consent and consensus, is how to deal with states that are not parties to a particular agreement. Any state may avoid the obligations of the Montreal Protocol, or any other agreement, merely by refraining from signing and ratifying. In the case of the Montreal Protocol, the problem of nonparties was particularly acute because the parties to the agreement were undertaking expensive obligations in purely economic terms. Nonparties would not incur those costs, putting parties to the agreement at a competitive disadvantage. Article 4 of the Montreal Protocol, entitled "Control of Trade with Non-Parties," addresses this issue. The agreement's trade provisions require parties to the Protocol to prohibit imports from and exports to nonparties of bulk CFCs; products containing CFCs, such as refrigerators and air-conditioners; and products manufactured with CFCs that do not contain them, such as computer chips. At the same time, trade in those products was freely permitted among

---

16. On August 29, 1997, a Florida company was fined $37 million by a federal court for smuggling 4000 tons of CFCs into the United States. Jail sentences were also imposed on three company officials. 28 BNA Env't Rep. Curr. Dev. 839 (1997). At the Ninth Meeting of the Parties to the Montreal Protocol, the parties agreed on a new international licensing system to track trade in CFCs.

parties during the phaseout period. Can you explain why negotiators believed this provision was essential? What would you expect the effect of these requirements to be on relations among parties and nonparties? What beneficial results would you expect for the environment?

17. **COPs and MOPs.** Like its predecessor, the Vienna Convention, the Montreal Protocol is an organic instrument that sets out a framework for future cooperative action by the parties to the instrument. Article 6, entitled "Assessment and Review of Control Measures," specifies periodic reviews of the science with an eye to revising the Protocol. Article 11 calls for regular meetings of the parties to the Protocol (MOPs), which in practice are held simultaneously with the conferences of the parties to the Vienna Convention (COPs). As described in the Shimberg excerpt, the first revisions to the Protocol were adopted in 1990. Even before that, at the first MOP held in 1989, the parties to the then-new Protocol, which had just entered into force, adopted a decision entitled the "Helsinki Declaration on the Protection of The Ozone Layer." This document states that the Protocol parties "agree to phase out the production and the consumption of CFC's controlled by the Montreal Protocol as soon as possible but not later than the year 2000." In other words, the Helsinki Declaration states the same goal as the London amendments and adjustments of a year later. What do you think is the purpose of the Helsinki Declaration? What is the Declaration's legal status? If the Helsinki Declaration accomplished this goal in 1989, what need was there for the London amendments and adjustments? Why would Shimberg not even mention the Helsinki Declaration? Can you identify a legal relationship among the Protocol, the Declaration, and the London adjustments and amendments?

18. **Revising the Protocol and a novel twist.** To date, the periodic reexamination of the Protocol has resulted in five revisions: in 1990 in London, in 1992 in Copenhagen, in 1994 in Vienna, in 1997 in Montreal, and in 1999 in Beijing. Customary international law specifies that an amendment to a multilateral treaty is binding only on those states that indicate their affirmative intent to accept those new obligations, ordinarily through ratification or acceptance of the amendment. In effect, an amendment is a new agreement under international law. The drafters of the Protocol, however, saw that the customary rule is an unattractive option for issues such as stratospheric ozone depletion, in which the scientific knowledge underlying treaty provisions is in a constant state of evolution and reassessing international obligations is often desirable, if not necessary. Under the customary rule, there is a serious risk that repeated amendment of an agreement in light of new scientific developments will result in classes of parties, each with its own configuration of obligations depending upon the amendments to which it has acceded. This danger is particularly grave in the case of complex, delicately balanced regulatory regimes such as the Montreal Protocol, where the costs to state parties are high.

## IMPACT OF INTERNATIONAL AGREEMENTS ON CHLORINE LEVELS IN THE STRATOSPHERE



FIGURE 15-2

*This figure shows that, because of the long atmospheric lifetimes of CFCs, the 50% reductions called for in the unamended 1987 Protocol would have been useful but insufficient to protect the ozone layer. The assessment and review procedure in the Protocol provided a basis for the parties to the agreement to take the further, more aggressive action incorporated in subsequent revisions.*

*See http://www.uwmc.uwc.edu/geography/globcat/CL-agreement-impact.htm. See also http://www.niwa.co.nz/shared/faquv8_large.jpg/view.*

In a "sleeper" provision little noticed at the time of its drafting, Article 2, Paragraph 9 of the Montreal Protocol modifies the customary rule by providing for "adjustments" — a term otherwise unknown to international law — that are binding on all parties to be adopted by a two-thirds majority vote. There is no opt-out provision, as with the Whaling Convention discussed in Chapter 8. True majority voting of this sort is virtually unknown to the international legal system, which almost always operates by "consensus" or unanimity. Can you see why there is a preference in international relations for acquiescence by every state, in effect giving every country a veto? What drawbacks can you see to the adjustment process? In an approach worthy of Solomon, but understandable in light of the international bias in favor of consensus, the parties to the Protocol split the difference, adopting adjustments on the streamlined, nonconsensus model for those substances already covered by the agreement, but requiring full-blown amendments to add new substances. As of this writing, 185 states are party

to the Vienna Convention, 184 to the Protocol, and 164, 145, 91, and 47 to the amend-
ments adopted, respectively, in 1990, 1992, 1997, and 1999.

19. **Developing countries.** On the one hand, the widespread phaseout of CFCs has been
a major environmental success story and a triumph of international cooperation for
environmental protection. Despite the odds against such a result — CFCs were stable,
nonflammable, nontoxic, cheap to manufacture, and easy to store; were an essential
component of over $100 billion worth of equipment, including refrigerators, building
and automobile air-conditioners, and factories producing products from solvents to
insulation to medical instruments; and were chemicals for which no acceptable alterna-
tive was readily available — CFCs are no longer being used in many nations of the
world.[17] On the other hand, the CFC phaseout has been incomplete:

> The biggest challenge of all may lie in the developing world and Russia. Most of
> th[e] remaining production of CFCs is being used in Russia and the newly inde-
> pendent states of the former Soviet Union — in violation of their treaty
> obligations. Third World Countries, which account for a smaller share, have
> another decade to phase out CFCs. And their use is predicted to grow enormously
> as countries like China continue to develop toward a consumer-oriented industrial
> economy; expanding in population size all the while. Household appliance compa-
> nies in both China and India, for instance, are planning to produce millions of
> refrigerators and freezers using CFCs, as well as HCFCs, over the next few
> decades....

> The problem in both regions is lack of resources to make the transition. ICOLP, of
> course, is sharing its technological breakthroughs with developing countries. But
> despite the multiple advantages and relatively short payback periods of many of
> these advances, eliminating CFCs requires some hefty upfront investments....

> Many companies in developing countries cannot raise that kind of capital in the
> span of a few years. In theory, there is a mechanism in place to help them do it....
> One of the provisions hammered out during the [Montreal Protocol negotiating
> sessions] was a special Multilateral Fund, to be paid for by the industrialized world,
> which would help poorer countries offset the costs of the phaseout.

> To date, the Fund has financed more than 1,000 projects at a total cost of $440
> million. These projects, which are already in place and working, will eliminate 30
> percent of all ozone depleters used in the Third World by the turn of the century.
> Much of the investment has been used to finance suitable alternatives to CFCs,
> especially as coolants, solvents, and degreasers. "In 1995, we approved $205 million
> worth of projects to phase out 22,000 metric tons of these chemicals in Third
> World countries," says Omar El-Arini, head of the fund. "If we kept that up, we
> could replace all the chemicals the developing countries are committed to phase
> out by 2010, if they continue their current rate of consumption."

> That last qualification, however, is a big one. It is virtually a given that developing
> countries will increase their rate of consumption, and that they will need even
> more help than the framers of the Montreal Protocol originally envisioned. But as
> the ozone emergency has dropped off the front pages and out of the public's

---

17. According to reliable estimates, global production of CFCs declined from more than one million tons in 1986
to about 250,000 tons in 1995; and production of halons decreased from about 200,000 tons in 1986 to about
40,000 tons in 1995; but production of HCFCs rose sharply during that period. 28 BNA Env't Rep. Curr. Dev.
837–838 (1997) [Eds.].

consciousness, the resolve of the signatories has wavered. The multilateral Fund has been receiving about 20 percent less money than was pledged for 1996. Hinrichsen, Fixing the Ozone Hole Is a Work in Progress, The Amicus Journal, Fall 1996, at 38.

Article 5 of the Protocol responds to the demands of developing countries by giving them a 10-year grace period for implementing the obligations in the Protocol. Why do you think the negotiators might have chosen this particular formula? From the point of view of environmental efficacy, is this a helpful provision or a harmful one? Does it reflect an appropriate balance of competing factors?

Assuming that the international phaseout proceeds according to plan, what will be the ultimate effect on the ozone layer?

> Because it can take up to a decade for a CFC molecule to reach the stratosphere, the ozone that is being destroyed today is very probably, in part, being destroyed by CFCs put into the atmosphere before the first ozone hole was discovered. As a result, CFC concentrations in the stratosphere are expected to double from 1989 to 2000, and decades will pass before we feel effects of the resultant five to twenty percent increase in u.v. radiation. Another source claims that half of the total amount of CFCs produced since 1930 will be produced from now until the phase-out is complete, and yet another source predicts increasing ozone destruction for some 20 years and a return to pre-ozone layer hole concentrations around 2050.... One of the most worrisome aspects of the ozone-hole problem is that the worst is yet to come.... We simply do not know how much damage we have done (or will do) to ourselves, to other species, and to the natural balance among the forces that control the biosphere. We know that some destruction will happen, indeed is happening, but the effects are presently impossible to calculate. Newton and Dillingham, Watersheds 155, 165, 167 (1994).

And finally, the most commonly utilized substitutes for CFCs — HCFCs — are themselves less potent ozone-destroying substances, as well as "greenhouse gases."

Studies by the United Nations Environment Programme and the World Meteorological Organization conclude that the Montreal Protocol has been effective in reducing stratospheric ozone depletion. Ozone depletion is expected to peak over the next several decades but will thereafter begin to abate, and ozone levels should return to levels normal in the mid-1950s by the middle of this century. But these agencies caution that the ozone layer will remain particularly vulnerable for the next decade, and that failure to implement the Montreal Protocol and its successor agreements will delay or even prevent recovery of the ozone layer.

At the Fourteenth Meeting of the Parties to the Montreal Protocol, in November 2002, developed nations agreed to a funding package worth approximately $500 million for reducing the use of ozone depletors in developing nations. China, the world's largest manufacturer and consumer of CFCs, has promised to dismantle its 37 CFC manufacturing plants by 2010. In the United States, EPA promulgated regulations in 2003 (68 Fed. Reg. 2819) to phase out HCFCs in a manner similar to the CFC phaseout program.

20. **The rule of law: confronting scofflaws.** Article 8 of the Protocol directs the MOP to adopt noncompliance procedures "for treatment of Parties found to be in non-compliance." In recognition of the fact that there is little to be done if a state party chooses

flagrantly to violate its international obligations, the Protocol prefers the term "compliance" to the stronger concept of "enforcement." Can you imagine why that might be so? In 1992, the MOP adopted a compliance mechanism, administered by an Implementation Committee, that can be triggered either by a third party or by the noncomplying state itself. Why might a state choose to, in effect, accuse itself of noncompliance? If you were the diplomatic representative of a party admittedly not in compliance, how would you frame your presentation to the Implementation Committee? The first two cases considered by the Implementation Committee concerned Russia and Bulgaria, both of which identified serious impediments to compliance. Nonetheless, the Committee declined to recommend cutting off multilateral aid or trade sanctions, probably the two most serious punishments available to the Committee. Can you imagine why the Implementation Committee might have taken such a lenient approach? If you were representing Russia or Bulgaria, can you make an argument that it would be environmentally counterproductive to sanction your client in that manner?

21. **Technology-forcing reconsidered, and pollution prevention.** Technology-forcing can be a viable mechanism for coping with environmental threats if some or all of the following are features of the problem context or regulatory strategy:

- a substantial, and comparatively clear, environmental threat, and especially a direct threat to public health;
- a credible "hammer" limiting the use of, or banning, a dangerous substance;
- substitutes that are at least theoretically recognized and comparable with regard to costs;
- variance and exemption procedures that are flexible, fair, limited, predictable, and enforceable;
- effective market-enlisting mechanisms, such as tax incentives or disincentives, trading systems, preferential governmental purchasing, and opportunities for private industry;
- clear, generally applicable standards without opt-out possibilities, such as the California preemption waiver;
- supervision of the introduction of substitutes in order to avoid adverse unintended consequences;
- adequate enforcement at all stages of the process;
- agreement between the Executive and Legislative Branches with regard to the need for and the structure of the technology-forcing system finally adopted;
- adequate lead time for compliance;[18]

---

18. See Natural Res. Def. Council v. EPA, 655 F.2d 318, 329 (D.C. Cir. 1981) ("the presence of substantial lead time for development before manufacturers will have to commit themselves to mass production of a chosen prototype gives the agency greater leeway to modify its standards if the actual future course of technology diverges from expectation"). In this case, the court upheld EPA's emissions standards for light-duty diesel vehicles based on "trap-oxidizer" technology, even though a durable model of this device was unavailable. This was not a technology-forcing decision, but one regarding the lead time for compliance with a technology-based standard (see Chapter 12).

- on the international level, differential standards for developed and developing nations, technology-sharing and funding assistance by developed nations for the benefit of developing nations, and effective trade restrictions to track and prevent smuggling.

And note the linkage in both international and domestic environmental law between technology-forcing and pollution prevention strategies: As noted earlier, the more rigorous and predictable that environmental protection standards become, the more industry will be motivated to cut back on the use of polluting processes and the volume of pollutants released to the environment.