**United States District Court
District of Massachusetts**

```
                                )
RICHARD MAX STRAHAN,            )
        Plaintiff,              )
                                )
        v.                      )    Civil Action No.
                                )    05-10140-NMG
STEVEN PRITCHARD, in his        )
official capacity as Secretary  )
of the Massachusetts Executive  )
Office of Environmental Affairs,)
DAVID M. PETERS, in his official)
capacity as Commissioner of the )
Massachusetts Department of Fish)
and Game, and PAUL DIODATI, in  )
his official capacity as        )
Director of the Massachusetts   )
Division of Marine Fisheries,   )
        Defendants.             )
                                )
```

**MEMORANDUM & ORDER**

**GORTON, J.**

Conservationist and pro se plaintiff, Richard Max Strahan
("Strahan"), moves for a preliminary injunction enjoining the
defendants from continuing to license certain commercial fishing
equipment that allegedly entangles whales in violation of 16
U.S.C. § 1538 et seq., the Endangered Species Act ("ESA"). The
plaintiff also seeks an order requiring that the defendants
hereafter license only fishing gear that poses no significant
entanglement threat to whales, that the defendants fund research
to develop such gear and that they fund efforts to increase the
size of the whale population. The defendants oppose the motion

-1-

in its entirety.

## I.   **Background**

The ESA prohibits persons from causing any harm to endangered animals. Several species of whale inhabiting the North Atlantic Ocean, including those that are the subject of this lawsuit, are classified as endangered under the ESA and are thus entitled to the protection of federal law.

Because whales are incapable of enforcing their own legal rights, Strahan brings this action on their behalf under the "citizen suit" provision of the ESA, 16 U.S.C. § 1540(g)(1), which authorizes any person to commence a civil suit to enjoin a governmental instrumentality that is alleged to be in violation of the conservation provisions of the ESA. The defendants are officers of three Massachusetts state agencies, the Executive Office of Environmental Affairs, the Department of Fish and Game and the Division of Marine Fisheries. Those agencies are collectively responsible for licensing fishing gear deployed in Massachusetts coastal waters, which consist of those waters within three nautical miles of shore as well as a substantial portion of Cape Cod Bay. The plaintiff alleges that fixed fishing gear, including lobster pot and gillnet equipment, causes endangered whales to become entangled in line, thereby injuring or killing the whales in violation of the ESA.

## A.   Prior Litigation

The issues raised by Strahan in the instant action are nearly identical to those raised more than ten years ago by the same plaintiff in Strahan v. Coxe. 939 F. Supp. 963 (D. Mass. 1996)(Woodlock, J.). In that case, United States District Judge Douglas P. Woodlock found that Strahan had standing to pursue his claims and that officers of the subject state agencies were liable for violations of the ESA. Specific, conclusive evidence was introduced demonstrating that nine right whales and one humpback whale had become entangled in fixed fishing gear in Massachusetts coastal waters. Judge Woodlock also found that, in light of the fisheries regulations in place at the time, such "takings" of endangered whales were likely to continue in the absence of injunctive relief.

The plaintiff in that case requested an injunction enjoining the defendants from issuing any new fixed-gear fishing permits in Cape Cod Bay for a certain period of time and an order requiring them to revoke existing fixed-gear permits. Rather than enter the injunctive relief sought by the plaintiff, Judge Woodlock attempted to fashion an injunction that "respects the contours of both the powers and limitations of a federal court and the protection afforded to an endangered species." 939 F. Supp. at 989. He ordered that, inter alia, the defendants develop and prepare a proposal to be submitted to the court to restrict,

-3-

modify or eliminate the use of fixed fishing gear in coastal
waters of Massachusetts in order to minimize the likelihood of
additional harm to endangered whales by such gear, and that the
defendants convene an Endangered Whale Working Group to engage in
substantive discussions with the plaintiff or his designated
representative, as well as other interested parties, regarding
modifications of fixed fishing gear and other measures to
minimize harm to endangered whales.  Those steps were taken and
the case remained under supervision of Judge Woodlock until it
was eventually dismissed by agreement of the parties in January,
2002.

## B.    The Instant Action

Strahan brings this action on the grounds that, since
January, 2002, endangered whales have continued to become
entangled in fixed fishing gear despite efforts by the defendants
to minimize the number of such entanglements.  The plaintiff
alleges that the following species of endangered whales have been
unlawfully injured or killed by fixed fishing gear: northern
right ("right whales"), humpback, fin and blue.  Right whales are
among the most depleted of whale species, with reportedly fewer
than 1,000 such animals remaining in the Atlantic Ocean.  All
four varieties of endangered whale are known to inhabit
Massachusetts coastal waters, including Cape Cod Bay, for
portions of each year.

-4-

In the amended complaint, the plaintiff alleges three occurrences of right whale entanglements and five humpback whale entanglements in or near Massachusetts waters, between June and November, 2002. The plaintiff specifically alleges that four of those entanglements involved fishing gear licensed by the defendants. The complaint does not allege any specific entanglements of fin whales or blue whales.

## 1. Requested Relief

The plaintiff filed a motion for preliminary injunction on April 18, 2006, but later, on August 15, 2006, filed the amended complaint seeking slightly different preliminary relief from that requested in the original motion. On November 17, 2006, the Court advised the parties, without objection, that it would treat the relief requested in the amended complaint as the plaintiff's pending motion for a preliminary injunction. The plaintiff, therefore, requests the following preliminary relief:

1) an order enjoining the defendants from further licensing and deployment of the allegedly harmful fishing gear until it has been scientifically certified to pose no risk of danger to protected whales ("whale-safe gear"),

2) an order requiring the defendants to fund research and development of whale-safe gear and to amend regulations to require only whale-safe fishing gear in the future,

3) an order requiring that the defendants fund efforts to increase the size of the whale population,

4) an award of costs to the plaintiff and

5) any further relief the Court deems appropriate.

-5-

## 2. The Evidentiary Hearing

The Court ordered an evidentiary hearing on the plaintiff's motion for a preliminary injunction. Testimony of seven witnesses was presented on November 17 and 27, 2006 and the parties made closing arguments on November 28, 2006. Prior to the evidentiary hearing, the Court indicated that it would treat evidence presented at that hearing for purposes of both the motion and the underlying action for declaratory judgment. While the plaintiff originally agreed with that proposition, he later objected both in writing and in open court on the first day of the hearing on the grounds that he had not been allowed sufficient discovery for a full presentation of evidence on the merits of the underlying claim.

On November 28, 2006, during closing arguments after the evidentiary hearing, the plaintiff proposed, for the first time, that the Court bifurcate the proceedings by making a determination on the issue of liability under the ESA and then hold a separate proceeding on the subject of appropriate relief. The plaintiff proposed alternative forms of relief, such as setting a date in the future by which the defendants would be required to adopt whale-safe fishing gear or otherwise come into full compliance with the ESA.

As Judge Woodlock has previously observed, the plaintiff appears pro se perhaps to the detriment of his own cause. While

-6-

Strahan demonstrates an admirable facility with the law and a
true passion for whale conservation, his lack of formal legal
training and sometimes abrupt courtroom demeanor have handicapped
the prosecution of his claims.  Although the Court has repeatedly
advised him that he would be well-served to retain counsel, he
has declined to do so but is, nevertheless, entitled to his day
in court.  The Court has done its best to accommodate the
plaintiff's presentation and to evaluate the evidence that has
been presented in a haphazard manner.

## II.  **Legal Analysis**

### A.  **Standard of Review**

The test for the issuance of a preliminary injunction under
the ESA differs from the traditional test.  For cases arising
under the ESA, the traditional balancing of the parties'
competing interests is not a consideration.  Strahan, 939 F.
Supp. 963, 989.  The statutory language, history and structure of
the ESA indicate that Congress intended that endangered species
be afforded the highest of priorities.  TVA v. Hill, 437 U.S.
153, 174 (1978).  The factors to consider, therefore, are 1) the
movant's likelihood of success on the merits, 2) the likelihood
of irreparable harm in the absence of injunctive relief and 3)
the effect on the public interest, bearing in mind that "the
balance of hardships and the public interest tips heavily in

-7-

favor of protected species." National Wildlife Foundation v.
Burlington Northern R.R., 23 F.3d 1508, 1511 (9th Cir. 1994).

## B.   Likelihood of Success on the Merits

Where the interim relief sought by the plaintiff is
essentially the final relief sought, "the likelihood of success
[on the merits] should be strong." In re Pye, 38 F.3d 58, 63
(1st Cir. 1994). In the instant case, the preliminary relief
requested by the plaintiff is, in essence, identical to the final
relief sought. The Court will not, therefore, enter the
injunctive relief unless the plaintiff has demonstrated a strong
likelihood of success on the merits.

### 1.   Elements of Actionable Claim Under the ESA

The ESA prohibits the "taking" of any wildlife that has been
classified as an endangered species. 16 U.S.C. § 1538(a)(1)(B).
To "take" means "to harass, harm, pursue, hunt, shoot, wound,
kill, trap, capture, or collect" an endangered creature. 16
U.S.C. § 1532(19). Under the ESA, injunctive relief cannot issue
based solely on the possibility that an endangered species might
be disturbed. A plaintiff must show actual harm or harassment.
See American Bald Eagle v. Bhatti, 9 F.3d 163, 166 (1st Cir.
1993). This Court has previously held that the entanglement of
endangered whales in fishing gear constitutes a "taking" under
the ESA. Strahan v. Coxe, 939 F. Supp. at 984. In that Strahan
case, the Court found that endangered whales had been taken as a

-8-

result of entanglement in fishing gear that was licenced by the defendants or was in Massachusetts coastal waters. Id.

## 2.   The Licensing System

Chapter 130 of the Massachusetts General Laws vests the Division of Marine Fisheries ("DMF"), of which the defendant Paul Diodati ("Diodati") is the Director, with broad authority to regulate fishing within the coastal waters of the Commonwealth. Pursuant to that authority, DMF requires that virtually all commercial fishing vessels obtain a permit from DMF before they may take fish, including shellfish, from coastal waters. See 322 C.M.R. §§ 7.01-7.05, 8.08. DMF is a division of the Department of Fish and Game ("DFG"), which, in turn, is under the auspices of the Executive Office of Environmental Affairs ("EOEA"). Defendant David M. Peters ("Peters") is the Commissioner of the DMF and defendant Steven Pritchard ("Pritchard") is the Secretary of the EOEA.

Commercial fishermen must obtain separate licences for fishing in the waters of different jurisdictions. Federal waters, which are those waters more than three miles off shore, are regulated by the National Marine Fisheries Service ("NMFS"). Other states have agencies equivalent to the DMF to license commercial fishing in their own waters. The fishing gear used in each jurisdiction, however, is nearly identical, making it impossible to discern from visible inspection which jurisdiction

-9-

has licensed that gear.  Furthermore, many fishermen obtain
licenses to fish in multiple jurisdictions with the same gear, so
even being able to identify the fishermen who own the gear does
not necessarily reveal the jurisdiction in which it may have been
deployed at any given time.

### 3.    The Evidence

The following facts are drawn from evidence presented during
three days of hearings on November 17, 27 and 28, 2006.  That
evidence consists of the testimony of six witnesses called by the
plaintiff, one witness called by the defendants, and 23 exhibits.

### a.    Fixed Fishing Gear

The principal subject of this lawsuit is a category of
commercial fishing equipment known as "fixed fishing gear."  As
defined and used by the parties, the term "fixed fishing gear"
describes any sort of fishing equipment that rests on the bottom
of the ocean and is attached to a floating buoy by a vertical
line, including lobster traps and gillnet gear.  Lobster traps,
or "pots", are set on the ocean floor and are marked by a
floating surface buoy attached to the traps by a line.
Lobstermen use such buoys to identify the location of their traps
and to haul the traps out of the water.  A series of traps set on
a "trawl" are typically connected by lengths of rope known as
"ground line."  Trawls consist of up to 20 traps set many yards
apart and fishermen may obtain licenses for up to 40 trawls, or

-10-

800 traps. Each trawl is marked by one buoy at either end of the trawl. Because whales can become entangled in any line they encounter in the water, both vertical buoy line and ground line pose a threat of entanglement to endangered whales.

Like lobster pots, gillnet gear is set underwater and is marked on either end by floating buoys attached to vertical lines. The bottom edge of the gillnet is weighted so as to sit on the ocean floor while the top edge floats thus suspending the net upward. Fish swim into the net, are entrapped and caught when fishermen retrieve the nets. Whales can become entangled in the buoy lines and the gillnets themselves, although the actual nets are less frequently the cause of whale entanglements.

### b.  Evidence of Whale Entanglements

The plaintiff alleges that numerous endangered whales have become entangled in fixed fishing gear set in Massachusetts waters. The testimony demonstrated, however, that it is remarkably difficult to determine where or when a whale becomes entangled and, therefore, to attribute liability for such entanglements. Whales are often discovered with pieces of fishing gear attached to their bodies without any identifying components such as a buoy marked with a license number. That may be a result of happenstance or, as the plaintiff has suggested, it may be the nefarious work of unscrupulous fishermen who successfully obscure any association with a whale entanglement by

-11-

removing their buoys from entangled whales. Either way, without an identifying marker, it is impossible to determine the owner of a particular piece of fishing gear or line and equally difficult to determine whether that gear was licensed for use in state or federal waters.

It is also difficult to determine where an entanglement actually occurred. Whales are infrequently observed while caught in a stationery piece of fixed fishing gear. Rather, they are more often found swimming free but wrapped in a line or other equipment that has broken free from the rest of the traps or nets underwater. By the time the entangled whale is discovered, it is impossible to know exactly where it first came into contact with the offending equipment.

The testimony during the evidentiary hearings focused on several specific whale entanglements. A humpback whale was observed to be entangled in the waters off Cape Cod, Massachusetts, on or about August 2, 2006. That whale was disentangled by Scott Landry of the Provincetown Center for Coastal Studies ("PCCS"). Mr. Landry recovered fishing gear attached to the whale, including a mark identifying the fisherman to whom it belonged and passed the gear along to the NMFS. Two documents entered into evidence as Exhibit Nos. 8 and 20 show that the NMFS identified and interviewed the fisherman who owned the offending gear and that, according to the fisherman and his

-12-

records, the gear had been set in federal waters. The conclusion to be drawn from such evidence is, therefore, that the humpback whale probably became entangled in fishing gear in federal waters, not in Massachusetts waters.

Dr. Michael Moore testified about an entangled humpback whale that was reportedly observed off the coast of Plymouth, Massachusetts, on or about October 1, 2002. The following day, a humpback whale, presumably the same animal, was found dead on the shore of Provincetown. Dr. Moore performed a necropsy analysis on that animal and determined that the entanglement had been a cause of the whale's death. No line or identifying marker, however, was found on that whale and it is, therefore, impossible to determine exactly where the whale had been originally entangled or whether it had been entangled in gear licenced by the defendants.

Testimony also established that a right whale, known as "No. 2212", was disentangled in Cape Cod Bay in September, 1998. Because the case before Judge Woodlock was then still pending, that incident is beyond the scope of consideration for purposes of this action. Dr. Moore also testified regarding a right whale calf that was entangled off the coast of Florida or Georgia in January, 2006. That animal was, quite obviously, not entangled in Massachusetts waters. It was, however, entangled in gillnet gear and evidence with respect to that incident was

-13-

apparently offered to demonstrate that gillnet gear poses a danger to whales.

The plaintiff's amended complaint alleges that six additional entanglements of either right or humpback whales have occurred since 2002. No testimony was offered with respect to those whales and there is no other evidence on the record to support a conclusion that any of them was entangled in Massachusetts coastal waters or in fishing gear licensed by the defendants.

On December 18, 2006, the plaintiff filed a 36-page final memorandum in support of his motion for a preliminary injunction. That filing was made ten days after the original deadline imposed by the Court and substantially exceeded the ten-page limit set by the Court.[1] In that brief, the plaintiff alleges that humpback whales were observed to be entangled in Massachusetts waters on July 9, 2006 and August 23, 2006. Limited testimony was offered with respect to the first of those incidents and the record does not support a conclusion that either of those incidents involved whales entangled in Massachusetts waters or in gear licensed by the defendants.

In his final memorandum in support of his motion for a

---

[1]The plaintiff did, however, seek and receive leave to file a memorandum after the original filing deadline and in excess of the page limit. The defendants filed their final memorandum in accordance with the Court's original order.

preliminary injunction, the plaintiff also refers, for the first time, to 11 additional whale entanglements occurring between 1999 and 2004 and cites reports attached to his filing.  Those attachments are not accompanied by an affidavit and were not presented as evidence during the evidentiary hearing.  The reports, like other evidence in this case, demonstrate that whales do become entangled in fixed fishing gear in or near Massachusetts coastal waters, but fail to identify exactly where those entanglements occurred and, therefore, fail to establish liability on the part of the defendants.

Because the plaintiff has presented no conclusive evidence demonstrating that protected whales have, since 2002, become entangled in Massachusetts coastal waters or in fishing gear licensed by the defendants, the Court finds that Strahan has not made a "strong showing" of likelihood of success on the merits of his underlying claim that the defendants have violated the ESA. In re Pye, 38 F.3d at 63.

## C.   Irreparable Harm

For purposes of the pending motion, the Court does not need to resolve definitively the question of whether the defendants are liable for past entanglements but must, nonetheless, consider whether the plaintiff has demonstrated a "strong likelihood" that whales will continue to be taken in violation of the ESA. Strahan, 939 F. Supp. at 984; see National Wildlife Federation,

-15-

23 F.3d at 1511.

Evidence before the Court establishes three facts: 1) endangered whales are known to become entangled in fixed fishing gear, 2) fixed fishing gear is licensed by the defendants and deployed in state waters and 3) endangered whales are known to exist in state waters. According to the plaintiff, those three facts lead to the inescapable conclusion that whales will continue to become entangled in fixed fishing gear in Massachusetts state waters. Wherever line and whales share the water, Strahan argues, there is a risk of entanglement, and, therefore, a substantial risk of irreparable harm in violation of the ESA. A recent change in state fishing regulations, however, undermines the plaintiff's contention that whale entanglements are inevitable.

## 1. Sinking Line

Testimony at the evidentiary hearing established that whales can become entangled in both buoy line and ground line attaching lobster traps in a trawl. As described above, multiple lobster traps in a trawl are connected by ground line. Ground line ordinarily floats. When ground line floats in the water column it presents a threat of entanglement to whales, especially in trawls with many traps. A technological improvement over floating ground line is sinking ground line, which is rope designed to sink to the ocean floor.

-16-

A new regulation recently took effect in Massachusetts that makes sinking ground line mandatory in state waters. See 322 C.M.R. 12.04. Several witnesses testified that sinking ground line is a significant step forward in terms of whale safety. Mr. Scott Kraus said that the use of sinking line would render the risk of ground line entanglements nearly nonexistent. Mr. Scott Landry testified that sinking line is the most risk-averse line available, and Dr. Michael Moore confirmed that the new regulation requiring sinking line is a noteworthy safety advancement.

Massachusetts is the first jurisdiction to require sinking ground line year-round. The federal regulatory scheme allows lobstermen to set traps with sinking ground line even when certain segments of the ocean are closed to other fixed-gear fishing due to whale activity, presumably because the sinking line, in the opinion of federal regulators, poses a low risk to whales.

Sinking line will not eliminate the risk of whale entanglements. Strahan contends that sinking ground line will have minimal effect on the number of whale entanglements because whales are infrequently entangled in ground line in the first place. Vertical buoy line, according to Strahan, is the real threat, and the advent of sinking ground line will have no effect on the presence of vertical line in the water. Three witnesses,

-17-

however, testified that sinking line will reduce the threat to whales by removing a significant proportion of existing line from the water column.

Given that the sinking ground line regulation only went into effect on January 1, 2007, and that no other jurisdiction has yet required sinking ground line year-round, the recurrence of whale entanglements in Massachusetts waters cannot be accurately predicted. The evidence suggests that such entanglements will become less frequent after the imposition of the new regulation. Because injunctive relief may be granted only upon a showing that the alleged activity will "actually" (as opposed to "potentially") cause harm to endangered animals, an injunction at this time is not warranted. American Bald Eagle, 9 F.3d at 166.

## 2.   Gillnets and Other Gear

There is evidence on the record that gillnet gear causes whale entanglements. The use of sinking line will not affect the practice of gillnet fishing. Gillnet fishing in Massachusetts coastal waters is, however, already subject to extensive regulation. According to the testimony of several witnesses, gillnet fishing is banned in Cape Cod Bay from January through May of each year, when right whales are most likely to be present in the area. Gillnet fishing is also subject to federally-administered Seasonal Area Management ("SAM") and Dynamic Area Management ("DAM"). Under SAM, gillnet fishing is prohibited in

-18-

certain areas during certain times of the year that coincide with the presence of endangered whales. Under DAM, a fishing area can be temporarily closed if two or more right whales are observed in a particular area within a two-week time frame. When a DAM fishery closure is ordered, gillnet gear must be removed from the subject waters. Lobster gear must also be removed during a DAM closure, unless sinking ground line is used. The effectiveness of both SAMs and DAMs was debated by witnesses but the record does not indicate that their use is so ineffective as to warrant injunctive relief.

In the absence of more specific evidence that gillnet gear has actually entangled endangered whales or poses to them a significant, ongoing threat, the Court will not, at this time, enjoin the use of gillnet gear. Unless and until it is demonstrated that SAMs and DAMs are deficient methods of protecting endangered whales from gillnet gear, the Court defers to the experience and judgment of trained marine regulators.

### 3. Whale-Safe Gear

The plaintiff contends that whales could be spared further irreparable harm if only the defendants developed and implemented so-called whale-safe fishing gear, or fishing equipment designed to pose as little a risk of entanglement to whales as possible. Sinking ground line, as discussed above, is one example of such a technological improvement in equipment. The plaintiff contends,

-19-

however, that sinking line will not significantly reduce whale
entanglements and that other technologies are feasible and that
the Court should require that they be implemented by the
defendants.

With respect to the alternative remedy suggested by the
plaintiff during his closing argument and in his final memorandum
in support of his motion for preliminary injunction, the
plaintiff emphasizes that rather than suspend all licensing and
further fishing with fixed gear, the Court should require the
defendants to compel the use of whale-safe fishing gear on or
before some future date. He argues that invention needs a
"necessary mother" to put pressure on research and development of
such technology, which, he asserts, will not occur in the absence
of judicial fiat.

The evidence suggests that on-going efforts are underway to
develop whale-safe fishing gear but that few designs have yet
proved practicable. The plaintiff called Clifford Gaudy to
testify regarding his invention of a potentially whale-safe buoy.
Mr. Gaudy, who is an engineer affiliated with the Massachusetts
Institute of Technology, has devised a buoy that is less likely
to entangle whales if caught in their baleen or on their
appendages. Mr. Kraus, however, testified that the Gaudy buoy is
of limited value. He described numerous potential improvements
in fishing gear, from mundane solutions such as line with weak

links to futuristic proposals such as line that glows or is soluble if embedded in the blubber of a large whale. None of those improvements has been shown to be a practical alternative to current fishing equipment.

The Court is not prepared to order governmental agencies to develop or implement whale-safe fishing gear without regard to cost or practicality. The record indicates that there are scientists, such as Mr. Gaudy, hard at work inventing and refining such equipment, and the Court will not interfere with their creativity or impose arbitrary deadlines for the implementation of non-existent technology. The Court expects, however, that the defendants will continue to monitor developments in the field of fishing technology, and, as with sinking ground line, consider enforcing the use of any technology that is feasible, practical and effective in promoting whale safety.

## D.   **Effect on the Public Interest**

The presumption in cases arising under the ESA is that the balancing of harms and effect on the public interest tips in favor of protecting the endangered animals. See National Wildife, 23 F.3d at 1511. A thorough analysis of the effect of the requested relief on the public interest, therefore, is neither warranted nor appropriate. In his motion for a preliminary injunction the plaintiff seeks extraordinarily broad

-21-

relief, i.e. that the Court enjoin the defendants from all
further licensing of fixed fishing gear and require all persons
currently using fixed gear to immediately remove such gear from
coastal waters.  The New England Legal Foundation ("NELF") has
filed a brief as amicus curiae pointing out the obvious
detrimental impact that such an order would have on the
Massachusetts fishing industry.  It persuasively suggests that
the requested injunction would be devastating to the livelihood
of fishermen and to the survival of their communities.

During closing arguments and in his final memorandum in
support of the motion for a preliminary injunction, however,
Strahan proposed an alternative form of injunctive relief.  He
urges the Court to set a deadline in the future by which time the
defendants will be obliged to implement improved fishing
technology to minimize the potential for whale entanglement.  He
suggests that such an order would have a less dramatic impact on
the public interest.

The Court is not persuaded that the defendants are liable
for entanglements of endangered whales 1) in Massachusetts waters
or 2) in fishing gear licensed by the defendants but it is
convinced that such gear poses an ongoing (even if declining)
threat to endangered whales.  The law prohibits the taking of
endangered species under any circumstances and entanglement in
fixed fishing gear constitutes a "taking."  In light of newly-

-22-

implemented regulations prohibiting the use of floating ground line, the broad injunctive relief sought by the plaintiff is unwarranted at this time but careful monitoring of the situation is, indeed, justified. Consistent with the equitable powers conferred by 16 U.S.C. § 1540(g)(1), the Court will enter an order that will ensure the temporary monitoring of the threat posed to endangered whales by fixed fishing gear without unduly disrupting the commercial fishing industry.

## ORDER

In accordance with the foregoing, the plaintiff's motion for preliminary injunction (Docket No. 80) is **DENIED.**

This action will be stayed for a period of two years.  The parties are directed to file joint status reports on October 1, 2007, July 1, 2008 and February 1, 2009 informing the Court whether, since the date of this order:

1) any endangered whales have become entangled in fixed fishing gear in Massachusetts coastal waters and/or in fixed fishing gear licensed by the defendants,

2) the requirement to use sinking ground line in lobster trawls, pursuant to 322 C.M.R. 12.04, has been effectively enforced with respect to the commercial lobster fleet,

3) any noteworthy advances in the development of whale-safe technology have been made, and

4) there have been any amendments to state procedures for obtaining commercial fishing licenses that are intended to affect the safety of endangered whales.

The Court will give further consideration to the underlying claim for declaratory judgment at the conclusion of the stay imposed hereby or upon motion of the parties should there be a material change in circumstances.

**So ordered.**

Nathaniel M. Gorton
United States District Judge

Dated January 24, 2007

-24-