UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

RICHARD MAX STRAHAN )
)
*Plaintiff* )
) Civil Action No.
v. )
) 05 – 10140 - NMG
SECRETARY, MASSACHUSETTS EXECUTIVE )
OFFICE OF ENERGY AND )
ENVIRONMENTAL AFFAIRS[1], *et al.* )
) 21 September 2007
*Defendants* )

---

PLAINTIFF'S REQUEST TO CONDUCT DISCOVERY AND TO DELAY FILING OF REQUIRED STATUS REPORT

---

Citizen-Prosecutor Richard Max Strahan moves the Court's to allow him to conduct discovery so that he can adequately prepare the first required status report that the Court's 24 January 2007 order requires to be filed on 1 October 2007. On 24 January 2007 the Court issued a final judgment ("Order") denying Strahan's request for injunctive relief against the Defendants, delaying for two years any decision on whether to grant Strahan his request for a declaratory judgment, and otherwise stayed the proceedings — including any possible discovery — for the interim[2]. The Order also required the parties to file three joint status reports ("Joint Status Report") with the Court with the first to be filed on 1 October 2007. The Defendants have refused Strahan's numerous requests to provide him access to information that is in their exclusive possession that is needed in order to address the required issues in the Status Report. Strahan needs and asks to do discovery to get the required information. He also asks the Court to extend for the filing of the first Joint Status Report to a later date to allow him to complete

1 The original named defendant Ellen Roy-Herzfelder has subsequently left her employment as the Secretary of the Massachusetts Executive Office of Environmental Affairs and was replaced subsequently by first one and then another person. For consistency, Strahan has adopted the current caption for his civil action.

2 Strahan objected to the Court's denying him his right to trial and further discovery and has appealed the Court's Order.

the requested discovery.

At this time, Strahan cannot meaningfully participate in filing the Joint Status Report because the information that is needed to produce the Joint Status Report is currently in the exclusive possession of the Defendants, the Center for Coastal Studies ("CCS") and the National Oceanic and Atmospheric Agency ("NOAA"). Strahan has made numerous requests to the Defendants, NOAA, and CCS to provide him the required information. The Defendants, NOAA and the CCS refused his requests to each of them for the required information. Therefore, Strahan is asking the court to allow him to subpoena the required information from NOAA and CCS. He is asking the Court to allow him to conduct full discovery against the Defendants to get the required information.

On 20 September 2007 the Defendants served on Strahan a unilaterally drafted report ("Defendants' Report") that they intend to file with the Court as the required Joint Status Report. See Attachments ## 1-4. Obviously the Defendants prepared this document without any input from Strahan and with information in their exclusive possession that they refused to this day to provide Strahan.

The Defendants' Report refers to a 12 May 2007 disentanglement of a Humpback Whale ("May 2007 Whale Entanglement" allegedly from Lobster Pot gear in Massachusetts coastal waters just off Provincetown MA. Apparently the Defendants identified the owner of the gear, contacted him, and then interviewed him, Expectedly, this fisherman ("May 2007 Entangler") is alleged to have claimed during the interview that the fishing gear involved in the May 2007 Whale Entanglement was lost by him in federal waters where he had earlier placed it. Obviously whether any of these allegations by the Defendants is true or not cannot be meaningfully commented on by Strahan unless he is provided the records on which these allegations are based. For example Strahan should be supplied the name of the May 2007 Entangler so he can personally interview him about the facts underlying the May 2007 Whale Entanglement.

Strahan managed to obtain a copy of a center for CCS web page ("CCS Webpage") on the May

2007 Entanglement through discovery in a another action. See Attachment #5. The CCS Webpage claims that the May 2007 Entanglement must have occurred in Massachusetts waters because the entangle whale was found anchored to a location in Massachusetts state waters by the entangling gear anchored to the seafloor at this location.. The comments on the CCS Webpage are inconsistent with statements made by the Defendants' Report which claim that the CCS disentanglement efforts took place outside of Massachusetts waters. The CCS Webpage claims that the disentanglement occurred inside Massachusetts state waters.

The Defendants' Report all mentions that the Defendants since the issuance of the Order conducted an extensive survey of Massachusetts coastal waters for the locations of lobster gear and then assessed whether the gear used sinking buoy lines. This survey resulted in the Defendants mapping the location of all lobster gear in Massachusetts' coastal waters. Strahan should be supplied this information as this information directly reflects on the likelihood of whales being entangled in Massachusetts state waters at any one location.

**Strahan's Requested Discovery**

1. The name, address, phone number, and license number of the May 2007 Entangler.
2. The records of the Defendants sonar survey work in Massachusetts coastal waters to determine the presence of lobster pot gear and then to judge whether this gear was complaint or not.
3. All records in the possession of the Center for Coastal Studies concerning reports on entangled whales generated after the date the Order was issued.
4. The opportunity to serve interrogatories, requests for admissions, and notice of depositions on the Defendants in order to assess the four enumerated issues in the Order.

**Needed Discovery Relevant to Needed to Comply with the Court's Order**

The Order required that the Joint Status Report deal with four specific issues —

1. "Any endangered whales have become entangled in fixed fishing gear in Massachusetts coastal waters and/or in fixed gear licensed by the defendants."

2. "The requirement to use sinking ground line in lobster trawls — pursuant to 322 C. M. R. 12.04 — has been effectively enforced with respect to the commercial lobster fleet."

3. "Any noteworthy advances in the development of whale safe technology has been made, and"

4. "There have been any amendments to state procedures for obtaining commercial fishing licenses that are intended to affect the safety of whales."

It is impossible for the Plaintiff to meaningfully respond to any of the enumerated requirements of the Order without the Court offering him the opportunity for discovery. All the available information that underlies any meaningful response to each of these items is in the exclusive possession of the Defendants and their allies — the CCS and NOAA. All of these parties have refused Strahan's requests for copies of the needed relevant information in their possession.[3] This refusal is simply based on their desire that Strahan not succeed in the instant action in his claims against the Defendant because they share the same vested interests of the Defendants.

In regards to above enumerated items ## 1-3, all information relevant to these items are in the exclusive possession of NOAA, CCS and the Defendants. Since whales are lawfully protected species all information collected on whales is done under permits issued by NOAA. Also almost all research on whales is sponsored by two government agencies — the U. S. Navy and NOAA. Both these facts mean that all information on whales and their entanglement in fishing gear is exclusively gathered and stored by agents of NOAA and the Navy. In the northeast NOAA's two-principle agents are the New England Aquarium and CCS. In addition, CCS has been issued by NOAA an exclusive permit to disentangle whales. NOAA also has exclusively tasked CCS to establish and operate the only network in the northeastern United States of individuals and groups allowed by NOAA to gather information on entangled whales and to investigate these entanglements — including operating the only functioning

3 For example, Strahan had many conversations with CCS employees, including its CEO Richard Delaney about his being able to get a reasonable amount of copies on whale and sea turtle entanglement reports form them. CCS made it clear that it would not supply him a single page of any document in its possession. Delaney — a former employee of the Defendants — repeatedly told Strahan that CCS wanted Strahan to lose in court and wanted the Defendants to win.

hotline. In Massachusetts, the Department of Fish and Game ("DFG") funds CCS to do aerial surveys of Massachusetts coastal waters to gather and then archive information on sightings of whales and whales entangled in fishing gear. The Defendants give over one-half million dollars a year to CCS to do survey work for it and other tasks. CCS has no desire to supply information to Strahan and in doing so "bite the hand that feeds it."

In 2007, Strahan has made numerous requests to CCS, NOAA, and the DFG for information that they gathered on sightings of whales in Massachusetts and sightings of entangled whales off the Massachusetts coast. He has also asked NOAA and the DFG to supply him information in 2007 their funding of whale survey work and their enforcement activities in regards to whales. In 2007 NOAA, CCS, DFG have refused Strahan's repeated requests for voluntary release of information to him by them. In short, Strahan has been repeatedly rebuked by each of them.

Unless the Court allows Strahan to issue subpoenas and conduct discovery he will never have in the future any relevant information concerning the entanglement of whales in fishing gear. All of these relevant facts mean that all information that is needed to meaningfully prepare the Joint Status Report is in exclusive possession of parties hostile to Strahan's prevailing in his claims against the Defendants. Strahan has been unable to obtain the required information form these parties because they simply refuse to provide it to him under any circumstances because they believe he will use the requested information in a manner that will be adverse to their vested interests

**Summary**

Strahan needs and seeks to conduct discovery in order to obtain the information necessary to meaningfully prepare the required Joint Status Report. He also asks the to delay the required date for filing the first Joint Status Report to a later date to be determined so that he can first complete his requested discovery.

For the above reasons the Plaintiff asks the Court to GRANT his requested relief. .

BY:

________________________________

Richard Max Strahan, Plaintiff
236 West Portal Avenue, #195
San Francisco CA 94127
617.233.3854

*Pro Se and Proud!*

I certify that I consulted with the Defendants attorney Daniel Hammond of the Office of the Massachusetts Attorney General on the above motion on several occasions. .

______________________________

Richard Strahan, Plaintiff

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

RICHARD MAX STRAHAN,

Plaintiff

v.

STEVEN PRITCHARD, in his official capacity as Secretary of the Massachusetts Executive Office of Environmental Affairs,

DAVID M. PETERS, in his official capacity as Commissioner of the Massachusetts Department of Fish and Game,

and

PAUL DIODATI, in his official capacity as Director of the Massachusetts Division of Marine Fisheries,

Defendants

Civil Action
No. 05-10140-NMG

**PARTIES' FIRST JOINT STATUS REPORT**

By order dated January 24, 2007, this Court stayed the instant action and ordered the plaintiff, Richard Max Strahan ("Strahan"), and the defendants, officials of the Commonwealth of Massachusetts (the "State Defendants"), to file periodic status reports with the Court addressing four questions posed by the Court that relate to the subject matter of this litigation,.. The parties' first set of responses to these four questions, covering the period from the date of the order through the instant date (the "First Period"), follow.

**Issue No. 1: Whether any endangered whales have become entangled in fixed fishing gear in Massachusetts coastal waters and/or in fixed fishing gear licensed by the State Defendants.**

State Defendants' Response:

A list of endangered whale entanglements during the First Period, prepared by the Provincetown Center for Coastal Studies (the "CCS") and available on its Large Whale Disentanglement Network website, is attached hereto as Exhibit A. A summary of entanglements with possible relevance to Massachusetts, prepared by the State Defendants, forms the first section of a September 19, 2007, memorandum from Paul Diodati, Director of the Massachusetts Division of Marine Fisheries (the "MDMF"), and his deputy, Daniel J. McKiernan, to Bryan Killian and Daniel J. Hammond, Assistant Attorneys General, also attached hereto as Exhibit B.

As Exhibit B states, the CCS and the National Oceanic and Atmospheric Administration ("NOAA") have identified 12 cases of entangled endangered whales seen in United States waters between Maine and North Carolina during the First Period. As the Court noted in its order, "it is remarkably difficult to determine where or when a whale becomes entangled and, therefore, to attribute liability for such entanglements." Strahan v. Pritchard, 473 F.Supp.2d 230, 236 (D.Mass. 2007). However, based on investigations conducted by the CCS and by the MDMF, it does not appear that any of the twelve cases involved endangered whales becoming entangled in fixed gear licensed by Massachusetts and set in Massachusetts state waters.

The MDMF investigated three of the 12 reported entanglements, because each of the three involved a whale first seen entangled while swimming in state waters. A summary of those

three incidents appears in Exhibit B. Of special note is the May 12, 2007, entanglement of a humpback whale denoted as "Banjo," found and disentangled by the CCS in Massachusetts state waters off the coast of Provincetown. An MDMF investigation revealed that the lobsterman whose gear (a detached buoy line) was removed from the whale is duly licensed to fish in Massachusetts and federal waters. The lobsterman in question reported having lost a buoy line from a trawl set in federal waters shortly before the reported entanglement, suggesting that the entanglement occurred in federal, not state, waters. A map displaying coordinates of the sites where the buoy line was reportedly set, and where Banjo was subsequently seen entangled, is attached hereto as Exhibit C.

Strahan's Response:

**Issue No. 2: Whether the requirement to use sinking ground line in lobster trawls, pursuant to 322 C.M.R. 12.04, has been effectively enforced with respect to the commercial lobster fleet.**

State Defendants' Response:

State Defendants' actions to monitor and enforce the statewide, year-round ban on floating ground line in Massachusetts waters are summarized in Section 2 of Exhibit B.

Briefly stated, the MDMF has worked with the Massachusetts Environmental Police (the "MEP") to ensure, first, that non-compliant, floating ground line would be detectable via the use of single-beam sonar. Having concluded that it was, MEP patrol vessels equipped with single-beam sonar have begun conducting patrol missions looking for non-compliant ground lines, and

citing fishermen who employ it. The MEP has also incorporated groundline inspections into their routine boarding of commercial lobster- and trap-fishing vessels. To date, at least five fishermen have been cited for using buoyant ground line, and two are being summonsed to state court.

As a general proposition, non-compliance has been detected primarily in areas (near Cape Ann, for example) that did not become subject to the statewide floating ground line ban until January 1, 2007, suggesting a lag time for some fishermen in those areas to bring their gear into compliance with the new regulations. By contrast, enforcement efforts suggest that in areas where the ban has been in place since 2003 (i.e., Cape Cod Bay), the degree of compliance is very high.

Strahan’s Response:

**Issue No. 3: Any noteworthy developments that have been made in the development of whale-safe technology.**

State Defendants’ Response:

The State Defendants are unaware of any noteworthy developments in whale-safe gear technology during the First Period. Its staff will, however, attend the annual meeting of the Right Whale Consortium on November 7-8, 2007, at which it anticipates receiving updates on whale-safe gear research and development that were first described at the Consortium’s 2006 meeting. The State Defendants anticipate summarizing those developments in detail in their next joint status report, due on July 1, 2008.

The State Defendants have devoted significant time and energy to improving the durability of sinking ground line, the issue responsible for some of the industry's resistance to the new Massachusetts regulations. A summary of these efforts appears in Section 3 of Exhibit B.

Strahan's Response:

**Issue No. 4: Whether there have been any amendments to state procedures for obtaining commercial fishing licenses that are intended to affect the safety of endangered whales.**

State Defendants' Response:

There have been no amendments to Massachusetts permitting or licensing regulations during the First Period.

Strahan's Response:

**Other Matters:**

State Defendants' Resopnse:

During the First Period, the State Defendants engaged in a variety of other cooperative projects related to endangered whale conservation, including but not limited to aerial surveillance, habitat monitoring, acoustic monitoring, gear compliance studies, ghost gear removal, and outreach. Details of these efforts are contained in the MDMF's Right Whale

Conservancy Program 2006 annual report (which has been supplemented to include 2007 activities), attached hereto as Exhibit D.

Strahan's Reponse:

______________________
Richard Max Strahan
Pro Se
(617) 233-3854

IAN BOWLES, in his
official capacity as Massachusetts
Secretary of Environmental Affairs;

MARY GRIFFIN, in her official
capacity as Massachusetts Commissioner
of the Department of Fish and Game;

and

PAUL DIODATI, in his official capacity
as Director of the Massachusetts Division
of Marine Fisheries

By their attorney,

MARTHA COAKLEY
ATTORNEY GENERAL

/s/Daniel J. Hammond
Bryan G. Killian
BBO # 271640
Daniel J. Hammond
BBO # 559475
Assistant Attorneys General
Government Bureau
One Ashburton Place, Room 2019
Boston, Massachusetts 02108
(617) 727-2200, exts. 2553, 2078

Date: October 1, 2007

# New Entanglements Cases in 2007

| Whale#/name | First seen: | Last seen: | Status: | Action: |
|---|---|---|---|---|
| **Humpback whale (species not confirmed) S. of Block Is.** | September 7, 2007 48 NM south of Block Is., RI | September 7, 2007 48 NM south of Block Is., RI | Entangled | Assess |
| **Humpback Grand Manan Banks "Sigma"** | August 23, 2007 Grand Manan Banks | August 23, 2007 Grand Manan Banks | Disentangled | None |
| **Finback East of Cape Neddick, Maine** | July 21, 2007 East of Cape Neddick, Maine | July 21, 2007 East of Cape Neddick, Maine | Entangled | Locate, document, assess |
| **Finback Great South Channel** | Great South Channel June 25, 2007 | Great South Channel June 25, 2007 | Entangled | Intervene |
| **Humpback whale "Egg Toss" Wildcat Knoll** | Wildcat Knoll June 23, 2007 | Wildcat Knoll June 23, 2007 | Entangled | Intervene |
| **Humpback whale Vineyard Sound** | Vineyard Sound June 2, 2006 | Vineyard Sound June 2, 2007 | Disentangled (by bystander; **entanglement not confirmed**) | None |
| **Humpback whale Race Point** WR-2007-6 | Race Pt. Massachusestts May 12, 2007 | Race Pt. Massachusestts May 12, 2007 | Disentangled | None |
| **Right whale, 3260 SSE of Chatham** WR-2007-5 | Great South Channel May 8, 2007 | Great South Channel June 25, 2007 | Minor entanglement | Monitor, assess |
| **Humpback whale Nags Head, NC** WR-2007-4 | Nags Head, NC April 29, 2007 | Nags Head, NC April 29, 2007 | Entangled (probable) | Assess, intervene |
| **Humpback whale False Cape, VA** WR-2007-3 | False Cape, VA March 12, 2007 | False Cape, VA March 12, 2007 | Disentangled | None |
| **Right whale SE of Chatham RW #2029** WR-2007-2 | 20 NM SE of Chatham, MA March 9, 2007 | Bay of Fundy September 18, 2007 | Entangled | Assess, tag, intervene |
| **Humpback whale 4 NM east of Beach Haven, NJ** WR-2007-1 | 4 NM east of Beach Haven, NJ January 27, 2007 | 2.5 NM southeast of Block Is., RI January 30, 2007 | Entangled | Document, assess, intervene |




*Commonwealth of Massachusetts*
**Division of Marine Fisheries**
251 Causeway Street, Suite 400
Boston, Massachusetts 02114
(617)626-1520
fax (617)626-1509

**Paul J. Diodati**
*Director*




**Deval Patrick**
*Governor*
**Ian A. Bowles**
*Secretary*

TO: Bryan Killian, Assistant Attorney General, Office of the Attorney General
Dan Hammond, Assistant Attorney General, Office of the Attorney General

FROM: Paul Diodati, Director, Division of Marine Fisheries
Daniel J. McKiernan, Deputy Director, Division of Marine Fisheries

DATE: September 19, 2007

RE: State Defendants' response to questions identified by the Court in its January 24, , 2007 order

By order dated January 24, 2007, the Court directed the parties to file a status report on October 1, 2007 informing the Court whether:

1) any endangered whales have become entangled in fixed fishing gear in MA or in fixed fishing gear licensed by the Commonwealth;

2) the requirement to use sinking ground line in lobster trawls pursuant to CMR 12.04 has been effectively enforced with respect the commercial lobster fleet;

3) any noteworthy advances in the development of whale-safe technology have been made; and

4) there have been any amendments to state procedures for obtaining commercial fishing licenses that are intended to affect the safety of endangered whales.

The Division of Marine Fisheries ("DMF") hereby responds on behalf of the State Defendants as follows:

**1. Endangered whales entanglements in fixed fishing gear in Massachusetts state waters or in fixed fishing gear licensed by Massachusetts.**

Since January 1, 2007 there have been no verifiable cases of endangered whales becoming entangled in Massachusetts state waters or in fixed gear licensed by Massachusetts. However, during this time there have been 12 new cases of endangered whales seen entangled in fixed gear in various locations ranging from Grand Manan, Canada, to Cape Neddick, Maine to Nags Head, North Carolina. These cases have been documented by NOAA fisheries and their contractor the Provincetown Center for Coastal Studies (the "CCS"). Attached to this memo is a list that includes all 12 cases. In addition, the CCS Atlantic Large Whale Disentanglement Network website contains the full details on these cases. DMF is highlighting three cases below because, at some point in the

case history of these events, the animals were sighted in state waters: Attached to this memo are the website descriptions of the three cases.

1. On March 9, 2007, an entangled right whale was seen 20 nautical miles ("nm") southeast of Chatham in federal waters. The CCS Atlantic Large Whale Disentanglement Network website states:

   > "The whale is described to have a line exiting the left side of the mouth, crossing the back, perhaps involving the right flipper, and then possibly wrapping the body. A white buoy was observed on the right side of the whale, but no additional trailing line or gear was observed."

   The second sighting of this animal occurred on March 21, 2007, when DMF and the CCS aerial survey saw the whale in the southern portion of Cape Cod Bay. Disentanglement efforts by the CCS were unsuccessful. DMF and the Massachusetts Environmental Police assisted in this disentanglement effort.

2. On May 12, 2007, a humpback whale was disentangled by the CCS in Massachusetts waters 2 nm northwest of Provincetown. The gear consisted of three wraps of 3/8-inch buoy line (ending at a high flyer buoy and pole) around the tail stalk. The whale was successfully disentangled and the gear was traced to a Massachusetts commercial lobsterman who also holds a federal commercial lobster permit. DMF staff thereafter spoke to the involved fisherman and assisted NOAA Fisheries in identifying the owner of the gear through the combination of permit number and buoy color scheme. The fisherman reported to DMF that prior to disentanglement, the lost buoy line was on a lobster trawl set in federal waters, just north of the disentanglement location. The fisherman provided DMF with the above location (LORAN coordinates 13824, 4415), which DMF determined was 6 nautical miles north of Provincetown. Attached to this memo is a map showing where the gear was set, as reported by the fisherman and plotted by DMF.

   The above entanglement appears to be similar to the August 2, 2006 humpback whale entanglement case previously presented to the Court. Both cases involved humpback whales entangled in buoy line fished by dual-permitted (state and federal) commercial lobstermen. In both cases the fishermen reported the position of lost gear to be in federal waters in the Stellwagen Bank region, a known habitat for humpback whales. Both whales were successfully disentangled, and the entangling gears remain in the possession of NOAA Fisheries.

3. On June 2, 2007, a humpback whale was reported entangled in Vineyard Sound. The PCCS Atlantic Large Whale Disentanglement Network website states as follows:

   > "One blue and white bullet-shaped buoy and approximately 30 feet of rope were removed from the whale. The buoy and the rope was described as very dirty with marine growth. This entanglement was first reported to the Coast Guard, which relayed the report to the NMFS stranding hotline, which relayed it to the Disentanglement Network hotline. Both the Coast Guard and the CCS got underway to the scene. The Coast Guard arrived on scene just after the operator of the reporting vessel removed all observed gear by pulling on the buoy. The whale then reportedly 'rolled out of the rope'."

The website indicates that gear was discarded by the reporting vessel. However, the reporting vessel's description of the disentanglement and the description of the action taken (simply pulling the gear aboard) does not suggest that the whales was ever seriously entangled or in distress." This case is categorized as unconfirmed.

**2. Sinking Groundline Compliance**

DMF and the Massachusetts Environmental Police ("MEP") have devoted substantial effort and resources to ensure compliance with the floating groundline prohibition. The year-round prohibition has been in place in Cape Cod Bay since 2003 but was extended to all state waters on January 1, 2007.

DMF initiated a pilot study in 2006 to evaluate methods to determine compliance with the state-wide floating groundline ban. DMF and MEP tested various sonar devices (single beam and multi beam) to visualize the arc of floating groundline in the water column. DMF staff have also worked with MEP to educate them on various rope types and ways to identify buoyant (and thus non-compliant) rope types that are made of materials lighter than seawater that, when rigged as groundlines, would float in the water column.

Fishermen occasionally use the single beam sonar on their fishing vessels to "locate" lobster trawls rigged with floating lines if the buoy lines have been severed leaving the trawl in place. The single beam sonar can visualize the acoustic signal of floating groundline. DMF contracted a local lobsterman to temporarily set a trawl with floating groundline for experimental purposes to allow the team to study its profile using the multi beam and single beam sonar. (The non-compliant gear was continually monitored for the 3-hour experiment and removed at the end of the experiment.)

Based on the above pilot study, DMF determined that the commonplace (and inexpensive) single beam sonar functions sufficiently to detect the presence of floating groundline in the water column. MEP patrol vessels are rigged with single beam sonar, making it possible for them to use the same tool to enforce the floating groundline ban. Use of single beam sonar to visualize floating groundline does require some finesse and practice.

DMF staff joined MEP officers on 5 patrol missions in May and July 2007 to practice and use sonar to detect the potential presence of non-compliant groundline. During the first trip, two fishermen were cited by MEP for non-compliant groundline in waters off Cape Ann. The four subsequent trips with DMF staff aboard (off Gloucester, Boston, Scituate, and Woods Hole) resulted in no violations.

MEP officers have incorporated groundline inspections into their routine boarding of commercial lobster and trap-fishing vessels. Finally, MEP officers have conducted investigations into potential cases of non-compliance based on tips from DMF staff and other fishermen. MEP's ongoing inspections in August 2007 have resulted in three fishermen being cited for non-compliant groundlines and two are being summonsed to court.

In summary, noncompliance was detected in the areas (Cape Ann and south of Cape Cod) where the sinking groundline rule only went into effect in January, 2007. Compliance appears to be high in Cape Cod Bay where fishermen have been subject to this rule since 2003 as a year-round rule, and since 1997 when the floating line ban was a seasonal (January- May 15) prohibition. DMF believes that publicity from the enforcement actions in the areas beyond Cape Cod Bay will permeate the industry and is expected to discourage further noncompliance.

**3. Whale-Safe Gear Research**

DMF is unaware of any noteworthy advances in whale-safe gear technology since November 2006. DMF staff will attend the annual Right Whale Consortium meeting on November 7-8, 2007. Information will be presented at the meeting on the progress of other whale-safe gear research. DMF is looking forward to participating in this event and will report on any noteworthy advances in whale-safe gear technology in the July 2008 status report.

The current gear research conducted by DMF, with funding from the National Fish and Wildlife Foundation and the National Marine Fisheries Service, focuses on improving the durability of sinking groundline. This research is described in more detail on pp. 10-17 in the Right Whale Conservation Program 2006 Report, attached to this status report as Exhibit C, and summarized below.

DMF and the Atlantic Offshore Lobstermen's Association have worked since 2003 to identify durable sinking groundlines and understand the causes of groundline degradation and failure. These efforts are aimed at benefiting both inshore and offshore fishermen. We use a combination of field and laboratory rope-testing techniques. In addition to partnering with Tension Technology International, a rope engineering and testing firm, to evaluate the specific causes of groundline degradation and failure. Currently we are working with inshore and offshore fishermen to field-test various brands of sinking groundline. These samples of rope are then tested for breaking strength and sent to Tension Technology for analysis of the patterns of rope damage. The ultimate goal of our work is to distribute this information to fishermen in order to guide them in purchasing durable and cost-effective whale-friendly rope. It is our plan to produce pamphlets and videos that demonstrate to fishermen how rope construction, rope materials, and changes to the hauling system can increase the service life of their sinking groundline.

Since November 2006, we have used our rope hauling simulator to evaluate effect of sediment on rope damage and to evaluate how changes to the hauling equipment affect damage to the ropes. Recent machine tests have suggested that the angle, spacing, and materials used in the hauling sheaves may make substantial differences in rope longevity. We recently received a grant from the National Marine Fisheries Service to analyze how these variables contribute to rope wear and how modifications to the hauling system can reduce that damage. We will use the rope-testing machine to evaluate the effect of sheave profile and angle, the depth at which the rope rides, sheave and knife material, and knife shape on rope damage. The results of our study have the potential to make significant improvements in rope longevity through minor changes in the design of the hauling system.

**4. Amendments to procedure for obtaining commercial fishing licenses**

Since the Court's order dated January 24, 2007, there have been no changes to state procedures for obtaining commercial fishing licenses that are intended to affect the safety of endangered whales.

**<u>Other endangered whale conservation work by the Division of Marine Fisheries</u>**

DMF's Protected Species Program carries out a range of cooperative projects related to endangered whale conservation including aerial surveillance, habitat monitoring, acoustic monitoring, gear compliance studies, ghost gear removal, and outreach. The Right Whale

Conservation Program 2006 Annual Report in Exhibit C of this status report describes DMF's activities and accomplishments in detail (including activities occurring through April, 2007).


CCS first sighting of Banjo, May 12
Reporting vessel sighted Banjo, May 12
Lost endline May 8
State Waters Line
0
2
4
8 Miles




Atlantic Large Whale Disentanglement Network

Home
Recent Postings
Highlights
The Whales
The Tool Box
Stories of Interest
Telemetry
Documentation
Network Notes
Letters
Weather
CURRENT CASES

**Last Updated May 15, 2007**

Home | Recent Postings | Highlights | The Whales | The Tool Box | Telemetry
Documentation | Network Notes | Letters | Weather

# Humpback Whale, Banjo, Disentangled Northwest of Race Point, Provincetown

**May 12, 2007**

Latest update - May 15, 2007




**First Report: May 12, 2007 08:00 EDT**

The USCG-Provincetown paged the Network with a report of an entangled wha just north of Race Point. The observers, researchers aboard the vessel *West Cov* were willing to stand by the whale despite poor and worsening sea conditions. ' animal was described as a humpback and anchored in gear.

DATE/TIME OBSERVED: 05/12/07 ~ 08:00 EDT

POSITION OBSERVED (Approx.): 42° 04.0' N 70° 16.0'W

GENERAL LOCATION: ~2 NM northwest of Race Point, Massachusetts

SPECIES: Humpback

ESTIMATED LENGTH: ~30 feet

DESCRIPTION: Whale anchored with wraps of rope at the flukes.

DESCRIPTION OF GEAR ON WHALE: white bullet buoy with wad of white rope.

PHOTO DOCUMENTATION: Yes

COMMENTS: The reporters noted bad sea conditions but were willing to stanc the animal until responders arrived.

The PCCS response team was underway by 09:15 aboard the *Ibis* and arrived a whale and the *West Cove* by 10:00. Sea conditions were very poor. The whale v the surface, oriented into the wind for most of the sighting and was struggling against weighted gear. The whale had three wraps of ~1/2 line around the pedu and multiple wraps around each fluke blade. The flukes and peduncle had num scrapes and evidence of bruising. Most body areas were observed and no gear c wounds were noted at the mouthline or flippers.

Considering the sea conditions the team decided to work aboard the *Ibis*, rather to deploy a smaller inflatable, to either make cuts to the entanglement or, if not successful, attach a telemetry buoy and wait for better sea conditions. Using a thirty-foot pole, the team was able to make a series of approaches aft of the ani finally making a single cut that parted the three peduncle wraps. The whale wc off the remaining loose wraps at the fluke blades with active behavior.

The team was able to recover the surface system but the remainder of the gear v necessarily lost. The whale has been identified as Banjo by the PCCS humpbac whale research team. Banjo was first seen in the spring of 2006 (now at least in third year) and had been seen recently, gear free.

Many thanks to the crew of the *West Cove* and Coast Guard Station Provinceto The disentanglement would not have been successful without such diligence ar patience.

**May 12, 2007 Race Point, Cape Cod, Massachusetts**



1



2



3

## Update: May 15, 2007

During disentanglement activivites on May 12, Banjo behaved as if its moveme was significantly restricted by the entanglement. This suggested to observers t the whale might be anchored or dragging heavy gear. However, preliminary analysis by PCCS of the gear removed from Banjo suggests that the whale was in fact, anchored at the time. This finding is further confirmed by the GPS trac the two vessels that spent nearly two hours with the whale. During the period still entangled the whale traveled 1.68 nautical miles at an average of 0.8 knots

The whale had two wraps of the 3/8 inch surface system line (ending at a high and buoy stick) wrapped around its peduncle. The team cut both wraps at the s time. More than 100 feet of buoy line was wadded into a tight tangle around th high flyer (loops of this sometimes wrapped the flukes but only temporarily.) buoy line ended in a frayed, bitter end.

**Click on images to enlarge.**



Gear removed from Banjo



Vessel track with Banjo

**Home**

**Return to top**

---

**The Atlantic Large Whale Disentanglement Network operates under fed authority and major support from the National Marine Fisheries Servi The views expressed and general content presented on this web site ar those of the authors and do not necessarily represent the views or official position of the Department of Commerce, the National Oceani and Atmospheric Administration (NOAA), or NOAA Fisheries.**




**The text and images on this site are copyrighted by the Center for Coastal Studies and m be reproduced without permission from CCS. If you are viewing this page and are n designated personnel of the Agencies listed, please contact the Network for permissio**




Home | Membership |Email Us | About Us